IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES, | ) | |
| | ) | |
| | ) | |
| v. | ) | 1:16-cr-265 (LMB) |
| | ) | |
| NICHOLAS YOUNG, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>**MEMORANDUM OPINION**</u>

Before the Court is defendant's Motion to Suppress Items Unconstitutionally Seized from

his Residence, Backpack, Pickup Truck, and Worplace [sic] Locker ("Motion to Suppress")

[Dkt. No. 69] and Motion for Reconsideration of March 10, 2017 Order ("Motion for

Reconsideration") [Dkt. No. 84]. The Motion to Suppress has been fully briefed, oral argument

has been held, and for the reasons stated in open court and more fully developed in this

Memorandum Opinion, the motion has been denied. Mar. 10, 2017 Order [Dkt. No. 78].

Defendant's Motion for Reconsideration has also been fully briefed and, because oral argument

will not assist the decisional process, the motion has been resolved on the papers. For the reasons

stated in this Memorandum Opinion, the Motion for Reconsideration will be denied.

I.       BACKGROUND

<u>The Criminal Complaint Affidavit</u>

On August 2, 2016, a magistrate judge issued an arrest warrant for the defendant based

on a criminal complaint alleging that, from October 2014 through July 28, 2016, Nicholas Young

("Young" or "the defendant") attempted to provide material support to a designated foreign

terrorist organization ("FTO"), specifically the Islamic State of Iraq and the Levant ("ISIL"), in

violation of 18 U.S.C. § 2339B ("Criminal Complaint"). [Dkt. No. 1]. The complaint was

supported by an affidavit signed by FBI Special Agent David Martinez ("Criminal Complaint Affidavit"), who stated that al-Qa'ida in Iraq ("AQI"), also known as ISIL and the Islamic State of Iraq and al-Sham ("ISIS"), has been a designated FTO since October 15, 2004 and that Sunni extremists as well as foreign fighters from Western countries have been traveling to Syria, usually through Turkey, to join ISIL. [Dkt. No. 2] ¶¶ 5, 7.

The affidavit described how Young, a police officer with the Washington Metropolitan Area Transit Authority ("WMATA") since 2003, had been interviewed in September 2010 by Federal Bureau of Investigation ("FBI") agents regarding his connection to Zachary Chesser, who had been arrested in 2010 for attempting to provide material support to al-Shabaab, another designated FTO. Id. ¶¶ 8, 9. A few months later, in January 2011, Young told an undercover law enforcement officer ("UCO") that he was wary of surveillance, frequently took the battery out of his cell phone when he wanted to go somewhere to talk, and had several "burner phones." Id. ¶ 10, 16. Young also told the UCO that he once aimed an AK-47 style rifle out of his window while scanning for law enforcement, that he was angry with the FBI for contacting his family and co-workers before interviewing him about Chesser, and that he was stockpiling weapons to use against law enforcement if they ever attempted to search his home. Id. ¶ 10, 15, 19. According to the UCO, Young said if someone ever betrayed him, their head would be in a cinder block at the bottom of Lake Braddock. Id. ¶ 11. In addition, Young spoke of kidnapping and torturing the FBI Special Agent who questioned him. Id. ¶ 15. On March 21, 2011, Young and the UCO met with Amine El Khalifi, who was later charged with attempting to use a weapon of mass destruction (an improvised explosive device or "IED") to detonate himself in the U.S. Capitol Building. Id. ¶ 13, 22. Over a meal, they discussed the fundamentals of marksmanship and Young and the UCO cautioned Khalifi to be careful about his online posts, as Chesser had

recently been arrested for online activity. Id. ¶ 14. The three met again on April 1, 2011, during which Khalifi spoke of how shaheeds (which the affidavit translates as "martyrs; in this context, those who die while conducting violent jihad") are sent to the highest levels of heaven and Young said that one of the greatest shaheeds is a convert who fights the kaffirs [infidels or unbelievers] for the Muslims." Id. ¶ 17. At another meal with the UCO and Khalifi on April 4, 2011, Young said that he would never talk about the things he was going to do; instead people would find out after it happened. Id. ¶ 19.

In an interview with the FBI in September 2011, Young admitted that he had traveled to Libya twice in 2011 and had been with rebels attempting to overthrow the Qaddafi regime. Id. ¶ 20. Baggage searches by Customs and Border Protection on Young's outbound flights revealed that he carried body armor, a Kevlar helmet, and several other military style items. Id.

In 2014, Young met on 20 separate occasions with an FBI Confidential Human Source ("CHS"), who was posing as a U.S. military reservist of Middle Eastern descent who was eager to become more religious and leave the military as a result of having to fight against Muslims during his deployment to Iraq. Id. ¶ 24. In August 2014, the CHS told Young he wanted to join ISIS and Young advised him to watch out for informants and avoid discussing his plans with others. Id. ¶ 25. Young also gave him suggestions on how to travel to ISIS territory without being detained by law enforcement. Id. On September 11, 2014, Young showed the CHS a pro-ISIL video on YouTube, id. ¶ 26, and throughout September and October gave him additional advice on how to evade authorities while joining ISIL, id. ¶ 26-28. During an October 2, 2014 conversation, Young suggested that the CHS contact representatives of ISIL through social media using a burner phone and advised him on the types of gear to pack. Id. ¶ 28. As part of a conversation recorded by the CHS on October 24, 2014, Young and the CHS discussed the

3

CHS's imminent departure from the United States and his cover story. Id. ¶ 33. Earlier, Young had offered to send a text a few weeks after the CHS left asking whether he was back from his vacation in the hope that the text would be found by law enforcement if they started investigating the CHS. Id. ¶ 32. On October 25, 2014, Young and the CHS went to a FedEx Office store and set up email accounts specifically for communicating with each other. Id. ¶ 34.

The CHS led Young to believe that he left the United States and succeeded in joining ISIL. Id. ¶ 35. In reality, the CHS had no further contact with Young and all communications between Young and the CHS's email account were between Young and FBI personnel posing as the CHS, referred to as "UCO2." Id. Young texted the CHS on November 20, 2014 saying, "Salam. Hope you had a good vacation." That same day, the UCO2 (posing as the CHS) sent an email to Young confirming that he had "made it to dawlah," another name for ISIL. Id. ¶¶ 2, 36. On December 17, 2014, Young emailed the CHS, congratulating him for making it to ISIL. Id. ¶ 37. Another email from Young on January 9, 2015 approvingly referenced the murders of the Charlie Hebdo magazine staff in Paris. Id. ¶ 38. Between February and July 2015, the two continued to email and Young told the CHS to let him know if he met any of the "Abo Salem Suhada Brig" mujahedeen with whom Young said he served when he was in Libya. Id. ¶ 39. The FBI understood "Abo Salem Suhada Brig" to refer to the Abu Salim Martyrs Brigade, a militia group in Libya with "possible links to al-Qaeda." Id.

On March 21 and 22, 2015, while Young was in email communication with the CHS, he attended an off-duty weapons training hosted by another WMATA officer. Id. ¶ 41. The officer observed Young bring a large amount of ammunition to the training and operate four firearms ranging from an Egyptian AK-47 to a .45 caliber pistol. Id. Young stated that he owned at least three other guns, including a World War II-era Russian Negant rifle, and said he wanted to buy a

crate of Negant rifles to hand out if things went bad. Id. On June 1, 2015, Young was

interviewed at his residence by law enforcement regarding an allegation of domestic violence. Id.

¶ 42. During the interview, Young admitted that he had dressed up as "Jihadi Kohn" for

Halloween in 2014, periodically dressed up as a Nazi, had a Nazi eagle tattooed on his neck, and

collected Nazi memorabilia. Id.

On June 15, 2015, Young emailed the CHS to ask him to get advice from his

commanders on how Young could move his money out of the United States, noting that law

enforcement officials were probably watching his bank account. Id. ¶ 40.

Law enforcement interviewed Young again on December 3, 2015, ostensibly in

connection with an investigation into the whereabouts of the CHS. Id. ¶ 43. Young stated that the

CHS had left for a vacation in Turkey approximately one year before. Id. He also said he had not

been in contact with the CHS since October 2014 and denied talking with the CHS about Syria.

Id. Law enforcement asked if he had the CHS's email address and Young supplied one but it was

not the email address through which Young had been in contact with the CHS. Id. Two days

later, on December 5, 2015, Young was interviewed by law enforcement again and said

essentially the same thing. Id. ¶ 44.

On January 14, 2016, the UCO2 (posing as the CHS) emailed Young and said, among

other things, that the CHS's mother had been questioned about the CHS's whereabouts. Id. ¶ 45.

Young replied on February 17, 2016, explaining that his response was delayed because he had to

be careful about his communications, and sharing that he too had been questioned by law

enforcement about the CHS. Id. That same day, Young replied to an earlier email from the CHS

and commented on the Paris attacks where 130 people were killed and 400 injured, which had

occurred just days earlier, saying the attackers were misunderstood and this gave the West a taste of what Muslims experience every day. Id. ¶ 46.

The UCO2 (still posing as the CHS) sent Young an email on April 18, 2016, stating that in the future Young could communicate with him through a particular mobile messaging application and giving Young his account name (referenced herein as "CHS's MM Account"). Id. ¶ 47. On July 14, 2016, CHS's MM Account received a message from an account set up through the same messaging application. Id. ¶ 48. Young was the only person to whom the FBI had provided the address for the CHS's MM Account. Id. ¶ 49. The following day, on July 15, 2016, Young emailed the CHS notifying him that Young had messaged him "on the app." Id. For these reasons, the affidavit refers to the account used to send the July 14, 2016 message as "Young's First MM Account." Id.

On July 18, 2016, the CHS messaged Young through Young's First MM Account and told Young that he could support ISIS by supplying gift cards, which ISIS could use to set up mobile messaging accounts to talk to individuals in the West seeking to join ISIS. The message also explained that ISIS was no longer receiving gift card codes from individuals in the United Kingdom who had previously supplied them and had only a few codes remaining. Id. ¶¶ 47-50. Young responded on July 21, 2016, asking why the cards were no longer being sent by the "brothers in UK" and saying "Inshallah more codes will come your way." Id. ¶ 51. On July 28, 2016, the CHS received a message from a mobile messaging account not previously used by Young. Id. ¶ 52. The message included twenty-two gift card codes. Id. ¶ 53. The CHS messaged Young's First MM Account saying "[m]ay Allah reward you for your efforts" and received a response from the account that sent the codes saying, "Glad it came through," and explaining

that the device used to send that message was going to be destroyed. Id. ¶¶ 54-55. The affidavit

refers to the account used to send the codes as Young's Second MM Account. Id. ¶ 53.

The affidavit represented, "Based on the foregoing, there is probable cause to believe

that, between in or about October 2014, and on or about July 28, 2016, in Fairfax County in the

Eastern District of Virginia, Nicholas Young knowingly attempted to provide material support

and resources to a designated [FTO], namely [ISIL], in violation of 18 U.S.C. § 2339B." Id. ¶ 56.

The Search Warrants

Along with authorizing the arrest warrant based on that criminal complaint, the same

magistrate judge authorized a search warrant, supported by a separate affidavit by Special Agent

David Martinez ("Residence Affidavit"), Def. Ex. 1 [Dkt. No. 69-3] at 5-12, for the search of

Young's residence ("Residence Warrant"). Id. at 1. According to the search warrant application,

the purpose of the search was to find evidence of attempt to provide material support to a

designated foreign terrorist organization, in violation of § 2339B. Id. at 4. Unlike other search

warrants described below, the Residence Warrant also sought evidence related to two additional

offenses: obstruction of justice, in violation of 18 U.S.C. § 1512, and false statements, in

violation of 18 U.S.C. § 1001. Id. "Attachment A" to the warrant described the ten categories of

items to be seized. Id. at 3. These categories included:

> 1. All records and documents, however maintained, that concern the international transfer of money or assets, or the procurement of any item that may have been involved in or in support of terrorist or violent acts, including photographs, correspondence, and safe deposit keys.
> 2. All records and documents, however maintained, referring or relating to identities or aliases of Nicholas Young.
> 3. All records and documents, however maintained, referring or relating to past travel or planned travel by Nicholas Young, including airline tickets, credit card bills, bank records, checks, itineraries, passports, and visas.
> 4. Any and all records, documents, invoices and materials that concern any accounts with any internet service provider;
> 5. All records, documents, and paraphernalia, however maintained, relating to ISIL/ISIS (or any of its aliases), other designated terrorist groups, or any individual or

group engaged in terrorism or terrorist activity, or communications with or involving such groups and/or individuals.

6. All contact lists, however maintained (including but not limited to names, addresses, phone numbers, Internet accounts or usernames, photographs or other identifying information) of individuals associated with Nicholas Young and/or foreign terrorist groups.

7. All records and documents, however maintained, referring or relating to the purchase or use of gift cards, encryption programs, or applications that may be used for clandestine or covert communications.

8. All records and documents, however maintained, referring or relating to any storage facilities, safety deposit boxes, mailboxes, or other locations where any of the foregoing items may be located.

9. Any and all firearms, ammunition, body armor, military-style equipment, or explosive materials or their precursors.

10. Any communications or electronic device capable of storing any of the items to be seized, including but not limited to all cellular phones, smart phones, electronic data processing and storage devices, computers and computer systems, keyboards and other associated peripherals, Central Processing Units, external and/or internal drives, portable drives, external and internal storage devices such as magnetic tapes and/or disks or diskettes, together with system documentation, operating logs, software and manuals, passwords, test keys, encryption codes or similar codes that are necessary to access computer programs, and the stored contents of the items described in this paragraph, which may be searched for only the items listed above.

Id.

In establishing probable cause for the search, the Residence Affidavit incorporated all of the representations in the Criminal Complaint Affidavit, Residence Aff. ¶ 1, and supplied the following additional facts: An individual who was formerly a close friend of Young's, referred to as "CW," consented to the search and copying of CW's electronic devices, which included numerous communications with Young as well as photographs. Id. ¶ 5. The CW had been at Young's residence on many occasions and reported that Young maintained several firearms in a gun safe in his residence. Id. According to the affidavit, "Young once asked CW about the chemical components of gun powder, but that CW refused to answer the question for fear that Young would attempt to make something in CW's residence." Id.

The affiant represented that based on his training and experience he had reason to believe that "individuals generally keep important documents and financial records in their home or

office" and because Young did not have a permanent office, "he likely kept his important records at this residence." Id. ¶ 9. The Residence Affidavit also explained that "records relating to income, assets, and expenditures, . . . are likely to be relevant to his purchase of gift cards for transmission to CHS and ISIL in July 2016, as well as assets he sought to send overseas in 2015. Such records are also likely to be relevant to his contacts with terrorist groups in the past, and his past travel or attempts to travel overseas to fight on behalf of terrorist groups." Id. Because Young set up an email account for the CHS that would be difficult to trace, used a burner phone to transmit the gift card codes, and used two mobile messaging accounts to communicate with the CHS's MM Account, the affidavit represented that Young "uses electronic devices and is sophisticated about computer matters." Id. ¶ 11. The affidavit then listed the types of information that are usually stored on electronic devices, including data regarding deleted files, and requested authority to seize Young's electronic devices and conduct off-site searches of these devices. Id. ¶¶ 14-15.

Young was arrested on August 3, 2016 for violation of 18 U.S.C. § 2339B, attempting to provide material support to a designated terrorist group. [Dkt. No. 8]. After Young's arrest, a K-9 officer and dog did a sweep of the exterior of his personal vehicle, a Dodge Dakota truck ("Dodge truck"), and the dog gave a positive alert for hazardous material. Gov. Ex. 3, [Dkt. No. 75-3] ¶ 12. The vehicle was then inventoried and transported to a secure location on a flatbed truck. Id. The inventory of the Dodge truck's contents included "one Kel-Tec .380 firearm, an empty magazine, six hollow point rounds, and $1,065 in cash." Id. When the flatbed truck arrived at the secure location, the driver noticed a cell phone lying on the flatbed of the truck below and between the rear wheels of Young's Dodge truck. Id. ¶ 13. It was a black AT&T ZTE Go Phone matching the packaging found in Young's backpack. Id.

On August 11, 2016, a different magistrate judge approved four search warrants for (1) the contents of Young's backpack, including a black Casio G'z One flip-phone, and a black Amazon tablet ("Backpack Warrant"), Gov. Ex. 3 [Dkt. No. 75-3]; (2) Young's Dodge truck ("Truck Warrant"), Gov. Ex. 4 [Dkt. No. 75-4]; (3) a black AT&T ZTE GoPhone found on the bed of the flatbed truck that had transported Young's Dodge truck on August 3, 2016 ("GoPhone Warrant"), Gov. Ex. 5 [Dkt. No. 75-5]; and (4) Young's workplace locker at the Franconia/Springfield Metropolitan Transit Police Department's District 2 substation ("Locker Warrant"), Gov. Ex. 6 [Dkt. No. 75-6]. Each warrant application represented that the search was related to a violation of 18 U.S.C. § 2339B, attempting to provide material support to a designated FTO, and described the items to be seized in "Attachment A," which mirrored the Residence Warrant's ten categories of items to be seized. See Gov. Ex. 3 at 12; Gov. Ex. 4 at 12; Gov. Ex. 5 at 12; Gov. Ex. 6 at 12.

The four search warrants were supported by a single combined affidavit by FBI Special Agent Nicholas Caslen ("Caslen Affidavit"), Gov. Ex. 3 at 2-11, which expressly incorporated the Criminal Complaint Affidavit, id. ¶ 3. The Caslen Affidavit added that Young was arrested at WMATA Headquarters on August 3, 2016 and that during a search incident to arrest officers found a folded piece of paper bearing the name of the mobile messaging account provider and the account name for "Young's First MM Account," as described in the Criminal Complaint Affidavit. Id. ¶ 6.

In support of the warrant to search the contents of Young's backpack, the affidavit added that the backpack, which was on Young's person when he was arrested, contained a July 23, 2016 receipt from an electronics store in Fairfax, Virginia for the purchase of ten gift cards, an empty package for an AT&T ZTE GoPhone, a black Casio G'z One flip-phone, and a black

Amazon tablet. Id. ¶¶ 7-8. The affiant added that when Young was arrested he asked officers to turn off the cell phone but they declined, knowing that turning a phone off often locks the phone so that it requires a pass code to become operational again. Id. ¶ 9. According to the affidavit, the Amazon tablet located in Young's backpack was capable of running the messaging application that Young used to communicate with the CHS. Id. ¶ 10.

As to the Dodge truck, the affidavit explained that it was registered to Young and he drove it to work on the morning of his arrest. Id. ¶¶ 11-12. It then stated the facts set forth above regarding the K-9 sweep, the positive alert, the transport of the Dodge truck, the ensuing inventory, and the discovery of the cell phone on the bed of the flatbed truck used for transport. Id. ¶¶ 12-13.

In support of the warrant to search the contents of this phone, the affiant represented that a GoPhone is "a prepaid phone that is readily used as a 'burner' phone" and "can operate the messaging account that Young utilized to communicate with UCO2". Id. ¶ 14. Metro Police security footage revealed that on the day of his arrest, Young went to his vehicle and appeared to be handling something underneath the truck. Id. ¶ 15. The affidavit represented that officers "believed that the phone found on the tow truck was a phone used by Young and hidden underneath his Dodge Dakota, but dislodged in the course of transport." Id.

With respect to Young's locker, the affidavit stated that on the day of Young's arrest, a WMATA officer showed FBI agents Young's locker, which was secured by a combination lock. Id. ¶ 16. That same day, Metro Police opened the combination lock and FBI agents replaced it with a different lock to secure the contents pending acquisition of a search warrant. Id. The affidavit explained that Young had a receipt for ten gift cards on his person at the time of his arrest, but he sent more than ten gift card codes and no receipt for the other gift cards had yet

been located. Id. ¶ 17. Like the Residence Affidavit, the Caslen Affidavit represented that people often store records in their workplaces and "records relating to income, assets, and expenditures, . . . are likely to be relevant to his purchase of gift cards for transmission to CHS and ISIL in July 2016, as well as assets he sought to send overseas in 2015. Such records are also likely to be relevant to his contacts with terrorist groups in the past, and his past travel or attempts to travel overseas to fight on behalf of terrorist groups." Id. ¶ 18. And, like the Residence Affidavit, the Caslen Affidavit explained that Young "uses electronic devices and is sophisticated about computer matters," id. ¶ 20, listed the types of information that is usually stored on electronic devices, and requested authority to seize Young's electronic devices and conduct off-site searches of the devices, id. ¶¶ 22-13.

On December 15, 2016, Young was indicted on charges of attempting to provide material support to a designated FTO, namely ISIL, and obstruction of justice. [Dkt. No. 38]. According to the indictment, the time period during which his attempt to provide material support occurred was from December 2, 2015 to August 2, 2016. Id.

II.        DISCUSSION

A. <u>Standard of Review</u>

For a search warrant to be valid under the Fourth Amendment it must be based "upon probable cause, supported by Oath or affirmation, and particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. A court reviewing a magistrate judge's decision to authorize a warrant is to "accord great deference to the magistrate's assessment of the facts presented to him," <u>United States v. Blackwood</u>, 913 F.2d 139, 142 (4th Cir. 1990), and considers whether there was a "substantial basis for . . . conclud[ing]" that probable cause existed, <u>Jones v. United States</u>, 362 U.S. 257, 271 (1960).

B. Defendant's Motion to Suppress

1. Probable Cause

Defendant challenges the Residence Warrant, Backpack Warrant, Truck Warrant, and Locker Warrant (but not the GoPhone Warrant) on the basis that the government failed to establish probable cause for any crime other than the gift-card purchase and that the warrants were insufficiently particular regarding the items to be seized. All four of the challenged warrants incorporate the Criminal Complaint Affidavit and include what appear to be identical copies of Attachment A.[1]

Probable cause to search is "a fair probability that contraband or evidence of a crime will be found." Illinois v. Gates, 462 U.S. 213, 238 (1983). "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules," id. at 232, and thus requires a "totality of the circumstances" analysis, id. at 238. A magistrate judge reviewing a search warrant application for probable cause makes "a practical, common-sense decision . . . , given all the circumstances set forth in the affidavit before him." Id. And the affidavit submitted in support of the search warrant application is presumed valid. Franks v. Delaware, 438 U.S. 154, 171 (1978).

Defendant's primary focus appears to be on the breadth of criminal activity for which there was probable cause and, by extension, the scope of the warrants. His argument that "the

---

[1] The government argues that no warrant was required to search either the defendant's truck, Gov. Opp. at 17-18, or backpack, id. at 18-19. The evidence from defendant's truck—the AT&T GoPhone—was found during an inventory search, which is an exception to the Fourth Amendment's warrant requirement. United States v. Matthews, 591 F.3d 230, 234 (4th Cir. 2009). And the backpack was searched as part of a search incident to a lawful arrest, another well-settled exception to the Fourth Amendment warrant requirement. United States v. Robinson, 414 U.S. 218, 224 (1973). The defendant's reply makes no attempt to refute either of these arguments.

affidavits [fail] to cite a factual basis to find probable cause of any terrorism-related crime beyond the alleged gift-card distribution," Def. Mem. at 3, assumes that the search warrants should have been limited to evidence of the gift-card charge set forth in the indictment and argues that the categories of evidence referenced by the warrants were overbroad. In response, the government argues that the warrants are not limited to the acts charged in the indictment and points to evidence of other forms of material support described in the Criminal Complaint Affidavit, including statements that Young advised the CHS regarding how to join ISIS as early as August 2014. Gov. Opp. at 5. Young counters that the government cannot rely on the "advice" theory of material support because Young was not indicted for this activity. Reply at 5.

The government's position is correct. The indictment, which was issued over four months after the search warrants were authorized, "has no bearing on whether or not a warrant was validly issued." Maryland v. Garrison, 480 U.S. 79, 85 (1987). As the Supreme Court has explained, "Just as the discovery of contraband cannot validate a warrant invalid when issued, so is it equally clear that the discovery of facts demonstrating that a valid warrant was unnecessarily broad does not retroactively invalidate the warrant." Id. Instead, "[t]he validity of the warrant must be assessed on the basis of the information that the officers disclosed, or had a duty to discover and to disclose, to the issuing Magistrate." Id.

The Court finds that the information set forth in the Criminal Complaint Affidavit is more than enough to establish probable cause to believe that "between . . . October 2014, and . . . July 28, 2016, . . . Nicholas Young knowingly attempted to provide material support and resources to a designated [FTO], namely [ISIL], in violation of 18 U.S.C. § 2339B." Complaint Aff. ¶ 56.

As the affidavit recited, over the course of several months beginning in 2014, Young advised the CHS regarding how to join ISIS, instructing him to avoid being detained at the

border by traveling to Turkey with a tour group booked through a travel agency. Id. ¶¶ 24-28. Young coached the CHS on avoiding law enforcement detection by using burner phones, not posting any information online, and traveling with a quality zoom camera rather than binoculars. Id. ¶¶ 27-28. For months, Young sent emails to the CHS, one of which asked for advice on how to transfer money abroad. Id. ¶¶ 34-40. Later, after the UCO2 (posing as the CHS) told Young that he could aid ISIS by supplying gift card codes which could be used to set up mobile messaging accounts for recruitment, id. ¶¶ 47-50, Young sent twenty-two gift card codes, id. ¶ 53.

The affidavit supplied additional evidence of Young's possible connection to FTOs, including his two trips to Libya in 2011and the presence of body armor, a Kevlar helmet, and several other military-style items in his luggage. Id. ¶ 20. Young even admitted that he served in the "Abo Salem Suhada Brig." in Libya, a group the FBI believes has "possible links to al-Qaeda and that is known as the Abu Salim Martyrs Brigade." Id. ¶ 39.

In addition to his travels to fight with a militia in Libya and his provision of gift card codes to what he believed was a member of ISIS, Young had multiple associations with persons involved with FTOs, including Chesser, who was arrested for attempting to provide material support to al-Shabaab, and Khalifi, who was later charged with attempting to detonate an IED in the U.S. Capitol Building. Id. ¶¶ 9, 13-14, 22.

These facts provided a robust basis for the magistrate judge to conclude that there was probable cause to believe that Young was providing material support to an FTO. Although the gift cards are the most direct evidence of material support, as shown above, there was much additional evidence of support.

Defendant denies that he had any connection to an FTO and argues, without citing any legal support, that "since the government relies on these affidavit representations to establish probable cause to support the seizures, . . . the Court should hold a hearing, pursuant to Franks v. Delaware, 438 U.S. 154 (1978)." Reply at 2. "An accused is generally not entitled to challenge the veracity of a facially valid search warrant affidavit." United States v. Allen, 631 F.3d 164, 171 (4th Cir. 2011). The narrow exception to this rule, set forth in Franks, provides that a defendant is entitled to an evidentiary hearing concerning the veracity of statements in a warrant affidavit if he makes "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." 438 U.S. at 155–56 (emphasis added). As the Supreme Court emphasized, "To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." Id. at 171. In addition, the false information must be essential or material to the probable cause determination. Id. at 171–72.

Defendant cannot satisfy these requirements. Although he contends that the accusation that he is associated with an FTO is false, he does not offer evidence that demonstrates that it is false, nor does he allege much less offer evidence that the government knew it to be false or exhibited reckless disregard for the truth. In light of defendant's failure to make these necessary showings, his conclusory request for a Franks hearing fails.

Next, defendant argues that the government cannot rely on his statements about ways to bring weapons into this courthouse, the chemical composition of gunpowder, and hatred for the FBI to support a showing of probable cause. According to the defendant, none of these

statements "could constitute criminal charges that withstand First Amendment scrutiny." Reply at 8. Although it is true that the First Amendment protects advocating for the use of force, see Brandenburg v. Ohio, 395 U.S. 444, 447 (1969), the First Amendment "does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent," Wisconsin v. Mitchell, 508 U.S. 476, 489 (1993). The well-established requirement that law enforcement officers notify criminal suspects that their speech may be used against them in a court of law before custodial interrogations demonstrates as much. See Miranda v. Arizona, 384 U.S. 436 (1966). Further, courts have rebuffed arguments similar to defendant's in other material support for terrorism cases. For example, in United States v. Kaziu, 559 F. App'x 32, 35 (2d Cir. 2014), a defendant appealed his conviction for providing material support to an FTO, arguing that the admission of evidence of his extremist writings, political views, and the videos he watched violated the First Amendment. The Second Circuit was unpersuaded, explaining that the defendant "was not convicted for his speech; rather, his political beliefs were introduced to prove the mens rea element of the charged crimes." Id.; see also United States v. Rahman, 189 F.3d 88, 118 (2d Cir. 1999) (per curiam) ("[W]hile the First Amendment fully protects [defendant's] right to express hostility against the United States, and he may not be prosecuted for so speaking, it does not prevent the use of such speeches or writings in evidence when relevant to prove a pertinent fact in a criminal prosecution. The Government was free to demonstrate [defendant's] resentment and hostility toward the United States in order to show his motive for soliciting and procuring illegal attacks against the United States."). Similarly, here, defendant's comments indicate that he possessed knowledge about how to harm government employees and the motive to do so.

2. <u>Particularity</u>

Defendant's Motion to Suppress also focuses on specific categories of evidence, namely the categories in Attachment A pertaining to "any and all firearms" and "records and documents," arguing that these categories fail the Fourth Amendment's particularity requirement. Because the challenged warrants all use the same Attachment A, the Court need not analyze particularity as to each warrant but only as to each of the challenged categories. As explained in the sections that follow, defendant's arguments are meritless.

The Framers included the particularity requirement to end the practice of issuing general warrants, which permitted "a general, exploratory rummaging in a person's belongings." <u>Coolidge v. New Hampshire</u>, 403 U.S. 443, 467 (1971). Nevertheless, a warrant does not impose a "constitutional strait jacket" on law enforcement officers. <u>United States v. Dornhofer</u>, 859 F.2d 1195, 1198 (4th Cir. 1988) (internal quotation marks omitted). In this vein, "[c]ourts must refrain from interpreting warrant terms in a 'hypertechnical' manner, and should instead employ a 'commonsense and realistic' approach." <u>United States v. Dargan</u>, 738 F.3d 643, 647 (4th Cir. 2013) (citing <u>Williams</u>, 592 F.3d at 519).

"The particularity requirement is fulfilled when the warrant identifies the items to be seized by their relation to designated crimes and when the description of the items leaves nothing to the discretion of the officer executing the warrant." <u>United States v. Williams</u>, 592 F.3d 511, 519 (4th Cir. 2010). In the Fourth Circuit, a warrant generally satisfies the particularity requirement when it allows officers "to seize only evidence of a particular crime." <u>United States v. Fawole</u>, 785 F.2d 1141, 1144 (4th Cir. 1986). Although a warrant authorizing a search for evidence relating to "general criminal activity" such as "fraud" or "conspiracy" is "overbroad because it 'provides no readily ascertainable guidelines for the executing officers as to what

items to seize,'" "a warrant authorizing a search for evidence relating to 'a specific illegal activity,' such as 'narcotics,' or 'theft of fur coats' is sufficiently particular." United States v. Dickerson, 166 F.3d 667, 694 (4th Cir. 1999) (citing United States v. George, 975 F.2d 72, 76 (2d Cir. 1992)), rev'd on other grounds, 530 U.S. 428 (2000). Examples of cases in which the Fourth Circuit has upheld a broad description of the property to be seized include United States v. Ladd, 704 F.2d 134, 136 (4th Cir. 1983), in which the court upheld a search warrant giving officers the discretion to seize all property relating to "the smuggling, packing, distribution and use of controlled substances," as fully satisfying the particularity requirement because "[m]ore specificity is not required by the Constitution." Similarly, in United States v. Anthony, 4 F.3d 986, 1993 WL 321595, at *2 (4th Cir. Aug. 24, 1993) (unpublished table decision), the Fourth Circuit upheld a warrant that authorized agents to search for evidence relating to the crime of bank robbery, finding that although the warrant was "certainly broad in its description" it did not fail to "provide that degree of specificity required by the precedent of this court." Id.

     i.    "Any and All Firearms"

Defendant argues that the firearms, body armor, ammunition, and military-style equipment seized pursuant to the search warrants should be suppressed because the search warrant applications failed to demonstrate that these items were obtained illegally and did not link them to what he inaccurately describes as the "gift-card-crime" or obstruction of justice charges set forth in the indictment. Def. Mem. at 9. Defendant's focus on the charges in the indictment as limiting the scope of the warrants is misplaced. The question is whether the category of evidence at issue is sufficiently particular to constrain the executing officers' discretion by allowing them to seize only items that are fruits, evidence, or instrumentalities of the criminal activity referenced in the affidavit.

Defendant's contention that the category "any and all firearms" is impermissibly overbroad relies primarily on one Ninth Circuit case, Millender v. County of Los Angeles, 620 F.3d 1016 (9th Cir. 2010) (en banc), which was reversed by the U.S. Supreme Court, see Messerschmidt v. Millender, 565 U.S. 535 (2012). There, the Los Angeles Country Sherriff's Department had applied for a warrant to search the residence of Jerry Ray Bowen, a man who had assaulted his girlfriend by firing a black sawed-off shotgun at her during an altercation. 620 F.3d at 1020. The search warrant authorized the sheriff to search for and seize, among other things, all firearms capable of firing ammunition and all ammunition. Id. at 1021. The location to be searched belonged to Bowden's foster mother, Brenda Millender. Id. at 1022. Millender and her spouse filed a civil suit against dozens of deputy sheriffs, among others, under 42 U.S.C. § 1983, alleging violations of their Fourth and Fourteenth Amendment rights. Id. at 1023. The district court found the warrant's authorization to seize all firearms and firearm-related materials unconstitutionally overbroad and, on a motion for summary judgment, rejected the deputies' qualified immunity claim. Id. A twelve-judge panel of the Ninth Circuit accepted the deputies' interlocutory appeal and found that the warrant did not establish probable cause to seize all firearms and firearm related materials because "the deputies had a precise description of the firearm used by Bowen in connection with his assault." Id. at 1027. In light of this information, "the deputies had probable cause to search for a single, identified weapon, whether assembled or disassembled. They had no probable cause to search for the broad class of firearms and firearm-related materials described in the warrant." Id. The Ninth Circuit went on to conclude that the deputies were not entitled to qualified immunity.

The U.S. Supreme Court reversed, finding that "it would not have been entirely unreasonable for an officer to believe, in the particular circumstances of this case, that there was

probable cause to search for all firearms and firearm-related materials." Messerschmidt,565 U.S.
at 549 (internal quotation marks omitted). Although this holding does not directly address the
validity of the warrant, it does call into question the Ninth Circuit reasoning on which defendant
relies, because, unlike the Ninth Circuit, the Supreme Court believed that, notwithstanding the
specific description of the weapon used in the assault, the context of the crime made it
reasonable for officers to believe they could pursue a broader search.

        In addition, Millender is distinguishable from the facts at issue here because the Ninth
Circuit's narrow reading of probable cause rested on the highly detailed information available to
the officers at the time they applied for the search warrant—namely the allegation of a single
assault crime and credible statements regarding the precise type of gun used in the execution of
that crime. 620 F.3d at 1027. The Ninth Circuit readily acknowledged that it has permitted
seizure of broad classes of items in other cases, id. at 1026-27, pursuant to its precedent that
"generic classifications in a warrant are acceptable . . . when a more precise description is not
possible," United States v. Cardwell, 680 F.2d 75, 78 (9th Cir. 1982) (internal quotation marks
omitted).

        Here, the Criminal Complaint Affidavit, which was relied on in the search warrants, was
not focused on a single act or occurrence. Instead, it described a pattern of criminal behavior
establishing probable cause to believe that the defendant had been providing material support to
an FTO over a nearly six-year period and the evidence and instrumentalities of that crime were
not amenable to the precise description available in Millender. In the Fourth Circuit, "[t]he
degree of specificity required when describing the goods to be seized may necessarily vary
according to the circumstances and type of items involved.'" United States v. Torch, 609 F.2d
1088, 1090 (4th Cir. 1979). "Thus, a warrant that describes the items subject to seizure in broad,

generic terms can be valid if the description is as specific as the circumstances and the nature of the activity under investigation permit." Godbey v. Simmons, No. 1:11CV704, 2014 WL 345648, at *6–7 (E.D. Va. Jan. 30, 2014), aff'd, 577 F. App'x 239 (4th Cir. 2014). In keeping with this principle, the warrants in this case were not defective in their description of the items to be seized.

Moreover, the Criminal Complaint Affidavit's reference to a wide variety of firearms, which defendant discussed potentially using for a multitude of criminal acts, established probable cause for a wider search. Young told the UCO that he once aimed an AK-47 style rifle out of the window of his residence while scanning for law enforcement and shared with the UCO a method for smuggling firearms into the federal courthouse in Alexandria. Complaint Aff. ¶¶ 10, 12. According to the UCO, Young discussed the fundamentals of marksmanship with Khalifi, who was later arrested for attempting to use a weapon of mass destruction, id. ¶¶ 13, 22, and told the UCO that he was stockpiling weapons and would use those weapons against law enforcement personnel if they attempted to search his home, id. ¶ 19. In addition, Young attended a weapons training event armed with a large amount of ammunition and four firearms, ranging from an Egyptian AK-47 to a .45 caliber pistol, and stated that he owned three more weapons and wanted to buy a crate rifles in case "things went bad." Id. ¶ 41. Customs and Border Patrol records also indicate that Young traveled to Libya in 2011 with body armor, a Kevlar helmet, and several other military-style items. Id. ¶ 20. This evidence, combined with more direct evidence of providing material support to an FTO, was sufficient to establish probable cause for officers to search and seize "any and all firearms, ammunition, body armor,

military-style equipment, or explosive materials or their precursors" in Young's home, truck, backpack, and locker as potential evidence.[2]

Finally, defendant cites the government's decision not to seek civil forfeiture of the eighteen seized firearms as evidence that the search warrants did not supply probable cause that the firearms were evidence of material support for an FTO. Def. Mem. at 14. As the government correctly explains, the government's "election to forebear from seeking forfeiture of the firearms" is irrelevant because the probable cause standard needed to obtain a warrant is a lower showing than the preponderance of evidence standard required for forfeiture. Gov. Opp. at 11 n.7.

In sum, the category in Attachment A beginning with "Any and all firearms . . ." satisfies the Fourth Amendment's particularity requirement and the items seized thereunder will not be suppressed.

      ii.   <u>"Any and All Documents"</u>

Defendant makes similar claims regarding lack of particularity for the categories of evidence which he misleadingly describes as a search for "all records and documents." Def. Mem. at 15.[3] Contrary to how defendant describes what the warrants authorized, the categories of documents and records were carefully limited as follows:

---

[2] Defendant attempts to bolster his argument with a string cite to eight cases regarding particularity and weapons searches. Def. Mem. at 13-14. None of the cases are from this jurisdiction, therefore they are not controlling upon this Court, and none are on all fours with the circumstances of this case.

[3] As before, defendant begins his attack on the "records and documents" categories with the flawed premise that the only criminal activity at issue was the gift-card purchase. Def. Mem. at 15. As explained above, the criminal complaint addresses a much broader set of activities. In addition, the mere fact that the government had evidence indicating one gift card purchase did not preclude investigating whether there were additional forms of material support. Indeed,

1. All records and documents . . . that concern the international transfer of money or assets, or the procurement of any item that may have been involved in or in support of terrorist or violent acts . . . .
2. All records and documents . . . referring or relating to identities or aliases of Nicholas Young.
3. All records and documents . . . referring or relating to past travel or planned travel by Nicholas Young . . . .
4. Any and all records, documents, invoices and materials that concern any accounts with any internet service provider;
5. All records, documents, and paraphernalia . . . relating to ISIL/ISIS (or any of its aliases), other designated terrorist groups, or any individual or group engaged in terrorism or terrorist activity, or communication with or involving such groups and/or individuals.
6. All contact lists . . . of individuals associated with Nicholas Young and/or foreign terrorist groups.
7. All records and documents . . . referring or relating to the purchase or use of gift cards, encryption programs, or applications that may be used for clandestine or covert communications.
8. All records and documents . . . referring or relating to any storage facilities . . . or other locations where any of the foregoing items may be located.

Each of these categories is directly linked to criminal activities identified in the affidavit.

The first category, which authorizes officers to seize evidence regarding the procurement of items that could be used "in support of terrorism or violent acts" and the international transfer of assets, as well as the seventh category, which authorizes seizure of evidence of gift card purchases and other applications that can be used for a similar purpose of clandestine communication, are both directly related to the Criminal Complaint's allegation that the defendant intended to and attempted to provide financial support to an FTO by purchasing and transmitting gift cards as an unregulated mode of currency. Complaint Aff. ¶¶ 40, 50. Simply put, this is evidence of the actus reus of material support.

---

defendant cites no authority for the absurd proposition that once the government finds evidence of one criminal act it should look no further.

The third and sixth categories authorize officers to seize evidence that may further link Young to FTOs, authorizing seizure of records and documents regarding his travel activity and his contacts. As the search warrant affidavits explained, "Such records are also likely to be relevant to his contacts with terrorist groups in the past, and his past travel or attempts to travel overseas to fight on behalf of terrorist groups." Residence Aff. ¶ 9; Caslen Aff. ¶ 18 . Because the affidavits establish probable cause regarding attempted material support for an FTO, this evidence is directly relevant to the offense.

The fifth category authorizes the seizure of information showing that Young may have been influenced by terrorist ideology or communicated with individuals or groups involved in terrorism. This material, like the allegedly First Amendment speech discussed above, is potential evidence of mens rea.

The second, fourth, and eighth categories authorize officers to seize records and documents regarding potential sources of evidence, namely other aliases used by the defendant, other internet accounts, and other physical places where he might have hidden evidence. Given the defendant's use of burner phones and anonymous email accounts for communication, Complaint Aff. ¶ 34; Residence Aff. ¶ 11; Caslen Aff. ¶ 20, it was reasonable to infer that he might have taken additional steps to conceal evidence of his interactions with FTOs. Courts have routinely upheld warrants authorizing the seizure of these types of information. See, e.g., United States v. Hubbard, No. CRIM 09-272, 2009 WL 5103226, at *1 (D. Minn. Dec. 17, 2009) (warrant authorizing seizure of records and documents that pertain to accounts with any Internet Service Provider); United States v. Graham, No. CRIM 08-251, 2009 WL 1066048, at *7 (D. Minn. Apr. 20, 2009) (warrant authorizing seizure of "records and other documents tending to show off-site storage facilities and/or locations").

Interspersed throughout defendant's argument are objections that the categories of information identified in Attachment A were unbound by date restrictions. See, e.g., Def. Mem. at 14. Although defendant seems to be implying that this is inconsistent with the particularity requirement, this claim has no legal basis: "a search warrant does not fail the particularity requirement by not explicitly articulating a time frame." United States v. Moore, 775 F. Supp. 2d 882, 898 (E.D. Va. 2011). The Fourth Amendment "specifies only two matters that must be 'particularly describ[ed]' in the warrant: 'the place to be searched' and 'the persons or things to be seized.'" United States v. Grubbs, 547 U.S. 90, 97 (2006) (alteration in original). The cases cited by the defendant are not to the contrary. Def. Mem. at 15-17. Each of those cases involved an alleged fraud scheme, United States v. Abboud, 438 F.3d 554, 561 (6th Cir. 2006) (bank fraud); United States v. Ford, 184 F.3d 566, 575 (6th Cir. 1999) (tax fraud); United States v. Vilar, No. S305CR621, 2007 WL 1075041, at *1 (S.D.N.Y. Apr. 4, 2007) (securities fraud, investment advisor fraud, mail fraud, and wire fraud), which, as explained above, requires greater particularity with respect to the items to be seized because the crime is so general that it "provides no readily ascertainable guidelines for the executing officers as to what items to seize." Dickerson, 166 F.3d at 694. In contrast, the crime of material support for terrorism alleged in this case is more specific and yields predictable forms of evidence, such as money transfers, travel to fight or train abroad, etc. In addition, the inculpatory activities set forth in the affidavit in support of the criminal complaint span from 2010 to 2016, which justified an expansive time period.

In support of his contention that the categories of documents, "decoupled from any specific terrorism crime" constitute a "general warrant," defendant relies on a string cite of seventeen cases, not one of which is from this Circuit. Def. Mem. at 15-17. Beyond the fault of

citing only law outside the Fourth Circuit, suggesting that there is no such precedent in this jurisdiction, these cases are inapposite. Many, including Millender, have already been addressed. The others generally involve warrants with categories like "all other evidence of criminal activity," Cassady v. Goering, 567 F.3d 628, 635 (10th Cir. 2009), "any papers, things or property of any kind relating to previously described crime," United States v. Buck, 813 F.2d 588, 590 (2d Cir. 1987), or "all business records," Voss v. Bergsgaard, 774 F.2d 402, 406 (10th Cir. 1985). The categories of documents referenced in Attachment A, as summarized above, contain no similarly capacious categories. To the contrary, the contrast between the cases relied on by defendant and the categories of evidence at issue here further highlight the particularity with which Attachment A's categories are drawn.

Defendant also challenges the seizure of his electronic devices, arguing that "where the government attempts to seize the information stored on a computer, as opposed to the computer itself, the underlying information must be identified with particularity and its seizure supported by probable cause." Def. Mem. at 17. Defendant quotes Attachment A as authorizing searches of "all cellular phones, smart phones, electronic data processing and storage devices, computers and computer systems, keyboards, and other associated peripherals, Central Processing Units, external and/or internal hard drives, portable drives . . . ." Id. at 18 (citing Attachment A). According to defendant, this description of the items to be searched is not sufficiently particularized. Id. But, defendant has once again quoted selectively because Attachment A clearly states that these items "may be searched only for the items listed [in the categories] above." See Attachment A. In other words, the search of the electronic devices was limited to the scope of documents and records which the Court has found are sufficiently particular and supported by probable cause.

Defendant, again relying on authority from outside the Fourth Circuit, cites a string of cases where searches of electronic devices were invalidated, Def. Mem. at 17; however, each of the invalidated warrants failed to meaningfully limit the information to be seized and none call into question the limitation clause in the warrants in this case. See United States v. Riccardi, 405 F.3d 852, 862–63 (10th Cir. 2005) (invalidating a warrant authorizing officers to search electronic devices for "the . . . thing or means of conveyance hereinbefore specified for such items"); United States v. Hunter, 13 F. Supp. 2d 574, 584 (D. Vt. 1998) (invalidating a warrant because one section pertaining to electronic devices "did not indicate the specific crimes for which the equipment was sought, nor were the supporting affidavits or the limits contained in the searching instructions incorporated by reference"); In re Grand Jury Subpoena Duces Tecum Dated Nov. 15, 1993, 846 F. Supp. 11, 12 (S.D.N.Y. 1994) (quashing a grand jury subpoena that simply sought various computers and provided no limitations with respect to the information to be searched).

In short, defendant has failed to establish any lack of particularity for the "records and documents" and electronic devices to be searched. To the contrary, each of the "records and documents" categories is tied to criminal activity described in the Criminal Complaint Affidavit and the search of the electronic devices was, in turn, constrained by these "records and documents" categories.

3. Good Faith Exception

The government argues that, "even if this court were to find probable cause lacking [as to particular categories of evidence], the defendant's motion should be denied because the officers conducting the searches relied in good faith on facially valid warrants," and therefore the seizures fall within the scope of the good faith exception established by the Supreme Court in

United States v. Leon, 468 U.S. 897, 920 (1984). Gov. Opp. at 19. This Court does not need to address Leon because it finds no basis to hold any of the warrants invalid. In addition, two different magistrate judges found probable cause established by the affidavits relevant to these searches and agents went to the trouble of getting search warrants that they did not need for defendant's truck and backpack. See supra note 1.

Nevertheless, were the Court to reach the good faith exception, defendant's arguments that this exception does not apply are baseless. Defendant claims that the exception "does not apply . . . where the law enforcement agent who is the affiant for the invalid warrant is also the agent who executed the warrant." Reply at 16. This argument is foreclosed by Leon's own language which says that there is no deterrence value and hence no need for suppression "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope." 468 U.S. at 920. In other, words, the Supreme Court contemplated a scenario in which the same officer would both request and execute the warrant.

Defendant's alternative argument, that good faith does not apply because officers misled the magistrate by including in the affidavit information the officer knew was false or would have known was false but for the officer's reckless disregard of the truth, Reply at 17, is similarly unpersuasive. According to defendant, the two false representations are that the defendant had "'contacts with terrorist groups in the past' and attempted to 'travel overseas to fight on behalf of terrorist groups.'" Id. at 17-18 (citing Residence Aff. ¶ 9). Defendant submits no evidence that these statements were false or that officers knew these statements to be false or acted with reckless disregard to their truth. To the contrary, the Criminal Complaint Affidavit clearly indicates that defendant travelled to Libya on two occasions and that he traveled with body armor. Complaint Aff. ¶ 20. Making no attempt to rebut these facts, defendant's primary

contention is that the representations that he had contacts with terrorist groups and fought on behalf of terrorist groups must be false because they are predicated upon a link "between the Abu Salim Martyr's [sic] Brigade and the FTO al-Qaeda" and the government has "variously" described this link as "'possible,' 'likely' or certain." Reply at 18. Preliminarily, it bears emphasizing that, irrespective of the FBI's belief about a connection between the Abu Salim Martyrs Brigade and al-Qaeda, it is clear that Young believed that the Brigade was connected to an FTO as he told the CHS, whom he believed had joined ISIL, to let him know if he encountered any of the mujahedeen Young had served with in Libya. Complaint Aff. ¶ 39. Even if the qualifiers in the affidavit were inconsistent, they are not material. Leon's misleading information exception is drawn from Franks, which focuses on false statements that are "necessary" to probable cause, commonly referred to as the materiality requirement. 438 U.S. at 156. To determine whether a statement is material, the court "set[s] [the allegedly false statement] to one side," and evaluates whether "there remains sufficient content in the warrant affidavit to support a finding of probable cause." Id. at 172. Even if the Court excises the qualifiers "likely" and "certain," and instead reads the affidavit as only asserting a "possible" connection between the Abu Salim Martyrs Brigade and the FTO ISIL, in view of all the facts in the affidavits concerning defendant's communications with someone he believed to have joined ISIL and sending the gift card codes to that person, there would still be more than sufficient probable cause to believe that defendant was attempting to provide material support to an FTO.

   4. Prejudicial Pieces of Evidence

      Defendant's final argument is that "various unduly prejudicial items seized outside the scope of the warrants should be suppressed," specifically "Nazi paraphernalia and a Confederate flag [seized] from [defendant's] home." Def. Mem. at 19. The government argues that this claim

is premature because the government has not yet identified which seized items it will seek to use at trial. Gov. Opp. at 21. The Court disagrees. As defendant explained, he submitted a formal Rule 12(b)(4)(B) request for notice of the government's intent to use evidence, and the government responded that defense should assume that all seized evidence would be used at trial. In light of this representation, defendant's request that certain items be suppressed was ripe for consideration. During oral argument, the government represented that it has since decided that it will not use the Confederate flag at trial, Mar. 10, 2017 Tr. [Dkt. No. 79] at 12:23-13:7, therefore the Court's analysis will focus only on the seized Nazi paraphernalia.

The Nazi paraphernalia identified by defendant was seized in connection with the section of the warrant authorizing the seizure of "All records, documents, and paraphernalia, however maintained, relating to ISIL/ISIS (or any of its aliases), other designated terrorist groups, or any individual or group engaged in terrorism or terrorist activity, or communications with or involving such groups and/or individuals." See Attachment A. The issue raised in defendant's Motion to Suppress is whether Nazi paraphernalia constitutes "paraphernalia . . . relating to . . . a terrorist group or terrorist activity." Whether seizure of this material was authorized by the warrants is properly raised in a motion to suppress and appropriate for resolution at this stage in the proceedings.

A search conducted pursuant to a warrant "is limited in scope by the terms of the warrant's authorization." United States v. Phillips, 588 F.3d 218, 223 (4th Cir. 2009). In determining the scope of a warrant, as in determining the validity of a warrant, courts are to employ a "commonsense and realistic" approach and avoid "hypertechnical scrutiny . . . lest police officers be encouraged to forgo the warrant application process altogether." Id. (internal quotation marks and citations omitted). "Whether seized evidence falls within the scope of a

warrant's authorization must be assessed solely in light of the relation between the evidence and the terms of the warrant's authorization." United States v. Williams, 592 F.3d 511, 520–21 (4th Cir. 2010). "If . . . documents not covered by the warrant are improperly seized, the government should promptly return the documents or the trial judge should suppress them." Id. at 519–20.

The critical question is whether Nazi paraphernalia relates to "a group engaged in terrorism or a terrorist activity." To determine what constitutes "terrorism" and how law enforcement officers would understand that word, the Court has considered guidance from the Black's Law Dictionary definition of terrorism as "[t]he use or threat of violence to intimidate or cause panic, esp. as a means of achieving a political end." Black's Law Dictionary (10th ed. 2014). Similarly, the U.S. Code defines terrorism as activities that "appear to be intended (i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping." 18 U.S.C. § 2331(1), (5). Drawing on information that is common knowledge, a reasonable officer would likely know that the Nazis used violence and threats of violence as a means of achieving their political end of ethnic cleansing and to intimidate or coerce the Jewish population of Germany, among other minorities. Based on this information, it was reasonable for the officers to conclude that the Nazis, though not a designated FTO, engaged in terrorist activity, as defined by Black's Law Dictionary and the U.S. Code.

At oral argument, the government submitted evidence to establish context for the search warrants, arguing that the Nazi paraphernalia at issue is relevant to the crimes set forth in the Criminal Complaint. One seized document, titled "Alert Roster" for "5 Kompanie B 19. Panzergrenadier Rgt." listed names, contact information, and German aliases for ten individuals, including the defendant,  under the name "Strm. [Storm Trooper] Klaus Düsselkamp." The

government also pointed out that the roster has "the death's head logo at the top. So it's not just Nazi; it's SS." Mar. 10, 2017 Tr., [Dkt. No. 79] at 15:21-24. Others exhibits included photos of the defendant dressed in a SS uniform. Although the defendant suggests that the beliefs of a "neo-Nazi or white-nationalist" are incongruous with those of "anti-American radical islamists," Def. Mem. at 19, the government argues that the evidence seized from defendant's home establishes a connection between Nazism and certain Islamic leaders. Specifically, the government points to a propaganda poster labeled "Die Allianz" or "The Alliance," with the subtitle "1939-2004," "Welttreffen der Islamisten und Nazis" or "The Worldwide Association of Islamists and Nazis," Mar. 10, 2017 Tr. at 19:10-16, and photos of Hitler with Amin al-Husayni, also known as the Mufti of Jerusalem, during the Second World War, all of which were found in the defendant's possession, id. at 19:20-20:5. The government argues that, in this context, it was reasonable for officers to conclude not only that the Nazis qualified as a terrorist organization but that the Nazi paraphernalia in the defendant's home was relevant to the material support charge. The Court agrees. The Criminal Complaint Affidavit demonstrated defendant's affiliations with radical Islam and interest in Nazi ideology. Among other things, Young told law enforcement he dressed up as "Jihadi John" for Halloween in 2014, had dressed up as a Nazi before, had a Nazi eagle tattooed on his neck, and collected Nazi memorabilia. Complaint Aff. ¶ 42. More broadly, the amount of Nazi paraphernalia at defendant's home, the nature of those materials, and the connection those materials established between certain Islamic figures and Nazism work together to support the conclusion that the Nazi paraphernalia constitutes relevant evidence of defendant's interest in terrorist organizations.

Defendant resists this conclusion, arguing that there were many pieces of "war memorabilia [in his home]—not just Nazi-related—which the government evidently selectively

chose not to seize." Def. Mem. at 19 (emphasis in original). This claim does nothing to advance

defendant's argument. To the contrary, the government's selective seizure of "memorabilia" or

"paraphernalia" suggests that law enforcement officers only seized those materials "relating to

. . . any individual or group engaged in terrorism or terrorist activity." See Attachment A.

In sum, the Court finds that in the context of the facts of this case, the Nazi paraphernalia

was within the scope of the warrant. Whether the Nazi paraphernalia is, as defendant argues,

unduly prejudicial, is a separate question to be reserved for pre-trial motions in limine.

For these reasons, as well as the reasons stated in open court, defendant's Motion to

Suppress Items Unconstitutionally Seized from his Residence, Backpack, Pickup Truck, and

Worplace [sic] Locker [Dkt. No. 69] has been denied.

C. Defendant's Motion for Reconsideration

On April 6, 2017, defendant filed a Motion for Reconsideration of the Court's March 10,

2017 order denying his Motion to Suppress.[4] [Dkt. No. 84]. The government filed an opposition

[Dkt. No. 87], to which defendant replied [Dkt. No. 88]. Because some of the evidence relied

upon in the Motion for Reconsideration is classified, all of the briefs on this issue have been

sealed.

There is no provision in the Federal Rules of Criminal Procedure governing motions for

reconsideration, therefore courts are guided by analogy to the standards established by the civil

rules. Under the relevant civil rule, Fed. R. Civ. P. 60, a court may relieve a party from a

judgment or an order based on"(1) mistake, inadvertence, surprise, or excusable neglect; (2)

newly discovered evidence that, with reasonable diligence, could not have been discovered in

---

[4] The Motion for Reconsideration was filed in a combined document with defendant's Reply in Support of Motion for Disclosure of FISA-Related Material and/or to Suppress the Fruits or Derivatives of Electronic Surveillance and Physical Search Pursuant to FISA. [Dkt. No. 84].

time to move for a new trial under Rule 59(b); (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party; (4) the judgment is void; (5) the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or (6) any other reason that justifies relief." Defendant makes no attempt to invoke any of these rationales. Instead, his argument appears to be based on a new thought or the recent identification of evidence previously in his possession. Because defendant has failed to establish grounds for filing the Motion for Reconsideration, the Court is under no obligation to entertain it. Robinson v. Wix Filtration Corp. LLC, 599 F.3d 403, 412 (4th Cir. 2010).

Moreover, even assuming arguendo that the Motion for Reconsideration is properly based on the newly discovered evidence exception, defendant's argument is without merit. Defendant claims that the classified information to which he cites undermines the affidavit's assertion that there was probable cause to seize "any and all firearms" and that omission of this evidence constitutes a Franks violation. Nothing in defendant's motion establishes that any false information was included in the affidavits at issue or that any critical information was omitted. As the Fourth Circuit has cautioned, "the affirmative inclusion of false information in an affidavit is more likely to present a question of impermissible official conduct than a failure to include a matter that might be construed as exculpatory" because invalidating warrants for omissions "potentially opens officers to endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit. The potential for endless rounds of Franks hearings to contest facially sufficient warrants is readily apparent." United States v. Colkley, 899 F.2d 297, 301 (4th Cir. 1990). Defendant's Franks argument is nothing more than a wild goose chase. The evidence referenced by the

defendant is not relevant to the determination of whether probable cause of criminal activity, specifically attempted material support for an FTO, would be found in the places to be searched and would not have undermined probable cause to search for and seize "any and all firearms" in his possession. As such, defendant's Motion for Reconsideration fails to establish any basis for changing the finding that the search warrants at issue were based on probable cause and complied with the Fourth Amendment's particularity requirements.

III.     CONCLUSION

For these reasons, defendant's Motion to Suppress [Dkt. No. 69] has been denied and his Motion for Reconsideration [Dkt. No. 84] will be denied by an appropriate Order to be issued with this Memorandum Opinion.

Entered this _9th_ day of May, 2017.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge