**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No.: 16cr265 (LMB) |
| | ) |
| | ) |
| NICHOLAS YOUNG, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**MEMORANDUM IN SUPPORT OF DEFENDANT NICHOLAS YOUNG'S OMNIBUS
MOTION *IN LIMINE***

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................1

FACTUAL BACKGROUND………………………………………..…………………………………3

ARGUMENT ...................................................................................................................................6

   I.     LEGAL STANDARD………………………………………………………………..6

   II.    IRRELEVANT CATEGORIES OF EVIDENCE………………………………………7

        A.  Nazi/White Supremacist Memorabilia Is Irrelevant………………...………………8

        B.  Firearms, Body Armor and Other Military Objects Are Irrelevant…………..……14

        C.  Irrelevant Miscellany ...............................................................................................17

   III.   EVIDENCE THAT FAILS RULE 403 BALANCING .................................................17

        A.  Nazi/White Supremacist Evidence Holds No "Probative Value" and Poses
            Catastrophic "Unfair Prejudice"……………………………………………..……..18

        B.  Firearms, Body Armor and Other Military Objects Hold No "Probative Value"
            and Carry Extreme "Unfair Prejudice"………………………………….…..…..…21

        C.  Graphic ISIS and Islamist Videos/Images Hold No "Probative Value" and
            Carry Extreme "Unfair Prejudice"……………………………………..……….....22

        D.  Miscellaneous Evidence That Fails Rule 403 Balancing………...………………..24

   IV.   PROHIBITED CRIMES, WRONGS, AND OTHER ACTS…………………………25

        A.  Inappropriate Activities Concerning Special Agent Are Barred Under Rule
            404(b)………………………………………………………………...………25

        B.  Additional Inappropriate Activities from 2011 Are Barred Under Rule 404(b)......26

CONCLUSION……………………………………………………………………………..27

Defendant Nicholas Young, through his undersigned counsel, files this omnibus Motion *in Limine* to prevent the government from presenting certain categories of evidence at trial because they are irrelevant – Federal Rule of Evidence 401 –  and any remaining probative value is overwhelmingly outweighed by a danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, wasting time, and needlessly presenting cumulative evidence. Fed. R. Evid. 403.  Other categories are inappropriate character evidence.  Fed. R. Evid. 404(b).

## PRELIMINARY STATEMENT

As this Court by now knows, the gravamen of the indictment in this matter alleges Nicholas Young's provision of $245 in gift cards in July 2016 to an undercover informant who had pretended to join the Islamic State in Syria.  To prove an inchoate violation of the material support for terrorism statute at issue, the government must establish that Mr. Young knowingly attempted to provide material support or resources to a foreign terrorist organization ("FTO"), in the knowledge that the organization is a designated terrorist organization or that the organization has engaged or engages in terrorism.  18 U.S.C. § 2339B.  And since Mr. Young will raise an entrapment defense, the government will also attempt to prove he had a predisposition to materially support the FTO before the criminal investigation began, in 2010 or earlier.  *See Jacobson v. United States*, 503 U.S. 540 (1992).

Several categories of the government's proposed evidence bear little relationship to these burdens of proof.  To the contrary: they are almost certainly calculated to stoke fear and loathing in the jury against Mr. Young.  This irrelevant and unfairly prejudicial evidence falls under the following headings.

**Nazi memorabilia**.  In a case concerning Mr. Young's alleged sympathies for an Islamist and largely Arabic terror group in the Middle East, the government seeks to present historical

1

memorabilia selectively seized from his home to paint him as a Nazi sympathizer or white supremacist, and therefore somehow predisposed to materially support an anti-American radical Islamist FTO primarily comprising racial minorities.  Common sense would suggest the proposed Nazi evidence is not actually about establishing a spurious link between 21st century Middle East religious fanaticism and a 20th century European atheistic biological determinism that had little use for Levantine peoples.  It is, rather, about reaching for the *ne plus ultra* of unfair prejudice in our society: superficially tarring an objectionable person as a "Nazi." The government's support for drawing such a connection rests on too thin a reed of fact to establish relevance, much less a probative value that would outweigh proverbial Nazi prejudice.  To be clear: Mr. Young is not a "Nazi."

**Firearms and body armor**.  Although the government alleges that Mr. Young has in the past uttered inappropriate violent language, the charged conduct in this case is nonviolent.  The government has never alleged any intent – still less a plan or conspiracy – to commit or aid violent acts on the part of Mr. Young, who has no criminal history.  Yet the government has proposed introducing into evidence every single firearm or piece of body armor owned by Mr. Young.  But all the firearms were lawfully acquired, in most cases before Mr. Young even converted to Islam (and thus before he was even in a position to be predisposed to violent jihad).  If ownership of lawfully acquired firearms *ipso facto* established a predisposition to terrorism, then tens of millions of law-abiding Americans would find themselves in the dock. The government should not be permitted to scare the jury into a guilty verdict on a nonviolent criminal act with these items.

**Graphic ISIS and Islamist videos/images**.  The government intends to display for the jury graphic videos and images apparently shared by ISIS followers on websites such as

2

YouTube and other social media.  Not only does the dubious content of these clips add nothing substantive to the proof in this case, the scary images will gratuitously repulse and inflame the jury, dealing enormous unfair prejudice to the defendant.  At the most, any relevance to the videos/images would lie solely in the fact of Mr. Young's possession and/or viewing of them. Those bare facts, plus brief verbal summaries of the clips, are sufficient.

**Irrelevant and unduly prejudicial miscellany**.  The government has threatened to introduce evidence of episodic pharmaceutical misuse; play "white power" and jihadi "nasheeds" music for the jury; and even present evidence going to Mr. Young's sexual orientation.  All of these items are irrelevant; all fail F.R.E. 403 probative value/unfair prejudice balancing.

**Evidence barred by Rule 404(b)**.  The government intends to introduce evidence of inappropriate activities allegedly pursued by Mr. Young in 2011.  All of these are extrinsic to the charged crime.  All should be excluded as proscribed character evidence.  Fed. R. Evid. 404(b).

## FACTUAL BACKGROUND

On May 17, 2017, the government produced a list of its proposed exhibits.  (Declaration of Nicholas D. Smith, Exh. 1.)  Although the list contains hundreds of items – many, if not most, of them redundant – the documents, records, and objects fall into a limited number of buckets.

**Communications between Mr. Young and informants/undercover agents**. The proposed exhibits contain dozens of emails, encrypted chat messages, audio recordings, and other communications between Mr. Young, the confidential informant, and undercover agents in this investigation.  (Smith Decl., Exh. 1, pp. 1-10.)  Apart from a few categories outlined *infra*, in the main Mr. Young will not challenge the relevance or unfair prejudice of these communications.

**Communications between Mr. Young and "Mohamed_2060@yahoo.com."** The government intends to introduce communications between email accounts allegedly opened by Mr. Young and a Libyan national called Mohammed. (Smith Decl., Exh. 1, pp. 3-4.) As with the informant/undercover agent communications, Mr. Young does not challenge the relevance/unfair prejudice of most of these items.

**Nazi/white supremacist artifacts**. The exhibit list contains dozens of items pertaining to the Nazis and/or white supremacists, seized from Mr. Young's home. They are listed as the following:

| | | |
|---|---|---|
| "SS tie tact" | "God Bless Hitler" | "SS books" |
| "Finish what Hitler started from phone" | "Skorzeny – 81_200px-Otto_Skorzeny_young"[1] | "SS reenactment email outing 2000" |
| "Nazi DVD" | "Cartoon Jew directing USA tank" | "SS Panzer Division emails 2005" |
| "Nazi Eagle" | "Cartoon Jew directing Colin Powell" | "Hitler biograph in Arabic" |
| "Hitler laughing" | "Jewish swine #35" | "German WWII Iron cross etc" |
| "Alliance between Nazis & Islamists" | "Israeli flag doormat photo" | "Nazi reenactment uniform" |
| "89_muftihitler.jpg" | "SS Hitlers Instrument of Terror" | "Nazi belt buckle" |
| "88_mufti_inspecting2.jpg" | "Hitler portrait" | "Hitler: no more Mr. Nice Guy" |
| "Gott Mit Us! Poster" | "German military flag" | "Who Rules America" |
| "DVD Nazi reenactors by Swastika Flag" | "Young in Nazi uniform" | "Young with pistol – Nazi uniform" |
| "Young w pistol and salute" | "Young by Swastika flag" | "Young w SS death's head hard hat" and "soft hat" |
| "Not Young but Heil Hitler salute" | "Information for prospective members of the National Alliance" | "What is the National Alliance" |
| "Photo of German flag" | "Israel is the real Devil – flag w swastika" | "Israeli killing jesus" |

---

[1] According to the Encyclopedia Britannica, Otto Skorzeny was a Nazi SS officer whose notoriety owed to the rescue of Benito Mussolini from confinement in the Abruzzi mountains and to a recognizable dueling scar across his face. *See* Otto Skorzeny entry, ENCYCLOPEDIA BRITANNICA, available at: https://www.britannica.com/biography/Otto-Skorzeny.

| "Hitler pointing 1559509_335_avatar" | "Nazi hat with totenkopf" | |

**Firearms, body armor and sundry military objects**.  The exhibit list contains dozens of firearms, antique weapons (such as swords), and body armor seized from Mr. Young's home. (Smith Decl., Exh. 1, pp. 5, 14-16, 22-23.)  They are listed as follows:

| "knife from truck" | "rifle scope" | "Bayonet" |
|---|---|---|
| "Photo with gas mask from Verizon Gz" | Eight (8) "pistols" | "Face mask" |
| Eighteen (18) "Long guns" and/or "rifles" | "Rack of ammo photo" | Sets of "body armor" |
| "swords on couch" | Nineteen (19) "knives" | "Grenade" |
| "pyrodex muzzle loading propellant" | "cord with propellant explosives" | "gas mask" |
| "night vision scope" | "night vision kit" | "bug detector" |
| Various photos of guns | Various photos of ammo | Body armor receipts |

**Graphic ISIS and/or Islamist videos and images**.  The exhibit list contains a number of videos and still images posted on YouTube and other social media websites and message boards which are graphic and gruesome in nature.  (Smith Decl., Exh. 1, pp. 11-12.)  Although it is not clear in every case which particular video/image the exhibit list is referring to, they are listed as follows:

| "YouTube Screw Infidels" | "YouTube video, Line 55186" | "YouTube – dua" |
|---|---|---|
| "Jordanian Pilot YouTube" | Various screenshots of YouTube Channel "alex7263" | "YouTube-Islam2" |
| "ISIS Executioner the Bulldozer" | "YouTube -avganistan.mp4" | "YouTube-Islam5" |
| "UBL video-1_obl.9907.rm" | "YouTube – Children of Gaza under fire" | "YouTube-jihad or hajj" |
| "YouTube -mujahideen" | "YouTube-NEW anwar al awlaki" | "YouTube-Oh Muslims Al Quds is crying for help" |

5

| "YouTube – Tour of Jannah" | "YouTube- Quran" | "YouTube-You Claim to Love the Prophet Mohammed" |
| --- | --- | --- |
| YouTube: FBI: Man Known Online as "Alshishani" Bites FBI Agent | Facebook post: Hunting Humans: Where Them Zombies At? | Facebook post: Hunting Humans: Start them Young |

**Miscellaneous items**.  The government's exhibit list contains music selections allegedly found on Mr. Young's iPod: "white power" music and "nasheeds," or traditional Islamic music. (Smith Decl., Exh. 1, pp. 14, 18.)  The government has also represented that it will seek to present evidence that Mr. Young misused a prescription drug, and, apparently, evidence going to Mr. Young's sexual orientation.

<u>**ARGUMENT**</u>

## I.    LEGAL STANDARDS

**Rule 401**. Federal Rule of Evidence 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401; *see also United States v. Leftenant*, 341 F.3d 338, 346 (4th Cir. 2003) (to meet the relevance standard, evidence must be "worth consideration by the jury" or have a "plus value").  Rule 402 provides that "evidence which is not relevant is not admissible." Fed. R. Evid. 402.

**Rule 403**.  Rule 403 provides that the Court may "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.  In assessing the probative value of evidence under a Rule 403 evaluation, the Court "must weigh the marginal probative value of admission versus the marginal danger of admission in view of the entire record, including potential evidentiary alternatives." *United States v. Bellinger*, 652 Fed. Appx. 143, 2016 U.S.

6

LEXIS 10667, *18 (4th Cir. June 13, 2016); *see also Carnell Constr. Corp. v. Danville Redevelopment & Hous. Auth.*, 745 F.3d 703, 719 (4th Cir. 2014) (same).

"What counts as the Rule 403 'probative value' of an item of evidence, as distinct from its Rule 401 'relevance,' may be calculated by comparing evidentiary alternatives." *Old Chief v. United States*, 519 U.S. 172, 184, 117 S. Ct. 644, 136 L. Ed. 2d 574 (1997).  Meanwhile, "[t]he term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the fact finder into declaring guilty on a ground different from proof specific to the offense charged." *Id.*, 519 U.S. at 180.  "Unfair" prejudice is "prejudice that damages an opponent for reasons other than its probative value, for instance, an appeal to emotion ...." *United States v. Mohr*, 318 F.3d 613, 620 (4th Cir. 2003); *see also United States v. Smallwood*, 306 F. Supp. 2d 582, 587 (E.D.Va. 2004) (Ellis, J.) ("The advisory committee's note and controlling authority interpreting the Rule define unfair prejudice as 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'").

**Rule 404**.  Rule 404(b), meanwhile, states that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character. [] This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b).  The Fourth Circuit permits the admissibility of extrinsic acts when they are "(1) relevant to an issue other than character, (2) necessary, and (3) reliable." *United States v. Mark*, 943 F.2d 444, 447 (4th Cir. 1991).

## II.  IRRELEVANT CATEGORIES OF EVIDENCE

The following categories of evidence do not satisfy the threshold standard of relevance under Federal Rule of Evidence 401.  They should be excluded from trial.

### A.    Nazi/White Supremacist Memorabilia Is Irrelevant

The government intends to introduce at trial approximately fifty Nazi and/or white supremacist-themed objects – posters, images, and military artifacts (*see supra* chart, p. 4.) The government's relevance arguments for these objects were articulated in the hearing for Mr. Young's motion to suppress documents, records and objects seized from his home pursuant to a Rule 41 search warrant.  (Smith Decl., Exh. 2, Hr'g Trans. dated Mar. 10, 2017.)  The government widely misses the mark.

 First, the government appears to suggest the Nazi materials are relevant because (a) there is evidence concerning an online message board user with the handle "Düsselkamp" on a website called LiveLeak; (b) "Düsselkamp" is a "Nazi stormtrooper name"; (c) Düsselkamp posted pro-ISIS comments; and (d) the government will establish Mr. Young as the creator of Düsselkamp by showing Mr. Young's affinity for things Nazi-related.  (Smith Decl., Exh. 2, p. 16.)  This argument fails for at least the following reasons: Mr. Young does not dispute creating the LiveLeak handle, so there is no relevance foundation whatsoever to lay with Nazi evidence; and, at all events, the government concedes that the handle's profile picture itself – a photograph of Mr. Young's dog, Mr. Charles – establishes Mr. Young's creation of the account – without the aid of fifty pieces of Nazi-themed evidence. (*Id.*).

Second, the government observes that a history book seized from Mr. Young's home bore the title "Hitler's Instrument of Terror." And because this case concerns material support for *terrorism*, the Nazi materials are somehow rendered relevant from the book title.  (Smith Decl., Exh. 2, p. 17.)  In determining that the Rule 41 search and seizure warrants encompassed Nazi materials in the context of Mr. Young's motion to suppress evidence, the Court set out a more refined version of that position:

8

The critical question is whether Nazi paraphernalia relates to "a group engaged in terrorism or a terrorist activity." To determine what constitutes "terrorism" and how law enforcement officers would understand that word, the Court has considered guidance from the Black's Law Dictionary definition of terrorism as "[t]he use or threat of violence to intimidate or cause panic, esp. as a means of achieving a political end." Black's Law Dictionary (10th ed. 2014). Similarly, the U.S. Code defines terrorism as activities that "appear to be intended (i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping." 18 U.S.C. § 2331(1),(5).  []

Drawing on information that is common knowledge, a reasonable officer would likely know that the Nazis used violence and threats of violence as a means of achieving their political end of ethnic cleansing and to intimidate or coerce the Jewish population of Germany, among other minorities. Based on this information, it was reasonable for the officers to conclude that the Nazis, though not a designated FTO, engaged in terrorist activity, as defined by Black's Law Dictionary and the U.S. Code.

(Mem. Op., dated May 9, 2017, p. 32.)

One need not downplay Nazi atrocities – or upset this Court's prior holdings – to point out that deeming Nazi materials relevant in U.S. material support for FTO cases, based on the Black's Law Dictionary terrorism definition, leads to unacceptable results.  It is also common knowledge that, abhorrent though they were, the National Socialists were the governing political party of a European nation-state leading up to and during the Second World War.  If internationally recognized national governments can be said to satisfy the Black's Law Dictionary terrorism definition – "[t]he use or threat of violence to intimidate or cause panic, esp. as a means of achieving a political end" – or the definition in Section 2331 – activities that "appear to be intended (i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping" – then it is uncontroversial to observe that virtually every country with a military has at some point satisfied the definition.  Just to remain

9

in the context of World War II, the Court need only take notice of a few major historical events to appreciate the untoward results yielded by applying the Black's Law definition to governments: are U.K. "Keep Calm and Carry On" posters evidence of terrorism due to British area bombing of Hamburg and Dresden? Including governments within the definition proves too much.  For that reason, the government will cite no precedent in which an internationally recognized government has been found to meet either the Black's Law or U.S. Code terrorism definitions.[2]

Beyond the government/non-state actor distinction, there are other key differences between Nazism and radical Islamism that render Nazi materials irrelevant.  The cornerstone of Nazi ideology was an atheistic biological determinism ultimately rooted in pseudo-scientific social Darwinism widely popular in Western Europe and America in the late 19th century.[3] Nazism's race theory politically, socially and economically subordinated historically maligned "inferior races" as such – e.g., Jews, Roma, and Slavs – to the "Aryan race" which was said to be of Northern European origin.  Politically, the goals of Nazism were revenge for the perceived Carthaginian peace of the first world war, rearmament, irredentism and "living space" for ethnic Germans, primarily in Central and Eastern Europe.

By contrast, the politics, worldview, and ideology, such as it is, of ISIS or Islamic State, could not be more distinct.  ISIS is a non-state terrorism group formed in 2014 as an offshoot of Al-Qaeda in Iraq.  Like other Islamist terrorist groups, its religious ideology rests exclusively on an ultra-"conservative" strain of Islam called Wahhabism, which was founded in the 18th century

---

[2] Of course, at Nuremberg, captured Nazi officials were not tried for "terrorism" but for war crimes, crimes against humanity, crimes against peace, and other similar crimes perpetrated by national government officials. *The Nurnberg Trial*, 6 F.R.D. 69 (1946).

[3] TIMOTHY SNYDER, BLACK EARTH: THE HOLOCAUST AS HISTORY AND WARNING (2015), p. 2.

in what is now Saudi Arabia.[4]  The "strictest" form of Sunni Islam, Wahhabism holds that Sharia

law, taken from the Quran, should be regarded as the sum total of all political life and society.

Although Wahhabism does not require it, the vast majority of ISIS members are ethnic Arabs.

To sum up:

| Nazis | ISIS |
|---|---|
| 20th Century atheists and moral relativists. | Adheres to the most austere strain of a 7th century Abrahamic religion. |
| Held that non-Aryans, as such, should be suppressed for "hygienic" reasons. | Follows Islam, which does not draw race-based distinctions.  In any case, most ISIS members are non-"Aryan." |
| Politically concerned with overturning the post-WWI peace settlement in Europe. | Politically concerned with conquering and maintaining territory in Syria and Iraq to form a theocratic state called the "caliphate." |
| Denial of moral phenomena/insistence on moral interpretation the basis of horrific violence. | Denial of moral interpretation/insistence on moral phenomena the basis of horrific violence. |

Ultimately the government's points come to this: whatever the manifest differences, in

the popular mind both the Nazis and ISIS serve as exemplars of distilled evil, and both have a

hatred for Jewish people.  That is not enough.  That a defendant has some sort of interest in

Objectionable Group X is not a relevant fact in his prosecution for materially aiding

Objectionable Group Y solely on the commonality that X and Y are deeply loathed by the public

and nothing more.

And if this case were a hate crime prosecution – one in which the perpetrator acted based

on bias against the victim's race or religion, 18 U.S.C. § 249 – the fact that Nazis and ISIS

members both hate the Jewish people would arguably render Nazi materials relevant.  But this

case does not concern a hate crime but instead the prohibition on material support for terrorism, a

---

[4] PATRICK COCKBURN, THE AGE OF JIHAD: ISLAMIC STATE AND THE GREAT WAR FOR THE MIDDLE EAST (Verso 2016), p. 3.

law with a view to the protection of society overall, not a select minority class.  For that reason, all of the government's proposed evidence pertaining to the defendant's perceived bias against Jewish people should be excluded as irrelevant.  (*See supra* chart, p. 4.)

All the material factors distinguishing Nazis and ISIS apply with equal force to the government's threatened introduction of "Ku Klux Klan stuff" and white supremacist literature. (Smith Decl., Exh. 2, p. 17.)  It cannot be repeated too often: this is not a hate crime prosecution. At all events, white supremacism's ideology – that the "white race" should be supreme in some fashion or other – in fact runs contrary to the ideology of ISIS/Islamic State insofar as (a) the vast majority of the latter are not members of the "white race," and (b) ISIS/Islamic State concerns itself with theocratic government of territory it is attempting to seize in the Middle East, not with the secular governments of Western Europeans and Americans with which white supremacism purports to concern itself.

Finally, the government attempts to bring in the Nazi materials following a more circuitous logic.  According to the government, the search of Mr. Young's home yielded what appeared to be a "World War II propaganda poster [] but [with] the date 1939-2004."  (Smith Decl., Exh. 2, p. 19.)  The government claims it had the German language on the poster translated as: "The Alliance 1939-2004.  The Worldwide Association of Islamists and Nazis." (*Id.*)  On seeing these words, according to the government, "all of a sudden, you're beginning to think, well, wait a minute now.  Is there something else going on here?" (*Id.*)  Following that discovery, the government then noticed that Mr. Young had evidently "liked" on Facebook a certain historical figure, one Mohammad Amin Al-Husayni.  (*Id.*)  In turn, Al-Husayni, according to the government, also "known as the Mufti of Jerusalem during World War II, [was

12

known] for his alliance with Hitler." (*Id.*)  Juggling some combination of these allegations, the government suggests, the Nazis materials somehow become relevant.

 The logic of this argument fails.  In the first place, if the "Alliance" poster allegedly indicates Mr. Young's affinity for Islamists (as the government argues), the government may rest there: there is no burden of proof requiring the government to show a further link to the Nazis. That a Nazi image is paired with an Islamist group in a single poster is not somehow an open sesame to introduce other Nazi evidence that has nothing to do with radical Islamism.  Had the government found a poster with a mujahideen riding a donkey in the Hindu Kush, that would not render relevant two trial days' worth of evidence of donkey behavior.  Secondly, that Mr. Young "liked" Al-Husayni on Facebook holds no relevance: to even approach creating some sort of relevant Nazi/Islamist connection on this basis the government would need to establish the predicate that Mr. Young "liked" the Al-Husayni page *because of* some meeting with Hitler and *not because of* anything else Al-Husayni is publicly known for: his Wikipedia page contains over fifteen-thousand words; Hitler's name accounts for twenty-nine of them, or two-tenths of one percent.   The government has not laid this foundation, because it cannot.  *See United States v. Kaplan*, 490 F.3d 110, 122 (2d Cir. 2007) ("The length of the chain of inferences necessary to connect the evidence with the ultimate fact to be proved necessarily lessens the probative value of the evidence, and may therefore render it more susceptible to exclusion as unduly confusing, prejudicial, or time-consuming . . ." (quoting *United States v. Ravich*, 421 F.2d 1196, 1204 n.10 (2d Cir. 1970) (Friendly, J.)).

 In the end, the government's relevance theory drawing an improbable line from Nazis/white supremacists to radical Islamism is not sincere historical argument.  These materials do not have a "tendency" to make it more "probable" that Mr. Young would support an FTO in

the Middle East.  Fed. R. Evid. 401.  If anything – as common sense suggests –  they show the exact opposite.

### B.   Firearms, Body Armor and Other Military Objects Are Irrelevant

Although the government alleges that Mr. Young made a handful of violent comments some five years before he was arrested in this case, the charged conduct centers on a nonviolent act: providing gift cards to an informant.  The government has never alleged any intent – still less a plan or conspiracy – to commit or aid violent acts on the part of Mr. Young, who has no criminal history.  Mr. Young's lawfully acquired firearms and military objects are therefore entirely irrelevant to this case.

The government's exhibit list contains virtually every weapon seized from Mr. Young's home –  from rifles to a glass sword.  (*See supra* chart, p. 5.)  None of these shows a propensity to commit the charged criminal act of sending petty contributions to a terror group.  The government cannot cite a single precedent for the proposition that ownership of lawfully-acquired weapons *ipso facto* goes to establish a propensity to give contributions to an FTO.  And for good reason: there is no logical connection.

Even if there were some hypothetical fact pattern where lawful ownership of firearms could be said to show a propensity to give material aid to an FTO, *in this case* the government does not allege a single factual link between any of the firearms, body armor or other military artifacts and the charged conduct.  It could not so allege even if it wished to.  For most of the firearms, the government will not show – because it cannot show – that *Mr. Young acquired the weapons* <u>*after*</u> *converting to Islam in 2006*, and thus when he was in a position to become an

14

exponent of violent jihad.  Thus, as a chronological matter, the government has no argument that he was "stockpiling" weapons for some criminal act associated with an FTO.[5]

A case in point is *United States v. Rory Jackson*, 585 F.3d 703 (2d Cir. 2009).  There, New York City police officers responded to a 911 call reporting a gunshot in an apartment building.  585 F.3d at 705.  Arriving on the scene, they encountered Jackson loitering outside and ordered him to show his hands.  Jackson threw a juice can at the officers and ran.  Giving chase, an officer spotted what appeared to be a gun in Jackson's jacket.  *Id.*  Jackson was caught, the officers retraced the chase route, recovering a gun without prints in a garbage can.  For that single gun, Jackson was charged with one count under 18 U.S.C. § 922(g)(1) as a felon in possession of a firearm.  *Id.*  At trial the government moved to introduce the seized gun, of course, but also dozens of "firearms, other weapons, bullet-proof vests, drugs and cash." *Id.*  These additional items were found a day after Jackson's arrest in the apartment building where the first gunshot was reported: the girlfriend of Jackson's friend would testify she saw Jackson the night before the arrest in the arsenal apartment.  *Id.*  The government's relevance argument: background to the crime and "inextricable intertwining of evidence."  *Id.*

On appeal, Jackson's conviction was reversed because the trial court admitted the additional guns, body armor and drugs.  The Second Circuit reasoned:

> The [guns/body armor/drug] evidence from the apartment was not particularly helpful to explain the crime. The Government's version of the facts was simple and complete: the police responded to a report of a shooting in the building; they approached a group of people outside the building; Jackson fled; Officer Jordan saw a gun in Jackson's pocket; the police later apprehended Jackson; and an officer found the gun near where Jackson had run.
>
> The Government did not need the contraband to explain why the police were at the building, why Officer Jordan pursued Jackson, why Jackson was arrested, or why Jackson was charged with possessing a firearm. Failing to

---

[5] In fact, Mr. Young has been shooting guns with his grandfather and sister since childhood.

detail the contents of the apartment would not have left any gaps in the Government's case, nor have left the jury wondering about missing pieces of the story. [] We think the evidence more likely confused the jury than assisted its understanding of the case. []

The evidence was also devastating to Jackson. Without this evidence, the Government's case was that Jackson was a convicted felon with a gun who ran from the police. With the evidence, the Government invited the jury to infer that Jackson at least associated with dangerous drug dealers equipped with an array of weapons who operated a narcotics business out of a residential apartment building. In light of such evidence, Jackson had little chance to prevail on his argument that he did not possess a single handgun.

*Id.* at 708-10.

Just as in *Jackson*, the government does not need all (or any) of Mr. Young's firearms to prove he sent gift cards to an undercover informant, or to prove Mr. Young's predisposition to materially support an FTO.  Nor is there any gap in the government's case absent its "stockpiling" evidence: the charged conduct is that Mr. Young sent the gift cards to someone he believed was an ISIS member; nothing in that order of proof has anything to do with guns/body armor.  And just as in *Jackson*, the extra evidence is devastating to Mr. Young: without the evidence the government's case is that Mr. Young was willing to send $245 in contributions to ISIS; with the evidence the government "invite[s] the jury to infer" that Mr. Young was stockpiling arms and armor to launch some act of violence.  585 F.3d at 710.

Other decisions are in accord.  *See e.g.*, *United States v. Curley*, 639 F.3d 50, 60-61 (2d Cir. 2011) (in stalking and harassment case, trial court abused discretion in admitting irrelevant evidence of defendant's rifles, ammunition, bulletproof vest, and ski mask); *United States v. Ulbrict*, 79 F. Supp. 3d 466, 492-93 (S.D.N.Y. 2015) (in dark web marketplace case where charged offenses were limited to three types of contraband – narcotics, computer hacking materials, and fraudulent identification documents – evidence of firearms and other weapons excluded from trial as irrelevant); *United States v. Bundy*, 2017 U.S. Dist. LEXIS 17209, at *8-9

16

(D. Nev. Feb. 17, 2017) (granting in part Rule 401 motion requesting that government's evidence be limited to weapons possessed "during the [criminal] confrontation").

### C.      Irrelevant Miscellany

The government's exhibit list contains a few miscellaneous evidence categories which are plainly irrelevant: alleged pharmaceutical misuse; playing "white power" and "nasheeds" music to the jury; and potential evidence concerning Mr. Young's sexual orientation.

**Pharmaceutical misuse**.  The government has indicated to counsel that it may introduce evidence in its case-in-chief concerning Mr. Young's alleged misuse of prescription drugs. Needless to say: such alleged misuse can have no relevance in a material support for terrorism prosecution.  It should be excluded.

**"White power music" and "Nasheeds."** The proposed exhibit list includes certain "white power" songs and "Nasheeds" (Islamic music) taken from Mr. Young's iPod.  (Smith Decl. Exh. 1, pp. 14,18.)  There is no relevance in playing this music to the jury; it would only serve to frighten, estrange or repel jurors.  At the most, the government could inform the jury "Nasheeds" were found on Mr. Young's iPod with a verbal description of the music.

**Sexual orientation**.  Strange as it may seem, undersigned counsel understand from prior counsel that the government intends for some reason to introduce evidence regarding the defendant's sexual orientation.  Such evidence is irrelevant and should be excluded.

## III.     EVIDENCE THAT FAILS RULE 403 BALANCING

Even if the Court were to deem the aforementioned categories of evidence relevant under Rule 401, they should still be excluded under Rule 403 since their probative value is dramatically outweighed by a danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, wasting time, and needlessly presenting cumulative evidence.  Fed. R. Evid. 403.

### A.    Nazi/White Supremacist Evidence Holds No "Probative Value" and Poses Catastrophic "Unfair Prejudice"

Even if the categories of Nazi/white supremacist evidence outlined above somehow satisfy the standard of relevance, there can be no doubt that its "probative value" is virtually nil and the "unfair prejudice" catastrophically high.  In addition, the sheer number of Nazi/white supremacist objects the government intends to introduce would almost eclipse the FTO evidence in this case: wasting time, confusing the jury, and needlessly presenting cumulative evidence. This is textbook Rule 403-excluded evidence.

As regards the "probative value" side of the equation, the government boasts a great deal of "evidentiary alternatives" to the Nazi/white supremacist material in its attempt to prove Mr. Young was predisposed to materially support a Middle Eastern FTO.  *Old Chief*, 519 U.S. at 184.  To wit: all the alleged evidence concerning Mr. Young's interest in *Islamism, FTOs, or at least Middle Eastern politics, including hundreds of hours of communications with undercover informants and agents*.  Even if the Nazi/white supremacist materials nose across the relevance threshold in some obscure sense, their probative value to the underlying burden of proof – was Mr. Young predisposed to give petty cash to ISIS before the investigation began? – pales next to the government's other forms of traditional terrorism investigation evidence.

As for "unfair prejudice," it is difficult to imagine a category of evidence more unfairly prejudicial – more likely to inflame and upset a jury and elicit an emotional verdict – than Nazi/white supremacist evidence.  Branding someone a "Nazi" in our society is the nadir of character assassination, perhaps vying only with crimes against children in its obloquy.[6]  *See*

---

[6] Indeed, the tactic of attempting to win an argument by labeling the opponent a "Nazi" has become so overused in social media culture that a "law" has been created.  "Godwin's Law" holds that "as an online discussion grows longer, the probability of a comparison involving Hitler approaches 1." Wikipedia, the Free Encyclopedia, Godwin's law, available at: http://www.goo.gl/YHbe2z.  Enforcing the "law": once a Hitler comparison has been made, the thread is finished and whoever mentioned Hitler automatically loses the debate.  *Id.*

*e.g.*, *United States v. Mostafa Kamel Mostafa*, 16 F. Supp. 3d 236, 266 (S.D.N.Y. 2014) (in

terrorism case, excluding statements concerning Hitler and Jewish people for failing Rule 403

balancing); *United States v. Bowman*, 302 F.3d 1228 (11th Cir. 2002) (reversing trial court over

inclusion of "white pride" t-shirt, since "the uneasy racial history of criminal law in the United

States has yielded a simple rule-of-thumb: There is no place in a criminal prosecution for

gratuitous references to race, especially when a defendant's life hangs in the balance. Elementary

concepts of equal protection and due process alike forbid a prosecutor to seek to procure a

verdict on the basis of racial animosity"); *see also United States v. Stone*, 852 F. Supp. 2d 820,

835 (E.D. Mich. 2012) (excluding under Rule 403 evidence of anti-Semitism and references to

Nazis, Hitler and Stalin).  Unquestionably, this is "prejudice that damages an opponent for

reasons other than its probative value, for instance, an appeal to emotion …." *Mohr*, 318 F.3d at

620.

     The Nazi/white supremacist evidence is "unfairly prejudicial" for another reason.  It

presents a wildly misleading and falsely curated picture of Mr. Young's personality.

Undersigned counsel have previously argued that the Nazi materials were selectively seized from

Mr. Young's home in the following senses.  First, Mr. Young is an avid collector of war

memorabilia, not simply Nazi-related but pertaining to the U.S. Civil War, Vietnam, World War

I and II, and many other conflicts.  Yet the government is attempting to present solely the Nazi

materials to create the misleading impression that he subscribes to Nazi ideology.  In a previous

decision, the Court found that the government's selectiveness in seizing these materials may in

fact show that "law enforcement officers only seized those materials 'relating to . . . any

individual or group engaged in terrorism or terrorist activity.'" (Mem. Op., ECF 91, p. 34.)  But

that begs the question: whether it says anything about terrorist propensity to present a mountain

19

of Nazi materials *stripped of the context that these objects amounted to a small fraction of the larger universe of non-Nazi military artifacts in Mr. Young's home*.  If Nazi materials are found standing alone in a man's home, that creates an entirely different set of personality assumptions than the scenario where they are found alongside military objects from a dozen wars.  It is no less misleading than to grab one book at random off someone's shelf and construct the reader's personality from that volume alone.  Lolita's not the only book on the shelf here.

Second, the Nazi materials create a misleading perception of Mr. Young's personality because they fail to account for the fact that he was a World War II reenactor, as well as a reenactor of other conflicts.  The government proposes showing the jury highly inflammatory pictures of Mr. Young in Nazi costume.  Yet even if the government grudgingly acknowledges at trial that Mr. Young – and, it must be added, other law enforcement officer acquaintances – was only costumed as a reenactor, the defense cannot simply cry, Out damn spot, and remove the taint.  As the government well knows, Mr. Young and many others reenacted World War II battles on public property, in the open, with the full knowledge of the appropriate authorities.  There is no allegation he participated in any sort of political advocacy or agitation for modern-day Nazi or white supremacist causes whatsoever.  Mr. Young wouldn't have been in Charlottesville.

Nor are the Rule 403 defects limited to "unfair prejudice." The government's exhibit list contains approximately fifty pieces of Nazi/white supremacist evidence.  (*See supra* chart, p. 4.)  Indeed, the list boasts nearly as many Nazi/white supremacist exhibits as those concerning actual terrorism evidence, such as, *e.g.*, jihadist literature.  This material flunks every single Rule 403 test: it wastes time; it confuses the jury by threatening to transform a terrorism case into some

sort of hate crime case; and it needlessly presents cumulative evidence: what does the 49th Nazi picture add to this case?

The "probative value" of Nazi/white supremacist materials – nil – is substantially outweighed by the risk of unfair prejudice, wasting time, confusing the jury, and needlessly presenting cumulative evidence.  They should be excluded.

### B. Firearms, Body Armor and Other Military Objects Hold No "Probative Value" and Carry Enormous "Unfair Prejudice"

The government has yet to articulate how lawfully owned firearms and other military objects prove either Mr. Young's provision of gift cards to the informant, or his predisposition to financially support terrorist causes.  But even if it had, there is no "probative value" to these weapons, as compared with other evidentiary categories, and they pose extreme "unfair prejudice" with the jury.

As with the Nazi/white supremacist materials, the dozens of firearms, swords, knives, photos of Mr. Young holding firearms, and pieces of body armor in the government's exhibit list are not nearly as probative as the hundreds of pieces of evidence actually concerning Mr. Young's alleged interest in Islamism and ISIS.  For that reason, the government possesses extensive "evidentiary alternatives" to the weapons and military artifacts, rendering the latter of exceedingly low "probative value."  *Old Chief*, 519 U.S. at 184.  It is difficult to apprehend quite how a lawfully-owned firearm, acquired before the defendant even converted to Islam, comes near the probative value of, say, pro-ISIS statements in a material support for FTO case.  And, again, the government's allegations make no attempt to connect any of these weapons or military objects to the charged crimes, or any other violent plan or conspiracy.

As for the "unfair prejudice," it is quite simply enormous.  The government intends to wave dozens of scary-looking rifles in front of the jury.  Regardless of whether they were

lawfully owned and had nothing to do with the charged crime, the jury will be inflamed and frightened.  *Jackson*, 585 F.3d at 708-710; *Curley*, 639 F.3d at 60-61; *Ulbrict*, 79 F. Supp. 3d at 492-93.

Moreover, the weapons will confuse the jury as to the issues under consideration: by menacing the jury with a continuous stream of weapons, is the government insinuating Mr. Young intended to use them in an act of violence? The jury will almost certainly believe so, even though that would be highly misleading: there is no such allegation in this case.  This is particularly true in the case of the body armor.  On seeing this evidence the jury may be led to believe Mr. Young intended to use it in some sort of terrorist attack.  In reality, the evidence would show something far more banal: Mr. Young collected pieces of body armor with a view to reselling them on websites like eBay since at the time prices were rising on the items and he could turn a profit.   And, of course, the ceaseless presentation of guns, knives, swords and similar objects is also a waste of the court's and jury's time.

The "probative value" of lawfully acquired firearms, body armor and other military objects is substantially outweighed by "unfair prejudice," as well as by the risk of wasting time, confusing the jury, and needlessly presenting cumulative evidence.  These objects should be excluded.  But even if their probative value is somehow deemed weightier than their unfair prejudice, verbal descriptions of the weapons, coupled with Mr. Young's ownership of them, should suffice.  There is no evidentiary justification for brandishing the weapons and weapons photographs in front of a jury.

### C.    Graphic ISIS and Islamist Videos/Images Hold No "Probative Value" and Carry High "Unfair Prejudice"

The defense does not dispute that, in a material support for terrorism case, a defendant's possession or dissemination of ISIS- or other FTO-created media can constitute a relevant fact.

However, the exhibit list indicates the government intends to play for the jury, and display, highly graphic videos and other gruesome images. (*See supra* chart, pp. 5-6.) This plainly fails Rule 403 balancing.

Any probative value in the allegation that Mr. Young viewed, or shared, FTO-inspired media lies in the bare fact that he viewed or shared it. There is no additional probative value in the underlying graphic image itself. A verbal description of the video is more than sufficient. In any case, any marginal probative value in displaying a gruesome image to the jury is dramatically outweighed by the risk of unfair prejudice to the defendant. There is no dispute in this case over the horrifying nature of media created by ISIS. To show such graphic images to a jury is to guarantee an "emotional verdict," *Mohr*, 318 F.3d at 620, regardless of the fact that a defendant allegedly viewed the image – and did not create it – and regardless of its lack of connection to the underlying criminal act. *See United States v. Al-Moayad*, 545 F.3d 139, 152-163 (2d Cir. 2008) (in material support case, trial court improvidently permitted testimony concerning a suicide bombing in Tel Aviv and a video documenting Osama Bin Laden's visit to a training camp); *United States v. Abu-Jihaad*, 553 F. Supp. 2d 121, 128 (D. Conn. 2008) (excluding mujahideen fighting videos insofar as they contained extreme violence, bloody bodies and mutilation); *Stone*, 852 F. Supp. 2d at 835 (excluding video of "graphic footage of 9/11"); *United States v. Gamory*, 635 F.3d 480, 493-94 (11th Cir. 2011) (ruling that the district court abused its discretion in admitting into evidence a rap video in which the defendant appeared in light of its minimal probative value, that it contained inadmissible hearsay statements, and that "[t]he lyrics presented a substantial danger of unfair prejudice because they contained violence, profanity, sex, promiscuity, and misogyny").

All of these videos/images should be excluded.  It is more than sufficient for the government to use verbal descriptions.

### D.       Miscellaneous Evidence That Fails Rule 403 Balancing

As explained above, the government intends to play "white power" and "nasheeds" music to the jury; introduce evidence of Mr. Young's alleged prescription drug misuse; and possibly introduce evidence regarding Mr. Young's sexual orientation.  All these categories fail Rule 403 balancing.

**"White power" and "nasheeds" music**.  For all the reasons outlined above, "white power" music has no relevance in this case, and thus no "probative value." But even if it had any probative value, it would be substantially outweighed by the risk of unfair prejudice: an emotional verdict based on racial contention elicited from a jury scared by the music.  *Bowman*, 302 F.3d 1228.  And even if that were not the case, any probative value in the music would lie solely in the fact of the defendant's possession of it, not in playing the music for the jury.  *See e.g.*, *United States v. Sampson*, 335 F. Supp. 2d 166, 191-93 (D. Mass. 2004) (excluding memorial video of victim that featured "evocative" and "poignant" music that "would have inflamed the passion and sympathy of the jury").

As for "nasheeds" (Islamic) music, while Mr. Young's possession of it may constitute a relevant fact, its probative value is quite low: there is no suggestion that the simple fact of listening to nasheed music is an indicator of a predisposition to contribute materially to terrorism any more probative than the bare fact of practicing Islam.  That is, there can be almost no probative value in an attribute that fails to distinguish the defendant from 1.8 billion other people on the planet.  In any event, any probative value is substantially outweighed by the risk of unfair

prejudice in the form of a jury intimidated and/or estranged from the defendant by music alien to their ears and "alarming." *Sampson*, 335 F. Supp. 2d at 191-93.

**Prescription drug misuse**.  As explained above, there is no relevance to the alleged fact that Mr. Young misused prescription drugs at some point, so there can be no probative value to the evidence.  Even if there were, the *de minimis* probative value would be substantially outweighed by the risk of unfair prejudice against Mr. Young for being a perceived drug abuser.

**Evidence concerning sexual orientation**.  The defendant's sexual orientation is not a relevant issue in this case, much less one with probative value.  And even if it were, the unfair prejudice would quite clearly outweigh any crumb of relevance.

**"Threema" message concerning ISIS slavery**.  The government intends to introduce a conversation on the encrypted messaging service "Threema" between the defendant and undercover informant, in which the former appears to "joke" about "buying a slave" like the members of ISIS do.  Even if this conversation were relevant to some issue in this case, its probative value would be low: the government alleges a great deal of alternative evidence to show Mr. Young's predisposition to materially support ISIS.  But its unfair prejudice is very high: it risks eliciting a verdict based on emotion.  This single text message should be excluded.

## IV.    PROHIBITED CRIMES, WRONGS, AND OTHER ACTS

The following categories of proposed evidence fail to comply with Federal Rule of Evidence 404(b).  They should be excluded.

### A.    Inappropriate Activities Concerning Special Agent Are Barred Under Rule 404(b)

The government intends to introduce evidence concerning a certain FBI Special Agent, who interviewed Mr. Young and about whom the government alleges Mr. Young made inappropriate comments as a "joke." (Smith Decl., Exh. 1, p. 20.)  Specifically, the government

25

will attempt to show that, in March 2011, Mr. Young "said that he was angry with the FBI for contacting Young's family members and co-workers before speaking to him.  UCO reported that Young spoke about finding out where the FBI Special Agent who questioned him lived, and then kidnapping and torturing her. UCO reported that UCO doubted that Young seriously intended to act upon those words." (Crim. Compl., ECF 2, pp. 4-5.)

This alleged event constitutes an act extrinsic to the charged gift-card crime.  Nor does the act have any bearing whatsoever on Mr. Young's predisposition to materially support terrorism.  Accordingly, it should be excluded under Rule 404(b).  (It fails Rule 401 and Rule 403 balancing analysis for the same reasons.)

### B.     Additional Inappropriate Activities from 2011 Are Barred Under Rule 404(b)

The government will attempt to introduce evidence concerning various inappropriate remarks and actions Mr. Young allegedly made and undertook in 2011:

(1) Mr. Young said he was wary of surveillance and there was an occasion when he aimed an AK-47 style rifle out of the window of his residence while scanning for law enforcement (ECF 2, ¶ 10);

(2) Mr. Young allegedly stated that if he was ever betrayed by someone, this person's life expectancy would be diminished; and that he and the UCO should pour gasoline on FBI cars and light them (*Id.*, ¶ 11);

(3) Mr. Young allegedly stated he used to torture animals when he was a child[7]; that he despised the FBI and that someone with his skills could attack the FBI; and described a method a person could use to bring guns into the Alexandria courthouse undetected (*Id.*, ¶ 12);

(4) Mr. Young allegedly spoke about the fundamentals of marksmanship with Amine El Khalifi (*Id.*, ¶ 13);

(5) Mr. Young allegedly possessed several "burner phones" (*Id.*, ¶ 16);

(6) Mr. Young allegedly skipped work on April 1, 2011, with a fake excuse (*Id.*, ¶ 18);

---

[7] Mr. Young will deny making this offensive statement.  He would never torture animals.

26

(7) on March 21 and 22, 2015, Mr. Young allegedly participated in a weapons training event provided by another Metro Transit Police Department officer, who observed Mr. Young bring ammunition and various guns to the training (*Id.*, ¶ 41).

All of these alleged comments and actions are extrinsic to the charged gift-card crime.

Nor do they have any relevance to Mr. Young's predisposition to financially aid an FTO.

Accordingly these comments/actions should be excluded under Rule 404(b).  (They fail Rule 401 and Rule 403 balancing analysis for the same reasons.)

## **CONCLUSION**

For all the foregoing reasons, the aforementioned categories of evidence should be excluded from trial in this case.

Date: September 24, 2017                            Respectfully submitted.

*/s/ Nicholas D. Smith*
Nicholas D. Smith (VA. Bar. 79745)
108 N. Alfred St.
Alexandria, VA 22314
Phone:(703)548-8911
Fax:(703)548-8935
nbs@davidbsmithpllc.com

Linda Moreno (admitted *pro hac vice*)
Linda Moreno P.A.
511 Avenue of the Americas
No. 312
New York, NY 10011
813-247-4500
Lindamoreno.esquire@gmail.com

27

**<u>Certificate of Service</u>**

I hereby certify that on the 24th day of September, 2017, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following CM/ECF user(s):

> AUSA Gordon D. Kromberg
> AUSA John Gibbs
> U.S. Attorney's Office
> 2100 Jamieson Avenue
> Alexandria, Virginia 22314
> gordon.kromberg@usdoj.gov
> john.gibbs@usdoj.gov

And I hereby certify that I have mailed the document by United States mail, first class postage prepaid, to the following non-CM/ECF participant(s), addressed as follows: [none].

> */s/ Nicholas D. Smith*
> Nicholas D. Smith
> VA Bar No. 79745
> David B. Smith, PLLC
> 108 North Alfred Street
> Alexandria, Virginia 22314
> (703) 548-8911 / Fax (703) 548-8935
> nds@davidbsmithpllc.com