IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 1:16-CR-265 |
| | ) | |
| NICHOLAS YOUNG | ) | |

GOVERNMENT'S OPPOSITION TO
DEFENDANT'S OMNIBUS MOTION IN LIMINE

Defendant Young asserts that he was entrapped into supporting terrorists and obstructing justice, Young's Brief at 2,[1] but moves to bar much of the government's evidence of his predisposition to do so on the grounds or relevance or undue prejudice. His motion should be denied. The defense in this case is based on a claim of entrapment. In light of that defense, the evidence at issue is relevant, and its probative value outweighs the risk of undue prejudice.

Background

In December 2016, Young was indicted for attempting to provide material support to the Islamic State ("ISIS") and obstruction of justice. In essence, the indictment alleges that, to keep the government from learning that his friend ("Mo") had joined ISIS in November 2014 - - and that Young was still in regular contact with him - - Young tried to mislead the FBI in December 2015 about his contacts with Mo over the previous 18 months. The indictment further alleged that, in July 2016, Young attempted to send money to ISIS by transmitting gift card codes to an account that Young believed was controlled by Mo.

---

[1] "Young's Brief at __" refers to "Memorandum in Support of Defendant Nicholas Young's Omnibus Motion in Limine," Docket #117-1.

Young claims that he was entrapped.  As a result, the government must show that he was predisposed to support ISIS.  As best we can tell, Young will argue that his contact with an undercover officer known to him as "Khalil" between 2010 and 2012 contributed to his "entrapment" in 2016.  *See* Young's Brief at p.1 ("the government will also attempt to prove he had a predisposition to materially support the FTO before the criminal investigation began, in 2010 or earlier").   As a result - - at least according to Young - - the government's proof of predisposition must predate his encounter with Khalil.  In light of that argument, the government's proof of Young's predisposition will include evidence that pre-dates 2010.

Months ago, the government produced to the defense a draft list of its trial exhibits, many of which will be used not only to establish Young's motive to support ISIS, but also to rebut his claim that he was entrapped into attempting to do so.  Young moved to exclude numerous of those exhibits. Dkt. 117.  That motion is not supported by the law, and should be denied.

<u>Argument</u>

In his moving pleading, Young cites to a variety of cases holding that various types of evidence were inadmissible in those cases as irrelevant or unduly prejudicial.  As far as we could tell, only one of those cases involved a defense of entrapment.  This distinction is vital because, when submitted to prove predisposition, evidence of prior bad acts is not subject to the constraints on the admission of such evidence that are ordinarily applied pursuant to Rule 404(b).

Young seeks to have his cake and eat it too:  he puts his mindset at issue by claiming entrapment, but simultaneously claims that the government's evidence of his mindset should be barred as unduly prejudicial.  Settled authority precludes this tactic.  As the Supreme Court held years ago, "if the defendant seeks acquittal by reason of entrapment he cannot complain of an appropriate and searching inquiry into his own conduct and predisposition as bearing upon that

issue.  If in consequence he suffers a disadvantage, he has brought it upon himself by reason of the nature of the defense."  *Sorrells v. United States,* 287 U.S. 435, 451 (1932), *quoted in United States v. McLaurin*, 764 F.3d 372, 381 (4th Cir. 2014).  Evidence of Young's support for terrorism is, therefore, admissible to rebut his own claim that his desire to support ISIS was implanted in him by the government.

Because Young's arguments in support of his motion virtually ignore entrapment law, they rest on propositions that are inapplicable to his case.  As explained below, the exhibits in question are indisputably relevant.  Their probative value outweighs any risk of unfair prejudice, and they should be admitted - - at the least - - to prove his predisposition to support terrorists.

I.     Character Evidence Is Relevant and Admissible in Entrapment Cases

Relevant evidence is any evidence that "has any tendency to make a fact more or less probable than it would be without the evidence," so long as "the fact is of consequence in determining the action."  Fed.R.Evid. 401.  All relevant evidence is admissible, except as otherwise provided by the Constitution, by Act of Congress, or by applicable rule.  Fed.R.Evid. 402.  Evidence of other bad acts may be admissible to prove intent or motive.  Fed. R. Evid. 404(b).  Indeed, "[e]xtrinsic acts evidence may be critical to the establishment of the truth as to a disputed issue, especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct."  *Huddleston v. United States*, 485 U.S. 681, 685 (1988).

While evidence of other bad acts may be admissible to prove intent or motive, Rule 404 generally prohibits such evidence to prove the defendant's character - - except in cases involving claims of entrapment.  Indeed, Rule 404(b)'s requirements are relaxed when the defendant claims entrapment.  When a defendant claims entrapment, "there is no doubt that proving

predisposition is one of the purposes for which bad-act evidence may be admissible." *United States v. McLaurin,* 764 F.3d 372, 380 (4th Cir. 2014).

"Predisposition is itself a broad concept, and a broad swath of evidence, including aspects of the defendant's character and criminal past, is relevant to proving predisposition." *Id.* at 381. As a result, and "[g]iven the range of evidence that is relevant to the predisposition issue, certain bad-act evidence may be admissible under Rule 404(b) in entrapment cases that would not be admissible in cases where entrapment is not an issue." *Id.* As the *McLaurin* panel stated:

> Proving disposition to commit a crime is very close to proving "criminal propensity," the very type of prejudice against which the general prohibition on admission of evidence of other crimes is directed. In an entrapment case, however, the issue is precisely whether the accused, at the time of the government inducement, had a propensity to commit crimes of the nature charged — that is, whether he was predisposed to do so.

*Id.*[2] Thus, "assertion of an entrapment defense does not justify admission of every bad act ever done by the defendant, but distinguishing the unwary innocent from the unwary criminal nonetheless requires a "searching inquiry." *Id. See also United States v. Thomas*, 134 F.3d 975, 980 (9th Cir. 1998) (since character is an essential element of the entrapment defense, "even if the proffered evidence were not admissible under Rule 404(b), we would still hold that it is admissible [in an entrapment case] under Rule 405(b)").

Young's claim that this case is just a "gift card" case, Young's Brief at 1, is an epic understatement of the conduct at issue. The indictment charges that Young attempted to provide material support to ISIS, both by trying to protect an individual that he believed to be an ISIS fighter, and also by sending money for the purpose of financing ISIS's recruitment of other

---

[2] Internal quotations and citations are omitted from quotations throughout this pleading.

fighters.  Nevertheless, even if Young's characterization were true, his claim that this is just a "gift card" case would not limit the predisposition evidence that would be admissible.

When used to show predisposition in a terrorism case, the relevant prior design to commit the crime or similar crimes need be only a rather generalized idea or intent to inflict harm on interests of the United States.  *United States v. Cromitie*, 727 F.3d 194, 207 (2d Cir. 2013).  *See United States v. Hackley*, 662 F.3d 671, 682 (4th Cir. 2011) ("Predisposition is not limited only to crimes specifically contemplated by the defendant prior to government suggestion").  Evidence of conduct occurring both before and after the defendant was contacted by the government is admissible to prove predisposition.  *United States v. Squillacote*, 221 F.3d 542, 566 (4th Cir. 2000).

By claiming entrapment, Young asserts that his desire to support ISIS was implanted by the government.  As discussed below, evidence of Young's support for terrorism in general (or ISIS in specific) is relevant and admissible to disprove this assertion.

II.   Evidence of Young's Predisposition Is Not Unfairly Prejudicial

Young claims that numerous categories of evidence are unfairly prejudicial.  "Where the evidence is probative, [however,] the balance under Rule 403 should be struck in favor of admissibility, and evidence should be excluded only sparingly."  *United States v. Lentz*, 524 F.3d 501, 525–26 (4th Cir. 2008).  "Evidence which tends to rebut a defendant's claim of innocent action is unlikely to be unduly prejudicial."  *United States v. El-Mezain*, 664 F.3d 467, 509–11 (5th Cir. 2011) (in a terrorist financing case, affirming the admission of videotapes of demonstrators destroying American flags and violent images of the aftermath of Hamas suicide bombings).

When evidence in terrorism cases is probative, it properly is admitted even though it may be "alarming," *United States v. Benkahla,* 530 F.3d 300, 310 (4th Cir. 2008); "disturbing,"

*United States v. Salameh*, 152 F.3d 88, 122 (2d Cir. 1998); or even "blood curdling." *United States v. Mubayyid,* 658 F.3d 35, 56 (1st Cir. 2011).  This is so because such evidence is "directly related to the nature of the crimes that the defendant has set out to commit." *United States v. Mehanna,* 735 F.3d 32, 64 (1st Cir. 2013).  "Terrorism trials are not to be confused with high tea at Buckingham Palace." *Id.*

In short, emotionally-charged evidence that might be barred in a different context is admitted in terrorism cases, because such evidence is no more inflammatory than the emotionally-charged crimes with which the defendant has been charged in the first place.  *See, e.g., United States v. Abu–Jihaad*, 630 F.3d 102, 132–33 (2d Cir. 2010) ("[W]e conclude that the recorded discussions were both highly probative of the charged crime and, to the extent they referenced uncharged contemporaneous support for jihad, no more inflammatory than the charges alleged in the indictment.").

As discussed below, none of the government's evidence in this case is more prejudicial than the charges for which Young was indicted.   Even if there were a risk of undue prejudice, the court could cure it by instructing jurors on the purpose for which they may consider the government's evidence of predisposition.  *United States v. Sterling*, 860 F.3d 233, 248 (4th Cir. 2017) (affirming this Court's limiting instruction that effectively mitigated any risk of unfair prejudice from prior bad act evidence).

III.    <u>The Government's Exhibits Are Admissible</u>

In his motion, Young moves to bar admission of hundreds of separate exhibits, but justifies their exclusion only to the extent that they fit within categories he specifies.  In doing so, he would have the Court sweep with an improperly broad brush.  Individual exhibits are

probative of motive and predisposition for multiple reasons. As a result, they are not as easily characterized as Young suggests.

For example, Young moves to bar the government from introducing the explosives and components of explosives seized from his residence, as well as the approximately 19 firearms; 18,000 rounds of ammunition; 70 pieces of body armor; and 60 knives, daggers, and swords that were seized there as well. Possession of such an arsenal surely is probative of a predisposition to support terrorists. *See, e.g., United States v. Lampley,* 127 F.3d 1231, 1243 (10th Cir. 1997) (defendant's carrying of guns was proof of his predisposition to enter a conspiracy to bomb buildings in Texas and Alabama). Indeed, possession of that arsenal is admissible to establish simply a motive to support terrorists regardless of any entrapment defense. *United States v. Hassan,* 742 F.3d 103, 143 (4th Cir. 2014) (knowledge that his co-conspirator "was stockpiling weapons" was probative of the defendant's involvement in a conspiracy to support terrorists).[3]

Yet, Young's possession of individual items within that arsenal is probative of his predisposition and intent, regardless of their inclusion within the stockpile as a whole. For example, included within the arsenal are individual weapons that also appeared in photos of Young wearing traditional Arab or Muslim garb, and in photos of Young in the uniform of Nazi SS Stormtrooper Klaus Dusselkamp. Among the seized weapons are knives that bear Nazi insignia. Other knives were designed so that they can be smuggled past metal detectors; they are relevant not only because they were parts of Young's arsenal, but also because they lend color and credence to Khalil's expected testimony that Young bragged about his ability to smuggle weapons into the Alexandria Federal Courthouse.

---

[3] Young claims that he possessed this arsenal as an investor, Young's Brief at 22, but this is an argument as to the weight of the evidence, not to its admissibility. In any event, the 18,000 rounds of ammunition (enough to fire one round per second continuously for more than five hours) that Young possessed does not appreciate in value.

In short, individual exhibits fall within multiple categories, and may be admissible for multiple reasons.  The admissibility of each exhibit merits consideration in its own right, but, in the space of this one pleading, we cannot address all the reasons for the admissibility of each exhibit.  As a result, we can bring to the Court's attention just a handful of the exhibits that would be barred by Young's generalized arguments.  Accordingly, we request the opportunity to address with specificity in the future the admissibility of any particular exhibit that, in light of the present motion, the Court is inclined to bar.

    A.  <u>Evidence of Young's Support for Nazis and White Supremacists</u>

Regardless of whether support for Nazis is always relevant to prove a defendant's support for terrorists, it surely can be relevant when a defendant puts his motivation to support terrorism at issue by claiming entrapment.  As discussed below, the evidence in this case will establish that Young supported both Nazis and ISIS, and that his motivation to do so was the hatred of Jews that he shared with both.  As a result, evidence of Young's support for Nazis is relevant to establish his predisposition to support ISIS.  *See United States v. Mahon*, CR 09–712 PHX–DGC, No. 2010 WL 4038763, at *11 (D. Ariz. Oct. 14, 2010) (holding that defendant's "allegiance to [white supremacist] groups that advocated violence" constituted evidence of predisposition to commit violent crimes), *aff'd*, 793 F.3d 1115 (9th Cir. 2011).  *See also United States v. Magleby*, 241 F.3d 1306, 1319 (10th Cir. 2001) (admitting racist song lyrics on white supremacist CD owned by the defendant in a non-entrapment case because the defendant's state of mind was at issue);  *United States v. Mostafa*, 16 F. Supp. 3d 236, 260, 266 (S.D.N.Y. 2014) (admitting defendant's statement, "these dirty Jews, Christians, most of them homosexual

persons," in a non-entrapment case, but not admitting other disparaging statements on the ground that they were cumulative).[4]

Exhibit 1 to this pleading is a report by Dr. Daveed Gartenstein-Ross, titled *Report on the Relationship Between Affinity for Nazism and Inclination to Support Militant Islamist Groups*. With a Ph.D in World Politics (and a law degree), Dr. Gartenstein-Ross has extensively researched, written, lectured, and taught about Islamist militancy and terrorism; white separatists and Neo-Nazis, and radicalization processes.  Exhibit 1, at 1-9.[5]

As detailed in Dr. Gartenstein-Ross's report, the mechanisms of radicalization that attract individuals to neo-Nazism and to militant Islam are highly similar.  Exhibit 1, at 10-18.  The report also details multiple areas of convergence and ideological similarities between Nazi and Islamist militant movements, and the historical precedent for this convergence.  *Id.* at 18-22. The report details the centrality of Jew-hatred to both movements, and discusses numerous cases where extremists motivated by hatred of Jews, like Young, embraced both ideologies simultaneously, or moved fluidly from one to the other.  *Id.* at 23-39.

The report also explains that, when individuals convert to Islam after having been immersed in or attracted to Nazism, they often dive right into the extremist end of the spectrum of Islamic ideology.  In short, in Exhibit 1, Dr. Gartenstein-Ross explains why evidence of an

---

[4] Young characterizes the decision in *United States v. Bowman,* 302 F.3d 1228 (11th Cir. 2002), as "reversing trial court over inclusion of 'white pride' t-shirt." Def. Br. at 19.  To the contrary, the decision affirmed the conviction, and no such t-shirt is discussed in the opinion. The Eleventh Circuit did agree that evidence of a motorcycle club's whites-only policy was not admissible evidence, because the defendant's "allegiance to a racist organization is not relevant to his guilt or innocence in this case."  *Id.* at 1239.  In contrast, Young's entrapment defense renders his own allegiances very much at issue.

[5] As a convert to Islam, Dr. Gartenstein-Ross's first book, *My Year Inside Radical Islam,* was about his time employed by the American branch of a Saudi charity that was designated by the United States as a provider of financial and material support to al-Qaeda.  Exhibit 1, at 2.

individual's attraction to Nazism is related to the question of whether that individual is predisposed to supporting Islamist terrorists. *Id.* at 35.

In this context, evidence of the relationship between Naziism and radical Islamists, as well Young's attraction to Nazis, is probative of whether Young's support for ISIS was implanted in him by the government, or the product of his own predisposition to support terrorists that hate Jews just like he does. This includes evidence of Young's involvement with Nazis and radical Islam at the same time.

Exhibit 2 consists of trial exhibits that are probative of Young's intense interest in terrorism - - of the Nazi variety. These include:

> Government Exhibit ("GX") 10-220, two slides found in Young's computer, explaining that the lightning bolt symbol of the SS is "used in various tattoos mainly by the Neo-Nazi and Racist skinheads" and "characterizes the belief of these extremist groups in Anti-Semitism, White Supremacy, and Fascism." While possession of such slides obviously does not establish one to be Nazi sympathizer, such possession is probative of whether the owner understands the symbolism of the SS lightning bolts;

> GX 10-701, a book seized from Young's residence, titled "The SS: Hitler's Instrument of Terror", with the SS lightning bolt symbol on its cover. Again, possession of such a book obviously does not establish one to be Nazi sympathizer, but such possession is probative of whether the owner understands the nature of the Nazi SS;

> GX 3-110, a tie-tac seized from Young's truck in August 2016, in the shape of the Nazi SS lightning bolt symbol;

> GX 10-903, a photo first saved on his home computer in 2007, showing Young in his Nazi SS uniform and holding a pistol;

> GX 10-905, a photo first saved on his home computer in 2007, showing Young and his associates in their Nazi SS uniforms in front of a Nazi flag;

> GX 10-907, a photo of Young in his Nazi SS uniform, with his "death's head" logo;

GX 4-300, a booking photo of Young's arm tattoo taken after his arrest in August 2016, showing the official insignia of the 9th SS Panzer Division "Hohenstaufen;"[6]

GX 10-714, a flag seized from Young's house, known as the "reichskriegsflagge," and typically used by Neo-Nazis.[7]  Use of this flag by Neo-Nazis stems from its earlier use by the Freikorps, a precursor of the Nazis that, following World War I, sought to use brutality against their enemies in Germany (particularly Jews) as political expression.  Many Freikorps officers became prominent Nazi officials, including Rudolf Höss, a commander of the Auschwitz concentration camp;[8]

GX 11-400, a photo of Young' truck, with the license plate "FRI-KRP," a reference to the Freikorps;[9] and

GX 10-459 and GX 10-495, two of the approximately 50 knives seized from Young's house; these knives bear the Nazi swastika and eagle.[10]

Exhibit 3 includes GX 13-105, a book found in Young's residence in 2016.  The book, *Serpent's Walk,* is by a leader of the American Neo-Nazi movement known as the National Alliance, and is about an underground Nazi revolutionary movement (led by the SS) to reverse the results of World War II.  In short, the book is propaganda for the National Alliance.  Trial

---

[6]  *See, e.g.,* Patrick Hook, *Hohenstaufen: 9th SS Panzer Division* (Surrey, UK: Ian Allan Publishing, 2005).

[7] Anti-Defamation League, "Imperial German Flag" (n.d.), available at https://www.adl.org/education/references/hate-symbols/imperial-german-flag.

[8]  *See, e.g.,* http://www.nytimes.com/1987/06/21/books/the-women-they-feared.html*;* Robert Gerwarth, *"The Central European Counter-Revolution: Paramilitary Violence in Germany, Austria, and Hungary after the Great War,"* Past and Present 200:1 (2008), pp. 179-81.

[9]  Also visible in the photo is the bumper sticker on Young's truck that states "Boycott the Terrorist State of Israel."

[10]  Young's suggestion that he was merely a participant in World War II reenactments goes to the weight of the evidence, but not their admissibility.  In any event, Young did not merely assume the identity of an ordinary soldier in the German army, but that of a member of a Nazi SS unit, with the "death's head" insignia on his headgear.  Moreover, as some of the exhibits attached to this pleading establish, he did not assume the Dusselkamp identity solely for the purpose of participating in battle reenactments.

evidence will show that, in approximately 2010, Young gave another copy of that same book to a friend.

Exhibit 3 also includes GX 10-862 and GX 10-863, both seized from Young's residence in 2016.  GX 10-862 is a pamphlet titled "Who Rules America," and published by National Vanguard Books, the publishing arm of the National Alliance.  In the pamphlet, William Pierce (the actual author of *Serpent's Walk)* argues that "there is nothing  - - plague, famine, economic collapse, even nuclear war - - more dangerous to the future of our people" than the "Jewish control of the American mass media."

*Serpent's Walk* and *Who Rules America* are probative of Young's interest in terrorism - - of the Neo-Nazi variety.  As such, they are admissible to show his predisposition to support terrorism.  *See United States v. Siraj*, No. 07–0224–CR, 2008 WL 2675826 at *2 (2d Cir. July 9, 2008) (affirming admission into evidence of books and videos recommended by the defendant despite claims that they were unduly prejudicial).

In *Siraj*, the defendant ("Matin") claimed that he was entrapped into a conspiracy to support terrorism.  He argued that the probative value of books the government sought to introduce at trial was outweighed by their prejudicial value, but the district judge rejected his argument.  On appeal, the Second Circuit agreed that the books were properly admitted, on the grounds that, "[t]o the extent that Matin recommended the books, they were relevant to show predisposition; and to the extent the books were for sale in the shop where Matin worked, they tended to rebut Matin's assertion that the cooperating witness first exposed him to radical Islam and violent jihad."  *Id*.  The same reasoning applies to the books and videos that Young gifted, recommended (on Facebook or otherwise) or simply maintained in his possession.

GX 10-863 is a flyer depicting two Klansmen burning a cross, with the caption, "Burning Cross Records, Your Newest White Power Music Source."  Notwithstanding the relevance of the flyer inherent in Young's possession of it in 2016, its admission also will corroborate the testimony of a witness who is expected to testify about Young's ideological journey after college, including that he observed Young listening to "white power" music.

Evidence at trial will include evidence of Young's support for terrorism based on the convergence of the Jew-hatred commonly espoused by Nazis and radical Islamists.  We expect to present testimony from a former friend of Young that, after attending a gathering of Neo-Nazis in approximately 2000, Young said words to the effect of "don't discount an alliance with Muslims to combat the Jews."

Exhibit 4 includes selected exhibits that, along the same lines, we expect to introduce to establish Young's interest in the *convergence* of Nazis and Islamists. Many of these involve Haj Amin al-Husseini, the Mufti of Jerusalem during World War II.  As noted in Exhibit 1 (at page 33), "Perhaps no other figure did more to foster ties between rightwing extremism and militant Islam."  As explained by Dr. Gartenstein-Ross, Husseini made pro-Axis radio broadcasts to the Arab world in which he implored Muslims to aid the Nazi slaughter, and stressed the ideological affinities between German National Socialism and Islam.  In one broadcast, he urged Muslims to "kill the Jews wherever you find them. This pleases God."  Exhibit 1, at 34.

Exhibit 4 includes GX 10-231, a photo of al-Husseini with Hitler, that was saved on Young's computer media in 2007.  As explained in the report of Dr. Gartenstein-Ross, during the meeting with al-Husseini, Hitler assured him of the Nazis' commitment to exterminating the Jews, and promised eventually to make Husseini the "Arab führer."  Exhibit 1, at 34.

Following the meeting with Hitler, Husseini played an important role for the Nazis. In 1943, he helped organize the 13th Waffen Mountain Division of the SS Handschar, a volunteer force composed predominantly of Bosnian Muslims.  Exhibit 1, at 34.  Exhibit 3 includes GX 10-232 and 10-240, photos found in Young's media, of Husseini inspecting the Muslim SS troops.  GX 10-238 and 10-237 also were found in Young's media; the former shows Muslim SS troops, and the latter shows them reading a booklet authored by Husseini, "Islam und Judentum."  According to Dr. Gartenstein-Ross, that booklet was intended to inspire Muslim SS units, and promote their involvement in the Jewish genocide.  Exhibit 1, at 34.

Exhibit 4 also includes GX 10-230, a poster saved to Young's computer media in December 2007.  Depicting Husseini shaking hands with a Nazi, the poster bears the words (translated into English), "Worldwide Association of Nazis and Islamists."  The poster is not a collector's item from World War II; according to the poster, the alliance started in 1939, but it was still active as of 2004.  Also in Exhibit 4 is GX 8-107, which is a screenshot from Young's Facebook page (in the name of Ciaphas Cain) referencing Mohammad Amin al-Husayni.[11]

Exhibit 5 is GX 14-180, a partial list of the websites that Young had bookmarked on his home computer in 2011.  Listed chronologically, the list shows that, during the same time period that Young bookmarked websites related to Jew-hatred, Neo-Nazis, and Hitler, he also bookmarked websites related to Bin Laden, Anwar Awlaki, and other radical Islamists.[12]

---

[11]  Of all of Young's materials related to Husseini, none reflected any context other than his relationship to Hitler, Nazis, and the Muslim SS troops that Husseini recruited.

[12]  One bookmark was to a webpage regarding Alois Brunner, a Nazi who converted to Islam.  As detailed on the webpage bookmarked by Young, Brunner had been an assistant to Adolf Eichmann, and an SS officer responsible for sending around 100,000 Jews to concentration camps.

Exhibit 6 consists of GX 8-108 and GX 8-109, reflecting that Young linked his Facebook page to a news article about the 2011 arrest in Pittsburgh of Emerson Begolly, an American Neo-Nazi who converted to Islam and called on-line for Jews to be slaughtered.  Begolly, who was sentenced to 102 months in prison for soliciting crimes of violence, is a subject of Dr. Gartenstein-Ross's report.  *See* Exhibit 1, at 24.

Exhibit 7 consists of the juxtaposition of GX 14-113 and GX 14-114, which show Young in his SS uniform before a Nazi flag (and his colleagues performing a "sieg heil" salute) in photos saved to his computer media on January 28, 2006, and GX 14-117 and GX 14-119, which show Young dressed in Muslim garb in photos saved to his computer five days later.  In GX 14-119, Young is holding a rifle.

Proof at trial will show that Young manifested his support for Naziism *at the same time* as he manifested his support for ISIS.  For example, when Young created an email account in October 2014, in order to be able to communicate covertly with "Mo" (who Young believed would be serving with ISIS in Syria), Young set it up under the name under the name "Essakobayashi."  Required to provide the internet service provider ("ISP") with a date of birth in order to create the new account, Young provided *Hitler*'s birthday:  4/20/89.  Exhibit 8 includes GX-100 and GX 6-109-5T; the former is the ISP record reflecting the date of birth that Young used, and the latter is the transcript of the part of the conversation in which Young told Mo that Young using Hitler's birthday as the birthdate for "Essakobayashi."

Exhibit 8 also includes GX 4-203, a graphic found on the phone seized from Young incident to his arrest.  Describing it as stating, over a picture of billowing smokestacks, that

"Together we can finish what Hitler started" does not do it justice, so we include it here (in color, as it was found on Young's phone):



Exhibit 8 further includes:

> GX 14-107, a photo found in Young's computer media in 2011 and again in 2016, showing obviously Muslim women marching with a sign stating "God Bless Hitler";

> GX 10-700, a photo of a framed portrait of Hitler found in Young's residence in August 2016; and

> GX 10-711: two posters found in Young's residence in August 2016, with a photo of Hitler and the words, "When I come back, no more Mr. Nice Guy."

Also included Exhibit 8 are GX 10-814 and GX 10-815. GX 10-814 is a document found among Young's possessions in August 2016, which appears to contain a list of people for whom he prayed. Along with members of his family, friends, and co-workers, the list includes five leaders from modern times: Hitler, Mussolini, Saddam Hussein, Haj Amin Al-Husaini, and "Skorzeny." GX 10-815 is a photo of Skorzeny found in Young's computer media.

As Dr. Gartenstein-Ross explains, Otto Skorzeny was a Nazi who fled Germany for Egypt after the fall of Hitler, and later organized Palestinian terrorist forays into Israel. Exhibit

1, at 34.  According to his Wikipedia entry, Skornezy was believed to have set up an organization that helped hundreds of SS war criminals escape from Germany after Nazi Germany fell.  *See* https://en.wikipedia.org/wiki/Otto_Skorzeny.

Exhibit 9 consists of selected trial exhibits that are probative of the hatred for Jews that is a common link between Young's support for Nazis and his predisposition to support ISIS. GX 11-401 is a photo of the Israeli flag that Young used as a doormat for the entrance to his residence.  The following exhibits were saved in Young's computer media:

> GX 10-250, a cartoon with Arabic writing and depicting the American military as under the whip of a crazed Jew;
>
> GX 10-251, a cartoon with Arabic writing and depicting Colin Powell as a puppet of a stereotypical Jew;
>
> GX 10-252, a cartoon depicting a pig with the face of a stereotypical Jew, titled "Jewish Swine"; and
>
> GX 14-138, a picture of a swastika imposed on an Israeli flag, with the caption "The Greatest Devil".

Exhibit 10 consists of trial exhibits that are probative of Young's affiliation with Nazism and his support for ISIS at the same time, including:

> GX 706, a (redacted) roster of "5 Kompanie B 19. Panzergrenadier Rgt., reflecting that Young's alias on that roster was Stormtrooper Klaus Dusselkamp;
>
> GX 8-500, screenshots of the Liveleak website, showing that "Dusselkamp" created the channel in 2007, and posted on it as late as May 7, 2015; and
>
> GX 8-501, screenshots of the Liveleak website, showing that "Dusselkamp" justified the burning alive by ISIS of the captured Jordanian pilot.

In short, the evidence sampled above shows that Young's support for Nazis was intertwined with his support for Islamic extremists, and that both were motivated by hatred of Jews.

Young claims that the Nazi materials should not be admitted because the government seized only Nazi-related materials from his house, and did not seize other collectibles that Young

possessed.  Whether the government cherry-picked Young's Nazi paraphernalia is a matter for argument at trial, and does not bear on their admissibility.  We expect, however, that the evidence will show that (1) the only foreign leader whose birthdate Young used for his own contact information was Hitler; (2) the only framed portrait of a foreign leader from modern times that Young had in his house was Hitler's; (3) the only historical identity that Young used for postings on Liveleak in support of ISIS was Stormtrooper Klaus Dusselkamp; and (4) the only leaders from modern history included on Young's prayer list were Hitler, Mussolini, and Saddam Hussein.[13]

Young's claim that the government's evidence of his adherence to Nazi ideology is unduly prejudicial also must fail.  Courts routinely admit evidence more prejudicial than that which Young challenges, including defendants' prior convictions and even serious uncharged crimes.  *See*, *e.g.*, *McLaurin*, 764 F.3d at 382-84 (upholding admission of defendants' prior robbery conviction and firearm possession to prove their predisposition).  *See also United States v. Abu–Jihaad*, 630 F.3d 102, 132–33 (2d Cir. 2010) (upholding admission of bad-act evidence over Rule 403 objection because evidence was "no more inflammatory than the charges alleged in the indictment").

Young also argues that evidence of his pre-2010 adherence to Nazi ideology is not necessary because the government possesses evidence of his post-2010 adherence to ISIS ideology.  Young's entrapment defense undercuts the logic of this argument as well.  After all, Young asserts that the government must prove his predisposition before Young met Khalil in 2010 - - and ISIS was not even formed until 2014.  To the extent that evidence of predisposition

---

[13]   In light of Young's argument that the seized Nazi material was only a fraction of his memorabilia collection, the volume and scope of the seized material is at issue.  As a result, none of the Nazi material could be cumulative; all is relevant and necessary to rebut Young's claim that the Nazi-related exhibits were cherry-picked from a bigger collection of memorabilia.

before 2010 is essential to refute Young's entrapment claim, evidence of his adherence to Nazi ideology before 2010 is necessary to show predisposition. *United States v. Queen*, 132 F.3d 991, 998 (4th Cir. 1997) (evidence is necessary where, considered in the "light of other evidence available to the government," it is an "essential part of the crimes on trial, or where it furnishes part of the context of the crime").

The cases upon which Young relies do not support the outcome he seeks because virtually none are entrapment cases. Cases actually involving entrapment show the weakness of his argument. *See, e.g., United States v. Mohamud*, 843 F.3d 420, 434 (9th Cir. 2016) (affirming admission of evidence that the defendant supported Osama Bin Laden and the September 11 attacks); *United States v. Cromitie,* 727 F.3d 194, 212-13 (2d Cir. 2013) (affirming admission of evidence that the defendant wanted to bomb a police car); *United States v. Siraj*, 2008 WL 2675826 (2d Cir. July 9, 2008) (affirming admission of extremist videos); *United States v. Higham*, 98 F.3d 285, 291 (7th Cir. 1996) (affirming admission of defendant's threat to 'blow a hole through" a victim); *United States v. Mahon*, No. 2010 WL 4038763, at *11 (D. Ariz. Oct. 14, 2010) (admitting evidence of the defendant's allegiance to violent white supremacist groups), *aff'd*, 793 F.3d 1115 (9th Cir. 2011).

> **B.** **Evidence of Young's Prior Transfer of Funds**
> **Overseas in Furtherance of Unlawful Conduct**

Exhibit 11 consists of documents seized from Young's residence in August 2016 that establish that, long before he met a government agent, he transmitted money overseas under fake names or from a fake address. GX 10-802 is a Western Union receipt from October 21, 2005, reflecting the transfer of $450 to Zdravko Stefanov Daskalov ("Zdravko") in Bulgaria, by Nicholas Young. The Western Union document reflects that, on that occasion, Young specified on the form his actual name and address.

GX 10-801 is another Western Union receipt, from October 30, 2008, reflecting the transfer of $380 by Young to Zdravko.  This document reflects that, this time, Young specified as his address as the fictional address of 11881 "Hellbreak" Avenue in Fairfax, Virginia.  GX 10-803 is a third Western Union receipt, from August 15, 2013, reflecting the transfer of $812 to Zdravko by "Simon Belmont."  GX 10-804 is an email, dated May 12, 2004, from Zdravko to "Rudolph Van Waldron," regarding a shipment of drugs for $134.

The relevance of these exhibits is not that they show that Young purchased illegal drugs (we make no claim about the legality of the purchases).  Their relevance, instead, is that, long before Young met any government agent, he used fake names and a fake address to transmit money overseas in the course of transactions about which he did not want the government to know.  Indeed, his transmittal of funds under fake names or from a fake address between 2008 and 2014 is admissible evidence of his predisposition to send money to ISIS through the Threema Application ("the Threema App") in 2016.  To the extent that this evidence is "prejudicial" because it involved the purchase of drugs, any risk of prejudice could be mitigated by a limiting instruction.

C.  Evidence of Possession and Dissemination of ISIS and Al Qaeda Propaganda

The videos and images of ISIS and al-Qaeda propaganda that Young possessed are central evidence of Young's predisposition to support ISIS.  In addition to evidence of videos and images seized from his residence and computer media, testimony at trial will establish that, in 2014, Young showed Mo an extremist video, and that in May 2015, Young linked a jihadi video ("Screw Infidels") to his Facebook page.  Such evidence is admissible to show Young's intent.  *United States v. Hassan*, 742 F.3d 104, 142 (4th Cir. 2014) (in a terrorism prosecution

not involving entrapment, evidence posted by defendant Yaghi on Facebook promoting his radical and violent jihadist beliefs supported his conspiracy convictions).

As the Fourth Circuit wrote in *Hassan,* "Hassan's nefarious intentions were substantiated when, in January 2009, he instructed his paramour to remove his postings on his Facebook page as well as postings on 'Muslim Gangsta For Life,' which endorsed his radical ideology."  The "Screw Infidels" video that Young posted on his Facebook page is analogous to the "Muslim Gangsta for Life" posts that Hassan posted on his own Facebook page.  *Id*. at 145.

Given Young's entrapment defense, the ISIS and al-Qaeda videos and images that he possessed are indisputably relevant.  *See United States v. Mehanna*, 735 F.3d 32, 62 (1st Cir. 2013) ("[T]he government's case depended on proving that the defendant's actions emanated from views that, over time, had aligned with al-Qa'ida's.  The media that he consumed en route to forming those views is a salient part of the story."); *United States v. Siraj*, No. 07–0224–CR, 2008 WL 2675826, at *2 (2d Cir. July 9, 2008) ("testimony regarding a videotape Matin had given to the cooperating witness . . . was relevant to the question of inducement because it showed that Matin was already well acquainted with the type of violent and graphic material he claims the cooperating witness used to entrap him").  Young does not suggest otherwise, and claims solely that the videos and images are unduly prejudicial and that written descriptions suffice.  The law is to the contrary.

For example, in *United States v. Mohamud*, 843 F.3d 420, 434 (9th Cir. 2016), the Ninth Circuit agreed that, to rebut an entrapment defense, the government was entitled to introduce evidence that the defendant supported Osama Bin Laden and the September 11 attacks, and possessed a magazine aimed at American jihadists.  In *United States v. El-Mezain*, 664 F.3d 467, 509-11 (5th Cir. 2011), the Fifth Circuit agreed that, to rebut the defendants' denial that they

21

supported Hamas, the government was entitled to introduce evidence seized from the defendants' offices, including images of violence and videos glorifying Hamas and depicting Hamas leaders. *Id.* at 509–11.[14]

Similarly, in Young's case, evidence of ISIS videos serves a vital purpose: to rebut his claim that he was not predisposed to support ISIS. As the court in *El-Mezain* concluded, the high probative value of this evidence outweighs the risk of undue prejudice to Young.[15]

Young cites *United States v. Abu-Jihaad*, 553 F. Supp. 2d 121, 128 (D. Conn. 2008), as a decision "excluding mujahideen fighting videos insofar as they contained extreme violence, bloody bodies and mutilation." Def. Memo at 43. *Abu-Jihaad* is not an entrapment case, but Young's characterization of it is misleading anyway. There, the court *admitted* videos depicting "fighting between the mujahideen and Russian troops, replete with numerous explosions, shootings, and dead soldiers as well as Muslim fighters," and "glorify[ing] martyrdom and also the killing of non-believers." *Abu-Jihaad,* 553 F. Supp. 2d at 128. While the court did direct the government to edit the videos to remove some particularly gruesome images, it held that "it is difficult—if not impossible—for the Government to give the jury an accurate sense of the nature

---

[14] Like Young, the defendants in El-Mezain engaged in terrorist *financing* but not terrorist violence themselves. "Although this case relates to terrorism, it does not involve charges of specific terrorist acts. Instead, it focuses on the defendants' financial support for terrorism and terrorist ideology." *El-Mezain,* 664 F.3d at 483.

[15] In so holding, the El-Mezain court rejected the defendants' undue prejudice objections, which relied on *United States v. Al–Moayad*, 545 F.3d 139 (2d Cir. 2008) - - a case that Young also cites. In *Al–Moayad*, the court held that testimony from a victim of a Hamas bomb attack on a bus and images of the aftermath of the attack were not admissible under Rule 403. The court reached that ruling because the government offered this evidence to show the defendants' knowledge that Hamas engaged in terrorist activity, even though the defendants never denied such knowledge. 545 F.3d at 160. In Young's case, however, the issue in this case is not whether he knew that ISIS engaged in terrorist activity - - because he indisputably did - - but whether he *supported* such activity.

22

of these videos without playing for the jury some of the violent and graphic portions of the videos.  Otherwise, the jury would have an inaccurate sense of their content." *Id.*

On appeal, the Second Circuit upheld the admission of the videos, holding that "[a]lthough these excerpts included depictions of violence, as was necessary not to distort the sense of the films as a whole, the depictions were limited and, as the district court accurately observed, less gruesome than many seen on nightly news dispatches from Baghdad." *United States v. Abu-Jihaad*, 630 F.3d 102, 133–34 (2d Cir. 2010) (also holding that extremist material from websites the defendant visited was properly admitted).  *Accord United States v. Pugh,* 162 F. Supp. 3d 97, 117–18 (E.D.N.Y. 2016) (in a non-entrapment case, admitting edited videos of ISIS executioners, because the "nature and content" of the videos spoke strongly to the defendant's "state of mind").  Given this precedent and the fact that Young has elected to pursue an entrapment defense, the ISIS and al-Qaeda videos and images are properly admitted to show Young's predisposition.

    D.   Evidence of Young's Possession of Islamic Nasheeds and White-Power Music

Young argues that the government should be precluded from playing his music on grounds of relevance and prejudice.  He suggests that, at most, the relevance of the music would lie in the fact that he possessed it.  Young's Br. at 24.  We plan to introduce evidence that Young possessed certain music, but do not seek to play any.  Exhibit 12 contains GX 10-304, a photo of Young's iPod, which reflects that, among Young's music selections, were "ISIS Techno Remix" and "Jihad Nasheed."  That evidence surely is probative of his predisposition. *See* , *e.g.*, *United States v. Magleby*, 241 F.3d 1306, 1319 (10th Cir. 2001) (finding that probative value of racist song lyrics on white supremacist CD owned by the defendant outweighed prejudicial effect and were properly admitted in civil rights case because defendant's state of mind was at issue).

E.   Young's Statement of Desire to Join ISIS in Order to Obtain a Slave

Young seeks to bar evidence of his desire to acquire a slave.  That evidence is admissible because, troubling as it may be, the prospect of obtaining a slave was one of Young's motivations for supporting ISIS.  *See United States v. Mostafa*, 16 F.Supp.3d 236, 258, 268 (S.D.N.Y. 2014) (evidence that the defendant justified enslaving captives was admissible even in a case *not* involving entrapment).  As the court found in *Mostafa*, Young's own statement is admissible because it is "no more prejudicial than that with which he has already been charged." *Id.* at 258.  By claiming entrapment, Young placed his intent at issue, and his own statements are admissible to prove his intent.

In addition to showing Young's predisposition, the evidence of Young's desire to acquire a slave is admissible because it is inextricably intertwined with evidence of other communications that Young had with Mo.[16]  As the Fourth Circuit has explained, "evidence of uncharged other acts is intrinsic and not subject to Rule 404 if the acts arose out of the same series of transactions as the charged offense or if the evidence of the uncharged conduct is necessary to complete the story of the crime on trial." *United States v. Day*, 700 F.3d 713 (4th Cir. 2012).  Such evidence is *direct* evidence of a crime.

Much of the evidence to which Young objects is inextricably intertwined with the evidence of the offenses charged against him.  For example, Exhibit 13 reflects that Young used the Threema App on July 30, 2016, to tell Mo about Young's desire to acquire a slave[17] - - and

---

[16]   More precisely, the evidence of Young's desire to acquire a slave is admissible because it is inextricably linked with evidence of other communications that Young had with the accounts that were controlled by the FBI - - but which Young *thought* were controlled by Mo.

[17]   "To be honest, I would like to buy a slave. . seriously, lol, but I heard the supply is low. . inshallah a large crop of Alawi women will fall into the hands of the mujahideen."

then immediately wrote that the local mosques were "corrupt" because they preached that "the jihad is within ourselves, jihad of the pen, blah blah blah, the usual emotional stuff, zero evidence." Young's derogation of the local mosques as "corrupt" because they did not interpret "jihad" necessarily to entail violence surely is probative of his predisposition to support ISIS - - but that derogation exists on the same screen shot that contains the statements that he made about desiring a slave in the same message. Further, as seen in Exhibit 10, GX 8-504, under the identity of "Dusselkamp," Young posted on Liveleak in December 2014, his agreement that mujahideen were authorized to take "wives" from among their captives. Regardless of how disturbing they are, Young's relevant statements about slaves simply cannot be disentangled from his other relevant statements, and are intrinsic to the case against him.

   F. <u>Young's Statement of Desire to Kidnap and Torture an FBI Agent</u>

   Young challenges the admission of his statements to Khalil that he wanted to kidnap and sexually torture a female FBI special agent who previously interviewed him. These statements evidence his intent and are probative of predisposition.

   In addition to proving Young's predisposition, this evidence is relevant for several related reasons. First, Young asserts that this prosecution is the continuation of an unfair focus on him that started in 2011 - - but Khalil's report to the FBI regarding Young's stated desire to kidnap an FBI agent was (not surprisingly) a factor in triggering that focus; to the extent that Young argues that the focus on him was unfair, we must be permitted to provide the context for that focus.

   Second, in light of Young's claim of entrapment, Khalil's credibility is at stake. Khalil's credibility is enhanced, however, by the fact that the FBI found on Young's computer a photograph of the agent that (Khalil reported that) Young said that he wanted to kidnap. Third,

Young's musings about kidnapping and sexually torturing the agent is akin to his musings about attacking FBI generally, and corroborates other testimony on that point.

Statements of defendants' desire to attack law enforcement are routinely admitted to prove their predisposition.  *See*, *e.g.*, *United States v. Cromitie*, 727 F.3d 194, 212-13 (2d Cir. 2013) (holding that defendant's statement, "I would actually like to put a fucking bomb in the back of a cop car while he's sitting in the motherfucker and watch him just explode, I would be the most happiest person in the world," was properly admitted to prove predisposition in case where defendant claimed entrapment.  *See also United States v. Hassan*, 742 F.3d 104, 143 (4th Cir. 2014) (in a terrorism prosecution not involving entrapment, discussions regarding the kidnapping of a Marine officer supported the defendant's terrorism conspiracy conviction); *Mostafa*, 16 F. Supp. 3d at 267, admitting defendant's statements evincing a desire to kidnap non-Muslims).  Because Young's statements to Khalil about kidnapping an FBI agent has significant probative value, it should admitted to establish predisposition.

> G.   Evidence of Prior Statements About Attacking Law Enforcement, Violence Against Informants, Firearms Training, and Counter-Surveillance Measures

Young also moves to exclude several instances of his statements and conduct which are relevant and should be admitted to prove his predisposition.  These include:

a) Suggesting that he and Khalil pour gasoline on FBI cars and light them;

b) Recounting to Khalil how Young aimed a rifle out of the window of his residence while scanning for law enforcement;

c) Telling Khalil that someone with Young's skills could attack the FBI; and

d) Describing to Khalil a method by which Young could smuggle weapons into the Alexandria Federal Courthouse so that they could be passed to confederates undetected.

All properly should be admitted as evidence of predisposition.  *Cromitie*, 727 F.3d at 212-13 (statements of desire to bomb police car, airport, and synagogue were proper evidence of predisposition); *United States v. Hassan*, 742 F.3d 104, 143 (4th Cir. 2014) (in a terrorism prosecution not involving entrapment, discussions regarding how a person could easily gain entry into an American military facility as a truck driver supported defendant's conviction).

Prior threats of violence - - such as Young's statement to Khalil that, if he ever were betrayed by someone, that person's life expectancy would be greatly diminished - - also properly should be admitted to show predisposition.  *See, e.g., United States v. Higham*, 98 F.3d 285, 291 (7th Cir. 1996) (upholding admission of evidence of defendant "putting gun in the side of a man and threatening to 'blow a hole through [him]'" to prove predisposition in prosecution of defendant for hiring someone to commit murder for him).

Finally, Young's consciousness of government surveillance - - such as Young's statement that he was wary of government surveillance, his aiming an AK-47 style rifle out of the window of his residence while scanning for law enforcement, and his possession of disposable cell phones - - also is properly admissible to show his predisposition.  *See, e.g., United States v. Ham*, 944 F.2d 902 *2 (4th Cir. 1991) (Table) (upholding admission of evidence to prove predisposition that defendant's residence was found stocked with attack dogs, five firearms, and a surveillance camera); *United States v. Gonzalez*, 19 F.3d 1169, 1173 (7th Cir. 1994) (citing, as evidence of predisposition, defendant's detection of government surveillance).[18]

---

[18]  With respect to additional items listed by Young in his motion, animal abuse and a traffic ticket were part of conversations that Young had with Khalil.  To refute allegations that Khalil entrapped him, Khalil should be able to testify as to all of their conversations.  That being said, we do not plan to introduce the ticket itself in our case-in-chief.  With respect to sexual preference, we do not plan to present evidence on that topic (aside from possibly presenting testimony on other subjects from witnesses who were Young's ex-girlfriends).

<u>Conclusion</u>

"[I]if the defendant seeks acquittal by reason of entrapment he cannot complain of an appropriate and searching inquiry into his own conduct and predisposition as bearing upon that issue.  If in consequence he suffers a disadvantage, he has brought it upon himself by reason of the nature of the defense."  *Sorrells v. United States,* 287 U.S. 435, 451 (1932), *quoted in United States v. McLaurin*, 764 F.3d 372, 381 (4th Cir. 2014).  Evidence of Young's predisposition to support terrorism is, therefore, admissible to rebut his own claim that his desire to support ISIS was implanted in him by the government.

For the foregoing reasons, Young's motion in limine should be denied.

Respectfully submitted,

Dana J. Boente
United States Attorney

By:        _____/s/_____
Evan N. Turgeon
Special Assistant United States Attorney

Gordon D. Kromberg
Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: (703) 299-3700
Fax: (703) 299-3981
Email: gordon.kromberg@usdoj.gov

<u>Certificate of Service</u>

I hereby certify that on October 10, I electronically filed the foregoing

GOVERNMENT'S OPPOSITION TO OMNIBUS MOTION IN LIMINE with the Clerk of

Court using the CM/ECF system, which will send a notification of such filing (NEF) to counsel

of record.

_____/s/_____
Gordon D. Kromberg
Assistant United States Attorney
Virginia Bar No. 33676
Assistant United States Attorney
Attorney for the United States
2100 Jamieson Avenue
Alexandria, VA  22314
(703) 299-3700
(703) 837.8242 (fax)
gordon.kromberg@usdoj.gov
