**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br> Plaintiff,<br><br>v.<br><br>NICHOLAS YOUNG,<br> Defendant. | )<br>)<br>)<br>)<br>)<br>) Case No.: 16cr265 (LMB)<br>)<br>) |

**REPLY IN SUPPORT OF DEFENDANT NICHOLAS YOUNG'S OMNIBUS MOTION**
***IN LIMINE***

Defendant Nicholas Young is charged with giving gift cards, valued at $245, to an undercover informant who pretended to join the Islamic State in Syria ("ISIS"). If true, this would constitute an attempted violation of 18 U.S.C. § 2339B – as would a gift of one dollar– since the statute does not contain a *de minimis* exception. The gift cards capped an undercover investigation into Mr. Young that began in 2010 or earlier, some six years before he was arrested in this case.[1] ISIS, the foreign terrorist organization at issue, came into existence sometime in 2014 – or about four years after the terrorism investigation began.

Before pleading with his friend for the gift cards in July 2016, the informant had cultivated Mr. Young's friendship for two years. Mr. Young had other friends too. Years before his informant-friend encouraged him to commit the charged crime, the government arranged Mr. Young's friendship with a separate undercover agent. As with the informant who would follow, the government agent egged on radical viewpoints and extreme opinions in Mr. Young.

---

[1] The government argues this is not just a gift card case, since it has charged obstruction of justice for attempts to "mislead the FBI in December 2015 about his contacts with Mo [the undercover informant]." Opp. at 1. It could not charge a false statement under 18 U.S.C. § 1001 as there is no argument for the materiality of a statement concerning a fictitious investigation into a fictitious identity created by investigators. That problem is not solved via the expedient of pleading a violation of 18 U.S.C. § 1512, which requires the obstruction of an "official proceeding," not a fictitious governmental investigation into its own informant. *See*, *e.g.*, *United States v. Gary Ermoian*, 727 F.3d 894, 911 (9th Cir. 2013) (holding that a criminal investigation, much less a fictitious one, is not an "official proceeding" under § 1512). This issue will be briefed at the appropriate time.

1

That was then.  Today the government cites evidence of the radicalism encouraged by its informants and agents to contest the sad reality that, left alone by the government, Mr. Young would not have sent gift cards to a Middle Eastern country where he has never traveled and to a terrorist group with whose members he has never communicated.  To date, the government has offered no evidence that the real-life terrorist group does in fact send requests to Virginians, or Americans generally, for petty contributions such as gift cards.   It will never offer that evidence.

A six-year investigation yielding $245 gift cards given to an informant-friend does not necessarily square with the public's expectations in a terrorism prosecution.  That is why about half or more of the government's proposed exhibits do not concern extremist Islamism or even the Middle East, but instead highly inflammatory and irrelevant Nazi/white supremacist materials and lawfully owned firearms and related objects unconnected to the charged conduct.  The government's opposition to Mr. Young's motion *in limine*: fails to cite a single terrorism case precedent permitting the use of Nazi and/or white supremacist evidence, relying instead on a makeweight expert opinion that does not withstand basic *Daubert* scrutiny because its method is litigation-driven; makes no attempt to connect any of the firearms or other military objects to the charged conduct or entrapment predisposition standard; and offers no argument for why the jury should be shown gruesome images when the defendant's knowledge that ISIS creates such media is not contested.

### A.      Mr. Young Does Not Seek To Have His Cake and Eat It Too

The government argues that, in raising an entrapment defense, Mr. Young "puts his mindset at issue by claiming entrapment, but simultaneously claims that the government's evidence of his mindset should be barred as prejudicial." Opp. at 2.[2]  It cites pages of case law

---

[2] "Opp." refers to "Government's Opposition to Defendant's Omnibus Motion in Limine," ECF 127.

for the (uncontroverted) proposition that character evidence may sometimes be admissible in an entrapment case. *Id.* at 3-5. As the government knows, Mr. Young has never made that argument. He acknowledges that certain types of character evidence, ordinarily barred under Rule 404(b), are admissible where a defendant raises an entrapment defense. He argues, instead, that the specific categories of evidence outlined in his motion *in limine* – particularly Nazi/white supremacist items, lawfully owned firearms, and military objects unconnected to charged conduct – do not satisfy Rule 401 relevance or Rule 403 probative value/unfair prejudice balancing even in the entrapment case context. Those categories of evidence neither prove the charged conduct nor establish a predisposition to commit the crime of material support for a radical Islamist terrorist group. Mot. at 7-24.[3]

To create space for its Nazi/white supremacist-themed evidence and the firearms/military objects, the government inaccurately represents what constitutes valid predisposition evidence in a terrorism case. It contends that "the relevant prior design to commit the crime or similar crimes need be only a rather generalized idea or intent to inflict harm on interests of the United States." Opp. at 5 (citing *United States v. Cromitie*, 727 F.3d 194, 207 (2d Cir. 2013)). *Cromitie* was not so sweeping. The panel majority used the intent-to-inflict-harm-on-interests-of-the-United-States predisposition formulation by way of rejecting the dissent's far more narrowly defined standard: a predisposition to "bomb specific targets." *Cromitie*, 727 F.3d at 207-208. Stated in less abbreviated form, the majority held that the relevant predisposition in a terrorism case is:

> to have a state of mind that inclines [one] to inflict harm on the United States, be willing to die like a martyr, be receptive to a recruiter's presentation, whether over the course of a week or several months, of the specifics on an operational plan, and welcome an invitation to participate.

[3] "Mot." refers to "Memorandum in Support of Defendant Nicholas Young's Omnibus Motion in Limine," ECF 117-1.

3

*Id.*

The predisposition evidence in *Cromitie*: announcing an intention to join a terrorist organization in Pakistan; expressing an interest in buying guns and missiles from a militant Islamist; after the informant states "let's pick a target," suggesting "Stewart Airport"; commenting that "it doesn't matter to me what they do to me after I kill President Bush." 727 F.3d at 212-213. The common thread is a link to radical Islamist-inspired violence. None of the *Cromitie* predisposition evidence remotely resembles the government's Nazi/white supremacist evidence, whose only articulable link to Islamist-inspired violence is the notion of a sterile radicalism emptied of underlying values and ideas.[4] The predisposition standard is in this Circuit is mercifully uncomplicated: the question is whether the defendant was "predisposed to commit *the* crime," *United States v. Sligh*, 142 F.3d 761, 762 (4th Cir. 1998) (emphasis added); *see also United States v. Jones*, 976 F.2d 176, 179 (4th Cir. 1992) (same). The government may credibly argue, for predisposition purposes, the crime here cannot be so narrow as material support for the Islamic State. It cannot credibly argue that the crime is something broader than material support for Islamist-inspired terrorism, because the crime is material support for a

---

[4] The government also cites a Fourth Circuit decision for the proposition that "predisposition is not limited only to crimes specifically contemplated by the defendant prior to government suggestion." Opp. at 5 (quoting *United States v. Hackley*, 662 F.3d 671, 682 (4th Cir. 2011)). Unfortunately, that much-cited quotation is vague to the point of meaninglessness. In any case, to the extent the government suggests this standard implies it may satisfy its predisposition burden in an Islamist-inspired terrorism case by adducing Mr. Young's predisposition to commit a non-Islamist extremism crime (such as a hate crime), it is wrong. The *Hackley* rule cited by the government was itself a quote drawn from a previous Fourth Circuit decision. *Hackley*, 62 F.3d at 682 (quoting *United States v. Ramos*, 462 F.3d 329, 334-335 (4th Cir. 2006)). Yet the meaning of the quoted standard is no clearer in *Ramos*. After announcing that "predisposition is not limited only to crimes specifically contemplated by the defendant prior to government suggestion," 462 F.3d at 334-335, the Fourth Circuit in *Ramos* determined that "the evidence presented at trial demonstrat[ed] that the government did not induce [the defendant] to [commit the criminal] act." *Id.* at 335. But the entrapment element of inducement is distinct from the element of predisposition, *United States v. Daniel*, 3 F.3d 775, 778 (4th Cir. 1993), so it appears the *Ramos* court was improperly weaving an inducement concept into its predisposition analysis. *Ramos*, 462 F.3d at 335.

Foreign Terrorist Organization, virtually all of which since September 11, 2001, are connected to militant Islamism (and not Nazism or white supremacism).[5]

### B.      Firearms, Body Armor and Other Military Objects

After listing the quantity of firearms, ammunition and body armor found in Mr. Young's home, the government flatly states, "possession of such an arsenal is surely probative of a predisposition to support terrorists." Opp. at 7.  This statement is not an argument; it is a bare legal conclusion.

Mr. Young's motion in *limine* argued the government has never alleged any intent or plan or conspiracy on his part to commit or aid violent acts.  And while the government's initial complaint in this case alleged Mr. Young made violent comments five years before he was arrested for the gift cards, that protected speech is indisputably not charged conduct in this case. Furthermore, all of the firearms owned by Mr. Young were lawfully acquired and the majority of them purchased before Mr. Young converted to Islam in 2006 and thus before he was in a position to become a radical jihadist.  The government has disputed none of these facts despite being given many opportunities to do so.  No precedent cited by the government stands for the proposition that lawfully owned weapons, whatever the quantity, are *ipso facto* "probative of a predisposition to support terrorists." Opp. at 7.  The government cites two cases.  In *United States v. Lampley*, it was not firearm ownership *per se* that was proof of a predisposition to enter a conspiracy to bomb buildings, but the carrying of guns "*during and in relation to the conspiracy.*" 127 F.3d 1231, 1243 (10th Cir. 1997) (emphasis added).  Here, the government does not allege any firearms or weapons use "during and in relation to" the charged gift card conduct.

---

[5] See Foreign Terrorist Organizations, U.S. Dep't of State, available at
http://www.state.gov/j/ct/rls/other/des/123085.htm.

The government argues that "possession of that arsenal is admissible to establish simply a motive to support terrorists regardless of any entrapment defense." Opp. at 7.  For this proposition it cites *United States v. Hassan*, 742 F.3d 103, 143 (4th Cir. 2014).   In fact, *Hassan* has nothing to say at all about establishing motive through weapons stockpiling evidence. Instead, in the section of the decision cited by the government, the court holds that evidence of the terrorism conspiracy lay in the fact that one defendant was "stockpiling weapons and surrounding himself with like-minded [violent jihadists]" who viewed killing non-Muslims as a prescribed obligation.  *Hassan*, 742 F.3d at 144.  The decision does not say whether the defendant stockpiled weapons at the same time he surrounded himself with violent jihadists, or, as here, acquired firearms before he was even a Muslim and was familiar with no jihadists at all. The chronological distinction is critical.  The government does not even address it.

Wherever one's public policy views on gun ownership lie, there is no disputing that the government's argument – ownership of a firearms collection *ipso facto* "surely is probative of a predisposition to support terrorists," Opp. at 7 – has enormous and unintended implications.  It cannot be denied that the government's description of Mr. Young's firearms collection is scary, particularly in light of recent events.  And yet an estimated 7.7 million Americans, roughly the population size of New York City, own between eight and 140 guns each.[6]  An estimated 55 million Americans own guns.[7] The government's position that "such [] arsenal[s] surely [are] probative of a predisposition to support terrorists" – even when not connected to charged conduct – would seem to prove too much by many factors.  The government just doesn't go there.

---

[6] *See 3% of Americans own half the country's 265 million guns*, USA Today, available at http://www.usatoday.com/story/news/2016/09/22/study-guns-owners-violence/90858752/.

[7] *Id.*

Finally, the government makes a handful of arguments as to why specific weapons/military objects are relevant and satisfy Rule 403 probative value/unfair prejudice balancing. Opp. at 7. The only point remotely pertaining to radical Islamist-inspired terrorism is "weapons that also appear[] in photos of Young wearing traditional Arab or Muslim garb." *Id.* Even if the Court were inclined to permit those photos, it should not include Nazi/white supremacist-themed weapons because Nazi/white supremacist materials hold no relevance in this case, much less a probative value that outweighs the enormous unfair prejudice.[8]

### C.     Nazi/White Supremacist Evidence and Dr. Daveed Gartenstein-Ross

Although its brief devotes nearly half its pages to Nazism, the government's opposition fails to cite a single terrorism case precedent permitting the use of Nazi and/or white supremacist evidence under Rules 401 and 403. Opp. at 8-19. It does not address any of the cultural, ideological, historical distinctions drawn in Mr. Young's motion between Nazism and ISIS. Instead, the government cites the 39-page opinion of an author named Dr. Daveed Gartenstein-Ross– the government declines to characterize Gartenstein-Ross as an expert witness, but this is the implication – and then takes a breathless tour through every piece of highly prejudicial Nazi/white supremacist evidence without stopping much to make legal arguments.

### 1.     Dr. Daveed Gartenstein-Ross

Exhibit 1 to the government's opposition is a document bearing the title "Report on the Relationship between Affinity for Nazism and Inclination to Support Militant Islamist Groups –

---

[8] And even if the Court were to find Nazi/white supremacist materials generally relevant and with a probative value that is not substantially outweighed by unfair prejudice, these weapons should be excluded because they are cumulative of the dozens of other non-weapon Nazi/white supremacist evidence.

The government's position that it "cannot address all the reasons for the admissibility of each [weapon] in the space of this one pleading," has it backwards. The government cannot explain why *any* firearm or other military object is relevant given its failure to allege their connection to any of the charged conduct. Nothing specific about any given weapon overcomes that obvious failure, even if there's another knife under the couch with a Nazi eagle.

United States v. Nicholas Young" (the "Report").  Dr. Gartenstein-Ross is its author.  Exh. 1, at

1.[9]  The government does not expressly describe him as an expert witness, but the Report is

offered as an expert opinion on the Nazism-ISIS connection the government yearns to establish.

Because the defense has had no prior notice of Gartenstein-Ross or his Report, Mr. Young has

had no opportunity to challenge his opinion under Rules 702, 703 and 705 of the Federal Rules

of Evidence, even though the Report was commissioned in February 2017.  Exh. 1, at 10.   For

that reason alone, the Report should be disregarded for purposes of the motion *in limine*.

But even if the Court were not inclined to give the defense a full opportunity to brief the

admissibility of this expert opinion, the Rule 702 failings are evident on the face of the Report.

It is not close.  Dr. Gartenstein-Ross reports he is the Chief Executive Officer of a company

called Valens Global, "a private commercial entity that focuses on the challenges posed by

VNSAs." Exh. 1, at 1.  By "VNSAs," Dr. Gartenstein-Ross means "violent non-state actors

(VNSAs)," which he has "around twenty years of professional experience and educational study

examining." *Id.*  Dr. Gartenstein-Ross cites four bullet-pointed instances where he has been

"court-certified to serve as an expert witness on terrorism and Islamist militant groups." *Id.* at 4.

Three of the bullets are immigration court matters, and the fourth is a case called *Foley v. Syrian

Arab Republic* (D.D.C. 2017).  *Id.*  A PACER search for that Washington D.C. case, performed

on the evening of October 10, 2017, turned up matter number 11-cv-699, and yielded one hit for

a keyword search of Dr. Gartenstein-Ross's name: a minute entry indicating a liability hearing

was held in November 2016, during which one of Plaintiff's witnesses is listed as Dr.

Gartenstein-Ross (one assumes the same Gartenstein-Ross).  It is not clear from the minute entry

---

[9] The Report states that the U.S. Attorney's Office in the Eastern District of Virginia asked Dr. Gartenstein-Ross to provide his analysis in February 2017.  Exh. 1, at 10.  The defense had never received the Report until the opposition was filed to the motion *in limine*.

whether Dr. Gartenstein-Ross was certified by the court to serve as an expert witness on terrorism and Islamist militant groups, but there appears to be no publicly filed expert report or opinion on file or Rule 702 briefing.

Dr. Gartenstein-Ross's CV includes hundreds of books, monographs, articles, and speeches on Islamist militancy.  Exh. 1, at 4-7.  However, although the subject of the Report is the putative links between Nazism and militant Islam, Dr. Gartenstein-Ross's writings on the subject of the "militant white separatist and neo-Nazi movement" appear to consist of two "technical publications," and two popular press articles, one a *Weekly Standard* article entitled "The Peculiar Alliance," dated 2005, the other a review of a "seminal book *The Enemy of my Enemy*" by an author called George Michael, published in 2006.  Exh. 1, at 7.  Much of the Report's ISIS/Nazi compare-and-contrast is an amalgam of the *Weekly Standard* article (2005)[10] and analysis drawn from *The Enemy of my Enemy* book (2006), that is, of publications dated eight to nine years before the emergence of the FTO at issue in this case.  Exh. 1, at 23-39.

The Report's conclusions are: (1) "the mechanisms of radicalization that can attract an individual to neo-Nazism and to militant Islam are highly similar"; (2) "there are numerous salient case studies of convergence between Nazi or neo-Nazi ideology and militant Islamism in individuals that bear out the relationship between pro-Nazi beliefs and proclivity to support militant Islamists.  This convergence also has historical precedents"; (3) "when individuals have been attracted to or immersed in neo-Nazism, and then converted to Islam, they most frequently

---

[10] The Peculiar Alliance, The Weekly Standard, available at http://www.weeklystandard.com/the-peculiar-alliance/article/7210.  The to-be-sure paragraph: "Such an alliance seems unlikely on its face; after all, neo-Nazis view most Muslims as racially inferior, while Islamic extremists believe that neo-Nazis are just another flavor of infidel." And here, nine years later, is Dr. Gartenstein-Ross's Report on Nicholas Young: "It may seem counterintuitive or surprising that there would be areas of convergence between Nazism and Islamist militancy, or that both ideologies might appeal to the same person.  After all, a committed Nazi would view many Muslims as racially suspect, while Islamist militants tend to view 'infidels' as a whole as their adversaries." Exh 1, at 18.

dive right into the extremist end of the diverse spectrum of Islamic practice, rather than showing interest in more moderate expressions of faith." Exh 1, at 10.

The Report fails Rule 702 analysis because these "conclusions" (number 2 appears to be a premise) are not "the product of reliable principles and methods"; the expert has not "reliably applied the principles and methods to the facts of the case"; and the testimony is "based on [in]sufficient facts or data." Fed. R. Evid. 702. First, it is not clear how the Report reaches its conclusions from its methods. Its argument sections run as follows.

*Radical ideology.* "Several studies" have shown that "radical ideology" is an "important vehicle driving extremist violence." Exh 1, p. 11. Much of this discussion appears to concern "radical ideology" generally, as distinguished from the values and content giving substance to particular examples of radical ideologies. *Id.* Of the studies cited, only one appears to draw connections between militant Islam and "far-right ideologies" (such as Nazism), the Michael Jensen and Gary LaFree study entitled *Final Report: Empirical Assessment of Domestic Radicalization* (the "EADR"). Exh. 1, at 13. The Report cites one specific passage in this connection from the EADR: "Regardless of how we model the relationship between ideology and extremist behaviors, far right and Islamist ideologies appear to have a significant and positive relationship to violence." Exh. 1, at 13 (quoting Jensen and LaFree, *Final Report: Empirical Assessment of Domestic Radicalization (EADR)* (College Park, Md.: University of Maryland, 2016)).[11] This quote from the EADR appears to lend support to the Report's three aforementioned conclusions.

---

[11] The defense urges the Court to review the Jensen and LaFree study, apparently relied on by Gartenstein-Ross, which is available at https://www.ncjrs.gov/pdffiles1/nij/grants/250481.pdf. It is far more effective than the defense's efforts in drawing fine, data-driven distinctions between militant Islam and far-right ideology.

However, one is troubled to find that this quote runs quite contrary to many other seemingly antithetical conclusions in the EADR.  Here are other assessments from the same study, which Dr. Gartenstein-Ross appears to have omitted from the Report, or failed to consider:

- "Extent research has failed to rigorously compare Islamist, far right, far left, and other extremist movements *despite prima facie indications that there are important differences in the radicalization causes and processes for individuals who act across these milieus*," EADR, at 15 (emphasis added);

- "On average, individuals on the far right and those motivated by a single issue tend to be significantly older at their date of public exposure than their far left or Islamist counterparts," *id.*;

- "The education levels of extremists vary considerably when compared across ideological groups.   [O]ur data show that individuals on the far right are less educated than other groups, with only 25.4% of valid cases holding a college degree or higher compared to the sample average of 43.3%.... Islamist extremists are near the average, with 41% holding a college degree or higher," *id.*, at 17;

- "By a large margin, Islamist extremists had the highest numbers of first and second generation immigrants, making up 80% and 55% of all immigrants in the dataset in those categories, respectively. Individuals classified as far right have the lowest levels of first or second generation immigrant status, at 1.3% overall," *id.*, at 18;

- "Far right extremists also show a relatively high rate of involvement in formal extremist groups at 58.6%, but were also often associated with informal extremist groups—a classification of organization with less leadership structure or defined roles, and includes groups often referred to as 'cells' and small, informal militias. Individuals described as Islamists and single issue had the lowest rate of group membership overall, with 23.1% and 18.2% acting without any known group affiliation, respectively," *id.*, at 18.

Indeed, in a section of the EADR entitled "Implications for Criminal Justice Policy in the United States," Jensen and LaFree conclude that "The [EADR's] analyses of these questions show that there is no 'one-size-fits-all' model of radicalization." EADR, at 74.  The authors add:

11

"*Significant differences in background characteristics, group affiliations, and radicalization processes exist across ideological milieus*." *Id* (emphasis added). After all, among other differences, "[w]hile the radicalization of individuals on the far left and those motivated by Salafi jihadist ideologies tends to occur in early adulthood, individuals on the far right and those who are motivated by single-issues often radicalize later in life." *Id.* Given these conclusions, it is suspect that Gartenstein-Ross cherry picks from the EADR in support of seemingly prefabricated conclusions. This outcome-driven research certainly casts a cloud over the rest of the analysis.

*Political Grievance*. This argument section appears to draw some sort of distinction between "radical ideology" and "political grievance," though the definitional metes and bounds remain fuzzy. It appears the only part relating to ISIS/Nazis is the line that "both militant Islamist and neo-Nazi movements feature ideological true believers, as well as those whose involvement in the movement is driven more by individual or group experience." Exh. 1, at 15. A little of both – for both groups? Don't many political and civil society groups and institutions feature "ideological true believers"? Does that mean Gartenstein-Ross's conclusion should be expanded from Nazi/ISIS to every ideologue?

*The Particular Role of Hate Speech*. "Hateful messages are a staple of extremist ideologies." Exh. 1., at 16. Again, as with such generic, value-emptied concepts as "radical ideology" and "political grievance," the concept of hateful speech and action does not draw ISIS and the Nazis any closer together than ISIS and PETA, or Nazis and the Weathermen. Gartenstein-Ross sees *dehumanization* as the connecting tissue. Exh. 1, at 17. Ah, but dehumanization has been practiced historically not just by "VNSAs" and neo-Nazis, but also

internationally recognized governments in times of war throughout history: World War II propaganda is one low-hanging fruit example.[12]

*The Convergence: Nazism and Islamist Militancy*.  Finally, the Report offers a specific Nazi/ISIS linking argument to support its conclusions – but it's just a grab bag of adjectives: both are "totalitarian"; "rigid"; "far-reaching"; and divide the world into "good" and "evil." Exh. 1, 18.  Unfortunately, these generic adjectives do nothing to separate Nazis and ISIS from Soviet Communism, against which Nazism positioned itself in the interwar period (as the Report acknowledges, Exh. 1, at 20), the Massachusetts Bay Colony, Calvinism under Oliver Cromwell, Present day Democratic People's Republic of Korea, the list is expandable.

Similarly, the fact that ISIS and the Nazis share a "Jewish scapegoat" lends no support to the Report's conclusions.  Ex. 1, at 35.  It is true that Nazis and militant Islamists both suffer from a stubborn and unwelcome hatred of Jewish people.  Yet the Report fails to grapple with the lamentable and more salient fact that even this commonality does not bring Nazis and ISIS materially closer together relative to other groups and ideologies.  The Report acknowledges that such an infamous propaganda work as the *Protocols of the Elders of Zion* was "birthed in czarist Russia." Exh 1., at 37.  It leaves out the unspoken implication: if abiding anti-semitism is to be the linking factor, then an impartial, and not litigation-driven, analysis would consider whether the Nazi/ISIS comparison should sweep a little broader to include, for example, by some estimates 74% of Middle East and North Africa, 34% of Eastern Europe, 24% of Western Europe, and 19% of North America, which percentages harbor anti-Semitic attitudes according

---

[12] *See A Critical Comparison Between Japanese and American Propaganda During World War II*, available at http://msu.edu/~navarro6/srop.html.

to the Anti-Defamation League.[13]  Anti-Semitism is a serious but also very widespread phenomenon not particularly localized in the groups at issue.

As for whether the Report is based on "sufficient facts and data," Fed. R. Evid. 702, it is not.  The data supporting the conclusions comprise eight case studies – eight short biographical vignettes of people who "illustrate the Nazi-militant Islamist connection." Exh 1, at 23.  As a general matter, anecdotal case studies do not satisfy Rule 702.[14]  Secondly, the Report's eight case studies do next to nothing to eliminate exogenous factors, outside of Nazi/ISIS ideological similarity, that may have led the subjects to dabble in both extremisms – such as, for example, any of the socio-economic or geographic factors covered by the EADR which the Report omits to deal with: the subjects run the gamut from a Swiss born in 1927, to a contemporary American living in Pennsylvania, to a Catalan called Diego Jose Frias Alvarez. Exh 1, at 23-34.  Thirdly, the Report appears to have no analysis of the facts of Nicholas Young's case at all to determine, for example, whether any of this analysis applies to Mr. Young's case.

### 2.     The Government's Nazi/White Supremacist Cases Are Inapposite, Exhibits 2-10 Should Be Excluded under Rules 401 and 403

The case law cited by the government does not support its Nazi/white supremacist argument.  Opp. at 8.  Contrary to the government's analysis, in *United States v. Mahon*, 09-cr-712, 2010 U.S. Dist. LEXIS 110129 (D. Ariz. Oct. 14, 2010), it was not merely the defendant's "allegiance to [white supremacist] groups that advocated violence" which constituted evidence of a predisposition to commit violent crimes.  Instead of political views as such, it was the

---

[13] See Anti-Defamation League, ADL Global 100, available at http://global100.adl.org/#map.

[14] *See e.g.*, *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012) ("Red flags that caution against certifying an expert include reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, lack of testing, and subjectivity."); *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999) (expert testimony should not be based solely on temporal proximity and anecdotal evidence); *United States vs. Ira Stockton, et al.*, 13-cr-571, 2016 U.S. Dist. LEXIS 186465, *7 (D.N.M. May 2, 2016) (expert lacks sufficient facts and data where he relied on "anecdotal case studies").

defendant's violent action in support of those views which was apparently dispositive.  2010 U.S. Dist. LEXIS 110129, at *17-18.  Here, the government alleges no violent action by Mr. Young in support of Nazi/white supremacist views: indeed, it alleges no action whatsoever, just a collection of war memorabilia and bric-a-brac.

In *Unites States v. Magleby*, 241 F.3d 1306, 1319 (10th Cir. 2001), the racist song lyrics were admitted because this was a case involving a hate crime: a cross-burning episode.[15]  Thus, unlike in this case, the defendant's views on race were directly relevant to the charged crime.[16]

Over approximately ten pages of briefing, the government walks the Court through all of its Nazi evidence.  Opp. at 10-20.  Almost none of this discussion consists of legal argument, but rather sulfurous visual description which neatly underscores the extent to which the government's case rests atop a pile of manifestly unfairly prejudicial material:

*Exhibit 2*: the government offers nothing to explain or defend the relevance of these Nazi materials, only visual description designed to stoke fear and loathing.  For that reason alone, they should be excluded. To state the obvious, pointing out an endless series of SS lightning bolts and providing historical summaries of the "Freikorps" is not the same as showing why any of this material is relevant in a militant Islamist material support for terrorism case, much less probative enough to outweigh enormous unfair prejudice.

---

[15] In *United States v. Mostafa*, 16 F. Supp. 3d 236, 260, 266 (S.D.N.Y. 2013), the court admitted an anti-Semitic statement for a context-specific reason; the government did not propose to turn half of its case into a hate crime trial as here.  And in *United States v. Siraj*, 468 F. Supp. 2d 408, 423 (S.D.N.Y. 2008), the books and videos admitted by the court had nothing to do with Nazism/white supremacism but rather with standard militant Islamism evidence concerning mujahedeen.

[16] The government argues that "the cases upon which Young relies do no support the outcome he seeks because virtually none are entrapment cases." Opp. at 19.  This is the fallacy of, if a citation doesn't prove everything it proves nothing.  Anyway, the government cites no specific decisions to make its point.  The cases it cites "actually involving entrapment," are distinguished throughout this reply.  None of them concerns Nazi/white supremacist evidence or firearms possession as *ipso facto* terrorism evidence unconnected to charged conduct.

*Exhibit 3*: To endow the Nazi memorability with some contemporary terrorism significance, the government attempts to show Mr. Young's alleged predisposition for the *neo-Nazi* movement.  Opp. at 11-12.  But the ownership of a pamphlet ("Whole Rules America"), a book ("Serpent's Walk") and a poster ("Worldwide Association of Nazis and Islamists") does not "establish one to be a neo-Nazi" any more than the lightning bolt SS symbols establish one to be a Nazi (Exhibit 2), in which context the government acknowledges the point.  Opp. at 10.  As with Exhibit 2, there is no relevance and Rule 403 argument here at all, merely sulfurous description.  The vague defense that a racist photo (GX 10-863) shows "Young's ideological journey since college," Opp. at 13, is patently inadequate given the prejudice involved and that "Young's journey" is not an element of the crime in this case.  And the government has nowhere alleged Mr. Young's real-life participation in or agitation for neo-Nazi or white supremacist causes.  It is all literature and pictures in his home.

*Exhibit 4*: The government strains to present Haj Amin al-Husseini, the Mufti of Jerusalem during World War II, as the missing link between ISIS and the Nazis.  Opp. at 12-15. The pages of superfluous historical information provided by the government fail to explain: why, even if the four or five Mufti photographs in Exhibit 4 the government wishes to use are deemed admissible, that decision should unlock and somehow make relevant historical Nazi paraphernalia from World War II that has nothing to do with militant Islam.  The government has no argument for it.

*Exhibits 5 and 6*: The government makes no relevance argument for the Nazi-related bookmarks on Mr. Young's computer, nor does it make any Rule 403 balancing argument.  Opp. at 14.  It does not explain why this evidence is not cumulative, nor why it is uniquely probative. Nor does it cite any case law for the proposition that bookmarking on a home computer, an

ephemeral practice requiring little thought, can constitute proper entrapment predisposition evidence. The fact that Mr. Young apparently linked his Facebook page to a news article about the 2011 arrest of Emerson Begolly, "an American neo-Nazi who converted to Islam," is too equivocal to be relevant: it is not clear what rationale Mr. Young had in linking the article. Opp. at 15.

*Exhibit 7*: In case its failed ISIS/Nazi ideological nexus argument fails to persuade the Court, the government contends it should be permitted to show a picture of Mr. Young in Nazi reenactment costume – with no visual reference to militant Islam at all – simply because, five days later, Mr. Young saved completely different picture of himself in "Muslim garb" on his computer. Opp. at 15. But of course the fact that action A and action B happen within the same week does not intrinsically endow the actions with common properties: if I travel in Eastern Europe the first part of the week, there is not something extra Eastern European about the second part when I return to Washington D.C., simply because the actions occurred in the same week. If the government has a relevance argument for a "Muslim garb" photo, it has an argument for that photo, not every prejudicial picture in its possession.

*Exhibit 8:* The reductio ad absurdum: Mr. Young used as an email password the date 4/20/89 and this renders relevant Nazi materials because that date is Hitler's birthdate. Opp. at 15. The argument nicely shows how the Nazi/white supremacist materials obscure more than they reveal in a terrorism case. No relevance argument and no Rule 403 balancing argument is offered. There is none. GX 4-203 is a smokestack picture the government embeds in its brief: the government may or may not know that this picture was texted unsolicited to Mr. Young, but that knowledge likely would not stop the government from engaging in character assault for the reason that it can and no other. GX 14-107, GX 10-700, and GX 10-711 are more generic Nazi-

themed pictures; there is no argument for relevance or probative value.  GX 10-815 is a

photograph of the Nazi Otto Skorzeny: the government claims this is more relevant than other

Nazi pictures because, according to Dr. Gartenstein-Ross, he "organized Palestinian terrorist

forays into Israel." Opp. at 16.  What Palestinian terrorist forays into Israel have to do with the

US law against material support for terrorism is not explained.

*Exhibit 9*: Generic anti-Semitic cartoons, and a photo of the Israeli flag that Young

allegedly used as a doormat. Opp. at 17.  As explained above and elsewhere, the fact both ISIS

and the Nazis have a hatred for Jewish people is not relevant in this case, as it is not a hate crime

case, but a material support for terrorism case concerning all segments of society.  The

government has offered no data to suggest most people susceptible to a pro-ISIS inclination are

tilted in that directly primarily by anti-Semitism, or that Mr. Young was allegedly pulled in that

direction primarily because of Jewish people.

*Exhibit 10*: These are Nazi-related items designed to prove Mr. Young created the

Liveleak handle "Dusselkamp." Opp. at 17.  As explained elsewhere, Mr. Young does not

dispute creating Dusselkamp, so there is no need to lay a foundation with this Nazi-themed

evidence.  The government contends that even if it cherry-picked Mr. Young's Nazi

paraphernalia, in the sense that all of the aforementioned materials are a minority share of the

universe of military memorabilia in his home, that is an argument going to weight, not

admissibility.  Opp. at 18.  The government cites no authority for this proposition.  It is wrong.

Rule 403 asks whether the probative value of a piece of evidence is substantially outweighed by

unfair prejudice.  The probative value for predisposition purposes of a collection of Nazi artifacts

alone is less than the probative value of Nazi artifacts buried in a greater universe of military

objects.  And it is unfairly prejudicial, a misleading half-truth, to present the Nazi materials as

evidence of Mr. Young's character shorn of the context that the seizure was selective.  In an extraordinary final argument, the government states that the Nazi materials are necessary (and thus survive Rule 403 balancing) because "to the extent that evidence of predisposition before 2010 is essential to refute Young's entrapment claim, *evidence of his adherence to Nazi ideology before 2010 is necessary to show predisposition*." Opp. at 19 (emphasis added).  Here the game is given up: the government's anomalous insistence on using Nazi related evidence in a material support for terrorism case is not driven by a principle but an outcome-driven need.

### D.      Graphic ISIS and Islamist Videos/Images

Mr. Young has conceded, from the outset, that possession and or distribution of ISIS and/or al-Qaeda-related videos and images is relevant in this case.  None of the cases cited by the government, however, support the position that it may play or show brutal or gruesome videos and images to the jury; none of the cited cases concern ISIS which produces uniquely repellent media.  Neither the element of Mr. Young's intent, nor his predisposition, justifies the extreme unfair prejudice of the display of the underlying images themselves.  In fact, the government's reluctance to even describe the videos/images it wishes to show indicates it understands their unfairly prejudicial nature; this also makes it impossible to completely brief the issues.

The government cites *United States v. Mohamud*, 843 F. 3d 420, 434 (9th Cir. 2016) where it was allowed to introduce evidence that the defendant supported Osama Bin Laden and possessed a magazine aimed at American jihadists. But *Mohamud* did not even concern a Rule 403 analysis, which is the issue here.  And possession of a jihadist magazine is not nearly on the prejudice level of a gruesome video.  The government also cites *United States v. El-Mezain*, 664 F. 3d 467, 509-11 (5th Cir. 2011) in which the government was entitled to introduce images of violence and videos glorifying Hamas.  But the *El-Mezain* court reached this result only by

distinguishing *United States v. Al-Moayad*, 545 F.3d 139, 160 (2d Cir. 2008).  In *Al-Moayad*, images of a Hamas bomb attack were deemed inadmissible under Rule 403 because the government's purpose was to prove the defendant's knowledge that Hamas engaged in terrorism, even though the defendant never denied such knowledge. 545 F.3d at 160.[17]  This case is closer to *Al-Moayad* than to *El-Mezain*.  Mr. Young does not deny knowledge of the brutality of ISIS videos and images (and Al-Qaeda videos).  The government responds that the videos/images are necessary to show he *supported* such activity (or had a predisposition to).  Opp. at 22 n. 15.  But it fails to explain how the underlying graphic and prejudicial video adds any probative value to the fact of Mr. Young's possession and a description of the video.  Forcing jurors to watch does not add anything but unfair prejudice.  The government cites *United States v. Abu-Jihaad*, 630 F.3d 103, 133-34 (2d Cir. 2010) for the Second Circuit's upholding of the trial court's admission of films where, "as a whole, the depictions were limited and, as the district court accurately observed, less gruesome than many seen on nightly news dispatches from Bagdad." While the government is not completely forthcoming on the type of videos it wishes to play, if they are bloody and gruesome ISIS videos, they will not be "less gruesome than many seen on nightly news dispatches." The government simply has no precedent and no legitimate rationale for playing horrid videos, instead of simply describing them.

## **CONCLUSION**

For all the foregoing reasons, the aforementioned categories of evidence should be excluded from trial in this case.

---

[17] It cites to *Siraj*, for the holding that "testimony regarding a videotape [defendant] had ….was relevant to the question of inducement because it showed that [he] was already well acquainted with the type of violent and graphic material he claims [he was entrapped with]." 2008 WL 2675826, at *2.  Yet Mr. Young's argument is not about testimony concerning videos and images, but the actual playing of them to the jury.

Date: October 11, 2017                    Respectfully submitted.

                                          */s/ Nicholas D. Smith*
                                          Nicholas D. Smith (VA. Bar. 79745)
                                          108 N. Alfred St.
                                          Alexandria, VA 22314
                                          Phone:(703)548-8911
                                          Fax:(703)548-8935
                                          nbs@davidbsmithpllc.com

                                          Linda Moreno (admitted *pro hac vice*)
                                          Linda Moreno P.A.
                                          511 Avenue of the Americas
                                          No. 312
                                          New York, NY 10011
                                          813-247-4500
                                          Lindamoreno.esquire@gmail.com

**Certificate of Service**

I hereby certify that on the 11th day of October, 2017, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following CM/ECF user(s):

> AUSA Gordon D. Kromberg
> AUSA John Gibbs
> U.S. Attorney's Office
> 2100 Jamieson Avenue
> Alexandria, Virginia 22314
> gordon.kromberg@usdoj.gov
> john.gibbs@usdoj.gov

And I hereby certify that I have mailed the document by United States mail, first class postage prepaid, to the following non-CM/ECF participant(s), addressed as follows: [none].

*/s/ Nicholas D. Smith*
Nicholas D. Smith
VA Bar No. 79745
David B. Smith, PLLC
108 North Alfred Street
Alexandria, Virginia 22314
(703) 548-8911 / Fax (703) 548-8935
nds@davidbsmithpllc.com