**REDACTED / CLEARED FOR PUBLIC RELEASE**

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 10-17-2017 BY J43J41742 NSICG

This redacted version only

███████████████

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

Filed with the Classified
Information Security Officer
CISO _NRW_
Date _4/10/2017_

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| v. | ) Case No.: 16cr265 (LMB) |
| NICHOLAS YOUNG, | ) |
| Defendant. | ) |

## DEFENDANT NICHOLAS YOUNG'S CLASSIFIED REPLY IN SUPPORT OF MOTION FOR DISCLOSURE OF FISA-RELATED MATERIAL AND/OR TO SUPPRESS THE FRUITS OR DERIVATIVES OF ELECTRONIC SURVEILLANCE AND PHYSICAL SEARCH PURSUANT TO FISA; AND MOTION FOR RECONSIDERATION OF MARCH 10, 2017 ORDER

Defendant Nicholas Young, through his undersigned counsel, submits this classified memorandum: (1) in further support of his Motion for Disclosure of FISA-Related Material and/or to Suppress the Fruits or Derivatives of Electronic Surveillance and Physical Search Pursuant to FISA (ECF 65) (the "FISA Motion"); and (2) as a motion to reconsider the Court's March 10, 2017 Order denying his Motion to Suppress Documents, Records, and Objects Seized Pursuant to August 2016 Warrants (ECF 69) (the "Suppression Motion"). (These arguments are treated together since both rest in part on the same classified documents submitted herewith.)

In opposition to the FISA Motion, the government has publicly filed a 60-page unclassified memorandum, together with a classified submission containing materials submitted to the Foreign Intelligence Surveillance Court (FISC), on an unknown date, in support of an order (or orders) authorizing blanket electronic surveillance of ███████████████ ███████████████████████████████████ (ECF 82, 83.)

███████████████

**REDACTED / CLEARED FOR PUBLIC RELEASE**

1

REDACTED / CLEARED FOR PUBLIC RELEASE

██████ █ ████████

While undersigned counsel objects to being denied access to the classified submission, and thus

an ability to effectively argue, Mr. Young has no quarrel with most of the government's fulsome

statutory analysis and authorities. Yet, in the narrow areas where he does contest the

government's position, the FISA Motion should be granted, because: (1) an adversarial hearing

should be held since the government has already deliberately made available to defense counsel

classified materials (the "Classified Memoranda") that likely dovetail with the substance of the

FISA materials submitted to the FISC[1]; and (2) the Classified Memoranda (a) do not establish

probable cause that Mr. Young was the "agent of a foreign power" when the FISC likely issued

the relevant order(s), and (b) show that the probable cause determination was likely

impermissibly based solely on activities protected by the First Amendment to the Constitution of

the United States. In addition, the overcollection of ███████████████████████ is

inappropriate in this case. Because the government is incorrect that the good-faith exception

applies to FISA (virtually the sole purely legal dispute between the parties), all the fruits and

derivatives of the resulting ███████████████████████████████ must be suppressed

pursuant to 50 U.S.C. §§ 1806(e) & 1825(h).

The Classified Memoranda also warrant reconsideration of the Court's March 10, 2017

Order denying the Suppression Motion. During the March 10 hearing, the Court made no secret

of its serious concern with violent speech the government alleges Mr. Young uttered some five

years before the search warrants were obtained in August 2016. The Court seemed to indicate

---

[1] Along with its opposition papers, the government filed an affidavit in which the Attorney General states
that disclosure of the FISA materials to the defense would harm the national security of the United States.
ECF 82-2. By noting that the Classified Memoranda likely trace the substance of the FISA materials,
undersigned counsel is in no way quarreling with the Attorney General's affidavit, only noting that it may
be possible for the Court to hear pertinent argument on these issues without any additional, inappropriate
disclosures to undersigned counsel. A closed hearing could be held in which only the Classified
Memoranda are discussed – there will be no discussion of the FISA materials. Nothing in the Attorney
General's affidavit appears to be inconsistent with such a solution.

REDACTED / CLEARED FOR PUBLIC RELEASE

███████████

that these misguided comments, while not crimes in themselves, substantially drove the Court's

determination that there was probable cause to believe all Mr. Young's lawfully owned firearms

and body armor were evidence of a crime. The Court rightly observed that these alleged violent

remarks littered the face of the affidavit in support of the criminal complaint which was

submitted with the search warrant applications. ECF 2.[2] The Classified Memoranda, which were

not made available to the Court before the March 10 hearing, indicate that these affidavit

representations relied on by the Court were misleading via material omission. Following a

hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), the Suppression Motion should be

granted.

## I.   THE FISA INFORMATION SHOULD BE SUPPRESSED

### A.   The FISA Applications Likely Failed to Establish Probable Cause that Young Was the "Agent of a Foreign Power"

The government may not conduct FISA electronic surveillance or physical searches

except upon the issuance of a FISC order finding that, *inter alia*, there is probable cause to

believe the target is a "foreign power" or an "agent of a foreign power." 50 U.S.C. §§

1805(a)(1)-(4), 1824(a)(1)-(4).[3] Because Mr. Young is a U.S. citizen, and granted the nature of

the investigation, the government was almost certainly required to make a probable cause

showing in its FISA application(s) that he was an "agent of a foreign power" because he

"knowingly engage[d] in [] international terrorism, or activities that are in preparation therefor,

for or on behalf of a foreign power" or "knowingly aid[ed] or abet[ted] any person in

---

[2] Undersigned counsel is mindful of the Court's instruction that he should attach a copy of the complaint affidavit to all motions concerning the document, but in this instance counsel seeks the Court's leave to merely cite the docket entry and page number, as he is uncertain as to the quantity of ink remaining in the secure printer made available to him in the SCIF and is required to print five copies of this brief.

[3] Mr. Young addresses *infra* the government's so-called "emergency" powers to conduct warrantless electronic surveillance and physical searches without a FISC order, and the risk that these powers constitute overused exceptions that swallow the rules.

███████ ██ ████   REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

██████████████████

[international terrorism for or on behalf of a foreign power]" or "knowingly conspire[d] with any person to engage in [international terrorism for or on behalf of a foreign power]." 50 U.S.C. §§ 1801(b)(1),(2) & 1821(1).[4]

Although defense counsel has not seen the FISA materials, the Classified Memoranda attached hereto likely roughly adumbrate what the government's agent-of-a-foreign-power showing was predicated upon. In Classified Memorandum # 1, ████████████████

████████  ████████████████████████████████

████████████ Mr. Young, who is codenamed "Slow Decline." ████████████████

████████████████████

█ ████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████

█ ████████████████████████████████

████████████████████████████████

████████████████

█ ████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

---

[4] The "foreign power" predicate in the government's FISA application was almost certainly "a group engaged in international terrorism or activities in preparation therefor." 50 U.S.C. §§ 1801(a)(1)-(7) & 1821(1).

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE



There did not appear to be probable cause to conduct such a search based on his Facebook postings/beard disputes/Qur'an ownership/Newfound God.) Mr. Young reportedly had "two contacts" with Zachary Chesser in September 2009. Of course, Chesser was arrested for Material Support for Terrorism in this district in or around September 2010;

(unknown/Constitutionality unknown),

(unknown/Constitutionality unknown)

Based on the above information, an

Classified Memorandum # 1.

REDACTED / CLEARED FOR PUBLIC RELEASE

██████████████

Other classified documents made available to the defense indicate ████████████

███████████████████████████████████████████████████████

████████████████ It appears the UCE, alias ██████ who pretended to strike up a

friendship with Mr. Young in 2010 the better to investigate him for crimes, was also or ████████

████████████████████████████ ██ ██████████████████████

████████████████████████████████████████████████████████████

████ may have also involved Amine ElKalifi, who pled guilty to material support for terrorism

in this district. Undersigned counsel does not believe ██████ was ever charged, although counsel

does not even know whether ████ still resides in the United States. (Undersigned counsel asked

Mr. Young, who indicated he did not know.)

██████████████████████████████████████████████████

███████████████████████████████████████████████ Mr. Young has

informed undersigned counsel that ██████ once told him that he ██████ had relatives in the

Jordanian government, possibly Jordanian intelligence. In the notes documenting one of

UCE ████████ (recorded) conversations with Mr. Young, UCE appears to recall Mr. Young

whispering something about al-Qaeda into his ear, which may have been in connection with

████████ (Mr. Young did not, in fact, whisper this.). In other UCE ████████ notes from late 2010/early

2011, ████ is reported to have made comments about Osama Bin Laden in a positive light in the

presence of Mr. Young. UCE ██████ recalls that Mr. Young "shook his head" or made no

response. Based on what he has seen of the UCE notes, Mr. Young never positively praised al-

Qaeda or Osama Bin Laden, according to what the UCE remembered.

████████████████████████████████████████

███████████████████████████████████████████████████

██████████████

REDACTED / CLEARED FOR PUBLIC RELEASE



have been involved in longstanding litigation in this district, particularly concerning ▬▬▬▬▬▬▬▬

In addition, the government's criminal complaint, ECF 2, indicates that Mr. Young had one or more meetings at a restaurant with Amine ElKalifi. Mr. Young is alleged to have talked about "marksmanship." (Mr. Young has been uncontroversially shooting guns since his youth with his grandfather and sister.)

Undersigned counsel cannot know to a certainty whether the FISA materials rest on these facts, or facts very similar to them. Nor can he know whether he has been told the complete truth by Mr. Young. But ▬▬▬▬▬▬▬▬▬▬ and that undersigned counsel believes Mr. Young is telling him the truth, the defense believes the investigation into Mr. Young commenced based on a series of terrible misunderstandings.

In the first place, the aforementioned facts taken together do not establish probable cause that Mr. Young was the agent of a foreign power because he "knowingly engage[d] in [] international terrorism, or activities that are in preparation therefor, for or on behalf of a foreign power" or "knowingly aid[ed] or abet[ed] any person in [international terrorism for or on behalf

REDACTED / CLEARED FOR PUBLIC RELEASE

██ █

of a foreign power]" or "knowingly conspire[d] with any person to engage in [international terrorism for or on behalf of a foreign power]." 50 U.S.C. §§ 1801(b)(1),(2) & 1821(1). █████



Plainly, that would not be enough to establish probable cause that he was an *agent* of that FTO.

More importantly, the above facts do not come close to a showing of probable cause that *Mr. Young* was engaged in international terrorism on behalf of any FTO. To be clear: He has never been engaged in international terrorism. An ill-advised association with ████ does not make that showing: that is manifest guilt by association. And indeed *Brady* disclosures made by the government in this case indicate that Mr. Young was "distancing himself" from ████ in 2011. Mr. Young represents to undersigned counsel that the government is "absolutely wrong" that ████████████████████. Mr. Young's travel to Saudi Arabia was to make the Hajj (he had only converted to Islam a few years earlier), and undersigned counsel believes ████ was there too. ████ invited Mr. Young to Jordan to visit with his family. Taken alone, these facts do not even come close to an agent-of-a-foreign-power showing for Mr. Young — even if one or both of these individuals was in possession of questionable literature (on this point, see *infra*).

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

Nor does Mr. Young's brief acquaintance with Messrs. Chesser and ElKalifi make the agent-of-a-foreign-power showing. Again, undersigned counsel can only represent what he has been told by Mr. Young – but counsel, who has known him for months, believes him. Mr. Chesser's association with Mr. Young involved nothing more than a passing acquaintance, as they both attended George Mason University at approximately the same time. It was the stuff of a handful of chance encounters. The predominant subject of their conversation: Japanese anime cartoons. In addition -- for what it is worth, as the man is a terrorism convict -- the government has produced letters from Mr. Chesser, written from prison in Florence, Colorado, in which he writes that, on learning of Mr. Young's arrest and charges, he was confused since the Muslims Chesser associated with at GMU all knew Mr. Young was a cop, was a conservative,[5] and not interested in Jihad. The government appears to have produced these letters as *Brady* material.

Finally, there is Amine ElKhalifi. A connection to Amine would be a remarkable fact for the government to cite in support of a probable cause showing. Mr. Young was introduced to Amine *through the government's own agent* – UCE ▮▮▮▮ Mr. Young encountered ElKhalifi around two times. Mr. Young had no knowledge whatsoever that ElKhalifi harbored plans to conduct any sort of terrorism on behalf of an FTO. In undersigned counsel's conversations with Mr. Young, the latter expresses a very low opinion of ElKhalifi.

The government is likely attempting to establish the agent-of-a-foreign-power showing through certain literature possessed by, or online videos watched by, Mr. Young. (On the First Amendment implications of this, see Section B *infra*.) But it goes without saying that the watching of videos on YouTube falls incredibly short of a probable cause showing that the

---

[5] Mr. Young is almost certainly the first American ever charged with Islamist terrorism who: (1) was in the ROTC; (2) was a card-carrying Republican until recently; and (3) passionately supported Congressman Ron Paul and Senator Rand Paul.

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

███████████████

watcher is an agent of an FTO. Undersigned counsel encourages the Court to run a Google search for al-Qaeda- or ISIS-related videos.[6] Thousands of mainstream media articles -- in outlets such as the New York Times, the Washington Post, and CNN -- not only hyperlink to the underlying videos themselves but embed them in articles for easier viewing. A few months ago, an article in the New Yorker by reporter Robin Wright linked to and embedded into her article detailed ISIS pamphlets for the construction of truck bombs. This is not to suggest a reporter's use of the videos is the same as a defendant's in a material support case; it obviously isn't. But it does indicate the ubiquity of the videos in mainstream society; how easily accessed they are; how comparatively innocent it can be to jump from link to link in modern media; that because viewing the videos is an online judgment made in a matter of milliseconds, deliberative thinking is out of the question; and that millions of readers of these mainstream publications have watched these videos too. The notion that they are all, on that basis, one bad-seed association away from FISA surveillance is deeply troubling.

The subject of Mr. Young's trip to Libya must be discussed. In its opposition to the Suppression Motion, the government argued repeatedly that during his trip in April/May 2011 Mr. Young likely associated with a Libyan terror group called Abu Salim Martyr's Brigade. The government represented to the Court that Mr. Young accordingly violated 18 U.S.C. § 2339B by virtue of the trip.

Yet, the Classified Memoranda indicate these representations were not accurate. ██

████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

---

[6] Counsel is not suggesting the Court should actually watch the content of the videos.

REDACTED / CLEARED FOR PUBLIC RELEASE



REDACTED / CLEARED FOR PUBLIC RELEASE

These points are important for several reasons. First, they indicate an inconsistency between the factual representations made by the government in opposition to the Suppression Motion -- Mr. Young's alleged joining of ████████ linked group in Libya (he did not join any such group) -- and its underlying records. Such an inconsistency should cause the Court to

REDACTED / CLEARED FOR PUBLIC RELEASE

scrutinize the FISA material representations all the more closely. (There are additional

inconsistencies between the government's representations to the Court, as discussed *infra*.)

Second, as indicated in the Classified Memoranda,

Finally, it is important to note that, whatever the FISA materials allege about Mr.

Young's status as an agent of a foreign power ██████████████ the government

ultimately brought no charges on those grounds. Of course, probable cause at Time 1 does not

necessarily translate to charges at Time 2. But the fact that the government was likely ultimately

incorrect in its agent-of-a-foreign-power allegation should prompt the Court to scrutinize the

FISA materials even more closely. And to the extent the government makes the argument that it

may not have brought ██████████ charges against Mr. Young only because it had to protect

sources and methods -- the churchillian allowing of Coventry to be destroyed to save the Enigma

intercepts -- this claim too warrants extra scrutiny.

### B. The FISA Applications Were Likely Based on Protected First Amendment Activities -- Solely

FISA dictates that no United States person may be considered a "foreign power" or an

"agent of a foreign power" solely on the basis of activities protected by the First Amendment to

the Constitution of the United States. 50 U.S.C. §§ 1805(a)(2)(A) & 1824(a)(2)(A). Throughout

REDACTED / CLEARED FOR PUBLIC RELEASE.

the opposition, the government maintains that the Court need not hear argument from the defense on any issue arising from this intricate statutory scheme, as it is all "straightforward." *See, e.g.,* ECF 82-1, p. 47. Yet, there is hardly a subject more complex in Constitutional law than the First Amendment. (The government appears to relegate the issue to less than one page.) Nor is there a subject more important to this case: the government's entire investigation and gift-card sting operation themselves are arguably a half-decade-long end run around speech and freedom of association rights. From the government's constant citation to political online message board comments to its attempts to prosecute him based on Nazi-themed books and pictures, it is uncharged disagreeable speech and company driving this entire case under the premise of a gift card.

The Supreme Court has held that speech and possession of literature concerning, and membership in groups advocating, violence and the overthrow of the U.S. government, without more, are protected by the First Amendment. *Brandenburg v. Ohio,* 395 U.S. 444, 447-49 (1969) (government may not forbid or proscribe advocacy of violence or lawless action except where such advocacy is directed to inciting or producing "imminent lawless action" and is likely to incite or produce such action); *Lamont v. Postmaster General,* 381 U.S. 301 (1965) (mail addressee's First Amendment rights violated by opt-in requirement for Communist literature); *Scales v. United States,* 367 U.S. 203, 229 (1961) (Smith Act, which proscribed membership in Communist Party, saved from facial freedom of association challenge because the Act required "clear proof that a defendant specifically intends to accomplish the aims of the organization by resort to violence" and holding that "clear and present danger"[7] speech doctrine applies to freedom of association rights) (internal quotation marks omitted); *Yates v. United States,* 354

---

[7] The "clear and present danger" formulation, Justice Holmes' test from *Schenck v. United States,* 249 U.S. 47 (1919), was supplanted by the "imminent lawless action" formula in *Brandenburg,* which is the test now in force.

REDACTED / CLEARED FOR PUBLIC RELEASE

███████████

U.S. 298 (1957) (overturning Smith Act conviction of fourteen officials for being members of

the Communist Party USA); *see also Holder v. Humanitarian Law Project*, 561 U.S. 1, 36

(2010) (18 U.S.C. §2339B, the material support for terrorism statute, is applied consistently with

the First Amendment only where charged activities/advocacy are "directed to, coordinated with,

or controlled by foreign terrorist groups").

It is worth dilating on specific decisions that drive home the ramifications of these

expansive rights. Justice Holmes' dissent in *Abrams v. United States*, 250 U.S. 616 (1919) is the

lodestar. *Abrams* concerned several New Yorkers charged under the Sedition Act of 1918 for

distributing leaflets which scathingly criticized the Wilson administration for meddling in the

Russian Revolution. 250 U.S. at 620. They were signed: "revolutionists" and "rebels" and

"anarchists." *Id.* at 618. Jacob Abrams, an immigrant from Ukraine, belonged to a socialist cell

in New York. Not only did he distribute the leaflets on behalf of the Bolsheviks – he materially

supported them: he personally paid for and organized the print job.[8]

There had been a war on. The U.S. and its allies were locked in a deathmatch with the

Central Powers. And the leaflets distributed by the revolutionists actually urged the Workers of

the World to throw a wrench into the United States' war production, overthrow the government

and its repulsive "Kaiser" president, and launch armed rebellion. *Id.* at 622.

Justice Holmes dissented from the opinion of the Court upholding conviction. He wrote:

---

[8] The Great Dissent: How Oliver Wendell Holmes Changed his Mind – and Changed the History of Free Speech in America, Thomas Healy (Metropolitan Books 2013), p. 173. The Sedition Act of 1918 essentially allowed the government to prosecute all speech critical of the U.S. during the First World War. In its breadth and potential for abuse, it was similar to the Material Support for Terrorism statutes. Of course, in 1918 Congress did not think to draw a distinction between advocacy of Communist views and "material support" for them, a distinction it likely would have found odd (together with the *Citizens United* majority). This distinction was crafted following the September 11 terrorist attacks to create a law that vested great discretion in counterterrorism prosecutors but which would withstand scrutiny of nearly 100 years of First Amendment jurisprudence in between. Mr. Young may raise several First Amendment defenses in this case. (These are not inconsistent with the doctrine that the impossibility defense may not be raised against an attempt charge based on an undercover operation.)

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

The power [to prosecute violent speech] undoubtedly is greater in time of war than in time of peace because war opens dangers that do not exist at other times. But as against dangers peculiar to war, as against others, the principle of the right to free speech is always the same. It is only the present danger of immediate evil or an intent to bring it about that warrants Congress in setting a limit to the expression of opinion where private rights are not concerned....

Now nobody can suppose that the surreptitious publishing of a silly leaflet by an unknown man, without more, would present any immediate danger that its opinions would hinder the success of the government arms or have any appreciable tendency to do so....

In this case sentences of twenty years imprisonment have been imposed for the publishing of two leaflets that I believe the defendants had as much right to publish as the Government has to publish the Constitution of the United States now vainly invoked by them....

Only the emergency that makes it immediately dangerous to leave the correction of evil counsels to time warrants making any exception to the sweeping command, "Congress shall make no law . . . abridging the freedom of speech."

*Abrams*, 250 U.S. at 631.

The first Red Scare was followed by another. Justices Black and Douglas famously

evoked the kinds of prosecutions brought in that era.  Concurring in *Yates*, Justice Black

observed:

The kind of trials conducted here are wholly dissimilar to normal criminal trials. Ordinarily these "Smith Act" trials are prolonged affairs lasting for months. In part this is attributable to the routine introduction in evidence of massive collections of books, tracts, pamphlets, newspapers, and manifestoes discussing Communism, Socialism, Capitalism, Feudalism and governmental institutions in general, which, it is not too much to say, are turgid, diffuse, abstruse, and just plain dull. Of course, no juror can or is expected to plow his way through this jungle of verbiage. The testimony of witnesses is comparatively insignificant. Guilt or innocence may turn on what Marx or Engels or someone else wrote or advocated as much as a hundred or more years ago. Elaborate, refined distinctions are drawn between "Communism," "Marxism," "Leninism," "Trotskyism," and "Stalinism." When the propriety of obnoxious or unorthodox views about government is in reality made the crucial issue, as it must be in cases of this kind, prejudice makes conviction inevitable except in the rarest circumstances.

The Court says that persons can be punished for advocating action to overthrow the Government by force and violence, where those to whom the advocacy is addressed are urged "to *do* something, now or in the future, rather than merely to *believe* in something." Under the Court's approach, defendants could still be convicted simply for agreeing to

15



REDACTED / CLEARED FOR PUBLIC RELEASE

talk as distinguished from agreeing to act. I believe that the First Amendment forbids Congress to punish people for talking about public affairs, whether or not such discussion incites to action, legal or illegal.

*Yates*, 354 U.S. at 339.

Justice Black went on to quote an authority from this district:

As the Virginia Assembly said in 1785, in its "Statute for Religious Liberty," written by Thomas Jefferson, "it is time enough for the rightful purposes of civil government, for its officers to interfere when principles break out into overt acts against peace and good order. . . ."

*Id.* (quoting 12 Hening's Stat. (Virginia 1823), c. 34, p. 85.)

Another summation of the era's top law enforcement priority comes from Justice

Douglas. Dissenting in *Dennis v. United States*, 341 U.S. 494 (1951), here is Douglas:

So far as the present record is concerned, what petitioners did was to organize people to teach and themselves teach the Marxist-Leninist doctrine contained chiefly in four books: Stalin, Foundations of Leninism (1924); Marx and Engels, Manifesto of the Communist Party (1848); Lenin, The State and Revolution (1917); History of the Communist Party of the Soviet Union (B.) (1939).

Those books are to Soviet Communism what Mein Kampf was to Nazism. If they are understood, the ugliness of Communism is revealed, its deceit and cunning are exposed, the nature of its activities becomes apparent, and the chances of its success less likely. That is not, of course, the reason why petitioners chose these books for their classrooms. They are fervent Communists to whom these volumes are gospel. They preached the creed with the hope that some day it would be acted upon.

The opinion of the Court does not outlaw these texts nor condemn them to the fire, as the Communists do literature offensive to their creed. But if the books themselves are not outlawed, if they can lawfully remain on library shelves, by what reasoning does their use in a classroom become a crime? . . . .

[This] is the meaning of the clear and present danger test [:] When conditions are so critical that there will be no time to avoid the evil that the speech threatens, it is time to call a halt. . . .

This record, however, contains no evidence whatsoever showing that the acts charged, *viz.*, the teaching of the Soviet theory of revolution with the hope that it will be realized, have created any clear and present danger to the Nation. . . . .

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED - CLEARED FOR PUBLIC RELEASE

The nature of Communism as a force on the world scene would, of course, be relevant to the issue of clear and present danger of petitioners' advocacy within the United States. But the primary consideration is the strength and tactical position of petitioners and their converts in this country. On that there is no evidence in the record. If we are to take judicial notice of the threat of Communists within the nation, it should not be difficult to conclude that *as a political party* they are of little consequence. Communists in this country have never made a respectable or serious showing in any election. I would doubt that there is a village, let alone a city or county or state, which the Communists could carry. Communism in the world scene is no bogeyman; but Communism as a political faction or party in this country plainly is. Communism has been so thoroughly exposed in this country that it has been crippled as a political force. Free speech has destroyed it as an effective political party. It is inconceivable that those who went up and down this country preaching the doctrine of revolution which petitioners espouse would have any success.

How it can be said that there is a clear and present danger that this advocacy will succeed is, therefore, a mystery. Some nations less resilient than the United States, where illiteracy is high and where democratic traditions are only budding, might have to take drastic steps and jail these men for merely speaking their creed. But in America they are miserable merchants of unwanted ideas; their wares remain unsold. The fact that their ideas are abhorrent does not make them powerful.

The political impotence of the Communists in this country does not, of course, dispose of the problem. Their numbers; their positions in industry and government; the extent to which they have in fact infiltrated the police, the armed services, transportation, stevedoring, power plants, munitions works, and other critical places -- these facts all bear on the likelihood that their advocacy of the Soviet theory of revolution will endanger the Republic. But the record is silent on these facts. If we are to proceed on the basis of judicial notice, it is impossible for me to say that the Communists in this country are so potent or so strategically deployed that they must be suppressed for their speech.

*Dennis*, 341 U.S. at 582-585.

It is not quaint to compare liberty/security balancing in the early Communist era with today's threats from FTO. McCarthyist excesses notwithstanding, the Communist threat was of course deadly serious. Much like ISIS, the Soviet Union was managed by a criminal regime headed by a murderous dictator.[9] On a scale beyond ISIS' capability, between the 1920s-1950s

---

[9] What the Court has not yet heard: the evidence in this case will show Mr. Young telling the government's informant that he (Young) believed ISIS was a "gang of criminals," which he realized the moment he saw on TV the "mugshot of Abu Bakr al-Baghdadi." The government did not put this quote in its complaint. What the Court will also hear: multiple times, to multiple of the government's informants

REDACTED - CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

Stalin ordered the murder of millions of his own people and others around the world.[10] Like ISIS, Stalin and his regime were bent on blowing up the geopolitical order, in the Soviet Union's case by fomenting ideological coups around the world.[11] Like ISIS, the Soviet regime kept slave laborers.[12] Stalin's spies in the United States contrived to steal the country's most closely guarded nuclear secrets, accelerating the dictatorship's access to weapons capable of destroying the planet many times over.[13] Much of the American Left apologized for the Soviet Union -- far greater in their numbers than the obscure Americans who support ISIS today.

Yet, for all these national security threats, the federal courts concluded the era with a First Amendment standard that prohibits prosecution of speech unless it is directed to inciting or producing "imminent lawless action" and is likely to incite or produce such action. *Brandenburg*, 395 U.S. at 447-49.

The Court should find the FISA information improperly collected if the FISA materials are predicated on speech, advocacy, reading materials, YouTube videos and exercises of the freedom of association unless they clear the high hurdle of *Brandenburg*. They almost certainly do not. No less than in the case of past trials concerning "elaborate and refine distinctions" between "'Communism,' 'Marxism,' 'Leninism,' 'Trotskyism,' and 'Stalinism,'" this Court should not allow this case to turn on distinctions between something called the "Abu Salim Martyr's Brigade,"[14] other rebel "brigades" and "groups" in the Libyan Civil War, the Libyan

---

and agents, Mr. Young unequivocally stated that he wanted to help Muslims without doing anything to violate the law.

[10] Modern Times, Paul Johnson (HarperCollins 1983), p. 271.

[11] *Id.* at 285.

[12] *Id.*

[13] *Id.* at 274.

[14] Public reports indicate that the Abu Salim Martyr's Brigade (which to be clear Mr. Young did not "join") actually engaged in pitched battles with ISIS in Libya in the recent past. So the government is prepared to offer to the Court and jury, in an American criminal trial in Virginia, the spectacle of factual disputes over battles between various Islamist groups in a North African country.

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

National Army, groups "linked" to al-Qaeda, groups "associated" with al-Qaeda, ISIS and others.

**C.     The Court Should Pay Close Attention to the Use of "Emergency Powers"**

The FISA Motion opposition describes the use of so-called "emergency employment" of electronic surveillance and physical search. ECF 82-1, p. 5. This appears to enable the government to conduct warrantless electronic surveillance and physical searches without even going to the FISC, so long as it seeks a FISA order within seven days. *Id.*

The defense has no way of knowing whether this procedure was used. (If it wasn't, it is not clear why the government would discuss these powers in its brief, or what classified footnote 9 is referencing.) If it was, however, the risks of abuse are obvious: it appears the government could (1) unilaterally conduct warrantless electronic surveillance without even making the agent of a foreign power showing to any court; (2) find evidence that *is* relevant to the agent of a foreign power showing; and then (3) present that evidence to the FISC *post hoc*. Of course, such a procedure would defeat the entire purpose of privacy protections built into FISA. Although there appears to be no caselaw on this scenario in the FISA context, in ordinary law enforcement this gambit is strictly prohibited under the fruit of the poisonous tree doctrine. *Wong Sun v. United States*, 371 U.S. 471 (1963).[15]

Accordingly, to the extent the government employed "emergency powers" the Court should strictly scrutinize whether the government was "reasonabl[e]" in declaring an "emergency situation" necessitated issuing blanket surveillance of virtually all of Mr. Young's electronic communications. It should also ask whether any information collected during the "emergency

---

[15] The defense asks the Court to be somewhat forgiving in assessing Mr. Young's legal citations. There is no internet in the SCIF, so when it occurs to defense counsel to cite an authority, it has to be from memory or because the thought occurred to counsel and was researched before entering the SCIF to complete the memorandum.

REDACTED / CLEARED FOR PUBLIC RELEASE

situation" was then fed into the application to the FISC for a surveillance order in violation of *Wong Sun*.

**D.    The Government's Minimization Procedures Explanation Is Not Straightforward and Minimization Was Meaningless Here**

The government acknowledges that FISA required it to follow "relevant minimization procedures to appropriately minimize the information acquired pursuant to FISA." ECF 82-1, p. 31. It does not explain specifically what those procedures are, or how they were followed. *Id.*, pp. 31-35.

The government implicitly acknowledges overcollection may have occurred but argues that "activities of foreign powers and their agents are often not obvious from an initial or cursory overhear of conversations"; that "agents of foreign powers frequently engage in coded communications, compartmentalized operations, the use of false identities"; that "innocuous-sounding conversations may in fact be signals of important activity;" that "agents of a foreign power are often very sophisticated and skilled at hiding their activities." ECF 82-1, p. 31-32. There is nothing unusual about a Leave-It-To-The-Security-Professionals explanation in a national security matter. But it is more than usually inappropriate in this case.

It has been time-consuming, but undersigned counsel has reviewed a significant percentage of these communications. The amount of overcollection is difficult to accurately convey to the Court. The defense puts in a request that the Court send an employee to review the

20

DEDACTED / CLEARED FOR PUBLIC RELEASE

collection in the SCIF.  In undersigned counsel's estimation, the preponderance of the

communications were between ███████████████████████████████████

███████████████████████

The vast majority of these communications are not the "coded communications of agents

of a foreign power." They are private conversations that it was entirely inappropriate and

disconcerting for the government to intrude on. ████████████████████

████████████████████████████████████████████

████████████████████████████ (undersigned counsel stopped reading

when it became apparent there was nothing to see). ██████████████████

████████████████████████████████████████████

There are ████████ communications that should not have been collected or reviewed by

government agents.

Contrary to the government's assertion, this is not a question of "totally eliminat[ing]"

the collection of "innocent conversations." ECF 82-1, p. 33.  Nor is it the "mere fact that

innocent conversations were recoded." *Id.* (*citing United States v. Hammoud*, 381 F.3d 316, 384

(4th Cir. 2004).  All but the tiniest sliver of the surveilled communications appear to concern

subjects having nothing to do with this case.[16]

That raises the question of why the parties are even arguing over their suppression.  The

answer is likely that the government will attempt to use its overly-collected surveillance to

impeach Mr. Young with what it believes are petty, unrelated, non-terror crimes which the

surveillance team scrupulously followed and analyzed, which are a hundred miles below the

bureau's focus, and which were likely tracked for the purpose of impeachment at trial. In the

---

[16] Even the tiniest sliver is of no use to the government, though it seems to believe it will prove something damaging with them.

REDACTED / CLEARED FOR PUBLIC RELEASE

production provided to defense counsel, these incidental crime reports were sandwich in between

hundreds of files of a different nature.

There is also an issue concerning the period of the surveillance.  Undersigned counsel

came across ▮▮▮▮▮▮▮▮▮▮▮▮▮ that ▮▮▮▮▮▮▮. ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮ – but ▮▮▮▮▮▮▮▮. Mr. Young converted to

Islam in 2006 – the year his father passed away.

To be fair, undersigned counsel had a conversation concerning this subject a few months

ago with the case agent, SA Caslen, in the SCIF. ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Undersigned

counsel lacks the technical knowhow to assess the accuracy of this explanation but notes it here

in case the Court is in a better position to consider it.

In sum, there was manifest overcollection of ▮▮▮▮▮▮▮▮▮▮

▮▮▮

## E. The "Good-Faith" Exception Does Not Apply to FISA, and the Information Should Be Suppressed

The government contends that even if there was no probable cause that Mr. Young was

the agent of a foreign power – or even if the FISA application(s) was based solely on First

Amendment protected activities – the surveilled information should not be suppressed because

government agents relied on FISA orders in good faith.  ECF 82-1, p. 25.  This argument fails

REDACTED / CLEARED FOR PUBLIC RELEASE

because, unlike the Fourth Amendment to the Constitution, Congress created in FISA a specific suppression protocol that does not contemplate "good faith" errors. And for good reason.

The suppression subsections of FISA state that, upon receiving notice, an aggrieved person against whom the information is to be used may move to suppress the use of the FISA information on two grounds: (1) that the information was unlawfully acquired; or (2) that the electronic surveillance or physical search was not conducted in conformity with an order of authorization or approval. 50 U.S.C. §§ 1806(e), 1825(f). Nothing in these subsections contemplates a "good faith" exception. It's not hard to see why. The "aggrieved person" is – as the government itself demands – denied access to virtually all information pertaining to the FISA surveillance and physical search. In those circumstances it would be impossible (barring a leak of classified information, which undersigned counsel does not endorse to be clear) to make a showing that the collection was not in "good faith." A good-faith exception would in every case swallow the suppression protocol in FISA.

None of the case law cited by the government is to the contrary. In *United States v. Ning Wen*, 477 F.3d 896, 897 (7th Cir. 2007), the Seventh Circuit did not hold that "federal officers were entitled to rely in good faith on a FISA warrant [pursuant to *United States v. Leon*, 468 U.S. 897 (1984)]." ECF 82-1, p. 25. In *Ning Wen*, the court's citation to and analysis of the good-faith exception under *Leon* was prompted by the defendant's *Fourth Amendment* suppression argument, not an argument pursuant to 50 U.S.C. §§ 1806(e), 1825(f). 477 F.3d at 897. Any observations from the Court about *Leon*'s application to FISA were obiter dicta. (Because FISA information is classified, and Easterbrook's opinion was quite public, the court's FISA analysis of "good faith" was *necessarily* obiter dicta.) The same distinction is true for the other authorities cited by the government. *See United States v. Mubayyid*, 521 F.Supp.2d 125, 141 n. 12 (D.Mass.

REDACTED / CLEARED FOR PUBLIC RELEASE

████████████████

Nov. 5, 2007) (FISA/Good-faith analysis was dicta and a question separate from the one here:

the court was in a posture to assume unconstitutionality of FISA under a Fourth Amendment

challenge (and fall back Fourth Amendment principles such as *Leon*), whereas here the question

is a matter of strictly applying 50 U.S.C. §§ 1806(e), 1825(f)); *United States v. Duka*, 671 F.3d

329, 346 (3d Cir. 2011) (same). Again, if undersigned counsel's explanation of the relevant

distinctions is not completely clear, he notes that there is no internet for legal research inside the

SCIF. Counsel believes that if the Court carefully reviews the decisions cited by the government

it will see that none squarely holds that *Leon*'s good-faith doctrine applies to FISA.

Any such holding would render the statutory suppression provisions a dead letter, as it is

impossible for the defense to show the absence of good faith barring a classified leak. If the

Court finds a lack of probable cause that Mr. Young is an agent of a foreign power, he requests a

hearing solely on the unclassified legal issue of whether the good-faith exception applies to

FISA, so that complete argument can be made.

## II.     THE COURT SHOULD RECONSIDER AND GRANT THE SUPPRESSION MOTION

During the March 20, 2017 hearing on Mr. Young's Suppression Motion, the defense

argued that the August 2016 warrants were overbroad in authorizing seizure of all Mr. Young's

lawfully owned firearms and body armor because there was no probable cause they were

collectively evidence of a specific crime. A significant part of the Court's disagreement on this

issue centered on violent speech Mr. Young allegedly uttered five years before the warrants were

issued. The Court rightfully observed that the affidavit in support of the complaint, ECF 2,

contains quite a bit of violent speech.

The Classified Memoranda indicate that the allegations the Court relied on were

strikingly misleading. Classified Memorandum # 3 contains several material omissions of fact

██████ █ ███

██ ██ █

UNCLASSIFIED//CLEARED FOR PUBLIC RELEASE

that should have been told to the magistrates.  Undersigned counsel encourages the Court and the clerks to carefully review the entire document.

Classified Memorandum # 3 ████████████████████████

████████████████ Undersigned counsel asks the Court to notice that within the PDF

document containing ████████ the relevant document is buried below ████████████

████████████████████. Among other things, the ████████ states:

█ ████████████████████████████████

████████████████████████████

████████████████████

█ ████████████████████████████

████████████████████████████████

████████████

█ ████████████████████████████████

████████████████████████████

████████████████████

█ ████████████████████████████

████████████████████████████

████████████████████████████████

████████████████████████████

█ ████████████████████████████

REDACTED//CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE REDACTED / CLEARED FOR PUBLIC RELEASE



The material omissions go on and on. Undersigned counsel strongly urges the Court to review the violent speech it read from the affidavit in support of the criminal complaint in open court, review Classified Memorandum # 3, and compare the two. In undersigned counsel's strong opinion, the material omissions from the affidavit *are extraordinary*. They completely change a reader's understanding of the gravity of the allegations -- allegations the Court relied on in finding probable cause to search Mr. Young's house to seize all his lawfully owned firearms.

---

[17] In fact, "SLOW DECLINE" received a commendation from the U.S. Attorney for the District of Columbia for apprehending a robber armed with an 8-inch knife who was fleeing the crime scene. Mr. Young was carrying his police firearm and would have been well within his rights to open fire on the bandit. Instead, he subdued a criminal basically wielding a butcher's knife without using any weapon at all. This is all demonstrably established. The government has the letter of commendation.

REDACTED / CLEARED FOR PUBLIC RELEASE

Your Honor, if the criminal complaint were a prospectus, material omissions on this scale would lead to a decade of shareholder securities lawsuits and SEC enforcement actions. The affidavit in support of the complaint is not saved from all this by virtue of one disclaimer, possibly a footnote, indicating that the UCE█████ may have thought Mr. Young "would not follow through" with his comments. As the Court well knows, there is a rule of completeness — and when you make a representation it must be complete and accurate — and vague disclaimers do not overcome material omissions. *See, e.g., FHFA v. Nomura*, 11-cv-6201 (S.D.N.Y. May 2015) (Cote, J.).

(A final point: during the hearing the Court observed that this case is not just about gift cards, that the charge is Material Support for Terrorism under 18 U.S.C. §2339B. Undersigned counsel did not have presence of mind during the hearing to make the following response. It is true that Material Support is the charging statute in this case, but given its breadth, it is possible for a defendant to be in violation in ways both violent and incredibly nonviolent. Since there is no *de minimis* exception, in principle a defendant could violate the statute by buying a cup of coffee to a known FTO terrorist. Conversely, a defendant may violate the statute by providing precursor materials to blow up a biological weapon that threatens an entire city population. We believe the Court would agree that the *factual predicate* for a material support charge should go some ways in determining whether lawfully owned firearms are evidence of the charged crime. Another example: It is possible to violate the RICO statutes in violent and nonviolent ways. Under a classic RICO prosecution with loan sharking or other coercive predicates, perhaps there might be automatic probable to seize all the defendant's lawfully owned weapons. Conversely, if the RICO defendant operates, say, a fake university that peddles bogus real estate investment

CLEARED FOR PUBLIC RELEASE

degrees, the Court would probably agree that the bare fact that the charging statute is RICO would not authorize a raid of the defendant's luxury apartment for weapons.)

Classified Memorandum # 3 shows many omissions from the warrant applications. A *Franks* hearing should be held to decide the question of materiality. But perhaps more importantly it throws a light on how much of grave mistake this investigation is, in undersigned counsel's opinion. ████████████████████████████████████ why did they continue inserting agents and informants into his life?

Memorandum # 3 ████████████████████████████████

████████████████████████████████████████████ ██ ██

████████████████████████████████ The DOJ decided, correctly we believe, not to charge Mr. Young in 2011. But if he *was* a terrorist in 2011, he should at least have been fired in not arrested. If he wasn't a terrorist in 2011 – between Libya, the guns, the questionable associates – how can anyone believe he was in 2016 when the only thing that had changed was $245 in alleged gift cards? The government's position on the public threat is not straightforward in this case.

Mr. Young respectfully requests that the Court order a *Franks* hearing and reconsider its decision on the Suppression Motion.

Respectfully submitted,

Nicholas D. Smith

CLEARED FOR PUBLIC RELEASE

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 10-17-2017 BY J43J41T42 NSICG

This redacted version only

# CLASSIFIED

# MEMORANDUM # 1

REDACTED / CLEARED FOR PUBLIC RELEASE

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 10-17-2017 BY J43J41742 NSICG
This redacted version only



REDACTED / CLEARED FOR PUBLIC RELEASE

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 10-17-2017 BY J43J41T42 NSICG

This redacted version only

REDACTED / CLEARED FOR PUBLIC RELEASE

# CLASSIFIED

# MEMORANDUM # 2

REDACTED   CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 10-17-2017 BY J43J41742 NSICG
This redacted version only



REDACTED / CLEARED FOR PUBLIC RELEASE



REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE



REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE



REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE



REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE



REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE



REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE



REDACTED / CLEARED FOR PUBLIC RELEASE



ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 10-17-2017 BY J43J41T42 NSICG

This redacted version only

# CLASSIFIED

# MEMORANDUM # 3

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED
DATE 10-17-2017 BY J43J41T42 NSICG
This redacted version only









Case 1:16-cr-00265-LMB   Document 132   Filed 10/31/17   Page 54 of 61 PageID# 1196













