**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>　　Plaintiff, )<br>　　　　　　　　　　　　　　 )<br>　　v. 　　　　　　　　　　　　 )<br>　　　　　　　　　　　　　　 ) Case No.: 16cr265 (LMB)<br>NICHOLAS YOUNG, 　　　　　 )<br>　　Defendant. 　　　　　　　 ) | |

**DEFENDANT NICHOLAS YOUNG'S REPLY IN SUPPORT OF MOTION TO
EXCLUDE TWO EXPERT WITNESSES FROM TRIAL**

Defendant Nicholas Young, through his undersigned counsel, files this reply in further support of his Motion to Exclude Two Expert Witnesses from Trial. (ECF 142.)

The government's Opposition (ECF 150) does not deny that: (a) proposed expert Dr. Daveed Gartenstein-Ross has no peer-reviewed publications concerning the subject of the Nazi/ISIS Report (135-4); (b) Gartenstein-Ross has never offered expert testimony in a criminal case; (c) he has never offered expert testimony on his Nazi/ISIS "convergence" thesis in any case, criminal or civil; (d) the leading empirical study in the field of domestic radicalization, which was funded by the Department of Justice –Jensen and LaFree, *Final Report: Empirical Assessment of Domestic Radicalization (EADR)* (College Park, Md.: University of Maryland, 2016) – runs directly contrary to Gartenstein-Ross's "convergence" opinion; (e) no court, in any Circuit (or any other jurisdiction in the world), at any time, has ever accepted expert testimony on the subject of a neo-Nazi/white supremacist/militant Islam "convergence." (ECF 150, pp. 1-17.)

Instead of addressing these points, the government contends, first, that Gartenstein-Ross is, generally, a prolific scholar, author, lecturer, and public intellectual. (ECF 150, p. 2.) It also cites Gartenstein-Ross's personal damascene moments – he was once a Muslim "who worked at

1

an Islamic charity connected to al-Qaeda" – as a reason to certify him as an expert witness on the ISIS/Nazi "convergence." (*Id.*) These are *non sequiturs*. The government provides no authority – there is none – holding that where a proposed expert is a "public intellectual"[1] or a prolific author in *any* field, he or she is therefore *ipso facto* qualified to offer expert testimony on the particular issue of fact in question for which the trier of fact purportedly needs expert elucidation. Here, that issue of fact is whether there is some sort of credible present-day connection between white supremacism and militant Islam. On that subject, Gartenstein-Ross has no scientific/technical/specialized qualifications, as shown for example by his reliance on popular Nazi Germany histories which were regarded by academics in the field as obsolete many decades ago.[2]

Second, the government argues that, while Gartenstein-Ross may have never testified on his ISIS/Nazi thesis in any case and may have never testified on any subject in any criminal case, there are two experts who *have* been admitted in terrorism cases: Evan Kohlmann and Matthew Levitt. (ECF 150, p. 4.) This is another *non sequitur*. Needless to say, Gartenstein-Ross is not Evan Kohlmann or Matthew Levitt. The government offers no authority for the proposition that because *some* expert has been certified to testify in a terrorism case, *every* expert must be so certified regardless of the content of their opinions.

---

[1] The government offers no evidence Gartenstein-Ross has been considered a public intellectual, which usually refers to a public figure known for deep erudition across diverse fields. Examples would be William F. Buckley, Christopher Hitchens, Susan Sontag. By contrast, Gartenstein-Ross, respectfully, appears to be more narrowly focused on militant Islamic terrorism, as distinguished from for example Nazi Germany history or white supremacism.

[2] The government attaches an opinion from *Foley v. Syrian Arab Republic*, 11-cv-699 (D.D.C. 2017) to demonstrate that Young "cannot contest that Dr. Gartenstein-Ross was, in fact, earlier this year accepted in the United States District Court for the District of Columbia as an expert witness in the evolution of the history of terrorist organizations and their claims of responsibility for acts of terrorism." (ECF 150, p. 2.) As Young has explained, Gartenstein-Ross's expert hearing was a default hearing: the court was given no opposition arguments to his testimony whatsoever. (ECF 142, p. 3.) The government does not deny this.

2

And Gartenstein-Ross is *not* Kohlmann and Levitt in more ways than one. In the terrorism cases cited by the government, Kohlmann and Levitt did not put their signature below an expert opinion to the effect that white supremacism and militant Islam share an "historic convergence." *See United States v. Hassan,* 742 F.3d 104 (4th Cir. 2014); *United States v. Benkahla*, 530 F.3d 300 (4th Cir. 2008); *United States v. Chandia*, 514 F.3d 365 (4th Cir. 2008); *United States v. Hammoud*, 381 F.3d 316 (4th Cir. 2004); *United States v. Farhane*, 634 F.3d 127 (2d Cir. 2011); *United States v. Damrah,* 412 F.3d 618 (6th Cir. 2005). To be clear: none of these cases concerns an expert offering to opine at trial that white supremacism and militant Islam share an historical convergence – or indeed anything else in common except for a handful of abstract adjectives and an anti-Semitism not distinguishable from that infecting other fringe groups across the ideological spectrum.

In *Benkahla*, the Fourth Circuit observed that Mr. Kohlmann "regularly testifie[d] in terrorism-related prosecutions." 530 F.3d at 309. Gartenstein-Ross has never testified in a terrorism-related prosecution (or in any case on the subject of his expert thesis). Kohlmann "gave background information on radical Islam and jihad generally rather than discussing [the defendant] individually." *Id.* Gartenstein-Ross does not propose to give "background information on radical Islam and jihad generally." He proposes to "examine what an examination" of dozens of items seized from Mr. Young's home have to say about the hypothesized "historic convergence" between white supremacism and militant Islam. (ECF 142, pp. 5, 14-20.) Instead of giving "background information on radical Islam generally," like Kohlmann, Gartenstein-Ross proposes to mainline hearsay into the trial which he reports he obtained from, among other sources, amateur blogs. (*Id.*, p. 16) (Gartenstein-Ross proposing to testify expertly about the "Abu Salim Martyr's Brigade," which he apparently has no personal

3

knowledge of, and for which he obtained information from a blog called the "Long War Journal"[3]).

In *Hassan*, the district court sent back Kohlmann's "very lengthy expert report," putting the government on notice that "only expert testimony relevant to the case is admissible and it should tailor the examination of Kohlmann accordingly." 742 F.3d at 131. The Fourth Circuit declined to reverse the district court's decision to ultimately certify Kohlmann because, although his methods were not subject to peer review, "his consultation with others in the field" gave the court assurance. *Id.* By contrast, Gartenstein-Ross has not indicated he has consulted with "others in the field" on his white supremacism/militant Islam hypothesis. That may be because, unlike in *Hassan* where Kohlmann testified about a subject he and his colleagues studied – militant Islam – Gartenstein-Ross proposes to testify on a subject, and in a field, in which he stands alone: a white supremacist and militant Islam "convergence." The government cannot satisfy the *Hassan*-required "consultation with others in the field" because there are no others in the field of White Supremacism-Is-Militant Islam studies.

In *Farhane*, the district court's decision to certify Kohlmann as an expert was not reversed because, among other reasons, the government made a showing that Kohlmann's work "had undergone various forms of peer review." 634 F.3d at 159. It made a showing his opinions were "generally accepted within the relevant community" and that his "methodology was similar to that employed by experts that have been permitted to testify in other federal cases involving terrorist organizations." *Id.* Here, by contrast, the government has made *no* showing that Garteinstein-Ross's "examining what an examination" of "cultural significance" to prove the white supremacist/militant Islam "convergence" has ever been accepted by a single scholar, let

---

[3] *See,* Wikipedia, Long War Journal: http://en.wikipedia.org/wiki/Long_War_Journal.

4

alone "general acceptance within the relevant community." The government has made no showing that Gartenstein-Ross's thesis is based on a methodology "similar to that employed by experts that have been permitted to testify in other federal cases involving terrorist organizations." *Farhane*, 634 F.3d at 159. To the contrary: the government has not cited a single instance in any court, in any Circuit, at any time, where such testimony has ever withstood Rule 702 scrutiny.

Another of Kohlmann's cases, *United States v. Hausa* 12cr134 (E.D.N.Y. 2017) (decision available at ECF 150-5), offers the government no assistance. In *Hausa*, Judge Cogan found that the government demonstrated to the court's satisfaction that "other terrorism experts rely on similar facts and data in forming their opinions." Mem. Op., p. 3. The government demonstrated Kohlmann's methods were "generally accepted in the international terrorism field." *Id.* at 4. The government demonstrated that Kohlmann's methodology had been published in academic papers that "were subject to peer review and he did not receive negative comments as to the methodology used." *Id.* at 4. Here, the government has made no showing that other experts in the field have relied on Gartenstein-Ross's facts in arriving at the white supremacist/militant Islam thesis which has never been endorsed in federal court before. The government has made no showing that Gartenstein-Ross has ever been subject to peer review, let alone peer review without negative comments like Kohlmann. Moreover, Judge Cogan specifically held that he would not allow Kohlmann to "become a conduit for hearsay." *Id.* at 4. Here, vast swaths of Gartenstein-Ross's testimony are not merely "based" on hearsay, but offer to directly convey these out-of-court statements to the fact finder for their truth. (ECF 142, pp. 14-20.)

Beyond making an apples-to-oranges comparison with Kohlmann (pure militant Islam testimony) and Gartenstein-Ross (novel ISIS/Nazi hypothesis), the government fails to disclose

cases where *Kohlmann*'s bread-and-butter terrorism expert testimony was excluded for being irrelevant and prejudicial. *See*, *e.g.*, *United States v. Amawi*, 695 F.3d 457, 503 (6th Cir. 2012) (affirming exclusion of Kohlmann because, among other reasons, the following testimony was irrelevant and prejudicial: meaning of Arabic words, geopolitics in the Middle East); *see also United States v. Rahman*, 189 F.3d 88, 134-35 (2d Cir. 1999) (concluding that generalized testimony about Islam and Islamic law was properly excluded as irrelevant to the question whether the defendant conspired to levy war or commit crimes of violence against the United States). Indeed, the Sixth Circuit observed that Kohlmann's testimony was "limited to providing additional context regarding items *already in evidence*. *Amawi*, 695 F.3d at 504 n. 11. By contrast, Gartenstein-Rose proposes to discuss a broad range of hearsay items not already in evidence, including highly prejudicial matter concerning Nazi history; Hitler; the SS; the *Turner Diaries*; 9/11 conspiracies; and anti-Semitism. (ECF 142, pp. 14-20.)

Likewise, in *Damrah*, Matthew Levitt testified as an expert in a field in which (a) he was an expert (militant Islam) and (b) in which other experts at least existed. 412 F.3d at 625. As for Gartenstein-Ross, the government has shown no other expert who shares the white supremacist/militant Islam thesis. To the contrary, the leading empirical study in the field, the EADR, demonstrates this thesis lacks any data-based foundation. Further, in *Damrah*, the defendant objected to Levitt's testimony on the ground it was *based* on hearsay, not that it served as a conduit for the government to introduce hearsay at trial. *Id.* Here, by contrast, Garnstein-Ross proposes to directly transmit prejudicial hearsay evidence to the jury on a range of subjects: Nazis; SS; white supremacist literature; militant Islam literature not found in Mr. Young's possession; Hitler's relationship with one of his favorite fellow-Austrian commandos; 9/11

conspiracy theory; anti-Semitism literature; who and what the "Abu Salim Martyr's Brigade" consists of (based on the reporting of a blog). (ECF 142, pp. 14-19.)

Nor is the government correct to rely on the district court memorandum opinion in *Damrah* (decision available at ECF 150-6). There, among other findings, Judge James S. Gwin specifically refused to allow Levitt to "disclose any inadmissible hearsay to the jury prior to a determination by the Court." Mem. Op., p. 12. Here, by contrast, Gartenstein-Ross's proposed expert testimony is virtually entirely compiled of references to hearsay evidence, and of the most highly prejudicial sort. (ECF 142, pp. 14-19.) Moreover, Judge Gwin, in certifying Levitt, relied on the fact that Levitt's method had been "peer reviewed." (ECF 150-6, p. 13.) Not so with Gartenstein-Ross. Judge Gwin also relied on the government's showing that Levitt had vetted his methods with others in the field of international terrorism policy. (*Id.*) Not so, Gartenstein-Ross's white supremacism/militant Islam hypothesis. Judge Gwin then concluded his opinion with the bottom line: Levitt was permitted to testify expertly but "limited to his area of expertise – Middle Eastern terrorist groups." (*Id.*) If Gartenstein-Ross does have an area of expertise – which Mr. Young disputes – it would be "Middle Eastern terrorist groups" and not Nazi Germany or white supremacists for which he has no credentials, no peer review, no stated consultation with others in the field, no expert testimony experience.

Similarly, in *Hammoud*, Mr. Levitt testified on his particular subject of expertise: Hizballah. 381 F.3d at 337. The government made a showing that Mr. Levitt's work was subject to "tremendous peer review." *Id.* It made a showing that Mr. Levitt would "discuss his findings and conclusions with others to ensure their soundness." *Id.* Here, the government has offered no peer review for Gartenstein-Ross or his Nazi/ISIS convergence thesis. In fact, when contacted and questioned about Gartenstein-Ross's Nazi/ISIS thesis, Jensen, the author of the

7

aforementioned EADR domestic radicalization study, stated that he was aware of no study on this subject at all. Moreover, in *Hammoud*, the defendant did not even challenge Levitt's testimony that his methodology was "generally employed in the social sciences." 381 F.3d at 337. Here, by contrast, Mr. Young strenuously objects to Gartenstein-Ross's proposed testimony on the grounds that there is not even a relevant social science field on the white supremacist/militant Islam "convergence"; no academics have apparently ever offered a similar thesis; there is no empirical support for it; and no court in the country has ever endorsed it.

In sum, Gartenstein-Ross's proposed testimony is nothing like Levitt's or Kohlmann's. Indeed, given that Levitt and Kohlmann have vastly more experience testifying as experts in terrorism cases, one might reasonably wonder why the government did not select *them* to testify in this case. One possibility is they were unwilling to sign their names below the hypothesis that white supremacism shares a "historic convergence" with militant Islam – a thesis that simultaneously undermines the seriousness of both white supremacism and militant Islam by attempting to strangely insist that an apple is an orange and vice versa.

Even if the Levitt/Kohlmann precedent were sufficient to cover Gartenstein-Ross, his proposed testimony should still be excluded. His testimony recites enormously prejudicial hearsay material about Nazis; SS; anti-Semitism; 9/11 conspiracy. Even assuming some sort of relevance argument could be made for these subjects in a militant Islam terrorism case – and it cannot – Gartenstein-Ross's testimony would patently fail Rule 403 unfairly prejudicial/probative value balancing. This is true solely by virtue of the fact that the government has never offered a single precedent where these inflammatory subjects have even been referenced in a militant Islam terrorism case. That being the case, it is inconceivable that

these subjects would have such profound probative value as to outweigh the proverbial and lethal prejudice of Nazi and white supremacist evidence.

The government closes by observing that "it is unrealistic to expect that a typical juror could understand much of the evidence in this case [citing, variously, Al-Qaeda, the Frikorps, the Waffen SS, the National Alliance] without the assistance of expert testimony such as that provided by Gartenstein-Ross." (ECF 150, p. 14.)

On this point, Defendant Young is in complete agreement. It *is* unrealistic to expect any reasonable person to believe that white supremacism is the same phenomenon as militant Islam. However, it does not follow that the fact finder needs an expert to educate him or her on this issue, any more than he or she needs to be instructed by an expert that 2+2=5.

As for Ian Campbell, the Arlington County police officer, the government contends that, even if he testifies as a fact witness, he may properly testify about "neo-Nazis, *Hunter*, *Serpent's Walk*, and other indicators of extremism that he looks for as a police officer." (ECF 150, p. 15.) This is patently an inaccurate statement of law. A fact witness testifies about facts *in the case* of which they have personal knowledge; an expert witness testifies on an area of scientific, technical or specialized knowledge if it would help the fact finder decide an issue of fact. Officer Campbell cannot, as a fact witness, testify about "indicators of extremism" generally. *United States v. Garcia*, 752 F.3d 382, 2014 U.S. App. LEXIS 9046, 2014 WL 1924857, at *7-8 (4th Cir. May 15, 2014) (holding that the district court abused its discretion in allowing law enforcement expert testimony where "there were inadequate safeguards to protect the jury from conflating [the expert's] testimony as an expert and fact witness."). (The government also inaccurately represents the subject of Campbell's lay witness testimony. It asserts Campbell attended a "neo-Nazi gathering with the defendant." (ECF 150, p. 15.) If the Court inspects

Discovery Letter # 24 attached to the government's opposition, ECF 150-7, it will see the government previously referred to this incident as a "neo-Nazi rally." So the allegation went from a "rally" to a "gathering." In fact, the allegation is still false.  Mr. Young attended a British National Party meeting with Campbell in 2000 – after both had been in a European Racism class at George Mason University.)

  The government has offered no CV for Mr. Campbell; no experience as an expert; no method; no previous testimony; no peer review; no data.  He is not an expert and therefore his expert testimony on the "indicators of extremism" should be excluded.

Dated: November 30, 2017          Respectfully submitted.

                 */s/ Nicholas D. Smith*
                 Nicholas D. Smith (VA. Bar. 79745)
                 108 N. Alfred St.
                 Alexandria, VA 22314
                 Phone:(703)548-8911
                 Fax:(703)548-8935
                 nbs@davidbsmithpllc.com

                 Linda Moreno (admitted *pro hac vice*)
                 Linda Moreno P.A.
                 511 Avenue of the Americas
                 No. 312
                 New York, NY 10011
                 813-247-4500
                 lindamoreno.esquire@gmail.com

## Certificate of Service

I hereby certify that on the 30th day of November, 2017, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following CM/ECF user(s):

> AUSA Gordon D. Kromberg
> AUSA John Gibbs
> U.S. Attorney's Office
> 2100 Jamieson Avenue
> Alexandria, Virginia 22314
> gordon.kromberg@usdoj.gov
> john.gibbs@usdoj.gov

And I hereby certify that I have mailed the document by United States mail, first class postage prepaid, to the following non-CM/ECF participant(s), addressed as follows: [none].

 */s/ Nicholas D. Smith*
Nicholas D. Smith
VA Bar No. 79745
David B. Smith, PLLC
108 North Alfred Street
Alexandria, Virginia 22314
(703) 548-8911 / Fax (703) 548-8935
nds@davidbsmithpllc.com