IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 1:16cr265 |
| | ) | |
| NICHOLAS YOUNG | ) | |

GOVERNMENT'S OPPOSITION TO
<u>DEFENDANT'S MOTION FOR A NEW TRIAL</u>

After being convicted on all counts, Defendant Nicholas Young moves for a new trial on several grounds which have one thing in common:  they all lack merit.  For the reasons set forth below, Young's motion for a new trial should be denied.

<u>Background</u>

In December 2016, a grand jury returned an indictment charging Young with attempting to provide material support to a designated foreign terrorist organization (ISIS) in violation of 18 U.S.C. § 2339B, two counts of obstruction of justice in violation of 18 U.S.C. § 1512(c)(2), and one count of obstruction of justice in violation of 18 U.S.C. § 1512(b)(3).  Dkt. No. 38.

In Count 1, the indictment alleged that in July 2016, Young attempted to send money to ISIS by transmitting gift card codes to an account that Young believed was controlled by an ISIS fighter that he knew as "Mo."  In Count 2, the indictment alleged that, in order to keep the government from learning that he believed that the individual that he knew as "Mo" had joined ISIS, Young tried to mislead the FBI during interviews in December 2015 about his contacts with "Mo" over the previous 18 months.   In Count 4, the indictment alleged that on November

20, 2014, Young sent "Mo" a text message designed to mislead the FBI about Mo's whereabouts.[1]

In pretrial pleadings and at the final pretrial conference, the defense stated its intent to offer an entrapment defense, which required the government to prove that Young was predisposed to support ISIS.  In short, Young argued that his contact with an undercover officer known to him as "Khalil" between 2010 and 2012 contributed to his "entrapment" in 2016.  *See* Young's Motion In Limine, Dkt. No. 117-1 at 1 ("[S]ince Mr. Young will raise an entrapment defense, the government will also attempt to prove he had a predisposition to materially support the FTO before the criminal investigation began, in 2010 or earlier.").  As a result - - at least according to Young - - the government's proof of Young's predisposition to support ISIS in 2016 had to predate his encounter with Khalil in 2010.  In light of that argument, the government introduced evidence of Young's predisposition that predated 2010.

Trial began on December 11, 2017.  After a five-day trial, the jury returned a verdict of guilty on all counts.  The Court scheduled sentencing for February 23, 2018.

<u>Argument</u>

Whether to grant or deny a motion for new trial rests within the discretion of the district court.  *United States v. Perry*, 335 F.3d 316, 320 (4th Cir. 2003).  The "trial court's discretion should be exercised sparingly, and a new trial should be granted only when the evidence weighs heavily against the verdict."  *United States v. Arrington*, 757 F.2d 1484, 1486 (4th Cir. 1985).[2] In this case, Young's motion for a new trial should be denied.  Young received a full and fair trial, and the jury's verdict was supported by the evidence.

---

[1]  On December 1, 2017, the Court dismissed the § 1512(b)(3) charge *sua sponte*.  Dkt. No. 197.

[2] Internal quotations and citations are omitted from quotations throughout this pleading.

I.      Evidence of Young's Adherence to Nazi Ideology and Possession of
        <u>Body Armor Was Properly Admitted as Predisposition Evidence</u>

Young argues that any evidence of his adherence to Nazi ideology and possession of

weapons and body armor was irrelevant and unduly prejudicial, and therefore that the Court

erred in admitting any such evidence at trial.  However, as the Court stated on multiple

occasions, Young's decision to pursue an entrapment defense rendered that material relevant and

- - in many cases - -admissible.

In renewing this argument in his motion for a new trial, Young makes a second attempt to

eat his cake and have it too:  he put his mindset at issue by claiming entrapment, but

simultaneously claims that the government's evidence of his mindset should have been barred as

unduly prejudicial.  Settled authority precludes this tactic.  As the Supreme Court held years ago,

a defendant raising an entrapment defense cannot complain of a "searching inquiry" into his own

conduct:

> if the defendant seeks acquittal by reason of entrapment he cannot
> complain of an appropriate and searching inquiry into his own conduct
> and predisposition as bearing upon that issue.  If in consequence he suffers
> a disadvantage, he has brought it upon himself by reason of the nature of
> the defense.

*Sorrells v. United States*, 287 U.S. 435, 451 (1932), *quoted in United States v. McLaurin*, 764

F.3d 372, 381 (4th Cir. 2014).  Evidence of Young's affinity for terrorism conducted by Nazis,

therefore, properly was admissible to rebut his own claim that his desire to support ISIS was

implanted in him by the government.

A.   <u>Character Evidence Is Relevant and Admissible in Entrapment Cases</u>

Relevant evidence is any evidence that "has any tendency to make a fact more or less

probable than it would be without the evidence," so long as "the fact is of consequence in

determining the action."  Fed. R. Evid. 401.  All relevant evidence is admissible, except as

3

otherwise provided by the Constitution, by Act of Congress, or by applicable rule.  Fed. R. Evid.

402.  Evidence of other bad acts may be admissible to prove intent or motive.  Fed. R. Evid.

404(b).  Indeed, "[e]xtrinsic acts evidence may be critical to the establishment of the truth as to a

disputed issue, especially when that issue involves the actor's state of mind and the only means

of ascertaining that mental state is by drawing inferences from conduct."  *Huddleston v. United*

*States*, 485 U.S. 681, 685 (1988).

While evidence of other bad acts may be admissible to prove intent or motive, Rule 404

generally prohibits such evidence to prove the defendant's character—except in cases involving

claims of entrapment.  Indeed, Rule 404(b)'s requirements are relaxed when the defendant

claims entrapment.  When a defendant claims entrapment, "there is no doubt that proving

predisposition is one of the purposes for which bad-act evidence may be admissible."  *United*

*States v. McLaurin*, 764 F.3d 372, 380 (4th Cir. 2014).

"Predisposition is itself a broad concept, and a broad swath of evidence, including aspects

of the defendant's character and criminal past, is relevant to proving predisposition."  *Id.* at 381.

As a result, and "[g]iven the range of evidence that is relevant to the predisposition issue, certain

bad-act evidence may be admissible under Rule 404(b) in entrapment cases that would not be

admissible in cases where entrapment is not an issue."  *Id.*  As stated in *McLaurin*:

> Proving disposition to commit a crime is very close to proving "criminal propensity," the very type of prejudice against which the general prohibition on admission of evidence of other crimes is directed.  In an entrapment case, however, the issue is precisely whether the accused, at the time of the government inducement, had a propensity to commit crimes of the nature charged — that is, whether he was predisposed to do so.

*Id.*  Thus, "assertion of an entrapment defense does not justify admission of every bad act ever

done by the defendant, but distinguishing the unwary innocent from the unwary criminal

nonetheless requires a "searching inquiry."  *Id.*

"Predisposition is not limited only to crimes specifically contemplated by the defendant prior to government suggestion." *United States v. Hackley*, 662 F.3d 671, 682 (4th Cir. 2011). When used to show predisposition in a terrorism case, the relevant prior design to commit the crime or similar crimes need be only a rather generalized idea or intent to inflict harm on interests of the United States. *United States v. Cromitie*, 727 F.3d 194, 207 (2d Cir. 2013). Evidence of conduct occurring both before and after the defendant was contacted by the government is admissible to prove predisposition. *United States v. Squillacote*, 221 F.3d 542, 566 (4th Cir. 2000).

By claiming entrapment, Young asserted that his desire to support ISIS was implanted by the government. As discussed below, evidence of his support for terrorism in general (or ISIS in specific) was relevant and admissible to disprove this assertion.

B.  Evidence of Young's Predisposition Was Not Unfairly Prejudicial

Young claims that any evidence related to his adherence to Nazi ideology or his possession or body armor was unfairly prejudicial. "Where the evidence is probative, [however,] the balance under Rule 403 should be struck in favor of admissibility, and evidence should be excluded only sparingly." *United States v. Lentz*, 524 F.3d 501, 525–26 (4th Cir. 2008). "Evidence which tends to rebut a defendant's claim of innocent action is unlikely to be unduly prejudicial." *United States v. El-Mezain*, 664 F.3d 467, 509–11 (5th Cir. 2011) (in a terrorist financing case, affirming the admission of videotapes of demonstrators destroying American flags and violent images of the aftermath of Hamas suicide bombings).

C.  Each Piece of Evidence Concerning Young's Nazi Ideology
Was Relevant, Not Cumulative, and Not Unduly Prejudicial

Regardless of whether support for Nazis is always relevant to prove a defendant's support for terrorists, it surely can be relevant when a defendant puts his motivation to support terrorism

5

at issue by claiming entrapment.  The evidence at trial established that Young supported both Nazis and ISIS, and that his motivation to do so was the hatred of Jews that he shared with both. As a result, evidence of Young's support for Nazis was relevant to establish his predisposition to support ISIS.  *See United States v. Mahon*, CR 09–712 PHX–DGC, No. 2010 WL 4038763, at *11 (D. Ariz. Oct. 14, 2010) (holding that defendant's "allegiance to [white supremacist] groups that advocated violence" constituted evidence of predisposition to commit violent crimes), *aff'd*, 793 F.3d 1115 (9th Cir. 2011).

In this context, evidence of the relationship between Nazism and radical Islamists, as well Young's attraction to Nazis, was probative of whether Young's support for ISIS was implanted in him by the government, or such support for ISIS was the product of his own predisposition to support terrorists that hate Jews just like he does.  This includes evidence of Young's involvement with Nazis and radical Islam at the same time.

To establish that Young was predisposed in 2010 to support ISIS in 2016, the government established the following facts:

1.  Young was attracted to Nazi terrorists before 2010;
2.  Young knew that the Nazis to whom he was attracted were terrorists;
3.  Young hated Jews;
4.  Young was interested in an alliance between Nazis and Islamic terrorists; and
5.  Young was attracted to Nazis and Muslim terrorists at the same time.

Contrary to Young's suggestion, the government did not inundate the jury with Nazi evidence.  Instead, the Court sharply limited the quantity of predisposition evidence the government was permitted to introduce.  By our count, approximately 36 exhibits were introduced to establish the five points listed above.  Even of those 36 exhibits, most were in no way controversial.

Moreover, although all Nazi-related evidence was relevant to establish Young's predisposition, most was also relevant on another basis as well, such as to corroborate witness testimony. Because the number of individual exhibits introduced at trial but now at issue is so limited, *every* Nazi- or white supremacist-related exhibit admitted at trial is discussed below, as each one relates to the five points set forth above.

1. <u>Young was Attracted to Nazi and White Supremacist Terrorists Before 2010</u>

| | |
|---|---|
| GX 4-300 | Booking photo of Young's SS tattoo |
| GX 8-500 | LiveLeak account in the name of Dusselkamp |
| GX 10-706 | Reenactment group roster |
| GX 10-714 | Reichkriegsflagge |
| GX 10-715 | Photo of foot locker with the name "Dusselkamp" |
| GX 10-860 | the book "*Serpent's Walk*," seized from Young's residence |
| GX 10-861 | the book *Hunter*, seized from Young's residence |
| GX 10-863 | Flyer for "White Power Music" from "Burning Cross Records" |
| GX 10-903 | Photo of Young in Nazi uniform at a dinner, 11/17/2007 |
| GX 11-400 | FRI-KRP license plate |
| GX 13-105 | the book *Serpent's Walk*, gifted to Ian Campbell by Young in 2010 |

To establish that Young was affiliated with a group that (at the least) posed as members of the Nazi SS, the government introduced a roster of individuals from Northern Virginia that included Young with the alter ego of Stormtrooper Klaus Dusselkamp. GX 10-706. To establish that he was still affiliated with his Dusselkamp identity in 2016, the government introduced a photo of a footlocker found in Young's residence with the name "Dusselkamp" on it, GX 10-715, and records of a LiveLeak account used by Young as late as 2015, in the name Dusselkamp. GX 8-500.

Pre-trial, Young argued that his use of the "Dusselkamp" identity and his possession of Nazi memorabilia resulted not from an affinity for Nazism, but from his involvement with a World War II reenactment group. To establish that his interest in Nazism was not limited to involvement with a reenactment group, a photo of his SS tattoo was admitted into evidence. GX

4-300.  Also admitted into evidence was a single photo of Young in his Nazi SS uniform, at a dinner that obviously was not a war reenactment.  GX 10-903.[3]

To further establish that Young's affiliation with neo-Nazis went beyond war reenactments, the government introduced a photo of the license plate of Young's truck, FRI-KRP, GX 11-400, and Kenneth McNulty testified that Young had a German flag hanging in his residence.  GX 10-714.  Dr. Gartenstein-Ross testified that the Freikorp was a precursor of the Nazi SS before World War II, and that neo-Nazis used the "Reichkriegsflagge" after the war when use of the swastika flag was banned.

As further corroboration of Young's attraction to neo-Nazis, the government introduced into evidence copies of the books *Serpent's Walk* and *Hunter,* that were seized from Young's residence at the time of his arrest.  GX 10-860, 10-861, as well as the copy of *Serpent's Walk* that Young gifted to Ian Campbell in 2010.  GX 13-105.  Gartenstein-Ross explained the publisher of both books was a leading neo-Nazi organization known as the National Alliance, and that both books were propaganda for the neo-Nazi movement.  *See United States v. Siraj*, No. 07–0224–CR, 2008 WL 2675826 at *2 (2d Cir. July 9, 2008) (affirming admission into evidence of books and videos recommended by the defendant despite claims that they were unduly prejudicial).

When Young's residence was searched in August 2016, investigators found his iPod, which contained nasheeds (Islamic songs) that were obviously laudatory of the Islamic State, such as "ISIS Nasheed", "Jihad Nasheed", "ISIS Techno Remix", and "ISIS Best Nasheed."  GX 10-303; GX 10-304; and GX 10-305.  To show that Young's interest in music that promulgated

---

[3]  Despite Young's repeated mischaracterizations, only one photo of him in a Nazi uniform was introduced into evidence, GX 10-903, and none were admitted of the several available of him in front of a Nazi flag.  *See, e.g.,* Young's Memorandum in Support of Motion for a New Trial (Dkt. No. 206-1) (hereinafter "Young's Memorandum"), at p. 5 ("pictures of the defendant dressed as a Nazi"); at p. 14 ("pictures of the defendant dressed as a Nazi").

terrorism pre-dated his contact with government agents, the government presented evidence from Kenneth McNulty.  McNulty testified that, when he was Young's housemate between 2003 and 2007, he heard Young listening to racially inflammatory music.  To corroborate McNulty's testimony on this point, the government introduced a single photograph of a flyer from "Burning Cross Records - Your Source for White Power Music."  GX 10-863.  *See United States v. Magleby*, 241 F.3d 1306, 1319 (10th Cir. 2001) (admitting racist song lyrics on white supremacist CD owned by the defendant in a non-entrapment case because the defendant's state of mind was at issue).

Most of the exhibits listed obviously were not "inflammatory."  While individual exhibits may have been disturbing, they properly were admitted because of their probative value in the particular context of this case.  When evidence in terrorism cases is probative, it properly is admitted even though it may be "alarming," *United States v. Benkahla*, 530 F.3d 300, 310 (4th Cir. 2008); "disturbing," *United States v. Salameh*, 152 F.3d 88, 122 (2d Cir. 1998); or even "blood curdling." *United States v. Mubayyid*, 658 F.3d 35, 56 (1st Cir. 2011).  This is so because such evidence is "directly related to the nature of the crimes that the defendant has set out to commit." *United States v. Mehanna*, 735 F.3d 32, 64 (1st Cir. 2013).

In short, emotionally charged evidence that might be barred in a different context is admitted in terrorism cases, because such evidence is no more inflammatory than the emotionally charged crimes with which the defendant has been charged in the first place.  *See*, *e.g.*, *United States v. Abu–Jihaad*, 630 F.3d 102, 132–33 (2d Cir. 2010) ("[W]e conclude that the recorded discussions were both highly probative of the charged crime and, to the extent they referenced uncharged contemporaneous support for jihad, no more inflammatory than the charges alleged in the indictment.").

In this case, Young was charged with attempting to provide material support to a group that proudly executed or made sex slaves of the civilians it captured, and proudly burned alive a military pilot that it captured.  In one of the most central exchanges of text messages in the entire case, on August 2, 2016, Young wrote that he himself wanted to purchase a slave from civilian women captured by ISIS.  GX 3-224.  In short, none of the government's evidence in this case was more prejudicial than the charges for which Young was indicted.  In any event, this Court instructed the jury to consider this evidence only for the limited purpose of determining whether Young was predisposed to commit the charged offense.

    2.    <u>Young Knew that the Nazis to Whom He Was Attracted Were Terrorists</u>

GX 10-220    Slides from Young's computer "Signs of Extremism"
GX 10-701    Book: *SS: Hitler's Instrument of Terror*

To establish that Young knew that the Nazi SS were obviously terrorists, the government introduced the cover of GX 10-701, a book owned by Young titled "SS: Hitler's Instrument of Terror."  To establish that Young knew that, even today, the lightning bolt insignia of the Nazi SS was a neo-Nazi symbol, the government introduced GX 10-220, a PowerPoint slide from Young's own slide deck.  Neither of those items fairly could be called "inflammatory."

    3.    <u>Young Hated Jews</u>

GX 10-252    "Jewish Swine" graphic
GX 11-401    Israeli flag used as a doormat

Dr. Gartenstein-Ross testified that a hatred of Jews is a factor that causes some adherents to Nazi ideology also to support radical Islamic ideology.  Khalil testified that Young regularly talked about his hatred of Jews.  To corroborate Khalil's testimony that Young hated Jews, Menzies testified that Young used an Israeli flag as a doormat.  GX 11-401.  To establish that Young's use of an Israeli flag as a doormat was motivated by hatred of Jews (rather than by

disagreement with Israeli government policies), the government introduced one graphic from

Young's computer in 2007, depicting "Jewish Swine."  GX 10-252.  While the graphic was

disturbing, it properly was admissible because of its probative value.  *Salameh*, 152 F.3d at 122

(affirming the admission of "disturbing" evidence in a terrorism trial); *United States v. Mostafa*,

16 F. Supp. 3d 236, 260, 266 (S.D.N.Y. 2014) (admitting defendant's statement, "these dirty

Jews, Christians, most of them homosexual persons," in a non-entrapment case, but not

admitting other disparaging statements on the ground that they were cumulative).[4]

4.     Young Was Interested in an Alliance
       Between Nazis and Islamic Terrorists

| | |
|---|---|
| GX 4-203 | Graphic on phone, "Together We Can Finish What Hitler Started" |
| GX 8-107 | Young's Facebook page, "Liking" Haj Amin Al-Husayni |
| GX 8-108 | Young's Facebook page, linking to video about Emerson Begolly |
| GX 8-109 | Screenshot of video about Emerson Begolly |
| GX 10-241 | Photo of Muslim women with "God Bless Hitler" sign |
| GX 10-230 | Graphic of "The Alliance" Between Islamists and Nazis |
| GX 10-231 | Photo of Haj Amin Al-Husayni with Hitler |
| GX 10-232 | Photo of Al-Husayni inspecting Muslim SS troops |
| GX 10-236 | Photo of Portrait of Al-Husayni |
| GX 10-237 | Photo of Muslim SS troops |
| GX 10-238 | Photo of Muslim SS troops reading "Islam und Judentum" |
| GX 10-240 | Photo of Al-Husayni on a magazine cover |
| GX 10-814 | Prayer list including Hitler and Al-Husayni |
| GX 13-101: | Pamphlet "Information for Prospective Members of the National Alliance" |
| GX 13-102 | Pamphlet, "Free Speech" |
| GX 13-103 | Pamphlet, "Heritage and Destiny" |
| GX 13-104: | Pamphlet, "What is the National Alliance?" |

Campbell testified that, as part of a school project, he and Young attended a gathering of

white supremacists in 2001.  Campbell testified that after the meeting, Young told him not to

---

[4] Young alleges that "pictures were displayed at trial of cartoon stereotyped Jewish people," Young's Memorandum at p. 6, and that the government introduced "cartoons of stereotyped Jewish people" and "images of stereotyped Jewish people." *Id.* at 14 and 16.  If Young intended in those allegations to reference the pig with human features in the "Jewish Swine" graphic in GX 10-252, then that would constitute a total of *one* such picture relevant to his three claims of multiple cartoons and images.

discount an alliance with the Muslims to combat the Jews.  That testimony was key to

establishing Young's predisposition to support ISIS in 2016.  To corroborate that key testimony,

the government introduced into evidence pamphlets that Campbell had acquired at that gathering

and retained, titled "Information for Prospective Members of the National Alliance", "Free

Speech", "Heritage and Destiny", and "What is the National Alliance?"  GX 13-101 through GX

104.  Not one of those items fairly could be called "inflammatory."

Campbell's testimony - - that Young told him not to discount the idea of an alliance with

the Muslims to combat the Jews - - also was corroborated by Young's possession in 2007 of a

computer file containing the graphic of a poster titled "The Alliance: Worldwide Association of

Nazis and Islamists 1939 - 2004."  The poster depicted a generic Nazi shaking hands with Haj

Amin Al-Husayni, the Mufti of Jerusalem.  GX 10-230.  As Gartenstein-Ross explained, Al-

Husayni is famous for allying himself with Hitler in World War II, in the hopes that Hitler would

bring the "final solution" to Palestine.[5]

In pursuant of that alliance, Al-Husayni recruited a division of Muslim troops to serve in

the Nazi SS.  To corroborate the inference that Young knew of Al-Husayni's involvement with

Hitler, the government introduced from Young's computer media in 2007 a photo of Al-Husayni

with Hitler, GX 10-231; a photo of Al-Husayni reviewing the Muslim SS troops that he had

recruited, GX 10-232; and two photos of those Muslim SS troops, including one in which the

troops were reading a booklet, purportedly based on Islamic law, which was written by Al-

Husayni to incite hatred against Jews.   GX 10-237 and GX 10-238.

To establish that Young's possession of those computer files was no accident, the

government introduced Young's Facebook page in which he "liked" Al-Husayni in 2011, GX 8-

---

[5]   While that poster may have looked like a collector's item from World War II, the fact that it contained
the dates "1939 - 2004" indicated that it was of far more recent vintage.

107, as well as two portraits of Al-Husayni on computer files from 2007, GX 10-236 and GX 10-240, and Young's prayer list, which included Hitler and Al-Husayni together.  GX 10-814.  None of those items fairly could be called "inflammatory."

Campbell's key testimony further was corroborated by Young's possession of a photo on his computer media from 2007 of Muslim women with a sign "God Bless Hitler," GX 10-241, and a graphic on Young's cell phone from January 2014 (before Young met "Mo") that depicted chimneys belching smoke and the words "Together we can finish what Hitler started."  GX 4-203.  Once again, while the two items likely were "disturbing," they were properly admitted because of their probative value in the context of this case.

Similarly, Campbell's key testimony was corroborated by proof of Young's interest in Nazis who became Muslims.  Accordingly, the government introduced GX 8-108, a copy of Young's Facebook page from 2011, in which Young linked to a story, GX 8-109, about the arrest of former neo-Nazi turned jihadist Emerson Begolly, who called online for Jews to be slaughtered.

### 5.   Young Was Attracted to Nazis and Muslim Terrorists at the Same Time

GX 3-110     Tie tac found in truck in August 2016
GX 10-101A   Internet sites bookmarked by Young as of 2016
GX 10-700    Framed Portrait of Hitler
GX 14-180    Internet sites bookmarked by Young as of 2011

Young argued pre-trial (and at trial) that one could not simultaneously be a Nazi and also a radical Muslim.  To establish that the contrary was true, the government introduced evidence that, even in August 2016, Young possessed in his truck an SS tie tac, GX 3-110, and in his residence, a framed portrait of Adolf Hitler.  GX 10-700.  Further, the government introduced evidence of the Internet websites he bookmarked on his computer as of 2011, GX 14-180, and as of 2016.  GX 10-101A.  For example, GX 14-180 shows that during the same time period that

Young bookmarked websites related to Jew-hatred, Neo-Nazis, and Hitler, he also bookmarked websites related to Bin Laden, Anwar Awlaki, and other radical Islamists.[6]

The single admitted photograph of Young in his Nazi uniform admitted at trial, GX 10-903, referenced in Section I, above, was admitted to help establish that Young was attracted to Nazi and white supremacist terrorists before 2010. That same photograph, however, also was relevant to show that Young was attracted to Nazis and Muslim terrorists at the same time. That photograph was created on Young's computer media on January 28, 2006. Government exhibit 14-119, showing Young dressed in Muslim garb and holding a rifle, was saved to his computer media just five days later.

In short, the evidence admitted at trial was not cumulative. Because courts routinely admit evidence more prejudicial than that which Young challenges, including defendants' prior convictions and even serious uncharged crimes, Young's claim that the government's evidence of his adherence to Nazi ideology is unduly prejudicial must fail. *See*, *e.g.*, *McLaurin*, 764 F.3d at 382-84 (upholding admission of defendants' prior robbery conviction and firearm possession to prove their predisposition). Further, in light of Young's entrapment defense, it was necessary to show that Young's support for Nazis was intertwined with his support for Islamic extremists, and that both were motivated by hatred of Jews.

II.    Dr. Gartenstein-Ross's Testimony Properly Was Admitted

    A.    No *Daubert* Hearing Was Required

Young claims that the Court erred in admitting Dr. Gartenstein-Ross's expert testimony without first holding a *Daubert* hearing and - - according to Young - - without making

---

[6]  That list included a site devoted to Alois Brunner, a Nazi who converted to Islam, and properly also could have been listed above, on page 11, with the evidence that was probative of Young's interest in an alliance between Nazis and Islamic terrorists.

findings under Federal Rule of Evidence 702.  This claim misstates both the law and the facts.

First, a *Daubert* hearing is not mandated in all cases.  This is so because trial judges have significant discretion in determining the admissibility of expert opinion.  *Kumho Tire Co.*, *Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).  For example, the Fourth Circuit ruled that Judge Hilton did not abuse his discretion when he declined to hold a *Daubert* hearing before allowing Evan Kohlmann to testify as an expert witness in a terrorism case.  *United States v. Chandia*, 514 F.3d 365, 375 at n.3 (4th Cir. 2008).  Accordingly, it was within this Court's discretion as to whether a *Daubert* hearing was necessary before Gartenstein-Ross could testify as an expert.

Second, the Court did make findings under Rule 702 in open court.  On November 25, 2017, Young filed a motion to exclude Dr. Gartenstein-Ross as a witness.  Dkt. No. 142.  The government filed its written response and exhibits thereto on November 29, 2017, Dkt. No. 150, to which Young replied on November 30, 2017.  Dkt. No. 157.  The Court heard argument on this motion on December 1, 2017.  Dkt. No. 161.

In both its written submission and in open court, the government established that Dr. Gartenstein-Ross's testimony met both the relevancy and reliability standards set forth in Rule 702 and *Kuhmo Tire Co.*  "[A]t bottom, the court's evaluation is always a flexible one, and the court's conclusions necessarily amount to an exercise of broad discretion guided by the overarching criteria of relevance and reliability."  *Oglesby v. General Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999).  This Court's conclusion that Dr. Gartenstein-Ross could testify as an expert is consistent with numerous other cases involving social scientists whose testimony is used to explain to the jury concepts and relationships with which they were likely to be unfamiliar. *See*, e.g., *United States Benkahla*, 530 F.3d 300, 308, 309 n.2 (4th Cir. 2008); *United States v. Ali Al-Timimi*, Dkt. No. 1:04-cr-00385-LMB-1, Dkt. No. 65 (E.D. Va. Mar. 18, 2005);

*United States v. Hassan*, 742 F.3d 104, 131 (4th Cir. 2014) (Evan Kohlmann permitted to testify as terrorism expert); *United States v. Farhane*, 634 F.3d 127, 158 (2d Cir. 2011) (same); *United States v. Hausa*, No. 1:12-cr-0134, Dkt. No. 220 (E.D.N.Y. Feb. 10, 2017) (same); *United States v. Damrah*, No. 1:03-cr-484 (N.D. Ohio June 9, 2004) (admitting Matthew Levitt's testimony regarding international terrorism generally and the Palestinian Islamic Jihad in specific because although "Levitt's methodology appears to be little more than reading copiously, analyzing the data that he reads, and conveying that knowledge to others . . . *it seems to be very much the gold standard in the field of international terrorism.*"), *aff'd*, 412 F.3d 618 (6th Cir. 2005) (quoting district court's conclusion that Levitt's methodology is "the gold standard in the field of international terrorism").

As was the situation in the *Benkahla* and *Al-Timimi* cases, the evidence in this case included exhibits, messages, graphics, and conversations involving language, concepts, and clerics common to Islamic extremism, communications referencing jihads in Somalia, Syria, Iraq, and Libya, and videos and written materials possessed by the defendant and published by terrorist groups to promote Islamic extremism. It also includes similar materials common to neo-Nazi extremism.

Because much of this evidence fell outside of a person's everyday experience, the typical juror likely was unfamiliar with the relevant ideas, terms (such as jihad, kafir, shaheed), people (such as Awlaki, Maqdisi, Zawahiri, Amin al-Hussaini, William Pierce), organizations (such as Abu Salim Martyrs' Brigade, al-Shabaab, al-Qaeda in the Arabian Peninsula, the Freikorps, the Waffen SS, the National Alliance), theories, and other aspects of both radical Islam and neo-Nazi extremism. *See Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993) ("Testimony from an expert is

16

presumed to be helpful unless it concerns matters within the everyday knowledge and experience of a lay juror.").

Upon consideration of these factors and having heard argument from both sides, the Court appropriately denied Young's motion as it pertained to Dr. Gartenstein-Ross.  Dkt. No. 161, 162.  For the same reasons, Young's renewed attack on the admission of Dr. Gartenstein-Ross's expert testimony must likewise fail.

> B.   Gartenstein-Ross's Testimony Explained the
>        Convergence That Was Already Established in the Evidence

Young argues that, had Dr. Gartenstein-Ross not testified, "there would have been no Nazi/white supremacist evidence at trial."  Young's Memorandum at p. 15.  Contrary to that argument, evidence at trial established the connection between Nazi terrorism and jihadist terrorism - - as well as Young's adherence to both ideologies - - independent of Dr. Gartenstein-Ross's testimony.  While Dr. Gartenstein-Ross's testimony certainly explained the context of these materials and the mechanism of Young's radicalization, much of the same materials could have been admitted (without a broader context) without Dr. Gartenstein-Ross's testimony.

First - - and most obviously - - Ian Campbell testified that, in 2001, Young told him not to discount the possibility of an alliance with the Muslims to combat the Jews.

Second, Young possessed on his computer a graphic poster of a Muslim and a Nazi in the "Worldwide Alliance of Nazis and Islamists 1939 - 2004."  GX 10-230.[7]

Third, in October 2014, at the FedEx store, Young told Mo that Young chose the birthday of Adolf Hitler as Young's own when Young registered for the Essakobayashi email account that

---

[7] While Dr. Gartenstein-Ross identified the Muslim in the poster as Haj Amin al-Husayni, the poster's significance as indicating Young's interest in an alliance between Nazis and Muslims - - as described by Campbell - - would be apparent even if the Muslim in the poster were not identified.

Young planned to use to communicate with Mo.  GX 6-109-5T.  Email subscriber records confirmed that Young used the birthday of 4/20/89 as his own.  GX 1-200.

Fourth, email subscriber records established that Young again used Hitler's birthday as his own in 2015, when he created the MaliktheAmerican account to communicate with his associates at the Abu Salem Martyrs' Brigade.  GX 1-300.  Further, Young maintained in his truck a scrap of paper with the birthday 4/20/89.  GX 3-105.

Fifth, the graphic that Young had on his phone, GX 4-203  ("Together we can finish what Hitler started" besides smoking chimneys), as well as the photo that he had on his computer media, GX 10-241 (a Muslim woman carrying the "God Bless Hitler" sign), made an obvious connection between Nazism and radical Islam in and of themselves.

Sixth, the timing of Young's involvement with Muslims and Nazis raised the same connection.  After all, the government introduced a photo of Young dressed as a Nazi with a gun, GX 10-903, that was created on his computer media just six days before another photo of Young with a gun was created on that computer media, but this time, dressed as a Muslim.  GX 14-119.

Seventh, on his Facebook page in 2011, Young linked to a story on Nazi-turned-Muslim terrorist Emerson Begolly, and "liked" Amin al-Husayni.  GX 8-107 through 109.

Eighth, Young included Amin al-Husayni on his prayer list, along with Hitler and Nazi-turned-Muslim Nicholas Skorzeny.  GX 10-814.  And, of course, Young possessed photos of Al-Husayni, Hitler, and Skorzeny.  GX 10-231; GX 10-236; GX 10-240; GX 10-700.[8]

Finally, the bookmarks for Young's Internet searches between 2007 and 2016 were split between websites devoted to Nazis and websites devoted to Islamic terrorists

---

[8]  Young's photo of Skorzeny, GX 10-242, was not admitted at trial, as cumulative.  Had Dr. Gartenstein-Ross not testified, it likely would not have been cumulative.

In short, in light of the evidence listed above, it is fanciful for Young to argue that, had Dr. Gartenstein-Ross not testified, "there would have been no Nazi/white supremacist evidence at trial."  Young's Memorandum at p. 15.  Nazi/white supremacist evidence still would have been admitted at trial even had Dr. Gartenstein-Ross not testified - - but the jury likely would have not understood some of its broader context.

III.   Testimony Regarding Body Armor and Chemicals
       Found in Young's Residence Was Properly Admitted

Young also claims that his rights were violated when the Court permitted Special Agent Caslen to testify regarding body armor and chemicals found in Young's residence.  In Young's view, the Court's pre-trial ruling on his motion *in limine* constituted "law of the case" and could not be revisited.   Young's view of the law is mistaken.

In ruling on Young's motion *in limine*, this Court expressly noted that "it's a fluid - - it's a flexible kind of ruling, and that is, normally my rulings on a motion *in limine* are always with a caveat that if something changes during the course of the trial, the decision may be reversed, so it's a, sort of a preliminary ruling on certain issues."  Dkt. No. 206-3 at 2:22-3:2.  The Court's position was exactly right, because an *in limine* evidentiary ruling does not constitute a final ruling on admissibility.  *Palmieri v. Defaria*, 88 F.3d 136, 139 (2d Cir. 1996).

"Indeed even if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to alter a previous *in limine* ruling."  *Luce v. United States*, 469 U.S. 38, 41-42 (1984).  This is so because "a trial court, exercising sound judicial discretion, may always alter such rulings as the case unfolds."  *United States v. Nivica*, 887 F.2d 1110, 1116 (1st Cir. 1989).  As Judge Cacheris wrote last year, "[a] court's ruling regarding a motion *in limine* is subject to change when the case unfolds, particularly if the actual testimony differs

from what was [expected]." *United States v. Seko*, 2017 WL 1318008 (E.D. Va. April 10, 2017) (*quoting Luce*, 469 U.S. at 40 n.2).

As typically happens at trial, testimony was given in this trial that provided context that was not available when this Court's *in limine* decisions were made.  For example, at trial, the government's first witness, the undercover officer "Khalil," testified that Young brought up the possibility of Young and others conducting an attack on the FBI, and stated that he believed such a group attack would be successful.  Khalil also testified that Young said that ballistic vests would be useful if the FBI were to come to his residence.

Later, defense counsel elicited testimony from Kenneth McNulty (Young's housemate between 2003 and 2007, and long-time friend), that Young collected military artifacts and objects, including helmets and ammo cans.  *See* Defendant's Exhibit List, Dkt. No. 195-4.  It hardly could be the case that Young could introduce his military helmets as defense exhibits, but the government would be barred from introducing the rest of Young's body armor.

Ultimately, the Court's evidentiary rulings at trial appropriately balanced, at the time a given piece of evidence was introduced, the evidence's probative value against its potential for unfair prejudice.  This approach was entirely consistent with the Court's pretrial rulings, which the Court characterized as a "sort of a preliminary ruling on certain issues."  Dkt. No. 206-3 at 2:22-3:2.  Given the prior testimony concerning Young's comments about  the possibility of a group attack on a federal building, evidence of possession of enough body armor to outfit a squad and smoke and thermite grenades - - both of which have battlefield uses - - - was relevant evidence of Young's predisposition.

Moreover, the record reflects conclusively that the Court was sensitive to concerns of undue prejudice.  Despite Khalil's testimony that Young brought up a potential group attack on a

federal building[9] and aimed a rifle out his window while looking for government surveillance, the Court did not permit the jury even to hear about the dozens of firearms or 18,000 rounds of ammunition found in Young's home.  The Court permitted only three short questions on body armor, and no piece of body armor was displayed for the jury.

In reality, these evidentiary rulings were actually generous to Young, given that his entrapment defense sanctioned an "appropriate and searching inquiry into his own conduct and predisposition."[10]  *Sorrells*, 287 U.S. 435, 451 (1932) ("If in consequence he suffers a disadvantage, he has brought it upon himself by reason of the nature of the defense."), *quoted in McLaurin*, 764 F.3d at 381.  As a result, Young's claims of "disadvantage" must fail.

IV.   The Court Rightly Sustained the Government's Hearsay Objections

Young also claims that the Court erred in precluding certain cross-examination questioning by defense counsel on hearsay grounds.  As discussed below, the Court's rulings were correct.

A.   Young's Prior Statements to Non-Testifying Agents

Young argues that he should have been permitted to introduce, through cross-examination of FBI agents, statements that Young previously made to other, non-testifying FBI agents.  Those questions properly were barred, for multiple reasons.

---

9 In fact, Khalil would have testified that Young provided a plan to attack *this* courthouse to free a Muslim prisoner, but the Court barred Khalil from mentioning before the jury that the plan was to attack this courthouse (in specific) rather than a federal building (generally).

10 Young hardly can be heard complain about unfair treatment from this Court after the Court barred the government from allowing Khalil to testify about Young's musings about kidnapping and torturing a female FBI agent.  The Court maintained that bar, even after the cross-examination of Khalil, when defense counsel elicited Khalil's admission that, at one point, Young said that he "respected" the FBI agents who interviewed him about Zachary Chesser.  This Court saw that, in Khalil's notes, the one statement about Young "respecting" the FBI agents was immediately preceded by a lengthy description of Young's thoughts about kidnapping and torturing one of those same agents.

First, the questions called for statements by Young (such as, for example, "I do not support ISIS"), that were elicited for the truth of the statements by Young. Those statements called for the statements of a declarant (Young) for the purpose of establishing the truth of the declarant's statements. As such, they were "hearsay" within the meaning of Federal Rule of Evidence 801(c). Had they been offered by the government, those statements might be admissible as admissions of a party-opponent under Federal Rule of Evidence 801(d)(2). Offered by the defense, however, they simply were hearsay barred by Federal Rule of Evidence 802.

Young claims that the statements were admissible as a hearsay exception as statements of Young's then-existing state of mind, under Federal Rule of Evidence 803(3), but that claim is meritless. A "threshold requirement" for invoking Rule 803(3) is that "there must be no suspicious circumstances suggesting a motive for the declarant to fabricate or misrepresent his or her thoughts." *United States v. Srivastava*, 411 F. App'x 671, 684 (4th Cir. 2011). Such a motive clearly exists in this case; Young made the statements at issue during interviews with FBI counterterrorism investigators, at a time when, as established by extensive evidence at trial, he (a) believed himself to be under FBI investigation; (b) possessed jihadist materials; (c) associated with multiple individuals later convicted of terrorism offenses; and (d) communicated with a member of an al Qaeda-connected jihadist group known as the Abu Salim Martyrs' Brigade. Under such circumstances, Rule 803(3) could not be invoked. *See United States v. Secor*, 73 F. App'x 554, 566 (4th Cir. 2003) (Rule 803(3) did not apply to the defendant's admonition to his employee to "tell the truth" where defendant was aware he was under investigation by the IRS and that his employee had an appointment to meet with IRS agents later that day).

Second, even if the statements by Young somehow were not inadmissible hearsay, they were not within the personal knowledge of the FBI agent witness under cross-examination by Young.  Instead, defense counsel asked the FBI agent witness (for ease of reference, "FBI Agent 1") whether another FBI agent (for ease of reference, "FBI Agent 2") had reported that Young had made a particular statement (again, for example, "I do not support ISIS").  In essence, defense counsel asked FBI Agent 1 to testify as to what FBI Agent 2 had written about what the declarant (Young) had said.  Even if some exception to the hearsay rule would have allowed FBI Agent 2 to testify as to Young's statement, there is no way that FBI Agent 1 - - the witness at trial - - permissibly could recount what the declarant (Young) said without also recounting what FBI Agent 2 *reported* that Young said.  As a result, any testimony by FBI Agent 1 regarding what FBI Agent 2 reported regarding what Young said would be barred by Federal Rule of Evidence 802.

Young's statements in Agent 2's report also would not have been admissible under the Federal Rules of Evidence 803(6), because third-party statements in police reports do not fall within this exception.  *United States v. Saunders*, 886 F.2d 56, 58–59 (4th Cir. 1989) ("statements made to the officer by third parties under no business duty to report" are not admitted under Rule 803(6)).  Young's statements also would not have been admissible under Federal Rule of Evidence 803(8), because the FBI's reports of the statements that he made to the FBI are not "findings resulting from any type of evaluative process whatsoever." *United States v. D'Anjou*, 16 F.3d 604, 610 (4th Cir. 1994).

Third, even if the statements by Young to government agents other than the ones testifying were somehow not barred by the hearsay rule, they properly would be barred as beyond the scope of direct exam of the witnesses who did testify.  After all, the government's

witnesses did not testify on direct exam as to any responses made by Young to other government agents.  As a result, any questions directed to them on cross-examination would be beyond the scope of the direct exam.

### B.   SA Caslen's Recounting of What Eubanks Said Would be Hearsay

Despite the fact that he did not make this argument at trial, Young now claims that he should have been allowed to ask Special Agent Caslen what one of Young's former colleagues told Special Agent Caslen about Young on the ground that such testimony falls within the hearsay exception for "[a] reputation among a person's associates or in the community concerning the person's character."  Fed. R. Evid. 803(21).  However, the transcript reveals that the question posed to Special Agent Caslen had nothing to do with Young's reputation in the community.  Instead, it only concerned one specific statement that Young's former colleague may have made to Special Agent Caslen:

> Q. Okay. And do you recall an interview with a retired Officer Eubanks?
>
> A. I do recall interviewing him.
>
> Q. And what did Mr. Eubanks say to you?
>
> MR. KROMBERG: Objection, Judge.
>
> THE COURT: Oh, that clearly would be hearsay, so I'll sustain the objection.

Transcript of Hearing, December 15, 2017, Dkt. No. 205-3 at 159.

At a bench conference, the Court asked defense counsel to identify the statement that he sought to elicit from Special Agent Caslen:

> THE COURT:  What's the statement?
>
> MR. SMITH: The statement is that he never knew Mr. Young to be radical in any way, he was shocked by the charges, he never had any relationship–

>THE COURT: You have got to call the person, Eubanks himself, to put that in.
>
>MR. SMITH: Well, Your Honor, we've tried our hardest, but we can't, so–
>
>THE COURT: No, you can't do it this way. You're offering it for the truth of its contents. That's the only point. No. Objection sustained.

*Id.* at 160.

As this exchange highlights, the question at issue did not concern Special Agent Caslen's understanding of Young's reputation in the community; instead, it concerned one specific out-of-court statement by Eubanks, an individual whom the defense did not call to testify.  Any answer to this question would not only be improper hearsay, but it also would be irrelevant; that a potential witness (who Young apparently was unable to locate) may have been unaware that Young covertly sent money to someone he thought was an ISIS fighter hardly was relevant to any issue in this case.

Young now argues that his question called for a response that would have been admissible under Fed.R.Evid. 803(21), as calling for information about Young's reputation. Even if he had made that argument at trial, it would have failed.  After all, while Eubanks' testimony as to Young's reputation in the community might have fallen within Rule 803(21), the same is not true of the testimony that Young sought from Special Agent Caslen regarding what Eubanks said about Young's reputation in the community.  In any event, Special Agent Caslen did not testify on direct examination as to Young's reputation in the community.  As a result, even if the question was designed to elicit Eubanks' view of Young's reputation in the community, it properly was barred as calling for hearsay, and because it called for information that was beyond the scope of direct examination.

V.      Defense Counsel Was Not Precluded from Discussing Young's LiveLeak Posts

Young further claims the Court erred in denying him the ability to question Special Agent Caslen about Young's LiveLeak posts.  He is fundamentally wrong on the facts of what occurred.

During Special Agent Caslen's direct testimony, the Court barred Caslen from testifying as to inculpatory posts Caslen observed on Young's LiveLeak account.  During his cross-examination, however, defense counsel began to ask about specific purportedly exculpatory comments on the same account.  The Court did not preclude this line of questioning, but, instead, warned that, if the defense pursued questions about LiveLeak posts, then the government would be able to revisit on re-direct examination the LiveLeak posts that it had been precluded from introducing on its direct examination.

As the transcript clearly reflects, defense counsel then chose not to proceed with questions about LiveLeak:

> THE COURT:        But on cross, if you're going to start going into specific elements within that account, and I don't quite know where that's all being tied up, the government then has a right to ask if they can go into other comments on the same account,  so, I mean, you need to think about where you're going with this.
>
> MR. SMITH:        Your Honor, can I ask the government to explain what it just meant by --
>
> THE COURT:        Well, you know what's going on. So ask the question if you want to, or move on to something else.
>
> MR. SMITH:        Your Honor, we need a bench conference.  Can we have that, please?
>
> THE COURT:        No, we've had too many. Let's go.

BY MR SMITH:

Q.              Okay. So you're familiar with the entire case file from
                the beginning of the investigation in September 2010 until
                the arrest in August 2016, correct?

Transcript of Hearing, December 15, 2017, Dkt. No. 205-3 at 157.

In sum, the Court simply advised the defense that if it were to elicit testimony concerning

Young's non-extremist statements on the account, the door would be open for the government to

elicit testimony concerning Young's extremist statements on the same account.  Defense counsel

chose not to elicit testimony about the LiveLeak account, and moved on to another topic.  That

decision was not the product of an erroneous evidentiary ruling, but simply a calculated trial

strategy.

VI.     The Court's Extensive Voir Dire Regarding Pretrial Publicity Was Sufficient

Young also claimed prejudice from the Court's denial of his motion for a jury

questionnaire regarding an article published in the *Washington Post* in the weeks before trial.

*See* Dkt. No. 185.  Young's complaint about pretrial publicity resulting from the article is

particularly ironic, in light of the defense counsel's involvement in the media interview of Young

that was the basis of the article, as well as others that occurred earlier in the year.  Dkt#89.

Nevertheless, the Court engaged in extensive voir dire of the 125-person jury pool

regarding the article.  The Court asked any member of the jury pool who had been exposed to

pretrial publicity about the case to state on the record the extent of such exposure.  In addition, at

several points during the trial, and at the conclusion of each trial day, the Court also directed the

jury to refrain from reading or otherwise learning anything about the case outside the courtroom.

These procedures were sufficient to ensure that the jury was not tainted by pretrial publicity from

one newspaper article.

VII.    <u>The Defense Should Have Marked Its Documents</u>

Finally, Young claims his rights were somehow violated because the Court directed his lawyer to number or otherwise label the documents he sought to use in cross-examination.  In fact, the Court did not bar the defense from using unmarked documents in its cross-examination of government witnesses.  To the extent that the Court directed the defense to mark its exhibits, that was necessary because Young neither filed an exhibit list before trial or provided the government copies of the documents it was using during cross-examination; as a result, neither the Court nor the government knew if particular documents were being introduced as substantive evidence (as prior recollection recorded) or being used merely to refresh recollections.  In any event, the Court's reminders to defense counsel to mark the exhibits that he was using hardly could have prejudiced Young.

<u>Conclusion</u>

For the foregoing reasons, Young's motion for a new trial should be denied.

Respectfully submitted,

Dana J. Boente
United States Attorney

By:    _____/s/_____
Evan N. Turgeon
Special Assistant United States Attorney

Gordon D. Kromberg
Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: (703) 299-3700
Fax: (703) 299-3981
Email: gordon.kromberg@usdoj.gov

<u>Certificate of Service</u>

I hereby certify that on January 16, 2018, I electronically filed the foregoing

GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR A NEW TRIAL with

the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF)

to counsel of record.


                                                         /s/
                                             Gordon D. Kromberg
                                             Assistant United States Attorney
                                             Virginia Bar No. 33676
                                             Assistant United States Attorney
                                             Attorney for the United States
                                             2100 Jamieson Avenue
                                             Alexandria, VA  22314
                                             (703) 299-3700
                                             (703) 837.8242 (fax)
                                             gordon.kromberg@usdoj.gov