**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No.: 16cr265 (LMB) |
| | ) |
| NICHOLAS YOUNG, | ) |
| | ) |
| Defendant. | ) |

**DEFENDANT NICHOLAS YOUNG'S REPLY IN SUPPORT OF MOTION FOR A NEW TRIAL**

Defendant Nicholas Young, through his undersigned counsel, files this reply in support of his motion for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure. (ECF No. 206-1.)[1]

### A.      The Expert Witness and Nazi/White Supremacist/Anti-Semitic Evidence

Mr. Young's trial saw the admission of dozens of pieces of Nazi, white supremacist, and anti-Semitic evidence over multiple trial days.  The Court admitted into evidence, *inter alia*, images of burning crosses, a cartoon of Jewish people depicted as pigs, a disrespected Israeli flag, and the defendant costumed as a Nazi standing before an oversized swastika.  Mr. Young was neither charged with, nor investigated for, a hate crime.  Such evidence has never before been admitted in federal court for a militant Islamism terrorist crime, and quite possibly in any other type of federal litigation.  Inflammatory, repulsive, and prejudicial, these materials challenge an itemized accounting of the trial's fundamental fairness.  There is no case law to cite

---

[1] On January 19, 2018, the defense filed a reply brief in support of its Rule 29(c) motion.  (ECF No. 211.)  In one section, the motion referenced the so-called "exculpatory no" doctrine, citing *United States v. Cogdell*, 844 F.2d 179, 182 (4th Cir. 1988).  *Cogdell* was abrogated in *Brogan v. United States*, 522 U.S. 398 (1998).

1

on this issue, as the courts have never admitted such evidence.  Its admission here was category error.

Apart from the government's *ipse dixit*, establishing the relevance of these materials to the facts of the case fell to the expert witness, Dr. Daveed Gartenstein-Ross.  The "scientific, technical or other specialized knowledge" offered by this expert was his testimony on the "cultural significance" of the unfairly prejudicial Nazi/white supremacist/anti-Semitic materials seized, outside the scope of a search warrant, from the defendant's home.  But, as the Opposition does not deny, that expert (i) was admitted without Fed. R. Evid. 702 findings on the record and without *voir dire* prior to his trial testimony; (ii) offered testimony based on information gleaned from blogs in a foreign language he could not read; (iii) had never before testified in a contested civil or criminal trial on any matter; and (iv) testified about a hypothesized white supremacist/militant Islam "convergence" that has never been the subject of expert testimony in federal court; is contradicted by the leading empirical domestic radicalization study in the field, funded by the Department of Justice; has not been subject to any peer review; and is based on a case study involving nine subjects which was created specifically for this litigation in consideration for $16,000.

The definition of white supremacism is the deprecation of racial minorities.  The vast majority of militant Islamists are ethnic minorities.  So conventional wisdom in this case chimed with the rules of evidence.

 In defense of these materials, the government offers a few responses in Opposition. (ECF No. 209, pp. 3-18.)  First, the government reprises its pretrial argument that, in an entrapment defense case, "character evidence is relevant and admissible." (ECF No. 209, pp. 3-5.)  This uncontested truism will not support the decision to admit Nazi evidence.  As the defense

2

explained before trial, there has never been any argument in this case that, as a general matter, character evidence was barred.  Rather, the determinative points are these: Even assuming some character evidence may be admitted (1) there was no factual foundation laid to establish the relevance of Nazi/white supremacist/anti-Semitic images and literature to a militant Islamism terrorism case; and (2) even if there were some faint relevance, it was grossly outweighed by the plain unfair prejudice.  As the Court will see for itself, none – not one – of the government's cited cases concerns Nazi/white supremacist/anti-Semitic evidence.  To the contrary, the Court will see that all of these cases concern meat-and-potatoes terrorism evidence, such as videotapes of "Hamas bombings" and the like.  The defense distinguished these cases in pretrial briefing. (ECF No. 128.)

So the record is clear: the government has never offered any precedential support for this category of evidence at any point in this proceeding.

Next, the government makes a series of arguments itemizing the dozens of Nazi/white supremacist/anti-Semitic pieces of evidence.  (ECF No. 209, pp. 6-14.)  But before defending the Nazi evidence over thirteen pages of briefing, the government first disclaims the suggestion it "inundated the jury" with Nazi and anti-Semitic imagery.  (*Id.* at 6.)  That is because it was "only" permitted to show the jury "approximately 36" pieces of Nazi evidence, including but not limited to a "Jewish swine graphic"; "Israeli flag used as doormat"; "SS: Hitler's Instrument of Terror"; "Together We Can Finish What Hitler Started"; "Photo of Muslim SS troops," Holocaust smokestacks, and so on.  (*Id.* at 6-11.)  Indeed, the dozens of pieces of Nazi evidence, defended by the government over as many pages, show the "Court sharply *limited* the quantity of predisposition evidence the government was permitted to introduce." (*Id*. at 6.) (emphasis added).  Perhaps the jury did not see quite enough Nazi evidence in a militant Islam terror case.

The government offers "five points" that are said to render the Nazi evidence relevant to "establish that Young was predisposed in 2010 to support ISIS in 2016: (1) Young was attracted to Nazi terrorists [sic] before 2010; (2) Young knew that the Nazis to whom he was attracted were terrorists; (3) Young hated Jews; (4) Young was interested in an alliance between Nazis and Islamic terrorists; and (5) Young was attracted to Nazis and Muslim terrorists at the same time." (ECF No. 209, p. 6.)

It cannot escape comment, right at the outset, how anomalous is the government's relevance theory.  This case is not about a defendant's "hatred of Jews." It is not a hate crime case.  It is a material support for militant Islamic terrorism case involving a Google Play gift card given to a paid informant.  Would the Rules of Evidence permit the government to offer 36 exhibits on Mr. Young's alleged anti-Semitism if he had succumbed to a narcotics sting and raised entrapment? If he had bribed an informant and raised entrapment? In post-9/11 America, terrorism is a political crime aimed at American society and government overall, not toward Jewish people specifically.  That suggestion is not just factually wrong, it is offensive.

None of these "five points" are relevant absent the foundational testimony of an expert such as Gartenstein-Ross.  It is not a matter for the Court to take judicial notice of that Nazism/white supremacism may be equated culturally, politically and penologically with militant Islamic terrorism on account of a shared hatred of Jewish people (Point 1). Counterintuitive at the very least, equating racist Nazism with militant Islamism is certainly not "a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201.  Aside from Gartenstein-Ross's testimony, the government offered no evidence at trial that "Young's hatred of Jews"

4

(Point 2) is relevant in this case.  It merely offered its emotionally charged say-so.  And without offering evidence that a "hatred of Jews" is somehow evidence of an inclination to support ISIS, "Young's interest in an alliance between Nazis and Islamic terrorists" (Point 3) and "Young's attraction to Nazis and Muslim terrorists at the same time" (Point 4), are no more relevant in this case than a Colombian drug kingpin's eccentric interest in an "alliance" between South-American fugitive Nazis and narco-traffickers would render anti-Semitic cartoons and sullied Israeli flags relevant in a conspiracy to distribute cocaine trial.  Boiled down, the government's "five points" synonymize anti-Semitism – and indeed, pure political opposition to the State of Israel – with terrorism.  This is not the function of the U.S. counterterrorism laws.  And it invites an encroachment on political speech.

The government offers a list of nine facts it says establish the Nazi/Islamist militant "convergence" even absent Gartenstein-Ross's "cultural significance" expert testimony.  (ECF No. 209, pp. 17-19.)  To be clear, these arguments do not withstand scrutiny.  "Most obvious," the government avers, is the testimony of Ian Campbell who testified that some sixteen years before his arrest, Young allegedly told him not to discount the possibility of "an alliance with the Muslims against the Jews."  (*Id.* at 17.)  In the first place, even assuming Mr. Campbell accurately recalled from memory a comment made sixteen years ago, "an alliance with the Muslims against the Jews" is not necessarily or even probably terrorism.  The government does not even explain how such a comment is terrorism, as opposed to political speech.  It does not show how this comment necessarily entails violence.  It does not explain why it equates "Muslims" with "terrorists." This is yet another example of the government's false equivalence-drawing between anti-Semitism and terrorism.  Secondly, the witness's testimony was discredited by his forthright acknowledgment that he could recall little else about this period of

time – except, coincidentally, the very same will-o'-the-wisp Muslim-Nazi connection the government's prosecutors summoned him to the U.S. Attorney's office to discuss a few months before trial before subpoenaing him.

The Opposition throws into the not-just-Gartenstein-Ross mix a poster displaying the purported "alliance" between "a Muslim and a Nazi"; Mr. Young's use of Hitler's birthday as a password; a Holocaust smokestack picture on his cell phone; and an image extracted from his computer showing "a Muslim woman carrying the 'God Bless Hitler' sign." (ECF No. 209, p. 18.)  But, again, a poster showing a "Muslim" and a Nazi in alliance, does not intrinsically say anything about militant Islamist terrorism, unless it is the government's contention that all Muslims are dormant terrorists.   Even if it did, one poster would not render "approximately 36" pieces of Nazi/white supremacist/anti-Semitic evidence relevant and admissible under Rule 403. Of course, Hitler's birthday is invincibly irrelevant to the case – as are the smokestack and God Bless Hitler pictures – and no facial connection to militant Islamic terrorism was offered at all. As it did pretrial, the government makes the spurious chronological point that computer metadata showed a Nazi reenactment photo was created "just six days" before a separate photo was created of Young "dressed as a Muslim." (ECF No. 209, p. 18.)  Here, of course, the government again: (a) implicitly equates all visual identifiers of Islam with terrorism; (b) illogically assumes a similarity in ideological content from temporal proximity; and (c) ignores that, as Officer McNulty testified, the picture of Young "dressed as a Muslim" was actually a visual gag.

The government adds that Gartenstein-Ross was not the only relevance foundation for the Nazi evidence because, *on Facebook*, Young "linked to a story on Nazi-turned-Muslim terrorist Emerson Begolly," and "liked" Amin Al-Husayni.  (*Id.* at 18.)  It is almost beyond dispute these arguments are frivolous. That Mr. Young posted an article about a terrorist in no way shows he

6

supports terrorism, any more than the publishing of it demonstrates the periodical's support.  The government offered no evidence Mr. Young "liked" Al-Husayni – a virtually meaningless social media gesture – *because of* that man's connection to Hitler.  Nor, of course, did the government show how Husayni, an historical figure from the 1930s, relates to the terrorist group ISIS which formed in 2014 (except for the fact that both are Muslim).  For that same reason, Mr. Young's "prayer" to Hitler and Husayni cannot, on its own, serve as an open sesame to 36 pieces of Nazi/white supremacist/anti-Semitic evidence.  (The "prayer" itself, which had nothing to do with terrorism, plainly failed Rule 403 balancing.)

Lastly, the government says, "the bookmarks for Young's internet searches between 2007-2016 [which] were split between websites devoted to Nazis and websites devoted to Islamic terrorists" allowed it, absent Gartenstein-Ross, to introduce 36 separate pieces of Nazi/white supremacist/anti-Semitic evidence.  (*Id*. at 18.)  This is a misrepresentation on several levels.  First, the government means here that *of the curated website bookmarks shown to the jury* half were Nazi and half militant Islamic.  The government excluded the computer bookmarks having nothing to do with either category.  Accordingly, the premise of this clustering point is false.  In addition, a great deal of the Nazi and militant Islam images taken from Mr. Young's computer was downloaded within a narrow timeframe, many of them over the course of a single day, belying any fixation or long-term interest.  (ECF No. 146, GX 16-000.)  And, relatedly, the assumption that any two subjects researched online in the same day, or time period, must have intrinsic value commonality is without any basis in evidence.  Of course, the government could not – and (presumably) would not – argue a "convergence" between Colgate Toothpaste and Nazism if those website bookmarks were created within "*just six days*" (even if an expert were paid to say it).

The government's remaining relevance arguments all beg the same question: they presuppose relevance of Nazi/white supremacist material in attempting to establish the same point.  "To establish that Young was affiliated with a group that posed as members of the Nazi SS, the government introduced a roster of individuals from Northern Virginia that included Young with the alter ego of Stormtrooper Klaus Dusselkamp"[2]; "To establish he was still affiliated with his Dusselkamp identity…."; "To establish that his interest in Nazism was not limited to involvement with a reenactment group…."; "To further establish that Young's affiliation with neo-Nazis went beyond war reenactments…."; "As further corroboration of Young's attraction to neo-Nazis…."; "To show that Young's interest in music that promulgated terrorism pre-dated his contact with government agents, the government presented evidence from Kenneth McNulty [] who testified that [] he heard Young listen to racially inflammatory music" [begging the question whether white supremacism may be equated with militant Islamic terrorism]; "To corroborate McNulty's testimony on this point, the government introduced a single photograph of a flyer from "Burning Cross Records [a picture of a burning cross]"; "to establish that Young knew that [] the lightning bolt insignia of the Nazi SS was a neo-Nazi symbol…."; "to corroborate Khalil's testimony that Young hated Jews…."; "To corroborate the inference that Young knew of Husayni's involvement with Hitler…."; "to establish that Young's use of an Israeli flag as a doormat was motivated by hated of Jews (rather than by disagreement with Israeli government policies), the government introduced one graphic from Young's computer in 2007, depicting 'Jewish swine'" [presupposing the question whether one is anti-

---

[2] As the Court will recall, Mr. Young acknowledged pretrial that he created the Dusselkamp Liveleak account.  There was no dispute on this point at trial.  As the government knows, its purported need to prove Mr. Young's association with this moniker at trial was entirely disingenuous.

Semitic or instead anti-Israel is somehow relevant to a U.S. terrorism case].  (ECF No. 209, pp. 9-14.)

"In short," concludes the government following fourteen pages of Nazi evidence description, "the evidence admitted at trial was not cumulative." (*Id.* at 14.)

Yes, indeed.  So to sum up: the Nazi evidence was not cumulative – and did not depend solely on Gartenstein-Ross – because the government needed it to prove the militant Islam terrorism defendant's interest in ….Nazis.  And it needed *additional* Nazi evidence to *corroborate* that interest in the first batch of Nazi evidence.  And this is all germane to a militant Islam terrorism case because there was a single Nazi history book in the defendant's home bearing a title that included the word "*terror*." And there was *also* a picture of a Muslim shaking a Nazis' hand on the defendant's computer.  So there you have it.  No expert was needed to show white supremacism is the same thing as militant Islam.  And, of course, none of this represented an inappropriate attempt to irreparably damage the defendant's reputation with prejudicial evidence, because, after all, as a general matter, character evidence is not universally excluded in an entrapment case.

There was no relevance foundation whatsoever for any of the Nazi/white supremacist/anti-Semitic evidence – still less all "approximately 36" pieces of it – without Gartenstein-Ross.  Yet the admission of Gartenstein-Ross's testimony breached Fed. R. Evid. 702.  The Opposition is forced to admit this, at least in part.  Mr. Young noted that, before the expert testified to the jury, there was no *voir dire* of the witness and no Rule 702 reliability findings on the record.  The Opposition simply responds that, on December 1, 2017, the Court heard argument on Mr. Young's *Daubert* motion to exclude Gartenstein-Ross's testimony, and that the Court denied the motion.  (ECF No. 209, p. 15.)

Even in the run-of-the-mill case, that is not enough.  *See*, *e.g.*, *United States v. Jawara*, 474 F.3d 565, 583 (9th Cir. 2007) ("The district court stated only: 'The testimony will be allowed, and the Court finds that a *Daubert* hearing is unnecessary.' Although the district court's ruling suggests an implicit finding of reliability, the failure to make an explicit reliability finding was error."); *Mukhtar v. California State University*, 299 F.3d 1053, 1066 (9th Cir. 2002) ("[T]he only indication we have that the district court found [the expert's] testimony reliable is the fact that it was admitted . . . . Surely *Daubert* and its progeny require more."); *United States v. Delfino*, 510 F.3d 468, 470 (4th Cir. 2007) (Rule 702 reversible error where district court fails to consider "factors constraining its exercise of discretion"); *United States v. Kenyon*, 481 F.3d 1054, 1061 (8th Cir. 2007) ("Before admitting testimony based on scientific, technical or other specialized knowledge, a district court must ensure that the testimony rests on a reliable foundation.").

But, here, the absence of Rule 702 findings before trial was particularly harmful.  In addition to being the sole conduit for the highly prejudicial Nazi evidence, Gartenstein-Ross: (a) offered testimony based on information gleaned from blogs in a foreign language he could not read; (b) had never before testified in a contested civil or criminal trial on any matter; and (c) testified about a hypothesized white supremacist/militant Islam "convergence" that has never been the subject of expert testimony in federal court; is contradicted by the leading empirical domestic radicalization study in the field; has not been subject to any peer review; and is based on a case study involving nine subjects which was created specifically for this litigation.

The government's attempt to rehabilitate Gartenstein-Ross is telling.  It cites cases where *other* experts have testified in terrorism cases, and focuses on Gartenstein-Ross's militant Islam testimony, as opposed to his Nazi/militant Islam "convergence" thesis.  (ECF No. 209, pp. 15-

10

16.)  But as Mr. Young showed pretrial, the terrorism experts cited by the government have

never testified about a Nazi/militant Islam "convergence" – nor has any other expert, ever.  (ECF

No. 157, pp. 2-8) (distinguishing Evan Kohlmann and Matthew Levitt cases).  The government's

comparison is apples to oranges: unlike Kohlmann and Levitt, who have testified on

uncontroversial subjects widely accepted in the field such as militant Islam ideology,

Gartenstein-Ross offered an untested, highly controversial, and unprecedented Nazi/militant

Islam thesis *that has been squarely contradicted by the leading empirical radicalization study in*

*the field*, Jensen and LaFree, Final Report: Empirical Assessment of Domestic Radicalization

(EADR) (College Park, Md.: University of Maryland, 2016) (data-driven study, funded by the

Department of Justice, concluding that there is insufficient data to compare militant Islamist and

far-right radicalization, but initial signs indicate material distinctions between the two).

 And, contrary to the government's argument, Gartenstein-Ross did not testify merely

about "jihad, kafir, shaheed," like Kohlmann and Levitt; he testified about a "Nazi/Muslim

convergence." Yet the expert's own CV demonstrated he did not possess the qualifications to

offer this intersectional analysis (assuming any expert does).  Explaining its Rule 702 findings on

the record would have required the Court to grapple with these facts before deciding to allow the

expert to testify to the jury.

 So Gartenstein-Ross was necessary to lay the relevance foundation for the Nazi/white

supremacist/anti-Semitic evidence.  But he was also a but-for cause in the admission of this

unfairly prejudicial evidence in another way.  Most of the pieces of Nazi/white supremacist/anti-

Semitic evidence came in through Gartenstein-Ross's testimony.  No other witness testified

about the bulk of this evidence or its relevance.  Almost certainly, his testimony was

improvidently admitted, and in its train, the deeply prejudicial Nazi/white supremacist/anti-Semitic evidence that eliminated the prospect of a fair trial.

As the government itself allows, in reviewing Rule 403 determinations at trial the Courts of Appeal determine whether the prejudicial evidence in question was "more inflammatory than the charges alleged in the indictment." (ECF No. 209, p. 9.) (*citing United States v. Abu-Jihaad*, 630 F.3d 102, 132-33 (2d Cir. 2010). Here, the nonviolent terrorism charge in the indictment was giving a gift card to an informant who pretended to be in ISIS. "Approximately 36" pieces of Nazi/white supremacist/anti-Semitic evidence were admitted, including images of burning crosses, a cartoon of Jewish people depicted as pigs, a disrespected Israeli flag, and the defendant costumed as a Nazi standing before an oversized swastika. The question whether this material was "more inflammatory" than the Google play gift card charge answers itself.

### B. Admission of Evidence Concerning Violence Undermined Fundamental Fairness, and Violated Due Process Protections

The Court's decision to permit the government to introduce at trial highly prejudicial evidence of grenades, body armor, and firearms, which the Court had excluded from evidence before trial, violated the defendant's due process rights. In Opposition, the government can hardly contest this fact, although it is responsible for the decision to ignore the Court's pretrial rulings at trial and at significant risk.

In Opposition, the government claims there was no error because "an *in limine* evidentiary ruling does not constitute a final ruling on admissibility." (ECF No. 209, p. 19.) This argument fails for several reasons. First, the cases it cites do not support its position. (*Id.*, *citing Palmieri v. Defaria*, 88 F.3d 136, 139 (2d Cir. 1996); *Luce v. United States*, 469 U.S. 38, 41-42 (1984); *United States v. Nivica*, 887 F.2d 1110, 1116 (1st Cir. 1989); *United States v. Seko*, 2017 WL 1318008 (E.D. Va. Apr. 10, 2017)). *Palmieri* was a civil case, not a criminal one; there was

no due process issue at all; and the decision concerned the appellate final judgment rule, not a trial court's reversal at trial of its pretrial *in limine* ruling.  88 F.3d at 139.

*Luce* and *Nivica* concern the same issue, which has nothing to do with Mr. Young's argument: in those cases, the court ruled, pretrial, that prior conviction impeachment evidence *would* be admitted if the defendant should testify.  In both cases, the defendant then declined to testify.  On appeal the courts rejected the defendants' challenges to these pretrial decisions because, not having testified, the harm they complained of was too speculative.  *Luce*, 469 U.S. at 41-42; *Nivica*, 887 F.2d at 1116.  And in *Seko*, the issue did not arise at all; in its standard-of-law section the *Seko* court merely cited to *Luce*.  *Seko*, 2017 WL 1318008.

In contrast to those cases, the issue here is whether the Court may, pretrial, describe evidence as "highly prejudicial" and as failing Rule 403, and exclude such evidence, only to admit it later at trial.  The government claims that the Court "expressly noted that 'it's fluid – it's a flexible kind of ruling.'" (ECF No. 209, p. 19.)  This is true as far as it goes.  But this argument fails because the Court set out the specific parameters in which its motion *in limine* decision would be subject to change: "So I think it would be error to allow [evidence of military objects] unless as the case goes in, there is some argument by the defense that Mr. Young *was a completely pacific person that never had any interest in promoting any acts of violence.*" (ECF No. 206-2, Hr'g Trans., dated Oct. 27, 2017, p.15:22-17:21.) (emphasis added).

At trial, the defense never "opened this door" to firearms, grenades and body armor.  The only such argument made by the government rests on a misrepresentation of the facts.  (ECF No. 209, p. 20.) The government assets, falsely, that "defense counsel elicited testimony from Kenneth McNulty that Young collected military artifacts and objects, including helmets and ammo cans." (*Id.*)  The government cites to no trial transcript.  That is not surprising.  This is a

false representation because, as it knows, the defense exhibits it cites to were used only to cross-examine the final witness at trial, S.A. Nicholas Caslen.  (ECF No. 205-3, pp. 170-172.)  And the government's highly inappropriate elicitation of grenade, body armor, and firearms testimony occurred *prior to* S.A. Caslen's cross-examination.  (*Id.*, pp. 100:1 – 103:21.)  Contrary to the government's representation (without any citation to the record), there was no testimony elicited from Kenneth McNulty about "helmets and ammo cans."  The colloquy, misrepresented by the government, concerned the fact that Mr. Young's grandfather served as an officer in the Air Force, which accounted for the airborne jump boots in Mr. Young's home.[3]  This testimony, of course, did not even approach presenting Mr. Young as "*a completely pacific person that never had any interest in promoting any acts of violence.*"  (ECF No. 206-2, Hr'g Trans., dated Oct. 27, 2017, p.15:22-17:21.) (emphasis added).  Nor does the government even claim it did.

Mr. Young went to trial in reliance on this Court's *in limine* ruling.  As the Court stated pretrial, the body armor, grenade and firearm evidence was "highly prejudicial."  (ECF No. 206-2, Hr'g Trans., dated Oct. 27, 2017, p.15:22-17:21.)  At one point early in trial, the Court specifically admonished the government that to admit such evidence would be "courting

---

[3] Perhaps realizing it was unwise to elicit the excluded grenades, body armor and firearms testimony, over the Court's express order, the government changes the subject and argues that Mr. Young somehow cannot object because the Court barred separate testimony concerning alleged comments about "attacking *this* courthouse" and "kidnapping and torturing a female FBI agent." (ECF No. 209, p. 21 n. 9, 10.) (emphasis original).  First, there is no rule that prohibits Mr. Young from objecting to improperly included evidence simply because other improper evidence was excluded.

Second, the government, once again, grossly mischaracterizes the evidence in this case. Contrary to the government's representation, Khalil would *not* have testified that "Young provided a plan to attack *this* courthouse []." (*Id.* at 21. n. 9.)  As the government's attorney knows, his own witness explained there was no such "plan" and that the comment, if it was made at all, was not made as any sort of "plan." (ECF No. 211-1, pp. 28-32.)  And as for the "kidnapping of an FBI agent," once again the government knows its own witness, Khalil, characterized this comment, if it was made at all, as an exceedingly toxic joke.

reversible error." To reverse this ruling at trial, when there is no evidence to support a "door

opening," is a due process violation.  *See, e.g.*, *United States v. Pacheco*, 434 F.3d 106, 116 (1st

Cir. 2006); *United States v. Mendel*, 746 F.2d 155, 161 (2d 1984); *Lee County Branch of the*

*NAACP* v. *City of Opelika*, 748 F.2d 1473, 1480 n.12 (11th Cir. 1984) (observing that "due

process . . . mandates that when the rules of the game are changed, the players must be afforded a

full and fair opportunity to play by the new regulations" (citation and internal quotation marks

omitted)).

In *Pacheco*, for example, the First Circuit held that "the district court abridged the

defendant's right to a fair trial when, after ruling one way, it proceeded to act in a wholly

inconsistent manner without prior notice."  It elaborated:

> Fair notice is one of the essentials in a trial, whether at the outset of the
> proceedings or at subsequent stages of the case. *See, e.g.*, *Russell* v. *United
> States*, 369 U.S. 749, 760-64, 82 S. Ct. 1038, 8 L. Ed. 2d 240 (1962). The
> concern with fairness (and, hence, with notice) is heightened in criminal cases.
> A serious and prejudicial infringement of the right to a fair trial can violate due
> process. *Cf. Neron* v. *Tierney*, 841 F.2d 1197, 1200 (1st Cir. 1988) ("The Due
> Process Clause guarantees a criminal defendant that his trial will comport with
> prevailing notions of fundamental fairness." (citation and internal quotation
> marks omitted)). Where, as here, a court makes a ruling that places a
> criminal defendant on notice of the parameters of the charge to be put to the
> jury and subsequently reneges on that commitment without forewarning the
> defendant, the court's error is serious and may well be prejudicial. *Cf. In re
> Fidelity/Micron Sec. Litig.*, 167 F.3d 735, 737 n.1 (1st Cir. 1999) (disapproving
> of "courts imposing rules of practice without some form of notice that would
> allow the parties and their counsel to conform their conduct accordingly").

*Pacheco*, 434 F.3d at 116.

So too in Mr. Young's case.  All of the charges here alleged nonviolent conduct.  That is

precisely why the Court correctly excluded evidence of firearms, body armor and grenades

before trial, deeming it "highly prejudicial."  But, when that holding was subsequently reversed

without pretrial forewarning to Mr. Young, he was materially prejudiced at trial.

### C.      Preventing Admission of Key Predisposition Statements Undermined Fundamental Fairness

**Young's Statements Concerning Bin Laden.**  The Court prevented the defense from eliciting testimony from a government witness concerning out-of-court statements of Mr. Young's deprecating militant Islamism figures, like Osama bin Laden, between 2010-2016. (ECF No. 206-1, pp. 12-13.).  Such testimony was admissible either as non-hearsay or under the state-of-mind exception to hearsay.  Fed. R. Evid. 803(3).

In Opposition, the government misapprehends the issue.  It argues that Mr. Young's statements to federal agents deprecating figures like Osama Bin Laden were elicited "for their truth." (ECF No. 209, p. 22.)  Because the statements in question were opinions, that argument does not make sense.  The defense did not attempt to elicit the comments in order to prove the factual truth of Mr. Young's disparaging comments about Bin Laden but to show that Mr. Young lacked the state-of-mind or predisposition necessary to commit the charged crime.  This is not hearsay evidence.  And Mr. Young's predisposition to support terrorism was the key issue at trial.

Even assuming these comments were hearsay, the Opposition also misunderstands Fed. R. Evid. 803(3), the state of mind hearsay exception.  Comments like Mr. Young's are routinely admitted under Rule 803(3).  *See, e.g.*, *United States v. Ibisevic*, 675 F.3d 342, 349 (4th Cir. 2012) (vacating trial court's denial of Rule 33 motion, based on exclusion of defendant's out-of-court state-of-mind statements).  The government claims Rule 803(3) doesn't apply in this case because, first, Mr. Young made the comments to federal agents, triggering the "threshold requirement" that "there must be no suspicious circumstances suggesting a motive for the declarant to fabricate or misrepresent her thoughts." (ECF No. 209, p. 22.)  The Opposition cites *Untied States v. Srivastava*, 411 F. App'x 671, 684 (4th Cir. 2011).  The problem is *Srivastava*

did not apply any "suspicious circumstances" rule, and the cases the court cites in support a rule

not actually applied in *Srivastava* do not in fact provide any support for it.  *See United States v.*

*Neely*, 980 F.2d 1074, 1083 (7th Cir. 1992) (not containing a "suspicious circumstances"

exception to Rule 803(3)); *United States v. Faust,* 850 F.2d 575, 585 (9th Cir. 1988) (same).

And in *United States v. Secor*, 73 F. App'x 554, 566 (4th Cir. 2003), the court held that such a

rule, if it exists, only applies where the evidence has shown the declarant had sufficient time to

manufacture the false state of mind.  73 F. App'x at 566-567.  The government made no such

showing at trial with regard to the statements Mr. Young made to interviewing agents.  To the

contrary, a great deal of evidence at trial showed that Mr. Young was, in anything, too

forthcoming with federal agents during interviews, such as the evidence showing that he

frequently volunteered discussing his trip to the Libyan civil war with federal agents; his claim,

made directly to FBI counterterrorism agents, that the War on Terror was not cost-effective; his

objection to federal agents during interviews to the use of undercover informants, etc.

 The government attempts to muddy the waters by claiming that, even if Mr. Young's

anti-Jihadist figure comments to federal agents were admissible on their own, the defense

attempted to elicit them from FBI Agent 1 when the comments were made to FBI Agent 2.  (ECF

No. 209, p. 23.)  The Opposition claims that FBI Agent 1 therefore lacked personal knowledge of

the comments.  This is false: "FBI Agent 1" (the lead case agent S.A. Caslen) testified, as a

"summary witness," that he had reviewed the case file and was personally familiar with the

entire course of the counterterrorism investigation.  (ECF No. 205-3, pp. 109-110.)  This

constitutes personal knowledge of the documents created in the course of the investigation.  Fed.

R. Evid. 602 ("Evidence to prove personal knowledge may consist of the witness's own

testimony.").  The summary testimony agent ("FBI Agent 1") was permitted to testify on direct

about actions performed and undertaken by other agents, so it would be inappropriate to prohibit the defense from eliciting the same testimony during cross-examination.  (*See*, *e.g.*, ECF No. 205-3, pp. 91-92.)  (This point also belies the government's argument that Mr. Young's proposed cross-examination testimony went beyond the scope of direct.  ECF No. 209, p. 24.)

The government also claims that even if Mr. Young's comments themselves are non-hearsay or satisfy Rule 803(3), the out-of-court statement of "FBI Agent 2," which embeds Mr. Young's comments, would constitute hearsay.  (ECF No. 209, p. 23.)  Not so.  FBI-302 memoranda contained Mr. Young's comments, and these memoranda satisfy the hearsay exception under Rule 803(6).  *United States v. Saunders*, 886 F.2d 56, 58-59 (4th Cir. 1989) ("[E]ntries in a police or investigating officer's report which result from the officer's own observations and knowledge may be admitted under Rule 803(6).").  The government argues that Mr. Young's embedded comments, however, would not be encompassed within Rule 803(6), i.e., that it was hearsay-within-hearsay (*citing Saunders*).  The government is confused.  The rule it references means that statements of third parties who have no duty to report to investigating officers are not hearsay-exempted *under Rule 803(6)*.  That, however, does not mean the embedded third-party statement may not be admitted under a *separate* hearsay exception. *Saunders*, 886 F.2d at 59.  Here, Mr. Young's deprecation of figures like Osama Bin Laden was either non-hearsay or hearsay-exempted under Rule 803(3), the state-of-mind exception.

**Officer Eubanks' Reputation Statements**.  The Court prevented the defense from eliciting a police officer's out-of-court statement that, *inter alia*, Mr. Young was not in any way radical.  (ECF No. 205-3, pp. 159:10 – 160:18.)  This was admissible under Fed. R. Evid. 803(21), the hearsay exception for a reputation among a person's associates concerning the person's character.  The Opposition claims that because the defense merely objected to the

18

exclusion of this statement and did not say the words "Federal Rule of Evidence 803, subsection 21," Mr. Young's argument must fail. There is no such hyper-technical objection rule, and the government's argument is frivolous. The Opposition also argues, again, that even if Eubanks' reputation-for-lack-of-radicalism statement was admissible under Rule 803(21), the testifying agent's own memorandum embedding that statement was not admissible. (ECF No. 209, p. 25.) Again, this argument fails because the testifying agent's memorandum was admissible under Rule 803(6). *Saunders*, 886 F.2d at 58-59.

**Exclusion of Exculpatory Liveleak Comments**. The Court prevented the defense from eliciting testimony from a government agent that Mr. Young had publicly come out against ISIS on the Liveleak website in 2014 and 2016, during the heart of the government's investigation. (ECF No. 206-1, pp. 13-14.) The Court instructed the defense it could either elicit such testimony and withdraw all relevance/prejudice objections to any and all of the government's Liveleak evidence, or else forgo any examination on the subject altogether. *Id.* The Court did not give the defense an opportunity to even inquire with the government about which particular excluded Liveleak comments this would entail. *Id.*

The Opposition has no response to this error. It represents, inaccurately, that the Court took this action because "the Court barred Caslen from testifying as to inculpatory posts Caslen observed on Young's Liveleak account." (ECF No. 209, p. 26.) This is false. The Court did not bar the government from introducing any and all Liveleak posts *because they were inculpatory*. It barred the government from introducing a very small number of posts because they failed Rule 403 balancing. Nothing about that decision precluded the defense from introducing *separate* Liveleak comments simply because they exculpated the defendant, and because other, unfairly

prejudicial posts had been excluded under Rule 403.  The government cites no case law in support of this trade-off imposed on the defense.  There is none.

### D.       Finding Prejudicial Pretrial Publicity but Denying Jury Questionnaire

The Court determined a week before trial it could not necessarily ensure a fair trial because of prejudicial pretrial publicity.  (ECF No. 173.)  Yet the Court denied the defense's jury questionnaire request a day after it was filed, and ordered a jury pool one week after making the prejudicial pretrial publicity finding.  (ECF No. 124.)  A good deal of the jury pool was familiar with this publicity, and indeed, a man stood up and announced in front of the entire jury pool that he had heard about the "arsenal of weapons" in the defendant's home.  A jury questionnaire should have been used.

In Opposition, the government blames the defense for this prejudicial publicity, because the defendant exercised his First Amendment rights by publicly rebutting the government's repeated attacks on his character.  (ECF No. 209, p. 27.)  It is difficult to tally how disingenuous the government's Opposition is on this point, but the defense will make an effort.  The *prejudice* of the publicity was created – exclusively – when the government chose to use highly unfairly prejudicial and irrelevant Nazi evidence in this case and publicize it, without any forewarning to the defense, in opposing Mr. Young's motion to suppress evidence in March 2017.  (ECF No. 77.) Perhaps not coincidentally it was exactly this evidence, including the specific pictures displayed by the government in the suppression hearing, which was picked up and reported on by *The Washington Post*.  The government's response is inappropriate and hypocritical.

For the foregoing reasons, the Court should grant a new trial to Defendant Young in the interest of justice.

Dated: January 23, 2018.

Respectfully submitted.

*/s/ Nicholas D. Smith*
Nicholas D. Smith (VA. Bar. 79745)
108 N. Alfred St.
Alexandria, VA 22314
Phone:(703)548-8911
Fax:(703)548-8935
nds@davidbsmithpllc.com

**<u>Certificate of Service</u>**

I hereby certify that on the 23rd day of January, 2018, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following CM/ECF user(s):

> AUSA Gordon D. Kromberg
> AUSA John Gibbs
> U.S. Attorney's Office
> 2100 Jamieson Avenue
> Alexandria, Virginia 22314
> gordon.kromberg@usdoj.gov
> john.gibbs@usdoj.gov

And I hereby certify that I have mailed the document by United States mail, first class postage prepaid, to the following non-CM/ECF participant(s), addressed as follows: [none].

> */s/ Nicholas D. Smith*
> Nicholas D. Smith
> VA Bar No. 79745
> David B. Smith, PLLC
> 108 North Alfred Street
> Alexandria, Virginia 22314
> (703) 548-8911 / Fax (703) 548-8935
> nds@davidbsmithpllc.com

22