**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No.: 16cr265 (LMB) |
| | ) |
| NICHOLAS YOUNG, | ) |
| | ) |
| Defendant. | ) |

## <u>SENTENCING MEMORANDUM OF NICHOLAS YOUNG</u>

## I.    INTRODUCTION

Some six years before Nicholas Young's arrest in August 2016, the FBI opened a counterterrorism investigation into him.  Following year-long pretrial discovery and a trial, it remains unclear what factors triggered the probe.  It seems reasonably likely that the investigation began due to an employment dispute between Young, who was a police officer, and his superiors at the Washington Metro Transit Authority concerning his beard length and his disorderly workspace, where he kept a copy of the Quran.  The Bureau had also learned that Young's cell phone contacts included the terrorism convict Zachary Chesser, who, like Young, attended George Mason University.[1]  Whatever its origin, the government then investigated Young, whom it codenamed Slow Decline, for over half a decade through extensive surveillance and the surreptitious use of undercover agents and informants.  During this period it also attempted to recruit Young as a paid informant.  He declined.

In July 2016, Young sent $245 in Google Play gift cards to an undercover agent, posing as a paid informant, who, in turn, had pretended to befriend Young and, later, to join ISIS in Syria.  There has never been any allegation Young has ever communicated – or attempted to communicate –  with any person in fact in Syria, or in ISIS, at any point in his life.  There has never been any allegation Young has ever traveled to Syria – or made plans to travel there – at any point in his life.  There has never been any allegation Young has ever given material support – or attempted to give material support – to any terrorism-associated person who is not a government agent or informant.  At trial, roughly half of the government's case consisted of

---

[1] The government would later learn that Young and Chesser were barely acquaintances.  Chesser himself would later write that, on campus, it was widely known that Young was a conservative police officer who appeared averse to militant Islam.

inflammatory Nazi images and tchotchkes seized from the defendant's home for the first time following his arrest.  A jury found Young guilty of attempting to materially support terrorism.

Young's presentence report puts his sentencing guidelines range at thirty to sixty years in prison.  That is, the Sentencing Commission of the United States recommends that Young, now thirty-seven years old, remain in prison until he is between sixty-seven and ninety-seven years of age: or roughly a day in prison for every penny Young gave to the government – at its request.  This is the sentencing range even though Young has no criminal history, and this was not a crime of violence: under the guidelines, a defendant's criminal history is automatically enhanced to the highest category, Category VI, on account of the terrorism-crime charge the government chose to bring.  In that sense, the government itself picked the sentence severity even before it solicited the crime.

Sentencing in that range would be to break a butterfly on a wheel because, among other reasons, the government's six-year counterterrorism investigation involved no terrorists, no violence, and no criminal conspiracy.  After *United States v. Booker*, 543 U.S. 220 (2005), *Gall v. United States*, 552 U.S. 38 (2007), and *Kimbrough v. United States*, 552 U.S. 85 (2007) – and pursuant to the factors set out in 18 U.S.C. § 3553(a) – a downward variance to three to four years of incarceration is appropriate.  *See also* Sameer Ahmed, *Is History Repeating Itself? Sentencing Young American Muslims in the War on Terror*, 126 Yale L.J. 5 (2017).  Attached to this memorandum are letters from Nicholas's friends, family, former colleagues, and interested parties.

## II.    GOVERNING PRINCIPLES

As the U.S. Supreme Court established in *Booker*, *Gall*, and *Kimbrough*, a sentencing court has broad discretion to consider nearly every aspect of a particular case, and a particular

defendant, in fashioning an appropriate sentence. "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall*, 552 U.S. at 52 (citing *Koon v. United States*, 518 U.S. 81, 113 (1996)). It is axiomatic that *Booker* rendered the U.S. Sentencing Guidelines ("Guidelines") advisory rather than mandatory. *Booker*, 543 U.S. at 264.

Following *Gall* and *Booker*, federal appellate review of district court criminal sentences is now limited to determining whether they are reasonable. *See, e.g.*, *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008) ("[T]he question [is] . . . [i]n light of the facts and circumstances of the offense and offender, is the sentence so unreasonably high or unreasonably low as to constitute an abuse of discretion by the district court?"). The *Gall* Court held that appellate courts may not presume that a sentence outside the Guideline range is unreasonable. To the contrary, as the Court of Appeals observed in *Gardellini*, district court sentencing decisions are reviewed under a deferential standard limited to identifying an abuse of discretion regardless of whether a challenged sentence is "within or outside the Guidelines." *Id.*

The *Kimbrough* Court stressed that the sentencing judge is not bound by the Guidelines or Guidelines Policy Statements; rather, the court may make its own policy judgments, even if those judgments are different than those provided for in the Guidelines. *Kimbrough*, 552 U.S. at 101; *see also Spears v. United States*, 555 U.S. 261, 264–65 (2009) ("That was indeed the point of *Kimbrough:* a recognition of district courts' authority to vary from the crack cocaine Guidelines based on *policy* disagreement with them, and not simply based on an individualized

determination that they yield an excessive sentence in a particular case. The latter proposition was already established pre-*Kimbrough*." (emphasis in original)); *Gardellini*, 545 F.3d at 1092 (After *Kimbrough*, "district courts are free in certain circumstances to sentence outside the Guidelines based on policy disagreements with the Sentencing Commission—and . . . appeals courts must defer to those district court policy assessments").

It is of course well-settled that *Booker* and its progeny rendered the Guidelines "truly *advisory*," permitting district courts to sentence differently: "differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Gardellini*, 545 F.3d at 1096 (emphasis in original).

The primary federal statutes governing sentencing in the federal district courts are 18 U.S.C. § 3553(a) and 18 U.S.C. § 3661. Section 3553(a) contains an introductory portion and seven subsections. The introductory portion directs the sentencing court, in determining a particular sentence, to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from future crimes of the defendant, and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the Guidelines; (5) Guidelines Policy Statements; (6) the need to avoid unwarranted sentence disparities; and (7) the need to provide restitution.  18 U.S.C. § 3553(a).

The introductory portion of § 3553(a) also directs the sentencing court to "impose a

sentence sufficient but not greater than necessary" to comply with the purposes of subsection (2). This "parsimony provision" embodies "the overarching goal in federal sentencing." *Freeman v. United States*, 131 S. Ct. 2685, 2692 (2011). Notably, § 3553(a)'s sufficient-but-not-greater-than-necessary clause sets an independent and certain limit on the sentence that a court may impose to meet the goals of sentencing. *See, e.g., United States v. Terrell*, 696 F.3d 1257, 1263 (D.C. Cir. 2012) ("The district court's statement that a 188–month sentence was 'just as serious' as a 210–month sentence [] calls into question whether the court believed the 210–month sentence it ultimately imposed was truly 'sufficient, but not greater than necessary,' [under § 3553(a)]."); *see also United States v. Baker*, 655 F.3d 677, 683 (7th Cir. 2011) (stating that the sentencing court is to impose "a minimally sufficient sentence"); *United States v. Rodriquez*, 527 F.3d 221, 228 (1st Cir. 2008) (explaining that a district court evaluating a variant sentence request should consider all relevant § 3553(a) factors as a group and strive to construct a sentence that is minimally sufficient to achieve the broad goals of sentencing"); *United States v. Kikumura,* 918 F.2d 1084, 1111 (3d Cir. 1990) (characterizing the command as a statutory duty to impose a "minimally sufficient" sentence).

Of crucial importance, 18 U.S.C. § 3661 makes it clear that "no limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." Put simply, in addition to the § 3553(a) sentencing factors, the court may receive and consider *any* information concerning the defendant's background, character, and conduct in imposing a sentence. The Supreme Court recently highlighted the centrality of this concept: "In particular, we have emphasized that '[h]ighly relevant—if not essential—to [the] selection of an appropriate sentence is the

possession of the fullest information possible concerning the defendant's life and characteristics.' Permitting sentencing courts to consider the widest possible breadth of information about a defendant 'ensures that the punishment will suit not merely the offense but the individual defendant.'" *Pepper v. United States*, 131 S. Ct. 1229, 1240 (2011) (internal citations omitted).

Appellate courts across the country have accordingly upheld significant downward variances predicated on various § 3553(a) factors, including for family and mental-health related reasons. In *United States v. Cole*, for example, the Eighth Circuit affirmed a district court's decision to downwardly vary from a Guidelines range of 135-168 months imprisonment to probation. --- F.3d ----, 2014 WL 4251596, at *1 (8th Cir. Aug. 29, 2014). There, the criminal defendant was convicted for her role in a fraud and tax evasion scheme that stole approximately $33 million from the electronics retailer Best Buy over a four year period. *Id.* This scheme the sentencing court described as "one of the largest corporate frauds in Minnesota history." *Id.* Yet the Court of Appeals upheld the district court's sentence of probation because the defendant "had no prior contact with law enforcement," was not "a consummate fraudster, [or] a pathological liar," and a probationary sentence would allow the defendant to work and earn money to make restitution to the victims of the fraud. *Id.*

Similarly, in *United States v. Sayad*, 589 F.3d 1110 (10th Cir. 2009), the sentencing court calculated Sayad's sentencing range for his drug trafficking offense at the Guidelines maximum of 60 months based on his PSR. Nevertheless, the sentencing court imposed, and the Tenth Circuit affirmed, a sentence of five years probation, citing the § 3553(a) factors, and noting Sayad's "supporting and loving family," the "necessity for [Sayad] to be with his family considering his father's health and their ability to survive, if not prosper, in the very demanding

6

business of running a restaurant," Sayad's naiveté and immaturity, Sayad's expression of anguish over his criminal conduct, his good physical health, his lack of any substance abuse history, and the potential for his rehabilitation outside of imprisonment. *Id.* at 1114-1115.

Analogous decisions that affirm, and pay significant deference to, downward variances based on § 3553(a) factors are legion. *See*, *e.g.*, *United States v. Howe*, 543 F.3d 128, 130 (3d Cir. 2008) (affirming downward variance from Guidelines range of 18 to 24 months' imprisonment to probation on account of defendant's role as a "devoted husband, father, and son," and because defendant made an "isolated mistake" and was "remorseful at sentencing"); *United States v. Lovato*, 798 F. Supp. 2d 1257, 1259 (D.N.M. 2011) (imposing probation notwithstanding a Guidelines range of 21 to 27 months' imprisonment because defendant suffered from mental illness); *United States v. Davis*, No. 07 Cr. 727 (HB), 2008 U.S. Dist. LEXIS 44030, at *1, 18 (S.D.N.Y. June 6, 2008) (rejecting the Guidelines sentencing range of 18 to 24 months' imprisonment and, based on the § 3553(a) factors, sentencing the defendant to "time served, supervised release, and 200 hours of community service").

Sentencing courts may not *presume* the Guidelines range is reasonable. *United States v. Milstead*, 509 F. App'x 5, 6 (D.C. Cir. 2013) (citing *Gall*, 522 U.S. at 50). Instead, the sentencing court's assessment should include a review of the § 3553(a) sentencing factors, aided by the arguments of the prosecution and the defense. *Terrell*, 696 F.3d at 1262 ("[W]ith respect to each individual defendant, the court must evaluate how well the applicable Guideline effectuates the purposes of sentencing enumerated in 18 U.S.C. § 3553(a).") (internal citations omitted).  To the contrary, sentencing courts are free to impose sentences outside the recommended range wherever the district court determines that the Guidelines

range does not effectively serve the purposes set forth in Section 3553(a). *Terrell*, 696 F.3d at 1262 (reversing trial court for holding that it had the power to depart from the Guidelines range only if it found "compelling reasons" to do so).

To adequately explain its sentence, the district court must provide a statement of reasons, or else the "sentence is imposed in violation of law." *In re Sealed Case*, 527 F.3d 188, 191 (D.C. Cir. 2008) (reversing sentencing decision under plain error standard where district court "gave no explanation at all for choosing a sentence of eighteen months"). As the Court of Appeals explained in *In re Sealed Case*, the sentencing court's failure to provide a fulsome statement of reasons is plain error:

> Even when the length of the resulting sentence would otherwise be reasonable. . . . The absence of a statement of reasons is prejudicial in itself because it precludes appellate review of the substantive reasonableness of the sentence, thus seriously affecting the fairness, integrity or public reputation of judicial proceedings.

*Id.* at 193 (internal citations and quotations omitted).

## III.  THE TWO-LEVEL "VIOLENT ACT" ENHANCEMENT DOES NOT APPLY UNDER USSG §2M5.3(b)(1)(E)

Before reaching the § 3553(a) factors, we address first the PSR's suggestion that the Court should find a two-level increase in Young's offense level because "the offense involved the provision of funds or other material support or resources with the intent, knowledge, or reason to believe they are to be used to commit or assist in the commission of a violent act." USSG §2M5.3(b)(1)(E).

That enhancement does not apply in this case. No facts were offered at trial showing that Young provided the Google Play gift cards to the paid informant, "knowing" they would be used to commit or assist in the commission of a violent act. In the first place, and most obviously, the entire crime was the exclusive creation of the government: there was no possibility whatsoever

8

the gift cards would be used to aid in the commission of a violent act.  That eliminates any possibility of the defendant's "knowledge" the cards would be so used.  As for the defendant's "intention" that the cards would be so used – even if that intent was objectively impossible to effect – the government offered no evidence at trial that Young gave the cards to the informant "Mo" to aid an act of violence, as opposed to some other motive, such as misplaced friendship. The government's evidence at trial focused on whether the defendant sent the gift cards, and what words the informant used to solicit them, not on what the defendant may or may not have been thinking when they were sent.

## IV.   THE TWO-LEVEL ADJUSTMENT FOR OBSTRUCTION OF JUSTICE DOES NOT APPLY UNDER USSG § 3C1.1

The government contends the Court should find a two-level adjustment to the Count 1 offense level for obstruction of justice under USSG § 3C1.1.  It is mistaken.

USSG Section 3C1.1 provides:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.

USSG § 3C1.1.

First, Section 3C1.1 does not apply here since the charge to which it would apply – Count 1, attempted material support for terrorism, 18 U.S.C. § 2339B – concerned criminal conduct that occurred in July 2016.  By contrast, the government alleges that the defendant's obstruction of justice occurred, respectively, in November 2014 (Count 4) and December 2015 (Count 2).  (ECF No. 38.)  Accordingly, by its terms, Section 3C1.1 does not apply because the defendant's alleged obstruction was not – and by definition, could not have been – directed toward "the administration of justice *with respect to the investigation, prosecution, or*

9

*sentencing of the **instant offense of conviction**.*" USSC § 3C1.1 (emphasis added).  The government offered no evidence, nor could it have, showing that Mr. Young attempted to obstruct an investigation into a future crime which the government had yet to even solicit.

Second, for similar reasons, Section 3C1.1 does not apply because the government did not offer substantial evidence at trial proving beyond a reasonable doubt that Defendant Young attempted to obstruct justice.  Young submitted this argument in connection with post-trial Rule 29 briefing. And even if the government did offer substantial evidence of obstruction of justice, applying a Section 3C1.1 enhancement to Count 1 would constitute impermissible double-counting given that the independent obstruction of justice counts would be included within the offense level.

## V.   THE THREE-LEVEL INCHOATE CRIME DECREASE APPLIES UNDER USSG § 2X1.1

Section 2X1.1 of the sentencing guidelines provides:

(b) Specific Offense Characteristics

(1) If an attempt, decrease by 3 levels, unless the defendant completed all the acts the defendant believed necessary for successful completion of the substantive offense or the circumstances demonstrate that the defendant was about to complete all such acts but for apprehension or interruption by some similar event beyond the defendant's control.

USSG §2X1.1(b)(1).

The application note, in the Background section, further provides that "sometimes, however, the arrest occurs well before the defendant or any co-conspirator has completed the acts necessary for the substantive offense.  Under such circumstances, a reduction of three levels is provided under §2X1.1(b)(1) or (2)." USSG §2X1.1, Application notes.

In this case, the substantive offense on which Count 1 was based is providing material support to a person in fact associated with a designated foreign terrorist organization.  18 U.S.C. § 2339B.  Of course, providing material support to a FBI agent is not a complete crime

under Section 2339B.  The government offered no evidence to show the defendant was anywhere near "complet[ing] the acts necessary for the substantive offense," i.e., providing material support to a person in fact associated with an FTO.  Indeed, the government offered no evidence that the defendant ever even communicated with any person in an FTO.  Accordingly, the three-level decrease under Section 2X1.1(b)(1) applies.

## VI.    THE NATURE AND CIRCUMSTANCES OF THE OFFENSE CALL FOR A DOWNWARD VARIANCE (§ 3553(a)(1))

This Court is familiar with the nature and circumstances of the offense, from the Indictment as well as trial.  In connection with the circumstances of the offense, we note the following:

1.      The defendant had – and has – no real-world connection to any foreign terrorist organization whatsoever.  There has never been any allegation Young has ever communicated – or attempted to communicate –  with any person in fact in Syria, or in ISIS, at any point in his life.  There has never been any allegation Young has ever traveled to Syria – or made plans to travel there – at any point in his life.  There has never been any allegation Young has ever given material support – or attempted to give material support – to any terrorism-associated person who is not a government agent or informant.  There has never been any allegation Young agitated for the material support of ISIS on social media (though there *was* evidence Young agitated *against* the group on the Liveleak website between 2014-2016).  There has never been any allegation that Young planned any sort of terroristic violence.

All of this stands in marked contrast to the case of *United States v. Harris Qamar*, 16-cr-227 (E.D. Va. 2016).  This Court sentenced Qamar, who was charged with attempted material support for ISIS, to 102 months' incarceration with credit for time served.  (ECF No. 44.)  Qamar's case is orders of magnitude more dangerous than Young's.  Unlike Young, Qamar: (1)

11

attempted to join ISIS in Syria, and *before* being approached by any government agent (ECF No. 2, ¶ 35).; (2) undertook concrete actions to join ISIS, *unsolicited by the government*, such as buying plane tickets and seeking a new passport to travel to Syria (*Id*. at ¶ 36); (3) aided in the creation of an ISIS-inspired propaganda video by proposing locations that might be attacked by terroristic violence and actually taking the photographs of cased sites himself (*Id*. at ¶¶ 55-66); (4) incessantly agitated for ISIS on social media (*Id*. at ¶¶ 9-23); and (5) demonstrated, over a significant span of time, a pathological fixation on nihilistic violence that he was planning to perpetrate. (*Id.* at ¶ 29.)

In short, Qamar's case was a model of undercover investigative work compared to Young's. First, the defendant's proclivity for materially supporting the very FTO in question was amply demonstrated *before* the government initiated the national-landmark-targeting crime solicitation. (ECF No. 2, ¶¶ 35, 55.) This was shown both by Qamar taking concrete steps, unbidden by the government, to travel to Syria to join ISIS but also through unequivocal agitation for the group on social media. Not only are those factors missing in this case, *in the very same period he was being investigated, between 2014-2016, Defendant Young came out against, and criticized, ISIS on social media.*

Second, the undercover informant met Qamar in September 2015 and the crime-solicitation for the propaganda video occurred in May 2016 – less than a year later. During this period, Qamar was consistently agitating for ISIS and sincerely declaring his willingness to engage in gruesome violence in support of that group. (*Id*. at ¶¶ 21, 55.) A year earlier he had tried to join ISIS. That is, the government recognized the risk, devised a crime solicitation, and the defendant unsurprisingly bit at the first opportunity (which his parents had previously denied him by taking his passport), all within fewer than twelve months. Young's case is completely

different.  Young was investigated *for over six years*.  During this span of time, Young: (1) was offered *paid work* for the FBI as an informant; (2) demonstrated such a lack of predisposition to support an FTO that the Bureau's investigation into him went virtually dormant; (3) demonstrated his lack of proclivity to support an FTO simply by virtue of remaining on the police force and carrying out his duties over the entire time he was investigated without incident.

2.      So Qamar's case offers a counterpoint to Young's in terms of sentencing factors, but it also neatly illustrates the line dividing entrapment from proper conviction.  Here, a jury found Young guilty of attempted material support for terrorism.  However, unlike in *Qamar*, the government offered no evidence of Young's inclination to *materially* support any FTO before the start of its six-year-long investigation.  To the contrary, the government uncovered evidence, following the defendant's arrest, showing Young refusing to provide night-vision scopes to a Libyan national after determining such a transfer would be against federal law.  The government heavily relied on inflammatory and prejudicial Nazi and white supremacist imagery to carry its evidentiary burden.  This makes it virtually impossible to untangle the extent to which the jury's verdict rested on undue prejudice.  Although the jury did not find entrapment here, the Court can and should consider these facts in downwardly varying from the guidelines range.

3.      Another mitigating factor is Young's motive.  As evidence at trial demonstrated, the informant Mo had befriended Young for years before soliciting the crime.  The paid informant cultivated this friendship by appealing to Young's sentimental side, engaging in intimate conversations about girlfriends and Nicholas's deceased father.  When the informant repeatedly solicited the gift cards, Nicholas did not send them out of his ideological support for ISIS, as in the case of Qamar.  He did so because he believed he was helping someone who had

13

been his friend.  Of course, his decision to help a friend who had pretended to join ISIS was patently poor judgment and certainly unethical.  But there remains a material moral difference between sending the gift cards with the aim of bolstering a terror group and sending them out of a misplaced desire to help a dubious friend.

## VII.   THE HISTORY, CHARACTERISTICS, BACKGROUND, CHARACTER, AND CONDUCT OF NICHOLAS YOUNG JUSTIFY A DOWNWARD VARIANCE (§ 3553(a)(1))

### A.   First Offender/Atypical Conduct

Young is a first-time offender.  His life and employment history are at odds with the unlawful conduct charged in this case.  A *Booker-Gall-Kimbrough* downward variance is therefore warranted based on atypical conduct.

As a general matter, first-offender status is, in and of itself, an appropriate basis for a downward variance.  *See*, *e.g.*, *United States v. Huckins*, 529 F.3d at 1317 (10th Cir. 2008) (affirming that district court's downward variance of 60 to 79 months below the calculated Guidelines range was reasonable and permissibly took into account the Defendant's lack of a criminal record); *United States v. Munoz-Nava*, 524 F.3d at 1142-43 (10th Cir. 2008) (downward variance to one year imprisonment and one year home confinement from recommended Guidelines range of 65-78 months imprisonment supported by district court's finding of several factors including that defendant had no felony criminal record and his offense was "highly out of character"); *United States v. Tomko*, 562 F.3d 558, 560 (3d Cir. 2009) (affirming probationary sentence based partly on defendant's "negligible criminal history").

But beyond his first-offender status, Young served as a police officer with the Washington Metro Transit Authority for thirteen years.  He served with distinction.  Among other examples, at one point he was awarded a commendation from the U.S. Attorney's Office

14

in the District of Columbia for apprehending a burglar, armed with a long knife, without having recourse to his firearm.  In short, his career was dedicated to preventing crime, not participating in it.  And, significantly, this was true throughout the entire length of the government's six-year counterterrorism investigation.

### B.    Young's Good Deeds, Character and Background

When Young was arrested in August 2016 and charged with a terrorism crime, there was only one reaction among his family, friends and colleagues: complete shock.  This astonishment arose from the fact that the man they knew, his character, was and is inconsistent with a criminal mind in general and the conduct charged in this case in particular.  Young's good works, and the character they exemplify, are in and of themselves a factor that the Court must consider in determining a sentence.  The numerous letters submitted on Young's behalf testify to his loyalty to friends and family; hardworking nature; service to others; and a demonstrated acceptance of people from all backgrounds which is completely inconsistent with the evidence selectively presented at trial.

One of those letters is from **Joy Young**, Nicholas's mother.  Joy is an administrative assistant at Mt. Eagle Elementary school in Alexandria, Virginia.  Or she was until recently. She immediately retired the day the jury found her son guilty of a terrorism crime, her heart broken.  From the time she left fulltime employment with the CIA in order raise Nicholas to the present, Joy offers examples of Nicholas's patriotism, his admiration for those who serve in the armed forces (such as his grandfather), his kindheartedness, and his acceptance of all races and creeds.

As regards the Nazi paraphernalia presented by the government, Joy supplies some biographical information concerning Nicholas which offers a further proof – if one were

necessary – of the bottomless inappropriateness of the government's racism evidence in this case. The defense chose not to raise this issue in this case because the suggestion that these facts are somehow necessary to demonstrate the manifest unfair prejudice of the government's Nazi evidence is offensive.

**Ashley Young** writes in support of her brother. Ashley knows the defendant better than anyone else. And she does not recognize the person portrayed by the prosecution. Nicholas loves his country, what it stands for, and its constitution, she writes. She notes that this past week marks the eleventh anniversary of their father's death, which affected Nicholas so much. "When our father died," she writes, "I saw the light inside Nick go dim. At some points that light was just a flicker. I had hoped that the career my brother had made for himself or the love of his girlfriend would make him happy again. I prayed many nights that he would not live in regret or sadness. I'm not sure if he will ever get over the loss of our dad."

Another letter comes from **Tom McNulty**, the father of Officer Kenneth James McNulty, once Nicholas's best friend. The government subpoenaed Officer McNulty to testify at trial against Nicholas. Tom, who was a defense contractor for ten years in Iraq, Afghanistan and Kuwait, notes Nicholas's time in the ROTC, as well as his "strong belief in our government and demonstrat[ions of] a patriotic enthusiasm." Tom has "always viewed Nick as a close and trustworthy friend, and still do[es]. He has been to my home on numerous occasions, and I would welcome him back any time."

Despite the stigma and fears of career repercussions, multiple colleagues from the Metro Transit system have written in support. One, **Henry Marrow**, was a station manager with Washington Metro Transit Authority (WMATA) who has known Nicholas since 2003, when he first came to WMATA as a transit officer. Marrow, an African American who served in the

U.S. Navy aboard three aircraft carriers during the Vietnam conflict, observes that Nicholas "was well respected among the passengers.  He was always cordial and helpful.  He was just a very good officer – Caucasian, Negro, Asian, Latino – race did not matter to Officer Young.  That is why this story is incredible.  The customers at the Takoma Park Station used to call him 'Officer Friendly' because of his interactions with the riders of the rail."

Another, **Derrick Stokes**, has served as an African American officer with WMATA for twelve years.  Stokes met Nicholas very early in his career and worked side-by-side with him for several years.  Stokes writes:

> Nicholas is the most genuine person that I have ever met.  He is willing to do anything for the people that he considers his friends, even if providing that help would put him in a bad situation.  I can only speak of my experiences with him, but he has always been an honest and dependable person. . . .
>
> In my personal opinion, I don't believe that Nick posed a threat to anyone.  Not the department, the transit system, or the community.  I base this on the time I spent with Nick beyond just work.  He has been to my family's baby showers, home warming, etc.  The person portrayed in the media is not the same person that I have come to know over the years. . . .
>
> When it became common knowledge that he was a Muslim, he was ostracized by many of his co-workers.  But he never let it bother him, and just kept moving forward.  Even through the constant harassment from those around him, he showed a strength of character that is rare in most people.
>
> During the times we worked the same beat together, I never saw him treat people unfairly or without respect.[2]

Another current WMATA officer, **LaTesia Christian**, also African American, has written in support of Nicholas's character.  Christian, who had served as an officer with

---

[2] Mr. Stokes writes that he "was kind of surprised that [he] wasn't called upon to speak on [Nicholas's] behalf [at trial]." Unfortunately, as with a number of Young's other colleagues and WMATA's human resources department, messages delivered to Mr. Stokes went unanswered for months.  It is apparent that the stigma of a terrorism trial scared many of Mr. Young's colleagues and friends away.

Nicholas for years, writes that he was a "fair, reliable, kind-hearted, caring, loyal, and honest friend who would be there for a person in a time of need." Nicholas, she adds, "took the steps to make sure [people he encountered on the beat as an officer] were dealt with fairly."

Many of Nicholas's friends outside of work have submitted letters. **Stefanie Tolosa**, a radiology administrator at Inova Mr. Vernon Hospital, grew up with Nicholas, who "has always been like the brother [she] never had." When Mrs. Tolosa heard about Nicholas's arrest, she knew that it "had to be some kind of horrible mistake. There is no way the man I've loved as a brother for the past 28 years committed the crimes he's being accused of." Early on, she writes:

> Nicholas developed a strong interest in the military [] and would have joined after high school if his dad had let him. He excelled in Boy Scouts, ROTC, and loved to do WWII reenactments. We used to make fun of him always dressing up, thinking it was nerdy. . . . I never thought in a million years that later on in his life that would be used as a slander against him to call him a neo-Nazi. Nick had friends and girlfriends from all different walks of life, race, and religions, including Jewish. . . .

> This has really shaken my confidence in [government]. I feel like he was tricked. He was put in a situation that he never would have been in on his own. It's like the FBI watched him for so long and couldn't find anything, so they set him up to do something he wouldn't have done on his own so they could get him in trouble. They chose to focus on items found in his home to portray him a specific way to make their case. Almost all of those things are irrelevant and have nothing to do with the type of person he is or what he believes in.

**Lourdes Castro** has known Nicholas for nearly 25 years. Nicholas, whom she considers family, has always been a "kind-hearted, straight-laced and responsible law-abiding citizen." She adds:

> Nick's maturity, disciplined behavior and respect for authority continued well into adulthood. He always showed respect for the law and for his fellow citizens in his everyday life and in his career as a proud law-enforcement police officer. Nick always followed the rules while policing, and never used intimidation or showed disrespect to anybody. Nick treats everyone with respect. He does not look down on, or discriminate against, anyone. I am outraged that Nick's military reenactment hobby (that I used to make fun of him for as a teen) was used to slander and paint him as a neo-Nazi. Nick is not, and never has been, anti-Semitic or racist in any way. He has always had friends and girlfriends of all races and religions, and was in a serious long- term relationship with a

18

Jewish woman whom he loved very much.

**Anthony Babin**, another longtime friend of Nicholas's who is also African American, writes:

> Nick is not a neo-Nazi. He is a good guy, and does not discriminate against anyone! There was always a very diverse group of people at Joy's Christmas dinners. We joked it was like the United Nations, with a white Muslim (Nick), a Hispanic guy, a Jewish guy, me and another black guy along with Ashley and Joy. Nick and his family are very good people, and I am blessed to have them in my life. The last time I saw Nick, my wife and I announced to him that we were having a baby. He was so happy for us. I am very sad that Nick may not ever get a chance to meet my daughter. He is not dangerous; he is not a terrorist. He is my friend; he is my brother. Nick Young is a good man.

**Sayma Maqsodi**, who has known Nicholas for approximately twenty years, recalls how, at George Mason University, Nicholas would help her "prepare for [her] exams. He was always teaching [her] about history, religion, and math. He was someone who always volunteered a helping hand even if you didn't ask for it. I was amazed by how much a 20-year-old guy knew so much about so many different topics. He not only loved teaching others what he knew but also wanted to absorb as much information about others' culture, religion and language." She concludes: "I've read all the articles and seen the charges set against him and in my heart I don't believe he is a terrorist or a supporter of terrorism."

Similarly, **Heather Hogan**, who has known Nicholas for twenty years, informs the Court that he was, and remains, "a kind-hearted, intelligent man, who does his best to act thoughtfully in a world where most people clamor through like bulls in china shops." **Laura Holland** agrees, writing about Nicholas as a "kind, intelligent and gentle person who loves to read."

Nicholas's extended family has submitted letters in support. So have Nicholas's former teachers. They are unified in expressing their shock at the charges, which are so inconsistent with the man they knew. Also included among the letters are those submitted by interested third-

19

parties, such as members of civil liberties groups following this case.  (All letters attached hereto as **Exhibit A**.)

### C.      Diagnosed Mental Illness

In December 2016, a clinical psychologist retained by the defense determined the defendant suffers from Major Depressive Disorder, anxiety and trauma-related disorders. (Report of Sara E. Boyd, Ph.D, attached hereto as **Exhibit B**.)  Dr. Boyd concluded that these illnesses predated the death of his father in 2007, "but were substantially aggravated by his father's unexpected death and the feelings of guilt that Mr. Young felt in response."

By way of recommendations, the psychologist proposed "ongoing psychiatric consultation and medication management [as] vital for the purpose of treatment [] He would also benefit from an evidence-based PTSD treatment, such as Prolonged Exposure or Cognitive Processing Therapy. [] To the extent that appropriate psychological treatment is available in incarceration settings, Mr. Young will be able to participate and make some gains toward recovery.  However, the psychotherapy interventions that are likely to produce improvement are most effectively delivered in community settings."

It is both necessary and appropriate that the Court weigh these considerations in imposing a sentence.  *See*, *e.g.*, *United States v. Miranda*, 505 F.3d 785, 794 (7th Cir. 2007); *Lovato*, 798 F. Supp. 2d at 1259; *United States v. Flowers*, 946 F. Supp. 2d 1295, 1298 (M.D. Ala. 2013).

### D.      Family Circumstances and Support, and Dependents

As discussed above, Joy Young, the defendant's mother, retired the day after verdict in this case.  It seems clear to undersigned counsel that she cannot support herself with retirement checks alone.  Nicholas Young's ability to earn income to support himself and his mother upon his release from incarceration is unquestionably a ground for a downward variance in the post-

*Gall/Kimbrough* era. *Sayad*, 589 F.3d at 1117-18 (varying downward based partly on the "necessity for [defendant] to be with his family considering his father's health and their ability to survive, if not prosper, in the [their] business"); *see also United States v. Galante*, 111 F.3d 1029 (2d Cir. 1997).

In addition, as the Court can glean from the letters and testimonials submitted on Nicholas's behalf, there is a good deal of family support for him.  The financial and emotional support on the outside that a defendant can be expected to receive from family and community members is another valid basis for a downward variance.  *See*, *e.g.*, *Sayad*, 589 F.3d at 1114-1115; *United States v. Autery*, 555 F.3d 864, 874 (9th Cir. 2009) (family support one of several valid grounds for downward variance from 41-51 months to probation); *United States v. Martin*, 520 F.3d 87, 92 (1st Cir. 2008) (family support one of three valid reasons for 91-month downward variance).

### E.    Strong History of Employment

From his time in high school to his arrest, there has hardly been a time when Young was not gainfully employed.  Of course, he was employed as a police officer with the Washington Metro Transit Authority for thirteen years leading up to his arrest.  This is a factor that the Court may consider in imposing a sentence and in granting a downward variance. *United States v. Ruff*, 535 F.3d 999, 1001 (9th Cir. 2008); *see also Tomko*, 562 F.3d at 570-72.

### F.    Remorse

A defendant's true remorse, whether exceptional or not, is a valid basis for a downward variance.  *See*, *e.g.*, *United States v. Howe*, 543 Fed. 3d 128, 138 (3d Cir. 2008).

Here, as Young's letter to the Court will demonstrate, he is remorseful for the crime he committed.  His sincerity may be measured in part by his desire to continually edit and perfect

his letter to the Court.  The defense has submitted this memorandum today in order to file it a

week in advance of the sentencing hearing.  Mr. Young's letter will be filed promptly.

## VIII.   CONSIDERATION OF THE REMAINING § 3553(a) FACTORS CALLS FOR A MODERATE SENTENCE

### A.      Section 3553(a)(6)

Title  18  U.S.C.§ 3553(a)(6)  directs  that  the  "need  to  avoid  unwarranted  sentence

disparities among defendants with similar records who have been found guilty of similar

conduct" be considered when imposing sentence.

In addition to the *Qamar* case, discussed above, another companion case was *United

States v. Amri*, 17-cr-50 (E.D. Va. 2017).  Again, the defendant Haris Qamar in fact attempted to

join ISIS in Syria, unlike Young.  In *Amri*, the defendant was aware of Qamar's attempt and

falsely told FBI agents he was not.  (ECF No. 2, p. 5.)  Further, Amri allegedly told an informant

that, after the FBI interview, Amri advised Qamar to be careful because the FBI was asking

about who supported ISIS.  Amri later corrected his representation with agents, but also advised

that he gave Qamar $50 for basic necessities after Qamar was unable to get a refund for his $700

airline ticket to Turkey.  (*Id.* at 6.)  Amri, who was over thirty years old, was found guilty of a

violation of 18 U.S.C. § 1001.  He was sentenced to **24 months' imprisonment**.

In contrast to Amri's case, Young did not know anyone who actually traveled to Syria or

actually joined a Foreign Terrorist Organization.  Young never attempted at any point to

communicate with anyone in ISIS, and did not know anyone who had.  Unlike Amri's case,

Young's investigation was built entirely on fictional representations by undercover agents.

Unlike in Amri's case, there was no risk whatsoever that any of Young's comments to FBI

agents would interfere with any terrorism investigation at all.

The following comparable cases involve sting operations, with informants, resulting in material support for terrorism charges:

| | | | |
|---|---|---|---|
| *U.S. v. Erick Wotulo*, 16-cr-416 | District of Maryland | Attempted material support to FTO in the form of state-of-the-art firearms | 30 months' incarceration |
| *U.S. v. Hanifa bin Osman*, 16-cr-416 | District of Maryland | Attempted material support to FTO in the form of state-of-the-art firearms | 37 months' incarceration |
| *U.S. v. Mark Robert Walker*, 04-cr-2701 | Western District of Texas | Attempted material support to FTO in Somalia in the form of weapons, financial support, creation of websites | 24 months' incarceration |
| *U.S. v. Lamont Ranson*, 05-cr-16 | Southern District of Mississippi | Attempted material support to FTO in the form of false identification documents | 29 months' incarceration |
| *U.S. v. Romero-Panchano*, 03-cr-182 | Southern District of Texas | Attempted material support for FTO through soliciting members of terrorist group in weapons-for-drugs deal | 36 months' incarceration |
| *U.S. v. Jasminka Ramic*, 15-cr-49 | Eastern District of Missouri | Attempted material support for ISIS including military supply gear | 36 months' incarceration |

**B.      Section 3553(a)(2)(A)**

The Court must consider the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. The Court must apply these concepts to Young's specific situation and articulate its thinking in some fashion. The Court is permitted to weigh and discount these factors against other statutory factors

that it is considering, and to give different weights to different factors in the particular circumstances of Young's case.

Terrorism crimes are – certainly as a general matter – serious in nature.  But, as the defense has noted above, this was a terrorism investigation with no terrorists, no violence, and no criminal conspiracy.  Unlike other terrorism-crime defendants sentenced by this Court, there is no allegation here that Young ever communicated with any person associated with ISIS, ever attempted to travel to Syria, or ever attempted to give material support to any terrorism-associated person who was not a government informant or agent.

These are significant mitigating factors.  The Court can certainly demonstrate the seriousness of real-life terrorism offenses, promote respect for the law, and provide just punishment by imposing three to four years' incarceration with supervised release.  Young has already been branded for life as a convicted supporter of terrorism.  As if that were not enough, he has been savagely, irrelevantly, and unfairly tarred in the press as a neo-Nazi.  A sentence such as the one outlined in this memorandum will certainly send a strong message regarding respect for the law and just punishments.

C.     Section 3553(a)(2)(B)

The Court must consider the need for the sentence to afford adequate deterrence to criminal conduct.  The Court is also permitted to weigh this factor against other factors that it is considering.  For the same reasons noted above, a sentence of three to four years' incarceration can serve the purpose of general deterrence in Young's case.  The Court and jury have determined that it is permissible for the government to investigate a man for six years, including through constant intrusive surveillance, and the surreptitious use of undercover informants and agents, and justify it when the defendant succumbs to a sting operation

involving about $250 in gift cards.  If that does not deter people in similar positions, it is

difficult to imagine how far a police state would need to reach to create more deterrence.

### D.        Section 3553(a)(2)(C)

The Court must consider the need for the sentence to protect the public from further

crimes of Nicholas Young.  Based on the information made available to the Court, there is no

reason at all to believe that incarcerating Nicholas is required in order to protect the public from

any potential future crimes on his part.  Indeed, he has never been charged with any crime except

for where the government has solicited the sending of gift cards.

In fact, considering Young's record as a police officer in the Metro Transit system –

including a commendation from the D.C. U.S. Attorney for apprehending an armed robber – one

might even say that a sentence of incarceration is less likely to protect the public than no

sentence at all.  The offense is atypical of Nicholas's life as a whole.  And even if he had some

inclination to commit a crime in the future, the suffering he has endured as a result of this case

would be sufficient to deter him for the rest of his life and then some.

### E.        Section 3553(a)(2)(D)

The Court must consider the need for the sentence imposed to provide Young with

needed educational or vocational training, medical care, or other correctional treatment in the

most effective manner.  As for medical treatment, as mentioned above, a clinical psychologist

retained by the defense has found that Young suffers from Major Depressive Disorder, anxiety

and trauma-related disorders.

She also determined that "ongoing psychiatric consultation and medication management

[are] vital for the purpose of treatment [] He would also benefit from an evidence-based PTSD

treatment, such as Prolonged Exposure or Cognitive Processing Therapy. [] To the extent that

25

appropriate psychological treatment is available in incarceration settings, Mr. Young will be able to participate and make some gains toward recovery.  However, the psychotherapy interventions that are likely to produce improvement are most effectively delivered in community settings." This medical opinion warrants downward variance from the guidelines range.

### F.      Section 3553(a)(4),(5)

As noted above, the Court must consult and consider applicable Guideline provisions and Guidelines Policy Statements, but is now permitted "to tailor the sentence in light of other statutory concerns as well, *see* § 3553(a)." *Booker*, 543 U.S. at 245.  Under *Booker-Gall-Kimbrough* and their progeny, the Court is fully empowered to disagree with the Guidelines and Guidelines Policy Statements.  The Supreme Court only requires that any such disagreement, and any deviation from the Guidelines range, must be acknowledged and explained by the sentencing court, typically in reference to the § 3553(a) factors.

The guidelines range in this case – between thirty to sixty years of incarceration – is a miscarriage of justice on its face.  The guidelines for violations of 18 U.S.C. § 2339B do not distinguish between supporting violent attacks on civilians and population centers, on the one hand, and the delivery of a gift card to a paid informant, on the other. Both automatically trigger a base offense level of 26 points, plus the 12-level terrorism crime enhancement under USSG § 3A1.4(a).

To apply the same set of guidelines to a terror bombing and to a gift-card case involving no real terrorists, no violence, and no criminal conspiracy is to break a butterfly on a wheel. Attention has increasingly turned to the hatchet-over-scalpel effect of these guidelines in terror crimes.  *See*, *e.g.*, Sameer Ahmed, *Is History Repeating Itself? Sentencing Young American Muslims in the War on Terror*, 126 Yale L.J. 5 (2017) (comparing sentencing in the War on

Drugs with the War on Terror and analyzing, among other points, the history of the "terrorism enhancement" under USSG § 3A1.4).[3]  Ahmed notes:

> Criminal conduct subject to the Terrorism Enhancement varies significantly: from planning and participating in a violent attack that kills hundreds of people to making false statements to law enforcement officials. Yet the Terrorism Enhancement does not take into account this broad range of conduct, and the resulting Guidelines range is often inconsistent with the actual statutes that criminalize the underlying conduct in the first place. For example, the material support for terrorism statutes prohibit providing "material support"—such as money, training, expert advice, and assistance—to terrorists. Unlike the Enhancement, these statutes recognize that different levels of support require different punishments. While 18 U.S.C. § 2339A permits a maximum sentence of fifteen years, if death is caused by the support provided, the maximum increases to life imprisonment. Furthermore, under section 2339C, if financial support is provided with the intent to fund an act of terrorism, the maximum sentence is twenty years. But if someone only conceals such financial support, the maximum is reduced to ten years. Contrary to these varying levels of punishment, the minimum sentence under the Terrorism Enhancement is 17.5 years, regardless of the type of material support provided. Therefore, while the material support statutes demonstrate that Congress indicated that sentences should be "proportional to the culpability of the conduct, to the injury that can be directly attributed to a defendant's actions, and to the nature of the organization's actions," the Terrorism Enhancement treats those who provide any type of material support to a terrorist as harshly as the terrorist who commits the violent act.

> Others have recognized that the seriousness of terrorism offenses differs based on the underlying conduct. Christina Parajon Skinner, for example, divides offenders into "hard core" and "soft core" groups.  Hard-core defendants are those that have committed "terroristic acts or attempts, [when] there are no mitigating circumstances to consider." As an example, Skinner provides Zacarias Moussaoui, the "twentieth hijacker," who received a life sentence for his role in the 9/11 attacks and never demonstrated remorse for his actions. For these individuals, long sentences "are proportional to the threat they pose."

> On the other hand, soft-core defendants include individuals "whose conduct has less directly threatened U.S. interests," such as those convicted of providing material support or in sting operations initiated by government informants.

> The Terrorism Enhancement also does not take into account the individual characteristics of each defendant. The young American Muslims analyzed in this Feature all have little to no criminal history, and but for the Terrorism Enhancement would have been placed in Category I instead of VI, which could have reduced their potential Guidelines sentence by fifteen years or more. The Sentencing Commission has recognized that individuals with no criminal record have the lowest rate of recidivism. One study determined that 93.2% of

---

[3] Available at: http://www.yalelawjournal.org/feature/is-history-repeating-itself-sentencing-young-american-muslims-in-the-war-on-terror

> first-time offenders did not recidivate. In other situations for defendants with no criminal history, courts have given sentences below the advisory Guidelines range, recognizing that a lesser term of incarceration is still a substantial punishment and deterrent for someone who has never experienced prison before. However, such considerations do not apply for most terrorism defendants.

Ahmed, 126 Yale L.J. 5.

In other words, the guidelines for terrorism crimes are qualitatively and quantitatively different from nearly all other federal crimes.  And yet the severity of terrorism sentences does not rest on any empirical foundation.  As Ahmed concludes, as of 2017, "neither the Sentencing Commission nor the courts applying the Terrorism Enhancement have provided any empirical evidence to support the presumption that terrorism defendants are uniquely dangerous.  The legitimacy of the Guidelines is derived from the belief that they are based on reliable data and principles.  However, when the Terrorism Enhancement was promulgated, no statistically sound evidence was used to substantiate that all terrorism defendants were so different to necessitate such a large increase in the Guidelines range." *Id.*  In fact, studies have tentatively shown the opposite to be true.  The limited available data suggest that "individuals convicted of terrorism offenses do *not* recidivate at higher rates than those convicted of other crimes.  Of the more than 300 prisoners who have completed their terrorism sentences since 2001, 'Justice Department officials and outside experts could identify only a handful of cases in which released inmates had been rearrested, a rate of relapse far below that for most federal inmates.'" Ahmed, 126 Yale L.J. 5.

The lack of any empirical support for the guidelines range in this case – and the failure of the guidelines to rationally distinguish between violent and nonviolent conduct – is itself a ground for a significant downward variance. *Spears v. United States*, 555 U.S. 261, 264–65 (2009) (holding that when the Commission fails to fulfill its institutional role, a district court can

vary from the guidelines "based on policy disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case").

## IX.    CONCLUSION

For all of the foregoing reasons, Defendant Young respectfully submits that a significant downward variance from the guidelines range is appropriate here.

Dated: February 16, 2018.

Respectfully submitted.

*/s/ Nicholas D. Smith*
Nicholas D. Smith (VA. Bar. 79745)
108 N. Alfred St.
Alexandria, VA 22314
Phone:(703)548-8911
Fax:(703)548-8935
nds@davidbsmithpllc.com

**<u>Certificate of Service</u>**

I hereby certify that on the 16th day of February, 2018, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following CM/ECF user(s):

> AUSA Gordon D. Kromberg
> AUSA John Gibbs
> U.S. Attorney's Office
> 2100 Jamieson Avenue
> Alexandria, Virginia 22314
> gordon.kromberg@usdoj.gov
> john.gibbs@usdoj.gov

And I hereby certify that I have mailed the document by United States mail, first class postage prepaid, to the following non-CM/ECF participant(s), addressed as follows: [none].

> */s/ Nicholas D. Smith*
> Nicholas D. Smith
> VA Bar No. 79745
> David B. Smith, PLLC
> 108 North Alfred Street
> Alexandria, Virginia 22314
> (703) 548-8911 / Fax (703) 548-8935
> nds@davidbsmithpllc.com