IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 1:16cr 265 |
| | ) | |
| NICHOLAS YOUNG | ) | |

POSITION OF THE UNITED STATES
WITH RESPECT TO SENTENCING FACTORS

In accordance with Section 6A1.2 of the *Sentencing Guidelines* and this Court's policy regarding guideline sentencing, the government hereby represents that it has reviewed the Probation Office's presentence report and that, with one minor exception,[1] it does not dispute any of the factors or facts set out therein.  The guideline range is accurately calculated at 360 months to 720 months in prison.

As philosopher Karl Popper wrote in *The Open Society and Its Enemies*, "if we are not prepared to defend a tolerant society against the onslaught of the intolerant, then the tolerant will be destroyed, and tolerance with them."  Further, Popper wrote, "[w]e should therefore claim, in the name of tolerance, the right not to tolerate the intolerant."  In accordance with our right not to tolerate the intolerant - - as well as the calculations of the PSR - - the Court should sentence the defendant to a long prison sentence.

---

1 At Paragraph 64, the PSR states that the government indicated that a witness testified at trial that the defendant offered to get him steroids and that he was aware the defendant's employer did not test for steroids.  At page 53 of Khalil's notes, Khalil reported those very facts, but he did not testify about that subject at trial and that portion of his notes was neither offered nor admitted at trial.  Government Exhibit ("GX") 11-202

<u>Facts</u>

The facts of this case are described, in large part, in the presentence report ("PSR").
Reliance on the facts contained in the PSR alone, however, understates the ferocity of the violent
ideology to which Young adhered, and the depravity of the terrorist organization he attempted to
support.

In July 2014, Abu Bakr al-Baghdadi declared the Islamic State ("ISIS") a caliphate and
anointed himself the Caliph, or leader, of the organization.  The Islamic State promotes its
savagery through conventional media sources and modern social media outlets.  It publicly
distributes videotaped beheadings of religious minorities, American journalists, and humanitarian
aid workers.  It burned alive a foreign soldier held captive in a cage, and distributed the video of
his brutal death.  It promotes and engages in the widespread slaughter, rape and enslavement of
religious minorities.  Its savagery respects no moral or geographic boundaries, and it continues to
promote and inspire violent acts, including within the United States.

Between 2014 and 2016, Police Officer Nicholas Young found this organization
appealing.  In early 2015, he watched the Islamic State burn to death a Jordanian pilot in a cage.
In Officer Young's view, however, the victim was a "rat" who deserved his fate.  GX 1-204
("heard about the rat pilot being picked up"); GX 8-502 ("it was a horrible death and hard to
watch . . . but what's good for the goose is good for the gander").[2]

---

2 All of the exhibits cited in this pleading were included in the set of exhibits provided to
the Court and the defendant prior to trial, but not all were admitted at trial.  For the convenience
of the Court, we are bringing to the Court's chambers a binder with copies of the exhibits cited in
this pleading.

In Young's view, the rape and enslavement of religious minorities conducted by ISIS was not only not wrong, GX 8-504 ("I accept" that they are authorized to take captives as "wives"), but also something in which he, himself, wanted to engage.  As he wrote, on August 2, 2016, "[t]o be honest I would like to buy a slave. . seriously, lol, but I heard the supply is low  . . inshallah a large crop of Alawi women will fall into the hands of the mujahideen."   GX 2-125.

In Young's view, the ISIS attack on the offices of the French newspaper, Charlie Hebdo, that resulted in the murder of a "dozen or so" employees, was righteous.  GX 1-204 ("A couple brothers…were named in an assault on a French newspaper that had been making cartoons for years that were insulting…they had been getting warned for years to stop their insults…they earned themselves hell for their insults.").   In his view, even ISIS's mass murder of concert patrons in Paris in November 2015, was righteous.  GX 1-220 ("Yea, saw Paris.  One of the dead was a woman who was out with her male 'friend dancing' and [her] husband was at home taking care of their kid that night. I don't think the husband is shedding too many tears. lol").

Young did not limit his praise for attacks inspired by the Islamic State only to those that occurred overseas.  Referring to the attack, in May 2015, on a Draw Mohammed cartoon contest in Garland, Texas, Young demonstrated his solidarity with the attackers.  GX 1-210 ("Yeah, after the Texas thing even crazy Bill O Reilly criticized the event organizers for basically asking for it. Just be nice, that's all people have to do and not go out of their way to insult people").

In February 2015, the Islamic State posted a video in which ISIS killers marched 21 captives onto a beach in Libya, and then, for the "crime" of being Coptic Christians, beheaded them.  The video shows the killers using the eye sockets of the victims for leverage as they sawed away with bowie knives.  On March 23, 2016, Nicholas Young bookmarked that video to his computer.  The following photo was taken from that video:

3



GX 10-101-A ("http--shoebat.com-2015-02-15-watch-video-isis-savages-beheading-twenty-one-

copticchristians-saw-martyrs-beheaded-name-jesus-fulfilled-.url").

Other videos reflecting the Islamic State's depravity that Young bookmarked to his

computer included:

"watch New ISIS Video Shows Child Soldiers Executing 'Spies' Heavy.com.url"
(December 15, 2015);

"ISIS Documentary 2015 - Selling Girls - YouTube.url" (February 6, 2016); and

"watch New ISIS Mass Execution Video Features French Executioner Heavy.com.url"

GX 10-101-A.

Young's support for the Islamic State apparently was not inhibited by watching these

videos.  To the contrary, knowing of its depravity, Young still supported ISIS.  Indeed, when in

July 2016, the FBI offered him what appeared to be a chance to provide material support to the

Islamic State, he jumped at the opportunity.

4

Young's attempt to support the Islamic State was no aberration from the rest of his life. Five years before he decided to support the Islamic State, he served with the Abu Salem Martyrs' Brigade in Libya.  As Dr. Gartenstein-Ross explained at trial, the Abu Salem Martyrs' Brigade is a Salafi group that was started by mujahideen associated with al-Qaeda.  In an email on July 20, 2015, Young explained that they were "like minded" with ISIS.  GX 1-214.   Notwithstanding the fact that they were "like minded" with ISIS (or, perhaps, *because* of that fact), they were, in Young's view, "the best of brothers."  GX 1-214.[3]

Moreover, even before Young risked his life in Libya to support the "best of brothers" (who were "like minded" with the Islamic State), he posed and acted as Stormtrooper Klaus Dusselkamp of the Nazi SS.  He wore an SS tattoo on his shoulder.  GX 4-300.   As Young's own book explained, the Nazi SS was Hitler's "instrument of terror", and their symbol was parallel thunderbolts.  GX 10-701.  As Young's own power point slides explained, the parallel thunderbolt symbol found in Young's truck after his arrest, GX 3-110, is a symbol that is used today by domestic terrorist groups in the United States.  GX 10-220.

Ian Campbell testified that, as part of a school project, he and Young attended a gathering of white supremacists in 2001.  Campbell testified that, after the meeting, Young told him not to discount an alliance with the Muslims to combat the Jews.  Young's interest in such an alliance found tangible expression in his poster titled "The Alliance:  Worldwide Association of Nazis and Islamists  1939 - 2004."  The poster depicted a generic Nazi shaking hands with Haj Amin Al-Husayni, the Mufti of Jerusalem.  GX 10-230.  As Dr. Gartenstein-Ross explained, Al-Husayni is famous for allying himself with Hitler in World War II, in the hopes that Hitler would bring the

---

3 Three years before he tried to send money to the Islamic State, he posted as his Facebook profile a photo of a terrorist.  GX 8-103; GX 15-100 at p. 89.

"final solution" to Palestine.  GX 15-100.  On Young's Facebook page, Young "liked" Al-Husayni.  GX 8-107.  Indeed, Young included Al-Husayni on Young's prayer list, along with Young's relatives, friends, and Adolph Hitler.  GX 10-814.

Ultimately, Young supported both Nazis and the Islamic State simultaneously.  Why else would he have used Hitler's birthday as his own, when signing up for the Essakobayashi account to communicate with Mo in the Islamic State, and the MaliktheAmerican account to communicate with associates from the Abu Salem Martyrs' Brigade in Libya?  GX 1-200; GX 1-300; GX 6-109-5T.  After all, he maintained in his residence both a video of a speech by bin Laden, and a framed portrait of Hitler.  GX 10-202; GX 10-700.

As Dr. Gartenstein-Ross explained at trial, affiliation with Nazis is not inconsistent with conversion to Islam.  Dr. Gartenstein-Ross identified numerous individuals that crossed from Nazism to radical Islam since World War II, including Alois Brunner (GX 14-180); Emerson Begolly (GX 8-108; GX 8-109); Nicholas Skorzeny (GX 10-242; GX 10-814); David Myatt, Steven Smyrek; Ahmed Huber; Sascha Lemansky; Devon Arthurs, Thomas Ustics; Diego Alvarez, and Johann von Leers.  GX 15-100.

Young's motivation to support both Nazis and the Islamic State simultaneously was the virulent hatred of Jews that he shared with both.  Dr. Gartenstein-Ross testified that a hatred of Jews is a factor that causes some adherents to Nazi ideology also to support radical Islamic ideology.  Khalil testified that Young regularly talked about his hatred of Jews.  Young used an Israeli flag as a doormat.  GX 11-401.  That his use of such a flag as a doormat was motivated by hatred of Jews - - rather than by disagreement with Israeli government policies - - was established by the graphic from Young's computer, depicting "Jewish Swine."  GX 10-252.  Even in August

2016, Young maintained a graphic on his cell phone that depicted chimneys belching smoke, and the words "Together we can finish what Hitler started." GX 4-203.

As Dr. Gartenstein-Ross explained, individuals attracted to Nazi ideology by a hatred of Jews and the aspects of modernity that Jews often represent can also be attracted to parts of Islam that espouse hatred of Jews and modernity as well. For some individuals who have embraced both Nazism and militant Islamism, the two movements' contempt for Jews is of utmost importance, and allows them to overlook incongruent aspects of Nazi and jihadist ideology. Individuals attracted to Nazi ideology by a view that the world is controlled by a conspiracy of Jews can also be attracted to parts of Islam that espouse the same view. GX 10-250; GX 10-251. Hate speech can contribute to dehumanization of others; acceptance of the dehumanization of Jews by Nazis can enable Nazis to convert to Islam in order to pursue the same goal of demonizing Jews. In this case, that appears to be exactly what happened with Nicholas Young.

<u>Argument</u>

The nature and circumstances of the defendant's offense, as well as the value of general deterrence, warrant a long jail sentence in this case. Beyond that, however, the need to protect the public from this defendant calls for even a longer one.

The Court should first calculate what the punishment for Young would be were the sole relevant conduct his attempt to obstruct justice in December 2015. As alleged in Count 2 of the Indictment, he attempted to conceal from the FBI his knowledge of what he thought was Mo's travel to Syria to join the Islamic State. For that calculation, the Court should consider the ten-year sentence that Judge Cacheris imposed against Sabri Benkhala, for obstructing an investigation into Benkhala's own travel to join Lashkar-e-Taiba in Afghanistan. *See United*

*States v. Benkahla,* 530 F.3d 300 (4th Cir. 2008).  Both Young and Benkahla attempted to mislead investigators about travel to serve with a terrorist organization.

It is true that, in 2004, Benkahla attempted to obstruct an investigation into his own service with a terrorist group that actually occurred in 1999, while Young attempted to obstruct an investigation into Mo's service with a terrorist group that never actually happened.  In that sense, Young's obstruction (at least that obstruction that occurred in December 2015) was less culpable than Benkahla's.

On the other hand, the terrorist group that Benkahla joined in 1999 was not designated as a terrorist group until 2002, so his attendance at that camp was not necessarily illegal.[4]  In contrast, the terrorist group that Young attempted to protect in 2015 was designated as such, so the illegality of Mo's service with the Islamic State was obvious to Young.  In that sense, Young's obstructive conduct (even considering just the conduct that occurred in December 2015), was more culpable than Benkahla's.

Last year, this Court imposed two-year sentences against Soufian Amri and Michael Queen for obstruction of justice, but their criminal conduct was far less serious than that of Benkahla or Young.  Like Young, Amri and Queen lied to conceal from the FBI information about someone they knew.  Yet, what Amri and Queen attempted to conceal from the FBI in 2016 was Qamar's aborted attempt to join the Islamic State in 2014.  In 2016, neither was aware of Qamar's ongoing attempts to help the Islamic State; indeed, each believed that Qamar's involvement with the Islamic State had ended in 2014, when his parents stopped him from attempting to travel to Turkey.

---

4 This Court likely recalls that, in 2004, it acquitted Benkahla of attendance at that camp because the government failed to prove that it was located in Afghanistan rather than in Pakistan.

8

In contrast, in December 2015, Young lied to conceal his understanding of Mo's service with the Islamic State in Syria that, to Young's knowledge, was ongoing. Amri and Queen lied to protect Qamar while they were ignorant of Qamar's ongoing attempts to help the Islamic State, but Young lied to protect Mo under the belief that Mo was, at that very time, actually an ISIS fighter. Accordingly, Young's obstruction of justice in December 2015 is far more serious than that of Amri and Queen. To be sure, it is more comparable to that of Benkahla.

Once the Court has calculated an appropriate punishment for Young's attempt to obstruct justice in December 2015, it should consider how that punishment should be enhanced for Young's separate attempt to obstruct justice in November 2014. As alleged in Count 4 of the Indictment, in November 2014, Young attempted to deceive the authorities about his own knowledge of Mo's travel to Syria to join the Islamic State; to do so, he sent a deceptive text message that Young expected the FBI to find, once the investigators determined that Mo had joined the Islamic State. GX 6-201.

While Count 2 focused on Young's attempt to mislead the FBI about Mo, Count 4 focused on Young's attempt to mislead the FBI about Young, himself. As designed, the text message would be irrelevant to any criminal culpability for Mo; instead, it was designed to induce the FBI to believe that Young was ignorant of Mo's plan to join the Islamic State. As Young explained in October 2014, when he told Mo about Young's plan to send a ruse text message, the text message would be good for *Young*. GX 6-108-1T.

This attempt to obstruct justice, in November 2014, is likely less serious than Benkahla's obstruction. That being said, it is more serious than that of Amri and Queen. As noted above, Amri and Queen were ignorant of Qamar's ongoing attempts to support the Islamic State when they attempted to obstruct justice. Moreover, Amri and Queen lied to protect Qamar, and not

themselves.  In November 2014, in contrast, Young tried to dupe the FBI to protect his own involvement in what he understood to be Mo's ongoing attempt to join the Islamic State.  As a result - -  and without minimizing the severity of the attempts by Amri and Queen to obstruct justice - - the Court should recognize that Young's attempt to obstruct justice in November 2014 is more serious than the attempts by Amri and Queen to obstruct justice in June 2016.

Once the Court has calculated an appropriate punishment for Young's attempt to obstruct justice in December 2015 (as charged in Count 2), and enhanced that punishment for his attempt to obstruct justice in November 2014 (as charged in Count 4), it should consider how that punishment should be enhanced for Young's separate attempt to obstruct justice in February 2012, when he counseled Khalil to refuse to answer questions that Young predicted the FBI would ask Khalil about Khalifi.  As Khalil testified, Young told Khalil that, in light of Khalifi's arrest for trying to detonate himself at the U.S. Capitol Building on behalf of al-Qaeda, the FBI likely would approach Khalil to ask about people that Khalil and Khalifi knew in common; Young advised Khalil to refuse to answer certain questions.[5]  This attempt, too, deserves more punishment than did the attempts to obstruct justice made by Amri and Queen.

While Amri counseled Queen to lie, Young counseled Khalil to refuse to answer some questions.  In a vacuum, advice to refuse to answer questions may be more benign than advice to lie.  Nevertheless, Young's conduct was still more serious than Amri's.  After all, when Amri counseled Queen to lie about Qamar, Amri and Queen were unaware that Qamar was involved in any illegal activity.  In contrast, when Young counseled Khalil to lie about Khalifi, Young knew that Khalifi had just been arrested for attempting to detonate himself in the U.S. Capitol Building;

---

[5] As Khalil explained, the questions that Young advised him to refuse to answer were not ones with respect to which Khalil might have a privilege to remain silent.

in essence, Young attempted to obstruct an investigation into what he thought was intended to be a horrendous bombing. Young's attempt to obstruct an investigation of Khalifi (when Young knew that Khalifi had been arrested in the course of an attempt to commit mass murder upon behalf of al-Qaeda), surely deserves more punishment than Amri's attempt to obstruct an investigation of Qamar (when Amri did not know of Qamar's ongoing attempt to help ISIS).

Once the Court has calculated (a) an appropriate punishment for Young's attempt to obstruct justice in December 2015 (as charged in Count 2); (b) enhanced that punishment for his attempt to obstruct justice in November 2014 (as charged in Count 4); and (c) enhanced that punishment for his attempt to obstruct justice in February 2012; it should (d) consider how that punishment should be enhanced for his attempt to provide material support to ISIS in July 2016.

In making that calculation, the Court should not allow the relatively small amount of money involved to mask the significance of what Young attempted to do. At trial, the government introduced Young's copy of the "special" November 2010 issue of *Inspire* magazine, put out by al-Qaeda of the Arabian Peninsula ("AQAP"). The "special" issue of *Inspire* focused on the immense costs that were imposed on the western world by "Operation Hemorrhage." According to AQAP, a terrorist operation that cost AQAP only $4,200 cost western governments hundreds of millions of dollars. GX 14-104.

In short, even small amounts of money in the hands of terrorist organizations can enable them to impose terrible costs on society as a whole. As a result, significant sentences are imposed for the transfer to terrorist groups of what might otherwise be considered relatively small amounts of money. For example, in *United States v. Jama*, No. 1:14cr230, Judge Trenga last year sentenced the defendant to 12 years in prison for transferring approximately $4,600 to the terrorist group al-Shabaab.

11

Here, Young sent the gift card codes after being told that they would be used to purchase Threema apps, and that those Threema apps would be used to communicate with recruits from around the world who wanted to join the Islamic State.  Young understood that ISIS wanted a separate Threema app to communicate with every ISIS recruit, and that the provision of more Threema apps would enable ISIS to bring more recruits to join the Islamic State from around the world.  GX 2-106; GX 2-108; GX 2-109.

Young purchased his own Threema app in order to communicate with the account that he believed was controlled by Mo.  GX 1-222; GX 2-201.  As a result, Young obviously knew the cost of a Threema app.  *See, e.g.,* https://itunes.apple.com/us/app/threema/ id578665578?mt=8 (selling Threema apps for $2.99).  Accordingly, Young knew that $245 worth of gift card codes in the hands of ISIS could purchase 81 separate Threema apps.  Further, he knew that those 81 separate Threema apps then would enable the Islamic State to import 81 more recruits to murder, rape, and enslave those unfortunate enough to fall into its hands.  In any event, and regardless of the number of recruits that Young believed the Islamic State could obtain with the gift card codes that he attempted to send it, the photo included on page 4 of this pleading (from an ISIS video that Young bookmarked, GX 10-101-A), demonstrates that he knew the magnitude of the barbarities that could be accomplished by just a handful of depraved murderers.

In considering how Young's punishment should be enhanced for his attempt to provide material support to ISIS in July 2016, the Court should consider the 102-month sentence that this Court imposed last year against Haris Qamar.  In some respects, the cases of Qamar and Young are similar.  Both Qamar and Young attempted to send gift card codes to the Islamic State, but in both cases, the recipient accounts were controlled by the FBI.  In both cases, the amount of

money at stake was relatively small; Qamar purchased approximately $80 worth of gift cards,[6] and Young purchased $245 worth of such gift cards. Both understood that the gift card codes would be used to bring additional recruits to the Islamic State.

Before attempting to send the gift card codes, both Young and Qamar were interested in joining mujahideen overseas. Qamar sought to join the Islamic State in 2014, but his plan fell apart when his parents took away his passport. While Young actually traveled to join mujahideen affiliated with al-Qaeda in Libya in 2011, his doing so was not necessarily illegal, because the Abu Salem Martyrs' Brigade was not a designated terrorist group. With respect to their comparative culpability, Qamar's failure to make it even to the airport to leave the United States tends to lessen his (relative) culpability, but that failure is probably balanced by the fact that the mujahideen that Young joined in 2011 were not officially designated as terrorists.

In one important respect, Qamar's conduct was more serious than Young's. Both Qamar and Young did more to support the Islamic State than merely attempt to send gift card codes, but Qamar's actions in support of the Islamic State were more serious than Young's. In addition to sending the gift card codes, Young counseled Mo on how to evade authorities in order to reach the Islamic State. While Young's conduct (especially since he was a police officer) is appalling, Qamar's conduct was worse. Qamar helped take photos of local landmarks in the expectation that such photos would be used in an on-line ISIS publication, in order to encourage lone-wolf attacks (or at least scare Americans by showing them that ISIS supporters were already in the country). Aside from the gift card codes that they both attempted to provide to the Islamic State, Qamar's actions in support of ISIS were likely more serious than Young's.

---

[6] Even of that $80, much of it was purchased with money given to Qamar by an informant cooperating with the government.

Yet, the punishment that Young deserves for his attempt to provide material support should be significantly harsher than what this Court imposed on Qamar.  Most obviously, Qamar quickly accepted responsibility for his actions, pled guilty, submitted to debriefings with the investigators, and publicly rejected the ideology to which he once was enthralled.  Young has taken none of those actions.

Moreover, when Qamar purchased gift card codes for transmission to the Islamic State, he was an immature 26-year-old man-child, who still lived with his parents, and spent his time at video games.  In contrast, when Young purchased gift card codes for transmission to ISIS, he was a 37-year old police officer with thirteen years of service.

While Qamar had no money or property, Young lived in a house that he owned, free and clear.  While Qamar had no firearms, Young possessed in his home 21 firearms and over 18,000 rounds of ammunition.[7]  Unlike Qamar, Young is skilled with firearms.  As Khalil reported, Young offered to teach marksmanship to Amine El-Khalifi.[8]

Khalil reported that Young said that he would go "postal" with a bullet proof vest someday, but that, unlike Khalifi, Young would not say in advance what he planned to do.  While Young might not say in advance what he planned to do, he often talked about attacks that he *could* do.  Those attacks were far more sophisticated than anything thought up by Qamar.

As Khalil testified, Young said that someone with his skills could attack an FBI establishment.  Young said that he knew the building where the Joint Terrorism Task Force was

---

7  Young also possessed in his home more than 60 knives, including some made of polymers that would not be detected by metal detectors.

8  We have no evidence that Khalifi received such a lesson before his arrest in February 2012 for attempted to detonate himself in the U.S. Capitol Building on behalf of al-Qaeda

located.  (Khalil).  He said that, although he did not know its specific floor, he could find out.

(Khalil).  He said that, if one person attacked the JTTF, it would be suicide, but that the FBI

would be in trouble if there were more than one attacker.  (Khalil).  He said that a few well-

trained people with guns could cause serious damage.  (Khalil).

As Khalil testified, Young said that he would tie to a cinder block and dump in Lake

Braddock anyone who betrayed him.  Young also described a plan by which he could use his

police credentials to smuggle weapons past security at this very courthouse, in order to free a

Muslim prisoner.[9]  The plan was to smuggle the weapons into the building, and then hand them to

others inside the building who had already passed through security.  (Khalil).

Young told Khalil that he was angry at the FBI for the way that they approached him

after Chesser's arrest, and told Khalil of a plan to kidnap and sexually torture the FBI agent

involved.  Young told Khalil that he researched the FBI agent; in fact, a search of his computer in

2011 found that he downloaded her photo onto his computer.  GX 12-28; GX 12-29; GX 14-110.

As Khalil testified, Young pointed his AK-47 rifle out the window of his house to look for

surveillance, and said that he would point a shotgun through the hole in his door after he removed

his door knob.  As Menzies testified, Young placed upon his kitchen table a large gun mounted

on a tripod, and pointed it at the townhouses behind theirs.  As Khalil testified, Young said that if

the FBI came to his house, "that's what assault rifles, ballistic vests, & amphetamines are for."

Unlike Qamar, Young routinely engaged in sophisticated measures to thwart law

enforcement.  When his house was searched in August 2016, Young had a "bug detector" and at

least 20 cell phones.  GX 10-620; GX 10-650.  Young used "burner" phones to thwart FBI

---

[9] At trial, the object was described simply as "a federal building."

15

surveillance, and often took the batteries out of his phones before engaging in discussions regarding topics such as jihad. (Khalil). Indeed, after transmitting the gift card codes, Young texted "Mo" on his Threema account that Young was going to get "rid of" the phone that was used to transmit the gift card codes. GX 2-130 ("Getting rid of the device now. . . Gonna eat the SIM card"). In fact, investigators never found the phone that was used to transmit the codes.

Unlike Qamar, Young possessed in his residence components for explosives, including a grenade ignition kit, hollow grenades, a thermite grenade, muzzle-loading propellant, and magnesium powder. GX 10-600; GX 10-601; GX 10-603; GX 10-604; GX 10-605; GX 10-607; GX 10-608; GX 10-609; GX 10-610. In addition, he possessed instructions on how to make explosives. GX 14-101 ("Make a Bomb in the Kitchen of Your Mom"); GX 14-106 ("How to Make Semtex" and other explosives).

Young's possession of 70 pieces of body armor, including 10 ballistic vests, (Caslen), may be even more disturbing than his stock of firearms, ammunition, and components for explosives. After all, his possession of enough body armor to outfit a paramilitary squad is particularly disturbing, in light of his statements to Khalil that an attack on the local JTTF office by one person would be suicide, but that the FBI would be in trouble if faced with an attack by a few people. Indeed, Young's possession of that body armor is even more disturbing, in light of the method that he described to Khalil, by which Young could smuggle guns into this Courthouse, and then distribute them to confederates who already passed through a metal detector.

Unlike Qamar, Young is not a mere online jihadist, or simply an ideological zealot. Of all the many differences between Qamar and Young, the most obvious is that Young proved that he was willing to join the mujahideen. While Qamar could not make it even to the airport without his parents' permission, Young served in Libya with the Abu Salem Martyrs' Brigade, a Salafi

16

group started by mujahideen associated with Al Qaeda. (Gartenstein-Ross). Indeed, Young went to Libya to serve that group not once, but *twice*. In contrast, Qamar was stopped from joining the Islamic State in 2014, when his parents took away his passport - - and then, when he was offered the means to get to Syria in 2016 (in the course of the sting operation against him), he declined to take advantage of the opportunity.

In determining how *much* more punishment Young deserves than Qamar for the transmission of gift cards, the Court also should consider the fact that Young has shown his willingness to put his ideology into action by traveling to Libya, and fighting alongside ideological zealots that, in Young's word, are "like minded" with ISIS. That travel proves that Young is willing to put his words, and ideology, into action. With his arsenal of guns, knives, armor, ammunition, and explosives, he also had the means with which to do so.

In short, while Qamar came across as a misguided overgrown child, Young comes across as a steely-eyed hard case. For that reason, alone, the punishment appropriate for Young's attempt to provide material support to the Islamic State merits substantially more punishment than this Court imposed on Qamar. But there is more.

In light of his background, Young's threats, such as the one that he made to drown in Lake Braddock anyone who betrayed him, must be taken seriously. Young now knows that Khalil and Mo betrayed him. As a result, they have to wonder whether he ever will come after them. Notwithstanding any other reason, a long term of incarceration should be imposed on Young, to protect the public from the possibility that, using the skills he gained as a police officer (or through his service with the Abu Salem Martyrs' Brigade), he will retaliate against those that he believes betrayed him.

17

Finally, the Court should consider the fact that, while that Young was obstructing justice and attempting to support terrorists, he was a sworn law enforcement officer:

> In 2011, when he served with the Abu Salem Martyrs' Brigade in Libya, he was on leave from his job with the Metro Transit Police Department.  GX 10-806; GX 16-103.

> In 2012, when he counseled Khalil to refuse to answer questions relating to the investigation of Khalifi's attempt to commit mass murder in the Capitol, he was a police officer responsible to protect the passengers of the Metro system - - including those at the Capitol South Metro Station.  GX 16-105.

> In October 2014, when he advised Mo how to evade detection on the way to join ISIS, he was passing on information that he gained from his training as a police officer.  GX 16-401; GX 16-402.

> In November 2014, when he sent the ruse text message designed to mislead the FBI, he was a sworn law enforcement officer.  GX 16-106.

> In February 2015, when he tried to email a message from a FedEx store in Fairfax Virginia, to Mo with ISIS in Syria, he was wearing his police uniform.  GX 7-205a.

> In December 2015, when he attempted to conceal from the FBI that he understood Mo to be serving with ISIS in Syria, he was a sworn law enforcement officer.  GX 16-106

> In July 2016, when he attempted to send gift card codes to ISIS for use in bringing more recruits to the Islamic State, he was a sworn law enforcement officer.

We expect police officers to protect and serve.  We do not expect them to thwart investigations of terrorist plots, or to advise others how to do so.  We do not expect them to try to send money to terrorists, or advise others how to join it.  These are not the actions that the public is entitled to expect from its law enforcement officers.  To the contrary, these are the actions of the criminals that we expect the police to arrest.

Young was sworn to enforce the law in this community, and uphold the Constitution of this country.  Instead, he did just the opposite.  For years, he abused his position of trust.  For this

reason alone, he is not like any other defendant who has been sentenced for a terrorism offense.

As the only police officer convicted of a terrorism offense, he is unique.

In sum, the punishment that Young deserves is -

(a) the punishment that he deserves for attempting to obstruct justice in December 2015 (when he attempted to mislead the authorities about the whereabouts of Mo), as charged in Count 2; *plus*

(b) the punishment that he deserves for attempting to obstruct justice in November 2014 (when he attempted to mislead authorities about his own knowledge about Mo's activities), as charged in Count 4; *plus*

(c) the punishment that he deserves for attempting to obstruct justice in February 2012 (when he attempted to cause Khalil to refuse to answer questions about Khalifi); *plus*

(d) the punishment that he deserves for attempting to provide material support to ISIS in July 2016 (by transmitting gift card codes to someone he believed was an ISIS fighter), as charged in Count 1.

The punishment that Young deserves is all that - - *plus* that which he deserves for trying - - *while serving as a police officer* - - to promote a depravity that, given the chance, would destroy Western civilization. Accordingly, a long term of incarceration should be imposed on him, to protect the public from the possibility that, using the skills he gained through police training or his service with the Abu Salim Martyrs' Brigade, he will act on his desire to acquire a slave girl, or otherwise try to serve the mujahideen.

## Conclusion

Nicholas Young hoped to support the Islamic State by sending it money. In doing so, he knew that his money would be used to bring more murderers to the service of the Islamic State. He failed to achieve his goals through no second thoughts on his part, but only because the person to whom he sent the money was not an ISIS barbarian but, in fact, a government agent.

19

Even to this very day, Young has expressed no remorse for his actions, or for his attraction to barbarians who pride themselves on murder, torture, and enslaving girls and women. The unfortunate fact is that he has an attraction to depravity that cannot rationally be explained. Even if for no other reason, a long term of incarceration should be imposed against him to protect the public from the possibility that the next time someone solicits his help in furthering the goals of depraved barbarians, it will not be the FBI doing so in an undercover capacity.

Through his conduct, Young attempted to strike at the heart of the safety of our community and nation - - a community and nation that he swore, as a law enforcement officer, to protect. There is no antidote to the unfathomable bloodlust and attraction to depravity deep within him. As a result, only a long term of imprisonment can promote respect for the law; reflect the seriousness of the offense; afford adequate deterrence to criminal conduct; protect the community; and provide just punishment for his offense.

Respectfully submitted,

Tracey Doherty-McCormick
Acting United States Attorney

John T. Gibbs
Assistant United States Attorney

_____/s_____
Gordon D. Kromberg
Assistant United States Attorney
Virginia Bar No. 33676
Attorney for the United States
2100 Jamieson Avenue
Alexandria, VA  22314
(703) 299-3700
(703) 837.8242 (fax)
gordon.kromberg@usdoj.gov

20

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 16, 2018, I electronically filed the foregoing POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING FACTORS with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to counsel of record.

_____/s_____
Gordon D. Kromberg
Assistant United States Attorney
Virginia Bar No. 33676
Assistant United States Attorney
Attorney for the United States
2100 Jamieson Avenue
Alexandria, VA  22314
(703) 299-3700
(703) 837.8242 (fax)
gordon.kromberg@usdoj.gov