1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
------------------------------:
                              :
UNITED STATES OF AMERICA      :
                              :
                              :
    -vs-                      :   Case No. 1:16-cr-265
                              :
                              :
NICHOLAS YOUNG,               :
               Defendant.     :
                              :
------------------------------:
```

PARTIAL TRANSCRIPT
(Opening Statements)

December 11, 2017

Before:   Leonie M. Brinkema, USDC Judge

And a Jury

APPEARANCES:

John T. Gibbs, Gordon D. Kromberg and Evan N. Turgeon,
Counsel for the United States

Nicholas D. Smith and Linda Moreno,
Counsel for the Defendant

The Defendant, Nicholas Young, in person

1           NOTE:  A portion of the case is heard on December 11,

2    2017 in the absence of the jury as follows:

3    JURY OUT

4           THE COURT:  All right.  First of all, any objection

5    to the preliminary charge to the jury?

6           MR. KROMBERG:  No, Your Honor.

7           MS. MORENO:  No, Your Honor.

8           THE COURT:  All right, very good.

9           I've given each side 20 minutes for their opening

10   statements.  I understand, via a phone call from Mr. Smith,

11   that there is issues about demonstratives.  I don't expect the

12   Government is going to use any demonstratives during its

13   opening statement.

14          If you are, let's get it cleared up right now.

15          MR. KROMBERG:  I gave the defense this morning the

16   list of the exhibits that they already have that I was going to

17   use.

18          THE COURT:  In your opening statement?

19          MR. KROMBERG:  Yeah.  And they are things that we

20   have already talked about.  There is the pictures of people

21   involved.  There is the pictures of the telephone being found

22   in the truck.  And the picture of the backpack where the

23   receipts are found.  And there is a picture of Young as a Nazi.

24   With six days later there is a picture of him as a Muslim with

25   a rifle.

3

```
1                THE COURT:  Wait.  All right.  You're on your feet,
2     Ms. Moreno, go ahead.
3                MS. MORENO:  So, Your Honor, we just got the -- we
4     had requested what demonstratives they wanted to use a couple
5     of days ago, and then today we got the list.  Which are,
6     frankly, most of them objectionable.
7                He wants to use a picture of the smokestack that --
8                MR. SMITH:  That someone texted to the defendant.
9                THE COURT:  All right.
10               MS. MORENO:  Nazi stuff.  He wants to use a picture
11    of Hitler.  He wants to use a picture of the Israeli flag.
12    Highly prejudicial.
13               THE COURT:  We're going to make it simple.  I'm going
14    to really be mean on both sides because this case has got to
15    get tried appropriately.
16               No demonstratives in the opening statements for
17    either side.  I know a picture is worth a thousand words.  I
18    will give you the thousand words.  If you need an extra couple
19    minutes or two, Mr. Kromberg or Mr. Gibbs, I'll give it to you.
20               Let's keep this case moving with as few objections as
21    possible.  All right, I've taken care of that issue.
22               MS. MORENO:  Yes, Your Honor.
23               THE COURT:  All right.  We have --
24               MR. KROMBERG:  Your Honor, may I just --
25               THE COURT:  Yeah.
```

1       MR. KROMBERG:  I understand.  What Ms. Moreno did not

2  mention, the pictures of the people involved, I wanted to

3  just -- some of these names are going to be coming up again and

4  again, and I wanted to have a picture of Saleh Albarmawi, a

5  picture of Amine El-Khalifi, and a picture of Liban Muhammad

6  who are going to be coming up.  And I wanted to put them on the

7  screen so there is some association between unusual names and

8  actual people.

9       THE COURT:  Those three pictures of three people is

10  not what defense counsel is worried about.  They are worried

11  about smokestacks and those highly incendiary kinds of issues.

12      Am I correct, Ms. Moreno?  Again, I want there to be

13  some common sense to this.  You need to be --

14      MS. MORENO:  I am getting used to things, I promise.

15      I think we should live with the Court's ruling.  I

16  don't think there should be any more discussion about it.  And

17  I think both sides -- I'm ready to proceed without any

18  demonstratives.

19      THE COURT:  When the witness starts to testify, then

20  the picture would be appropriate, it's within context.  We'll

21  keep it simple.  Just do it with old fashioned words, that's

22  fine.

23      In terms though of this afternoon, now we're going to

24  start up again about 5 o'clock, and we're going to take about

25  40 minutes for the opening statements.

1          The first witness on your list, is that still the

2     witness you plan to start this afternoon?

3          MR. KROMBERG:  It would be Khalil, Your Honor.

4          THE COURT:  And you can do him in 20 minutes?  Or you

5     just want to get it started?

6          MR. KROMBERG:  Well, that is our first witness,

7     that's who we --

8          THE COURT:  All right, that's fine.  So we need the

9     screen though; is that correct?

10         MR. KROMBERG:  We do.

11         THE COURT:  So we need to get the screen up before we

12    come back in.  All right?  And I assume that was worked out.

13         In any case, if not, you'll have to switch your

14    witness list around.

15         All right, we are recessing court --

16         MS. MORENO:  I am so sorry, Your Honor.

17         THE COURT:  Yes, ma'am.  You have to be at the

18    lectern.  I'm sorry, we can't hear you otherwise.

19         MS. MORENO:  In the 20 minutes that's allotted, does

20    the Court give a five-minute warning?  Because I would ask that

21    of the Court --

22         THE COURT:  I'll be watching.

23         MS. MORENO:  Thank you.

24         THE COURT:  You want a five-minute warning?

25         MS. MORENO:  Please, Your Honor.

6

```
 1              THE COURT:  All right.

 2              MS. MORENO:  Thank you so much.

 3              MR. KROMBERG:  Your Honor, could we -- by the way,

 4    could we talk about the rule on witnesses?

 5              THE COURT:  Yes.  There has to be a rule on

 6    witnesses.  Now, that means that anyone who is going to be

 7    testifying in the case, other than the case agent, has to be

 8    out of the courtroom.  That includes any experts.

 9              And it also means that if it comes out that any

10    spectators or family members have talked to witnesses about

11    what's going on in the courtroom before that witness testifies,

12    that witness may be not able to testify, may be tainted.  All

13    right?

14              So I expect both sides -- and that works for the

15    Government as well.

16              MR. KROMBERG:  Yes, ma'am.

17              THE COURT:  All right.  Anything further before we

18    get started?

19              MS. MORENO:  No, Your Honor.

20              THE COURT:  All right.  Then I think we're probably

21    starting up again around 5 o'clock.  All right, we need to get

22    the screen up.  Recess court.

23              NOTE:  At this point a recess is taken; at the

24    conclusion of which the case continues as follows:

25    JURY OUT
```

7

1          THE COURT:  Before we pull the jury in, are there any

2    last minute issues?

3          MR. KROMBERG:  Not from the Government, Judge.

4          THE COURT:  No?  All right, let's bring the jury in.

5          NOTE:  At this point the jury returns to the

6    courtroom; whereupon the case continues as follows:

7    JURY IN

8          THE COURT:  There are a couple extra chairs.  Those

9    of you who have got your coats with you, you probably should

10   have put them in the jury room.  But if you want to just pass

11   them down to be make yourselves more comfortable, you can put

12   them there.

13         And, folks, I recognize -- counsel, have a seat.

14         I recognize the way this courtroom is set up, when

15   the lawyers are standing at the podium, it may block the view

16   for some of you from the witness box.  Move to another

17   position.

18         The only reason I don't have these last four seats

19   filled is I can't see you, and I like to watch my jury.  But

20   it's more important that you can see the witness.

21         So if any of you feel that your vision of the witness

22   is being blocked, please don't be shy about moving down to the

23   far end of the box.  All right.  And I think that way all of

24   you should be able to see.

25         All right, who is going to open for the Government?

1          MR. KROMBERG:  I am, Your Honor.

2          THE COURT:  All right, Mr. Kromberg.

3          MR. KROMBERG:  Good afternoon everybody.  As I was

4    already introduced, I am Gordon Kromberg.  I am an Assistant

5    United States Attorney here in Alexandria.

6          With my colleagues, Assistant United States Attorney

7    John Gibbs, Special Assistant United States Attorney Evan

8    Turgeon, we are representing the United States in this case.

9    Evan Turgeon is special, he is a Special Assistant United

10   States Attorney because he's on detail to us from the

11   Department of Justice.

12         Special Agent Nicholas Caslen from the FBI, he's the

13   case agent, he is the lead investigator.

14         Mr. Fabian Vera is a paralegal specialist in our

15   office, and he helps us keep track of the evidence, and he

16   works the technology, and we would be lost without him.

17         Together we're going to show you that between

18   December 2015 and August 2016 that man, Nicholas Young,

19   attempted to support, provide support to ISIS, the Islamic

20   State.

21         ISIS is an acronym, and you will hear it is the

22   Islamic State of Iraq and Syria, sometimes known as ISIL, the

23   Islamic State of Iraq and the Levant.  Sometimes known as, in

24   Arabic I think, Dawla.  We are going to show you that.

25         We are going to show you that he also attempted to

1    obstruct justice in order to prevent the authorities from

2    learning that he had helped someone that he knew go join the

3    Islamic State, leave the United States and go join the Islamic

4    State in Syria.

5           Now, what the judge is going to tell you, I believe,

6    because it's what she always says, what I say is not evidence.

7    What Mr. Gibbs says is not evidence.  What the defense

8    attorneys tell you is not evidence.  The evidence is what the

9    witness will tell you.

10          But I am going to tell you now what I think the

11   witnesses are going to say.  But if there is any conflict

12   between what any of the lawyers say and what any of the

13   witnesses say, it's what the witnesses say that goes.

14          So the first fact to know in this case is that

15   Nicholas Young was a police officer when this happened, sworn

16   to uphold the law.

17          The second fact to know is that this was a sting

18   case.  What a sting case means is when he was engaged in this

19   criminal activity, he thought he was dealing with someone that

20   he didn't know was in fact working for the Government.  The guy

21   who was in fact working for the Government in this case was

22   named Mo.

23          You will meet Mo.  You will hear that Young and Mo

24   met in May, June, the spring of 2014.  They became friendly.

25   You will hear parts of recordings where they talked about Mo's

1   plan to go join ISIS.  Mo was going to leave the United States

2   and go join the jihad in Syria.

3           Hearing that Mo was going to go leave the United

4   States to join the designated terrorist organization known as

5   ISIS, Officer Young didn't arrest him, didn't report him, but

6   said, hey, let me give you some advice on you can you get

7   through airport, get through Customs, get across the border.

8           You will hear how Officer Young said, hey, let's go

9   to a FedEx store because we'll set up e-mail accounts at the

10  FedEx store, we won't be using our own computers, we'll go to

11  the FedEx store and use the computers there, and we'll set up

12  new e-mail accounts that you will use only to talk to me and I

13  will use only to talk to you.  And then how could anyone ever

14  know that these accounts exist?

15          And you'll see that they went to the FedEx store and

16  they set up the accounts.  You will hear that Young, Officer

17  Young says, now, after you leave, I'm going to send you a text

18  message.  Don't reply.  Mo says, why not?

19          Officer Young says, because once the FBI figures out

20  that you have gone to join ISIS, they are come investigating,

21  and they are going to come look at everyone you knew to see if

22  anyone helped you, if anyone knew about this.  And they are

23  going to come talk to me, and they're going to look at me.  And

24  if there is this text message that I send to you that says, I

25  think you're going on a two-week vacation, it will be good for

1  me.  So whatever you do, don't respond to it.

2           So you'll hear how Mo left the country, left the

3  United States in October 2014.  And that was the last time

4  Officer Young ever saw Mo.  After that, all communications are

5  in writing.

6           You'll see that a couple weeks after Mo left, Officer

7  Young sent him a message, a text message.  And the text message

8  said:  Hope you had a good vacation.  If you want to have

9  lunch, hit me up.

10          That text was designed to mislead the authorities

11  into thinking that Officer Young didn't know that Mo had gone

12  to join ISIS.  That text was an attempt to obstruct justice.

13          You will see how from November 2014 to December 2015

14  Young and Mo exchanged e-mails.  They exchanged messages about

15  ISIS, about what Mo was doing at ISIS, about fighting,

16  terrorist attacks around the world.

17          Officer Young wrote:  Hey, be on the lookout for some

18  of my buddies from when I was in the jihad in Libya in 2011.

19          And you'll hear that Officer Young went to fight in

20  Libya in 2011 for an organization called the Abu Salim Martyrs

21  Brigade.  And Officer Young told Mo in the e-mail that these

22  guys that I was with, they are like-minded with your guys.

23  Like-minded with ISIS.

24          You'll see the e-mails where Officer Young says, hey,

25  I'm thinking of trying to get my money out of the United

1    States.  Could you ask your commanders if there is a good way

2    to get the money, get my money out of the United States without

3    the American authorities knowing about it.  Mo says, I'll ask,

4    but he never came up with any answers.

5         Now, keep in mind, it's not actually Mo on the other

6    end of the e-mails, it's the FBI.

7         You will hear from Special Agents Sikorski and

8    Siegfried how from October 2014 through August 2016 they

9    corresponded with Young while posing as Mo.

10        You will hear that in December 2015 the FBI comes to

11   talk to Officer Young.  And they say to him, hey, we're looking

12   for information about people in the area that may be supporting

13   ISIS.  Do you know anybody who has gone to join ISIS?  And

14   Officer Young says, I don't really know anything about that.

15        And they ask him, well, what about this guy Mo?  And

16   he says, yeah, I knew him a little.  I think, you know, he

17   might have gone over on vacation or something.  I haven't been

18   in contact with him.

19        Well, do you have an e-mail for him, they said.  He

20   says, nah, I had one, but I lost it, it was Mohammed something

21   or other.

22        The FBI leaves.  And Officer Young then recommences

23   his communication, his e-mail communication with Mo, saying,

24   hey, the FBI was coming to look for you.  And he sends it on

25   the e-mail that they had set up at the FedEx store, which was

1    called v4vendetta@mail.com.

2           So they go back to exchanging messages about ISIS,

3    about fighting, about terrorist attacks.  And then Mo sends

4    Officer Young a message.  He says, I just got this app for a

5    cell phone called a Threema, Threema.  It encrypts your text

6    messages.  If you go buy the Threema app, you can contact me on

7    this Threema account number and our text messages will be

8    encrypted.

9           Young goes and buys the Threema app and corresponds

10   with Mo on the encrypted Threema app.

11          On July 18, 2016, Mo sends -- I mean, really, the

12   FBI, but Mo sends a text message that says, you know, a lot of

13   our brothers, our fighters, our brothers are getting droned.

14   We need to bring more recruits here to help us.  Can you,

15   Young, can you help?  Can you help us by sending us Google gift

16   card codes?

17          It's a little bit complicated.  You'll hear about it.

18   But the point is that when you buy a gift card, on the back of

19   a gift card is a code.  That code is the equivalent of money.

20   And that ISIS wanted to use those Google gift card codes to buy

21   more Threema apps because the recruits that were going to come

22   to join ISIS needed to communicate with someone from ISIS, and

23   they were going to communicate through a Threema app, but ISIS

24   needed a different Threema account for every recruit in order

25   to keep operational security.

1          Young texts back on the encrypted Threema app,

2   inshallah, good willing, you will get it, you will get the

3   Google gift card codes.

4          And on July 28 the Google gift card codes arrive on

5   Mo's encrypted Threema account.  And they came from a different

6   Threema account than the one that had been -- with whom --

7   excuse me.  The one with which Mo had been corresponding with

8   Young.

9          But the FBI will tell you, you will hear, that Mo's

10  Threema account number was never given to anybody other than

11  Young.  So the only person who would be sending the gift card

12  codes to Mo on that Threema account was Young.

13         Shortly after that, Young is arrested.  And when he

14  is arrested, he has a bag with him.  In the bag are some

15  papers.  The papers have -- one of the scraps has Mo's Threema

16  account number, and Young's Threema account number, and Young's

17  e-mail address, the one that he set up at the FedEx store back

18  in October.

19         In the bag was also a receipt for the purchase of

20  gift cards at Best Buy.  And the FBI went all through Best Buy

21  and they got the video of Officer Young buying the gift cards.

22         Also in the bag was the packaging for a cell phone.

23  And that cell phone was later found -- it's a complicated

24  story, but you will see that it was found in connection with

25  the seizure of Officer Young's truck.  And that cell phone had

1    the Threema messages on it, not the ones sending the gift

2    cards, but just the corresponding with Mo part.  And it was the

3    same serial number on the phone that was on the packaging for

4    the cell phone that was in Young's possession when he was

5    arrested.

6            In short, the proof that Officer Young attempted to

7    support the Islamic State is pretty clear.  But we understand

8    that Officer Young isn't contesting that he did it, but he's

9    saying, I was entrapped into doing it.

10           As the judge will explain, for entrapment to exist,

11   there has to be something called inducement and in the absence

12   of something called predisposition.

13           As I expect the judge to explain to you later,

14   inducement for purposes of entrapment requires more than mere

15   solicitation by the Government.  It requires Government

16   overreaching and conduct sufficiently excessive to implant a

17   criminal design in the mind of an otherwise innocent party.  No

18   Government overreaching, can't be any entrapment.

19           You won't see any evidence of Government overreaching

20   here.  Indeed, no one even asked Officer Young to attempt to

21   protect Mo from the reach of the U.S. Government by lying to

22   the FBI or by sending the text message to try to deceive the

23   FBI.  There was no inducement.

24           But as the judge will explain for the entrapment to

25   exist, for the entrapment defense to exist, the defendant could

1  not have been predisposed to commit the crime.  That is to say,

2  there could be no entrapment if the defendant already had the

3  readiness and willingness to commit the crime when he was first

4  approached.

5       I expect the judge will also instruct you that

6  evidence of the defendant's ready response to the text message

7  saying, hey, can you send gift cards, can be used to prove that

8  he was predisposed to break the law.

9       I expect the judge will instruct you that

10  predisposition can be found based on behavior after the

11  investigators first contact the defendant.

12       As I said, you won't see any evidence of inducement,

13  but you will see evidence of predisposition.  That is to say,

14  that the defendant had the readiness and the willingness to

15  break the law long before he got caught up in the

16  investigation.

17       For example, you will see as early as 2007 he was

18  collecting speeches by Bin Laden, magazines, online magazines

19  put out by Al Qaeda.  Manuals on jihad.

20       You will see that under the name Dusselkamp he posted

21  support for ISIS online.  You will see that for years before

22  ISIS even existed, Officer Young was attracted to terrorists of

23  a different variety, Nazis.  Okay.  You will hear that he

24  sometimes posed as Stormtrooper Klaus Dusselkamp of the Nazi

25  SS.  You will hear that the SS specialized in terrorism, that's

1    what they did.  They were as vicious a terrorist group as ever

2    existed.

3           You will hear that Officer Young didn't merely play a

4    Nazi SS officer for social engagements or World War II

5    reenactments, he saw himself as that.  He has a big tattoo on

6    his shoulder, which you will see, which is an SS tattoo.  You

7    will see that he was attracted to SS terrorists and Islamic

8    terrorists at the same time.

9           You will see, for example, that he has a photo that

10   he has downloaded to his computer of him in his SS uniform.

11   And then six days later, and this was January 2006 and

12   February -- late January or early February 2006, he downloads a

13   picture of himself in Muslim garb carrying his rifle.

14          You will see that in his house in August 2016 when he

15   was arrested, he had a framed portrait of Adolf Hitler.

16          You'll wonder, how could one person be attracted to

17   both Nazis and Islamic terrorists?  You will hear that it's not

18   uncommon, and that one link that they have in common is that

19   they both hate Jews.

20          Young's friend from college, you will hear from him,

21   he's going to come in and say, well, as they left a neo-Nazi

22   gathering years ago Officer Young said -- well, not Officer

23   Young at the time, Nicholas Young says to him, hey, don't

24   discount the possibility of an alliance with the Muslims to

25   combat the Jews.

1          You will see that Young's hatred of Jews was quite

2     extraordinary.  When he was arrested, there was a graphic on

3     his phone showing some smokestacks and the logo Together We Can

4     Finish What Hitler Started.

5          You will see that in 2009 the doormat to his house

6     was an Israeli flag.

7          The first witness you are going to hear from will be

8     an undercover officer.  He is going to be known as Khalil.  He

9     was known to Officer Young as Khalil.  And Khalil will testify

10    that in his undercover capacity he was trying to get to know

11    someone else who had been suspected of radicalizing one of

12    Young's friends.  One of Young's friends by the name of Zachary

13    Chesser had been arrested for a terrorism offense in 2010 in

14    Northern Virginia.  And Khalil tries to get into the same

15    circles to find out if this guy Saleh Albarmawi was the guy who

16    radicalized this young convert by the name of Zachary Chesser.

17         And you will hear that Khalil says, so when I was

18    trying to get close to Albarmawi, I meet Nicholas Young.  And

19    Nicholas Young was close to Albarmawi, so I stayed close to

20    Nicholas Young so that I could get close to Albarmawi.

21         THE COURT:  Mr. Kromberg, you're almost up, your time

22    is up.

23         MR. KROMBERG:  I thought, Judge, you were going to

24    give me a little bit more time since --

25         THE COURT:  I will give you an extra minute or two.

1   Go ahead.

2          MR. KROMBERG:  Thank you, Your Honor.

3          You'll hear Khalil testify that when he was with

4   Young, Albarmawi regularly justified Islamic terrorism.

5          Khalifi -- you will also hear that one of the people

6   in the same circle, Amine El-Khalifi, later was arrested for

7   trying to blow himself up in the U.S. Capitol building.  And

8   that Khalifi at a dinner with Officer Young and Khalil talked

9   about how he was going to become a martyr.

10          And how Officer Young said, no one is ever going to

11   know what I'm going to do until after I do it.  But he talked

12   about how he could attack a federal building, how he could

13   attack the FBI building, and how he was going to go Postal some

14   day.

15          He talked about a plan on how he could smuggle

16   weapons into a federal building --

17          MS. MORENO:  Objection.

18          THE COURT:  Sustained.

19          MS. MORENO:  Move to strike.

20          THE COURT:  That's out of the case.  Let's go.

21          MR. KROMBERG:  Khalil is going to talk about how when

22   he and -- after Khalifi got arrested, Officer Young said, the

23   FBI is going to come talk to you, just like they came to talk

24   to me after Chesser was arrested.  You don't have to talk to

25   them.  And whatever you do, don't tell them about certain

1    things.

2          You will hear that Khalil also met another guy in the

3    same circle around Albarmawi and Young by the name of Liban

4    Mohammed.  And how Khalil ended up in a plot with Liban

5    Mohammed to join Al-Shabaab, a terrorist group in Somalia, and

6    that he did not recruit Nicholas Young to that plot because

7    that wasn't his goal.  His goal was Albarmawi and Liban

8    Mohammed.

9          You will also hear from Daveed Gartenstein-Ross, he

10   is what we call an expert witness, who will explain to you the

11   context of the various individuals and organizations that were

12   mentioned in the testimony.  He will explain to you parts of

13   the history of the Libyan civil war, the history and background

14   of ISIS, and the Abu Salim Martyrs Brigade.

15         Finally, Special Agent Caslen is going to testify.

16   He will be a summary witness.  He is going to try and tie the

17   various pieces of evidence together in this case.

18         There will be a lot of evidence in this case, and

19   we're going to try and make the best use of your time.  But at

20   the end of the case, the evidence is going to show that

21   Nicholas Young attempted to obstruct justice in November of

22   2014 when he sent that text message that he hoped the FBI would

23   find that would make it look like Nicholas Young didn't know

24   that Mo was going to join ISIS.

25         And it's going to show that he attempted to obstruct

1  justice in December of 2015 when he told the FBI, I don't know

2  how to contact the guy, I don't have an e-mail for him, I

3  thought he was just going on a tour.

4          It is going to show that he attempted to provide

5  material support to the Islamic State by trying to protect an

6  Islamic State fighter from being identified by the United

7  States of America.

8          And it's going to show that he attempted to support

9  the Islamic State by sending the Google Play gift card codes to

10 someone he thought was an Islamic State fighter.

11         At the close of the evidence Mr. Gibbs and I will

12 speak directly to you again and summarize the evidence that you

13 will have heard.  At that point I expect we're going to ask for

14 you to return a verdict of guilty.

15         Thank you.

16         THE COURT:  All right.  Ms. Moreno.

17         MS. MORENO:  Ladies and gentlemen, in this case

18 you're going to learn through the evidence that the FBI induced

19 Nick Young, a police officer who had served with distinction,

20 to commit a crime that they created where none would have

21 existed, and tried for six years to create a criminal when they

22 couldn't find one.  And that is the reason we're here today.

23         What is the crime here?  It's not anti-Semitism.  Mr.

24 Young isn't charged with any hate crimes here.  The charge is

25 an attempted material support of a designated foreign terrorist

1    organization.  And you must focus on those charges.

2           It's about a six-year investigation that started in

3    December 2010 with Khalil.  And what they have to show for it

4    are Google Play cards.  And that's why they're talking about

5    Hitler, and I'll address that in a minute.

6           Nothing here in this case is what it seems like on

7    the surface.  And you're going to learn that nobody in this

8    case, least of all Nick Young, was in ISIS.  And that Nick

9    Young never spoke to anybody in ISIS.  He never attempted to

10   contact anyone in ISIS.  And he never attempted to travel over

11   there to Syria, there is no evidence of that.

12          In fact, when we're talking about predisposition,

13   which I'll talk address in a minute, he rejected ISIS.

14          And as Mr. Kromberg talked about, there are a number

15   of undercover operatives here.  Khalil met Nick Young in

16   December of 2010, and he recorded and reported on Nick Young

17   until April of 2012, a two-year investigation.  And what

18   happened?  Nothing.

19          Two years later, Mo 1, because there are two Mos, Mo

20   1, the paid informant who was paid about $40,000 for his work,

21   he reported and recorded on Nick Young from May for about five

22   months.

23          And then we had Mo 2, another undercover agent, who

24   reported on Mr. Young for two years, from October 2014 until

25   his arrest in August of 2016.

1          Six years this investigation lasted.  And you're

2    going to learn that all these communications and these e-mails

3    and texts to Nick Young were carefully vetted and composed by

4    the FBI in order to get Nick Young to commit a crime.

5          Remember, what are the charges here?  There are three

6    of them, all non-violent.  None of them deal with Nazis or

7    anti-Semitism.  None of them are hate crimes.

8          The sole count, one, attempted material support of

9    ISIS where Nicholas Young sent $245 worth of Google Play gift

10   cards to an undercover agent who he believed was his friend for

11   two years.  This is not about whether the cards were sent.

12   This charge is about whether he materially supported ISIS and

13   whether he was entrapped into doing so.

14         Now, the two obstruction of justice charges, just to

15   summarize, and you'll get instructions from the Court, is

16   whether Mr. Young obstructed an official proceeding by

17   misleading the FBI on the destination and purpose of their own

18   agent that they were handling and managing, and who they knew

19   where he was all the time, and whether there was any official

20   proceeding in this case, which there wasn't.

21         So who is Nick Young?  He was born and raised here in

22   Virginia.  Described as a Libertarian.  He had an interest in

23   politics, and he talked about Mideast politics and geopolitics

24   in general.

25         You will learn that he converted from Catholicism to

1    Islam in late 2006 around the time his father passed away.

2          You will hear that he was described as a re-enactor,

3    one of those guys that gets together with others and pretends

4    to be fighters from the past.

5          And you will hear that he was a weapons collector.

6    All lawful, by the way.  There are no charges here that Nick

7    Young possessed any guns unlawfully or any weapons unlawfully.

8          And you're going to hear through the recordings and

9    the statements and the e-mails with the undercover operatives

10   that Nicholas Young wanted to make a life in this country,

11   wanted to retire from the police department here in America,

12   and that he would never have left America because he would miss

13   living here.  That's who he was personally.

14         What about his professional life?  He was a police

15   officer for the Washington D.C. Metro Transit Police, first and

16   foremost, for 13 years.  And he served with distinction.  He

17   was dedicated to protecting the passengers.

18         And by the way, during that 13-year period of time he

19   was never cited, disciplined for any discriminatory or racist

20   conduct to anyone.  Nothing.  He served with distinction.  In

21   fact, he was commended for his performance during that 13-year

22   period of time until he was arrested and his career was ended.

23         Let me talk about these Nazi materials.  You're going

24   to be instructed on what you're allowed to use some of this

25   stuff for.  Even if you want to consider it at all, the judge

1   is going to be specific, and she's going to tell you that you

2   can't use these photos, Hitler, and smokestacks, or the rest of

3   what Mr. Kromberg talked about in his opening statement, just

4   because they're offensive.

5           You'll be instructed also that the possession of this

6   stuff is protected by the Constitution, and that you can't

7   convict Nick Young on the possession of this stuff alone.

8           And the illogical, nonsensical link that the

9   Government wants you to make between white supremacists who are

10  somehow aligned with militant Islamists who are terrorists,

11  will not be borne out by the evidence or by your own common

12  sense.  You will conclude that, of course, Muslims do not

13  believe in white supremacy.

14          And what's not in dispute is that those materials,

15  those white supremacist materials, came to the Government's

16  attention after they arrested Nick Young, not before.  So they

17  brought these charges without knowing about these materials.

18  They arrested him.  And now they want to use these materials to

19  prove the charges.

20          And as I said, there is no evidence that he was ever

21  disciplined for any sort of discrimination or racist conduct on

22  the police force.

23          So how are they going to prove this link?  Well, Mr.

24  Kromberg talked about a Mr. Ross.  And there will only be one

25  witness, which should be no surprise, that will try to persuade

1    you that there is a connection between militant Islamic

2    terrorism and white supremacy.  And in the field of terrorism

3    studies, you're going to learn that Mr. Ross academically is

4    alone in his opinion.  He's the only member of that academic

5    club who believes that.  And that he is not a scholar and he is

6    in this for his own interests.

7           So let's talk about the relevant evidence in this

8    case.  The evidence is going to show you that the FBI

9    manufactured the crime.  This was their specific idea.  Their

10   agents, their timing, their methodology of what to do and how

11   to do it, and at their insistence.

12          And because of how the Government acted in this case,

13   Nick Young can assert the complete defense of entrapment to

14   Count 1.  And what is it?  Mr. Kromberg mentioned some of it.

15   Inducement and predisposition.

16          So what does the Government have to prove?  They have

17   to prove beyond a reasonable doubt, first, that Nick Young sent

18   these gift cards knowing that this guy Mo was in ISIS.  And if

19   and only if they show you that, then the entrapment would be a

20   complete defense to that charge.

21          If you so find that the Government induced Mr. Young

22   to sending the cards in the first place, it was their idea, and

23   that they failed to show you beyond a reasonable doubt that he

24   had no predisposition to do this before he was approached by

25   Government agents, which would have been December 2010.

1          So did they induce Nick Young into committing the

2    crime?  You bet.  And how do we know that?  Well, you're going

3    to hear over a six-year period of time all of these agents

4    making up stories, befriending Nick Young.  They prayed with

5    him.  They dined with him.  They shared war stories.  And they

6    talked about women, and their lives, and the past, and the

7    future.  All lies from their end.  And they came to him over

8    and over, elaborately weaving these fake stories.

9          And you're going to need to consider all those years,

10   this inducement of subtle pressure, not from someone hostile to

11   Nick Young, but someone he thought he was sharing a true

12   friendship with.  In this case, the fictitious Mos.

13         But it wasn't going fast enough for the agents over

14   this six-year period of time.  It wasn't going fast enough for

15   them.  So during this six-year period of time, which you will

16   learn that Nick Young in recordings and writings rejected ISIS,

17   they were frustrated.  They were frustrated with the slow pace

18   of Nick Young and the apparent unwillingness of him to engage

19   in criminal conduct.  And do you want what they named him?

20   They named him Slow Decline.

21         They ratcheted up the inducements, the narrative, the

22   ploy.  And in some of the last e-mails between Mo and Mr.

23   Young, he talked about how there were stories of bombs killing

24   children and destroying homes.  Stories of dead children.

25         And the Government, the FBI agents, talked about and

1   characterized those e-mails.  And do you know what they said?

2   They said, we hit the case with a defibrillator.  This is June

3   2016, six years after this all began.  We hid the case with a

4   defibrillator.  Why?  Because it wasn't going anywhere.

5           And when they were frustrated because he still wasn't

6   doing what they wanted him to do, they said -- and you will see

7   this.  They said, let's hope he goes one step further, one more

8   step, one giant leap for Slow Decline.  This is July 19, 2016,

9   two weeks before he's arrested.

10          So what about his predisposition for criminal

11  conduct?  There is none.  You will learn that Nick Young wasn't

12  predisposed, and that he rejected ISIS and its campaign.

13          And the first place you look is his performance as a

14  police officer, which he served with honor and distinction.

15  And there was no predisposition there, certainly.

16          So where else is the evidence of the lack of

17  predisposition?  Well, you're going to learn that Nick Young

18  was interviewed by the FBI eight times, eight times.  And all

19  eight times he consented, he talked to them without counsel

20  while he was a police officer.

21          This Libya trip that Mr. Kromberg mentioned, I want

22  to talk to you about that.  Mr. Young spoke to the Customs and

23  Border Patrol agents and talked about his trips to Libya.  This

24  is 2011.  And you'll hear that Mr. Young was inspired by the

25  Arab Spring.  Was outraged that Muammar Gaddafi, at the time an

1 enemy of the United States, was exterminating his people.  And

2 he went over to Libya.  He told CPB that.  He told the FBI.  He

3 told anyone who would listen.  You know why?  Because he was

4 proud of it.  And he didn't hide it.

5          And guess what happened to him when he came back.

6 And he declared the body armor, you will hear about this, from

7 his trips in Libya.  And do you know what happened to him?

8 Nothing, 2011, because he didn't do anything wrong.  Because

9 his conduct was not unlawful.  And because there is no evidence

10 that he joined any terrorist organization in 2011.  He told the

11 FBI that he thought it was his personal duty to report

12 terrorist attacks.

13          Now, you're going to hear about the back and forth

14 and the communications and the messages between Khalil, Mo No.

15 1, and Mo No. 2 with Nick Young.  And it's important for you to

16 pay attention to these because you're going to learn that Mr.

17 Young had extended conversations in September of 2014 before Mo

18 allegedly traveled to Syria.  And he told Mo, he told him, he

19 said, any American who attempts to join ISIS doesn't have any

20 wisdom.  He told Mo that he was against ISIS.  And he described

21 the head of ISIS in a mug shot, Mr. Baghdadi.  And he said,

22 that organization sounds like a bunch of criminals hungry for

23 power and money.

24          And why is this important?  He is talking to his

25 friend Mo in an unguarded way.  He thinks he is his friend, so

1    he is being honest about his opinions and what he thinks.  And

2    he told Mo that if he learned that someone was going to blow up

3    the subway, his help would be needed to stop them.  That's what

4    he said.

5            And then when Mo was making this fake noise about

6    going over there to join ISIS, Mr. Young said, you know, either

7    way, you're not at the end of a plank.  You have breathing

8    room.  It's a lot of responsibility there.  No one is holding a

9    gun to your head.  Because he was trying to dissuade Mo from

10   doing that, from going over there.

11           He told Mo that it was illegal to join a foreign

12   terrorist organization or to take up arms against the United

13   States.  And that makes sense, right, because when he came back

14   from Libya, what did -- which was lawful, Mr. Young told

15   everybody about that.

16           Now, what else did Nick Young say about ISIS?  And

17   this will be very important.  In November of 2015 -- Mr.

18   Kromberg has talked about accounts and e-mails back and forth.

19   But in November of 2015 -- and this is supposedly after Mo

20   travels to Syria.  This is very important.  Behind the

21   anonymous protections of the Internet, in a LiveLeak account

22   you will learn that Nick Young was scolding people who were

23   criticizing aspects of America.  And he wrote:  I live in the

24   U.S. because it's my country.  I don't support extremism.  I

25   live here because I was born here, and I feel welcome here.

1    And if you want to say something about this country, get in

2    line for citizenship.

3              And then he said:  I do not support ISIS in terms of

4    I don't wish for them to come out on top.

5              That's what he said in November of 2015.  All of

6    these statements are evidence of his lack of predisposition,

7    which you must consider.

8              And with respect to the obstruction charges, you will

9    get instructions from the Court on this, but they don't make

10   any sense.  There was no official proceeding and the Government

11   was not mislead.

12             Nick Young wrote to one of these fake friends:  You

13   can be a good Muslim and a good cop.

14             The Government's failure to provide you with any

15   evidence of integrity, which is what you should insist on,

16   beyond a reasonable doubt, the complete defense of entrapment,

17   will lead you to acquit Nick Young of all the charges.

18             Thank you.

19             THE COURT:  All right.  As I understand it, it is

20   going to take a few minutes to set the courtroom up for the

21   first witness.  And because of the hour, it makes no sense to

22   take that time right now.

23             So you all have been very patient, it was a long voir

24   dire, ladies and gentlemen, I am going to let you get out a few

25   minutes early tonight.  I am normally going to go until 6, but

1  I want to make sure you come back rested.

2          We will start tomorrow morning -- now, I know

3  Northern Virginia traffic is horrendous, and I don't know where

4  you all live, but is there anybody who feels you cannot get

5  here by 9 o'clock tomorrow morning?  Because we can't start

6  until you are all here.

7          So please make every effort you possibly can to be

8  here.  There shouldn't be any weather problems this week.

9          When you go home tonight, please remember my

10 cautions.  Do not -- and there has been some media coverage

11 about this case, I think it has been covered a bit today as

12 well.  Do not consume any information about this case.

13         Get a good night's sleep.  Get maybe some exercise.

14 Get your minds off the case, don't even think about it.  Go

15 home and just come back here rested tomorrow morning.

16         We will go as close to 6 o'clock tomorrow as

17 possible.  I want to get this case really moving so that we

18 don't push this any further toward the holiday season than we

19 have to.

20         So leave your notebooks here, and we'll see you

21 promptly at 9 o'clock tomorrow morning.  Thank you.

22         We'll stay in session.

23         NOTE:  At this point the jury leaves the courtroom;

24 whereupon the case continues as follows:

25 JURY OUT

1    THE COURT:  All right.  So what we'll do then, either

2    tonight or tomorrow morning before 9 o'clock, we'll set the

3    screen up.  All right.

4    MR. KROMBERG:  Yes, Judge.

5    THE COURT:  And then I am going to rely on the

6    support staff to make sure that the only people who will be

7    sitting over here are people who have the appropriate

8    clearances.  All right?

9    MR. KROMBERG:  Yes, Judge.

10   THE COURT:  All right.  The first witness, Mr.

11   Kromberg, how long do you anticipate the direct taking?

12   MR. KROMBERG:  It could easily take 45 minutes,

13   Judge.  I expect that the cross will be longer, but he's a

14   substantial witness, he is going to talk about a lot of things.

15   THE COURT:  I understand.  All right.  I just wanted

16   to get an idea about that.  All right.

17   Now, what is this issue about trying to put documents

18   on the electronic system with a -- I'm concerned about that.

19   And I will tell you why I'm concerned.

20   Look where the Government's screen is.  The

21   Government's screen is right here on the counsel table.  And I

22   think jurors would be able to see that.

23   MR. SMITH:  This screen, Your Honor?

24   THE COURT:  Yes, it worries me.

25   MR. SMITH:  Could we tilt it?  It might just be a --

1    the reason we proposed this idea of using the Elmo is twofold.

2    We think we can save over the course of the trial several hours

3    because if we're using documents for impeachment that are not

4    formally in evidence, we will have to be constantly handing up

5    documents.

6             And the reason we can't use a binder with tabs for

7    the witnesses is we don't know what shape that the direct

8    examination will take.  So we can't predict in advance which

9    particular documents we may need for cross-examination.

10             So if we use the screens, which I understand from

11    Lance Bachman we can do, we will save a lot of time in terms of

12    handing up impeachment documents.

13             But also, the witness can communicate with the lawyer

14    by using a kind of touch device to indicate particular places

15    on the document with his hand which only the lawyer, the

16    witness, the Government attorneys, and the Court will see.

17             THE COURT:  Well, I don't know how that is going to

18    make any sense to the jury.  Give me an example of what you're

19    going to do.  Put it on the system.

20             MR. SMITH:  Okay.  Your Honor, right now, obviously,

21    the whole court can see it, as well as the jurors.  But there

22    is a switch, I understand, that allows --

23             THE COURT:  I just hit it.

24             MR. SMITH:  Yes, you just hit it.

25             THE COURT:  Can you see, are the jurors able to see?

1          MS. MORENO:  No.

2          MR. SMITH:  And then, Your Honor, there is one more

3    thing you can do with it.  It will save a lot of time because

4    when the witness --

5          THE COURT:  You need to be at the lectern.

6          MR. SMITH:  Oh, sorry.  So when the witness is

7    sitting in the box, the witness can actually touch parts of the

8    document and indicate where the witness is referencing on the

9    document.  And that saves a lot of time itself because if the

10   attorneys have to stay at the lectern when they are speaking, I

11   can't exactly understand which part of a document the witness

12   is referring to.

13         And so, there is going to be a lot of waste and

14   inefficient time in complex documents with heavy redactions

15   about where -- and there is obviously unredacted, unclassified

16   portions.  So we're going to need to reference particular parts

17   of pages that are not obvious.

18         So I think we would save a tremendous amount of time

19   at trial by using the ELMO and switching it off only for

20   documents that are not in evidence, only for impeachment

21   documents.

22         THE COURT:  Well, we will see.  We're not going to

23   have a ton of sort of quiet secretive documents.  The jury will

24   grow crazy and it won't be that helpful.  So we will see how it

25   works.

1          MR. SMITH:  Okay.

2          THE COURT:  But you're planning to do that with

3    Khalil?

4          MR. SMITH:  With the witnesses for which we're using

5    impeachment, documents that are not part of the Government's

6    case in chief and that are not introduced, that are not in the

7    Government's exhibit list.

8          So if the document is in the Government's list, there

9    is no reason not to show the jury.  If a document is not in the

10   Government's exhibit list and it's not a defense evidence, and

11   we're not introducing it in evidence but only using it to

12   cross, then the jury shouldn't see it.

13         THE COURT:  We will have to see.  I mean, it sounds

14   to me as though that may start getting extraordinarily tedious

15   and not all that valuable.  We will wait and see how it looks

16   when it goes in.

17         But I see the screen that I need to hit is this one.

18         MR. SMITH:  And if the alternative is to do it the

19   analog way, the jury still is not going to understand what

20   document -- because if we hand a document up to the witness,

21   the jury is not going to know what document that is either.

22         THE COURT:  Yeah, but if these are not sworn

23   statements of the witness, how much of that is going to be

24   valuable, I don't know.  If these are recordings, you can use

25   the recordings.

1          MR. SMITH:  There is recordings as well, and we will

2     be using those.  But these -- we're not making any relevance

3     point with Your Honor right now.  We're simply saying, if Your

4     Honor thinks that these documents shouldn't be used, they

5     shouldn't be used.  But this would just speed up the process by

6     being able --

7          THE COURT:  We'll see, we'll see.  When we get to

8     that point, we'll see.

9          MR. SMITH:  Okay.

10         THE COURT:  I see the button to be pushed.  But I am

11    not convinced that that is going to be terribly effective.  All

12    right.  Anything further?

13         So we will have the courtroom ready to go with that

14    first witness, because it takes five minutes or so, as I

15    understand it, to set it all up.

16         MR. KROMBERG:  Your Honor, I hate to say it, but I

17    agree with Mr. Smith on how this could be helpful.  For

18    example, let's say I wanted to show a picture to -- a picture

19    of a person -- I want to show a picture of Ali Tamimi to the

20    witness.  So the witness needs to look at that picture.  The

21    defense needs to know what I'm talking about.  You need to know

22    what I'm talking about.  But the jury shouldn't see it until

23    it's introduced into evidence, at which point it can be

24    introduced into evidence.

25         THE COURT:  I understand that.  But I also have books

1    and they have books.  For photographs, that's one thing.  But,

2    I mean, with documents, many times the documents on these

3    screens are not all that --

4              MR. KROMBERG:  Right.  So I will say that for the

5    Government, we're not using much in the way of documents with

6    text on it.  That's more of the defense thing.  We have more

7    pictures that --

8              THE COURT:  And a lot of these pictures I don't

9    expect there is going to be an objection.  You know how we are.

10             MR. KROMBERG:  That's what I thought.

11             THE COURT:  I mean, is there any objection to Exhibit

12   14?  No, then it goes right out.

13             MR. KROMBERG:  I thought there was none, except it

14   turns out the opening statement drew objections on the

15   exhibits.  So I don't think we're going to have objections, but

16   we might.

17             THE COURT:  I'm not going to be terribly generous

18   with objections.  All right?  But again, if you walk over the

19   line, we'll do it.  All right.

20             MR. KROMBERG:  I am sorry for keeping you, but this

21   issue that did come up, Khalil is the witness, and I want to

22   make sure I have it straight.  There was an objection during my

23   opening about the smuggling guns in.  I had said, I think at

24   the hearing on Friday, that I understood Your Honor's ruling,

25   we're not allowed to saying anything about smuggling guns into

1      the courthouse, but I was going to say a federal building.

2              And that ties into the fact that there were 60 pieces

3      of body armor, that he could outfit a squad.  Because he said,

4      what Khalil is going to say, he talked about how he could

5      smuggle weapons in to people who had gotten through security on

6      their own and then there could really be some damage done.

7              So I thought, what I was planning to do was using

8      leading questions to Khalil on that issue --

9              THE COURT:  No, no, you can't lead.

10             MR. KROMBERG:  Okay.  Well, then --

11             THE COURT:  You will draw an objection.  No, don't

12     lead your witness.

13             MR. KROMBERG:  That's fine, but then I am going to

14     instruct him that he cannot say the word "courthouse," and

15     we're talking about a federal building, not a courthouse.

16             THE COURT:  That's right.  That's what we had talked

17     about.

18             MR. KROMBERG:  Thank you, Your Honor.

19             THE COURT:  All right.  All right, we will recess

20     court.  See you back here at 9 o'clock tomorrow morning.

21         ------------------------------------------------
                      PARTIAL TRANSCRIPT CONCLUDED
22

23              I certify that the foregoing is a true and
           accurate transcription of my stenographic notes.
24

25                  /s/  Norman B. Linnell
                  Norman B. Linnell, RPR, CM, VCE, FCRR