1

UNITED STATES DISTRICT COURT.
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

```
UNITED STATES OF AMERICA     .    Criminal No. 1:16cr265
                             .
     vs.                     .    Alexandria, Virginia
                             .    February 23, 2018
NICHOLAS YOUNG,              .    9:30 a.m.
                             .
          Defendant.         .
                             .
. . . . . . . . . . .
```

TRANSCRIPT OF SENTENCING
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT:              JOHN T. GIBBS, AUSA
                                 GORDON D. KROMBERG, AUSA
                                 EVAN N. TURGEON, SAUSA
                                 United States Attorney's Office
                                 2100 Jamieson Avenue
                                 Alexandria, VA 22314


FOR THE DEFENDANT:               NICHOLAS D. SMITH, ESQ.
                                 David B. Smith, PLLC
                                 108 North Alfred Street
                                 Alexandria, VA 22314
                                   and
                                 LINDA MORENO, ESQ.
                                 Linda Moreno P.A.
                                 511 Avenue of the Americas
                                 No. 2
                                 New York, NY 10011


ALSO PRESENT:                    SA NICHOLAS CASLEN

OFFICIAL COURT REPORTER:         ANNELIESE J. THOMSON, RDR, CRR
                                 U.S. District Court, Fifth Floor
                                 401 Courthouse Square
                                 Alexandria, VA 22314
                                 (703)299-8595


(Pages 1 - 25)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

2

1                   P R O C E E D I N G S

2                    (Defendant present.)

3              THE CLERK:  Criminal Case 16-265, United States of

4    America v. Nicholas Young.  Will counsel please note their

5    appearances for the record.

6              MR. KROMBERG:  Good morning, Your Honor.  Gordon

7    Kromberg, John Gibbs, and Evan Turgeon for the United States.

8    With us at counsel table is FBI Special Agent Nicholas Caslen.

9              THE COURT:  Good morning.

10             MR. SMITH:  Good morning, Your Honor.  Nicholas Smith

11   for defendant Nicholas Young, and with me is Ms. Linda Moreno.

12             MS. MORENO:  Good morning.

13             THE COURT:  Good morning.

14             All right, this matter comes on first of all, we have

15   two pending motions from the defense:  defendant's motion for a

16   new trial and defendant's motion for acquittal on Counts 2 and

17   4.  Both parties have extensively briefed these motions, and I

18   don't need to hear a whole lot of argument.

19             Mr. Smith or Ms. Moreno, who's going to argue the

20   defense motions?

21             MS. MORENO:  Mr. Smith, Your Honor.

22             THE COURT:  All right.  Mr. Smith, is there anything

23   you want to add to your motion for a new trial?

24             MR. SMITH:  No.

25             THE COURT:  All right.  Basically, you've argued in

1  that motion that the case should go for a new trial because

2  your client suffered undue prejudice from the evidence that was

3  introduced, including the evidence about his involvement with

4  white supremacists and Nazi groups, any relationship that that

5  might have to radical Islam; that the Court made errors in

6  admitting hearsay evidence; that your client was prejudiced by

7  pretrial publicity; and the fact that the Court did not allow a

8  jury questionnaire; and that various evidence was kept out that

9  you felt would help your client.

10        The government has, obviously, filed an objection to

11  that motion, and I'm fully satisfied that there's nothing

12  raised in your motion that would justify a new trial.  You

13  know, we addressed many of these issues before the case itself.

14  In terms of the pretrial publicity, as the government properly

15  points out, some of that was at your own doing because of the

16  extensive interviews that the defendant was engaged in.

17        There's no requirement for a jury questionnaire, and

18  I do point out, and I think this is a significant fact, that

19  the Court gave the defense an additional peremptory, so you had

20  11 peremptory strikes, and you only used six of them, so the

21  jury pool itself was found to be unobjectionable based on the

22  record in this case.  So I don't find there's any basis to

23  grant a new trial, and the motion is denied.

24        In terms of the motion for a judgment of acquittal on

25  Counts 2 and 4, you raise an interesting legal argument, and I

4

1   don't dispute that there's case law especially in the Ninth

2   Circuit that supports your argument that an FBI investigation

3   does not qualify as an official proceeding for purposes of a

4   1512(c)(2) prosecution.

5          First of all, this case is not covered by *Amri*,

6   because *Amri* involved a different portion of the obstruction

7   statute, but in looking at the language of 1512, including the

8   language in subsection (f)(1) which talks about the fact that

9   an official proceeding does not have to actually be pending at

10  the time, the government, I think, has correctly argued,

11  although I think one can debate the issue, but has correctly

12  argued that there was sufficient evidence from which a

13  reasonable jury could draw the conclusion that the defendant

14  would have known that a grand jury investigation was either

15  ongoing or anticipated to be ongoing, and therefore, I'm

16  satisfied again that the motion for judgment of acquittal on

17  Counts 2 and 4 should be denied.

18         So your motions are denied, and we'll proceed to

19  sentencing.

20         MR. SMITH:  Thank you, Your Honor.

21         THE COURT:  Wait.  While you're there, who's going to

22  handle the sentencing?

23         MR. SMITH:  Ms. Moreno.

24         THE COURT:  All right.  Ms. Moreno, come on up to the

25  lectern.  Have you had enough time yourself to go over the

1  pre-sentence report and to go over it thoroughly with

2  Mr. Young?

3          MS. MORENO:  Your Honor, with respect to specific

4  questions about the PSR, I think Mr. Smith handled that with,

5  with our client, so if there are specific questions about the

6  PSR --

7          THE COURT:  Well, in terms of all the objections that

8  were made to the pre-sentence report, which the probation

9  officer at the end of the report, of course, listed and then

10  explained why they were not being granted or -- I've looked at

11  all of those, and the argument that evidence is in the

12  pre-sentence report that might not have come in at trial is

13  really not appropriate.

14          In fact, in your sentencing memo, you point to

15  section 3661 of Title 18, which says there's no limitation on

16  the information, background, character, or conduct of the

17  defendant.  So the Probation Office not only has to help inform

18  the Court as to the basis for a sentencing decision, but also,

19  as you know, those pre-sentence reports inform the Bureau of

20  Prisons in terms of making an appropriate judgment call as to

21  the best way to incarcerate an individual.

22          And so all of -- to the extent that those objections

23  are based upon, well, this wasn't evidence that may have come

24  up at trial, even if that were the case, I'm satisfied that

25  those were proper matters to have in the pre-sentence report,

1  so those various objections are denied -- or overruled, all

2  right?

3           So the Probation Office calculated the offense level

4  here as a level 42.  The -- because of the nature of the

5  offenses, that bumps the criminal history, and I think this is

6  one of those artificial things in the guidelines, all right?

7  So I don't mind telling you that, but your client, who

8  otherwise would have a criminal history I, gets a criminal

9  history VI, and that then makes the guideline range 360 to 720

10 months, even though the mandatory max -- statutory max for each

11 offense, I believe, is 20 years.

12          The fine range is $50,000 to $250,000.  There are

13 three counts of conviction, so there's $300 of special

14 assessments.  And those are the guidelines we have to work

15 with, all right?

16          I have read all the letters, including Mr. Young's

17 letter, so I want to make sure you know that, but let me hear

18 then first from the United States as to its position on

19 sentencing.

20          MR. KROMBERG:  Thank you, Your Honor.  The first

21 point I'd like to make is that what happened in July 2016 was

22 not an aberration.  It wasn't something -- it was not an

23 isolated example.  It wasn't something that was out of

24 character for the defendant because you've got to -- before you

25 even think about what the appropriate punishment is for what

1   happened in July 2016, so in December 2015, that obstruction of

2   justice, that was designed to protect what Mr. Young believed

3   to be an ISIS fighter.

4           In that sense, it was nothing like the *Amri* and *Queen*

5   case because Amri and Queen didn't think that Qamar at the time

6   was a threat, was doing anything wrong, but in December of

7   2015, Mr. Young, a police officer, knew or believed that Mo was

8   an ISIS fighter, and he lied to the FBI about it.  He tried to

9   lie to the FBI about it, tried to mislead the FBI about it.

10          And then a year before that, November 2014, when he

11  obstructed justice then by sending that ruse text message, that

12  wasn't to protect Mo, so that was something different.  That

13  November 2014 text message was designed to deceive the FBI

14  about Mr. Young himself.

15          And then in February 2012, when the FBI was

16  investigating the *Amine El Khalifi* case, Khalifi was the guy

17  who wore a suicide vest, he was going to blow himself up in the

18  U.S. Capitol, you heard Khalil testify that, well, yeah, we

19  were sitting at dinner, and we were talking about Khalifi being

20  arrested, and Mr. Young told me that, you know, the FBI is

21  going to come talk to you because they came and talked to me

22  after Chesser was arrested, and they're going to ask you

23  questions.  Don't answer all their questions.

24          And here's a police officer telling someone not to

25  answer the FBI's questions about someone who was trying to blow

8

1    himself up in the U.S. Capitol Building.

2         So that's -- I think it's important to keep in mind

3    that nearly four years -- four years? -- more than four years

4    before the events that led to the, the material support case

5    came up, the police officer is telling someone not to tell the

6    FBI anything -- or not to tell the FBI certain facts about an

7    investigation of an al Qaeda plot to bomb the U.S. Capitol.

8         The second thing I wanted to make sure that I can try

9    to get the Court to focus on is that the $245 of gift cards is

10   not -- I mean, it's a small amount in relative -- in absolute

11   terms, obviously, but ISIS didn't need the $245.  What they

12   needed was the gift card codes.

13        You might -- the Court probably recalls that in the

14   *Haris Qamar* case, Qamar had to be implored to send anything,

15   and Qamar sent something like $40 of his own money and $40 of

16   the CHS's money to buy $80 worth of gift card codes.

17        When Mo in this case asked for the gift card codes,

18   he didn't say any amount in particular.  He said, "We need gift

19   cards," and Mr. Young immediately went and got seventeen $10

20   gift cards and five $15 gift cards and sent them off.

21        He wasn't -- he didn't say, "This is all I'm going to

22   do.  I'm not going to do anything else."  He wasn't asked to do

23   anything else.  He sent those cards, and that was it.  But

24   those $245 worth of gift cards were going to be used for

25   Threema accounts to communicate with fighters who were going to

1    come to join ISIS, and as Mr. Young knew from buying his own

2    Threema account, the Threema account only costs $3.

3            We talked in the sentencing pleading about the

4    difference between Mr. Qamar and Mr. Young.  Mr. Qamar was, I

5    think, the last somewhat similar case that the Court has

6    handled, and Qamar, as scary as he sounded online, he was an

7    immature guy living with his parents who when offered the

8    chance by the informant to go join ISIS, he said, "No, I'm not

9    going to go."

10           And he did -- he went and -- and he went and took the

11   photographs that were going to be used for video, which was a

12   really bad thing, but he was -- I think the Court saw him as

13   living in a video game world, that he was a fantasist.

14           Mr. Young is completely different.  Mr. Young

15   traveled thousands of miles to go fight.  He now claims that he

16   has PTSD.  He has -- he talked about, you heard from Khalil,

17   the plot to smuggle weapons into this courthouse, the plot --

18   the plan to attack an FBI building, and the defense says, well,

19   but he wasn't planning on doing it.  He just talked about this

20   stuff.

21           And that might be true.  And that might be true.  He

22   might get -- some people might get the benefit of the doubt on

23   that, but do you get the benefit of the doubt on that when you

24   also have ten ballistic vests and 18,000 rounds of ammunition

25   and 21 firearms and explosives, and you have PTSD?

1           And the only time we know he was ever asked to help

2    ISIS, he accepted.  Maybe someone else would get the benefit of

3    the doubt that, well, okay, yes, he's just speculating.  When

4    he talked about kidnapping and torturing an FBI agent, you

5    know, that's just a bad sense of humor, but when it comes to

6    figuring out the appropriate punishment for this defendant, he

7    shouldn't get the benefit of the doubt.

8           One of the reasons is, Judge, that even now, he has

9    not been honest with the Court or the public or his friends.

10   The first thing is the psychologist's report, the psychologist

11   says that Mr. Young suffers from particular symptoms,

12   including -- and he reported that he had these perceptual

13   distortions and it might be PTSD, and when the psychologist

14   asked him about his use of drugs, he said, "Well, yeah, I used

15   illicit drugs to cope with insomnia and other psychiatric

16   symptoms."

17          We had evidence, and the Court said that it wasn't

18   going to come into evidence for the trial, but that he's been

19   using steroids since 2004, and the search of his house in 2016,

20   we found steroid equipment.  It happens to be that depression

21   and suicidality are the most common long-term neuropsychiatric

22   side effects of the use of -- long-term use of anabolic

23   steroids.  I have a peer-reviewed study that talks about that

24   which I'll pass up to the Court.  This is not something --

25          THE COURT:  Mr. Van Roekel?

1        MR. KROMBERG:  This is something that had it been

2   mentioned to the psychologist, might have made a difference.

3   Long-term use of steroids leads to paranoia, leads to

4   depression, leads to insomnia.

5        But even more than that, the Court has these letters,

6   and it's awful what happens to Mr. Young's family as a result

7   of Mr. Young.  I mean, it's terrible, but what he told his

8   family, he had his family submit letters based on lies.

9        MR. SMITH:  Objection.

10       THE COURT:  Mr. Smith, how many times have I told you

11  you have to stand up when you speak to the Court?  And this is

12  a sentencing hearing.  You'll be able to rebut anything that's

13  said.

14       MR. KROMBERG:  Robert Rohrbach, Jr.'s letter to the

15  Court:  "I met the defendant in 2016.  He told me the full

16  story.  The crime itself was him having compassion for a man

17  who wanted to call his family and buy that man a phone card."

18       The defendant's mother:  "Finally, after doing

19  nothing about Mo's request for Google Play cards, he started to

20  receive e-mails from Mo pleading for them so he could call his

21  family members.  Only then did Nicholas finally purchase them."

22       Geraldine Scalia:  "He thought he was doing something

23  helpful, enabling someone to call his sick parents."

24       Philip Scalia:  "He fell for Mo's sad story about a

25  pregnant wife and poor mother."

12

1         Where could that story have come from?  Because this

2    is not a case where there's a confidential informant who tells

3    one story and the defendant who tells another.  This is, this

4    is a case where every single communication between Mo and the

5    defendant was written down and introduced into evidence, every

6    single one.

7         MR. SMITH:  Objection, Your Honor.  There were

8    actually many communications that were never produced by

9    government, and there has been a suspicion of spoliation, which

10   we can present to Your Honor, but --

11        THE COURT:  No, we don't need to go into that.

12        MR. KROMBERG:  The text -- the Threema text messages

13   when Mo said, "Can you please send the gift cards?" was very

14   clear.  "We have lost a lot of fighters recently, and we need

15   to bring in more, and we need Threema apps so we can

16   communicate with them."  That -- there was nothing about

17   calling families, not a word, and the defense knows it.

18        And yet the defense even now submits letters from the

19   family members saying, oh, this was about enabling Mo to call

20   his family.  That's cynical, and it's manipulative, and it

21   means that the defendant has not accepted responsibility for

22   his actions.

23        So, Judge, when the Court imposes sentence on the

24   defendant, he should be punished for his obstruction of justice

25   in December of 2015, trying to protect an ISIS fighter from

1   being found by the U.S. government; in November 2014 for trying

2   to protect himself from being found for having helped the ISIS

3   fighter; in February 2012 for trying to thwart an FBI

4   investigation into an al Qaeda plot to bomb the U.S. Capitol;

5   and in July 2016 for trying to send gift cards to ISIS so they

6   can bring more fighters to ISIS.

7          The defendant was a police officer, sworn to protect

8   people in this community.  He did the opposite, and he should

9   be punished for it.

10         Thank you, Your Honor.

11         THE COURT:  All right.  Ms. Moreno?

12         MS. MORENO:  May it please the Court, Your Honor.

13         THE COURT:  Yes, ma'am.

14         MS. MORENO:  We're not here to relitigate the case.

15  I wanted to make some general comments to the Court.  I know

16  this Court has read all the letters, including Mr. Young's

17  letter, including every single motion that was filed, and paid

18  close attention to the trial.  The defense obviously has a

19  different view of what happened and why Nicholas Young did what

20  he did, and nonetheless, we stand convicted.

21         I'm not going to get into a debate with the

22  prosecutor about motives, but it is clear and the evidence was

23  brought out that what he did was send gift cards to someone he

24  thought was his friend.  Of course, this was not true.  And

25  this was a misguided, one-sided friendship, and he made a

1    terrible mistake.

2            And in the context of what was going on in the

3    back-and-forth, if the Court remembers, Mo was talking about

4    many things, including his pregnant wife, the death of children

5    that he was seeing in the conflict, etc.  This is context; this

6    is not an excuse.  And I think the Court has to look

7    holistically at this.

8            We do say that this was also borne out of Nick

9    Young's source of loneliness and connecting to another guy with

10   a history and experience and love of the military.

11           Who is Nick Young, Your Honor?  And that's who we

12   would like you to focus on in this case.  You can see part of

13   it through his own letter, which we believe -- I will tell you

14   as a defense lawyer who's been doing this for a long time, I

15   thought it was one of the best letters I've read, the most

16   sincere.  He -- it's contrite.  It's a recognition of the lack

17   of good judgment.  It's a confession of his shame.  It tries to

18   give context to what he did, and it tells the Court he hopes

19   that there is hope after this sentencing.  And it also asserts,

20   I think most importantly, his love for this country, no matter

21   what the government can argue.

22           Judge, this is not a typical terrorism case where we

23   see around the United States the facts of defendants talking

24   about their hatred of America, their encouraging violence

25   against American citizens.  You know, some of this, I believe,

1   could rise to the level of criticism of foreign policies on

2   which we all disagree.  Some of the language certainly was

3   rhetoric, provocative, inflammatory, but given who Nick Young

4   was for the last almost four decades, his involvement in school

5   in the ROTC program, I, I think that there's no question that

6   when Nick Young says that he loves his country, that we should

7   believe him, and that when he says he made a terrible mistake

8   and he is willing to pay for that mistake, we should believe

9   him, too.

10          Sufficient but not greater than.  So he's lost a lot

11   already.  He acknowledges that in his letter, Your Honor.  The

12   question is how long -- how much longer in prison is sufficient

13   but not greater, but not greater than.

14          We can also glean who Nick was from the character

15   letters that were submitted on his behalf, letters of enduring

16   lifetime friendships, not people who met him 5 years ago but 25

17   years ago, 30 years ago, his elementary school principal, law

18   enforcement officers who thankfully at this point came forward

19   and told the Court what he was really like on the job.

20          And, Judge, he shouldn't be sentenced and punished

21   because he was a law enforcement officer.  He served with

22   distinction for ten years before he made this terrible mistake.

23   We say to the Court you should take that into consideration and

24   credit him for that.

25          Representing Nick Young for me has been a privilege.

1   Since Dr. Al-Arian's case 15 years ago, I've done a lot of

2   these cases around the country and consulted on numerous

3   terrorism cases here and the United Kingdom, and Nick stands

4   out, Judge.  He stands out to me as a client.  I'm not going to

5   relitigate all the things that are not in this case that we see

6   in all these other cases that I've personally seen as a defense

7   lawyer:  no real connection to a foreign terrorist

8   organization, traveling to fight not for a terrorist

9   organization, which is the insinuation for -- by the

10  government.

11          He doesn't fit the profile, Judge.  He doesn't fit

12  the profile that we too often see.

13          And I will say this:  Reading the government's

14  sentencing brief was a bit troubling to me because I will

15  assert to the Court that in conversations I had with learned

16  counsel across the table when we talked about this case, that

17  Mr. Kromberg actually made the comment that he thought it was a

18  two-year sentencing case.  That was at a certain point in the

19  case, but I thought it was interesting to me that that comment

20  was made at a time when he knew all the worst facts about

21  Nicholas Young, all the case history much better than I did

22  because I was brought in late to the case, as the Court well

23  knows.

24          So when I read the government's sentencing brief, I

25  thought, well, I don't know, they're not asking for a

1    particular number, but they're sort of leaving, leaving it out

2    there that the Court should just throw away the key on Nick

3    Young.  That's exactly what Your Honor should not do.

4          Not even the PSR assigns a significant value to a

5    betrayal of trust in terms of the fact that he was a law

6    enforcement officer and perhaps violated his, his mandate,

7    which he didn't do, Judge.  We say he didn't do that.

8          "Wisdom comes alone through suffering," Aeschylus.

9    Mr. Young has suffered.  He will continue to suffer his whole

10   life.  We ask that it not be greater but just sufficient, and

11   we ask for a significant downward variance.  Thank you.

12         THE COURT:  All right.  Mr. Young, come up to the

13   lectern.  This is your chance to say anything you would like

14   the Court to consider.  I have read your letter several times,

15   but obviously, you have a right to say anything else you'd like

16   the Court to consider.

17         THE DEFENDANT:  Yes, Your Honor.  I'll keep this

18   short.  You know, the prosecution's brought up quite a few

19   times about the amount of body armor I had in my house.  All

20   but one of those pieces was purchased after they had already

21   expired, after they had already expired.  The dates that are on

22   them are from, like, the mid-'90s.  It's -- they just don't

23   have the same use, you know, being so old.  You know, it's for

24   collector's value.

25         The important thing I'd like to say is that when I

1    declined the government's offer to spy on other Muslims in the

2    mosque, I had offered them services that I thought were more

3    important than that.  They declined.  That's in their

4    paperwork.  And it would have been at significant risk to

5    myself, and I was never contacted about that again after I made

6    the offer.

7         All I'd like to say now is I'm very sorry for letting

8    my friends down, letting my family down.  Those people in my

9    life deserved better from me, and they'll get better from me.

10        That's all, Your Honor.

11        THE COURT:  All right.  Well, Mr. Young, you present

12   a very difficult case for the Court because on the one hand,

13   you strike everybody as a very mild-mannered person.  You've

14   represented yourself as a patriot, that you've been devoted to

15   the United States, and that you are not a risk.

16        The problem the Court has is, you know, we can't look

17   inside a human being and really judge what is true.  As I told

18   the jury at the end of the trial, it's never easy sitting in

19   judgment of another human being, but that's what some of us

20   have to do, and so I have to look at the evidence before me,

21   and I have to draw what would be considered in my view

22   reasonable inferences from that evidence, and one of the -- two

23   of the main concerns in sentencing is -- are deterrence.  We

24   want to deter an individual from reengaging in the criminal

25   activity and also send messages to others who might be thinking

1    about engaging in such activity.

2         But if you think about why do we worry about

3    deterrence, we worry about deterrence because we're concerned

4    about protecting the community from future similar criminal

5    conduct.  Your case is particularly troublesome because we not

6    only have the specific crimes for which you were convicted, but

7    there's this other additional evidence that strikes the Court

8    as indicating that there is a real danger from someone like

9    yourself.

10        The amount of weaponry and armament you had in your

11   home differentiates your case from that of Qamar, for example.

12   The number of firearms, 18,000 rounds of ammunition, 60

13   knife-type instruments, some of which were of polymer, which

14   means they could get by a lot of metal detectors, and those

15   were not one-inch pocket knives, the fact that you had

16   grenade-related and explosive-related items in your home,

17   videos on how to make a bomb, that kind of stuff is very, very

18   troubling to the Court.

19        When you combine that type of weaponry in your home,

20   whether you're calling it for collecting purposes or not, I

21   still have to look at that as real.  Then we have the issue of

22   now mental health, which, of course, can be a very dangerous

23   component when combined with weaponry.

24        We have the uncontested evidence that you were a

25   consumer of very violent videos.  The government submitted

1    several of those pieces of evidence.  You had bookmarked ISIS

2    videos assassinating people, and then we have the rhetoric.

3    Whether it was meant in jest, whether it was not intended to be

4    real, we still have your own words both in e-mail messages and

5    then through the testimony of Khalil and Mo.

6              You definitely had animosity towards the FBI.  Now,

7    the FBI is not equivalent to the United States of America, but

8    many people consider it, you know, our bastion federal law

9    enforcement agency, and that anti-FBI animus coupled with these

10   other factors is another indicator that someone may, in fact,

11   be posing a real threat.

12             All of these things combined, plus, unlike many of

13   these cases we have involving material support where the

14   government has been involved, you did take two trips to Libya.

15   And, you know, it's interesting that during the trial, you

16   know, you introduced photographs that made it look like it was

17   almost like a tourism visit, but your psychologist now, as the

18   government pointed out, says you may have posttraumatic stress

19   syndrome from what you experienced in Libya.

20             All that goes into the mix that the Court has to

21   consider in determining what is the appropriate sentence here,

22   and having considered those various factors, I'm satisfied, and

23   it's still going to be a variant sentence, that a sentence of

24   180 months in the custody of the Bureau of Prisons, with credit

25   for time served, to be imposed concurrently on Counts 1, 2, and

1   4, is sufficient but not greater than necessary to achieve the

2   purposes of 3553(a).

3          When you've finished the 180-month sentence, you'll

4   serve fifteen years of supervised release on Count 1 and three

5   years of supervised release on Counts 2 and 4.  The supervised

6   release on Counts 2 and 4 is concurrent with each other and

7   concurrent with the 15 years on Count 1.

8          Now, in terms of the conditions of supervision, you

9   must first of all be of uniform good behavior, which means you

10  cannot violate any federal, state, or local laws.  Do you

11  understand that?

12         THE DEFENDANT:  Yes, Your Honor.

13         THE COURT:  Secondly, you have to follow all the

14  conditions of supervision, which will be printed on the

15  judgment order and explained to you by the Probation Office.

16  Do you understand that?

17         THE DEFENDANT:  Yes, Your Honor.

18         THE COURT:  As additional and special conditions of

19  supervision, you are first of all required to submit to such

20  drug testing, because you must be drug free, so you'll have to

21  submit to such drug testing and such in- or outpatient drug

22  treatment as directed by the Probation Office.  You'll be

23  required to pay the costs for the testing and treatment to the

24  extent that you are able, and you will have to waive any

25  privacy rights that you have to the drug testing program so the

1    Probation Office can monitor your compliance.

2              Do you understand that?

3              THE DEFENDANT:  Yes, Your Honor.

4              THE COURT:  Secondly, you must satisfactorily

5    participate in such mental health evaluation and treatment,

6    including the taking of any medication or any in- or outpatient

7    treatment, as directed by the Probation Office.

8              Do you understand that?

9              THE DEFENDANT:  Yes, Your Honor.

10             THE COURT:  Again, you'll be required to pay the

11   costs to the extent you are able, and you will have to waive

12   any privacy rights that you have so that the Probation Office

13   can monitor your progress.  Do you understand that?

14             THE DEFENDANT:  Yes, Your Honor.

15             THE COURT:  You are barred from having any

16   communications whatsoever, and that means in person, by

17   telephone, e-mail, etc., with any known terrorists or terrorist

18   organizations.  Do you understand that?

19             THE DEFENDANT:  Yes, Your Honor.

20             THE COURT:  And lastly, you'll have to comply with

21   the requirements of the computer monitoring program of the

22   Probation Office, and you will have to consent to the

23   installation of computer monitoring software on any software --

24   any computer to which you have access, and that will be

25   performed by a Probation Office, and there will be restrictions

1   on what you can do on your computer.  There will be a notice

2   placed on the computer at the time of installation to warn

3   others of the existence of the monitoring software, and you'll

4   have to notify others of the software monitoring.

5            Do you understand that?

6            THE DEFENDANT:  Yes, Your Honor.

7            THE COURT:  And you'll not be able to remove or

8   tamper with that in any respect.

9            The Court finds based upon your financial situation

10  that you don't have the costs for incarceration, any other

11  costs of supervision, or the statutory fines.  However, there

12  are $300 of special assessments that must be made.

13           Do you understand that?

14           THE DEFENDANT:  Yes, Your Honor.

15           THE COURT:  Was there any forfeiture in this case,

16  Mr. Kromberg?

17           MR. KROMBERG:  There was not, Your Honor.

18           THE COURT:  All right.  Now, because you pled not

19  guilty and went to trial, you have a right to appeal both your

20  convictions and your sentence.  If you plan to file an appeal,

21  such appeal must be noticed within 14 days of today's date.

22           You have the right to be represented by counsel

23  during your appeal.  If you are unable to afford appellate

24  counsel, you'll need to apply to the Court of Appeals, the

25  Fourth Circuit, to have counsel appointed for you, and they

1    will appoint counsel for you.

2            Do you understand?

3            THE DEFENDANT:  Yes, Your Honor.

4            THE COURT:  Now, was there any request in terms of a

5    recommendation for a facility?

6            MR. SMITH:  Your Honor, we would -- we were about to

7    ask for a prison camp in Virginia --

8            THE COURT:  Well, I'm not going to put a camp for

9    this type of an offense.  I will recommend a facility as close

10   to this area as possible, all right?

11           MR. SMITH:  We would request a minimum security

12   facility.

13           THE COURT:  I will recommend to the Bureau of Prisons

14   a facility as close to this area as possible.

15           MR. SMITH:  Thank you.

16           THE COURT:  It's up to the Bureau of Prisons to make

17   those decisions.

18           Was there anything further from the United States?

19           MR. KROMBERG:  Judge, in the condition of supervised

20   release, could the defendant be required to notify the

21   probation officer if he's going to possess more than personal

22   use quantities of body armor or cutting instruments?  Because

23   it just seems that 70 pieces of body armor is not necessary for

24   someone on supervised release, but maybe he has a right to

25   something, but not enough to --

1          THE COURT:  Well, all right.  I mean, obviously, the

2    law now is he cannot possess any firearms.

3          MR. KROMBERG:  Or ammunition.

4          THE COURT:  I'm going to add weapons or any weapons

5    of destruction or any significant knives.  I mean, you know,

6    you can cook but some of these knives.

7          MR. KROMBERG:  And I think the body armor may be more

8    troubling than the -- than even some of the knives, Judge.

9          THE COURT:  I can't see any reason for body armor.

10   I'll include that, yes.

11          All right, anything further?

12                    (No response.)

13          THE COURT:  The defendant is remanded.  Thank you.

14          MR. KROMBERG:  Thank you, Your Honor.

15                    (Which were all the proceedings

16                     had at this time.)

17

18             CERTIFICATE OF THE REPORTER

19      I certify that the foregoing is a correct transcript of

20   the record of proceedings in the above-entitled matter.

21

22

23              _____
                          /s/
24                  Anneliese J. Thomson

25