1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION


UNITED STATES OF AMERICA      .      Criminal No. 1:16cr265
                              .
     vs.                      .      Alexandria, Virginia
                              .      December 11, 2017
NICHOLAS YOUNG,               .      2:00 p.m.
                              .
            Defendant.        .
                              .
. . . . . . . . . . .


TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

VOLUME I


APPEARANCES:

FOR THE GOVERNMENT:              JOHN T. GIBBS, AUSA
                                 GORDON D. KROMBERG, AUSA
                                 EVAN N. TURGEON, SAUSA
                                 United States Attorney's Office
                                 2100 Jamieson Avenue
                                 Alexandria, VA 22314


FOR THE DEFENDANT:               NICHOLAS D. SMITH, ESQ.
                                 David B. Smith, PLLC
                                 108 North Alfred Street
                                 Alexandria, VA 22314
                                   and
                                 LINDA MORENO, ESQ.
                                 Linda Moreno P.A.
                                 511 Avenue of the Americas
                                 No. 2
                                 New York, NY 10011


ALSO PRESENT:                    SA NICHOLAS CASLEN
                                 NICHOLAS ENNS
                                 FABIAN VERA


(Pages 1 - 153)

2

INDEX

OPENING STATEMENTS BY:

  MR. KROMBERG                                         121
  MS. MORENO                                          135


WITNESS                          EXAMINATION      PAGE




JURY PANEL QUESTIONING:

   THE COURT                                            3


COURT'S PRELIMINARY INSTRUCTIONS

   THE COURT                                          106

1            NOTE:  The case is called to be heard in the presence

2   of the jury panel as follows:

3   JURY PANEL IN

4            THE CLERK:  Criminal case 16-265, the United States

5   of America versus Nicholas Young.  This case comes on for trial

6   by jury.

7            Will counsel please note their appearances for the

8   record.

9            MR. KROMBERG:  Good afternoon, Your Honor.  Gordon

10  Kromberg, John Gibbs, and Evan Turgeon for the United States.

11            With us at the second counsel table is FBI Special

12  Agent Nicholas Caslen and paralegal specialist Mr. Fabian Vera.

13            THE COURT:  Good afternoon.

14            MR. SMITH:  Good afternoon, Your Honor.  Nicholas

15  Smith for defendant Nicholas Young.  With me is Ms. Linda

16  Moreno as counsel.

17            MS. MORENO:  Good afternoon.

18            MR. SMITH:  And we also have a paralegal here, who is

19  another Nicholas, Nicholas Enns.  So we have four Nicholases in

20  this case.

21            MS. MORENO.  Thank you, Your Honor.

22            THE COURT:  Good afternoon.

23            MS. MORENO:  Good afternoon.

24            THE COURT:  And good afternoon, ladies and gentlemen.

25  Thank you very much for being at court this afternoon.

1          You are being considered for service on a jury that

2   is going to hear a criminal case brought by the United States

3   of America versus the defendant, Nicholas Young.

4          Now, this is the time of the trial called voir dire,

5   that's the technical legal term basically for jury selection.

6   We are going to choose 14 of you to act as the jury in this

7   case.

8          Now, if you are selected to be a juror, I want you to

9   think about yourself as if you were a judge, just like me.  I

10  can't give each of you a black robe to wear while you're

11  sitting in the jury box, but that is the role that you are

12  going to play because jurors are judges, specifically you are

13  judges of the facts of the case.

14         Now, you know yourself that if you had to be in court

15  in front of a judge, you would want to make sure that that

16  judge didn't have any preconceptions, any biases, or any ideas

17  about the case that might taint his or her decision making.

18  And that's the background that we have for asking the questions

19  that we're going to ask you today.

20         Now, I ask the questions, and I am going to use the

21  word "you" in the question, but as you think about the question

22  I want you to apply it not just to yourself individually, but

23  also to any of your immediate family members or close personal

24  friends.

25         Now, if you think that you do have an answer to the

1  question, the procedure will be for you to raise your hand, you

2  will need to stand and state your name, and then we will have a

3  discussion about the question and your answer.

4         If at any point there is something that you feel is

5  very personal and sensitive and you don't want to raise it in

6  front of everybody in the courtroom, the procedure is for you

7  to ask to approach the bench.  You will then come up on this

8  side, and the prosecutors will follow you.  My court reporter

9  has to get up here first.  So you have to wait for him or her,

10  I have two different court reporters working on this case, to

11  come up first.  And then we will have the juror come up, and

12  the prosecutors on the other side, the defense team comes up,

13  and we will have a private conversation with you.

14         Now, any time I am having what is called a bench

15  conference, because this is the bench, we put on that funny

16  white noise machine.  And that is meant to block your hearing

17  of what's going on up here, but it's also difficult for us to

18  hear over that machine.  So it's really important, whenever we

19  have a bench conference, whether it's during voir dire or

20  during the trial itself, you can stand up and stretch, move

21  around a little bit, but if you start to talk, it creates too

22  much other noise in the courtroom.

23         Now, our first order of business is going to be to

24  call attendance.  When you hear your name called, please stand

25  and say "here" or "present," and then you may have a seat.

6

1          NOTE:  The jury panel is called and sworn.

2          THE COURT:  All right, ladies and gentlemen, now I am

3     going to give you a very brief overview as to what the issues

4     are in this case.  And the first question I am going to be

5     asking you is whether you think you may have seen, read, heard,

6     or know anything at all about this case?

7          Nicholas Young, the defendant, is a former police

8     officer with the Washington Metro Transit Authority and has

9     been charged with three counts.  Count 1 alleges that between

10    December 3, 2015, and August 2, 2016, in Fairfax County, within

11    this district and elsewhere, that he knowingly and unlawfully

12    attempted to provide material support and resources to ISIL,

13    that is the Islamic State of Iraq and the Levant, a group

14    designated as a foreign terrorist organization, or FTO.

15         And more specifically, the Government alleges that

16    the defendant attempted to provide this support by providing

17    misleading information to the Federal Bureau of Investigation

18    about the location of a person known to him as Mo and whom

19    Young believed had traveled from the United States to Syria to

20    join ISIL.

21         In addition, the Government alleges that Young

22    provided gift cards and gift card codes to Mo, whom he believed

23    would use those gift cards and gift card codes to help ISIL

24    recruit members.

25         In Count 2 he is charged with obstruction of justice.

1    Specifically that between December 3 and 5 of 2015 in Fairfax

2    County, he knowingly, unlawfully, and corruptly attempted to

3    obstruct an official proceeding by attempting to deceive FBI

4    investigators as to the destination and purpose of a trip made

5    by Mo, who Young believed had traveled from the United States

6    to join Syria -- I'm sorry, had traveled from the United States

7    to Syria to join ISIL.

8         And in Count 3, he is charged with another count of

9    obstruction of justice, this time involving a text message that

10   he sent on November 20, 2014, to a cell phone he believed was

11   used by Mo in an attempt to make it falsely appear to the FBI

12   that Mo had left the United States for a vacation tour in

13   Turkey, whereas he believed that Mo had gone to Syria to join

14   and fight for ISIL.

15        The defendant denies that he is guilty of these

16   charges and will argue that he lacked any predisposition to

17   commit the charged crimes and instead was induced by the

18   Government to do what he did.  Specifically, he will argue that

19   Khalil, whom he met in 2010, and later Mo, were at all times

20   paid agents of the federal government.  And that but for Khalil

21   and Mo befriending him, none of the conduct for which he is

22   charged would have occurred.

23        Now, there has been some publicity about this case.

24   Last week there were publications both online and in the Sunday

25   portion of the Washington Post about this case.  There has also

1   I think been some other online information about it over the

2   past several months.

3            I want to know whether any of you believe you have

4   seen, heard, read, or in any respect think you might know

5   something about this case?

6            If you have such an answer, you need to raise your

7   hand.  And I am going to start -- I have to point to you, it is

8   very rude, but we do it this way.  And I am going to start on

9   the left.

10           So in the first row on the left, there is no -- yes,

11   sir, your name, please.

12           JUROR DIAZ:  Ariel Diaz, juror 18.

13           THE COURT:  Wait, you have to speak slowly so I can

14   hear you.  What's the last name?

15           JUROR DIAZ:  Diaz, number 18.  I just listened to the

16   news and I heard on the news about Nicholas Young.

17           THE COURT:  And that was recently?

18           JUROR DIAZ:  I'm sorry?

19           THE COURT:  Was that recent?

20           JUROR DIAZ:  I guess I listened to maybe within the

21   past week.

22           THE COURT:  Now, is there anything you heard in that

23   news broadcast that you think has tainted your mind?

24           In other words, do you feel you have made up your

25   mind about any of the issues in this case from what you heard

1    on the news?

2              JUROR DIAZ:  Only that --

3              THE COURT:  Well, I don't want to know what you

4    heard.  But I just want to know, do you think it might have

5    affected how you would think about this case?

6              JUROR DIAZ:  I don't know, actually.  I just heard it

7    and just knew he was on a sting operation.

8              THE COURT:  All right.  But again --

9              JUROR DIAZ:  I don't have -- yeah, I mean, without

10   seeing, hearing all the specifics, I can't really say.

11             THE COURT:  Have you made -- do you think you have

12   made up your mind about any issues?

13             JUROR DIAZ:  No.

14             THE COURT:  All right.  Thank you, Mr. Diaz.

15             Now, the lady behind you -- yes, ma'am, your name,

16   please.

17             JUROR BARRETTE:  Kristin Barrette.

18             THE COURT:  Hold on, we have to find you on the list.

19   All right.  How do you spell the last name?

20             JUROR BARRETTE:  Kristin Barrette, B-a-r-r-e-t-t-e.

21             THE COURT:  Number 4.  All right.  Yes, ma'am.

22             JUROR BARRETTE:  I am not entirely certain that this

23   is the same case, but there is actually a gentleman who was

24   arrested in my former neighborhood for something

25   extraordinarily similar.  And if that's the case --

1       THE COURT:  Do you live in Alexandria?

2       JUROR BARRETTE:  No.  I used to live in Fairfax.

3       THE COURT:  In the Alexandria section of Fairfax?

4       JUROR BARRETTE:  No, ma'am.

5       THE COURT:  All right.

6       JUROR BARRETTE:  It was on Heron Ridge Drive in

7  Fairfax.

8       THE COURT:  That's not this defendant.  But do you --

9  is it?  It is.  All right.

10      Do you feel that might affect your ability to judge

11  this case?

12      JUROR BARRETTE:  Well, uhmm --

13      THE COURT:  This is a very hard question to answer,

14  but you really do need to think about it very carefully.  If

15  you feel that, you know, there was neighborhood talk about it

16  or whatever -- I mean, if you think that could affect you, then

17  you need to tell us that, Ms. Barrette.

18      JUROR BARRETTE:  Given that I was familiar with this

19  man prior to this taking place, I think there is a chance that

20  might be the case.

21      THE COURT:  All right.  Thank you, Ms. Barrette.

22      Anybody else on the left side?  Yes, ma'am, in the

23  second row.  Your name, please.

24      JUROR CHOI:  Kyou-Bin Choi.  Last name Choi, C-h-o-i.

25      THE COURT:  All right.  You will just have to speak

1    as loud as you can because we have to hear you, Ms. Choi.  Yes,

2    ma'am.

3                JUROR CHOI:  I just heard the news about it, that's

4    why the name is familiar.

5                THE COURT:  Is there anything about what you heard in

6    the news article that you think could affect your ability to

7    judge this case fairly?

8                JUROR CHOI:  Probably not.  I didn't think much about

9    it.

10               THE COURT:  You didn't think much about it?  All

11   right.  Thank you, Ms. Choi.

12               There were other hands over here on the left.  Near

13   the wall -- yes, whoever's hand is near the wall.  Yes, sir.

14               JUROR DAVIS:  Yes, Ken Davis, juror 17.  Just vaguely

15   familiar with the case.

16               THE COURT:  I'm sorry, you're Mr. Davis?

17               JUROR DAVIS:  Yes.  I am just vaguely familiar with

18   the case from the newspaper.  Not so much with the details.  So

19   I don't think there is anything that would impair or influence

20   my judgment on the case.

21               THE COURT:  You haven't made up your mind about any

22   issue?

23               JUROR DAVIS:  No, ma'am.

24               THE COURT:  All right.  Thank you, Mr. Davis.

25               There are some more folks back there.  Yes, your

1   name, sir.  Next to Mr. Davis.  Yeah.

2           JUROR EVANS:  Betty Evans.  I read it in the

3   Washington Post, but there was nothing in it that I think would

4   really influence my judgment.

5           THE COURT:  Was it the Sunday Post?

6           JUROR EVANS:  Probably.

7           THE COURT:  All right.  But again, nothing in the

8   article particularly struck you such that you think you've made

9   up your mind about anything?

10          JUROR EVANS:  No, because I thought trial had already

11  started --

12          THE COURT:  I'm sorry, you thought the trial had

13  already started?

14          JUROR EVANS:  The trial had already started, so I

15  didn't think much about it.

16          THE COURT:  All right.  Thank you, Ms. Evans.

17          There are some more folks.  Way in the back, yes,

18  sir, your name.  At the very back.

19          JUROR GHOSE:  Devajyoti Ghose.  I have heard of the

20  case in general terms, not this last piece, but earlier, I

21  believe.  At this time it's hard to say whether it could have

22  affected my judgment or not.

23          THE COURT:  Well, do you think it's possible that it

24  may have affected your judgment, that you might have pre-

25  decided any issues?

1              JUROR GHOSE:  Not pre-decided, no.

2              THE COURT:  Or have any feelings or beliefs about the

3     case?

4              JUROR GHOSE:  I generally do like to read about

5     things related to ISIL and so forth, but not relating to this

6     specific case.

7              THE COURT:  All right.  Thank you, Mr. Ghose.

8              There were some other folks.  Yes, sir, your name.

9              I'm sorry, I have to point to you.  Yes, ma'am.

10             JUROR FONTENETTE:  Shawn Fontenette, juror number 24.

11             THE COURT:  Yes, ma'am.

12             JUROR FONTENETTE:  I recently read about it in the

13    Washington Post, as well as heard about it on the news this

14    morning.  And I believe I read an article online from the

15    Washington Post.

16             THE COURT:  So you have had a fair amount of exposure

17    then, Ms. Fontenette?

18             JUROR FONTENETTE:  Yes.

19             THE COURT:  From what you've read or heard, do you

20    feel it would be difficult for you to be impartial as a juror

21    in this case?

22             JUROR FONTENETTE:  Yes.

23             THE COURT:  All right.  Thank you, Ms. Fontenette.

24             There is I think one other person.  Yes, your name,

25    please.

1           JUROR ELSBURY:  William Elsbury.

2           THE COURT:  The last name?

3           JUROR ELSBURY:  Elsbury, E-l-s-b-u-r-y.

4           THE COURT:  Yes, sir.

5           JUROR ELSBURY:  If this is the same officer that was

6   earlier, maybe last year or months ago was in the news.

7           THE COURT:  Yes.

8           JUROR ELSBURY:  Where he was fired from --

9           THE COURT:  Well, in any case, you've heard some --

10          JUROR ELSBURY:  I have heard, yes.  I heard a little

11  bit more recently as well.

12          THE COURT:  That is correct.  Is there anything that

13  you've heard or seen that you think could affect your ability

14  to judge this case impartially?

15          JUROR ELSBURY:  The only thing that really struck me,

16  it seemed like there was something about finding additional

17  weapons at his home or something like that.  I don't remember.

18          THE COURT:  You think that that would make it

19  difficult for you to be impartial in judging the case?

20          JUROR ELSBURY:  Perhaps, yeah.

21          THE COURT:  All right.  Thank you, Mr. Elsbury.

22          Anybody else on the left side?

23          All right, now in the center, let me start in the

24  first row.  On the aisle, yes, sir, your name, please.

25          JUROR McCRAVE:  Michael McCrave.  Probably when the

15

1    case --

2            THE COURT:  Wait, wait, just slow down one second.  I

3    have got to get your name.

4            JUROR McCRAVE:  McCrave.

5            THE COURT:  Yes, Mr. McCrave.

6            JUROR McCRAVE:  Probably when the case came out a

7    year or plus ago, read about it, heard about it.  But nothing

8    of it at this moment would influence my judgment.

9            THE COURT:  You haven't made your mind up about any

10   of the issues in the case?

11           JUROR McCRAVE:  No, ma'am.

12           THE COURT:  All right.  Thank you, Mr. McCrave.

13           And then there is a lady in the first row.  Yes,

14   ma'am, your name, please.

15           JUROR LAYTON:  Georgianna Layton.

16           THE COURT:  Yes, Ms. Layton.

17           JUROR LAYTON:  I'm not sure if this is even the case,

18   but this morning I heard on Channel 7 News, they were talking

19   about a police officer with ISIS, they think connection, and

20   that the jury selection was going on today.

21           THE COURT:  That's what this case is.

22           JUROR LAYTON:  Yeah.  I asked my husband, did you

23   hear the name?  And he goes, no.  And I said, I wonder if

24   that's me.

25           That's it, that's as far as --

1          THE COURT:  Ms. Layton, is there anything about that

2    situation that you feel might make it hard to be an impartial

3    juror?

4          JUROR LAYTON:  No, because I didn't even know his

5    name.

6          THE COURT:  All right.

7          JUROR LAYTON:  I just heard the situation.

8          THE COURT:  Thank you.  Now, folks, let me just say

9    for a second, we all just laughed, all right.  And I always

10   tell this to jurors so that you understand the context in which

11   humor may occur in a trial.  This is a very serious criminal

12   case, but even in the most serious things that we do in life,

13   there are times when, as human beings, something funny happens

14   and we all laugh.  It doesn't mean it's not a serious

15   enterprise.

16         And I always -- some of you, I am sure, go to the

17   theater.  If you have ever seen the play Hamlet, it's the most

18   serious tragedy in the English language, and right in the

19   middle of this deep, dark tragedy there is slapstick humor.

20   And Shakespeare did that to break up the tension.

21         So if from time to time we have a moment like this

22   where, as human beings, we all just laugh, it doesn't mean that

23   this is not a very serious trial.  And it doesn't mean that the

24   lawyers, or the judge, or the jury is not taking it seriously.

25   So I want you to understand the context of that.  All right?

1          Now, is there anybody else in the first row?

2          Now, in the second row, I see more hands going up.

3    Yes, your name, sir.

4          JUROR RENAUD:  My name is John Renaud, juror 67.

5          THE COURT:  Yes, sir.  Have you --

6          JUROR RENAUD:  I heard about this in generalities at

7    the time of the original arrest, but not in any of the

8    particulars.

9          THE COURT:  Was there anything about what you have

10   heard in the past that you feel would make it difficult for you

11   to be an impartial juror?

12         JUROR RENAUD:  No.

13         THE COURT:  Thank you, Mr. Renaud.

14         More people.  Yes, your name, sir.

15         JUROR LARSON:  Dave Larson.

16         THE COURT:  Yes, Mr. Larson.

17         JUROR LARSON:  Yeah, I read about it when the

18   gentleman was first arrested or apprehended.

19         THE COURT:  And not more recently than that?

20         JUROR LARSON:  No.

21         THE COURT:  Is there anything about what you did read

22   that you feel might affect your ability to be impartial?

23         JUROR LARSON:  No.

24         THE COURT:  No?  All right.  Thank you, Mr. Larson.

25         Yes, sir, you're name, please.

1          JUROR KAUFFMAN:  The last name is Kauffman, first

2    name is Thomas.

3          THE COURT:  Is it with a C or a K?

4          JUROR KAUFFMAN:  With a K.

5          THE COURT:  Got you.  Yes, sir.

6          JUROR KAUFFMAN:  Heard about the case several months

7    ago, not the particulars.  Just he was a police officer --

8          THE COURT:  And is there anything about what you read

9    that you think could affect your impartiality?

10          JUROR KAUFFMAN:  No.

11          THE COURT:  All right.  Thank you, Mr. Kauffman.

12          Are there more people who think they have been

13    exposed -- yes, sir, on the aisle, your name, please.

14          JUROR PONTICELLO:  Philip Ponticello.

15          THE COURT:  Can you spell the last name.

16          JUROR PONTICELLO:  P, as in Paul,

17    o-n-t-i-n-c-e-l-l-o.

18          THE COURT:  I have got you.  Number 65, right?

19          JUROR PONTICELLO:  Yes, ma'am.

20          THE COURT:  Yes, sir.

21          JUROR PONTICELLO:  Just saw on Channel 7 this morning

22    about it, and something on Google about it.  And I thought that

23    was maybe the trial, but they never said any more than what you

24    have said this morning about it.

25          THE COURT:  Is there anything about what you either

1   heard or saw on Google or this morning on the news that you

2   think could affect your impartiality?

3                   JUROR PONTICELLO:  No.

4                   THE COURT:  All right, thank you.

5                   Anyone else in the center?  Yes, your name, please.

6                   JUROR OBUCHOWSKI-BERMAN:  Susan Obuchowski-Berman.

7                   THE COURT:  Yes, ma'am.

8                   JUROR OBUCHOWSKI-BERMAN:  I remember hearing about

9   this case, it was probably within the past year.  Nothing very

10  recent.

11                  THE COURT:  Is there anything about what you did hear

12  though that you feel could affect your impartiality?

13                  JUROR OBUCHOWSKI-BERMAN:  No.

14                  THE COURT:  Thank you, ma'am.

15                  Anyone else in the center?

16                  Now, on the far right, over here, is there anybody?

17                  All right, way in the back, yes, sir.

18                  JUROR WINER:  Jonathan Winer.

19                  THE COURT:  Yes, sir.

20                  JUROR WINER:  I saw it on the online Washington Post

21  the last few days.  There were details shared in that article

22  that the Court mentioned today that piqued my interest, points

23  of maybe personal introspections, but I guess it depends upon

24  how it is presented whether or not that would influence me.

25                  THE COURT:  But you did read the online article this

1   past week?

2           JUROR WINER:  Yes, I did.  I don't know what the date

3   was, but it was the Washington Post online in the last few

4   days.

5           THE COURT:  And then, I'm sorry, did you say you then

6   did some research or further --

7           JUROR WINER:  No, it was information in that

8   article --

9           THE COURT:  All right.

10          JUROR WINER:  -- that piqued my interest.

11          THE COURT:  All right.  Thank you, sir.

12          And in the back, yes, your name, please.

13          JUROR WALDRON:  Cory Waldron, juror 87.  I am

14   familiar with the case to the point where I looked into it a

15   little bit when the defendant was first arrested, and am

16   familiar with the Government's accusations based on at least

17   that initial time frame.

18          THE COURT:  And do you feel that you have sort of

19   made up your mind about any issues?  Or do you feel that you

20   would have problems being impartial in judging the case?

21          JUROR WALDRON:  I believe I can remain impartial.

22          THE COURT:  But you have done some research on it?

23          JUROR WALDRON:  Nothing beyond the cursory, like of

24   the arrests.

25          THE COURT:  Well, when you said you did some

1    research, I mean, did you go online and follow --

2              JUROR WALDRON:  Just like Twitter and Web searches.

3    It was mainly an NBC News story.

4              THE COURT:  All right.  Thank you, sir.

5              Is there anybody else?

6              All right.  The next question, ladies and gentlemen,

7    I'm very aware of the fact that we are running into the holiday

8    season, Hanukkah starts this week and we are getting close to

9    Christmas.

10             There is a fair amount of evidence in this case.

11   There is some complicated issues, and it's going to take

12   several trial days.  We're going to work as hard as we can to

13   make this as efficient a trial as possible.

14             But let me give you an approximate idea of the time

15   commitment that this case will involve.  We're going to run

16   until approximately 6 o'clock this evening, and then hopefully

17   start tomorrow morning at 9 o'clock and run to approximately 6.

18             We have a one-hour lunch break around 1 o'clock, and

19   I always give jurors a mid-afternoon and a mid-morning break.

20   And sometimes if the trial is a very complicated trial,

21   sometimes we might even have two breaks in the morning and the

22   afternoon.  It sort of depends on how things are going.

23             We will certainly be in trial all of this week and

24   most likely through Wednesday of next week, it could even go

25   into Thursday.  I cannot imagine it will go past Friday.  But

1    we need jurors who can give us their full time and attention.

2            And that means that if you have any pre-purchased

3    flights or travel plans which can't be changed, you have child

4    care commitments, or work commitments, I know some of you are

5    teachers, that cannot be rearranged, we need to know that now.

6            So let me start again on the left side.  Is there

7    anybody, given that time commitment and the structure of the

8    day, that you feel you could not sit as a juror for this case?

9            Yes, sir, your name again, please.  You are Mr. Diaz?

10           JUROR DIAZ:  Yes, ma'am.  Sorry.  Juror 18.

11   Basically, I'm still in a 16-week supervisory course for my

12   work, and I have classes on the 13th and the 20th.

13           THE COURT:  And you can't miss the classes?

14           JUROR DIAZ:  No, no, especially the last two weeks.

15   And on the 21st it's going to be my son's graduation from

16   George Mason.

17           THE COURT:  All right.  Thank you, Mr. Diaz.

18           Yes, sir, your name, please.

19           JUROR ASIAMA:  Kwami Asiama, number 2.

20           THE COURT:  Yes, sir.

21           JUROR ASIAMA:  I do have travel plans sometime

22   Thursday this week through next week.  That is flexible though,

23   but just to let you know.

24           THE COURT:  When do you need to be leaving?

25           JUROR ASIAMA:  Thursday this week.

```
 1              THE COURT:  I'm sorry?

 2              JUROR ASIAMA:  Thursday this week.

 3              THE COURT:  Thursday of this week?

 4              JUROR ASIAMA:  Yes.

 5              THE COURT:  But how flexible are those plans?

 6              JUROR ASIAMA:  Very flexible.

 7              THE COURT:  Can you postpone that trip for as long as

 8   a week or seven or eight days?

 9              JUROR ASIAMA:  Yes, it can be postponed.

10              THE COURT:  All right.  Thank you, Mr. Asiama.

11              Yes, your name, please.

12              JUROR CLELLAND:  Name is Mark Clelland.

13              THE COURT:  Can you spell the last name.

14              JUROR CLELLAND:  C-l-e-l-l-a-n-d.

15              THE COURT:  Number 14.

16              JUROR CLELLAND:  Yes, ma'am.  I am currently enrolled

17   in college, and I have finals for some of my classes that I

18   have already paid for later this week.

19              THE COURT:  When are your finals?  Are they in the

20   evening or during the day?

21              JUROR CLELLAND:  The first one is scheduled Thursday

22   at 10 a.m.

23              THE COURT:  All right.  Thank you, Mr. Clelland.

24              And, I'm sorry, do you have more than one exam

25   scheduled?
```

24

1          JUROR CLELLAND:  No, just that one Thursday.

2          THE COURT:  Is there -- is there a way of having that

3   continued, or is that not possible in your university?

4          JUROR CLELLAND:  I haven't inquired.  I am not sure

5   about moving that.

6          THE COURT:  Is this an online program, or is it like

7   a George Mason or AU?

8          JUROR CLELLAND:  It is Northern Virginia Community

9   College.  It is an in-person class.

10          THE COURT:  And the semester ends December 22?

11          JUROR CLELLAND:  No.  The last final is this

12   Thursday, like three days from now.

13          THE COURT:  That's the last final?

14          JUROR CLELLAND:  Correct.

15          THE COURT:  Thank you.  All right.

16          Yes, ma'am, against the wall.  Your name, please.

17          JUROR DAOUST:  Andrea Daoust, D-a-o-u-s-t.

18          THE COURT:  Yes, ma'am.

19          JUROR DAOUST:  I recently -- I am a business owner, a

20   small business owner.  I recently changed my business to

21   virtual.  And I haven't worked out all the kinks in it yet.

22          And so, therefore, I am responsible for payroll and

23   everything that happens in terms of the mail, anything incoming

24   and outgoing.  And I have four employees that I'm responsible

25   for.

1          So could I manage it?  Yes, but it would be

2     difficult.

3          THE COURT:  All right.  Thank you, ma'am.

4          Yes, your name again, please.

5          JUROR BARRETTE:  Number 4, Kristin Barrette.

6          THE COURT:  Yes, Ms. Barrette.

7          JUROR BARRETTE:  May I approach the bench, Your

8     Honor?

9          THE COURT:  Actually, I don't think I need to have

10    you do that, but thank you.

11         Okay.  Yes, your name, please.

12         JUROR COTTERMAN:  Bruce Cotterman.

13         THE COURT:  Yes, Mr. Cotterman.

14         JUROR COTTERMAN:  Travel plans on December 22, and

15    they cannot be postponed.

16         THE COURT:  And are they in the morning or in the

17    afternoon?

18         JUROR COTTERMAN:  I think it's 8:30 in the morning.

19         THE COURT:  Okay.  Again, I'm not sure the case will

20    go that long, but we're trying out of an abundance of caution

21    to see how people's schedules are.  Thank you, Mr. Cotterman.

22         Yes, your name, please.

23         JUROR HONG:  Brian Hong.

24         THE COURT:  Spell the last name.

25         JUROR HONG:  H-o-n-g.

1          THE COURT:  Yes, Mr. Hong.

2          JUROR HONG:  So I am a manager in the hospitality

3   industry, and currently right now our specific location is

4   short staffed, so I am actually held responsible to help assist

5   and the rest of the region.

6          THE COURT:  Well, would it be an actual -- is there

7   no one who can take your spot for a week or ten days?

8          JUROR HONG:  No, everyone else is on vacation.

9          THE COURT:  So it would be a hardship for your

10  company?

11         JUROR HONG:  No one would be able to fill the spot.

12         THE COURT:  And this is a hospitality business?

13         JUROR HONG:  Yes.

14         THE COURT:  And this is your busy season?

15         JUROR HONG:  Yes.

16         THE COURT:  Thank you, Mr. Hong.

17         Anybody else on the left side?

18         How about in the center section, anybody in the first

19  row?

20         Yes, ma'am, your name again, please.

21         JUROR EILER:  My name is Ashley Eiler.  I'm a

22  teacher.  I could get a substitute teacher, but it's very

23  problematic for me because I have to drive back to Woodbridge,

24  and then I have to put all my lesson plans in for the next day.

25  So I am still responsible for my lessons even though I'm here.

27

1          THE COURT:  What grade do you teach?

2          JUROR EILER:  Middle school, 6, 7, and 8.

3          THE COURT:  So is this the end of the semester for

4    them too?

5          JUROR EILER:  Yeah.  Well, our quarter ends -- we

6    have to turn in grades on Wednesday.

7          THE COURT:  So in order for a substitute to take over

8    for you, how much prep time would you have to put in?

9          JUROR EILER:  At least an hour or two a day.

10          THE COURT:  Each day?

11          JUROR EILER:  Yeah, just to get the lesson plans

12    prepared and write it all down and leave it.  And then I'd have

13    do grades and things like that too?

14          THE COURT:  And you'd have to do that every single

15    day that you were here as a juror?

16          JUROR EILER:  I would probably have to group them

17    together a little bit, but yeah.

18          THE COURT:  All right.  Thank you, ma'am.

19          Who else in the first row?  Yes, your name, please.

20          JUROR GANTENBEIN:  Alice Gantenbein.  Juror number --

21    I don't know.

22          THE COURT:  27, does that sound right?

23          JUROR GANTENBEIN:  That sounds right.

24          THE COURT:  Good.

25          JUROR GANTENBEIN:  I'm also a teacher, seventh grade

1   life science.  I have a field trip with 38 students on Friday.

2   There is no one to take them if I don't go.  Not that I am

3   looking forward to going with 38 kids outside.

4           THE COURT:  All right.

5           JUROR GANTENBEIN:  I also am enrolled in two classes,

6   one of which meets at 4:30 tonight.

7           THE COURT:  All right.  Thank you, ma'am.

8           Yes, your name, please.

9           JUROR FRISCHKORN:  Yes, Susan Frischkorn.

10          THE COURT:  Yes, ma'am.

11          JUROR FRISCHKORN:  I'm a teacher also.  I'm the only

12  K-5 teacher, instructional technology teacher.  When I'm out,

13  they don't get a sub.  So I would have to cancel all my push-in

14  lessons and teacher meetings.

15          THE COURT:  All right.  Thank you, ma'am.

16          Anyone else?  Yes, ma'am.

17          JUROR GAYTON:  Cynthia Gayton.  I'm not sure what my

18  juror number is.

19          THE COURT:  28.

20          JUROR GAYTON:  I'm a professor, I teach.  Final exam

21  is on Friday, it's an oral presentation.  And a final paper due

22  on this Thursday.  I don't have -- there are no substitutes for

23  my program, it's only me.  And since it's an oral presentation,

24  I'm the only one who is going to be able to determine whether

25  they have passed, basically.

1          THE COURT:  And again, it's not something that could
2    be pushed off a week or too?
3          JUROR GAYTON:  It can't be because all of our exams
4    are scheduled and the rooms are scheduled, not without
5    affecting other professors and other students, and I have nine
6    students that this would affect.
7          THE COURT:  All right.  Thank you, ma'am.
8          All right.  Now in the second row -- third row.  Yes,
9    sir, your name, please.
10          JUROR RENAUD:  My name is John Renaud, number 67.
11          THE COURT:  Yes, sir.
12          JUROR RENAUD:  I am scheduled to be out of town
13    starting not this -- next Wednesday.  And I have sought and
14    gotten excused for the tail end of next week already.  I don't
15    know if that's a factor or not.
16          THE COURT:  So has the jury section already excused
17    you?
18          JUROR RENAUD:  Yes.
19          THE COURT:  All right.  Thank you, sir.
20          Anybody else in the --  yes, on the aisle, your name,
21    sir.
22          JUROR PONTICELLO:  Phil Ponticello.
23          THE COURT:  Yes, sir.
24          JUROR PONTICELLO:  I am the primary caregiver for my
25    wife, she has a doctor's appointment on Friday.  She is unable

1   to drive herself.  The doctor's appointment I can't reschedule,

2   and her doctor is in town only twice a month.

3           THE COURT:  Is there family member or friend who

4   could take her?

5           JUROR PONTICELLO:  No, ma'am.

6           THE COURT:  No?  All right, sir, thank you.

7           Anybody else in the back?  So everybody in the center

8   section has told me about any time commitment or scheduling

9   problems?

10          Yes, your name, please.

11          JUROR NINTEMAN:  I am James Ninteman,

12  N-i-n-t-e-m-a-n.

13          THE COURT:  I'm sorry?

14          JUROR NINTEMAN:  N-i-n-t-e-m-a-n.

15          THE COURT:  I have you, yes, you are 57.

16          JUROR NINTEMAN:  I am a regional manager.  We have

17  got two organization of parties' effort I am involved with.

18  One, I have got 45 people scheduled to be at our office on

19  Thursday afternoon at 4.  And then I am taking all of our

20  foremen out to dinner where we give bonuses out Friday at 5.

21  It's complicated, I really should be there.

22          That's all.

23          THE COURT:  All right.  Thank you, sir.

24          Anybody else in the center?  Yes, your name, please.

25          JUROR PIEDRAHITA:  Yes, Hector Piedrahita.

1          THE COURT:  Can you spell the last name.

2          JUROR PIEDRAHITA:  P-i-e-d-r-a-h-i-t-a.

3          THE COURT:  I have it, yes, sir.

4          JUROR PIEDRAHITA:  I have -- my wife has a very tough

5     schedule, and I have two boys.  So it might be -- I might have

6     to find some alternative babysitting if it requires that much

7     time.

8          THE COURT:  What time do you have to pick your

9     children -- are they in school?

10          JUROR PIEDRAHITA:  Yeah, they are in school, yes.

11          THE COURT:  What time do they normally get picked up?

12          JUROR PIEDRAHITA:  One gets picked up about 7:45 and

13     the next one 8:30.

14          THE COURT:  That's in the morning, that's the school

15     bus?

16          JUROR PIEDRAHITA:  Yes.  And then they are back by

17     3:30, 4 o'clock.

18          THE COURT:  So right now is it your wife who takes

19     care of them?

20          JUROR PIEDRAHITA:  No, my wife, she is a full-time

21     employee as well, and her job is a little bit more demanding

22     than mine, but I have got to be home for the kids.

23          THE COURT:  Do you have any regular babysitters or

24     family members --

25          JUROR PIEDRAHITA:  I don't.  I do have family

1   members, I've just got to check with them first before that

2   somebody is going to be there for the boys.

3            THE COURT:  So you don't know at this point?

4            JUROR PIEDRAHITA:  No, I do not.  I didn't know this

5   much commitment was going to be required.

6            THE COURT:  All right.  Thank you, sir.

7            Anybody else in the center?  In the center section?

8   Yes, your name.

9            JUROR PARKS:  Tim Parks, number 61.

10           THE COURT:  Yes, Mr. Parks.

11           JUROR PARKS:  Sure.  I work for a consulting company,

12  and we have a very short staff right now.  And it's going to be

13  very tough to replace what I'm doing for the next week or so.

14  We have a very large payroll process on Fridays.  They can

15  probably get through it, but no one has been ready or trained

16  for those processes at this point in time.

17           THE COURT:  Would the situation require you to take

18  time after jury service to be prepping people?

19           JUROR PARKS:  At night.

20           THE COURT:  I'm sorry?

21           JUROR PARKS:  At night, and in the morning before the

22  jury.

23           THE COURT:  All right.  Thank you, sir.

24           JUROR PARKS:  Thank you.

25           THE COURT:  There was another hand up.  Yes, way in

1    the back.  Wait, let the young lady who is on the aisle -- yes,

2    ma'am, your name.

3              JUROR JHA:  I am Sandhya Jha.

4              THE COURT:  Can you spell the last name.

5              JUROR JHA:  J-h-a.

6              THE COURT:  Are you number 41?

7              JUROR JHA:  Yes.

8              THE COURT:  Yes, ma'am.

9              JUROR JHA:  I am a software engineer, and I have a

10   release due, like production, the goal will go to production on

11   this Sunday.  So it just requires trouble for me if I have to

12   stay here the whole day.

13             THE COURT:  How much work would you have to put in

14   each night?

15             JUROR JHA:  A few hours.

16             THE COURT:  A few hours.  All right.  Thank you,

17   ma'am.

18             Now, sir, in the back.

19             JUROR W. YEH:  Wen-Kuei Yeh.

20             THE COURT:  Hold on one second, we have two Mr. Yehs

21   on our jury list.

22             JUROR W. YEH:  First name is W-e-n.

23             THE COURT:  You are number 92?

24             JUROR W. YEH:  Yes.

25             THE COURT:  Yes, sir.

34

1          JUROR W. YEH:  I have three little kids, and my

2   parents are watching them for me, but I don't know what their

3   schedule is for the next two weeks.

4          And plus, I am managing a store.  So I don't know, I

5   mean, they won't be -- my two oldest will be out of school next

6   Monday.

7          THE COURT:  Starting Monday?

8          JUROR W. YEH:  Yes.  Yes, it's Loudoun County, so

9   they are out of school early.

10          THE COURT:  Wow, that's really early.

11          JUROR W. YEH:  So I need to make sure I can work with

12   their schedule and work with my schedule.

13          THE COURT:  And you don't have that schedule worked

14   out yet?

15          JUROR W. YEH:  I mean, I have my set schedule for the

16   store already, but I am basically working all next week and

17   this week.

18          THE COURT:  All right.  Thank you, sir.  Does that

19   take care of everybody in the center?

20          Now on the far right, over here.  Let's see, in the

21   first row.  Yes, ma'am, on the aisle, your name, please.

22          JUROR TU:  I don't know --

23          THE COURT:  I'm sorry, I need your name first.

24          JUROR TU:  The last name T-u.  I don't know my juror

25   number.

1    THE COURT:  I will get it, just one second.  You're

2  83.

3    JUROR TU:  83, thank you.

4    THE COURT:  Yes, ma'am.

5    JUROR TU:  I don't know right now what my schedule

6  is.  I come back and I am the one that work closely with

7  product manager, engineer, so I can secure all the funding for

8  the budgets.  And I work on the contracts.  So they don't know

9  right now I am going to be selected or not.  But if they really

10  need me, because they rely on me on all the budgets and finance

11  on the contracts, can I come back and ask the judge like, first

12  of all, can I be let go.  I don't know.

13    THE COURT:  Well, once we start the trial, we have to

14  go straight through with it.  So there is no flexibility in

15  that respect.

16    JUROR TU:  Yeah, that's what I know, because every

17  time someone asks --

18    THE COURT:  All right.  Thank you, ma'am.

19    JUROR TU:  Yes, they need me to work on projects and

20  everything for that.

21    THE COURT:  All right, thank you.

22    Anybody else in that row?

23    Now, in the second row, I see a hand.  Yes, your

24  name, please.  I can't see you.  Just stand up.  Yeah, your

25  name.

1          JUROR SUNKARA:  Venkatram Sunkara.

2          THE COURT:  You will have to spell the last name for

3   me.

4          JUROR SUNKARA:  Sunkara, S-u--

5          THE COURT:  Wait, wait.

6          JUROR SUNKARA:  S-u-n-k-a-r-a.  78, I guess.

7          THE COURT:  Yes, sir.

8          JUROR SUNKARA:  Yes.  I have my son's special needs

9   assessment tomorrow.  And on the 13th I have the hearing

10  meeting.  And because I live in Loudoun County, that means

11  December 15 the schools are closed for the rest of the year.

12         THE COURT:  All right.  So he needs his annual IEP

13  done right now?

14         JUROR SUNKARA:  His eligibility hearing is on the

15  13th.  And tomorrow we have to receive the assessment and

16  acknowledge the assessment so we can actually attend the

17  meeting on the 13th.

18         THE COURT:  All right.  Thank you, Mr. Sunkara.

19         On the aisle, yes, ma'am, your name, please.  Yes.

20         JUROR STEWART:  Mary Stewart.  I just have a one-hour

21  problem, I am a professor at Georgetown in the evenings, and I

22  am giving an oral examine on Tuesday at 6.

23         THE COURT:  That's tomorrow Tuesday?

24         JUROR STEWART:  It is.

25         THE COURT:  So you would have to leave by 5 o'clock

1    at the latest?

2              JUROR STEWART:  Yes.

3              THE COURT:  You couldn't push the exam until a little

4    bit later?

5              JUROR STEWART:  I will attempt with the university,

6    but there is another section that comes in right after us.

7              THE COURT:  How many students do you have?

8              JUROR STEWART:  I have five who are presenting

9    tomorrow.

10             THE COURT:  Five tomorrow?  Okay.  Thank you, ma'am.

11             Yes, your name, sir, the second row.

12             JUROR SPIEGEL:  Eric Spiegel.

13             THE COURT:  Yes, sir.

14             JUROR SPIEGEL:  I work in e-commerce, online sales.

15   And these two weeks are probably the busiest two weeks of the

16   entire year for me.  I would be happy to do something with a

17   shorter schedule, but I feel like the two weeks would be --

18             THE COURT:  Would it be a hardship for you?

19             JUROR SPIEGEL:  Yeah.  I am the only one in my

20   company that does the job too, so there is no one else that can

21   fill in.

22             THE COURT:  All right.  Thank you, sir.

23             In the middle, I have to just point to you.  I'm

24   sorry.  Go ahead, stand up, please.  Your name, please.

25             JUROR O'HARE:  Regina O'Hare.

38

1        THE COURT:  Yes, ma'am.

2        JUROR O'HARE:  I just have a problem with the going

3    until 6 o'clock.  I have a second job where I teach fitness

4    classes at night.  And it's actually really hard to find

5    someone to sub for those.  So I teach at 7 o'clock on Monday

6    and Wednesday.

7        THE COURT:  And where -- I don't need the street

8    name, but what town?

9        JUROR O'HARE:  It's in McLean.  But I'm worried about

10   getting from here to there and set up by that time.

11       THE COURT:  And it's Monday and Wednesday nights?

12       JUROR O'HARE:  Yes.

13       THE COURT:  Other than that, would you be available?

14       JUROR O'HARE:  Yes.

15       THE COURT:  All right.  Thank you, Ms. O'Hare.

16       Yes, next to Ms. O'Hare, yes.  Your name, please.

17       JUROR MARKER:  Rachael Marker, like what you write

18   with.

19       THE COURT:  Wait, hold on one second.  I am sorry,

20   Marker?

21       JUROR MARKER:  Yes.

22       THE COURT:  Yes, Ms. Marker.

23       JUROR MARKER:  I am a kindergarten special education

24   teacher.  Aside from -- I teach in Loudoun County, so I am off

25   and available all next week.  I am just concerned about getting

1   a substitute this week.  Nobody tends to pick up my sub jobs

2   because of my position.  And lesson planning aside, I can

3   handle all that.  I am just a little concerned day to day for

4   the sub.

5           THE COURT:  All right.  Thank you, Ms. Marker.

6           The gentleman against the wall.  Yes.

7           JUROR J. YEH:  Yeh, Y-e-h.

8           THE COURT:  Yes, Mr. Yeh.  I have got you.

9           JUROR J. YEH:  So my girlfriend has a scheduled

10  surgery on Friday.  I am the driver and a caretaker.  I would

11  talk to the doctors if I have to do scheduling.  I am not sure

12  if I should do --

13          THE COURT:  So you definitely have an appointment

14  with the doctor on Friday?

15          JUROR J. YEH:  Yes.

16          THE COURT:  And that can't be changed?

17          JUROR J. YEH:  Well, I don't know if there is a

18  penalty to change or not.  I would have to talk to her.  I

19  would to call the doctor's office.

20          THE COURT:  But you don't know?

21          JUROR J. YEH:  Right.

22          THE COURT:  Thank you.

23          Yes, in the back.  Your name, please.

24          JUROR SMITH:  Scott Smith, juror 75.

25          THE COURT:  Yes, sir.

1          JUROR SMITH:  I have a couple of things.  My boss is

2   out of country and I'm the manager in the office.  So we have

3   an interview coming on Wednesday that we can't move because of

4   the competitive environment.

5          THE COURT:  It's this coming Wednesday?

6          JUROR SMITH:  Yes.  We also -- I have a problem with

7   6 o'clock.  My autistic son, I am home by 5:15 in order to be

8   able to pick him up from the therapist to bring him home.

9          And then we actually have travel on the 22nd.

10          THE COURT:  All right.  Thank you, Mr. Smith.  That's

11   a trifecta, what you just gave me.

12          Is there anybody else?  On the aisle, yes, sir, your

13   name, please.

14          JUROR SMILEK:  Jan Smilek, I think number 74.

15          THE COURT:  Yes, sir.

16          JUROR SMILEK:  I previously informed the Court that I

17   will be traveling on this Wednesday, and Wednesday through

18   Friday, and received a temporary delay.

19          THE COURT:  All right.  So in other words, this

20   coming Wednesday and three days you're going to be gone?

21          JUROR SMILEK:  Yes.  I have already communicated with

22   the court that I am going to be out of state.

23          THE COURT:  All right.  Thank you, sir.

24          Yes, sir, your name.

25          JUROR VARGO:  Lane Vargo, with a V like Victor.

41

1          THE COURT:  Yes, Mr. Vargo.

2          JUROR VARGO:  I have business travel scheduled for

3    next Monday through Wednesday out of state.

4          THE COURT:  Is that at all changeable?

5          JUROR VARGO:  No.

6          THE COURT:  You can't change that?  No?  All right,

7    thank you, sir.

8          Yes, your name.

9          JUROR WINER:  Jonathan Winer.

10         THE COURT:  Yes, Mr. Winer.

11         JUROR WINER:  Yeah, I have already communicated to

12   the Court, at the end of next week I will be out of state on

13   personal travel, but it's Friday, we will be gone Friday.  So

14   if it goes that long, it doesn't impact me even then, but --

15         THE COURT:  All right.  Thank you, sir.

16         Now, is there anybody else?  Yes, in the back, your

17   name.

18         JUROR WALDRON:  Cory Waldron, juror 87.

19         THE COURT:  Yes, sir.

20         JUROR WALDRON:  Similar situation to Mr. Winer, I'm

21   out next Friday for personal travel.

22         THE COURT:  All right, thank you.

23         Now, is there anybody else for whom that trial

24   schedule is a problem?  Yes, ma'am, your name, please.

25         JUROR ISLAM:  Jawaher Islam, I-s-l-a-m.  I don't know

1   my juror number.

2          THE COURT:  Your number is 40.

3          JUROR ISLAM:  40, okay.  So I have to take care of my

4   family member, he is special needs also.  So my husband, he

5   can, but I think he is also busy season, he cannot take care

6   him some of the times that he is working.

7          So I don't know if I would be able to --

8          THE COURT:  Are there other family members or close

9   friends who have sometimes helped you take care of that child?

10         JUROR ISLAM:  I can look.

11         THE COURT:  Well, the trouble is we need to know.

12         JUROR ISLAM:  I don't know.

13         THE COURT:  You don't know.  All right.  Thank you,

14  ma'am.

15         I see another hand in the back.  Yes, ma'am.

16         JUROR EISENBERG:  Monica Eisenberg.

17         THE COURT:  What's your last name?

18         JUROR EISENBERG:  Eisenberg.

19         THE COURT:  Yes, Ms. Eisenberg.

20         JUROR EISENBERG:  I'm sick.

21         THE COURT:  You're sick?

22         JUROR EISENBERG:  Yes, I am sick.  And I don't know

23  if what I have is going to get worse the rest of the week.  I

24  would like to know if it's okay to call at the last minute if I

25  can't make it.  I don't know --

1          THE COURT:  I recognize that you actually made an

2   effort to come in here today, so I appreciate that.  Have a

3   seat, I think we can take care of the situation.

4          Is there anybody else?  Do I see any other hands up?

5   No.

6          All right, counsel, approach the bench.

7          NOTE:  A side-bar discussion is had between the Court

8   and counsel out of the hearing of the jury panel as follows:

9   AT SIDE BAR

10          THE COURT:  Now, first of all, does Mr. Young want to

11   be present at bench conferences?  He has a right to be here if

12   you want him.  If you don't want him, that's fine, but it's one

13   way other the other.  So you decide.

14          MS. MORENO:  And if he is up here, Your Honor, will

15   the Marshals also --

16          THE COURT:  They always follow him up.

17          MS. MORENO:  Can we just notify him of that?  Can we

18   take five seconds?

19          Can you do that for me?

20          I would rather him not come up.

21          THE COURT:  I understand why.  By I just have to give

22   you that option.

23          MS. MORENO:  Thank you, Your Honor.

24          THE COURT:  Not that many people read the Washington

25   Post.

1              MR. GIBBS:  That's surprising.

2              THE COURT:  I thought we would have a lot more,

3    that's interesting.

4              MS. MORENO:  If we were in New York, it would be a

5    different story, and if it was in the New York Times.

6              THE COURT:  Your client is waiving his appearance at

7    the bench conferences.

8              MR. SMITH:  Not all of them, just the ones --

9              THE COURT:  No, no, it can't be -- it's all or none,

10   we can't have it back and forth.

11             MR. SMITH:  Okay.  Can I tell him?

12             THE COURT:  Yes.  He is coming up.  So he will be at

13   all bench conferences.  All right.

14             MS. MORENO:  Okay.

15             MR. SMITH:  We changed our minds.

16             THE COURT:  All right.  Consistent, that's the point.

17             MR. SMITH:  Yes.

18             THE COURT:  Now, I plan to excuse, as I indicated to

19   you earlier, on the basis of these first two questions, I am

20   going to excuse any juror who I have concerns about for

21   pretrial publicity taint or they're not available for our

22   schedule.  So listen carefully as I excuse these.  Okay?

23             THE CLERK:  Judge, I have one more.

24             THE COURT:  Who is that?

25             THE CLERK:  Juror number 41.

45

1          THE COURT:  Don't worry about her.  I have already

2     got that.

3          Number 4, Barrette.  She is the one who knows the

4     defendant.  Number 14.  15.  16.  18.  19.  20.  21.  24.  25.

5     27.  28.  37.  40.  41.  49.

6          MR. SMITH:  Did Your Honor say 49?

7          THE COURT:  49.  That's the special ed. teacher.  57.

8     58.  61.  64.  65.  67.  74.

9          MR. SMITH:  Did Your Honor say 67?

10          THE COURT:  67.

11          MR. SMITH:  And that was because of the

12     unavailability next Wednesday?

13          THE COURT:  Yes.  74.  75.  76.  77.  78.  83.  86.

14     87.  89.  92.  93.

15          Now, is there any objection to those jurors being

16     stricken for cause based upon either some pretrial publicity

17     exposure or unable to meet this time schedule that we have set

18     for this trial?

19          MS. MORENO:  No objection from the defense, Your

20     Honor.

21          THE COURT:  No objection from the defense.

22          MR. GIBBS:  Nor from the government, Judge.

23          THE COURT:  Then I'm going to excuse those jurors

24     now.  I will read their names and numbers out.  That will be a

25     much smaller group with which we can work.  All right?

1    MS. MORENO:  Yes, I appreciate that.  Thank you, Your

2    Honor.

3    NOTE:  The side-bar discussion is concluded;

4    whereupon the case continues before the jury panel as follows:

5    BEFORE THE JURY PANEL

6    THE COURT:  The following jurors are going to be

7    excused.  Please leave quietly so the rest of the jurors can

8    hear as their names are being called.

9    Number 4, Ms. Barrette.  Number 14, Mr. Clelland.

10   Number 15, Mr. Cotterman.  16, Andrea Daoust.  18, Ariel Diaz.

11   19, Ashley Eiler.  20, Monica Eisenberg.  21, William Elsbury.

12   24, Shawn Fontenette.  25, Susan Frischkorn.  27, Alice

13   Gantenbein.  28, Cynthia Gayton.  37, Brian Hong.  40, Jawaher

14   Islam.  41, Sandhya Jha.  49, Rachael Marker.  57, James

15   Ninteman.  58, Regina O'Hare.  61, Timothy Parks.  64, Hector

16   Piedrahita.  65, Philip Ponticello.  67, John Renaud.  74, Jan

17   Smilek.  75, Scott Smith.  76, Eric Spiegel.  77, Mary Stewart.

18   78, Mr. Sunkara.  83, Ms. Tu.  86, Lane Vargo.  87, Cory

19   Waldron.  89, Jonathan Winer.  92, Wen-Kuei Yeh.  93, John Yeh.

20   NOTE:  The above-named jurors are excused and leave

21   the courtroom.

22   JUROR KWAK:  Your Honor --

23   THE COURT:  Yes, sir.

24   JUROR KWAK:  I'm sorry, my number is 44, Kwak, with a

25   K.

47

1          THE COURT:  Yes, Mr. Kwak.

2          JUROR KWAK:  Yes.  So you didn't excuse the other

3    reasons, my family.  I have some communication problem.

4          THE COURT:  Are you having trouble understanding

5    English?

6          JUROR KWAK:  Yes, please.  I already made request,

7    but they denied, the request was denied.  But I think my

8    English is not enough for jury service.  So how can I judge the

9    other people?

10          THE COURT:  All right.  We will get to you in a

11    minute.  All right, thank you.  Have a seat, please.

12          All right, ladies and gentlemen, I am going to have

13    other questions for you now, so please listen to these

14    questions carefully.

15          Remember the background for these questions.  That

16    is, we need to have 14 people.  We now know that you have the

17    time to give us, but it's also very important, given some of

18    the issues in this case, that you also listen carefully to my

19    questions and provide answers if you possibly can.

20          I want, first of all, for the prosecution team to

21    once again reintroduce themselves to the jury.  Also, identify

22    the agencies with which you are working.

23          Mr. Kromberg.

24          MR. KROMBERG:  I am Gordon Kromberg, I am an

25    Assistant United States Attorney here in the Eastern District

48

1   of Virginia, Alexandria Division.

2          MR. GIBBS:   John Gibbs.   I am also an Assistant U.S.

3   Attorney here in the Alexandria Division of the U.S. Attorney's

4   Office.

5          MR. TURGEON:   I am Evan Turgeon, I'm a Special

6   Assistant U.S. attorney here in the Alexandria Division of the

7   U.S. Attorney's Office.

8          MR. CASLEN:   Nicholas Caslen, I work for the Federal

9   Bureau of Investigation, special agent.

10          MR. VERA:   My name is Fabian Vera, I am a paralegal

11   with the U.S. Attorney's Office.

12          THE COURT:   Now, ladies and gentlemen, do any of you

13   think you might know in any personal or business capacity any

14   of the federal prosecutors, the case agent, or the paralegal?

15   Is there anybody?   All right.

16          Then, Mr. Smith, you can introduce your team.

17          MR. SMITH:   I am Nicholas Smith.   I am representing

18   the defendant, Nicholas Young.

19          THE COURT:   Mr. Smith, I am sorry, identify your law

20   firm and where it's located.

21          MR. SMITH:   The law firm I work for is called David

22   B. Smith, PLLC, and I am a partner with that law firm.

23          THE COURT:   And it's located in Alexandria.   All

24   right.

25          MS. MORENO:   Hello, my name is Linda Moreno, I am out

1    of New York.  And I am also defense counsel for Nicholas Young.

2         We also have Nicholas Enns, the fourth Nicholas.

3         MR. ENNS:  Yes, ma'am.  And I am a paralegal

4    contracted out to work for this case.

5         THE COURT:  All right.  Ladies and gentlemen, any of

6    you think you might know either of the defense counsel, the

7    paralegal, or the defendant, Mr. Young?  Is there anybody?

8         Ever had any business or personal relationships with

9    any of these folks?

10        To your knowledge, have any of you ever used the

11   services of the law firms involved here or been involved in

12   litigation with any of these firms?

13        All right, you may have a seat.  Thank you.

14        Now I'm going to ask each side to list the names of

15   any witnesses who you believe you may be calling during the

16   course of the trial.  We would like to know if any of the

17   jurors might recognize any of these witnesses.

18        Mr. Gibbs.

19        MR. GIBBS:  Thank you, Judge.  The Government intends

20   to call the following witness, we are going to call him an

21   Undercover Employee, who is going to testify under the name

22   Khalil Sullivan.  John Gervino with ICE.  John Minichello with

23   the FBI.

24        There will be a confidential human source testifying

25   under the name Mo.  Cameron Siegfried, who was a Task Force

1  agent with the FBI previously.  There will be an agent

2  testifying on behalf of the FBI as Special Agent Smith.  There

3  will be another FBI agent by the name of John Sikorski.  Paul

4  Lee is a forensic examiner with the FBI.  Ian Campbell is with

5  the Arlington County Police.  Kenneth Jamie McNulty is with the

6  Fairfax County Police.

7        We have a witness by the name of Brian Menzies, that

8  is spelled M-e-n-z-i-e-s.  There is going to be a witness by

9  the name of Daveed Gartenstein-Ross.  Special Agent Caslen, who

10  you just heard from, will testify.  And a witness by the name

11  of Joanne Dill who previously worked for WMATA.

12        And then it is possible, although we're not certain,

13  but there is another FBI employee by the name of Jamaal King.

14  And a second FBI employee by the name Mirian, M-i-r-i-a-n,

15  Fontanez.

16        THE COURT:  Ladies and gentlemen, do any of you think

17  you might recognize any of those names as people you might know

18  or have worked with?

19        Oh, I am surprised.  All right, very good.

20        Yes, ma'am, your name, please.

21        JUROR BROOKS:  Kira Brooks.

22        THE COURT:  Ms. Brooks, which name did you recognize?

23        JUROR BROOKS:  I don't recognize specific names, but

24  my company does a lot of work with Homeland Security and we

25  work with the FBI.  But I don't have any conflict with any of

1    people named here this morning.

2              THE COURT:  Ms. Brooks, what kind of work do you do?

3              JUROR BROOKS:  I own a management consulting company.

4    We do a lot of work with the Department of Homeland Security.

5              THE COURT:  If you can talk about it, what kind of

6    work does your --

7              JUROR BROOKS:  The particular contract is classified.

8              THE COURT:  Do you work on that contract yourself?

9              JUROR BROOKS:  I do consult to that client, yes.

10             THE COURT:  Well, given the nature of the issues in

11   this case -- as we said, it is an attempted support, material

12   support of ISIS, and obstruction of justice.  And given your

13   kind of work, do you feel you might have difficulty being an

14   impartial juror in this case?

15             JUROR BROOKS:  Yes.

16             THE COURT:  All right.  Thank you, Ms. Brooks.

17             All right.  Anybody else on the left side who thinks

18   you might recognize the names of any of these witnesses?

19             Now, in the center I saw some hands up.  Yes, your

20   name, sir.

21             JUROR EVANCHO:  Evancho, George.

22             THE COURT:  Yes, sir.

23             JUROR EVANCHO:  I am a retired federal employee.  My

24   last agency was Immigration and Customs Enforcement where I

25   served as the special security officer.  And John Gervino's

1  name is familiar to me.  I am not sure if I have met him, but I

2  am sure I have had some kind of dealings with him, I just can't

3  exactly pinpoint what those are.

4          THE COURT:  Do you feel that your prior work or the

5  nature of the issues in this case could make it difficult for

6  you to be impartial in judging this case?

7          JUROR EVANCHO:  No, Your Honor.

8          THE COURT:  All right.  And the relationship you had

9  with this person -- I mean, had you actually worked with this

10 person?

11         JUROR EVANCHO:  Not directly, Your Honor.  I was a

12 special security officer, I managed our SCIF.  And occasionally

13 we would have criminal investigators from the various agencies

14 come in, and I would assist them in doing whatever they needed

15 to do inside the SCIF.  No professional dealings otherwise, or

16 social for that matter.

17         THE COURT:  All right.  So that you recognize the

18 name, but you --

19         JUROR EVANCHO:  Yes.

20         THE COURT:  But did you ever have any face-to-face

21 contact with this person?

22         JUROR EVANCHO:  Your Honor, I honestly don't

23 remember.  That name is just very familiar to me.

24         THE COURT:  Because you've worked in that kind of an

25 agency, do you think you might tend to believe the testimony of

1  federal law enforcement people over that of an ordinary

2  civilian?

3          JUROR EVANCHO:  I'm sorry, Your Honor?

4          THE COURT:  Yes.  Because of your prior work, and

5  your work in a SCIF, and your work with intelligence matters,

6  do you feel that you might have more confidence in the

7  testimony of a federal agent, federal investigator than that of

8  a civilian?

9          JUROR EVANCHO:  No, Your Honor.

10          THE COURT:  All right.  Thank you, Mr. Evancho.

11          JUROR EVANCHO:  Yes, ma'am.

12          THE COURT:  Anybody else?  Yes, ma'am, in the back.

13          JUROR McKENZIE:  Yes, Patricia McKenzie.

14          THE COURT:  Yes, ma'am.

15          JUROR McKENZIE:  I didn't quite hear the first name

16  that you called, but I think you said Sullivan.

17          MR. GIBBS:  Well, actually he will be testifying

18  under a pseudonym.  So for purposes of his testimony, his name

19  that he will be using in court will be Khalil Sullivan.  That

20  is not his real name though.

21          JUROR McKENZIE:  Okay.  I just wanted to be sure

22  because my former boss' name is Cleovis Sullivan who works at

23  the Virginia Department of Transportation.  I just wanted you

24  to know.

25          MR. GIBBS:  It's not the same person.

54

1          THE COURT:  It's not the same person.  Thank you,

2    ma'am.  That is very careful listening, we appreciate that.

3          Is there anybody else in the center section?

4          How about on the right side, anybody who recognized

5    any of those names?

6          All right, I will ask Mr. Smith or Ms. Moreno, do you

7    have any witness names you want to run by the jury?

8          MS. MORENO:  Not at this time, Your Honor, no.

9          THE COURT:  All right.  Thank you.

10          Now, it's very important the jurors understand that

11    the credibility of each witness who testifies in a trial has to

12    be evaluated on its own merits.  And, therefore, I want to ask

13    the rest of the panel, do any of you hold the belief that

14    because a person is employed in law enforcement his or her

15    testimony is worthy of more or less belief than that of a

16    non-law enforcement witness?

17          Does anybody have that feeling or belief?  All right.

18          Some of the Government's witnesses' identities must

19    not be publicly disclosed.  And before these witnesses testify,

20    we are going to actually have a screen be pulled across the

21    courtroom to prevent the public from seeing these witnesses.

22    Of course, you, that is whoever is going to be in the jury, and

23    all of the trial participants will not have your views

24    obstructed.

25          Do any of you think that the use of the screen or the

1    fact that certain witnesses' identities cannot be disclosed

2    could affect your ability to judge this case impartially?

3            Do any of you feel that could be a problem for you?

4    No?  All right.

5            And do you feel you would have any difficulty in

6    evaluating that witness' testimony differently than that of an

7    ordinary civilian witness?  Is there anybody?

8            I want to know now whether any of you have any past

9    or present experience working in law enforcement?  And so,

10   specifically, although this is not limited to these agencies, I

11   want to know whether any of you have ever in the past or are in

12   the present employed by or doing business with the Department

13   of Justice?

14           Now, the Department of Justice is a large federal

15   agency.  It includes the Federal Bureau of Investigation, the

16   Drug Enforcement Administration, and up until about I guess now

17   ten years or so ago the Immigration and Naturalization Service.

18           But this would include also, expand this question to

19   the Central Intelligence Agency, the Department of Homeland

20   Security, which now includes the Immigration and Customs

21   Enforcement, or ICE agency, the Fairfax County Police

22   Department, the Arlington County Police Department, and the

23   Washington Metropolitan Transit Authority.

24           So do any of you have any current or past employment

25   or business dealings with any of those agencies or any other

1    law enforcement experience?

2           Let me start on the left side first.  Yes, ma'am,

3    your name, please.

4           JUROR BROOKS:  I'm Kira Brooks.

5           THE COURT:  I'm sorry?

6           JUROR BROOKS:  Kira Brooks.

7           THE COURT:  Yes, Ms. Brooks.

8           JUROR BROOKS:  Just what I said before, I have worked

9    with --

10          THE COURT:  That's fine.  Thank you, Ms. Brooks.

11          Yes, against the wall, your name, sir.

12          JUROR BATT:  Yes, Stephan Batt.

13          THE COURT:  Yes, Mr. Batt, number 5.

14          JUROR BATT:  I worked at Homeland Security for about

15   seven years.  And I worked at Coast Guard headquarters, DHS

16   headquarters, and TSA headquarters.

17          THE COURT:  And you are currently at Homeland

18   Security?

19          JUROR BATT:  No, I left about a year-and-a-half ago.

20          THE COURT:  Are you now in civilian employment?

21          JUROR BATT:  No, I work at the U.S. PTO.

22          THE COURT:  All right.  Now, is there anything about

23   your past experience in the law enforcement agencies, including

24   the Coast Guard, that you feel could affect your impartiality

25   in this case?

1          JUROR BATT:  No, ma'am.

2          THE COURT:  In any respect, I am going to repeat the

3    question, do you think you might believe the testimony of a

4    Homeland Security agent more or less than that of a civilian

5    based upon your experience with the agency?

6          JUROR BATT:  No, ma'am.

7          THE COURT:  All right.  Thank you, Mr. Batt.

8          Yes, your name, sir.

9          JUROR CARPER:  Timothy Carper, number 10.

10         THE COURT:  I'm sorry, I can't hear you.

11         JUROR CARPER:  Timothy Carper, I'm number 10.

12         THE COURT:  Yes, Mr. Carper.

13         JUROR CARPER:  I am currently employed by the Drug

14   Enforcement Administration.

15         THE COURT:  In what capacity?

16         JUROR CARPER:  I am an IT staff, technical.

17         THE COURT:  So you do IT work?

18         JUROR CARPER:  Yes.

19         THE COURT:  Have you ever done any actual law

20   enforcement out-in-the-field kind of work?

21         JUROR CARPER:  No.

22         THE COURT:  No?  How long have you been with DEA?

23         JUROR CARPER:  Two-and-a-half years.

24         THE COURT:  And any other law enforcement agency

25   experience other than DEA?

1          JUROR CARPER:  No.

2          THE COURT:  So when you say IT, are you doing -- is

3     it personnel IT, or what kind of IT do you do?

4          JUROR CARPER:  IT security.  So intrusion detection,

5     vulnerability, I just protect the infrastructure.

6          THE COURT:  Is there anything about your work with

7     the DEA that you think could affect your ability to be

8     impartial in judging in this case?

9          JUROR CARPER:  No.

10         THE COURT:  This is not a DEA case, they are just

11    part of the Justice Department.  Have you had contact with

12    agents while you have been at --

13         JUROR CARPER:  No agents.

14         THE COURT:  Not at all?

15         JUROR CARPER:  No, I am not in that capacity.

16         THE COURT:  Thank you, Mr. Carper.

17         Yes, your name, sir.

18         JUROR DAVIS:  Yes, Kenneth Davis, juror 17.

19         THE COURT:  Yes, Mr. Davis.

20         JUROR DAVIS:  I work with a consulting firm that has

21    several clients, such as Homeland Security and intelligence

22    agencies.  And we are also on a contract vehicle with WMATA,

23    but I am not personally involved in any of those client

24    relationships.

25         THE COURT:  And can you tell us what kind of work you

1    do for your employer?

2          JUROR DAVIS:  Federal financial management

3    consultant.

4          THE COURT:  All right.  So your company does work

5    with these agencies, but you yourself don't?

6          JUROR DAVIS:  That's correct.  I am in executive

7    level leadership with the firm, but I don't serve directly

8    those clients currently.

9          THE COURT:  Is there anything about the issues in

10   this case and the kind of work that you do that you feel could

11   make it difficult for you to be impartial as a juror?

12         JUROR DAVIS:  No, Your Honor.

13         THE COURT:  All right.  Thank you, Mr. Davis.

14         Anybody else?  Yes, way in the back, your name, sir.

15         JUROR GOIDICH:  Thomas Goidich, G-o-i.

16         THE COURT:  Can you spell the last name again.

17         JUROR GOIDICH:  G-o-i --

18         THE COURT:  G-o-i.  Mr. Goidich, yes, sir.

19         JUROR GOIDICH:  I work for a CPA firm, and we have

20   work at DEA and U.S. Marshals on different contracts.

21         THE COURT:  Were any of those contracts involved with

22   specific law enforcement projects?

23         JUROR GOIDICH:  No.

24         THE COURT:  Is there anything about your work at

25   those agencies that you feel could make it difficult for you to

1    be impartial in judging this case?

2              JUROR GOIDICH:  No, ma'am.

3              THE COURT:  Thank you, sir.

4              Anybody else on the left side?

5              Now in the center?  Yes, your name, again, sir.

6              JUROR McCRAVE:  Michael McCrave.  Retired Naval

7    officer.  Two years as a legal officer.  Also worked with the

8    DEA and NSA on other missions as part of being in the Navy.

9              THE COURT:  Given that -- now, how many years ago was

10   that?

11             JUROR McCRAVE:  That was 20 years ago as far as

12   active duty.  I am still currently employed working for the

13   Navy building ships currently.

14             THE COURT:  Is there anything about your past work in

15   law enforcement or intelligence work that you feel could affect

16   your impartiality to judge this case?

17             JUROR McCRAVE:  No, ma'am.

18             THE COURT:  Do you feel in any respect you might

19   believe the testimony of Government agents over that of

20   ordinary civilians because of your work in that area?

21             JUROR McCRAVE:  No, ma'am.

22             THE COURT:  All right.  Thank you, Mr. McCrave.

23             Yes, your name, sir.

24             JUROR EVANCHO:  Evancho, George.

25             THE COURT:  Yes, sir.

61

1          JUROR EVANCHO:  Previous work at the FBI in a

2     clerical capacity, 1976, 1977.  And Immigration and

3     Naturalization Service, also non-law enforcement position.  I

4     was a security specialist, personnel security specialist.  And

5     then Immigration and Customs Enforcement under DHS where I was

6     a security specialist, special security officer.

7          THE COURT:  Is there anything about all those jobs

8     that you feel might make it difficult for you to be impartial

9     in judging this case?

10          JUROR EVANCHO:  No, Your Honor.

11          THE COURT:  And again, do you feel in any respect you

12     would tend to believe the testimony of a federal law

13     enforcement officer, or a state law enforcement officer for

14     that matter, over that of a civilian?

15          JUROR EVANCHO:  No, Your Honor.

16          THE COURT:  All right.  Thank you, Mr. Evancho.

17          Anyone else in the first row?

18          Second row then.  Yes, sir, your name, please.

19          JUROR KAUFFMAN:  Last name is Kauffman, with a K,

20     Thomas.

21          THE COURT:  Yes, sir.

22          JUROR KAUFFMAN:  Between January of 1996 and December

23     of 2007 I served on the Fairfax County Board of Supervisors,

24     and in that capacity I represented Virginia on the Metro Board.

25          THE COURT:  Do you feel in any respect that that

1   relationship with that agency could affect your ability to be

2   impartial in judging this case?

3           JUROR KAUFFMAN:  No.  It has been a decade.

4           THE COURT:  All right.  Thank you, sir.

5           Anybody else in that row?  Yes, your name, please,

6   ma'am.

7           JUROR OBUCHOWSKI-BERMAN:  Susan Obuchowski-Berman.  I

8   have worked with the U.S. Department of Justice and the U.S.

9   Department of Homeland Security, and I am currently a federal

10  employee with the Department of State.

11          THE COURT:  And what are you doing at State right

12  now?

13          JUROR OBUCHOWSKI-BERMAN:  I'm an investigative

14  analyst with our counterintelligence division.

15          THE COURT:  All right.  Now, given the nature of the

16  issues in this case and your work, do you feel you would have

17  difficulty being impartial in judging this case?

18          JUROR OBUCHOWSKI-BERMAN:  I think it is likely.

19          THE COURT:  All right.  Thank you, ma'am.

20          Yes, sir, your name, please.

21          JUROR OLIVER:  Yes, ma'am, I am retired military --

22          THE COURT:  I'm sorry, I need your name first.

23          JUROR OLIVER:  I'm retired military, and I also --

24          THE COURT:  I need you're name.

25          JUROR OLIVER:  Oh, Oliver.  Juror number 60.

63

1          THE COURT:  Yes, Mr. Oliver.

2          JUROR OLIVER:  Yes.  I am retired military, and I

3   currently work at the National Reconnaissance Office, armed

4   security.  And I work with a lot of the Homeland Security and

5   also Fairfax County.

6          THE COURT:  All right.  Are you actually involved in

7   active investigations?

8          JUROR OLIVER:  Yes, ma'am.  I get full notices just

9   like police officers do.

10          THE COURT:  Mr. Oliver, based upon that, do you feel

11   you might have difficulty in being impartial in judging this

12   case?

13          JUROR OLIVER:  No, ma'am.

14          THE COURT:  Given the nature of the issues in this

15   case, you don't think you might have some issues?

16          JUROR OLIVER:  I'll be okay.  I wouldn't have any.

17          THE COURT:  No preset ideas about the issues in this

18   case?

19          JUROR OLIVER:  No, ma'am.

20          THE COURT:  And you don't think you would favor the

21   testimony of a law enforcement officer against that of an

22   ordinary civilian?

23          JUROR OLIVER:  Oh, I would probably be a little

24   impartial in that part.

25          THE COURT:  I'm sorry?

1              JUROR OLIVER:  I would probably favor a police

2    officers with that one.

3              THE COURT:  All right.  Thank you, sir.

4              All right, anybody else?  Yes, way in the back.

5              JUROR YIANILOS:  Christopher Yianilos.

6              THE COURT:  Can you spell the last name.

7              JUROR YIANILOS:  Y-i-a-n-i-l-o-s.

8              THE COURT:  Yes, sir.

9              JUROR YIANILOS:  From 1999 until 2009 I worked with

10   the United States Senate and advised on many of the issues and

11   agencies that you mentioned, including WMATA.  I am a lawyer,

12   but not practicing, but I assisted a family friend with a case

13   of deportation that went before Immigration.

14             THE COURT:  All right.  Do you feel that any of those

15   experiences might make it difficult for you to be impartial in

16   judging this case?

17             JUROR YIANILOS:  No, Your Honor.

18             THE COURT:  In any respect, do you feel you might

19   believe the testimony of a federal law enforcement officer or

20   agent over that of an ordinary civilian?

21             JUROR YIANILOS:  No, Your Honor.

22             THE COURT:  All right.  Thank you, sir.

23             Anybody else in the center section?

24             How about on the far right then?  Yes, sir, your

25   name, please.

1          JUROR PHILLIPS:  Yes, Your Honor, Carter Phillips.

2          THE COURT:  Yes, Mr. Phillips.

3          JUROR PHILLIPS:  I was an assistant to the Solicitor

4   General from 1981 to 1984.

5          THE COURT:  All right.  Did you ever handle cases

6   involving these types of issues?

7          JUROR PHILLIPS:  I handled a wide range of criminal

8   cases while I was in the Justice Department.

9          THE COURT:  Mr. Phillips, do you feel in any respect

10  your past work in that area might make it difficult for you to

11  be impartial in judging this case?

12         JUROR PHILLIPS:  I don't think so, Your Honor, no.

13         THE COURT:  In any respect do you feel you might have

14  a pro prosecution bias, it's bad word, but I have to say it,

15  because of your past work?

16         JUROR PHILLIPS:  Too many years have passed, and I

17  have been on both sides of the aisle.

18         THE COURT:  And you are currently an attorney,

19  correct?

20         JUROR PHILLIPS:  I am currently an attorney.

21         THE COURT:  Have you done any criminal defense work?

22         JUROR PHILLIPS:  I have done a substantial amount of

23  criminal defense work.

24         THE COURT:  White collar?

25         JUROR PHILLIPS:  Yes, ma'am.

1          THE COURT:  All right.  Thank you, Mr. Phillips.

2          Anybody else?  Way in the back, yes, your name,

3    please.

4          JUROR WOLF:  My name is Garrett Wolf.

5    Approximately --

6          THE COURT:  Wait, wait, wait one second.  We have got

7    to find you on the papers.  Mr. Wolf, yes, sir.

8          JUROR WOLF:  Approximately 15 years ago I had a

9    year-long internship with the Department of Homeland Security.

10         THE COURT:  And what kind of things were you exposed

11   to there?

12         JUROR WOLF:  Just database administration.

13         THE COURT:  Database administration.  Is there

14   anything about that experience that you feel might make it

15   difficult for you to be impartial in judging this case?

16         JUROR WOLF:  No.

17         THE COURT:  All right.  Thank you, Mr. Wolf.

18         Now is there anybody else?  Anybody -- yes, your

19   name, please.

20         JUROR MEINKEN:  My name is Timothy Meinken.

21         THE COURT:  Yes, Mr. Meinken.

22         JUROR MEINKEN:  I'm not in law enforcement, but my

23   brother is an agent in the DEA.

24         THE COURT:  Is he around here?

25         JUROR MEINKEN:  No, he is not.

1          THE COURT:  All right.  Is there anything he may have

2   told you about his experiences as a DEA agent that you feel

3   could affect your ability to judge this case impartially?

4          JUROR MEINKEN:  No, I don't think so.

5          THE COURT:  In any respect do you think you might

6   believe the testimony of a federal law enforcement officer over

7   that of a civilian because your brother is a federal law

8   enforcement officer?

9          JUROR MEINKEN:  No, ma'am.

10         THE COURT:  All right.  Thank you, sir.

11         Anybody else?  Some of you have already answered this

12  question, so you don't need to repeat your answers.  But are

13  there any other jurors who have any specialized training or

14  experience, either in the areas of counterterrorism or

15  radicalization?  Is there anybody?

16         Have any members of the panel had any particularly

17  positive or negative experiences with persons of the Muslim

18  faith?  Is there anybody?

19         Yes, ma'am, your name, please.

20         JUROR MATTOS:  Kathy Mattos.

21         THE COURT:  Yes, Ms. Mattos.

22         JUROR MATTOS:  I teach English as a second language

23  to immigrants, and there are numerous people of the Muslim

24  faith.

25         THE COURT:  And it will probably -- you will hear

1    that the defendant is a convert to Islam.  In any respect would

2    your experience with members of that faith in your view make

3    any difference to you in terms of how you would judge this

4    case?

5             JUROR MATTOS:  I don't think so.

6             THE COURT:  All right.  Thank you, ma'am.

7             Is there anybody else?  Yes, in the back.

8             JUROR KASUN:  Regina Kasun.  I'm in health care, and

9    I work with many health care professionals that are Muslim.

10            THE COURT:  And, Ms. Kasun, is there any --

11            JUROR KASUN:  It's been positive.  I don't think it

12   would make any difference.

13            THE COURT:  In any respect would you feel that that

14   religion would in any way factor into your decision making in

15   this case?

16            JUROR KASUN:  No.

17            THE COURT:  All right.  Thank you, Ms. Kasun.

18            There were some other hands.  Yes, ma'am, your name,

19   please.

20            JUROR LAYTON:  Georgianna Layton.  I taught for

21   five years, so I have had a lot ESL students, ESL families.

22   And now for the last five years I mentor teachers.  So I work

23   with first- and second-year teachers, and I have ESL teachers

24   there, numbers of students, but there have been positive

25   interactions.

1          THE COURT:  So again, nothing about those

2    interactions that might affect your ability to be impartial in

3    judging the case?

4          JUROR LAYTON:  No, ma'am.

5          THE COURT:  All right.  Thank you.

6          Yes, I see another hand there.  Yes, ma'am.

7          JUROR HILLA:  Elizabeth Hilla.

8          THE COURT:  How do you spell your last name?

9          JUROR HILLA:  H-i-l-l-a.

10          THE COURT:  I have got you.  Yes, ma'am.

11          JUROR HILLA:  And same as these ladies, I teach

12    English as a second language as a volunteer position, so I meet

13    lots of people from Muslim countries.

14          THE COURT:  And you don't feel that in any respect

15    would affect your ability to be impartial in judging --

16          JUROR HILLA:  I don't think so.

17          THE COURT:  All right.  Thank you, Ms. Hilla.

18          Way in the back, yes, ma'am.

19          JUROR McKENZIE:  I think this might be repetitive,

20    but I --

21          THE COURT:  Are you Ms. Evans?

22          JUROR McKENZIE:  Ms. McKenzie.

23          THE COURT:  I am sorry, Ms. McKenzie.

24          JUROR McKENZIE:  What number am I?

25          THE COURT:  I will give it to you in a second here.

1    You are, if you are Patricia McKenzie, you are 53.

2              JUROR McKENZIE:  Thank you.  I'm an HR consultant

3    working with the Virginia Department of transportation, so I

4    work with a very diverse group of people in the community

5    allot.  So I would have no issues on this matter.

6              THE COURT:  Thank you, Ms. McKenzie.

7              On the far side, yes.

8              JUROR HOWARD:  Elizabeth Howard.

9              THE COURT:  Yes, Ms. Howard.

10             JUROR HOWARD:  Just in terms of positive experiences,

11   I have personal friends who are Muslim.

12             THE COURT:  And again, do you feel in any respect

13   that could affect your ability to judge this case impartially?

14             JUROR HOWARD:  No, I do not.

15             THE COURT:  All right.  Thank you, ma'am.

16             And in the back, yes, your name, please.

17             JUROR GOPAL RATNAM:  Ajitha Gopal Ratnam.

18             THE COURT:  You will have to spell the last name.

19             JUROR GOPAL RATNAM:  G-o-p-a-l --

20             THE COURT:  I have got you, Mr. Ratnam.

21             JUROR GOPAL RATNAM:  I have got friends who are

22   Muslim.  Nothing, I have just had positive --

23             THE COURT:  So again, you don't feel that would

24   affect you one way or the other?

25             JUROR GOPAL RATNAM:  No.

```
1              THE COURT:  All right.  Thank you, ma'am.

2              Anyone else on this side?

3              Center?

4              How about the far right?  Let me start at the front.

5    Yes, ma'am, your name, please.

6              JUROR TUCKER:  Elke Tucker.

7              THE COURT:  Can you spell the last name.

8              JUROR TUCKER:  T-u-c-k-e-r.

9              THE COURT:  Yes, Ms. Tucker.

10             JUROR TUCKER:  My stepson is Muslim, and the whole

11   family, but no negative experiences.

12             THE COURT:  So again, that would not in your view

13   make any difference to you?

14             JUROR TUCKER:  Probably not.

15             THE COURT:  I am sorry?

16             JUROR TUCKER:  Probably not.

17             THE COURT:  No.  All right.  Thank you, Ms. Tucker.

18             Way in the back in the corner.  Your name, sir.

19             JUROR WOLF:  Garrett Wolf.

20             THE COURT:  Yes, Mr. Wolf.

21             JUROR WOLF:  I am a Christian pastor, but I

22   participate in a lot of interfaith community dialogs with

23   people of various different faiths and backgrounds, but it's

24   all been positive experiences.

25             THE COURT:  All right.  So again, that wouldn't make
```

```
 1    any difference to you one way or the other?

 2              JUROR WOLF:  No.

 3              THE COURT:  All right, thank you.

 4              And in the corner.

 5              JUROR WUKITSCH:  Thomas Wukitsch.

 6              THE COURT:  Can you spell the last name again.

 7              JUROR WUKITSCH:  W-u-k-i-t-s-c-h.

 8              THE COURT:  Yes, sir.

 9              JUROR WUKITSCH:  I have several personal friends who

10    are Muslim, including a college roommate who is still one of my

11    best friends.  I do not feel that would affect my ability to

12    judge this case fairly.

13              THE COURT:  All right.  Thank you, sir.

14              Anybody else?

15              JUROR ASIAMA:  I am a Christian, and my wife is --

16              THE COURT:  I am sorry, wait a second.  You are Mr.

17    Asiama, number 2.

18              JUROR ASIAMA:  Kwami Asiama.

19              THE COURT:  Yes, sir.

20              JUROR ASIAMA:  I grew up in Ghana where we have

21    Muslims and Christians living together in a positive way.  And

22    I am practicing Christian, and I tried to convert some of them,

23    and I am not successful, but that's who I am.

24              THE COURT:  And do you feel in any respect the fact

25    that the defendant is a convert to Islam, would that in any
```

1    respect affect your ability to judge this case fairly?

2              JUROR ASIAMA:  No.

3              THE COURT:  All right.  Thank you, sir.

4              Is there anyone else?

5              Now, there will be evidence in this case of Mr. Young

6    possessing white supremacist and Nazi materials and having

7    expressed anti-Israel and anti-Semitic views.  This evidence is

8    being submitted solely to address the issue of the defendant's

9    predisposition.  Mr. Young is not being prosecuted for

10   possessing such materials or holding such beliefs.

11             Would you have any difficulty in fairly evaluating

12   the case in light of such evidence?

13             Would that evidence give any of you difficulty in

14   evaluating this case?  All right.  There may also be -- yes,

15   ma'am.  And your name again.

16             JUROR TUCKER:  Elke Tucker.

17             THE COURT:  Yes, Ms. Tucker.

18             JUROR TUCKER:  In regards to Nazi material, I am from

19   Germany, and I am particularly sensitive in that regard to that

20   period of time.

21             THE COURT:  So you think that could affect how you

22   would judge the case, Ms. Tucker?

23             JUROR TUCKER:  I would have to listen to it.  I don't

24   know.

25             THE COURT:  But it might?

1              JUROR TUCKER:  Could be.  I don't know.

2              THE COURT:  All right.  Thank you, ma'am.

3              Is there anybody else?  Yes, Mr. Asiama.

4              JUROR ASIAMA:  As a former student of the University

5  of Science and Technology in Ghana in Africa, in '87 I was a

6  member of the Ghana Holyland Fellowship Association.  In that

7  capacity, we visited Israel.  I just want to make sure I put

8  that in the record.

9              THE COURT:  But in any respect, would that make it

10  difficult for you to be impartial in judging this case?

11             JUROR ASIAMA:  No.

12             THE COURT:  No?  All right, sir.

13             Yes, ma'am.  And you are Ms. Brooks?

14             JUROR BROOKS:  Kira Brooks.  My husband and his

15  family are Jewish, and that would be hard for me to be

16  impartial.

17             THE COURT:  All right.  Thank you, Ms. Brooks.

18             Anybody else on the left side?

19             How about in the center?  Yes, ma'am, your name,

20  please.

21             JUROR OBUCHOWSKI-BERMAN:  Susan Obuchowski-Berman.

22             THE COURT:  Yes, ma'am.

23             THE OBUCHOWSKI-BERMAN:  My husband's side of the

24  family is Jewish.

25             THE COURT:  And do you feel that that kind of

1    evidence might make it difficult for you to be impartial?

2          JUROR OBUCHOWSKI-BERMAN:  Yes.

3          THE COURT:  All right.  Thank you, ma'am.

4          Is there anybody else?  Yes, your name, please.

5          JUROR PEISACH:  Brian Peisach.

6          THE COURT:  Can you spell the last name.

7          JUROR PEISACH:  P-e-i-s-a-c-h.

8          THE COURT:  Mr. Peisach, number 62.  Yes, sir.

9          JUROR PEISACH:  Well, I am Jewish, so I would be --

10          THE COURT:  Would that make it --

11          JUROR PEISACH:  I would be against anti-Semitism.

12    But in terms of the case, I don't think it would influence me.

13          THE COURT:  Do you feel though that if somebody had

14    that kind of literature in their possession or maybe espoused

15    anti-Israeli feelings, that that could make it difficult for

16    you to evaluate his case fairly?

17          JUROR PEISACH:  I think I could evaluate the case

18    fairly.

19          THE COURT:  All right.  Thank you, sir.

20          Anybody else?  All right.

21          There may be evidence in this case of Mr. Young

22    legally possessing multiple firearms.  Would any of you because

23    of things you have seen or heard about firearm possession in

24    United States, or because you are in advocacy groups either for

25    or against firearms, feel that that kind of evidence might make

1    it difficult for you to be fair in evaluating this case?  Is

2    there anybody?

3              Yes, ma'am, your name, please.

4              JUROR KASUN:  Regina Kasun.  I forget what number I

5    am.  I think I am 41.

6              THE COURT:  Yes, 42.

7              JUROR KASUN:  42.  I just have never been pro gun.  I

8    served in the military as an Army nurse way back, but just I

9    have never been pro gun personally.

10             THE COURT:  And so, if you had evidence of possession

11   of multiple firearms, that could be a problem for you?

12             JUROR KASUN:  It might sway my decision one way or

13   the other.  I am uncertain.

14             THE COURT:  All right.  Thank you, ma'am.

15             Yes, your name, please.

16             JUROR MATTOS:  Kathy Mattos.

17             THE COURT:  Yes, Ms. Mattos.

18             JUROR MATTOS:  Personal feelings against firearm

19   possession, especially multiples, make me wonder if I could be

20   really fair.

21             THE COURT:  Thank you, ma'am.

22             Yes, sir, your name, please.

23             JUROR McILVENNA:  Scott McIlvenna.  I am not sure of

24   my number.

25             THE COURT:  52.

1          JUROR McILVENNA:  52, okay.  I own a rifle for deer

2     hunting, so a state Virginia license.  But I would be impartial

3     to any information.

4          THE COURT:  And that's fine.  I mean, the Second

5     Amendment gives you a right to possess firearms, but some

6     people because of personal experiences, things they have read,

7     membership in the NRA, or membership in the Brady organization,

8     have strong views about firearm possession such that it could

9     affect an impartial evaluation of the case.

10          JUROR McILVENNA:  I don't have any memberships with

11     anything like that.

12          THE COURT:  So you don't have any problems with the

13     firearms?

14          JUROR McILVENNA:  No, ma'am.

15          THE COURT:  All right.  Thank you, sir.

16          Anyone else in the center?  How about way in the

17     back.  Yes, sir, your name, please.

18          JUROR GHOSE:  Devajyoti Ghose.  I don't have my juror

19     number.

20          THE COURT:  Wait, wait one second.  You are number

21     29.

22          JUROR GHOSE:  So I do have strong views about

23     firearms.  And I have some members of my family who had bad

24     experiences.

25          THE COURT:  So you feel that that evidence could make

1  a problem for you in being impartial?

2           JUROR GHOSE:  I am not sure.  It would depend upon

3  the type of weapons, but it is hard to make a broad judgment

4  about that.

5           THE COURT:  All right.  Thank you, sir.  Thank you.

6           Against the wall there, yes, sir.

7           JUROR DAVIS:  Yes, Ken Davis, juror 17.  I don't have

8  any affiliation with any firearms organizations, but I do have

9  strong personal feelings about ownership of multiple firearms.

10          THE COURT:  Do you feel that those feelings could

11 affect how you might judge this case?

12          JUROR DAVIS:  Potentially, depending upon the

13 quantity and the type of firearm.

14          THE COURT:  All right.  Thank you, sir.

15          Anybody else?  Yes, your name.

16          JUROR TUCKER:  Again, Elke Tucker.

17          THE COURT:  I'm sorry, your last name again?

18          JUROR TUCKER:  Tucker, T-u-c-k-e-r.

19          THE COURT:  Yes, Ms. Tucker.  The firearms give you

20 concern as well?

21          JUROR TUCKER:  Yes.  I am from Germany, we have

22 strict gun laws, guns aren't allowed.  And my personal belief

23 is they are too permissible with guns laws, so I would have a

24 problem.

25          THE COURT:  All right.  Thank you, ma'am.

1          Is there anybody else?  Yes, Mr. Asiama.

2          JUROR ASIAMA:  I think I would be really biased when

3   it comes to guns because I have a strong conviction about

4   firearms possession.

5          THE COURT:  Thank you, sir.

6          Is there anybody else?  All right.

7          Have any members of the panel themselves, or again,

8   remember, this applies to your immediate family members or

9   close personal friends, ever been the subject of a criminal

10  investigation or charged with violating a non-traffic criminal

11  law?

12         Anybody who has had that issue come up?  All right.

13         Have any members ever been the victim of a crime of

14  violence related to terrorism?

15         Yes, sir, your name again.

16         JUROR McCRAVE:  Michael McCrave.

17         THE COURT:  Yes, Mr. McCrave.

18         JUROR McCRAVE:  I had numerous friends at the

19  Pentagon on 9/11.

20         THE COURT:  All right.  Now, would that experience in

21  your view possibly affect how you might judge this case?

22         JUROR McCRAVE:  I would like to think not.

23         THE COURT:  I understand there is an ambivalence

24  there.  I mean, listen, it's very difficult to say, I'm not

25  sure I can be fair, but it's really important that you do that

1    kind of careful analysis.

2          JUROR McCRAVE:  Well, I have been thinking also on

3    the white supremacist literature and such, and that does

4    somewhat disturb me.

5          THE COURT:  All right.  Thank you, sir.

6          Yes.

7          JUROR PHILLIPS:  Carter Phillips, Your Honor.

8          THE COURT:  Yes, sir.

9          JUROR PHILLIPS:  I am the chair of Sidley Austin.

10   Sidley's offices were destroyed in 9/11.  I would have a hard

11   time putting that out of my mind.

12         THE COURT:  These are tough questions.  There are

13   serious issues in this case.  And I appreciate that, Mr.

14   Phillips.  Thank you.

15         JUROR PHILLIPS:  Thank you, Your Honor.

16         THE COURT:  Way in the back.  Yes, sir, your name,

17   please.

18         JUROR WUKITSCH:  Thomas Wukitsch.

19         THE COURT:  Yes, I am sorry, how do you spell your

20   last name?

21         JUROR WUKITSCH:  W-u-k-i-t-s-c-h.

22         THE COURT:  Yes, Mr. Wukitsch.

23         JUROR WUKITSCH:  Both of my parents were foreign

24   service officers serving in the Middle East.

25         THE COURT:  We are having trouble hearing you.  Can

1   you speak --

2           JUROR WUKITSCH:  Both of my parents were foreign

3   service officers serving in the Middle East.  Both of them,

4   particularly my father, were subject to various attempted

5   terrorist actions from time to time, people attempting to blow

6   him up in the course of his duties.  That never actually

7   occurred, thankfully.  And I do not think it would affect my

8   impartiality in this.

9           THE COURT:  You do not think that would affect you?

10          JUROR WUKITSCH:  No.  No, I do not.

11          THE COURT:  All right.  Thank you, sir.

12          Yes, your name, please.

13          JUROR YIANILOS:  Chris Yianilos.

14          THE COURT:  Yes, sir.

15          JUROR YIANILOS:  Your Honor, go back to your previous

16  question, I think it was whether you had a family member or

17  close personal friends that had been convicted of something

18  more than a minor traffic.

19          THE COURT:  Correct.

20          JUROR YIANILOS:  I have a close personal friend that

21  was convicted of a federal drug conspiracy.

22          THE COURT:  Was it in this court, if you know?

23          JUROR YIANILOS:  It was in this court back in the

24  late '80s.

25          THE COURT:  Do you know whether I might have been the

1    judge?

2            JUROR YIANILOS:  You were not.

3            THE COURT:  All right.  Is there anything about that

4    experience in your family or -- did you come to the trial at

5    all?

6            JUROR YIANILOS:  No.  And it was a friend, not a

7    family member.

8            THE COURT:  All right.  Is there anything about that

9    experience that you feel could affect your impartiality in

10   judging this case?

11           JUROR YIANILOS:  No, Your Honor.

12           THE COURT:  All right.  Thank you, sir.

13           Folks, I have asked you a lot of questions.  If there

14   is something that comes to mind as this is going on and you

15   realize that maybe you have an answer to a previous question,

16   it's perfectly appropriate for you to raise your hand.

17           All right.  I think the question we're asking though

18   right now was whether any of you have ever been the victim of a

19   crime of violence involving terrorism.

20           Yes, ma'am, your name, please.

21           JUROR LAYTON:  Georgianna Layton.  My sister and

22   cousin were in the Twin Towers, they both came out alive, but

23   very scary thought.

24           And going back, with gun control, my brother-in-law

25   just recently passed, was a New York City policeman, shot in

1    the line of duty.  His partner was shot and killed, and they

2    maimed him in the knees so he couldn't do anything to help him.

3            So gun control, I am against also.

4            THE COURT:  So do you feel those experiences might

5    make it difficult for you to be impartial in judging this case?

6    Some of those issues --

7            JUROR LAYTON:  Gun control I feel very strongly

8    about.

9            THE COURT:  All right.

10           JUROR LAYTON:  Because that was a police officer that

11   was attacked, both of them.

12           THE COURT:  Thank you, ma'am.  Thank you.

13           Anybody else?

14           I think we have had a few of you who told me you are

15   lawyers, but let me just ask this question.  Have any of you

16   received any training in the law?  That is, are you currently a

17   lawyer or have taken law courses?  Are you a paralegal or have

18   taken paralegal courses?  Are you a legal secretary?  Or do you

19   work in a law firm?

20           So I want to know now whether any of you have any

21   training or experience in the field of law?  Anybody on the

22   left side?  No?

23           How about in the center?  Mr. McCrave.

24           JUROR McCRAVE:  Yes, ma'am.  I was a Navy legal

25   officer for two years on the ship.

1           THE COURT:  All right.  Thank you, sir.

2           Anybody else in the center?  Yes, ma'am.  You are --

3           JUROR OBUCHOWSKI-BERMAN:  Susan Obuchowski-Berman.

4           THE COURT:  Yes.  And you have some legal training?

5           JUROR OBUCHOWSKI-BERMAN:  I do.  I have a Master's in

6    criminal justice investigation, so I did take some law courses

7    during that.  And I deal with law in my day-to-day work.

8           THE COURT:  All right.  Thank you, ma'am.

9           Yes, Mr. --

10          JUROR OLIVER:  Juror number 60.  I am currently

11   enrolled in university, criminal justice student.

12          THE COURT:  And you are Mr. Oliver?

13          JUROR OLIVER:  Yes, ma'am.

14          THE COURT:  All right.  You're taking courses.

15          All right.  Anybody else?  Yes.

16          JUROR YIANILOS:  Christopher Yianilos.  I'm an

17   inactive member of the Virginia Bar.  And I served as a federal

18   law clerk in the mid-'90s.

19          THE COURT:  Where did you clerk?

20          JUROR YIANILOS:  Southern District of West Virginia.

21          THE COURT:  Is there anything about your legal

22   training or experience that you feel could affect your

23   impartiality in this case?

24          JUROR YIANILOS:  No, Your Honor.

25          THE COURT:  Now, at the end of the trial I give the

1   jury the legal instructions.  Those are the principles of law

2   that have to be applied.

3        Should I explain a principle that is different from

4   what you might remember it being, or you disagree with how I

5   have phrased it, can you put aside your own view of the law and

6   just follow the law as given to you by the Court.

7        JUROR YIANILOS:  Yes, Your Honor.  I don't think I

8   have my own views of the law anymore, it has been so long.

9        THE COURT:  They might come back when you've heard

10   them.  But anyway -- All right.  Thank you, sir.

11        Is there anybody else?  All right, Mr. Phillips, I

12   know about you.

13        Yes, sir, your name again.

14        JUROR PEISACH:  Brian Peisach.

15        THE COURT:  Your name?

16        JUROR PEISACH:  Brian Peisach.

17        THE COURT:  Yes, Mr. Peisach.

18        JUROR PEISACH:  I have taken some courses in college

19   on criminology and business law.

20        THE COURT:  All right.  Thank you, sir.

21        Anybody else?

22        Do any members of the panel have any prior jury

23   experience either serving on a trial jury or a grand jury,

24   whether in state or federal court?

25        How about -- all right, we will start on the right

1    side this time.  Yes, the person on the aisle.

2            JUROR SHANHOLTZER:  Yeah, Mike Shanholtzer.  I think

3    I am 72.  I was on a criminal trial case in Leesburg.

4            THE COURT:  How long ago, do you remember?

5            JUROR SHANHOLTZER:  Probably ten years ago.

6            THE COURT:  And what was the issue in the case?

7            JUROR SHANHOLTZER:  It was assault and battery, and

8    some theft involved, felony theft.

9            THE COURT:  Do you remember what the jury did?

10           JUROR SHANHOLTZER:  It was a conviction.

11           THE COURT:  Was there anything about your experience

12   as a juror in that case that you feel could affect your

13   impartiality in judging this case?

14           JUROR SHANHOLTZER:  No, I don't think so.

15           THE COURT:  All right.  Thank you, sir.

16           How about anybody else on the right side?  Yes, your

17   name, please.

18           JUROR TUMP:  Neil Tump.

19           THE COURT:  What's the last name?

20           JUROR TUMP:  Tump, T-u-m-p.

21           THE COURT:  Tump, T-u-m-p, yes, sir.

22           JUROR TUMP:  Served on jury duty in the state of

23   Florida ten years ago in a criminal case.

24           THE COURT:  What was at issue, do you remember?

25           JUROR TUMP:  Drugs, drug dealing.

1          THE COURT:  What did the jury do?

2          JUROR TUMP:  Convicted.

3          THE COURT:  Was there anything about your experience

4   as a juror in that case that you feel could affect your

5   impartiality to be a juror in this case?

6          JUROR TUMP:  No, Your Honor.

7          THE COURT:  All right.  Thank you, Mr. Tump.

8          Anyone else on the right side?  Yes, ma'am.

9          JUROR TUCKER:  Yes, I was a juror in Manassas

10  12 years ago.

11         THE COURT:  Was there anything about that experience

12  that you feel could affect your impartiality?

13         JUROR TUCKER:  No.

14         THE COURT:  All right.  Thank you, ma'am.

15         And way in the back.  Yes, sir, your name, please.

16         JUROR GOLDSTEIN:  Ron Goldstein.

17         THE COURT:  Yes, Mr. Goldstein.

18         JUROR GOLDSTEIN:  I served on a municipal court jury

19  in Southern California.

20         THE COURT:  How long ago was that, if you can recall?

21         JUROR GOLDSTEIN:  About 30 years.

22         THE COURT:  What was at issue, do you remember?

23         JUROR GOLDSTEIN:  Prostitution, assault and battery,

24  and repossession of a home.

25         THE COURT:  And what did the jury do?

1          JUROR GOLDSTEIN:  Prostitution was a conviction.

2    Repossession of the home, he lost the home plus punitive

3    damages.  And the assault and battery was dismissed.

4          THE COURT:  Is there anything about those experiences

5    that you feel could affect your impartiality in judging this

6    case?

7          JUROR GOLDSTEIN:  No.

8          THE COURT:  All right.  Thank you, Mr. Goldstein.

9          How about in the center section?  Let's start in the

10   first row.  Again, your name, sir.

11         JUROR EVANCHO:  Evancho, George.  I served in a civil

12   case back in, oh, gosh, 1972 while I was a student at King's

13   College in Wilkes Barre, Luzerne County.  And a criminal case

14   in Prince William County sometime during the '90s, I don't

15   remember exactly.

16         THE COURT:  What was involved in the criminal case?

17         JUROR EVANCHO:  It was drugs.

18         THE COURT:  Drugs?

19         JUROR EVANCHO:  Yes.

20         THE COURT:  And what did the jury do?

21         JUROR EVANCHO:  It was pled several days into the

22   case.  There was a plea agreement.  And we don't know what

23   happened.

24         THE COURT:  Was there anything about those

25   experiences that you feel could affect your impartiality in

1    judging this case?

2          JUROR EVANCHO:  No, Your Honor.

3          THE COURT:  All right.  Thank you, sir.

4          Yes, ma'am.

5          JUROR LEWIS:  Michele Lewis.

6          THE COURT:  I am sorry, the last name?

7          JUROR LEWIS:  Lewis.  I am sorry.

8          THE COURT:  Yes, ma'am, Lewis.

9          JUROR LEWIS:  I served as a foreman of the grand jury

10   out in Prince William County about five years ago.  But no jury

11   duty.  I just served as the foreman.

12         THE COURT:  All right.  Now, you know that grand

13   juries are very different from trial juries?

14         JUROR LEWIS:  Right, right.  Oh, yeah.

15         THE COURT:  Ms. Lewis, was there anything about your

16   experience on a grand jury that you feel could affect your

17   impartiality in judging this case?

18         JUROR LEWIS:  No.

19         THE COURT:  Thank you, ma'am.

20         Yes, your name again, please.

21         JUROR McILVENNA:  McIlvenna, I think it's 52, if I

22   can remember correctly.

23         THE COURT:  It is.

24         JUROR McILVENNA:  Leesburg, probably about 12 years

25   ago, a DUI case.  The individual was convicted, kind of go

1    through a rehabilitation program.

2              THE COURT:  Was there anything about your experience

3    on that jury that you feel might make it difficult for you to

4    be an impartial juror in this case?

5              JUROR McILVENNA:  No, Your Honor.

6              THE COURT:  Thank you, sir.

7              Way in the back.  Yes, sir.

8              JUROR YIANILOS:  Last name Yianilos.

9              THE COURT:  Yes, sir.

10             JUROR YIANILOS:  Perhaps two or three years ago I was

11   in a jury in the city of Alexandria for a DUI case.

12             THE COURT:  Was there anything about that -- what did

13   the jury do in that case?

14             JUROR YIANILOS:  Convicted.

15             THE COURT:  Was there anything about that experience

16   that you feel could affect your impartiality as a juror in this

17   case?

18             JUROR YIANILOS:  No, Your Honor.

19             THE COURT:  All right.  Thank you, sir.

20             All right.  Yes, yes, ma'am.

21             JUROR KASUN:  Regina Kasun, 42.  I was just thinking

22   about the white supremacy issue.  And I think that that might

23   be difficult for me.

24             THE COURT:  Thank you, Ms. Kasun.

25             All right.  Way in the back.  Yes, you are Mr. --

1          JUROR OLIVER:  Juror number 60, Oliver.

2          THE COURT:  Mr. Oliver.

3          JUROR OLIVER:  What she just said, with the white

4     supremacy, that would be a problem for me.

5          THE COURT:  Thank you, Mr. Oliver.

6          On the left side, is there anybody -- do I have

7     everybody with jury experience now?  Anybody on the left side?

8          Do any members of the panel feel that they have a

9     problem understanding or speaking English?  Anybody?

10         All right.  Let me start with -- your name, please.

11         JUROR CAYLOR:  Caylor, Nubia.

12         THE COURT:  Can you spell the last name.

13         JUROR CAYLOR:  C-a-y-l-o-r.

14         THE COURT:  Ms. Caylor?

15         JUROR CAYLOR:  Yes.

16         THE COURT:  Have you had any trouble understanding

17    what I have said?

18         JUROR CAYLOR:  No.  But if I am required to do

19    writing, or sometimes understanding very sophisticated words, I

20    may have trouble.

21         THE COURT:  Ms. Caylor, jurors don't have to write

22    anything.

23         JUROR CAYLOR:  All right.

24         THE COURT:  But you have to be able to listen and

25    understand.  And there may be -- there may be evidence that you

1   need to read.  Do you have any trouble reading English?

2          JUROR CAYLOR:  No.  This is my first experience, so I

3   don't know what is involved.  So I don't want to be -- do

4   something that I am unable to do properly.

5          THE COURT:  I am able to understand you.  And if you

6   have been able to understand me, then I think your English is

7   fine.

8          JUROR CAYLOR:  All right.  Thank you.

9          THE COURT:  All right.  Thank you, Mr. Caylor.

10          Let's see.  Yes, your name, please.

11          JUROR CHOI:  Kyou-Bin Choi.  I think I'm number 12.

12          THE COURT:  Number 12.  Yes, Ms. Choi.

13          JUROR CHOI:  Yes.  Throughout the day I think I

14   understand most of the English, this is my second language, but

15   I kind of -- I think I'm missing some.

16          THE COURT:  Do you feel you haven't understood

17   everything I've said?

18          JUROR CHOI:  I guess some of them.

19          THE COURT:  All right.  Thank you, ma'am.

20          Way in the back.  Yes, sir, your name, please.

21          JUROR GREWAL:  Grewal, Rachpal.

22          THE COURT:  Can you spell -- can you spell the last

23   name.

24          JUROR GREWAL:  Grewal, G-r-e-w-a-l.

25          THE COURT:  G-

1          JUROR GREWAL:  -- r-e-w-a-l.

2          THE COURT:  Grewal.

3          JUROR GREWAL:  Yes, ma'am.

4          THE COURT:  Yes, sir.

5          JUROR GREWAL:  I have like some difficulty about

6    words I cannot understand.  So I don't want to make a wrong

7    decision, that's what I am saying.

8          THE COURT:  All right.  Thank you, sir.

9          Yes, your name, please.  The gentleman on the aisle.

10         JUROR KWAK:  Yes, number 44, Tae Kwak.  I already

11   tell you, I'm sorry, I cannot understand some communication.

12         THE COURT:  All right, Mr. Kwak, thank you.

13         Anybody else for whom English is a problem?  Yes,

14   sir, your name, please.

15         JUROR SHIVAPURKAR:  Narayan Shivapurkar.  I have a

16   case --

17         THE COURT:  Wait, just one second, I have got to get

18   your name on my list here first.  How do you spell the last

19   name?

20         JUROR SHIVAPURKAR:  Shivapurkam.  S-h-i-v-a --

21         THE COURT:  You're number 73.

22         JUROR SHIVAPURKAR:  Yes.  Medically, I am taking some

23   medication, so I have temporary some hearing problems.

24   Hopefully it will be taken care of, but in the nearest future I

25   might have some problems, especially with your speaking from

1    there.  I have some -- I have no problem with talking to him or

2    something.

3              THE COURT:  Well, we do have hearing -- we have

4    earphones that we can give people who have --

5              JUROR SHIVAPURKAR:  Yes, something like that would be

6    needed.

7              THE COURT:  And again, any juror who cannot

8    understand something -- jurors are not allowed to ask

9    questions, but if you couldn't hear, or if an English word was

10   not understandable, you can raise your hand as a juror and we

11   will correct that.

12             So if we are able to give you the headset, do you

13   feel that you understand English well enough?

14             JUROR SHIVAPURKAR:  Yes, ma'am.

15             THE COURT:  Very good.  Thank you, sir.

16             Anybody else?

17             Now, ladies and gentlemen, I have asked a far range

18   of questions, and you all know the background for this.  That

19   is, that we need to have jurors who can be completely impartial

20   as they evaluate this case and who have the time and the energy

21   to give this case.

22             So do any of you know of any other reason than you've

23   already given to me why you feel you could not sit as

24   completely attentive and fair juror?

25             All right, counsel, approach the bench.

1          NOTE:  A side-bar discussion is had between the Court

2   and counsel out of the hearing of the jury panel as follows:

3   AT SIDE BAR

4          THE COURT:  All right.  I am planning to, if our

5   numbers are right, we are going to be two short.  Which means

6   I'm taking the strikes from the Government.  I want to get this

7   case started.

8          First of all, are there any additional voir dire

9   questions the Government wants the Court to ask?

10         MR. GIBBS:  No.  We're good, Judge.

11         THE COURT:  You're satisfied.  All right.

12         Any additional voir dire that the defense wants the

13  Court do ask?

14         MS. MORENO:  We are satisfied.

15         THE COURT:  You're satisfied.  Here are the jurors I

16  am going to strike.  All right.  Number 2, Mr. Asiama.  Number

17  9, Kira Brooks.  Number 12, Choi.  17, Davis.  29, Ghose.  33,

18  Grewal.  42, Kasun, that was firearms and anti-Semitism.  44,

19  Kwak, that is English.  47, Layton.  50, Mattos.  51, McCrave.

20  59, Obuchowski-Berman, anti-Semitism was an issue there.  60,

21  Oliver, that was the white supremacy.  63 Phillips.  84,

22  Tucker, that was firearms and Nazi.

23         Are there any other jurors -- first of all, does the

24  Government have any objection to the jurors that I have struck?

25         MR. GIBBS:  No, Judge.

1          THE COURT:  Are there any additional jurors the

2     Government wants the Court to consider for cause?

3          MR. GIBBS:  No, we're good, Judge.  Thank you.

4          THE COURT:  Are there any -- first of all, is there

5     any objection to the jurors whom I have just struck?

6          MS. MORENO:  No, Your Honor.

7          THE COURT:  All right.  Are there any additionals you

8     would like stricken?

9          MS. MORENO:  Yes, Your Honor.  We would ask juror

10    number 11, Caylor, Nubia Janeth, to be struck on the basis of

11    language.  We believe that she does not -- she is not going to

12    be able to get through this case fairly.

13         And if the Court is conflicted about that, I would

14    ask the Court to ask her more deeply about that because she

15    volunteered that she had a problem.  When she spoke, it seemed

16    like she did.  This certainly was her second language.

17         So we would ask the Court to strike juror number 11,

18    I believe it is, for language issues.  That's the first one.

19         THE COURT:  Well, that's interesting.  She works --

20    her employer is Virginia Heart.  Let me find out what kind of

21    work she does do.  Hold on, you all just all step aside for a

22    second.

23         NOTE:  The side-bar discussion is concluded;

24    whereupon the case continues before the jury panel as follows:

25    BEFORE THE JURY PANEL

1           THE COURT:  Ms. Caylor, what kind of work do you do?

2           JUROR CAYLOR:  I work at INOVA Hospital.

3           THE COURT:  You work at a hospital?

4           JUROR CAYLOR:  INOVA.  And I do registration.

5           THE COURT:  Registration?

6           JUROR CAYLOR:  Yes.

7           THE COURT:  How long have you been in the United

8  States?

9           JUROR CAYLOR:  Like 19 years.

10           THE COURT:  19 years?

11           JUROR CAYLOR:  I can communicate fine and I write,

12  but I don't know what level for my English can be, like

13  superseded by what you guys require me to do.

14           THE COURT:  It sounds as though you are more confused

15  about what you do as a juror than English.

16           JUROR CAYLOR:  Yeah.

17           THE COURT:  But you say you do registration at one of

18  the Fairfax hospitals?

19           JUROR CAYLOR:  Yes.

20           THE COURT:  Okay.

21           NOTE:  A side-bar discussion is had between the Court

22  and counsel out of the hearing of the jury panel as follows:

23  AT SIDE BAR

24           THE COURT:  I think her biggest problem is that she

25  has a little difficulty expressing herself.  But if she has

1    been in the States for 19 years, she works registration at an

2    America hospital, she seemed to understand the question.

3             MS. MORENO:  Well, Your Honor, I would say that a

4    juror has to be able to express themselves very well in the

5    deliberating room.  And we would reassert our objection on the

6    basis of language for cause to that particular juror.

7             THE COURT:  I am going have to sit down and do the

8    math on this to see.  We are so close to having enough jurors,

9    we need to get this case going.  I will think about it.

10            Go ahead.

11            MS. MORENO:  May I ask Your Honor, did the Court

12   strike juror 17?

13            THE COURT:  Yes.

14            MS. MORENO:  Okay, thank you.  I'm so sorry.

15            THE COURT:  That was firearms, among other things.

16            MS. MORENO:  Your Honor, we would assert that juror

17   number 22, Mr. Evancho, should be stricken for cause.  He had

18   dealings with the SCIF.  He thinks he is familiar with Mr.

19   Gervino.  In fact, the quote is, he's sure he has had dealings

20   with Mr. Gervino, who is a witness for the prosecution.  He is

21   a retired federal employee.

22            We would ask the Court to find a cause challenge on

23   juror number 22.

24            THE COURT:  Yeah, I had double question marks about

25   him too.  If I had enough, I would be much more willing to.  We

1    have got to check the numbers.

2              MS. MORENO:  If I may, just 30 seconds, Your Honor.

3              Oh, juror number 73, Mr. Shivapurkar.  I do not

4    believe the Court struck juror number 73.  And you talked about

5    his hearing issues.  But I am convinced that language is an

6    issue for this particular juror.  And we don't believe that he

7    can -- that he is fit to serve, understanding the language and

8    expressing himself as a juror must do in deliberations.

9              So we would urge a cause strike on juror number 73.

10             I think that may be -- oh, sorry, there is one more.

11             THE COURT:  Well, believe it or not, he is on the

12   university faculty at Georgetown.  So let me -- if we're

13   talking about the same juror.

14             MS. MORENO:  Shivapurkar.

15             THE COURT:  Shivapurkar, number 73.  He is a

16   university professor.  So English will not be a problem.  I

17   will double-check that.  Let me do that right now.

18             MR. SMITH:  Could we provide him with a headset?

19             THE COURT:  Yes.

20             NOTE:  The side-bar discussion is concluded;

21   whereupon the case continues before the jury panel as follows:

22   BEFORE THE JURY PANEL

23             THE COURT:  Mr. Shivapurkar, where are you, sir?

24   Shivapurkar?

25             Did he go out?

1          Give him some headsets.

2          Mr. Shivapurkar, can you hear me now?

3          JUROR SHIVAPURKAR:  Yeah, yeah, no problem.

4          THE COURT:  Do I understand you are a university

5    professor at Georgetown?

6          JUROR SHIVAPURKAR:  I am, yes.

7          THE COURT:  What do you teach?

8          JUROR SHIVAPURKAR:  I am in oncology.

9          THE COURT:  Oncology?

10         JUROR SHIVAPURKAR:  Yes.

11         THE COURT:  So you are in medicine?

12         JUROR SHIVAPURKAR:  Medical school, yes.

13         THE COURT:  Do you have any problem with English at

14   all?

15         JUROR SHIVAPURKAR:  No, no.

16         THE COURT:  It's just the hearing?

17         JUROR SHIVAPURKAR:  Yeah, the hearing, anything you

18   say to me, it can be taken care of, but I am not sure whether

19   it can be taken care of within a week or so.

20         THE COURT:  If we have the earphones that we can give

21   you for the whole trial, will that --

22         JUROR SHIVAPURKAR:  Yes, that's fine.

23         THE COURT:  Thank you.

24         NOTE:  A side-bar discussion is had between the Court

25   and counsel out of the hearing of the jury panel as follows:

1   AT SIDE BAR

2          THE COURT:  Okay, he can hear.

3          MS. MORENO:  One last --

4          THE COURT:  Wait, wait, one second.  Go ahead.

5          MS. MORENO:  One last request, Your Honor.  Juror

6   number 62, Brian Peisach.

7          Your Honor, he identified -- he stood up when the

8   Court was inquiring about whether anyone would have any issues

9   or problems with the white supremacist literature and the Nazi

10  paraphernalia.  He immediately identified himself.  And he said

11  that he -- first, he said he would, and then he said he

12  wouldn't.

13         And I don't think the Court should take any chances

14  with a juror like that.  So we would urge a cause strike

15  against juror number 62.

16         MR. GIBBS:  Judge, I don't think that's a basis for

17  cause.  Again, you asked a very clear question.  He talked

18  about it, but the follow up was:  Can you be fair and

19  impartial --

20         THE COURT:  I'm not going to strike every Jewish

21  member of the panel.  He identified himself as Jewish, but he

22  did not indicate there would be a problem.

23         So you certainly have a bunch of peremptories, you

24  have got 11, so I am not taking any peremptories away from you,

25  but I am going to overrule that objection.  So he will still be

1    on the board.

2          And it's one attorney per issue.  So, Ms. Moreno,

3    you've got the voir dire.  But the same, when you have got a

4    witness, if you do the direct, you do all the objecting for

5    that witness.

6          MS. MORENO:  I understand.

7          MR. GIBBS:  Thank you, Judge.

8          THE COURT:  So the two I haven't resolved, Caylor I'm

9    satisfied, I am going to overrule your objection on Caylor

10   because 19 years in the United States and she is a registrar at

11   a local hospital.

12         Evancho is the only one, number 22.

13         MS. MORENO:  Your Honor --

14         THE COURT:  The problem we apparently have is that

15   the last juror, the professor, because he didn't let us know

16   that he wasn't able to hear, did not probably hear the whole

17   voir dire.  So I hate to have to do it all over again.

18         Is the Government sufficiently satisfied with the

19   basic pool that we have got that you're not going to squawk

20   about losing one or two peremptories?

21         MR. GIBBS:  We are not going to squawk about that.

22   That's fine if we lose some peremptories.

23         THE COURT:  All right.  Well, I am going to go ahead

24   and -- I am not going to over the whole -- we have been here

25   for two hours.  I am not going to --

1          MS. MORENO:  Your Honor, we are going to withdraw our

2     objection to juror number 73.  We will withdraw our

3     peremptory -- I mean, our challenge for cause to juror number

4     73.

5          THE COURT:  Then I will trade you, I will give you

6     Evancho.

7          MS. MORENO:  Thank you, Your Honor.

8          THE COURT:  All right.  So Evancho is out, 22 is out.

9     All right.  Caylor is staying in.  And Mr. Shivapurkar is

10    staying in.  Okay.

11         Are we all clear on that?  Ready?

12         MS. MORENO:  May I ask, Your Honor, just the next

13    protocol in terms of the striking, will we have just a couple

14    of minutes to confer about these names?

15         THE COURT:  You have got to do it quickly, but go

16    ahead.

17         MS. MORENO:  I understand.

18         THE COURT:  One more minute.  Up here though.  I

19    don't want you going back to your tables.

20         In terms -- I thought what the Court was going to do

21    was put 14 in the box now.

22         THE COURT:  Only of the ones that I have not stricken

23    from the -- yes.  The next thing that is going to happen is my

24    courtroom deputy will call 14 names.  They are going up there.

25    But the 14 she calls are going to be from the group that I have

1    not stricken for cause.

2            MS. MORENO:  Yes, Your Honor.

3            THE COURT:  You then start using your peremptories.

4            MS. MORENO:  Yes, yes.  But because we don't back

5    strike, we have to wait to see who the 14 are, am I correct in

6    that?

7            THE COURT:  Yes.

8            MS. MORENO:  Okay.  I just wanted to make sure.

9            THE COURT:  But once the 14 are there, you have got

10   14 in the box, the Government gets the board first.  If they

11   don't strike anybody --

12           MS. MORENO:  I understand.

13           THE COURT:  If they strike two, you have got 12 left.

14           MS. MORENO:  I understand.

15           THE COURT:  But anyone who you don't strike on that

16   first round is in.

17           MS. MORENO:  I understand.  No back-striking.

18           THE COURT:  Then we're set to go.

19           MS. MORENO:  I appreciate that.

20           THE COURT:  And I am finding the panel now to be

21   without any problems.  All right.  This panel is acceptable to

22   the Court.  I think we are going to go ahead and choose a jury.

23           NOTE:  The side-bar discussion is concluded;

24   whereupon the case continues before the jury panel as follows:

25   BEFORE THE JURY PANEL

1      THE CLERK:  If I call your name, please come forward

2    and have a seat in the jury box.

3      Juror number 26, Jo Ellen Frost.  Juror number 54,

4    Timothy Meinken.  Juror number 32, Ajitha Gopal Ratnam.  Juror

5    number 48, Michele Lewis.  Juror number 62, Brian Peisach.

6    Juror number 70, Justin Sculietti.  Juror number 72, Michael

7    Shanholtzer.  Juror number 91, Thomas Wukitsch.  Juror number

8    31, Ronald Goldstein.  Juror number 56, Scott Mueller, Sr.

9    Juror number 39, Robert Hull, Jr.  Juror number 85, Neil Tump.

10   Juror number 5, Stephan Batt.  Juror number 3, Lina Barkawi.

11     MS. MORENO:  She is not --

12     THE COURT:  No, she is not here.

13     THE CLERK:  Juror number 45, David Larson.

14     NOTE:  The lawyers exercise their strikes.

15     THE CLERK:  If I call your name, you may leave the

16   courtroom and exit the building.  Juror number 48, Michele

17   Lewis.  Juror number 72, Michael Shanholtzer.  Juror number 62,

18   Brian Peisach.  Juror number 26, Jo Ellen Frost.  Juror number

19   5, Stephan Batt.

20     NOTE:  The above-named jurors are excused and leave

21   the courtroom.

22     THE CLERK:  If I call your name, please come forward

23   and have a seat in the jury box.  Juror number 30, Thomas

24   Goidich.  Juror number 8, Arthur Briggs.  Juror number 94,

25   Christopher Yianilos.  Juror number 90, Garrett Wolf.  Juror

1    number 10, Timothy Carper, IV.

2              NOTE:  The lawyers exercise their strikes.

3              THE CLERK:  If I call your name, you may leave the

4    courtroom and exit the building.  Juror number 10, Timothy

5    Carper.

6              NOTE:  The above-named juror is excused and leaves

7    the courtroom.

8              THE CLERK:  If I call your name, please come forward

9    and have a seat in the jury box.

10             Juror number 1, Woogas Ali.

11             NOTE:  No furthers strikes are taken.

12             THE CLERK:  Ladies and gentlemen, will you please

13   stand and raise your right hand.

14             NOTE:  The jury for the case is sworn.

15             THE COURT:  I want to thank everybody who attended

16   court this afternoon, I know it has been a long time, but we

17   have now selected the 14 people who will be the jury in this

18   case.

19             So the rest of you are free to leave, or you may stay

20   and watch the proceedings.  But thank you for your attendance.

21             NOTE:  Those jurors not selected for jury duty are

22   excused and leave the courtroom.

23             THE COURT:  Now, ladies and gentlemen, I know you

24   want to take a break, and in about five minutes I am going to

25   let you take a break, but I want to give you some preliminary

1    instructions.

2           First of all, Mr. Goidich and Mr. -- I'm sorry, I

3    don't have your names correct, Mr. Wukitsch, I am terrible on

4    names, but the two of you who are sitting on the end, we are

5    going to give you notebooks and let you pass them down to each

6    other.  I am sorry, they are on the other end this time.  So

7    Mr. Larson and Mr. Wolf.

8           Many judges don't let jurors take notes, but it is my

9    practice to let jurors take notes if they want to.  And I just

10   want to give you a quick caution about that.

11          If you do decide to take notes, that's only for your

12   own personal memory aid.  You don't have to take notes.  It is

13   very important for jurors to make sure you're always watching

14   witnesses as they testify because facial expressions, how

15   people just walk around the courtroom, all that can tell you

16   something about them.  And so, we don't want you to have your

17   head buried in your lap trying to take notes.

18          The most important thing is to be listening carefully

19   because at the end of the case you will have to rely upon your

20   memory of the evidence when you make your decisions.

21          If note taking helps you keep focussed and helps you,

22   you're welcome to take notes.  But they are your own personal

23   memory aid.  They are not evidence in the case.  They are not

24   to be shown to the other jurors.

25          And you are all co-equal judges.  Each of your

1    individual memories and your opinions about the evidence is

2    worthy of consideration and respect by all the other jurors.

3         The fact that some of you may have taken a lot of

4    notes doesn't mean that that juror's memory or opinion is any

5    more worthy of consideration than that of a juror who takes

6    very few or none.

7         So with those understandings in mind, you're welcome

8    to take notes.  Whenever we're on a recess, just leave your

9    notebooks on your chairs, and we will get them back to you.

10   And of course, overnight we would keep them here as well.

11        Now, very quickly, I will give you an overview of

12   what you can expect in terms of the structure of the trial.

13   When you get back from your afternoon break, we're going to

14   have what is called opening statements.  I have given each side

15   approximately 20 minutes for making their opening statements.

16   This is the time when the lawyers will give you a brief

17   overview as to what the lawyers believe the case will look like

18   at the end.

19        If you know jig-saw puzzles, you know that the box

20   cover has the picture of the final puzzle.  You put all the

21   pieces together, and here is what you get.  And you're

22   basically going to get two different covers.  That's usually

23   what happens with opening statements.

24        Now, in a criminal case, the burden is upon the

25   Government, that is the prosecution, to prove its case.  And

1    that burden of proof is called proof beyond a reasonable doubt.

2            And because that is a heavy burden, the rules provide

3    that the Government gets to go first at each stage of the

4    proceedings.  That's why the Government, the prosecutors, will

5    make the first opening statement.  Then we turn to the defense.

6            Now, in our legal system, there is absolutely no

7    burden or obligation on a defendant to do anything at trial.

8    The defense doesn't have to make an opening statement, they

9    don't have to call any witnesses, they don't have to ask any

10   questions, because the burden of proof is on the Government.

11           A person who has been charged with criminal activity

12   walks into a courtroom with no evidence against him, a

13   completely clean slate.  That's called a presumption of

14   innocence.  And that presumption is only overcome if the

15   Government can prove guilt beyond a reasonable doubt.

16           But if the defense does want to make an opening

17   statement, then they would make it at that time.

18           After the opening statements are made, then we get

19   into the evidence portion of the trial.

20           Now, in this case there are different categories of

21   evidence.  The parties have stipulated to certain facts.  When

22   the parties stipulate to a fact, that means that they are not

23   going to present any evidence to prove that fact.  They are

24   satisfied that that fact is the case.

25           But you are the jury and the jury has the right to

1    disregard a stipulation because you are the fact finders.  But

2    I just want you to understand what a stipulation is.

3            The next type of evidence is the testimony of

4    witnesses.  All of the witnesses in this case will be in the

5    courtroom testifying from that witness box.

6            As I indicated earlier, there are a couple of

7    witnesses who, when they testify, the rest of the people in the

8    courtroom will not be able to see them.  You will be able to.

9            And there will be a couple of witnesses who will be

10   testifying under pseudonyms.  That is, not their true name.

11   And I have already explained that to you during the voir dire.

12           The Government will call its first witness, and that

13   line of questions is called the direct examination.  After the

14   direct examination is done, if the defense has issues they want

15   to raise, they can do what is called cross-examination.  After

16   the cross-examination, the Government is allowed another round

17   of questioning, which we call redirect, but that is limited to

18   the scope of the issues that are raised during cross.

19           And then the defense can ask one last round of

20   questions of that witness if there were things raised in the

21   redirect which the defense wants to clarify or address.

22           Then that witness is done and we call the next

23   witness until every witness has testified in the Government's

24   case.

25           The Government may also introduce evidence.  There

1   may be physical evidence such as there may be photographs,

2   there may be tape recordings, that's what we call physical or

3   hard evidence.

4           Then we will turn to see whether the defense plans to

5   put on any evidence.  Again, there is no burden on the defense

6   to put on any evidence whatsoever.

7           If, however, the defense does decide to put on

8   evidence, then when they call their witnesses, it would just be

9   the reverse order.  So the first defense witness would first be

10  questioned by defense counsel, that's called the direct exam.

11  Then the Government could do the cross.  And we would go that

12  way until the defense had put in any of their evidence.

13          In some cases the Government is allowed to make a

14  rebuttal case.  In which case they would then switch again and

15  the Government would call their witnesses first, and that would

16  be how that would work.

17          When all the evidence is in, then you will hear what

18  are called closing arguments.  Again, the Government gets to

19  make the first closing argument, and that's when the lawyers

20  are going to sum up all the issues and the evidence in the case

21  for you.  The defense then has the chance to make their closing

22  argument.  And because that heavy burden is on the Government,

23  the rules provide that the Government may make a rebuttal

24  argument.

25          Then it's my job as the presiding judge to give you

1   the specific legal instructions that you will need to apply as

2   you find the facts in the case.

3          Now, during the course of the trial a lawyer may

4   object to a question that is being asked or to a piece of

5   evidence that is coming in.  And it is a lawyer's job to object

6   when he or she believes that something is going on that

7   violates a rule of evidence, some prior ruling of the Court, or

8   some rule of criminal procedure.  And it's my job as the judge

9   to rule on an objection.  If I agree with the objection, I do

10  think that there is a problem, I will say either objection

11  granted or sustained.  And those words mean the same thing.

12         On the other hand, if I don't think the objection has

13  any merit, I will say objection overruled or denied.  And those

14  words mean the same thing.

15         It's very important that jurors not hold it against a

16  lawyer or the lawyer's client the fact that he or she has made

17  an objection.  Nor should you try to read anything into how I

18  rule on an objection.  The fact that I may grant an objection

19  doesn't mean I think that side should win the case.  Or if I

20  should deny an objection, that I feel that side should lose the

21  case.

22         It's the same way as an umpire or a referee in a

23  sporting event calls balls or strikes or fouls or whatever,

24  it's done to keep the enterprise going by the rules and not to

25  help one side or to hurt the other.

1          Now, it's extremely important that jurors not begin

2    making up their minds until they have heard all the evidence,

3    all the arguments of counsel, and received the instructions

4    from the Court.

5          So while this case is going on, and it's going to

6    take several days, it's really important to get to know each

7    other, you can talk about the weather, you can talk about the

8    holiday season, whatever you would like to talk about, but do

9    not start talking about what's going on in the courtroom, or a

10   particular witness, or a piece of evidence because that means

11   you're starting to deliberate, and that would be a violation of

12   your duty to sit and listen to everything and not make up your

13   minds until you have got all the information that you need.

14         The other very important principle of our justice

15   system is that cases have to be decided on what you see and

16   hear only in the courtroom.  That's why I spent so much time at

17   the beginning of the trial trying to find out if you had read

18   or heard anything about this in the news.

19         Now, I am not going to sequester you.  I am not

20   locking you up here at the courthouse for the next few days.

21   And you are allowed to watch television and go on the Internet,

22   but you are not allowed to conduct any investigation whatsoever

23   about this case.

24         You are also not allowed to listen to or consume any

25   media coverage about this case.  It's really important.  And

1    you must not discuss this case or in any way communicate about

2    it to any of your family members or friends or anyone else.  It

3    is all right to say, I'm in jury duty in federal court and I'm

4    going to be there the next couple of days.  But if they start

5    saying, what case are you hearing, you must say, the judge said

6    I can't talk about it.

7             And that's really important because Americans are

8    fascinated by trials, especially criminal trials.  I guarantee

9    you, if you start talking about the case, you will have

10   questions asked of you or free advice given to you about some

11   of the things you're talking about, and that means your thought

12   process would be tainted.

13            So it's really important -- and I will tell you, we

14   have a great track record here in Northern Virginia of our

15   juries really listening to these instructions.  There have been

16   some horrible stories in other courts where jurors have gone

17   home and gone on the Internet and looked things up and ruined

18   that trial.

19            So it's really important, and you can just blame me

20   if you are getting bothered by family members or business

21   associates or whatever, just say, the judge says I absolutely

22   can't talk about the case.  If you do that, we will have an

23   excellent trial.

24            It's going to be really important that you stay well

25   rested, not get sick.  I think the weather is going to

1    cooperate with us over the next few days.

2              And our nickname in this court is the Rocket Docket.

3    We are one of the fastest courts in the country.  I will be

4    very strict with the lawyers about time limits, trying not to

5    waste your time because we know it's very valuable time and

6    it's a difficult time period.  We will get this case to you as

7    quickly as we can.  But, obviously, it is a complex case and we

8    do need to give it the time that it needs.

9              So at this point I am going to let you all go, and I

10   am going to give you 20 minutes to stretch your legs.  I am

11   afraid the cafeteria is closed at this hour.  And I don't know

12   if we have coffee in there yet for you or not.  But just give

13   yourselves a chance to move around a little bit.

14             You are not frozen to the seats you are in.  You are

15   free to move around within the box, but I am going to stay in

16   session to talk to counsel for a couple minutes.  But the jury

17   may leave.

18             NOTE:  At this point the jury leaves the courtroom;

19   whereupon the case continues as follows:

20   JURY OUT

21             THE COURT:  All right.  First of all, any objection

22   to the preliminary charge to the jury?

23             MR. KROMBERG:  No, Your Honor.

24             MS. MORENO:  No, Your Honor.

25             THE COURT:  All right, very good.

1          I've given each side 20 minutes for their opening

2     statements.  I understand, via a phone call from Mr. Smith,

3     that there is issues about demonstratives.  I don't expect the

4     Government is going to use any demonstratives during its

5     opening statement.

6          If you are, let's get it cleared up right now.

7          MR. KROMBERG:  I gave the defense this morning the

8     list of the exhibits that they already have that I was going to

9     use.

10          THE COURT:  In your opening statement?

11          MR. KROMBERG:  Yeah.  And they are things that we

12     have already talked about.  There is the pictures of people

13     involved.  There is the pictures of the telephone being found

14     in the truck.  And the picture of the backpack where the

15     receipts are found.  And there is a picture of Young as a Nazi.

16     With six days later there is a picture of him as a Muslim with

17     a rifle.

18          THE COURT:  Wait.  All right.  You're on your feet,

19     Ms. Moreno, go ahead.

20          MS. MORENO:  So, Your Honor, we just got the -- we

21     had requested what demonstratives they wanted to use a couple

22     of days ago, and then today we got the list.  Which are,

23     frankly, most of them objectionable.

24          He wants to use a picture of the smokestack that --

25          MR. SMITH:  That someone texted to the defendant.

```
 1              THE COURT:  All right.

 2              MS. MORENO:  Nazi stuff.  He wants to use a picture

 3    of Hitler.  He wants to use a picture of the Israeli flag.

 4    Highly prejudicial.

 5              THE COURT:  We're going to make it simple.  I'm going

 6    to really be mean on both sides because this case has got to

 7    get tried appropriately.

 8              No demonstratives in the opening statements for

 9    either side.  I know a picture is worth a thousand words.  I

10    will give you the thousand words.  If you need an extra couple

11    minutes or two, Mr. Kromberg or Mr. Gibbs, I'll give it to you.

12              Let's keep this case moving with as few objections as

13    possible.  All right, I've taken care of that issue.

14              MS. MORENO:  Yes, Your Honor.

15              THE COURT:  All right.  We have --

16              MR. KROMBERG:  Your Honor, may I just --

17              THE COURT:  Yeah.

18              MR. KROMBERG:  I understand.  What Ms. Moreno did not

19    mention, the pictures of the people involved, I wanted to

20    just -- some of these names are going to be coming up again and

21    again, and I wanted to have a picture of Saleh Albarmawi, a

22    picture of Amine El-Khalifi, and a picture of Liban Muhammad

23    who are going to be coming up.  And I wanted to put them on the

24    screen so there is some association between unusual names and

25    actual people.
```

1          THE COURT:  Those three pictures of three people is

2   not what defense counsel is worried about.  They are worried

3   about smokestacks and those highly incendiary kinds of issues.

4          Am I correct, Ms. Moreno?  Again, I want there to be

5   some common sense to this.  You need to be --

6          MS. MORENO:  I am getting used to things, I promise.

7          I think we should live with the Court's ruling.  I

8   don't think there should be any more discussion about it.  And

9   I think both sides -- I'm ready to proceed without any

10  demonstratives.

11         THE COURT:  When the witness starts to testify, then

12  the picture would be appropriate, it's within context.  We'll

13  keep it simple.  Just do it with old fashioned words, that's

14  fine.

15         In terms though of this afternoon, now we're going to

16  start up again about 5 o'clock, and we're going to take about

17  40 minutes for the opening statements.

18         The first witness on your list, is that still the

19  witness you plan to start this afternoon?

20         MR. KROMBERG:  It would be Khalil, Your Honor.

21         THE COURT:  And you can do him in 20 minutes?  Or you

22  just want to get it started?

23         MR. KROMBERG:  Well, that is our first witness,

24  that's who we --

25         THE COURT:  All right, that's fine.  So we need the

1    screen though; is that correct?

2           MR. KROMBERG:  We do.

3           THE COURT:  So we need to get the screen up before we

4    come back in.  All right?  And I assume that was worked out.

5           In any case, if not, you'll have to switch your

6    witness list around.

7           All right, we are recessing court --

8           MS. MORENO:  I am so sorry, Your Honor.

9           THE COURT:  Yes, ma'am.  You have to be at the

10   lectern.  I'm sorry, we can't hear you otherwise.

11          MS. MORENO:  In the 20 minutes that's allotted, does

12   the Court give a five-minute warning?  Because I would ask that

13   of the Court --

14          THE COURT:  I'll be watching.

15          MS. MORENO:  Thank you.

16          THE COURT:  You want a five-minute warning?

17          MS. MORENO:  Please, Your Honor.

18          THE COURT:  All right.

19          MS. MORENO:  Thank you so much.

20          MR. KROMBERG:  Your Honor, could we -- by the way,

21   could we talk about the rule on witnesses?

22          THE COURT:  Yes.  There has to be a rule on

23   witnesses.  Now, that means that anyone who is going to be

24   testifying in the case, other than the case agent, has to be

25   out of the courtroom.  That includes any experts.

1    And it also means that if it comes out that any

2  spectators or family members have talked to witnesses about

3  what's going on in the courtroom before that witness testifies,

4  that witness may be not able to testify, may be tainted.  All

5  right?

6    So I expect both sides -- and that works for the

7  Government as well.

8    MR. KROMBERG:  Yes, ma'am.

9    THE COURT:  All right.  Anything further before we

10  get started?

11    MS. MORENO:  No, Your Honor.

12    THE COURT:  All right.  Then I think we're probably

13  starting up again around 5 o'clock.  All right, we need to get

14  the screen up.  Recess court.

15    NOTE:  At this point a recess is taken; at the

16  conclusion of which the case continues as follows:

17  JURY OUT

18    THE COURT:  Before we pull the jury in, are there any

19  last minute issues?

20    MR. KROMBERG:  Not from the Government, Judge.

21    THE COURT:  No?  All right, let's bring the jury in.

22    NOTE:  At this point the jury returns to the

23  courtroom; whereupon the case continues as follows:

24  JURY IN

25    THE COURT:  There are a couple extra chairs.  Those

1    of you who have got your coats with you, you probably should

2    have put them in the jury room.  But if you want to just pass

3    them down to be make yourselves more comfortable, you can put

4    them there.

5           And, folks, I recognize -- counsel, have a seat.

6           I recognize the way this courtroom is set up, when

7    the lawyers are standing at the podium, it may block the view

8    for some of you from the witness box.  Move to another

9    position.

10          The only reason I don't have these last four seats

11   filled is I can't see you, and I like to watch my jury.  But

12   it's more important that you can see the witness.

13          So if any of you feel that your vision of the witness

14   is being blocked, please don't be shy about moving down to the

15   far end of the box.  All right.  And I think that way all of

16   you should be able to see.

17          All right, who is going to open for the Government?

18          MR. KROMBERG:  I am, Your Honor.

19          THE COURT:  All right, Mr. Kromberg.

20          MR. KROMBERG:  Good afternoon everybody.  As I was

21   already introduced, I am Gordon Kromberg.  I am an Assistant

22   United States Attorney here in Alexandria.

23          With my colleagues, Assistant United States Attorney

24   John Gibbs, Special Assistant United States Attorney Evan

25   Turgeon, we are representing the United States in this case.

1  Evan Turgeon is special, he is a Special Assistant United

2  States Attorney because he's on detail to us from the

3  Department of Justice.

4          Special Agent Nicholas Caslen from the FBI, he's the

5  case agent, he is the lead investigator.

6          Mr. Fabian Vera is a paralegal specialist in our

7  office, and he helps us keep track of the evidence, and he

8  works the technology, and we would be lost without him.

9          Together we're going to show you that between

10  December 2015 and August 2016 that man, Nicholas Young,

11  attempted to support, provide support to ISIS, the Islamic

12  State.

13          ISIS is an acronym, and you will hear it is the

14  Islamic State of Iraq and Syria, sometimes known as ISIL, the

15  Islamic State of Iraq and the Levant.  Sometimes known as, in

16  Arabic I think, Dawla.  We are going to show you that.

17          We are going to show you that he also attempted to

18  obstruct justice in order to prevent the authorities from

19  learning that he had helped someone that he knew go join the

20  Islamic State, leave the United States and go join the Islamic

21  State in Syria.

22          Now, what the judge is going to tell you, I believe,

23  because it's what she always says, what I say is not evidence.

24  What Mr. Gibbs says is not evidence.  What the defense

25  attorneys tell you is not evidence.  The evidence is what the

1    witness will tell you.

2            But I am going to tell you now what I think the

3    witnesses are going to say.  But if there is any conflict

4    between what any of the lawyers say and what any of the

5    witnesses say, it's what the witnesses say that goes.

6            So the first fact to know in this case is that

7    Nicholas Young was a police officer when this happened, sworn

8    to uphold the law.

9            The second fact to know is that this was a sting

10   case.  What a sting case means is when he was engaged in this

11   criminal activity, he thought he was dealing with someone that

12   he didn't know was in fact working for the Government.  The guy

13   who was in fact working for the Government in this case was

14   named Mo.

15           You will meet Mo.  You will hear that Young and Mo

16   met in May, June, the spring of 2014.  They became friendly.

17   You will hear parts of recordings where they talked about Mo's

18   plan to go join ISIS.  Mo was going to leave the United States

19   and go join the jihad in Syria.

20           Hearing that Mo was going to go leave the United

21   States to join the designated terrorist organization known as

22   ISIS, Officer Young didn't arrest him, didn't report him, but

23   said, hey, let me give you some advice on you can you get

24   through airport, get through Customs, get across the border.

25           You will hear how Officer Young said, hey, let's go

1    to a FedEx store because we'll set up e-mail accounts at the

2    FedEx store, we won't be using our own computers, we'll go to

3    the FedEx store and use the computers there, and we'll set up

4    new e-mail accounts that you will use only to talk to me and I

5    will use only to talk to you.  And then how could anyone ever

6    know that these accounts exist?

7           And you'll see that they went to the FedEx store and

8    they set up the accounts.  You will hear that Young, Officer

9    Young says, now, after you leave, I'm going to send you a text

10   message.  Don't reply.  Mo says, why not?

11          Officer Young says, because once the FBI figures out

12   that you have gone to join ISIS, they are come investigating,

13   and they are going to come look at everyone you knew to see if

14   anyone helped you, if anyone knew about this.  And they are

15   going to come talk to me, and they're going to look at me.  And

16   if there is this text message that I send to you that says, I

17   think you're going on a two-week vacation, it will be good for

18   me.  So whatever you do, don't respond to it.

19          So you'll hear how Mo left the country, left the

20   United States in October 2014.  And that was the last time

21   Officer Young ever saw Mo.  After that, all communications are

22   in writing.

23          You'll see that a couple weeks after Mo left, Officer

24   Young sent him a message, a text message.  And the text message

25   said:  Hope you had a good vacation.  If you want to have

1   lunch, hit me up.

2          That text was designed to mislead the authorities

3   into thinking that Officer Young didn't know that Mo had gone

4   to join ISIS.  That text was an attempt to obstruct justice.

5          You will see how from November 2014 to December 2015

6   Young and Mo exchanged e-mails.  They exchanged messages about

7   ISIS, about what Mo was doing at ISIS, about fighting,

8   terrorist attacks around the world.

9          Officer Young wrote:  Hey, be on the lookout for some

10  of my buddies from when I was in the jihad in Libya in 2011.

11         And you'll hear that Officer Young went to fight in

12  Libya in 2011 for an organization called the Abu Salim Martyrs

13  Brigade.  And Officer Young told Mo in the e-mail that these

14  guys that I was with, they are like-minded with your guys.

15  Like-minded with ISIS.

16         You'll see the e-mails where Officer Young says, hey,

17  I'm thinking of trying to get my money out of the United

18  States.  Could you ask your commanders if there is a good way

19  to get the money, get my money out of the United States without

20  the American authorities knowing about it.  Mo says, I'll ask,

21  but he never came up with any answers.

22         Now, keep in mind, it's not actually Mo on the other

23  end of the e-mails, it's the FBI.

24         You will hear from Special Agents Sikorski and

25  Siegfried how from October 2014 through August 2016 they

1    corresponded with Young while posing as Mo.

2            You will hear that in December 2015 the FBI comes to

3    talk to Officer Young.  And they say to him, hey, we're looking

4    for information about people in the area that may be supporting

5    ISIS.  Do you know anybody who has gone to join ISIS?  And

6    Officer Young says, I don't really know anything about that.

7            And they ask him, well, what about this guy Mo?  And

8    he says, yeah, I knew him a little.  I think, you know, he

9    might have gone over on vacation or something.  I haven't been

10   in contact with him.

11           Well, do you have an e-mail for him, they said.  He

12   says, nah, I had one, but I lost it, it was Mohammed something

13   or other.

14           The FBI leaves.  And Officer Young then recommences

15   his communication, his e-mail communication with Mo, saying,

16   hey, the FBI was coming to look for you.  And he sends it on

17   the e-mail that they had set up at the FedEx store, which was

18   called v4vendetta@mail.com.

19           So they go back to exchanging messages about ISIS,

20   about fighting, about terrorist attacks.  And then Mo sends

21   Officer Young a message.  He says, I just got this app for a

22   cell phone called a Threema, Threema.  It encrypts your text

23   messages.  If you go buy the Threema app, you can contact me on

24   this Threema account number and our text messages will be

25   encrypted.

1          Young goes and buys the Threema app and corresponds

2     with Mo on the encrypted Threema app.

3          On July 18, 2016, Mo sends -- I mean, really, the

4     FBI, but Mo sends a text message that says, you know, a lot of

5     our brothers, our fighters, our brothers are getting droned.

6     We need to bring more recruits here to help us.  Can you,

7     Young, can you help?  Can you help us by sending us Google gift

8     card codes?

9          It's a little bit complicated.  You'll hear about it.

10    But the point is that when you buy a gift card, on the back of

11    a gift card is a code.  That code is the equivalent of money.

12    And that ISIS wanted to use those Google gift card codes to buy

13    more Threema apps because the recruits that were going to come

14    to join ISIS needed to communicate with someone from ISIS, and

15    they were going to communicate through a Threema app, but ISIS

16    needed a different Threema account for every recruit in order

17    to keep operational security.

18         Young texts back on the encrypted Threema app,

19    inshallah, good willing, you will get it, you will get the

20    Google gift card codes.

21         And on July 28 the Google gift card codes arrive on

22    Mo 's encrypted Threema account.  And they came from a

23    different Threema account than the one that had been -- with

24    whom -- excuse me.  The one with which Mo had been

25    corresponding with Young.

1          But the FBI will tell you, you will hear, that Mo's

2    Threema account number was never given to anybody other than

3    Young.  So the only person who would be sending the gift card

4    codes to Mo on that Threema account was Young.

5          Shortly after that, Young is arrested.  And when he

6    is arrested, he has a bag with him.  In the bag are some

7    papers.  The papers have -- one of the scraps has Mo's Threema

8    account number, and Young's Threema account number, and Young's

9    e-mail address, the one that he set up at the FedEx store back

10   in October.

11         In the bag was also a receipt for the purchase of

12   gift cards at Best Buy.  And the FBI went all through Best Buy

13   and they got the video of Officer Young buying the gift cards.

14         Also in the bag was the packaging for a cell phone.

15   And that cell phone was later found -- it's a complicated

16   story, but you will see that it was found in connection with

17   the seizure of Officer Young's truck.  And that cell phone had

18   the Threema messages on it, not the ones sending the gift

19   cards, but just the corresponding with Mo part.  And it was the

20   same serial number on the phone that was on the packaging for

21   the cell phone that was in Young's possession when he was

22   arrested.

23         In short, the proof that Officer Young attempted to

24   support the Islamic State is pretty clear.  But we understand

25   that Officer Young isn't contesting that he did it, but he's

1    saying, I was entrapped into doing it.

2            As the judge will explain, for entrapment to exist,

3    there has to be something called inducement and in the absence

4    of something called predisposition.

5            As I expect the judge to explain to you later,

6    inducement for purposes of entrapment requires more than mere

7    solicitation by the Government.  It requires Government

8    overreaching and conduct sufficiently excessive to implant a

9    criminal design in the mind of an otherwise innocent party.  No

10   Government overreaching, can't be any entrapment.

11           You won't see any evidence of Government overreaching

12   here.  Indeed, no one even asked Officer Young to attempt to

13   protect Mo from the reach of the U.S. Government by lying to

14   the FBI or by sending the text message to try to deceive the

15   FBI.  There was no inducement.

16           But as the judge will explain for the entrapment to

17   exist, for the entrapment defense to exist, the defendant could

18   not have been predisposed to commit the crime.  That is to say,

19   there could be no entrapment if the defendant already had the

20   readiness and willingness to commit the crime when he was first

21   approached.

22           I expect the judge will also instruct you that

23   evidence of the defendant's ready response to the text message

24   saying, hey, can you send gift cards, can be used to prove that

25   he was predisposed to break the law.

1          I expect the judge will instruct you that

2  predisposition can be found based on behavior after the

3  investigators first contact the defendant.

4          As I said, you won't see any evidence of inducement,

5  but you will see evidence of predisposition.  That is to say,

6  that the defendant had the readiness and the willingness to

7  break the law long before he got caught up in the

8  investigation.

9          For example, you will see as early as 2007 he was

10 collecting speeches by Bin Laden, magazines, online magazines

11 put out by Al Qaeda.  Manuals on jihad.

12         You will see that under the name Dusselkamp he posted

13 support for ISIS online.  You will see that for years before

14 ISIS even existed, Officer Young was attracted to terrorists of

15 a different variety, Nazis.  Okay.  You will hear that he

16 sometimes posed as Stormtrooper Klaus Dusselkamp of the Nazi

17 SS.  You will hear that the SS specialized in terrorism, that's

18 what they did.  They were as vicious a terrorist group as ever

19 existed.

20         You will hear that Officer Young didn't merely play a

21 Nazi SS officer for social engagements or World War II

22 reenactments, he saw himself as that.  He has a big tattoo on

23 his shoulder, which you will see, which is an SS tattoo.  You

24 will see that he was attracted to SS terrorists and Islamic

25 terrorists at the same time.

1          You will see, for example, that he has a photo that

2    he has downloaded to his computer of him in his SS uniform.

3    And then six days later, and this was January 2006 and

4    February -- late January or early February 2006, he downloads a

5    picture of himself in Muslim garb carrying his rifle.

6          You will see that in his house in August 2016 when he

7    was arrested, he had a framed portrait of Adolf Hitler.

8          You'll wonder, how could one person be attracted to

9    both Nazis and Islamic terrorists?  You will hear that it's not

10   uncommon, and that one link that they have in common is that

11   they both hate Jews.

12         Young's friend from college, you will hear from him,

13   he's going to come in and say, well, as they left a neo-Nazi

14   gathering years ago Officer Young said -- well, not Officer

15   Young at the time, Nicholas Young says to him, hey, don't

16   discount the possibility of an alliance with the Muslims to

17   combat the Jews.

18         You will see that Young's hatred of Jews was quite

19   extraordinary.  When he was arrested, there was a graphic on

20   his phone showing some smokestacks and the logo Together We Can

21   Finish What Hitler Started.

22         You will see that in 2009 the doormat to his house

23   was an Israeli flag.

24         The first witness you are going to hear from will be

25   an undercover officer.  He is going to be known as Khalil.  He

1  was known to Officer Young as Khalil.  And Khalil will testify

2  that in his undercover capacity he was trying to get to know

3  someone else who had been suspected of radicalizing one of

4  Young's friends.  One of Young's friends by the name of Zachary

5  Chesser had been arrested for a terrorism offense in 2010 in

6  Northern Virginia.  And Khalil tries to get into the same

7  circles to find out if this guy Saleh Albarmawi was the guy who

8  radicalized this young convert by the name of Zachary Chesser.

9         And you will hear that Khalil says, so when I was

10  trying to get close to Albarmawi, I meet Nicholas Young.  And

11  Nicholas Young was close to Albarmawi, so I stayed close to

12  Nicholas Young so that I could get close to Albarmawi.

13         THE COURT:  Mr. Kromberg, you're almost up, your time

14  is up.

15         MR. KROMBERG:  I thought, Judge, you were going to

16  give me a little bit more time since --

17         THE COURT:  I will give you an extra minute or two.

18  Go ahead.

19         MR. KROMBERG:  Thank you, Your Honor.

20         You'll hear Khalil testify that when he was with

21  Young, Albarmawi regularly justified Islamic terrorism.

22         Khalifi -- you will also hear that one of the people

23  in the same circle, Amine El-Khalifi, later was arrested for

24  trying to blow himself up in the U.S. Capitol building.  And

25  that Khalifi at a dinner with Officer Young and Khalil talked

1    about how he was going to become a martyr.

2           And how Officer Young said, no one is ever going to

3    know what I'm going to do until after I do it.  But he talked

4    about how he could attack a federal building, how he could

5    attack the FBI building, and how he was going to go Postal some

6    day.

7           He talked about a plan on how he could smuggle

8    weapons into a federal building --

9           MS. MORENO:  Objection.

10          THE COURT:  Sustained.

11          MS. MORENO:  Move to strike.

12          THE COURT:  That's out of the case.  Let's go.

13          MR. KROMBERG:  Khalil is going to talk about how when

14   he and -- after Khalifi got arrested, Officer Young said, the

15   FBI is going to come talk to you, just like they came to talk

16   to me after Chesser was arrested.  You don't have to talk to

17   them.  And whatever you do, don't tell them about certain

18   things.

19          You will hear that Khalil also met another guy in the

20   same circle around Albarmawi and Young by the name of Liban

21   Mohammed.  And how Khalil ended up in a plot with Liban

22   Mohammed to join Al-Shabaab, a terrorist group in Somalia, and

23   that he did not recruit Nicholas Young to that plot because

24   that wasn't his goal.  His goal was Albarmawi and Liban

25   Mohammed.

1         You will also hear from Daveed Gartenstein-Ross, he

2    is what we call an expert witness, who will explain to you the

3    context of the various individuals and organizations that were

4    mentioned in the testimony.  He will explain to you parts of

5    the history of the Libyan civil war, the history and background

6    of ISIS, and the Abu Salim Martyrs Brigade.

7         Finally, Special Agent Caslen is going to testify.

8    He will be a summary witness.  He is going to try and tie the

9    various pieces of evidence together in this case.

10         There will be a lot of evidence in this case, and

11   we're going to try and make the best use of your time.  But at

12   the end of the case, the evidence is going to show that

13   Nicholas Young attempted to obstruct justice in November of

14   2014 when he sent that text message that he hoped the FBI would

15   find that would make it look like Nicholas Young didn't know

16   that Mo was going to join ISIS.

17         And it's going to show that he attempted to obstruct

18   justice in December of 2015 when he told the FBI, I don't know

19   how to contact the guy, I don't have an e-mail for him, I

20   thought he was just going on a tour.

21         It is going to show that he attempted to provide

22   material support to the Islamic State by trying to protect an

23   Islamic State fighter from being identified by the United

24   States of America.

25         And it's going to show that he attempted to support

1    the Islamic State by sending the Google Play gift card codes to

2    someone he thought was an Islamic State fighter.

3          At the close of the evidence Mr. Gibbs and I will

4    speak directly to you again and summarize the evidence that you

5    will have heard.  At that point I expect we're going to ask for

6    you to return a verdict of guilty.

7          Thank you.

8          THE COURT:  All right.  Ms. Moreno.

9          MS. MORENO:  Ladies and gentlemen, in this case

10   you're going to learn through the evidence that the FBI induced

11   Nick Young, a police officer who had served with distinction,

12   to commit a crime that they created where none would have

13   existed, and tried for six years to create a criminal when they

14   couldn't find one.  And that is the reason we're here today.

15         What is the crime here?  It's not anti-Semitism.  Mr.

16   Young isn't charged with any hate crimes here.  The charge is

17   an attempted material support of a designated foreign terrorist

18   organization.  And you must focus on those charges.

19         It's about a six-year investigation that started in

20   December 2010 with Khalil.  And what they have to show for it

21   are Google Play cards.  And that's why they're talking about

22   Hitler, and I'll address that in a minute.

23         Nothing here in this case is what it seems like on

24   the surface.  And you're going to learn that nobody in this

25   case, least of all Nick Young, was in ISIS.  And that Nick

1    Young never spoke to anybody in ISIS.  He never attempted to

2    contact anyone in ISIS.  And he never attempted to travel over

3    there to Syria, there is no evidence of that.

4             In fact, when we're talking about predisposition,

5    which I'll talk address in a minute, he rejected ISIS.

6             And as Mr. Kromberg talked about, there are a number

7    of undercover operatives here.  Khalil met Nick Young in

8    December of 2010, and he recorded and reported on Nick Young

9    until April of 2012, a two-year investigation.  And what

10   happened?  Nothing.

11            Two years later, Mo 1, because there are two Mos, Mo

12   1, the paid informant who was paid about $40,000 for his work,

13   he reported and recorded on Nick Young from May for about five

14   months.

15            And then we had Mo 2, another undercover agent, who

16   reported on Mr. Young for two years, from October 2014 until

17   his arrest in August of 2016.

18            Six years this investigation lasted.  And you're

19   going to learn that all these communications and these e-mails

20   and texts to Nick Young were carefully vetted and composed by

21   the FBI in order to get Nick Young to commit a crime.

22            Remember, what are the charges here?  There are three

23   of them, all non-violent.  None of them deal with Nazis or

24   anti-Semitism.  None of them are hate crimes.

25            The sole count, one, attempted material support of

1    ISIS where Nicholas Young sent $245 worth of Google Play gift

2    cards to an undercover agent who he believed was his friend for

3    two years.  This is not about whether the cards were sent.

4    This charge is about whether he materially supported ISIS and

5    whether he was entrapped into doing so.

6          Now, the two obstruction of justice charges, just to

7    summarize, and you'll get instructions from the Court, is

8    whether Mr. Young obstructed an official proceeding by

9    misleading the FBI on the destination and purpose of their own

10   agent that they were handling and managing, and who they knew

11   where he was all the time, and whether there was any official

12   proceeding in this case, which there wasn't.

13         So who is Nick Young?  He was born and raised here in

14   Virginia.  Described as a Libertarian.  He had an interest in

15   politics, and he talked about Mideast politics and geopolitics

16   in general.

17         You will learn that he converted from Catholicism to

18   Islam in late 2006 around the time his father passed away.

19         You will hear that he was described as a re-enactor,

20   one of those guys that gets together with others and pretends

21   to be fighters from the past.

22         And you will hear that he was a weapons collector.

23   All lawful, by the way.  There are no charges here that Nick

24   Young possessed any guns unlawfully or any weapons unlawfully.

25         And you're going to hear through the recordings and

1   the statements and the e-mails with the undercover operatives

2   that Nicholas Young wanted to make a life in this country,

3   wanted to retire from the police department here in America,

4   and that he would never have left America because he would miss

5   living here.  That's who he was personally.

6           What about his professional life?  He was a police

7   officer for the Washington D.C. Metro Transit Police, first and

8   foremost, for 13 years.  And he served with distinction.  He

9   was dedicated to protecting the passengers.

10          And by the way, during that 13-year period of time he

11  was never cited, disciplined for any discriminatory or racist

12  conduct to anyone.  Nothing.  He served with distinction.  In

13  fact, he was commended for his performance during that 13-year

14  period of time until he was arrested and his career was ended.

15          Let me talk about these Nazi materials.  You're going

16  to be instructed on what you're allowed to use some of this

17  stuff for.  Even if you want to consider it at all, the judge

18  is going to be specific, and she's going to tell you that you

19  can't use these photos, Hitler, and smokestacks, or the rest of

20  what Mr. Kromberg talked about in his opening statement, just

21  because they're offensive.

22          You'll be instructed also that the possession of this

23  stuff is protected by the Constitution, and that you can't

24  convict Nick Young on the possession of this stuff alone.

25          And the illogical, nonsensical link that the

1   Government wants you to make between white supremacists who are

2   somehow aligned with militant Islamists who are terrorists,

3   will not be borne out by the evidence or by your own common

4   sense.  You will conclude that, of course, Muslims do not

5   believe in white supremacy.

6          And what's not in dispute is that those materials,

7   those white supremacist materials, came to the Government's

8   attention after they arrested Nick Young, not before.  So they

9   brought these charges without knowing about these materials.

10  They arrested him.  And now they want to use these materials to

11  prove the charges.

12         And as I said, there is no evidence that he was ever

13  disciplined for any sort of discrimination or racist conduct on

14  the police force.

15         So how are they going to prove this link?  Well, Mr.

16  Kromberg talked about a Mr. Ross.  And there will only be one

17  witness, which should be no surprise, that will try to persuade

18  you that there is a connection between militant Islamic

19  terrorism and white supremacy.  And in the field of terrorism

20  studies, you're going to learn that Mr. Ross academically is

21  alone in his opinion.  He's the only member of that academic

22  club who believes that.  And that he is not a scholar and he is

23  in this for his own interests.

24         So let's talk about the relevant evidence in this

25  case.  The evidence is going to show you that the FBI

1  manufactured the crime.  This was their specific idea.  Their

2  agents, their timing, their methodology of what to do and how

3  to do it, and at their insistence.

4         And because of how the Government acted in this case,

5  Nick Young can assert the complete defense of entrapment to

6  Count 1.  And what is it?  Mr. Kromberg mentioned some of it.

7  Inducement and predisposition.

8         So what does the Government have to prove?  They have

9  to prove beyond a reasonable doubt, first, that Nick Young sent

10  these gift cards knowing that this guy Mo was in ISIS.  And if

11  and only if they show you that, then the entrapment would be a

12  complete defense to that charge.

13         If you so find that the Government induced Mr. Young

14  to sending the cards in the first place, it was their idea, and

15  that they failed to show you beyond a reasonable doubt that he

16  had no predisposition to do this before he was approached by

17  Government agents, which would have been December 2010.

18         So did they induce Nick Young into committing the

19  crime?  You bet.  And how do we know that?  Well, you're going

20  to hear over a six-year period of time all of these agents

21  making up stories, befriending Nick Young.  They prayed with

22  him.  They dined with him.  They shared war stories.  And they

23  talked about women, and their lives, and the past, and the

24  future.  All lies from their end.  And they came to him over

25  and over, elaborately weaving these fake stories.

1          And you're going to need to consider all those years,

2     this inducement of subtle pressure, not from someone hostile to

3     Nick Young, but someone he thought he was sharing a true

4     friendship with.  In this case, the fictitious Mos.

5          But it wasn't going fast enough for the agents over

6     this six-year period of time.  It wasn't going fast enough for

7     them.  So during this six-year period of time, which you will

8     learn that Nick Young in recordings and writings rejected ISIS,

9     they were frustrated.  They were frustrated with the slow pace

10    of Nick Young and the apparent unwillingness of him to engage

11    in criminal conduct.  And do you want what they named him?

12    They named him Slow Decline.

13         They ratcheted up the inducements, the narrative, the

14    ploy.  And in some of the last e-mails between Mo and Mr.

15    Young, he talked about how there were stories of bombs killing

16    children and destroying homes.  Stories of dead children.

17         And the Government, the FBI agents, talked about and

18    characterized those e-mails.  And do you know what they said?

19    They said, we hit the case with a defibrillator.  This is June

20    2016, six years after this all began.  We hid the case with a

21    defibrillator.  Why?  Because it wasn't going anywhere.

22         And when they were frustrated because he still wasn't

23    doing what they wanted him to do, they said -- and you will see

24    this.  They said, let's hope he goes one step further, one more

25    step, one giant leap for Slow Decline.  This is July 19, 2016,

1    two weeks before he's arrested.

2            So what about his predisposition for criminal

3    conduct?  There is none.  You will learn that Nick Young wasn't

4    predisposed, and that he rejected ISIS and its campaign.

5            And the first place you look is his performance as a

6    police officer, which he served with honor and distinction.

7    And there was no predisposition there, certainly.

8            So where else is the evidence of the lack of

9    predisposition?  Well, you're going to learn that Nick Young

10   was interviewed by the FBI eight times, eight times.  And all

11   eight times he consented, he talked to them without counsel

12   while he was a police officer.

13           This Libya trip that Mr. Kromberg mentioned, I want

14   to talk to you about that.  Mr. Young spoke to the Customs and

15   Border Patrol agents and talked about his trips to Libya.  This

16   is 2011.  And you'll hear that Mr. Young was inspired by the

17   Arab Spring.  Was outraged that Muammar Gaddafi, at the time an

18   enemy of the United States, was exterminating his people.  And

19   he went over to Libya.  He told CPB that.  He told the FBI.  He

20   told anyone who would listen.  You know why?  Because he was

21   proud of it.  And he didn't hide it.

22           And guess what happened to him when he came back.

23   And he declared the body armor, you will hear about this, from

24   his trips in Libya.  And do you know what happened to him?

25   Nothing, 2011, because he didn't do anything wrong.  Because

1  his conduct was not unlawful.  And because there is no evidence

2  that he joined any terrorist organization in 2011.  He told the

3  FBI that he thought it was his personal duty to report

4  terrorist attacks.

5          Now, you're going to hear about the back and forth

6  and the communications and the messages between Khalil, Mo No.

7  1, and Mo No. 2 with Nick Young.  And it's important for you to

8  pay attention to these because you're going to learn that Mr.

9  Young had extended conversations in September of 2014 before Mo

10  allegedly traveled to Syria.  And he told Mo, he told him, he

11  said, any American who attempts to join ISIS doesn't have any

12  wisdom.  He told Mo that he was against ISIS.  And he described

13  the head of ISIS in a mug shot, Mr. Baghdadi.  And he said,

14  that organization sounds like a bunch of criminals hungry for

15  power and money.

16          And why is this important?  He is talking to his

17  friend Mo in an unguarded way.  He thinks he is his friend, so

18  he is being honest about his opinions and what he thinks.  And

19  he told Mo that if he learned that someone was going to blow up

20  the subway, his help would be needed to stop them.  That's what

21  he said.

22          And then when Mo was making this fake noise about

23  going over there to join ISIS, Mr. Young said, you know, either

24  way, you're not at the end of a plank.  You have breathing

25  room.  It's a lot of responsibility there.  No one is holding a

1    gun to your head.  Because he was trying to dissuade Mo from

2    doing that, from going over there.

3            He told Mo that it was illegal to join a foreign

4    terrorist organization or to take up arms against the United

5    States.  And that makes sense, right, because when he came back

6    from Libya, what did -- which was lawful, Mr. Young told

7    everybody about that.

8            Now, what else did Nick Young say about ISIS?  And

9    this will be very important.  In November of 2015 -- Mr.

10   Kromberg has talked about accounts and e-mails back and forth.

11   But in November of 2015 -- and this is supposedly after Mo

12   travels to Syria.  This is very important.  Behind the

13   anonymous protections of the Internet, in a LiveLeak account

14   you will learn that Nick Young was scolding people who were

15   criticizing aspects of America.  And he wrote:  I live in the

16   U.S. because it's my country.  I don't support extremism.  I

17   live here because I was born here, and I feel welcome here.

18   And if you want to say something about this country, get in

19   line for citizenship.

20           And then he said:  I do not support ISIS in terms of

21   I don't wish for them to come out on top.

22           That's what he said in November of 2015.  All of

23   these statements are evidence of his lack of predisposition,

24   which you must consider.

25           And with respect to the obstruction charges, you will

1    get instructions from the Court on this, but they don't make

2    any sense.  There was no official proceeding and the Government

3    was not mislead.

4           Nick Young wrote to one of these fake friends:  You

5    can be a good Muslim and a good cop.

6           The Government's failure to provide you with any

7    evidence of integrity, which is what you should insist on,

8    beyond a reasonable doubt, the complete defense of entrapment,

9    will lead you to acquit Nick Young of all the charges.

10          Thank you.

11          THE COURT:  All right.  As I understand it, it is

12   going to take a few minutes to set the courtroom up for the

13   first witness.  And because of the hour, it makes no sense to

14   take that time right now.

15          So you all have been very patient, it was a long voir

16   dire, ladies and gentlemen, I am going to let you get out a few

17   minutes early tonight.  I am normally going to go until 6, but

18   I want to make sure you come back rested.

19          We will start tomorrow morning -- now, I know

20   Northern Virginia traffic is horrendous, and I don't know where

21   you all live, but is there anybody who feels you cannot get

22   here by 9 o'clock tomorrow morning?  Because we can't start

23   until you are all here.

24          So please make every effort you possibly can to be

25   here.  There shouldn't be any weather problems this week.

1          When you go home tonight, please remember my

2     cautions.  Do not -- and there has been some media coverage

3     about this case, I think it has been covered a bit today as

4     well.  Do not consume any information about this case.

5          Get a good night's sleep.  Get maybe some exercise.

6     Get your minds off the case, don't even think about it.  Go

7     home and just come back here rested tomorrow morning.

8          We will go as close to 6 o'clock tomorrow as

9     possible.  I want to get this case really moving so that we

10    don't push this any further toward the holiday season than we

11    have to.

12         So leave your notebooks here, and we'll see you

13    promptly at 9 o'clock tomorrow morning.  Thank you.

14         We'll stay in session.

15         NOTE:  At this point the jury leaves the courtroom;

16    whereupon the case continues as follows:

17    JURY OUT

18         THE COURT:  All right.  So what we'll do then, either

19    tonight or tomorrow morning before 9 o'clock, we'll set the

20    screen up.  All right.

21         MR. KROMBERG:  Yes, Judge.

22         THE COURT:  And then I am going to rely on the

23    support staff to make sure that the only people who will be

24    sitting over here are people who have the appropriate

25    clearances.  All right?

1          MR. KROMBERG:  Yes, Judge.

2          THE COURT:  All right.  The first witness, Mr.

3   Kromberg, how long do you anticipate the direct taking?

4          MR. KROMBERG:  It could easily take 45 minutes,

5   Judge.  I expect that the cross will be longer, but he's a

6   substantial witness, he is going to talk about a lot of things.

7          THE COURT:  I understand.  All right.  I just wanted

8   to get an idea about that.  All right.

9          Now, what is this issue about trying to put documents

10  on the electronic system with a -- I'm concerned about that.

11  And I will tell you why I'm concerned.

12         Look where the Government's screen is.  The

13  Government's screen is right here on the counsel table.  And I

14  think jurors would be able to see that.

15         MR. SMITH:  This screen, Your Honor?

16         THE COURT:  Yes, it worries me.

17         MR. SMITH:  Could we tilt it?  It might just be a --

18  the reason we proposed this idea of using the Elmo is twofold.

19  We think we can save over the course of the trial several hours

20  because if we're using documents for impeachment that are not

21  formally in evidence, we will have to be constantly handing up

22  documents.

23         And the reason we can't use a binder with tabs for

24  the witnesses is we don't know what shape that the direct

25  examination will take.  So we can't predict in advance which

1    particular documents we may need for cross-examination.

2          So if we use the screens, which I understand from

3    Lance Bachman we can do, we will save a lot of time in terms of

4    handing up impeachment documents.

5          But also, the witness can communicate with the lawyer

6    by using a kind of touch device to indicate particular places

7    on the document with his hand which only the lawyer, the

8    witness, the Government attorneys, and the Court will see.

9          THE COURT:  Well, I don't know how that is going to

10   make any sense to the jury.  Give me an example of what you're

11   going to do.  Put it on the system.

12         MR. SMITH:  Okay.  Your Honor, right now, obviously,

13   the whole court can see it, as well as the jurors.  But there

14   is a switch, I understand, that allows --

15         THE COURT:  I just hit it.

16         MR. SMITH:  Yes, you just hit it.

17         THE COURT:  Can you see, are the jurors able to see?

18         MS. MORENO:  No.

19         MR. SMITH:  And then, Your Honor, there is one more

20   thing you can do with it.  It will save a lot of time because

21   when the witness --

22         THE COURT:  You need to be at the lectern.

23         MR. SMITH:  Oh, sorry.  So when the witness is

24   sitting in the box, the witness can actually touch parts of the

25   document and indicate where the witness is referencing on the

1    document.  And that saves a lot of time itself because if the

2    attorneys have to stay at the lectern when they are speaking, I

3    can't exactly understand which part of a document the witness

4    is referring to.

5            And so, there is going to be a lot of waste and

6    inefficient time in complex documents with heavy redactions

7    about where -- and there is obviously unredacted, unclassified

8    portions.  So we're going to need to reference particular parts

9    of pages that are not obvious.

10           So I think we would save a tremendous amount of time

11   at trial by using the ELMO and switching it off only for

12   documents that are not in evidence, only for impeachment

13   documents.

14           THE COURT:  Well, we will see.  We're not going to

15   have a ton of sort of quiet secretive documents.  The jury will

16   grow crazy and it won't be that helpful.  So we will see how it

17   works.

18           MR. SMITH:  Okay.

19           THE COURT:  But you're planning to do that with

20   Khalil?

21           MR. SMITH:  With the witnesses for which we're using

22   impeachment, documents that are not part of the Government's

23   case in chief and that are not introduced, that are not in the

24   Government's exhibit list.

25           So if the document is in the Government's list, there

1   is no reason not to show the jury.  If a document is not in the

2   Government's exhibit list and it's not a defense evidence, and

3   we're not introducing it in evidence but only using it to

4   cross, then the jury shouldn't see it.

5           THE COURT:  We will have to see.  I mean, it sounds

6   to me as though that may start getting extraordinarily tedious

7   and not all that valuable.  We will wait and see how it looks

8   when it goes in.

9           But I see the screen that I need to hit is this one.

10          MR. SMITH:  And if the alternative is to do it the

11  analog way, the jury still is not going to understand what

12  document -- because if we hand a document up to the witness,

13  the jury is not going to know what document that is either.

14          THE COURT:  Yeah, but if these are not sworn

15  statements of the witness, how much of that is going to be

16  valuable, I don't know.  If these are recordings, you can use

17  the recordings.

18          MR. SMITH:  There is recordings as well, and we will

19  be using those.  But these -- we're not making any relevance

20  point with Your Honor right now.  We're simply saying, if Your

21  Honor thinks that these documents shouldn't be used, they

22  shouldn't be used.  But this would just speed up the process by

23  being able --

24          THE COURT:  We'll see, we'll see.  When we get to

25  that point, we'll see.

1          MR. SMITH:  Okay.

2          THE COURT:  I see the button to be pushed.  But I am

3     not convinced that that is going to be terribly effective.  All

4     right.  Anything further?

5          So we will have the courtroom ready to go with that

6     first witness, because it takes five minutes or so, as I

7     understand it, to set it all up.

8          MR. KROMBERG:  Your Honor, I hate to say it, but I

9     agree with Mr. Smith on how this could be helpful.  For

10    example, let's say I wanted to show a picture to -- a picture

11    of a person -- I want to show a picture of Ali Tamimi to the

12    witness.  So the witness needs to look at that picture.  The

13    defense needs to know what I'm talking about.  You need to know

14    what I'm talking about.  But the jury shouldn't see it until

15    it's introduced into evidence, at which point it can be

16    introduced into evidence.

17         THE COURT:  I understand that.  But I also have books

18    and they have books.  For photographs, that's one thing.  But,

19    I mean, with documents, many times the documents on these

20    screens are not all that --

21         MR. KROMBERG:  Right.  So I will say that for the

22    Government, we're not using much in the way of documents with

23    text on it.  That's more of the defense thing.  We have more

24    pictures that --

25         THE COURT:  And a lot of these pictures I don't

1    expect there is going to be an objection.  You know how we are.

2              MR. KROMBERG:  That's what I thought.

3              THE COURT:  I mean, is there any objection to Exhibit

4    14?  No, then it goes right out.

5              MR. KROMBERG:  I thought there was none, except it

6    turns out the opening statement drew objections on the

7    exhibits.  So I don't think we're going to have objections, but

8    we might.

9              THE COURT:  I'm not going to be terribly generous

10   with objections.  All right?  But again, if you walk over the

11   line, we'll do it.  All right.

12             MR. KROMBERG:  I am sorry for keeping you, but this

13   issue that did come up, Khalil is the witness, and I want to

14   make sure I have it straight.  There was an objection during my

15   opening about the smuggling guns in.  I had said, I think at

16   the hearing on Friday, that I understood Your Honor's ruling,

17   we're not allowed to saying anything about smuggling guns into

18   the courthouse, but I was going to say a federal building.

19             And that ties into the fact that there were 60 pieces

20   of body armor, that he could outfit a squad.  Because he said,

21   what Khalil is going to say, he talked about how he could

22   smuggle weapons in to people who had gotten through security on

23   their own and then there could really be some damage done.

24             So I thought, what I was planning to do was using

25   leading questions to Khalil on that issue --

1          THE COURT:  No, no, you can't lead.

2          MR. KROMBERG:  Okay.  Well, then --

3          THE COURT:  You will draw an objection.  No, don't

4    lead your witness.

5          MR. KROMBERG:  That's fine, but then I am going to

6    instruct him that he cannot say the word "courthouse," and

7    we're talking about a federal building, not a courthouse.

8          THE COURT:  That's right.  That's what we had talked

9    about.

10          MR. KROMBERG:  Thank you, Your Honor.

11          THE COURT:  All right.  All right, we will recess

12    court.  See you back here at 9 o'clock tomorrow morning.

13          -------------------------------------------------

14

15

16

17

18

19

20          I certify that the foregoing is a true and
        accurate transcription of my stenographic notes.

21

22

            /s/  Norman B. Linnell
23          Norman B. Linnell, RPR, CM, VCE, FCRR

24

25