UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

```
UNITED STATES OF AMERICA     .    Criminal No. 1:16cr265
                             .
     vs.                     .    Alexandria, Virginia
                             .    December 12, 2017
NICHOLAS YOUNG,              .    9:00 a.m.
                             .
          Defendant.         .
                             .
. . . . . . . . . . .
```

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

<u>VOLUME II</u>

<u>APPEARANCES:</u>

FOR THE GOVERNMENT:        JOHN T. GIBBS, AUSA
                           GORDON D. KROMBERG, AUSA
                           EVAN N. TURGEON, SAUSA
                           United States Attorney's Office
                           2100 Jamieson Avenue
                           Alexandria, VA 22314


FOR THE DEFENDANT:         NICHOLAS D. SMITH, ESQ.
                           David B. Smith, PLLC
                           108 North Alfred Street
                           Alexandria, VA 22314
                             and
                           LINDA MORENO, ESQ.
                           Linda Moreno P.A.
                           511 Avenue of the Americas
                           No. 2
                           New York, NY 10011


ALSO PRESENT:              SA NICHOLAS CASLEN
                           NICHOLAS ENNS
                           FABIAN VERA


(Pages 154 - 425)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

1   OFFICIAL COURT REPORTER:          ANNELIESE J. THOMSON, RDR, CRR
                                      U.S. District Court, Fifth Floor
2                                     401 Courthouse Square
                                      Alexandria, VA 22314
3                                     (703)299-8595

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

156

I N D E X

|  | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| **GOVERNMENT'S WITNESSES:** | | | | |
| Khalil Sullivan | 168 | 221 | 244 | |
| John Gervino | 247 | 253 | 256 | |
| SA John Richard Minichello | 263 | 284 | 342 | 345 |
| Mo | 347 | 381 | | |

EXHIBITS

|  | MARKED | RECEIVED |
|---|---|---|
| **GOVERNMENT'S:** | | |
| No. 1-101 | | 274 |
| 1-102 | | 275 |
| 1-103 | | 276 |
| 1-200 | | 271 |
| 6-101-2 | | 351 |
| 6-102-2 | | 354 |
| 6-103-2 | | 355 |
| 6-103-3 | | 356 |
| 6-103-5 | | 357 |
| 6-103-6 | | 358 |
| 6-104-2 | | 361 |
| 6-104-3 | | 363 |
| 6-105-1 | | 367 |
| 6-106-4 | | 370 |
| 6-107-1 | | 371 |
| 6-108-1 | | 372 |
| 6-108-2 | | 375 |
| 6-109-4 | | 376 |
| 6-109-5 | | 378 |
| 6-109-6 | | 379 |
| 6-110-1 | | 365 |
| 6-201 | | 280 |

157

1                                    EXHIBITS

2                                          MARKED          RECEIVED

3      GOVERNMENT'S:

4      No. 6-202                                             278
           6-203                                             282
5          7-201A                                            377
           7-201C                                            377
6          9-101                                             212

7          9-102                                             171
           9-103                                             181
8          9-104                                             185
           9-105                                             359
9          9-106                                             344

10         9-107                                             344
           9-108                                             172
11         11-202A                       203                 203
           11-220                                            215
12         11-500                                            200

13         12-31                                             258
           12-32                                             259
14         12-33                                             262
           12-37                                             260
15         16-101 and 16-102                                 259

16         16-103                                            260
           16-105                                            263
17         16-106, 16-401 and 16-402                         260

18

       DEFENDANT'S:
19

20     No. 1                                                 295
           12                                                421

21

22

23

24

25

1                     P R O C E E D I N G S

2                     (Defendant present, Jury out.)

3          THE CLERK:  Criminal Case 16-265, United States of

4     America v. Nicholas Young.  Would counsel please note their

5     appearances for the record.

6          MR. KROMBERG:  Good morning, Your Honor.  Gordon

7     Kromberg, John Gibbs, and Evan Turgeon for the United States.

8          THE COURT:  Good morning.

9          MR. SMITH:  Good morning, Your Honor.  Nicholas Smith

10    for defendant Nicholas Young, as well as Linda Moreno and our

11    paralegal, Nicholas Enns.

12         THE COURT:  Good morning.

13         MS. MORENO:  Good morning.

14         THE COURT:  All right, we still are waiting on two

15    jurors.  I'll have my court security officer continue to

16    monitor that situation, but I understood there was a pretrial

17    matter?

18         MR. KROMBERG:  There is, Your Honor.  Based on the

19    opening statement from defense yesterday, where Ms. Moreno said

20    that the government -- the agents were frustrated that the case

21    was going slowly and that she, she was quoting from, I guess, a

22    text message about how the agents were hitting the case with a

23    defibrillator, it seems to me there's two issues there.

24         One, the issues in this case are inducement of

25    predisposition, and inducement is measured by what happened,

1   not what the agents thought should happen or thought of doing

2   but didn't do.  So if we go into what the agents were thinking

3   about but didn't do or why they did what they did, I think it's

4   irrelevant to the issue of whether the defendant was induced or

5   not.  Whether he was induced or not is measured by what

6   happened, what he saw, not what the agents said among

7   themselves.

8          The second -- related to that, though, is if they

9   want to talk, if the defense wants to get into why the agents

10  were frustrated, then it's only fair that the government gets

11  to answer why the agents were frustrated, and the agents were

12  frustrated, as you've heard, because of the things that were

13  said by the defendant that caused the agents to think that

14  Mr. Young was a very great danger.

15         So I think the best solution here is the defense

16  should -- the Court should rule it irrelevant to what the

17  government agents were thinking and what they were talking

18  about because that's irrelevant to whether he was induced or

19  not.  The inducement is every -- there's only text messages and

20  e-mails.  There's no verbal communications between the agents

21  and the defendant.  It was only text messages and e-mails,

22  which are all going to be in evidence.

23         THE COURT:  All right, who wants to address that?

24         MR. SMITH:  I'll address that, Your Honor.  So as the

25  Court knows, there are two elements to --

1          THE COURT:  Wait, wait, wait, wait.

2          All right, go ahead.

3          MR. SMITH:  The Court is familiar with the entrapment

4   standard, which contains two elements.  The first is

5   inducement, as Mr. Kromberg noted, and the second is

6   predisposition.

7          The inducement prong of entrapment is government

8   focused.  It focused on what the solicitation of the

9   defendant's crime consisted of, how was the crime -- how was

10  the crime solicited.

11         The text messages and e-mails that Mr. Kromberg is

12  referring to are actually the, contain the process by which the

13  agents were crafting the solicitation message to the defendant.

14  Now, there was an original -- there was one message, and then

15  it was fixed because that might --

16         THE COURT:  All right, anytime that door is open --

17         MR. SMITH:  Okay.

18         THE COURT:  -- it means the jury possibly could hear

19  what's in the courtroom, so we need to stop talking, all right?

20         MR. SMITH:  So Mr. Kromberg is correct that part of

21  the entrapment standard focuses on the defendant, the

22  defendant's mental state, what was the defendant's mental state

23  before he first encountered government agents in the

24  investigation, but when it comes to inducement, and we

25  understand from the government's opening statement that

1    inducement is a strong part of their case, they're going to be

2    pushing the argument that there was no inducement in this case,

3    these messages that Mr. Kromberg are referring to are critical

4    to establish what kind of solicitation there was, how long did

5    the solicitation exist, why were certain solicitation messages

6    used rather than others.

7           If it's the government's position that there was an

8    original solicitation of crime message that went too far, well,

9    why did it go too far?

10          THE COURT:  Well, wait.  The problem is, though, you

11   will be opening the door to permit the government to bring in

12   all of the thought process, all of the concerns that the agents

13   had, which means if they thought that your client had the

14   potential to blow up a federal courthouse or federal buildings,

15   that's going to open the door to that entire line, and I don't

16   really think you want to do that.  You should consult, I think,

17   with Ms. Moreno on this as well.

18          Right now, the government is correct that in terms of

19   inducement, it has to do with what specifically was presented

20   to your client.  All the background chatter, all the planning,

21   why we did this rather than that, is actually irrelevant to

22   that, but if you're going to go into that area, if you really

23   want to go in there, then it's going to open the door.  That's

24   the open door issue.

25          MR. SMITH:  And I will go speak with my cocounsel,

1   but I want to make one factual point first.  The messages and

2   the e-mails that Mr. Kromberg is referring to are from 2015 and

3   2016.  The opening door risk that the Court is referring to is

4   from six years before that, so we're only referring to

5   concerns -- the crafting of the solicitation message between

6   2015 and '16, Your Honor, so we're not launching a broadside on

7   the FBI's decision to investigate at any other point of the

8   investigation.  It's --

9            THE COURT:  It will reasonably open the door to the

10  government being able to explain why they were so concerned,

11  why they focused on your client and continued to focus on him

12  and were developing different strategies.

13           As I understand their position, they truly believed

14  up until probably the very end that your client really was a

15  very serious menace, and that would justify their frustration

16  in that they didn't get the smoking guns that they were

17  expecting to get.  They didn't get as much as they thought they

18  would get, but that's an issue you're going to open up.

19           MR. SMITH:  Okay.

20           THE COURT:  So you ought to consult about that.

21           MR. SMITH:  We, we will consult --

22           THE COURT:  All right.

23           MR. SMITH:  -- but I'll just note for the record once

24  that the concerns about -- that Mr. Kromberg referenced in

25  opening and to which we objected were from six years before the

1    messages that we're --

2              THE COURT:  I understand that.

3              MR. SMITH:  Okay.

4              MR. KROMBERG:  If I could correct the record, Judge,

5    first, they weren't six years before.  They were sent in 2011,

6    and these text messages --

7              THE COURT:  Just one second.  Any problem with

8    whoever just came in?

9              THE COURT SECURITY OFFICER:  No, ma'am.

10             MR. KROMBERG:  The text messages were 2014, 2015, and

11   2016.  And Special Agent Caslen, as the summary witness, will

12   testify if asked that he didn't sleep at nights because he was

13   concerned that that man was a danger because he had talked

14   about kidnapping an FBI agent and torturing her, and he had a

15   plan to smuggle weapons into this courthouse that the marshal

16   would say might well work.

17             THE COURT:  Well, we're not going to get into that no

18   matter what, or that will be definitely sealed.

19             All right, are we still waiting on a juror?

20             THE COURT SECURITY OFFICER:  One.

21             THE COURT:  All right, we have one juror who's not

22   here.

23             So have you-all decided?

24             MR. SMITH:  The witness hasn't -- the relevant

25   witness hasn't taken the stand yet, so, Your Honor, we have

1    heard the Court's message loud and clear, and we understand

2    that that is the risk, that door opening, but because the

3    witness has not testified yet, we can't exactly make a decision

4    about which direction we want to go in with cross-examination

5    yet, but we have received the Court's message and understand

6    that that would be --

7                 THE COURT:  All right.

8                 MR. SMITH:  Does Your Honor understand what I'm --

9                 THE COURT:  Well, yes and no.  I mean, again, the

10   first witness who's testifying, this is irrelevant to that

11   witness.

12                MR. KROMBERG:  No.

13                THE COURT:  It's not?

14                MR. KROMBERG:  This is the witness -- excuse me.

15                This is the witness who would testify to those facts.

16   If, if we're going to get into why the FBI was so afraid of

17   this defendant, it's going to be on the basis of the statements

18   that the defendant made to this witness.

19                THE COURT:  Khalil.

20                MR. KROMBERG:  Correct.

21                THE COURT:  All right.  Then you need to decide now.

22   Now, we're waiting on a juror.  I'm going to recess until the

23   juror gets here.  You-all consult, and then when I come back

24   in, all you have to do is say, you know, we're going there or

25   we're not going there.

1          MR. SMITH:  Okay.

2          THE COURT:  That's all you have to tell me.  And

3    that's the cue.

4          MR. SMITH:  That's about five minutes, Your Honor?

5          THE COURT:  I don't know.  We can't do anything until

6    the last juror arrives, so we'll recess court.

7              (Recess from 9:09 a.m., until 9:17 a.m.)

8                        (Defendant present, Jury out.)

9          THE COURT:  All the jurors are here now, Ms. Moreno,

10   so we want to get started.  Yes.

11         MS. MORENO:  Yes, Your Honor.  As Mr. Smith said, we

12   understand the Court's message.  We understand the issue about

13   using the rationale why the agents were frustrated.  That would

14   open the door to why they felt that Mr. Young was a great

15   danger.

16         Understood.  Not going to go there, but I will remind

17   the Court that yesterday in his opening, in Mr. Kromberg's

18   opening, he talked about the federal courthouse or the federal

19   building, and I objected, and the Court sustained that.  So if

20   it's a tradeoff here that we're not going to go into certain

21   areas, we would ask the same of the government in not going

22   into not only the sexual torture comment apparently that

23   Mr. Young made, which the Court already ruled was out, but also

24   the stuff about going into the federal courthouse.

25         And I will also tell the Court that it's not a

1    comment that Mr. Young made that he was going to go into the

2    federal courthouse, which I think the Court might be under that

3    impression.  He said someone could do that.  So I don't, I

4    don't think that's proper.

5           THE COURT:  All right.  Well, I've already indicated,

6    I think at this point, let's get this case started.  Get your

7    direct in, and let's see how things go.

8           MR. KROMBERG:  Right.  I'm sorry, but I have to go

9    back to what I said in opening was I did not mention

10   courthouse; I said federal building.  Ms. Moreno objected, you

11   sustained it, but then after the openings, we talked again, and

12   I said that last week, I had said I was going to use court- --

13   I was going to use "federal building" instead of "courthouse,"

14   and as I said, I was going to lead the witness through it to

15   make sure he didn't say "courthouse," and Your Honor said,

16   "Don't lead."

17          THE COURT:  Yeah, but I assume you talked to the

18   witness --

19          MR. KROMBERG:  Yes.

20          THE COURT:  -- ahead of time and said, "Do not

21   mention 'courthouse.'"

22          MR. KROMBERG:  Yes.

23          THE COURT:  All right.

24          MR. KROMBERG:  We're going to talk federal building,

25   and that's all we're going to talk about.

1    THE COURT:  All right.  Well, that is appropriate.

2  That's how I parsed that particular issue.

3    MR. KROMBERG:  Thank you.

4    THE COURT:  All right, let's get the jury in.

5    (Jury present.)

6    THE COURT:  Good morning, ladies and gentlemen.

7  Again, you-all have a seat.  If some of you feel that you can't

8  see the witness, please make sure that you move down to the

9  further seats because it is important to be able to see.  It

10  probably -- once there's attorneys standing at the podium, it

11  may make it more difficult for some of you, all right?  And

12  again, if you feel that you want to, just, you know, move on

13  down.

14    I want to thank you for being here this morning.

15  Again, I know sometimes -- there was some kind of a problem on

16  the beltway.  We can't start until all of you are here,

17  however, so if you can try to make an effort to be here by nine

18  o'clock?

19    But we're ready to go.  We're going to start with the

20  government's first witness.

21    MR. KROMBERG:  Your Honor, the government calls

22  Khalil.

23    THE COURT:  All right, Khalil.

24    KHALIL SULLIVAN, GOVERNMENT'S WITNESS, AFFIRMED

25    THE WITNESS:  Good morning.

                            DIRECT EXAMINATION

1  BY MR. KROMBERG:

2  Q.   Good morning, Khalil.  For purposes of today, you're going

3  to be using the name "Khalil," and what was the last name that

4  you were known by when you knew the defendant?

5  A.   Khalil Sullivan.

6  Q.   Khalil Sullivan.  Spell "Sullivan" for the record, if you

7  would.

8  A.   S-u-l-l-i-v-a-n.

9  Q.   All right.  And between 2010 and 2012, were you acting as

10 an undercover officer for the FBI?

11 A.   Yes, sir.

12         THE COURT:  You need to move closer to the microphone

13 and speak up.

14         THE WITNESS:  Yes, ma'am.

15         Yes, sir.

16 BY MR. KROMBERG:

17 Q.   During your undercover work, what did you say Khalil

18 Sullivan was?  Or let me change that:  Who did you say Khalil

19 Sullivan was when people asked?

20 A.   I portrayed myself as an active duty U.S. Marine that was

21 a new convert to Islam.

22 Q.   And where did you say you were from?

23 A.   I was from Boston, Massachusetts.

24 Q.   And as Khalil Sullivan, did you know the defendant,

1   Nicholas Young?

2   A.   Yes, sir.

3   Q.   Can you please point him out?

4   A.   He's in the middle of the table right there, sir

5   (indicating).

6            MR. KROMBERG:  And, Judge, the record will reflect

7   that the witness correctly identified the defendant?

8            THE COURT:  Wait.  Is there any objection to that?

9            MS. MORENO:  No objection.

10           THE COURT:  All right, the witness has identified the

11  defendant.

12  BY MR. KROMBERG:

13  Q.   So how did you meet Nicholas Young?

14  A.   I first met -- I first met Mr. Young at a party in

15  Alexandria, I believe.

16  Q.   A wedding?

17  A.   Yes, sir.

18  Q.   And was that in December of 2010?

19  A.   Yes, sir.

20  Q.   Now, do you have -- you have a book with you?

21  A.   Yes, sir.

22  Q.   Are those your notes?

23  A.   Yes, sir.  These are the notes as they pertain to

24  Mr. Young.

25  Q.   Okay.  And so you can refer to your notes at any time

Sullivan - Direct                                                           170

1   because we're going to be talking about things that happened

2   five -- four, five, and six years ago.

3   A.   Yes, sir.

4   Q.   Okay.  So at that wedding, December 2010, how did it come

5   about that you met Nicholas Young?

6   A.   I was invited to the party, and he, he happened to be at

7   the party also, and through the course of conversation that

8   night, we struck up a conversation with each other.

9   Q.   In your role as an undercover officer, why were you going

10  to that wedding?

11  A.   I was going there -- I was going to that party, my

12  objective was to meet Saleh Al-Barmawi.

13  Q.   Okay.  Can you please take a look at Government Exhibit

14  9-102, who the court security officer will --

15              THE COURT:  Now, do you have a set for the Court?

16              THE CLERK:  Yes, I have it.

17              THE COURT:  All right.

18              THE WITNESS:  Yes, sir.

19  BY MR. KROMBERG:

20  Q.   Okay.  Do you recognize that photo?

21  A.   Yes, sir.

22  Q.   And who is that?

23  A.   This is Saleh Al-Barmawi.

24              MR. KROMBERG:  Judge, we'd like to move into evidence

25  and publish to the jury the photo of Saleh Al-Barmawi that is

1   Government Exhibit 9-102.

2            THE COURT:  Any objection?

3            MS. MORENO:  No objection.

4            THE COURT:  All right, it's in.

5            (Government's Exhibit No. 9-102 was received in

6   evidence.)

7            THE COURT:  I think we should spell that name, too.

8   BY MR. KROMBERG:

9   Q.   Can you spell Al-Barmawi's name?

10  A.   Probably not.

11  Q.   Well, for purposes of the record, it will be Saleh,

12  S-a-l-e-h, last name Al-Barmawi, A-l-B-a-r-m-a-w-i?

13  A.   Sounds good to me.

14  Q.   Okay.  Now, when you're at the wedding and you meet

15  Mr. Young, what were the topics of your conversation with

16  Mr. Young at that wedding?

17  A.   My topics of conversation, we started off, we had similar

18  backgrounds as far as both coming from a Christian background.

19  We talked about my job, his job as a police officer.

20           Later on, we discussed Islam, discussed Islam in

21  America.  Mr. Young felt that there was a -- he talked about,

22  he felt -- he believed that there was a conspiracy against,

23  against Muslims in the United States.

24           Portraying myself as a newer Muslim, he talked about

25  some of the mosques in the area.  He talked about the Adams

Sullivan - Direct                                                    172

1   Center, and -- he talked about the Adams Center in Loudoun

2   County, Virginia.  He cautioned me against going there because

3   of the Sufis that were there.  He didn't really --

4   Q.   Before you go any farther --

5   A.   Sorry.

6   Q.   -- what did you -- can you explain not in detail, we're

7   not asking you to be an expert on Sufis, but just what do you

8   mean when you say Sufis?  Is it a sect of Islam?

9   A.   Yes.  Sufism is a --

10  Q.   A different sect than what Mr. Young was?

11  A.   At that point, I didn't know what sect he was, but the

12  targets of the investigation were not Sufis.

13  Q.   Was there any discussion about Farooque Ahmed?  Was there?

14  A.   Yes, sir.

15  Q.   Okay.  Now, before we talk about that, I'd like you to

16  take a look at Government Exhibit 9-108.

17          THE COURT:  Any objection?

18          MS. MORENO:  No objection.

19          THE COURT:  All right, it's in.

20          (Government's Exhibit No. 9-108 was received in

21  evidence.)

22          MR. KROMBERG:  Can you publish 9-108?

23  Q.   And who is Farooque Ahmed?  Who is that?

24  A.   Farooque Ahmed, he's an individual that was arrested for,

25  I believe, conspiring with al Qaeda for a plot against the

Sullivan - Direct                                                              173

1    Metro system.

2    Q.   Right.  And what was your conversation with Metro Police

3    Officer Young about Farooque Ahmed the first day you met him?

4    A.   When I, when I spoke to him, he mentioned -- he talked

5    about -- he didn't name Farooque by name, but he talked about

6    his case, that individual was recently arrested, and he talked

7    about him having a conversation with another Muslim who was

8    condemning Farooque Ahmed for his actions.

9            Mr. Young's response to that was that we should, we

10   should support the -- we should support the Muslim until he's

11   judged, then even after he's judged, he talked about just

12   providing support for him, you know, for him and his, his

13   family.  That's sort of the -- he didn't get into the details

14   of supporting his actions or anything like that.  He was just

15   talking about more just supporting him and just supporting his

16   family through this.

17   Q.   So did you end up obtaining Mr. Young's phone number that

18   day?

19   A.   Yes, sir.

20   Q.   How did that come about?

21   A.   Saleh directed -- I believe Saleh directed Mr. Young to

22   give me his phone number.

23   Q.   Saleh Al-Barmawi?

24   A.   Saleh Al-Barmawi, yes, sir.

25   Q.   So how -- by the way, do you recall that phone -- what

Sullivan - Direct                                                    174

1    that phone number was?

2    A.    No, I do not.

3    Q.    How did your relationship with Mr. Young develop after

4    that time?

5    A.    It developed -- it just developed into, like, a social,

6    friendly relationship after that.  It just -- we would go to,

7    occasionally go to prayer services together, go out to eat.

8    Later on, we went to some movies together, and just developed

9    into a social, friendly relationship.

10   Q.    What -- who else traveled in the same circles that you

11   would meet together with Mr. Young?

12   A.    Are you talking initially or over the course of the entire

13   case?

14   Q.    Just starting out, starting out.

15   A.    Starting out, it was mostly myself -- it was mostly

16   myself, Saleh Al-Barmawi, and there were other, other

17   individuals at that time, because we would -- there would be

18   sort of circles of people that would go to sort of the same,

19   you know, the same mosques.  We'd attend classes together.  I

20   can't recall all the people initially that were, that were

21   involved.

22   Q.    What could you see of Mr. Young's relationship with Saleh

23   Al-Barmawi, with Saleh Al-Barmawi?

24   A.    My observations and the statements that were made to me,

25   that they had a very close relationship with each other.  The

1    first night that I met, Saleh and Mr. Young were talking about

2    traveling to Jordan together, traveling to hajj together, which

3    is significant in Islam.

4    Q.   That's a trip to Mecca?

5              MS. MORENO:  Objection.

6              THE COURT:  And what's the basis for the objection,

7    Ms. Moreno?

8              MS. MORENO:  Expert testimony, foundation.

9              THE COURT:  Oh, I think a member of that religion can

10   talk about what the hajj is.  Overruled.

11   BY MR. KROMBERG:

12   Q.   What, what did Saleh Al-Barmawi say about jihad while you

13   and Nick Young were together?

14   A.   Saleh talked about jihad as --

15             MS. MORENO:  Objection.  Hearsay.

16             MR. KROMBERG:  Judge --

17             THE COURT:  Is it being offered for the truth of its

18   contents?

19             MR. KROMBERG:  No.  We're putting in the fact that

20   Saleh Al-Barmawi is the person who radicalized, if anyone --

21             MS. MORENO:  Objection.

22             MR. KROMBERG:  -- not him.

23             THE COURT:  I'm going to overrule the objection.  Go

24   ahead.

25   BY MR. KROMBERG:

Sullivan - Direct                                                    176

1  Q.   What did Saleh Al-Barmawi say about jihad in the presence

2  of Nick Young?

3  A.   There were numerous conversations about jihad.  Saleh,

4  Saleh advocated -- he first said that jihad is, you know,

5  martyrdom is the highest level.  He talked about martyrdom,

6  becoming a shaheed, which is martyr in Islam, about getting to

7  the highest level of paradise.  He talked about that jihad is

8  an individual responsibility.

9  Q.   Now, when you say "individual responsibility," as opposed

10 to what?

11 A.   As opposed to it's up to the individual to engage in

12 jihad, not necessarily wait for, like, a leader or somebody to

13 tell you to go do it.

14 Q.   Okay.

15 A.   He also talked about that where jihad is, jihad against

16 the Israelis, jihad -- he used the word that Israel and

17 Americans are his enemy.

18        He also talked about scholars that profess violent

19 jihad against the United States.

20 Q.   Did he talk about sheikhs that did not tell people to

21 fight?

22 A.   Yeah.  He said that there are certain sheikhs that don't

23 tell people to engage in jihad, and he said that those people

24 are wrong.

25 Q.   What did he say about Usama Bin Laden?

1            MS. MORENO:  Objection.

2            THE COURT:  Again, I'm going to overrule that given

3    the nature of the issues in the case.

4            THE WITNESS:  He, he discussed Usama Bin Laden.  He

5    said that he wished that he could have got more fatwas from

6    him.  And a fatwa is just an Islamic ruling from a scholar.  So

7    he mentioned that he would have liked to got more rulings from

8    Usama Bin Laden, and he -- when he talked about Usama Bin

9    Laden, he used the word that he made many beautiful statements.

10           He did not elaborate much on that, but he also said,

11   talking about Usama Bin Laden, he said there were some things

12   that he didn't necessarily agree with Usama Bin Laden said, but

13   he kind of smirked and didn't elaborate on those facts.

14   Q.   So did, did -- who, if any, leaders -- Islamic leaders did

15   Saleh Al-Barmawi say that he himself looked up to?

16   A.   He --

17   Q.   And again, I'm only talking about conversations that when

18   you were with Mr. Young.

19   A.   Yes.  There's one particular sheikh that Saleh Al-Barmawi

20   said that he looked up to was Mohammad Al-Maqdisi, and he said

21   that he's a Jordanian, one of the greatest scholars.  He said

22   that Maqdisi is on America's hit list because he openly

23   professes jihad.

24   Q.   What did Saleh Al-Barmawi say about Anwar Awlaki?

25           MS. MORENO:  Objection.

Sullivan - Direct                                                    178

1          THE COURT:  Overruled.

2          THE WITNESS:  I can't recall what he said about Anwar

3    Awlaki.

4    Q.   How about Ali Al-Timimi?

5          MS. MORENO:  Objection.

6          THE COURT:  Overruled.

7          THE WITNESS:  I don't believe that conversation on

8    Al-Timimi was in the presence of Mr. Young.

9    BY MR. KROMBERG:

10   Q.   Okay.  We'll leave it then.

11         So what did Saleh Al-Barmawi say in the presence of

12   Nicholas Young about American soldiers or people who worked

13   with Coalition Forces?

14   A.   Yeah, because we had a conversation but not in the

15   presence of Mr. Young, but there was one particular --

16         THE COURT:  Wait, wait, wait, I'm sorry.  These are

17   only conversations that you recall were made in the presence of

18   Mr. Young.

19         THE WITNESS:  Yes, ma'am.  I was just clarifying that

20   when he asked about the soldiers, that conversation was not in

21   the presence of Mr. Young, but there was a conversation about a

22   particular woman that worked for, worked for U.S. Forces.

23   BY MR. KROMBERG:

24   Q.   That was in the presence of Mr. Young?

25   A.   Yes.

1   Q.   Yeah.   And what was that conversation?

2   A.   Saleh was saying that he, he expressed disgust for a woman

3   working with Coalition Forces, and he made the statement that

4   her working for Coalition Forces would be reason enough just to

5   shoot her.

6   Q.   What did Saleh Al-Barmawi do about the possibility that

7   the FBI might be investigating him?

8   A.   We would -- he would talk in codes sometimes.  He would

9   lower his voice, but he would also -- if he wanted to talk

10  about certain, certain topics, we would actually leave and go

11  for walks.

12  Q.   When you say "we," would it be we, you, Nicholas Young,

13  and Saleh Al-Barmawi?

14          MS. MORENO:  Objection.  Leading.

15          THE COURT:  That's leading.  Sustained.

16  BY MR. KROMBERG:

17  Q.   Okay.  Did you happen to go on walks around a golf course

18  with Saleh Al-Barmawi?

19  A.   Yes.

20  Q.   Who was with you when you did that?

21  A.   Mr. Young.

22  Q.   Okay.  And what topics were -- what type of topics were

23  discussed when you'd go walking around the golf course?

24  A.   I don't recall what topics were discussed at that time.

25  If I, if I could refer to my notes?

1   Q.   You can refer to your notes at any time here.

2   A.   Okay.  I can't recall what, in the interests of time --

3   Q.   We'll get back to that.

4   A.   Okay.

5   Q.   But the point is feel free to refer to your notes and --

6   so those notes are -- well, tell the jury about how those notes

7   got compiled.  How did they get compiled?

8   A.   These notes -- these are my reporting.  Pretty much the

9   way the process would be is I would go out and I would have a

10  meeting, and then once the undercover meeting was completed, I

11  would come back and type my notes as soon as possible while the

12  event was still fresh in my, in my memory, and then those

13  reports were, were turned over to the FBI.

14  Q.   Okay.  And were those notes in front of you, are they

15  categorized by date?

16  A.   Yes, sir.

17  Q.   Take a look, if you would, at Government Exhibit 9-103.

18  A.   Yes, sir.

19  Q.   Do you recognize that photo?

20  A.   Yes, sir.  This is --

21  Q.   In the future, when you look at the picture, you look at

22  it, don't show the jury the picture.  You're just going to look

23  at the picture until the judge says the jury can see the

24  picture.

25  A.   Okay.  Sorry.

1   Q.   Do you recognize that?

2   A.   Yes, sir, I do.

3   Q.   And who that?

4   A.   It's Amine El-Khalifi.

5            THE COURT:  There's no objection?

6            MS. MORENO:  No.

7            THE COURT:  It's in.

8            (Government's Exhibit No. 9-103 was received in

9   evidence.)

10  BY MR. KROMBERG:

11  Q.   Who is Amine El-Khalifi?

12  A.   Amine El-Khalifi was an individual that I associated with

13  that was later arrested for attempting to commit a suicide

14  bombing at the U.S. Capitol.

15  Q.   So did Mr. Khalifi know Mr. Young?

16  A.   They -- I would say they were not friends, they were not

17  close, but they knew of each other, yes.

18  Q.   Were there occasions when you dined together, the three of

19  you?

20  A.   Yes, sir.

21  Q.   And how did that come about?

22  A.   That came about, we were going to a lecture.  Well, the

23  first time, it was just sort of groups of circles that we would

24  just go out to eat, like, after classes, after prayer services.

25  We would just go out to eat with each other, and that's how

Sullivan - Direct                                                    182

1   sort of like the circles came together.

2   Q.   So what topics did Khalifi tend to talk about when you and

3   he and Mr. Young were together?

4   A.   There was, there was only a couple times that myself,

5   Khalifi, and Mr. Young were all together, but during those

6   times, Khalifi talked about -- he talked about martyrdom.  He

7   talked about the highest level of paradise to become a shaheed

8   is to become a martyr, and he talked about that you would have

9   to die in battle to become a shaheed.  He talked about his

10  Facebook account being shut down because he posted radical

11  mujahideen propaganda.

12        He talked about marksmanship.  He asked me to teach

13  him how to -- he asked me to teach him about marksmanship, and

14  we also had a conversation --

15  Q.   What was Mr. Young's involvement, if any, in the

16  discussion about marksmanship?

17  A.   I don't recall the specifics about it.  We would just --

18  him and I also, I believe, just talked about some basics of

19  marksmanship.

20  Q.   When you say "him and I" both, were you referring to

21  Mr. Young and you or Khalifi and you?

22  A.   Oh, Mr. Young and I.

23  Q.   We're talking about marksmanship with Khalifi?

24  A.   Yes.  But it wasn't, it wasn't like a class or a lesson or

25  anything.  We were just talking about marksmanship.

1    Q.   Okay.  Do you recall a dinner with Mr. Young and Khalifi

2    at Chili's restaurant in April 2011?

3    A.   Yes, sir, I do.

4    Q.   And what, if anything, do you recall that Mr. Khalifi said

5    about martyrdom in Mr. Young's presence?

6    A.   That's when he spoke about martyrdom, basically obtaining

7    the highest level of paradise.

8    Q.   What, if anything, do you recall him saying about life,

9    about this life?

10   A.   About this life is just a test.  He also, Mr. Khalifi

11   believed that God had a test or a task for me that was unknown

12   at this time, and we talked about -- we talked about martyrdom.

13   I believe he was talking about the different, you know, types

14   of martyrdom.

15          And at that time, Mr. Young mentioned that, something

16   to the effect that one of the greatest shaheeds, one of the --

17   I'd have to refer to my notes.

18   Q.   Please do.  That would be your notes from, that would have

19   been April 2011?

20          April 1, 2011.

21   A.   Mr. Young just talked about one of the greatest shaheeds

22   is the man who initially fights the Muslim, becomes a Muslim,

23   and then fights the kufir as a Muslim, which a kufir is a

24   disbeliever.

25   Q.   Was there a time when you said you were distancing

Sullivan - Direct                                                        184

1    yourself from Mr. Khalifi, when you told Mr. Young that you

2    were distancing yourself from Mr. Khalifi?

3    A.    Yes, sir.

4    Q.    And how did that come about?

5    A.    I would have to go -- it was a conversation where -- I

6    don't recall how exactly the conversation of Khalifi came up.

7    I talked about him posting radical, radical material on the

8    Internet, that I was distancing myself from that.  Mr. Young

9    talked about that I should recommend that he goes to, he goes

10   to Syria.

11   Q.    That you should recommend to who, that who goes to Syria?

12   A.    Amine Khalifi.

13   Q.    Mr. Young said that you should tell Khalifi to go to

14   Syria?

15   A.    Yes.

16   Q.    Go to Syria to do what?

17   A.    He didn't, he didn't specify.

18   Q.    Okay.  And this was approximately when?  2011?

19   A.    Yeah, 2011.  And he said it -- we -- I mean, we had a lot

20   of hypothetical conversations, and, I mean, there were times we

21   were joking, there was times we were not joking, and it's --

22   these types of conversations we had, he never had a

23   conversation where he said, like, you know, this is the plan,

24   this is what you have to do, lay it out.  It was just sort of a

25   statement, a statement that he made.

1  Q.   What, if anything, did he say about your firearms?

2  A.   My firearms?  We talked about firearms a lot, just casual

3  conversations, but after Amine was arrested, I recall a

4  conversation where Mr. Young and I both legally possessed

5  firearms, and I made the -- I talked about possibly selling my

6  firearms so that if anybody thought that I was involved with

7  Amine or that I had anything to do with him, that maybe that

8  might lower suspicions.

9        And he mentioned -- when I mentioned that, he

10  mentioned that he necessarily wasn't going to sell his, but he

11  talked about the possibility of stashing his weapons, burying

12  his weapons and having, like, a topographical map to locate

13  them.

14  Q.   Could you take a look at Government Exhibit 9-104?  And

15  tell us if you recognize that person.

16  A.   Yes, sir.

17        MS. MORENO:  No objection.

18        MR. KROMBERG:  All right.

19        (Government's Exhibit No. 9-104 was received in

20  evidence.)

21        MR. KROMBERG:  Please publish 9-104.

22  Q.   And who is that?

23  A.   That is Liban Mohamed.

24  Q.   Who was Liban Mohamed?

25  A.   Liban Mohamed is an individual that over the course of

1   time radicalized and recruited me to go fight for Al-Shabaab.

2   Q.   Well, let's start even before that.  Where was Liban

3   Mohamed living when you met him?

4   A.   In Alexandria, Virginia.

5   Q.   Okay.  And was there any relationship between Liban

6   Mohamed and Nicholas Young?

7   A.   I -- from the first time when we met, it was my

8   understanding that Mr., Mr. Young and Liban were not friends

9   but knew each other because of -- we talked about the circles

10  before -- because of an individual named Zachary Chesser.  So

11  it's my understanding that they physically saw each other

12  before but never really engaged in any kind of conversations.

13  Q.   What was, could you tell, was the relationship between

14  Liban Mohamed and Saleh Al-Barmawi?

15  A.   They knew each other well.  There was a little bit of

16  animosity, animosity there.

17  Q.   And what did that appear to be based on?

18  A.   Well, the conversation that I had, now, this was a

19  conversation that I had with Saleh that was not in the presence

20  of Mr. Young.

21          MS. MORENO:  Objection.

22          THE COURT:  Well, in this -- this is a different kind

23  of question.  This is asking the relationship between --

24          MR. KROMBERG:  -- Al-Barmawi and Liban Mohamed.

25          THE COURT:  So I'm going to overrule the objection.

1            THE WITNESS:  Okay.  Saleh Al-Barmawi and Liban

2     Mohamed both openly professed violent jihad to me, and what

3     Saleh Al-Barmawi was doing, he was upset about is that Liban

4     was too outspoken and sort of reckless, and he didn't give

5     specifics, but he felt that Liban in his -- how blatant he was

6     and how reckless he was, may have contributed to Zachary

7     Chesser being arrested.

8     Q.   Okay.  So now you were saying that you were involved with

9     Liban Mohamed in a plot, correct?

10    A.   Yes, sir.

11    Q.   In your undercover capacity?

12    A.   Yes, sir.

13    Q.   Please tell us about that.

14            MS. MORENO:  Objection.

15            THE COURT:  Overruled.

16            THE WITNESS:  Over the course of my relationship with

17    Mr. Mohamed, he vetted me, provided me with extremist

18    propaganda.  He provided me with extremist reading materials,

19    and slowly over time, he began to educate me, and he

20    radicalized me, to the point where once he felt comfortable

21    with me, he expressed a desire for me to travel to Somalia,

22    where I would, where I would train and fight with Al-Shabaab.

23            During that time, we actually went, we actually made

24    a plan to go overseas.  We started collecting equipment,

25    material, and there were several people that were supposed to

1   go with us over to Somalia.

2   Q.   And these several people, where were they from?

3   A.   Still the Northern Virginia, the Northern Virginia area.

4   Actually, the Northern Virginia area and also Minnesota.

5   Q.   And what time -- what time frame was this happening?

6   A.   My relationship with Liban or, like, the planning phase?

7   Q.   Both.

8   A.   Okay.  My relationship, I don't remember the exact time.

9   I met Liban in 2011, but the actual operational phase when

10  Liban and I were, were putting together a plan -- well, when

11  Liban was and I was just sort of part of that plan, was the

12  spring and summer of 2012.

13  Q.   So what role did Mr. Young have in the plan for the young

14  men from Northern Virginia to go to fight in Somalia?

15  A.   None.

16  Q.   Why didn't you solicit Mr. Young to join that plan?

17  A.   Because that, I mean, twofold.  One, that just wasn't my

18  role.  I wasn't a recruiter.  I wasn't a radicalizer.  That was

19  Liban's role.  That was the first, but the second part, I

20  was -- he wasn't -- Liban felt that he was -- he told me at

21  times that he was suspicious of Mr. Young.

22          But Mr. Young just, he just wasn't naturally involved

23  in the plan like that.  He never, he never expressed a desire

24  to me to, you know, to be involved in that, that type of

25  planning.

1        And also, as an undercover, I'm just an investigative

2   technique.  I do what my case agents tell me to do, and I was

3   told specifically at that point to stay away from Mr. Young and

4   don't try to involve him in anything like that.

5   Q.    So turning back to your activities with Mr. -- your

6   relationship with Mr. Young, what types of things would you

7   talk about just in, in your relationship with him from when you

8   met him in December 2010 to, to when you stopped seeing him in,

9   I think, April 2012?

10  A.    I believe so, yes, sir.

11  Q.    Yes.  So what types of things did you talk about?  What

12  types of things did you do?

13  A.    Well, it would depend, where is Mr. Young and I alone, or

14  was Mr. Young and I with other people?

15  Q.    Well, let's start with other people.

16  A.    Okay.  Other people, if we were with Saleh Al-Barmawi, the

17  conversations would be a lot of time Islamically based, a

18  little more, I would say, sort of conservative.  We didn't talk

19  about a lot of -- there wasn't a lot of joking.  I mean, you

20  know, if there were jokes, it was normally about the Jews, but

21  there wasn't a lot of joking.  There wasn't a lot of

22  conversation outside of -- there was a lot of conversation sort

23  of outside of Islam just because that, you know, Saleh

24  Al-Barmawi, he was the one that was -- I mean, he was my main

25  target, so I would play off whatever conversations that, that

1   he was, that he was engaged in.

2   Q.   You mentioned joking about the Jews.  What do you mean,

3   joking about the Jews?

4          MS. MORENO:  Objection.

5          MR. SMITH:  Objection.

6          THE COURT:  Only one attorney per witness, all right?

7   And it's Ms. Moreno's witness.  All right.

8          I'm going to overrule the objection.

9   BY MR. KROMBERG:

10  Q.   What do you mean -- what do you mean, joking about the

11  Jews?

12  A.   There seemed to be a common thread between Mr. Young,

13  Saleh, and pretty much almost all of the, I won't say all but

14  the people that were targets of the investigation or just

15  involved in it.  It was an overall hatred of Jews, where there

16  would be, it would be jokes.

17         Like, as of one time, I remember Saleh was telling a

18  joke in the presence of Mr. Young where the punch line was that

19  one -- people would be more upset at the death of one

20  non-Jewish bicycle maker than the death of 15 million Jews.

21         There was always conversations about the hatred of

22  Jews, you know, talking about how, wishing that Iran would

23  attack Israel, referring to the Jews as pigs.

24  Q.   So you were talking about what you did when you were with

25  Saleh Al-Barmawi and Young.  What types of things did you do

Sullivan - Direct                                                      191

1    when you were just with Mr. Young, just the two of you?

2    A.   We would just have just normal conversations.  We'd talk

3    about politics, talk about work, I mean, talk about women

4    sometimes.  We would just go to restaurants.  A couple times,

5    we just went to movie theaters and didn't really talk that much

6    about Islam that much at all.

7    Q.   What, if anything, was said about steroids?

8              MS. MORENO:  Objection.

9              THE COURT:  About what?

10             MR. KROMBERG:  Steroids.  Steroids.

11             THE COURT:  I'm going to sustain that objection.

12   BY MR. KROMBERG:

13   Q.   Okay.  What attitude did he exhibit -- attitude Mr. Young

14   exhibit towards the FBI?

15   A.   Overall distrust of the FBI and also some animosity

16   towards the FBI for the way that they handled questioning him

17   after Zachary Chesser was arrested for attempting to provide

18   material support to Al-Shabaab and threatening the South Park

19   rioters.

20   Q.   What did he believe was the status of any investigation of

21   him?

22   A.   He believed that both he and Saleh were currently under

23   investigation by the FBI.

24   Q.   What did he say about having received classified

25   information to that effect?

Sullivan - Direct                                                      192

1   A.   There was a conversation one time where I don't recall how

2   it came to be, but Mr. Young told me that there was a woman

3   that, didn't specify where she worked, but that she, she sort

4   of tipped him off that he was under investigation.  What

5   Mr. Young said is that this woman saw a piece of paper with his

6   name on it, and there were some other details, but relayed that

7   information to him.

8        He said that the woman first asked him:  Are you a

9   member of some, like, organized crime ring, or something to

10  that effect, but that she relayed information to him that she

11  saw a paper that showed that he was under investigation.

12  Q.   What did he say about the FBI listening to his

13  conversations?

14  A.   He believed that, that his phones were wiretapped, which

15  means that the government was actively listening to his calls.

16  Q.   What did he do to thwart the FBI listening to him?

17  A.   I would observe him at times, he would take out his

18  battery, he'd take out his battery, but he told me that he

19  would change up phones.

20  Q.   Well, did the term "burner phone" come up?

21  A.   Yes, sir.

22  Q.   What is a burner phone?

23  A.   A burner phone is just a prepaid phone that's really

24  not -- that you can just -- it's not attached to a person.  You

25  just -- it's not attached to you.  It's just like a throw-away

Sullivan - Direct                                                    193

1    phone, a prepaid phone.

2    Q.   What did he say would happen if the FBI came to his house?

3    A.   He -- there was times that we talked about that, and

4    again, like, there were times where we would, we would be

5    joking, we would be talking serious.  He would just mention

6    that how, that he did have weapons and that he would be within

7    his rights to shoot somebody that was on his property.

8    Q.   What did he say about the use of ballistic vests were for?

9    A.   We talked -- again, he said not that this was his plan,

10   but he talked about that, configuring, like, sort of medieval

11   armor, configuring medieval armor that would not be for an

12   assault but more of like to fortify a position, and that

13   mentioned something about if somebody tried to raid his home,

14   that's what, like, I believe he said that assault rifles and

15   amphetamines are for.

16   Q.   What did he say about looking for surveillance outside his

17   house?

18   A.   He told me that, that there was a time where he believed

19   he spotted surveillance, and he was looking for surveillance

20   with a, I believe he said an AK-47 or some sort of rifle with a

21   light attachment.

22   Q.   What did he say, if anything, about missing a doorknob on

23   his front door?

24   A.   There was a time when his doorknob was missing, and he

25   made a comment, but he was laughing when he made this comment,

1  that he'd be able to stick, like, a shotgun out the doorknob so

2  it was like a, as a gun port.

3         Later on, though, I observed that that doorknob was

4  fixed.

5  Q.   What attitude did Mr. Young exhibit towards informants?

6  A.   He -- when we talked about informants, both Saleh and

7  Liban, we were all having a conversation about informants, and

8  it was the consensus that we should, we should try to uncover

9  who actually the informants are, right.

10 Q.   That would be you, right?

11 A.   That would be me, which is -- that would be correct.

12 Q.   What did he say -- what did Mr. Young say would happen to

13 anyone that he found would betray him?

14 A.   He made statements that, you know, their life expectancy

15 would be quickly diminished, and he also talked about, I

16 believe, I can't recall if he said head or feet being in cinder

17 blocks and thrown into Lake Braddock.

18 Q.   Did Young -- what, if anything, did he say about why he

19 was unlike Amine Al-Khalifi?

20        And could you put Khalifi on?  That's the guy who was

21 arrested for the suicide bomb attack attempt at the Capitol.

22 A.   There was a time when he was mentioning that Amine was

23 very, very outspoken, and I believe that he said something to

24 the effect that if I was going to do something, like, nobody

25 would know about it, kind of like he wouldn't talk about it.  I

Sullivan - Direct                                                        195

1  believe that was sort of the crux of the conversation.

2  Q.   What, if anything, did he say about going postal?

3  A.   He just talked, you know, just through conversations

4  sometimes, he talked about -- we both had conversations where

5  it was just, you know, he said that, you know, if I went

6  postal, that, you know, that he had a large amount of firearms.

7  Q.   What, if anything, did he say about bulletproof vests and

8  going postal?

9  A.   We talked about bulletproof vests.  A lot of times, he

10  mentioned that he had bulletproof vests.  There were times

11  where he asked me about bulletproof vests, what types I had.

12         I believe there was a conversation where he asked me

13  if I had ever known of anybody that was, like, shot with a

14  bulletproof vest, and he -- the conversations were just

15  basically around that, about different levels of bulletproof

16  vests.

17  Q.   What, if anything, did he say about the possibility of

18  attacking an FBI establishment?

19  A.   That, that a couple -- I believe that a couple

20  well-trained people would be able to attack the FBI

21  establishment.

22  Q.   So what, what, if anything, did he say about someone with

23  his skills?

24  A.   What -- do you recall what date that was?

25  Q.   Hang on.  I will get it for you.

Sullivan - Direct                                                    196

1          March 12, 2011, if I can refer you to your notes.

2    A.   2011, you said?

3    Q.   Yeah, March 12.

4    A.   Oh, sorry.  I thought you said 2012.

5    Q.   March 12, 2011.

6    A.   Give me one second, sir.

7          Okay.  And the question was --

8    Q.   What, if anything, did he say about someone with his

9    skills?

10   A.   He didn't, he didn't necessarily specify what his

11   skills --

12   Q.   Would you go to page 4 of your notes, if you would, for

13   that date?

14   A.   Yes, sir.  I'm looking at that.

15         He just mentioned that somebody with his skills could

16   attack an FBI establishment.  He didn't specify what his skills

17   were.

18   Q.   Did he say -- what, if anything, did he say about where

19   the FBI building was, the JTTF?  Joint Terrorism --

20   A.   Yeah, the JTTF.  He said that it's in D.C., but he does

21   not know exactly what floor it is, but he could find out what

22   floor the JTTF is on.  He also stated that if one person

23   attacked the JTTF, it would be suicide, but if more than one

24   person did it jointly, the untrained FBI would be in trouble.

25   Q.   Okay.  Is it correct that he talked about a plan by which

1  he could use his police credentials to smuggle weapons past

2  security?

3          MS. MORENO:  Objection.

4          THE COURT:  Sustained.  That's leading.

5  BY MR. KROMBERG:

6  Q.   What, if anything, did he say about using police

7  credentials to smuggle weapons past security in a federal

8  building?

9  A.   Okay.  He mentioned that --

10  Q.   You're not going to talk about what --

11  A.   Yes, I understand.  He mentioned one time that he entered

12  a federal building and he was able to just show his police

13  credentials and that he could have -- that he discovered that

14  he could probably get easily four or five guns into that

15  establishment and that if he chose to do so, he would be able

16  to hand them out to other people.

17  Q.   So how often were you seeing Mr. Young in early 2011?  And

18  you can refer to your notes if it's helpful.

19  A.   Early 2011, I mean, I was seeing him -- I was not seeing

20  him every single day, but again, he was not the, the target in

21  the investigation.  So I would be seeing him but not on a, on a

22  daily basis and not -- nowhere near as frequently as other

23  individuals.

24  Q.   So did there come a time -- or when did there come a time

25  when you stopped seeing him pretty regularly?

1   A.    Yes, sir.

2   Q.    And when was that?

3   A.    When the focus of the investigation shifted from Mr. Saleh

4   Al-Barmawi to Liban Mohamed.

5   Q.    Well, even, even before that, look at your notes for

6   April 4 --

7   A.    Yes, sir, yes.

8   Q.    April 4, 2011.

9   A.    Yes, sir.

10  Q.    Was there a time -- how long was it did it go between when

11  you saw him on April 4 and the next time you saw him?

12  A.    Between, like, April and May, there was a -- it was a -- I

13  didn't see him, I didn't hear from him, and a lot of other

14  people didn't hear from him or see from him.

15  Q.    Did he tell you that he was going somewhere on April 4?

16  A.    No, he did not.

17  Q.    When you next saw him in May, late May, did he tell you

18  where he had been?

19  A.    No, sir.

20  Q.    Okay.  Did you ask him where he had gone?

21  A.    No, I did not.

22  Q.    Why not?

23  A.    Because if he wanted me to know, he would have told me.

24  Q.    Okay.  What, if anything, did he say about having been in

25  combat?

1   A.   I talked about my, my combat experience as a Marine over

2   in Iraq previously with him, and we would just have casual

3   conversations about combat, and I remember on one particular

4   occasion, he made a comment that, you know, people, people

5   here, they just don't know what it's like to be in combat.

6        He didn't necessarily say he was in combat, but

7   that's -- he was saying it -- he didn't say that he was in

8   combat, but he said in a manner that somebody who was in

9   combat, just saying, you know, that people around here, you

10  know, people just don't know what it's like.

11  Q.   How did he describe -- talking about his job as a police

12  officer, how did he describe his performance as a cop?

13  A.   We didn't talk about his performance as a police officer

14  that much.  I mean, the couple times we did talk about it, I

15  remember, vaguely remember one conversation where I think he

16  said that he, he hasn't written many tickets in the year, maybe

17  one ticket, but, I mean, I could be wrong on that.

18       But there was another time -- the only other time we

19  really talked about his, his job that -- he said that he felt

20  that his job was out to get him, that there was a conspiracy

21  against him.

22       And then he mentioned one incident one time when I

23  believe it was in the City of Fairfax that he was stopped for a

24  moving violation, and he did not identify himself as a police

25  officer, and he told me that because of the anti-Semitic bumper

Sullivan - Direct                                                    200

1    stickers on his car, like, he didn't really know how the cop

2    would react to that.  I believe he also said that he was

3    supposed to be on duty then anyway, so he didn't want to -- he

4    didn't want his job to find out.

5    Q.   And how would his job find out?

6    A.   Actually, I retract that.  He didn't tell me -- he didn't

7    tell me that he didn't want his job to find out.  He just told

8    me that he was supposed to be on duty at the time.

9              MR. KROMBERG:  Your Honor, at this point, I'd like to

10   read into evidence Stipulation No. 27 between the parties.

11             THE COURT:  All right.

12             MR. KROMBERG:  That the United States and the

13   defendant hereby stipulate and agree that Government Exhibit

14   11-500 is an authentic copy of the traffic ticket received by

15   defendant Nicholas Young on March 28, 2011.

16             And we'd like to move into evidence Government

17   Exhibit 11-500, which is the traffic ticket from March 28,

18   2011.

19             THE COURT:  Any objection?

20             MS. MORENO:  No objection.

21             MR. SMITH:  No.

22             THE COURT:  All right, it's in.

23             MR. KROMBERG:  Thank you, Your Honor.

24             (Government's Exhibit No. 11-500 was received in

25   evidence.)

1          THE COURT:  Are you publishing that or not?

2          MR. KROMBERG:  No.

3          THE COURT:  All right.

4          MR. KROMBERG:  The jury can look at it.  It's just

5   the traffic ticket.  People have seen traffic tickets.

6          If I could have just one moment?

7   Q.   So if I can direct your attention to your notes from

8   April 1, 2011?  I'm referring to the incident about the traffic

9   ticket.

10  A.   Yes, sir.

11  Q.   Did you see in the notes where you talked -- where you

12  wrote down that he was worried that the police officer who

13  pulled him over would call his police department?  In the

14  notes, it's in the part about after the meal at Chili's

15  concluded.

16  A.   Yes, sir.  April 1, you said, sir?

17  Q.   April 1.

18  A.   Okay.

19  Q.   Do you see the part about the meal at Chili's?

20  A.   Yes, sir.

21  Q.   Okay.  And then your reference to the police officer

22  pulled him over?

23  A.   Yes, sir.

24  Q.   Okay.  Was there -- did Mr. Young express a concern --

25  what, if any, concern did Mr. Young express about him -- the

Sullivan - Direct                                                    202

1    police officer calling Metro to find out if he, he was really a

2    police officer?

3    A.   I don't remember the details.  It just said that Mr. Young

4    was worried that --

5             MS. MORENO:  Objection, Your Honor.  Improper.  Is

6    his recollection refreshed?  He's reading from his notes?

7             THE COURT:  Yeah, I mean, again, if the witness

8    cannot remember and has to look at the notes -- do the notes

9    refresh your memory as to what happened?

10            THE WITNESS:  I don't remember talking about that.

11            THE COURT:  All right.

12   BY MR. KROMBERG:

13   Q.   Okay.  Well, then -- so just looking at your notes from

14   that particular page, were these the notes that you wrote at

15   the time that you did remember?

16   A.   Yes, sir.

17            MR. KROMBERG:  Okay.  Well, then in that case, Judge,

18   we're going to move this page in as the past recollection

19   recorded.

20            MS. MORENO:  Objection.  There are a number of items

21   on this page, Your Honor.

22            THE COURT:  That's the problem.  I'll have you redact

23   the page so just this relevant answer can be there.  Why don't

24   you read that answer then in right now for the record so the

25   jury has context.

1           MR. KROMBERG:  Okay.

2           THE COURT:  And what exhibit number are you putting

3   on that then?

4           MR. KROMBERG:  This is 11-202.  Let's make it 11-202A

5   because 11-202 is the notes as a whole.

6           THE COURT:  Well, the notes as a whole will not be

7   going in.

8           MR. KROMBERG:  Right.  So 11-202A.

9           THE COURT:  All right.  You will need to make sure

10  that's done at lunchtime --

11          MR. KROMBERG:  Yes, ma'am.

12          THE COURT:  -- so we can get it in the record, all

13  right?

14          MR. KROMBERG:  Yes, ma'am.

15          THE COURT:  That will be allowed in.

16          (Government's Exhibit No. 11-202A was marked and

17  received in evidence.)

18          MR. KROMBERG:  And if I may read that portion of the

19  notes --

20          THE COURT:  No, let the witness do it.

21          MR. KROMBERG:  Okay.

22          THE WITNESS:  I wrote that SD, that is, Mr. Young,

23  was worried that the police officer who pulled him, SD,

24  Mr. Young, over will call his police department.

25  BY MR. KROMBERG:

1    Q.    Keep going.

2    A.    "SD stated that some officers are required to report to,

3    quote, roll call, where others are supposed to report directly

4    to the Metro station.  SD stated that on the day he was

5    supposed to report directly to a Metro station, SD stated that

6    he was late and had already reported over his radio that he,

7    SD, was on duty at the Metro station.  SD was concerned that if

8    he, SD, told the police officer that he too was an officer,

9    his, SD, police department would find out and make an inquiry

10   as to why SD had reported for duty yet he, SD, was stopped on a

11   traffic stop in his POV, not in uniform, and had lied about his

12   duty status."

13   Q.    That's it.  Now, POV, privately owned vehicle?

14   A.    Yes, sir.

15             MR. KROMBERG:  If I may just a moment?

16             Thank you, Your Honor.

17   Q.    Okay.  Directing your attention to August 27, 2011, did

18   you have occasion to meet Mr. Young at the Islamic Heritage

19   Center?

20   A.    August 27?  Let me get back to that, sir.

21             You said August 27, sir?

22   Q.    Correct.  Well, let me do it this way:  Was there a time

23   that he talked about going on -- that Mr. Young talked about

24   going on leave for an extended period?

25   A.    Yes, sir.

Sullivan - Direct                                                        205

1  Q.   Okay.  And can you tell us what you recall of that and

2  approximately when that occurred?

3  A.   In August time frame.  He, he did not give me many

4  details.  He just had a conversation that, that he was going to

5  be going away again, and I believe that he talked about some

6  sort of a problem he was having with his police department over

7  leave, but he told me he was going to go away again and --

8  Q.   Did he tell you where he was going?

9  A.   No, he did not.

10  Q.   Did you ask him where he was going?

11  A.   No, I did not.

12  Q.   Why not?

13  A.   If he wanted me to know, he would have told me.

14  Q.   So after that time, August 27, 2011, do you know -- do you

15  recall the next time you saw him?  And if you can refer to your

16  notes, refer to your notes.

17  A.   August 2011?

18  Q.   In fact, let me ask you, do you -- can you take a look at

19  Government Exhibit 11-101?  Now, 11-101 is a DVD.  Is the DVD

20  in front of you?

21  A.   Yes, sir.

22  Q.   Okay.  Are there your initials or your Khalil initials on

23  the DVD?

24  A.   Yes, sir.

25  Q.   And you listened to what's on that DVD?

Sullivan - Direct                                                                206

1    A.   Yes, sir.

2    Q.   Can you tell us what's on that DVD?

3    A.   It says recording of my interactions on that day.

4    Q.   On January 26, 2012?

5    A.   Yes, sir.

6    Q.   Okay.  How did it happen that you came to be recording him

7    on this day, January 26, 2012?

8    A.   This is the point in the investigation where I was

9    directed by the case agents to start recording my interactions.

10   Q.   Your interactions with who?

11   A.   With mostly Liban Mohamed.  With anybody at that point.

12   Liban Mohamed.  We were moving into sort of the criminal phase.

13   Q.   The criminal phase with respect to who?

14   A.   Liban Mohamed.

15   Q.   And that would -- tell us again what the criminal case

16   against Liban Mohamed was.

17   A.   This was the point where Mr. Mohamed was actively

18   recruiting me to collect weapons -- I'm sorry, collect

19   equipment to go over and fight and train Al-Shabaab in Somalia.

20   Q.   Okay.  So is Government Exhibit 11-101 an accurate

21   depiction of what happened at that meeting on January 26, 2012,

22   with Mr. Young, Mr. Al-Barmawi, and Liban Mohamed?

23   A.   Yes, sir.

24        MR. KROMBERG:  The government moves into evidence

25   11-101.  We do not plan to play it, Judge, but if the jury

Sullivan - Direct                                                      207

1    wants to listen to it later --

2              THE COURT:  I don't do it that way.  If, if you're

3    putting in an audiotape, it gets played during the trial.

4              MR. KROMBERG:  Okay.  These are long.  These are --

5    they're long, and the point of this is nothing happened, Judge.

6    That's what we're trying to get across.  There's nothing there.

7              MS. MORENO:  Judge --

8              THE COURT:  Wait a minute, wait a minute, wait a

9    minute.  I don't think it's correct to pile a ton of stuff on a

10   jury without it having been adequately discussed, explained,

11   and played for them in open court.

12             MR. KROMBERG:  Okay.

13             THE COURT:  All right?  So if it has no value, then

14   there's no sense putting it in the record.

15             MR. KROMBERG:  Okay.

16             THE COURT:  All right?  So 101 is not in at this

17   point.

18   BY MR. KROMBERG:

19   Q.   Take a look at 11-102.

20   A.   Yes, sir.

21   Q.   Is that a recording that you put your initials on?

22   A.   Yes, sir.

23   Q.   When was that meeting?

24   A.   That was on February 11, 2012.

25   Q.   And was that when you went to see the movie *The Grey*?

Sullivan - Direct                                                    208

1   A.   Let me get to that date, sir.  I believe so, though.

2        February 11, yes, sir, we saw *The Grey*.

3   Q.   Did you listen to what was on there?

4   A.   Yes, sir.

5   Q.   Is it an accurate depiction of what happened on that

6   meeting?

7   A.   Yes, sir.

8        MR. KROMBERG:  We're going to leave it not moved into

9   evidence again, but it exists if the defense wants to use it.

10       THE COURT:  All right.

11  BY MR. KROMBERG:

12  Q.   Take a look at Government Exhibit 11-103.

13  A.   Yes, sir.

14  Q.   What is that?

15  A.   This is also a recording --

16       MS. MORENO:  Excuse me, may we approach?

17       THE COURT:  Yes.

18       (Bench conference on the record.)

19       THE COURT:  All right, what's the point of talking

20  about tapes if they don't have anything in them?

21       MR. KROMBERG:  So my -- when I said there's nothing

22  in them, I meant nothing about entrapment, nothing about

23  inducement.  They're just two people talking about normal

24  things.

25       If the defense is going to say that Khalil

1   radicalized this guy, here we have five tapes of their

2   meetings.  We don't have any other tapes, but these are the

3   five we have, and there's nothing in them about radicalization,

4   about entrapment, but it's the -- we're trying to prove

5   something that did not happen, and here are tapes that show

6   that at least these five meetings, which are the only tapes we

7   have, nothing happened.

8           MS. MORENO:  I'm utterly confused, Your Honor.  It's

9   never been the defense position that Khalil radicalized our

10  client.  What is he talking about?

11          THE COURT:  Well --

12          MS. MORENO:  These tapes, these recordings are

13  several hours long, a number of them.

14          MR. SMITH:  Each.

15          MS. MORENO:  Each.  So what are we doing here?  I'm

16  just lost, Judge.

17          THE COURT:  All right, I think this line of

18  questioning isn't helping in any respect.  It's only going to

19  have the jury scratching their heads, wondering what's going on

20  here.  Let's move on.

21          MR. KROMBERG:  That's fine.

22          THE COURT:  If in the defendant's case they get

23  closer to this kind of issue, it may have to be revisited in

24  the rebuttal situation.

25          MR. KROMBERG:  That's fine.  I'm surprised to hear

1   what Ms. Moreno said, that they're not saying --

2            THE COURT:  I'm really surprised, too, because I

3   recall when I was giving the jury the summary of the

4   defendant's theory of the case, you-all asked me to add Khalil,

5   so there was that sentence in my opening description of the

6   case, but it didn't use the word "radicalized."

7            MS. MORENO:  Radicalized --

8            THE COURT:  All right.

9            MS. MORENO:  -- which is a different theory, Your

10  Honor.

11           THE COURT:  Well, the inducement is somewhat there.

12  All right, at this point, it's not an issue.

13           MS. MORENO:  Okay.

14           MR. KROMBERG:  Thank you.

15           THE COURT:  Thank you.

16           MS. MORENO:  Thank you.

17           (End of bench conference.)

18  BY MR. KROMBERG:

19  Q.   So I'd like to turn your attention now to the next meeting

20  you had with Mr. Young, which was on February 26, 2012?

21  A.   Yes, sir.

22  Q.   And you were wearing a recording on that meeting as well,

23  correct?

24  A.   Yes, sir.

25  Q.   During that meeting, where were you, do you recall?

1   A.    That time, we were at the Bonefish Grill in Greenbriar

2   Shopping Center.

3   Q.    And you went to see a movie as well?

4   A.    Yes, sir.

5   Q.    *Act of Valor*?

6   A.    Yes, sir.

7   Q.    Okay.  So what conversation, if any, during that meeting

8   was there about Amine El-Khalifi?

9   A.    This was after Amine was arrested.  He was arrested for,

10  for going to the Capitol with a suicide vest.

11          We talked about his arrest.  During this time, I

12  brought up the -- you know, based on, you know, previous

13  conversations, I brought up the topic for us about trying to

14  uncover who the informant was, you know, trying to figure out

15  who exactly set Mr. Khalifi up.  I was the one that initiated

16  that conversation.

17          We talked about.

18  Q.    Why did you do that?

19  A.    Well, based on previous conversations that I had with

20  numerous people, that seems to be a common thread of like

21  that's what people would want to do during this conversation,

22  and I was trying to redirect the attention from myself.  It's

23  almost like, you know, if you bring it up, then maybe people

24  won't look at you.

25  Q.    Well, in fact, you weren't the informant on the Khalifi

1  case, were you?

2  A.    Not really.

3  Q.    Well, you weren't the person who was involved with the

4  plot?

5  A.    No.

6  Q.    All right.  So what did Nick Young tell you would likely

7  happen to you as a result of your involvement with Mr. Khalifi?

8  A.    We talked about, both talked about that the FBI would

9  mostly likely come talk to me based on my, based on my

10  communications and my interactions with Amine.  He told me

11  that -- he just gave me some advice that, you know, when I'm

12  talking to them, to keep it short, simple, and sweet; and he

13  also told me that I really wouldn't have to answer questions, I

14  don't have to answer questions, opinion-based questions or

15  lifestyle questions, but --

16  Q.    What did Mr. Young -- what did Mr. Young say that was a

17  basis for why he believed this would happen to you now?

18  A.    I believe it's because he said that this is what happened

19  to him when Zachary Chesser was arrested.

20  Q.    Could you take a look at Government Exhibit 9-101, which

21  is a photo?

22              THE COURT:  Any objection to 101?

23              MS. MORENO:  No objection.

24              THE COURT:  All right, it's in.

25              (Government's Exhibit No. 9-101 was received in

Sullivan - Direct                                                          213

1   evidence.)

2   BY MR. KROMBERG:

3   Q.    Zachary Chesser, correct?

4   A.    Yes, sir.

5   Q.    And that's who Mr. Young was talking about?

6   A.    Let me refresh my recollection, sir.  He -- I remember he

7   had, he had these conversations.  He talked to me numerous

8   times about being interviewed because of his interaction with

9   Zachary Chesser.  I have to see if it was on this particular

10  date.

11  Q.    Well, okay.  It doesn't even matter for our purposes here.

12  A.    Okay.

13  Q.    So he gave you advice about speaking to the FBI.  That's

14  fine.  Was that meeting recorded?

15  A.    Yes, sir, it was.

16  Q.    Okay.  Did you have any other meetings with him?  April

17  27, 2012?

18  A.    Yes.  But also for that meeting, sir --

19  Q.    Please.

20  A.    On that particular meeting, you asked about other

21  conversations we had.  We did, we did talk about the

22  circumstances of which Mr. Khalifi, which Amine was arrested.

23  During that time -- because we talked about him being a police

24  officer and me being in the military, and I, I told him that it

25  was my opinion that if Amine was not truly set up, if he wasn't

Sullivan - Direct                                                    214

1   truly set up, if he actually did some of those things, then I

2   think what Amine did was wrong.

3          So I, I denounced what Amine did, and I gave -- and I

4   said because, you know, if he went through with that, if he

5   went through with that plot, then he wouldn't have killed any

6   politicians or anything like that.  He would have ended up

7   killing, like, a police officer like him that's just sitting

8   there or some tourist or something like that.

9          So I, you know, I denounced -- and I said if he

10  wasn't set up, if he actually did it, then I -- then what he

11  did was wrong.

12  Q.   And what did Mr. Young say in response?

13  A.   I don't, I don't remember exactly what his response was,

14  but Mr. Young never verbally supported what Amine did.

15  Q.   Okay.  So the next time you saw him was April 27, 2012?

16  Take a look at Government Exhibit 11-105, the DVD.

17  A.   Yes.  Yes, sir, April 27.

18  Q.   So you -- this, this was the point where you were

19  recording all meetings?

20  A.   Yes.

21  Q.   So that was -- so you know that was your last meeting with

22  him?

23  A.   Yes.

24  Q.   Okay.  Did you ever see him again after April 27, 2012?

25  A.   I don't, I don't recall seeing him.

1   Q.    Please look at Government Exhibit 11-220.

2               THE COURT:  What is that, Mr. Kromberg?

3               MR. KROMBERG:  That's a text message, or it's an

4   e-mail containing a text message.

5               THE COURT:  Is there any objection to that?

6               MS. MORENO:  No objection.

7               THE COURT:  All right, 11-220 is in.

8               (Government's Exhibit No. 11-220 was received in

9   evidence.)

10  BY MR. KROMBERG:

11  Q.    You can look at it on the screen if it's easier.

12  A.    Yes, sir.

13  Q.    Do you recognize that?

14  A.    Yes, sir.

15  Q.    So what, what is that?

16  A.    That is a, that is a message that was, that was sent to me

17  from, from Nick that I forwarded on to the FBI, and at this

18  particular -- he just -- it's just reaching out to me because

19  he hasn't talked to me in a while, to --

20  Q.    Can you read that?  I don't think that the jury can really

21  read that.

22  A.    Okay.  It said, "Salam Alikom akhí," which is, that's a

23  traditional Islam greeting.  "Its your brother in Islam Nick.

24  I hope everything is going okay.  You dropped off the grid,

25  haven't seen you forever.  I'll admit I have done the same

Sullivan - Direct                                                216

1    thing a few times, about a year ago there was a 3 or 4 month

2    period when the only time I left the house was for jumma" --

3    that's prayer services -- "but I was in a bad place then.  Hope

4    you are well.  Listen man, I got weekends off nowadays.  Whats

5    the good word?  Hit me up.  My phone fried a number of months

6    back but I still have the same number.  571-236-8195.  Lost

7    everyones number.  Don't be a stranger.  Lets meet up soon.

8    Nick."

9    Q.   And what did you do in response to receiving that message?

10   A.   I don't believe I responded to him.

11   Q.   Now, this -- what's on the screen, that is not -- correct

12   me if I'm wrong.  That's what you sent to the FBI after you got

13   the text message?  That's cut and pasted, or was that to you

14   directly?

15   A.   I think it was a -- no, this was an e-mail.  It wasn't a

16   text message.

17   Q.   Okay.  Now, why did you have so little contact with

18   Mr. Young after April 2012?

19   A.   Because I was engaged heavily with Liban Mohamed and I

20   believe there was like six or seven other individuals that were

21   supposed to be traveling with us, so at that point --

22   Q.   Traveling to Somalia?

23   A.   Yes, to join Al-Shabaab.

24        Mr. Young was not part of that.  We were not trying

25   to make him part of that, and I was directed by, by the FBI to

1    not have contact with Mr. Young.

2    Q.    Okay.  So in the course of your relationship with -- when

3    you knew him, between December 2010-April 2012, what books or

4    written materials did you give Mr. Young about Islam?

5    A.    I don't recall giving him anything.

6    Q.    What videos or music did you give him about Islam?

7    A.    I don't recall -- I don't recall giving him anything, and

8    I certainly wouldn't have given him anything inflammatory.

9    Q.    What criminal activity did you ever ask him to engage in?

10   A.    None.  I actually refrained from trying to engage him in

11   any kind of criminal activity.

12   Q.    Between you and Mr. Young -- between your role of Khalil

13   Sullivan and Mr. Young, who was supposed to know more about

14   Islam?

15   A.    I can't speak to the exact knowledge of Islam that

16   Mr. Young had, but I will say that Mr. Young was a Muslim much

17   longer than I and has already -- and, and there was one point

18   that Saleh told me that he's impressed with the dedication, you

19   know, of Nick as a Muslim even though he doesn't have a lot of

20   time.

21   Q.    Saleh Al-Barmawi?

22   A.    Yes, sir.  Yes, sir.  But I can't, I can't really speak to

23   his, Mr. Young's level of education as far as Islam, but he

24   said he wasn't Muslim much longer than, than I.

25   Q.    What, if anything, did you ever tell him to do differently

1   to be a better Muslim?

2   A.   I can't recall having any conversations like that.

3   Q.   Of all the people in the circle, the circles around

4   Mr. Young, who was the leader in all things relating to Islam?

5   A.   There were -- the circles overlapped.  You had sort of

6   Liban Mohamed's circle and then Saleh Al-Barmawi's, but in the

7   Saleh Al-Barmawi's circle, which Mr. Young was more rooted in,

8   Saleh Al-Barmawi was, was the leader.  In fact --

9   Q.   And how did -- how was he treated by others when you saw

10  that -- him there with Mr. Young?

11  A.   He was treated with respect.  I mean, there were times

12  when I've been with people where they actually called Saleh

13  "sheikh."  Saleh would give classes to people.  He would always

14  be the one that sort of -- when I was around, people would go

15  to him for advice.  People would go to him.

16         There was one particular time that Saleh actually

17  gave me what's called a fatwa to get out of the military.

18  Again, fatwa is an Islamic ruling.

19         Saleh frequently taught classes to people.  He would

20  have study sessions where he would always be the one that is

21  the leader, and people looked up to him.  And there was one

22  time that -- and Saleh would also correct people.  I remember

23  there was one occasion where we were just talking around, we

24  were talking about Hitler, and Mr. Young, you know, we were

25  talking about Hitler and talking about other Jews.

1          MS. MORENO:  Objection.

2          THE COURT:  Overruled.

3          THE WITNESS:  Okay.  And where Mr. Young mentioned

4   something.  As I said, he said this -- he was sort of laughing

5   when he said it, but he mentioned that he was going to pray for

6   the soul of Hitler.  That's when Saleh came down and said:  No,

7   you can't pray for the soul of somebody who's a disbeliever.

8          So he, Saleh would correct you.  I mean, there were

9   times that Saleh would correct me on the proper hand to eat

10  with.  So he was definitely the leader of that, the people.

11  BY MR. KROMBERG:

12  Q.   Do you remember a movie at Saleh Al-Barmawi's house, *Lion*

13  *of the Desert*?

14  A.   Yes, sir.

15  Q.   So can you tell the jurors about what happened at that --

16  what that evening was?

17  A.   That was a movie of the *Lion of the Desert*.  It was at

18  Saleh Al-Barmawi's house, where Saleh invited a bunch of people

19  over.  The movie was about, I believe it was about the Libyan

20  jihad against the Italians.

21  Q.   In the 1920s and '30s?

22  A.   Yes.  The 1920s --

23          MS. MORENO:  Objection.

24          THE COURT:  What's the basis for the objection?

25          MS. MORENO:  Mr. Kromberg is testifying.

1              THE COURT:  Sustained.

2              THE WITNESS:  Okay.

3  BY MR. KROMBERG:

4  Q.   When was the Italian jihad against -- was the Libyan jihad

5  against the Italians?

6  A.   It was based on, like, the early 1900s.

7  Q.   Okay.

8  A.   Early 1900s, that's what I could recall about the movie.

9  I believe it was the Libyans versus the Italians.

10             During the course of the movie, as I said, it was at

11 Saleh's house.  He was the one that invited people over.  Saleh

12 Al-Barmawi at times throughout the movie will point out

13 significant, significant events that happened in the movie.

14 Like, there was a couple times where somebody was talking about

15 jihad, about his obligation.  Saleh actually got up and

16 cheered.  There was one point in the movie where a woman's

17 husband was killed as a martyr, and I don't remember who in the

18 audience asked, but they turned to Saleh and said:  Why, you

19 know, why is she crying?  Because her husband is now a martyr.

20             Saleh said:  Well, she's still missing -- you know,

21 she's still missing her husband.

22             Because previously in conversations, I believe, I

23 believe Mr. Young was there on that, where talking about jihad,

24 Saleh mentioned that jihad would solve a lot of our problems.

25             MR. KROMBERG:  Okay.  Thank you.  Nothing further for

1    the witness at this time.

2              THE COURT:  All right.

3              MR. KROMBERG:  Please answer defense's questions.

4              THE WITNESS:  Yes, sir.  Thank you.

5                         CROSS-EXAMINATION

6    BY MS. MORENO:

7    Q.   Good morning, Mr. Sullivan.

8    A.   Good morning, ma'am.

9    Q.   Excuse me, I've had terrible luck; I broke my glasses.

10   A.   No problem.

11   Q.   Sometimes they'll fall.  Pardon me.

12             Now, Mr. Sullivan, you met Nick Young in December of

13   2010?

14   A.   Yes, ma'am.

15   Q.   And your first report on Nick Young was in December 2010?

16   A.   Yes, ma'am.

17   Q.   And you met with Nick Young from December 2010 through

18   April 2012?

19   A.   On and off, yes, I believe that --

20   Q.   And the times that you met with him, you sometimes just

21   reported on him?  You issued reports, correct?

22   A.   I would, I would report on whoever, whoever that I really

23   met.

24   Q.   And that would include Nick Young?

25   A.   Yes.

Sullivan - Cross                                                    222

1    Q.    Right.  And so that big binder of notes that you have in

2    front of you --

3    A.    Yes, ma'am.

4    Q.    -- are notes and your reports about Nick Young?

5    A.    Yes, ma'am.

6    Q.    And I think it's the last four or five meetings with --

7    where you met with Nick Young, you recorded those meetings?

8    A.    Yes, ma'am.

9    Q.    Okay.  Now, so is it fair to say that you met with him

10   about 20 times during that period of time?

11   A.    That sounds about right.  That sounds about right.

12   Q.    And in those meetings, you and Mr. Young, I'm not talking

13   about all these other people you've been talking about --

14   A.    Okay.

15   Q.    -- just your discussions with Mr. Young --

16   A.    Yes, ma'am.

17   Q.    -- you talked about many things, right?

18   A.    Yes, ma'am.

19   Q.    And you talked about many things.  You were in an

20   undercover capacity.

21   A.    Yes, ma'am.

22   Q.    Right.  And the entire time, the entire relationship with

23   Mr. Young, he didn't know your true name, right?

24   A.    No, he did not, ma'am.

25   Q.    He didn't know who you were, correct?

Sullivan - Cross                                                              223

1    A.    Know who fake me is or real me?

2    Q.    Who you really were.

3    A.    Oh, no, he did not.

4    Q.    Right.  And so all those various times that he was talking

5    about surveillance of Muslims and mosques, he had some of those

6    conversations with you, correct?

7    A.    Yes, yes.

8    Q.    You were actually surveilling Muslims and mosques,

9    correct?

10   A.    No.  I was not surveilling Muslims and mosques.  I was

11   going in tasked with obtaining information on very specific

12   people that had already been predicated themselves to be prone

13   to violence.

14   Q.    You were praying in mosques with some of the subjects of

15   your investigation, correct?

16   A.    Yes, yes.

17   Q.    You attended prayers with those people, correct?

18   A.    Yes.

19   Q.    And you attended prayers with Mr. Young.

20   A.    Yes, ma'am.

21   Q.    Right?  And all the time you were doing that, you were

22   working in an undercover capacity?

23   A.    Yes, ma'am.

24   Q.    And while you were -- when you were outside of the mosque,

25   you had sort of a social relationship with Mr. Young, correct?

1   A.   Yes, ma'am.

2   Q.   And throughout that social relationship, you, of course,

3   were deceiving Mr. Young on who you were, correct?

4   A.   Yes, ma'am.

5   Q.   And what your purpose was, in fact, in talking to

6   Mr. Young, right?

7   A.   Yes, ma'am.

8   Q.   Because after you would meet with Mr. Young and others,

9   you would go back to your car or your office and type up the

10  notes of the conversations, correct?

11  A.   Yes.

12  Q.   All right.  And you had, you had -- you talked a little

13  bit about this, but you talked about many things with

14  Mr. Young, right?  And when you would, when you would make

15  these reports -- this is before the recording.

16  A.   Yes, ma'am.

17  Q.   You would be in touch, of course, with -- you would be in

18  touch, of course, with your superiors, correct, after these

19  meetings?

20  A.   You mean would I establish -- would I have contact with

21  them?

22  Q.   Right.

23  A.   Yes.

24  Q.   Yes.  And you would share your reports with your

25  superiors, correct?

Sullivan - Cross                                                    225

1    A.   Are you talking immediately afterwards?

2    Q.   At any time.

3    A.   The process in which, how it normally happened, I would

4    have --

5             THE COURT:  Mr. Sullivan, stay closer to the

6    microphone and speak up, please.

7             THE WITNESS:  Sorry.  The process in which it

8    normally happened is I would have my meeting with whoever.

9    Afterwards, sometimes, sometimes I would physically meet with

10   somebody, but a lot of times, it was just phone conversation

11   with just a, hey, I'm okay, done for the day.

12            There was a -- it wasn't really sharing -- like, if

13   there was anything significant that happened during those

14   times, then, then I would relay that information, like,

15   verbally, right then and there if there was something

16   significant, but they wouldn't -- then I would just go write my

17   report, and I would give it to them when I finished my report.

18   That's the process in which, which it happened.

19   Q.   I understand.  You would also get direction from your

20   superiors, correct, in how you were conducting your

21   investigation?

22   A.   Yes.  Yeah, they -- yeah.  They're the ones that dictated

23   the targets are who we went after.  Yes, they dictated

24   everything.  I was just an investigative technique.

25   Q.   Did you -- you talked about this person, Amine Khalifi.

1   A.   Yes, ma'am.

2   Q.   Yes.  And you, you said that Mr. Young was not friends and

3   not close to Mr. Khalifi in direct.

4   A.   Yes, yes.

5   Q.   Okay.  And, in fact, you introduced Mr. Khalifi to Nick

6   Young.

7   A.   It wasn't set up me to introduce Nick to Amine Khalifi.

8   It just happened by chance.  He said:  We have these circles.

9   And even the first time that we met was after a class and

10  prayer services, where there was just a group of people that

11  went out to the restaurant afterwards.

12  Q.   And you introduced Mr. Khalifi to Nick Young?

13  A.   I don't believe I was the one that physically introduced

14  him.  I mean, he was, he was with me, and I went out to eat

15  with somebody who was with Amine Khalifi, and then we sort of

16  met each other that way.  I mean, I don't think I was the one

17  that went up and said:  Hey, Amine, this is, you know, this is

18  Nick, you guys meet each other.

19          I don't -- like I said, I don't know exactly how that

20  meeting went, but yes, he was with me, and I was the one that

21  said we're going to go to this location right here, and that's

22  where Amine was, but it wasn't the intention or my direction to

23  get these two together.

24  Q.   But you understood that Mr. Young didn't know Mr. Khalifi

25  before that?

1  A.   It was my -- I don't think that he -- he definitely wasn't

2  friends with him, but I don't know if he's ever physically seen

3  him before, anything like that.  I can't recall that.  I don't

4  believe so.

5  Q.   You also spoke about Liban Mohamed was suspicious of

6  Mr. Young.

7  A.   Yes.

8  Q.   Right?  And you talked about this whole Somalia --

9  A.   Yes, ma'am.

10  Q.   -- issue.

11       And Mr. Young didn't have anything to do with that,

12  right?

13  A.   No, nothing.

14  Q.   You talked about, you talked about -- just a moment,

15  please.

16       Now, in, in the relationships and the discussions

17  that you had with Nick Young --

18  A.   Yes, ma'am.

19  Q.   -- you told him many things that weren't true, right?

20  A.   Yes.

21  Q.   Right.  And you told him that you kept from the Marine

22  Corps that you were a Muslim because it would endanger your Top

23  Secret clearance.

24  A.   Yes.

25  Q.   Right.  And that wasn't true, right?

Sullivan - Cross                                                    228

1    A.    No.

2    Q.    You also told him when they talked about Israel and

3    Palestine, you brought up that you hated the British --

4    A.    Yes.

5    Q.    -- because of what they did to Ireland.

6    A.    Yes.

7    Q.    Right.  You compared that situation with Israel and

8    Palestine in that, in that conversation, right?

9    A.    I don't recall doing that, but if it's written in my

10   reports, then it happened.

11   Q.    Now, in December of 2010, right from the very beginning,

12   you started talking to -- you indicated in your reports that

13   you were speaking to Nick Young as old friends because you had

14   bonded almost immediately; isn't that right?

15   A.    Yes.  And that actually was not by design at all.  It

16   just -- him and I just -- he wasn't even the target that I was

17   going there to meet.  It's just him and I generally just seemed

18   to have good conversations and get along.

19   Q.    You bonded and spoke like old friends from the very

20   beginning, right?

21   A.    Yeah.  We were very comfortable.

22   Q.    And that's because you were talking to him about the

23   military, right?

24   A.    Yes.

25   Q.    And talking to him about subjects that were of interest to

1   him and that were common to him, correct?

2   A.   Well, it was -- I don't know what, what topics you're

3   referring to.

4   Q.   Well, the topics that I mentioned, the military, right?

5   A.   Yes, yes.  The military, yes.

6   Q.   And about Islam, about the faith, right?  You guys talked

7   about religion some?

8   A.   Yeah, some.  I mean, everybody in the room was Muslim, so

9   that was, I mean, that was just a common, a common bond with

10  everybody in that room.

11  Q.   Including you, sir?  Are you a Muslim?

12  A.   Am I --

13              MR. KROMBERG:  Objection, Judge.

14              THE COURT:  Wait, wait, wait.  Only the persona can

15  be discussed.

16              MS. MORENO:  Well, may we approach, Your Honor?

17              THE COURT:  Yes.

18              (Bench conference on the record.)

19              THE COURT:  Where's your client?

20              MR. SMITH:  I just don't know if it's sensitive to

21  the government to discuss this right here with him there.  I

22  didn't know if that's right.

23              THE COURT:  All right, we'll waive this one time.

24  Wait, switch positions.

25              MS. MORENO:  I'm sorry.

1              THE COURT:  All right.

2              MS. MORENO:  Your Honor?

3              THE COURT:  Yes.

4              MS. MORENO:  In direct, I objected with the way

5    Mr. Kromberg was examining the witness about some issues

6    regarding Islam, and you overruled my objection, and you

7    indicated as a member of the religion, referring to

8    Mr. Sullivan, he could properly talk about that.

9              MR. KROMBERG:  That was with regards to the hajj,

10   what the hajj was.

11             MS. MORENO:  Yeah, right.  But the impression that

12   the jury has is that he's a Muslim, and I don't think that's

13   appropriate unless he is.

14             THE COURT:  No, no, no.  I think he can clearly, he

15   can clearly testify to the persona that he was presenting.

16   Obviously, he's presented a persona of being a Muslim.

17             Anybody who knows anything about Islam knows what

18   hajj is.  I mean, you can ask him how he knows about hajj,

19   whether the agents talked to him or he's done research, but you

20   cannot ask him anything about his personal actual identity,

21   which would include where he went to school, where he's really

22   from, although he's clearly got a Boston accent, or his

23   religion.

24             MS. MORENO:  Okay.

25             MR. KROMBERG:  Thank you, Your Honor.

1          (End of bench conference.)

2   BY MS. MORENO:

3   Q.   By the way, you spoke about Zachary Chesser in direct.

4   A.   Yes, ma'am.

5   Q.   Yes.  And you know that Mr. Young didn't really know

6   Zachary Chesser, correct?

7   A.   Yeah.  I think he told me that he might have had, like,

8   one phone contact -- one, one phone call with him.  He said he

9   wasn't very, very close to him.  He just afterwards, just

10  showing support at court proceedings and support for his wife.

11  But again, he didn't say that he supported, you know, his

12  action.

13          THE COURT:  Mr. Sullivan, keep your voice up again.

14          THE WITNESS:  He said that, from what I gather from

15  that, he spoke to him, I believe he said one time, so he didn't

16  have much of an interaction with him.  It was more so just

17  showing support for him post-arrest.

18  BY MS. MORENO:

19  Q.   And his family.

20  A.   Yes, post-arrest.

21  Q.   Now, you talked about the Serbian Kosovo conflict.

22  A.   Yes.

23  Q.   And you indicated that Kosovo was such a clear-cut cause

24  for jihad.  That was something you brought up, correct?

25  A.   Yes.

Sullivan - Cross                                                       232

1   Q.    In conversations.

2   A.    Yes.

3   Q.    Mr. Young -- you, you talked about the Marine Corps.

4   A.    Yes.

5   Q.    And your issues with the Marine Corps with Mr. Young,

6   correct?

7   A.    Yes.

8   Q.    And Mr. Young actually tried to persuade you to stay in

9   the Marine Corps at times?

10  A.    I don't recall that.  I recall him more trying to persuade

11  me to get out and apply to some police departments, if my --

12  Q.    He also told you about -- he tried to encourage you to

13  join law enforcement, right?

14  A.    Yeah.  That's -- yeah.  I don't, I don't recall him trying

15  to persuade me to stay in the Marine Corps.  I thought it was

16  that I should apply to some police departments when I got out.

17  Q.    You had political discussions about Egypt and the Arab

18  Spring.  Do you recall those?

19  A.    Yes, sir -- yes, ma'am, sorry.

20  Q.    And Mr. Young spoke negatively about President Mubarak,

21  correct?

22  A.    Yes, he did.

23  Q.    Mubarak who was ultimately ousted from power, right?

24  A.    Yes.

25  Q.    You told Mr. Young that you wanted to get out of the

Sullivan - Cross                                                    233

1   Marine Corps because Barack Obama was your commander in chief.

2   A.   Yes.

3   Q.   Do you remember telling him that?

4   A.   Yes.

5   Q.   Was that said in Mr. Young's presence?

6   A.   That what?

7   Q.   That you wanted to get out of the Marine Corps because

8   Barack Obama was the commander-in-chief?

9   A.   If you, if you can point me to what day you're talking

10  about?  That statement, do you want to know the context behind

11  it or just yes or no?

12  Q.   February 28, 2011, I believe.

13  A.   Okay.

14  Q.   It will be around page 4.

15  A.   February 28?

16  Q.   2/28/11?

17  A.   I don't have that.

18       Okay.  You said page 4, ma'am?

19  Q.   I think it's page 6 actually.  We can move on, sir.

20  A.   Okay.  I see that.  Yes, that's -- we, we had that

21  conversation.  It was myself, Nick, and Saleh Al-Barmawi.

22  That -- that's when Al-Barmawi stated that I should get out of

23  the military and when -- that's when Nick agreed that Obama --

24  made a statement that Obama was a kufir, which is a

25  disbeliever.

Sullivan - Cross                                                        234

1    Q.   You had a conversation with Nick Young about issues with

2    enforcing unjust laws.  Do you remember that?

3    A.   Yes.  I, I think I, I asked him if there was any kind of

4    conflict with his job as a police officer and sharia law, which

5    he said he hasn't run into any conflicts, and I believe that's

6    the time when he talked about me joining maybe the DEA or

7    something like that because that would be little -- that would

8    be less conflicting with sharia law.

9    Q.   Mr. Kromberg focused you on this discussion about

10   attacking an FBI establishment, right?

11   A.   Yes.

12   Q.   Do you remember that?

13   A.   Yes, ma'am.

14   Q.   But in your notes, you, you didn't write that Nick Young

15   said that he wanted to do that.

16   A.   No, he -- it's --

17   Q.   Hold on.  He didn't, he didn't say that, right?

18   A.   No.  He mentioned --

19   Q.   That he wanted to do that.

20   A.   No.  He said that -- a lot of these conversations, I mean,

21   I will say that some of the conversations we had were

22   hypothetical.  If, if he said that he wanted to, he was going

23   to, then he would have then been the target of investigation.

24        These are just conversations that just came up, which

25   is why I would engage sometimes, we would have to see if those

Sullivan - Cross                                                    235

1    words are hypothetical or if those truly are plans.

2    Q.   Right.  And you didn't perceive them to be any kind of

3    plans?

4    A.   I didn't, I didn't take -- the way he said it, we would

5    have hypothetical conversations like that.  The way he said it,

6    I didn't take it as a plan, but what was a little alarming is

7    that he kind of went into a little bit of details of, like, how

8    he would do it if he was going to do it.  I mean --

9    Q.   He didn't say how he would do it.  He talked

10   hypothetically about how someone could do it; isn't that right?

11   A.   No.  I mean, the one part when he talked about somebody

12   with his skills.

13   Q.   No.  So I refer you to your notes.

14   A.   What date, what date is this?

15   Q.   Okay.  March 8, 2011.

16   A.   March 8, okay.

17   Q.   About four pages.

18        Now, you wrote these reports, right?

19   A.   Yes, I did.

20   Q.   And in these reports, you wanted to be accurate, correct?

21   A.   Yes.

22   Q.   Because that was --

23   A.   I'm sorry.

24   Q.   Excuse me.  Because that was important, right?

25   A.   Yes, absolutely.

1  Q.    To have accurate information?

2  A.    Yes, ma'am.

3  Q.    And, of course, as an, as an FBI agent, you wanted to make

4  sure that if there was --

5          MR. KROMBERG:  Objection, Judge.

6          THE COURT:  Yes.  He's not an FBI agent.  He was

7  working for the FBI.

8          MS. MORENO:  I'm sorry; my apologies.

9  Q.    But you wanted to make sure that the information was

10 accurate, right?

11 A.    Absolutely, yes.

12 Q.    Because, because others were reviewing this information.

13 A.    Yes.

14 Q.    Right.  And so it would have been important if, in fact,

15 Mr. Young said, "I'm going to attack a courthouse or an FBI

16 establishment."  That would have been important?

17 A.    He, he --

18 Q.    That would have been important.

19         MR. KROMBERG:  Objection, Judge.  She should let the

20 witness answer the question.

21         THE COURT:  The question is quite simple, and the

22 question is was it important, and the answer would be yes or

23 no.

24         THE WITNESS:  Yes, it was important.

25 BY MS. MORENO:

Sullivan - Cross                                                        237

1   Q.   Right.  And, in fact, in some of these reports, sometimes

2   you actually quote Mr. Young, correct?  You put quotes around

3   what he said.

4   A.   Yes.

5   Q.   And in a lot of -- but most of it are your recollection of

6   what he had said, correct?

7   A.   Yes.

8   Q.   And you -- and in recalling what he had said, you really

9   wanted to make sure you got it right.

10  A.   Yes.

11  Q.   Yes.  Okay.  And so when you wrote this report --

12  A.   You said March 8, ma'am?

13  Q.   Excuse me, sir.

14          Sorry, I'm so sorry.  It is March 12.

15  A.   12th, okay.

16  Q.   Four pages in.

17  A.   Okay.  Okay.

18  Q.   And you wrote that --

19  A.   Sorry.

20  Q.   Let me finish.

21  A.   Sorry.  Sorry about that.

22  Q.   I'm sorry.  "SD" is who?

23  A.   Mr. Young.

24  Q.   And that stands for, do you know?

25  A.   That was his, the reporting code name.

Sullivan - Cross                                                      238

1   Q.   Stated that he despises the FBI and that someone with

2   skills could attack an FBI establishment.  That's what you

3   wrote, right?

4   A.   Yes.  Yes, ma'am.

5   Q.   And in that sentence, you didn't write that he said that,

6   correct, that he could do that?

7   A.   Well, he did because he said that, that he could find out

8   where the JTTF was, so he did, he did implicate himself in

9   that.  That's where he said, when he was talking about overall

10  his different skills, so if you're talking about somebody

11  attacking the JTTF and somebody doing this, yes, there were --

12  and sort of the general somebody with skills, somebody with

13  this, but he implicated himself.  He said, "I could find" --

14  that he could find out what floor the JTTF was on.

15  Q.   And he didn't tell you that he was going to be the one to

16  attack an establishment.

17  A.   No, and I didn't say -- no, and I didn't take this as a

18  plan.  This was more, like, hypothetically.  This wasn't, I

19  mean, I didn't --

20  Q.   Right.

21  A.   I didn't gather from that that he was actively planning on

22  attacking the JTTF.

23  Q.   And, in fact, Nick Young told you that while he distrusted

24  the FBI, that he respected the professionalism the agents

25  showed when they spoke to him?  He told you that?

1    A.    He -- yes.  He was, he was able --

2    Q.    Did he tell you that?

3    A.    Yes.  He was able to separate at times.

4    Q.    And -- now, in March 28, 2011, you had known Mr. Young

5    about four months; is that right?  About four?

6    A.    About that, yes.

7    Q.    And you were friendly with him.

8    A.    Yes.

9    Q.    Right?  It's fair to say that he considered you a friend,

10   correct?

11   A.    Yes.

12   Q.    And his comments to you and his conversations to you would

13   have been unguarded, correct?

14   A.    Yes.

15   Q.    All right.

16   A.    Yes.

17   Q.    And he told you in March 28 of 2011 in a conversation that

18   he wanted to help Muslims as much as he could without doing

19   anything criminal and losing his job.  He told you that.

20   A.    Yes, he did.

21   Q.    And in a private conversation, right?

22   A.    I remember him saying that.  I don't know if it was

23   private.  I don't know if there was other people present.

24   Q.    But he told that to you.

25   A.    Yes, he did, ma'am.

1              MS. MORENO:  May I have a moment, Your Honor?

2              THE COURT:  Yes, ma'am.

3   BY MS. MORENO:

4   Q.   You talked about gays in the police department.  Do you

5   remember that?

6   A.   I remember talking about homosexuals in the military.  I

7   don't remember talking about it in the police department.

8   Q.   And he said he didn't think it was going to be a big deal

9   to have --

10  A.   No, he did not.

11  Q.   -- gay people in the military, right?

12  A.   No, he did not.  No.

13          Yeah, that's what he said.

14  Q.   I'm sorry?

15  A.   No, I just -- yes, I remember that.  I remember that

16  conversation, yes.

17  Q.   He talked about -- he talked about politicians with you,

18  correct?  Politics and politicians?

19  A.   Yeah, we talked about politics a lot.

20  Q.   And he told you that Democrats and Republicans are equally

21  as bad but you find good politicians in both parties?  He told

22  you that?

23  A.   Yes.  I think he was more of a Ron Paul guy.

24          THE COURT:  Again, Mr. Sullivan, if you mumble, we

25  can't hear you.

1           THE WITNESS:  Okay.  Yeah, he was talking about that,

2    that there was some good.  I think he -- I remember him saying

3    that he, he was more in favor of Ron Paul.

4    BY MS. MORENO:

5    Q.   Of Ron Paul, meaning the Libertarian politician?

6    A.   I believe him, him saying -- making positive comments.  I

7    can't recall exactly what, but I remember positive comments

8    about that.

9    Q.   In 2012, February 11, 2012, he talked to you about

10   retiring from the police department.  Do you remember that?

11   A.   February 11?

12   Q.   2012, sir.  You had a conversation with him about

13   Mr. Young retiring from the police force, right?

14   A.   Okay.  Yes.

15   Q.   Right?  Do you remember that?

16   A.   I remember having conversations with him about him

17   retiring.  If it was -- if you're saying it was on that day,

18   then it was on that day.

19   Q.   And he told you that he wanted to retire in the United

20   States, right?

21   A.   Are you getting this from my notes or recording?

22           THE COURT:  Well, you can't ask questions.

23           THE WITNESS:  I'm sorry; I'm sorry.  I don't, I

24   don't, I don't recall that.  I'm trying to look it up right

25   here.  I don't recall.  I don't recall that conversation.

1        THE COURT:  You can lead.  Go ahead and lead so we

2   get right to it.

3        MS. MORENO:  Thank you.

4   Q.   In February 11 -- I'm sorry, February 26, 2012.

5   A.   Okay.  I was looking at February 11.  I didn't see that.

6   Q.   Nick Young told you that he envisioned retiring in the

7   United States and owning property in a Muslim country.  He told

8   you that, right?

9   A.   Yes.  I vaguely recall that conversation, yes.

10  Q.   Is that right, sir?  I'm sorry, I didn't hear you.

11  A.   What page?  Is that the second page?

12  Q.   The very first page, February 22, 2012.

13  A.   Yes, okay.  Yes, ma'am.  He said --

14  Q.   This is after you guys went to another movie, the *Act of*

15  *Valor*, right?

16  A.   Yes.

17  Q.   You went to movies together?

18  A.   Yes.

19  Q.   All right.  And he told you that he wanted to retire in

20  the United States, right?

21  A.   Yes, ma'am.

22  Q.   And he told you about his conversations with FBI agents at

23  times when they would interview him, correct?

24  A.   Yes.

25  Q.   Right.  And he told you that the U.S. government had asked

1  him if he would commit an act of violence in America.

2  A.   Yes.

3  Q.   And he said not if he was in his right mind.

4  A.   Yes.

5  Q.   Right?

6  A.   Yes, ma'am.

7  Q.   He told you that.

8         And the last communication you had with Nick Young

9  was April 27, 2012, correct?

10  A.   Is that when that e-mail was that --

11  Q.   I believe so.

12  A.   Yes.  If that was the e-mail, that was the last

13  communication, I believe.

14  Q.   And after April 27, 2012 -- and you know that this was

15  also after he came back from Libya, correct?

16  A.   Yes, ma'am.

17  Q.   You know that.

18  A.   Yes, I knew about that.

19  Q.   And -- so Mr. Young, though, was not arrested in April of

20  2012, right?

21  A.   No.

22  Q.   No.  He wasn't arrested.

23  A.   No.

24         MS. MORENO:  May I have a brief moment, Your Honor?

25         THE COURT:  Yes, ma'am.

Sullivan - Redirect                                                    244

1              MS. MORENO:  Nothing further.

2              MR. KROMBERG:  Your Honor, I'm sorry, but we need to

3      approach on a matter.

4              THE COURT:  All right.

5              (Bench conference on the record.)

6              THE COURT:  Again, your client is not here.  We have

7      to have a consistency with this.

8              MR. SMITH:  We just wanted to make sure there wasn't

9      a security issue.

10             THE COURT:  This issue is Ms. Moreno.

11             All right, Mr. Kromberg?

12             MR. KROMBERG:  Your Honor, Ms. Moreno asked the

13     question, "You wrote that he respected the FBI agents who came

14     to interview him."

15             I'm passing the Court the notes from that.  The last

16     line says he respected the agents.  The line immediately before

17     that is talking about torturing the FBI agent who came to

18     interview him.  That's not respecting them.

19             We should be able to ask what did he really say about

20     the FBI agents who came to interview him.

21             THE COURT:  No, let it be.

22             MR. KROMBERG:  Okay.

23             (End of bench conference.)

24                       REDIRECT EXAMINATION

25     BY MR. KROMBERG:

Sullivan - Redirect                                              245

1    Q.   Very briefly, Mr. Sullivan --

2              THE COURT:  Wait, wait.

3              MR. KROMBERG:  Oh, sorry.

4              THE COURT:  Always wait for my court reporter.

5    BY MR. KROMBERG:

6    Q.   Very briefly, Mr. Sullivan, Ms. Moreno asked you about

7    conversations about Mr. Mubarak and the Arab Spring.

8    A.   Yes, sir.

9    Q.   Directing your attention to February 7, 2011 --

10   A.   Yes, sir.

11   Q.   -- when you and he were talking about that, what did

12   Mr. Young say about peaceful protests?

13   A.   February 7?

14   Q.   February 7.

15   A.   Mr. Young talked about how that protesting, whether the

16   protesting really wasn't accomplishing anything, and that

17   peaceful protests, you need to seize places by force.

18   Q.   Thank you.

19   A.   If you want something, you need to take it by force.

20             MR. KROMBERG:  Thank you.  Nothing further, Judge.

21             THE COURT:  Any recross?

22             MS. MORENO:  No.

23             THE COURT:  All right, thank you.  I am assuming

24   Mr. Sullivan will not be called again, or is that a

25   possibility?

1        MR. KROMBERG:  Depending on what might happen in the

2   future, he might be called again.

3        THE COURT:  All right.  Then, Mr. Sullivan, you're

4   still under court control, so to speak, for your subpoena.

5   You're not to discuss your testimony or anything you've seen or

6   heard in court with any witness who has not yet testified.

7        Do you understand?

8        THE WITNESS:  Yes, ma'am.

9        THE COURT:  All right, you're free to go at this

10  point.

11       THE WITNESS:  Thank you.

12                         (Witness stood down.)

13       THE COURT:  And I think this makes sense to have our

14  morning recess because we have to take the screen down.  Again,

15  as much of the trial as possible will be public, and this gives

16  the jury a chance to have your mid-morning break.  I'm going to

17  give you-all 15 minutes, so we'll reconvene at 20 after.  Thank

18  you.

19            (Recess from 11:04 a.m., until 11:22 a.m.)

20                         (Defendant present, Jury out.)

21       THE COURT:  Any issues before we bring the jury in?

22                         (No response.)

23       THE COURT:  No?  All right, let's bring them in,

24  please.

25                         (Jury present.)

1        THE COURT:  All right, ladies and gentlemen, I just

2   want to remind you you cannot be in the courtroom unless we

3   have brought you in, so if you have anything that you need, you

4   need to send a note to us, but we sometimes are discussing --

5   have a seat, please.  We're sometimes discussing matters,

6   logistics or other issues, and it's not appropriate for the

7   jury to hear, and so it's really important that you follow our

8   instructions on that.

9        So when you come in the morning, you go directly to

10  the jury room, and during the recesses or when you come back

11  from lunch, you go directly, you know, to the jury room, all

12  right?  Thank you.

13        All right, call your next witness.

14        MR. TURGEON:  The government calls John Gervino to

15  the stand.

16            JOHN GERVINO, GOVERNMENT'S WITNESS, AFFIRMED

17                      DIRECT EXAMINATION

18  BY MR. TURGEON:

19  Q.   Will you please state your name and spell it for the

20  record.

21  A.   It's John Gervino, G-e-r-v-i-n-o.

22  Q.   How are you employed?

23  A.   I'm a private consultant currently.

24  Q.   In May of 2011, how were you employed then?

25  A.   I worked for Homeland Security Investigations, and I was

1    assigned to the Washington Field Office, Federal Bureau of

2    Investigation's Joint Terrorism Task Force.

3    Q.   And what was your specific position?

4    A.   I was assigned to the task force, and as an agent, and at

5    the time, I would assist whatever case activity needed

6    assistance.

7    Q.   On May 20, 2011, did you have occasion to interview a

8    traveler entering the United States?

9    A.   Yes, I did.

10   Q.   And who was that traveler?

11   A.   Nicholas Young.

12   Q.   How do you remember what happened so long ago?

13   A.   Well, I've reviewed my notes.

14   Q.   Do you have those notes with you in court today?

15   A.   I do.  They're right here.

16   Q.   Do you recognize the defendant?

17   A.   He's right here in the middle, with the blue suit, blue

18   tie, yes.

19            THE COURT:  Any objection to the identification?

20            MS. MORENO:  No objection.

21            THE COURT:  All right, the witness identified the

22   defendant.

23   BY MR. TURGEON:

24   Q.   How did you happen to encounter the defendant on May 20,

25   2011?

1  A.   I was at Dulles International Airport, and the defendant

2  was returning from abroad.

3  Q.   From which country did his flight originate, if you

4  remember?

5  A.   I believe his flight originated in France.  Prior to that,

6  he was in Egypt.  Prior to that, he was in Libya.

7  Q.   How long did you speak with him?

8  A.   I want to say approximately an hour.

9  Q.   And what did the defendant say about his employment?

10 A.   He was a police officer with Metro Transit Police.

11 Q.   Do you recall the defendant having any tattoo at that

12 time?

13 A.   I do.

14 Q.   What, if anything, do you recall about that tattoo?

15 A.   When I recall the tattoo, I believe it was on the upper

16 left area of his neck.

17 Q.   And what did you think about that?

18         MS. MORENO:  Objection.

19         THE COURT:  Sustained.  His view, his opinion, unless

20 you have something more specific, is not relevant to the case.

21 BY MR. TURGEON:

22 Q.   What, if anything, did the defendant tell you about where

23 he had been before returning to the U.S.?

24 A.   The defendant told me that he was in Libya, in Benghazi,

25 Libya, and Misrata, Libya.

Gervino - Direct                                                          250

1  Q.    And what, if anything, did he tell you about his time in

2  Misrata?

3  A.    During his time in Misrata, I believe he spent about three

4  weeks at various locations, and he told me he was providing

5  medical aid to wounded rebels.

6  Q.    And who did he tell you that he stayed with during that

7  time?

8  A.    He never mentioned a specific individual.  He just

9  mentioned that he stayed in various locations in Misrata.

10           THE COURT:  Can you spell that, please, as best you

11  can?

12           THE WITNESS:  Yes.  It's M-i-s-r-a-t-a.

13           THE COURT:  And what is that, Misrata?

14           THE WITNESS:  It's a province or a location in Libya.

15           THE COURT:  All right.

16  BY MR. TURGEON:

17  Q.    And what, if anything, did he tell you about the people

18  with whom he stayed while he was there?

19  A.    I believe he stayed with humanitarian workers, migrants,

20  and fighters in the house.  He stayed with fighters.

21  Q.    What, if anything, did you ask him about weapons?

22  A.    I asked him if he ever handled or fired a weapon while he

23  was in Libya.

24  Q.    And what did he tell you?

25  A.    He said he did not fire one, although he wanted to.  He

1    did, however, handle an AK-47.

2    Q.   Do you recall him telling you anything about vehicles in

3    which he rode?

4    A.   Yes.  He told me he handled an AK-47.  He stood on top of

5    a Jeep or gun truck with -- that had a mounted rocket

6    propeller -- rocket-propelled device on top of the vehicle.

7    Q.   What did he tell you about his involvement in fighting in

8    Libya?

9    A.   He told me -- let me just review my notes, if I may.

10   Q.   Sure.  Just look up at me when you've finished reviewing

11   your notes.

12   A.   Will do.

13        He told me he was shot at on a couple of occasions

14   in, in Libya, in Misrata, and ricochets came very close to him,

15   to him.

16   Q.   What did he tell you that he wore while he was in Libya?

17   A.   He wore a ballistic vest, which he painted a red crescent

18   symbol on the back of the vest.

19   Q.   On what date did he say that he left Libya?

20   A.   I believe on or about May 20 of 2011.

21   Q.   And on what date was his reservation for leaving Libya?

22   A.   For May 30.

23   Q.   What did you ask him about the ten-day difference between

24   the day that he left and the day that he was supposed to leave?

25   A.   I asked him his reason for leaving early since his

Gervino - Direct                                                        252

1    reservations were booked ten days -- there was a ten-day

2    difference.  He said he wanted to save vacation time and save

3    his life.

4    Q.   What did he tell you about the level of danger in Misrata?

5    A.   It was becoming more -- Misrata was becoming more and more

6    dangerous.  There were more mortar rounds landing and -- let me

7    just review my notes, if I may.

8              And larger mortar rounds.

9    Q.   What did you ask him about, about people he met over

10   there?

11   A.   Throughout the interview, on a number of occasions, I

12   asked him to provide names, descriptions, anything of who he

13   met, and he did not provide any descriptions or names.

14   Q.   Well, why did you ask him that question, though?

15   A.   Because the U.S. government is very interested in people

16   who, you know, were over there at that particular time.

17   Q.   And about how many times did you ask him that?

18   A.   There's four occasions throughout our encounter that I

19   asked him for descriptors of people he met.

20   Q.   How did he respond?

21   A.   He did not recall any details.

22   Q.   What did he tell you about how he felt about your

23   interview with him?

24   A.   Towards the end of the interview, he said he was angry,

25   and he felt like he was being interrogated.

Gervino - Cross                                                      253

1    Q.   What did he tell you about his treatment since 2008?

2    A.   He specifically mentioned that -- he said to me, "What

3    gives?  I've been getting the stink eye since 2008."

4             To me, that meant he felt he was being surveilled.

5    Q.   Did you see his luggage?

6    A.   I saw his luggage.

7    Q.   And was all of that luggage returned to him?

8    A.   I believe Customs and Border Protection kept part of his

9    luggage -- part of his belongings.

10   Q.   Did he provide any contacts or telephone numbers?

11   A.   Yes, he did.

12   Q.   And what was that number?

13   A.   One second.  571-236-8195.

14            MR. TURGEON:  The Court's indulgence for a moment?

15            THE COURT:  Yes, sir.

16            MR. TURGEON:  No further questions, Your Honor.

17            THE COURT:  All right.  Cross-examination?

18                         CROSS-EXAMINATION

19   BY MS. MORENO:

20   Q.   Mr. Gervino, now, you indicated -- you made a report in

21   this case, correct?

22   A.   That's correct.

23   Q.   And that's the report that you are reviewing from the

24   witness stand?

25   A.   That's correct.

1   Q.    Right?

2   A.    That's correct.

3   Q.    And you characterized Mr. Young during this interview that

4   you had with him in May 2011, you characterized him as being

5   cooperative throughout the interview, correct?

6   A.    I did.

7   Q.    Okay.  And that's because he told you in detail where he

8   was going and what he did, right?

9   A.    I would not agree to that.

10  Q.    Okay.  So he told you about when he left, correct?

11  A.    Yes, he did.

12  Q.    All right.  And he told you how long he stayed, correct?

13  A.    Yes, he did.  Yes.

14  Q.    And he told you the ways in which he traveled, correct?

15  A.    Yes.

16  Q.    He told you the places that he stayed, correct?

17  A.    Yes.

18  Q.    Right?  Like hotels, right?

19  A.    Yes.

20  Q.    And he told you about people that he stayed with, right?

21  A.    No, that's not correct.

22  Q.    He told you that -- he described people in Misrata that he

23  had seen, correct?

24  A.    Let me -- may I look at my notes again, please?

25  Q.    If you can't recall.

1           THE COURT:  Agent, can you recall without looking at

2    your notes?

3           THE WITNESS:  Yes.  He, he told me he stayed with

4    migrant workers, rebels, and humanitarian aid people.

5    BY MS. MORENO:

6    Q.    Right.  And he told you the reasons why he went over

7    there, right?

8    A.    Yes.

9    Q.    And he told you that he had seen reports that Gaddafi was

10   exterminating his people, right?

11   A.    That's correct.

12   Q.    And that he wanted to do something that was not for him,

13   correct?

14   A.    Correct.

15   Q.    And that he intended to write different senators about the

16   situation.  Do you remember that?

17   A.    Correct, yes.

18   Q.    Right?  He was going to write John McCain and Joseph

19   Lieberman, correct?

20   A.    I do remember that.

21   Q.    Complaining about Gaddafi, right?

22   A.    Yes.

23   Q.    Exterminating his people, correct?

24   A.    Correct.

25   Q.    And he then detailed some of the equipment that he had

1    with him, correct?  Some of his luggage?

2    A.   Can you, can you rephrase that?

3    Q.   His ballistic equipment.

4    A.   Yes.

5    Q.   He discussed that, right?

6    A.   Yes.

7    Q.   And, in fact, that equipment was returned to him.  You

8    know that, right?

9    A.   I do not know that.

10   Q.   Okay.  Did you have an occasion to speak with the other

11   agents who returned his equipment?

12   A.   I don't recall any conversation.

13          MS. MORENO:  Okay.  Nothing further.

14          THE COURT:  Any redirect?

15          MR. TURGEON:  Yes, ma'am.

16                     REDIRECT EXAMINATION

17   BY MR. TURGEON:

18   Q.   What, if anything, did the defendant tell you about his

19   travel to the Libyan border?

20   A.   The defendant mentioned that while in Alexandria, Egypt,

21   he secured a transport to the Libyan border which took

22   approximately seven hours by vehicle.

23   Q.   And did you ask him with whom he traveled?

24   A.   I did.

25   Q.   And what names did he provide you?

1   A.   He did not provide names.

2   Q.   How many times did you ask him for names of individuals

3   with whom he'd stayed or whom he met overseas?

4            MS. MORENO:   Objection.   Asked and answered.

5            THE COURT:   Sustained.

6   BY MR. TURGEON:

7   Q.   What names, if any, did the defendant provide you about

8   individuals he stayed with overseas?

9            MS. MORENO:   Objection.

10           THE COURT:   Sustained.   It's been asked and answered.

11           MR. TURGEON:   No further questions, Your Honor.

12           THE COURT:   Any recross?

13           MS. MORENO:   No.

14           THE COURT:   Is anybody going to call Agent Gervino

15  again in the course of the trial?

16           MR. TURGEON:   No, Your Honor.

17           THE COURT:   What about the defense?   Are you going to

18  recall this witness in any respect?

19           MS. MORENO:   No, Your Honor.

20           THE COURT:   All right.   Then, sir, you're now excused

21  as a witness.   You can stay in court and watch the proceedings,

22  or you may leave, but you're not to discuss your testimony or

23  anything you see or hear in court with any witness who has not

24  yet testified.

25           THE WITNESS:   Thank you.

1                          (Witness excused.)

2              THE COURT:  Your next witness?

3              MR. GIBBS:  We will call Special Agent Minichello,

4    Judge.  Actually, Judge, we have some stipulations before that.

5    I apologize.

6              THE COURT:  All right.

7              MR. TURGEON:  Yes, I have some signed stipulations

8    that the government would like to enter into evidence.  First,

9    Your Honor, the government moves to offer a signed stipulation

10   marked Government Exhibit 12-31 into evidence and to read that

11   stipulation to the jury.

12             THE COURT:  All right, go ahead.

13             (Government's Exhibit No. 12-31 was received in

14   evidence.)

15             MR. TURGEON:  The stipulation reads:  The United

16   States and the defendant hereby stipulate and agree that

17   Government Exhibits 16-100 through 16-102 are photographs taken

18   by the FBI and/or U.S. Customs and Border Protection officials

19   of belongings of defendant Nicholas Young upon his arrival at

20   the Washington Dulles International Airport on May 24, 2011.

21             And based on that stipulation, Your Honor, the

22   government offers Government Exhibits 16-101 and 16-102 into

23   evidence and seeks to publish those to the jury.

24             THE COURT:  I'm sorry, just 101 and 102?  I thought

25   you said the stipulation was 100 through 102.

1          MR.  TURGEON:  That's correct, Your Honor.  We're

2  offering 16-101 and 16-102 only.

3          THE COURT:  Any objection to those two going into

4  evidence?

5          MS. MORENO:  No objection.

6          THE COURT:  All right, they're in.

7          (Government's Exhibit Nos. 16-101 and 16-102 were

8  received in evidence.)

9          THE COURT:  Do you want to publish them to the jury?

10          MR. TURGEON:  Yes, Your Honor.  Could I have 16-101,

11  please?  This is a photograph of what appears to be body armor.

12          And 16-102, it's a photograph of the defendant's U.S.

13  passport.

14          THE COURT:  All right.

15          MR. TURGEON:  The government moves to offer a signed

16  stipulation marked Government Exhibit 12-32 into evidence and

17  to read that stipulation to the jury.

18          THE COURT:  Go ahead.

19          (Government's Exhibit No. 12-32 was received in

20  evidence.)

21          MR. TURGEON:  The stipulation reads:  The United

22  States and the defendant hereby stipulate and agree that

23  Government Exhibit 16-103 is an accurate copy of an e-mail from

24  defendant Nicholas Young to his superiors at the Metro Transit

25  Police Department in August 2011.

1          The government also moves to offer a second

2     stipulation marked Government Exhibit 12-37 into evidence and

3     to read that to the jury.

4          THE COURT:  Go ahead.

5          (Government's Exhibit No. 12-37 was received in

6     evidence.)

7          MR. TURGEON:  That stipulation reads:  The United

8     States and the defendant hereby stipulate and agree that

9     Government Exhibits 16-103, 16-106, -401, and -402 are

10    authentic business records of the Washington Metropolitan Area

11    Transit Authority.

12         And based on those stipulations, the government

13    offers Government Exhibit 16 -- excuse me, Exhibits 16-103,

14    106, 401, and 402 into evidence.

15         THE COURT:  Any objection?

16         MS. MORENO:  So stipulated.

17         THE COURT:  All right, they're in.

18         (Government's Exhibit Nos. 16-103, 16-106, 16-401,

19    and 16-402 were received in evidence.)

20         THE COURT:  Are you going to publish any of those or

21    not?

22         MR. TURGEON:  Excuse me, Your Honor?

23         THE COURT:  Are you going to publish any of those or

24    not?

25         MR. TURGEON:  Yes, all of them, please.

1              THE COURT:  All right.

2              MR. TURGEON:  16-106.  That is a Metro Transit Police

3    oath of office that appears to be signed by the defendant.

4              16-401 is a certificate of completion and training

5    slides for a counterterrorism course held on May 25, 2006.

6              16-402 is another certificate of completion and

7    training slides for a counterterrorism course held on June 27

8    and 28 in 2012.

9              MR. SMITH:  Your Honor, we object on relevance

10   grounds.

11             THE COURT:  Is this your witness?

12             MR. SMITH:  Our objection is that there's no relevant

13   witness --

14             THE COURT:  On your feet, please.  On your feet.

15             MR. SMITH:  The objection is these documents don't

16   seem to pertain to the last witness who was testifying.

17             THE COURT:  Well, they don't have to.  They're

18   stipulations.  The government can put them in at any point.

19             MR. SMITH:  They're stipulations as to authenticity,

20   which we agreed to, but the relevance of the documents --

21             THE COURT:  Well, there was no objection to their

22   being entered into evidence, so they're in evidence.  There was

23   no objection when I asked if there was any objection, so

24   they're in.  Overruled.

25             Let's move on.

1          MR. TURGEON:  So that's 16-402.  And Government

2    Exhibit 16-103, the second e-mail in that e-mail chain is an

3    e-mail from the defendant to his superior at the Metro Transit

4    Police Department, which appears to include travel confirmation

5    for a trip from Washington to Cairo, departing on August 31,

6    2011.

7          THE COURT:  Call your next witness.

8          MR. TURGEON:  Excuse me, Your Honor.  There's one

9    more.

10         THE COURT:  All right.

11         MR. TURGEON:  The government moves to offer

12   stipulation marked Government Exhibit 12-33 into evidence and

13   to read that stipulation to the jury.

14         THE COURT:  Go ahead.

15         (Government's Exhibit No. 12-33 was received in

16   evidence.)

17         MR. TURGEON:  That stipulation reads:  The United

18   States and the defendant hereby stipulate and agree that

19   Government Exhibit 16-105 is a photograph that accurately

20   depicts the Metro Transit Police Department's Code of Honor

21   document that was found by the FBI and/or U.S. Customs and

22   Border Protection officials among the belongings of the

23   defendant, Nicholas Young, at Hartsfield Jackson Atlanta

24   International Airport, in Atlanta, Georgia, on May 10, 2012.

25         Based on that stipulation, the government offers

1    16-105 into evidence.

2              THE COURT:  Any objection?

3              MS. MORENO:  Not to that exhibit, Your Honor.

4              THE COURT:  All right, it's in.

5              (Government's Exhibit No. 16-105 was received in

6    evidence.)

7              MR. TURGEON:  And I'd like to publish that to the

8    jury as well.

9              THE COURT:  Go ahead.

10             MR. TURGEON:  16-105 is a photograph of what appears

11   to be a signed version of the Metro Transit Police Code of

12   Honor.  Thank you.

13             THE COURT:  All right, your next witness?

14             MR. GIBBS:  Judge, at this time, we'd call Special

15   Agent John Minichello to the stand.

16             THE COURT:  All right.

17    SA JOHN RICHARD MINICHELLO, GOVERNMENT'S WITNESS, AFFIRMED

18                        DIRECT EXAMINATION

19   BY MR. GIBBS:

20   Q.   Good morning, sir.

21   A.   Good morning.

22   Q.   Sir, would you please state your name for the record and

23   also spell your last name.

24   A.   Yes.  My name is John Richard Minichello.  My last name is

25   spelled M-i-n-i-c-h-e-l-l-o.

1  Q.   And who do you work for?

2  A.   I work for the Federal Bureau of Investigation, or the

3  FBI.

4  Q.   And how long have you worked for the FBI?

5  A.   At this point, approximately eight years.

6  Q.   And where were you assigned in mid-2013?

7  A.   I was assigned to the Washington Field Office of the FBI.

8  Q.   And that's here in Washington, D.C.?

9  A.   That's correct, yes.

10 Q.   And at that time in mid-2013, were you working on any

11 investigations that eventually made you aware of the defendant,

12 Nicholas Young?

13 A.   I was, yes.

14 Q.   Was any other agent assigned to that investigation with

15 you as a co-case agent?

16 A.   They were.

17 Q.   And who was that?

18 A.   My co-case was Agent Cameron Siegfried.

19 Q.   And would you know how to spell his last name?

20 A.   I'll make sure.  Yeah, it should be S-i-e-g-f-r-i-e-d.

21 Q.   And, Special Agent Minichello, are you familiar with

22 what's known as a confidential human source, or a CHS?

23 A.   I am, yes.

24 Q.   What is that?

25 A.   A confidential human source is an individual that the FBI

1    uses to collect information or evidence related to an

2    investigation.

3    Q.    And was a confidential human source introduced into this

4    investigation that you were just testifying about?

5    A.    They were, yes.

6    Q.    Who was that?

7    A.    That was Mo.

8    Q.    And was Mo paid in his role as a confidential human

9    source?

10   A.    He was, yes.

11   Q.    How much was he paid?

12   A.    Approximately $34,000.

13   Q.    And what did that roughly $34,000 include?

14   A.    It included both payments for services for activities

15   related to our investigation, and it also covered expenses

16   related to travel and other incidental expenses that came up

17   that he had to pay during the investigation.

18   Q.    And is paying a CHS something that the FBI routinely does?

19   A.    Yes, that's routine.

20   Q.    Now, Special Agent Minichello, what is a handling agent?

21   A.    A handling agent is the FBI agent or individual that

22   interacts with the human source and provides them with taskings

23   of what to do and also receives information they've collected

24   to put into reports about their investigation.

25   Q.    And in this investigation, who were Mo's handling agents?

1   A.   Mo's handling agent was both myself and Agent Siegfried

2   that I mentioned earlier.

3   Q.   And what did being Mo's handling agent entail?

4   A.   Generally, it entailed meeting with the human source, Mo,

5   on a regular basis, receiving information and data collected

6   related to our taskings, and providing them with new taskings

7   about what information we need to collect and how to go about

8   doing that.

9   Q.   And, Special Agent, can you explain what a legend or a

10  back story is?

11  A.   Sure.  When working with a confidential human source,

12  we'll often work out a, what we call a legend or a back story

13  for that source, and what that is, it is a back story that the

14  source can provide to subjects or other individuals that

15  they're interacting with that isn't their real personal

16  history.

17          The reason for that is that the human source risks

18  exposure to them and their families with the subjects if those

19  subjects would be aware of who they actually were, and so we

20  give them this back story.  It also allows the human source to

21  provide a reason for being where they are and for interacting

22  with the subjects.

23  Q.   And what was Mo's legend or back story?

24  A.   Mo's back story was that he was of Palestinian descent and

25  that he had previously been with the United States military.

1  Q.   And when Mo started working for the FBI as a confidential

2  human source, what, if anything, was he told about keeping his

3  relationship with the FBI secret?

4  A.   Mo was advised that for his own safety, he should not tell

5  other people that he was working with the FBI.

6  Q.   But at some point in the investigation, did you learn that

7  Mo had, in fact, told somebody about his relationship with the

8  FBI?

9  A.   We did, yes.

10  Q.   All right.  Can you describe what happened?

11  A.   Yeah.  Briefly, we received an e-mail -- I received an

12  e-mail from an individual who was clearly not Mo, and that

13  e-mail intimated that that individual was aware that Mo was

14  working with the FBI.

15  Q.   And as a result of getting that e-mail that was clearly

16  not from Mo, what did you do?

17  A.   We were concerned about the safety of the human source,

18  Mo, and so we looked carefully to identify who was the sender

19  of that e-mail and then to deal with the source, to figure out

20  who else the source might have informed that he was working

21  with the FBI.

22  Q.   And can you describe what you did to try to get to the

23  bottom of this event?

24  A.   Yeah.  We did a number of different actions after we got

25  that e-mail.  Those included discussing the matter with the

1    human source, and also conducted research on our own pertaining

2    to the e-mail as well as the individual we later identified to

3    be the sender of that e-mail.

4    Q.   And who did you determine that Mo had actually told about

5    his relationship with the FBI?

6    A.   Initially, we determined that an individual named

7    Stephanie and as well as an individual named Keith were

8    individuals that Mo had told about his working relationship

9    with the FBI, and then later, we also determined that there was

10   another individual named David.

11   Q.   And who did you determine Stephanie was?

12   A.   Stephanie was Mo's girlfriend at the time.

13   Q.   And who did you determine David and Keith were?

14   A.   David and Keith were both individuals that were involved

15   in the same line of work that Mo was.

16           THE COURT:  I'm sorry, what do you mean by same line

17   of work?

18           THE WITNESS:  Do you want me to clarify?

19           THE COURT:  Well, do you mean they were other

20   undercover people or they had --

21           THE WITNESS:  No, I apologize, in the same line of

22   work that Mo is involved in now.

23           THE COURT:  All right.

24           MR. GIBBS:  Thank you, Judge.

25   Q.   Now, Special Agent Minichello, when did this occur?

1   A.    In roughly April of 2014.

2   Q.    And had Mo been introduced to the defendant by that point?

3   A.    He had not, no.

4   Q.    And when was Mo eventually introduced to the defendant?

5   A.    Mo was introduced to the defendant in May of 2014.

6   Q.    Now, you testified that in April 2014, Mo was not

7   reporting on the defendant and hadn't met the defendant at that

8   point, correct?

9   A.    At the time of the incident you're talking about, yes,

10  that is correct.

11  Q.    Yes.  But at some point, did Mo start to provide

12  information about the defendant?

13  A.    Yes.

14  Q.    And did the FBI ultimately task Mo to start recording his

15  interactions with the defendant using the FBI's equipment?

16  A.    We did, yes.

17  Q.    And when was that?

18  A.    The first recordings were in July of 2014.

19  Q.    And from that point forward in July of 2014, was Mo always

20  recording his interactions with the defendant?

21  A.    Mo was, yes.

22  Q.    Now, what was the procedure to get these recordings back

23  from Mo once they were done?

24  A.    Mo was issued an FBI recording device, which he kept on

25  his person and could activate and deactivate prior to his

1    meetings with the subject, Nick Young.  Once that had occurred,

2    we would meet with Mo at the soon as practical time that didn't

3    put him in danger, retrieve that device, and then we would be

4    able to access the information on that device after retrieval.

5    Q.    And, Special Agent Minichello, did there come a point in

6    time that Mo was removed from the investigation of the

7    defendant?

8    A.    He was, yes.

9    Q.    Why was that?

10   A.    We mentioned before the concept of a story arc or a

11   legend.  The legend that had been developed with Mo naturally

12   culminated with his supposed travel to join ISIS, the terrorist

13   group, and that is what we engineered into the structured story

14   with Nicholas Young.  It therefore made sense for the source's

15   credibility to culminate that story arc with the source

16   departing and actually traveling to join ISIS, and that's the

17   point at which we removed him.

18   Q.    And, Special Agent Minichello, before Mo reportedly left

19   this area, did he and the defendant set up e-mail accounts?

20   A.    They did, yes.

21   Q.    Okay.  And whose idea was it to set up those e-mail

22   accounts?

23   A.    That was Nicholas Young's idea.

24            THE COURT:  I'm sorry?  That was whose idea?

25   BY MR. GIBBS:

1  Q.    Whose idea was that?

2  A.    Yeah, the subject's.

3          MR. GIBBS:  Okay.  Your Honor, we have a stipulation,

4  it's Stipulation No. 1, I'd like to read into the record.

5          THE COURT:  All right.

6          MR. GIBBS:  The United States and the defendant

7  hereby stipulate and agree that Government Exhibits 1-101

8  through 1-222 are authentic business records of 1&1 Mail &

9  Media, Incorporated.

10         And, Your Honor, at this time, I'd like to have the

11 witness look at one of those exhibits that was just referenced,

12 and that would be Government Exhibit 1-200.

13         THE COURT:  Is there any objection to 1-200?

14         MR. SMITH:  No.

15         (Government's Exhibit No. 1-200 was received in

16 evidence.)

17 BY MR. GIBBS:

18 Q.    And, Special Agent, what is 1-200?

19 A.    This exhibit is -- it's subscriber information for an

20 e-mail account.

21 Q.    And do you know whose e-mail account this is?

22 A.    Yes.

23 Q.    And whose e-mail account is this?

24 A.    The e-mail account essakobayashi@mail.com was used by

25 Nicholas Young.

1              MR. GIBBS:  And if we could publish that?

2              And if we could go to the second page?

3    Q.    Special Agent Minichello, looking at the bottom of the

4    second page, what was the first date listed for this Essa

5    Kobayashi account?

6    A.    Do you want the very last date listed or the --

7    Q.    Yeah, the -- yeah, the last date.  It begins at the

8    bottom.

9    A.    October 25, 2014.

10   Q.    Thank you.  And, Special Agent Minichello, when did Mo

11   supposedly leave the country?

12   A.    Mo supposedly left the country and did actually leave the

13   country in October of 2014.

14             THE COURT:  I'm sorry, your voice trails off.  You

15   need to stay near the microphone and keep it up.

16             THE WITNESS:  I apologize, Your Honor.

17             THE COURT:  All right.  And that answer again,

18   please?

19             THE WITNESS:  Of course.  October of 2014.

20   BY MR. GIBBS:

21   Q.    And where did Mo tell the defendant he was going to first?

22   A.    Mo indicated that he was going to first travel to Turkey.

23   Q.    And you said Mo did travel overseas, in fact, and did Mo,

24   in fact, go to Turkey?

25   A.    He did, yes.

Minichello - Direct                                                     273

1   Q.   Who went with him?

2   A.   I did.

3   Q.   Now, what was the reason for actually traveling abroad

4   with Mo?

5   A.   There were a couple reasons, but the primary reason was

6   that by traveling to Turkey -- by Mo actually traveling to

7   Turkey, it created a record of his travel in government

8   systems, and there was concern at the time that Nicholas Young

9   might have access to government records and be able to check

10  whether Mo had actually traveled to Turkey.

11  Q.   And what did you and Mo do in Turkey to backstop his

12  travel story?

13  A.   While we were in Turkey, we traveled primarily in Istanbul

14  and took photographs and other -- collected other information

15  that we could send back to verify that Mo was actually in

16  Turkey at that time.

17  Q.   And at this time, sir, I'd like to have you take a look at

18  Government Exhibit 1-101.  Do you have that?

19  A.   I do.

20  Q.   And what is this exhibit?

21  A.   This is an e-mail message sent from an account, V x

22  Vendetta, V4Vendetta, to account essakobayashi@mail.com.

23  Q.   And what's the date on that e-mail?

24  A.   The e-mail is dated October 27, 2014.

25        MR. GIBBS:  Your Honor, at this time, we would move

1  in Government Exhibit 1-101.

2         THE COURT:  Any objection?

3         MR. SMITH:  No.

4         THE COURT:  All right, it's in.

5         (Government's Exhibit No. 1-101 was received in

6  evidence.)

7         MR. GIBBS:  And if we could publish that, please?

8         THE COURT:  Go ahead.  Blow it up.  The jury can't

9  see that.

10         MR. GIBBS:  We'll zoom in on that, Judge.

11  Q.   Special Agent Minichello, who wrote this e-mail?

12  A.   This e-mail was a collaborative effort between myself and

13  Mo.

14  Q.   And which one -- can you identify which e-mail address is

15  Mo's?

16  A.   Yes.  Mo's e-mail address is the first one there, that

17  V4Vendetta@mail.com.

18  Q.   And which one is Young's?

19  A.   Essakobayashi@mail.com.

20  Q.   And you testified a few minutes earlier that before Mo

21  left, the defendant and he set up e-mail accounts so they could

22  communicate?

23  A.   That's correct.

24  Q.   Are these the e-mails they set up?

25  A.   That is also correct, yes.

1   Q.   Okay.  And the e-mail indicates that there's an

2   attachment.  What's attached to this e-mail?

3   A.   There's a photograph attached to that e-mail, and it's a

4   photograph of the Libyan consulate in Istanbul.

5           MR. GIBBS:  So if we could pull that up?

6   Q.   And, Special Agent Minichello, what was Young's connection

7   to Libya?

8   A.   Young had traveled to Libya prior to this and had

9   discussed that with the source, Mo.

10  Q.   Next, if I could have you take a look at Government

11  Exhibit 1-102?

12          THE COURT:  Any objection?

13          MR. SMITH:  No.

14          THE COURT:  All right, it's in.

15          (Government's Exhibit No. 1-102 was received in

16  evidence.)

17          MR. GIBBS:  Thank you.  We'll move it in.  Publish

18  it, please.  And if we could zoom in on that?

19  Q.   And just briefly, what is this e-mail?

20  A.   This is a second e-mail from the V4Vendetta account used

21  by Mo to Essa Kobayashi, which was used by Nicholas Young.

22  Q.   And if you look at that e-mail, towards the end, it says,

23  quote -- it talks about Mo meeting someone raising money for

24  the mujahideen, and then it reads, "He is helping me get to my

25  next step, he knows some of the guys we talked about down

Minichello - Direct                                                  276

1    south."

2              Now, the "guys we talked about down south," what did

3    you intend to convey using that term?

4    A.   That term is a reference to ISIS based on the source and

5    Nicholas Young's previous conversations.

6    Q.   And what did you intend to convey in that e-mail by using

7    the term "mujahideen"?

8    A.   Again, this is supposed to be a reference to ISIS.

9    Q.   Thank you.

10             Next, if I could have you take a look at Government

11   Exhibit 1-103?

12             And we would ask to move that one into evidence.

13             THE COURT:  Any objection?

14             MR. SMITH:  No, Your Honor.

15             THE COURT:  All right, it's in.

16             (Government's Exhibit No. 1-103 was received in

17   evidence.)

18             MR. GIBBS:  If we could publish it?

19             THE COURT:  You may publish it.

20   BY MR. GIBBS:

21   Q.   And while we're zooming in, Special Agent Minichello, what

22   is Government Exhibit 1-103?

23   A.   This is a third e-mail from the V4Vendetta account to the

24   Essa Kobayashi account we discussed.

25   Q.   And what was the date of this third e-mail?

1    A.    It was dated October 30, 2014.

2    Q.    Now, did you include any photographs with this e-mail?

3    A.    I did, yes.  There are three.

4    Q.    And if you could -- we'll go through each of the three

5    photographs.  If you could indicate just what they are briefly?

6    A.    Of course.  The one marked U.S. 00150 is a photograph of

7    the Blue Mosque.  A similar photograph of the Blue Mosque is

8    for 151.

9    Q.    And let's get caught up.

10          That's the Blue Mosque in Istanbul?

11   A.    That's correct.

12   Q.    And then what's the third photograph?

13   A.    The third photograph is a picture of green birds in a tree

14   that we took while in Istanbul.

15   Q.    And what's the significance of a photograph of green

16   birds?

17   A.    Based on my experience, the reference to green birds is a

18   reference that individuals involved with extremist groups are

19   aware of, as green birds are believed to carry the souls of

20   martyrs to heaven.

21   Q.    Now, in that e-mail, you wrote, "Im leaving the city

22   tomorrow and headed south."  What was "south" a reference to?

23   A.    "South" was a reference to traveling to Syria, which was

24   south of where he was currently.

25   Q.    And how much longer did you and Mo remain in Turkey after

1    that e-mail?

2    A.   Within the next 24 hours, we departed from Turkey.

3    Q.   And where did you and Mo go after leaving Turkey?

4    A.   Mo and I returned to the United States.

5    Q.   And, Special Agent Minichello, at some point after

6    returning to the United States, did the FBI obtain the

7    defendant's telephone records?

8    A.   We did, yes.

9    Q.   If you could, take a look at Government Exhibit 6-202.

10           THE COURT:  Is there any objection to 6-202?

11           MR. SMITH:  One moment, Your Honor.

12           No.

13           THE COURT:  It's in.

14           (Government's Exhibit No. 6-202 was received in

15    evidence.)

16           MR. GIBBS:  We will move it in.

17    Q.   What is 6-202, Special Agent?

18    A.   6-202 is a court order ordering a telephone provider, in

19    this case Verizon Wireless, to provide telephone records to the

20    FBI.

21    Q.   And what's the date of this court order?

22    A.   The order is dated --

23    Q.   It should be on the last page.

24    A.   Yes.  Sorry, I'm flipping back.

25           It's dated November 7, 2014.

1          MR. GIBBS:  Could we pull up the first page of that,

2    please?

3    Q.   In the first paragraph there is the number, the

4    571-236-8195.  Is that the defendant's telephone number?

5    A.   That's correct, yes.

6    Q.   Now, what was the reason for getting the defendant's

7    telephone records when you did?

8    A.   We wanted to have an active order in place that provided

9    us with telephone records because we were aware that based on

10   discussions between Mo and the defendant, the defendant would

11   likely send a text communication to Mo as part of their plan.

12   Q.   And was Mo told that you had gotten the defendant's

13   telephone records?

14   A.   No.

15   Q.   What was Mo told about whether he should keep the same

16   telephone that he and the defendant had been communicating on?

17   A.   Mo was clearly instructed to keep that telephone number

18   active in case the defendant contacted him.

19   Q.   And what was Mo instructed to do if he received any

20   communications from the defendant?

21   A.   Mo was instructed to immediately contact myself if he

22   received such communication.

23   Q.   And did you, in fact, receive a phone call from Mo about

24   Nick Young?

25   A.   I did, yes.

Minichello - Direct                                              280

1    Q.   And what did you two discuss in that telephone call?

2    A.   I directed Mo to send me the text message that he received

3    from Nicholas Young.

4    Q.   And if you would, please take a look at Government Exhibit

5    6-201.

6              THE COURT:  Any objection?

7              MR. SMITH:  No objection.

8              THE COURT:  It's in.

9              (Government's Exhibit No. 6-201 was received in

10   evidence.)

11             MR. GIBBS:  And if we could publish that?

12             THE COURT:  Go ahead.

13   BY MR. GIBBS:

14   Q.   And, Special Agent Minichello, what is Government Exhibit

15   6-201?

16   A.   This is a record of a text message that was forwarded to

17   me by Mo after that discussion we mentioned.

18   Q.   And there are a few places at the top of that document

19   that are redacted.  Do you see that?

20   A.   I do, yes.

21   Q.   Do you know what those redactions are of?

22   A.   Yes.  They're redactions of the source's telephone number.

23   Q.   Mo's telephone number?

24   A.   Correct.

25   Q.   And did you have an opportunity to see this document

Minichello - Direct                                               281

1   before the redactions were there?

2   A.   I did, yes.

3   Q.   And did you recognize Mo's telephone number?

4   A.   I did, yes.

5   Q.   Now, what is the date that this text message was forwarded

6   to you from Mo?

7   A.   On November 20, 2014.

8   Q.   And what is the time?

9   A.   The time listed there you can see is 11:06 p.m.

10  Q.   And who is, who is it sent to?

11  A.   It was sent to, you can see there the

12  echotranslation2011@gmail.com, which is an e-mail account that

13  I controlled.  It was tied to a telephone number that Mo

14  forwarded that text to me.

15  Q.   So echotranslation was your account?

16  A.   Correct.

17  Q.   Now, as a result of getting the court order for the

18  defendant's telephone number that you testified about a few

19  moments ago, was the FBI able to determine if the defendant

20  had sent a text message to Mo's phone at around eleven o'clock

21  on November 20, 2014?

22  A.   Yes, we had.

23  Q.   I'd like you to take a look at Government Exhibit 6-203.

24            THE COURT:  Any objection?

25            MR. SMITH:  No.

Minichello - Direct                                                    282

1          THE COURT:  It's in.

2          (Government's Exhibit No. 6-203 was received in

3    evidence.)

4          MR. GIBBS:  Thank you.  If we could publish that?

5    Q.   Once it's up, if you could explain to the jury what this

6    document is?

7    A.   Absolutely.  The image you see here is an image taken from

8    our system, system record with the FBI that allows us to view

9    telephone records that have been provided to us by a telephone

10   provider.  So a telephone provider gives us the records, and

11   our system allows us to look at those records in a clear and

12   concise manner.  This is the image of what we see when we look

13   up those records that were provided to us.

14         MR. GIBBS:  Is there any way to enlarge that at all,

15   or are we stuck with what we've got?

16   Q.   And, Special Agent Minichello, what is listed as the

17   target number here?

18   A.   The target number, that's 1-571-236-8195.

19   Q.   And whose record is that?

20   A.   Nicholas Young's.

21   Q.   Now, the destination number is blacked out.  Do you see

22   that redaction there?

23   A.   I do, yes.

24   Q.   Were you able to look at this before it was blacked out?

25   A.   I was, yes.

Minichello - Direct                                                    283

1    Q.    And whose number was under the blacked-out portion?

2    A.    That was Mo's number.

3    Q.    And finally, how does the date and time on this document

4    from the Verizon record compare with the date and time listed

5    on the previous exhibit?

6    A.    The date is identical.  The time is approximately four to

7    five minutes prior to the previous exhibit.

8    Q.    And had Mo been instructed that if he got any text

9    messages or communications from the defendant, it was important

10   to immediately notify you?

11   A.    He was, yes.

12   Q.    And, Special Agent Minichello, how much longer did you

13   remain on the investigation after Mo supposedly left to go join

14   ISIS?

15   A.    I remained involved in the investigation until end of

16   November-early December 2015, when I transferred to a different

17   field office with the FBI.

18   Q.    Okay.  And finally, if we go back just briefly to

19   Government Exhibit 6-201, to the last page there?

20   A.    Okay.

21   Q.    Now, you testified that this was the text message

22   forwarded to you by Mo, correct?

23   A.    That's correct.

24   Q.    And is the text -- or the words in that text message

25   included at the end of that document?

1   A.    They are, yes.

2   Q.    And what does that say?

3   A.    The forwarded text message reads:  "Salam.  Hope you had a

4   good vacation.  If you want to grab lunch after jumma, hit me

5   up."

6              MR. GIBBS:  Thank you.  That's all I've got.  I

7   believe the defense will have some questions with you.  Thank

8   you.

9              MR. SMITH:  Yes.

10             THE COURT:  All right, Mr. Smith?

11                          CROSS-EXAMINATION

12  BY MR. SMITH:

13  Q.    Good afternoon, Agent Minichello.

14  A.    Good morning.  How are you?

15  Q.    Well.  How are you?

16  A.    Doing well.

17  Q.    So, Mr. Minichello, you've testified that you were the

18  handler agent for Mo, the CHS, the confidential human source in

19  this case?

20  A.    I was one of the handlers.

21  Q.    One of the handlers.  And Agent Siegfried was the other,

22  the co-handler?

23  A.    Correct.

24  Q.    Now, you've testified that the -- that you would work with

25  the confidential human source to create a legend that would

1  allow the confidential human source to report on certain

2  targeted individuals; is that right?

3  A.    Correct.

4  Q.    And the purpose of creating this legend was to establish

5  trust between the confidential human source and the target,

6  correct?

7  A.    That was a part of it, yes.

8  Q.    And the purpose was to establish a personal connection

9  between the informant and the, and the target, correct?

10 A.    In some ways, yes, to establish some personal connection

11 as well as to obfuscate some personal connection that the

12 defendant --

13 Q.    So the legend you helped create for Mo, among other

14 things, was that he was Palestinian, correct?

15 A.    Correct.

16 Q.    That he had a grandmother in Palestine in the West Bank,

17 correct?

18 A.    Yes.

19 Q.    That she was under fire in the West Bank, correct?

20 A.    I don't recall that aspect of that.

21 Q.    We'll get to that.

22        That she had a sister in the West Bank, correct?

23 A.    I believe so, yes.

24 Q.    He had a strained relationship with his father, correct?

25 A.    Yes.

1    Q.    Yes.  He went to George Mason University, correct?

2    A.    I don't recall.

3    Q.    We'll get to that, but --

4            THE COURT:  Well, you don't need to say, "We'll get

5    to that."  Let's just ask the question.

6            MR. SMITH:  Okay.

7    Q.    So there were occasions when, when you worked with Mo, the

8    informant, that he would be recorded, he'd be wearing a wire,

9    correct?

10   A.    That is correct, yes.

11   Q.    There were also occasions when he wasn't wearing a wire,

12   correct?

13   A.    That's correct, yes.

14   Q.    When he's reporting on Nicholas Young?

15   A.    Correct.

16   Q.    And you testified that Nicholas Young met Mo, the

17   informant, in May of 2014, correct?

18   A.    Correct.

19   Q.    That he wasn't wired, right?

20   A.    At the time that he met Nick Young, is that what you're

21   asking?

22   Q.    Yes.

23   A.    Correct.

24   Q.    Now, you've testified that Mo had lied to the FBI in April

25   of 2014, correct?

1   A.    Right.

2   Q.    So you're relying on Mo, the liar, to report on Nicholas

3   Young unrecorded, correct?

4   A.    No.  I was relying on Mo, who had told a lie but is not a

5   liar.

6   Q.    Okay.  So he meets Nicholas Young -- the informant meets

7   Nick on what date, do you remember?

8   A.    I don't recall.

9   Q.    It was May 22, right?

10  A.    I don't recall but somewhere around there, yes.

11          MR. SMITH:  A document.

12          THE COURT:  Wait, wait, you stay right there.

13          THE WITNESS:  Thank you.

14          THE COURT:  Is there a question?

15  BY MR. SMITH:

16  Q.    The question is did you draft -- do you see a memo in

17  front of you right now?

18  A.    Yes.

19  Q.    It's an FBI memo, right?  It's called a 1036 memo?

20  A.    Okay.

21  Q.    What is a 1036 memo?

22  A.    Well, in this case, it's a report of a -- basically a

23  report of a report of information that I collected from a

24  source.

25  Q.    Okay.  And you were collecting information from the source

Minichello - Cross                                                    288

1    in that particular memo on Nicholas Young meeting with the

2    informant, correct?

3    A.    Yes, that's correct.

4    Q.    You didn't record -- you didn't instruct Mo to wear a wire

5    on that occasion, correct?

6    A.    Not that I recall.

7    Q.    Why didn't you?

8    A.    We often don't have sources record every conversation they

9    have with individuals.

10   Q.    When you review your notes, your summary of that meeting

11   on May 22 between the informant and Nicholas, did you record

12   that Nicholas discussed ISIS with Mo?

13   A.    Did I record as in conduct a recording, or did I write --

14   Q.    Did you reflect in your memorandum dated May 22, 2014 --

15   A.    Understood.  I'm sorry, what was it you were asking about

16   then?

17   Q.    Did you reflect --

18            THE COURT:  Wait, stop one second.  You both have to

19   slow down.  You have to speak more slowly and louder.  Stop

20   rustling papers.  It gets picked up on the microphone,

21   Mr. Smith, all right?

22            MR. SMITH:  Sorry, sorry.

23            THE COURT:  All right, let's start over.  Ask the

24   question, please.

25   BY MR. SMITH:

1   Q.   The memorandum you're holding right now was drafted by

2   you, correct?

3   A.   The information in there was, yes.

4   Q.   Okay.  It's dated May 22, correct?  The meeting that

5   allegedly occurred between the informant and --

6   A.   May 22, that is correct.

7   Q.   Okay.

8   A.   The memorandum is not.

9   Q.   Now, your summary of that meeting as reported to you by

10  the informant, who is not wired, on May 22, does your summary

11  include any discussion between Nicholas Young and the informant

12  on the subject of ISIS?

13  A.   Does not appear to in this particular report.

14  Q.   You've testified today that this meeting was not recorded,

15  correct?

16  A.   That is correct.

17  Q.   Isn't it true that the case agent in this case originally

18  believed this meeting was recorded?

19  A.   I don't recall.

20  Q.   Okay.  I'm handing up some documents.

21         THE COURT:  Mr. Young -- I'm sorry, Mr. Smith, there

22  is a microphone there.  Every time you hit the microphone --

23         MR. SMITH:  I apologize, Your Honor.  I apologize.

24         THE COURT:  All right.

25         MR. SMITH:  I'll try to be quiet.

1              THE COURT:  All right, this is taking too long.

2    Ladies and gentlemen, I'm going to give you a five-minute

3    break.  I'm going to get this better organized.

4              MR. SMITH:  It's organized right now, Your Honor.  I

5    can --

6              THE COURT:  All right.  No more of these long delays.

7    Now, what is the question?

8    BY MR. SMITH:

9    Q.   The question is do you see the e-mail from March 23 from

10   the case agent in this case, Nicholas Caslen, indicating the

11   number of meetings between the informant and Nicholas that were

12   not recorded?

13             THE COURT:  March 23 --

14             MR. SMITH:  March 23 e-mail from Nicholas Caslen.

15             THE COURT:  Of what year?

16             MR. SMITH:  2016.

17             THE WITNESS:  I mean, that's not what it says.  It

18   says, "I think."  It's implying that it's unclear.

19   BY MR. SMITH:

20   Q.   Do you see the e-mail in which the case agent says, "I

21   think there are one or two unrecorded e-mails"?  The e-mail is

22   dated March 23, 2016.  Do you see --

23   A.   The e-mail that I see reads, "I think the first one or two

24   weren't recorded.  I will get in touch with Cam and a former

25   handler to get the specifics."

1    Q.    When Mr. Caslen says, "I will get in touch with Cam and

2    the former handler," who was he referring to?

3    A.    Both with myself and Cameron Siegfried, the agent we

4    discussed earlier.

5    Q.    Now, did Mr. Caslen get in touch with you as indicated in

6    that e-mail of March 23, 2016?

7    A.    I don't recall specifics of the discussions, but yes, we

8    had discussions of him about which means were recorded.

9              THE COURT:  Agent, you've still got to speak up.

10             THE WITNESS:  I'm sorry, Your Honor.

11             THE COURT:  You're fading away.

12             THE WITNESS:  I apologize.

13   BY MR. SMITH:

14   Q.    Now, can you turn your attention to the March 24, 2016,

15   e-mail in front of you?

16   A.    Okay.  I see it.

17   Q.    Is that an e-mail from Special Agent Nicholas Caslen?

18   A.    Yes, it is.

19   Q.    What does it say?

20   A.    It says, "It looks like there were four meets that weren't

21   recorded," and it lists dates.

22   Q.    What are those dates?

23   A.    The first date is May 31, 2014; the second date is June 5,

24   2014; a third date is June 9, 2014; and the fourth and last

25   date is July 12, 2014.

1   Q.   Did Mr. Caslen, as referenced in the March 23, 2016,

2   e-mail we just reviewed, speak to you about the number of

3   unrecorded dates before he wrote the e-mail on March 24, 2016?

4   A.   I can't recall.

5   Q.   You cannot recall.

6            You've testified that the first time Mr. Young met

7   with the informant was May 22, 2016, correct, as reflected in

8   your --

9   A.   I testified it was in May, yes.  I believe you said the

10  date from the report.

11           THE COURT:  2014.

12           MR. SMITH:  2014, correct.

13  Q.   So this meeting was not recorded, but the case agent

14  originally believed it may have been, and you're stating he was

15  incorrect?

16  A.   I was stating that he did not know based on that e-mail,

17  yes.

18  Q.   He said that he was going to reach out to you, but he did

19  not, you're testifying?

20  A.   Did not reach out to me?  No.

21  Q.   Reach out to you about the number of unrecorded --

22  A.   I'm saying I can't recall the number of conversations I

23  had with Nick Caslen about that.  I'm also saying that he

24  appeared unsure based on the e-mail whether or not those

25  meetings were recorded.

1   Q.   I understand.  You've testified today that the first

2   recording between the undercover informant and Nicholas Young

3   was made in July 2014, correct?

4   A.   The first recording that Mo made during -- that I have on

5   record recorded was in July of 2014.

6            MR. SMITH:  Can you put on the May 29 tape?

7            MR. ENNS:  May 29?

8            MR. SMITH:  May 29, 2014.

9            This was produced -- this is a record that was

10  produced to us in discovery, Your Honor.

11           THE COURT:  Is there an objection to this?

12           MR. GIBBS:  No, Judge.

13           THE COURT:  All right.

14           MR. SMITH:  Just go to 14 minutes, 40 seconds.

15           THE COURT:  I don't think it's happening.  Let's go.

16           MR. SMITH:  Can you turn to May 29?  Okay.  We'll get

17  back to that.

18           May 29, 2014.

19           THE COURT:  He says it's not -- Mr. Smith, back at

20  the lectern.  Move on.  You don't have it.

21           MR. SMITH:  Okay.

22  Q.   Do you recall the first occasion in which Mr. Young

23  allegedly discusses ISIS with the CHS, the informant?

24  A.   I don't recall the exact date, but I know we recorded it.

25  Q.   Okay.

1    A.   Made a record of it, sorry.

2    Q.   You did make a record?

3    A.   Of the recording, yes.

4    Q.   Do you see the memorandum in front of you?

5    A.   I do.

6    Q.   Did you draft it?

7    A.   Yes.

8    Q.   It's dated -- what's the date of the meeting on the

9    memorandum you drafted between the informant and Nicholas

10   Young?

11   A.   The date of the meeting is on 29 June 2014 -- no, I'm

12   sorry, that's reporting it.  It's not the date of the actual

13   meeting.

14   Q.   Correct.  And you report, you write, you transcribe there

15   that Mr. -- the informant informed you that Nicholas Young and

16   the informant discussed ISIS on that occasion, on June 29,

17   2014, right?

18   A.   Yes, that's correct.

19   Q.   Mo was not wearing a wire on this occasion, correct?

20   A.   That is correct.

21   Q.   Okay.  Now, let's take a step back.  You testified earlier

22   that the first recorded meeting between Nicholas Young and the

23   informant was from July of 2014, correct?

24   A.   Recorded or reported?  I'm sorry.

25   Q.   Recorded meeting.  The first meeting in which the CHS, Mo,

1    was wearing a wire with Nicholas Young was in July 2014,

2    correct?

3    A.   That's correct.

4            MR. SMITH:   Okay.   We're playing a recording that was

5    marked May 29 -- May 31, 2014.

6            THE COURT:   Does this have an exhibit number so we

7    have it for the record?

8            MR. SMITH:   We're going to mark it as Defense

9    Exhibit 1.

10           THE COURT:   Is there any objection to Defense

11   Exhibit 1?

12           MR. GIBBS:   No, Judge.

13           THE COURT:   All right, it's in.

14           (Defendant's Exhibit No. 1 was received in evidence.)

15           MR. SMITH:   14:40.

16           THE COURT:   This is taking too long.   Move on to

17   something else.

18           MR. SMITH:   You'll let me know when you've got it,

19   right?

20   Q.   So we're about to discuss a May 29 meeting that was

21   recorded by your informant, Mo.   During this May -- after this

22   May 29 meeting, you drafted this memo.

23           THE COURT:   Mr. van Roekel?

24   BY MR. SMITH:

25   Q.   You see it doesn't have a date on it, does it?   It's

1  redacted, right?

2  A.   I'm checking, please.

3           MR. SMITH:  Have you got it?

4           MR. ENNS:  14:40.

5           MR. SMITH:  Okay.  Just hold on to it for a second,

6  okay?

7           THE WITNESS:  Yeah, this document does not have a

8  date.

9  BY MR. SMITH:

10  Q.   It does not have a date on it, does it?

11  A.   That's right.

12  Q.   The date, if you look at the top section of the memo,

13  there's a redacted box, correct?

14  A.   There is a redacted box, yes.

15  Q.   Where a date might be to indicate when the meeting was

16  held, right?

17  A.   It's blacked out.  I can't tell.

18  Q.   If you turn the memorandum over, you'll see a highlighted

19  passage about the Soviet invasion of Afghanistan.  Do you see

20  that?

21  A.   I see the highlighted passage.  Let me read it real quick.

22           MR. SMITH:  This is a section --

23           (Defendant's Exhibit No. 1 excerpt was played.)

24  BY MR. SMITH:

25  Q.   Do you recognize that voice that said, "Were they

1  legitimate jihadis, or were they criminals?"  Do you recognize

2  that voice?

3  A.   I'd have to listen to it again, I'm sorry.

4  Q.   Excuse me?

5  A.   I'd have to listen to it again, I'm sorry.

6           MR. SMITH:  Play it again.

7           (Defendant's Exhibit No. 1 excerpt was played.)

8           MR. SMITH:  Pause it.

9  Q.   Did you hear the phrase, "Was that a jihad, or were they

10 criminals?"  Did you hear that phrase?

11 A.   I believe so, yes.

12 Q.   Whose voice is that?

13 A.   The primary voice speaking there, and actually now I can't

14 remember, I'd have to go back and listen to it again --

15 Q.   I'm referring to the last --

16 A.   The primary voice speaking as you hear it is, it sounds

17 like Mo.

18 Q.   Yes.  And the last voice, did you hear the phrase:  "Were

19 they rebels or were they -- were they legitimate jihadis or

20 were they criminals?"  Did you hear the phrase in the clip we

21 just played?

22 A.   I'd have to hear it again, I'm sorry.  I'll listen --

23           THE COURT:  No, we're not hearing it again.

24 BY MR. SMITH:

25 Q.   Okay.  That voice, is that voice not Nicholas Young?

Minichello - Cross                                                    298

1    A.    I can't tell.

2    Q.    You can't tell.

3          There's a highlighted passage on your memorandum.

4    Can you read that for me, please?  What does it say?

5    A.    Yes, absolutely.  It said, "Nick appeared to agree with

6    Peshwaz and stated that the Soviet invasion" --

7          THE COURT:  Agent, you've got to speak louder and

8    more slowly.

9          THE WITNESS:  Of course.  "Nick appeared to agree

10   with Peshwaz and stated that the Soviet invasion of Afghanistan

11   was a legitimate jihad.  Nick argued that" --

12   BY MR. SMITH:

13   Q.    So if I understand you correctly, you've reflected in that

14   memorandum that Nick agreed, Nicholas Young, the defendant,

15   agreed with Peshwaz that the Soviet invasion -- that there was

16   a legitimate jihad against the Soviet invasion of Afghanistan,

17   correct?

18   A.    The Soviet invasion of Afghanistan, yes, that's correct.

19   Q.    You testified earlier today the first recorded meeting

20   between Mo and the defendant was in July 2014, correct?

21   A.    I testified the first meeting that I tasked Mo to record

22   that Mo recorded was in July.

23   Q.    Now, did you -- we just played a recording.  Does it

24   reflect the conversation you've written down in that

25   memorandum?

1   A.   Not necessarily.  The information, though, is similar from

2   what they sound on the recording.

3   Q.   What's the date of your memorandum?

4   A.   On this memorandum?

5   Q.   Yes.

6   A.   The one we discussed that didn't have a date?

7           THE COURT:  Did you become aware that at some point,

8   Mo was recording conversations that you or the FBI had not

9   directed him to record?

10          THE WITNESS:  There was a point that that happened,

11  yes, Your Honor.

12          THE COURT:  When did that happen?

13          THE WITNESS:  That was before this time frame.  I

14  can't remember the exact date that it occurred, though, I'm

15  sorry.

16          THE COURT:  I'm sorry, when did you find out that

17  that had happened?

18          THE WITNESS:  I can't recall.  It was before --

19  during April of 2014, I believe.

20          THE COURT:  In April of 2014, you found out that Mo

21  had made some recordings?

22          THE WITNESS:  I knew of one recording that Mo made

23  that he was not directed to make, but it was not of the subject

24  Nicholas Young.

25          MR. SMITH:  Your Honor, if I may, may I continue the

1    cross-examination?

2              THE COURT:  We'll see.  Go ahead.  Let's move this

3    along.

4              MR. SMITH:  Now, please play 14:40 again.

5              (Defendant's Exhibit No. 1 excerpt was played.)

6              MR. SMITH:  Your Honor, this disc we're playing was

7    marked as the 5/31 meeting.  It was a recording that the

8    government produced to us as reflecting a recorded meeting that

9    Mo conducted in May of 2014.  That's what we're playing from.

10   Q.   The highlighted passage from your memorandum,

11   Mr. Minichello, what does it read?

12   A.   It reads, "Nick appeared to agree with Peshwaz and stated

13   that the Soviet invasion of Afghanistan was a legitimate

14   jihad."

15   Q.   Now, the date of your memorandum is on the second document

16   I gave you, correct?  The date you drafted the memorandum, as

17   opposed to when the meeting occurred.

18   A.   Yes.  Assuming these are the same, which they appear to

19   be, then the date drafted would have been 6 June 2014.

20   Q.   That's before July 2014, correct?

21   A.   It is, yes.

22   Q.   Okay.  So there were recordings.  Mo did make recordings

23   before July 2014.  Your testimony was incorrect, right?

24   A.   Not necessarily.  I don't recall that --

25             THE COURT:  Mr. Smith, you've got to stop turning

1    pages.  We cannot hear you.  We can't hear the witness, all

2    right?

3              Now, what was your answer to that question?

4              THE WITNESS:  My answer to that question was I do not

5    recall a recording by Mo of the subject prior to that, though

6    this information does appear similar.

7    BY MR. SMITH:

8    Q.   Is that a memorandum drafted by you, Mr. Minichello?

9    A.   Yes, it is.

10   Q.   What's the date you drafted the memorandum on?

11   A.   The date listed here is June 9, 2014.

12   Q.   And the meeting that the memorandum reflects between the

13   undercover informant and Nicholas is when?

14   A.   It's June 5, 2014.

15   Q.   Was this meeting recorded?

16   A.   Not that I recall, no.

17   Q.   The case agent originally believed it was recorded,

18   correct?

19   A.   I do not know.

20   Q.   Go to the *Jencks* statement that's in front of you,

21   JKS2-001342.  It's the e-mail from March 24, 2016, from Agent

22   Caslen stating the total number of unrecorded meetings?

23   A.   Oh, that one.  Well, no, it says, "it looks like."

24   Q.   "It looks like."

25              And on the March 23, 2016, e-mail you have in front

1    of you from Agent Caslen, he states that he was going to speak

2    to you about the number of unrecorded meetings, correct?

3    A.    In the March 23 e-mail, it does.

4    Q.    Yes.  And then on March 24, Mr. Caslen says there are four

5    unrecorded meetings, correct?

6    A.    No.  Mr. Caslen says it looks like there were four.

7    Q.    It looks like there are four.  Is one of those four

8    June 5, 2014?

9    A.    Yes, it is.

10   Q.    Now, Mr. Minichello, you've testified that it was

11   Mr. Young's idea to set up an e-mail account with the

12   undercover informant, Mo, to speak once the undercover

13   informant, Mo, pretended to go to Syria, correct?

14   A.    I did, yes.

15             MR. SMITH:  Can you give me October 10, 2016?

16             And go to 1 hour, 17 minutes -- excuse me, go to 58

17   minutes.

18             (Excerpt of audio was played.)

19             MR. SMITH:  You were supposed to go to 10-16-2014, 58

20   minutes.  10-16-2014, 58 minutes.  Thank you.

21             (Excerpt of audio was played.)

22             THE COURT:  All right, we're stopping this.

23             Ladies and gentlemen, I'm going to let you get your

24   lunch break early today, all right?  We're going to be on

25   break.  I'd like you back here promptly at -- it's now 12:30.

Minichello - Cross                                                    303

1    I want you back here at 1:30, please, for lunch, all right?

2    We'll stay in session.

3                            (Jury out.)

4           THE COURT:  Now, there are three problems with what

5    is happening right now.  The point you're trying to make is a

6    legitimate point, but it's not being made well, and I do not

7    want -- it's confusing the jury to put on this kind of

8    evidence.

9           First of all, with tapes, there's normally a

10   transcript which helps the jury in listening to them.  These

11   are almost indecipherable; that's number one.

12          Number two, I have told you, Mr. Smith, these are

13   very sensitive microphones.  What you've got is a strip

14   microphone on the lectern.  Every time you move your papers, it

15   is picked up.  It is making it -- I'm sure my court reporter is

16   going crazy -- almost impossible to hear.  So you're

17   undercutting your own presentation by continuing to rattle your

18   papers.

19          Number three, your paralegal is not getting these

20   tapes properly timed or coordinated such that we're getting

21   right to it.  We will not -- I will not permit this kind of

22   long delay or listening to static or conversations that are

23   indecipherable.  You've got to work it out.  That's why we're

24   breaking now for lunch, all right?  Get it worked out.

25          But you cannot continue to rattle your papers at the

1    podium, all right?

2              MR. SMITH:  Your Honor, I apologize for rattling the

3    papers, but I'd just like to address the timing issue.

4              THE COURT:  No, you don't need to.  We're recessing

5    court.  We'll see you back here after the lunch break.

6              (Recess from 12:37 p.m., until 1:30 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Minichello - Cross                                                    305

```
 1                    A F T E R N O O N   S E S S I O N

 2                         (Defendant present, Jury out.)

 3              THE COURT:  All right, Mr. Smith, how much longer do

 4     you think your cross is going to take?

 5              MR. SMITH:  I think about --

 6              THE COURT:  On your feet, please, at the lectern.

 7              MR. SMITH:  Your Honor, I think it will be about 15

 8     to 20 minutes, but it's going to be sped up because we're going

 9     to -- we've marked a bunch of exhibits so that Mr. Minichello

10     can go through them in order chronologically.

11              THE COURT:  All right.

12              MR. SMITH:  And then the remaining documents we're

13     going to show Mr. Minichello are marked with Bates stamps so

14     that we can quickly go to the correct page.

15              THE COURT:  All right.  For all future witnesses

16     starting tomorrow, you need to make sure you've got your

17     documents in a binder.  You give them to the witness at one

18     time, and that way we don't have this back-and-forth.

19              MR. SMITH:  I understand.  And if I may, I'd like to

20     make one point about the recordings, and this will hold through

21     for the rest of trial probably.  There are -- produced to the

22     defense in discovery were hundreds and hundreds of hours of

23     recorded conversations, maybe multiplying that is not correct.

24     Hundreds of hours of conversations.  And sometimes the

25     undercover informant was wearing a wire for the entire day, so
```

1    it will be five-six hours.

2         So the defense has had to, to find arguably *Brady*

3    material, pick through hours and hours and hours of

4    conversations, and try to isolate select moments that are

5    relevant to the defense in this case.

6         The defense has spent countless hours trying to

7    isolate specific moments in which the defendant can be heard

8    speaking to the informant.  The recordings are faint.  It's

9    occasionally very difficult to understand the defendant unless

10   the listener is wearing headphones.  So we would just ask the

11   Court's patience in -- when we play certain recordings, it

12   might not be the exact moment at which the relevant comment is

13   made, but it will be made within a matter of moments.

14         THE COURT:  For purposes of the record, you have to

15   have the specific excerpts that you're going to use on one

16   disc.  We're not going to send down to the Court of Appeals,

17   should this case go that way, the entire disc.

18         And the second problem you've got with doing it this

19   way is without transcripts, it's almost impossible to hear

20   them.  Now, we're not going to play them four or five times for

21   the jury.  This was, you know -- both sides' obligation is to

22   produce the evidence in a format that the jury will be able to

23   without too much difficulty understand.

24         So we've got to get this case moving.  We are under a

25   tough time period, but anyway --

 1              MR. SMITH:  And just, Your Honor, for the record, so

 2    on the transcripts point, which is an excellent point, the

 3    problem with the transcripts of the recordings that were

 4    produced by the government is twofold.  They don't themselves,

 5    the memoranda that summarize the recordings don't purport to be

 6    exhaustive, so the agents will accurately represent that they

 7    listened to this recording, but they're not purporting to

 8    represent every single minute in the conversations.

 9              So one problem is the transcripts don't cover all of

10    the relevant what we think is *Brady* material.

11              THE COURT:  You do that on cross.  But anyway, the

12    government will have transcripts for the tapes you're going to

13    play?

14              MR. GIBBS:  That's correct, Judge.

15              THE COURT:  All right.  And you have them in one

16    book, the way is our normal practice here?

17              MR. GIBBS:  I believe we do.  I think what we'll

18    do -- and, in fact, Judge, I want to let the Court know Mo is

19    the next witness.  He would have a number of clips, so we

20    would -- our thinking was to provide all the discs to him to

21    identify, move into evidence, and then play them sequentially,

22    and so I believe when you say they're all in the same book, I

23    think Mr. Vera is actually going to pull all the clips -- all

24    the discs out and have them all there on the witness stand so

25    we can go through them one by one.

1              THE COURT:  But in terms of listening to them, do you

2      have the transcripts for each one of those clips available?

3              MR. GIBBS:  We do, Judge.

4              THE COURT:  And they should be in one book.  What we

5      tell the jurors is, you know, turn now to tab 4, tab 7, or

6      tab 9.

7              MR. GIBBS:  Correct, Judge.  So we -- all the discs

8      are numbered, and the transcripts are that same number with the

9      -T on it.

10             THE COURT:  All right.  All right, let's bring the

11     jury in.

12             MR. SMITH:  Just one --

13                       (Jury present.)

14             THE COURT:  All right, folks, I hope you had a good

15     lunch.  We're going to try to make sure that things get moving

16     a little bit faster now, all right?

17             Mr. Smith?

18             MR. SMITH:  Your Honor, I've marked several exhibits

19     as Defense Exhibit 2, Defense Exhibit 3, Defense Exhibit 4,

20     Defense Exhibit 5, Defense Exhibit 6 and 7.  Some of these

21     documents are documents that I was reviewing with Agent

22     Minichello before we took a break, but now they are marked and

23     in chronological order so that we can discuss them with Agent

24     Minichello in order.

25     BY MR. SMITH:

1    Q.   Good afternoon, Agent Minichello.

2    A.   Good afternoon, sir.

3    Q.   There is a document in front of you marked Defense

4    Exhibit 2.  Do you see that document?  There's a yellow sticky

5    note on the front that says DX-2.

6    A.   Oh, I see, DX-2.  It's got a little 1 underneath it?

7    Q.   Yes.

8    A.   Okay.

9    Q.   Is that a memorandum that's drafted by you?

10   A.   Yes.

11   Q.   What is the date of your memorandum draft?

12   A.   It's dated 6 June 2014.

13   Q.   Okay.  And does it reflect a meeting that the undercover

14   informant alleged he had with Mr. Young on a certain date in

15   May?  If you look near the top of the memorandum, there should

16   be a date in May.

17   A.   Yep.  I'm sorry, I see it.  Just let me look through it

18   real quickly.

19        Yes, that is correct.

20   Q.   And which date is that on the memorandum?

21   A.   The date listed there is May 22, 2014.

22   Q.   Now, you're testifying today that there was no recording

23   of the undercover informant Mo's alleged meeting with Nicholas

24   on May 22, 2014; is that correct?

25   A.   I testified that Mo did not make a recording of that

1    meeting on May 22, 2014.

2    Q.   Right.  And you testified that Mo to the best of your

3    knowledge did not make any recordings in his meetings with

4    Nicholas Young until July 2014; is that correct?

5    A.   That is correct.

6    Q.   Okay.  So there is no recording for this meeting on

7    May 22, which is reflected in the memorandum DX-2 in front of

8    you?

9    A.   I can testify that to my knowledge, Mo did not make a

10   recording of that, correct.

11   Q.   Now, in your memo, do you reflect that Mo had a

12   conversation with Nicholas Young about ISIS in DX No. 2 in the

13   memo in front of you?

14   A.   I do not see a mention of ISIS in this report.

15   Q.   You do not see a mention --

16           THE COURT:  This is the last time we're going to do

17   this.  If you're asking him to read reports and say something

18   that is or isn't in it, it just can't go like this.

19           All right, he said there was -- your answer was no.

20           THE WITNESS:  Correct.

21           MR. SMITH:  Your Honor, this is going to go quickly.

22   Q.   Do you see a document marked DX-3 in front of you?

23   A.   I do, yes.

24   Q.   Now, does -- what's the date of the memorandum?

25   A.   That memorandum is dated 6 June 2014.

1    Q.    Okay.  Did you draft that memorandum?

2    A.    Yes.

3    Q.    Now, there's no date of the alleged meeting that this

4    memorandum reflects between Nicholas Young and Mo in that

5    memorandum, correct?  The memorandum purports to summarize a

6    meeting between Nicholas Young and the undercover informant,

7    Mo, but there is no date of the meeting in that memorandum,

8    correct?

9    A.    Let me check.  That's correct.

10   Q.    Now, there's a paragraph that we were reading in the

11   earlier session about the Soviet invasion of Afghanistan.  Can

12   you find that paragraph?  I think it's on the second page of

13   DX-3.

14   A.    Let me look.

15   Q.    It begins, "Nicholas appeared to agree that the Soviet

16   invasion of Afghanistan was a legitimate jihad."

17   A.    Here we go.  Third page, I have it.

18   Q.    Can you read that sentence, please?

19   A.    Yes.  "Nick appeared to agree with Peshwaz, who stated

20   that the Soviet invasion of Afghanistan was a legitimate

21   jihad."

22            MR. SMITH:  Okay.  Please play the recording, please,

23   at 3 minutes, 40 seconds.

24            (Audio excerpt was played.)

25            MR. SMITH:  Stop it.

1    Q.   Is that voice not Mr. Young saying that the rebels against

2    the Afghanistan government are not jihad; they are criminals?

3    Did you, did you understand that from the recording?

4    A.   I can't recall that specific bit.

5    Q.   Yeah.  Do you think that that conversation, that clip we

6    just played is the same clip that you're -- is the same portion

7    of conversation you're purporting to summarize in the June 6

8    memo marked DX-3?

9    A.   No.  I mean, the information is similar.  It talks about

10   the Soviet invasion of Afghanistan.

11   Q.   So you are agreeing that you are purporting to reflect the

12   conversation we just listened to on the recording in the

13   memorandum in front of you marked DX-3?

14   A.   No.  I'm saying that they have the same information in

15   them.

16   Q.   Okay.  Can you turn to DX-4, please?

17        Now, you've testified today that the first recorded

18   conversation between the informant and Nicholas Young was in

19   July 2014, correct?

20   A.   The first recording that Mo made of this subject, Nicholas

21   Young, defendant now, was in July.

22   Q.   And so you're testifying that what we just heard was not a

23   recording between Nicholas Young and the undercover informant

24   in May 2014; is that correct?

25   A.   I'm testifying that I did not task the, Mo to make a

Minichello - Cross                                                    313

1    recording of that conversation.

2    Q.   I'm not asking whether you tasked him.  I'm asking --

3          THE COURT:  You need to let the witness finish.

4    You're cutting him off.

5    BY MR. SMITH:

6    Q.   Mr. Minichello, I'm not asking whether you tasked Mo with

7    recording a conversation between Young and himself in May 2014.

8    I'm asking whether the clip we just listened to, as reflected

9    in your memorandum dated June 6 and marked DX-3, is a

10   conversation between Mr. Young and Mo in May of 2014.

11   A.   And I can't speak to the veracity of that, whether or not

12   it is, in fact, that conversation.

13   Q.   Were you the handler agent for Mo in this case?

14   A.   At that time?  Yes.

15   Q.   Yes.  Because you drafted a memo dated June 6, 2014,

16   correct?

17   A.   That's correct, yes.

18   Q.   Yes.  So are you representing today that you do not

19   recognize Mo's voice?

20   A.   I -- as I testified earlier, that does sound like Mo in

21   that recording.

22   Q.   Are you -- now, as Mo's handler, would you often hear

23   Nicholas Young's voice on recordings that Mo made?

24   A.   Yes.

25   Q.   Do you recognize Nicholas Young's voice?

1  A.   It does sound similar to Nicholas Young, yes.  I'm not

2  trying to evade that.  I just can't --

3  Q.   Right.  The clip we just listened to sounds like Mo

4  speaking to Nicholas Young, correct?

5  A.   It sounds very similar, yes.

6  Q.   And it sounds like the conversation you were recording in

7  a memorandum dated June 6, 2014, correct?

8  A.   The information that is in that memorandum sounds very

9  similar to that conversation that we heard in that recording,

10 yes.

11 Q.   So when you testified earlier that the first recording

12 that was made between the informant and Nicholas Young was July

13 2014, that was probably incorrect, correct?

14 A.   No, that is incorrect.  I testified that the recording

15 that -- the first time that I tasked Mo to make a recording of

16 Nicholas Young, the first recorded conversations that I tasked

17 Mo to make were in July.

18       THE COURT:  Excuse me, what you're saying then is

19 apparently Mo made one or two unauthorized recordings?  Isn't

20 that what you're saying?  You start the official request from

21 the FBI to record in July.

22       THE WITNESS:  Yes, although I'm not -- I'm also not

23 testifying this particular recording is made by Mo of the

24 subject.  It does sound like it is a conversation between the

25 two, yes, in May.

Minichello - Cross                                                    315

1           THE COURT:  All right, that's the answer.  We've been

2     over this several times.

3           THE WITNESS:  So I don't mean to be obfuscating.  It

4     just --

5     BY MR. SMITH:

6     Q.    Okay.  Please turn to DX-5, please.  Is this a memorandum

7     you drafted?

8     A.    Yes, it is.

9     Q.    Does it have a date that purports to reflect a meeting

10    between Mo and Nicholas Young, Mo the informant and Nicholas

11    Young?

12          It's near the top.  Does it say June 29, 2014?

13    A.    I see the date.  I'm just making sure that --

14    Q.    Okay.

15    A.    -- what you're asking for is what's in the reporting.

16          Yes, it looks like on June 29, 2014, he had a meeting

17    with Nick --

18    Q.    Does it appear that the -- does the -- did Mo represent to

19    you that he had a conversation with Nicholas Young on June 29

20    about ISIS?

21    A.    Let me check.

22          Yes.

23    Q.    Do we have any reason to believe that this is not the

24    first occasion in which you recorded in a memorandum that

25    Mr. Young had a conversation about ISIS with the informant, Mo?

1   A.    I'm sorry, could you restate the question?

2   Q.    Do you have any reason to believe that this memorandum

3   you're holding marked DX-5 is not the first occasion in which

4   you drafted a memorandum representing that the informant, Mo,

5   told you he had a conversation with Mr. Young about ISIS?

6   A.    Not that I can recall, no.

7   Q.    You have no reason to believe that this is not the first

8   alleged occasion in which Mo discusses ISIS with Nicholas

9   Young, correct?

10  A.    I'm sorry, I -- could you rephrase the question?

11  Q.    You're the case agent -- the agent handler for Mo, the

12  informant, correct?

13  A.    Yes, absolutely.

14  Q.    So you are familiar with the recorded history of

15  conversations between Mo and Nicholas Young, correct?

16  A.    Yes.

17  Q.    Do you have any reason to believe based on your knowledge

18  as agent handler for Mo that there was any recorded

19  conversation or memorialization of Mo's alleged conversations

20  with Nicholas about ISIS before this date, June 29?

21  A.    I have no reason to believe that Mo recorded any

22  conversations with Nicholas Young about ISIS before this date.

23  Q.    Thank you.  This meeting is not recorded, correct?

24  A.    Not to my knowledge.

25  Q.    Go to DX -- look down in DX-5.  There's a second date,

1    July 6, below the June 29 date.

2              Do you see July 6?  It's in the same exhibit marked

3    DX-5.

4    A.   Yep, I'm just going through it.  I don't see a date.

5    Stand by.

6    Q.   It's about midway, you have to go down the page.

7    A.   6 July?

8    Q.   Yes.

9    A.   Sorry.

10   Q.   So this purports to be a memorialization of a meeting

11   between the informant, Mo, and Nicholas, correct?

12   A.   Yes.

13   Q.   On July 6?

14   A.   It does.

15   Q.   Okay.  Now, does it say whether Mo alleged he had a

16   conversation with Nicholas Young about ISIS?  It does, doesn't

17   it?

18   A.   I have to read it, I'm sorry.

19   Q.   Okay.

20   A.   Please stand by.

21   Q.   I'm not asking you for content.  If you just find the word

22   "ISIS" and see that it alleges that Mr., Mr. Young had a

23   conversation with Mo about ISIS, that's all you need to

24   confirm.

25   A.   Well, I see the comment -- I see the term "ISIS" --

Minichello - Cross                                                    318

1    Q.    Yes.

2    A.    -- but as it reads, it doesn't necessarily say they had a

3    conversation about it in the first section.

4    Q.    What does it say?

5    A.    Do you want me to read the paragraph?

6    Q.    Please.

7    A.    Okay.  "CHS attended prayer" --

8            THE COURT:  Slow down and louder, please.

9            THE WITNESS:  Sorry, Your Honor.  "CHS attended

10   prayer at Sully Adams on 6 July 2014.  CHS met with Young and

11   T.J. in line for food prepared for breaking the day's FSA.

12   Young asked what they thought" -- it's a misspelling -- "about

13   the recent developments with ISIS.  T.J." --

14   BY MR. SMITH:

15   Q.    Stop.  You just read that Young asked about the recent

16   developments with ISIS, correct?

17   A.    Yes.

18   Q.    So this memorandum purports to reflect that the undercover

19   informant, Mo, had a conversation with Nicholas Young about

20   ISIS on July 6, correct?

21   A.    Well, no.  It says that Young asked their opinion on it.

22   It does not talk --

23   Q.    They had a conversation about ISIS according to Mo,

24   correct?

25   A.    Well, I hadn't gotten that far yet.  It says that Young

1   asked him about it.  I don't know whether they had the

2   discussion or not.

3   Q.   It says that Young asked about ISIS on July 6, correct?

4   A.   Yes, correct.

5   Q.   This meeting is not recorded, correct?

6   A.   Not to my knowledge, no.

7   Q.   Okay.  So we've -- so in DX-5, we have June 29 and July 6.

8   On both of those dates, you memorialize that Mo represented to

9   you he had a meeting with Nicholas Young and discussed ISIS on

10  both of those dates, correct?

11  A.   That he met with Nicholas Young and in a second meeting,

12  yes, Young asked him about the recent developments --

13  Q.   And you're testifying you have no reason to believe these

14  are not the first memorializations by you of alleged

15  conversations between Mo and Nicholas Young about ISIS,

16  correct?

17  A.   I don't recall previous memorializations to that effect.

18  Q.   Okay.  They're both not recorded, right?

19            THE COURT:  That's been asked and answered.  Let's

20  move on.

21  BY MR. SMITH:

22  Q.   Please go to DX-6, please.  Do you see this memorandum was

23  drafted by you, correct?

24  A.   Yes, that's correct.

25  Q.   What date does it purport to reflect in a meeting between

1    the informant, Mo, and Nicholas Young?

2    A.   The day of the meeting?

3    Q.   Yes.

4    A.   The first section is unclear.

5    Q.   Do you see July 13 --

6    A.   Then there's a second section --

7    Q.   Do you see July 13, the day July 13 in the document marked

8    DX-6?

9    A.   I see that date listed, yes.

10   Q.   And does this purport -- did you draft this memorandum?

11   A.   Yes.

12   Q.   Does it purport to represent that Mr. Young had a

13   conversation with Mo about ISIS?

14   A.   Let me see.

15   Q.   You just need to look for the word "ISIS," and then you

16   can let me know what it says.

17   A.   Okay.  Sorry, it wasn't highlighted.  I'm going to read

18   through to make sure I don't miss something.

19   Q.   Okay.

20        THE COURT:  No, we're not taking time for people to

21   read.

22        MR. SMITH:  This is the last step, Your Honor.

23        THE COURT:  This has got to be the last one.  This is

24   taking too much time.

25        MR. SMITH:  There is one more document after this.

1          THE COURT:  No, there will not be another one like

2   this.  It's taking too long.

3          MR. SMITH:  Your Honor, it's not like this.

4          THE COURT:  Let's move this.

5          THE WITNESS:  Sorry, Your Honor.

6          THE COURT:  Ask the question; let's get the answer.

7          MR. SMITH:  I'm just waiting for the --

8          THE COURT:  We want the answer, Agent.

9   BY MR. SMITH:

10  Q.   I asked the agent whether on July 13, Mo represented to

11  you that he had a conversation about ISIS with Nicholas Young.

12  A.   Yes.  Mo represented that he had a meeting with Nicholas

13  Young on July 13, and then the second paragraph, it says that

14  Young said that at this point, with the khalifa being declared

15  by ISIS -- IS is Islamic State -- if another person tries to

16  declare khalifa, they should kill him.

17  Q.   Okay.  So we've just discussed DX-5 and DX-6.  DX-5

18  includes dates June 29, 2014 --

19          THE COURT:  That's repetitive.  Let's move on.

20          MR. SMITH:  Your Honor -- okay.

21  Q.   Please turn to the document marked DX-7.  This is the

22  final document we're reviewing on this subject.  It's a series

23  of e-mails in March 2016.  Do you see DX-7?

24  A.   I do.

25  Q.   Can you please turn to -- there's *Jencks* Bates stamps at

1   the bottom of the page that begins JKS.  Do you see those JKS

2   letters?

3   A.   I do, yes.

4   Q.   Do you see JKS, the last digits are 001275?  1275.

5   A.   Here it is.

6   Q.   Do you see the e-mail on March 23, 2016, from Agent

7   Caslen?

8   A.   I do, yes.

9   Q.   He says -- read it to me, please.

10  A.   Just the body?

11  Q.   Just the body of the e-mail.

12  A.   It says, "I think the first one or two were (sic)

13  recorded.  I will get in touch with Cam and a former handler to

14  get the specifics of how many."

15  Q.   Now, you can't testify to what Mr. Caslen was thinking,

16  but this e-mail represents that he reached out to you about the

17  "one or two" that's referenced in the e-mail, correct?  "I

18  think the first one or two weren't recorded"; is that what you

19  said?

20  A.   That's what that read, and it indicates that he may have

21  had the intention of reaching out to both Cam and myself.

22  Q.   Okay.  Please turn to *Jencks* page No. 001342.

23  A.   Sorry.

24  Q.   001342.

25  A.   Yep.  Sorry.  I'm just making -- okay.  I have it here.

Minichello - Cross                                                         323

1   Q.   Do you see the e-mail on March 24, 2016, from Caslen?

2   A.   Yes.

3   Q.   So this e-mail is after the first e-mail we reviewed on

4   March 23, 2016, correct?

5   A.   That would make sense, yes.

6   Q.   Okay.  And what does the March 24, 2016, e-mail from Agent

7   Caslen say?

8   A.   The body reads, "It looks like there were four meets that

9   weren't recorded," then it lists the dates, which are May 31,

10   2014; June 5, 2014; June 9, 2014; and July 12, 2014.

11   Q.   Okay.  So two new dates have been added to the, to the

12   e-mail we reviewed on March 23, correct?  Mr. Caslen first says

13   one or two meetings are not recorded on March 23.  He says he's

14   going to speak to the former handler about it.  That's you,

15   right?

16   A.   Correct, yes.

17   Q.   Then on March 24, Mr. Caslen says there are four meetings

18   that are not recorded?

19   A.   That's correct.

20   Q.   Now, finally turn to *Jencks* 001273.

21   A.   127, I'm sorry, what was the last number?

22   Q.   001273.

23   A.   1273.

24   Q.   Yeah.

25   A.   Okay.

Minichello - Cross                                               324

1   Q.    Do you see an e-mail from -- it begins on the, maybe the

2   page before, 001272.  It's an e-mail dated March 29, 2016.

3   There's a whole bunch of redactions in it, continuing to the

4   next page, but on page *Jencks* No. 001273, do you see a line

5   that says, that adds two more unrecorded dates, unrecorded

6   meetings between -- alleged unrecorded meetings between

7   Mr. Young and the informant, Mo?

8            You'll see a date, June 29, about midway through the

9   page?

10  A.    Okay.  I see where you're talking about.

11  Q.    Okay.  So what does that unredacted line say?

12  A.    It said, "Recordings were not conducted during the

13  meetings on June 29, 2014, or July 13, 2014."

14  Q.    Okay.  So we started on March 23, the e-mail from

15  Mr. Caslen we just reviewed saying there are one or two

16  meetings that are not recorded.  He says he's going to speak to

17  you.  The next e-mail is dated March 24.  He says there are

18  four unrecorded meetings.  Then the final e-mail on March 29

19  says there are two additional unrecorded meetings.  This is

20  within the span of five days, correct?

21  A.    Part of that's correct, yes.

22  Q.    Okay.

23  A.    It doesn't say there were two additional dates, but it

24  does list two additional dates.

25  Q.    Now, on March 29, 2016, one of the additional dates that

Minichello - Cross                                                      325

1   was added was June 29, 2014, correct?

2   A.   That e-mail indicates that there was no meeting during the

3   meeting on June 29, 2014.

4   Q.   That e-mail indicates there was no recorded -- there was

5   no record -- there was no recorded wire of the meeting on June

6   29?

7   A.   It says recordings were not conducted.

8   Q.   Recordings were not conducted.

9        Now, you recall that you agree that June 29, 2014, to

10  the best of your knowledge, is the first recorded time,

11  instance in which the informant, Mo, allegedly had a

12  conversation with ISIS about Mr. Young, correct?

13  A.   No.

14  Q.   You testified earlier that --

15  A.   I don't believe so.  Say that again.  Maybe I missed it.

16  Q.   You testified earlier that June 29, 2014, there was a

17  meeting between Mr. Young and the undercover informant,

18  correct?  That's DX No. 5?

19  A.   I thought you said recording.  I apologize, go ahead.

20  Q.   There was a meeting -- you say there was a meeting on

21  June 29, 2014.  That's DX-5?

22  A.   Yep.

23  Q.   And you agreed that to the best of your knowledge, as

24  agent handler in this case, you're aware of no previous

25  memorializations of Mr. Young allegedly having a conversation

1   about ISIS with Mo, correct?

2   A.    Before the June 29 date.

3   Q.    Before the June 29 date.

4   A.    I don't recall any, no.

5   Q.    You testified earlier that you have no reason to believe,

6   there were no earlier memorializations earlier than June 29,

7   2014, reflecting an alleged conversation about ISIS between

8   Nicholas Young and Mo?

9          MR. GIBBS:  Judge, if he testified to that before,

10  it's asked and answered.

11         THE COURT:  Sustained.

12         MR. GIBBS:  Thank you.

13  BY MR. SMITH:

14  Q.   Mr. Minichello, I'd like to talk to you about compensation

15  of the informant, Mo.  So you've testified he was paid over

16  $30,000 to report on Nicholas, correct?

17  A.    Yes, that's correct.

18  Q.    And he was compensated, Mo, for results, correct?

19  A.    He was compensated for a number of things.  Usually we pay

20  sources, as we did in the case of Mo, for expenses incurred, if

21  they have any during the course of their operations, as well as

22  for the services rendered, their time spent, activities that

23  they conduct in our behalf.  We compensate them for that.

24  Q.    So was the compensation tied to performance evaluation in

25  any respect?

1   A.   No, not necessarily.  We will discontinue sources if we

2   feel that they are not performing.

3   Q.   You instructed Mo that he would be paid for results in

4   discussing ISIS with Nicholas, correct?

5   A.   No, I don't recall that.

6   Q.   No?  You instructed Mo to raise the subject of ISIS with

7   Nicholas?

8   A.   I don't recall the exact task we related to that.  We, I'm

9   sure, would have instructed him that if the subject came up, it

10  would be of interest to us.

11  Q.   If the subject came up, it would be of interest to you,

12  but did you instruct Mo to raise the subject of ISIS with

13  Nicholas?

14  A.   I can't remember the exact time I would have done that.

15  It's possible, though.

16  Q.   It's possible.

17       You testified earlier that Mo began recording

18  conversations without you instructing him to.  When was that?

19  A.   Prior to his being tasked to engage Mr. Young, he had

20  conducted a recording untasked by us of a meeting with some

21  other subjects.

22  Q.   And did you investigate?

23  A.   I'm sorry, I don't understand.

24  Q.   When did you find out that Mo was recording conversations

25  without your instructing him to?

Minichello - Cross                                                    328

1    A.   There's only one instance, and I can't remember the exact

2    date, but it was before he was tasked as Mr. Young.

3    Q.   So when you found out that he was recording conversations

4    without instructing him to, did you investigate why Mo was

5    doing that?

6    A.   Well, there wasn't any need to investigate it.  Mo told us

7    that he had conducted a recording.  It's not illegal to do that

8    by any means.  We prefer that sources use FBI devices for

9    recording purposes because they are controlled, we can attest

10   to their veracity after the fact, but it's by no means criminal

11   for him to have done so.

12            So after we determined that it occurred, after the

13   source told us, "Hey, I made a recording," we instructed him

14   not to do that in the future and to only do task recordings for

15   us.

16   Q.   So you testified that Nicholas first met Mo in May 2014,

17   correct, to the best of your knowledge?

18   A.   Yes.

19   Q.   But he was -- Nicholas Young was a subject of interest to

20   the Counterterrorism Division of which you are a part before

21   May 2014, correct?

22   A.   Yes, he was.

23   Q.   Mr. Young met the undercover agent, Khalil, in December

24   2010, correct?

25   A.   I don't recall.

1    Q.    A counterterrorism investigation into Nicholas was opened

2    in September 2010, correct?

3    A.    I can't remember the exact date.

4    Q.    In 2010, it was opened?

5    A.    I can't recall.  I believe that's accurate, but I can't

6    recall the exact date.

7    Q.    Okay.  Before Mr. Young met the undercover informant, Mo,

8    he had traveled to Libya in 2011, correct?

9    A.    I know that Mr. Young had traveled to Libya.  I do not

10   know the dates of that.

11   Q.    But the Bureau understood, the counterterrorism section

12   understood that Mr. Young had traveled to Libya in 2011,

13   correct, before he met Mo?

14   A.    I can't attest to the dates, but yes, he had traveled to

15   Libya.  I was aware of that.

16   Q.    The Bureau understood that Mr. Young carried a firearm

17   routinely as a part of his work with Metro Transit Police,

18   correct?

19   A.    I believe that's accurate, yes.

20   Q.    They understood these facts between 2011 and May 2014,

21   when Mo first met Nicholas, correct?

22   A.    Yes.

23   Q.    Did you instruct Mo to meet Nicholas, encounter Nicholas,

24   and report on Nicholas at any point before May 2014?

25   A.    I don't recall.  I don't believe so.  That meeting

1    occurred not at our direction, as I recall.  I don't believe I

2    tasked him to meet with --

3    Q.   Well, you testified to the best of your knowledge, the

4    first time Mr. Young met the informant, Mo, was in May of 2014,

5    correct?

6    A.   Correct.  I can't see why I would have tasked him to do

7    that.

8    Q.   You did not -- you did not task Mo to report on Nicholas

9    at any point between 2010, when the investigation opened, and

10   2014, correct?

11   A.   I do not recall, no.

12   Q.   Now, the Bureau understood that Mr. Young made a second

13   trip to Libya in September 2011, correct?  There was one trip

14   in May of 2011.  There was a second trip in September of 2011,

15   correct?

16   A.   I'm sorry, I cannot attest to those dates.

17   Q.   After Mr. Young returned from Libya, the Bureau attempted

18   to recruit Nicholas as an undercover informant, correct?

19   A.   I can't attest to that either.

20   Q.   You don't know whether Mr. Young was recruited as an

21   undercover informant?

22   A.   I'm sorry?

23   Q.   You don't know whether Mr. Young was recruited by the

24   Counterterrorism Section as an undercover informant?

25   A.   To my knowledge, he was not recruited as a CHS.

1    Q.    He was not?

2    A.    Correct.

3    Q.    Okay.

4          THE COURT:  Ladies and gentlemen, I do want you to be

5    aware that when the lawyers make a statement of fact in a

6    question, if the witness says, "I don't remember," "I can't

7    recall," or "I don't know," the lawyer's question is never

8    evidence.  It's only the answer that a witness provides that's

9    the evidence, so be very careful in understanding the

10   difference between that.

11         MR. SMITH:  I'm keeping the papers off the lectern

12   here so I don't -- okay.

13   Q.    I'm handing up a document that we will mark as Defense

14   Exhibit 8.

15   A.    Thank you, sir.

16   Q.    Now, that's a, what you call a 302 memo, right?

17   A.    It is, yes.

18   Q.    What's a 302 memo?

19   A.    It is a document that reports factual information to the

20   best of our knowledge that we've recorded through an interview

21   or other means -- other investigative activities we conduct in

22   the FBI.

23   Q.    Okay.  So before you review this document, you've

24   testified, to be clear, that you were unaware that the

25   Counterterrorism Section has attempted to recruit Mr. Young as

1    an informant?

2    A.    Correct.

3    Q.    Okay.  What is the date on that 302?

4    A.    It is dated September 29, 2011.

5    Q.    Okay.  Can you turn to the last page of the memorandum?

6    Excuse me, first tell me, what agent was interviewing Mr. Young

7    on September -- well, what is the agent's name at trial?

8    A.    I'm sorry, I don't understand the question.

9              THE COURT:  Wait, wait, wait, wait, wait.

10             MR. GIBBS:  Can we approach?

11             THE COURT:  Yes.

12             (Bench conference on the record.)

13             MR. GIBBS:  Judge, I believe that the answer is going

14   to be one of the FBI witnesses whose identity is protected, but

15   I'm not -- I mean, I think at a minimum, he needs to be asked

16   as a leading question, but this is a document from 2011 that he

17   didn't author.  I'm not quite sure where we're getting with

18   the --

19             THE COURT:  You need to ask him has he ever seen that

20   document before.  He's already testified he doesn't know.  His

21   involvement appears to be from 2014 on.  You cannot let this

22   name get revealed, so I think this line of questioning should

23   stop.  You should be able to get this from another witness.

24             MR. SMITH:  Okay.  Well, it might depend, Your Honor,

25   depending on -- we don't know exactly who's going to testify

1   for the government.  We have never received a witness list.

2          THE COURT:  You've got a list right here.

3          MR. SMITH:  The government actually refuses to give

4   us an exhibit list.

5          MR. KROMBERG:  I provided the names directly to

6   Ms. Moreno, and I announced it in open court yesterday for all

7   the world to hear.

8          THE COURT:  All right, let's move this along.  This

9   agent is not going to help you on this point.

10          MR. SMITH:  Okay, okay.  Fine.

11          THE COURT:  By the way, you've got to let the witness

12   finish the answer.  You're keeping him -- this transcript is

13   going to be a complete piece of garbage.  You have to wait

14   until the witness finishes answering.

15          MR. SMITH:  Sometimes I can't hear him, Your Honor.

16          THE COURT:  I'm sorry?

17          MR. SMITH:  Sometimes I can't hear him.

18          THE COURT:  Well, then tell him to speak up.  I've

19   been having problems, too, all right?

20          (End of bench conference.)

21   BY MR. SMITH:

22   Q.   Mr. Minichello, you were Mo's agent handler, so you were

23   following the conversations that the informant, Mo, alleged he

24   had with Nicholas throughout the course of the investigation

25   while you were the agent handler for Mo, correct?

1   A.   That's correct, yes.

2   Q.   Were you aware -- did you review any alleged

3   communications between Mr. Young and Mo in which Mo represented

4   that Nicholas had ever actually spoken to anyone in ISIS?

5   A.   I'm sorry, could you repeat the question?

6   Q.   In reviewing Mr. Young's alleged conversations with Mo

7   through recordings or through debriefings, did you ever come to

8   learn that Nicholas Young had ever spoken to anyone actually in

9   ISIS, any members of ISIS?

10  A.   Sorry, I'm thinking.  Give me a second.

11       I can't recall having any statements where he said he

12  had contacted somebody directly in ISIS.

13       THE COURT:  Ladies and gentlemen, are any of you

14  having trouble hearing the witness?

15                      (Jurors nodding heads.)

16       THE COURT:  You are.

17       THE WITNESS:  I'm sorry.

18       THE COURT:  You've got to speak up.  I don't know how

19  many times I have to say that, all right?

20       THE WITNESS:  I keep trailing off.  I apologize.

21  BY MR. SMITH:

22  Q.   So you're unaware of the defendant ever actually speaking

23  to ISIS during the course of your investigation with Mo between

24  May of 2014 and August of 2016; is that correct?

25  A.   That's correct.

1   Q.   So you continued to instruct Mo to discuss ISIS with

2   Nicholas Young when you had no information that he was speaking

3   to anyone in ISIS, correct?

4   A.   That's correct.

5   Q.   Now, you've testified about some e-mails that were sent

6   from someone pretending to be Mo in Turkey but who was not

7   actually Mo.  It was an agent, correct?

8   A.   No, incorrect.  Those e-mail communications were a

9   collaborative effort between myself and Mo.

10          THE COURT:  Agent, speak up.

11          THE WITNESS:  That is incorrect.  Those e-mail

12  communications were a collaborative effort between myself and

13  Mo, so to say that they were not from Mo is inaccurate.

14  BY MR. SMITH:

15  Q.   Okay.  So the first -- you've represented that the first

16  e-mail that was a collaborative effort between you and Mo to

17  Nicholas Young after Mo pretended to leave the United States on

18  October 25, 2014, was an e-mail dated October 27, 2014,

19  correct?

20  A.   No.  Mo did leave the country.  We both traveled to

21  Turkey.

22  Q.   No, no, I'm saying -- my question is you were representing

23  that the first communication for Mo to Nicholas Young after Mo

24  left the country -- after the person pretending to be Mo left

25  the country was dated October 27, 2014, correct?

1    A.   Okay.  To be clear, Mo left the country, not pretending to

2    be Mo.  Mo left the country, as did I, and --

3    Q.   Well, his name is not actually Mo.

4    A.   Understood.  So just to be clear, yes, the person we're

5    talking about as Mo left the country with me, and then from

6    Turkey, we sent that first e-mail.  The collaborative effort

7    that was that e-mail, we sent it back to Nicholas Young.

8    Q.   Did Nicholas respond to that e-mail?

9    A.   To the series of e-mails, yes, but there was a delay in

10   the time between that e-mail was sent and the time that he

11   replied.

12   Q.   How long was the delay?

13   A.   How long was the delay?

14   Q.   Yes.

15   A.   You know, I don't remember the exact date that he replied,

16   but I believe it was in December of 2014.

17   Q.   So you wrote him an e-mail in October, after Mo left the

18   country, and he doesn't respond to it for three months, right?

19   A.   Not three months, but there is a delay, yes, as I

20   discussed.

21   Q.   Okay.  So the process -- the process by which you created

22   these e-mails, you said initially it was collaborative between

23   yourself and the undercover informant, Mo.  It was

24   collaborative for that October 27 e-mail from Turkey, right?

25   A.   There were three e-mails that were done collaboratively

1    with the source, the ones I discussed earlier.

2    Q.   Right.  But actually, the agents were all communicating

3    with each other by e-mail how to solicit Nicholas Young to

4    discuss ISIS, correct?

5    A.   There were communications about how to solicit -- how to

6    deal with messages to Nicholas Young, as I recall, yes.

7    Q.   And those solicitation communications were about the same

8    time that -- about the same time that you're e-mailing

9    Mr. Young about Mo being in ISIS, correct?

10   A.   I don't recall which ones you're referring to, but if you

11   can point me to one?

12   Q.   I will.

13   A.   Thank you.

14          MR. SMITH:  Here it is.  All right.

15          I'm handing up a document marked Defense Exhibit --

16   the last one was 9, correct?

17          THE COURT:  The last one was 8.

18          MR. SMITH:  The last one was 8?  So this will be

19   Defense Exhibit 9.

20          MR. GIBBS:  Nick, can I take a look at it?

21          MR. SMITH:  Do you want to take a look at it?

22          MR. GIBBS:  Yeah.

23          Your Honor, we object to this line of questioning.

24   This goes back to the objection we had earlier about the

25   process of creating some of these e-mails.  This appears to be

1  a --

2          THE COURT:  Is this agent-to-agent discussions?

3          MR. GIBBS:  They are, but it's after Agent Minichello

4  left the squad, and he is not included in those communications.

5          THE COURT:  I'll sustain the objection.

6          MR. GIBBS:  Thank you.

7          THE COURT:  Move on.

8          MR. SMITH:  So if the defense understands correctly,

9  there will be an additional witness on the subject matter of

10 communications --

11         THE COURT:  Let's move on.  We're not asking

12 questions about the trial.  Do you have any more questions for

13 this witness?

14         MR. SMITH:  I do have one final list of questions

15 here.

16 Q.   Now, Mr. Minichello, you learned from Mo on several

17 occasions that Nicholas Young was pushing back against Mo's

18 conversations about ISIS, correct?

19 A.   No, but can you point me to a particular discussion that

20 you're referring to?

21         THE COURT:  I'm sorry, this has to stop.  You're

22 rattling your papers.  You did it while you were asking the

23 question, which made it hard to hear, and you're doing it while

24 the witness is answering, all right?  All right, ask the

25 question again.

1   BY MR. SMITH:

2   Q.   Mr. Minichello, there came a time when you learned from Mo

3   that Nicholas Young was pushing back against Mo's efforts to

4   discuss ISIS, correct?

5   A.   I don't recall that, but if you can point me to a

6   particular document, I can --

7   Q.   I will.

8   A.   -- talk about it.

9   Q.   I will.  Didn't Mo tell you --

10          THE COURT:  Jurors can't hear you again, Agent.

11          THE WITNESS:  I apologize.

12          THE COURT:  I don't know what to say.

13          THE WITNESS:  I'm losing my voice.  Sorry.

14          THE COURT:  Lean right into that microphone, and

15   speak up.

16          THE WITNESS:  Yes, ma'am.

17   BY MR. SMITH:

18   Q.   On September 11, 2014, didn't you reflect that Nicholas

19   Young told Mo, "I saw Baghdadi's mug shot on the news, and I

20   was like, oh, they sound like a bunch of criminals who are

21   hungry for power and money"?

22   A.   I don't recall.

23   Q.   You don't recall ever hearing that comment?  That doesn't

24   stick out in your mind?

25   A.   It doesn't stick out in my mind.  I'm not saying it didn't

Minichello - Cross                                                340

1    happen.  I just don't recall to put it to a date.

2    Q.   Specifically or you don't recall it ever having been said?

3    A.   I don't recall.  I'm sorry, I don't remember exactly that

4    comment, but I would have probably documented something like

5    that.

6    Q.   So I'm going to hand up a document marked Defense

7    Exhibit -- is this 10?

8           THE COURT:  Does the government need to see this

9    exhibit, or are you all right with it?

10          MR. GIBBS:  Let me take a quick look.  Is this the

11   transcript?

12          MR. SMITH:  This is the transcript.

13          MR. GIBBS:  Thank you, Judge.

14          THE COURT:  All right.

15   BY MR. SMITH:

16   Q.   That's a memorandum called the 1057 memorandum, correct?

17   A.   That's correct, yes.

18   Q.   And can you turn to page 12 of that memorandum?  Well,

19   first, tell me, this is a reflection of a recording that was

20   made on September 11, 2014, correct?

21   A.   Stand by.  Let me take a look.

22   Q.   Okay.

23   A.   Sorry.  If you know where I'm looking for that, feel

24   freely to steer me in the --

25   Q.   Looking at page 12, there's a sticky note there that says

1   "Baghdadi."

2   A.   There are separate -- there are separate 1057s up here.

3   Which one are you referring to?

4   Q.   The September 11, 2014, 1057, and it's on page 12 of that

5   document.

6   A.   On the entire pile?

7   Q.   Well, yeah.  If you look at the bottom of the page, there

8   are page numbers, and it says page 12.

9   A.   But there are duplicative page numbers, that's all.  I'll

10  find it.  Sorry.

11          Okay.  Here's a page 12, and, I'm sorry, your

12  question was?

13  Q.   Do you see where -- do you recall Mo informing you that

14  Mr. Young said on September 11, 2014, "I saw Baghdadi's mug

15  shot on the news, and I was like, oh, they sound like a bunch

16  of criminals who are hungry for power and money"?  Do you

17  remember reviewing that, that recording?

18  A.   Not in particular, but I'm sure it would have been

19  recorded and have a transcript done for it.

20  Q.   Do you recall Mo telling you or listening to a recording

21  reflecting that Nicholas told Mo on September 11, 2014, if he

22  ever heard someone was going to blow up the subway, you need

23  Nicholas's help to stop them?  Do you remember learning that?

24  A.   No, I don't recall those particular events.  Not that they

25  weren't recorded.  I just don't recall them offhand.

1   Q.   Did there come a time that you learned that Mo was having

2   a conversation with Nicholas on September 11, 2014, and when Mo

3   said he wanted to help militant Islam, Nick said, "Why now?"

4   A.   I'm sorry, do you want me to reference the transcript and

5   tell you what was recorded or what I recall?

6   Q.   Do you have any reason to believe --

7   A.   I do not -- I want to be clear.  I don't recall --

8            THE COURT:  Stop.  This is not proper.  You're trying

9   to read the transcript in.  We've got the recordings.  Play the

10  recordings, but asking this witness what he remembers or

11  doesn't remember is not proper.  We're stopping the cross

12  unless you have something new to go into.

13           Anything else?

14           MR. SMITH:  We're finished, Your Honor.

15           THE COURT:  All right.  Any redirect?

16           MR. GIBBS:  Briefly.  I want to redirect on the

17  transcript.

18           Can I take a look at it?

19           THE COURT:  Do you need the exhibit?

20           MR. GIBBS:  I do.  I need the exhibit that has that

21  Baghdadi comment on it.

22                          REDIRECT EXAMINATION

23  BY MR. GIBBS:

24  Q.   All right, Special Agent Minichello, I'd like to hand this

25  document back up to you.

1    A.    Thanks.

2    Q.    Sir, this is the document you just testified about related

3    to al-Baghdadi.

4            MR. SMITH:  Your Honor, objection.  The Court just

5    ruled that this testimony --

6            THE COURT:  If we have this conversation recorded,

7    the best evidence is for the jury to hear it.

8            MR. SMITH:  Correct.

9            THE COURT:  So I'm going to do the same to the

10   government that I did to defense.  Let's move on.  This is --

11           MR. GIBBS:  Judge, I don't have it cued up.  I just

12   want him to read about three lines from that.

13           THE COURT:  No, I've sustained the objection.

14   BY MR. GIBBS:

15   Q.    Special Agent Minichello, you were asked on cross about

16   some of the reporting of Mo, and there were some names that

17   came up there.  Do you recall the name Peshwaz?

18   A.    I do.

19   Q.    And who is Peshwaz?

20   A.    Peshwaz Waise is who that's referring to, and he's a -- he

21   was another investigative subject of the FBI.  I really do

22   apologize; I'm losing my voice.  Peshwaz Waise is who I was

23   referring to, and he was another investigative subject --

24   counterterrorism subject of the FBI at that time.

25   Q.    All right, if you can take a look at Government Exhibit

1   9-106?

2   A.   I'm sorry, is it in that folder?

3           THE COURT:  9-106?

4           MR. GIBBS:  Correct, Judge.

5           THE COURT:  Do we have the exhibit folder?

6           MR. GIBBS:  And also, while we're up, 9-107, the

7   second one.

8           And, Judge, if there's no objection to the pictures

9   of Peshwaz and also T.J. Singh, who is the other person?

10          THE COURT:  All right, any objection to 106 or 107?

11          MR. SMITH:  No, Your Honor.

12          THE COURT:  All right.

13          MR. GIBBS:  We would publish 9-106, please.

14          THE COURT:  They're both in.

15          (Government's Exhibit Nos. 9-106 and 9-107 were

16  received in evidence.)

17  BY MR. GIBBS:

18  Q.   And who -- you were testifying about Peshwaz.  Who is, who

19  is on the screen?

20  A.   9-106 is Peshwaz Waise.

21  Q.   And what was his relationship with the defendant, Nick

22  Young?

23  A.   Peshwaz Waise was a friend and appeared to be a confidante

24  of Nicholas Young.

25  Q.   And then if we can go to 9-107?  Who is that?

Minichello - Redirect                                          345

1    A.    9-107 is Tejpal Singh.

2    Q.    Who is he?

3    A.    He is another friend of both Peshwaz and Nicholas Young,

4    and we quite often referred to him as T.J.

5    Q.    Okay.  And what's his relationship with Nicholas Young?

6    A.    Again, he appears to be a friend and confidante of

7    Nicholas Young.

8              MR. GIBBS:  All right.  Thank you, Judge.  That's all

9    I've got.

10             THE COURT:  All right.  Any recross, Mr. Smith?

11                       RECROSS EXAMINATION

12   BY MR. SMITH:

13   Q.    Mr. Minichello, you just testified about Peshwaz.  You

14   testified that he was a confidante of Mr. Young's, correct?

15   A.    Yes.

16   Q.    Do you know whether Peshwaz had Mr. Young's phone number?

17   A.    I don't recall if he did or not.

18   Q.    He didn't have?  Peshwaz did not have Mr. Young's phone

19   number, did he?  You have Mr. Young's cell phone, correct?

20   A.    I don't personally.  I don't recall if we have that number

21   or not.

22   Q.    It was seized as part of the seizure raid of Mr. Young's

23   home in October -- August 2016?

24             MR. GIBBS:  Judge, the witness has already said he

25   doesn't know the answer to this question.

1          THE COURT:  Sustained.

2          MR. SMITH:  That's it, Your Honor.

3          THE COURT:  All right, thank you.

4          Now, it's not the Court's practice to have witnesses

5   recalled in the direct examination.  I see that this witness's

6   name appears again on the list.  Are you really planning to

7   recall him?

8          MR. GIBBS:  We are, Judge.  This witness comes up at

9   the end on the day of the arrest, and he's involved in the

10  post-arrest interview, so for purposes of the chronology of the

11  case, we've done it that way.

12         THE COURT:  All right.  Then, Agent Minichello, you

13  are not excused as a witness.  That means you cannot be in

14  court, and you're not to discuss your testimony with anyone,

15  but the next time you're in court, you'd better have a better

16  voice, all right?

17         THE WITNESS:  I understand, Your Honor.

18                         (Witness stood down.)

19         THE COURT:  All right.  Ladies and gentlemen, we need

20  to take a five-minute recess because we have to put the screen

21  back up, so you'll get a chance to stretch your legs for just a

22  couple of minutes, but don't leave the jury room because we're

23  going to get you right back in here.

24         We'll recess court.

25         (Recess from 2:28 p.m., until 2:37 p.m.)

1                          (Defendant and Jury present.)

2              THE COURT:  Call your next witness.

3              MR. GIBBS:  We call Mo, Your Honor.

4                  MO, GOVERNMENT'S WITNESS, AFFIRMED

5                          DIRECT EXAMINATION

6    BY MR. GIBBS:

7    Q.   Good afternoon, sir.

8    A.   Hello.

9    Q.   Sir, the name that you are testifying under today is Mo,

10   correct?

11   A.   That is correct.

12   Q.   And that's the name that the defendant knew you as?

13   A.   That is correct.

14   Q.   Now, sir, in 2013, did you begin working as an FBI source

15   here in Northern Virginia?

16   A.   Yes.

17   Q.   And what time of year was that?

18   A.   I started back in August 2013.

19   Q.   Were you living in Northern Virginia at that time?

20   A.   Correct.

21   Q.   And were you paid in your role as an FBI source?

22   A.   Yes.

23   Q.   Now, when you started working as a source, were there

24   particular FBI agents that you worked with?

25   A.   Yes.

Mo - Direct                                                              348

1    Q.    And who were they?

2    A.    Agent John Minichello and Cameron.

3    Q.    Do you know Cameron's last name?

4    A.    I don't recall.

5    Q.    Now, did there come a point in time during your work as an

6    FBI source that you met the defendant, Nicholas Young?

7    A.    Yes.

8    Q.    And when did you and the defendant first meet?

9    A.    May of 2014.

10   Q.    Is the defendant here in court today?

11   A.    Yes.

12   Q.    All right, can you just point him out and indicate what

13   he's wearing?

14   A.    He's wearing a blue navy suit.

15            THE COURT:  Any objection to the identification?

16            MS. MORENO:  No objection.

17            THE COURT:  All right, the witness has identified the

18   defendant.

19   BY MR. GIBBS:

20   Q.    Now, Mo, did you ever learn where the defendant lived?

21   A.    I've never been to his house, no.

22   Q.    But did you know where he lived?

23   A.    Yes.

24   Q.    And where did he live?

25   A.    In the Fairfax area.

1  Q.    And you said you never went to his house?

2  A.    No, sir.

3  Q.    And did he ever come to your house?

4  A.    No.

5  Q.    Now, at some point after working with the FBI as a source

6  for a period of time, did the FBI get you to start recording

7  your meetings with the defendant?

8  A.    Yes.

9  Q.    And did they provide you with FBI equipment in order to do

10 that?

11 A.    Correct.

12 Q.    And when was that?

13 A.    July of 2014.

14 Q.    And from the point when the FBI provided you with the

15 recording equipment to record your meetings with the defendant,

16 did you always record your meetings with him?

17 A.    Yes.

18 Q.    And, sir, I believe there are some discs on the stand up

19 there with you.  Do you see those?

20 A.    Yes.

21        MR. GIBBS:  All right.  And, Your Honor, at this

22 time, I'd like to have the witness identify the first one.  I

23 believe it's Exhibit 6-101-2T, dated July 27, 2014.

24 Q.    Do you see that?

25 A.    6-101-2?

1   Q.   Yep.

2   A.   Yes.

3   Q.   And do you recognize that disc?

4   A.   I do.  It's got my initial on it.

5   Q.   Is that how you recognize it?

6   A.   Yes.

7   Q.   And prior to coming to court today, did you listen to a

8   number of discs and initial them with, with putting your

9   initials on it?

10  A.   I have.

11  Q.   And did you also compare what's on the recording with the

12  transcript for accuracy?

13  A.   Yes, I have.

14  Q.   And when you did that, did you have an opportunity to make

15  any corrections on the transcript that you caught?

16  A.   I did.

17          MR. GIBBS:  All right.  Your Honor, at this time, we

18  would move in Government Exhibit 6-101-2.  We would ask --

19          THE COURT:  Any objection?  Any objection?

20          MR. SMITH:  One moment, please.

21          No objection.

22          THE COURT:  Whose witness is this?

23          MR. SMITH:  This is my witness, Your Honor.  No

24  objection.

25          THE COURT:  All right, it's in.

1           (Government's Exhibit No. 6-101-2 was received in

2     evidence.)

3           MR. GIBBS:  And, Your Honor, we would ask to play

4     that disc along with the transcript, which is 6-101-2T.

5           THE COURT:  All right, go ahead.

6           (Government's Exhibit No. 6-101-2 was played.)

7     BY MR. GIBBS:

8     Q.   Now, Mo, in that clip, the defendant said, "People don't

9     look favorably towards, like, the Islamic State."  Now, had you

10    and the defendant already been talking about the Islamic State

11    by July 27 of 2014?

12    A.   Yes.

13    Q.   And also in that clip, the defendant used the term "the

14    new Caliphate."  What is "the new Caliphate"?

15    A.   He's referring to the Islamic State.

16    Q.   Is that also what's known as ISIS?

17    A.   Yes.

18    Q.   And then at page 2 of the transcript, when the defendant

19    brought up Abu Bakr, did you know who that was?

20    A.   Yes.

21    Q.   And who is Abu Bakr?

22    A.   He's the ruler of ISIS.

23    Q.   And what role, if any, did Abu Bakr have in declaring that

24    ISIS was the new Caliphate?

25           MR. SMITH:  Objection, Your Honor.

1           THE COURT:  If you know.  Overruled.  Only if you

2   know.

3           THE WITNESS:  Can you state the question?

4   BY MR. GIBBS:

5   Q.   Sure.  What role, if any, did Abu Bakr have in declaring

6   that ISIS was the new Caliphate?

7   A.   He went on stand and declared in front of thousands of

8   people that he's the new ruler.

9   Q.   And when did he declare the new Caliphate?

10  A.   It was during Ramadan of 2014.

11  Q.   And what time of year does Ramadan generally fall in?

12  A.   It was around June.

13  Q.   All right.  So not too far before this particular

14  recording?

15  A.   No.

16  Q.   All right.  Next if you could take a look at the disc at

17  6-102-2?

18  A.   Okay.

19  Q.   Do you recognize that?

20  A.   Yes.

21          MR. GIBBS:  And we would ask to move that in and play

22  the transcript that accompanies this, which is 6-102-2T.

23          THE COURT:  Any objection?

24          MR. SMITH:  Your Honor, no objection to the disc.  We

25  object to the government's summaries of the audio recordings,

1    which were never produced to the defense and reflect the

2    government's --

3            THE COURT:  We're just cueing up the transcript of

4    the tape right now; is that correct?

5            MR. GIBBS:  Correct.

6            MR. SMITH:  It's the government's understanding of

7    the --

8            THE COURT:  Excuse me, you need to be on your feet

9    when you're speaking.

10           MR. SMITH:  Your Honor, we believe it's the

11   government's understanding of the transcript rather than an

12   agent's summary of the transcript.  This is a summary that the

13   government's attorneys have drafted.

14           THE COURT:  Ladies and gentlemen, let me just tell

15   you what the real evidence is in a case that involves any type

16   of recording.  It's what you are able to hear on the recording,

17   the actual voices speaking.  That's the evidence.

18           Transcripts are prepared solely as an aid to help you

19   listen, but if you, if you detect any difference between the

20   transcript and what you're hearing, you have to go with what

21   you hear, and if the transcript says something and you don't

22   hear that on the tape, then you have to disregard the

23   transcript, all right?

24           Let's play it.

25           MR. GIBBS:  Thank you, Judge.

Mo - Direct                                                              354

1              (Government's Exhibit No. 6-102-2 was received in

2    evidence and played.)

3    BY MR. GIBBS:

4    Q.   Sir, in that recording, the defendant talked to you about

5    being careful, and he said, "I look at tons of stuff on the

6    Internet."  We'll get back to this in a bit, but did the

7    defendant ever show you some ISIS videos at some point?

8    A.   Yes.

9    Q.   And later in that recording, the defendant suggested to

10   you about going on a tour group and having a printed itinerary.

11             MR. SMITH:  Objection, Your Honor.  Leading.

12             THE COURT:  Sustained.

13   BY MR. GIBBS:

14   Q.   Who came up with the idea in that recording of going with

15   a tour group and having a printed itinerary?

16             MR. SMITH:  Objection.  Best evidence.

17             THE COURT:  No, overruled.

18   BY MR. GIBBS:

19   Q.   Whose idea was that to go with a tour group and have a

20   printed itinerary?

21   A.   Nick.

22   Q.   And at the end of that recording, he told you that you

23   can't carry more than $10,000.  Who was the first person to

24   tell you about this $10,000 currency limit?

25   A.   Nick did.

1  Q.   The defendant?

2  A.   Correct.

3       MR. GIBBS:  Your Honor, if we could turn to -- and,

4  sir, if you could take a look at 6-103-2?  And we would offer

5  that into evidence and ask to play it along with 6-103-2T.

6       MR. SMITH:  No objection.

7       THE COURT:  All right, it's in.

8       (Government's Exhibit No. 6-103-2 was received in

9  evidence and played.)

10 BY MR. GIBBS:

11 Q.   Now, sir, at the beginning of that clip, the defendant

12 told you to lose the phone and take the battery out.  Did you

13 know what he meant by that?

14 A.   To put my phone away.

15 Q.   And how frequently would the defendant tell you to do

16 things like that?

17 A.   A few times.

18 Q.   And later, the defendant told you about a brother who

19 moved down here who was in the Marines.  Who first told you

20 about that brother in the Marines?

21 A.   The defendant.

22 Q.   And how about the Moroccan guy he said who got arrested on

23 terrorism charges?  Who first told you about him?

24 A.   The defendant.

25 Q.   And at one point, the defendant said that he had been

1    interviewed by the feds a few times.  When was the first time

2    the defendant told you that?

3    A.   That was the first time.

4    Q.   In that recording we just heard?

5    A.   Correct.

6    Q.   And he also told you that they try to get you with, like,

7    financial stuff.  In your dealings with the defendant, how

8    often did you offer him financial stuff?

9    A.   None.

10   Q.   How often did the FBI task you to offer him financial

11   stuff?

12   A.   Never.

13           MR. GIBBS:  Your Honor, if we could turn to 6-103-3?

14   Q.   Do you see that there, sir?

15           THE COURT:  Any objection?

16           MR. SMITH:  No objection.

17           THE COURT:  All right, it's in.

18           (Government's Exhibit No. 6-103-3 was received in

19   evidence.)

20           MR. GIBBS:  We'll ask to move that in and play that

21   with the transcript, please.

22           THE WITNESS:  I see that.

23           (Government's Exhibit No. 6-103-3 was played.)

24   BY MR. GIBBS:

25   Q.   Now, sir, in the recording we just heard, the defendant

1  said, "If you go to Morocco, how are you going to get to Syria

2  or Iraq?"  At this point in September of 2014, where was ISIS's

3  territory located?

4              MR. SMITH:  Objection.

5              THE COURT:  If you know.

6              THE WITNESS:  Iraq and Syria.

7  BY MR. GIBBS:

8  Q.   And do you recall in that recording the defendant

9  mentioning to you that you should get an Associated Press job

10 or a journalist-type badge?

11 A.   Correct.

12 Q.   Who came up with the idea of getting an Associated Press

13 job or a journalist-type badge?

14 A.   The defendant.

15             MR. GIBBS:  Next if we could turn to 6-103-5 and 5T?

16 It's another disc dated September 11, 2014.  If we could play

17 that?

18             THE COURT:  Any objection?

19             MR. SMITH:  No objection, Your Honor.

20             THE COURT:  All right, it's in.

21             (Government's Exhibit No. 6-103-5 was received in

22 evidence and played.)

23             MR. GIBBS:  Now, if we can go straight to the next

24 clip, which is also on that date, 6-103-6?

25             THE COURT:  Any objection?

1                MR. SMITH:  No objection.

2                THE COURT:  All right, it's in.

3                (Government's Exhibit No. 6-103-6 was received in

4    evidence and played.)

5    BY MR. GIBBS:

6    Q.   Now, sir, in the first clip we heard, the defendant asked

7    if you had watched the latest Light Revival and Light Reloaded

8    videos, and then he said, "That's why I brought this, so I'll

9    show you it."  What did the defendant actually bring you to

10   show?

11   A.   The ISIS-produced video.

12   Q.   And what did he bring to play it on?

13               MR. SMITH:  Objection.

14               THE COURT:  What's the basis for the objection?  On

15   your feet, please.

16               MR. SMITH:  The basis is personal knowledge of how

17   the video was created and by whom the video --

18               THE COURT:  That wasn't the question, I don't

19   believe.

20               MR. GIBBS:  No, the question was what did he bring to

21   play it on.

22               THE COURT:  What was the device upon which it was

23   going to be played.

24               MR. SMITH:  It was the question before that about --

25               THE COURT:  Well, you objected to this question.

1  Overruled.

2  BY MR. GIBBS:

3  Q.   And what did the defendant bring to play the video on?

4  A.   I can't recall.

5  Q.   But did you actually watch some videos with the defendant

6  that day?

7  A.   Yes.

8  Q.   And in the second clip, the defendant said, "Hicham and

9  T.J., like, watch these a lot."  Who is Hicham?

10  A.   Hicham is a friend of the defendant.

11  Q.   Do you know his -- well, Your Honor, at this time, I'd

12  like to read Stipulation No. 19 into the record.

13          THE COURT:  All right.

14          MR. GIBBS:  The United States and the defendant

15  hereby stipulate and agree that Government Exhibit 9-105 is a

16  photograph that accurately depicts Hicham Hall.

17          And we would ask to publish that photograph, which is

18  Exhibit 9-105.

19          THE COURT:  Any objection?

20          MR. SMITH:  No objection.

21          THE COURT:  All right, it's in.

22          (Government's Exhibit No. 9-105 was received in

23  evidence.)

24  BY MR. GIBBS:

25  Q.   And do you recognize that individual, sir?

1   A.   I do.

2   Q.   And who is he?

3   A.   That's Hicham, the defendant's friend.

4   Q.   And he also -- you mentioned Hicham and T.J.  Who is T.J.?

5   A.   T.J. is another friend of the friend and a friend of

6   Hicham.

7            MR. GIBBS:  And if we could pull up 9-107, which is

8   already in evidence?

9            THE COURT:  All right.

10  BY MR. GIBBS:

11  Q.   And who is that?

12  A.   T.J.

13  Q.   That's the person you just testified about?

14  A.   Correct.

15  Q.   Now, a moment ago, you said that the defendant played some

16  videos for you.  Where were the two of you when, when you

17  watched those videos?

18  A.   Do you want me to tell you exactly where?

19  Q.   Well, I mean, just generally.

20  A.   We're at the Afghani restaurant in Fairfax.

21  Q.   And is that someplace you often went and had meals

22  together?

23  A.   Yes.

24  Q.   And in the second clip that we heard, you asked the

25  defendant if you should be sitting like that.  Why did you ask

1   him that question?

2   A.   Because we were in -- we were in the open.

3   Q.   And then in response, the defendant said, "I watch this

4   one when I'm at lunch at work."  Who did the defendant work

5   for?

6   A.   D.C., D.C. Metro Police, or Transit.

7   Q.   And, and what was the topic of these videos you watched in

8   the Afghani restaurant?

9   A.   The topic of the video?

10  Q.   Yes.

11  A.   I can't recall.

12  Q.   What were they about, though?

13  A.   They were ISIS propaganda, recruiting videos, talking

14  about jihad and several other topics.

15  Q.   And there at the end of that second clip that we heard,

16  the defendant asked if you had talked to Hicham about anything,

17  because he said he's, quote, very against.  What was Hicham

18  against at that point?

19  A.   Joining ISIS or supporting ISIS.

20          MR. GIBBS:  Thank you, sir.

21          If we can next go to Exhibit 6-104-2?

22          MR. SMITH:  No objection.

23          MR. GIBBS:  Thank you.

24          THE COURT:  It's in.

25          (Government's Exhibit No. 6-104-2 was received in

Mo - Direct                                                              362

1    evidence.)

2              MR. GIBBS:  We'd ask to play that along with the

3    transcript, and this is a clip dated October 2, 2014.

4              (Government's Exhibit No. 6-104-2 was played.)

5    BY MR. GIBBS:

6    Q.   Now, sir, at the beginning of that clip we just listened

7    to, the defendant said he watched videos of guys running around

8    in sandals and, quote, even, like, fighting.

9              How did the defendant's reference to fighting compare

10   to what you were saying was the purpose of your trip?

11   A.   Say that again?

12   Q.   How did the defendant's reference to fighting in that clip

13   compare with what you were telling him you were planning to do

14   with your trip?

15   A.   He was referring to ISIS fighters fighting in the videos

16   he showed me.

17             MR. SMITH:  Objection.

18             THE COURT:  What's the basis for the objection?

19             MR. SMITH:  The witness should not be testifying

20   about the defendant's personal mental state of which he has no

21   personal knowledge.

22             THE COURT:  I'll sustain that objection.

23   BY MR. GIBBS:

24   Q.   And what were you telling the defendant your plans were?

25   A.   To travel overseas.

Mo - Direct                                                               363

1   Q.   To do what?

2   A.   To join our fight.

3   Q.   And when the defendant was giving you advice about what

4   you should pack for that trip, he mentioned digital video

5   cameras and digital zooms.  Who first brought up those topics

6   in your discussions?

7   A.   The defendant.

8   Q.   And he also said that he heard that these guys are on,

9   like, social media, like, lesser known things like Kik.  Who

10  first brought up social media things like Kik in your

11  discussions?

12  A.   The defendant.

13  Q.   And after he brought up Kik, the defendant said to you you

14  can actually get in contact with these people over that.

15          MR. SMITH:  Objection.  Best evidence.

16          THE COURT:  Overruled.

17  BY MR. GIBBS:

18  Q.   And what did you understand "these people" to refer to?

19  A.   Fighters overseas or recruiters.

20          MR. GIBBS:  Thank you.

21          Your Honor, if we can next turn to Exhibit 6-104-3?

22          THE COURT:  Any objection?

23          MR. SMITH:  No.

24          THE COURT:  It's in.

25          (Government's Exhibit No. 6-104-3 was received in

1   evidence and played.)

2   BY MR. GIBBS:

3   Q.   All right.  Now, sir, in the clip we just listened to, the

4   defendant told you that there's a chance you'll get asked,

5   like, a lot of questions, and then you brought up T.J.  Remind

6   us again who T.J. is.

7   A.   T.J. is the second picture that was shown.

8   Q.   And who is he?

9   A.   The defendant's friend.

10  Q.   And that's Tejpal Singh?

11  A.   Yes.

12  Q.   And at that point, you said to the defendant that, quote,

13  you were there at the Little Italian when he was explaining

14  about his flight.  What was that a reference to?

15  A.   An experience he had.  He was pulled aside for extra

16  questioning.

17  Q.   And he told that story to you and the defendant?

18  A.   Yes.

19  Q.   And was anyone else there?

20  A.   Yes.

21  Q.   Who else was there?

22  A.   A guy named Peshwaz was there, and I don't recall if

23  Hicham was there or not.

24  Q.   Okay.  But those are -- and who are Peshwaz and Hicham?

25  A.   It's another person in the group of -- in the circle of

1    friends of the defendant.

2           MR. GIBBS:  All right, thank you, sir.

3           Next if we could turn to Government Exhibit 6-110-1,

4    which is a clip dated October 9, 2014?

5           THE COURT:  Any objection?

6           MR. SMITH:  What was the exhibit number again?

7           THE COURT:  110, 6-110.

8           MR. SMITH:  No objection.

9           THE COURT:  It's in.

10          (Government's Exhibit No. 6-110-1 was received in

11   evidence.)

12          MR. GIBBS:  And we would ask to play that, Your

13   Honor.  Thank you.

14          THE COURT:  Yes, sir.

15          (Government's Exhibit No. 6-110-1 excerpt was

16   played.)

17          MR. SMITH:  Objection.  Relevance.  Your Honor, we

18   object to the relevance.  The government is playing a

19   ten-minute clip that has no relevance to this case.

20          THE COURT:  I think this has been long enough.

21          MR. GIBBS:  And that's the end of it, Judge.  Thank

22   you.

23   Q.   So, sir, who was doing most of the talking there in that

24   clip?

25   A.   Hicham.

Mo - Direct                                                            366

1          MR. GIBBS:  And if we could pull up Government

2    Exhibit 9-105?

3          THE COURT:  Any objection to -- oh, that's the

4    photograph.

5          MR. GIBBS:  It's in evidence.

6          MR. SMITH:  No objection.

7    BY MR. GIBBS:

8    Q.   And who is this again?

9    A.   That's Hicham.

10   Q.   All right.  So he was the one doing most of the talking in

11   the clip we just listened to, correct?

12   A.   Correct.

13   Q.   All right.  And can you just set this up?  First of all,

14   where were you when this clip was recorded?

15   A.   We were at Hicham's house.

16   Q.   What was going on at Hicham's house?

17   A.   He was inviting us over for dinner.

18   Q.   And when you say "we were there," who else besides

19   yourself and Hicham were there?

20   A.   T.J. and the defendant.

21   Q.   And just describe for us sort of how -- what stage of the

22   night was it when this -- or of the dinner was it when this

23   clip was recorded?

24   A.    It was past dinnertime.  Almost everyone left, and myself,

25   the defendant, and Hicham were talking.

Mo - Direct                                                              367

1    Q.    And where did this conversation take place?

2    A.    At Hicham's basement or lower bedroom, I guess.

3    Q.    And so at the time that the recording was made, who was

4    there?  Was it just the three of you?

5    A.    Correct.

6    Q.    And at this point in time, was Hicham aware of what your

7    plans were?

8    A.    Prior to this?

9    Q.    Yes.

10   A.    He had the indications, but it was solidified and then

11   this clip.

12   Q.    And what did you do while all this was going on?  What was

13   your response?

14   A.    I was just listening to what he was saying.

15   Q.    And was Nick Young there for the entire conversation?

16   A.    Yes.

17           MR. GIBBS:  Thank you.

18           Your Honor, next we would move to Government Exhibit

19   6-105-1, which is a clip dated actually the next day,

20   October 10, 2014.

21           THE COURT:  Any objection?

22           MR. SMITH:  No objection.

23           THE COURT:  It's in.

24           (Government's Exhibit No. 6-105-1 was received in

25   evidence.)

1              MR. GIBBS:  Thank you.  We'd ask to play that along

2    with the transcript.

3              THE COURT:  Yes.

4              (Government's Exhibit No. 6-105-1 excerpt was

5    played.)

6              MR. SMITH:  Objection.  Relevance.

7              THE COURT:  This is not a drug case, so you need to

8    keep that out, all right?

9              MR. GIBBS:  Okay.

10             THE COURT:  Sustained.

11             MR. GIBBS:  Can we pick it up there, Your Honor?

12             THE COURT:  Get past that.

13             (Government's Exhibit No. 6-105-1 excerpt was

14   played.)

15             MR. SMITH:  Objection.  Objection.

16             THE COURT:  Wait, wait, wait.  Take it off.  Take it

17   off.

18             MR. GIBBS:  Your Honor, this was completely

19   unsolicited.  The defendant offered this as an example of why

20   he is so paranoid and how even somebody trying to sell him cut

21   rate steroids is somebody he's suspicious of at the gym.  So it

22   certainly goes to his state of mind.  He was not prompted by

23   the source.

24             MR. SMITH:  Your Honor, the defendant's state of mind

25   about drugs is irrelevant to this case.

1            THE COURT:  It is, and I've told the jury that, and

2      we have 14 very attentive people who understand the difference.

3            This is not a drug case, folks, all right?  So any

4      reference or discussion about drugs, there's no indication that

5      the defendant is using or selling drugs.

6            Let's just move on.  Overruled.

7            MR. GIBBS:  Let's finish it.

8            (Government's Exhibit No. 6-105-1 excerpt was

9      played.)

10     BY MR. GIBBS:

11     Q.   Now, sir, in the clip we just heard, the defendant talked

12     about being suspicious of everyone and trying not to deal with

13     people in mosques.  How often would he say things like that to

14     you?

15     A.   Often.

16     Q.   And at the end of the clip, the defendant talked about

17     Nabil saying certain things last night and your reaction to

18     what he said.  Can you explain what had happened with Nabil the

19     night before?

20     A.   Yes.  We were talking about ISIS and whether it's

21     legitimate to legitimize their cause, and the defendant was

22     suspicious of me up until he saw me defending my side of the

23     story.

24     Q.   And what was your side of the story?

25     A.   That ISIS is legitimate.

1   Q.   And when he talked about that occurring the night before,

2   was the night before the dinner at Hicham's place you already

3   testified about?

4   A.   It was that night.

5   Q.   And in terms of Hicham, I didn't ask you this before, but

6   you testified about who Hicham is.  Did, did Nick Young know

7   Hicham before you did?

8   A.   Yes.

9   Q.   All right.  So how did you meet, first meet Hicham?

10  A.   I met Hicham going to Adams Sully.

11  Q.   What is that?

12  A.   It's a mosque at Sully, and I forgot the name of the town.

13          MR. GIBBS:  That's all right.  Thank you.

14          Judge, next we would ask to play Government Exhibit

15  6-106-4, and the transcript is 4T.

16          THE COURT:  Any objection?

17          MR. SMITH:  No objection.

18          THE COURT:  All right, it's in.

19          (Government's Exhibit No. 6-106-4 was received in

20  evidence and played.)

21  BY MR. GIBBS:

22  Q.   Now, sir, in the clip we just listened to, at one point,

23  the defendant told you to stick with the medical story until

24  you get to wherever you're trying to reach.  What was the

25  medical story?

1   A.   The medical back- -- so with my medical background and

2   with the story of joining an organization, going along with

3   that, when I get to ISIS territory, that I can tell them my

4   medical background before I mention my military background.

5   Q.   And the defendant also made a comment at the end of that

6   clip about, he said, thousands of people getting buried alive.

7   What was that a reference to?

8            MR. SMITH:  Objection.

9            THE COURT:  If you understand.  Do you know from the

10  context what that was about?

11           THE WITNESS:  Yes, Your Honor.

12           THE COURT:  All right, go ahead.  Overruled.

13           THE WITNESS:  From the videos that were shown of

14  thousands of people being buried by ISIS.

15           MR. GIBBS:  Thank you.

16           Your Honor, next we would turn to Government Exhibit

17  6-107-1.  It's a clip dated October 17, 2014.

18           MR. SMITH:  No objection.

19           MR. GIBBS:  We'd ask to play that.

20           THE COURT:  All right, it's in.

21           (Government's Exhibit No. 6-107-1 was received in

22  evidence and excerpt was played.)

23           MR. SMITH:  Objection, Your Honor.  Relevance.  This

24  conversation is just dragging on and on.

25           THE COURT:  I agree with that.  I'll sustain the

Mo - Direct                                                      372

1   objection.

2            MR. GIBBS:  That's fine, Judge.

3   Q.   Before we move to the next clip, at the beginning of that

4   particular clip, the defendant told you that if you get a

5   boarding pass with four S's on it, it means you've been

6   selected for additional screening.  Who first told you that

7   piece of information?

8   A.   The defendant.

9            MR. GIBBS:  Thank you.

10           Next, Your Honor, I'd like to move to Government

11  Exhibit 6-108-1 and 1T.

12           MR. SMITH:  No objection.

13           THE COURT:  It's in.

14           (Government's Exhibit No. 6-108-1 was received in

15  evidence and excerpt was played.)

16           MR. SMITH:  Objection, Your Honor.  Relevance.  This

17  is --

18           MR. GIBBS:  Judge, this is the last clip we have of

19  any length, and this is actually the one where the defendant

20  proposes the text message that he's going to --

21           THE COURT:  I'm going to overrule the objection.

22           MR. GIBBS:  Thank you.

23           (Government's Exhibit No. 6-108-1 excerpt was

24  played.)

25           THE COURT:  All right, I think the jury has been

Mo - Direct                                                                373

1   sitting now for over two hours.  It's a good time to take a

2   break, and I'll give everybody 15 minutes.  We'll start up at

3   25 of.

4            MR. GIBBS:  Thank you, Judge.

5                (Recess from 4:21 p.m., until 4:37 p.m.)

6                          (Defendant present, Jury out.)

7            THE COURT:  How much longer do you have with this

8   witness?

9            MR. GIBBS:  I was looking, Judge.  I don't think much

10  longer.  I've got one clip that's about four minutes and then a

11  couple others that are less than a minute each, and I've got

12  just a couple of exhibits to show and just a couple of

13  pictures, so I anticipate ten minutes maybe, maybe fifteen, but

14  quickly.

15           THE COURT:  All right.  He went on around 2:40 today.

16  I want to make sure this case doesn't drag, so I'm alerting the

17  defense that you're going to get no more than about the same

18  time for direct.  So if you're expecting a four- or five-hour

19  cross, it's not going to happen.

20           MR. GIBBS:  I understand.

21           THE COURT:  All right, let's bring the jury in.  And

22  the witness can come in.

23                          (Jury present.)

24           THE COURT:  As I said before, folks, you're not

25  frozen to any particular seat, so make sure that you feel

1   comfortable moving around in the box.  I know some of you have

2   moved down, which is just fine.  Especially the people who have

3   been in the back row for all today, you know, you have to

4   either look at the big screen or the ones on the front row, so

5   maybe tomorrow you may want to switch position, okay?  You

6   don't have to.  It's up to you-all.

7            All right, Mr. Gibbs, the witness is back on the

8   stand.

9            MR. GIBBS:  All right, thank you.

10  Q.   All right, sir, at the end of that last clip, the

11  defendant made a statement how he said that, quote, I'm going

12  to text your phone, like, today or after that or something,

13  because it will be good for me.

14           Do you recall that?

15  A.   I do.

16  Q.   And what were you expected to do from the FBI if you got a

17  text message like that from the defendant?

18  A.   To immediately notify them and send over the text.

19  Q.   And did you, in fact, get a text message like that from

20  the defendant?

21  A.   I did.

22  Q.   And what did you do with it?

23  A.   I forwarded it to Agent John Minichello.

24           MR. GIBBS:  And if we could just pull up Exhibit

25  6-201, which is already in evidence?

1   Q.   And, sir, do you recognize this?

2   A.   I do.  I've seen it before.

3   Q.   I'm sorry, what is this?

4   A.   This is, yeah, a text message that the defendant sent to

5   my phone.

6            MR. GIBBS:  If we could just blow up the message at

7   the end of that?  And then I'll move on.

8            THE COURT:  It's there.  It's already there.

9            MR. GIBBS:  Okay.  Thank you.

10  Q.   And is that the text message he sent to you on that day?

11  A.   Yes.

12           MR. GIBBS:  Thank you.

13           Your Honor, next if we could, I would offer into

14  evidence 6-108-2, which is another clip.

15           MR. SMITH:  No objection.

16           THE COURT:  All right, it's in.

17           (Government's Exhibit No. 6-108-2 was received in

18  evidence.)

19           MR. GIBBS:  If we could play that, Mr. Vera?  Thank

20  you.

21           (Government Exhibit No. 6-108-2 was played.)

22  BY MR. GIBBS:

23  Q.   Sir, in that clip, the defendant told you that it's only

24  illegal to take up arms against a U.S. ally or to join a

25  terrorist organization, and then he described what could happen

Mo - Direct                                                                    376

1    if you lied to a federal agent.  Who was the first one to bring

2    up the consequences of lying to a federal agent?

3    A.    Yeah, the defendant.

4              MR. GIBBS:  All right.  Next if we could move to

5    Government Exhibit 6-109-4?

6              THE COURT:  Any objection?

7              MR. SMITH:  No objection.

8              THE COURT:  All right, it's in.

9              (Government's Exhibit No. 6-109-4 was received in

10   evidence.)

11             MR. GIBBS:  We'd ask to play that.

12             (Government's Exhibit No. 6-109-4 was played.)

13   BY MR. GIBBS:

14   Q.    Now, sir, where did you and the defendant go after this

15   conversation on October 25, 2014?

16   A.    The Kinko's in Sterling.

17   Q.    And how did you get there?

18   A.    By vehicle.

19   Q.    And whose vehicle was it?

20   A.    My vehicle.  It was a rental.

21             MR. GIBBS:  And, Your Honor, at this time, I would

22   read another stipulation into evidence.

23             THE COURT:  All right.

24             MR. GIBBS:  It's Stipulation No. 15, which states

25   that the United States and the defendant hereby stipulate and

1  agree that Government Exhibits 7-200 through 7-215 are

2  authentic business records of FedEx Office & Print Services,

3  Inc., and at this time, I would offer into evidence two of

4  those exhibits, which is 7-201A and 7-201C.

5           THE COURT:  Any objection?

6           MR. SMITH:  No objection.

7           THE COURT:  All right, they're both in.

8           (Government's Exhibit Nos. 7-201A and 7-201C were

9  received in evidence.)

10          MR. GIBBS:  If we could publish -- let's do 7-201A.

11 Q.   And, sir, can you describe what this is a photograph of?

12 A.   It's a photograph of myself and the defendant.  I'm in the

13 pink shirt, and we've -- that's a picture of us entering the

14 Kinko's.

15 Q.   And he's the one in the dark shirt; is that correct?

16 A.   Correct.

17 Q.   And what did you two do at the store on October 25 of

18 2014?

19 A.   We paid for a FedEx card with cash to log on to a computer

20 so that it doesn't trace back to us.

21 Q.   And what were you actually purchasing in the FedEx store?

22 A.   Computer time -- or a card that allows to log in to a

23 computer to use the computer.

24 Q.   Okay.  And so let's -- Your Honor, at this time, we would

25 ask to play another short clip, which is Government Exhibit

Mo - Direct                                                                 378

1  6-109-5.

2          THE COURT:  Any objection?

3          MR. SMITH:  No objection.

4          THE COURT:  All right, it's in.

5          (Government's Exhibit No. 6-109-5 was received in

6  evidence and excerpt was played.)

7          MR. SMITH:  Objection, Your Honor.

8          THE COURT:  Wait a minute, wait a minute.

9          MR. SMITH:  We weren't told which clip this would be

10 so --

11         THE COURT:  It's 6-109-5.

12         MR. SMITH:  Your Honor will see from the exhibit list

13 in this case that the government has not provided minutes for

14 the recordings that it intends to play in court, so the defense

15 is unaware of which particular minutes the government wants to

16 play from a given recording.  We object to this.

17         MR. GIBBS:  Your Honor, these were all provided to

18 the defense.

19         THE COURT:  As long as you've had the entire exhibit,

20 the fact that the government is not playing the whole thing is

21 not in my view a violation of the rules.  So the objection is

22 overruled.

23         Let's go.  You may play it.

24         Did you lose it?

25         MR. VERA:  I did.  One second.

1              (Government Exhibit No. 6-109-5 was played.)

2      BY MR. GIBBS:

3      Q.   And, sir, what was going on in this clip?

4      A.   We were setting up our accounts, communication accounts,

5      e-mail accounts.

6      Q.   Okay.  And you were setting up your e-mail accounts, and

7      as part of that, did you have to provide a, a birth date?

8      A.   Yes.

9      Q.   And what birthday did the defendant provide?

10     A.   Hitler's birthday.

11     Q.   And did you know what Hitler's birthday was at that point?

12     A.   Not at the time, no.

13             MR. GIBBS:  All right.  And, Your Honor, we have one

14     last clip I'd like to play, which is 6-109-6.

15             THE COURT:  Any objection?

16             MR. SMITH:  No objection.

17             THE COURT:  All right, it's in.

18             (Government's Exhibit No. 6-109-6 was received in

19     evidence and played.)

20     BY MR. GIBBS:

21     Q.   So, sir, what was going on in that clip?

22     A.   We were still filling out data and -- while we were

23     creating accounts, we were filling out data and actually

24     creating the user name of the account, of each e-mail account.

25     Q.   And what was the defendant's e-mail account that he set up

Mo - Direct                                                                  380

1    on October 25, 2014, with you?

2    A.    Essa Kobayashi, the one that was shown.

3    Q.    And was that the last day that you saw the defendant

4    before this trial started?

5    A.    I can't recall.  Either we met again one last time before

6    that, or that was the last time.

7    Q.    Okay.  But was this towards the end of your last in-person

8    meetings with the defendant?

9    A.    Yes.

10   Q.    And what happened after the two of you parted ways?

11   A.    Basically, he gave me a, gave me a hug and told me --

12   wished me luck.

13   Q.    And where did you go at that point?

14   A.    From there?

15   Q.    Well, did you -- you know, a few days after this, where

16   did you go?

17   A.    I left to Turkey.

18   Q.    With?

19   A.    With Agent John Minichello.

20   Q.    All right, thank you.

21          And at any of the time while you were still in touch

22   with the defendant or with the defendant, at any point, did you

23   ever ask the defendant to lie if he was approached by the FBI

24   about you?

25   A.    No.

1              MR. GIBBS:  Thank you.

2              Your Honor, that's all I have, Judge.

3              THE COURT:  All right.  Cross-examination?

4                        CROSS-EXAMINATION

5    BY MR. SMITH:

6    Q.   So, Mo, I'm Nicholas Smith.  I'm representing Nicholas

7    Young.  I'm going to cross-examine you with some questions.

8    A.   Hello.

9    Q.   So you're testifying here today under a pseudonym,

10   correct?

11   A.   That's correct.

12   Q.   You are -- your role in this case was as a paid informant

13   for the FBI?

14   A.   Yes.

15   Q.   You're not an agent of the FBI.  You are sort of a

16   contractor for the FBI.  They pay you to, to report on a

17   target?

18   A.   I'm not a contractor.

19   Q.   You're not an agent of the FBI, correct?

20   A.   No, and I'm not an agent.

21   Q.   You were paid over $34,000 to report on Nicholas Young,

22   correct?

23   A.   Specifically for Nicholas Young?  I was paid 34,000, yes.

24   Q.   In connection with this investigation into Nicholas Young?

25   A.   Yes.

Mo - Cross                                                         382

1   Q.   How did your payment work?  Were you paid for results?

2   A.   I don't understand the question.

3   Q.   Were you paid regardless of whether you performed poorly

4   by the FBI in connection with your investigation into Nicholas

5   Young?

6   A.   The payment wasn't just for Nicholas Young.  I started

7   working before that.

8   Q.   When did the -- when did the government agree to make a

9   payment to you of $34,000?

10  A.   It wasn't a sum payment.  It was --

11  Q.   How was it -- how did the payment work?

12  A.   I started back in August 2013, and they would pay me for

13  information.

14  Q.   What kind of information did they pay you for?

15  A.   I don't seem to understand.

16  Q.   What kind of information did the FBI pay you for?

17  A.   Any information that they needed help with.

18  Q.   Such as?  What's an example of the information they needed

19  help with?

20  A.   I don't, I don't understand what you're saying.

21  Q.   They told you they needed information, and they agreed to

22  pay you in exchange, correct?

23  A.   That's not how it worked.

24  Q.   How does it work?

25  A.   They would, they would help -- they would ask me to do

1    something, and I would --

2    Q.    What would they ask you to do?

3    A.    Before Nicholas Young?  Are we talking about --

4    Q.    I'm asking you what they paid you to do.  What did they

5    pay you the $34,000 to do?

6    A.    They paid me to gather information.

7    Q.    What kind of information?

8    A.    Any information that would hurt, like, hurt U.S. citizens,

9    U.S. interests.

10   Q.    Any information that would hurt U.S. citizens or U.S.

11   interests?

12   A.    Correct.

13   Q.    They also instructed you to engage in conversations with

14   ISIS about the targets you're reporting on, correct?  You were

15   instructed to raise the subject of ISIS with the targets of the

16   investigations?

17   A.    Of Nicholas?

18   Q.    Yes.

19   A.    No.

20   Q.    You were not instructed to do that?

21   A.    No.

22   Q.    So you created a legend with your agent handler, correct?

23   A.    I don't seem to understand.  A legend?

24   Q.    Are you familiar with the term "legend"?

25   A.    No.

1   Q.    You created a fake personality with the agent handler who

2   you worked with, correct?  And you would assume that

3   personality while you're reporting on an individual?

4   A.    I wouldn't say a fake, no, but I was planning on

5   traveling, yes.

6   Q.    So you assumed a fake identity in order to report on

7   Nicholas Young, correct?

8   A.    A fake identity?  No.

9   Q.    It wasn't fake?

10  A.    No.

11  Q.    So you are testifying here today you were not under a

12  pseudonym when you met Nick and gave him your background?  That

13  was true information, correct?

14  A.    The, the pseudonym is short for my, for my real name.

15  It's not fake.

16  Q.    When you introduced yourself to Nicholas Young, you

17  explained where you were from, correct?

18  A.    Yes.

19  Q.    And that you had family members, correct?

20  A.    Yes.

21  Q.    And was that information true or false?

22  A.    It's true.

23  Q.    All of it was true?

24          MR. GIBBS:  Judge, may we approach on this?

25          THE COURT:  Yes.

1           (Bench conference on the record.)

2           MR. GIBBS:  Judge, I think the witness is a little

3    bit confused as to I hope we're not bringing out true

4    information, but obviously, anything that relates to who he

5    truly is is protected by the protective order.

6           MR. SMITH:  Your Honor, we've got several documents

7    in discovery from the government stating that the information

8    he told Nicholas Young was false.  If he's now testifying it's

9    true, that's a credibility issue.  It's impeachment.

10          MR. GIBBS:  No, I think he's confused by the

11   question.  I think he's just --

12          THE COURT:  Well, the problem is you cannot reveal

13   his true identity or any information that could lead somebody

14   to figure out who he is, and that's part of the sensitivity of

15   this case.  That's the whole reason why we have the screen up.

16   So you need to stay away from that.

17          MR. SMITH:  Your Honor, I'm not asking him about his

18   true identity.  I'm asking whether the information that he gave

19   the defendant about his background was true or false.

20          THE COURT:  That's the same thing.  He's of

21   Palestinian origin.  You've already got him verifying his true

22   first name is Mohammad.  I mean, I'm concerned.  I thought

23   you-all would be on your feet sooner.

24          All right, stay away from it.

25          MR. SMITH:  Stay away from it?

1              THE COURT:  Stay away from it.

2              (End of bench conference.)

3    BY MR. SMITH:

4    Q.    Now, when did you meet Nicholas Young?

5    A.    I met him back in May of 2014.

6    Q.    And where did you meet him?

7    A.    At the Sully Mosque.

8    Q.    And were you at the Sully Mosque to meet Nicholas Young

9    that day?

10   A.    That specific day?

11   Q.    The first time you met him, were you going to the Sully

12   Adams Mosque in order to meet Nicholas Young, or did you happen

13   to chance on him there?

14   A.    No, I just -- it was a chance.

15   Q.    So at what point were you directed by your agent handler

16   to report on Nicholas Young?

17   A.    It wasn't until later.

18   Q.    It was not until later.

19   A.    Yes.

20   Q.    Your agent handler instructed you on how to describe

21   yourself to Nicholas Young in order to develop a relationship

22   with him, correct?

23   A.    Can you elaborate?

24   Q.    You were directed by your agent handler to develop a

25   relationship with Nicholas Young, correct?

1    A.   Yes.

2    Q.   And how did he instruct you to develop a relationship with

3    Nicholas Young?

4    A.   He asked me to report any conversations that I had with

5    Nicholas Young.

6    Q.   Right.  But before you had sensitive conversations with

7    Nicholas Young, you were directed to develop a connection with

8    him first, correct?

9    A.   He was in the same group of friends of Hicham and T.J., so

10   by default, he was part of the -- by the association, it fell

11   naturally.

12   Q.   Your agent handler directed you to become friends with

13   Nicholas Young, to report on him, correct?

14   A.   Yes.

15   Q.   And how did he tell you -- how did your agent handler

16   direct you to develop a friendship with Nicholas Young?

17   A.   I don't seem to understand.  How did he -- how did he ask

18   me to do that?

19   Q.   You just testified that he -- that your agent handler

20   directed you to become friends with Nicholas Young, correct?

21   A.   Yes.

22   Q.   And how did your agent handler instruct you to go about

23   becoming friends with Nicholas Young?

24   A.   Simply to strike a relationship and listen.

25   Q.   Strike a relationship.  And how would you -- how did you

1    strike the relationship?

2    A.   Two guys going to the masjid and praying and, and meeting

3    afterwards for dinner or something like that.

4    Q.   So you told Nicholas Young you went to George Mason

5    University, correct?

6    A.   Correct.

7    Q.   Nicholas Young went to George Mason University, correct?

8    A.   Yes.

9    Q.   You told him you were in the military reserves, correct?

10   A.   Correct.

11   Q.   You told him that you had a religious conflict at work

12   with the military reserves that might cause you to leave,

13   correct?

14   A.   Yes.

15   Q.   You knew that Nicholas Young told you that he had a

16   religious conflict at work with the police department, correct?

17   A.   I don't recall.

18   Q.   So you had a -- you met Nicholas Young in 2014, and your

19   relationship under this pseudonym lasted until about August of

20   2016, correct?

21   A.   Me personally physically?

22   Q.   The character called Mo had a relationship between -- with

23   Nicholas Young between May 2014 and August 2016, including

24   e-mails, correct?

25   A.   Yes.

1  Q.   You met with Nicholas Young over 23 times, correct?

2  A.   I don't recall the exact times, but that sounds about

3  right.

4  Q.   You met with Nicholas Young on many more occasions than on

5  the occasions for which we played clips during your direct

6  testimony, correct?

7  A.   Past my trip to Turkey?  Is that what you're saying?

8  Q.   Including all of the times you've met with the defendant,

9  Nicholas Young, there were a number of occasions you met with

10  Nicholas Young in addition to the dates for which we played

11  clips, audio clips during your direct testimony, correct?

12  A.   Past my trip to Turkey, I did not meet with Nicholas

13  Young.

14  Q.   There was a number of times which you met with Nicholas

15  Young, correct?  Over 20 times, right?

16  A.   I don't recall.

17  Q.   You met with Nicholas Young on occasions which you did not

18  play in a recording during your direct testimony, correct?

19  A.   Again, I don't recall how many times.

20  Q.   I'm not asking you how many times.

21  A.   Okay.  I haven't met him after my trip to Turkey.

22        THE COURT:  No, no, that's not, that's not the

23  question.  The question is were all of your conversations that

24  you had, you in person had with him played in court today?

25        THE WITNESS:  Not all of them.

1   BY MR. SMITH:

2   Q.   Not all of them.  So there were times when you met with

3   Nicholas Young there was no recording which was played in court

4   today, correct?

5   A.   All of them were recorded, but not all of them were

6   played.

7   Q.   All of your meetings with Nicholas Young were recorded?

8   A.   Yes.

9   Q.   Okay.  You testified on direct today that the first

10  recording you made of Nicholas Young was in July 2014, correct?

11  A.   Audio recording, yes.

12  Q.   No, you said all -- you just testified, sir, that all of

13  your meetings with Nicholas Young were recorded, correct?

14  A.   Yes, audio recording.

15  Q.   And you also testified that the first recorded meeting was

16  July 2014, correct?

17  A.   Yes.

18          MR. SMITH:  This is Defense Exhibits 2 through 6.

19  Q.   Do you see the sticky note that says DX-2 on it?

20  A.   Yes.

21  Q.   This is an FBI memorandum called a 1036 form.  Do you

22  recognize the author of the memorandum?

23  A.   Yeah -- yes.

24  Q.   What does it say?

25  A.   John Minichello.

1   Q.   Who is John Minichello?

2   A.   He's the FBI agent I was in contact with.

3   Q.   He's your agent handler, right?

4   A.   Yes.

5   Q.   This memorandum reflects your meeting --

6           MR. GIBBS:  Judge, he can -- if he's using it to

7   refresh, he needs to be able to have a chance to read it and

8   hear a question instead of having it, the sort of leading

9   questions right here.

10          MR. SMITH:  This is cross-examination.

11          THE COURT:  Number one, on cross-examination, the

12  other side can lead, as you know.  Number two, though, I don't

13  want a whole lot of repetition, and so to the extent that this

14  is going over what was rehashed with the agent, we're not going

15  to hear it a second time.

16          MR. SMITH:  Your Honor, the witness just testified --

17          THE COURT:  Mr. Smith, when I'm speaking, you don't

18  speak over the Court.  The court reporter cannot get two people

19  at the same time.  Let me finish.

20          I'm going to permit a little bit of this as long as

21  it's not repeating everything that's been going on, all right?

22          MR. SMITH:  Okay.

23          MR. GIBBS:  Thank you, Judge.

24  BY MR. SMITH:

25  Q.   Do you see the date May 22 in the document marked DX-2?

1    A.    Yes.

2    Q.    Does that May 22 date reflect a meeting you had with

3    Nicholas Young?

4    A.    Yes.   That's -- this is in part of information I provided

5    in an e-mail to John.

6    Q.    So, so that May 22 date is May 22, 2014, correct?

7    A.    Yes.

8    Q.    So you just testified here today that you have had no

9    meetings with Nicholas Young that were not recorded, correct?

10   A.    I said the audio recordings start in July.

11   Q.    Right.   Okay.   Can you turn to DX No. --

12              THE COURT:   Well, wait.   You're saying audio

13   recordings.   Are there some other kind of recordings going on

14   here?

15              THE WITNESS:   No, ma'am.   I met the defendant in May;

16   however, in July is when the audio recordings started.

17              THE COURT:   So you did not -- were not involved in

18   any recordings with the defendant in May or June?

19              THE WITNESS:   Well, I would pass any information to

20   the agent, though.

21              THE COURT:   No, no, that's not the question.

22              THE WITNESS:   Yes.

23              THE COURT:   The question is were you involved, either

24   yourself on your own -- at your own initiative or at the

25   direction of the FBI, were you recording conversations you had

Mo - Cross                                                              393

1    with Mr. Young in May and June?

2              THE WITNESS:  No.

3    BY MR. SMITH:

4    Q.   You testified earlier today that you never met with

5    Mr. Young on an occasion in which you did not record the

6    conversation, correct?

7    A.   Correct.

8    Q.   And you acknowledged that the memorandum in front of you

9    on May 22, 2014, reflects a meeting you had with Mr. Young,

10   correct?

11   A.   Correct.

12   Q.   And you've testified earlier that July 2014 was the first

13   time that you recorded a meeting with Nicholas Young, correct?

14   A.   Yes.

15   Q.   Thank you.

16             Turn to DX-4, please.  Do you see the date on that

17   memorandum?  Excuse me, do you recognize the author of the

18   memorandum?

19   A.   I do.

20   Q.   Who is it?

21   A.   John Minichello.

22   Q.   He's your agent handler, right?

23   A.   Yes.

24   Q.   Do you see the June 5 date in the body of the memorandum,

25   June 5, 2014?

Mo - Cross                                                          394

1   A.    I see a -- I see a June 9.

2   Q.    It's DX-4.

3   A.    I am looking at DX-4.

4               I see it in the body now.

5   Q.    Do you see it?

6               Does this reflect a meeting between you and Nicholas

7   Young on June 5, 2014?

8   A.    Yes.  It was a group of friends.  We were all there at a

9   little, little Italian restaurant.

10  Q.    Right.  And every time you met with Nicholas Young, there

11  was an audio recording, right?

12  A.    With this group of friends?  That was prior to the

13  recording starting.  This one you're referring to --

14  Q.    Nicholas Young is mentioned in that memorandum on June 5,

15  2014, correct?

16  A.    Correct.

17  Q.    And you've testified today that the first -- you never had

18  a meeting with Nicholas Young without recording it, correct?

19              MR. GIBBS:  Judge, that's been asked and answered.

20              THE COURT:  Sustained.  Let's move this along.

21  BY MR. SMITH:

22  Q.    Can you turn to DX-5, please?

23  A.    Okay.

24  Q.    Do you see the author of that memo?  It's John Minichello,

25  right?

1   A.   Yes.

2   Q.   He's your agent handler, right?

3   A.   Correct.

4   Q.   Do you see the June 29 date?

5   A.   I see it.

6   Q.   Does this reflect a meeting you had with Nicholas Young on

7   June 29, 2014?

8   A.   Yes, Nicholas was present.

9   Q.   Was this meeting recorded?

10  A.   No.

11  Q.   Did you discuss ISIS with Nicholas Young on June 29, 2014?

12  A.   Can I read this?

13  Q.   Well, first you have to try -- do you remember?  Do you

14  recall discussing ISIS?  Sir --

15  A.   I don't recall.  I would have to --

16  Q.   You can't recall, okay.

17        Did your agent handler ever instruct you not to

18  record a meeting with Nicholas Young?

19  A.   Did he not --

20  Q.   Did he instruct you to go on certain meetings --

21  A.   No.

22  Q.   -- with Nicholas Young and not record?

23  A.   And not record?

24  Q.   Yes.

25  A.   No.  I don't seem to understand --

1  Q.   So you're acknowledging that this June 29 date, meeting

2  between you and Nicholas Young that you allege was not

3  recorded, correct?

4  A.   No, it was -- it wasn't recorded by audio; however, I

5  would --

6  Q.   It wasn't -- excuse me, what did you say?

7  A.   It wasn't recorded through audio, but I would, I would

8  pass on information to him, yes.  This entire time, I would

9  pass on information every time.

10  Q.   And why were you not wearing a wire on this occasion?

11  A.   I'm not familiar how FBI does, like, how they acquire it.

12  Q.   Who makes the decision whether you wear a wire when you

13  meet with Nicholas Young?

14  A.   I do not know.

15  Q.   You don't know?

16  A.   Are you asking me who in the FBI makes that decision?

17  Q.   Yes.  When you would go out and meet with Nicholas Young

18  as a paid informant, would your agent handler direct you to

19  wear a wire?

20  A.   Yes, my agent, my agent would direct me.

21  Q.   And there were occasions when he directed you not to,

22  correct?

23  A.   Not to, not to wear a wire?

24  Q.   Wear a wire in a meeting with Nicholas Young, correct?

25            MR. GIBBS:  Judge, objection.  The witness already

1    testified that starting in July, he was recording all of his

2    meetings.  This is a rehash.

3             THE COURT:  This is a slightly different question,

4    though.  The question is whether anybody at the FBI ever told

5    Mo not to wear a wire when he was communicating with Mr. Young.

6    That's the question.

7             Do you understand the question?

8             THE WITNESS:  No one told me that.

9    BY MR. SMITH:

10   Q.   No one told you that.  So on this occasion on June 29,

11   reflected in DX No. 5, the document in front of you --

12   A.   Yes.

13   Q.   -- you have testified you were not wearing a wire,

14   correct?

15   A.   Correct.

16   Q.   And why were you not wearing a wire on this occasion?

17   A.   Because it was prior to when the FBI told me to wear a

18   wire.

19   Q.   So the decision of whether to wear a wire is up to the

20   agent handler, not you, correct?

21   A.   Correct.

22   Q.   There were occasions when you wore a wire when you did not

23   tell the agent handler, correct?

24   A.   That is not correct.

25   Q.   It isn't?

Mo - Cross                                                        398

1   A.   No.

2   Q.   Thank you.

3              Can you turn to DX-6, please?  Excuse me, in the same

4   document, DX-5, please find the date July 6.  It's below the

5   June 29 date.

6              Do you see July 6?

7   A.   Is it on the first page?

8   Q.   Mo, have you ever lied to the FBI?

9   A.   Yes.

10  Q.   You have.  How many times?

11  A.   Once.

12  Q.   Once?  When was that?

13  A.   I can't recall the date, but I did.

14  Q.   Do you see the July 6 date in that memo, DX-5?

15             THE COURT:  You can lead him.  Just get him right to

16  the page.

17             MR. SMITH:  It's on the page.  It's on that one page.

18             THE COURT:  All right, ask the question.

19             THE WITNESS:  Yes, I see July 6.

20  BY MR. SMITH:

21  Q.   Does that reflect a meeting you had with Nicholas Young on

22  July 6, 2014?

23  A.   That looks correct.

24  Q.   Right.  Did you have that meeting with Nicholas Young on

25  July 6, 2014?

Mo - Cross                                                                      399

1   A.    Yes.

2   Q.    Do you remember it?

3   A.    Not entirely, but yes.

4   Q.    Okay.  Do you see where it says you discussed ISIS with

5   Nicholas Young, July 6?  Look for the word "ISIS" on that memo.

6   A.    I see.  I see where you're saying.

7   Q.    Do you remember that conversation?

8   A.    Not entirely, but yes.

9   Q.    Not entirely, but yes?

10  A.    As in, like, the scope of the conversation, yes, but I

11  haven't looked at this reporting.

12  Q.    Please go to DX-6, please.  It reflects a meeting on

13  July 13, 2014.

14  A.    I'm looking at it.

15  Q.    Was this meeting recorded between you and Nicholas Young?

16  I'm just -- no?  Was it recorded?

17  A.    When you say "recorded," like, did I report it?

18  Q.    Record it.  Were you wearing a wire during that meeting?

19  No, I'm asking you if you wore a wire, not what the --

20  A.    May I look at the --

21  Q.    The memo doesn't say.  I'm asking you whether you recall

22  wearing a wire.

23  A.    I need, like -- I need to read the information to

24  understand so I can refresh my memory.

25  Q.    I'm saying did you wear a wire on July 13, 2014?

Mo - Cross                                                        400

1  A.    Yes.  I wore a wire starting in July, yes.

2  Q.    Okay.  Okay.  Mo, you've testified today about some of

3  these clips from meetings you were wearing a wire on with

4  Nicholas Young during your meetings.

5  A.    Yes.

6  Q.    And this began in July 2014, correct?

7  A.    Yes.

8  Q.    Those clips we played from July 27 -- July 27, August 10,

9  September 11, October 2, October 10, October 16, October 17,

10 October 23, October 24, and October 25, those did not -- those

11 were clips from the meetings, correct, selections from your

12 entire conversation with Nicholas Young, correct?

13 A.    Yes.

14 Q.    Those clips were not the entire conversation you had with

15 Mr. Young on those given days, correct?

16 A.    They were --

17 Q.    There was conversation that was recorded on those days I

18 just listed but was not played in court, correct?

19 A.    Correct.

20        MR. SMITH:  Let me pull up September 11, 2014, and

21 start at 42 minutes, 54 seconds.  Don't start it yet.

22        MR. ENNS:  What is the time?

23        MR. SMITH:  The time is 42 minutes, 54 seconds, but

24 don't play it yet.

25 Q.    So, Mo, on -- you testified about September 11, 2014,

1  correct?

2  A.   Yes.

3  Q.   Didn't you tell Nicholas that you wanted to help out in

4  Syria and Nicholas responded, "Why now?"

5  A.   Yes.

6  Q.   And didn't Nicholas argue that no one restricts us from

7  practicing our religion here?  By "here," he meant the United

8  States?

9  A.   Can, can you --

10 Q.   Didn't Nicholas argue on September 11, 2014, one of the

11 dates you testified about today, that no one restricts us from

12 practicing our religion here, meaning you had brought up the

13 subject of ISIS on this date, and Nicholas responds, "Why now?

14 No one restricts us from practicing our religion here."

15          Do you remember that?

16 A.   I recall.

17 Q.   You recall it?

18 A.   Yes.

19 Q.   Do you recall it specifically?

20 A.   It was part of the conversation.

21          MR. SMITH:   Right.   Please play 42, 42 minutes, 54

22 seconds.   Can you turn it up?

23          You're on September 11, 2014.

24          (Audio excerpt was played.)

25 BY MR. SMITH:

1   Q.   Mo, did you -- it's kind of hard to hear the conversation.

2   We are marking that audio clip on September 11, 2014, between

3   the minutes 42 minutes, 54 seconds, and 46 minutes, 45 seconds,

4   as Defense Exhibit, I believe it's 10 now.  It's kind of hard

5   to hear the audio on that clip, but did you hear Mr. Young

6   referencing Abdullah?

7   A.   Yes.

8   Q.   Who is Abdullah?

9   A.   I'm not familiar with who Abdullah is at the moment.

10  Q.   But you heard Mr. Young referencing an Abdullah who had

11  something to say about a concept of not rebelling against the

12  legitimate government, correct?  Did you, did you catch that?

13  A.   Yes.

14  Q.   And you've heard Mr. Young make that statement, right?

15  A.   Yes.

16  Q.   So what Mr. Young was saying right here when you were

17  telling him, "Wouldn't it be more free, wouldn't it be more

18  liberating to move abroad and overseas?" is Mr. Young was

19  telling you about Abdullah, who is citing this Islamic concept

20  that you can't overthrow a legitimate government, correct?

21  A.   What Mr. Young was saying?  Correct.

22  Q.   Mr. Young had told you this before, right, before

23  September 11, 2014?  He had told you about this concept that

24  it's un-Islamic to overthrow the legitimate government,

25  correct?  He had told you this before?

Mo - Cross                                                          403

1   A.   Yes.

2   Q.   When did he tell you that?

3   A.   I don't recall.

4   Q.   But you remember him saying that to you on multiple

5   occasions, right?

6   A.   Everything that I've -- I reported, I reported to either

7   in the recording or in audio, but yes.

8   Q.   Your first audio recording was on -- with Mr. Young was on

9   July -- in July 2014, right?

10  A.   Audio recording, correct.

11       MR. SMITH:  Right.  Play the May 31 recording, 14

12  minutes, 40 seconds.

13       (Audio excerpt was played.)

14       MR. SMITH:  Now, pause it.

15  Q.   Whose voice is that?

16  A.   It sounds like my voice.

17       MR. SMITH:  Right.

18       Keep playing.

19       (Audio excerpt was played.)

20       MR. SMITH:  Pause it.

21  Q.   Whose voice is the second voice, the one who's responding

22  to you?

23  A.   The defendant.

24       MR. SMITH:  Okay.  Keep playing.

25       (Audio excerpt was played.)

1           MR. SMITH:   Pause it.

2    Q.   Did you hear what Mr. Young said on the recording?

3    A.   It doesn't sound clear.

4    Q.   Didn't Mr. Young tell you when you -- you raised the

5    subject of the Soviet invasion of Afghanistan in that clip,

6    right?

7    A.   Yes.

8    Q.   And doesn't Mr. Young say -- question you and say, "Are

9    they rebels?  Are they mujahideen?" which is something noble,

10   right, according to you in that comment?  I mean, he says, "Are

11   they mujahideen, or are they criminals because they've rebelled

12   against the legitimate government?"

13          Did you hear that?

14   A.   Yes.

15   Q.   And Mr. Young makes a similar comment on September 11,

16   2014, correct?

17   A.   Yes.

18   Q.   Now, turn quickly, really quickly back to DX-3 in front of

19   you, sticky note DX-3.  Do you see, do you see it's a

20   memorandum by John Minichello?

21   A.   Yes.

22   Q.   Do -- so flip to the second page, and do you see where it

23   says:  Mr. Young appears to agree that -- with Peshwaz that the

24   Soviet invasion of Afghanistan, there was a legitimate jihad?

25   Do you see that paragraph?

1    A.    Yes.

2    Q.    That's reflecting the conversation we just listened to,

3    right?

4    A.    This conversation?

5    Q.    Yeah, the conversation we were just listening to on the

6    audio recording.  That's -- this memorandum you're looking at

7    is reflecting a -- just read the memorandum, that paragraph.

8    A.    Read it out loud?

9    Q.    Sure.

10   A.    "Nick appeared to agree with Peshwaz and stated that the

11   Soviet invasion of Afghanistan was a legitimate jihad.  Nick

12   argued that there is currently no khalifa, so Muslims cannot

13   rely on the government to declare jihad.  T.J. stated that

14   jihad was declared in Egypt, and Hall responded saying that

15   nobody mobilized.  Nick stated that the situation in Egypt

16   showed that relying on governance to declare jihad does not

17   work.  He also said that if an individual could help defend

18   fellow Muslims, they should do so."

19   Q.    That's the recording -- the memorandum you're reading

20   right now reflects a summary of the recording we were just

21   listening to, correct?

22   A.    Yes.

23   Q.    Thank you.

24            That was on May 31, 2017, correct?

25   A.    That recording?

1  Q.   That, what you were just reading.  You see it's drafted on

2  June 6, 2014.  Do you see that, DX-3?

3  A.   Yes.

4  Q.   And so -- and if you flip to the next page, the Soviet

5  invasion of Afghanistan, that reflects the May 31 meeting you

6  had with Mr. Young, right?  And that's the clip we were just

7  listening to?  Yes?

8  A.   Yes.

9  Q.   Thanks.

10         On September 11, Nicholas told you he had been

11  against ISIS because of all the bad stuff he was hearing about

12  them, right?

13  A.   Yes.

14  Q.   He told you on the same day that when he saw Baghdadi's

15  mug shot on the news, he thought they sounded like a bunch of

16  criminals who were hungry for power and money, right?

17  A.   I don't recall.

18  Q.   You don't recall?  It's on -- do you see that memorandum

19  in front of you is dated, reflects the meeting you had with

20  Mr. Young on September 11, 2014?

21  A.   Yes.

22  Q.   So you flip to page 12.  The page numbers are at the

23  bottom.  It's up near the top of the page.

24         Didn't Nicholas tell you that when he saw Baghdadi's

25  mug shot on the news, he thought they sounded like a bunch of

1   criminals who are hungry for power and money?

2   A.   Yes.

3   Q.   On September 11, didn't you tell Nicholas, "I've kind of

4   made up my mind to go to Syria," to which Nicholas responds,

5   "It's kind of nice in the U.S., isn't it?  Good opportunities"?

6   A.   Yes.

7           MR. SMITH:  Let's play that.  Can you go to

8   September 11, 2014, 1 hour, 51 minutes, 42 seconds?

9           (Audio excerpt was played.)

10          MR. SMITH:  We're moving into evidence as Defense

11  Exhibit 11 a September 11, 2014, audio at 1 hour, 51 minutes,

12  42 seconds, to 1 hour, 54 minutes, 45 seconds.

13          MR. GIBBS:  No objection, Judge.

14          THE COURT:  We'll have to see how that goes in, but

15  all right.

16  BY MR. SMITH:

17  Q.   Mo, on September 11, 2014, Nicholas told you that Muslims

18  are not allowed to spy on each other, right?

19  A.   Correct.

20  Q.   And he told you that if somebody -- that there's a

21  difference, there's something -- he said there's an exception,

22  right?  Do you remember what his exception was?

23  A.   Not exactly, but yes.

24  Q.   Didn't he tell you that spying on other Muslims would be

25  legitimate if there's violence involved, in any potential

1   violence?

2   A.   Correct.

3          MR. SMITH:  Can you play, can you play 9/11/2014,

4   2 hours, 19 minutes, 14 seconds?

5          THE COURT:  Mr. Smith, I have to tell you that unless

6   the jurors have much better hearing than I do, I don't think

7   other than traffic, we're getting anything out of these tapes.

8   It's not helping.

9          MR. SMITH:  Your Honor, we're going to move each

10  selection into evidence and then allow the jury to listen to

11  the recordings with headphones and then also move in the

12  transcript of the recording.  The reason we're doing it both

13  ways is because the government often did not reflect the entire

14  conversation in the transcript.

15         THE COURT:  We should have the transcripts now and

16  not at some later time because there's no way of being able to

17  compare what we're seeing the way we did with the government.

18  We could look at the transcript and we could be hearing.  We're

19  not going to be doing this case piecemeal like that.  You

20  should have the evidence ready at this point if you're going to

21  be playing it.

22         MR. SMITH:  Your Honor, this is all of the evidence

23  that the government presented to it, and we're also going to

24  introduce into evidence every transcript that the government

25  gave us.

1          THE COURT:  Well, whether I'll permit it is another

2     question.  Let's continue this.  But I'm just thinking -- raise

3     your hands, folks.  Are you able to hear anything reasonably on

4     this?

5          A JUROR:  A little.

6          THE COURT:  Just a little?  A very small amount.

7     It's terribly difficult to put a case on like this.

8          So ask your questions of the witness, all right, but

9     in terms of just sitting here and listening to a lot of

10    tapes --

11         MR. SMITH:  Your Honor, I will ask the questions, and

12    if the witness does not recall Mr. Young's comment to him, I

13    will play the recording and introduce it into evidence.

14         THE COURT:  Well, we'll see.  Let's ask the question.

15    BY MR. SMITH:

16    Q.   On September 11, 2014, Nicholas told you that if someone

17    was going to blow up a subway, you should notify him because he

18    would stop it, correct?

19    A.   Correct.

20    Q.   On September 11, 2014, Nicholas told you he wanted to make

21    someone's life better in response to your comment that you were

22    young and restless, correct?

23    A.   I do not recall.

24         MR. SMITH:  This is a short clip, Your Honor,

25    September 11, 2014, 1 hour, 2 minutes, 42 seconds.

1              (Audio excerpt was played.)

2    BY MR. SMITH:

3    Q.    When you mentioned on September 11, 2014, that you wanted

4    to go abroad and you had made up your mind, didn't Nicholas

5    push back and say he sees younger guys like you talking

6    radically, right?

7    A.    Yes.

8    Q.    And he said he didn't mean to insult you, but he said,

9    "I'm older than you," right, and, "I'm a little bit less

10   radical than you," right?

11   A.    I don't recall.

12            MR. SMITH:   September 11, 2014, 1 hour, 9 minutes, 22

13   seconds.   1 hour, 9 minutes, 22 seconds.

14            (Audio excerpt was played.)

15            MR. SMITH:   Stop it.

16            We're introducing that clip as Defense Exhibit 12,

17   which is September 11, 2014, 1 hour, 9 minutes, 22 seconds, to

18   1 hour, 13 minutes.

19   Q.    Mo, in that clip, Mr. Young said he was thinking about

20   younger brothers who went overseas, right?

21   A.    Yes.

22   Q.    And Mr. Young said:   Why this narrow criteria they've set

23   for themselves?   Why do they have this narrow criteria they set

24   for themselves, right?

25   A.    Yes.

1   Q.    And by "narrow criteria," Mr. Young meant why do they

2   believe they have to go overseas to fight, right?

3   A.    Yes.

4   Q.    On September 11, 2014, you told Nicholas that the dictator

5   of Syria was burying innocents up to their necks, torturing

6   them, and that was a reason to support ISIS, didn't you?

7   A.    Yes.

8   Q.    You would frequently have conversations about Dictator

9   Assad of Syria and how he was butchering civilians, correct?

10  A.    Yes.

11  Q.    You were instructed by your agent handler to use the

12  subject of Syria and Assad in discussions with ISIS about

13  Nicholas -- with Nicholas about ISIS because you knew Nicholas

14  had an interest in geopolitics, correct?

15  A.    Yes.

16  Q.    You played on Nicholas Young's interest in geopolitics to

17  get him to talk about ISIS, correct?

18  A.    Yes.

19  Q.    In response to your comment that the dictator of Syria was

20  burying innocents up to their necks and torturing them,

21  Nicholas told you he was against ISIS months before that,

22  correct?

23  A.    Yes.

24  Q.    You testified about your conversations with Nicholas on

25  October 2, 2014, today, correct?

Mo - Cross                                                              412

1   A.    Yes.

2   Q.    When you told Nicholas that you had firmed up your

3   decision to go to Syria, to go abroad to Turkey, Nicholas told

4   you to find another job in the same field in America, correct?

5   A.    In the same field?

6   Q.    He told you to get -- you told him you'd lost your job,

7   right?

8   A.    Correct.

9   Q.    Why did you tell him you'd lost your job?

10  A.    Because I actually did lose my job.

11  Q.    You were being paid by the FBI to inform on Nicholas,

12  correct?

13  A.    Yes, during that time.

14  Q.    Is that paid work?

15  A.    From that period when I met, yeah, Nicholas Young.

16  Q.    So when you -- you told Nicholas Young you had lost your

17  job on October 2, 2014, correct?

18          MR. GIBBS:  Objection, Judge.  Asked and answered.

19          MR. SMITH:  Okay.

20          THE COURT:  Sustained.

21  BY MR. SMITH:

22  Q.    On October 2, 2014, Nicholas told you to find another job

23  in America, right?

24  A.    Yes.

25  Q.    Now, you've testified today about a conversation you had

Mo - Cross                                                                413

1    at Hicham Hall's house on October 9, 2014.  Do you remember

2    that?

3    A.    I do.

4    Q.    And there was a clip played from that meeting on

5    October 9, 2014, where Hicham is kind of ranting at you, right?

6    A.    Yes.

7    Q.    That conversation you had with Hicham was when you were

8    inside Hicham's house that evening after dinner with Hicham's

9    family, correct?

10   A.    Correct.

11   Q.    But then you walk out of the house with Nicholas and

12   Hicham, and then Hicham confronts you after that conversation,

13   correct?

14   A.    Correct.

15   Q.    Hicham says essentially:  All of this ISIS conversation

16   you're talking about, you need to be careful, and, you know, if

17   I ever see you again, I might inflict physical harm on you.

18              Do you remember that?

19   A.    I do.

20   Q.    That happened after the conversation that you had with

21   Hicham that was played today, correct?

22   A.    You mean, like, after the recording?

23   Q.    There was a clip that we played today from your meeting

24   with Hicham and Nicholas Young on October 9, 2014, correct?

25   A.    Correct.

1   Q.   And that conversation from the clip took place in Hicham

2   Hall's house that evening, on October 9, correct?

3   A.   Correct.

4   Q.   But when you left his house that evening after that

5   conversation for which we played the clip, Hicham Hall

6   confronted you about your interest in ISIS, correct?

7   A.   Yes.

8   Q.   He said, "If I ever see you again, I might inflict

9   physical harm on you because of your interest in ISIS,"

10  correct?

11  A.   I can't recall if he said exactly that, but --

12  Q.   Essentially?

13  A.   Yes, essentially.

14  Q.   And that happened after Hicham's conversation with you,

15  right?

16  A.   Yes.

17  Q.   Didn't one day -- you testified about October 10, 2014,

18  correct?  That's one day after the meeting at Hicham's house?

19  A.   Yes.

20  Q.   You testified today about your meeting with Nick on

21  October 10, 2014.  We played a clip from it, correct?

22  A.   Correct.

23  Q.   Didn't Nicholas Young tell you on October 10, one day

24  after the meeting at Hicham's house, that Hicham was speaking

25  from his heart and that Nicholas Young understood where he was

1   coming from?

2   A.    I don't recall that.

3          MR. SMITH:   October 10, 2014, 2 hours, 34 minutes.

4   October 10.

5          MR. ENNS:   2 hours, 34 minutes?

6          MR. SMITH:   2 hours, 34 minutes.   This is only one

7   minute long.   2 hours, 34 minutes.

8          (Audio excerpt was played.)

9          MR. SMITH:   Tap me when you've got it, okay?

10          (Audio excerpt was played.)

11  BY MR. SMITH:

12  Q.   So didn't Nicholas tell you the next day, on October 10,

13  2014, that he understood where Hicham was coming from?

14  A.   Yes.

15  Q.   And -- but when he said that, "I understand where Hicham

16  is coming from," he was referring to when Hicham confronted you

17  the evening before, correct?

18  A.   Yes.

19  Q.   So when the prosecutor in your direct testimony asked you

20  whether -- suggested Nicholas was agreeing with Hicham's

21  comments to you inside the house, that's not what Nicholas

22  Young was referring to on October 10, was it?

23  A.   He's referring to what Hicham has stated.

24  Q.   When Mr. Young told you on October 10, 2014, that he

25  understood where Hicham was coming from, Mr. Young was

1    referring to when Hicham confronted you about ISIS the night

2    before, correct?

3             MR. GIBBS:  Judge, he can't say what Mr. Young was

4    thinking.

5             THE COURT:  Sustained.

6    BY MR. SMITH:

7    Q.   Didn't -- on October 10, 2014, the same day we're talking

8    about, didn't Nicholas tell you to constantly purify your

9    intentions?

10   A.   He did.

11   Q.   Didn't he tell you you should always follow your

12   conscience?

13   A.   Yes.

14   Q.   Didn't he suggest that this idea you have of going

15   overseas might be an opinion you have that you're sticking to

16   out of pride?

17   A.   I don't recall that.

18            MR. SMITH:  This is 30 seconds, Your Honor.

19   October 10, 2014, 38 minutes, 39 seconds.

20            You let me know when you get those, okay?

21            MR. ENNS:  38 minutes, 39 seconds.

22            MR. SMITH:  Yeah.

23            THE COURT:  Let's move this along.  Come on, ask your

24   next question.

25   BY MR. SMITH:

1    Q.   So you agree that on October 10, he told you to purify

2    your intentions?

3            MR. GIBBS:   He just testified, Your Honor, he

4    couldn't remember.

5            THE COURT:   Sustained.

6    BY MR. SMITH:

7    Q.   On October 10, 2014, didn't Nicholas tell you, "You're

8    going to get grilled if you go to Syria and come back"?

9    A.   Yes.

10   Q.   He told you this a lot, right?

11   A.   Yes.

12   Q.   He told you on multiple occasions right around the time

13   you left for Syria on October 25, 2014, correct?

14   A.   Correct.

15   Q.   Didn't he tell you he personally would be afraid to do

16   that because you're going to get caught?

17   A.   Yes.

18   Q.   At the end of your meeting on October 10, 2014, didn't

19   Nicholas suggest to you that you might be feeling pressured and

20   not to change your mind about Syria at the end of the meeting?

21   A.   I don't recall.

22           MR. SMITH:   The paralegal now explains that he's

23   good.

24           Please play October 10, 2014, 56 minutes, 54 seconds,

25   to the end.

Mo - Cross                                                           418

1          MR. ENNS:  One more time?

2          MR. SMITH:  October 10, 2014, 56 minutes, 54 seconds.

3          (Audio excerpt was played.)

4          MR. SMITH:  Is this October 10?

5          (Audio excerpt was played.)

6          MR. SMITH:  Stop it.  Stop it.

7    Q.   You testified about your meeting with Nicholas Young on

8    October 16, 2014, correct?

9    A.   Correct.

10   Q.   During that meeting, you attempted to have Nicholas offer

11   to purchase your vehicle, your Jeep, right?

12   A.   Did I offer him to buy?

13   Q.   Your agent handler instructed you before this meeting to

14   see whether Nick might be willing to buy your Jeep before you

15   went overseas, right?

16   A.   I don't recall.

17   Q.   Do you recall trying to sell your Jeep before you went

18   abroad?

19   A.   I do recall trying to sell it, but I don't recall trying

20   to sell it to him.

21   Q.   You tried to sell it to him, and he didn't agree to buy

22   your Jeep, did he?

23   A.   I don't recall.

24   Q.   Now, in your direct testimony, you testified that on

25   October 16, 2014, it was Nicholas Young's idea to create a Kik

1    account, right?

2    A.    Yes.

3    Q.    It was actually your idea, wasn't it?

4    A.    To create a Kik account?

5    Q.    Yeah.  It was your idea.  You came up with the idea of Kik

6    because Nicholas told you that he's not familiar -- he's not

7    tech savvy, he doesn't know about Kik, correct?

8    A.    No, that's not true.

9    Q.    It was your idea to come up with Kik, wasn't it?

10          MR. GIBBS:  He just answered the question.  Asked and

11   answered.

12          THE COURT:  Sustained.  Sustained.

13   BY MR. SMITH:

14   Q.    On October 10, 2014, during your conversation with Nick

15   about e-mails when you travel abroad, you told Nick you'd have

16   your sister and mom's contact information in your phone,

17   correct?

18   A.    I don't recall.

19   Q.    During this meeting on October 10, 2014, you said that the

20   whole purpose of your booking of the tour in Turkey was to have

21   a good story, and Nicholas said, "You should actually take the

22   tour," didn't he?

23   A.    Yes.

24   Q.    During this meeting, Nicholas asked you whether you might

25   go from Turkey to Palestine instead of Syria, correct?

Mo - Cross                                                         420

1   A.   Yes.

2   Q.   You didn't correct him, did you?

3   A.   I'm sorry?

4   Q.   You didn't say, "No, I'm not going to Palestine," did you?

5   A.   No.

6   Q.   During this meeting on October 10, 2014, Nicholas

7   cautioned you that it's tough to leave something you know for

8   something you don't, didn't he?

9   A.   I don't recall.

10  Q.   During this meeting, Nicholas -- you asked Nicholas if he

11  wanted to go to Syria, and he said, "No, I'd rather go to

12  Libya, where I have friends," right?

13  A.   Say that again?

14  Q.   During the meeting on October 10, 2014, you asked Nicholas

15  if he wanted to go to Syria, right?

16  A.   Correct.

17  Q.   And he said, "No, I'd rather go to Libya.  I have friends

18  there."  Right?

19  A.   Yes.

20  Q.   At some point during your meeting on October 10, 2014,

21  Nicholas told you why he decided to stay in the U.S. and not go

22  back to Libya again, right?

23  A.   I don't recall.

24  Q.   He told you it was his girlfriend, his Canadian

25  girlfriend, right?

1    A.    I don't recall.

2             MR. SMITH:   Your Honor, we have to play October 16,

3    2014, 2 hours, 22 minutes, 30 seconds.   This is October 16,

4    2014, and it's at 2 hours, 22 minutes, 30 seconds.

5             October 16, 2014, 2 hours, 22 minutes, 30 seconds.

6             (Audio excerpt was played.)

7             MR. SMITH:   Stop it.

8             Your Honor, we move into evidence that clip from

9    October 16, 2011.   It's going to be Defense Exhibit 12.

10            MR. GIBBS:   No objection, Judge.

11            THE COURT:   All right.

12            (Defendant's Exhibit No. 12 was received in

13   evidence.)

14            MR. SMITH:   That's December (sic) 16, 2 hours, 22

15   minutes, 30 seconds, to 2 hours, 23 minutes, 36 seconds.

16   Q.    You met with Nicholas Young on October 17, 2014, correct?

17   That's one of the clips you played today.

18   A.    Yes.

19   Q.    During that meeting, you asked Nicholas Young whom you

20   could trust if you went to Syria, correct?   Who could you

21   trust?   You're asking Nicholas that question.

22   A.    Correct.

23   Q.    And he said unlike Libya, the situation there is more

24   complicated, right?

25   A.    Yes.

1   Q.   He said in Libya, it was either you're for a dictator, and

2   he was referring to Gaddafi, or you're against a dictator.

3   That was the situation in Libya, right?

4   A.   Yes.

5   Q.   And he said the situation in Syria is different because

6   there's all kinds of groups and players involved in the war

7   there, right?

8   A.   Yes.

9           THE COURT:  All right, it's six o'clock.  We're going

10  to close it up for today.

11          MR. SMITH:  One last comment, Your Honor.

12          THE COURT:  No, we're finishing at six o'clock.

13          Ladies and gentlemen, you've been very patient.  This

14  evidence, I know, is tough.  I want to make sure that everybody

15  gets a good night's sleep.  And again, please make sure you

16  avoid any media coverage about this case or anything else

17  related to ISIS or any kind of terrorist issues that might be

18  floating around right now.

19          Again, please make sure that you follow all of my

20  directions about not trying to make up your mind about any

21  issue or communicating about this case.  I am going to be

22  putting both sides on a time limit tomorrow so we start moving

23  this case more efficiently.

24          And if you can all try to be here by nine o'clock

25  tomorrow morning, we'd appreciate that, but we'll let you go.

1    I'm staying in session with counsel for a few minutes.

2                          (Jury out.)

3              THE COURT:  And the witness may leave.

4                          (Witness stood down.)

5              THE COURT:  All right, I don't know how in the world

6    this record is going to be put together.  The defense

7    absolutely must properly produce this evidence.  You're going

8    to need to put your specific clips on one tape.  We're not

9    going to have this so that somebody has to go through the tape

10   with a counter.  And there has to be a transcript to go with

11   this.  It's absolutely incomprehensible.  It's gobbledygook,

12   and I've never seen a record quite this bad.  I mean, the

13   government's wasn't all that much better.

14             These are terrible tapes.  I don't understand why the

15   FBI can't figure out a better way of cleaning up their tapes.

16   I mean, there's obviously important information for both sides

17   which the trier of fact is not going to be able to get in any

18   kind of reliable manner because the tapes are so bad.

19             Now, you mentioned headphones.  If you have a

20   headset, is it any easier to hear this stuff?  I mean, some of

21   you have been listening to this.

22             MR. SMITH:  It is, Your Honor.  It's far easier, Your

23   Honor.

24             THE COURT:  Well, what I'm going to do then is before

25   the jury comes in, not tomorrow but maybe Thursday, I'm going

424

1   to come in early and put on a set of headphones, and I want to

2   listen to one of your tapes again, because we should have done

3   that with the jury.  You should have given us a heads up on

4   that.  We have enough headsets.

5          But in any case, this case has to start moving.

6   We've been extremely slow.  There are repetitive questions.

7          Now, you're an excellent -- both sides are doing

8   this, but you're doing it more than anyone else, Mr. Smith:

9   You're repeating answers and making questions longer than they

10  have to be.  The prosecution sometimes does that, too.  It's a

11  great trick of trial advocacy.  I'm not going to permit it now.

12         Questions have to be shorter and more specific.  They

13  can't be repeated.  We're not going to go over things a second

14  and third time, and I said I'm putting you-all on a time limit.

15  You've got one hour to finish your cross-examination of this

16  witness.  So do triage, get your best points out, but that's

17  how we're going to get this case moving.

18         All right, we'll see you-all tomorrow morning at nine

19  o'clock.

20         MR. GIBBS:  Thank you, Judge.

21    (Recess from 6:05 p.m., until 9:00 a.m., December 13, 2017.)

22

23

24

25

1                CERTIFICATE OF THE REPORTER

2        I certify that the foregoing is a correct transcript of

3  the record of proceedings in the above-entitled matter.

4

5

6                              _____
                                          /s/
7                                 Anneliese J. Thomson

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25