426

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

UNITED STATES OF AMERICA      .    Criminal No. 1:16cr265
                              .
      vs.                     .    Alexandria, Virginia
                              .    December 13, 2017
NICHOLAS YOUNG,               .    9:00 a.m.
                              .
              Defendant.      .
                              .
. . . . . . . . . . .

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

<u>VOLUME III</u>

<u>APPEARANCES:</u>

FOR THE GOVERNMENT:          JOHN T. GIBBS, AUSA
                             GORDON D. KROMBERG, AUSA
                             EVAN N. TURGEON, SAUSA
                             United States Attorney's Office
                             2100 Jamieson Avenue
                             Alexandria, VA 22314

FOR THE DEFENDANT:           NICHOLAS D. SMITH, ESQ.
                             David B. Smith, PLLC
                             108 North Alfred Street
                             Alexandria, VA 22314
                               and
                             LINDA MORENO, ESQ.
                             Linda Moreno P.A.
                             511 Avenue of the Americas
                             No. 2
                             New York, NY 10011

ALSO PRESENT:                SA NICHOLAS CASLEN
                             NICHOLAS ENNS
                             FABIAN VERA

(Pages 426 - 737)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

1   OFFICIAL COURT REPORTER:       ANNELIESE J. THOMSON, RDR, CRR
                                   U.S. District Court, Fifth Floor
2                                  401 Courthouse Square
                                   Alexandria, VA 22314
3                                  (703)299-8595

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

428

I N D E X

| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| WITNESS ON BEHALF OF THE GOVERNMENT: | | | | |
| Mo (Resumed) | | 431 | 449 | 454 |
| Agent Cameron Siegfried | 458 | 502 | | |
| SA Smith | 533 | 546 | | |
| SA John Sikorski | 559 | 614 | 626 | |
| SA John Minichello (Recalled) | 628 | 642 | | |
| Paul Lee | 648 | 683 | 684 | |
| Ian Paul Campbell | 688 | 701 | | |

EXHIBITS

| | MARKED | RECEIVED |
|---|---|---|
| GOVERNMENT'S: | | |
| Nos. 1-101 thru 1-116 | | 461 |
| 1-210A | | 479 |
| 1-201 thru 1-219 | | 461 |
| 1-221 and 1-222 | | 561 |
| 1-220 | | 528 |
| 1-701 and 1-702 | | 663 |
| 2-101 thru 2-112 | | 563 |
| 2-116, 2-118 thru 2-123 | | 563 |
| 2-125 thru 2-130 | | 563 |
| 3-100 | | 594 |
| 3-101 | | 595 |
| 3-102 and 3-103 | | 597 |
| 3-104 thru 3-114, 3-117 thru 3-121, | | 603 |
| 3-115 | | 594 |

429

```
 1                          EXHIBITS

 2                                    MARKED        RECEIVED

 3    GOVERNMENT'S:

 4    Nos. 3-117A                                    605
           3-118A thru 3-120A                        608
 5         3-125                                      603
           3-200, 3-202 thru 3-226                    599
 6         3-300 and 3-302                            608

 7         4-101, 4-102, 4-104, 4-105                 609
           4-106                                      613
 8         4-107 thru 4-109                           609
           4-200                                      609
 9         4-300                                      629

10         5-101-4                                    541
           5-102                                      545
11         5-301-1 thru 5-301-3                       639
           6-103-7                                    454
12         7-101                                      612

13         7-102                                      610
           7-103                                      612
14         7-202A thru 7-216A                         463
           10-100                                     674
15         10-101A                                    677

16         10-861                                     699
           11-400                                     695
17         12-34                                      662
           12-36                                      665
18         18-100                                     688

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2                    (Defendant present, Jury out.)

 3           THE CLERK:  Criminal Case 16-265, United States of

 4    America v. Nicholas Young.  Would counsel please note their

 5    appearances for the record.

 6           MR. GIBBS:  Good morning, Your Honor.  John Gibbs,

 7    Gordon Kromberg, Evan Turgeon on behalf of the United States,

 8    along with Special Agent Nicholas Caslen and Paralegal

 9    Specialist Fabian Vera.

10           THE COURT:  Good morning.

11           MR. SMITH:  Good morning, Your Honor.  Nicholas Smith

12    for defendant Nicholas Young, and with me is counsel Linda

13    Moreno.

14           THE COURT:  All right.  Good morning, counsel.

15           MS. MORENO:  Good morning.

16           THE COURT:  The jury is here, so we'll get them in to

17    get started.  And remember, you have an hour to finish up the

18    cross-examination.

19                    (Jury present.)

20           THE COURT:  Oh, good, you're changing positions.  Do

21    you want to come down?  I'm not sure -- you're short.  You may

22    not be able to see from where you are.  I just won't be able to

23    watch you today, all right.  You-all have a seat.  You can sit

24    as soon as you're in the box.

25           Well, good morning, ladies and gentlemen.  I always
```

1    tell lawyers that when I have a jury that gets to court on

2    time, I know I have a very serious jury, and I want to thank

3    you.  Again, I recognize how traffic is, and it was cold out

4    there this morning, and I guess all of your engines started, so

5    that's great.

6           We're going to -- I just want you to know that I have

7    decided to give the lawyers time periods to keep this case on

8    schedule.  You know, everything in life has limits.  Even our

9    lives have limits.  There's no reason why trials shouldn't,

10   either, so people have to put their best evidence on within the

11   time I'm giving them, but I want to get this case to you as

12   quickly as we can.

13          So we're going to proceed, and, Mr. Smith, you're in

14   the middle of your cross-examination.

15          MR. SMITH:  Thank you, Your Honor.

16      MO, GOVERNMENT'S WITNESS, PREVIOUSLY AFFIRMED, RESUMED

17                 CROSS-EXAMINATION (Cont'd.)

18   BY MR. SMITH:

19   Q.   Good morning, Mo.

20   A.   Good morning.

21   Q.   Mo, I'd like to pick up on where we left off yesterday

22   when the cross-examination was recessed for the evening

23   yesterday.

24   A.   Yes.

25   Q.   Yesterday, you testified that your agent handler

1  instructed you to discuss geopolitics with Mr. Young in order

2  to encourage conversation about ISIS.  Correct?

3  A.    I do not recall.

4  Q.    Do you recall mentioning that you would raise the subject

5  of the dictator of Syria, Basher Assad, with Mr. Young in order

6  to discuss ISIS with Mr. Young?

7  A.    I do not recall.

8  Q.    Did you discuss the Syrian war with Mr. Young in

9  connection with ISIS?

10  A.    Yes.

11  Q.    And did Mr. Young take an interest in the Syrian war

12  because of the Syrian government's butchery of civilians in

13  that war?

14  A.    Yes.

15  Q.    And did you continue those conversations with Mr. Young

16  about the war and about how civilians were dying in Syria?

17  A.    Yes.

18  Q.    I'd like to talk about some of the other ways in which you

19  developed a personal connection with Mr. Young, okay?

20  Mr. Young would go out with you to eat at restaurants, correct?

21  A.    Yes.

22  Q.    He would buy you meals, correct?

23  A.    Yes.

24  Q.    You would have many conversations at these restaurants and

25  in social occasions which had nothing to do with terrorism,

Mo - Cross                                                          433

1   correct?

2   A.   That happened.

3   Q.   It happens on multiple occasions, correct?

4   A.   Yes.

5   Q.   You would buy him gifts, correct?

6   A.   I don't recall.

7   Q.   You bought him a Palestinian scarf.  Do you remember that?

8   A.   Yes.

9   Q.   So you do recall.

10       You would share stories about your families, correct?

11  A.   Yes.

12  Q.   You told him about your grandmother in the West Bank,

13  correct?

14  A.   Yes.

15  Q.   And that your grandma in the West Bank was not very

16  wealthy and was struggling to get by there, correct?

17  A.   I don't recall.

18  Q.   And Mr. Young told you about his father, correct?

19  A.   Yes.

20  Q.   He told you about how, his regrets about how he wished he

21  had gotten to know his father better, correct?

22  A.   Yes.

23  Q.   And you had multiple conversations about this, correct?

24  A.   Correct.

25  Q.   Mr. Young told you about his ex-girlfriends and his

1  romantic relationships in the past, correct?

2  A.   Yes.

3  Q.   You would have long conversations about girls and dating,

4  correct?

5  A.   Yes.

6  Q.   Mr. Young told you that one of the reasons why he never

7  went back to Libya after 2011 was that he developed a strong

8  relationship with one girlfriend from Canada, correct?

9  A.   Yes.

10 Q.   And he discussed with you how after this girlfriend broke

11 up with him, he was very devastated, and you had a long

12 conversation about that, correct?

13 A.   Yes.

14 Q.   That was in the same week that you decided to go to --

15 pretend to go to Syria, correct?

16 A.   I don't recall.

17 Q.   Okay.  Let's go back to the meetings we were discussing

18 yesterday which you testified about.

19 A.   Yes.

20 Q.   So you testified about a meeting on September 11, 2014,

21 with Mr. Young, correct?

22 A.   I did.

23 Q.   And then after that meeting, the next meeting you

24 testified about was not until October, correct?

25 A.   Correct.

1   Q.   Okay.  But you had some meetings with Mr. Young between

2   that September 11 meeting and the meetings in October, correct?

3   A.   All meetings were recorded.

4   Q.   I understand.  I'm just asking you to confirm that there

5   were some meetings between the September 11, 2014, meeting with

6   Mr. Young and the October 2014 meetings which you testified

7   about yesterday.

8   A.   I don't recall.

9   Q.   I'd like to hand up a document dated September 23, 2014.

10  It's an FBI summary.

11          THE COURT:  When you say all of your meetings with

12  Mr. Young were recorded, what do you mean by that?

13          THE WITNESS:  I mean by I was wearing a wire.

14          THE COURT:  So they were all -- in your view, they

15  were all audio recorded?

16          THE WITNESS:  Yes, ma'am.

17          THE COURT:  All right.

18  BY MR. SMITH:

19  Q.   So, Mo, if you take a look at that document, do you see

20  that if you -- it's an FBI memorandum reflecting a CHS

21  recording?

22  A.   Yes.

23  Q.   And can you see on the second page the date of the meeting

24  that it reflects between you and the defendant, Nicholas Young?

25  A.   Yes.

Mo - Cross                                                                436

1    Q.    Did you testify about that meeting yesterday?

2    A.    The little Italian cafe?  Yes.

3    Q.    You testified about that meeting yesterday, on

4    September 12.  You testified yesterday about September 11,

5    2014.  I'm asking you if you also testified about September 12,

6    2014, which is -- September 12 is reflected in that FBI

7    memorandum in front of you?

8    A.    Yes.  I only testified about September 11.

9    Q.    Okay.  Do you recall your conversation on September 12,

10   2014, with Mr. Young?  I'm not asking you to read the document.

11   I'm just asking whether you recall.

12   A.    No, I don't.

13   Q.    Okay.  So you don't recall what happened on that date?

14   A.    No.

15   Q.    If I asked you to review that document in front of you and

16   refresh your recollection, would you be able to?

17   A.    No.

18   Q.    Why not?

19   A.    Most of it is redacted.

20   Q.    Thank you.

21         Now, you testified yesterday about your meeting on

22   October 16, 2014, with Mr. Young, correct?

23   A.    Yes.

24   Q.    And during that -- do you recall that meeting?  Do you

25   recall that meeting?  I think it's the little Italian cafe.

1    That's what you were thinking about on October 16?

2    A.   I don't recall the exact location, but --

3    Q.   You testified yesterday about your meeting on October 16,

4    2014, right?

5    A.   Yes.

6    Q.   Who is Shuaib?

7    A.   Shuaib is the imam -- or one of the imams at the Sully

8    Mosque.

9    Q.   And did Shuaib ever have a conversation with you about

10   your thoughts about going to Syria or overseas?

11   A.   Yes.

12   Q.   What did Shuaib think about you going to Syria?

13   A.   He discouraged it.

14   Q.   What did he say to you?

15   A.   I don't recall the exact wordings, but --

16   Q.   Strongly discouraged it, correct?

17   A.   Yes, he discouraged it.

18   Q.   And what mosque is Shuaib an imam at?

19   A.   The Sully Mosque.

20   Q.   That's the mosque that you and Nicholas went to, right?

21   A.   Occasionally, he would go there.

22   Q.   That's where you met Nicholas, right, Sully Adams?

23   A.   The first time?  Yes.

24   Q.   Okay.  So do you recall that on your October 16 meeting

25   with Nicholas Young which you testified about, that Nicholas

1   Young told you -- he said to you Shuaib would have convincing

2   arguments for not going to Syria.  Do you remember that?

3   A.    I don't recall.

4   Q.    Do you recall that Mr. Young said Shuaib would have very

5   convincing arguments for not going to Syria and that maybe

6   perhaps you should listen to them?

7   A.    I do not recall.

8           THE COURT:  Again, ladies and gentlemen, this is an

9   example of whatever the lawyer said in that question you cannot

10  accept as evidence if the witness says he doesn't recall it,

11  all right?  I just want you to keep that clear.

12          MR. SMITH:  Your Honor, I just need one moment.

13  Q.    I'm handing up a document that's an FBI memorandum that's

14  a consensual recording on October 16, 2014.

15          Excuse me, I'm looking for -- I'm looking for

16  October 17.  Can you give me October 17?

17          Here it is.

18          October 17.  There you go.

19          MR. GIBBS:  Your Honor, obviously, he can try to

20  refresh the witness with this, but it's not marked at this

21  point, and it's not a transcript.  It's a summary of a

22  conversation.

23          THE COURT:  Well, it's simply being used to see if it

24  could refresh the memory of the witness.  That's all right, but

25  if the witness looks at it and it doesn't refresh anything,

Mo - Cross                                                              439

1    that's it.  It doesn't come into evidence.

2              MR. GIBBS:  Understood, Judge, but just for the

3    record, it needs to be marked as something so we at least have

4    a record of what was shown to the witness.

5              THE COURT:  You have that problem extensively.  What

6    number do you want to put on that?

7              MR. SMITH:  Let's call this Defense Exhibit 12.

8              THE COURT:  I think we have a thousand Exhibit 12s.

9    It's going to make no sense in this record.

10             MR. SMITH:  Your Honor, if I may, I'd like to first

11   describe the document to the court reporter, describe the date,

12   the author, hand it to the witness, and then after the witness

13   reviews it, I will explain the -- I will mark the document

14   after I cross-examine the witness.

15             THE COURT:  I'm not going to guarantee that this

16   record will ever be accurate.

17             MR. SMITH:  Thank you, Your Honor.

18             THE COURT:  This is not the way it should be done.

19             MR. SMITH:  I'm handing up a document dated

20   October 17, 2014.  It's an FBI memorandum drafted by Cameron

21   Siegfried.

22   Q.   Mo, let me know when you see the October 17, 2014, date.

23   A.   I see it.

24   Q.   Okay.  Does this memorandum reflect a summary of your

25   recording on October 17, 2014?

1          THE COURT:  The proper question is looking at that,

2    does that refresh your memory?

3          MR. SMITH:  I have to ask the question that I'm

4    asking -- it's a very long memorandum, so I asked him -- the

5    question for the witness was do you recall a conversation with

6    Shuaib -- a conversation about Shuaib with Nicholas Young on

7    October 17, 2014?

8          THE WITNESS:  I don't recall exactly the date that I

9    had a meeting with Shuaib.

10   BY MR. SMITH:

11   Q.   I'm not asking you about your meeting with Shuaib and the

12   date.  I'm asking you whether on October 17, 2014, you had a

13   conversation with Nicholas Young about Shuaib.

14   A.   I honestly can't recall.

15   Q.   Can you turn to page 11, please?

16   A.   Okay.

17   Q.   Can you review the middle of the page and see if Shuaib is

18   referenced, please?

19   A.   I see Shuaib.

20   Q.   What does it say there?  Does that refresh your

21   recollection --

22         THE COURT:  No, no, no.

23   BY MR. SMITH:

24   Q.   Does that refresh your recollection, Mo?

25   A.   I spoke to Shuaib many times.  I can't say that on that

Mo - Cross                                                          441

1    day specifically.

2    Q.    I'm not asking you about when you spoke to Shuaib.  I'm

3    asking you about whether Nicholas Young said to you on

4    October 17, 2014, that Shuaib would have convincing arguments

5    for not going to Syria and maybe you should not block it out of

6    your mind because he's probably more knowledgeable than you.

7    A.    I honestly don't recall.

8    Q.    And your, your recollection is not refreshed reviewing the

9    document in front of you?  You could just review that page

10   you're looking at, page 11.

11   A.    Yes.

12   Q.    So your recollection is refreshed?

13   A.    Yes.

14   Q.    So you do recall that Mr. Young said -- suggested to you

15   on October 17, 2014, that Shuaib would have convincing

16   arguments for not going to Syria?

17   A.    Yes.

18   Q.    And that maybe you should not block that out of your mind?

19   A.    Yes.

20   Q.    And that he's -- Shuaib is probably more knowledgeable

21   about you on the subject of whether you should go to Syria?

22   A.    Yes.

23   Q.    Thank you.

24         You testified yesterday about meetings you had with

25   Mr. Young on October 23 and October 25, 2014, correct?

Mo - Cross                                                            442

1   A.   Correct.

2   Q.   And you testified a little bit about a meeting you had on

3   October 24, 2014, correct?

4   A.   I can't recall exactly.

5   Q.   So, so you left the United States and the fictitious

6   identity you've created on October 25, 2014, correct?

7   A.   I can't recall, honestly, the exact date.

8   Q.   Do you recall the evidence yesterday showing you and

9   Mr. Young in a FedEx store?

10  A.   Yes.

11  Q.   And, and that was a FedEx -- that was an occasion in which

12  you created e-mails to chat when you left the country?

13  A.   Correct.

14  Q.   And that was October 25, 2014, correct?

15  A.   I would have to refresh my memory.

16  Q.   Okay.  You had a meeting the day before you left Syria

17  with Mr. Young, correct?

18  A.   Yes.

19  Q.   And during that meeting, Mr. Young said to you a few

20  things that should have cautioned you about going to Syria,

21  correct?

22  A.   I can't recall.

23  Q.   Mr. Young said to you, "It's only illegal to take up arms

24  against a U.S. ally," correct?

25  A.   Yes.

Mo - Cross                                                              443

1   Q.   He said to you, "It's illegal to join a terrorist

2   organization," correct?

3   A.   Yes.

4   Q.   This is a day before you left for Syria, correct -- or

5   Turkey, rather, correct?

6   A.   Yes.

7   Q.   He said to you, "There are other groups in Syria that are

8   not illegal terrorist organizations," correct?

9   A.   Correct.

10  Q.   He said, "If you have an itch to travel to Syria, you

11  might join a group that's not a terrorist group," correct?

12  A.   I can't recall.

13  Q.   And you asked him, "If Customs stops me and asks me

14  whether -- where I'm going, do I have to tell them?"

15          And Mr. Young said, "Yeah," correct?

16  A.   I can't recall.

17          MR. SMITH:  So this is a summary, an FBI summary of

18  Mo's consensual recording on October 24, 2014.  I'm handing it

19  up to the witness.

20          MR. GIBBS:  Judge, we have the same issue.  First of

21  all, it's not a marked document.  Second, this is a summary of

22  a recording that we played yesterday here in court.  The

23  statements that were just referenced we just heard on the

24  consensual audio yesterday.

25          THE COURT:  It's normally not wise cross-examination

1    to simply repeat what went on in the government's case.  The

2    jury did as best they could hear this yesterday.

3          MR. SMITH:  Your Honor, there were selective clips

4    from this meeting played yesterday.  It wasn't the entirety of

5    the conversation, so we are only eliciting parts of the

6    conversation that were not included.

7          Now, this one question about whether Mo would have to

8    tell CBP about coming back to Syria, that was included in the

9    clip played yesterday, but the clip was selective.  There were

10   seconds cut out, and, Your Honor, the government has presented

11   what it describes as a transcript of that recording.  We would

12   object to that description as a transcript.  It is only a

13   selective portion of the recording from that date.

14         THE COURT:  Well, we're not going to fight about what

15   is or is not a transcript, but at this point, if there's

16   something in addition to what was played yesterday, that is not

17   inappropriate.

18         MR. SMITH:  Thank you.

19         THE COURT:  So the objection is overruled.

20         MR. SMITH:  Thank you, Your Honor.

21         MR. GIBBS:  And, Judge, if I may, it's still an

22   unmarked document.

23         THE COURT:  We still have this problem.  I'm not sure

24   how it will ever get linked up, but at this point, let's get

25   this moving because of our time limit.

Mo - Cross                                                              445

1   BY MR. SMITH:

2   Q.   Do you see the document in front of you dated --

3   reflecting a meeting on October 24, 2014?

4   A.   Yes.

5   Q.   And this is a summary of your -- of the recording you

6   created during your meeting with Nicholas Young on October 24,

7   2014, correct?

8   A.   Yes.

9   Q.   Can you turn to page 5, please?  And can you review the

10  last line, the last comment on the page that begins with "SD"?

11  "SD" is for Slow Decline, so that is supposed to reflect a

12  summary of Mr. Young's comment.

13  A.   I'm looking at it.

14  Q.   Okay.  Can you review that comment and then review the top

15  of page 6 to about six lines down?  You can just let me know

16  when you're finished.  Six lines down on page 6 from the top.

17  You don't have to read it.  You can just let me know if that

18  refreshes your recollection.

19  A.   By reading it, it refreshes my recollection.

20  Q.   Okay.  So do you recall then on October 24, 2017, this is

21  the day before you left for Turkey, Mr. Young said, "They will

22  put you through the ringer if you go overseas and try to come

23  back"?

24          Do you remember that?

25  A.   Yes.

Mo - Cross                                                           446

1    Q.   Mr. Young told you, "They will want to know what cities

2    you're in, this and that," right?

3    A.   Yes.

4    Q.   And you asked him, "Do I have to tell them?  Do I have to

5    tell them that?"  Right?  Meaning do I have to tell them,

6    Customs, where I was going if I go overseas?  You asked him

7    that, correct?

8    A.   I don't recall.

9    Q.   Is your recollection refreshed on reviewing what I just

10   asked you to review, the memorandum in front of you on page 6,

11   the top of the page?

12   A.   Not entirely.

13   Q.   Not entirely, but he said something to the effect of --

14   you asked him, "I mean, am I going to get in trouble if I try

15   to come back from Turkey or Syria?"

16   A.   I don't recall.

17   Q.   And didn't Mr. Young say, "Yeah, you're going to go

18   through the ringer"?

19   A.   Yes, he did say that.

20   Q.   Okay.  Now, on the same day, October 24, 2014, the day

21   before you leave for Turkey, Mr. Young admonishes you about

22   something you have to keep in mind if you do go to Syria or if

23   you go to Turkey or anywhere overseas.  He gives you a word of

24   advice, correct?

25   A.   I don't recall.

Mo - Cross                                                          447

1   Q.   He says to you, "You can change your mind," and, "Some

2   people decide not to change their mind out of pride."

3            Do you remember that?

4   A.   I do not recall.

5   Q.   Can you turn to page 11, and can you review the last

6   comment on page 11, which begins "SD," for Slow Decline?

7   A.   That last paragraph, you said?

8   Q.   Yeah.  Can you review that?  And just -- you don't need to

9   read it.  Just tell me if that refreshes your recollection.

10  A.   Yes, I remember that.

11  Q.   So this appears to be in this memorandum, the last comment

12  Mr. Young made to you on October 24, 2014, the day before you

13  went to Turkey, correct?

14  A.   Correct.

15  Q.   And doesn't Mr. Young tell you that, you know, it's okay

16  if you change your mind about going?  Correct?

17  A.   Correct.

18  Q.   And doesn't he say that what you should basically do is

19  follow your conscience, correct?

20  A.   Yes.

21  Q.   Hadn't Mr. Young said this to you on a number of occasions

22  in this period of time in September and October 2014:  "The

23  most important thing is to follow your conscience"?

24  A.   Yes.

25  Q.   Mo, your relationship with Nicholas Young lasted between

Mo - Cross                                                          448

1   May 2014 and, if we include the e-mails that you and the agent

2   handler sent from Syria and Turkey, it includes up to August

3   2016, July of 2016, correct?

4            MR. GIBBS:  Judge, that's incorrect.

5            THE COURT:  Well, more than that, this witness has

6   already said that he's basically out of the situation after he

7   goes to Turkey, so he can't answer that question, so I'm

8   sustaining the objection.

9            MR. SMITH:  Okay.  I'll just note that yesterday,

10  Mr. --

11           THE COURT:  I sustained the objection.  You just ask

12  a new question.

13  BY MR. SMITH:

14  Q.   So your relationship with Mr. Young then lasted from May

15  2014 to October of 2014, correct?

16  A.   Correct.

17  Q.   And did you at any point ever see Mr. Young speak with

18  someone who was actually in ISIS, a member of ISIS?

19  A.   I can't recall.  I can't say whether or not.

20  Q.   You don't remember?  You don't know, right?

21  A.   I don't know.

22  Q.   Did you ever witness over these dozens of occasions in

23  which you were having conversations with Mr. Young about these

24  subjects that were in the recordings yesterday, did you ever

25  witness Mr. Young ever try to give material support to ISIS,

Mo - Redirect                                                            449

1  give something material to ISIS?

2  A.    Did I witness?

3  Q.    Yeah.

4  A.    No.

5  Q.    So ISIS's involvement in your part of this investigation

6  was fictitious, correct?

7  A.    My part?

8  Q.    During the time you were with, you were reporting on

9  Nicholas Young -- your agent handler instructed you to report

10 on Nicholas Young between May 2014 and October of 2014,

11 correct?

12 A.    Yes.

13 Q.    And you testified that you had conversations about ISIS

14 with Mr. Young in that period, correct?

15 A.    Correct.

16 Q.    But ISIS was never actually involved in any of these

17 conversations or plans or anything of any nature, correct?

18 A.    Yes.

19 Q.    You never communicated with ISIS, did you?

20 A.    No.

21         MR. SMITH:  Thank you, Your Honor.  That's it.

22         THE COURT:  All right.

23         MR. GIBBS:  Thank you, Judge.

24                      REDIRECT EXAMINATION

25 BY MR. GIBBS:

1   Q.   Good morning, Mo.

2   A.   Good morning, John.

3   Q.   You were testifying a few moments ago about Shuaib, the

4   iman at Sully Mosque, Shuaib, I can't remember his last time.

5   Do you recall that?

6   A.   Yes.

7   Q.   And you were asked some questions about Shuaib saying

8   things to discourage you from going to join ISIS.  Do you

9   recall that?

10  A.   Yes.

11  Q.   And by this point, had you made it clear that that was

12  your interest?

13  A.   Yes.

14  Q.   Now, when you were asked earlier about these e-mails you

15  set up right before you left the country, whose idea was it to

16  go set up those e-mails?

17  A.   It was the defendant.

18  Q.   And who went when you went to the store to set up those

19  e-mails?

20  A.   The defendant.

21  Q.   All right.  Was Shuaib there with you?

22  A.   No.

23  Q.   Was he invited to go with you?

24  A.   No.

25  Q.   Did anyone else go with you besides the defendant?

1   A.    No.

2   Q.    And what was the purpose of setting up those e-mails?

3   A.    To maintain communication and to update him about my trip.

4   Q.    And your trip to go do what?

5   A.    To join ISIS.

6   Q.    And at any point when you were setting up those e-mails,

7   did the defendant do anything or say anything to discourage you

8   from going to join ISIS?

9   A.    No.

10  Q.    Now, you were asked yesterday and today about some of the

11  recordings you made at the instruction of the FBI beginning in

12  July 2014.  Do you recall that?

13  A.    Yes.

14  Q.    And these were consensual recordings of the defendant,

15  right?

16  A.    Yes.

17  Q.    And yesterday on cross-examination, the defense asked you

18  about one recording that was made earlier, in May of 2014.

19  A.    Yes.

20  Q.    Do you recall that?

21        And that was a couple of months before the FBI

22  instructed you to start recording?

23  A.    Correct.

24  Q.    And do you remember yesterday the defense actually played

25  a portion of that recording?

Mo - Redirect                                                    452

1    A.    Yes.

2    Q.    Now, Mo, what, if any, recordings did you make with your

3    phone before the FBI instructed you to start recording the

4    defendant in July?

5    A.    The one in May.

6    Q.    And can you explain what happened with that one recording

7    on your phone?

8    A.    The defendant wasn't the subject.  The -- it was another

9    person.  It was Peshwaz, and he made a significant comment that

10   I felt needed to be passed on to Agent John Minichello, so I

11   took it upon myself to record and pass that to John.

12   Q.    All right.  And you mentioned Peshwaz.

13              Can we pull up 9-106, which is in evidence?

14              Who is this?

15   A.    That's Peshwaz.

16   Q.    All right.  And you testified a moment ago that the reason

17   you made that recording on your phone was that you believe

18   Peshwaz was making a significant statement?

19   A.    Correct.

20   Q.    And what was Peshwaz talking about?

21   A.    Jihad in Afghanistan.

22   Q.    And you testified a moment ago that once he made that

23   recording on your phone, you passed it to Special Agent John

24   Minichello, correct?

25   A.    Yes.

1    Q.    All right.  What did he tell you about making any

2    recordings without being instructed to do so by the FBI?

3    A.    To never do that again.

4    Q.    And did you follow that instruction?

5    A.    Yes.

6    Q.    And finally, one of the recordings you did make at the

7    instruction of the FBI that we heard yesterday was dated

8    September 11, 2014, and the defense asked you about that one.

9    They played a portion that related to Al Baghdadi.  Do you

10   recall that?

11   A.    Yes.

12   Q.    Who is Al Baghdadi?

13   A.    Al Baghdadi is the leader of ISIS.

14   Q.    And in the portion we heard yesterday the defense played,

15   the defendant made some comments about Al Baghdadi, his

16   pictures looking like a thug or looking like a criminal.  Do

17   you recall that?

18   A.    Yes.

19   Q.    And in that recording you made back in September of 2014,

20   do you remember what the defendant said about a minute and a

21   half after that in that recording?

22   A.    I do not recall.

23            MR. GIBBS:  Your Honor, we would ask to play, it's a

24   very short clip, I think it's 17 seconds long, it's cued up and

25   ready to go, and this is a portion from Exhibit 6-103-7, and we

Mo - Recross                                                         454

1    do have a transcript ready to go as well.

2              MR. SMITH:  No objection.

3              THE COURT:  All right, it's in.

4              (Government's Exhibit No. 6-103-7 was received in

5    evidence.)

6              MR. GIBBS:  Thank you.

7              THE COURT:  Do we have the audio?

8              MR. VERA:  Yes.

9              (Government's Exhibit No. 6-103-7 excerpt was

10   played.)

11             MR. GIBBS:  Thank you.

12             MR. SMITH:  Your Honor, three questions.

13             THE COURT:  Just one second.  He's not finished.

14             Are you done?

15             MR. GIBBS:  I am done.  Mo, thank you.

16             THE COURT:  All right.  Go ahead, Mr. Smith.

17                         RECROSS EXAMINATION

18   BY MR. SMITH:

19   Q.   Mo, after your testimony concluded yesterday on

20   cross-examination when the court recessed, did you discuss your

21   testimony yesterday with the attorneys after the hearing?

22   A.   No.

23   Q.   You did not, okay.

24             Yesterday you testified that the first time you made

25   a recording of Mr. Young in a meeting with him was July 2014,

1   correct?

2   A.   Correct.

3   Q.   And I asked you whether there was any recordings that you

4   had of meetings with Mr. Young before that point, correct?

5   A.   Yes.

6   Q.   You stated there were none, correct?

7   A.   Yes.

8   Q.   So your testimony yesterday was false, correct?

9   A.   The May recording was not about the defendant.

10  Q.   I'm not asking about a May recording.  Yesterday, I asked

11  you whether there were any recorded meetings that you had with

12  Mr. Young before July 2014, correct?

13  A.   All the audio recordings that were consensual were made in

14  July.

15  Q.   No, no, it's a yes or no.

16          MR. GIBBS:  Judge, he's attempting to answer the

17  question.

18          THE COURT:  Sustained.

19  BY MR. SMITH:

20  Q.   I asked you yesterday whether July 2014 -- there were any

21  meetings you had with Mr. Young that were recorded before July

22  of 2014, correct?

23  A.   Yeah.  You asked me if I had any meetings with the

24  defendant, so it sounded like the defendant alone.  That's why

25  I said July.

Mo - Recross                                                              456

1    Q.    I asked you yesterday whether you had ever recorded a

2    meeting with a target without the permission of your agent

3    handler, correct?

4    A.    I don't recall.

5    Q.    You said yesterday that you have never recorded a meeting

6    without the permission of your agent handler, correct?

7    A.    Correct.

8    Q.    Today you are -- it is your testimony that you have

9    recorded a meeting without the permission of your agent

10   handler, correct?

11   A.    Yes.  In May, yes.

12   Q.    So your testimony yesterday was incorrect, right?

13   A.    I was saying that the May -- or the recording that was

14   made in May, I did not have his permission to record that

15   meeting.

16   Q.    That is your testimony today, correct?

17   A.    Yes.

18   Q.    Yesterday when I asked you whether you had ever recorded a

19   meeting without the permission of your handler agent, you said

20   no, correct?

21              MR. GIBBS:  Judge, that's asked and answered.

22              THE COURT:  Sustained.

23              MR. SMITH:  Thank you.

24              THE COURT:  All right, does anybody anticipate

25   calling this witness again?

Mo - Recross                                                          457

1          MR. GIBBS:  Not from the government, Judge.

2          THE COURT:  How about from the defense?

3          MR. SMITH:  No.

4          THE COURT:  No?  All right.

5          Then thank you for your testimony.  You're free to go

6   at this time.  Do not discuss your testimony with any witness

7   who has not yet testified.

8                         (Witness excused.)

9          THE COURT:  All right.  Your next witness?

10         MR. GIBBS:  Cameron Siegfried, Your Honor.

11         THE COURT:  All right, Agent Siegfried.

12         MR. GIBBS:  And he does not need the screen to be up

13  while he's testifying.

14         THE COURT:  All right.  Ladies and gentlemen, because

15  it takes a couple of minutes to reset the courtroom, you're

16  getting a very short -- this is not your long morning coffee

17  break.  If you'd just leave the courtroom for a minute, we'll

18  recess for five minutes to reset.

19              (Recess from 9:39 a.m., until 9:44 a.m.)

20                      (Defendant present, Jury out.)

21         THE COURT:  All right, let's bring the jury in.  And

22  we want Agent Siegfried in here.

23                      (Jury present.)

24         THE COURT:  The agent should come around this way.

25      SA CAMERON SIEGFRIED, GOVERNMENT'S WITNESS, AFFIRMED

Siegfried - Direct                                                      458

                            DIRECT EXAMINATION

1

2  BY MR. GIBBS:

3  Q.   Good morning, sir.

4  A.   Good morning.

5  Q.   Sir, can you please state and spell your name for the

6  record.

7  A.   Yeah.  It's Cameron Siegfried, C-a-m-e-r-o-n, last name

8  Siegfried, S-i-e-g-f-r-i-e-d.

9  Q.   All right.  And, sir, your voice is a little soft-spoken,

10  and so sound doesn't always carry that well in here, so make

11  sure to lean forward so the mic can pick you up, if you will,

12  and try to keep your voice up, if you would.

13  A.   Sure.

14  Q.   And who do you work for?

15  A.   The Air Force Office of Special Investigations.

16  Q.   And how long have you been in that position?

17  A.   About 12 years.

18  Q.   And during your time with Air Force Office of Special

19  Investigations, were you assigned to work as a task force

20  officer with the FBI at any point?

21  A.   Yes, I was.

22  Q.   When was that?

23  A.   That was from December 2011 to April of 2016.

24  Q.   And where was that that you were assigned to work as a

25  task force officer?

Siegfried - Direct                                                     459

1   A.    The FBI Washington Field Office.

2   Q.    And as part of your duties as a task force officer, did

3   you participate in an investigation here in Northern Virginia

4   as co-case agent with Special Agent John Minichello?

5   A.    Yes, I did.

6   Q.    And were you assigned to that investigation during the

7   time when the CHS Mo supposedly left to go join ISIS?

8   A.    Yes, I was.

9   Q.    And when was that?

10  A.    Initially started around May of 2014.

11  Q.    And when did Mo supposedly leave to go join ISIS?

12  A.    That was towards the end of October of 2014.

13  Q.    And at that time, towards the end of October in 2014, did

14  John Minichello and Mo actually leave the country and travel to

15  Turkey?

16  A.    Yes, they did.

17  Q.    And did they send several e-mails, I believe it was three

18  in total, to the defendant from Mo's V4Vendetta mail account?

19  A.    Yes, that's correct.

20  Q.    And after the e-mails that were sent from Turkey, who

21  actually controlled that V4Vendetta e-mail account?

22  A.    It was myself and Agent Minichello.

23  Q.    And did you and Agent Minichello impersonate Mo when you

24  would send e-mails from that account to the defendant?

25  A.    Yes.

1  Q.   Did you receive e-mail from the defendant from his

2  essakobayashi e-mail account?

3  A.   Yes.

4          MR. GIBBS:  Your Honor, at this point, just in the

5  interests of sort of time and efficiency, if I could, and if

6  there's no objection, we'd like to move in all of the

7  essakobayashi e-mail accounts, which is Exhibits 1-201 through

8  1-219, and we'd like to move in all the V4Vendetta e-mails,

9  which is 1-101 through 1-116, and then I would just go through

10 them with the agent a little more quickly.

11         THE COURT:  Any objection?

12         MR. SMITH:  To virtually all of the e-mails, we have

13 no objection.  We --

14         THE COURT:  On your feet, Mr. Smith.  On your feet.

15         MR. SMITH:  We have an objection to one particular

16 exchange, but for the rest of the e-mails, we have no quarrel.

17         THE COURT:  Which one do you have an objection about?

18         MR. SMITH:  Can we approach the bench?

19         THE COURT:  Just tell me which one so I can see it.

20         MR. SMITH:  Your Honor, the, the e-mails are produced

21 in a way where there's long chains, so if we could explain it

22 at the bench --

23         THE COURT:  Wait, just give me the number, please.

24 They're all marked.

25         MR. SMITH:  Your Honor, they were not produced to the

Siegfried - Direct                                                   461

1    defense Bates stamped.

2              THE COURT:  Am I missing something?  How has the

3    government produced these exhibits?  I mean, you said --

4              MR. GIBBS:  With our exhibit numbers on them, Judge.

5    That's what -- the numbers I just referenced.

6              THE COURT:  So 1-201, for example -- it's very

7    specific.  It's a two-sentence exhibit.  You should be able to

8    tell me of this group which is the one you have a problem with.

9    Just give me the number; I'll look at it.

10             MR. SMITH:  Your Honor, we would need five minutes to

11   do that.  In the interests of speeding --

12             THE COURT:  All right, they're all in.  They're all

13   in at this point.  Let's go.

14             (Government's Exhibit Nos. 1-101 through 1-116 and

15   1-201 thru 1-219 were received in evidence.)

16             MR. GIBBS:  Thank you, Judge.

17             If we could pull up Exhibit 1-104?

18   Q.   Now, what is this?

19   A.   This is, this is an e-mail from the e-mail account that,

20   that we took over, Mo's e-mail account, to the defendant's

21   e-mail account on November 20 of 2014.

22   Q.   And so just to set the stage then, this is one of the

23   e-mails that you and Special Agent Minichello drafted and sent

24   to the defendant?

25   A.   That's correct.

1    Q.   And in the first line of that e-mail, you wrote, "I made

2    it to dawlah!"  What does "dawlah" refer to?

3    A.   "Dawlah" is an Arabic term for state.  It's typically used

4    among ISIS supporters and other travelers and, you know, common

5    among ISIS facilitators, recruiters, to describe the Islamic

6    State.

7    Q.   And so why didn't you just simply say, "Hey, I made it to

8    ISIS," instead of saying, "I made it to dawlah"?

9    A.   It's not, it's not common vernacular for how these

10   individuals talk, and it wasn't consistent with, with the

11   legend and the security protocols that they had set up prior

12   to, to Mo initially traveling.

13   Q.   And then if you look about four lines down in that e-mail,

14   you said, "The brothers look like they are making progress in

15   Derna."

16             Where is Derna?

17   A.   Derna is a, a town in northeastern Libya.

18   Q.   And what was the defendant's connection to Libya?

19   A.   He had attempted to travel there -- or traveled there at

20   least once and then attempted a second time.

21   Q.   And, Special Agent, in the course of the investigation,

22   was the FBI able to determine where Young went when he sent

23   e-mails to Mo?

24   A.   Yes.

25   Q.   And how did you learn that?

1   A.    We took the IP address off the e-mail header, took the

2   date and time stamp and did a subpoena to -- well, we took the

3   IP address, identified it resolved to a FedEx corporate office

4   in Texas, and then from there subpoenaed FedEx about an hour or

5   two time frame before and after the e-mail was sent to get

6   video from the FedEx store.

7   Q.    And how did you know which FedEx store to subpoena or to

8   seek those video records from?

9   A.    At the time, we didn't.  We assumed he likely used the

10  closest FedEx store to his, to his residence.

11  Q.    And were you correct in that?

12  A.    Yes.

13        MR. GIBBS:  If we could pull up -- actually, these

14  are not in yet, but we have a number of still photos from the

15  FedEx surveillance videos, and we would ask, again in the

16  interests of speed and efficiency, if we could, to move in

17  Exhibit 7-202A through 7-216A.  These are all FedEx stills.

18        MR. SMITH:  No objection.

19        THE COURT:  All right, they're all in.

20        (Government's Exhibit Nos. 7-202A through 7-216A were

21  received in evidence.)

22  BY MR. GIBBS:

23  Q.    And before we get to that, I just -- one question I had on

24  the previous exhibit, 1 -104, when you talked in that e-mail

25  about the brothers look like they are making progress in Derna,

1    who are the brothers you were referring to making progress in

2    Derna?

3    A.   "The brothers" was just a reference to other members of

4    the Islamic State.

5    Q.   In Libya?

6    A.   Yes.

7    Q.   Thank you.

8            All right, now if we can pull up the first still,

9    it's 7-202A.

10           And what is this?

11   A.   This is a still image of the defendant entering the FedEx,

12   FedEx office store.

13   Q.   All right, it's not real clear.  Are you able to make out

14   the date there at all?

15   A.   It appears to be December 12 of 2014.

16   Q.   Well, hold that thought.  If we can go to Exhibit 1-201,

17   see if that helps you at all with the date?

18   A.   Sorry.  It appears to be December 17 of 2014.

19           MR. GIBBS:  All right.  And if we could pull up

20   1-201?

21           THE COURT:  You've got to blow that up.  The jury

22   can't read that.

23           MR. GIBBS:  If we can enlarge the top section of

24   that?

25   Q.   How long after receiving the e-mail saying that Mo had

Siegfried - Direct                                                    465

1   made it to dawlah and that the brothers were making progress in

2   Derna did the defendant respond?

3   A.   It was approximately three weeks to a month.

4            MR. GIBBS:  All right.  In the first paragraph there

5   at the top, Mr. Vera, if we can highlight the sentence six

6   lines down where the defendant wrote, "I have been following

7   the news of the region"?

8   Q.   Now, Special Agent, in the course of your correspondence

9   with the defendant, how common was it for him to say that he

10  was following the news related to where Mo was located?

11  A.   It was fairly common.

12           MR. GIBBS:  And then if we could next move to

13  Government Exhibit 1-202?

14           MR. SMITH:  No objection.

15           THE COURT:  It's in.

16           MR. GIBBS:  And if we can blow up the top there?

17  Q.   What is this e-mail?

18  A.   This is an e-mail from the defendant to Mo's e-mail

19  account controlled by us on December 17, 2014.

20  Q.   So the same date as the last e-mail?

21  A.   Yes, it is.

22  Q.   And what did the defendant say in the second e-mail about

23  any pics that confirm that he had read the previous e-mails

24  that were sent from Turkey?

25  A.   He, he discussed the Blue Mosque and a -- the Libyan

Siegfried - Direct                                                     466

1    consulate that we had sent pictures of -- or actually, that

2    Agent Minichello had sent pictures of in previous e-mail.

3    Q.   Thank you.

4         All right, next if we can go to 1-203?

5         MR. SMITH:  No objection.

6         THE COURT:  These are all in already.

7    BY MR. GIBBS:

8    Q.   Yeah.  What is, what is this e-mail?

9    A.   This is an e-mail from the defendant to Mo's e-mail

10   account controlled by us on December 26, 2014.

11        MR. GIBBS:  And can we highlight that first sentence

12   that begins with the words, "Your brother"?

13   Q.   Based on a review of this e-mail, could you determine

14   which brother the defendant was referring to in that first

15   sentence?

16   A.   Yes.

17   Q.   Who was that?

18   A.   That was Hisham Hall.

19   Q.   How can you tell that was Hisham Hall?

20   A.   The description was consistent with, with Hisham's

21   consistent travel back and forth to school at the time.  He

22   was, he was attending school on the West Coast, and he came

23   into town in Northern Virginia a few weeks before, before Mo

24   had notionally left, and it was -- again, it was just

25   consistent with the description of Hisham Hall.

1  Q.   And that was based on your experience working on this

2  investigation?

3  A.   That's correct.

4  Q.   Thank you.

5        Next, if we can go to Exhibit 1-105?  And if we can

6  zoom in on the e-mail -- yeah, you've got it.

7        So what is this?

8  A.   This is an e-mail from Mo's e-mail account controlled by

9  us to the defendant on January 7, 2015.

10        MR. GIBBS:  And if we could, can we highlight the

11  portion in that e-mail from Mo's account, it's ten lines down,

12  that begins with the line, "People are big on Kik and twitter"?

13  And if we can highlight all the way down to where it says,

14  "talk to you sometime"?

15  Q.   Now, Special Agent, you put a reference in there, in your

16  e-mail to the defendant to the Jordan pilot.  What was that a

17  reference to?

18  A.   The Jordan pilot was a reference to a Jordanian pilot that

19  was participating in, in bombings of basically ISIS positions

20  in Syria and had ejected and was, was captured by ISIS in late

21  December of 2014.

22  Q.   And what does the word "we" refer to where you wrote,

23  "since we picked up the Jordan pilot"?

24  A.   "We" was just a reference to ISIS, the group that Mo was

25  with.

1    Q.    And in your e-mails to the defendant, did you frequently

2    reference events that were reported in the media?

3    A.    Yes, we did.

4    Q.    And was this an example of that?

5    A.    It was.

6              MR. GIBBS:  All right, if we could turn to Exhibit

7    1-204?  And if we can blow up the top portion?

8    Q.    What is this exhibit?

9    A.    This is an e-mail from the defendant to Mo's e-mail

10   account on January 8, 2015.

11   Q.    And keeping January 8, 2015, in mind, if we can go quickly

12   to Exhibit 7-204A?  So what is 7-204A?

13   A.    This is a still image of the defendant in the FedEx office

14   store on January 8 of 2015.

15   Q.    And that's the store that you subpoenaed the surveillance

16   records from?

17   A.    Yes, that's correct.

18             MR. GIBBS:  All right, let's go back to the e-mail

19   from January 8, if we could.

20             Mr. Vera, if you can zoom up on the top, and if you

21   can then highlight -- sorry, it's 1-204.  And if you can zoom

22   in on the first -- the second and third lines, beginning

23   with, "If you are unable to write or get injured"?

24   Q.    Now, how did the defendant's use of the word "commander"

25   in this e-mail fit into what you were telling him that Mo was

Siegfried - Direct                                                    469

1   doing overseas?

2   A.   Yeah, it appeared to be a reference that he, he understood

3   Mo to be with ISIS and, obviously, under a commander was the

4   way I read it.

5            MR. GIBBS:   And then if we can go down seven lines,

6   if we can highlight the sentence that begins, "Ha, yep, heard

7   about the rat pilot"?

8   Q.   Special Agent, what was the status of the Jordanian pilot

9   at this point?

10  A.   At this point, the, the status at least reported in the

11  media was unknown.

12  Q.   But was anyone widely reported to be holding the Jordanian

13  pilot?

14  A.   Yes.   He -- at that point, the ISIS was widely reported to

15  have captured that pilot.

16  Q.   And at some point after January 8 of 2015, what did ISIS

17  ultimately do to the Jordanian pilot?

18  A.   There were videos, obviously, published, I believe, in

19  early February of 2015.   The pilot was put in a cage and burned

20  alive.

21  Q.   And was that event widely reported?

22  A.   Yes, it was.

23  Q.   And then if possible, can we go down, I'd like to

24  highlight the portion -- the section that starts nine lines

25  down, where the defendant, it begins, "Not sure if you got the

Siegfried - Direct                                          470

1   news there yet," and goes down about five lines all the way

2   to, "according to people in the building."

3           Do you see that?

4   A.   Yes, I do.

5   Q.   All right.  And did you recognize what that was a

6   reference to?

7   A.   Yes.  It appeared to be a reference of the attack on the

8   *Charlie Hebdo* newspaper in Paris.

9   Q.   And can you describe that attack a little bit, exactly

10  what, what occurred?

11  A.   Yes.  I believe a couple individuals --

12          MR. SMITH:  Objection, Your Honor.  I believe the

13  witness is reading from a document on the witness stand.

14          THE COURT:  You do need to recall from your own

15  memory, without looking at anything.

16          THE WITNESS:  Yeah.

17          THE COURT:  All right.

18          THE WITNESS:  Yeah.  I believe a couple individuals

19  opened fire on a French newspaper, resulted in, you know, maybe

20  a dozen deaths.

21  BY MR. GIBBS:

22  Q.   All right, thank you.

23          Next if we can go to Government Exhibit 1-106 and

24  pull that up?  And can we highlight the sentence 13 lines down

25  that begins, "I heard about france"?

Siegfried - Direct                                                    471

1          And while we're pulling that up, can you explain what

2    that e-mail is, who it's from and who it's to?

3    A.   Yes.  This is an e-mail from Mo's e-mail account to the

4    defendant on January 29, 2015.

5    Q.   And so this is one that you and Special Agent Minichello

6    drafted and sent to the defendant?

7    A.   Yes, that's correct.

8    Q.   And in the highlighted portion there, when, when you said

9    that there are many brothers from there over here who seem so

10   happy -- well, actually, let me -- yeah.  So you talked about

11   France, said there are many brothers from over here who seem so

12   happy.  When you used the term "over here," what did you mean

13   for that to refer to?

14   A.   "Over here" was just a reference to Syria, Iraq, any

15   territory controlled by ISIS.

16   Q.   Thank you.

17          Next if we could pull up Government Exhibit 1-205?

18   What is 1-205?

19   A.   This is an e-mail from the defendant to Mo's e-mail

20   account on February 3, 2015.

21   Q.   All right.  Keeping that February 3 date in mind, if we

22   can pull up first 7-205A and then 7-205B?

23          Which, which exhibit is this?

24   A.   This is a still image of the defendant in the FedEx office

25   store, in his police uniform, on February 3, 2015.

Siegfried - Direct                                                      472

1    Q.   And that's 7-205A, correct?

2    A.   Yes, that's correct.

3    Q.   And then let's look at 7-205B.  And what is 7-205B?

4    A.   This is a second still image of the defendant in his

5    police uniform on February 3, 2015, in the FedEx office store.

6    Q.   And you said it's a photograph of the defendant in his

7    police uniform.  Who did he work for at that time?

8    A.   He worked for the Washington Metro Transit Authority.

9    Q.   Thank you.

10         Now, if we can move to Government Exhibit 1-206?

11   What is this document?

12   A.   This is an e-mail from the defendant to Mo's e-mail

13   account on February 18, 2015.

14   Q.   All right.  And again, with that February 18, 2015, date

15   in mind, if we could pull up 7-207A and then 7-207B?

16         What is 7-207A?

17   A.   This is a still image of the defendant entering the FedEx

18   office on February 18, 2015.

19   Q.   And how about 7-207B?

20   A.   This is a second image of the defendant leaving the FedEx

21   office store on February 18, 2015.

22   Q.   And that's the date that the previous e-mail we had on the

23   screen was sent, correct?

24   A.   That's correct.

25   Q.   Now, if we could go to Government Exhibit 1-107?  If we

1    can blow -- yeah, thank you.

2           Now, what is 1-107?

3    A.   It's an e-mail from Mo's e-mail account to the defendant

4    on March 2, 2015.

5           MR. GIBBS:  Mr. Vera, if we could highlight the

6    sentence eight lines down that begins with the words, "When we

7    are in Raqqah"?

8    Q.   Now, Special Agent, where is Raqqah?

9    A.   Raqqah is in Syria.

10   Q.   And what's the significance of Raqqah as it relates to

11   ISIS?

12   A.   At the time, that was basically considered their, their de

13   facto headquarters.

14   Q.   So essentially, the capital of the Islamic State?

15   A.   That's correct.

16   Q.   And as part of this e-mail that was sent to the defendant

17   on March 2, 2015, was a photograph also included with the

18   e-mail?

19   A.   Yes.

20          MR. GIBBS:  Can we pull that up?

21   Q.   And what is this a photograph of?

22   A.   It's a photograph of a neighborhood in Raqqah.

23   Q.   All right.  And what was, what was the reason of including

24   it with the e-mail?

25   A.   More or less just the reason was to provide additional

Siegfried - Direct                                          474

1    information to the defendant that, that showed that Mo was in,

2    in Raqqah.

3    Q.    Thank you.

4          And next if we can turn to Government Exhibit 1-207?

5    If we could pull up the e-mail at the top, please?  Okay.

6          And what is 1-207?

7    A.    This is an e-mail from the defendant to Mo's e-mail

8    account on April 10, 2015.

9          MR. GIBBS:  All right.  And, Fabian, if we can

10   highlight the entire last paragraph of that e-mail?

11   Q.    Now, do you see in that last paragraph where the defendant

12   said, "If you come across anymore libyan brothers"?

13   A.    Yes, I do.

14   Q.    All right.  Based on what you were telling the defendant,

15   where would Mo be located if he came across any more Libyan

16   brothers?

17   A.    In Syria and Raqqah specifically.

18   Q.    All right, thank you.

19         Next if we can go to Government Exhibit 1-208?  And

20   if we can zoom in on the top of that, what is 1-208?

21   A.    That is an e-mail from the defendant to Mo's e-mail

22   account on April 25, 2015.

23         MR. GIBBS:  All right.  And next if we can turn to,

24   quickly to Government Exhibit 7-209 A and 7-209B?

25         What is 7-209A?

1   A.   This is a still image of the defendant entering the FedEx

2   office on April 25, 2015.

3   Q.   And then can we go to 7-209B?  What is this exhibit?

4   A.   And that is another still image of the defendant leaving

5   the FedEx office on April 25, 2015.

6   Q.   And that's the same day as the previous e-mail we just

7   looked at?

8   A.   That's correct.

9          MR. GIBBS:  Next if we could turn to Government

10  Exhibit 1-209?

11  Q.   What is 1-209?

12  A.   That is an e-mail from the defendant to Mo's e-mail

13  account on May 8, 2015.

14  Q.   All right.  And that's short enough, I'm not going to ask

15  you any questions beyond that.  We'll move on to the next one.

16          Can we go to Exhibit 1-108?  If we could zoom in on

17  the -- as much as possible on that e-mail?

18          What is 1-108?

19  A.   That is an e-mail from Mo's e-mail account to the

20  defendant on May 10, 2015.

21          MR. GIBBS:  And, Fabian, if it's possible, can we

22  zoom in on the first paragraph to start with?  And can we --

23  yeah, that's good.

24  Q.   And, Special Agent, do you see the section about four

25  lines from the bottom that starts with, "We were back in the

1    city helping to train some of the new brothers"?  Do you see

2    where it goes all the way down to the end of that paragraph?

3    A.   Yes.

4    Q.   Now, when you talked about when we were back in the city,

5    what city did you intend for that to refer to?

6    A.   That was a, again, a reference to Raqqah.

7    Q.   And in May of 2015, who controlled Raqqah?

8    A.   ISIS did.

9    Q.   And when you wrote in that paragraph that -- when you

10   talked about getting places for food and to relax and you said

11   that is harder now that we went east, what is going east a

12   reference to?

13   A.   Going east was a, was a reference to Iraq, and

14   specifically later in Anbar province.

15   Q.   And is that a province in Iraq?

16   A.   Yes.

17   Q.   And what was the reason about including the reference

18   going to east?

19   A.   It was consistent with what ISIS was, was doing at the

20   time.  They were, they were attempting to, you know, keep and

21   gain additional territory in the Anbar province.

22   Q.   And was the push into Anbar province, was that an event

23   that was widely reported in the media?

24   A.   Yes, it was.

25             MR. GIBBS:  And next if we can pull up in the -- can

Siegfried - Direct                                                        477

1    you zoom in on the second paragraph, Fabian?  And if possible,

2    can we highlight the first four sentences of that second

3    paragraph, ending with "shahid"?

4    Q.   Now, Special Agent, this was included in the e-mail, and

5    it talked about the brothers in Texas.  What was that a

6    reference to?

7    A.   The brothers in Texas was a reference to an attack on a

8    Prophet Muhammad cartoon contest in Garland, Texas.

9    Q.   And in your e-mail to the defendant, you wrote that we

10   cheered when we heard the brothers became shahid.  Who did you

11   intend for "we" to refer to when you said that we cheered?

12   A.   "We" was a reference to ISIS.

13   Q.   What does it mean to become shahid?

14   A.   "Shahid" is a common term for a martyr.

15   Q.   Thank you.

16          Now, if we can next turn to Government Exhibit 1-210?

17   And what is Government Exhibit 1-210?

18   A.   This is an e-mail from the defendant to Mo's e-mail

19   account on May 13, 2015.

20   Q.   May 13, 2015.  So can we pull up Exhibits, let's start

21   with Exhibit 7-211A.  What is 7-211A?

22   A.   That's a still image of the defendant entering the FedEx

23   office on May 13, 2015.

24   Q.   And then can we turn to 211B, please?

25   A.   And that's a second still image of the defendant entering

1    the FedEx -- or actually appears to be leaving the FedEx office

2    on May 13, 2015.

3    Q.   All right, thank you.

4           And you testified earlier that when you checked the

5    IP information on the e-mails from the defendant, they came

6    back to that FedEx store?

7    A.   It actually returned to FedEx office corporate store, but

8    there was no way to actually determine the specific store.  The

9    only way we were able to do that was to get video surveillance

10   of the time frame of when he actually sent the e-mails.

11   Q.   Okay.  And this was a FedEx store near his house?

12   A.   Yes, it was.

13          MR. GIBBS:  All right, let's go back to the e-mail,

14   if we could, 1-210.  And if we can zoom in on that e-mail at

15   the top, please?

16   Q.   And what did the defendant's reference in his e-mail to

17   Mo's account, saying -- talking about the "Texas thing"

18   indicate to you as far as whether he had read your prior

19   e-mail?

20   A.   He appeared to be referencing the, you know, the reference

21   to the attack that we had discussed in the previous e-mail.

22          MR. GIBBS:  And can we highlight next that entire

23   second paragraph in there?

24   Q.   Now, with regards to the defendant's reference there to

25   news in *The Post* about a U.S.-trained army and a Saudi-funded

1   umbrella group getting aimed towards the brothers soon, were

2   you able to review any news stories that were consistent with

3   what the defendant's described there?

4   A.   Yes, I was.

5   Q.   All right.  I'm not going to pull this up yet, but I'd

6   like you to take a look at Government Exhibit 1-210A.  Do you

7   have that before you?

8   A.   Yes, I do.

9   Q.   All right, what is 1-210A?

10  A.   It is a *Washington Post* article.

11  Q.   And just generally, what is it about?

12  A.   Yeah, it basically discusses the U.S. efforts to train

13  Syrian rebels to counter ISIS.

14          MR. GIBBS:  All right.  And, Judge, we would move for

15  the admission of 1-210A at this point.

16          MR. SMITH:  Objection.  Hearsay.

17          MR. GIBBS:  Judge, we're not offering it for the

18  truth of the matter asserted.  It's what the defendant is

19  reading about.

20          THE COURT:  Overruled.  It's in.

21          (Government's Exhibit No. 1-210A was received in

22  evidence.)

23          MR. GIBBS:  Thank you.

24          So if we could publish that to the jury, please?

25  Q.   And in the previous e-mail the defendant wrote, he talked

1   about the news in *The Post*.  Who actually published this

2   article?

3   A.    *The Washington Post*.

4   Q.    And what is the date on this article, at least -- yeah,

5   the date on this one?

6   A.    It's May 7, 2015.

7   Q.    So six days before the defendant's e-mail?

8   A.    Yes.

9   Q.    All right.  And in the third paragraph of that news story,

10  who does it say that this program is aimed at countering?

11  A.    ISIS or ISIL.

12  Q.    Thank you.

13         Next if we could turn to Government Exhibit 1-211?

14  Maybe we can -- can you just highlight the top portion?

15         What is 1-211?

16  A.    It's an e-mail from the defendant to Mo's e-mail account

17  on June 13, 2015.

18  Q.    What is the subject of the e-mail from the defendant to

19  Mo's e-mail account?

20  A.    Subject was "Need advice."

21         MR. GIBBS:  All right.  And if we could briefly pull

22  up Exhibits, let's start with 7-212A?

23  Q.    What is 7-212A?

24  A.    It's a still image of the defendant in the FedEx office

25  store on June 13, 2015.

Siegfried - Direct                                                       481

1   Q.   And then how about 7-212B?

2   A.   It's a still image of the defendant leaving the FedEx

3   office on June 13, 2015.

4   Q.   Thank you.  Now, if we can go back to Exhibit 1-211?

5   That's the e-mail with the subject "Need advice."

6           And can we -- Mr. Vera, can we zoom in on the second

7   paragraph there?  And can you then highlight the last four

8   lines, beginning with, "Okay, now as to my question"?

9           Do you see that, Special Agent?

10  A.   Yes.

11          MR. GIBBS:  If we can go to, zoom in on the last

12  paragraph?  We have to sort of do this step by step.  And can

13  we then highlight the, the sentence three lines down in that

14  paragraph that begins, "Unfortunately I have enough flags on my

15  name"?

16          Now, in the e-mails that the defendant sent to you,

17  Special Agent, how would you describe his level of security

18  consciousness?

19  A.   He seemed to be fairly security conscious and cognizant

20  of, careful of what he sent.

21          MR. GIBBS:  And then staying with the e-mail, can we

22  highlight the sentence nine lines down that starts, "If not,

23  could you ask your commanders"?

24  Q.   Special Agent, what was the significance of the defendant

25  using the word "commanders" in his e-mail to you?

1          MR. SMITH:  Objection.

2          THE COURT:  We've already had that issue come up once

3    before.  He's already answered what "commanders" means, so I'm

4    sustaining the objection.  It's cumulative.

5          MR. GIBBS:  That's fine, Judge.

6          And next, if we can go farther down in that

7    paragraph, I want you to highlight the section 13 lines down

8    that begins, "I wanted to go to the one country I was in

9    before," and ends with, "the guys that you were with that have

10   a presence there."  So it's about five lines.

11   Q.   Now, when the defendant talked about "the one country I

12   was in before," did you know what that was a reference to?

13   A.   It appeared to be a reference to Libya.

14   Q.   And when he said that some issues arose with them, "unless

15   they pledged to your guys since I saw them last," based on what

16   you were telling the defendant, who were Mo's guys?

17   A.   Mo's guys were ISIS.

18   Q.   All right, next if we could turn to Government Exhibit

19   1-109?  What is 1-109?

20   A.   It's an e-mail from the -- from Mo's e-mail account to the

21   defendant on June 21, 2015.

22          MR. GIBBS:  And can we zoom in on the third

23   paragraph, Fabian?  And can you highlight the two sentences

24   four lines down that begin, "If you decide to leave, be

25   careful," and ends with, "it was for my tour"?

1   Q.   Now, Special Agent, in the earlier e-mail, the defendant

2   had asked about getting advice from Mo's commanders about

3   possibly moving money overseas.  Do you recall that?

4   A.   Yes.

5   Q.   And here is the response that, that was drafted and sent

6   to him.  Why didn't you encourage the defendant about moving

7   his money overseas with the help of Mo's commanders?

8   A.   You know, we just didn't think it was consistent with the

9   legend that had been built around Mo.  We hadn't asked for

10  anything up to that point, and we thought pushing him, you

11  know, to send money, you know, at that point didn't make any

12  sense and, you know, wanted to let him know sending money via

13  Western Union or a straight wire or anything like that was

14  probably a bad idea.

15  Q.   All right, thank you.

16           Next if we could go to Exhibit 1-110?  What is 1-110?

17  A.   That's an e-mail from Mo's e-mail account to the defendant

18  on July 14, 2015.

19  Q.   Right.  And if you drop down from there, it's sort of a

20  little tricky to read, if you drop down, if we could go to the

21  next header there, the one dated Sunday, June 21, 2015, that's

22  the one I want to ask you about.  What is that?

23  A.   That is an e-mail from Mo's e-mail account to the

24  defendant on June 21, 2015.

25  Q.   All right.  And so June 21, 2015, when you take a look at

Siegfried - Direct                                                              484

1    7-213A, what is 7-213A?

2    A.   This is a still image of the defendant in the FedEx office

3    on June 21, 2015.

4    Q.   And then what is 7-213B?

5    A.   That's a still image of the defendant leaving the FedEx

6    office on June 21, 2015.

7    Q.   All right, thank you.

8            Now if we could go back to the June 21 e-mail, which

9    is Exhibit 1-110?  And, Fabian, can we zoom in on that first

10   paragraph that starts, "V, thanks for the advice"?  And then

11   can we highlight the sentence two lines down that begins, "And

12   if there is a way to leave my email address"?

13           Special Agent, do you see in that e-mail where the

14   defendant said:  If there is a way to leave my e-mail address

15   with a trusted commander so I may be alerted if something

16   happens to you?  Do you see that?

17   A.   Yes.

18   Q.   All right.  Besides this "trusted commander," how many

19   other people did the defendant authorize Mo to share his e-mail

20   account with?

21   A.   No one.

22   Q.   Thank you.

23           If we can go to Exhibit 1-213?  If we could just zoom

24   in on the whole e-mail?  It's not very long.

25           What is 1-213?

1   A.   It's an e-mail from the defendant to Mo's e-mail account

2   on July 1, 2015.

3   Q.   All right, we'll come back to it in just a second, but if

4   we could pull up 7-214A?  And what is 7-214A?

5   A.   It's a still image of the defendant in the FedEx office

6   store on July 1, 2015.

7   Q.   Thank you.

8           Now, let's go back to the 1-213, and stay zoomed in

9   on it, if we can.  And can we highlight the last couple of

10  sentences at the bottom, starting with, "If you come across any

11  brothers from that city," and take it all the way to the end?

12          Now, in the defendant's e-mail to Mo's account, he

13  said that people from the Abo Salem Suhada Brig. is who I was

14  with mostly.  Who first brought up the Abo Salem Suhada Brig.

15  in your e-mails to the defendant?

16  A.   The defendant did.

17  Q.   Thank you.  Next if we can go to Government Exhibit 1-214?

18  And what is 1-214?

19  A.   That is an e-mail from the defendant to Mo's e-mail

20  account on July 20, 2015.

21  Q.   Thank you.

22          And, Fabian, if we can zoom in on the third paragraph

23  of that July 20 e-mail, the one that starts with, "Yeah, been

24  well over a month"?

25          And then four lines down, the defendant

Siegfried - Direct                                                    486

1   writes, "Yeah, I'm not sure who they are with now but assume it

2   is the same and they have a different leadership the brothers

3   where you are."

4            Where were you consistent in your e-mails in

5   indicating that Mo was?

6   A.   With ISIS, in ISIS-controlled territory in either Syria or

7   Iraq.

8            MR. GIBBS:  And then below -- let's see.  Then below

9   that, if we can pull up the part that begins, "Inshallah the

10  divisions will be solved," and ends with, "like minded"?

11  Q.   Now, in the e-mail -- in the defendant's e-mail to Mo's

12  account where he wrote about how he remembered these as being

13  the best of brothers and "like-minded" and how he wanted to see

14  the "divisions solved and the brothers united," what was your

15  understanding of which brothers this referred to?

16  A.   Seemed to be a reference to resolving the divisions

17  between ISIS and, you know, the group he's referencing.

18  Q.   And what group was that that he was referencing?

19  A.   The brothers he was with.

20  Q.   In where?

21  A.   In Libya.

22  Q.   Thank you.

23            Next if we can pull up Government Exhibit 1-112?  And

24  if we can zoom in on the top of that e-mail?

25            And if you can just indicate what Government Exhibit

1   1-112 is?

2   A.   It's an e-mail from Mo's e-mail account to the defendant

3   on October 1, 2015.

4            MR. GIBB:  Fabian, can we highlight the first

5   sentence of that second paragraph that begins, "Things here are

6   ok but everyone is talking about Russia"?

7   Q.   Special Agent, what was that in reference to?

8   A.   That was a reference to Russia's involvement in carrying

9   out air strikes supporting the Assad regime.

10  Q.   And was that event widely reported in the media?

11  A.   Yes, it was.

12           MR. GIBBS:  And then further down, five lines down,

13  can we highlight the sentence that begins, "My Canadian friend

14  told me"?

15  Q.   Now, when you wrote in that e-mail about a deal being

16  struck to split up Sham, can you explain what "Sham" means?

17  A.   Yes.  "Sham" was just a general reference to Syria.

18  Q.   All right, thank you.

19           Next if we can turn to Government Exhibit 1-216?  And

20  if we can zoom in on that e-mail at the top?

21           What is 1-216?

22  A.   Sorry, I'm just --

23  Q.   That's okay.  I jumped ahead on you a little bit.

24           Special Agent, it is on -- we will pull it up on the

25  screen as well if that's easier for you.

Siegfried - Direct                                                   488

1   A.    Okay.

2   Q.    I know you have to sort of toggle back and forth, but that

3   may be the best way to do it.

4   A.    Yeah, it's an e-mail from the defendant to Mo's e-mail

5   account on October 13, 2015.

6          MR. GIBBS:  And if we could highlight that first full

7   paragraph that starts, "Yes, it seems like the west"?

8   Q.    In the defendant's e-mail to Mo's account, when he talked

9   about, "everyone needs to join under one banner to repel them,"

10  what was your interpretation of what that meant?

11  A.    That seemed to be a reference to, my interpretation was,

12  the other groups fighting the Assad regime, including, you

13  know, al-Nusra Front and the Syrian rebels.

14  Q.    Thank you.

15         Next if we can turn to Government Exhibit 1-218?

16  That will be up on your screen in a moment.  If we can zoom in

17  on that?

18         Special Agent, would you -- could you tell what

19  brother the defendant was referring to in this particular

20  e-mail?

21  A.    Yes.  It appeared to be another reference to Hisham Hall.

22  Q.    And how could you tell this was a reference to Hisham

23  Hall?

24  A.    The references to him studying and, you know, I think the

25  defendant had referenced at one point that he was going back to

1   his home country, not explicitly saying Morocco, but that he

2   had been studying and kind of moving back and forth, and it was

3   consistent with, with Hisham Hall.

4   Q.   And is Hisham Hall from Morocco?

5   A.   Yes.

6   Q.   Okay.  All right, thank you.

7          Next if we could turn to Government Exhibit 1-113?

8   And if we can zoom in on the top just so it's a little more

9   easy to make out?

10         What is 1-113?

11  A.   That's an e-mail from Mo's e-mail account to the defendant

12  on November 15, 2015.

13         MR. GIBBS:  All right.  And, Fabian, if you could

14  highlight the entire second paragraph, zoom in on it?

15  Q.   Now, in the second paragraph of that e-mail to the

16  defendant, you talked about the news in Paris.  What was that a

17  reference to?

18  A.   That was a reference to the multiple attacks that went on

19  in Paris, I believe it was a few days prior to that.

20  Q.   And who claimed responsibility for those Paris attacks?

21  A.   ISIS did.

22  Q.   All right, thank you.

23         Now, Special Agent Siegfried, by this point in

24  November of 2015, the FBI and, you know, specifically you and

25  John Minichello had been using the V4Vendetta e-mail account to

Siegfried - Direct                                                    490

1    pose as Mo and to communicate with the defendant as though Mo

2    was with ISIS, correct?

3    A.   That's correct.

4    Q.   And around this point in the investigation, did the FBI

5    make a decision to approach the defendant directly?

6    A.   Yes.

7    Q.   And when was that?

8    A.   That was in, I believe December 3 was the first, first

9    time.

10   Q.   You said the first time.  How many interviews did the FBI

11   conduct with the defendant?

12   A.   At that point, it was December 3, and I believe December 5

13   he was interviewed a second time.

14   Q.   And who, who were the agents who conducted the interviews

15   with the defendant?  And keep in mind, one of the agents will

16   be referred to -- well, is not to be referred to in his real

17   name.  Do you know what his pseudonym is?

18   A.   Yes.

19   Q.   Okay.  Who were the agents who conducted those two

20   interviews?

21   A.   Agent Caslen and Agent Smith.

22             MR. GIBBS:  Thank you, sir.

23             Judge, at this point, this agent is one we did want

24   to break up as well because we'd like to present evidence of

25   the interviews at this point, but he will have a little bit of

1  testimony after that related to some additional e-mails, but

2  with the Court's indulgence, we'd like to finish our questions

3  now, we can either go into cross now or the defense can do

4  their entire cross once he's completed all of his testimony,

5  but the next witness we would call would be Special Agent

6  Smith, who will need to testify behind the screen about the

7  December 2015 interviews.

8          THE COURT:  I think it's -- the jury can, can parse

9  this together.  I think when a witness is on the stand, we

10 should try to get all of the testimony out.  Let's finish with

11 this witness.

12         MR. GIBBS:  That's fine, Judge.

13 Q.   All right.  So, Special Agent, in terms of the interviews

14 conducted by the FBI in December of 2015, after those two

15 interviews occurred in early December, what did that do to the

16 defendant's e-mail communications to Mo's account?

17 A.   The, the communication dropped for about, about a month,

18 month or so, maybe two.  I'd have to look.

19 Q.   Okay.  And after a certain amount of time passed without

20 getting any e-mails from the defendant, what did you do?

21 A.   We sent another e-mail.

22         MR. GIBBS:  And if we could pull up Government

23 Exhibit 1 -219?  And let's blow up the e-mail at the bottom, if

24 we could.

25 Q.   And what was the date of the e-mail at the bottom?

1    A.    This was an e-mail from Mo's e-mail account to the

2    defendant on January 16 of 2016.

3    Q.    Is it January 16 or January 14?

4    A.    Sorry, January 14, 2016.

5    Q.    Okay.  And what was the subject line of your e-mail to the

6    defendant?

7    A.    There is no subject.

8             MR. GIBBS:  And, Fabian, can we highlight the last

9    three sentences of that e-mail, starting with, "I think the

10   kuffar know I have made it somehow"?

11   Q.    Now, what did you intend to convey to the defendant by

12   using the term "kuffar"?

13   A.    "Kuffar" mean disbelievers, the government, FBI.

14   Q.    And did the defendant respond to this e-mail?

15   A.    Yes, he did.

16            MR. GIBBS:  All right.  And before we jump up to the

17   top of that, if we could pull up Government Exhibit 7-216A?

18   Q.    What is 7-216A?

19   A.    It's a still image of the defendant in the FedEx office on

20   February 16, 2016.

21            MR. GIBBS:  Okay.  And let's go back to the previous

22   exhibit, which is 1-219.  And can we zoom in on the top of that

23   now?  Actually, the "From" and "To" information, if we could

24   start with that?

25   Q.    All right, you testified a moment ago that your e-mail on

Siegfried - Direct                                                          493

1    January 14 had no subject.  What was the subject of the

2    defendant's e-mail to you on February 16, 2016?

3    A.   "Yeah, they were asking about you."

4    Q.   And approximately how long after your e-mail to the

5    defendant did he wait to respond?

6    A.   It was approximately a month.

7         MR. GIBBS:  And, Fabian, next could we zoom in on the

8    first paragraph of the defendant's e-mail?  And can we

9    highlight the first three lines of that first paragraph?  Yeah.

10   The first three sentences, I guess.

11        And then, Fabian, farther down in that same

12   paragraph, can you highlight the last four lines of that

13   paragraph, beginning with, "So again I was being careful"?

14   Q.   Now, in that first paragraph, the defendant talks about

15   Tor and some of these other apps to communicate on.  Who first

16   brought up the idea of these other devices such as Tor and

17   different apps that in the defendant's word would be "secure"?

18   A.   The defendant.

19   Q.   And you testified a moment ago that the subject line of

20   this particular e-mail was, "Yeah, they were asking about you."

21        Can we next zoom in on the second paragraph, Fabian?

22   And if we could, could we highlight the first seven lines of

23   that paragraph that end with, "at least 6 goons in teams of two

24   that were going around"?

25        Special Agent, is this where the defendant described

1    in his e-mail being questioned by the FBI?

2    A.   Yes.

3    Q.   And when the defendant said in that e-mail that they

4    wanted your phone, e-mail, Facebook info, were those the sorts

5    of questions he was asked, actually asked by the FBI in

6    February of 2015?

7    A.   Yes, he was.

8    Q.   And when the defendant told the person he believed was Mo

9    that he had said that Mo had gone on vacation and to visit

10   family, how did that compare with the story that the defendant

11   and Mo had come up to explain Mo's trip before he left?

12   A.   It was -- it's fairly consistent.

13            MR. GIBBS:  And then, Fabian, if we could -- at the

14   end of that paragraph, if we could highlight the last three

15   lines -- the last sentence, I guess, but it begins, "I read in

16   the papers"?

17   Q.   Now, in that last line, when the defendant used the

18   term "the state," did you recognize that reference?

19   A.   Yes, a common reference to Islamic State.

20   Q.   And with regards to the defendant saying that he read in

21   the papers about the state being able to make new passports and

22   then saying, "inshallah they could furnish you with necessary

23   documents in another name to travel regionally," were you able

24   to review any news reports prior to February 16, 2016, that

25   were consistent with what the defendant described?

Siegfried - Direct                                                    495

1    A.   Yes, I was.

2    Q.   All right.  I'd like you to take a look at Government

3    Exhibit 1-219A, and we're not going to pull it up.  I think, I

4    think it should be there in your stack because that's not in

5    evidence yet.

6    A.   I don't believe it is.

7    Q.   I think it should be attached to --

8             THE COURT:  It's not in the Court's book, either.

9    219A is not.

10             MR. GIBBS:  Oh, it's not?  All right, we may, we may

11   just come back and clean that up later, Judge.

12   Q.   All right, Special Agent, if you could turn to Government

13   Exhibit 1-220?  And we can pull that up on the screen, so you

14   maybe able to see it quicker that way.

15             And can you just highlight the top for us?

16             All right.  So you testified a moment ago about

17   getting an e-mail from the defendant dated February 16, 2016,

18   with the subject, "They were asking about you."  Did the

19   defendant then send a second e-mail about 20 minutes later on

20   that same date?

21   A.   Yes.

22   Q.   And that one is "Subject:  "Re:  Salam," correct?

23   A.   Yes.

24             MR. GIBBS:  Fabian, can we zoom in on the third

25   paragraph?  All right, thank you.  And can we highlight the

Siegfried - Direct                                                        496

1   section that begins a couple lines down, begins, "But yeah...I

2   have heard," and goes all the way down to, "group you are with

3   not divided"?

4   Q.   Now, in this e-mail, when the defendant said, "the only

5   way forward now is with the group you are with not divided,"

6   what group were you consistent in indicating Mo was with?

7   A.   ISIS.

8   Q.   And then next, Special Agent, if we could turn to

9   Government Exhibit 1-115?

10             THE COURT:  1-115?

11             MR. GIBBS:  Yes.  1-115, I'm sorry.  Pull it up, and

12  let's highlight the top portion.

13  Q.   And what is Government Exhibit 1-115?

14  A.   That is an e-mail from Mo's e-mail account to the

15  defendant on March 5, 2016.

16             MR. GIBBS:  All right.  And, Fabian, if we can zoom

17  in on that second paragraph of the e-mail at the top?  And then

18  if you can highlight the section, it starts three lines in

19  with, "The brothers that I have been helping," and then take it

20  all the way down to the end of that paragraph?

21  Q.   Now, Special Agent, did you tell the defendant in this

22  e-mail about another way or a new way that the two of you could

23  communicate?

24  A.   Yes.

25  Q.   And what was the new method you could use to communicate?

1   A.   We had, we had basically described an encrypted messaging

2   application called Threema that was widely being adopted by

3   ISIS.

4   Q.   And is that the reason you suggested it to the defendant?

5   A.   Yes, one of the reasons.

6   Q.   All right, thank you.

7        Next if we can go to Government Exhibit 1-116?  And

8   if we could just sort of zoom in on the entire paragraph, I

9   think we should be able to bring it up.

10        What is 1-116?

11   A.   That's an e-mail from Mo's e-mail account to the defendant

12   on April 18, 2016.

13        MR. GIBBS:  And, Fabian, can we zoom in on the entire

14   second paragraph, and then can we highlight the first three

15   lines that start with, "Although Allah," and ends with, "make

16   hijrah to Khilafah now"?

17        Now, what did you intend to convey to the defendant

18   by telling him, "I am blessed to be living in dawlah"?

19   A.   Just a reference to living under the Islamic State.

20        MR GIBBS:  And then, let's see, below that, can we

21   highlight the sentence two lines down that begins, "I mentioned

22   in last email," and ends with, "because more secure"?

23   Q.   Now, what did you intend to convey in that sentence by

24   using the term "hijrah"?

25   A.   I was basically kind of conveying that Mo was in the

Siegfried - Direct                                                        498

1   process of helping other facilitators move Westerners,

2   potential recruits into ISIS, and "hijrah" is just another word

3   for, you know, traveling.  It's common among ISIS supporters.

4   Q.   Right.  And you talked about helping facilitators recruit

5   people to ISIS, and in the e-mail message, you talked about how

6   the Threema app would help brothers make hijrah.

7   A.   Sure.

8   Q.   How was it that this Threema app would help brothers make

9   hijrah?

10  A.   It was a -- it was a secure way to communicate with, with

11  potential recruits, being able to set up one account and solely

12  communicate with that one person in order to facilitate the

13  travel to the Islamic city.

14  Q.   Right.  So was the idea that you would have a secure way

15  for one recruiter to talk to one potential fighter that

16  wouldn't be compromised?

17  A.   Yes.

18  Q.   And then after saying that and telling the defendant he

19  should text you on the Threema app because it's more secure,

20  you gave him an ID.  What was that ID?

21       Can we highlight that?

22  A.   Yeah.  That was UNTDSKA7.

23  Q.   And what does that Threema ID allow a user to do?

24  A.   Typically, the, the user or the recipient, if I sent that

25  user ID to somebody else, I mean, they typically would have to

1  know that ID in order to communicate with me.  It's a very

2  specific -- it's not tied to an e-mail or a phone number or

3  anything else.

4  Q.    And just as they would have to know that ID to communicate

5  with you, would you have to know their ID to communicate with

6  them?

7  A.    Yes.

8  Q.    Okay.  Now, Special Agent Siegfried, at the beginning of

9  your testimony, you testified about being detailed to the FBI

10  as a task force agent, and I believe your testimony was your

11  time as a task force agent ended in April 2016, correct?

12  A.    That's correct.

13  Q.    And this e-mail is dated April 18, 2016?

14  A.    Yes, it is.

15  Q.    So was this the end of your time with the FBI?

16  A.    Yes, it was.

17  Q.    And did you go back to the Air Force soon that after that?

18  A.    Yes, I did.

19        MR. GIBBS:  Okay.  Just a moment.

20        Yeah, there's one -- if I can just go back very

21  briefly to one exhibit, it's 1-220.  If you could pull that up,

22  Fabian?  And if you could zoom in on the third paragraph that

23  starts, "Yeah, saw Paris"?

24        Now, this was the e-mail dated February 16, 2016, the

25  "Re:  Salam" e-mail from defendant's e-mail address.  Do you

Siegfried - Direct                                                    500

1   see that.

2   A.    Yes.

3   Q.    All right.  When defendant talked about yeah, saw Paris,

4   and he gave a description of what happened, how did that relate

5   to something you had referenced in an earlier e-mail?

6   A.    I believe in a -- I'd have to look at it, but in an

7   earlier e-mail, I believe there was a reference to the

8   *Charlie* -- well, I'm sorry, give me one second.

9           This was a reference to the attacks in Paris in

10  November.

11          MR. GIBBS:  Okay.  Thank you.

12          And, Judge, there was one exhibit that we didn't have

13  a paper copy of, but I do have a -- I have it on the machine,

14  and -- well, actually, let me do this:  Can I just hand this up

15  to the witness and then authenticate it and move it in?

16          THE COURT:  Is it a newspaper article?

17          MR. GIBBS:  It is.

18          THE COURT:  All right.  Defense have seen it?

19          MR. GIBBS:  Yep.

20  Q.    All right, what's that exhibit number, Special Agent?

21  1-219A?

22  A.    Yes, that's correct.

23  Q.    All right, what is that exhibit?

24  A.    It is a Reuters news article.  The title is "Islamic State

25  Can Make Fake Syrian Passports."

1   Q.   All right.  And a few moments ago, you testified about an

2   e-mail from the defendant where he said, "I read in the papers

3   that the state has the ability to make new passports."  Was

4   that at least one article that was consistent with what the

5   defendant described?

6   A.   Yes.

7             MR. GIBBS:  Your Honor, if we could move that into

8   evidence and publish it, please?

9             MR. SMITH:  We object to it to the extent that it's

10  being used to establish -- we object to the evidence to the

11  extent it's being used to establish the truth of the contents

12  in the article but --

13            THE COURT:  Well, the right objection and the one

14  I'll sustain is there's no evidence that an American-based

15  person would have read a British news article.  The other one

16  was *Washington Post*.  The defendant is from this area; that's

17  not an unreasonable assumption.

18            MR. SMITH:  That's correct, Your Honor.

19            THE COURT:  So I will sustain that objection.  The

20  exhibit is not in.

21            MR. SMITH:  Okay.

22            MR. GIBBS:  Thank you, Judge.  I think that's all

23  we've got.

24            Thank you, sir.  I believe the defense will have some

25  questions for you.

1           THE COURT:  All right.  Cross-examination?

2                      CROSS-EXAMINATION

3    BY MR. SMITH:

4    Q.   Good afternoon, Agent Siegfried.

5    A.   Good afternoon.

6    Q.   So you've testified today that you began e-mailing the

7    defendant with some of your colleagues from, allegedly from

8    Syria but not actually in Syria around October 2014, correct?

9    A.   I began around November of 2014.

10   Q.   Oh, you began around November 2014, but the, the

11   individual, the agent pretending to be Mo began e-mailing

12   Nicholas Young allegedly from Syria or Turkey in October of

13   2014, correct?

14   A.   Yes.  I believe they, they sent those together.

15   Q.   And the first e-mail that was sent from Turkey from the

16   character pretending to be Mo was in October -- on October 27,

17   2014, correct?

18   A.   I don't have that in front of me but --

19   Q.   That's Government Exhibit 1-101.

20           Can we put that up?

21   A.   Yes, this appears to be the first e-mail.

22   Q.   Okay.  Do you recall whether the individual, the agent

23   pretending to be Mo asked Nicholas Young -- do you recall

24   whether the agent pretending to be Mo indicated in this e-mail

25   on October 27, 2014, that Mo was heading to Syria?

1    A.    I'm sorry, I don't understand the question.

2    Q.    Can you refresh your recollection by looking at this

3    document, this e-mail dated October 27, 2014?

4              MR. GIBBS:   Judge, just to be clear, this is not one

5    of the exhibits he authored or testified about.

6              THE COURT:   I would think you have a better witness

7    to ask this of, Mr. Smith.   Again, your time is somewhat

8    limited.

9              MR. SMITH:   Your Honor, Mr. Siegfried just testified

10   about the e-mails on October 27 and October 29.   They're

11   Government Exhibits 1-101 and 1-102.   He was a witness for

12   these --

13             THE COURT:   Look, if you want to ask it, I'm going to

14   allow you to do it, but this is probably not your best witness

15   since he said he was not in on the project at that point.   You

16   have another agent who's coming back here.

17             MR. SMITH:   Your Honor, that's not clear to us yet at

18   this point from the government's explanations to us, but we

19   will proceed quickly.

20             THE COURT:   All right.

21   BY MR. SMITH:

22   Q.    So in this e-mail on October 27, 2014, the agent

23   pretending to be Mo does not indicate that he would be

24   traveling to Syria, correct?

25             MR. GIBBS:   Judge, first of all, that misstates the

1    evidence because Special Agent Minichello testified he and Mo

2    drafted the e-mail, and the exhibit speaks for itself.

3            THE COURT:  You've reserved Minichello to come back.

4            MR. GIBBS:  Correct.

5            THE COURT:  Whether you call him or the defense calls

6    him, it's up to whoever you want -- however you want to do it,

7    but the point is he is the better witness rather than having

8    somebody who didn't author the article try to talk about what

9    it means.  So I'm going to sustain --

10           MR. SMITH:  We can --

11           THE COURT:  I'm sustaining the objection.  Move on,

12   sir.

13   BY MR. SMITH:

14   Q.   Agent Siegfried, the agent pretending to be Mo had

15   e-mailed Nicholas Young three times in a row in October and

16   November, before Nicholas Young responded to those e-mails, to

17   the agent pretending to be Mo, correct?

18   A.   I believe it was three times.

19   Q.   And the first time that the agent pretending to be Mo

20   e-mailed Nicholas Young was October 27, 2014, correct?

21   A.   Yes.

22   Q.   And Mr. Young did not respond until December 17, 2014,

23   correct?

24   A.   That's correct.

25   Q.   Now, Agent Siegfried, you testified about an e-mail which

Siegfried - Cross                                                    505

1    is Government Exhibit 1-204, dated January 8, 2015, correct?

2    That's Government Exhibit 1-204, and it referenced a Jordanian

3    pilot?

4    A.    Yes.

5    Q.    And it's your testimony that this e-mail indicated

6    Mr. Young's support for -- or interest in ISIS, as indicated by

7    the fact that he was referencing a Jordanian pilot burning in

8    this e-mail, correct?

9    A.    My understanding from, from reading the e-mails, he was

10   referring to the Jordanian pilot that we had referenced in a

11   previous e-mail.

12   Q.    At this point in time on January 8, 2015, there came a

13   time when the FBI investigated an account called a LiveLeak

14   account.  Are you familiar with that LiveLeak account?

15   A.    No.

16          MR. SMITH:  Okay.  This is a government -- this is a

17   document for the witness dated June 4, 2015.

18          MR. GIBBS:  Can we take a look?

19          MR. SMITH:  Sure.

20          THE COURT:  Has the government seen it?

21          MR. SMITH:  They produced it to us, Your Honor.

22          MR. GIBBS:  Your Honor, there's a couple issues with

23   this.  One, again, it's not a marked exhibit, but more

24   importantly, the question was whether he was familiar with the

25   defendant's LiveLeak account.  The defendant -- the witness

Siegfried - Cross                                                    506

1   said no.  Now, this appears to be an attempt to refresh him on

2   that, which since the answer is he doesn't know anything about

3   the LiveLeak account --

4           THE COURT:  Well, let him look at it and see if it

5   refreshes his recollection.

6   BY MR. SMITH:

7   Q.   I can -- actually, Agent Siegfried, are you familiar with

8   SSA Bryan Vorndran?

9   A.   Yes.

10  Q.   And who is he?

11  A.   He's the -- he was at the time the squad supervisor.

12  Q.   And what was his role in this case?

13  A.   Managing cases.  That's his job.

14  Q.   So did you work -- is it accurate to say you worked under

15  SSA Vorndran on this Slow Decline investigation?

16  A.   Yes.

17  Q.   And were you familiar with other aspects of the Slow

18  Decline investigation?

19  A.   On the peripherals.  I mean, I knew generally about the

20  general gist of the investigation.

21  Q.   So there's a memo in front of you, and it's dated June 14,

22  2015, correct?

23  A.   Yes.

24  Q.   And is that an FBI memorandum?

25  A.   Yes, it is.

1    Q.   And is it a memorandum that is purporting to summarize

2    Mr. Young's comments on at Web site called LiveLeak?

3            MR. GIBBS:  Judge, it's either going to refresh his

4    recollection or it's not.

5            THE COURT:  Right, right, right.

6            Have you ever seen that before?

7            THE WITNESS:  I don't recall seeing this specific

8    memorandum, but seeing the Düsselkamp, I vaguely remember that

9    as an account, but I don't recall the contents of the LiveLeak

10   account.

11           THE COURT:  All right.

12   BY MR. SMITH:

13   Q.   Do you recall whether the counterterrorism section

14   conducted an analysis of Mr. Young's LiveLeak comments?

15   A.    They may have.  I -- to my recollection, I don't know.

16   Q.    Okay.  I'm handing up a former government exhibit marked

17   8-508, which the government removed right before trial from its

18   exhibit list.

19           THE COURT:  Show it first to counsel.

20           MR. GIBBS:  Judge, again, we object.  This is a

21   witness who's testified he's not familiar with the LiveLeak

22   information.  This is, appears to be a screen shot related to

23   that.  We are calling witnesses later in this case who have

24   personal knowledge of that.  This witness clearly does not.

25           THE COURT:  You're using up your time, Mr. Smith, on

Siegfried - Cross                                                    508

1    stuff that doesn't appear to be --

2            MR. SMITH:  Your Honor, this is, this is impeachment

3    evidence because it concerns --

4            THE COURT:  Well, just show it to the witness then --

5            MR. SMITH:  Okay.  Thank you.

6            THE COURT:  -- and ask your question.

7            MR. SMITH:  Thank you.

8    Q.   This is a document that was formerly marked Government

9    Exhibit 8-508.

10           THE COURT:  Now, what is the question?

11   BY MR. SMITH:

12   Q.   Now, the question is do you see -- do you see this as a

13   screen shot from the Web site LiveLeak?

14           MR. GIBBS:  Objection.

15           THE COURT:  That's it.  That's all you're going to

16   ask.

17           MR. SMITH:  No, I'm just --

18           THE COURT:  But what happens is even though I tell

19   the jury and I know they're going to try very hard to put out

20   of their minds statements that counsel is making, now you're

21   practically testifying, because this is a witness who has said

22   he had a short-term involvement in this investigation.  He has

23   said that he does not know these other peripheral issues.

24           Agent, in looking at that document, do you know

25   anything about that?

1        THE WITNESS:  I personally do not recall.  I -- now

2   that I've seen the memorandum, I do recall there was a LiveLeak

3   account, but I don't recognize the screen shots, no.

4        THE COURT:  All right.  Then I'm sustaining the

5   objection.  Move on to some other topic.

6   BY MR. SMITH:

7   Q.   So, Agent Siegfried, is it accurate to say that between

8   October 2014 and until about June 2016, agents pretending to be

9   Mo were e-mailing Mr. Young continuously during that period

10  from the alias of Mo?

11  A.   Yes, that's correct.

12  Q.   So these agents continued to have conversations with

13  Mr. Young under the Mo alias throughout this period, but they

14  never arrested him, correct?

15  A.   That's correct.

16  Q.   Mr. Young remained on the police force during all of these

17  communications, correct, in Washington, D.C.?

18  A.   That's correct.

19  Q.   You have not testified that any of the comments in these

20  exchanges are in any way criminal, correct?

21       MR. GIBBS:  Judge, there's no basis for that.

22       THE COURT:  Sustained.

23       MR. GIBBS:  Thank you.

24  BY MR. SMITH:

25  Q.   You testified about a May 10, 2015, e-mail which was

1    marked Government Exhibit 1-108, correct?  And it referenced

2    going east.  The alias pretending to be Mo said he was going

3    east.  Do you recall that?

4    A.   That's correct.

5    Q.   Do you know whether Mr. Young knew what the alias Mo was

6    referring to when he said "going east"?

7              MR. GIBBS:  Judge, calls for speculation.

8              THE COURT:  Sustained.

9    BY MR. SMITH:

10   Q.   In the same e-mail, you reference -- Mo, the alias Mo,

11   references a Texas attack in the May 10, 2015, e-mail.  Do you

12   recall that?

13   A.   Yes.

14   Q.   Do you have any -- do you have any personal knowledge that

15   the defendant understood what you were referring to in that

16   e-mail?

17             MR. GIBBS:  Same objection, Judge.

18             THE COURT:  Sustained.

19   BY MR. SMITH:

20   Q.   Agent Siegfried, do you have any knowledge of whether the

21   defendant speaks Arabic?

22   A.   I believe he may speak limited Arabic.  I'm not sure.

23   Q.   You're not sure.  You don't know.  Okay.

24             You reference a *Washington Post* article dated May 7,

25   2015, in connection with that later e-mail from Mr. Young on

Siegfried - Cross                                                    511

1   May 10, 2015.  Do you recall that *Washington Post* article?

2   A.   Yes.

3   Q.   Do you have any evidence that Mr. Young reviewed that

4   article?

5            MR. GIBBS:  Judge, again, calls for speculation.

6            THE COURT:  Sustained.

7   BY MR. SMITH:

8   Q.   Now, you testified about a December 17, 2014, e-mail

9   marked GX-1-202, and it was an e-mail from an agent pretending

10  to be the Mo alias from Turkey which attached some photographs

11  of the mosque in Turkey.  Do you recall that?

12  A.   Yes.

13  Q.   Why did you send those, those mosque photos to Mr. --

14           MR. GIBBS:  Judge, this witness, the testimony is

15  that he did not send that.  It goes to the --

16  BY MR. SMITH:

17  Q.   Why did the agent pretending to be Mo send the pictures of

18  Turkey to Mr. Young?

19           THE COURT:  Wait, wait, wait.  We've already heard

20  that previously, all right?

21           MR. GIBBS:  It's cumulative.

22           MR. SMITH:  It's actually -- Your Honor, if I may?

23           THE COURT:  What is -- do you have an understanding

24  as to why that was done?  Either you do or you don't.

25           THE WITNESS:  Yes.

1          THE COURT:  All right.  I believe he can testify as

2     to what his understanding is, all right?

3          MR. SMITH:  Thank you, Your Honor.

4          THE COURT:  What is your understanding as to why

5     those photographs were sent?

6          THE WITNESS:  My understanding was to show exactly

7     what they had discussed previously before Mo had left, that he

8     would travel to Turkey under the guise of a tour, and he would

9     take photos while he was there to support that he was actually

10    there.

11    BY MR. SMITH:

12    Q.   Didn't your Mo -- you're informant Mo's agent handler,

13    correct?

14    A.   Yes.

15    Q.   Okay.  Didn't Nicholas once tell Mo that he downloaded a

16    picture of the Blue Mosque at work and he liked looking at it?

17    A.   I, I don't recall that.

18    Q.   Okay.  You testified that there was a June 21, 2015,

19    e-mail marked Government Exhibit 1-109, and Mr. Gibbs asked

20    you, "Why didn't you ask him to send Mo money in June 2015?"

21    Do you remember that question from Mr. Gibbs?

22    A.   Yes.

23    Q.   And your response was, "It would have been inconsistent

24    with the legend that Mo had created," correct?

25    A.   Yes.

1   Q.   And that was in June 2015, correct?

2   A.   Yes, I believe so.

3   Q.   Isn't it true that you had decided the investigation was

4   dragging at that point?  Isn't it true that the case agents

5   pretending to be Mo in June 2016 had said this case

6   investigation is slow, and Slow Decline --

7          MR. GIBBS:  Objection, Judge.  This is our prior

8   standing objection to the motivation of other agents, not this

9   agent, and information that was not contained in the e-mails.

10  If it didn't make it into the e-mails, it's not relevant.

11         MR. SMITH:  Your Honor, the relevance of these

12  communications is the purpose of the testimony elicited from

13  Cameron Siegfried is to show that the defendant had a

14  predisposition to support ISIS.  If there are documents from

15  the government's own agents indicating that things are slow

16  because they are not finding the predisposition they want, this

17  is relevant testimony.

18         MR. GIBBS:  Judge, first of all, this is the -- this

19  is the issue we discussed at the bench previously.

20         THE COURT:  Well, we should be at the bench now.

21         MR. GIBBS:  Thank you.

22         (Bench conference on the record.)

23         MR. GIBBS:  So, Judge, this -- I believe on the first

24  day of the trial, we discussed the issue about opening doors,

25  and this is the issue.  If they want to get into this whole

1   idea of why the government was very concerned here --

2            THE COURT:  Wait a minute.  I'm hearing noise in the

3   courtroom.  What's going on?

4            The clerk is speaking to the jurors.  Hold on a

5   second.

6            Is there a problem with the jurors?

7            THE CLERK:  No.  Just need to check in.

8            THE COURT:  Okay.  Go ahead.

9            MR. GIBBS:  Okay.  So this is that issue related to

10  opening the door.  If they want to open the door to the idea of

11  why the agents were very concerned and why they did certain

12  things, then, you know, those doors are going to be opened.

13           The problem here, too, is this is not -- as I

14  understand it, these are not communications by this witness, so

15  it doesn't go to his motivation, so --

16           MR. SMITH:  Your Honor, we believe his name is

17  redacted --

18           THE COURT:  Just a second.  I keep hearing the --

19  what is the jury talking about?

20           All right, go ahead.

21           MR. SMITH:  May I explain the relevance of the

22  documents?

23           THE COURT:  Go ahead.

24           MR. SMITH:  Okay.  So, Your Honor, Mr. Siegfried

25  testified that the reason he did not ask Nicholas Young to send

1  money to Syria was because it would have been inconsistent with

2  the legend, and I believe that -- I understand the purpose of

3  Mr. Gibbs' testimony, and I, and I think it's relevant because

4  it shows that we didn't -- the reason the government did not

5  ask him to commit the crime that they later asked him to commit

6  is not because he didn't have the predisposition, but it would

7  have been inconsistent with the legend that Mo had created for

8  his background, but if Your Honor looks at these

9  communications, you'll see that even internally, the agents

10 believed that -- they said they needed to hit the case with a

11 defibrillator to get it going.

12         This is not about the government's mindset.  This is

13 about one party is taking the position that the defendant had a

14 predisposition to support terrorism at this point.  If the

15 government takes the same, an internally inconsistent position,

16 we're allowed to raise the fact that the party making this

17 argument has argued internally the opposite.

18         Your Honor, if I may, there's one more comment that,

19 that is *Brady* in this case.  There's a July 2016 e-mail to the

20 lead case agent saying, "All, maybe Slow Decline is being

21 overly cautious," in response to their request that he send

22 more e-mails to Mo in Syria.

23         So we're not introducing this evidence to show what

24 the government thought, but if an opposing party is taking a

25 position with respect to the defense's predisposition at a

1    certain point and it has issued inconsistent statements on that

2    predisposition, we're entitled to inquire.

3            THE COURT:  Well, first of all, I'm not at all

4    convinced that that is correct, but the second problem you have

5    is the door being opened now to almost all of the concerns that

6    the FBI had about your client because there's so many -- so

7    much smoke in this case, and we're trying to keep as much of

8    that out, but I think it just opens the door completely to

9    everything, because they were concerned about the white

10   supremacist stuff, concerned about radical, other radical

11   issues, they found ammunition.  These are all things that it

12   opens up.

13           So I'm going to go ahead and continue my earlier

14   ruling that this is not relevant to the core issues in this

15   case.  The motivation of the government in this case and the

16   fact that they were frustrated, if they were, and they weren't

17   getting enough, is not relevant to the issues.  So I've made my

18   ruling.  You'll have to live with it.  Thank you.

19           (End of bench conference.)

20           THE COURT:  We're going to have our break in five

21   minutes, folks, because that's about the normal time to take

22   our mid-morning break.

23           Go ahead, Mr. Smith.

24   BY MR. SMITH:

25   Q.   Mr. Siegfried, you testified about an e-mail from the

1   alias Mo to Mr. Young on July 1, 2014.  It was marked

2   Government Exhibit 1-213, and it concerned the Abu Salim

3   Martyrs Brigade.

4           Do you remember that e-mail?

5   A.   Is that the 2015 e-mail?

6   Q.   It's 7/1/2015, Government Exhibit 1-213.  It references

7   Abu Salim Martyrs Brigade.

8   A.   Yes.

9   Q.   This e-mail was sent after Mr. Young returned from Libya,

10  not before, correct?

11  A.   Yes.

12  Q.   In fact, at this time, you had concluded there was no

13  evidence Mr. Young had joined the terrorist group in Libya,

14  correct?

15          MR. GIBBS:  Objection, Judge.

16          THE COURT:  What's the basis of the objection?

17          MR. SMITH:  And more --

18          THE COURT:  Wait a minute.  I'm trying to hear from

19  Mr. Gibbs.

20          MR. SMITH:  Not the documents that Your Honor just

21  ruled on.  There are distinct documents indicating that at the

22  time --

23          THE COURT:  Wait, wait, wait.

24          MR. GIBBS:  Wait.  The question was the witness had

25  concluded.

1          THE COURT:  Just stop.

2          Folks, start your break now, all right?  And I'll

3    have you back here, please, at 11:30, all right?  Thank you.

4                    (Jury out.)

5          THE COURT:  All right.  Now, let me hear the question

6    you want to ask the witness.

7          MR. SMITH:  So, Your Honor, there was a government

8    exhibit marked 1-213, and it was an e-mail.

9          THE COURT:  I have it in front of me, all right.

10         MR. SMITH:  July 2015.  And in that e-mail, Mr. Gibbs

11   elicited from the witness his opinion that this was

12   referencing, this Abu Salim Martyrs Brigade comment was

13   referencing a terrorist group in Libya, and, Your Honor, at the

14   point that this e-mail was sent, we have some evidence produced

15   in discovery indicating that the counterterrorism section

16   investigation into Mr. Young had no evidence that this Abu

17   Salim Martyrs Brigade was a terrorist group, was active in the

18   area of Libya where Mr. Young was.

19         So -- and why is this relevant?  Because the

20   government is eliciting this -- these conversations about Abu

21   Salim Martyrs Brigade to establish the point that Mr. Young had

22   a predisposition to support terrorism at this point, but there

23   was no evidence at this time that, that this group had anything

24   to do with terrorism, and, in fact, the government acknowledged

25   as much internally.

1            Mr. Siegfried was a part of this investigation.

2            MR. GIBBS:  And, Judge, if I could respond quickly?

3            THE COURT:  Yes.

4            MR. GIBBS:  Because the testimony was misstated.  The

5    e-mail was from the defendant saying, "The group I was with was

6    Abu Salim Martyrs Brig.," B-r-i-g-period.  My only question to

7    the agent was, "Who first brought up the Abu Salim Martyrs

8    Brigade?"

9            And he said, "The defendant," and I moved on from

10   that.

11           So I didn't ask him anything about the nature of the

12   group or what the FBI believed about the group, which isn't

13   relevant anyway.

14           The e-mail speaks for itself.  It's the defendant's

15   statement.  He volunteered that information to the person he

16   believed was Mo.  I didn't touch it beyond just pointing out

17   that the agent and the FBI didn't bring that up at all.  The

18   defendant brought it up himself, and that's the extent of the

19   testimony.

20           THE COURT:  That's how I recall the testimony.

21           MR. SMITH:  And, Your Honor, the only -- the

22   relevance of eliciting that comment at all is to establish

23   Mr. Young's predisposition to materially support terrorism.

24           THE COURT:  But it's your client who put the

25   statement in the e-mail.  The government didn't.  That's the

1  whole point.  Your client in his words includes the

2  statement, "People from the Abo Salem Suhada Brig. is who I was

3  with mostly.  I know there has been some problems there where

4  they are, but they are good brothers."

5         That's it.

6         MR. SMITH:  Would Your Honor agree that if it were --

7  if the Court could take judicial notice of the fact that Abu

8  Salim Martyrs Brigade is not a terrorist group hypothetically,

9  would Your Honor find that testimony relevant in this case

10 about Mr. Young commenting about the Abu Salim Martyrs Brigade?

11        THE COURT:  Oh, I, I think it's clearly relevant to

12 this case.  It shows among other things that your client has

13 been in a part of the world where groups of radical activity

14 are working.  I'm not going to get into taking judicial notice

15 of something like that.  I don't have any information before me

16 one way or the other, but I think this is a line of questioning

17 for this witness in particular that's not going anywhere.

18        So as I said, I'm going to sustain that objection.

19        MR. GIBBS:  Right.  I should just note for the

20 record, Judge, we will call a witness, our expert, who will be

21 able to testify about Abu Salim Martyrs Brigade.  This witness

22 just doesn't have the basis to do that.

23        THE COURT:  All right.

24        MR. GIBBS:  So thank you.

25        MR. SMITH:  And one final question, Your Honor?

1           THE COURT:  Yes.

2           MR. SMITH:  Would Your Honor find it relevant to

3    examine the witness on the FBI -- we have an internal document

4    here indicating that the FBI understood in March 14, 2016, that

5    Mr. Young told the informant that his contacts overseas had

6    views opposing ISIS.

7           MR. GIBBS:  Judge, again, the issue we're having, and

8    we had this discussion at the bench, sort of these internal

9    deliberations with the FBI are not relevant.  It does open the

10   door to why the FBI was so concerned and, you know, put these

11   resources on this case, but, you know, again, asking this

12   witness about internal deliberations that he was likely not a

13   part of and that never resulted in communications with the

14   defendant is just not relevant.  It has no -- you know, I think

15   Your Honor used the words "there's a lot of smoke here," and

16   you're trying to avoid the smoke.  That's a huge amount of

17   smoke here.

18           THE COURT:  I'm sustaining the objection.  All right,

19   we're on recess until 11:30.

20           (Recess from 11:18 a.m., until 11:31 a.m.)

21                       (Jury present.)

22           THE COURT:  All right, Mr. Smith.

23   BY MR. SMITH:

24   Q.   Agent Siegfried, you testified that on -- there was an

25   e-mail sent by Mr. Young on February 16, 2016, it was marked

1   GX-1-219, and it referenced the Tor secure app.  Do you

2   remember that e-mail?

3   A.   Yes, I do.

4   Q.   Did you testify that it was Mr. Young who first raised the

5   subject of communicating on a secure app with the informant?

6   A.   Yes.

7   Q.   You also testified about an e-mail that Mo, the alias Mo

8   sent to Mr. Young on June 14, 2016, correct, in which the alias

9   Mo attempts to solicit the defendant on texting on a more

10  secure app?  This was Government Exhibit 1-221.  It's an e-mail

11  sent from the alias Mo on June 14, 2016?

12          MR. GIBBS:  Judge, I don't believe that was one of

13  his exhibits.  He had left by April.

14          THE COURT:  That's correct.

15          MR. SMITH:  It's -- Your Honor, I'd like to hand up

16  an e-mail dated April 18, 2016, from the informant Mo to the

17  defendant.

18  Q.   Have you ever seen --

19          MR. GIBBS:  Judge, before he starts testifying again,

20  that is just a piece of paper.  It's not marked again.

21          THE COURT:  Well, these are not exhibits.  They're

22  not going into evidence.

23          MR. SMITH:  They're impeachment documents.

24          THE COURT:  They're a piece of paper that's just

25  being used to not impeach but to refresh this man's memory.

1   That's all right.

2              MR. GIBBS:  Okay.

3              THE COURT:  It's not going in the record.

4              MR. SMITH:  Thank you, Your Honor.

5   Q.    What is that e-mail that you're looking at?

6   A.    It's an e-mail from Mo's e-mail account to the defendant.

7   Q.    And have you ever seen that e-mail before?

8   A.    Yes.

9   Q.    Okay.  And is it true that in that e-mail, the alias Mo

10  attempts to solicit a conversation with the defendant on a

11  secure app?

12  A.    Yes.

13  Q.    And do you know when the defendant responded to that

14  e-mail dated April 18, 2016?

15  A.    I wasn't around when he responded.

16  Q.    One of, one of your exhibits was Government Exhibit 1-221.

17  It was dated June 14, 2016, and it was from the defendant to

18  the alias Mo.  Do you recall --

19             MR. GIBBS:  Objection again, Judge.  He left in April

20  2016.  We didn't offer that exhibit through this witness.

21             THE COURT:  I'm going to sustain the objection.  Get

22  it from the correct witness.  There will be another witness.

23  BY MR. SMITH:

24  Q.    Isn't it true -- you are the -- you are a case agent on

25  this case.  You are a case agent.  You read this e-mail on

1   April 18, 2016.  You've reviewed it before, correct?

2   A.   Yes.

3   Q.   Isn't it the case that when the defendant responded to

4   that e-mail, he indicated, "I really don't trust electronic or

5   e-mail communications.  Don't feel comfortable on this"?

6           MR. GIBBS:  Objection, Judge.  That's the June --

7           MR. SMITH:  "I don't really do the" --

8           THE COURT:  Wait, wait, wait.  When there's an

9   objection, you have to stop so we can hear the objection.

10          MR. GIBBS:  Objection.  I believe that's the text

11  from the June e-mail that was just ruled that the defendant

12  (sic) didn't have a basis to testify to because he had left the

13  FBI by that time.

14          THE COURT:  What are you reading from?

15          MR. SMITH:  This is not a text.  This is an e-mail

16  produced to the defense in discovery.

17          THE COURT:  It doesn't make any difference.  What's

18  the date of the e-mail?

19          MR. SMITH:  The date of the e-mail is June 14, 2016.

20          THE COURT:  Fine.  It's after this witness is no

21  longer involved, so I'm sustaining the objection.  You need to

22  move on to another line of questioning.

23  BY MR. SMITH:

24  Q.   So, Agent Siegfried, at several points during the e-mail

25  exchange, during the e-mail exchange in which you were drafting

1   e-mails with the alias Mo, the defendant, what was the

2   investigative purpose of having the alias write to Young about

3   Syrian butchery?

4   A.   I'm not sure what you're referring to.

5   Q.   Are you familiar with the fact that there are e-mails

6   between the defendant and the alias Mo between October 2014 and

7   June -- and April 2016 concerning the Syrian government's

8   butchery of its civilians?  Are you familiar with those

9   e-mails?  The alias Mo would write to Mr. Young in e-mails in

10  this period concerning the Syrian government's slaughter of its

11  people, correct?

12  A.   I believe --

13           MR. GIBBS:  Judge, again, we entered all the e-mails.

14  If he wants to show him one, I think that would be the best way

15  to approach this witness.

16           MR. SMITH:  Your Honor, I'm entitled to ask --

17           THE COURT:  I'm overruling the objection.  This is

18  cross-examination, and this is one of the two agents who was

19  handling Mo and handling this aspect of the investigation.  So

20  I'm overruling that objection.

21           MR. SMITH:  Thank you, Your Honor.  And I believe the

22  witness just said yes, but he was about to explain.

23           THE WITNESS:  Yeah.  I believe there may have been

24  reference to that at one point.  I don't recall exactly which

25  e-mail.

Siegfried - Cross                                                      526

BY MR. SMITH:

Q.   So do you understand as the handler agent for Mo what the

investigative purpose would have been to write about the Syrian

butcheries in Syria in the e-mail communications with

Mr. Young?

          MR. GIBBS:  Judge, again, this goes back to the FBI

deliberations.

          THE COURT:  Yes.  You continue to go on that theme,

which I have said is outside of the proper way of defending

this case.  I've made the ruling.  You need to go on now,

Mr. Smith.

          MR. SMITH:  Your Honor, this is a slightly different

point.  If I may, may we approach the bench?

          THE COURT:  You keep asking about strategy.  Strategy

is not really relevant to this case.

          MR. SMITH:  This concerns the defendant's mindset,

Your Honor.

          THE COURT:  No.  I'm sustaining the objection.  Let's

move on.

BY MR. SMITH:

Q.   In this time period between October 2014 and June 2016,

the alias Mo would write e-mails to the defendant about the

alias Mo's mother, correct?

A.   I believe we reference it on at least one occasion.

Q.   And was the reference to Mr. Young's -- Mr. -- the

Siegfried - Cross                                                    527

1   undercover informant Mo's mother, was that in connection

2   with -- was that designed to investigate Mr. Young's potential

3   material support for terrorism?

4          MR. GIBBS:  Objection, Your Honor.

5          THE COURT:  Sustained.

6   BY MR. SMITH:

7   Q.   So we just talked about these e-mail -- this e-mail

8   exchange between the informant Mo, the alias of the informant

9   Mo on April 18, 2014 -- 2016, and June 14, 2016, correct?

10         THE COURT:  I'm not sure the dates are correct.  Try

11  that again.

12         MR. SMITH:  I just examined the witness about an

13  e-mail dated April 18, 2016, that was marked Government Exhibit

14  1-116.  It's 2016.

15         THE COURT:  116, do you have it there?  It should be

16  in the book.

17         MR. SMITH:  This is the solicitation e-mail we just

18  discussed.

19  Q.   You reviewed this e-mail on April 18, 2016, in which the

20  undercover informant solicits a communication on the undercover

21  app with the defendant?

22  A.   Yes.

23  Q.   It's true that the defendant did not respond to this

24  communication for two months, correct?

25         MR. GIBBS:  Judge, again, we've established this

528

1    witness left at the end of April.  He didn't --

2              THE COURT:  Sustained.

3              MR. GIBBS:  Thank you.

4              MR. SMITH:  That's it, Your Honor.  Thank you.

5              THE COURT:  All right.  Is there any redirect?

6              MR. GIBBS:  The only thing I need to do, Judge, is

7    clean up one thing.  I believe we offered Government Exhibit

8    1-220, and when I read the list of exhibits we were offering in

9    order to speed things up, I don't think I mentioned that one.

10   That was the second February 16, 2016, e-mail.  We would ask to

11   move that into evidence as well.

12             THE COURT:  Any objection?

13             MR. SMITH:  No objection.

14             THE COURT:  All right, it's in.

15             (Government's Exhibit No. 1-220 was received in

16   evidence.)

17             THE COURT:  All right, does anybody have any further

18   questions for this witness?

19             MR. GIBBS:  I don't, Judge.  Thank you.

20             THE COURT:  He will not be recalled in the

21   government's case.

22             MR. GIBBS:  No, because we took him all the way to

23   the end.

24             THE COURT:  All right.  Does the defense expect to

25   call this witness again, Mr. Smith?

1         MR. SMITH:  Your Honor, whether we call this witness

2    will depend on how the government presents certain

3    communications later.

4         THE COURT:  That's fine.  That's the answer.

5         MR. SMITH:  Okay.

6         THE COURT:  So, Agent, you're not excused as a

7    witness.  You don't have to be here the rest of today, I can

8    guarantee you that, but you're not to discuss your testimony or

9    anything you've seen or heard in court with any witness who has

10   not yet testified, all right?

11        THE WITNESS:  Yes, ma'am.

12        THE COURT:  All right, thank you.

13                    (Witness stood down.)

14        THE COURT:  Call your next witness.

15        MR. GIBBS:  Judge, this is Special Agent Smith, and

16   this will require the screen.

17        THE COURT:  All right.  Folks, you're getting your

18   exercise this morning.  It only takes a couple of minutes.  I'm

19   actually going to stay in session, but you-all go out and just

20   stretch your legs, and we'll get you right back in here.

21                    (Jury out.)

22        THE COURT:  We need to get the screen up.

23        MR. SMITH:  Your Honor, may I address just one point

24   that has been concerning to Your Honor over the course of these

25   cross-examinations, which is which particular government agent

1    should be questioned about certain documents, is it this agent

2    or the next, and the reason, Your Honor, the defense is

3    attempting to question certain agents about time periods that

4    might not exactly coincide with their time in the investigation

5    is the government has not informed us which agents it will be

6    using to present which evidence.

7         Now, there was a team, there was a whole team of

8    agents who were on this case, and we have no information about

9    which agent will present which evidence.  So there's a risk if

10   we don't attempt to introduce certain evidence with Witness 1,

11   we'll lose that opportunity if Witness 2 does not present on

12   the subject matter we're trying to inquire into.

13        THE COURT:  Well, I mean, part of that, I think,

14   could have been worked out ahead of time.

15        Would the government have objected -- I mean,

16   obviously, they don't have to tell you exactly what every

17   witness is going to testify to.  This case has gone on for some

18   period of time, and there are obviously multiple agents who

19   have worked on it.

20        Has Minichello been on this case from the very

21   beginning?

22        MR. GIBBS:  I don't think so.  He left in 2015.

23        MR. KROMBERG:  May I address that, Judge?

24        THE COURT:  Yes, go ahead, Mr. Kromberg.  Up at the

25   lectern.

1            MR. KROMBERG:  Agent Minichello was not the agent

2    from the beginning.  Agent Jones was the agent from the

3    beginning.  Agent Jones is not being called to testify because

4    he left when -- quite a while ago.  Agent Minichello replaced

5    Agent Jones, and Agent Caslen replaced Agent Minichello.

6            THE COURT:  All right.

7            MR. KROMBERG:  But to answer, to answer Mr. Smith's

8    question, if he focused on the exhibits that we're introducing,

9    he would have the right witness, but he's asking questions

10   about the exhibits that haven't yet been introduced.

11           THE COURT:  All right.

12           MR. KROMBERG:  It's also true that if he wants to

13   call anyone in the defense case, he can call them, too.

14           THE COURT:  All right, to make things easier, to keep

15   this case moving, I will ask the government just to do a

16   timeline.  That's all that's needed.

17           MR. SMITH:  Thank you, Your Honor.

18           MR. KROMBERG:  In fact, thank you.  When I submitted

19   a timeline to the defense, they objected to it, but we want to

20   present a timeline to Special Agent Caslen's testimony as a

21   government exhibit to set forth just the concrete facts of what

22   happened when, and we're going to present that, as I hope will

23   be admitted, as a summary chart to go to the jury to help when

24   things happened.

25           THE COURT:  Here's what we'll do:  You take your

```
 1    timeline and just put agents on it.  In other words, Agent

 2    So-and-so and Agent So-and-so were here to here on the

 3    timeline.  There may be overlap, Agent So-and-so and Agent

 4    So-and-so were here.

 5              That should give the defense what they need, all

 6    right?

 7              MR. KROMBERG:  That will be fine.

 8              THE COURT:  Fine.  Let's move on then.  We're ready

 9    to bring the jury back in.

10              MR. GIBBS:  Your Honor, just one note.  With Special

11    Agent Smith, he's testifying to the December interviews with

12    the defendant.

13              THE COURT:  Hold on one second before we bring the

14    jury in.

15              MR. GIBBS:  Both of the December 3 and December 5

16    interviews were recorded.  We're going to play the entirety of

17    the last one because it's short.  We're going to play clips, a

18    few clips of the first interview.  I think the sound quality is

19    better than it was yesterday, but Your Honor had mentioned

20    headphones.  If we have them available, certainly I think it

21    would be helpful.

22              THE COURT:  Well, we don't have 14.  I mean, you-all

23    need to make some commonsense approaches to the Court about

24    logistics.  I would expect that an interview ought to have been

25    well recorded.  So it better be because the tapes have been, I
```

Smith - Direct                                                          533

1    think, really very, very unfair to the jury to have to listen

2    to that kind of evidence from both sides, all right?

3             MR. GIBBS:  Understood.

4             THE COURT:  All right, let's get the jury in here.

5    Is the witness available?  We can bring him in while they're

6    coming in.

7                        (Jury present.)

8             THE COURT:  All right, folks, you can all have a

9    seat.

10            All right, Mr. Gibbs?

11             SA SMITH, GOVERNMENT'S WITNESS, AFFIRMED

12                      DIRECT EXAMINATION

13   BY MR. GIBBS:

14   Q.   Good morning, sir.

15   A.   Good morning.

16   Q.   Sir, for purposes of this proceeding, you will be

17   testifying as Special Agent Smith, correct?

18   A.   Yes, sir.

19   Q.   And were you working as a task force officer for the FBI

20   beginning in 2010?

21   A.   Yes, sir.

22   Q.   And at some point during your time with the FBI, did you

23   participate in an investigation of the defendant, Nicholas

24   Young, as well as a number of other people?

25   A.   Yes, I did.

1   Q.   All right.  Is Nicholas Young here in court?

2   A.   Yes, sir.

3   Q.   Can you point him out and identify what he's wearing?

4   A.   He's in the -- sitting between his defense counsel at the

5   defendant's table.

6          THE COURT:  Any objection to the identification?

7          MS. MORENO:  No objection.

8          THE COURT:  All right.  The witness has identified

9   the defendant.

10         MR. GIBBS:  Thank you, Judge.

11  Q.   Special Agent Smith, over the course of the investigation,

12  was a CHS known as Mo introduced to the defendant?

13  A.   Yes, sir.

14  Q.   And at some point in time, did Mo supposedly leave the

15  country?

16  A.   Yes, sir.

17  Q.   And prior to supposedly leaving the country, what did Mo

18  and the defendant do so that they would be able to communicate?

19  A.   They established a -- e-mail accounts for both of them,

20  respectively.

21  Q.   And once Mo supposedly left the country, who was actually

22  controlling Mo's e-mail account?

23  A.   A combination of two colleagues on the same task force.

24  Q.   So these were FBI agents?

25  A.   One FBI agent and one task force officer.

1   Q.   Okay.  And by December of 2015, how long had the defendant

2   been corresponding with Mo's e-mail account?

3   A.   Over a year.

4   Q.   And by December of 2015, was the decision made to

5   interview the defendant?

6   A.   Yes, sir.

7   Q.   And where did that interview take place?

8   A.   The first interview occurred at the Panera in Fairfax.

9   Q.   And that's in Northern Virginia?

10  A.   Yes, sir.

11  Q.   And you said that's in Fairfax County?

12  A.   Yes, sir.

13       MR. GIBBS:  Your Honor, we would just ask for

14  judicial notice that that occurred in the Eastern District of

15  Virginia.

16       THE COURT:  I'll take such notice.

17       MR. GIBBS:  Thank you.

18  Q.   And you said the date of that interview was December 3,

19  2015?

20  A.   That's correct.

21  Q.   All right.  And how did you contact the defendant to be

22  able to interview him at that Panera bread in Fairfax?

23  A.   We called him.

24  Q.   All right.  And who specifically called him?

25  A.   I did.

Smith - Direct                                                          536

1    Q.   And what did you say to him?

2    A.   We called -- I don't remember the exact words I used, but

3    I -- we asked if he could help with a matter and meet with us.

4    Q.   Did you give him any more details than that?

5    A.   No.

6    Q.   And describe what happened.  Who got to the Panera first?

7    A.   Myself and Special Agent Caslen.

8    Q.   All right.  And was he the other person in the interview?

9    A.   Yes, sir.

10   Q.   And how long did it take the defendant to arrive?

11   A.   I can't remember, maybe 30 minutes or so.  We were there

12   maybe 20-30 minutes earlier.

13   Q.   And once the defendant arrived, is that when the first

14   interview took place?

15   A.   Yes, sir.

16   Q.   And was that interview recorded?

17   A.   Yes, sir.

18   Q.   And did the defendant know that?

19   A.   I -- no, he did not.  We did not advise the defendant that

20   we were recording the interview.

21   Q.   And when that interview first began, what were you asking

22   the defendant about initially?

23   A.   We interviewed him initially, asked him about an associate

24   of his that -- named Peshwaz Waise, another Northern Virginia

25   resident.

1              MR. GIBBS:  And if we can just pull up 9-106 briefly?

2    Q.   Do you recognize that individual?

3    A.   I do.

4    Q.   And who is that?

5    A.   That is Peshwaz Waise.

6    Q.   So that's the person you were asking the defendant about?

7    A.   Correct.

8    Q.   All right.  And next if you could take a look, Special

9    Agent, at Government Exhibit 5-101-1?  I believe there -- on

10   the lectern, there should be discs up there, right?  Yep.

11   A.   Okay.

12   Q.   Do you recognize that?

13   A.   I do.

14   Q.   And that's a disc, right?

15   A.   Actually, it's a transcript.

16   Q.   Okay.  Is there a disc with it?

17   A.   No, sir.

18              MR. GIBBS:  If I could indulge the court security

19   officer, we're going to be -- well, let's start with 5-101-1.

20   We'll ultimately enter all the ones in that series.

21              THE COURT SECURITY OFFICER:  5-101-1?

22              MR. GIBBS:  Yes, sir, 5-101-1.

23              THE COURT:  It's again just a piece of paper.

24   Where's your CD?

25              MR. GIBBS:  I believe it's in the bin, correct?

1              THE COURT SECURITY OFFICER:  There's no disc in here.

2              THE COURT:  Are there any discs over there at all?

3              THE COURT SECURITY OFFICER:  There are some that were

4    previously reviewed, Your Honor.

5              MR. GIBBS:  Judge, we actually have it.  I can hand

6    it up.  I apologize for that.

7              THE COURT:  All right.  We have one over here.

8    Mr. van Roekel?

9              Does that have the label on it?

10             MR. GIBBS:  It does, Your Honor.

11             THE COURT:  All right.  5-101-1, is that correct?

12             MR. GIBBS:  It is.  And actually, we put all the

13   clips on there, so I believe it's 101-1 through 101-7.

14   Q.   Is that correct?

15   A.   Yes, sir.

16   Q.   Okay.  And you reviewed that prior to your testimony here

17   today?

18   A.   I did.

19             MR. GIBBS:  Judge, we would move in the disc and ask

20   to play the first clip along with the transcript that

21   accompanies it.

22             THE COURT:  Any objection?

23             MS. MORENO:  No objection, Your Honor, as long as

24   it's described as clips, individual clips from the interviews.

25             MR. GIBBS:  Correct.

1              THE COURT:  Clips would be an excerpt.  It's not the

2      entire interview, all right.  But we'll have to talk about how

3      it all goes back to the jury, all right?  You're only playing

4      one clip, one portion of that.

5              MR. GIBBS:  Right.  And I can maybe clarify that a

6      bit.

7      Q.   So, Special Agent Smith, when you conducted the interview

8      with the defendant, with Special Agent Caslen present, how

9      long -- again, just roughly ballpark, how long were you at the

10     Panera there with the defendant?

11     A.   I would say approximately two hours, two-and-a-half hours

12     approximately.

13     Q.   Okay.  And obviously, the clips we're going to play do not

14     amount to anywhere near that time, correct?

15     A.   No, sir.

16     Q.   Okay.  So these are, these are excerpted from the longer

17     interview itself, right?

18     A.   Yes, sir.

19             MR. GIBBS:  All right, thank you.

20             And if we can start with 101-1 and 101-1T?

21             THE COURT:  T being the transcript?

22             MR. GIBBS:  Correct.

23             (Government's Exhibit No. 5-101-1 was played.)

24     BY MR. GIBBS:

25     Q.   Now, Special Agent, in that recording, the defendant said

1    when he was asked about Mo that Mo had left a year ago on

2    vacation and that he went to Turkey.  Now, by this point in the

3    investigation, what had the FBI agent who was posing as Mo led

4    the defendant to believe that Mo was doing?

5    A.   He was a fighter for the Islamic State.

6    Q.   And when Mo was still in this area here in Northern

7    Virginia, who helped him come up with the story that he was

8    going to Turkey for a vacation?

9    A.   The defendant, Mr. Young.

10            MR. GIBBS:  Next if we could turn to Government

11   Exhibit 5-101-2, which again is a clip of the December 3, 2015,

12   interview?  We'd ask to publish that along with the transcript.

13            THE COURT:  All right.

14            (Government's Exhibit No. 5-101-2 was played.)

15            MR. GIBBS:  All right, next I'd like to turn to clip

16   3, which is 5-101-3T, and ask to publish that by playing it

17   along with the transcript.

18            THE COURT:  All right.

19            (Government's Exhibit No. 5-101-3 was played.)

20   BY MR. GIBBS:

21   Q.   Now, Special Agent, in that clip, the defendant said at

22   one point that ISIS declared the Caliphate in the summer of

23   2014.  Do you recall that?

24   A.   I do.

25   Q.   And was that your understanding as well?

Smith - Direct                                                        541

1   A.   Yes, it is.

2   Q.   And at one point, the defendant brought up Peshwaz, and he

3   sort of compared him to Mo and said that Peshwaz was always

4   talking about religion and Mo wasn't.  Who was Peshwaz again?

5            MS. MORENO:  First of all, objection.  Leading.

6   Misstates the evidence.

7            THE COURT:  It is leading, so I'm sustaining the

8   objection.

9   BY MR. GIBBS:

10  Q.   Who is Peshwaz?

11  A.   Peshwaz is a Northern Virginia resident, also a subject of

12  the FBI.

13  Q.   And that was the person whose photograph you identified

14  earlier?

15  A.   Yes, sir.

16           MR. GIBBS:  Thank you.

17           And, Your Honor, we would next move into evidence and

18  play Exhibit 5-101-4.  That's another clip from the December 3

19  interview.

20           THE COURT:  All right, it's in.

21           (Government's Exhibit No. 5-101-4 was received in

22  evidence and was played.)

23  BY MR. GIBBS:

24  Q.   Special Agent Smith, in that quote when the defendant was

25  asked about where Mo was, he said, "Maybe he was going to

1    Turkey."

2              Where had Mo actually led the defendant to believe

3    that he was going?

4    A.   To the Islamic State's capital of Raqqah, in Syria.

5    Q.   And what was the story that the defendant and Mo came up

6    with to explain what he would be doing overseas?

7    A.   That he would be taking a tour in Turkey.

8    Q.   And towards the end of that clip, Special Agent Caslen in

9    talking to the defendant said, "You're a cop."  Where did the

10   defendant work at that time?

11   A.   He was a Metro Transit Police officer.

12             MR. GIBBS:  Your Honor, if we could play Exhibit

13   5-101-5?  That's another clip from the December 3 interview.

14             THE COURT:  All right.

15             (Government's Exhibit No. 5-101-5 was played.)

16             MR. GIBBS:  Your Honor, that was a short clip.  We'll

17   just go straight to the next one, which is 5-101-6T.

18             THE COURT:  All right.

19             (Government's Exhibit No. 5-101-6 was played.)

20             MR. GIBBS:  And then let's go to the last clip of the

21   December 3, 2015, interview, which is clip 7.  It's 5-101-7T.

22   If we could play that along with the recording?

23             THE COURT:  All right.

24             (Government's Exhibit No. 5-101-7 was played.)

25   BY MR. GIBBS:

Smith - Direct                                                        543

1  Q.   All right.  Special Agent Smith, at the beginning of that

2  last clip, the defendant said he hadn't had any contact with Mo

3  since October 2014.  Do you recall that?

4  A.   Yes, sir.

5  Q.   All right.  As of December of 2015, what sort of

6  communicating was the defendant doing with the person he

7  believed was Mo?

8  A.   They were exchanging e-mail correspondence.

9  Q.   And, in fact, later in that clip, he said that he used to

10 have an e-mail address for Mo, and he thought it was something

11 like mmohammad.  In fact, what was the e-mail address that the

12 defendant was using to communicate with the person he believed

13 was Mo?

14 A.   The e-mail address that the defendant was using was

15 essakobayashi@mail.com.

16 Q.   And the essakobayashi, that was the defendant's e-mail

17 address?

18 A.   Yes, sir.

19 Q.   And what was Mo's e-mail address?

20 A.   Mo utilized V4Vendetta@mail.com.

21 Q.   Thank you.

22         Now, Special Agent Smith, was a second interview with

23 the defendant conducted?

24 A.   Yes, sir.

25 Q.   How long after that first interview was the second one?

1   A.   Approximately two days.

2   Q.   And who conducted the second interview?

3   A.   Myself and Special Agent Caslen.

4   Q.   And where did that take place?

5   A.   That occurred outside his residence, also in Fairfax

6   County.

7           MR. GIBBS:  Again, Judge, we would ask that the Court

8   take judicial notice of the fact that it occurred in the

9   Eastern District of Virginia.

10          THE COURT:  Yes, we'll take such notice.

11          MR. GIBBS:  Thank you, Judge.

12  Q.   Was the defendant expecting you and Special Agent Caslen

13  when you arrived?

14  A.   No, sir.

15  Q.   And you said the interview took place outside of his

16  house?

17  A.   Well, the defendant stood inside his house, and myself and

18  Special Agent Caslen stood outside on his front step.

19  Q.   And was the second interview also recorded?

20  A.   Yes, it was.

21          MR. GIBBS:  And if we could, Your Honor, I would ask

22  to play that interview, and if I could hand up the disc?

23          THE COURT:  What exhibit number?

24          MR. GIBBS:  It's 5-102.

25          THE COURT:  Is there any objection to that?

Smith - Direct                                                      545

1              MS. MORENO:  No objection.

2              THE COURT:  No?  It's in.

3              (Government's Exhibit No. 5-102 was received in

4    evidence.)

5    BY MR. GIBBS:

6    Q.   First of all, do you recognize that?

7    A.   I do.

8    Q.   Do you see your initials on there or your name?

9    A.   I wrote "Smith" on there and the date.

10   Q.   You reviewed this prior to your testimony today?

11   A.   I did.

12             MR. GIBBS:  All right, we would ask to play 5-102 and

13   project the transcript along with it.

14             THE COURT:  All right, go ahead.

15             (Government's Exhibit No. 5-102 was played.)

16   BY MR. GIBBS:

17   Q.   Now, Special Agent Smith, toward the beginning of that

18   clip, the defendant had said Mo had, quote, talked about going

19   with, like, a tour group or something.  Prior to leaving, what

20   had Mo actually led the defendant to believe was the purpose of

21   his trip?

22   A.   To join the Islamic State.

23   Q.   And later in that clip, the defendant was asked about Mo's

24   e-mail, and he said it was probably in a car he had recently

25   sold.  During this time, what was the defendant using to

1    communicate with the person he believed was Mo?

2    A.    E-mail addresses that they set up together.

3    Q.    And what was the particular e-mail address he had for Mo?

4    A.    V4Vendetta@mail.com.

5    Q.    And later in that clip, the defendant denied knowing

6    anyone who gave Mo guidance or advice on his travel.  Before Mo

7    left for his trip, who was the person who gave him a great deal

8    of guidance or advice for his travel?

9    A.    Nicholas Young.

10            MR. GIBBS:  Thank you, sir.  I believe the defense

11   will have some questions for you.

12            THE COURT:  Okay.  Cross?

13                         CROSS-EXAMINATION

14   BY MS. MORENO:

15   Q.    Agent Smith, now, when you went to see Nick Young on

16   December 3, you were with Special Agent Caslen, correct?

17   A.    Yes, ma'am.

18   Q.    And that particular interview was about two hours, right?

19   A.    Yes, ma'am.

20   Q.    Two-and-a-half hours?

21   A.    Approximately, yes.

22   Q.    And not only did you have a recording, but you generated

23   what's called a 302 report on the basis of that first

24   interview, correct?

25   A.    Yes, ma'am.

1    Q.   And you've reviewed that particular report before

2    testifying here today, right?

3    A.   Yes, ma'am.

4    Q.   And the same is true of the second interview on

5    December 5, two days later.  We heard the clip on that just

6    now, right?

7    A.   Yes, ma'am.

8    Q.   And you also generated another 302 on that, correct?

9    A.   Yes, ma'am.

10   Q.   And that's just a report summarizing the interviews,

11   right?

12   A.   Yes, ma'am.

13   Q.   And you've also reviewed that one as well?

14   A.   Yes, ma'am.

15   Q.   Okay.  Because I'm going to ask you some questions about

16   that.

17           But first of all, when you called Nick Young, you had

18   asked him to meet you gentlemen at the Panera; is that right?

19   A.   That's my recollection.  I know that's where we ended up

20   in doing the interview.  I believe we, we suggested that

21   location.  I don't recall precisely where we said to meet.  It

22   just, that's where we ended up meeting.

23   Q.   Now, if -- Nick Young knew that he was meeting with you in

24   your capacity as an FBI agent, correct?

25   A.   Yes, ma'am, but I'm not an FBI.  I'm a task force officer.

Smith - Cross                                                        548

1   Q.   Sorry.  But he did -- he was advised that Special Agent

2   Caslen over here was going to meet with him, correct?

3   A.   I don't remember if I said over the phone who he'd be

4   meeting with, but I, I thought I mentioned that I was going to

5   be in the interview as well.

6   Q.   Here's my question:  He knew he was meeting with federal

7   law enforcement officers, correct?

8   A.   Yes, ma'am.  Yes, ma'am.

9   Q.   All right.  And when he went to see you, did he bring a

10  lawyer?

11  A.   No, ma'am.

12  Q.   Okay.  And this interview that lasted two-and-a-half

13  hours, at any time, he could have gotten up and left, correct?

14  A.   Yes, ma'am.

15  Q.   And at any time, he could have asked for a lawyer, right?

16  A.   Yes, ma'am.

17  Q.   But he continued to talk to you, correct?

18  A.   Yes, he did.

19  Q.   That entire interview.  And, in fact, two days later, he

20  spoke to you?

21  A.   Yes, he did.

22  Q.   And at no time did he want counsel with him?

23  A.   He never said anything like that.

24  Q.   Right.  Now, he -- so in that first interview, which is

25  the long interview, December 3, I want to focus your attention

1    on that, you talked about a variety of -- you talked about a

2    few people.  You talked about Peshwaz.

3    A.    Yes, ma'am.

4    Q.    Okay.  And you know that Mr. Young hadn't seen this

5    gentleman, Peshwaz, for a couple of years, right?

6    A.    That's what he told us.

7    Q.    Okay.  And you then asked him a number of different

8    questions about Mo, correct?

9    A.    Yes, ma'am.

10   Q.    And he had told you -- you had asked him where, if he

11   had -- if this gentleman, Mo, had family overseas, right?

12   A.    Yes, ma'am.

13   Q.    And he told you that he thought that he had some family in

14   Palestine, correct?

15   A.    Yes, ma'am.

16   Q.    By the way, there was a -- in one of the clips, there was

17   something about Mr. Young didn't speak the language or Arabic,

18   and I think it was cut off.  You have no evidence that

19   Mr. Young speaks Arabic, do you?

20   A.    I have none.

21   Q.    Okay.  I mean, you've never heard him on any tapes or

22   anything or in conversations speaking Arabic, right?

23   A.    No, ma'am.

24   Q.    You don't know that to be the case, correct?

25   A.    I do not believe -- I do not know him to speak Arabic.

1    Q.   Okay.  Now, it was kind of -- and forgive me for

2    characterizing it, but with you and Mr. Caslen, the both of you

3    were asking Nick Young questions, right?

4    A.   Yes, ma'am.

5    Q.   And it was kind of like a tag team between the two of you,

6    correct?

7    A.   Yes, ma'am.

8    Q.   Right.  Because you, you were -- and a lot of the

9    conversations, you were also trying to, shall we say, build

10   some sort of rapport with Mr. Young, correct?

11   A.   Yes, ma'am.

12   Q.   Okay.  Because sometimes either you or Special Agent

13   Caslen were talking about how -- talking about how perhaps ISIS

14   had been overexaggerated in the news, right?

15   A.   Yes.

16   Q.   You remember some of those comments.

17            But, of course, that's not how you really felt,

18   right?

19   A.   No, ma'am, I do not -- did not.

20   Q.   Now, you asked specifically about Mo and Mo's opinions

21   about the Islamic State a number of times in a number of ways,

22   fair?

23   A.   Yes, ma'am.

24   Q.   Okay.  And what you said was -- what Mr. Young would say

25   at various times, he would say yes, that Mo had a generally

1   favorable opinion of Islamic State.  He told you that, right?

2   A.   Yes, ma'am.

3   Q.   Okay.  And, in fact, Mr. Young had admitted to you that Mo

4   could have gone to fight with the Islamic State, right?

5   A.   Yes, something to that effect.

6   Q.   Right.  You remember him saying that, correct?

7   A.   He said -- I believe it was, it could have been inferred,

8   it's a possibility that he could have gone, I think, was as far

9   as an affirmative statement that he had joined the Islamic

10  State that he stated on that interview.  He did not say, to my

11  recollection, that he went to join the Islamic State or that he

12  had joined the Islamic State.

13  Q.   Mr. Young told you that Mo, or Mohammad -- when "Mohammad"

14  is used in your reports, that would be Mo, the Mo we're talking

15  about, correct?

16  A.   Yes, ma'am.

17  Q.   All right.  And he told you that Mohammad could be either

18  in the Islamic State or Palestine or with his sister somewhere

19  in the U.S.  He told you that, right?

20  A.   Yes, ma'am.  I don't have that exact part of the

21  transcript in front of me, but that sounds correct.

22  Q.   Okay.  Would you like to see your report?

23  A.   Sure, yes.

24          THE COURT:  He said it sounds correct.  He's not

25  disputing that.

1              MS. MORENO:   Okay.   Thank you, Your Honor.

2    Q.   And he told you -- in fact, he told you the correct date

3    that the last time that he had spoken to Mo -- excuse me, the

4    last -- the time that he thought Mo had left the country was

5    October 2014, right?

6    A.   Yes.   Mr. Young did say that he believed that Mo had

7    departed the United States before Halloween in 2015.

8    Q.   '14?

9    A.   '14, sorry.

10   Q.   Okay.   And, in fact, in one of the clips that we heard,

11   one of you gentlemen was talking about, well, he could have

12   gone between July and the fall or something, and Mr. Young

13   corrected you and said, "I think he left in October of 2014,"

14   right?

15   A.   Yes, ma'am, he did.

16   Q.   Okay.   And, in fact, Mo never -- Mo was always in the

17   country, right, except for that short trip with, with another

18   agent to Turkey?

19   A.   Yes, ma'am.

20   Q.   There was discussions about Syria between Mr. Young and

21   yourself, right?

22   A.   Yes, ma'am.

23   Q.   And when I say "yourself," I'm also including Agent

24   Caslen, correct?

25   A.   Correct.

1   Q.   And, and there was discussions about the confusing

2   situation in Syria, right?  We heard that in one of the, the

3   clips just now?

4   A.   Yes.

5   Q.   And, and the different, the different factions that were

6   over in Syria made it a confusing situation, correct?  Correct?

7   A.   Yes, correct.

8   Q.   In one of the conversations, I think Government's Exhibit

9   5-101-4, there was some discussions about Mo, and Mr. Young

10  said, "Yes, it could be inferred that he was going to ISIS."

11  A.   Yes.

12  Q.   He told you that, right?

13         But that he couldn't, he couldn't get really good

14  information because it was a difficult situation over there,

15  correct?

16  A.   Yes, ma'am.

17  Q.   In one of the clips played, 5-101-5, the question was

18  asked of Mr. Young if anyone in the community would have told

19  Mo to go over there.  Do you remember that discussion?

20  A.   I don't recall the question being that -- it was more of

21  would you have gone for guidance?  More open-ended than

22  suggesting that someone would tell him to go.

23  Q.   And Mr. Young replied that no one in the community would

24  actually tell him to go and fight, right?

25  A.   I wouldn't characterize that as -- respectfully, ma'am, it

Smith - Cross                                                    554

1   was just more open-ended.  I mean, I don't dispute what's in

2   the transcript, but I don't recall him saying exactly that.

3   Q.   You don't dispute what's in the transcript.

4   A.   Right.  I mean, I don't want to misspeak.  My recollection

5   is he said he didn't know of anyone he would go to the

6   community for for guidance and left it at that.

7   Q.   But again, there were a number of times when Mr. Young

8   said that it was a confusing situation over there --

9   A.   Yes, ma'am.

10  Q.   -- to you, right?

11         In fact, at one point when there were a number of

12  questions being asked and Mr. Young was hesitant about

13  answering specifically, Mr. Caslen said that Mr. Young wasn't

14  putting words in other people's mouths.  Do you remember that

15  comment on the clip that was played?

16  A.   I do.

17  Q.   Now, this entire time that you're asking questions about

18  Mo, you already knew the answers to these questions that you

19  were asking Mr. Young, right?

20  A.   Yes, ma'am.

21  Q.   And there wasn't any real FBI investigation into Mo,

22  correct?

23  A.   No, ma'am.

24  Q.   There was no grand jury investigation into Mo, right?

25  A.   No, ma'am.

Smith - Cross                                                      555

1   Q.   During this -- during these two interviews, you did not

2   say to Mr. Young that he himself was under investigation, did

3   you?

4   A.   No, ma'am.

5   Q.   At one point, focusing back on December 3, the first

6   interview, the long interview, there was a discussion, you were

7   asking him about Peshwaz, and I think either yourself or

8   Special Agent Caslen brought up the attacks on civilians in

9   California.  Do you remember that?

10  A.   Yes.

11  Q.   And, in fact, Mr. Young told you that one would not find

12  anything in the Koran that would encourage attacks on

13  civilians.  He told you that; do you remember that?

14  A.   Yes, ma'am.

15  Q.   And that's in your report, correct?

16  A.   Yes.

17          MS. MORENO:  May have a moment, Your Honor?

18          I have nothing further, Your Honor.

19          THE COURT:  All right.  Any redirect?

20          MR. GIBBS:  Nothing for this witness, Judge.  Thank

21  you.

22          THE COURT:  Superb timing since it's just about

23  lunchtime.  We can take the screen down and not have to waste

24  everybody's time doing that, all right.

25          No one's going to call Agent Smith again; is that

556

1    correct?

2            MR. GIBBS:  We are not, Judge.

3            MS. MORENO:  We are not.

4            THE COURT:  All right.  Then, sir, you're excused as

5    a witness.  You may leave at this time.  Do not discuss your

6    testimony with any witness who has not yet testified, all

7    right?

8            THE WITNESS:  Thank you, Your Honor.

9                        (Witness excused.)

10           THE COURT:  All right.  Then, ladies and gentlemen,

11   I'm going to give you one hour, so please be back here at 5 of

12   two, and we'll start the next witness at that time.

13               (Recess from 12:58 p.m., until 1:55 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  A F T E R N O O N   S E S S I O N

 2                       (Defendant present, Jury out.)

 3          THE COURT:  All right, the jury is ready.  I just

 4   want to find out, Mr. Gibbs or Mr. Kromberg, what's your time

 5   estimate now?  We have, I think, eight witnesses left on your

 6   list.

 7          MR. GIBBS:  I know this afternoon I've got two FBI

 8   witnesses, and I don't think they're going to take a

 9   tremendously long amount of time.  The first one is longer than

10   the other.  We will certainly finish with those two this

11   afternoon.

12          Then we've got Paul Lee, right?

13          MR. KROMBERG:  May I?

14          THE COURT:  Yes.

15          MR. KROMBERG:  So we have two FBI witnesses, a CART

16   examiner who should be short.  Then we have three or four

17   relatively short civilian witnesses that are here.  We want to

18   put them on.

19          Our expert witness we didn't tell to come until

20   tomorrow morning, but we could if necessary, if we get that

21   far, we can just go to our summary witness, Special Agent

22   Caslen.  So we could in theory finish tomorrow morning -- well,

23   again, it's tough to say, but --

24          THE COURT:  Right.

25          MR. KROMBERG:  -- we should expect to be done, our
```

1   case, tomorrow.

2           THE COURT:  That's my estimate.  I would suspect

3   probably midday tomorrow or so.

4           So that's just notice to the defense, if you're going

5   to have any witnesses, you need to have them on deck for

6   tomorrow.

7           MS. MORENO:  Yes, Your Honor.

8           THE COURT:  All right.  Now, what I do plan to do

9   is -- we'll get the jury in here in a second -- if we complete

10  all of the evidence by close of business tomorrow, which is

11  Thursday, even if it's not six o'clock, I'm going to send the

12  jury home a little early if we get done, like, at four or five,

13  because I think it's better if we can to have closing arguments

14  and instructions back to back and then let the jury start

15  deliberation.

16          I only have one criminal matter on the docket for

17  Friday morning.  That's at 9:00, so we can start Friday at

18  9:30, so that may be how we handle things.  We'll see how it

19  goes.

20          All right, let's bring the jury in.

21          And this is going to be Agent Sikorski?  That's the

22  next witness?

23          MR. GIBBS:  That's correct, Judge.

24          THE COURT:  All right.  Do you have somebody to get

25  him in here?

1           MR. GIBBS:  He's here.

2           THE COURT:  Oh, all right.  Agent, come up here and

3    stand by the witness box.

4                      (Jury present.)

5           THE COURT:  All right, ladies and gentlemen, I thank

6    you for being right here on time.  We're taking the next

7    witness.

8         SA JOHN SIKORSKI, GOVERNMENT'S WITNESS, AFFIRMED

9                      DIRECT EXAMINATION

10   BY MR. GIBBS:

11   Q.   Good afternoon, sir.

12   A.   Good afternoon.

13   Q.   Sir, would you please state your name for the record and

14   spell your last name.

15   A.   Sure.  My name is Jonathan Sikorski.  My last name is

16   spelled S-i-k-o-r-s-k-i.

17   Q.   And who are you employed by?

18   A.   I'm employed by the Department of Justice, FBI.

19   Q.   How long have you been with the FBI?

20   A.   I've been with the FBI since February of 2010, so a little

21   over seven-and-a-half years.

22   Q.   Now, sir, in the summer of 2016, were you assigned to

23   assist in the Nicholas Young investigation?

24   A.   Yes, I was.

25   Q.   And as part of that assignment, were you assigned to

1    impersonate a confidential human source named Mo in order to

2    communicate with the defendant?

3    A.   Yes, I was.

4    Q.   Now, prior to your communications with the defendant, had

5    he been communicating with anyone else at the FBI?

6    A.   Yes.  He had been communicating with other individuals

7    employed by the FBI online in a similar manner that I was going

8    to be.

9    Q.   And if you could -- we could -- let's see.  I'd like to

10   have you take a look at, let's just pull up Government Exhibit

11   1-221, which is already in evidence.  Do you -- yeah.

12            Special Agent Sikorski, what is this?

13   A.   This is an e-mail that I received on June 14, 2016, from

14   the Essa Kobayashi account to the V4Vendetta account.

15   Q.   And who is the Essa Kobayashi account from?

16   A.   That is the defendant.

17   Q.   And who was, who was handling the V4Vendetta account at

18   that point?

19   A.   At this point, it was the government operating --

20   impersonating the confidential human source known as Mo, but we

21   were -- the government was operating that account at that time.

22            MR. GIBBS:  All right, thank you.

23            And, Fabian, if we could highlight the portion that

24   begins, "I don't really do the tech thing," and ends with "but

25   inshallah that app will be okay"?

1   Q.   Special Agent Sikorski, when did the defendant say that he

2   would message you on the app?

3   A.   He said he would message me on the app within the week.

4         MR. GIBBS:  And then if we could bring up Government

5   Exhibit 1-222?  If we could blow that up?

6         THE COURT:  221 is not in yet.

7         MR. GIBBS:  Oh, it's not?

8         MR. SMITH:  It is in.

9         THE COURT:  Well, it's not showing on our list.

10        MR. GIBBS:  Okay.  And I trust your list.  This

11  morning, I intended to enter all the e-mails.  I would ask to

12  enter the last two Essa Kobayashi e-mails, which are 1-221 and

13  1-222.

14        THE COURT:  Is there any objection to those?

15        MR. SMITH:  No objection.

16        THE COURT:  All right, they're in.

17        (Government's Exhibit Nos. 1-221 and 1-222 were

18  received in evidence.)

19  BY MR. GIBBS:

20  Q.   And then as to that exhibit, 1-222, what is that, sir?

21  A.   This is an e-mail again from the Essa Kobayashi account to

22  the V4Vendetta account that was sent on Thursday, July 14,

23  2016.

24  Q.   And what did he say in that message?

25  A.   "Salam alikom brother, I messaged you on the app..."

Sikorski - Direct                                                        562

1    Q.    Now, you testified a moment ago that in his June 14

2    e-mail, the defendant said he would message you on the app

3    within a week.  How long did it actually take him?

4    A.    It was a full month.

5    Q.    And how many times did the FBI contact the defendant

6    between June 14 and July 14 to try to convince him to send a

7    message using the app?

8    A.    None.

9    Q.    Now, what was this app?

10   A.    The app we were referring to is an app called Threema,

11   T-h-r-e-e-m-a.

12   Q.    And can you explain what Threema is?

13   A.    Threema is a social media messaging app.  It's an

14   encrypted messaging app that is run on individuals' phones or

15   mobile devices or even could be run on a laptop.  That app

16   offers encrypted messaging from one end to the other.

17   Q.    And what is the -- what does the fact that it's encrypted,

18   what does that mean?

19   A.    It means that only the two users, so the two end users,

20   are able to view that message.  Therefore, the actual

21   communication that's going across the airways, whether it be a

22   cell phone signal or a WiFi network, is encrypted, and the two

23   end users are the people who can actually see what the message

24   says.

25   Q.    And beginning in mid-July of 2016, did you, in fact, begin

1   to communicate with the defendant using this Threema app?

2   A.   Yes, I did.

3           MR. GIBBS:  And, Your Honor, at this time, again for

4   the sake of a little bit of speed and efficiency, I'm going to

5   have the agent testify to a number of the Threema

6   communications, and if I could just offer into evidence, if

7   there's no objection, Exhibits 2-101 through 2-112, 2-116,

8   2-118 through 2-123, and 2-125 through 2-130?

9           THE COURT:  Any objection?

10          MR. SMITH:  No.  Your Honor, we have no objection,

11  but we don't know why we're not just admitting all of the

12  Threema messages.

13          THE COURT:  Because there's no sense in putting more

14  into the jury -- for the jury's consideration if we don't need

15  them all.  I don't want a lot of cumulative evidence, so it's

16  an appropriate use of an economical approach to things.  If

17  there are additional exhibits you want to use in your cross, of

18  course, you may.

19          MR. SMITH:  Okay.  Thank you.

20          THE COURT:  They're all in.

21          (Government's Exhibit Nos. 2-101 thru 2-112, 2-116,

22  2-118 thru 2-123, and 2-125 thru 2-130 were received in

23  evidence.)

24          MR. GIBBS:  Thank you, Judge.

25  Q.   So if we could, let's pull up 2-102.  Do you see that on

Sikorski - Direct                                                    564

1   the screen?

2   A.   Yes, I do.

3   Q.   And what is that?

4   A.   This is a picture of a Threema account.  The Threema

5   account is, has the user ID HWM5PPKH, and that is the user

6   account that sent me a message on the Threema account --

7   Threema account, sorry.

8   Q.   And whose Threema account is this?

9   A.   That's the defendant's, sir.

10  Q.   And next if we could pull up Exhibit 2-101?  What is

11  2-101?

12  A.   2-101 is again a picture of the phone I was utilizing to

13  use the Threema app.  In this case, it's a picture of the

14  message that the defendant sent me on Thursday, July 14, 2016.

15  Q.   And you talked about receiving it.  Did you actually

16  receive this message on a cell phone?

17  A.   Yes.  It's -- the actual photo that is behind that

18  zoomed-in picture, yes, that photo right there, that is a photo

19  of the actual cell phone I was using to send and receive the

20  messages.

21  Q.   And we're going to look at a number of Threema messages

22  here this afternoon.  Is that the way you captured all of the

23  defendant's Threema messages, by taking a photograph of it?

24  A.   Yes.  I used another phone and took a photograph of the

25  actual phone I was using.

1   Q.   And was there a reason that you did that?

2   A.   Yes.

3   Q.   And what was the reason?

4   A.   Many of the online encrypted messaging apps have a

5   security feature installed within them.  If I was to conduct a

6   screen capture of that actual message, it would send the other

7   user a notification that that screen capture was just taken,

8   and we did not, obviously, want that to happen.

9   Q.   And in the message that we have here before us, 2-101, the

10  defendant says:  "Salam alicom V."  Did you understand the

11  reference to V?

12  A.   Yes.  V is a reference to the e-mail account, the

13  V4Vendetta account that had previously been utilized by the FBI

14  and the confidential human source, Mo.

15  Q.   And the letters and numbers at the top, the HWM5PPKH,

16  again, what, what is that?

17  A.   That is the Threema user account that was being utilized

18  by the defendant's Threema account.  I believe it is assigned

19  by Threema.  I do not believe it is picked, but I can't

20  definitively say if that was a specific picked series of

21  letters and numbers.

22  Q.   All right.  And next if we could go to Exhibit 2-103?

23  A.   Yes.

24  Q.   Now, how long after the defendant's July 14 message did

25  you respond?

Sikorski - Direct                                                          566

1   A.   We waited about four days, and I responded on Monday,

2   July 18, 2016, and my response is indicated in the green bubble

3   that you can see in the lower half of that picture of the cell

4   phone.

5   Q.   All right, thank you.  You read my mind.

6            And in your message to the defendant, when you

7   said, "I was out on ribat over the past week," what does

8   "ribat" mean?

9   A.   "Ribat" is a term used by Islamic fighters as an operation

10  or fighting.  It's a term just used to abbreviate that.

11  Q.   All right, thank you.

12           Next if we can go to Exhibit 2-104?

13  A.   Yes.  This is again a picture of the phone I was utilized

14  to communicate on Threema, and there is a new message here, the

15  bottom bubble, that begins with, "I don't pay attention."  You

16  can see that I sent that message at 4:38 p.m., indicated by the

17  time stamp on the lower left.

18  Q.   And in that bubble at the bottom that we have just zoomed

19  in on, it said, "Lots more drones than there were b4 and a lot

20  of good brothers have earn shahadah."  What did you intend to

21  convey by using the term "shahadah"?

22  A.   "Shahadah" is an Islamic term used for individuals dying

23  on behalf of Allah sometimes on the battlefield, sometimes in

24  other ways, but it's a term utilized in that manner.

25  Q.   And then right after that, you talked about we lose a lot

1    and try to replace quick need to do it faster.

2              Was that the end of that message?

3    A.   Yes, it was.

4    Q.   Thank you.

5              Next if we could pull up Exhibit 2-105?

6    A.   Again, this is a continuation.  This is another picture of

7    the cell phone that I was utilizing, utilizing to communicate

8    on Threema.  The newest message is the message that I sent on

9    the bottom, indicated in the lower green bubble, that I sent at

10   4:41 p.m.

11   Q.   And in that lower message, you told the defendant, "I know

12   u mention u would loookfor that email account that u dont have

13   to sign up for and let us know about it."  What was that in

14   reference to?

15   A.   That was a reference to a previous conversation that the

16   individual, the other FBI employee had with the defendant on

17   the e-mail accounts.  That was referenced previously to my

18   involvement referencing making an e-mail account that was

19   secure to communicate back and forth.

20   Q.   And then below that, you said, "We dont use emails to talk

21   to the brothers in the west who make hijrah we stick to this."

22   What does "hijrah" refer to?

23   A.   "Hijrah" refers to a migration.  It's a term used for

24   migration of an individual from a non-Muslim country to a

25   country who is Muslim and is Islamic.

Sikorski - Direct                                                    568

1  Q.   And when you said in that message we stick to this to

2  communicate with brothers in the west who make hijrah, what did

3  you mean by "this"?

4  A.   I was referring to the Threema account that we were

5  utilizing here to communicate.

6  Q.   And what was your reason for including that detail?

7  A.   I wanted to convey to the defendant that we utilized the

8  encrypted messaging app to talk to individuals in the West

9  because of how security conscious the defendant had been in the

10 past with us, so I wanted to communicate that this was an

11 encrypted messaging app and this is how we communicate to

12 individuals in the West on this encrypted app.

13 Q.   And next if we could pull up Government Exhibit 2-106?

14 A.   Yes.  This is again a screen capture of messages that I

15 sent to the defendant using the Threema app.  The new message

16 is the lower green bubble again, indicated by the 4:46 p.m.

17 time stamp.

18 Q.   And in that message, you told the defendant, "The group of

19 brothers im' helping that get people to dawlah have 2 very

20 trusted brothers in Uk who buy us Google gift cards and send us

21 the codes on the back so we can by accounts on threema."

22       When you talked about the brothers that get people to

23 dawlah, first of all, what does "dawlah" refer to?

24 A.   "Dawlah" is a term used to refer to the Islamic State.  It

25 could be the Islamic State in Syria; it could be the Islamic

Sikorski - Direct                                                      569

1    State in Iraq.

2    Q.   And what did you mean when you talked about brothers that

3    get people to dawlah?

4    A.   Brothers, I was referring to ourselves, so brothers

5    meaning other individuals affiliated with ISIS getting

6    individuals to dawlah.

7    Q.   And so if they get them to dawlah, would these essentially

8    be recruiters for ISIS?

9    A.   Correct, yes.

10   Q.   And you used the term "U.K." in there.  What does "U.K."

11   stand for?

12   A.   The United Kingdom, England.

13   Q.   All right.  And, Special Agent Sikorski, next I'd like to

14   pull up Government Exhibit 2-107.  And what is, what is 2-107?

15   A.   Again, it is a picture of the cell phone that I was

16   utilizing to communicate on Threema.  Again, the newest message

17   is the one that you can see highlighted now at the bottom,

18   indicated -- there's a glare there, the flash on the camera,

19   but it says 4:51 p.m., the time stamp on which I sent the

20   message.

21   Q.   And is this a continuation of your July 18 Threema message

22   to the defendant?

23   A.   Yes, it is.

24   Q.   And in that message, what does the "blessed operation in

25   Belgium" refer to?

1    A.    I was referring to the ISIS-related attacks that occurred

2    in Belgium in and around the summer of 2016 in which an airport

3    and another location were attacked.

4    Q.    And then also in that message, what does the "operation in

5    Nice" refer to?

6    A.    I was referring to the ISIS operation that occurred in

7    Nice, France.  Nice is a city in France in which ISIS conducted

8    an attack on civilians.

9    Q.    And what did you tell the defendant about how those two

10   operations in Europe impacted ISIS's ability to get more Google

11   codes?

12   A.    I specifically told him that we only had a few codes left

13   and they won't be able to start again after those operations.

14   So the operations were impacting due to security increases the

15   amount of codes that we could receive.

16   Q.    Next if we could turn to Government Exhibit 2-108?  And

17   what is 2-108?

18   A.    2-108 is again a picture of the cell phone that I was

19   using to communicate on Threema.  Again, the newest message is

20   the one that you can see highlighted here that was sent at 4:56

21   p.m.

22   Q.    And what did you tell the defendant that your group needed

23   in lieu of the e-mail accounts that the defendant had talked

24   about previously?

25   A.    We, we told the defendant we needed more of the Google

1   codes.

2   Q.   And how, how can someone obtain these Google codes?

3   A.   Google codes are similar to a gift card, so Google codes

4   can be purchased by going to any type of a store, you know,

5   Walmart, your Target, your Best Buys, and purchasing what's

6   known as a Google Play card.  On the back of that card is a

7   code just like a gift card.  That code is then redeemable

8   online to purchase things like Threema accounts, to purchase

9   things from the Google Play store, whether it be apps, games,

10  but it's very similar to buying a gift card, taking the code

11  off the back of the gift card, and utilizing that code as

12  monetary value to buy something.

13  Q.   And in that message on 4:56 p.m., when you told the

14  defendant, "We have a few brothers waiting for a while now

15  until we can get them our contact info and cannot creat any new

16  accounts," what brothers were you referring to there?

17  A.   I was referring to the brothers that we had previously

18  talked about who we talked about with the defendant who we were

19  looking to bring over to dawlah in order to fight on behalf of

20  ISIS.

21  Q.   And in the last sentence of that message, you told the

22  defendant, "These brothers are being pushed to wilayat sirte in

23  Libya."  What is "wilayat sirte"?

24  A.   "Wilayat Sirte" refers to, "Wilayat" means province.

25  "Sirte" is a city or region of Libya.  So "Wilayat Sirte" is

1    basically the province or area in and around Sirte, Libya.

2    Q.    So based on your messages to the defendant, what impact

3    would getting additional Google codes have on getting ISIS

4    fighters into Libya?

5    A.    Those Google codes would allow us in dawlah, meeting Mo in

6    dawlah, to facilitate the travel of ISIS fighters into the

7    Wilayat Sirte area in Libya.

8    Q.    And next if we could turn to Government Exhibit 2-109?

9    And, Special Agent Sikorski, what is this exhibit?

10   A.    Again, this is a picture of the phone that I was

11   utilizing.  The newest message is the lower green box that was

12   just zoomed in on here, and you can see this is a message that

13   I sent at 5 p.m.

14   Q.    And in the second sentence of your message, you said that

15   if the defendant can only send a couple codes, that would be

16   okay.  What codes were you referring to again there?

17   A.    The Google Play card codes that we had just talked about.

18   Q.    And what -- can you just read what you said in the first

19   sentence to the defendant?

20   A.    "Their desire to fight for their religion is a inspiration

21   to us all."

22   Q.    And what was the reason for including that detail in your

23   message?

24   A.    We wanted to make it clear to the defendant that we --

25   these Google Play cards were going to be used to facilitate

1    individuals into Libya who wanted to fight.

2    Q.   And if we could next turn to Government Exhibit 2-110?

3    And what is Government Exhibit 2-110?

4    A.   This is a picture of the phone again that I was utilizing.

5    You can see there's a, a variation in this picture.  You can

6    see my messages were in green.  The messages from the

7    defendant, so his responses, are the messages that appear in

8    the white bubbles to the left, and you can see that those

9    messages were sent on Thursday, July 21, 2016.

10   Q.   Thank you.  And yeah, we've zoomed in on that -- the first

11   message there that begins, "I see your messages were from the

12   18th."  And after talking about how long it took your message

13   to arrive, the defendant described a failed military coup in

14   Turkey.  Did you know what he was talking about there?

15   A.   Yes.  In and around July of 2016, there was a highly

16   publicized on national news and covered live on a lot of news

17   organizations a military coup attempt in Turkey to overthrow

18   the government, and that ultimately failed around the same day,

19   if not the -- that night.

20   Q.   Thank you.  Next if we could go to Government Exhibit

21   2-111?

22   A.   Yes.  Again, this is a screen capture of the phone that I

23   was utilizing to communicate on Threema.  In this instance,

24   these are all messages sent by the defendant to my Threema

25   account.

1          MR. GIBBS:  Can we zoom in on the first large message

2   at the top there?

3   Q.   After the defendant in that message to you talks about a

4   base in Djibouti, special soldiers, and frequenting bars, he

5   then says that base likely affects east and north Africa and

6   maybe Yemen, as opposed to, quote, where you are, though.

7          In your Threema communications with the defendant and

8   the earlier e-mail communications with the defendant, where did

9   the FBI always lead him to believe that Mo was located?

10  A.   We always told the defendant or led him to believe that we

11  were in ISIS-controlled territory in Iraq or Syria and had

12  specifically mentioned that we were in Raqqah, Syria, at one

13  point.

14         MR. GIBBS:  Next if we can zoom in on the next two

15  messages together?

16  Q.   And in the message there at the top, what question did the

17  defendant ask about the cards?

18  A.   He specifically asked, "Why were the brothers in UK told

19  to stop though?"  Basically, it's just an abbreviation.  He

20  asked why were they told to stop sending the cards.

21  Q.   And then below that, the defendant said, "Inshallah more

22  codes will come your way."  What does "inshallah" mean?

23  A.   It's just an Islamic term for God willing.

24  Q.   Okay.  Next if we can go to Government Exhibit 2-112?

25  A.   Yes.  This is again a picture of the phone that I was

1    utilizing to communicate with the defendant on Threema, and

2    again you see in green the message that I sent back to the

3    defendant.  In this case, I sent it on Thursday, July 28, 2016,

4    at 1:54 a.m.

5             MR. GIBBS:  And can we zoom in on -- yeah, thank you.

6    Q.   Now, in the first sentence, you wrote, "The brothers in UK

7    stop getting codes to save for hijrah they have amazing comp

8    skills needed here and bec of Allah's will we were able to help

9    with there hijrah to khilafah."

10            First of all, what are "comp skills"?

11   A.   I was referring to computer skills.  I just abbreviated

12   "computer" to "comp" just for less characters.

13   Q.   And when you wrote about saving for hijrah and helping

14   with their hijrah, what does "hijrah" mean?

15   A.   Again, "hijrah" is a reference to individuals making a, a

16   move from a non-Islamic country to an Islamic country.

17   Q.   And when you wrote about their hijrah to khilafah, what

18   does "khilafah" mean?

19   A.   "Khilafah" is a reference to the Islamic State.

20   Q.   And towards the end of that Threema message to the

21   defendant, you wrote, "any codes u can get will helpful and

22   allow us to help many make hijrah.  Only need a few right now."

23            What did you mean when you said the codes would help

24   many make hijrah?

25   A.   I meant by us obtaining the Google codes off of the Google

1    Play cards, we would be able to facilitate the travel and talk

2    to those individuals on Threema, as I had previously mentioned

3    to the defendant, which would help us facilitate their travel

4    into Libya and ISIS-controlled territory.

5    Q.   Next if we could take a look at Government Exhibit 2-116?

6    A.   Yes.  This is again a picture of the cell phone that I was

7    utilizing to communicate with the defendant, and there's a

8    series of new messages here indicated by the time stamps on the

9    left at 2:04 a.m., 2:11 a.m., and 2, I believe that says 18,

10   but again, this picture would have to be zoomed in for me to

11   verify that bottom one.

12          MR. GIBBS:  All right.  So let's zoom in on the

13   bottom one, 2:18 a.m.

14          THE WITNESS:  Yes, it does say 2:18.

15   BY MR. GIBBS:

16   Q.   And in this message, you started off talking about

17   Djibouti and how, quote, kufar have these drone in Djibouti.

18   What was that statement in response to?

19   A.   That statement was in response to the defendant's message

20   previously indicating in talking about the base in Djibouti.

21   Q.   And you end that message by saying, "they know khilafah

22   cont to expand in Libya and we have many ppl there even if

23   media won't report."

24          Who is the "they" you're referring to when you wrote

25   "they know khilafah continue to expand in Libya"?

1    A.    I was referring to the west, western governments, the U.S.

2    government and U.S. authorities.

3    Q.    And who was the "we" you were referring to when you told

4    the defendant that we have many people in Libya?

5    A.    ISIS.

6    Q.    Next if we could turn to Government Exhibit 2-118?   And

7    what is this?

8    A.    This is again a picture of the cell phone that I was

9    utilizing to communicate with the defendant.   In this case,

10   this is a message that the defendant sent me.   Again, this is

11   similar -- the messages from the defendant are in the white on

12   the left-hand side of the message screen.

13   Q.    Okay.   And this one actually is a little blurry, and I

14   think we tried to zoom, and it's not legible, so I think we

15   have to keep it at this resolution, but, Special Agent

16   Sikorski, at the beginning of that message, where the defendant

17   said, "Yea, I'm careful.   Disturbing to know they were somehow

18   watching my house like 4 years back," in your communications

19   with the defendant, did he frequently portray himself as

20   security conscious?

21   A.    Yes.

22   Q.    And how did that impact the way that you communicated with

23   him?

24   A.    We had to make sure we were being security conscious with

25   the defendant, too.   Obviously, we couldn't state things in the

1    obvious that we would state with maybe other people we were

2    talking to because the defendant was security conscious and

3    indicated that to us in these three messages in previous

4    communications.

5           MR. GIBBS:  And can we highlight that one sentence

6    that starts, "Last year I was in a flight," pull it up in

7    yellow?

8    Q.   And the sentence we've highlighted that says, "Last year I

9    was in a flight and I'm nearly positive 2 agents were watching

10   me," is that an example of what you just testified to about the

11   defendant being security conscious?

12   A.   Yes, I was.

13   Q.   All right, if we can go to Exhibit 2-119?

14   A.   Yes.  Again, this is a picture of the phone I was

15   utilizing, and these are messages sent from the defendant to me

16   on the Threema account.

17          MR. GIBBS:  And can we highlight the message in the

18   middle that begins, "Yeah, the bases they have are strong"?

19   Q.   Can you just read that, if you're able to make it out?

20   A.   Yes.  The highlighted portion says, "Yeah, the bases they

21   have are strong.  But the people in them leave a lot for

22   recreation."

23   Q.   And did you understand what that was a reference to?

24   A.   Yes.  I understood that to be a reference to the fact that

25   the bases that individual is on that he had previously

1   mentioned, the bases themselves are very strong, but the

2   individuals who work on those bases or are assigned to those

3   bases leave for recreation.  So they leave to go to the

4   restaurants, to the stores, and things like that.

5   Q.   Next, if we could pull up Government Exhibit 2-120?

6        And what is this exhibit?

7   A.   Again, this is a continuation of the message.  The exhibit

8   is a picture of the cell phone I was utilizing to communicate

9   with the defendant on Threema, and this is a continuation of

10  the messages that the defendant sent me on the application.

11       MR. GIBBS:  And if we can just highlight the message

12  at the bottom?

13  Q.   And if you could just read that?  If you can make it out?

14  A.   It says, "oh, and YOU are the smart one.  Allah blessed

15  you with the intelligence and wisdom to stay off their radar

16  until you reached your objective."

17  Q.   And when the defendant talked in that message about

18  staying off their radar, what was your interpretation of who

19  "their" was referring to?

20  A.   The U.S. government, the FBI, U.S. authorities.

21  Q.   And next, if we could go to Government Exhibit 2-127?  And

22  what is 2-127?

23  A.   2-127 is a picture of the cell phone that I was utilizing

24  to communicate with the defendant.  This picture is of a new

25  Threema account.

1   Q.   All right.  So there's something different about this

2   account than the ones you previously testified about?

3   A.   Yes, there is.

4   Q.   And what is different about this Threema account?

5   A.   This Threema account is new.  You can see at the top it no

6   longer says that HWM account.  It has a, what I refer to as a

7   tilde, the little ~ symbol, and the capital letter L, as you

8   can see highlighted in yellow there.  This is not the previous

9   account that I was communicating with the defendant on.

10  Q.   And just for the record, all the Threema messages up to

11  this point we've been -- you testified about were from the

12  defendant's previous Threema account?

13  A.   Yes, they were.

14  Q.   And other than the defendant, did you give your Threema

15  account information to anyone else?

16  A.   No, I did not.

17  Q.   And was the message in this, we'll call this the ~ Threema

18  account, was this consistent with what you and the defendant

19  had been communicating about for the last two weeks?

20  A.   Yes, it was.  This Threema account began sending me Google

21  Play Card codes.

22  Q.   And actually, if we can just go back real quickly to I

23  believe it's the last exhibit, 2-120?  Or 126, I apologize.

24  A.   Yes.

25  Q.   Do you see the third message up from the bottom, the one

1   about Inshallah, the brother got arrested?  Is that it?

2          THE COURT:  I don't think that's the right exhibit.

3   BY MR. GIBBS:

4   Q.   Yes, let's go to 2-120.

5   A.   Yes, I do.  The third message from the bottom now

6   highlighted in yellow begins, "Inshallah the brother that got

7   arrested."

8   Q.   And this is a message from the defendant to your Threema

9   account, correct?

10  A.   Yes, it is.

11  Q.   Do you know what brother he was referring to there?

12  A.   Yes, I do.

13  Q.   And who was that?

14  A.   It was an individual -- do you want me to name him?

15  Q.   Yes.

16         MR. SMITH:  Objection, Your Honor.

17         THE COURT:  Wait.  What's the basis for the

18  objection?

19         MR. SMITH:  The objection is it's speculation who was

20  the defendant referring to.

21         MR. GIBBS:  Well, I think -- I can rephrase the

22  question.

23         THE COURT:  All right.

24  BY MR. GIBBS:

25  Q.   When the defendant referred to the brother that got

1   arrested making dawah will be okay, do you understand who that

2   was a reference to?

3   A.   Yes, I did.  It was a reference to an individual that the

4   defendant and I had previously talked about on Threema that

5   stuck his foot around the corner.  That individual was an

6   individual by the name of Peshwaz Waise.

7   Q.   And that's an individual here in the Eastern District of

8   Virginia, correct?

9   A.   Yes.  He's in the Northern Virginia area and known to the

10  defendant.

11  Q.   All right, thank you.

12           And while we're on this, so, you know, we were

13  talking about that ~ account.  This particular message had the

14  HWM55PPKH at the top, correct?

15  A.   Yes, it did.

16  Q.   All right.  So let's go back to the ~ account, which is

17  2-127.

18  A.   Yes.

19  Q.   In total, during the time you were impersonating Mo on

20  these -- on this Threema account, how many different Threema

21  accounts did the defendant use to communicate with you?

22  A.   Two total.

23  Q.   And what did -- well, first of all, let's go ahead and

24  highlight the message at the top there.  It's not extremely

25  easy to see, so if you could just read that, I would appreciate

1   it.

2   A.   It says, "Respond to verify receipt...may not answer

3   depending on when as this device will be destroyed after all

4   are sent to prevent the data being possibly seen on this end in

5   the case of something unfortunate."

6   Q.   And who came up with that idea of destroying the device?

7   A.   The defendant.

8   Q.   And down below where the defendant said, "after all are

9   sent," what did he actually send in the third bubble down below

10  there?

11  A.   In the third bubble below are Google Play codes or Google

12  codes.  Each of those codes is valued at $10.

13  Q.   And who came up with the idea of actually sending the

14  Google Play codes to you on a second Threema account?

15  A.   The defendant.

16  Q.   And you said that those codes at the bottom, those are

17  Google codes?

18  A.   Yes, they are.

19  Q.   And then turning to Exhibit 2-128, if we can just bring

20  that up for a moment?  And then if we can go to 2-129?

21        Are both of those exhibits, are they both a

22  continuation of those Google codes from the defendant?

23  A.   Yes, they were.

24  Q.   And where were you when you received these gift card

25  codes?

1   A.   I believe I was specifically in -- at the time I received

2   them, on the phone.

3   Q.   Well --

4   A.   I believe I was in Washington, D.C., or at my house in

5   Northern Virginia.  I don't remember exactly the first time

6   that I noticed that these were actually received.

7   Q.   And what did you ultimately do with the gift card codes

8   that the defendant sent you?

9   A.   I took those codes and created a separate Google account

10  at the Washington Field Office in Washington, D.C., and

11  redeemed each of those codes for the dollar amount indicated.

12  Some of the codes were redeemed for $10, and some of them were

13  indicated for -- redeemed for $15.  Each of the values matched

14  what were sent, either value 15 or value 10, as indicated in

15  those messages.

16  Q.   And was there a reason that you cashed those codes right

17  away?

18  A.   Yes.  We wanted to make sure that the defendant, if he was

19  able to track if the codes were redeemed, that he saw that the

20  codes were redeemed immediately because we needed to use them

21  immediately, as we had indicated, to facilitate the brothers

22  over to ISIS-controlled territory.

23  Q.   And what was the total value of the gift card codes that

24  the defendant sent you?

25  A.   The total value was $245.

Sikorski - Direct                                              585

1   Q.   And in the last message on Exhibit 2-129, can you read

2   what you said to the defendant in that green bubble after he

3   sent the last of the gift card codes?

4   A.   "MashaAllah may Allah reward you for your efforts.  This

5   will help the brothers from Sudan seeking to fight in path of

6   Allah in khilafah."

7   Q.   And based on what you were telling the defendant, where

8   would those brothers be fighting in the path of Allah?

9   A.   We told them they were being sent to that Wilayat Sirte

10  area of Libya.

11  Q.   And what date did you send that Threema message to the

12  defendant?

13  A.   I sent that on July 29, 2016.

14  Q.   And then if we can turn to Government Exhibit 2-130?

15         Now, the previous message you just testified about

16  that you sent, was that sent to the defendant's original

17  Threema account or to his second one?

18  A.   That was that second account, indicated by the ~L account.

19         MR. GIBBS:  And so in Exhibit 2-130 -- can we

20  highlight the -- yeah, you got the bottom two?  Thank you.

21  Q.   What does the -- on that green message from you, there's a

22  little symbol next to that of an eye, it looks like?

23  A.   Yes.  We haven't previously talked about this, but the

24  Threema application has a built-in feature that allows the

25  individual to see when the other end user reads the message.

1    So in this case, you can see the message indicated by the

2    actual eye indicates that the message was read at 10:41 a.m.,

3    and if you go to the previous, you can see the envelope that I

4    described previously means when I sent it.

5    Q.   And then after reading that or, you know, after the symbol

6    of the eye was on there, the message at the bottom in gray, who

7    was that from?

8    A.   That was from the defendant, the response to what I had

9    said in the green bubble.

10   Q.   And can you just read what the defendant said in that

11   message to you?

12   A.   Yes.  There's an emoji with a single index finger being

13   pointed up, and then it says, "glad it came through.  Getting

14   rid of device now..fo real.  Gonna eat the Sim card.  Have a

15   good day."

16   Q.   And who brought up this idea of getting rid of the device?

17   A.   That was the defendant.

18   Q.   And who brought up this idea of eating the SIM card?

19   A.   That is the defendant.

20   Q.   What is a SIM card?

21   A.   The SIM card is the little card that's in the back of your

22   phone.  It is a plastic-metallic chip that controls the IMEI

23   number, the IMSI number and things like that, or just the IMSI

24   number.  I may be mistaken there.  But it's basically the

25   control card for the phone that allows the phone to communicate

1   with the cell towers and things.

2   Q.   And was this last message from the ~ Threema account?

3   A.   Yes, it was.

4   Q.   So if we could go to Government Exhibit 2-121?  What is

5   2-121?

6   A.   Again, this is a picture of the phone that I was utilizing

7   to communicate with the defendant.  In this case, we are back

8   to the original defendant's HWM Threema account.

9   Q.   And can you read what you said in the first sentence of

10  that message to the defendant about the brothers in Sudan?

11  A.   Yes.  It says, "Salaam akhi.  The brothers in Sudan will

12  be grateful for your help."

13  Q.   And then further down in that message, you said,

14  "Sometimes ops last for few days or week depend on rafidi moves

15  when were out."  What were you referring to when you talked

16  about ops lasting for a few days?

17  A.   I was referring to the operations in which Mo, who I was

18  impersonating, was going out and fighting on behalf of ISIS.

19  Q.   And what does "rafidi" mean?

20  A.   "Rafidi" is a term used, it's a -- I think the literal

21  definition is something like rejectionist, but it's a term used

22  to describe Shia Muslims.

23  Q.   At the end, you said, "Your message gives strength and I

24  let brother know we have more codes bec of trusted brothers in

25  dar al kufar."  What does "dar al kufar" refer to?

Sikorski - Direct                                                    588

1   A.    Just land of a non-Believer.  Literal translation could be

2   the West, the U.S. and Europe.

3   Q.    And which trusted brothers in Dar al-Kufr were you

4   referring to in that message?

5   A.    The defendant.

6   Q.    Now, if we could next go to Government Exhibit 2-122?  And

7   what is 2-122?

8   A.    2-122 is again a picture of the phone I was utilizing to

9   communicate with the defendant on, and again, this is the

10  original HWM account, and you can see that the new message here

11  is the message the defendant sent me in the lower gray box.

12  Q.    Can you just read what the defendant said in the message

13  in that gray box?

14  A.    It says, "Rafida rats.  Allah bless you.  Stay safe.

15  Waalikom salam."

16  Q.    Next, if we could turn to Government Exhibit 2-123?

17  A.    Yes.  Again, this is a picture of the phone I was

18  utilizing to communicate with the defendant on Threema with.

19  There are two new messages indicated in the green boxes here

20  that I sent to the defendant.

21          MR. GIBBS:  And I believe we have the first message

22  highlighted on the screen at the moment.  If we can zoom in on

23  the second one next?

24  Q.    Now, in that message, after writing about the coup attempt

25  in Turkey, you told the defendant, "Border with Sham just to

1   large for them to lose thousands at once."  What does "Sham"

2   refer to?

3   A.   "Sham" refers to the Islamic State in Syria, basically the

4   actual territory.

5   Q.   And then towards the bottom of that message, you talked

6   about the Khilafah needs brave brothers and sisters, and then

7   you said, "We needed more brothers for fights so we move them

8   before sister."

9        What fight was that a reference to?

10  A.   Just the general fight that ISIS was fighting with the

11  Iraqi government, the U.S.-backed coalition, and the Syrian

12  government.

13  Q.   And then if we could turn to Government Exhibit 2-125?

14  What is 2-125?

15  A.   Again, it's a picture of the phone that I was

16  communicating with the defendant utilizing Threema, and the new

17  messages here sent on Thursday, August 2, 2016, are messages

18  the defendant sent me, as indicated in the gray bubbles to the

19  left.

20       MR. GIBBS:  All right.  And if we could pull up that

21  first gray bubble that starts, "Glad you weren't on ops for

22  long"?

23  Q.   Special Agent Sikorski, in that first message to you, what

24  did the -- what explanation did the defendant give for why the

25  Turkish border was harder to get through now?

Sikorski - Direct                                                590

1    A.   Because they had bent to Zionist pressure.

2         MR. GIBBS:  And then if we could blow up the second

3    bubble?

4    Q.   Now, about halfway down, the defendant said, "To be honest

5    I would like to buy a slave..seriously, lol, but I heard the

6    supply is low..inshallah a large crop of Alawi women will fall

7    into the hands of the mujahedeen."

8         What does "mujahideen" mean?

9    A.   It's a term used for an Islamic fighter.

10   Q.   And what does "Alawi" mean?

11   A.   "Alawi" refers to a group or sect of Muslims in Syria and

12   others parts of the Middle East.

13   Q.   And did you understand the defendant's reference to hoping

14   a large crop of Alawi women would fall into the hands of

15   mujahideen?

16   A.   Yes.  I --

17        MR. SMITH:  Objection as to speculation as to

18   defendant's mindset.

19        THE COURT:  I'm going to sustain the objection.

20   BY MR. GIBBS:

21   Q.   And, Special Agent Sikorski, in your communications with

22   the defendant, who was the only one to bring up an interest in

23   buying an Alawi slave?

24        MR. SMITH:  Objection.  Leading.

25        THE COURT:  Well, more than that, I think we're

1    getting beyond the scope of what's at issue in this case, so

2    I'll sustain the objection.

3    BY MR. GIBBS:

4    Q.   And, Special Agent Sikorski, if you can turn to Government

5    Exhibit 2-126?

6            And if we can -- first of all, what is 2-126?

7    A.   Again, it is a picture of the cell phone that I was

8    utilizing to communicate with the defendant via Threema on.

9            MR. GIBBS:  And if we can zoom in on the second

10   message from the bottom?

11   Q.   Now, in that second message, the defendant said, "Please

12   let me know if you find any brothers from Derna or Abu Salem

13   martyrs brigade."

14           First of all, where is Derna located?

15   A.   It's a city within Libya.

16   Q.   And in your Threema communications with the defendant, who

17   was the only one to bring up the Abu Salim Martyrs Brigade?

18           MR. SMITH:  Objection.  Leading.

19           THE COURT:  No, no.

20           MR. GIBBS:  That's not leading.

21           THE COURT:  That's not leading.  Overruled.

22           THE WITNESS:  It was the defendant.

23   BY MR. GIBBS:

24   Q.   And in terms of the defendant's request to tell him if you

25   found any brothers from either Derna or the Abu Salim Martyrs

1   Brigade, when you corresponded with him, where did you always

2   lead him to believe that Mo was located?

3   A.    In ISIS-controlled territory in Syria or Iraq.

4   Q.    And then if we could -- we can take that one down.

5         If we can go to the message just above that?  And in

6   the message above that, the defendant talked -- well, can you

7   read after the first sentence, the one that begins, "I was

8   talking to a very smart sister"?

9         MR. SMITH:  Objection.  Relevance.  Relevance.

10        MR. GIBBS:  I'm going to ask a question about that.

11        THE COURT:  You need to tie it up.  All right,

12  overruled.

13        THE WITNESS:  "I was talking to a very smart sister

14  from north Africa, she didnt have a good view of the khalifa,

15  or any mujahideen really...."

16  Q.    And then what does it say after the dot-dot-dot?

17  A.    "But that isnt suprising due to the brainwashing in those

18  corrupt mosques..(the jihad is within our selves, jihad of the

19  pen, blah, blah, the usually emotional stuff, zero evidence.)"

20  Q.    And was this the first time the defendant had brought up

21  this really smart sister from north Africa?

22  A.    Yes.

23  Q.    And when he used the term "khalifa," again, what does the

24  term "khalifa" mean?

25  A.    The Islamic State.

1    Q.    And he said, "a good view of the khalifa or any mujahideen

2    really."  Again, remind us what "mujahideen" means.

3    A.    "Mujahideen" is a term used for an Islamic fighter.

4    Q.    All right, thank you.

5            Now, Special Agent Sikorski, what was the date of the

6    defendant's last Threema message to you?  You may have to go

7    back.  Let's go --

8    A.    I have to look back, but I believe it was on August 2, but

9    I'd have to verify through the exhibit.

10   Q.    Right.  Let's go back to 2-125.  That will make it a

11   little easier.

12   A.    Yes.  It was there Tuesday, August 2, 2016.

13   Q.    And when was the defendant arrested?

14   A.    The next day.

15   Q.    So August 3, 2016?

16   A.    Yes.

17   Q.    And what was your role on August 3, 2016?

18   A.    My role on August 3, 2016, was to respond to the Metro

19   transit facility located in Springfield, Virginia, to secure

20   the defendant's vehicle and locker simultaneously to the

21   defendant's arrest.

22           MR. GIBBS:  And, Your Honor, at this time, I have a

23   stipulation to read into the record.

24           THE COURT:  All right.

25           MR. GIBBS:  Stipulation No. 6.  The United States and

1    the defendant hereby stipulate and agree that Government

2    Exhibit 3-100 is a photograph that accurately depicts defendant

3    Nicholas Young's truck on August 3, 2016, before it was

4    searched by the FBI."

5              And we would ask to move in Government Exhibit 3-100

6    at this time.

7              MR. SMITH:  No objection.

8              THE COURT:  All right, it's in.

9              (Government's Exhibit No. 3-100 was received in

10   evidence.)

11             MR. GIBBS:  And if we could just pull that up?

12   Q.   What is this, sir?

13   A.   That is a photo taken of the defendant's truck on the

14   morning of August 3 in Springfield, Virginia.

15   Q.   And then I have another stipulation to read, which is

16   Stipulation No. 9, where the United States and the defendant

17   hereby stipulate and agree that Government Exhibit 3-115 is a

18   photograph that accurately depicts a bumper sticker on

19   defendant Nicholas Young's truck on August 3, 2016, before it

20   was searched by the FBI.

21             And we have would ask to move in Government Exhibit

22   3-115.

23             MR. SMITH:  No objection.

24             THE COURT:  All right, it's in.

25             (Government's Exhibit No. 3-115 was received in

1    evidence.)

2              MR. GIBBS:  If we could publish that?

3    Q.   And, Special Agent Sikorski, you testified about your role

4    in the -- on the day of the arrest of the defendant.  What

5    role, if any, did you have in transporting the defendant's

6    truck on August 3, 2016?

7    A.   My role in transporting the defendant's truck was myself

8    and another special agent from the FBI watched that vehicle be

9    loaded onto a flatbed tow truck.  That tow truck then drove

10   with us behind it all the way from Springfield, Virginia, to a

11   location in Washington, D.C., where the vehicle was going to be

12   secured pending the issuance of a search warrant.

13   Q.   All right.  And I'd like to read into the record

14   Stipulation No. 7, which says, "The United States and the

15   defendant hereby stipulate and agree that Government Exhibit

16   3-101 is a photograph that accurately depicts the mode of

17   transport of defendant Nicholas Young's truck to an FBI

18   facility after it was seized on August 3, 2016.

19             And we would ask to move in Government Exhibit 3-101.

20             MR. SMITH:  No objection.

21             THE COURT:  All right, it's in.

22             (Government's Exhibit No. 3-101 was received in

23   evidence.)

24             MR. GIBBS:  And if we could publish that?

25   Q.   So you just testified a moment ago about the flatbed that

1    the truck was transported on.  Is this what it looked like that

2    day?

3    A.   Yes.  This is an exact depiction of what it looked like

4    when it arrived at the facility in Washington, D.C.

5    Q.   And who was in charge of making sure the truck stayed

6    secured until it could be transported?

7    A.   I was.

8    Q.   And where -- you said -- and what were you doing during

9    the time the truck was being moved?

10   A.   Myself and another special agent were traveling in my

11   FBI-issued bureau car directly behind this flatbed tow truck

12   with that truck on the back of it, following it to this

13   facility in D.C.

14   Q.   And what happened -- when you got to D.C., what happened

15   before the truck was taken off of the trailer?

16   A.   Myself and the other agent were waiting on the side of

17   this ramp.  As you can see, that goes up into the open door.

18   We were alerted by the tow truck driver that as he began to

19   undo the straps of the vehicle, the tow truck driver alerted us

20   that there was a cell phone lying on the flatbed of the tow

21   truck in between the two rear wheels.

22             MR. GIBBS:  And, Your Honor, at this time, we would

23   offer into evidence Exhibits 3-102 and 3-103, which are

24   photographs of that phone.

25             THE COURT:  Any objection?

1            MR. SMITH:  No objection.

2            THE COURT:  They're in.

3            (Government's Exhibit Nos. 3-102 and 3-103 were

4    received in evidence.)

5            MR. GIBBS:  Let's pull up 3-102 first.

6    Q.   Now, Special Agent Sikorski, who took this photo of the

7    phone?

8    A.   It was either myself or Special Agent Miriam Fontanez.  We

9    were both present.  I don't specifically remember which one of

10   us actually took the picture, but we were both present when we

11   were taking this evidence.

12   Q.   And you testified a moment ago about seeing the phone on

13   the flatbed on that day.  Is this the way it looked when it was

14   pointed out to you?

15   A.   Yes.  That is an exact -- that is the exact location that

16   I first observed it.  This is an unmoved photo.

17   Q.   And yeah, if we can look at Government Exhibit 3-103, that

18   might give you a better view.  What is this?

19   A.   Again, this is a zoomed-in picture of that cell phone

20   lying on the bed of the flatbed tow truck.

21   Q.   And what kind of phone was this?

22   A.   It was a ZTE phone.

23   Q.   And the color is?

24   A.   It was a, a black phone.  It had a clear, large screen on

25   the front side of it.  This is a picture of the back side, as

1    it was laying on the flatbed when we saw it.

2    Q.    And was there anything unusual on the phone itself?

3    A.    Yes.  On the front of the phone, where you would normally

4    see the front-facing camera, there was pieces of Scotch Tape,

5    clear Scotch Tape covering the front-facing camera.

6    Q.    And so what happened to the phone after you and Mirian

7    Fontanez found it on the trailer?

8    A.    We took possession of it as FBI evidence at that location.

9    From that location, we responded directly to the Washington

10   Field Office in Washington, D.C., and entered that phone into

11   FBI evidence.

12   Q.    And is that standard procedure on how you handle evidence

13   when you seize it at the FBI?

14   A.    Yes.

15   Q.    And this was you and Special Agent Fontanez that took the

16   phone back to the Washington Field Office?

17   A.    Yes, it was.

18         MR. GIBBS:  Your Honor, at this time, I would like to

19   read Stipulation No. 10, which says that the United States and

20   the defendant hereby stipulate and agree that Government

21   Exhibits 3-302 through 3-226 are messages found by the FBI on

22   the cellular telephone marked as Government Exhibit 3-200.

23         THE COURT:  All right, is there any objection to

24   those exhibits going in, that is, 3-202 through 226 and also

25   3-200?

1           MR. SMITH:  No objection.

2           THE COURT:  All right, they're all in.

3           (Government's Exhibit Nos. 3-200 and 3-202 thru 3-226

4    were received in evidence.)

5           MR. GIBBS:  Thank you.

6    Q.   Special Agent Sikorski, prior to your testimony today, did

7    you look at 3-202 through 3-226 from this phone?

8    A.   Yes, I did.

9    Q.   And what were those exhibits?

10   A.   Those exhibits were the forensic examination of the phone

11   that I found on the bed of that tow truck, and they are the

12   other end of the Threema communications that I was

13   communicating with my phone.  These exhibits are the other end

14   of that that were found on that phone that was lying on the bed

15   of the tow truck.

16   Q.   And so if we could -- I'm not going to display all of them

17   or even very many of them because you said these are the other

18   end of the messages.  So the defendant's messages you testified

19   about earlier were on this phone?

20   A.   Correct.  Both the defendant's messages to me and my

21   messages to the defendant were found on that phone that was

22   recovered from the bed of that flatbed tow truck.

23          MR. GIBBS:  Okay.  So I just want to pull up a couple

24   of these, but if I could pull up 3-202?  And if it's possible

25   to zoom in a little bit?

1   Q.   Now, Special Agent Sikorski, can you explain what this is?

2   A.   That is a picture of the phone that I found on the bed of

3   the flatbed tow truck.  You can see that clear Scotch Tape that

4   I indicated previously in the upper right-hand corner, and then

5   this specific HWM account is a -- is the Threema account that I

6   was communicating on with that other phone that you saw the

7   previous Threema messages from.

8   Q.   Right.  And we talked about the Threema account.  This was

9   the first Threema account that you were communicating with the

10  defendant, correct?

11  A.   Yes, it was.

12  Q.   Not the one that was used to send the codes?

13  A.   Correct.  This is the HWM account, not that account with

14  the ~L that I previously described.

15  Q.   And then if we can go to 3-203, what is 3-203?

16  A.   3-203 is a picture of that ZTE phone, and again, this is a

17  picture of the Threema accounts and messages on that phone.

18  Q.   And do you recognize any of the accounts in the middle of

19  that -- or on that phone anywhere?

20  A.   Yes.  I only recognize the lower account that's indicated

21  with a UNTDSKA7.  That is my Threema account that I was

22  utilizing to communicate with the defendant.

23  Q.   And off to the side of that account you were using to

24  communicate with the defendant, do you see a letter there?

25  A.   Yes.  Highlighted in yellow, this is again that same

1   symbol that I referred to as a tilde.  You see the ~V, with a

2   capital V.

3   Q.   And do you recognize the reference to the V?

4   A.   Yes.  That's a reference to the V4Vendetta and to the V

5   that the defendant had initially called me when he initially

6   said, "Salam alicom V" to the first Threema message he had sent

7   me.

8          MR. GIBBS:  And then just one more on this phone from

9   the truck flatbed.  If we could pull up 3-224?  If we can zoom

10  in on that a bit?

11  Q.   Now, did you recognize this message on the phone from the

12  flatbed as one that you had received previously?

13  A.   Yes.  This is one of --

14         MR. SMITH:  Objection, Your Honor.  Relevance.

15         THE COURT:  No.  It's connecting the dots, which the

16  government has the obligation to do.  Overruled.

17         THE WITNESS:  Yes.  This is the message that the

18  defendant sent me on my phone that I received from my Threema

19  account.  This is the actual message on that phone that he sent

20  me.

21  BY MR. GIBBS:

22  Q.   And, in fact, at the top of the phone, you can actually

23  see "ZTE."  That refers to the type of the phone?

24  A.   Yes.  That is the, I believe the brand of that particular

25  phone.

1    Q.   Now, you testified earlier, Special Agent Sikorski,

2    that -- well, first of all, you testified that you looked at

3    all the messages on this black ZTE phone from the flatbed

4    truck, correct?

5    A.   I looked at the exhibits from the Threema messages on that

6    phone.

7    Q.   Right.  And you testified earlier that the codes that the

8    defendant actually sent you were from a second tilde account.

9    Do you recall that?

10   A.   Yes, I do.

11   Q.   And in the last message the defendant sent, he said he was

12   getting rid of the device and he was eating the SIM card.  Do

13   you recall that message?

14   A.   Yes, I do.

15   Q.   So were any of those tilde messages found on this black

16   ZTE gophone?

17   A.   No, not to my knowledge.

18            MR. GIBBS:  Your Honor, at this time, I've got

19   another stipulation to read into the record.  It's Stipulation

20   No. 8.

21            The United States and the defendant hereby stipulate

22   and agree that Government Exhibits 3-104 through 3-114,

23   Government Exhibits 3-117 through 3-121, Government Exhibit

24   3-125, and Government Exhibit 3-300 are items that were found

25   by the FBI in defendant Nicholas Young's truck after his

Sikorski - Direct                                                    603

1    arrest.

2              THE COURT:  All right.  Do you want to move all of

3    those in at this point or not?

4              MR. GIBBS:  I would like to, Judge, and I'll have the

5    agent talk about some of those right now.

6              THE COURT:  Any objection?

7              MR. SMITH:  Your Honor, only to 3-300.  It's a Sony

8    Cyber-Shot camera seized from the truck.  We don't know what

9    the government intends to do with the camera, whether it

10   intends to just present the camera.

11             THE COURT:  All right.  That's the last one in the

12   series, so let's wait and see.

13             So at this point, 104 through 114, 117 to 121, 125

14   are in, correct?

15             MR. GIBBS:  Correct.

16             THE COURT:  All right.  300 is not yet in.

17             (Government's Exhibit Nos. 3-104 thru 3-114, 3-117

18   thru 3-121, and 3-125 were received in evidence.)

19             MR. GIBBS:  And then at this time, Judge, I would

20   like to have the, Special Agent Sikorski take a look at Exhibit

21   3-117.  Let's just pull that up.

22   Q.   Special Agent Sikorski, what is 3-117?

23   A.   3-117 is a picture of a FedEx office user card or stored

24   value card.

25   Q.   Okay.  And, in fact, there were a number of these FedEx

1    stored value cards found in the defendant's truck on the day of

2    the arrest, correct?

3    A.   I know of two.

4    Q.   Okay.  And in the investigation, we have a number of

5    e-mails that the defendant sent from the Essa Kobayashi e-mail

6    account that are in evidence, and we have a number of still

7    photos of the defendant in the FedEx.  Now, were you able to

8    look at the date and times of some of those e-mails and the

9    FedEx photos and compare that with the transaction detail

10   history we got from FedEx to confirm if, in fact, there were

11   transactions on those dates?

12   A.   Yes, I was.

13   Q.   All right.  And sort of a long, complex question, but

14   let's see if we can walk through this.

15          So 3-117, could we look at the back of that card,

16   Fabian?

17          And so there is a number on that.  Do you see that?

18   A.   Yes, I do.  It's highlighted in yellow.  It's RU402068209.

19   Q.   And if we can pull up 3-117A, which is the transaction

20   detail history for that particular FedEx value card?

21          THE COURT:  All right.  Now, the subsections A or B,

22   whatever you've got, were not formally moved in, so is there an

23   A for each of these exhibits?

24          MR. GIBBS:  I'm sorry, is there a page for?

25          THE COURT:  Yeah.  117A is a separate exhibit from

1   117.  When you did that mass moving in, we didn't talk about

2   subgroupings of As or Bs.  Is that expected to have happened?

3          MR. GIBBS:  Well, I'd like to have the agent take a

4   look at 117A, and I would like to have it moved in at this

5   time.

6          THE COURT:  What I'm saying is it's not in yet.

7          MR. GIBBS:  Okay.

8          THE COURT:  Okay.  Is there any objection to 117A?

9   I'm assuming defense counsel have it.  Mr. Smith, is there an

10  objection to 117A?

11         MR. GIBBS:  Judge, I would note we have a

12  certification for this.  This is a FedEx business record.

13         THE COURT:  I understand that, but let's --

14         MR. SMITH:  No objection.

15         THE COURT:  All right.  It's now in, and you may

16  publish it.

17         (Government's Exhibit No. 3-117A was received in

18  evidence.)

19         MR. GIBBS:  All right.  First of all, let's do it

20  this way:  Can we pull up Exhibit 1-219 to start with?  If you

21  could zoom in on the top of that?  This is an e-mail that's

22  already in evidence.

23  Q.   And, Special Agent Sikorski, do you see the date on that

24  e-mail in 1-219?

25  A.   Yes, I do.

1   Q.   And what is the date?

2   A.   It is February 16, 2016.

3          MR. GIBBS:   And then if we can pull up a second

4   exhibit, which is also already in evidence, it's 7-216A?

5   Q.   And this is a -- do you recognize this exhibit?

6   A.   Yes, I do.   It's a photo of a FedEx facility and the

7   defendant on February 16, 2016.

8   Q.   All right.   So the same date as the prior e-mail?

9   A.   Yes.

10          MR. GIBBS:   All right.   So let's go to the

11   transaction detail history 3-117A, if we can display that.

12   We'll have to blow that up.

13          Now, let's start at the top.   Is there a way to

14   enhance the actual number of the FedEx card?   And is there a

15   way to pull the other card, do them side by side?

16          THE COURT:   Let's move this along.   The jury, I

17   think, has the picture.

18          MR. GIBBS:   Okay.   And so let's just stick with the,

19   the exhibit on the right, which is the FedEx detail history.

20   And if we can bring that up by itself and blow it up a little

21   bit?

22   Q.   And, Special Agent Sikorski, the date we were asking about

23   was February 16, 2016.   For that particular FedEx card from the

24   defendant's truck, were you able to find any transactions where

25   that card was used at a FedEx on February 16, 2016?

1    A.   Yes.   There are three transactions indicated in lines

2    No. 27, 28, and 29 that occurred on February 16, 2016.

3    Q.   And were you able to make similar connections for other

4    transactions on those FedEx cards in preparation for your

5    testimony today?

6    A.    Yes.  I was able to connect at least three other

7    transactions in this same manner, linking the pictures with the

8    transaction dates and times from the FedEx transaction history.

9             MR. GIBBS:  All right.  And I won't make you go

10   through that again.  Thank you, though.

11            And then, Judge, we have -- I have another

12   stipulation, and this relates to Government Exhibit 3-300.  The

13   defendant -- the defense did not agree to that exhibit, which

14   was the camera from the truck.

15            Stipulation No. 11 says that the United States and

16   defendant hereby stipulate and agree that Government Exhibit

17   3-302 is a photograph that was found by the FBI on defendant

18   Nicholas Young's camera marked as Government Exhibit 3-300.

19            So we would ask to admit 3-302 and 3-300 into

20   evidence.

21            MR. SMITH:  Your Honor, we stipulated to the

22   authenticity of the document, not relevance.  We object to the

23   relevance of the document.  If Your Honor looks at --

24            THE COURT:  Let me take a look at it.

25            MR. SMITH:  The defense objects to the relevance in

1   connection with this particular witness.

2          THE COURT:  I'll permit it.  Overruled.

3          (Government's Exhibit Nos. 3-300 and 3-302 were

4   received in evidence.)

5          MR. GIBBS:  Thank you, Your Honor.  And if we could

6   publish 3-302?

7          And before I go to the next stipulation, I've just

8   got a couple more, Your Honor, I did not move in the other

9   FedEx transaction detail history, so 3-118A, 119A, and 120A are

10  three additional documents like the ones in 3-117A.  We'd ask

11  to move those three in as well.

12         THE COURT:  Any objection --

13         MR. SMITH:  Well --

14         THE COURT:  -- to 118A, 119A, and 120A?

15         MR. SMITH:  No objection.

16         THE COURT:  All right, all three are in.

17         (Government's Exhibit Nos. 3-118A thru 3-120A were

18  received in evidence.)

19         MR. GIBBS:  And I'd like to read into the record

20  Stipulation No. 12:  The United States and the defendant hereby

21  stipulate and agree that Government Exhibits 4-101, 102, 104,

22  105, 107 --

23         THE COURT:  Whoa, whoa, slow down.  101, 102, 104,

24  105, 107, what?

25         MR. GIBBS:  108.

1            THE COURT:  Go ahead.

2            MR. GIBBS:  109, and 4-200 were found by the FBI in

3   the course of arresting defendant Nicholas Young on August 3,

4   2016.

5            MR. SMITH:  No objection.

6            THE COURT:  All right, they're all in.

7            (Government's Exhibit Nos. 4-101, 4-102, 4-104,

8   4-105, 4-107 thru 4-109, and 4-200 were received in evidence.)

9            MR. GIBBS:  And if I could, there are two other

10  exhibits I'd like to show the agent.  If we could pull up

11  Exhibit 4-102?

12  Q.   Have you seen this document before, Special Agent?

13  A.   Yes, I have.

14  Q.   Do you recognize any of the markings on this document?

15  A.   Yes.  This document is actually upside down.  If you were

16  to rotate it 180 degrees like was just done there, the top

17  UNTDSKA7, that is my Threema account that I was utilizing to

18  communicate with the defendant.  You can see the word "Threema"

19  written there, which is the messaging app we were communicating

20  on, and the HWM5PPKH account is the defendant's account that

21  was communicating with me on the Threema application.

22  Q.   All right.  And then -- I've already rotated, unless you

23  could tell, but the other writing on there, do you recognize

24  that?

25  A.   No.

Sikorski - Direct                                                      610

1    Q.   Okay.  That will be for a different witness.

2            Then if we can go to Government Exhibit 4-104?  And

3    we're going to have to zoom in on the top of this exhibit, but

4    had you reviewed this previously, Special Agent Sikorski?

5    A.   Yes, I had.

6    Q.   And what is this?

7    A.   It appears to be an advertisement or -- for a local

8    business, roti, with some words written on it.

9    Q.   And as far as the words written on it, did you recognize

10   any of those words?

11   A.   I did recognize at the very, very top, you can see

12   above "Keep your," now highlighted in yellow, it says "Essa

13   Kobayashi."  That is the e-mail account of the defendant that

14   was communicating with the account being perceived to be Mo and

15   the V4Vendetta e-mail account.

16   Q.   Thank you.

17           And then if we could, if I could have you take a look

18   at Government Exhibit 4-107, or if we can pull that up?

19           If I could indulge the CSO, I'd also like to have the

20   agent take a look at Exhibit 7-102, which is a paper document.

21           MR. SMITH:  No objection.

22           THE COURT:  All right, it's in.  7-102 is in.

23           (Government's Exhibit No. 7-102 was received in

24   evidence.)

25   BY MR. GIBBS:

Sikorski - Direct                                                      611

1    Q.    All right.  Do you have that there in front of you?

2    A.    Yes, I have both 4-107 exhibit and 7-102.

3    Q.    Okay.  And were you able to compare those two?

4    A.    Yes, I was.

5    Q.    Okay.  And 4-107 is a Best Buy receipt that was found in

6    the course of arresting the defendant, correct?

7    A.    Yes, it is.

8    Q.    And what is 7-102?

9    A.    7-102 is a Best Buy records, I'll refer to here as a

10   duplicate copy of records that the FBI obtained from Best Buy.

11   These two transactions are identical.

12   Q.    Thank you.

13         And then, Special Agent Sikorski -- I've just got a

14   couple more stipulations, and I think we'll be done.

15         THE COURT:  Well, give the jury some context.  What

16   was bought?  What does the receipt refer to?

17   BY MR. GIBBS:

18   Q.    Yeah, can you go ahead and --

19   A.    The receipt is from Best Buy, Best Buy in Fairfax,

20   Virginia, and there are $100 worth, so ten $10 Google Play

21   cards purchased from Best Buy from these receipts.

22         MR. GIBBS:  And I believe 4-107, it's not upside

23   down, yeah, if we could enhance that a little bit?

24         And then finally while we're still on Best Buy, I'd

25   like to read into evidence Stipulation No. 14, which is:  The

1   United States and the defendant hereby stipulate and agree that

2   Government Exhibits 7-101, 7-102, 7-103, and 7-102 are

3   authentic business records of Best Buy, Inc.

4               THE COURT:  101, 102, and 103.

5               MR. GIBBS:  Correct.

6               THE COURT:  All right.

7               MR. SMITH:  Your Honor, the defense objects on the

8   basis of cumulative evidence.  This is unnecessary.  These are

9   videotapes showing that the defendant walked into Best Buy.

10              MR. GIBBS:  And I would make an offer of proof,

11  Judge, that is the evidence that he actually went in and bought

12  the receipt -- or bought the Google Play gift cards, or at

13  least some of them, and saved the receipts.  The videos are

14  very short.

15              THE COURT:  I'm going to overrule the objection.

16  They're in.

17              (Government's Exhibit Nos. 7-101 and 7-103 were

18  received in evidence.)

19              MR. GIBBS:  All right, thank you.

20              And if we could play beginning with the first video

21  and just roll right through them?

22              And for the record, we'll start with 7-101-1 and then

23  play 7-101-2 and 7-101-3, which are three Best Buy surveillance

24  videos.

25              (Government's Exhibit Nos. 7-101-1 and 7-101-2 were

Sikorski - Direct                                                        613

1    played.)

2              THE COURT:  How much longer is it like this?  This is

3    not adding much.

4              MR. GIBBS:  Yeah, go to the next one.

5              (Government's Exhibit No. 7-101-3 was played.)

6              MR. GIBBS:  And finally, Judge, I've just got two

7    more stipulations.  Stipulation 13:  The United States and the

8    defendant hereby stipulate and agree that Government Exhibit

9    4-106 is a photograph that accurately depicts the backpack of

10   defendant Nicholas Young after his arrest on August 3, 2016.

11             We would ask to move in that exhibit.

12             MR. SMITH:  No objection.

13             THE COURT:  All right, it's in.

14             (Government's Exhibit No. 4-106 was received in

15   evidence.)

16             MR. GIBBS:  If we could just publish it briefly?

17             And I'll read the last exhibit -- or last

18   stipulation, rather:  The United States and the defendant

19   hereby stipulate in Stipulation No. 29, they stipulate and

20   agree that metadata displayed on photographs from electronic

21   media among the government exhibits is metadata that was found

22   by the FBI forensic examiners who examined the electronic

23   media.

24             THE COURT:  Anything further?

25             MR. GIBBS:  No, Judge.  Thank you.

1            THE COURT:  All right.  Mr. Smith?

2            MR. GIBBS:  Thank you, Special Agent Sikorski.

3            THE WITNESS:  Thank you.

4            MR. SMITH:  Your Honor, we're going to be brief with

5    this witness.

6                         CROSS-EXAMINATION

7    BY MR. SMITH:

8    Q.   Good afternoon, Agent Sikorski.

9    A.   Good afternoon.

10   Q.   You testified when you began taking control of the alias

11   Mo's e-mail account, correct?

12   A.   Yes.

13   Q.   And approximately when was that?  When did you take

14   control of that e-mail account?

15   A.   It was in July of 2016.  I never sent any messages on that

16   e-mail account.  I only was in the receive mode.

17            MR. SMITH:  So -- and could we put up GX, Government

18   Exhibit 1-221?  This was -- I think -- can you blow it up?

19   Q.   This is the first e-mail that you testified about this

20   afternoon, correct?  It's from June 14, 2016?

21   A.   Correct.

22   Q.   You -- did you draft that e-mail, or was that drafted by

23   someone prior to you?

24   A.   This was an e-mail sent by the defendant to --

25   Q.   Excuse me, excuse me.  Did you receive that e-mail once

Sikorski - Cross                                                          615

1    you had taken control of Mo's account?

2    A.   No.  I was not in control of this account when this was

3    received.

4    Q.   Okay.

5    A.   I later viewed it, but this was not -- I did not have

6    control of this account until July of 2016.

7    Q.   When you took control of the account in July 2016, did you

8    review the previous communications between the defendant and

9    the alias Mo's e-mail account to familiarize yourself with the

10   communications?

11   A.   Yes, absolutely.

12   Q.   And in order to properly communicate with Young as the

13   alias Mo from that point forward?

14   A.   Yes, that's correct.

15        MR. SMITH:  Okay.  So -- and can you put Government

16   Exhibit 1-221 back up and blow it up?

17   Q.   So Mr. Young's e-mail on this date was in response to a

18   prior communication from, from the alias Mo, correct?

19   A.   Yes, that's correct.

20   Q.   And, in fact, there were two prior communications that

21   this e-mail on June 14 was in response to, correct?

22   A.   I would have to review to know that there was specifically

23   two, but this is definitely a response to previous messages.

24        MR. SMITH:  Can we put up Government Exhibit 1-115?

25   And blow up the, blow up the first e-mail.  The top, March 5.

1   Q.   Have you seen the March 5 e-mail from the alias Mo account

2   to Nicholas Young?

3   A.   Yes, I have.

4   Q.   And in that e-mail, does the alias Young -- or the alias

5   Mo ask -- broach the subject of communicating on a

6   surreptitious app in this exchange?

7   A.   Yes.

8   Q.   To the best of your knowledge, is this the first time that

9   the alias Mo raises the subject of using a secure app to

10  communicate with Young?

11  A.   Yes.  Right now, to the best of my knowledge, yes, it is.

12  Q.   And to the best of your knowledge, is this the first

13  communication between Mr. Young and Mo from either party

14  indicating that there would be further communications on the

15  secure app?

16  A.   Yes.

17          MR. SMITH:   Thank you.

18          Can you put up Government Exhibit 1-116?   Can you

19  blow up the -- yeah.

20  Q.   Have you seen this e-mail before from the alias Mo account

21  to Mr. Young?

22  A.   Yes, I reviewed it before.

23  Q.   And what is the date on that e-mail?

24  A.   It's April 18, 2016.

25  Q.   And this is an e-mail from the alias Mo to Nicholas Young

1   that was following up on the previous e-mail we looked at,

2   Government Exhibit 1-115?

3            Let me rephrase that.  Do you -- are you aware of any

4   e-mails exchanged between the alias Mo account and Nicholas

5   Young between March 5, 2016, which we just looked at, and the

6   e-mail in front of you, Government Exhibit 1-116?

7   A.   Again, I would have to look at all of the communications

8   to confirm because I was not in control of these e-mail

9   accounts at the time, so I'm unable to specifically -- in

10  between those dates, I just don't remember unless I was shown

11  the actual full communication.

12  Q.   So who was in control?  Which agent was in control of the

13  alias Mo's e-mail account at this point?

14  A.   I believe it was the Agent Cameron Siegfried.

15           MR. SMITH:  Siegfried.

16           Your Honor, we move these two e-mails into evidence

17  as complete statements.  The witness --

18           THE COURT:  Wait, wait, wait.  Aren't they already

19  in?  I thought we've seen both of these.

20           MR. GIBBS:  They are, Judge.  I don't think -- I

21  think these are our exhibits.

22           MR. SMITH:  We're moving them in, Your Honor, because

23  the government has not put a witness on to testify about these

24  exhibits.

25           THE COURT:  Wait, wait, wait, wait.  The exhibit

Sikorski - Cross                                                      618

1    numbers again are what?  Government Exhibit --

2            MR. SMITH:  Government Exhibit 1-115.

3            THE COURT:  115.

4            MR. SMITH:  And Government Exhibit 1-116.

5            THE COURT:  All right, they're both in evidence.

6            MR. SMITH:  All right.

7            THE COURT:  All right.  In case they weren't.  I

8    think they already are.  They are.

9    BY MR. SMITH:

10   Q.   The second e-mail on April 18, 2016, indicates that the

11   alias Mo e-mail account again requests that the defendant

12   Nicholas Young and the alias Mo communicate through a secure

13   app, correct?

14   A.   Yes.

15   Q.   And then if we go back to Government Exhibit 1-221, it's

16   dated June 14, 2016, correct?

17   A.   It is.

18   Q.   And it's from Nicholas Young to the alias Mo's account?

19   A.   Yes, it is.

20   Q.   Is this the first response that the defendant made to the

21   two e-mails we just looked at from March 2016 and April 2016?

22   A.   Again, to the best of my knowledge right now, yes, it is.

23   Q.   Thank you.

24            And does the defendant say in the e-mail in front of

25   you, Government Exhibit 1-221, "I don't really do the tech

1   thing...but I will inshallah message you on that app within the

2   week, likely before you read this message.  I really don't

3   trust any electronic or email communication...don't feel

4   comfortable even on this...but inshallah that app will be

5   okay."  Correct?

6   A.   Yes, that's a direct quote from the e-mail.

7   Q.   Did you testify earlier today that Mr. Young was the first

8   communicant between himself and the alias Mo to suggest

9   communicating on a secure app?

10  A.   I do not believe so.

11  Q.   So your testimony is it was the undercover informant, it

12  was the alias Mo that first suggested communicating on Threema?

13  A.   Yes, that's my recollection.

14  Q.   Okay.  Agent Sikorski, you testified that it was the

15  defendant Young who came up with the idea of sending codes on a

16  second account, a second Threema account, correct?

17  A.   Yes, I did.

18  Q.   But it was you who came up with the idea of sending the

19  codes in the first place, correct?

20  A.   We asked the defendant to send us Google Play codes, yes.

21  Q.   And the defendant had not offered to send Google Play

22  codes at any point before that, correct?

23  A.   Not to my knowledge.

24  Q.   But the government in the alias Mo role had suggested that

25  Mr. Young send Google Play cards before that, correct?

1   A.    Before, before what?

2   Q.    Before the -- so your message soliciting the Google Play

3   cards was dated July 18, 2016?  That's Government Exhibit

4   2-106.

5   A.    Yes.  That's my first response to the defendant on the

6   Threema app.

7   Q.    But prior to July 18, 2016, the alias Mo e-mail account

8   had suggested that Mr. Young send -- communicate through the

9   secure app through the use of Google Play gift cards, correct?

10  A.    Correct.  We had discussed how to purchase the app with

11  the, with the play card code.

12  Q.    That was Government Exhibit 1-221, dated June 14, 2016?

13  A.    I'd have to look.

14        MR. SMITH:  Can you put Government Exhibit 1-221 back

15  up?

16  Q.    This is an e-mail from the defendant's account to the

17  alias Mo's account dated June -- wait.  Excuse me.

18        Government Exhibit 1-115.  Government Exhibit 1-115

19  is a March 5, 2016, e-mail from the, from the government's

20  alias Mo account to the defendant's e-mail account.  The second

21  paragraph, within the second paragraph, do you see the line

22  that reads, "We think that the kuffar had spy or hacked

23  there," and it's, I believe it says -- what does it say?

24  ". . . Telegram and some other apps.  The brothers that I have

25  been helping with translations that were guiding people here

1   are starting to use an app," and it says "Threema," right?  "We

2   were been trying to mess around with the Threema app and a few

3   of the brothers with technology backgrounds think its safer

4   than the other apps.  These brothers are so smart to hear them

5   talk about this its amazing that Allah has brought them to us.

6   One problem is that it takes time to set up though since we

7   have to use gift cards to get the app."

8           This is an e-mail from the alias Mo account to the

9   defendant on March 5, 2016, correct?

10  A.   Yes, it is.

11  Q.   The defendant did not respond to this e-mail with a

12  suggestion that he could send those gift cards, did he?

13  A.   No, he did not.

14  Q.   Okay.  So if we go back to the solicitation of the gift

15  card charge on July 18, 2016, that's Government Exhibit 2-106,

16  the defendant did not respond to this message by sending gift

17  cards; is that correct?

18  A.   No, he did.  He did send gift cards.

19  Q.   I'm asking you about the message on July 18, Government

20  Exhibit 2-106.  In response to this message, did the defendant

21  send gift cards?

22  A.   Yes.  I believe in response to the messages that I was

23  sending him on Threema, he sent gift cards.

24  Q.   I'm referring to the July 18, 2016, message that's

25  Government Exhibit 2-106.  On the screen, do you see that it

Sikorski - Cross                                                     622

1    reads -- this is your message, correct?

2    A.   Yes.

3    Q.   It says, "The group of brothers im' helping to get people

4    dawlah have 2 very trusted brothers in Uk who buy us Google

5    gift cards and send us the codes" back on accounts.  "Theyve

6    been sending codes for a while . . .."

7            Next message says -- let's see here -- the response

8    to this text message on July 18 is Government Exhibit 2-109,

9    correct?  We've got 2-109?  Which begins, "Congratulations on

10   your child."

11           THE COURT:  That's not there.

12   BY MR. SMITH:

13   Q.   2-110?

14   A.   Yes, those messages are from the defendant to me on

15   July 21, 2016.

16   Q.   July 21.  Did the defendant send gift cards on July 21,

17   2016, to --

18   A.   No, he did not.

19   Q.   Okay.  So, so the defendant did not respond to the first

20   solicitation request for Google Play gift cards on July 18,

21   2016, correct?

22   A.   He did not respond with Google Play cards on July 21, no.

23   Q.   And then you sent a second message, correct, on July 28,

24   2016?  That's Government Exhibit 2-212?

25   A.   Yes, I did.

1    Q.   And in this message, Government Exhibit 2-212, it's the

2    July 28, 2016, message from the V4Vendetta account, "The

3    brothers in UK stopped getting codes to save for hijrah . . .."

4          Do you see that one?

5    A.   I'm flipping through my paper here.  Sorry.

6    Q.   It's 2-112?

7    A.   Yes.  Yes.  I now see in front of me Government Exhibit

8    2-112.

9    Q.   This is a message on July 28, 2016, correct?

10   A.   Yes, it is.

11   Q.   And this is in response to defendant's message of July 21,

12   2016, correct?

13   A.   Yes, it is.

14   Q.   So in this message, you are asking Mr. Young this a second

15   time, to send gift cards, correct?

16   A.   Yes, that's correct.

17   Q.   But it's actually a third time, though, right?

18   A.   The first time was the first time we just talked about on

19   the first messages that I sent, and this would be the second

20   time.  I'm not sure where the third time comes in.

21   Q.   Did you agree a few moments ago when we looked at

22   Government Exhibit 1-115 on March 5, 2016, that the V4Vendetta,

23   the Mo alias account had solicited gift cards from --

24          MR. GIBBS:  I'd object to the form of the question.

25          THE COURT:  I think that misstates that.  I'll

1    sustain the objection.

2              MR. GIBBS:   Thank you.

3              THE COURT:   Mentioning something and soliciting are

4    two different things.   You need more specifics.

5    BY MR. SMITH:

6    Q.   I think if we go back to Government Exhibit 1-115, which

7    is an e-mail dated March 5, 2016, do you agree, Agent Sikorski,

8    that this e-mail from yourself reads, "We think that the kuffar

9    had spy or hacked there telegram and some other apps.   The

10   brothers that I have been helping with translations that were

11   guiding people here are starting to use an app called Threema.

12   We were been trying to mess around with the Threema app and a

13   few of the brothers with technology backgrounds think its safer

14   than the other apps.   Only problem is that it takes time to set

15   up though since we have to use the gift cards to get the app."

16             Is that what it says?

17   A.   That's what it says, yes.

18   Q.   Did Mr. Young respond to this communication positively by

19   suggesting that you and the alias Mo should communicate through

20   the secure app?

21   A.   No.

22   Q.   He did not respond to that, that request until June 2016,

23   correct?

24   A.   Yes, I believe that's correct, the next response.

25   Q.   And in that response, Government Exhibit 1-221, he said,

1   "I really don't trust any electronic or email communication...

2   don't feel comfortable even on this."  Correct?

3   A.   Yes.  Without it directly in front of me -- it's in front

4   of me.  That was a paraphrase, but yes.

5   Q.   So finally, in Government Exhibit 2-112, that's July 28,

6   2016, and your message says, "Only need a few right now,"

7   meaning gift cards.  Just send a few, right?

8   A.   Yeah.  I said we only need a few.

9   Q.   You testified earlier today that you were in Washington,

10  D.C., when you received these messages on July 28, 2016,

11  correct?

12  A.   I believe I said I didn't remember if I was because some

13  of the messages I was home when I received them in Alexandria,

14  Virginia, and some of the time I was in D.C.  I don't

15  specifically remember when I actually received those messages.

16  I just don't remember, I'm sorry.

17  Q.   And is that true for all of the Threema messages that

18  were, that were discussed in your direct testimony?  Do you not

19  recall for any given message on Threema that you discussed in

20  your direct when you received -- whether you received it in

21  Alexandria or Washington, D.C.?

22  A.   Some of them I can -- some of them I can specifically tell

23  because the pictures that I took of them, you can tell, like,

24  one of them is my kitchen, the background is my kitchen

25  counter.  You can tell on some of them where I was based on

Sikorski - Redirect                                                      626

1   what the background of the picture is.

2   Q.   You don't remember for July 28?

3   A.   So if I looked at it at home and then actually took the

4   picture at the office, I just don't recall.

5   Q.   I'm just asking you today.  Today, as you testify today,

6   you do not recall?

7   A.   No, I don't recall if I was in D.C. or Virginia when I

8   actually received them.

9   Q.   Do you know where the messages were sent, the Threema

10  messages were sent from the defendant's side?

11  A.   No, I do not.

12  Q.   They were sent in Southwest, D.C., in L'Enfant Plaza,

13  correct?

14          MR. GIBBS:  Judge, the agent just testified he didn't

15  know.

16          THE COURT:  That's testifying.  Again, I would advise

17  the jury again, disregard that.  There's no evidence of that

18  unless the witness says yes, that's where it happened.

19          MR. SMITH:  That's all, Your Honor.

20          THE COURT:  All right.  Any redirect?

21                      REDIRECT EXAMINATION

22  BY MR. GIBBS:

23  Q.   One thing I -- you were asked on cross, it made me realize

24  I needed to bring it out earlier, was the Best Buy receipts you

25  testified about earlier?

Sikorski - Redirect                                                      627

1   A.    Yes.

2   Q.    And the Best Buy video?

3   A.    Yes.

4   Q.    Where was that Best Buy located?

5   A.    It was in Fairfax, Virginia.

6            MR. GIBBS:  That's all I have, Judge.  Thank you.

7            THE COURT:  Is anybody going to call -- any recross?

8   That's one question.

9            MR. SMITH:  (Shaking head.)

10           THE COURT:  No?  All right.

11           Is anybody going to call Agent Sikorski again?

12           MR. GIBBS:  The government is not, Judge.

13           THE COURT:  How about the defense?  Is the defense

14  planning to call this witness again?

15           MR. SMITH:  No, Your Honor.

16           THE COURT:  All right.  Then, Agent, you're excused

17  as a witness.  You can stay in court and watch the proceedings

18  or leave, but do not discuss your testimony or anything you see

19  or hear in court with any witness who has not yet testified.

20           THE WITNESS:  Yes, Your Honor.

21           THE COURT:  All right?

22                         (Witness excused.)

23           THE COURT:  All right, call your next witness.

24           MR. GIBBS:  John Minichello.

25           THE COURT:  All right.  Agent Minichello, you're

Minichello - Direct                                                    628

1    still under your affirmation to tell the truth from yesterday,

2    and I hope your voice is stronger.  All right?

3                THE WITNESS:  Yes, Your Honor.

4                THE COURT:  All right.

5             SA JOHN MINICHELLO, GOVERNMENT'S WITNESS,

6                   PREVIOUSLY AFFIRMED, RECALLED

7                        DIRECT EXAMINATION

8    BY MR. GIBBS:

9    Q.    Good afternoon, Special Agent Minichello.

10   A.    Good afternoon, sir.

11   Q.    In August 2016, when the defendant was arrested, did you

12   come back to this area to participate in processing the

13   defendant?

14   A.    Yes, I did.

15   Q.    And do you know what the defendant looked like?

16   A.    I do.

17   Q.    Is he here in the courtroom?

18   A.    He is.

19   Q.    Could you point to him and identify what he's wearing?

20   A.    He's there at the defense table.  He's wearing a purple

21   tie -- blue.

22                THE COURT:  Any objection?

23                MR. SMITH:  No objection.

24                THE COURT:  All right, he's identified.

25   BY MR. GIBBS:

1   Q.   Now, you said you were involved in processing the

2   defendant.   What was that role exactly?

3   A.   After his arrest, we brought defendant Nicholas Young to

4   the FBI office, the Washington Field Office, and took down his

5   biographical information, took photographs of the defendant.

6   Q.   And let's start with photographs of the defendant.   I

7   believe you have a folder there in front of you and should have

8   Exhibit 4-300 in there.

9            MR. SMITH:   One moment, Your Honor.   We object to

10  relevance, 403.

11           THE COURT:   All right, let me take a look.

12           Based on pretrial rulings that we've had, I'm going

13  to find that this can come in.   It is relevant given the issues

14  in the case, so the objection is overruled.

15           MR. GIBBS:   Thank you, Judge.   And if we could move

16  4-300 into evidence and publish it to the jury?

17           THE COURT:   It's in.

18           (Government's Exhibit No. 4-300 was received in

19  evidence.)

20  BY MR. GIBBS:

21  Q.   Now, what is 4-300?

22  A.   That's a tattoo we observed on Nicholas Young's left arm.

23  Q.   And was the defendant interviewed that day?

24  A.   He was, yes.

25  Q.   And did you interview him?

Minichello - Direct                                                      630

1   A.   I was one of two agents that interviewed him, yes.

2   Q.   All right.  And was the other agent who interviewed him

3   someone we will call Special Agent Jones?

4   A.   He is, yes.

5   Q.   And did the defendant sign an advice of rights form before

6   being interviewed?

7   A.   Yes, he did.

8   Q.   If you could take a look at Exhibit 5-302?

9            THE COURT:  Is there any issue about the way in which

10  the statements were taken from the defendant?

11           MR. SMITH:  (Shaking head.)

12           THE COURT:  No?

13           MR. SMITH:  No, Your Honor.

14           THE COURT:  They were voluntary?  You're satisfied

15  from *Miranda* warnings and all of that?

16           MR. SMITH:  Your Honor, this issue has never come up

17  before.

18           THE COURT:  Well, I know, so you get a chance to

19  raise it now.  Is there any issue about the voluntariness of

20  any statements made by your client?

21           MR. SMITH:  Would the Court allow us to speak with

22  our client before responding?

23           THE COURT:  Do it promptly, yes.

24           (Discussion between Mr. Smith and the defendant off

25  the record.)

Minichello - Direct                                                    631

1           MR. SMITH:  Your Honor, we have no objection.

2           THE COURT:  All right.

3           MR. GIBBS:  So we'd move 5-302 into evidence.

4           THE COURT:  5-302?

5           MR. GIBBS:  And if we could publish that?

6           THE COURT:  Hold on a second.

7           You really don't need it.  There's no issue.

8           MR. GIBBS:  That's fine.  We'll move on.  I'm going

9  to save a little time.

10 Q.   Special Agent Minichello, when you and Special Agent Jones

11 interviewed the defendant, was that interview videotaped?

12 A.   Yes, it was.

13 Q.   And prior to your testimony today, did you look at clips

14 from that interview and compare them with transcripts of those

15 clips for accuracy?

16 A.   I did, yes.

17 Q.   And did you initial the -- I think it's just one clip.

18 Did you initial that?

19 A.   I initialed a disc with those clips on it, yes.

20          MR. GIBBS:  All right.  If I could hand this up to

21 the defendant, have him authenticate it?

22          THE COURT:  You're handing it to the witness.

23          MR. GIBBS:  Yes, thank you.

24 Q.   And do you recognize that?

25 A.   I do.  And I recognize my initials on that disc.

1          MR. GIBBS:  All right.  Judge, at this time, what I'd

2    like to do is move in the disc which is 5-301, I believe it's

3    all three numbers:  5-301-1, -2, and -3.  All three clips are

4    contained on the one disc.  I'd like to move that into

5    evidence.

6          And this is the interview I was telling the Court

7    about that was actually videotaped.  So we have paper

8    transcripts.  These are short clips, but I'd like to pass those

9    out as well.

10          THE COURT:  All right, I think this is a good time

11    actually to take the afternoon break because you have to hand

12    out papers.

13          MR. GIBBS:  Sure.

14          THE COURT:  We can get -- we'll have the transcripts

15    on the chairs for the jurors when they come back in.  We'll be

16    in recess until four o'clock.

17          (Recess from 3:44 p.m., until 4:00 p.m.)

18                              (Defendant present, Jury out.)

19          THE COURT:  All right, I understand there's one or

20    two matters defense wants the Court to consider?

21          MR. SMITH:  Your Honor, I think we understand from

22    the government that the next witness, Agent Minichello, will be

23    testifying about his interview with the defendant on August 3,

24    2016.  This isn't charged conduct.  This is just a conversation

25    that the defendant had on the day of his arrest.  It doesn't --

Minichello - Direct                                                    633

1              THE COURT:  All right, let me find out, what's the

2    relevance of anything that's going to be said?

3              MR. GIBBS:  Judge, because it's charged conduct.  In

4    Count 1, he's charged from December to August 3, 2016, for

5    making a false statement about the destination and purpose of

6    Mo's trip and why he went over there.  They asked him about Mo

7    in the August 3 interview, and he lied about -- in answering

8    questions about Mo.  So it is part of Count 1.

9              THE COURT:  It's relevant.

10             MR. GIBBS:  Thank you.

11             THE COURT:  Overruled.

12             I thought there was another issue.

13             MS. MORENO:  Thank you, Your Honor.

14             THE COURT:  All right.

15             MS. MORENO:  I'm not sure exactly which witness is

16   going -- the government is going to try to get a number of

17   items in.  These are all these Hitler, smokestack --

18             THE COURT:  All right.

19             MS. MORENO:  -- Jewish cartoon stuff, and I'm not

20   sure who's going to do it.  I've asked.

21             We have stipulated to the places that it was found,

22   but we have not stipulated to relevance or the 403 issue, which

23   is very important to us.  So I certainly don't want any of

24   these published, and I don't want the government to tell the

25   jury that the defense has stipulated to it, and I'd like the

Minichello - Direct                                                      634

1   Court to look at each and every one of those -- that category

2   of items in -- that we feel are very prejudicial.

3           THE COURT:  I had previously told the government that

4   I wanted to take a look at what you were planning to introduce,

5   this type of evidence, to make sure that it was not cumulative

6   and that it was reasonable, all right?  And you still haven't

7   given it to the Court.  We're not just wholesale allowing, you

8   know, 25 or 30 exhibits.

9           You'll get, you know, I'm allowing you to go into

10  this somewhat because again, the predisposition issue is an

11  element the government's got to meet, all right?  And you've

12  made a strong argument that your client did not have any

13  disposition to get involved in this kind of activity until the

14  government got involved with him.  We've talked about this

15  before.  And I have made the decision based upon what has been

16  presented to me pretrial that there is enough evidence of some

17  connection between being part of a white supremacist,

18  anti-Semitic, or having those sympathies, and going into the

19  more radical form of, you know, militant Islam, and so it's

20  part of this case.

21          That's because of the way the case is being

22  litigated, but I'm not going to allow the government, I hope,

23  to overstep the bounds on the 403.

24          I did, if you recall in the initial voir dire to the

25  jury, tell them that's not what your client is being charged

1   for, and I will repeat a similar type of instruction to the

2   jury and explain to them the reason why this was permitted in,

3   it is relevance to the issue of predisposition.

4              MS. MORENO:  Your Honor, I, I don't want to frustrate

5   the Court's protocol at all or be disrespectful, but I believe

6   that each and every item that they're talking about we either

7   need to go to the bench or the Court needs to take a look at it

8   beforehand, because there are 30 or 40 of these exhibits

9   that -- cartoons, it's just -- it's beyond the pale.

10             And while the defense respectfully does not agree

11  with the Court's interpretation of predisposition and the

12  connection between militant Islam and white supremacy, we honor

13  the Court's decision, but still there's got to be a 403

14  gatekeeping aspect to this.

15             THE COURT:  Which witness is going to be testifying

16  to this?

17             MR. KROMBERG:  Your Honor, most of these items the

18  defense has stipulated to the authenticity of.

19             THE COURT:  That's not the issue.

20             MR. KROMBERG:  I understand.  So as a result -- and

21  that they were, they were seized at a particular place in

22  Mr. Young's home or from his computer media.  So we do not

23  think we needed to have a witness testify as to yes, these were

24  seized from Mr. Young's house.

25             That we -- for example, *Inspire* magazines put out by

Minichello - Direct                                                    636

1   al Qaeda, they were seized from the house, and the defense has

2   stipulated they were on the computer media.  I don't think that

3   we need a witness to say this was seized from the defendant's

4   house on his computer media.

5           We could -- now, it is true that I would ask

6   Mr. Daveed Gartenstein-Ross to talk about those items, but I

7   think that they can be admitted even before he gets here so we

8   don't have to go through the, okay, we move to admit -- "Do you

9   recognize this?  What is it?"

10          "It's an *Inspire* magazine.  There is an Usama Bin

11  Laden speech.  There is" --

12          THE COURT:  Now, wait, wait.  That is directly

13  related to the issues in this case.  That's not going to be the

14  problem.

15          MR. KROMBERG:  Right.

16          THE COURT:  The problem is the Nazi and white

17  supremacist exhibits.

18          MR. KROMBERG:  Right.

19          THE COURT:  How many of those are you planning to

20  introduce?

21          MR. KROMBERG:  There are approximately six

22  photographs of Mr. Young, and I may be off, it may be seven,

23  but six or so.  There is a framed portrait of Hitler.  There is

24  a poster of Hitler.

25          There is the series of photographs that Your Honor --

1   not photographs -- well, photographs that Your Honor has seen

2   involving the Mufti of Jerusalem during World War II and the

3   graphic of the Worldwide Association of Islamists and Nazis.

4   There's a picture of Otto Skorzeny, who is on the defendant's

5   prayer list along with Hitler, and Dr. Gartenstein-Ross is

6   going to speak about Skorzeny.

7           There are -- excuse me just a moment.  Let me take a

8   look.

9           MR. SMITH:  Your Honor, if I may just --

10          THE COURT:  No, this is not your issue.

11          MR. KROMBERG:  Your Honor, to the extent that Your

12  Honor wants to follow along, these are the series of exhibits

13  in No. 10, which are the things that were seized during the

14  2016 search.

15          THE COURT:  Look, actually what I don't want to do is

16  hold up a very conscientious jury.  Let's finish with this

17  witness because he's not related to this issue.

18          MR. KROMBERG:  And what I -- I actually do not

19  disagree with what Ms. Moreno said.  It may be appropriate

20  after this witness and the next witness also is talking about a

21  seized item that apparently we don't have a stipulation to, but

22  after that, then it's just predisposition witnesses.

23          THE COURT:  All right.

24          MR. KROMBERG:  And it may be appropriate to let the

25  jury go at that point and then talk about individual exhibits.

1              THE COURT:  Let's get, let's get the jury in.

2              MR. SMITH:  Your Honor, there's one critical point we

3      have to discuss.  Mr. Gibbs just made a representation to the

4      Court about the relevance of the next witness, and it's

5      factually inaccurate.

6              THE COURT:  He has this witness on the stand.  I want

7      to get this witness --

8              MR. SMITH:  Your Honor, this is -- I just need to

9      make an offer of proof.  It's absolutely essential, Your Honor.

10     This is essential.

11             Mr. Gibbs just represented that this next witness

12     would testify on Mr. Young's statements in the August 3, 2016,

13     interview, the arrest day.  Mr. Gibbs represented that this is

14     charged conduct.

15             If Your Honor just reviews the indictment, you'll see

16     that August 3, 2016, is not a date included in any of the

17     charges.  So this is not charged conduct, Your Honor.

18             MR. GIBBS:  Judge, I believe -- well, I don't --

19             MR. SMITH:  We have the indictment right here.

20             THE COURT:  I have the indictment.

21             MR. SMITH:  If Your Honor looks at Count 1, in

22     paragraph 3, it says, "between December 3, 2015, and August 2."

23             MR. GIBBS:  It says, "on or about August 2."

24             THE COURT:  And this is August 3?

25             MR. GIBBS:  Correct, Judge.

Minichello - Direct                                                639

1          THE COURT:  Overruled.  Let's go.

2                    (Jury present.)

3          THE COURT:  All right, everybody set?

4          All right, Mr. Gibbs?

5          MR. GIBBS:  Thank you.

6   Q.    Special Agent Minichello, you testified a moment ago that

7   you were one of the two FBI agents who participated in the

8   interview of the defendant after he was arrested in August of

9   2016, correct?

10  A.    That is correct, yes.

11  Q.    All right.  And if we could play the first clip of the

12  videotape -- well, and the interview was videotaped?

13  A.    Yes, it was.

14  Q.    All right.  If we could play that first clip?  And I

15  believe we have transcripts for that.

16          THE COURT:  All right.  So 5-301-1, that's what this

17  is?

18          MR. GIBBS:  It's 5-301-1, correct, Judge.

19          THE COURT:  All right.  And then 2 and 3 are also in.

20  They're all in.

21          (Government's Exhibit Nos. 5-301-1 thru 5-301-3 were

22  received in evidence.)

23          (Government's Exhibit No. 5-301-1 was played.)

24  BY MR. GIBBS:

25  Q.    All right.  Now, in that first clip, Special Agent

Minichello - Direct                                          640

1   Minichello, when you asked about the person in this picture

2   right here, whose picture did you show the defendant?

3   A.   It was a picture of Mo, the confidential human source we

4   talked about in my earlier testimony.

5   Q.   And when the defendant said at the end of that clip that

6   you-all are going to check phone records, was he right about

7   that?  Did the FBI, in fact, get his phone records?

8   A.   We did.

9   Q.   And was that the pen/trap order that allowed you to obtain

10  his Verizon records that we -- you testified about yesterday in

11  Exhibit 6-202?

12  A.   Correct.  That order as well as others from previous

13  intercepts of his telephone, yes.

14           MR. GIBBS:  All right.  And I'm not going to bring

15  that up, but if we can go to the second clip, which is 5-301-2?

16           (Government's Exhibit No. 5-301-2 was played.)

17  BY MR. GIBBS:

18  Q.   Now, Special Agent Minichello, at the end of that clip,

19  when the defendant said he never hung out at Mo's house and Mo

20  never hung out at his, was he accurate about that?

21  A.   To the best of my knowledge, yes.

22           MR. GIBBS:  And finally, if we could display Exhibit

23  5-301-3?

24           (Government's Exhibit No. 5-301-3 was played.)

25           MR. GIBBS:  All right.  And finally, Special Agent

1    Minichello -- can we pull up Exhibit 6-201 and go to the second

2    page?

3            THE COURT:  Is that already in?

4            MR. GIBBS:  It is already in, Judge.

5            THE COURT:  All right.

6            MR. GIBBS:  Can you blow up the message on the second

7    page?

8    Q.   All right, Special Agent Minichello, at the end of the

9    clip that we just played, the defendant said at the end, "I

10   thought he would be back, but he didn't come back."

11           Do you recall that?

12   A.   I do, yes.

13   Q.   And in an earlier clip, he talked about how you-all,

14   meaning the FBI, are going to check phone records.  Do you

15   recall that?

16   A.   I do, yes.

17   Q.   All right.  Now, the exhibit on the screen now, this is an

18   exhibit you testified about yesterday.  This is a text message

19   from the defendant's phone to Mo's phone in November of 2014.

20   Do you recall that?

21   A.   I do, yes.

22   Q.   Okay.  And how does the message that he sent to Mo's phone

23   back in November of 2014 compare with what he told you and

24   Special Agent Jones about how you were going to check phone

25   records and he thought he would be back?

1   A.   The two correlate in the sense that we did send -- we did

2   intercept a message from the defendant to Mo, and it was

3   retained in the telephone records.

4           MR. GIBBS:  Okay.  Thank you.  That's all I have,

5   Judge.

6           THE COURT:  All right.  Mr. Smith, any cross?

7           MR. SMITH:  Yes.

8                         CROSS-EXAMINATION

9   BY MR. SMITH:

10  Q.   Good afternoon, Agent Minichello

11  A.   Good afternoon, sir.

12  Q.   This interview was conducted on August 3, 2016, in the

13  clip we just viewed, correct?

14  A.   As I recall, yes, sir.

15  Q.   This was after Mr. Young was arrested?

16  A.   That's correct.

17  Q.   Okay.  At all times during this interview, there was no

18  FBI investigation into the informant, Mo, correct?  At the time

19  of this interview, there was no FBI investigation into your own

20  informant, Mo, correct?

21  A.   Mo was a not a target in the FBI investigation at that

22  time, no.

23  Q.   Has he ever been the target of an FBI investigation?

24  A.   Not by me nor to my knowledge.

25  Q.   Not to your knowledge.

1          There's never been at any point a grand jury

2    investigation into this informant, Mo, has there?

3    A.   I'm unaware of one.

4    Q.   You asked Nicholas Young in the interview:  Where did Mo

5    go, right?  You said:  Do you have any knowledge of where he

6    went?  I'm paraphrasing now.

7    A.   Let me find the clip here real click.  Which line are you

8    referring to of the transcript?

9    Q.   I'm sorry, I'm paraphrasing.

10   A.   Okay.

11   Q.   You said something to the effect of do you know where Mo

12   went?  Do you know why he's no longer in the Northern Virginia

13   area?

14   A.   I don't think we exactly said that, but --

15   Q.   Well --

16   A.   I'm not trying to parse words.  I just want --

17   Q.   Do you recall inquiring of the defendant on August 3,

18   2016, where -- whether he knew where Mo went?

19   A.   Generally, yes.  Absolutely.

20   Q.   Yes.  And what was Mr. Young's response, do you recall?

21   A.   I believe he said, "I don't know," but it's recorded here.

22   Q.   Or couldn't say?  He said, "I couldn't say"?

23          Was that false?

24   A.   Yes.

25   Q.   Why?

```
1    A.    Why was it false?

2    Q.    Yeah.

3    A.    I think based on the defendant's knowledge and previous

4    conversations with Mo, he had a very good idea of where he was

5    and that he was able to say that.  So saying that he couldn't

6    say that wasn't accurate.

7    Q.    Did the informant actually travel to Syria?

8    A.    No.

9    Q.    So if Mr. Young had said the informant had actually

10   traveled to Syria, that would be false, correct?

11   A.    No.

12   Q.    Why?

13   A.    Mr. Young could easily have said the informant --

14   Q.    I'm not asking you what Mr. Young could have said.  I'm

15   asking you whether it would have been false.

16          MR. GIBBS:  Objection, Judge.  The witness should be

17   allowed to answer the question.

18          THE COURT:  No, overruled.

19   BY MR. SMITH:

20   Q.    I'm asking you whether it would have been false if

21   Mr. Young had said he had gone to Syria.

22   A.    It would have been inaccurate, but it would not have been

23   out of line with --

24   Q.    It would have been inaccurate, correct?

25          THE COURT:  Wait.
```

1          THE WITNESS:  It would have been inaccurate at the

2    time, but to what the defendant would have suspected or

3    believed based on his foreknowledge where Mo was, he wouldn't

4    have been telling the truth at that point if he said he went to

5    Syria.

6    BY MR. SMITH:

7    Q.   So I'm not asking about what Nick knew.  I'm asking

8    whether it would have been as a matter of fact objectively true

9    or false for Mr. Young to say Mo had traveled to Syria.

10          MR. GIBBS:  Judge, I'd object on relevance grounds at

11   this point.

12          THE COURT:  Overruled.

13   BY MR. SMITH:

14   Q.   Would -- if Mr. Young had told you Mo had gone to Syria,

15   he told you that in the interview on the arrest day of

16   August 3, 2016, would that have been true or false?

17   A.   It would have been factually inaccurate; that is correct.

18   Q.   Thanks.  At all times during the interview on August 3,

19   2016, you knew where Mo had allegedly gone, right?

20   A.   Yes.

21   Q.   So you knew the answer to your own question you asked

22   Mr. Young on August 3, 2016, before you asked it, correct?

23   A.   Which question in particular, if you could read?

24   Q.   Did you know where Mo went in October of 2014?  We just

25   discussed how you said --

1  A.   Yes, absolutely.

2  Q.   So before you asked the question, you knew the answer,

3  right?

4  A.   Yes.

5  Q.   I think you also asked a question about whether you had --

6  how many communications have you had with Mr. -- with the

7  informant, Mo, since he left in October of 2014?  You asked

8  Nicholas that on August 3, 2016, correct?

9  A.   To the best of my knowledge, yes.  I believe we had a good

10  grasp of those communications.

11  Q.   You already knew the answer to exactly how many

12  communications he had had, correct?

13  A.   That's what I said.

14  Q.   You also asked him how many times had he met the

15  informant, Mo, right, on August 3, 2016?

16  A.   Something to that effect.  Would you like me to read the

17  exact line or --

18  Q.   No.

19  A.   Okay.

20  Q.   You already knew the answer, right?

21  A.   Yes.

22  Q.   Did you ask Mr. Young in this interview any questions that

23  you did not already have the answers to?

24  A.   I can look back.  I can't recall.  Would you like me to

25  review?

1    Q.   Okay.  Concerning Mo.

2    A.   Yes.  There are questions in there that relate to the

3    defendant's intentions, which I couldn't say though I could

4    speculate to.

5    Q.   I didn't ask you whether any of your questions concerning

6    Mo are questions for which you were seeking factual information

7    that could have corrected your understanding of what Mo had

8    done or said.

9    A.   Okay.  So could you restate your question?

10   Q.   I'm asking you whether there were any questions you asked

11   the defendant, Nicholas Young, on August 3, 2016, that would

12   have corrected your understanding of what the informant, Mo,

13   had done or said in the past.

14   A.   No.

15          MR. SMITH:  Thanks.  That's all I have.

16          THE COURT:  Any redirect?

17          MR. GIBBS:  No, Judge.  Thank you.

18          Thank you, sir.

19          THE COURT:  I'm assuming this agent now can step

20   down?  There's no one who's going to call him for a third time?

21          MR. GIBBS:  We have no intention of calling him for a

22   third time, Judge, thank you.

23          THE COURT:  How about the defense?  Do you plan to

24   call this witness again?

25          MR. SMITH:  No, not now, Your Honor.

1            THE COURT:  Well --

2            MR. SMITH:  We have no intention of calling this

3   witness again.

4            THE COURT:  All right.  Then, Agent, you may step

5   down.  You're now excused as a witness.  You can stay in court

6   and watch the proceedings or leave, but do not discuss your

7   testimony or anything you hear in court with any witness who

8   has not yet testified.  Thank you.

9            THE WITNESS:  Thank you, Your Honor.

10                      (Witness excused.)

11           THE COURT:  All right, your next witness?

12           MR. TURGEON:  The government calls Paul Lee to the

13  stand.

14           THE COURT:  Yeah, I'll ask the jury to turn in the

15  transcripts, please, so that you're not bothered by them.

16            PAUL LEE, GOVERNMENT'S WITNESS, AFFIRMED

17                      DIRECT EXAMINATION

18  BY MR. TURGEON:

19  Q.   Could you please state your name and spell it for the

20  record.

21  A.   Yeah.  My name is Paul Lee.  It's spelled P-a-u-l L-e-e.

22  Q.   How are you employed?

23  A.   I am a computer forensic examiner for the FBI.

24  Q.   How long have you been a computer forensic examiner?

25  A.   I've been doing computer forensic examining for over 12

1    years.  I've been employed with the FBI for 18 years.

2    Q.   Sir, could you please tell the jury what a computer

3    forensic examiner does?

4    A.   Basically, we recover data from evidence, digital

5    evidence, to include computer hard drives, servers, magnetic

6    medias, optical medias like CDs, electronic medias like thumb

7    drives, and also electronic devices like cell phones and

8    tablets.

9    Q.   What experience do you have in computer forensic

10   examinations?

11   A.   I've conducted basically data recovery for digital

12   evidence in, both in the Windows forensics, in Linux forensics,

13   in mobile devices.

14   Q.   Approximately how many computer forensic examinations have

15   you conducted in your career?

16   A.   I've done over, well over 600, and involving 1,500

17   devices, pieces of evidence.

18   Q.   And what sort of training do you have in computer forensic

19   examinations?

20   A.   I have --

21             THE COURT:  Is there any, any debate about the

22   qualification of this witness?

23             MR. SMITH:  No, Your Honor.

24             MS. MORENO:  No, Your Honor.

25             THE COURT:  Are you having him designated as an

Lee - Direct                                                              650

1    expert?

2              MR. TURGEON:  Yes, Your Honor.  The government moves

3    to certify the witness as an expert in computer forensic

4    examinations.

5              MS. MORENO:  No objection.

6              THE COURT:  All right, he's so qualified.  Let's move

7    this along.

8    BY MR. TURGEON:

9    Q.   Mr. Lee, what is the role of a search warrant in the

10   computer forensic process?

11   A.   Basically, a search warrant for -- from a computer

12   forensic standpoint, it allows me to give me the legal

13   authority to proceed with the examination.

14   Q.   And when in the process do you review the search warrant?

15   A.   I review it just before I conduct any examination, and I

16   have to confirm the search warrant.

17   Q.   Okay.  Let's talk about hard drives.  What's the first

18   step in conducting a computer forensic examination of a hard

19   drive?

20   A.   The key element is to preserve the evidence.  You do that

21   by obtaining an image of the hard drive, and then you work off

22   the image.

23   Q.   Could you please explain how that image is obtained?

24   A.   Basically, you, you can take the hard drive, remove it

25   from the computer.  You connect it to a computer, and you use a

1  software that is tested and approved by FBI Headquarters, and

2  that software basically does a bit-by-bit copy of the content

3  of the hard drive, of the evidence, and creates it in a file,

4  which we call an image, a forensic image.

5  Q.   What role does write-block play in preserving that

6  evidence?

7  A.   Write-block prevents data from writing into the original

8  evidence, but it allows the software or the hardware to see the

9  data within the evidence.  So it's a one-way data flow.

10 Q.   And then after you've made a copy, how do you determine --

11 after you've made an image, rather, how do you determine

12 whether that image is the same as the original?

13 A.   We use a -- by way of using a hash, it's called the MD5

14 hash, and what happens is that when we conduct the image of a

15 hard drive, we calculate the hash as we create the hard drive.

16 So the hash represents the original data, and then we calculate

17 it again on the copy image, and they should compare the same.

18 They pretty much represent like a fingerprint.

19 Q.   And so what happens to that MD5 hash value if there's one

20 change made to the imaged copy, like one period or one dot

21 added or subtracted?

22 A.   That hash would be dramatically different.

23 Q.   Sir, after you make an image of a seized hard drive, what

24 do you do with the original hard drive?

25 A.   The original hard dive is reassembled at a computer and

1    returned to Evidence Control, and I document it in the chain of

2    custody.

3    Q.    And then how do you proceed with the examination of the

4    image that you made?

5    A.    Basically, I take the image and run it against an approved

6    tool that we have to recover the data and sort it to a point

7    where I can present it to the investigator for review.

8    Q.    And after that recovery and analysis, what steps are taken

9    in the post-examination verification process?

10   A.    I take that image that I did the processing on, the data

11   recovery, and I run that hash again on that image, and it

12   should compare to the original.

13   Q.    And after that verification, what do you do with any files

14   or other evidence that you found?

15   A.    The files and the data that are recovered from, from the

16   analysis is posted for the case agents and the investigators

17   for review.

18   Q.    And were the steps you just described followed in this

19   case?

20   A.    Yes, sir.

21   Q.    So let me ask you about cell phones now.  What processes

22   are available for conducting a computer forensic examination of

23   a cell phone?

24   A.    A cell phone is a little different than computer hard

25   drive in the sense that cell phone, you're conducting the, not

1   just the memory chip but also the device, and typically, it is

2   conducted live.

3   Q.   Are there any other types of examinations that you can

4   conduct?

5   A.   Yeah.  There's, there's essentially two categories.  You

6   can do a logical extraction or a physical extraction, and

7   there's something in between as well but --

8   Q.   And how do you determine whether to conduct a logical or a

9   physical extraction?

10  A.   That is purely dependent on the make and model of the

11  phone; the condition of the phone, for example, if the phone

12  was soaked in water, it can drive how you have to extract that

13  data; and also dependent on the software version and also the

14  security that's applied to that phone, whether it's PIN lock or

15  gesture lock or so forth.

16  Q.   So could you please describe the process for conducting a

17  logical extraction, briefly?

18  A.   Yeah.  Basically, in a logical extraction, it's like

19  taking data from a live device because unlike a computer and a

20  hard drive, where a hard drive is just four screws and a couple

21  of connectors, you can pull it out, in a phone, the memory chip

22  is soldered into the circuit board, and you're not going to be

23  able to pull that, so you're going to have to conduct that exam

24  with the phone on and operating, and that would be typical of

25  logical examinations, and sometimes you do that with a physical

1    examination as well, with that technique, using certain tools.

2    Q.   So other than what you just mentioned, could you please

3    describe the process for conducting a physical examination of a

4    cell phone?

5    A.   Okay.  A physical examination, again, it could be done

6    live and also could be done as, basically turned off, where the

7    phone is not operating, but you're still live because you're

8    adding power to the phone, and you're extracting the data

9    directly from the circuit board.

10   Q.   So after you extract data from a cell phone using either

11   method, what is done with the original phone?

12   A.   The original phone is returned to evidence control.  If --

13   unless there's additional analysis that needs -- that's

14   required after a physical extraction.

15   Q.   How do you examine any data that you've extracted through

16   either means?

17   A.   The data extracted is processed and sorted just like

18   similar to an image, and it's presented to a form where it can

19   be easily reviewed by the investigators.

20   Q.   And then what do you do with any files or evidence that

21   you, that you found?

22   A.   I post that -- I archive that on a read-only DVD or CD or

23   optimal media, and I present that to the case squad, and I put

24   a similar copy up at the server so they can see it -- so

25   multiple people can see it at the same time.

1    Q.    And were those steps followed with regard to the cell

2    phone extractions you did in this case?

3    A.    Yes, sir.

4    Q.    When did you first become involved in this case?

5    A.    If I can look at my notes here?

6          I was assigned to this case on August 17, 2016.

7    Q.    What was your first assignment?

8    A.    My first assignment was to analyze four items, one being a

9    Toshiba laptop, one being a ZTE phone, and another item being a

10   Verizon flip phone, and then one more item, which is the Amazon

11   tablet.

12   Q.    Okay.  With the help of the court security officer, I'm

13   going to show you what's been marked as Government Exhibit

14   3-200.  I believe it's a physical phone already in evidence, I

15   believe.

16          MR. SMITH:  No objection.

17          THE COURT:  All right, it's in.

18   BY MR. TURGEON:

19   Q.    What is that, Mr. Lee?

20   A.    That is the ZTE phone that I analyzed.

21   Q.    So you've seen it before?

22   A.    It's a smartphone, yeah.

23   Q.    How can you identify it as such?

24   A.    The unique -- I notice in my photograph I have here in my

25   notes the uniqueness of the tape, the translucent tape that was

1    on there as found when I pulled it out of evidence.

2    Q.    And where on the phone is that tape?

3    A.    That is right over the camera, on the front, front camera.

4    Q.    Is that exhibit in substantially the same condition today

5    as when you finished conducting your examination of it?

6    A.    Yes.

7              MR. TURGEON:  Your Honor, at this time, the

8    government would like to read Stipulation No. 42 into evidence.

9              THE COURT:  All right.

10             MR. TURGEON:  It states:  The United States and the

11   defendant hereby stipulate and agree that Government Exhibit

12   3-200 is the cellular telephone depicted in Government Exhibit

13   3-103.

14             And can we pull up 3-103, please?

15             THE COURT:  Well, we've seen that already.  It's

16   already in evidence.

17             MR. TURGEON:  That is in evidence, Your Honor, yes.

18             THE COURT:  All right.

19   BY MR. TURGEON:

20   Q.    Mr. Lee, before beginning your examination of the phone,

21   did you review any search warrants?

22   A.    Yes, I did.

23   Q.    And based on that review, what, if anything, did you

24   determine?

25   A.    The search warrant allowed me the legal authority to

Lee - Direct                                                              657

1   proceed with my examination.

2   Q.   Mr. Lee, with regard to the tape on the camera that you

3   mentioned, was that tape already on the camera, or did you put

4   any additional or other tape on there?

5   A.   No, I did not put tape on it.  I typically do, but that

6   tape was already in place.

7   Q.   Okay.  Mr. Lee, what is an international mobile equipment

8   identity, IMEI number?

9   A.   The IMEI is an equipment, it's a hardware identifier that

10  basically -- it's a number that, that allows you to use the

11  network.  It's what the network uses to identify your equipment

12  in the tower, so if you're with AT&T, and they would look for

13  that IMEI and say, yeah, that is your equipment.

14  Q.   And is that a number that's unique to a phone?

15  A.   That's absolutely yes.

16  Q.   Were you able to determine the IMEI number of this phone?

17  A.   Yes, I did.

18  Q.   How did you do that?

19  A.   That was etched in the back of the -- if you open the back

20  on the battery, that's etched right there on the label.

21  Q.   And what was that IMEI number?

22  A.   That's a 15-digit number.  I'll have to look at my -- that

23  IMEI number is 869578020680874.

24  Q.   Mr. Lee, you're looking at notes right now?

25  A.   Yes.

1    Q.   Are those notes that you made when that information was

2    fresh in your mind?

3    A.   Yes.

4    Q.   From the examination?

5    A.   Yeah.  There's actually photographs, too, of the photos I

6    took.

7    Q.   I'm going to ask with the help of the court security

8    officer to show you what's been marked as Government Exhibit

9    4-109, which is, I believe, already in evidence, and that's

10   cell phone packaging found in the defendant's backpack.

11              THE COURT:  It's already in.

12              MR. TURGEON:  Excuse me, Your Honor?

13              THE COURT:  That exhibit is in.

14              MR. TURGEON:  Yes.  I'd like to have it presented to

15   the witness so he can testify about it.

16              THE COURT:  All right.

17              MR. TURGEON:  4-109, please.

18   Q.   Mr. Lee, is there an IMEI number listed on that packaging?

19   A.   Yes, it is.

20   Q.   And how does that number on the packaging compare to the

21   IMEI number that you found etched into the battery chamber of

22   that phone?

23   A.   That number is identical.

24   Q.   Okay.  Mr. Lee, what is the SIM card?

25   A.   A SIM card is a subscriber identity module, SIM, and what

Lee - Direct                                                          659

1    that is, it's a small plastic card that the inserted into the

2    phone, and that card is provided by your service provider,

3    like, say, Verizon or AT&T, and in that card contains the

4    necessary subscriber numbers to handshake with the network when

5    you use that service.

6              If you use a phone without the SIM card, you don't --

7    you're not going to be able to make calls or receive texts.

8    Q.   And by what sort of serial number, if any, is the SIM card

9    identifiable?

10   A.   The SIM card is identified with a, with a number they call

11   ICCID.  It stands for integrated circuit card identifier.

12   Q.   And is that a number that's unique to a SIM card?

13   A.   That's correct.

14   Q.   And did Government Exhibit 3-200 have a SIM card?

15   A.   The phone, yes, it did.

16   Q.   And were you able to determine that SIM card ICCID number?

17   A.   Yes.

18   Q.   How did you do that?

19   A.   It's two ways.  First of all, it's printed on the outside

20   of the card, so -- in clear view, and then also when you do the

21   extraction of the data, that data also shows the identical

22   number.  I usually match them both, make sure that there was

23   not a mistake in printing.

24   Q.   And did you match them both in this case?

25   A.   Yeah -- yes.

1  Q.   What was the ICCID number?

2  A.   The ICCID number for that card is a 20-digit number.

3  Sometime they're 21, sometime they're 20.  This is

4  89014103278807244994.

5  Q.   Could you please look at the cell phone packaging again,

6  Government Exhibit 4-109?

7  A.   Okay.

8  Q.   And how does the ICC- -- excuse me, do you see an ICCID

9  number on that packaging?

10 A.   Yes, I do.

11 Q.   And how does that ICCID number compare to the SIM card

12 that you were just testifying about from the cell phone?

13 A.   This number is the same.

14 Q.   Okay.  What analysis, if any, did you perform on the SIM

15 card?

16 A.   I do a logical extraction of the data to reveal the

17 numbers that are stored in that SIM card.

18 Q.   Were you able to determine that phone's telephone number?

19 A.   Yes.  That's stored in the SIM card as well.

20 Q.   What was that telephone number?

21 A.   That telephone number is 703-338-2313.

22 Q.   What type of analysis -- or extraction, rather, did you

23 conduct on that cell phone's handset?

24 A.   Initially, I tried to turn it on to see the condition, and

25 it was pattern locked, so not knowing the pattern, I wasn't

1   going to be able to get into it.  The tools that I use weren't

2   able to bypass that law.

3            So what I had to do was basically, and I'm certified

4   to do so, it's using advanced extraction, which is

5   disassembling the phone, installing the wires to the circuit

6   board, and communicate directly to the memory and download the

7   entire memory.  And it's 8-gigabyte size, or roughly 8

8   gigabytes.

9            THE COURT:  Eight gigabytes?

10           THE WITNESS:  Eight gigabytes.  Yeah, that phone is

11  8-gigabyte, but when you download the memory, it's slightly

12  smaller than that.

13           MR. TURGEON:  Your Honor, for the jury's reference,

14  I'd like to publish Exhibit 4-109, which is the cell phone

15  packaging.

16           THE COURT:  Any objection?

17           MR. SMITH:  No objection.

18           THE COURT:  All right, it's in.

19  BY MR. TURGEON:

20  Q.   Mr. Lee, is this the packaging you were just discussing?

21  A.   Yes.  Yes, sir.

22  Q.   So what were the results of the process you just

23  described?

24  A.   Basically, I was able to acquire a, a copy of the memory

25  data from the cell phone without having to remove the chip and

1    all, just basically just tapped into the circuit board and read

2    it, and then I was able to process that, that data.

3    Q.   And processing that data, what sort of information did you

4    recover?

5    A.   Media files, e-mails, and call logs, contacts, those kind

6    of things, and also apps that were, that were installed as a

7    third party.

8    Q.   Were you able to determine that phone's Google account

9    number?

10   A.   Yes.

11   Q.   Excuse me, Google account name?

12   A.   Yes, name and e-mail.

13   Q.   What Google account was registered to the phone?

14   A.   That Google account was in argeltal777@gmail.com.  I think

15   it's -- I think it's pronounced "argeltal777," I guess.

16   Q.   And what apps, if any, did you determine were installed on

17   that phone?

18   A.   There were not many third-party apps.  There was one that

19   was prominent.  It was Threema.

20        MR. TURGEON:  Okay.  I have here a signed stipulation

21   which is labeled Government Exhibit 12-34 which I'd like to

22   move into evidence and read to the jury.

23        THE COURT:  Go ahead.

24        (Government's Exhibit No. 12-34 was received in

25   evidence.)

Lee - Direct                                                           663

1            MR. TURGEON:  The United States and the defendant

2       hereby stipulate and agree that Government Exhibits 1-700

3       through 1-702 are authentic business records of Google, Inc.

4            THE COURT:  All right.  You're moving those exhibits

5       in now, 700, 701, and 702?

6            MR. TURGEON:  Just 701 and 702, Your Honor.

7            THE COURT:  All right, 1-701 and 702 are in.  Any

8       objection?

9            MR. SMITH:  No objection.

10           MS. MORENO:  No objection.

11           THE COURT:  All right.

12           (Government's Exhibit Nos. 1-701 and 1-702 were

13      received in evidence.)

14           MR. TURGEON:  At this time, Your Honor, I'd like to

15      publish Government Exhibit 4-102.

16           THE COURT:  That's already in, I believe.

17           MR. TURGEON:  That's already in evidence, Your Honor.

18           THE COURT:  All right, go ahead.

19           MR. TURGEON:  That's a scrap of paper seized from the

20      defendant's truck.

21           THE COURT:  Yes.

22           MR. TURGEON:  Actually, Your Honor, there's a

23      correction.  That was seized from the defendant's person at the

24      time of his arrest.

25      Q.   Mr. Lee, could you look at that exhibit, 4-102, on the

Lee - Direct                                                              664

1   screen?

2   A.   Yes.

3   Q.   Do you see on that screen anything that, that resembles

4   the Google account associated with that cell phone?

5   A.   Yeah.  It's the, it's the argeltal777@.  That's the part

6   that I, that I see there.

7              MR. TURGEON:  Okay.  I'd like to publish to the jury

8   and show to Mr. Lee Government Exhibit 1-701.

9              THE COURT:  All right.

10  BY MR. TURGEON:

11  Q.   Mr. Lee, what is this?  I believe it's on your screen,

12  Government Exhibit 1-701.

13  A.   This appears to be a Google return on a, maybe a

14  subpoenaed data of the Google account information that was

15  returned to the government, a typical return that I've come

16  across.

17             THE COURT:  I'm sorry, you were trailing off,

18  Mr. Lee.  You have to speak up.

19             THE WITNESS:  Oh, I'm sorry.  My apologies.  This

20  appears to be a Google return, data return from a request of

21  subscriber information.

22  BY MR. TURGEON:

23  Q.   Okay.  What e-mail address is associated with that

24  subscriber information?

25  A.   The e-mail address that's being returned, the data for

1   that e-mail address is argeltal777@gmail.com.

2   Q.   On what date was that Google account created, according to

3   the subscriber info?

4   A.   According to this document, the Google account was created

5   on July 12, 2016.

6   Q.   Okay.  I'd like to show you what's been marked as

7   Government Exhibit 1-702.  And what is this, Mr. Lee?

8   A.   That is a typical Google Play receipt.  When you purchase

9   an app online using the device, you would get that e-mail

10  return confirming that you purchased the app.

11  Q.   And from what e-mail address was that purchase of Threema

12  made?

13  A.   Yeah, that e-mail address on here is also argeltal,

14  argeltal777@gmail.com.

15  Q.   And according to that exhibit, on what date was that

16  purchased?

17  A.   That date on that exhibit shows July 12, 2016.

18          MR. TURGEON:  Your Honor, I have here another

19  stipulation labeled Government Exhibit 12-36, which I'd like to

20  move into evidence and read to the jury.

21          THE COURT:  Go ahead.

22          (Government's Exhibit No. 12-36 was received in

23  evidence.)

24          MR. TURGEON:  That stipulation reads:  The United

25  States and the defendant hereby stipulate and agree that the

Lee - Direct                                                          666

1    Threema encrypted messaging application was installed on the

2    cellular telephone marked as Government Exhibit 3-200 and was

3    registered to e-mail address argeltal777@gmail.com.

4              THE COURT:  All right.

5    BY MR. TURGEON:

6    Q.   Mr. Lee, after you finished work with that seized cellular

7    telephone, what did you do with the phone?

8    A.   I processed the data first because we still have a phone

9    that's locked, so I processed the data, and during the process,

10   it recovered the pattern, the lock pattern.  So now I have the

11   lock pattern of 1478 basically, and I tried that on the phone,

12   and I reassemble the phone, bring it back up, and that unlocked

13   the phone.

14   Q.   It turned it on?

15   A.   Yep.  It turned on, and it unlocked the phone using the

16   pattern.

17   Q.   And did you examine the contents of the phone?

18   A.   Yeah.  I had to look at the content because in the

19   request, they were looking for a certain app, so I was looking

20   for that app, and it was there.

21   Q.   And could I show you what's been marked as Government

22   Exhibit 3-202?  It's already in evidence.

23             Mr. Lee, do you recognize that photograph?

24   A.   Yes, I do.  I took it.

25   Q.   And what does that photograph depict?

1    A.   That photograph is a picture of the account, Threema

2    account as it appears on the phone.

3    Q.   And can I just -- can I pull up 3-203, please?

4            And did you take that photo as well?

5    A.   Yes, I did.

6    Q.   And 3-204?  And you took that as well?

7    A.   Yes, I did.

8    Q.   Okay.  And did you take several other photographs of

9    the messaging app?

10   A.   Yeah, I took a series of photographs on the contents of

11   that app.

12   Q.   Sir, after you finished examining the phone, what did you

13   do with it?

14   A.   I returned the phone to the evidence control and

15   documented it on chain of custody.

16   Q.   All right.  With the help of the court security officer,

17   I'd like to show you what's been marked as Government Exhibit

18   4-200.  That should be another cell phone.

19           Mr. Lee, have you seen that phone before?

20   A.   Yes, I have.

21   Q.   How can you identify it?

22   A.   There, there is a unique green tint around the screws on

23   this Verizon phone.  By the brand name, also.

24   Q.   And is that exhibit substantially in the same condition

25   today as when you first examined it?

Lee - Direct                                                          668

1   A.   Yes, it is.

2            MR. TURGEON:  The government moves to admit Exhibit

3   4-200 into evidence, Your Honor.

4            THE COURT:  Any objection?

5            MS. MORENO:  No objection.

6            THE COURT:  It's in.

7   BY MR. TURGEON:

8   Q.   Mr. Lee, before beginning your examination of that phone,

9   did you review any search warrants?

10  A.   Yes, I did.

11  Q.   And based on that review, what, if anything, did you

12  determine?

13  A.   The search warrant on the backpack where this phone was

14  seized basically allowed me to proceed with the forensic

15  examination.  It gives me the legal authority.

16  Q.   And what type of analysis, if any, did you perform on that

17  phone?

18  A.   This phone, because of the make and model, the only

19  analysis I could do was a logical extraction.

20  Q.   And through your examination of that phone, were you able

21  to determine the phone's telephone number?

22  A.   Yes, I did.

23  Q.   What was that?

24  A.   That telephone number is, my refreshed notes here, is

25  571-236-8195.

1   Q.   And what, if anything, did you find in your analysis of

2   that phone?

3   A.   In the, in the analysis using extraction with two

4   different tools, I've got the contacts, call lots, SMS, MMS,

5   and also a bunch of media files.

6   Q.   Okay.  And, Mr. Lee, I'm going to direct your attention in

7   that -- I believe in the folder right there should be something

8   marked Government Exhibit 4-203.

9           MR. SMITH:  Objection, Your Honor.  Objection.

10           THE COURT:  Wait a minute.  Whose witness is this?

11           MS. MORENO:  It's my witness.

12           THE COURT:  All right.

13           MS. MORENO:  And I'm sorry.

14           THE COURT:  Are you objecting?

15           MS. MORENO:  Yes, Your Honor.

16           THE COURT:  All right.  Is this related to what we

17   had a discussion of?

18           MS. MORENO:  Yes.

19           THE COURT:  Do I have a copy of 203 in my book?

20           MR. TURGEON:  Yes, you do, Your Honor, 4-203.

21           THE COURT:  Let me take a look at it.

22           MS. MORENO:  May we approach, Your Honor?

23           THE COURT:  Let me take a look at it first.

24           This was actually referenced in the opening

25   statement.

1              MR. TURGEON:  That is true, Your Honor, yes.

2              THE COURT:  Approach the bench, but we're going to

3       move this.

4              (Bench conference on the record.)

5              THE COURT:  Mr. Kromberg in his opening statement

6       mentioned this, the smokestack.  This is --

7              MS. MORENO:  Judge, with respect, so the opening

8       statements, I mentioned this in my opening statement, that it

9       may not be properly before the jury at the end of the case.

10      Opening statement isn't evidence.  This is not properly the

11      subject matter testimony of the CART expert.  This is just

12      another way to get this stuff in.

13             Your Honor, there are 42 separate exhibits in this

14      white supremacy-Nazi category.  I strongly object.  It's

15      irrelevant, and it's highly prejudicial.

16             THE COURT:  Well, it's not going to make sense right

17      now until Gartenstein testifies, which is tomorrow.

18             MR. KROMBERG:  In fact, Judge, the next witness, if

19      we get to it, is going to be Ian Campbell, who I had originally

20      told you last week was going to be the first witness, but he

21      couldn't be the first witness.

22             THE COURT:  He's the one who --

23             MR. KROMBERG:  He's the one who's going to say that

24      Mr. Young said, "Don't discount the idea of an alliance with

25      the Muslims to combat the Jews."  So we're going to get into

1   this with the next witness, but we, we have to admit this

2   evidence because the defense, although they have stipulated to

3   many things, and we're very grateful for that, they did not

4   stipulate that this was an authentic document found on that

5   phone.

6           THE COURT:  Well, if they have stipulated that all of

7   these exhibits were found on one of the devices of the

8   defendant --

9           MR. TURGEON:  They did not stipulate to that fact,

10  Your Honor.

11          MS. MORENO:  No, we didn't.

12          THE COURT:  Are you doing it on the record now?

13          MR. SMITH:  Yes, we've stipulated to authenticity.

14  It was a text message to someone sent.  This was sent as a text

15  message to the defendant.  The government knows that.

16          THE COURT:  So all right.  So what I'm hearing on the

17  record is that the defense is not contesting that these

18  exhibits, these problematic exhibits all were retrieved from

19  some device belonging to the defendant.

20          MS. MORENO:  That is correct, Your Honor.

21          THE COURT:  All right.  Then we don't need this

22  witness for any of that, all right?

23          MR. KROMBERG:  Sure.

24          THE COURT:  Whether the exhibits actually come in

25  will depend upon the proper foundation that you lay with the

1    future witnesses who testify, all right?

2             MS. MORENO:  Thank you.

3             MR. TURGEON:  Your Honor, with regard to this

4    particular exhibit, Mr. Lee will testify about the date that it

5    was created, the metadata, as well as what he was able to

6    determine as to how that image made its way onto the phone.

7             MS. MORENO:  It's irrelevant.  We're not contesting

8    that it was found on his device.

9             THE COURT:  No, but I think the government wants

10   something else.  They apparently want how long it's been

11   sitting on the device?

12            MR. TURGEON:  Both how long it has been sitting on

13   the device but we also know that the defense plans to argue

14   that this was sent to Mr. Young in an unsolicited text message,

15   and Mr. Lee is going to testify as to whether or not his

16   examination revealed that to be true.

17            MR. SMITH:  Okay.  Then we don't contest that.  We

18   don't contest it.  We're not going to raise that issue at

19   trial.

20            THE COURT:  Hold on to Lee as a possible rebuttal

21   witness if for some reason there's slippage.

22            MR. TURGEON:  Okay.

23            THE COURT:  Let's move this along, all right?

24            MS. MORENO:  Thank you.

25            (End of bench conference.)

Lee - Direct                                                          673

1          MR. TURGEON:  I'd like to publish Government Exhibit

2   11-220 to the jury, and that's already in evidence.

3          THE COURT:  All right.

4          MR. TURGEON:  11-220, please.  Can we zoom in on

5   that, please?

6   Q.   Mr. Lee, I'm directing your attention to Government

7   Exhibit 11-220.  Does that exhibit reflect the telephone

8   number -- a telephone number?

9   A.   Yeah, there's a telephone number in there.

10  Q.   And is that the same telephone number as the telephone

11  number in Nicholas Young's device that you're currently

12  discussing?

13  A.   That is the same number.

14  Q.   It's the same number.

15          Mr. Lee, after you completed working with that seized

16  telephone number, what did you do with that phone -- excuse me,

17  with that seized cellular telephone, what did you do with the

18  phone?

19  A.   I returned the phone to evidence control and documented it

20  on chain of custody.

21  Q.   Okay.  With the help of the court security officer, I'm

22  going to show you what's been marked as Government Exhibit

23  10-100.  And that's in this box.

24          THE COURT:  It's over here, Mr. van Roekel.

25  BY MR. TURGEON:

1    Q.   Mr. Lee, could you hold that up very briefly?  And could

2    you identify what that is?

3    A.   This is a Toshiba laptop.

4    Q.   Have you seen that laptop before?

5    A.   Yes, I have.

6    Q.   And how can you identify it?

7    A.   I can identify it by looking at the label, make, and model

8    down here as well, and also in this particular laptop, there's

9    a unique dent on the lower left corner, right here.

10   Q.   And have you conducted an examination of that laptop?

11   A.   Yes, I did.

12           MR. TURGEON:  You can bring it down.

13   Q.   Is that laptop in substantially the same condition today

14   as when you examined it?

15   A.   Yes, it is.

16           MR. TURGEON:  Your Honor, the government moves to

17   admit Exhibit 10-100 into evidence.

18           THE COURT:  Any objection?

19           MS. MORENO:  No objection.

20           THE COURT:  All right, it's in.

21           (Government's Exhibit No. 10-100 was received in

22   evidence.)

23   BY MR. TURGEON:

24   Q.   And, Mr. Lee, did you review a search warrant before

25   examining that laptop?

1    A.    Yes, I did.

2    Q.    And what did you determine from that?

3    A.    The search warrant for the house in which the laptop was

4    seized gives me the legal authority to proceed with the

5    examination.

6    Q.    What steps did you take to preserve the evidence on that

7    laptop?

8    A.    I initially removed the hard drives from the laptop

9    without turning on the laptop and then produced an image of

10   that hard drive.

11   Q.    Okay.

12   A.    And then in the process, creating the MD5 hash as well.

13   Q.    And were you able to obtain an image from that hard drive?

14   A.    Yes, I have.

15   Q.    And how did you know that image was identical to the

16   original?

17   A.    I then run the MD5 hash calculation again on the copy

18   image and compare it to the original MD5 hash, and they match

19   identical.

20   Q.    So after making that image and comparing the hash values,

21   what did you do with the original laptop?

22   A.    The original laptop was reassembled and returned to

23   evidence control.

24   Q.    And then what, if anything, did you do with the copy that

25   you had made of the image?

1  A.   The copy of the -- the image copy was used to conduct the

2  analysis to recover the files, the contents in that hard drive,

3  in the image, and then it's sorted and presented to the case

4  agent, so the reviewers.

5  Q.   And what -- using that software, what, if anything, did

6  you find?

7  A.   Basically, on that -- I've got audio files, photos, things

8  that were on the original requests, focusing on things that

9  contained words like --

10         THE COURT:  Well, wait, we don't need -- we don't

11  need that at this time.

12         MS. MORENO:  Objection.

13         THE WITNESS:  Okay.

14  BY MR. TURGEON:

15  Q.   And after you completed your review of that copy, did you

16  obtain another hash value?

17  A.   Yes, I did.

18  Q.   And what was the result of that?

19  A.   That the hash matches the original.

20  Q.   So what does that mean?

21  A.   That means that, that image was not altered during the

22  entire process of recovery, data recovery.

23  Q.   Okay.  I'm going to direct your attention --

24  A.   And it matches the original.

25  Q.   Directing your attention to what's been marked as

1   Government Exhibit 10-101-A, I believe that should also be in

2   the folder in front of you.  It may be the very last document

3   or the next-to-last document.  10-101A, yes.

4            Do you recognize the information on that document?

5   A.   Yes, I do.

6   Q.   Have you reviewed that document previously?

7   A.   Yes, I have.

8   Q.   And what information, if any, is contained on that

9   document?

10  A.   This is a summary of -- a subset of what's called a

11  Favorites, which is basically bookmarks from the Internet

12  Explorer browser.  So this is a subset of the, the bookmarks

13  that were found on the Internet Explorer browser which is

14  called Favorites.

15  Q.   And does that exhibit fairly and accurately depict

16  bookmarks that you found during your examination of that

17  laptop's hard drive?

18  A.   Yes, it does.

19           MR. TURGEON:  The government moves to admit Exhibit

20  10-101A into evidence, Your Honor.

21           MS. MORENO:  I think there will be an objection to

22  that.

23           THE COURT:  Oh, I think this is relevant.  I'm

24  overruling that objection.  This is in.

25           (Government's Exhibit No. 10-101A was received in

1   evidence.)

2           MR. TURGEON:  And the government moves to publish

3   that to the jury as well.

4           THE COURT:  Go ahead.

5   BY MR. TURGEON:

6   Q.   Mr. Lee, what is the, the fifth bookmark listed on that

7   exhibit?

8   A.   "Watch New ISIS Video Shows Child Soldier Executing

9   'Spies' heavy.com.url."

10  Q.   What's the next one?

11  A.   The next one down is "Islamic State propaganda video

12  features Karl" -- the name is spelled S-t-e-f-a-n-o-v-i-c.  I

13  will not attempt to pronounce that.

14  Q.   And what's the one after that?

15  A.   The one after that is "ISIS Documentary 2015 - Selling

16  Girls - YouTube.url."

17  Q.   And what's the one after that, just briefly?

18  A.   Http-shoebat.com."  It says "watch-video-isis-savages-

19  beheading-twenty-one-copticchristians-saw-martyrs-beheaded-

20  name-jesus-fulfilled-.url."

21  Q.   And then finally, what's the bookmark after that?

22  A.   "Watch New ISIS Mass Execution Video Features French

23  Executioner Heavy.com.url."

24           MR. TURGEON:  The Court's indulgence, Your Honor?

25           THE COURT:  What does "date modified" mean?

1          THE WITNESS:  That was the last time that that date

2    was updated, modified.

3          THE COURT:  What does that really mean?

4          THE WITNESS:  Okay.  So if, if there was an update to

5    that, to that URL, then that URL is modified.

6          THE COURT:  Okay.

7          THE WITNESS:  So unlike created date, created date

8    may stay the same, and later on, if the Web site updates that

9    URL for whatever reasons, it would bump the modified date.

10          THE COURT:  All right.

11          MR. TURGEON:  The government has no further questions

12    for Mr. Lee.

13          THE COURT:  All right.  Ms. Moreno?

14          MR. SMITH:  Your Honor, we have one question.

15          THE COURT:  No, no.  This is not your witness.  Is

16    this your witness or not?

17          MR. SMITH:  There was one cross-examination question.

18    It was a follow-on question to what Your Honor just asked.

19          THE COURT:  This is not your witness, though.  Who's

20    taking responsibility for this witness?

21          MR. SMITH:  Oh, you mean mine personally.

22          THE COURT:  Which attorney has this case -- this

23    witness?  I thought it was yours.

24          MR. TURGEON:  Your Honor, I actually have one more

25    question, one or two more questions for Mr. Lee, if I may.

1           THE COURT:  Go ahead.

2     BY MR. TURGEON:

3     Q.   Mr. Lee, with regard to that exhibit we were just talking

4     about, the date modified, how, if at all, does a date modified

5     change when someone visits a bookmark?

6     A.   Well, the bookmark items, sometimes the bookmark is

7     updated by content, you know, if the page is updated.  If

8     there's a change on the link, they will update that link as

9     well.

10    Q.   So --

11    A.   It's changed by the provider, by the page provider, I

12    believe.

13    Q.   Are you able to say based on this date modified that

14    someone using the computer visited the bookmark on that date?

15    A.   Yeah.  I think, I think the modify would trigger an

16    update.  When you visit that link, it would check the content,

17    maybe the cache content on the hard drive, compare it to the

18    data that is presenting.  If they're the same, they're not

19    going to update it, but if they're different, they're going to

20    update it.

21    Q.   So based on these bookmarks, are you able to tell when the

22    user of a computer visited the Web site listed?

23    A.   I don't think I can conclusively say that, as to when they

24    visited, but, but last update was, was there because if it

25    wasn't -- if the content was the same, you wouldn't have a

1    modified update.  So if you were to visit it later on, the

2    modified date may not change if the data is not, you know, it's

3    the same.

4    Q.   Are you able to say whether someone visited these Web

5    sites on these dates?

6            MR. SMITH:  Objection.  Asked and answered.

7            THE COURT:  All right, what I need to know is which

8    attorney -- I thought, Ms. Moreno, you started out with this

9    witness, didn't you?

10           MS. MORENO:  I am, Your Honor.

11           THE COURT:  Yes.  So the rule is the same attorney

12   stays with the witness, so only you can object.  Do you have an

13   objection?

14           MS. MORENO:  I do.

15           THE COURT:  What's the -- stand up, please.  What is

16   the objection?

17           MS. MORENO:  Asked and answered, Your Honor.  He did

18   ask him that question, and he said he couldn't tell him the

19   answer.

20           THE COURT:  Sustained.

21           MS. MORENO:  And he's gone back to it again.

22           THE COURT:  Sustained.

23   BY MR. TURGEON:

24   Q.   Mr. Lee, what relationship, if any, is there between the

25   date of the bookmark and the use of the computer to visit that

1    page?

2    A.   Usually when you visit a page, it's tracked in the cookies

3    basically.  It's not in the URL.  So that's typically how, how

4    that's worked.  If they drop a cookie on your computer, it will

5    show you, you know, when you visited that day.

6             THE COURT:  Mr. Lee, keep your voice up, please.

7             THE WITNESS:  I'm sorry.  When you, when you visit a

8    site last, they try to track your habits by updating that

9    cookie.  So, so usually it's last visit.  You would find, if

10   you could decipher the cookie, sometimes the codes are not as

11   easily decipherable.

12   BY MR. TURGEON:

13   Q.   Was the date that the page was bookmarked necessarily on

14   or before or after the date modified, or are you not able to

15   tell?

16   A.   Well, this is definitely -- the dates here definitely says

17   a visit had, was performed during those dates.  Whether that

18   was the latest one or not is --

19   Q.   What do you mean, performed during that?

20   A.   Well, you don't -- the bookmarks aren't added

21   automatically.  You have to do it.  It's a manual process.  So

22   if, if I have a page that I like to visit often, I'm going to

23   bookmark that page.  So I will, I will manually, me, not the

24   computer, add that bookmark on that -- on your favorites.

25   Q.   And --

Lee - Cross                                                          683

1   A.   So, so the user will -- this is all manually added by the

2   user.

3   Q.   And for each bookmark, when is that added?

4   A.   The first one is --

5              MS. MORENO:  Objection.  Asked and answered.

6              THE COURT:  No, I think this is slightly different.

7   Overruled.

8              THE WITNESS:  The first one is October 25.

9   BY MR. TURGEON:

10  Q.   So let's talk about the first one.

11  A.   Yeah.

12  Q.   On what date was that book-, was that bookmark added; are

13  you able to tell?

14  A.   It was, it was last updated on October 25, 2015.

15  Q.   And does that mean that someone using the computer visited

16  it on that date or not?

17  A.   Definitely on that date, yeah.

18             MR. TURGEON:  Okay.  Thank you.

19             THE WITNESS:  At some point that date, yeah, but it

20  may not be the latest date that he visited.

21             MR. TURGEON:  Thank you.

22             THE COURT:  All right, cross-examination?

23             MS. MORENO:  Just one or two questions.

24                             CROSS-EXAMINATION

25  BY MS. MORENO:

1    Q.    I'm confused, Mr. Lee.

2              THE COURT:  All right, come up.

3    BY MS. MORENO:

4    Q.    Date modified, I thought you said that it was those dates

5    reflected updates by the URL.  I thought you had said that --

6    A.    Yeah.

7    Q.    -- initially.

8    A.    Yeah.

9    Q.    Well, so do you have any sense of when the user of the

10   computer last visited any of those Web sites?  You can't tell

11   from that sheet.

12   A.    No, not last visited, but the question wasn't did the

13   person visit it that day.  The question was when was the last

14   visit.  Yeah, that would require cookies.

15   Q.    That would require cookies, and that's --

16   A.    If it's the last visited --

17   Q.    Let me just --

18   A.    I'm sorry.

19   Q.    And that's not reflected on this, on this sheet, right?

20   That information, the cookie information is not reflected on

21   this sheet?

22   A.    No, the cookie is not here.

23             MS. MORENO:  Right.  Okay.  Thank you.  Nothing

24   further.

25             THE COURT:  All right, anything further?

1           One question, so you don't have much leeway.

2                      REDIRECT EXAMINATION

3    BY MR. TURGEON:

4    Q.   Mr. Lee, if not the last visit, what date is represented

5    by those bookmark dates?

6    A.   The first bookmark is October 25, 2015.

7    Q.   And what does that mean?

8    A.   That means at that, that time, somebody at least

9    updated the -- modified that bookmark.

10   Q.   Thank you.

11   A.   It's usually going to be the user of that computer that

12   adds that bookmark in there.

13           MR. TURGEON:  Thank you.

14           THE COURT:  Any recross?

15           MS. MORENO:  No, Your Honor.

16           THE COURT:  All right.  Then I believe this witness

17   has completed his testimony, correct?

18           MR. TURGEON:  Yes, Your Honor.

19           THE COURT:  All right.  Thank you, Mr. Lee.

20           Is anyone going to call Mr. Lee again?  No?

21           MS. MORENO:  No, Your Honor.

22           THE COURT:  All right.  Then, sir, you're excused, so

23   you may stay in court now and watch the proceedings, or you may

24   leave, but don't discuss your testimony or anything you see or

25   hear with any witness who has not yet testified.

1            THE WITNESS:  Yes, Your Honor.

2            THE COURT:  Thank you.

3                         (Witness excused.)

4            THE COURT:  All right, your next witness?

5            MR. TURGEON:  Your Honor, I have one exhibit to

6    offer, and it's a self-authenticating exhibit.

7            THE COURT:  All right.

8            MR. TURGEON:  It's marked Government Exhibit 18-100.

9            THE COURT:  Is there any objection to 18-100?

10           MR. SMITH:  Yes, we do object, Your Honor, because

11   the Court has already ruled on this issue.

12           THE COURT:  Wait a minute.  Let me take a look at it.

13           MR. TURGEON:  Your Honor, if I may, the Court did

14   rule on an issue having to do with this; however, the Court's

15   ruling did not -- expressly did not prevent the government from

16   introducing additional evidence on this point.

17           THE COURT:  All right, let me see it.

18           MR. TURGEON:  I have a copy for Your Honor.

19           THE COURT:  All right, hand it up, please.

20           MR. TURGEON:  I'll hand it to the court security

21   officer.  Thank you.

22           Your Honor, there are two documents there.  The first

23   is the government's exhibit.  The second is the original Web

24   page for Your Honor's reference.

25           And with regard to the relevance, Your Honor, I'll

1    point Your Honor to about three-quarters of the way down the

2    second page.

3              THE COURT:  Approach the bench.

4              (Bench conference on the record.)

5              THE COURT:  All right, an element of the government's

6    case is that they have to establish there's an event here,

7    involved here within the proper time period, and we had this

8    issue come up.  This appears to be a document from the

9    Department of State that lists ISIS on their designated

10   counterterrorist organizations effective 2004.

11             If you're going to dispute this issue, we'll put

12   evidence in -- we'll put evidence on.  If you're not disputing

13   it, we don't need all of this.

14             MR. SMITH:  It's in dispute.

15             THE COURT:  I'm sorry?

16             MR. SMITH:  It is in dispute.

17             THE COURT:  All right.

18             MR. SMITH:  I think their expert will, will discuss

19   this, will cover this issue.

20             THE COURT:  Well, then this exhibit goes in then.

21             MR. TURGEON:  Yes.

22             MR. SMITH:  Oh, okay.  We misunderstood.  We thought

23   the government was attempting to relitigate this issue of an

24   instruction.

25             THE COURT:  No, no, no.  What they want to do now is

1    since we have this issue that's come up is they've got to put

2    on evidence of it.  This is a document that they want in.

3              No objection?  All right, it's in.

4              MR. TURGEON:  Thank you, Your Honor.

5              (End of bench conference.)

6              THE COURT:  No, no, that, I think, is the only

7    exhibit we've got.

8              All right, I have officially allowed 18-100 to be

9    admitted into evidence.

10             MR. TURGEON:  Thank you, Your Honor.

11             (Government's Exhibit No. 18-100 was received in

12   evidence.)

13             THE COURT:  All right, your next witness?

14             MR. KROMBERG:  The government calls Ian Campbell.

15             THE COURT:  All right.

16        IAN PAUL CAMPBELL, GOVERNMENT'S WITNESS, AFFIRMED

17                      DIRECT EXAMINATION

18   BY MR. KROMBERG:

19   Q.   Mr. Campbell, please state your full name and spell your

20   last name for the record, and be aware that you need to lean

21   forward a little bit so that your voice gets into the

22   microphone.

23   A.   Ian Paul Campbell, C-a-m-p-b-e-l-l.

24   Q.   I don't know if that's loud enough.

25             THE COURT:  Could you speak louder, sir?

1         THE WITNESS:  Ian Paul Campbell, C-a-m-p-b-e-l-l.

2  BY MR. KROMBERG:

3  Q.   All right.  So when you, when you answer from now on,

4  please keep up that timbre of voice and also that leaning

5  forward.

6         Mr. Campbell, how are you employed?

7  A.   I'm a detective with the Arlington County Police

8  Department.

9  Q.   And how long have you been so employed?

10  A.   Since 2006.

11  Q.   You're not here in the capacity of a detective in

12  Arlington County, correct?

13  A.   Correct.

14  Q.   You've been subpoenaed?

15  A.   I have.

16  Q.   Okay.  Do you know the defendant in this case?

17  A.   I do.

18  Q.   Okay.  Can you please point him out and describe what he's

19  wearing?

20  A.   The blue suit with the blue tie.

21         THE COURT:  Any issue about the identification?

22         MR. SMITH:  No.

23         THE COURT:  All right.

24  BY MR. KROMBERG:

25  Q.   And how do you know the defendant in this case?

1   A.    We went to college together.

2   Q.    And where was that?

3   A.    George Mason University.

4   Q.    Okay.  And when was that?

5   A.    1998 until around 2002.

6   Q.    Okay.  So please look at Government Exhibits 13-101, 102,

7   103, and 104; and after you've had a chance to look at them,

8   I'm going to ask you if you recognize them.

9   A.    I recognize all these exhibits.

10  Q.    And those are your items that you provided to the

11  government for use in this case, correct?

12  A.    They are.

13  Q.    Okay.  And where did you get those items?

14  A.    I got them at a meeting between the National Alliance -- a

15  group called the National Alliance and a group called the

16  American Friends of the British National Party.

17  Q.    And when was that?

18  A.    I believe spring of 2001.

19  Q.    Was Mr. Young involved in that at all?

20  A.    He was.

21  Q.    How did that come about?

22  A.    We were both involved in a class called European Racism.

23  As part of that class, we found out that they were having a

24  meeting of these two groups to be held in Arlington County.  We

25  approached the professor of this class and asked if we could

Campbell - Direct                                                   691

1   interview the person that is head of this group called the

2   American Friends of the British National Party for this class.

3   Q.   What was the reason for interviewing the head of the

4   American Friends of British National Party for the course on

5   European racism?

6   A.   It was part of a class project.

7   Q.   Excuse me, why this particular person as opposed to any

8   other person?

9   A.   The opportunity presented itself for -- to have a

10  firsthand knowledge, what we call a primary source, where I

11  could actually go and talk to the head of these groups that we

12  were studying and interview them and ask them what their views

13  on certain subjects were.

14  Q.   So what were the views of the British National Party that

15  made them relevant to the course on European racism as you

16  understood it at the time?

17  A.   The British National Party, as I understood at the time,

18  was a xenophobic political party.  They were more of like a

19  Britain for the British, very -- it was a racist group

20  essentially.

21  Q.   And how did you get the opportunity to go meet the, was it

22  Mark Cotteril?

23  A.   I believe that was his name, yes.

24  Q.   How did you get the opportunity to interview Mark

25  Cotteril?

Campbell - Direct                                                    692

1   A.   I can't remember off the top of my head.  It was arranged,

2   I think, through a friend or through the professor himself

3   where we could approach this guy.  We talked to him.  We gave

4   him a list of questions beforehand.  He agreed to do it, and we

5   met him at the rally in Arlington.

6   Q.   So it was a -- you mentioned the National Alliance.  What

7   was the National Alliance?  That was different from the

8   American Friends of the British National Party, right?

9   A.   It is.

10  Q.   Okay.  What is a National Alliance?

11  A.   The National Alliance is another, it's a neo-Nazi group.

12  It's an organization.

13  Q.   And you mentioned a rally, so where was this rally, and

14  what happened there?

15  A.   It was basically a meeting.  I don't remember exactly what

16  the topic of the meeting was.  It was held at a Thai restaurant

17  in Arlington, Virginia.

18          As part of this meeting, the group then went to the,

19  I believe it was either the German or the Austrian Embassy.  At

20  the time, the Country of Austria elected a far, essentially a

21  racist guy as either prime minister or some sort of -- he held

22  some sort of political office, and the government wasn't

23  allowing him to hold that political office, so this group went

24  to protest the embassy to show their dissatisfaction for that

25  decision.

Campbell - Direct                                                        693

1    Q.   How many people do you recall were at that

2    meeting/gathering/rally, whatever you're going to term it as,

3    in Arlington, at the Thai restaurant?

4    A.   I would say maybe 25 at most.

5    Q.   So why would you -- why do you characterize them as

6    neo-Nazis?

7    A.   Based on the publications that they put out, based on the

8    information that I know about them through research, through my

9    knowledge of them, through studying them.

10   Q.   Okay.  Well, let me turn your attention to a slightly

11   different topic.  Over the years after college, did you

12   continue to socialize with the defendant?

13   A.   After college, it was on and off maybe, not that much.

14   Q.   Did you know him to use any other names or any other

15   identities?

16   A.   I knew him to use the name Klaus.

17   Q.   Was there a last name that went with Klaus?

18   A.   I can't remember off the top of my head.

19   Q.   Did you -- have you heard the name Düsselkamp?

20   A.   Yes.

21   Q.   Was it Klaus Düsselkamp?

22   A.   From what I remember, yes.

23   Q.   And what was -- who was Klaus Düsselkamp in connection

24   with the defendant?

25   A.   From what I remember, it was sort of like a pseudonym.  I

Campbell - Direct                                                      694

1    know he was involved in a reenactment group, and from what I

2    remember, he would use that name for his reenactment group.

3    Q.   A World War II reenactment group?

4    A.   Yes.

5    Q.   And Storm Trooper Klaus Düsselkamp, what side was he on in

6    World War II?  Was he on the American side or the other side?

7    A.   It was German.

8    Q.   Okay.  When was -- before today, when was the last time

9    that you saw the defendant?

10   A.   I want to say early in 2010.

11   Q.   And what was the occasion in 2010?

12   A.   I'd run into him at work.  Me being a police officer in

13   Arlington and him with his profession, he was also in

14   Arlington.  We would run across each other, and in 2010, I was

15   celebrating my 30th birthday and invited him to Washington,

16   D.C., as part of that.

17   Q.   I'd like you to take a look at an exhibit, it should be --

18   the court security officer should be able to provide it to

19   you -- 11-400.

20           MR. SMITH:  Your Honor, we object on 403 grounds.

21   This is a running objection for all the pieces of this

22   testimony.

23           THE COURT:  All right, let me, let me just see what

24   this is.

25           All right, the objection is overruled.

1    BY MR. KROMBERG:

2    Q.   Mr. Campbell, do you recognize that photo?

3    A.   I don't recognize the photo, but I recognize the license

4    plate.

5    Q.   Do you recognize the truck?

6    A.   I don't recognize the truck itself, no.

7    Q.   But you recognize the license plate?

8    A.   I do.

9    Q.   Okay.  And what do you recognize the license plate as?

10   Belonging to anyone you know?

11   A.   It did belong to the defendant.

12        MR. KROMBERG:  Okay.  The government moves in

13   Government Exhibit 11-400, and we can publish it to the jury,

14   but we're going to get to it later, Judge.  I think let's just

15   publish it now for a moment.

16        THE COURT:  Yeah, I'm letting it in over the defense

17   objection.

18        (Government's Exhibit No. 11-400 was received in

19   evidence.)

20        MR. KROMBERG:  And if you can zoom in on the license

21   plate?  FRI KRP?  Okay, thank you.

22   Q.   So, Mr. Campbell, at your birthday party, did, did you

23   receive a gift from Mr. Young?

24   A.   I did.

25   Q.   The court security officer is going to give you what's

Campbell - Direct                                                    696

1    been marked Government Exhibit 13-105, which is a, a book.

2              Do you recognize that?

3    A.   I do.

4    Q.   And what is that?

5    A.   It is a book called *Serpent's Walk*.

6    Q.   And who, who owns that book?  I mean, whose book is that?

7    A.   Well, it was given to me as a gift.

8    Q.   Okay.  By, by Mr. Young?

9    A.   Correct.

10   Q.   All right.  What is that book about?

11   A.   I'm not quite sure.  I didn't read it.

12   Q.   Who is the author?

13   A.   A man named Randolph Calverhall.

14   Q.   I'm going to show you what's been marked Government

15   Exhibit 10-860, which is -- 10-860, and I'm going to ask if you

16   recognize that other book.

17             I'd also like to read a stipulation, Judge.

18             THE COURT:  Well, let's do one thing at a time,

19   Mr. Kromberg.

20             MR. KROMBERG:  Right, but the stipulation applies to

21   this particular book.

22             THE COURT:  All right, hold on one second.

23             All right, go ahead.

24             MR. KROMBERG:  So the stipulation is Government

25   Exhibit 12-22:  The United States and the defendant hereby

1  stipulate and agree that Government Exhibits 10-400 through

2  10-532, Government Exhibits 10-533 through 10-621, Government

3  Exhibits 10-650 through 10-825, and Government Exhibits 10-850

4  through 10-900 were found by the FBI in the course of searching

5  the residence of the defendant, Nicholas Young, in August 2016.

6         THE COURT:  It doesn't mean they're all going to be

7  entered into evidence.

8         MR. SMITH:  Your Honor, we stipulate to authenticity.

9  We have a running objection to every piece of evidence in

10  this --

11         THE COURT:  Ladies and gentlemen, I want to caution

12  you on this evidence that's coming in tonight and tomorrow, and

13  I think I mentioned it when we did the voir dire, and you-all

14  told me that you could evaluate the evidence in the proper

15  context in which it's being offered.

16         Because this case involves the defense of entrapment,

17  as everybody has explained to you at the beginning, the issue

18  about the mindset of the defendant is important.

19         I'm allowing some but not all of this type of

20  evidence about the defendant's involvement or interest in what

21  were considered to be anti-Semitic groups in evidence because

22  the government has to link some of that to whether or not he

23  was induced by government action to get engaged in all the

24  activities you've been hearing about or whether or not, you

25  know, he was absolutely innocent and it was all the government

1    that overwhelmed his free will and got him incited into doing

2    this.

3            So I want you to understand he is not being charged

4    and you cannot find him guilty for possessing Nazi or

5    anti-Semitic literature.  He's not being charged with that, he

6    cannot be convicted for that, but the evidence is being allowed

7    in to be considered, that's all, as whether or not it helps or

8    doesn't help to establish the predisposition issue, all right?

9    So let's go along with this now.

10           And the defense has a running objection to all of

11   this.

12           MR. KROMBERG:  Right.  And although I think this one

13   would be odd because 10-861 -- 10-861, if you can --

14           THE COURT:  Well, you're talking about 10-860 right

15   now.

16           MR. KROMBERG:  Let me, let me just switch it back to

17   861.  That will be easier.  861 we could do with a photo if

18   necessary.  Yes, basically a photo.

19   Q.   Is that a photo of the book *Serpent's Walk*?

20   A.   It is.

21           MR. KROMBERG:  Right.  I will represent to the Court

22   that that is just the photo.  We actually have the book, so

23   that -- Mr. Campbell, is that the same book -- excuse me, is

24   that a copy of the same book that the defendant gifted you in

25   about 2010 for your birthday?

Campbell - Direct                                                          699

1              THE WITNESS:  So this photo is the same book as the

2    book --

3    BY MR. KROMBERG:

4    Q.   Is it a copy of the same book?  Because that, that piece

5    of paper is supposed to represent the book that was seized from

6    the defendant's house in August 2016, so I'm asking if that is

7    the copy of the same book.

8              THE COURT:  No, is that the cover of the book?

9              THE WITNESS:  It appears so, yes.

10             THE COURT:  All right, that's a picture of the cover

11   of the book.

12             MR. KROMBERG:  Okay.

13             THE COURT:  Are you moving 861 in?

14             MR. KROMBERG:  Yes, Judge.

15             THE COURT:  All right.  Over the defense objection,

16   it's in.

17             (Government's Exhibit No. 10-861 was received in

18   evidence.)

19   BY MR. KROMBERG:

20   Q.   Now, 860 is before you as well, correct?  That's a cover

21   of another book.

22   A.   Correct.

23   Q.   Do you know what that book is?

24   A.   I do.

25   Q.   Okay.

1              MR. SMITH:  Objection, Your Honor.  This is the

2    expert testimony that Your Honor excluded.  One of these books

3    was not gifted to Mr. Campbell, and he is purporting to testify

4    about it as an expert.

5              THE COURT:  Well, wait a minute.  Not as -- have you

6    seen this book before?

7              THE WITNESS:  I have.

8              THE COURT:  Have you read it?

9              THE WITNESS:  No.

10             THE COURT:  You've only seen it?

11             THE WITNESS:  Yes.

12             THE COURT:  In what context did you see it?

13             THE WITNESS:  I provide training for the police

14   department, and I've put that in.

15             THE COURT:  But that's all -- you've not actually

16   read the book itself?

17             THE WITNESS:  No, I have not.

18             THE COURT:  I'll sustain the objection.

19             MR. KROMBERG:  Well, Judge, I actually didn't want to

20   ask what the book was about.  I wanted to ask who the book is

21   by.

22             THE COURT:  Well, how can you know what the book is

23   about if you haven't read it?

24             MR. KROMBERG:  I was going to talk about the cover of

25   the book and who is it by and who is it published by.

1           MR. SMITH:  Your Honor, objection.  This is exactly

2    what the Court ruled on before trial.

3           THE COURT:  Yeah, I'm going to -- I'm going to at

4    this point sustain the objection.  861 is in; 860 is not in.

5    BY MR. KROMBERG:

6    Q.   Okay.  Going back to the meeting you went to with

7    Mr. Young in connection with your college course, in the course

8    of your discussions with Mr. Young about that meeting, did the

9    subject of Muslims come up?

10   A.   It was not a discussion with him, no.

11   Q.   If it was not a discussion with him, did the subject of

12   Muslims come up when you were leaving that meeting?

13   A.   It did.

14   Q.   Okay.  And what did Mr. Young say at that point?

15   A.   At the time, the participants of the meeting, including

16   the person I was interviewing, was having a discussion with

17   another person there.  I don't know if it was about Israel or

18   about Muslims in general or about Jewish people, I can't

19   recall, but in the course of that conversation, Mr. Young

20   interjected something to the effect of, "Don't discount the

21   Muslims' ability to fight against the Jews."

22           MR. KROMBERG:  Okay.  Thank you.  Thank you,

23   Mr. Campbell.  The defense may have questions for you.

24                        CROSS-EXAMINATION

25   BY MR. SMITH:

Campbell - Cross                                                        702

1    Q.   Good evening, Mr. Campbell.  Did you say you were

2    subpoenaed to appear here today?

3    A.   I was.

4    Q.   So you're not coming here freely, right?

5    A.   Correct.

6    Q.   So you're coming here to testify today in an attempted

7    material support for terrorism case in 2017 --

8           MR. KROMBERG:  Objection, Judge.  That's totally

9    irrelevant to anything that this witness can answer.

10          THE COURT:  Now, wait a minute.  It's also a long

11   speaking question, which I advised everybody to try to reduce.

12   Just ask your question directly.

13   BY MR. SMITH:

14   Q.   You understand that you're here to testify today in this

15   material support case --

16          MR. KROMBERG:  Objection, Judge.  It's irrelevant

17   what --

18          MR. SMITH:  I haven't finished my question, Your

19   Honor.

20          MR. KROMBERG:  It's irrelevant.

21          THE COURT:  Mr. Kromberg, have a seat.

22          Do you understand why you're here today?

23          THE WITNESS:  I do, Your Honor.

24          THE COURT:  What's your understanding of why you're

25   here today?

1            THE WITNESS:  The accused is -- or the defendant is

2    accused of material support.

3            THE COURT:  And the government asked you to testify?

4            THE WITNESS:  They did.

5            THE COURT:  That's fine.  Ask your next question.

6    BY MR. SMITH:

7    Q.   So it's your testimony that you had a project in a George

8    Mason University class?

9    A.   Correct.

10   Q.   In 2000?

11   A.   I don't -- I think it was 2001.

12   Q.   2000-2001 approximately.  You couldn't remember when you

13   first spoke to the government about that?

14   A.   It was a spring class, yeah.  No, I couldn't remember.

15   Q.   Okay.  And then it's your testimony that ten years later,

16   the defendant gave you a book, and that book is not the subject

17   of Muslims or Islam, correct?

18   A.   I haven't read the book.  No, I don't know.

19   Q.   So you haven't read the book that Nicholas gave you, and

20   you're coming here to testify today that he gave you --

21           MR. KROMBERG:  Objection, Judge.

22           THE COURT:  Have a seat.

23           That's argumentative.  Sustained.

24   BY MR. SMITH:

25   Q.   So at some point before your testimony here today, the

1    FBI -- or the government called you in for an interview, right?

2    A.    Correct.

3    Q.    When was that?

4    A.    I don't recall off the top of my head.

5    Q.    Was it this year or --

6    A.    Yes, I believe so.

7    Q.    In January of 2017?

8    A.    I don't remember.

9    Q.    Okay.  Where was that meeting?

10   A.    There was a meeting here.

11   Q.    What is "here"?

12   A.    At the U.S. Attorney's Office.

13   Q.    So did they call you and tell you to come to the U.S.

14   Attorney's Office?

15   A.    I don't remember the exact way I came in to be called

16   here, yeah.  No.

17   Q.    But they reached out to you, not vice versa, right?

18   A.    Correct.

19   Q.    And in the meeting, who was at the meeting?

20   A.    I believe Mr. Kromberg and the agent next to him.

21   Q.    And did they tell you what the purpose of that meeting

22   was?

23   A.    To talk about the defendant.

24   Q.    And what sort of questions did they ask you?

25   A.    Basically about the testimony that I just gave, about my

Campbell - Cross                                                    705

1    interactions with him over the years, the statement that he

2    made at this rally.

3    Q.   So did they ever ask you about militant Islam?

4    A.   Not that I remember off the top of my head.

5    Q.   So is it fair to say that the purpose of the meeting was

6    to ask you about your experience with Mr. Young in 2000 as a

7    college roommate?

8              MR. KROMBERG:  Objection, Judge.  To characterize the

9    purpose of the meeting, the purpose of the meeting from the

10   government's side is irrelevant.  The purpose of the meeting

11   from the, from the witness's side is that he was asked to come

12   in.

13             THE COURT:  I don't know why you're objecting,

14   Mr. Kromberg.  It's late in the day, and this is not anything

15   that's harmful to the government's case.  Let's move on.

16   BY MR. SMITH:

17   Q.   So, Mr. Campbell, you were an old friend of Mr. Young from

18   the ROTC, correct?

19   A.   Correct.

20   Q.   You were his roommate in 2000 at George Mason, correct?

21   A.   I don't remember which year it was but --

22   Q.   You were his roommate in your senior year at George Mason?

23   A.   It was not my senior year, I believe.

24   Q.   Which year was it in college?

25   A.   I want to say it was maybe sophomore or junior.  I had

Campbell - Cross                                                    706

1    another roommate that moved out to live off campus, and he

2    basically came in and stayed in his room.

3    Q.    Was Mr. Young a Muslim when you were a roommate with him?

4    A.    No, he was not.

5    Q.    Was he a Catholic?

6    A.    I don't believe so, no.

7    Q.    You don't, okay.

8          So when you spoke to the government earlier this

9    year, could you remember when you took this European racism

10   class?

11   A.    I believe it was spring 2001.  It was around that time.

12   Q.    When the government asked you about it, you didn't

13   remember what time the class -- what year the class was, right?

14   A.    Correct.

15   Q.    Okay.  And then at some point in your meeting with the

16   government in -- earlier this year, in January 2017, you

17   realized the government was collecting information about white

18   supremacism for this about Nicholas Young, correct?

19   A.    I believe so, yes.

20   Q.    And then you told the government attorneys that Nicholas

21   and yourself had been in a project in a European racism class,

22   right?

23   A.    Correct.

24   Q.    And you didn't remember the date of the, the year in which

25   you took this class initially with the government?

1    A.    Correct.

2    Q.    But you did remember that you had a class project in which

3    you went to a British National Party meeting, correct?

4    A.    It was American Friends of the British National Party.

5    Q.    At a Thai restaurant, correct?

6    A.    Correct.

7    Q.    Where 50 people attended?

8    A.    I don't think it was that many.

9    Q.    And that there was an individual named Mark who was going

10   to be interviewed?

11   A.    Correct.

12   Q.    And he spoke with a reverend?

13   A.    Yes.

14   Q.    And this reverend was speaking about Muslims?

15   A.    I don't know if it was the reverend who was speaking about

16   Muslims or who was speaking about Muslims or if they were

17   speaking about Israel or Jewish people.  I don't remember.

18   Q.    You remembered all of those details?  You remembered all

19   of those details in your conversation with the government in

20   January of 2017?

21   A.    I don't remember, no.

22   Q.    Do you remember what other classes you took at Mason in

23   2000?

24   A.    Not off the top of my head, no.

25   Q.    Do you remember the names of any of your professors?

Campbell - Cross                                                      708

1    A.   The professor in that class was Gillette.  I've -- I mean,

2    I can rattle off names of my professors.  I don't know if it

3    was that particular year.

4    Q.   So you said that you don't remember basically which

5    classes you took?

6    A.   At that time?

7    Q.   Yeah.

8    A.   I mean, I remember which classes I took.  I couldn't give

9    you a chronological order of which classes I took when.

10   Q.   Do you remember any other projects you worked on besides

11   the British National Party meeting project?

12   A.   No.

13   Q.   Okay.  So you told the government's attorneys in January

14   of 2017 that you invited Nicholas to your 30th birthday party?

15          MR. KROMBERG:  Objection, Judge.  That's misstating

16   what the witness has said.  The witness said he spoke to me and

17   to Special Agent Caslen.  He didn't say government attorneys.

18          THE COURT:  But you are a government attorney,

19   Mr. Kromberg.  We don't need this kind of an objection.

20   Overruled.

21   BY MR. SMITH:

22   Q.   So the question was when you were speaking with

23   Mr. Kromberg and Agent Caslen, you told them that you invited

24   Nicholas to your 30th birthday party?

25   A.   Correct.

1   Q.   That was in 2009?

2   A.   That was 2010.

3   Q.   2010.  And that this party was -- did you tell

4   Mr. Kromberg and Agent Caslen who was invited to your birthday

5   party?

6   A.   I don't believe I said anything specific, no.

7            MR. SMITH:  I've got a 302 dated January 17, 2017.

8   It's an interview of Ian Campbell.

9            MR. KROMBERG:  Your Honor, we've had a long time of

10  improper cross-examination.  If the question is if it refreshes

11  his memory, that's the only question that is appropriate here.

12           THE COURT:  That is correct.  Take a look at the 302,

13  Officer Campbell, and see --

14  BY MR. SMITH:

15  Q.   If you turn to the second page, there's a paragraph in

16  which you're talking about, you seem to be talking about --

17           MR. KROMBERG:  Objection.

18           MR. SMITH:  I'm helping --

19           MR. KROMBERG:  Not Mr. --

20           THE COURT:  Just say:  Look at page 2.

21           MR. KROMBERG:  Does it refresh your recollection?

22  That's the appropriate question.

23           THE COURT:  Do you see -- you're looking at page 2?

24           THE WITNESS:  Yes, Your Honor.

25           THE COURT:  Does that refresh your memory?

1  BY MR. SMITH:

2  Q.    About the 30th birthday party.

3  A.    Yes.

4  Q.    So did you -- do you recall telling the -- Mr. Kromberg

5  and Agent Caslen whether you invited any of your friends -- any

6  other friends to the party?

7  A.    I don't recall telling them, but I do remember there

8  obviously being more people at my 30th birthday that I -- I

9  didn't name them --

10  Q.    Did you tell Mr. Kromberg that you had invited --

11          MR. KROMBERG:  Objection.

12  BY MR. SMITH:

13  Q.    -- your liberal Jewish friends?

14          THE COURT:  Wait.  Mr. Smith, you are again talking

15  over the witness.  You need to listen to him.  Let him finish.

16          MR. SMITH:  He had --

17          THE COURT:  No.  He started to object because you

18  were talking while the witness was talking.

19          All right, go ahead and finish your statement, sir.

20          THE WITNESS:  I had friends there that -- yeah, my

21  friends, they come from all different walks of life, and some

22  of them happen to be liberal, some of them happen to be Jewish.

23  BY MR. SMITH:

24  Q.    And so you told the government, Mr. Kromberg and Agent

25  Caslen, that Mr. Young gave you a copy of *Serpent's Walk* for

Campbell - Cross                                                        711

1   your birthday, right?

2   A.   Correct.

3   Q.   Do you remember that exchange at your birthday when

4   Mr. Young gave you the book?

5   A.   Vaguely.  I remember receiving the book from him and

6   seeing it.

7   Q.   Do you remember your reaction?

8   A.   I thought it was kind of odd.  I may have just put it in

9   my bag.

10  Q.   Did you, did you think it was funny?

11  A.   I thought it was odd.  I may have, I may have kind of like

12  laughed it off, as I normally would in a situation like that,

13  yes.

14  Q.   Did you have an interest in history at the time on your

15  30th birthday?

16  A.   I do.

17  Q.   Like, what kind of history?

18  A.   All sorts of history.  My dad was a historian.  He's an

19  author so --

20  Q.   World War II history as well, right?

21  A.   As well, yes.

22  Q.   Okay.  So, so after you have a meeting with the

23  government's attorney, Mr. Kromberg, and the case agent, Agent

24  Caslen, did you take some sort of action after you met them to

25  assist them in this case?

1   A.    I don't understand your question.

2   Q.    So after your -- so you had a meeting sometime this year,

3   earlier this year --

4   A.    Okay.

5   Q.    -- when you met with Mr. Kromberg sitting next to me and

6   Agent Caslen, correct?

7   A.    Correct.

8   Q.    And did you take some sort of action after your meeting to

9   assist in the prosecution of the case?

10  A.    What would this action be?  I don't understand what you

11  mean.

12  Q.    You don't recall next steps after you met with the

13  government to sort of help out, help uncover some of the

14  evidence that would be used in this case?

15  A.    I retrieved the book from my storage unit.

16  Q.    Okay.  Did, did you reach out to one of your professors

17  about this European --

18  A.    I did.

19  Q.    Okay.  Do you recall e-mailing him and telling him about

20  this case and inquiring whether the professor might have some

21  materials that would be useful to this case?

22  A.    I do.

23  Q.    And what did you -- and did the government ask you to do

24  that?

25  A.    I don't remember.

1  Q.   Do you think you would have done it on your own

2  initiative?

3  A.   Yes, probably.

4  Q.   Do you remember what you asked your professor?

5  A.   As part of that class, it was an interview, and it was

6  videotaped on a VHS, I believe it was.  It could have been a

7  smaller tape.  Either way, it was videotaped, and the videotape

8  was submitted to the professor.

9         There was an issue with the audio on the videotape,

10 so the interview was kind of pointless because the microphone

11 wasn't working, and that was the last I remember of the

12 videotape, so I thought that maybe he still had it somewhere.

13 Q.   So when you reached out to this professor from the

14 European racism class, did you sort of explain to the professor

15 in what capacity you were seeking this information?

16 A.   I did.

17 Q.   And what did you tell him?

18 A.   I don't remember off the top of my head, but I said

19 something about the investigation.

20 Q.   Can you just flip to the last page on the -- in the

21 document I gave you?  It's an e-mail from you to the professor

22 dated January 19, 2017.  It's the second paragraph?

23 A.   Yep.

24 Q.   Does that refresh your recollection?

25 A.   It does.

Campbell - Cross                                                          714

1   Q.   And what did you -- and what did you tell your professor

2   that -- in what capacity did you tell the professor you were

3   writing to him?

4   A.   It was in an investigative capacity.

5   Q.   You told him that you were working with the FBI in this

6   case, right?

7   A.   I did.

8   Q.   What did you mean by that?

9   A.   The FBI was obviously investigating the defendant and

10  asked me these questions, and I recalled these things, and I

11  asked the -- I told the professor basically why I was reaching

12  out for.

13  Q.   So did you not understand that they were interviewing you

14  as a potential witness?  Did you understand that the government

15  was interviewing you to work with the FBI in this

16  investigation?

17  A.   I did.

18  Q.   Or as a witness?

19  A.   As a witness.

20  Q.   That's what you meant here by "working with the FBI"?

21  A.   Correct.

22  Q.   Okay.  So at some point during your meeting in January of

23  2017 with, with the government attorney and the, and the case

24  agent, do you recall whether you told them about how often you

25  were still seeing Nicholas Young after college?

1   A.   I don't recall exactly, but it was on and off.  It was

2   intermittent.

3   Q.   How often would you say?

4   A.   In which period?  I mean --

5   Q.   I mean, so you were roommates in 2000.  2000, correct?

6   A.   I don't -- around that time, yes.

7   Q.   So how often would you say you met -- you saw Nicholas

8   Young between 2000 and 2010?

9   A.   Not very often.

10  Q.   Wasn't it like a couple times a year to get drinks?

11  A.   Yeah, maybe.

12  Q.   Okay.

13  A.   And that was more towards the end of college, and then

14  after that period, it was probably like a four- or five-year

15  period where, you know, we really didn't see each other.  I

16  really didn't know what he was doing until I saw him at work at

17  one point.

18  Q.   So is it fair to say when you lived with Mr. Young, he was

19  not a -- didn't give indications of militant radical Islamism?

20  A.   No, he did not.

21  Q.   Okay.  Just a few more questions.  So when you were in

22  college together, what would you and Young -- Nicholas Young do

23  together?  Did you hang out?

24  A.   Yeah, we would go to concerts together.

25  Q.   Like rock shows?

1    A.    That's pretty much the extent of it.

2    Q.    Clubs, right?

3    A.    Yeah.

4              MR. SMITH:  That's all, Your Honor.

5              THE COURT:  All right.  Mr. Kromberg, is there any

6    redirect?

7              MR. KROMBERG:  No, Your Honor.

8              THE COURT:  All right.  I assume that no one's going

9    to call Officer Campbell again?

10             MR. KROMBERG:  The government is not.

11             THE COURT:  How about the defense?

12             MR. SMITH:  No.

13             THE COURT:  No?

14        All right, sir, then you're excused as a witness.

15   Actually, we're going to be shutting things down.  So just

16   don't discuss your testimony with any witness who has not yet

17   testified.

18             THE WITNESS:  Thank you, Your Honor.

19                       (Witness excused.)

20             THE COURT:  All right, ladies and gentlemen, we're

21   actually moving quite well.  I can give you tomorrow a much

22   better time estimate, but we are moving faster.  I will need

23   you back here at nine o'clock, however, tomorrow morning, but

24   you're getting 15 minutes early released tonight, all right?

25        Again, please remember my cautions.  Do not try to

1    conduct any investigations.  Stay away from, you know, don't

2    start researching URLs and all that kind of stuff, all right?

3         It's really important again you get a good night's

4    sleep, keep following my instructions, and we'll see you-all

5    back here promptly at nine o'clock tomorrow morning.

6         All right, we're going to stay in session for a

7    minute or two.

8                        (Jury out.)

9         THE COURT:  Now, again, I don't think it's ever wise

10   for any attorney to object if the objection isn't really -- if

11   the question is not hurting the issue, and, Mr. Kromberg, I

12   think you must be tired because I don't think some of your

13   objections were necessary.

14        MR. KROMBERG:  I'm sure you're right, Judge, but it

15   is also true that ineffective assistance of counsel comes back

16   to bite the government, not the defense.  When he's handing

17   up -- when Mr. Smith is handing up exhibits to a --

18        MS. MORENO:  I'm sorry, that's so insulting.

19        THE COURT:  Wait, wait.  Have a seat.

20        MR. KROMBERG:  After he's been repeatedly told to

21   mark the exhibits, give it to the witness, and he doesn't do

22   it, our record, as the Court has said, is going to be a mess.

23        THE COURT:  But remember, these are not going into

24   evidence.  These 302s are not in the evidence.  They've not

25   been moved into evidence.  All this discussion about all these

718

1    documents, they're not in evidence.

2            MR. KROMBERG:  Okay.

3            THE COURT:  I haven't heard very many times --

4            MR. SMITH:  Your Honor, we just object to that

5    statement, which is kind of extraordinary, insulting,

6    unprofessional.

7            THE COURT:  Excuse me, it's late in the day, and

8    we're not going to have this type of back-snapping at each

9    other.  Look, this case has to stay on track.  You've done a

10   pretty decent job.

11           I think tomorrow, I want to make sure that we don't

12   have any extraneous problems tomorrow.  So the order of

13   witnesses for tomorrow, Mr. Kromberg, is who, Officer McNulty?

14   I'm looking at the list you gave me.

15           MR. KROMBERG:  Right.  If -- we have to find out if

16   Mr. -- I think it is true that it would be Mr. McNulty,

17   Mr. Menzies --

18           THE COURT:  I'm sorry, what is the purpose of the

19   Fairfax County officer?

20           MR. KROMBERG:  He was a roommate of, of Mr. Young

21   from approximately 2004 to 2007.  He is going to talk about --

22           THE COURT:  A little bit like this testimony?

23           MR. KROMBERG:  Correct.

24           THE COURT:  All right.

25           MR. KROMBERG:  Purely predisposition issues.  And

1    then Mr. Menzies replaced Mr. McNulty as the roommate from

2    approximately 2007 to 2010.

3                I think then we would go to Professor

4    Gartenstein-Ross, then the summary -- then Officer Dill from

5    the Metropolitan Washington Police Department, and then the

6    summary witness, Agent Caslen.

7                THE COURT:  All right.  So you're reversing the order

8    slightly.  Agent Caslen is your last witness?

9                MR. KROMBERG:  Correct.

10               THE COURT:  All right, that's fine.

11               MR. KROMBERG:  Correct.  I believe that Ms. Dill is

12   going to be very, very short.  I think Mr. McNulty is going to

13   be pretty short, although there is an issue that I think we do

14   need to talk about before we get to Mr. McNulty.

15               THE COURT:  All right.

16               MR. KROMBERG:  And that is that he's going to say

17   when he lived there, there were packages being -- I'm going to

18   ask, "What other names did you know the defendant to use?"

19               And he's going to say, "Oh, Rudolph Von Waldron."

20               And I'll say, "What did he use the name Rudolph Von

21   Waldron from?"

22               "Oh, he received packages from Bulgaria."

23               Now, what the packages from Bulgaria are, that he was

24   buying -- we have e-mail traffic to show he was buying illegal

25   steroids.  Now, I realize the Court has said this is not a drug

1    case, but these are international financial transactions.

2           THE COURT:  I'm not letting that in.  Forget it.

3           MR. KROMBERG:  And that may be, Judge, but when the

4    defense says, oh, this is purely a financial case, and it has

5    nothing to do with terrorism, we are put in the position of

6    saying, oh, here we have a financial transaction, financial

7    transactions under fake names to going -- to commit unlawful

8    activity.

9           THE COURT:  Mr. Kromberg, you're inviting reversible

10   error.  I will not let that evidence in.  Make sure your

11   witnesses know not to get into it.  Do not open that door.  I

12   will not permit it.  All right?

13          MR. KROMBERG:  Can we use the fact that he was using

14   fake names to get packages internationally, without going into

15   what was in the packages?

16          THE COURT:  No, that's too far back.  No, no.  All

17   right.

18          All right, is there anything else?  What are the

19   exhibit numbers that you're going to be tendering that have the

20   Nazi stuff in it?  And I assume they're all in my book?

21          MR. KROMBERG:  They are, Judge.

22          THE COURT:  All right.

23          MR. KROMBERG:  So you've already seen the one from

24   the phone.  That is the smokestack one that that CART examiner

25   was talking about.

721

1            THE COURT:  All right.

2            MR. KROMBERG:  The -- in the 8 series of exhibits,

3    there are LiveLeak -- we're going to -- we're going to prove

4    that the defendant had a LiveLeak account under the name of

5    Düsselkamp.

6            THE COURT:  All right.  The 8 series?

7            MR. KROMBERG:  Correct, 8-500 to 8-510.

8            THE COURT:  Hold on.

9            MR. KROMBERG:  And, Your Honor, they're actually not

10   about Nazi stuff other than it's the account in the name of

11   Düsselkamp, and --

12           THE COURT:  I'm permitting that in.

13           MR. KROMBERG:  Okay.  So that's the 8 series.  Then

14   the next would be --

15           THE COURT:  Well, when you say the 8 series --

16           MR. KROMBERG:  So it's 8-500, 8-501, 502.  Let's see,

17   503, 504, 505, 507, and 510.

18           THE COURT:  Well, the reason why this will be

19   relevant to the case, I'm skimming them very fast, but, I mean,

20   there are references to Islamic types of issues.

21           MR. KROMBERG:  Right.  These are all the ISIS ones.

22           THE COURT:  Yeah.

23           MR. KROMBERG:  The only connection to Nazism is the

24   name Düsselkamp.

25           THE COURT:  Yep, that certainly is relevant.  That

1  comes in.

2          MR. KROMBERG:  So after that, there would be 10-230,

3  and the exhibits --

4          THE COURT:  All right, hold on a second.  I'm sorry,

5  10-230?

6          MR. KROMBERG:  230.  These are -- the series of

7  Exhibits 10-230 through 10-252 are items that were found on the

8  defendant's computer media in 2016, and the first 10 or first

9  11 all have to do with the Mufti of Jerusalem, and the Mufti is

10 meeting Hitler and the Mufti recruiting Muslim troops for the

11 SS.  I think the Court has seen those before.

12         MR. SMITH:  Your Honor, we'd like to object to these

13 on the record.

14         THE COURT:  Because of the nature of this case and

15 the argument that there is this crossover between the interest

16 in the white supremacy and Nazism and radical Islam, I'm

17 permitting it over your objection.

18         MR. SMITH:  Your Honor, just to be clear, there's two

19 categories in here.  The first category, which is 10-30 through

20 10-36, relates to the Mufti, which is this figure that

21 Gartenstein-Ross will try to establish as the missing link

22 between militant Islam and white supremacism.  That's 10-230 to

23 10-236.

24         But then if Your Honor looks at, at 10-250 to 10-252,

25 cartoon Jew directing U.S. tank, cartoon Jew directing Colin

1    Powell, Jewish swine, that, Your Honor, is -- there's no

2    argument for relevance in this case and --

3          THE COURT:  Well, the linkage is the rabid

4    anti-Semitism.  That's definitely a linkage.  I'm going to

5    permit it.  It's not pretty stuff, and I've warned the jury

6    once and I'll warn them again that they have to use it in the

7    proper way, which is whether or not there was this

8    predisposition to engage in radical Islamic activity,

9    supporting them anyway, so I'm allowing it in.

10         MR. SMITH:  I'm not suggesting the Court should look

11   at these images, because they're horrible, but if the Court did

12   look at the images, it would see that there's no -- there's

13   nothing in these about Islam at all.  I mean, there's not even

14   a visual connection, whereas if the Court looks at these Mufti

15   pictures, Mufti and Hitler, then there's this visual connection

16   between the Mufti of Jerusalem, who, by the way, is a figure

17   from the 1930s, so how that's related to contemporary militant

18   Islamist is not explained, but at least there's, to put it

19   bluntly, a Muslim in that picture, right?

20         But when it comes to these Jewish swine and cartoon

21   Jew pictures, there's no visual connection whatsoever.  It's

22   pure prejudice.  If a, if a team of scientists came together to

23   create the most prejudicial Rule 403 image possible in a

24   criminal case, it would be these images:  10-250, 10-251,

25   10-252.  It is the purest kind of unfair prejudice you can

1    imagine.

2              THE COURT:  I recognize it's tough stuff, but that's

3    the nature of this case, so I'm letting it in.  All right.

4              MR. KROMBERG:  So, Your Honor, I was going to

5    continue.  So that was -- I had mentioned 10-230 through

6    10-240.  10-241 is apparently Muslim women holding a sign that

7    says "God Bless Hitler."

8              10-242 is this individual, Nicholas Skorzeny, who was

9    an SS officer who apparently later converted to Islam when he

10   escaped British jail after World War II is my understanding.

11   250, 251, and 252 are what Mr., Mr. Smith just talked about.

12             After that, please go to 10-700.  These are physical

13   items that were found during the search.

14             THE COURT:  Hold on.  They're not in my book.

15             MR. KROMBERG:  10-700 is not there?

16             THE COURT:  Well, not in this book.

17             MR. KROMBERG:  Oh.

18             THE COURT:  Do you have 10-700 there?

19             THE CLERK:  No.

20             THE COURT:  All right, 10-700.

21             MR. KROMBERG:  10-700, 701, 702.

22             THE COURT:  Well, 700 is the picture of Adolf Hitler

23   in a frame.

24             MR. KROMBERG:  701 is a book that says the SS was

25   Hitler's instrument -- I mean, the title:  *The SS:  Hitler's*

1   *Instrument of Terror*.   702 are other SS books.   We were not

2   going to use 703, the tie tack.   We're not going to use 710,

3   the belt buckle.

4         706 is the roster for the Düsselkamp group.   711 is a

5   poster that says, "When I come back" -- Hitler:   "When I come

6   back...no more Mr. Nice guy."

7         714 is a flag, not a swastika flag.   As I understand

8   it, it was used by neo-Nazis when they weren't using the

9   swastika, but that's the flag that we understand was, I think

10  Mr. McNulty is going to say was hanging in the workout room.

11        THE COURT:   Is he going to understand what this flag

12  is?

13        MR. KROMBERG:   No, no, no.   He's just going to say it

14  was -- Dr. Gartenstein-Ross is going to explain what the flag

15  is, but Mr. McNulty is going to say, "Yes, this is what was

16  hanging there."

17        10-15 is a picture of the locker that just says

18  "Düsselkamp" on it.   10-814 is a prayer list that included

19  Hitler and Skorzeny and the Mufti on it.   10-600 is the book

20  *Hunter*.   10-861 is the book *Serpent's Walk*.   10-862 --

21        THE COURT:   Wait, wait.   The *Hunter* book I've already

22  said is not coming in.

23        MR. SMITH:   Right.

24        THE COURT:   All right.

25        MR. KROMBERG:   It wasn't coming in through Campbell,

1    but it was found in his house, and Gartenstein-Ross is going to

2    talk about how this is part of the National Alliance neo-Nazi

3    publications.  So I understand that Officer Campbell couldn't

4    talk about it, it wasn't his, but -- in any event, "Who Rules

5    America?" is a photo, only we don't actually have the document.

6    And 10-863 is that white power music that Your Honor has seen

7    before.

8              Then there are -- we're going to try to use five of

9    the photos from the DVD that's marked 10-900.  And --

10             THE COURT:  These are reenactments?

11             MR. KROMBERG:  Well, no, they're parties, and they

12   are party scenes, but we don't seem to have any -- we're not

13   using any photos of reenactments.  The photos of other

14   gatherings but not reenactments.

15             11-401 is the Israeli flag door mat.

16             MR. SMITH:  Your Honor, we object.  We don't --

17             THE COURT:  I'm sorry?

18             MR. SMITH:  The Israeli flag, this is a -- this is a

19   U.S. terrorism prosecution case.  Why is an Israeli -- it's

20   just --

21             THE COURT:  Because again, the issue of anti-Semitism

22   is the link -- part of the linkage that makes any kind of

23   linkage make any sense between the Nazis and radical Islam.

24             MR. SMITH:  But, Your Honor, that's a national flag.

25   This is --

1      THE COURT:  I disagree with you on that.  I'm going

2  to allow it.

3      Yeah.

4      MR. KROMBERG:  And, Judge, the others, the 14 series,

5  there will be --

6      THE COURT:  Hold on.  Go ahead.

7      MR. KROMBERG:  -- three more photos of Young dressed

8  as a Nazi.

9      Those are the ones that were dated January 28, 2006.

10     THE COURT:  Which 14?  I mean, my --

11     MR. KROMBERG:  I'm sorry, 14-112, 113, and 114.

12     THE COURT:  Wait a minute, wait a minute.  This one

13  only goes up to 105.

14     MR. KROMBERG:  I'm sorry?

15     THE COURT:  Is there another 14 book?

16     THE CLERK:  No.

17     THE COURT:  14- what?

18     MR. KROMBERG:  Mr. Vera asked me to pass on that it's

19  volume 7.  It's 14-112, 113, and 114.

20     I would note, Judge, that 114 --

21     THE COURT:  Yeah.

22     MR. KROMBERG:  -- is not a picture of Young, but it

23  was Young's picture of other people at that gathering giving a

24  Heil Hitler salute.

25     THE COURT:  Yeah, that's starting to be cumulative

1    and overkill.  You don't need both 112 and 113.  You're making

2    your point.  You don't need to make it ten times.  So I'll let

3    you use some discretion, but you can't get these all in, all

4    right?

5              MR. KROMBERG:  Okay.

6              THE COURT:  They're repetitive.

7              MR. KROMBERG:  Then there's 14-134 and 135.

8              THE COURT:  All right, hold on.

9              MR. KROMBERG:  And these were items that were found

10   on his, the defendant's computer in 2011.

11             MR. SMITH:  Again, Your Honor, with respect to 14-10

12   to 135, we object to the insinuation that every anti-Israel

13   object in this case is evidence of predisposition to materially

14   support terrorism.  That's an extraordinary statement and

15   theory, Your Honor.

16             THE COURT:  Well, I agree that an isolated --

17             MR. SMITH:  That is coming close to prosecuting

18   political speech.

19             THE COURT:  And you can make that argument to the

20   jury, but I'm going to let -- again, I don't want all of these

21   in.  You have to use some discretion.  I'm saying this could

22   come in, but we're not going to have --

23             MR. KROMBERG:  Right.  Well, keep in mind, Judge,

24   that what you heard before was 45 exhibits.  Well, it's not 45

25   exhibits.  It's about seven photographs and ten graphics, and

1   then there's the stuff about the Mufti, which is ten right

2   there.

3          So yes, there are -- anyway, I also left out from the

4   Facebook, there's a link that Mr. Young linked to the

5   prosecution of another Muslim who was arrested on terrorism

6   charges who had been a Nazi.  That guy's name was Emerson

7   Begolly.

8          THE COURT:  There's no issue there, no problems with

9   that kind of thing.

10         MR. KROMBERG:  I think that is all.  If I may ask my

11  colleagues?

12         Anything else?

13         Anyway, Judge, I believe that is it.  If not the

14  entire universe, it's virtually the entire universe.

15         THE COURT:  As I said, some of it's a bit cumulative,

16  so I'll expect you to pare it down a bit, but the basic subject

17  areas I am permitting in over the defense objection.

18         MR. KROMBERG:  Thank you, Your Honor.

19         THE COURT:  All right.  All right, so we're starting

20  up at nine tomorrow morning.  So, Mr. Kromberg, what's your

21  estimate?  You will finish tomorrow?

22         MR. KROMBERG:  Oh, yes.  So as I say, the -- well,

23  one thing that I have not said is there are a number of items

24  that were found during the search that we are going to want to

25  publish, not only these but, but the more Islamic terrorism

1    things like *Inspire* magazine and the *Book of Jihad*.

2         THE COURT:  All of that's clearly relevant.

3         MR. KROMBERG:  So that's going to take some time to

4    just -- the defense has agreed generally speaking that they are

5    authentic, that they were the ones -- they were items that were

6    found at the house at the time of the search.  So it's still

7    going to take some time to do that --

8         THE COURT:  All right.

9         MR. KROMBERG:  -- but as far as witnesses go,

10   Mr. McNulty is going to be very short; Mr. Menzies is going to

11   be short, maybe equivalent to Mr. Campbell; and I believe that

12   Dr. Gartenstein-Ross is going to take some time because I want

13   to ask him what does this mean and what does that mean and what

14   is the -- in the context, what does this mean?  So that might

15   take a couple hours.

16        Special Agent Caslen's summary testimony I don't

17   think is going to be as long because I believe that most

18   everything will have already been talked about.

19        THE COURT:  Are all the summary exhibits, to the

20   extent you have any, have those been shared with the defense?

21        MR. KROMBERG:  We filed the timeline -- we gave the

22   defense a timeline.  It is -- I'm sure there will be changes to

23   it because we don't want to reference things that weren't

24   admitted, but they have the timeline that's more inclusive, and

25   we're going to have to take some things out of it to make sure

1    that we're not referencing anything that was not admitted, but

2    the defense has that.

3              THE COURT:  All right.

4              MR. SMITH:  One response to the militant Islam

5    documents:  If Your Honor looks at the 14 series, 14-101 to

6    14-104, Mr. Kromberg said that -- I believe he's made some

7    statement about all of these documents were -- all of this

8    literature was collected from Mr. Young's home.

9              In fact, I think three of these are not collected

10   from -- three of these *Inspire* magazines were not taken from

11   his home.

12             THE COURT:  Well, were they from his backpack or his

13   locker?

14             MR. KROMBERG:  They were all from the computer at his

15   home, Judge.  There was an additional paper copy that was found

16   during the search in August 2016, but all five issues of

17   *Inspire* magazine came from the computer that was searched in

18   September 2011.

19             MR. SMITH:  So the issue here, Your Honor, is whether

20   Gartenstein-Ross is testifying on any issues of this magazine

21   that were not found in Mr. Young's possession.  If they were

22   found in Mr. Young's possession, we have no objection.  The

23   question is in reviewing his expert report, it seemed that he,

24   he was proposing testimony on issues that were not even found

25   in the defendant's possession, and we would object to that type

1   of document.

2            THE COURT:  Well, to the extent he's testifying about

3   *Inspire*, I'm assuming you've shown him the ones that you seized

4   from the defendant's home?

5            MR. KROMBERG:  Well, yes.

6            THE COURT:  All right.

7            MR. KROMBERG:  Those are the ones we showed him, and

8   those are the ones we're going to ask him about.

9            THE COURT:  Then I don't think there should be an

10  issue there.

11           MR. SMITH:  And we'd just like to clarify that we're

12  not using any music at trial, that, you know, we're not playing

13  any music.

14           MR. KROMBERG:  I said before that we wanted to play

15  one video that Mr. Young posted on his Facebook page, and that

16  is the only one --

17           THE COURT:  Is it in English or Arabic?

18           MR. KROMBERG:  English -- excuse me, I'm sorry.

19           MR. SMITH:  Your Honor, we have no objection to that

20  video.

21           THE COURT:  Well, wait, there's no objection now.  Is

22  it in English or Arabic?

23           MR. KROMBERG:  Okay.  I think it's got English

24  subtitles.  But it's also -- we have, we have a number of

25  videos that were in an earlier version of the exhibit list that

1   we have taken off the exhibit list, and either

2   Dr. Gartenstein-Ross or Special Agent Caslen will describe

3   them, but we're not looking to play any others other than the

4   one that was posted on the Facebook page, and that's a music

5   video.  It's about two minutes long, maybe two-and-a-half.

6          I'm passed a note that says, "The Marshals Service

7   wants to know if any weapons are coming in tomorrow."

8          THE COURT:  No.

9          MR. KROMBERG:  No.

10          THE COURT:  That makes it easy, all right?  No.  All

11   right?

12          All right.  We could get this case to the jury on

13   Friday unless, again, I don't know what the defense case is

14   going to look like, if there is one, but -- so I don't want a

15   long holdup for the jury.  So one of the things that the

16   government needs to start doing is putting together an index of

17   the exhibits that have been admitted, all right?  Because I

18   have found that trials where there's a lot of evidence and the

19   jury has had a couple of days, one of the first questions we

20   get is could we have an index to the exhibits that have been

21   entered?

22          Now, I am very concerned about the defense case

23   because of the strange way in which evidence has been

24   discussed, and here is the problem:  You did play video clips.

25   We are not sending to the jury entire tapes and telling the

1    jury:  Go to counter hour 2, minute 30, second whatever.

2              MR. SMITH:  Your Honor means audio clips, right?

3              THE COURT:  The audio clips you have to make sure you

4    have on an easily retrievable disc, the way the government has

5    done it, because it's all sort of clips, and we have to make

6    sure that they match up with what was going on in trial, but

7    otherwise, it can't go to the jury because I'm not having them

8    wandering through these tapes that you've got.

9              So sometimes juries don't want to hear things

10   replayed for them, but I've just -- I've put you on notice that

11   it's got to be done better than it was done during the trial.

12             MR. SMITH:  Your Honor, we can put it all on one

13   easily accessible disc, and we can actually provide headphones

14   if necessary for the jury to listen to back there, but as far

15   as the exhibits are concerned, Your Honor has clarified that

16   when we're impeaching the witness with documents, we needn't

17   mark the exhibits if we don't intend to introduce them into

18   evidence.

19             THE COURT:  Right.  They're not --

20             MR. SMITH:  The only reason we had been marking them

21   before was because I think Your Honor said that we should be

22   marking them because the Court was under the impression we

23   intended to introduce the documents.

24             THE COURT:  All right.  But you're not.

25             MR. SMITH:  But we're not, so there's not going to be

1    a confused exhibit scenario.  We may have exhibits, but they're

2    not necessarily the documents we were using to impeach.  We

3    will provide an exhibit list to the government in due time.

4    So --

5                THE COURT:  All right.

6                MR. SMITH:  For each impeachment document we intend

7    to introduce as an exhibit.

8                THE COURT:  Well, impeachment -- all right.  All I'm

9    saying is you'd better get them labeled correctly, and you'd

10   better have a list for the Court and for the government if

11   you're putting on a case where you're putting on exhibits, but

12   I'm mostly concerned about the audio clips because there were

13   not any transcripts for them, and the way they were being

14   retrieved during the trial, as we all know, was difficult

15   because you're giving, you know, a time on a long tape, and

16   your paralegal was having some trouble retrieving them, but

17   that's not the way we ever do it for a jury.

18               So, I mean, they have to be, as the government did

19   it, you know, a nice, easily identifiable this is Exhibit 102,

20   102 is this two-minute clip from a conversation on a particular

21   date.

22               MR. SMITH:  We can put it together, Your Honor.

23               THE COURT:  All right, that needs to be done.  So I

24   don't want to waste -- both sides need to think about, as I

25   said, the exhibit list.

736

1          And what I require, because I've had this issue come

2   up before in other trials, the exhibit number and a

3   nonargumentative but helpful description of what the exhibit

4   is, all right?  And the other side -- each side has to exchange

5   their lists, and I want both sides to sign off on them.  In

6   other words, I don't want the defense arguing, oh, the

7   government in describing Government Exhibit 13 was

8   editorializing or trying to argue their case.  It has to be a

9   nice, clear description:  e-mail conversation, blank date,

10  that's fine.

11          Because again, we want the jury to be able to get to

12  the case without, you know, being here for five days trying to

13  muck through the evidence, because if they get frustrated, they

14  just, you know, will rush to judgment.  We don't want that, all

15  right?

16          Are there any other matters we have to take up before

17  tomorrow?

18          MR. KROMBERG:  Not from the government.

19          THE COURT:  So again, just make sure, counsel, that

20  if you do have witnesses, they're here, all right?

21          All right, we'll recess court until nine tomorrow.

22   (Recess from 6:11 p.m., until 9:00 a.m., December 14, 2017.)

23

24

25

1                   CERTIFICATE OF THE REPORTER

2        I certify that the foregoing is a correct transcript of

3    the record of proceedings in the above-entitled matter.

4                                   _____
                                              /s/
5                                    Anneliese J. Thomson

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25