UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

UNITED STATES OF AMERICA        .    Criminal No. 1:16cr265
                                .
        vs.                     .    Alexandria, Virginia
                                .    December 14, 2017
NICHOLAS YOUNG,                 .    9:00 a.m.
                                .
                Defendant.      .
                                .
.  .  .  .  .  .  .  .  .  .  .  .

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

VOLUME IV

APPEARANCES:

FOR THE GOVERNMENT:        JOHN T. GIBBS, AUSA
                           GORDON D. KROMBERG, AUSA
                           EVAN N. TURGEON, SAUSA
                           United States Attorney's Office
                           2100 Jamieson Avenue
                           Alexandria, VA 22314

FOR THE DEFENDANT:         NICHOLAS D. SMITH, ESQ.
                           David B. Smith, PLLC
                           108 North Alfred Street
                           Alexandria, VA 22314
                             and
                           LINDA MORENO, ESQ.
                           Linda Moreno P.A.
                           511 Avenue of the Americas
                           No. 2
                           New York, NY 10011

ALSO PRESENT:              SA NICHOLAS CASLEN
                           NICHOLAS ENNS
                           FABIAN VERA

(Pages 738 - 1071)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

739

1    OFFICIAL COURT REPORTER:          ANNELIESE J. THOMSON, RDR, CRR
                                       U.S. District Court, Fifth Floor
2                                      401 Courthouse Square
                                       Alexandria, VA 22314
3                                      (703)299-8595

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

740

<u>I N D E X</u>

|  | <u>DIRECT</u> | <u>CROSS</u> | <u>REDIRECT</u> | <u>RECROSS</u> |
|---|---|---|---|---|
| <u>WITNESSES ON BEHALF OF</u><br><u>THE GOVERNMENT</u>: | | | | |
| Kenneth James McNulty | 743 | 754 | 780 | 784 |
| Brian Michael Menzies | 786 | 801 | | |
| Joanne Dill | 810 | 814 | | |
| Dr. Daveed Gartenstein-Ross | 828 | 932 | | |
| SA Nicholas A. Caslen | 994 | | | |

<u>EXHIBITS</u>

|  | <u>MARKED</u> | <u>RECEIVED</u> |
|---|---|---|
| <u>GOVERNMENT'S</u>: | | |
| No. 1-100 | | 817 |
| 1-301 thru 1-308 | | 818 |
| 1-401 thru 1-408, 1-410 | | 819 |
| 1-600 | | 820 |
| 3-125 | | 821 |
| 4-203 | | 821 |
| 8-101 thru 8-104 | | 822 |
| 8-106 | | 1033 |
| 8-107 | | 824 |
| 8-108 | | 823 |
| 8-109 | | 1031 |
| 8-112 thru 8-115 | | 823 |
| 8-500 | | 1038 |
| 10-000 | | 745 |
| 10-103 | | 824 |
| 10-105 | | 824 |
| 10-202T | | 912 |
| 10-203 | | 925 |
| 10-204 | | 907 |
| 10-205 | | 916 |

741

<div style="page"></div>

1                       EXHIBITS (Cont'd.)

2                                    MARKED        RECEIVED

3    GOVERNMENT'S:

4    No. 10-208                                      908
         10-220, pages 1 and 2                      1026
5        10-230                                      881
         10-231                                      882
6        10-232, 10-236 thru 10-238, 10-240          884

7        10-241                                      886
         10-303 thru 10-305                          826
8        10-305-T                                   1054
         10-700                                      781
9        10-706, redacted                           1035

10       10-714                                      749
         10-807                                     1020
11       10-814                                     1049
         10-850                                      903
12       10-860                                      892

13       10-863                                      749
         10-818 and 10-822                           895
14       11-401                                      799
         12-13                                       822
15       13-101 thru 13-104                          893

16       13-105                                      894
         14-100                                      894
17       14-101 thru 14-105                          897
         14-119                                     1043
18       14-140                                     1057

19       14-141                                     1058
         14-180                                      879
20       15-201                                     1029

21

     DEFENDANT'S:
22

     No. 4                                           981
23       5                                           980
         6                                           982
24       7                                           980

25

1              P R O C E E D I N G S

2                   (Defendant and Jury present.)

3          THE CLERK:  Criminal Case 16-265, United States of

4     America v. Nicholas Young.  Would counsel please note their

5     appearances for the record.

6          MR. KROMBERG:  Good morning, Your Honor.  Gordon

7     Kromberg, John Gibbs, and Evan Turgeon for the United States.

8     With us at the counsel tables are FBI Special Agent Caslen and

9     paralegal specialist Fabian Vera.

10         THE COURT:  Good morning.

11         MR. SMITH:  Good morning, Your Honor.  Nicholas Smith

12    for defendant Nicholas Young, and with me is Ms. Linda Moreno.

13         MS. MORENO:  Good morning.

14         THE COURT:  Good morning.

15         And, ladies and gentlemen, I think you get the award

16    for being the most prompt jury.  I'm very, very pleased that

17    you could all get here on time.  Again, we're going to move

18    this case as quickly as we can.

19         Any problems last night for any of you?  Did you bump

20    into anything that you need to tell me about?  No?

21         Great, then we'll get started.  Call your next

22    witness.

23         MR. KROMBERG:  Good morning, Your Honor.  The

24    government calls Jamie McNulty.

25         THE COURT:  All right.

1        KENNETH JAMES McNULTY, GOVERNMENT'S WITNESS, AFFIRMED

2                        DIRECT EXAMINATION

3   BY MR. KROMBERG:

4   Q.   Good morning, Mr. McNulty.

5   A.   Good morning.

6   Q.   Now, the first thing is you have to remember to speak up

7   because I don't know if the amplifier works the way we -- it's

8   not ideal, so you need to keep your voice up, and it might help

9   to lean forward a little bit because that bar is what is

10  amplifying your voice.

11          So could you state your full name and spell your last

12  name for the record.

13  A.   Full name is Kenneth James McNulty.  Last name is

14  M-c-N-u-l-t-y.

15          THE COURT:  You have to speak up, Mr. McNulty, or we

16  can't hear you.

17          THE WITNESS:  Okay.

18          THE COURT:  Much louder.

19          THE WITNESS:  Kenneth James McNulty, M-c-N-u-l-t-y.

20  BY MR. KROMBERG:

21  Q.   And, Mr. McNulty, how are you employed?

22  A.   I work for the Fairfax County Police Department.

23  Q.   Now, are you here today because of your work in the

24  Fairfax County Police Department?

25  A.   No.

1    Q.   Okay.  Do you know the defendant, Mr. Nicholas Young?

2    A.   Yes.

3    Q.   And how do you know him?

4    A.   We grew up together, went to school together, lived

5    together.

6    Q.   How about what contact did you have with him after

7    college?

8    A.   After college.  So after college, I consider when I

9    graduated college in 2007, occasional --

10   Q.   Okay.  Let me strike that.

11        How about, why don't we start from the time you were,

12   say, 22, after, say, maybe 2002.

13   A.   Okay.

14   Q.   What contact did you have after you guys were how old at

15   that point?

16   A.   In 2002, I would have been 22.

17   Q.   Okay.  So after that point, what contact did you have with

18   him?

19   A.   After 2002, I believe it was in 2003, I moved in with him.

20   Q.   So you were roommates?

21   A.   Yeah.

22   Q.   Were you paying rent or --

23   A.   Yeah.

24   Q.   Okay.  In his house?

25   A.   Yes.  Well, at the time, it was his dad's.

1    Q.   And what was the address, do you remember?

2              THE COURT:  Well, we don't need that.  Just the

3    street address is fine.

4    BY MR. KROMBERG:

5    Q.   Heron Ridge Drive?

6    A.   Yes.

7    Q.   Okay.  I'm going to show you a photograph that's

8    Government Exhibit 10-000, and I will ask you if you recognize

9    that photograph.  The court security officer is going to give

10   that to you.

11             THE COURT:  Is there any objection to that?

12             MR. SMITH:  No objection.

13             THE COURT:  All right, it's in.  You can put it on

14   the screen.

15             (Government's Exhibit No. 10-000 was received in

16   evidence.)

17             MR. KROMBERG:  Would you please put on 10-000?

18   Q.   Mr. McNulty, you can just look at the screen over there.

19   A.   Yes, that looks like the house.

20   Q.   Okay.  And you -- how long did you live there?

21   A.   I lived there until about 2007.

22   Q.   Okay.

23             THE COURT:  So that's five years?

24             THE WITNESS:  Just under five years.

25             THE COURT:  All right.

1   BY MR. KROMBERG:

2   Q.   Do you recall his e-mail addresses that you've, that

3   you've known him to use?

4   A.   There was one that I spoke with him on, it was his

5   initials, NY and then 1203, I believe, @, it was like an AOL

6   account.

7   Q.   All right.  And was there a Flying Dutchman?

8          MR. SMITH:  Objection.  Leading, Your Honor.

9          THE COURT:  Sustained.

10  BY MR. KROMBERG:

11  Q.   Do you remember any other e-mail accounts that you knew

12  him to use?

13  A.   I would just talk to him on the AOL.

14  Q.   Okay.  I'm going to ask you to -- the court security

15  officer is going to show you a flag that's been marked

16  Government Exhibit 10-714.  This has been authenticated

17  pursuant to a stipulation as having been seized from the

18  defendant's house in August 2016.

19         MR. SMITH:  One moment, Your Honor.

20         What was the exhibit number again?

21         MR. KROMBERG:  10-714.

22  Q.   Could you take a look at that flag?

23  A.   I can touch it?

24         MR. SMITH:  Objection, Your Honor.

25         THE COURT:  The objection is overruled.

McNulty - Direct                                                    747

BY MR. KROMBERG:

Q.   Can you take a look at the flag?  Yes, you can touch it.
You can open it and look at it and see if you recognize it.

A.   Yeah, I recognize it.

Q.   Okay.  And how do you recognize it?

A.   I believe it was hung in the basement of the house.

Q.   When you were living there?

A.   Yes.

Q.   Can you -- do you see the eagle symbol on that flag?

A.   Yes.

Q.   What, if any, connection did that eagle symbol have to a
tattoo that Mr. Young had?

          MR. SMITH:  Objection.  Leading.

          THE COURT:  I don't think so.  I'll overrule the
objection.

          THE WITNESS:  Okay.  You want me to answer it?
Sorry.

BY MR. KROMBERG:

Q.   If the judge says you can answer, you can answer.

A.   Okay.  So it resembles a tattoo that he has on his neck.

Q.   Or at least he had on his neck when you knew him?

A.   Yes.

Q.   Okay.  So, so this flag was hanging downstairs.  What,
what was -- what kind of room was it where it was hanging?

A.   It was, like, a workout area.

1    Q.    So did he have workout equipment in there?

2    A.    Yes.

3    Q.    Treadmill?

4    A.    No treadmill.

5    Q.    Weights?

6    A.    Yeah.

7    Q.    Okay.  Did you have occasion while you lived there to see

8    the defendant working out in the workout room?

9    A.    Yes.

10   Q.    Okay.  Do you recall what sort of music that he listened

11   to when he was working out?

12              MR. SMITH:  Objection.  Leading.

13              THE COURT:  No, overruled.

14              THE WITNESS:  Okay.  So, you know, it would sound

15   like punk music when working out.

16   BY MR. KROMBERG:

17   Q.    And what kind of rhetoric did you hear in that music?

18   A.    There was occasion where there was some songs that had

19   some racially derogatory terms in them.

20   Q.    Okay.  Well, we're not going to -- we don't need to go

21   into the racially derogatory terms.

22              THE COURT:  Are you moving 10-714 into evidence at

23   this time or not?

24              MR. KROMBERG:  Yes, Your Honor.

25              THE COURT:  All right.  I know there's an objection,

1   but it's overruled.

2           MR. SMITH:  A relevance objection.

3           THE COURT:  It's overruled.

4           (Government's Exhibit No. 10-714 was received in

5   evidence.)

6           MR. KROMBERG:  At this time, Judge, we'd move in

7   10-863, which was -- we have a stipulation that was seized from

8   the residence on -- in August 2016.

9           THE COURT:  When you say "the residence" --

10          MR. KROMBERG:  Mr. Young's residence.

11          THE COURT:  Is this the one that they just saw the

12  photograph of?

13          MR. KROMBERG:  Yes.

14          THE COURT:  All right.  Just to make it clear to the

15  jury.

16          MR. SMITH:  We object to 403, relevance.

17          THE COURT:  All right.  The objection is overruled.

18          (Government's Exhibit No. 10-863 was received in

19  evidence.)

20          MR. KROMBERG:  And could we just publish that to the

21  jury now, 10-863?

22          MR. SMITH:  We also object to the playing of any

23  music, if that's what the government intends to do.

24          THE COURT:  All right, the Court is overruling the

25  objection.

McNulty - Direct                                                    750

1              MR. KROMBERG:  We're not going to ask to play any

2    music, Judge.

3              Could you zoom in on that?  Okay.  That's fine.

4    We'll move on.

5    Q.   Mr. McNulty, what, if any, interest did you see Mr. Young

6    exhibit with respect to Nazis while you were living with him?

7    A.   He was into a reenactment group where, from my

8    understanding, he portrayed a Nazi character.

9    Q.   What, if anything, did Mr. Young ever tell you about his

10   parents' attitudes towards his own interest in Nazis?

11   A.   I know -- I can't remember when, but there was some

12   discussion of one of his parents approaching him about his

13   choice in the reenactment group.

14   Q.   Well, when you say approached him, approached him in the

15   sense of did the parent have a -- did Mr. Young say that his

16   parent approved or disapproved?

17   A.   Disapproved.

18   Q.   Did you know Mr. Young's father?

19   A.   Yes.

20   Q.   Were you aware of Mr. Young's father's death?

21   A.   Yes.

22   Q.   Do you recall when that was?

23   A.   Around 2006.

24   Q.   Did you observe a change in Mr. Young's personality after

25   his father's death?

1   A.   Yeah.  I mean, you know, I could tell there was some

2   depression.

3   Q.   Was -- what relationship temporally, what relationship in

4   time was there between his father's death and when he started

5   to turned to Islam?

6   A.   I'm not sure, but it seemed, it seemed around the time he

7   would watch some videos that would, I guess, comfort him with a

8   guy that would just talk about the Koran, and it seemed to help

9   him cope with things going on.

10  Q.   So were you living with him when he converted to Islam?

11  A.   I don't know.  He -- I don't know the specific date that

12  he did.

13  Q.   Was there any -- did you observe any physical changes

14  around this time in Mr. Young?  And I'm referring to his

15  physical appearance.

16  A.   Yeah.  You know, maybe he just kind of would be unshaven,

17  but, you know, nothing, nothing more than that.

18          MR. SMITH:  Objection.  Relevance.

19          THE COURT:  Are you going to tie that up?

20          MR. KROMBERG:  I hope so.

21          THE COURT:  All right.  At this point, I'll overrule

22  the objection.

23  BY MR. KROMBERG:

24  Q.   What personality changes did you observe at that same

25  time?

1          MR. SMITH:  Objection.  Leading.

2          THE COURT:  Did you observe any personality changes?

3    That's not a leading question.

4    BY MR. KROMBERG:

5    Q.   Did you observe any personality changes?

6    A.   After the -- after his father's death?

7    Q.   At the time -- yes, but at the time that he's becoming

8    unshaven and watching videos.

9    A.   I mean, you know, there was some depression, you know, it

10   was up and down at times, but he, he kind of became a little

11   distant from me, you know, and I don't think it was the

12   father's death.  I think both of us just had different things

13   going on in our lives.

14   Q.   What, if any, changes did you see regarding who he

15   socialized with around that time?

16   A.   Well, I didn't know who he really socialized with.  I

17   didn't know that group of people, but, you know, he would talk

18   about he was hanging out with people.  I don't, I don't know

19   their names or anybody.

20   Q.   Did -- what, if anything, did you observe regarding the

21   videos he watched at that time?

22   A.   Well, you know, he would watch videos all the time.  He

23   was on YouTube all the time watching videos, like I mentioned

24   earlier, the guy talking about the Koran.  There was, there was

25   one occasion where there was a video that I can remember, and

McNulty - Direct                                          753

1   it was kind of like the humming that sounded like it was in

2   Arabic, and it was like a -- it was like a stereotypical, like,

3   terrorist camp video, but, you know, that, that was one time

4   that I saw that.

5   Q.   When you say that he was watching them all the time, what

6   do you mean by that?  Do you mean -- well, what do you mean by

7   "all the time"?  How many times a day was he watching them?

8   A.   Any time of day.  I mean, you know, I would wake up, leave

9   for work, and I could hear him in his room watching videos and

10  whatnot.  I don't, I don't know what it was of, but --

11  Q.   And what time would you leave for work?

12  A.   It varied.  At the time, I had a schedule where I'd work

13  one month of day work, one month of midnights, so it could have

14  been anywhere from five in the morning to five in the evening.

15  Q.   Did you know a Brian Menzies?

16  A.   The name sounds familiar.  I did not know him, though.  I

17  saw him in passing one time when I was moving out.

18  Q.   And what was he doing when you were moving out?

19  A.   He was moving in.

20  Q.   Okay.  Did you remain in contact with Mr. Young after you

21  moved out of the townhouse in 2007?

22  A.   Yes.

23  Q.   And how frequent was your contact?

24  A.   We would text on our birthdays "Happy Birthday."  We would

25  talk to each other maybe a couple times a year, not very often.

1            MR. KROMBERG:  Okay.  Thank you, Mr. McNulty.  I

2    expect the defense will have some questions for you.

3            THE COURT:  All right.  Cross-examination?

4                    CROSS-EXAMINATION

5    BY MR. SMITH:

6    Q.   Good morning, Mr. McNulty.

7    A.   Hi.

8    Q.   Were you subpoenaed to be here today?

9    A.   Yes.

10   Q.   You're not here voluntarily, correct?

11   A.   Correct.

12   Q.   So when you were living with Mr. Young between 2004 and

13   2007, you weren't just roommates, correct?

14   A.   Correct.

15   Q.   In fact, you were pretty close friends, correct?

16   A.   Yes.

17   Q.   And during the period you just testified about when you

18   said that Mr. Young was watching videos, you continued to be

19   friends with him throughout this period, correct?

20   A.   Correct.

21   Q.   In fact, you had a wedding during this period, right?

22   A.   Yes.

23   Q.   And you had a -- you married Fabiola, your girlfriend,

24   correct?

25   A.   Yes.

1   Q.   And she was a roommate with you and Nicholas, correct?

2   A.   Yes.

3   Q.   And Mr. Young had a good relationship with both of you,

4   correct?

5   A.   Correct.

6   Q.   During this whole period that you were describing with

7   Mr. Kromberg, correct?

8   A.   Correct.

9   Q.   In fact, Mr. Young was the best man at your wedding,

10  correct?

11  A.   Correct.

12  Q.   You also went to Nick's dad's funeral, correct?

13  A.   Correct.

14  Q.   So when were you first contacted by the government about

15  this case?

16  A.   I would say maybe six months ago.

17  Q.   Six months ago?  And who contacted you?

18  A.   I cannot recall the name of who contacted me.

19  Q.   Did you have a meeting with the government?

20  A.   Yeah.  They came to my house.

21  Q.   And what did they say?

22  A.   They just asked me some questions.

23  Q.   You said six months ago?

24  A.   It could have been different, but I'm just estimating

25  about six months ago.

1    Q.   And what sort of questions were they asking you?

2              THE COURT:  Keep your voice up a little bit louder,

3    please.

4              THE WITNESS:  Okay.  You know, just how I knew him,

5    how long I knew him, you know, anything observed.

6    BY MR. SMITH:

7    Q.   Were they asking you in particular whether you had seen

8    anything German-related in his house?

9    A.   Yeah.

10   Q.   That's where they were going with their questions towards

11   you?

12   A.   Well, I mean, they had asked about if I had recognized the

13   flag.

14   Q.   Which flag?

15   A.   The one right here.  Asked about music and videos.

16   Q.   So when you were living with Nick between 2004 and 2007,

17   you would all hang out together, you, Fabiola, and Nicholas,

18   right?

19   A.   Yes.

20   Q.   Fabiola liked Nicholas, right?

21   A.   Yes.

22   Q.   And Fabiola was -- what background is she?

23   A.   She's Hispanic.

24   Q.   And so were there many occasions in which you, Fabiola,

25   and Nicholas would have dinner together with Fabiola's family?

1  A.    Probably.

2  Q.    And her family is Hispanic, correct?

3  A.    Yes.

4  Q.    Did Fabiola's family like Nick?

5  A.    They did.

6  Q.    Why?

7  A.    I mean, you know, he's a likable guy.  He's nice.  He'll

8  talk to anybody.

9  Q.    And he is still a likable guy?

10  A.    Yeah.

11  Q.    So when you were living together between 2004 and 2007,

12  you, Fabiola, and Nick would do what together at the house?

13  Would you watch TV together?

14  A.    Yeah, we'd watch TV, movies.

15  Q.    Throughout this period you were talking about with

16  Mr. Kromberg, right?

17  A.    Yes.

18  Q.    So is it, is it accurate to say that when you say that you

19  heard Mr. Young watching video clips during this period, you

20  were not offended enough to stop hanging out with Nicholas,

21  correct?

22  A.    Correct.

23  Q.    Did there come a time when you met Nicholas's girlfriend

24  named Leesah?

25  A.    Leesah.

McNulty - Cross                                                            758

1    Q.    It might be spelled L-e-e-s-a-h.

2    A.    Yeah.  Yeah, it does sound familiar.

3    Q.    Do you recall her?

4    A.    Yeah.

5    Q.    Do you recall when Nicholas dated Leesah?

6    A.    I want to say it was, he started dating her before I moved

7    in, so maybe, like, between 2002.

8    Q.    Do you recall what -- was Nick close with Leesah?

9    A.    Yeah, he was close with her.

10   Q.    He would hang out with her a lot?

11   A.    Yeah.

12   Q.    And do you remember Leesah's background?

13   A.    I believe she was Asian.

14   Q.    And they had a close relationship, right?

15   A.    Yes.

16   Q.    Nick was spending a lot of time with her in this period?

17   A.    Yes.

18   Q.    Would you say that's about 2002 to 2004?

19   A.    Yes.

20   Q.    Now, your family had a relationship with Nicholas, too,

21   correct?

22   A.    Yes.

23   Q.    Your father and your mother both met Nicholas?

24   A.    Yes.

25   Q.    And what did they think of Nicholas?

1   A.   You know, once again, he was a likable guy.  They liked

2   him.

3   Q.   And when I said your mom, I meant your stepmom, right?

4   A.   Both my stepmom and my mom.

5   Q.   And your stepmom had, you know, she's met Nicholas, she's

6   had dinners with him, right?

7   A.   Yes.

8   Q.   During the period that you were discussing with

9   Mr. Kromberg?

10  A.   Yes.

11  Q.   And what's your stepmom's background?

12  A.   She's Asian.

13  Q.   She's Filipino?

14  A.   Yeah.

15  Q.   Now, Mr. McNulty, what does your father do?

16  A.   Right now, he works in government contracting.

17  Q.   Did there come a time when he served overseas?

18  A.   Yes.

19  Q.   And what did he do overseas, if it's not too sensitive to

20  mention?

21  A.   My understanding is that he did IT work on military bases.

22  Q.   Was he in Iraq at one point?

23  A.   Yes.

24  Q.   And did there come a time when he came back from Iraq

25  with, you know, objects that he had collected of interest and

1    gave them to you?

2    A.    Yes.

3    Q.    And do you remember what some of those were?

4    A.    One of the things he brought was, like, this leg

5    armor-type thing.  Something else he had brought was a, I don't

6    know the name for it, but it was like a, it was like a dress

7    that men wear.

8    Q.    What kind of men?

9    A.    Muslims.

10   Q.    And did he bring something else back, too?  Some people

11   call it a kufia?  It's a --

12   A.    Yes.  That was with, that was with the kind of dress.

13   Q.    And what color was that?

14   A.    It was white.

15   Q.    No, I mean the -- the dress was white, but what color was

16   the thing that you wear on your head -- that Muslims wear on

17   their heads?

18   A.    The one he brought, I thought it was white.

19   Q.    Was it red and checked?  Well, you remember that he

20   brought back sort of an Arab scarf that men wear over their

21   heads, right?

22   A.    Yeah.

23   Q.    When was that about?

24   A.    Well, he worked overseas from about 2004 until two

25   thousand --

1    Q.    '6?

2    A.    He was over there until about 2012, so he was on and off

3    over there for between those years.

4    Q.    So do you remember a time when your father came back from

5    Iraq and he brought back some of these traditional garbs, and

6    did you and Nick ever sort of put them on to have a laugh?

7    A.    I'm sure we did.

8    Q.    And you took pictures of that, right?

9    A.    I'm, I'm sure we did.

10   Q.    Do you recall an occasion when you took a picture of Nick

11   wearing a red check scarf and a white outfit and he might have

12   been holding -- sitting in front of a gun and looking very

13   scary?  Do you remember that occasion?

14   A.    It's kind of fuzzy, but I remember something like that.

15   Q.    So during that occasion when you took this gag picture of

16   Nick, were you -- do you think you were engaged in some sort

17   of, something terroristic?

18   A.    No.

19   Q.    It was supposed to be a joke, right?

20   A.    Yes.

21   Q.    Did you ever meet Janine?

22   A.    Yes.

23   Q.    Who was Janine?

24   A.    It was another girl that he was seeing.

25   Q.    And when was that about?

McNulty - Cross                                                        762

1   A.    This was probably 2005-2006.

2   Q.    Maybe about 2009?  You moved out from Nicholas's apartment

3   about 2007, right?

4   A.    Okay.  So maybe it was a little later.

5   Q.    But you continued to see him after -- you continued to

6   have a relationship with Nicholas --

7   A.    Yeah.

8   Q.    -- after you moved out, right?

9   A.    Yeah.

10  Q.    So you would have seen Nicholas and his girlfriend after

11  you moved out in 2007?

12  A.    Yeah.  I don't know if I saw them together after I moved

13  out.  I know I had talked to her one time.

14  Q.    And what was -- was Nicholas close to Janine?  Is that

15  fair to say?

16  A.    Yeah.

17  Q.    He had a good relationship with her, solid?

18  A.    Yeah.

19  Q.    What was Janine's background?

20  A.    I think she was, I can't remember what country

21  specifically, but Middle Eastern.

22  Q.    Was she, was she Pakistani?

23  A.    She could have been.

24  Q.    Did you know Zara?

25  A.    Zara?

1   Q.   Did you ever meet Zara?

2   A.   That name doesn't sound familiar.

3   Q.   You might have known her as Kristen or Kirsten?

4   A.   I'm not sure.

5   Q.   Do you recall that Nicholas had a girlfriend from Canada?

6   A.   Yes.

7   Q.   And when did you meet her?

8   A.   I don't think I ever met her.

9   Q.   You heard of her, though?

10  A.   I heard of her.

11  Q.   Did Nicholas ever tell you about her?

12  A.   Oh, yeah.  He would say --

13          MR. KROMBERG:  Objection, Judge, to what Nicholas

14  told this witness about his girlfriend.

15          THE COURT:  How is this relevant?

16          MR. SMITH:  This is -- the government is attempting

17  to establish a predisposition to commit crimes, and this

18  evidence shows that --

19          THE COURT:  You'd better approach the bench.

20          (Bench conference on the record.)

21          THE COURT:  Yes?

22          MR. SMITH:  Your Honor, this is relevant for a couple

23  of reasons.  One, she's Jewish, and he was dating her for

24  several years.  This is the Canadian girlfriend about whom

25  Mr. Mo testified earlier in the trial that Mr. Young told him

McNulty - Cross                                                        764

1   that Mr. Young did not want to go back to Libya because of his

2   girlfriend and his very close relationship with her.  If Mr. --

3            THE COURT:  All right.

4            MR. KROMBERG:  It's hearsay to have the defendant

5   offer his own testimony through his own -- through another

6   witness.  I can ask a question --

7            MR. SMITH:  It's not offered for the truth.

8            THE COURT:  Just a minute.

9            MR. KROMBERG:  The fact that she's Jewish is

10  obviously offered for the purpose of proving that she was

11  Jewish, for the truth of the fact that she was Jewish.  So you

12  cannot, you cannot bring in that evidence.

13           THE COURT:  It is -- coming in this way, it's

14  hearsay.  I'm sustaining the objection.  Let's go back.

15           MR. SMITH:  May I ask questions about the girlfriend?

16           THE COURT:  No.

17           (End of bench conference.)

18           THE COURT:  Wait, wait, wait.  You need to wait.

19  Make sure the court reporter is ready.

20           Now she's ready.

21           MR. SMITH:  Are you ready?

22  Q.   So I was asking about a girlfriend, Zara, but I'm going to

23  back up and ask you a more general question.  Is it fair to say

24  that during the time period you knew Nicholas Young, you saw

25  him date several different people?

1   A.    Yes.

2   Q.    And did you observe any sort of racist behavior of

3   Mr. Young in his selection of who he decided to have

4   relationships with?

5   A.    No.

6   Q.    And was that true for his friends as well?  So that -- we

7   were talking about his girlfriends, but did you see any racist

8   kind of discrimination in his selection of friends?

9   A.    No.

10  Q.    And you actually had quite a few minority friends,

11  correct?

12  A.    Correct.

13  Q.    And did Mr. Young ever suggest to you that you should not

14  hang around them for racial reasons?

15  A.    No.

16  Q.    So you testified about Mr. Young's music interests,

17  correct?

18  A.    Yes.

19  Q.    And what did you say again, what in particular was

20  something scary?

21  A.    Oh, no, I just said it sounded like punk music.

22  Q.    Punk music?

23  A.    Yeah.

24  Q.    But Mr. Young listened to lots of different kinds of

25  music, right?

1    A.    Correct.

2    Q.    So that's just one small part of it, right?

3    A.    Yes.

4    Q.    So you testified about this German flag that you saw in

5    Mr. Young's home?

6    A.    Yes.

7    Q.    But isn't it true that that German flag was just one of

8    the kind of military objects in Mr. Young's home?

9    A.    Yes.

10   Q.    There's a whole slew of different kinds of military

11   objects in his home, right?

12   A.    Yes.

13   Q.    Like, do you remember what he had?

14   A.    A lot of things.

15   Q.    Like what?

16   A.    I mean, he was a big collector of Warhammer 40K.

17   Q.    What is Warhammer 40K?

18   A.    So it's like a type of board game, and you make little

19   figurines, and you can paint them, and it's a type of game that

20   you can play.

21   Q.    So did he have lots of books about history?

22   A.    Yes.

23   Q.    And was it just German history?

24   A.    No.

25   Q.    Was it, like, Civil War history?

1   A.    It was probably every kind of history.

2   Q.    So, so you did see some German objects within that

3   collection of military --

4   A.    Yes.

5   Q.    -- sort of paraphernalia in his house?

6             But that was just one portion of all of these

7   military objects in his home, correct?

8   A.    Yes.

9   Q.    You saw Vietnam era objects in his home?

10  A.    Yes.

11  Q.    World War I objects in his home?

12  A.    Yes.

13  Q.    Mr. Young's grandfather was in the Air Force, correct?

14  Did you know that?

15  A.    I mean, I knew he was in the military.  I didn't know

16  which branch.

17  Q.    He was, he was -- so that sort of -- that sparked his

18  interest in United States military objects, correct?

19  A.    I imagine that's what it would be from.

20  Q.    Do you remember seeing, like, Air Force jump boots in his

21  home?

22  A.    Yes.

23  Q.    Like, various different kinds of U.S. military objects,

24  like ammo boxes from the U.S. Army, GI boxes from World War II?

25  A.    Yes.

1   Q.   Did you ever view Mr. Young as, as -- what was his

2   political orientation?  Was he conservative?

3   A.   Conservative, yes.

4   Q.   And he had a particular interest in a certain Republican

5   politician, right?

6   A.   So I know after I had moved out, I know I had come by at a

7   time and seen some, like, Ron Paul signs.

8   Q.   Right.

9   A.   Yeah.

10  Q.   Mr. Young liked Ron Paul, right?

11  A.   Yes.

12  Q.   And what was your understanding of what kind of a

13  politician Ron Paul is?

14          MR. KROMBERG:  Objection, Your Honor.  I don't see

15  the relevance of what Mr. McNulty's --

16          THE COURT:  I'm going to -- I'll overrule the

17  objection.

18          THE WITNESS:  Okay.  So, you know, Ron Paul, the idea

19  that I got from him is, like, small federal government.

20  BY MR. SMITH:

21  Q.   He opposes wars overseas, right?

22  A.   Correct.

23  Q.   And that was a political point of view, a political point

24  of view that Mr. Young shared, correct?

25  A.   Correct.

1    Q.    He thought that wars overseas were a drain on U.S.

2    resources, correct?

3    A.    Correct.

4    Q.    And do you think that Mr. Young's interest in this sort of

5    antiwar position was related to animosity towards American

6    soldiers?

7    A.    No.  I think it was just a feeling that he had.

8    Q.    In fact, it might have been inspired -- according to your

9    conversations with Mr. Young, it might have been inspired by a

10   concern for the U.S. military, correct?

11   A.    Could have been.

12   Q.    When you were friends with Mr. Young and you saw all these

13   possessions in his house, U.S. Army artifacts and all the rest,

14   did you get the sense that Mr. Young hated American soldiers?

15   A.    No.

16   Q.    You never got that sense, did you?

17   A.    No.

18   Q.    And you were very close to Mr. Young, right?

19   A.    Yes.

20   Q.    And to the contrary, wasn't Mr. Young pretty patriotic

21   about the military?

22   A.    He was.

23   Q.    And that would make sense because his grandfather was in

24   the Air Force, correct?

25   A.    Yes.

1    Q.   So did there come a -- so you -- how did you meet

2    Mr. Young?

3    A.   It was around '92-'93 time frame, between middle school

4    and high school.

5    Q.   And was there some activity that you bonded in together, a

6    kind of --

7    A.   Yeah.  We were in -- so in high school, we were in Junior

8    ROTC, which is, you know, I guess, kind of like military-type

9    classes and school where they teach you leadership and history,

10   and then in college, we actually did, continued into ROTC.

11   Q.   And Mr. Young, he remained in the ROTC for a bit longer

12   than you.  Do you know Mr. Campbell, Ian Campbell?

13   A.   Yes.

14   Q.   He was in the ROTC with both of you, correct?

15   A.   Yes.

16   Q.   And Mr. Campbell dropped out before Mr. Young, right?

17   A.   I believe so.

18   Q.   So when you were in the ROTC together with Mr. Young, did

19   you get the sense that he was, supported kind of a violent

20   overthrow of the government?

21   A.   No.

22   Q.   Did there come a time when you learned that Mr. Young

23   joined the National Guard?

24   A.   Yes.

25   Q.   And when was that?

1    A.    Maybe '99 to 2000.

2    Q.    Well, you know, wasn't it after September 11?

3    A.    Okay.  Maybe it was, because we, we used to actually work

4    security together during 9/11, and I remember talking to him on

5    the phone during 9/11 and both of us being in shock, and so

6    maybe it was after that.

7    Q.    You said both of you were in shock.

8    A.    Yeah.

9    Q.    Can you, can you explain what you mean by that?

10   A.    At the time, my dad was working at National Airport, and I

11   had gotten a call from him.  I called Nick because he was

12   working at the security site that we both worked at together,

13   and told him what was going on, and, you know, he seemed

14   surprised, and I think he went to a restaurant in the shopping

15   center to watch the TV and just stayed there the whole time

16   watching the TV.

17   Q.    Would you say that he was happy about September 11?

18   A.    No.

19   Q.    What would you say his reaction was?  Shock? dismay?

20   A.    Yeah.

21   Q.    Do you remember anything he specifically told you about

22   September 11?  Did he say -- did he give you some comments?

23   A.    I don't recall.

24   Q.    Okay.  You said that you were at a security site with him

25   on that day.

1   A.   Not on -- I was just talking with him on the phone.  I was

2   off that day because it was actually during a time where I was

3   working full time, and on Tuesdays and Thursdays, I would take

4   classes at George Mason, and so it was either a Tuesday or a

5   Thursday that 9/11 happened.

6   Q.   And at that time, you were not a Fairfax County police

7   officer?

8   A.   Correct.

9   Q.   So did there come a time when you learned about this case,

10  when you learned that Nick had been arrested?

11  A.   Yes.

12  Q.   And is it safe to say that you were shocked?

13  A.   Yes.

14  Q.   Is it safe to say that -- is it accurate to say that given

15  what you knew about Nick when you lived with him, the fact that

16  he was arrested for attempted material support for terrorism

17  was extraordinary to you?

18  A.   That it was extraordinary?

19  Q.   It was shocking.

20  A.   Yes.

21  Q.   Would you have expected that when you lived with him in

22  2004 to '7?

23  A.   No.

24  Q.   Now, you said that after Mr. Young's father died in -- you

25  said 2006, but it's 2007.

1   A.    Okay.

2   Q.    You went to his father's funeral, right?

3   A.    Yes.

4   Q.    And you said that you noticed a behavioral change in

5   Mr. Young?

6   A.    Yes.

7   Q.    Do you think that was because his father died?

8   A.    Yeah.

9   Q.    And did you have the sense that Nick wanted to have

10  conversations with you about his father's death?  He needed

11  someone to talk to about it?

12  A.    Yes.

13  Q.    So what would you talk about with him?

14  A.    You know, just he would express to me feelings that,

15  things that he wished he could have done that he didn't.  So,

16  you know, I would try to comfort him and tell him the right

17  thing to make him feel better.

18  Q.    So you testified about the reenactments kind of thing, the

19  Nazi World War II reenactments.

20  A.    Yeah.

21  Q.    And you said that you saw Nick doing the reenactments when

22  you were living with him between 2004 and '7?

23  A.    Yeah.

24  Q.    And you said that someone told -- Nicholas told you that

25  his parents told him they disapproved, right?

1   A.    Yeah.

2   Q.    Did you ever at any point see Mr. Young engaged in

3   political advocacy for white supremacism?  And by political

4   advocacy, I mean, like, you're familiar with, you know, going

5   to a rally and chanting and carrying signs in public.  That's

6   what political advocacy, that's what I mean by that.

7   A.    Yeah.  No, I never saw, like, politics mixed in with the

8   reenacting that he would do.

9   Q.    So it was kind of your sense that this was sort of like

10  dress-up?

11  A.    Yeah.

12  Q.    Are you familiar with the term "cosplay"?

13  A.    Yeah.

14  Q.    What is cosplay?

15  A.    Kind of you dress up in a character.

16  Q.    But it's like -- it's not to be meant sincerely; is that

17  right?

18  A.    It sounds right.

19  Q.    It's like you dress up as something to pretend for a day

20  that you're this character, but that doesn't mean that you

21  share that character's political views, correct?

22  A.    Correct.

23  Q.    So was it your sense that Mr. Young's dressing up as a

24  Nazi was sort of like a cosplay-type thing?

25  A.    Yeah.

1              THE COURT:  You really should say "yes" or "no," not

2    "yeah."

3              THE WITNESS:  Okay.  Yes.

4    BY MR. SMITH:

5    Q.   So I was asking you about Zara earlier, but -- I'm not

6    going to ask you about her background, but isn't it true that

7    Mr. Young would talk about her a lot?

8    A.   Yes.

9    Q.   He was very -- he loved her very much, right?

10   A.   Yes.

11   Q.   And did there come a time when -- were you still friends

12   with Nick when Zara and Nicholas Young broke up?

13   A.   He had talked about it, yes.

14   Q.   Do you remember when that was about?

15   A.   Maybe 2011-'12 time frame.

16   Q.   Maybe 2013?

17   A.   Okay.

18   Q.   And you encouraged Nick to remain in a relationship with

19   her about that time, right?

20   A.   Well, yeah, because I remembered him talking about his

21   feelings for her, and I told him, you know -- I don't remember

22   specifically saying, but I told him, you know, if you have

23   feelings for her, don't break the law, but make sure she knows

24   how you feel.

25   Q.   Don't break the law?

1   A.   As far as, like, harassing her.

2   Q.   Well, yeah.

3        So you also went to high school with Mr. Young,

4   right?

5   A.   Yes.

6   Q.   You went to West Potomac?

7   A.   Yes.

8   Q.   When you met with the government before you testified here

9   today, did the government ask you any questions like this?  I'm

10  asking about, you know, whether Nick Young was racist towards

11  any of your friends, whether he was racist and discriminatory

12  in his dating habits.  Did they ask you any of those questions?

13  A.   I don't recall those.

14  Q.   You don't recall them?

15  A.   Right.

16  Q.   Their questions were more focused on all of the German

17  things Nick had in his house, right?

18  A.   It was kind of more of an overall picture of everything,

19  the history of me knowing him.

20  Q.   So there came a time when Nick was dating Zara when --

21  she's the Canadian one?

22  A.   Okay.

23  Q.   When she couldn't get back into the United States.  Do you

24  remember that?

25  A.   Yes.

1   Q.   And, and did Nick ever -- so what was your sense of why

2   she couldn't get back into the United States?

3   A.   Her immigration.

4          THE COURT:  Wait, wait, wait.

5          MR. KROMBERG:  What is the witness's sense of why an

6   ex-girlfriend --

7          THE COURT:  I think this is getting -- this is

8   clearly not relevant at this point.  I'm sustaining the

9   objection.  Move on.

10         MR. SMITH:  This isn't about why she couldn't get

11  back into the United States.  It's just one personal anecdote

12  about Mr. Young that has nothing to do with the law.

13         THE COURT:  Let me hear the next question.

14         MR. SMITH:  Okay.

15  Q.   Do you remember that Mr. Young drove for about 20 hours

16  round trip when they would not allow --

17         MR. KROMBERG:  Objection, Judge.

18         THE COURT:  Again, sustained.  It's not relevant.

19  BY MR. SMITH:

20  Q.   So you testified earlier that Mr. Young had a kind of

21  Libertarian political mindset, right?

22  A.   Yes.

23  Q.   And is it your understanding that that Libertarian

24  political mindset that Mr. Young had included a belief in civil

25  liberties?

1    A.    Yes.

2    Q.    Strict constitutionalism?

3    A.    Yes.

4    Q.    Nick might have said this to you on a couple of occasions,

5    that he believes in strict constitutionalism?

6    A.    I know he was, he was firm in his constitutional rights.

7    Q.    And that was true throughout the period when you knew him

8    between 2004 to '7?

9    A.    Yes.

10   Q.    When you were living with Nick Young between 2004 and '7,

11   did it ever occur to you that he might while he was a police

12   officer attack some people for political reasons?

13   A.    No.

14   Q.    Does that seem -- does that idea seem even plausible to

15   you?

16   A.    No.

17   Q.    You had mutual friends in common with Nicholas Young,

18   right?

19   A.    Yes.

20   Q.    Who were those people?

21   A.    Other people that we went to school with.  One of them

22   that I can think of is Thomas Tsui.

23   Q.    Who's Thomas Tsui?

24   A.    He's a friend that we went to high school with, went to

25   college with.

McNulty - Cross                                                    779

1   Q.   He's another police officer, right?

2   A.   He was a police officer, yes.

3   Q.   Where was he a police officer?

4   A.   Arlington County.

5   Q.   And what's, what's Thomas Tsui's background?

6   A.   He was in the military.  He may still be.

7   Q.   He's Korean, right?

8   A.   He's Chinese.

9   Q.   Chinese.

10          And Nick was very close with Tommy Tsui, right?

11  A.   Yes.

12  Q.   When was that?  When was Nick close with Tommy Tsui?

13  A.   All through high school, college.

14  Q.   And after college as well?

15  A.   Yeah.

16  Q.   So at the time you had your wedding to Fabiola, you had

17  mutual friends who were minorities, right?

18  A.   Yes.

19  Q.   And Nicholas would hang out with all of -- with those

20  minority friends as well?

21  A.   Yes.

22  Q.   Did those -- did any of your mutual friends stop hanging

23  out with Nicholas because he was radical?

24  A.   No.

25  Q.   So you're currently an officer with the Fairfax County

1  Police Force?

2  A.    Yes.

3  Q.    But you're nearing retirement, aren't you?

4  A.    No.

5  Q.    How close are you?

6  A.    Well, I used to work for the Sheriff's Office, and when I

7  left there, I gave up all my time and started over.

8  Q.    So how many years have you got left?

9  A.    So if I count the Sheriff's Office and the police time, it

10  will be almost 17 years.

11         MR. SMITH:  Okay.  Thanks.

12         Your Honor, I think that's everything.

13         THE COURT:  All right.  Any redirect?

14         MR. KROMBERG:  Yes, Your Honor.

15                    REDIRECT EXAMINATION

16  BY MR. KROMBERG:

17  Q.    Mr. McNulty, what flags were hanging in the house when you

18  were living there besides the flag you identified before?

19  A.    So there was that flag.  I can remember a Confederate

20  flag.  There may have been a United States of America flag.

21  Q.    Hanging in the house?

22  A.    There may have been.

23  Q.    You remember the Confederate flag and you remember the

24  German flag hanging in the workout room?

25  A.    Yeah.

McNulty - Redirect                                                781

 1            MR. KROMBERG:  So can you bring up Government Exhibit

 2   10-700?

 3            Judge, this is -- we have a stipulation that this was

 4   seized from Mr. Young's residence in August 2016.

 5            MR. SMITH:  Objection.  403.

 6            THE COURT:  Let me take a look at it.

 7            Overruled.

 8            (Government's Exhibit No. 10-700 was received in

 9   evidence.)

10            MR. KROMBERG:  Can you put up on the screen 10-700,

11   please?

12   Q.   Do you see that framed portrait of Adolf Hitler?

13   A.   Yes.

14   Q.   Do you recall seeing that when you were living with

15   Mr. Young?

16   A.   No, I don't.

17   Q.   Do you recall seeing any framed portraits of any political

18   leaders in the house when you were living with Mr. Young?

19   A.   Not that I can recall.

20            MR. KROMBERG:  Please put up 4-300, which is admitted

21   already.

22   Q.   Do you recall that tattoo of Mr. Young?

23   A.   Yes.

24   Q.   And did you know what that tattoo was of?

25   A.   I don't know the details behind it.  I think it had

1   something to do with the reenactment unit that he was in.

2   Q.   So was that in your view just -- what was the term you

3   used before about what, when you're acting in a reenactment

4   unit?  What, what term was that?

5   A.   Like a character?

6   Q.   That was cosplay to get a tattoo, do you think?

7   A.   Well, that's, that's, I guess, the term that he had used.

8   I mean, you know, it's -- but, I mean, if you're asking what

9   that is, it's from his unit that he was --

10  Q.   How about the tattoo of the eagle on his neck?  Was that

11  part of the cosplaying?

12  A.   I don't know.

13  Q.   So take a look, if you would, at Government Exhibit 9-102,

14  which is in evidence.

15          MR. SMITH:  Objection.

16          MR. KROMBERG:  It's in evidence, Judge.

17          THE COURT:  It's in evidence.  Overruled.

18  BY MR. KROMBERG:

19  Q.   Do you recognize -- you can put the name on it.  It's in

20  evidence.

21          Do you recognize Saleh Al-Barmawi, who's in that

22  picture?

23  A.   No.

24  Q.   Never saw him?

25  A.   No.

1   Q.   So he wasn't one of the friends that you knew Nicholas

2   Young to have?

3   A.   So I, I knew the names that kind of sounded like Saleh,

4   but I never met him, never saw him.

5   Q.   How about 9-103?  Do you recognize this fellow, Amine El

6   Khalifi?

7   A.   No.

8   Q.   He was not one of the people you hung out with when you

9   hung out with Mr. Young?

10  A.   No.

11  Q.   How about 9-104?  Do you recognize Liban Mohamed?

12  A.   No.

13  Q.   So he was not one of the people you hung out with?

14  A.   No.

15  Q.   Okay.  How about 9-105?

16        MR. SMITH:  Objection.  Relevance.

17        THE COURT:  Overruled.

18  BY MR. KROMBERG:

19  Q.   Do you recognize Hicham Hall?

20  A.   No.

21  Q.   Not one of the people that you knew in common?

22  A.   Correct.

23  Q.   How about 9-106, Peshwaz Waise?  Do you recognize him?

24  A.   No.

25        MR. KROMBERG:  Okay.  Thank you, Judge.  I have

1   nothing further.

2            MR. SMITH:  Just a quick redirect, Your Honor.

3            THE COURT:  Yes, sir.

4                      RECROSS EXAMINATION

5   BY MR. SMITH:

6   Q.   So you testified that you didn't see the Hitler picture

7   that Mr. Kromberg just showed you in the home.

8   A.   Correct.

9   Q.   But you did see some German objects in the home --

10  A.   Correct.

11  Q.   -- when you lived with Nicholas.

12           Were those objects prominently -- were they hung up

13  on the walls?

14  A.   No.  I think most of the stuff he would keep in his closet

15  in his room.

16  Q.   Right.  It was all dumped in a drawer, right?

17           Do you know when Nicholas acquired those, all those

18  German artifacts?

19  A.   When he got into German reenacting.

20  Q.   He was in a European racism class -- do you remember

21  that? -- at George Mason?

22  A.   I can't remember, you know, specific classes he took.

23  Q.   Right.  But, like, when you were at the home, you know,

24  you were roommates together, was Nicholas trying to put Hitler

25  things up on the walls, you know, was he talking about Hitler a

1    lot?

2    A.    No.

3    Q.    Okay.  So, so it was all dumped in his closet is what

4    you're saying?

5    A.    Yeah.  Yes, sorry.

6    Q.    So do you know what Nick majored in?  Do you know what,

7    like, his focus of studies was at George Mason?

8              MR. KROMBERG:  Objection, Judge.  I think this is

9    beyond the scope of redirect.

10             THE COURT:  It's beyond the scope of the redirect.

11   BY MR. SMITH:

12   Q.    Okay.  So the government just showed you some pictures,

13   some scary photographs, right?

14   A.    Some photos of some guys.

15   Q.    Some photos, they looked like booking photos or something?

16   A.    It looked like some mug shots.

17   Q.    And the government asked you did you ever see, did you

18   ever see Nicholas with this person, right?

19   A.    Correct.

20   Q.    Did you ever know Nicholas to be an associate of Saleh,

21   and then he showed a picture of Saleh?

22   A.    Correct.

23   Q.    Right?  Did -- when you were living with Nick and when you

24   knew Nick, did you ever see Nick do anything dangerous with any

25   of these individuals?

1   A.   I never saw any of these individuals.  I never saw Nick do

2   anything dangerous.

3   Q.   Okay.  Did you see Nick sort of, like, sneaking around

4   with those sort of people who might look suspicious?

5   A.   No.

6             MR. SMITH:  Okay.  Thank you, Your Honor.

7             THE COURT:  All right, is anybody going to call this

8   witness again?

9             MR. KROMBERG:  No, Your Honor.

10            THE COURT:  What about the defense?  Mr. Smith?

11            MR. SMITH:  No, no.

12            THE COURT:  All right, thank you.

13            Then, Officer McNulty, you're excused as a witness.

14  You can stay in court and watch the proceedings or leave, but

15  you're not to discuss your testimony or anything you see or

16  hear in court with any witness who has not yet testified.

17            THE WITNESS:  Yes, Your Honor.  Thank you.

18                      (Witness excused.)

19            THE COURT:  Your next witness?

20            MR. KROMBERG:  Brian Menzies.

21            THE COURT:  Mr. Menzies.

22      BRIAN MICHAEL MENZIES, GOVERNMENT'S WITNESS, AFFIRMED

23                      DIRECT EXAMINATION

24  BY MR. KROMBERG:

25  Q.   Good morning, Mr. Menzies.  Please state your full name

1   and spell your last name for the record.  And before you do,

2   let me say you have to speak up and you have to lean forward a

3   little bit so that the jury can hear you.

4   A.   Okay.  Brian Michael Menzies.

5   Q.   Louder.

6   A.   Brian Michael Menzies.

7   Q.   And spell your last name, please.

8   A.   M-e-n-z-i-e-s.

9   Q.   Mr. Menzies, what city do you live in now?

10  A.   I live in South St. Paul, Minnesota.

11  Q.   And how are you employed?

12  A.   I currently work at Walmart as a department manager.

13  Q.   Are you studying to do something else?

14  A.   Yeah.  I'm studying to be an EMT and paramedic.

15  Q.   And you took a test on that this week?

16  A.   Yeah, I took a test on Tuesday.

17  Q.   Okay.  Do you know the defendant in this case, Mr. Young?

18  A.   Yes, sir.

19  Q.   Again, keep your voice up.

20  A.   All right.

21  Q.   How do you know him?

22  A.   I used to be his roommate.

23  Q.   And what time, what years were you his roommate?

24  A.   Around 2009-2010.

25  Q.   So did you move in -- do you recall the individual who was

1   the roommate before you moved in?

2   A.   Yeah.  I met him once or twice, Jamie.

3   Q.   And do you remember the last name?

4   A.   McNulty.

5   Q.   Okay.  So you moved in after Mr. McNulty moved out?

6   A.   Correct.

7   Q.   Okay.  Do you remember the address, Heron Ridge Road?

8   A.   Yeah.  I don't remember the exact, but Heron Ridge Drive,

9   Heron Ridge Road.

10  Q.   Okay.  When you were living together, did you socialize

11  much with Mr. Young?

12  A.   Me and Nick were on different schedules, so we'd see each

13  other a lot in passing and hung out a couple times.

14  Q.   Do you know -- who do you recall seeing that he did

15  socialize with?

16  A.   His, his girlfriend at the time was over a lot as well as

17  a man named Saleh.

18          MR. KROMBERG:  Can you put up 9-102, please, which is

19  in evidence?

20  Q.   Is that Saleh?  You can see it on your screen right next

21  to you, too.

22  A.   Yes, sir.

23  Q.   Okay.  Did you know Saleh Al-Barmawi?

24  A.   I never really hung out with him personally, but I would

25  interact with him, you know, at school events or when he was

1    over at the house.

2    Q.    What did you know him to do when he was at these school

3    events or when you would see him?

4    A.    He would talk a lot with, like, the younger students in

5    the MSA.

6    Q.    What is the MSA?

7    A.    What's that?

8    Q.    What is the MSA?

9    A.    Oh, sorry, the Muslim Student Association.

10   Q.    Right.  Please continue.  He would speak a lot with the

11   younger students at the MSA?

12   A.    Yeah.  We'd have, like, dinner nights, or we'd have

13   certain teachers or scholars come to the school, with MSA

14   hosting the event, and Saleh would be there and discuss things

15   with some of the students about Islam and whatnot.

16   Q.    Did he have a particular point of view he was known for?

17   A.    Yes.  Saleh was known to be very conservative and follow

18   the Salafi ideology.

19   Q.    And what is the Salafi ideology?

20            MS. MORENO:  Objection.

21            THE COURT:  Are you a member of that religion?

22            THE WITNESS:  I am Muslim, yes.

23            THE COURT:  All right.  Then as a Muslim, are you

24   aware of what that group is involved with?

25            THE WITNESS:  Yes.  I know a little bit about the

Menzies - Direct                                              790

1    ideology of the Salafi.

2           THE COURT:  Well, then you can speak as a member of

3    the faith your understanding of that ideology.  Go ahead.

4    Overruled.

5    BY MR. KROMBERG:

6    Q.   Please talk about -- please explain to the jury what

7    Mr. Al-Barmawi's position, what he talked about.

8    A.   So --

9           MS. MORENO:  Objection.  Hearsay.

10          THE COURT:  No, it's not being offered for the truth

11   of its contents.  It's being offered for what he heard this

12   individual say, so overruled.

13   BY MR. KROMBERG:

14   Q.   Please go ahead.

15   A.   You know, the Salafi ideology from my understanding was

16   the teachings of a man named Muhammad Abdul Wahhab of Saudi

17   Arabia in the 19th Century who believed that the three

18   generations after Prophet Muhammad were the generations who

19   held to the truth and that anything after that time would be

20   considered a religious innovation known as bid'a.

21   Q.   Bid'a, you have to -- you're going to have to spell it

22   because we have to have everything written down here.

23   A.   B-i-d-apostrophe-a.

24   Q.   Okay.

25   A.   So Saleh was very adamant in that ideological perspective,

1    and so, for instance, he would tell people, you know,

2    celebrating the Prophet's birthday would be an innovation.

3    Interaction with the opposite sex would be considered something

4    that would be considered sinful.  Something like prayer beads

5    would be considered an innovation.  You shouldn't be using them

6    because it imitates, you know, the Christians, Hindus,

7    Buddhists, stuff like that.

8    Q.    So what was Mr. Young's relationship to Saleh Al-Barmawi?

9    A.    Nick and Saleh were friends.  They hung out a lot

10   together.

11            MR. KROMBERG:  Please show 9-101.

12   Q.    Do you recognize 9-101 on your screen?

13   A.    Yes, sir.

14   Q.    And who is that?

15   A.    That is Zack Chesser.

16   Q.    Did you know Zachary Chesser?

17   A.    I knew him through school, yes.

18   Q.    What was Saleh's -- Saleh Al-Barmawi's relationship with

19   Zachary Chesser?

20   A.    Saleh was also friends with Zack.

21   Q.    Did you encounter Saleh Al-Barmawi at, in a store called

22   Halalco?

23   A.    Yes.

24   Q.    Can you describe what Halalco is and what happened when

25   you'd see Saleh at that store?

1    A.    Sure.  So Halalco is kind of like a little supermarket for

2    the local Muslim community in Virginia.  You'd have like a

3    restaurant, books, produce, you know, pretty much a little bit

4    of everything; and I went a lot of times there to get my, my

5    produce and goods as well as books; and a couple of times, I

6    would see Saleh or one of the Salafi brothers in the book

7    section, notably in the section on what they considered an

8    innovative subject such as mysticism, and basically --

9            MS. MORENO:  Excuse me.  Your Honor, I'm going to

10   object to this answer.  It's irrelevant.

11           THE COURT:  I think given the way the case is going,

12   it's not irrelevant.  I'm going to overrule the objection.

13           MR. KROMBERG:  Thank you, Your Honor.

14   Q.    Can you please make sure you speak up, though?

15   A.    Okay.  And, you know, I saw Saleh a couple times there as

16   I looked at books, just telling people that, you know, these

17   books are a bid'a or an innovation and why are you bothering

18   reading this stuff when all you need is, you know, the Koran

19   and the example of the Prophet known as the sunnah.

20   Q.    What is the sunnah?

21   A.    The sunnah, s-u-n-n-a-h, it's basically the example that

22   the Prophet and the generations after him left behind that

23   Muslims look to for guidance and instruction.

24   Q.    Was Mr. Al-Barmawi associated with any particular Islamic

25   school or institute?

1    A.    I know he endorsed Al-Maghrib Institute at the time.

2    Q.    And you're going to have to spell that, please.

3    A.    Okay.  A-l-dash-M-a-g-h-r-i-b, I believe, or i-r-b.

4    Q.    And where is the Maghrib Institute?

5    A.    It is a -- I don't believe it has any, like, headquartered

6    building.  It's an institute that holds online classes as well

7    as areas like a D.C. area, Texas, Boston, and they have

8    instructors, like I said, online or in person that will hold

9    lectures.

10   Q.    And what are the -- what is the particular viewpoint of

11   the Al-Maghrib Institute?

12   A.    At the time I was living in --

13             MS. MORENO:  Objection.

14             THE COURT:  I'm going to overrule that.

15   BY MR. KROMBERG:

16   Q.    Please answer.

17   A.    At the time I was living in Virginia, Al-Maghrib espoused

18   a very Salafi ideological viewpoint.

19   Q.    Are you familiar with an individual named Maqdisi,

20   M-a-q-d-i-s-i?

21   A.    No, sir.

22   Q.    How about Anwar Awlaki?

23   A.    Yes, sir.

24   Q.    Okay.  What, if anything, did Mr. Young say about Anwar

25   Awlaki?

Menzies - Direct                                                            794

1              MS. MORENO:  Objection.

2              THE COURT:  What's the basis for the objection?

3              MS. MORENO:  403, 401.

4              THE COURT:  Overruled.

5    BY MR. KROMBERG:

6    Q.   Please answer.

7    A.   What was the question?

8    Q.   I'm sorry.  What did Mr. Young say about Anwar Awlaki?

9    A.   A lot of the brothers I knew in Virginia were very

10   influenced by --

11             MS. MORENO:  Objection.

12             THE COURT:  I think now the answer is -- just listen

13   to the question and directly answer the question, please.

14   BY MR. KROMBERG:

15   Q.   What, if anything, did Mr. Young say about Awlaki?

16   A.   You know, Nick had some of his lectures and saw Anwar

17   Awlaki as someone who was a positive role model.

18   Q.   What did Saleh Al-Barmawi say about Awlaki?

19   A.   Saleh --

20             MS. MORENO:  Objection.

21             THE COURT:  Again, overruled.

22             THE WITNESS:  Saleh, too, was also very much

23   influenced by Anwar Awlaki's lectures and used him as kind of

24   like his main person that he would talk about as a good example

25   of a Muslim.

1   BY MR. KROMBERG:

2   Q.   What denomination of Islam were you when you lived with

3   Mr. Young?

4   A.   In the initial beginnings, I was Shia, and eventually I

5   became Sunni.

6   Q.   What reaction did Mr. Young and Mr. Al-Barmawi have to you

7   because of your status as a Shia?

8   A.   Nick never personally gave me any problems being Shia, but

9   Saleh was very adamant in his negative opinion of the Shia.

10  Q.   Is there a standard Islamic greeting that you exchange

11  when you meet another Muslim?

12  A.   Yes.  Traditionally when you greet another Muslim, you

13  say, As Salaamu Alaikum.

14  Q.   I think we're going to have to spell that.

15  A.   A-s S-a-l-a-a-m-u A-l-a-i-k-u-m.

16  Q.   When you saw Saleh Al-Barmawi and you gave him an Islamic

17  greeting, how would he respond to you when you were a Shia?

18  A.   He typically would not respond back and smirked at me.

19  Q.   What reaction did Zachary Chesser have to you as a Shia?

20  A.   The same thing as well, and sometimes as I would pray,

21  Zack would purposely step in front of me, which is considered

22  very rude in the Islamic faith to do so.

23  Q.   When you first met Mr. Young, how often did he interact

24  with other Muslims?

25  A.   When I first met Nick, we met at one of the MSA dinner

1    events, and Nick was very active with the brothers showing up

2    to all the MSA events.

3    Q.   How, how did you see Mr. Young's relationship with other

4    Muslims affected, if at all, by his relationship with Saleh

5    Al-Barmawi?

6    A.   You know, over time, I saw him strictly just kind of

7    hanging out with Saleh.

8    Q.   What, if any, discussion between Saleh Al-Barmawi and

9    Mr. Young do you recall hearing regarding the killing of U.S.

10   soldiers in Afghanistan?

11            MS. MORENO:   Objection.

12            THE COURT:   Overruled.

13            THE WITNESS:   As I recall, Saleh felt that it was

14   necessary, that, you know, the soldiers in Iraq or Afghanistan

15   were invaders, and that it was to be expected.

16   Q.   And what did Mr. Young say?

17   A.   At that time, Nick was in agreement.

18   Q.   Was there a particular curse that he used at that time

19   with respect to the American soldiers?

20   A.   Not that I can recall.

21   Q.   What attitude did Mr. Young express regarding government

22   surveillance of him?

23   A.   What was that?  Sorry, I coughed.

24   Q.   What attitude did Mr. Young express with regard to

25   government surveillance of him?

1    A.    I know at one point in time, Nick was aware of the

2    possibility of Internal Affairs looking into him, and so he was

3    telling me, you know, "Don't answer the door."

4    Q.    Keep your voice up, please.

5    A.    Sorry.  He was aware of internal investigations at his job

6    and told me, you know, "If anyone comes, don't answer a door.

7    I'll answer the door.  And if anyone comes looking for me, tell

8    them I'm not home," things like that.

9    Q.    What firearms did you see around the house?

10   A.    At the time I was living with Nick, I saw several.  I'm no

11   expert on firearms.

12              MS. MORENO:  Objection.

13              THE COURT:  I think now the door has been adequately

14   opened.  I'm allowing it in.  Overruled.

15              THE WITNESS:  I saw several handguns outside of his

16   gun that he carried for work.  I saw some type of assault

17   rifle.  I saw some type of gun set up on, like, kind of like a

18   tripod stand.  That's the ones I remember.

19   BY MR. KROMBERG:

20   Q.    What kind of gun was on -- as best you can describe, the

21   gun that was on the tripod, where was the tripod when you saw

22   it?

23   A.    The tripod was outside the -- in the dining room area, by

24   the balcony sliding door window area.

25   Q.    What, if anything, did Mr. Young say to you about his

Menzies - Direct                                                    798

1    feelings towards Jews?

2              MS. MORENO:  Objection.

3              THE COURT:  Overruled.

4              THE WITNESS:  Nick was very anti-Jewish while I lived

5    with him and mentioned it several times to me as well as my

6    sister.

7    BY MR. KROMBERG:

8    Q.   Please look at Government Exhibit 11-400.  I think the

9    court security officer will provide it to you.

10             MS. MORENO:  There'll be an objection to this, Your

11   Honor.

12             THE COURT:  All right, overruled.

13             Is this a document, or is this an object?

14             MR. KROMBERG:  It should be a picture.

15             THE COURT:  All right, there it is.

16   BY MR. KROMBERG:

17   Q.   Do you recognize that?

18   A.   Yes, I do.

19   Q.   What, what is that?

20   A.   It is an image of Nick's truck.

21   Q.   Okay.  Wait a minute.  Then I must have the wrong one.

22   Ha.

23             11-401, I'm sorry.  I think 11-400 is already in

24   evidence.

25             THE COURT:  It is.

1              MS. MORENO:  Your Honor, there is an objection to

2    11-401.

3              THE COURT:  All right, hold on.  Let me take a look

4    at it.

5              11-401 is a photograph.

6              MR. KROMBERG:  Correct.

7              THE COURT:  I understand the objection, but it's

8    overruled.  We've had that discussion before.

9              Is it not there?  Here, take mine.

10   BY MR. KROMBERG:

11   Q.   Okay.  Do you recognize what's been marked 11-401?

12   A.   Yes, sir.

13   Q.   Okay.  And what is that?

14   A.   It is the front door area of Nick's house, with the

15   Israeli flag on the ground as the doormat.

16             MR. KROMBERG:  Okay.  We move it into evidence and

17   ask to publish to the jury 11-401.

18             THE COURT:  It's in over defense objection.

19             (Government's Exhibit No. 11-401 was received in

20   evidence.)

21             MR. KROMBERG:  Can you please publish 11-401?

22   Q.   And that was the front door of the house you lived in with

23   Mr. Young?

24   A.   Correct.

25   Q.   What was Mr. Young's attitude towards Nazism?

1   A.   Nick had an interest in the Nazi Third Reich.  He talked

2   about it adamantly.  He had World War II Nazi paraphernalia as

3   well.  He had discussions about Hitler with myself as well as

4   my sister one time while she visited.

5   Q.   So I want to direct your attention now to April 2011.

6   You're still living there, right?

7   A.   April 2011, I believe so.

8   Q.   Well, let me ask you what, if anything, did Mr. Young tell

9   you about a trip that he was going to embark upon?

10  A.   Yes.  So then I was still living with him at the time.  He

11  was going on a trip.  He told me he was going to Africa --

12  South Africa.

13  Q.   Okay.  And do you recall him also going on a trip in

14  August 2011?

15  A.   I know when I was living with Nick, he went on a few trips

16  while I was with him for vacation.

17  Q.   Did he tell you where he went during that second trip in

18  August?

19  A.   The only one that I can recall remembering was when he

20  told me he was going to South Africa.

21  Q.   Did he ever tell you that he was going to or had gone to

22  Libya?

23  A.   He did not.

24  Q.   So at some point, you moved out of his -- of the

25  residence.  After you moved out -- well, let me ask you this:

1    Where was Mr. Young when you moved out?

2    A.   He was on one of his trips when I moved out.

3    Q.   Okay.  And what contact did you have with him after that?

4    A.   I had contact with Nick after I moved out maybe once or

5    twice.  I apparently misread my checkbook, and I apparently

6    owed Nick still a month or two of rent, and so we figured that

7    out, and I sent him the check.

8             MR. KROMBERG:  Okay.  Thank you.  I have nothing

9    further for this witness.  I -- I'm sorry, hang on just one

10   moment.

11            Thank you.  I imagine defense will have questions for

12   you.

13            THE COURT:  Yes, ma'am, go ahead.

14            MS. MORENO:  Thank you.

15                       CROSS-EXAMINATION

16   BY MS. MORENO:

17   Q.   Good morning, Mr. Menzies.

18   A.   Good morning.

19   Q.   Now, you lived with Nick Young from actually it was 2007

20   through 2011, about four years, correct?

21   A.   End of 2007, correct.

22   Q.   Right?  It wasn't 2009 to 2010.

23   A.   Okay.

24   Q.   Right?  It was four years?

25   A.   Give or take.  I don't know the exact dates, but I

1   remember moving in around the end of 2007 because of the

2   semester.

3            THE COURT:  I'm sorry, let me stop.  Mr. Menzies,

4   keep your voice up.  We're having trouble hearing you.

5            THE WITNESS:  Sorry, sorry.  Yes, I moved in probably

6   the end of 2007, at the end of the winter semester.

7   BY MS. MORENO:

8   Q.   You moved in when Mr. McNulty moved out, right?

9   A.   Yes.

10  Q.   Okay.  Now, you -- actually, you have gone through

11  different variations of faith in Islam; isn't that right?

12  A.   Correct.

13  Q.   Right.  You -- I believe you began as a Sufi, correct?

14  A.   Yes.  I have always remained a Sufi, which is the mystical

15  interpretation of Islam.

16  Q.   And then you were Shia, correct?

17  A.   Correct.

18  Q.   And then you're Sunni now?

19  A.   Yes.  Sunni is the foundation for Sufism.

20  Q.   Now, you talked a little bit about these other gentlemen,

21  Mr. Saleh.  Now, Mr. Saleh, he came to the home only once or

22  twice, to Nick Young's home, correct?

23  A.   Yeah, I saw Saleh several times while I was there.

24  Q.   And you -- but you saw him at these MSA gatherings,

25  correct?

1    A.    Correct.

2    Q.    And you felt insulted by Mr. Saleh and the other

3    gentlemen, correct?

4    A.    Other gentlemen?

5    Q.    You felt insulted by Mr. Saleh because he wouldn't return

6    the particular Salaam Alaikum greeting to you, right?

7    A.    Once I saw how Saleh was towards me, I kind of just

8    avoided him at that point as much as I could, yes.

9    Q.    You, you disliked him, correct?  That's fair to say?

10   A.    I wouldn't say disliked, but we obviously -- we had

11   cordial relations as much as possible.

12   Q.    And you felt that you couldn't get closer to Nick Young

13   because of what you perceived were relationships with other

14   people, right?

15   A.    No, I would not say that.

16          MS. MORENO:  May I have a moment, Your Honor?

17   Q.    You felt that Mr. Saleh had something to do with the fact

18   that you and Mr. Young never connected and became friends,

19   right?

20   A.    You know, initially, I mean, Nick and I, you know, we got

21   along very well.  We had some similar interests in some

22   tabletop games, but over time, Nick was very isolated from

23   myself and some of the other brothers that he initially hung

24   out with and spent more time with Saleh.

25   Q.    Do you remember being interviewed in this -- in connection

1  with this case, sir?

2  A.    Yes.

3  Q.    And that was June 13 of this year?  Do you remember that?

4  A.    Yes, it was this year.

5  Q.    Okay.  Do you remember talking to Agent Caslen?

6  A.    Yes, ma'am.

7  Q.    And do you remember telling them that you never

8  connected -- you felt that you never connected with Mr. Young

9  and became friends because of Mr. Saleh?

10 A.    Like I said, initially I felt me and Nick were getting

11 along well, but once Saleh was more and more in Nick's life is

12 when he started to disconnect from people.

13 Q.    Okay.  Now, Mr. Young told you that he supported Ron Paul,

14 correct?

15 A.    Yes.

16 Q.    And you understood that Mr. Young was a Libertarian,

17 right?

18 A.    Yes.

19 Q.    But you have an opinion that Libertarians are

20 anti-Semitic, correct?

21 A.    I do not.

22 Q.    Okay.

23 A.    I voted for Gary Johnson this past election, so I am

24 somewhat a Libertarian myself.

25 Q.    Do you recall telling Agent Caslen that Libertarians have

1    a history of being anti-Semitic?

2    A.    I do not recall that.

3            MS. MORENO:   Your Honor, I'd give this to the court

4    security officer to refresh his recollection.   I'm not marking

5    this.

6            THE COURT:   I understand.

7    BY MS. MORENO:

8    Q.    Handing up the June 13 302 interview with Mr. Menzies, if

9    you could look at page 189, the highlighted area?

10   A.    Yes, I read that.

11   Q.    And do you recall telling them that Libertarians,

12   according to you, have a history of being anti-Semitic?

13   A.    I do not recall that, no.

14   Q.    But that's what you told Mr. Caslen?

15           MR. KROMBERG:   Objection, Judge.   That is --

16           THE COURT:   No, you're testifying now.

17           You don't remember -- looking at that doesn't refresh

18   your memory?

19           THE WITNESS:   No, not that section.

20           THE COURT:   All right, that's the answer.   You can

21   return the document to counsel.

22   BY MS. MORENO:

23   Q.    By the way, these weapons that you talked about, you had

24   no knowledge that any of these weapons were unlawfully

25   possessed, correct?

Menzies - Cross                                                    806

1    A.   Yes, correct.

2    Q.   You had no knowledge that any of them were unlawful,

3    right?

4    A.   Yeah.  I mean, as him being a police officer and having

5    the weapons, I didn't think anything of it.  I was never a

6    firearms guy, so I just assumed.

7    Q.   You had no information that the possession of the guns was

8    unlawful?

9             MR. KROMBERG:  Objection.  Asked and answered.

10             MS. MORENO:  No.

11             THE COURT:  I think his answer is he had no such.

12   BY MS. MORENO:

13   Q.   Okay.  And by the way, during this period when you lived

14   with Mr. Young, you saw him to be a Ron Paul supporter,

15   correct?

16   A.   Yes.

17   Q.   And you saw that he had a garage full of posters and yard

18   signs, correct?

19   A.   Yes.

20   Q.   And those signs would go up around the house outside,

21   correct?

22   A.   Yeah.  Like when people put their support signs in the

23   front yard and stuff like that.

24   Q.   Now, you say that you overheard Mr. Young agree about this

25   comment regarding U.S. soldiers, right?

1    A.    Yes, yes.

2    Q.    Right?

3    A.    Yes.

4    Q.    Who else was there?

5    A.    Saleh.

6    Q.    And who else besides Mr. Saleh?

7    A.    That's the only two I remember.

8    Q.    Okay.  And when did that comment occur?

9    A.    It was either outside the house or it could have been at

10   George Mason.  I don't recall the exact location, but I

11   remember --

12   Q.    When?

13   A.    At some point when I was living there.

14   Q.    You don't, you don't know?

15   A.    I don't remember the exact date, no.

16   Q.    Did you tell anyone else about that comment?

17   A.    No.

18   Q.    Now, when you moved out, when you moved out, you did so

19   when Mr. Young was away, correct?

20   A.    Yes.

21   Q.    And, in fact, you owed him money, correct, when you moved

22   out?

23   A.    Yeah.  At the time, I was not aware.

24   Q.    And when you moved out, you didn't leave him the rent

25   money, right?

1    A.   When I moved out, I was not aware that I still owed him

2    rent.

3    Q.   But, but he got in touch with you after you moved out.  Do

4    you remember that?

5    A.   Yes.  He left me a voicemail, and I gave him a call back

6    the moment I got it, and we straightened it out.

7    Q.   In fact, he called you several times in order for you to

8    pay the back rent?

9    A.   That was because I was up in the mountains in New York and

10   I had no reception.

11   Q.   And you told him that you had to pay in installments,

12   right?

13   A.   At that time, yes.

14   Q.   And that's what you did, and that's what he accepted,

15   correct?

16   A.   Correct.

17   Q.   Now, Mr. Young never discussed Libya with you; isn't that

18   right?

19   A.   No.

20   Q.   And you never saw him watching any jihadi videos online,

21   correct?

22   A.   No.  I never watched TV or videos with him.

23   Q.   And you never heard him talk about al Qaeda, correct?

24   A.   Not at the time, no.

25   Q.   And this was during the four-year period that you lived

1   with him, right?

2   A.   Yes, at the time I lived with him.

3               MS. MORENO:  Thank you.

4               THE COURT:  No further questions?

5               MS. MORENO:  No further questions.

6               THE COURT:  Is there any redirect?

7               MR. KROMBERG:  No redirect, Judge.

8               THE COURT:  All right, is anybody going to call

9   Mr. Menzies again?

10              MR. KROMBERG:  Not the government, Judge.

11              THE COURT:  How about for the defendant?  Ms. Moreno?

12              MS. MORENO:  I'm sorry?

13              THE COURT:  Are you going to call the witness again?

14              MS. MORENO:  No.

15              THE COURT:  All right.  Then, sir, you're excused as

16  a witness.  You can stay in court and watch the proceedings, or

17  you may leave, but you're not to discuss your testimony or

18  anything you see or hear in court with any witness who has not

19  yet testified, all right?

20              THE WITNESS:  Yes, ma'am.

21                         (Witness excused.)

22              THE COURT:  All right.  And your next witness, is

23  that the expert?

24              MR. KROMBERG:  We could call -- we'll call Ms. Dill.

25              THE COURT:  All right.  This is a relatively short

Dill - Direct                                                           810

1   witness, as I understand?

2              MR. KROMBERG:  Yes.

3              THE COURT:  All right.

4              JOANNE DILL, GOVERNMENT'S WITNESS, AFFIRMED

5                        DIRECT EXAMINATION

6   BY MR. KROMBERG:

7   Q.   Good morning, Ms. Dill.

8   A.   Good morning.

9   Q.   Please state your full name and spell your last name for

10  the record, and also, it's important to keep your voice up

11  because the jurors need to hear you.

12  A.   Joanne Dill, D -- as in David -- i-l-l.

13  Q.   Ms. Dill, how are you employed?

14  A.   I work for Metro.

15  Q.   And in what capacity?

16  A.   I am a digital video evidence technician.

17  Q.   And how long have you been in that position?

18  A.   Since September.

19  Q.   And before that, how were you employed?

20  A.   I was a Metro Transit Police officer.

21  Q.   And how long had you been a Metro Transit Police officer?

22  A.   Twenty years.

23  Q.   Are you retired from Metro Transit Police?

24  A.   I retired May 1.

25  Q.   Congratulations.

Dill - Direct                                                              811

1    A.    Thank you.

2    Q.    What were your -- what are the responsibilities of a Metro

3    Transit Police officer?

4    A.    We patrol the Metro trains and buses.  I spent my whole

5    career except for one year where I patrolled buses, I patrolled

6    trains, riding the trains and walking through the stations.

7    Q.    Is the Metro system for purposes of the police department

8    divided into different districts?

9    A.    Yes, sir.  Right now, we have two districts, the District

10   1 and District 2.  We used to have a third district, which was

11   the revenue facility.

12   Q.    So I would like to direct your attention to the period of

13   2013 to 2014.  What district were you assigned?

14   A.    District 2.

15   Q.    And what district is that?

16   A.    At that time, it was based out of Franconia-Springfield, I

17   believe.  We moved from Huntington to Franconia, and it was the

18   Yellow Line and the Blue Line up through Metro Center and then

19   the Green Line down to Anacostia -- sorry, Branch Avenue.  And

20   at some point, we had Largo and New Carrollton, but that

21   switched.  So basically, south of Metro Center.

22   Q.    Do you know the defendant?

23   A.    Yes.

24   Q.    How do you know him?

25   A.    We worked together.  He was a police officer with me.

Dill - Direct                                                          812

1    Q.   Did you have occasion to speak with him while he was at

2    District 2?

3    A.   Yes.

4    Q.   And when would that have been?

5    A.   We had a number of different conversations over the course

6    of the years we worked together, but we had quite a few around

7    the summer of 2013.

8    Q.   Okay.

9              THE COURT:  Can you speak -- can you get a little

10   closer?  You'll have to bend slightly, I'm sorry.  That's the

11   microphone, that black strip.  All right.

12             THE WITNESS:  Is this better?

13             THE COURT:  Much better, thank you.

14   BY MR. KROMBERG:

15   Q.   In the course of your conversations with Mr. Young, did

16   the subject of religion come up?

17   A.   Yes.

18   Q.   Okay.  And did the subject of the Caliphate come up?

19   A.   Yes.

20   Q.   And what, if anything, was said about the Caliphate?

21   A.   I had been watching the news and seen the Caliphate

22   mentioned, and I was already suspicious of him, so I mentioned

23   it to him to see what he would say.

24   Q.   And what did he say?

25   A.   He said that he believed in it and he thought it was a

Dill - Direct                                                            813

1    good thing for that part of the world.

2    Q.   So to the best of your recollection, when did this

3    conversation occur?

4    A.   Probably six months to a year after the summer of 2013.

5    Q.   So am I hearing -- am I correct that it's late 2013 to the

6    middle of 2014?

7    A.   Approximately, yes.

8    Q.   And on a different note, when you're assigned to work in

9    the Metro Police -- in District 2, say, do you have to go

10   someplace first to clock in, or do you go to a station and

11   patrol where, a particular area?  I mean -- let me strike that.

12   Let me try that again.

13        Do you go some central place first, or do you go to

14   an assigned location where you're supposed to be first?

15   A.   You can do either.  For instance, I worked at the

16   Franconia district station.  They did what they called

17   decentralization, where if I live close to Branch Avenue, I can

18   check on at Branch Avenue, and that way I'm already patrolling

19   when my shift begins instead of going all the way to the

20   district.

21   Q.   How do you check in?  Excuse me, how did you check in?

22   A.   I did both.  I mean, if I --

23   Q.   No, no, I'm sorry.  How -- back when you checked in, how

24   did you check in?  What's the mechanics of it?

25   A.   Oh, if you decentralize?

Dill - Cross                                                             814

1    Q.    Yes.

2    A.    There is a phone, and you put it on speaker, and you call

3    into the district, and 20 years ago, when I started, you would

4    just talk to the sergeant.  Later on, they had this system

5    where there is a phone number where they would do a conference

6    call, and you would sort of be part of roll call from a

7    distance.  You would hear everything that went on in the roll

8    call room at the district from the conference call.

9    Q.    So who would be on the conference call from the district?

10   A.    The supervisor, the sergeant running the roll call, and

11   the other officers who were in the room, in the roll call room.

12   Q.    So how would the supervisor in the roll call room know

13   where you were when you called in?

14   A.    They wouldn't.  You could call in from your cell phone.

15   It was basically on the honor system.  You would call in from

16   that room.

17          MR. KROMBERG:  Okay.  Thank you.  Nothing further for

18   the witness.

19          Ms. Dill, I expect the defense will have some

20   questions for you.

21          THE COURT:  Ms. Moreno?

22                        CROSS-EXAMINATION

23   BY MS. MORENO:

24   Q.    Just a couple questions, Ms. Dill.  When did you meet with

25   the government in this case?

Dill - Cross                                                        815

1   A.    I met with the prosecuting attorney on Saturday.

2   Q.    This Saturday?

3   A.    Yeah.

4   Q.    That's the only time?

5   A.    That's the only time I've met with the attorney.

6   Q.    Okay.

7   A.    The -- there were a couple of FBI agents that interviewed

8   some of us.  It was before I retired, so probably the spring of

9   2017.  I don't know exactly when.

10  Q.    Let me just ask you this:  You worked with Mr. Young for a

11  number of years, I gather?

12  A.    Yes.

13  Q.    Okay.  And did you ever see Mr. Young discriminate,

14  racially treat any of the passengers?

15  A.    No.

16          MS. MORENO:  Nothing further.

17          THE COURT:  All right.  Any redirect?

18          MR. KROMBERG:  No, Your Honor.

19          THE COURT:  I assume that Ms. Dill does not need to

20  be recalled?

21          MR. KROMBERG:  She does not.

22          THE COURT:  All right, ma'am, then you're excused as

23  a witness, and that means that you can come in court and watch

24  the proceedings or leave, but you're not to discuss your

25  testimony or anything you see or hear in court until the case

816

1   is over.  Do you understand that?

2            THE DEFENDANT:  Yes, Your Honor.

3            THE COURT:  All right.

4                      (Witness excused.)

5            THE COURT:  Is your next witness the expert?

6            MR. KROMBERG:  Yes, but I propose to introduce some

7   of the exhibits that would have come in with a witness, with a

8   seizing agent, but we have stipulations for it, and that will

9   take some time, so we can get the exhibits in for the expert to

10  talk about.

11           THE COURT:  All right.

12           MR. SMITH:  Your Honor, may we address each one of

13  these exhibits with the Court before they're published all at

14  once?

15           THE COURT:  Well, are they all the ones we discussed

16  last night, or are there additional ones?

17           MR. SMITH:  There's dozens, Your Honor, so we just

18  need to be able to make objections to each on the record before

19  they're published.

20           MR. KROMBERG:  They are most of the ones that we

21  talked about last night, although we withdrew some, and there

22  are additional ones that I don't expect are going to be

23  problems at all because they have to do strictly with the

24  Islamic terrorism side of the case and not the Nazi side of the

25  case.

817

1          THE COURT:  All right, which books are we going to be

2  looking at?

3          MR. KROMBERG:  Well, I was going to start from the

4  beginning.  There are a lot.

5          MR. SMITH:  Before they're published, Your Honor, may

6  we have a conference so that we can put our objections --

7          THE COURT:  Let's just get it started so we're not in

8  the hypothetical.  Let's see what the problems are.

9          MR. SMITH:  All right.

10          MR. KROMBERG:  Judge, Exhibit 1-100 is subscriber

11  information from 1&1mail.com.  We have a certification from

12  1&1mail.com.  That is 1-000.  So I think that 1-100 comes in as

13  a business record of 1&1mail.com.

14          THE COURT:  Is there any objection?

15          MR. SMITH:  No.

16          THE COURT:  All right, that's in.

17          (Government's Exhibit No. 1-100 was received in

18  evidence.)

19          MR. KROMBERG:  Government Exhibits 1-301, 1-302, and

20  all the way through 1-308 are e-mails from the

21  MALIKtheAmerican@mail.com, which we have a stipulation No. 2

22  which I'd like to read into the record.  Stipulation No. 2,

23  which is Government Exhibit 12-2:  The United States and the

24  defendant hereby stipulate and agree that Government Exhibits

25  1-300 through 1-308 are authentic business records of 1&1 Mail

818

1    & Media, Inc.

2              We moved exhibits in, Judge, but we are going to wait

3    to publish them for when Special Agent Caslen testifies.

4              MR. SMITH:  No objection.

5              THE COURT:  All right.  So 301 and 302 through 308

6    are in.

7              MR. KROMBERG:  Thank you.

8              (Government's Exhibit Nos. 1-301 through 1-308 were

9    received in evidence.)

10             THE COURT:  All right.

11             MR. KROMBERG:  Now, Government Exhibits 1-401 through

12   1-410, same situation.  We don't need to publish them now.

13   We're going to speak about them later with Special Agent

14   Caslen, but we have the stipulation, Government Exhibit 12-3:

15   The United States and the defendant hereby stipulate and agree

16   that Government Exhibits 1-400 through 1-407 are authentic

17   business records of Yahoo!

18             And then stipulation No. 4, Government Exhibit 12-4:

19   The United States and the defendant hereby stipulate and agree

20   that Government Exhibit 1-408 is an accurate reproduction of

21   the e-mails that defendant Nicholas Young exchanged with the

22   address mohamed_2060@yahoo.com.

23             THE COURT:  Wait.

24             MR. KROMBERG:  Government Exhibit 12-5 --

25             THE COURT:  Wait, wait, wait, wait.  You wanted 401

1  through --

2      MR. KROMBERG:  Right.  Well, it's covered by three

3  separate stipulations, which I'm just going through the third

4  stipulation now.

5      THE COURT:  All right.

6      MR. KROMBERG:  And by the way, everybody should know

7  that the defense saved a lot of people, time, and effort by

8  entering into these stipulations, and we're grateful for that.

9      THE COURT:  All right.

10      MR. KROMBERG:  Stipulation No. 5, Government Exhibit

11  12-5:  The United States and the defendant hereby stipulate and

12  agree that Government Exhibit 1-410 is a true copy of an

13  affidavit of the defendant, Nicholas Young.

14      And, Judge, as a result of those stipulations, we

15  move in Government Exhibits 1-401 through 1-410, and we'll

16  publish them later.

17      THE COURT:  I don't, I don't think you mentioned 409.

18      MR. KROMBERG:  Correct.  You're exactly right, no

19  409.  401, 402, 403 --

20      THE COURT:  401 through 8 and then 10, but not 9.

21      MR. KROMBERG:  Exactly.

22      THE COURT:  All right, no 9.  They're in.

23      (Government's Exhibit Nos. 1-401 thru 1-408 and 1-410

24  were received in evidence.)

25      MR. KROMBERG:  Government Exhibit 1-600, we have a

820

1    stipulation No. 35 for that.  That is a Microsoft record, and

2    stipulation 35 says:  The United States and the defendant

3    hereby stipulate and agree that Government Exhibit 1-600 is an

4    authentic business record of Microsoft Corporation.

5         And once again, we're not going to publish that until

6    Special Agent Caslen testifies.  And therefore, we move in

7    1-600.

8         THE COURT:  Is there any objection?

9         MR. SMITH:  No objection.

10        THE COURT:  All right, it's in.

11        (Government's Exhibit No. 1-600 was received in

12   evidence.)

13        MR. KROMBERG:  Government Exhibit 3-125 is a Virgin

14   Mobile record, and it's covered by stipulation No. 8, I think.

15   That's what my notes say.  Is that right?

16        But I don't have -- I'm going to have to come back to

17   that because I don't have that stipulation right here, which I

18   thought I would.

19        THE COURT:  All right.

20        MR. KROMBERG:  Do we have a stipulation of that?

21   Okay.  Mr. Turgeon is stepping in for me, as usual.  Thank you.

22        Stipulation No. 8:  The United States and the

23   defendant hereby stipulate and agree that Government Exhibits

24   3-104 -- and, in fact, stipulation No. 12-8, is that already in

25   evidence?

1              SA CASLEN:  It is.

2              MR. KROMBERG:  Oh, okay.  In that case, sorry, we're

3    just moving into evidence Government Exhibit 3-125, and we will

4    publish it later when Special Agent Caslen testifies.

5              THE COURT:  Any objection?

6              MR. SMITH:  No objection.

7              THE COURT:  All right, it's in.

8              (Government's Exhibit No. 3-125 was received in

9    evidence.)

10             MR. KROMBERG:  Now, Government Exhibit 4-03, Judge,

11   is what the CART examiner testified about yesterday.

12             THE COURT:  All right, hold on.

13             MR. KROMBERG:  4-203, Judge.

14             THE COURT:  I need the book.  Just a second.

15             Yes.

16             MR. KROMBERG:  And that's what Mr. Lee testified

17   about, and it was not admitted when he testified, but we move

18   it in now, and Mr. Gartenstein-Ross will -- I expect will

19   testify about it.

20             THE COURT:  All right, I know there's a defense

21   objection under 403 to that.

22             MR. SMITH:  That's correct.

23             THE COURT:  And it's overruled.

24             (Government's Exhibit No. 4-203 was received in

25   evidence.)

1            MR. KROMBERG:  Now, I know that Government Exhibit

2    4-106 was admitted yesterday.  However, the stipulation that

3    covers it, I believe, was not admitted, and that's Government

4    Exhibit 12-13, which explains where that exhibit came from.  So

5    I'd like to read Government Exhibit 12-13, which says:  The

6    United States and defendant hereby stipulate and agree that

7    Government Exhibit 4-106 is a photograph that accurately

8    depicts the backpack of defendant Nicholas Young after his

9    arrest on August 3, 2006 (sic).  But the underlying Exhibit

10   4-106 is already in evidence.

11           THE COURT:  All right.

12           (Government Exhibit No. 12-13 was received in

13   evidence.)

14           MR. KROMBERG:  We're on Government Exhibits 8-01

15   through 8-04.

16           THE COURT:  Hold on.

17           MR. SMITH:  8-01?

18           MR. KROMBERG:  I'm sorry, 8-101.  8-101 through

19   8-104.

20           MR. SMITH:  So, Your Honor, we object to these on 401

21   and 403 grounds.

22           THE COURT:  All right, hold on.

23           I'm overruling the objection.  They're in.

24           (Government's Exhibit Nos. 8-101 thru 8-104 were

25   received in evidence.)

823

1          MR. KROMBERG:  So 8-101 through 104.

2          8-108 and Government Exhibits 8-112 through 8-115 are

3   authentic business records of Facebook, Inc.  That's

4   stipulation No. 17.  So we would move in not only 8-101 through

5   8-104 but also Government Exhibit 8-108 and Government Exhibits

6   8-112 through 8-115, which I expect Mr. Gartenstein-Ross to

7   talk about as well.

8          THE COURT:  I'm sorry, go over those again.

9          MR. KROMBERG:  8-101 through 8-104.

10          THE COURT:  Those are already in.

11          MR. KROMBERG:  8-108 and 8-112 through 8-115.

12          MR. SMITH:  And, Your Honor, I believe Your Honor

13   ruled on 8-108 yesterday, so we're not objecting to that, but

14   we object to the balance of the exhibits the government just

15   cited on 401 and 403 grounds.

16          THE COURT:  I'm permitting them in.  Overruled.

17          (Government's Exhibit Nos. 8-108 and 8-112 thru 8-115

18   were received in evidence.)

19          MR. KROMBERG:  8-107, Judge, the government -- there

20   was a stipulation, Government Exhibit 12-18:  The United States

21   and the defendant hereby stipulate and agree that Government

22   Exhibit 8-107 is an accurate screenshot of a Facebook account

23   taken by an FBI agent in 2011.  And we'd move in Government

24   Exhibit 8-107.

25          MR. SMITH:  We have no objection to that.

824

1           THE COURT:  It's in then.

2           (Government's Exhibit No. 8-107 was received in

3    evidence.)

4           MR. KROMBERG:  Now, I believe that stipulation 20 is

5    already in; is that correct?  No?  Okay.

6           Government Exhibit 12-20 says:  The United States and

7    the defendant hereby stipulate and agree that Government

8    Exhibits 10-103 through 10-109, Government Exhibit 10-202, and

9    Government Exhibits 10-203 through 253 were found by the FBI in

10   computer media found in the course of searching the residence

11   of defendant Nicholas Young in August 2016.

12          So at this point, we would like to move in many but

13   not all of the exhibits covered by that stipulation, and I'd

14   like to list the exhibits we'd want to move in.  If the Court

15   has the book starting at 10-103?

16          THE COURT:  All right.  Well, 103 is fine.  That's

17   in.

18          (Government's Exhibit No. 10-103 was received in

19   evidence.)

20          MR. KROMBERG:  And 105?

21          THE COURT:  Yes, that's in.

22          (Government's Exhibit No. 10-105 was received in

23   evidence.)

24          MR. KROMBERG:  106?

25          THE COURT:  I don't really see what relevance that

1   has.  Let's not overload the jury with stuff.

2           MR. KROMBERG:  If we could put that aside, we'd like

3   to explain it outside the presence of the jury, if I could.

4           109?

5           THE COURT:  I mean, you're going to have to have some

6   context for these.

7           MR. KROMBERG:  And that's -- the point is that

8   Mr. Gartenstein-Ross is -- I'm not publishing them now, Judge.

9   I'm going to publish them, and Mr. Gartenstein-Ross is going

10  to -- my hope is he's going to explain the context of these

11  things.

12          THE COURT:  I think it would be better then to do it

13  in the context of his testimony.  This is -- it's too abstract

14  at this point.

15          MR. SMITH:  Your Honor, the challenge is that

16  sometimes if it's in the context of the testimony, that an

17  exhibit would be published without --

18          THE COURT:  No, it can't be published until -- in

19  other words, the exhibit would be shown to the witness.  If the

20  witness recognizes or can he discuss it somehow, I think it's

21  better.  I mean, these --

22          MR. SMITH:  And then we'll go through the process

23  during the testimony?

24          THE COURT:  We'll see.  I mean, I know you have a

25  running objection.  If it's all 403, all you have to just do is

1   object --

2          MR. SMITH:  With some of the exhibits that

3   Mr. Kromberg is citing right now, we actually don't dispute

4   relevance.  I mean, that would be --

5          THE COURT:  Well, then you do it in the context of

6   the testimony.  This is too abstract this way.

7          MR. SMITH:  Okay.

8          THE COURT:  All right?

9          MR. KROMBERG:  Okay.  So there are --

10         THE COURT:  And this particular picture is too

11  abstract.

12         MR. KROMBERG:  That's fine.  So I can go to a

13  different series, a different stipulation, or if we can move to

14  10-303 --

15         THE COURT:  Hold on, I need another book.

16         MR. SMITH:  Just so Your Honor is clear, if you're at

17  the exhibit list 10-20 through --

18         THE COURT:  I'm at 10-303 right now.  That's what he

19  just mentioned.  So don't, don't keep throwing numbers at me.

20         MR. SMITH:  Okay.

21         THE COURT:  All right, 10-303.

22         MR. KROMBERG:  10-303, 304, and 305, the stipulation

23  21, Government Exhibit 12-21:  The United States and the

24  defendant hereby stipulate and agree that Government Exhibits

25  10-303 through 10-305 were found by the FBI on an iPod found in

1    the course of searching the residence of defendant Nicholas

2    Young in August 2016.

3              MR. SMITH:  And, Your Honor, we don't challenge the

4    relevance of that.

5              THE COURT:  All right, then 303 to 305 are in.

6              (Government's Exhibit Nos. 10-303 thru 10-305 were

7    received in evidence.)

8              MR. SMITH:  If I may, Mr. Kromberg just skipped right

9    over 10-20 -- 10-220 to 10-252.  These are, these are the

10   exhibits we were discussing after trial yesterday, and we

11   object to all of those on 401 and --

12             THE COURT:  He hasn't mentioned those yet.

13             MR. KROMBERG:  I would have mentioned them, but I

14   thought Your Honor didn't want me to mention them now.

15             THE COURT:  In the context of the witness.  This is

16   really tedious for a jury.  It makes no sense to spend our time

17   doing this right now, all right?  So let's get -- let's take

18   our morning break, which will be until eleven o'clock, and then

19   get your witness in, and we'll see how it goes then, all right?

20   All right.

21             (Recess from 10:42 a.m., until 11:05 a.m.)

22                            (Defendant and Jury present.)

23             THE COURT:  Mr. Kromberg, call your next witness.

24             MR. KROMBERG:  The government calls Mr. Daveed

25   Gartenstein-Ross.

1    DR. DAVEED GARTENSTEIN-ROSS, GOVERNMENT'S WITNESS, AFFIRMED

2                           DIRECT EXAMINATION

3  BY MR. KROMBERG:

4  Q.    Good morning.  Can you please state your full name, and

5  spell your last name for the record.

6  A.    Sure.  My name is Daveed Gartenstein-Ross.

7  Q.    Let me stop you right there.  You need to speak up because

8  the audience is across the room.  So please keep your voice up.

9  If necessary, lean forward into the strip microphone in front

10 of you.

11 A.    Sure.  Sorry about that.  My name is Daveed

12 Gartenstein-Ross, and the last name is spelled

13 G-a-r-t-e-n-s-t-e-i-n-hyphen-R-o-s-s.

14 Q.    Now, forgive my ignorance on a very basic question.  How

15 should I be -- how do you prefer to be addressed:  Mr. Ross?

16 Professor Ross? Dr. Ross?

17 A.    Dr. Gartenstein-Ross.

18 Q.    Dr. Gartenstein-Ross, that's what we'll do.

19         Okay.  Dr. Gartenstein-Ross, can you tell the jurors,

20 how are you employed?

21 A.    I am a senior fellow at a think tank called the Foundation

22 for Defense of Democracies, which focuses --

23 Q.    Keep your voice up.

24         THE COURT:  You need to keep your voice up.

25         THE WITNESS:  Sure.  Sorry about that.  I'm a senior

1  fellow at a think tank called the Foundation for Defense of

2  Democracies, which focuses on national security issues, and I'm

3  also the chief executive officer of a private firm called

4  Valens Global, which is focused on the problem set of violent

5  non-state actors.

6  BY MR. KROMBERG:

7  Q.   What is your educational background?

8  A.   I have a bachelor's degree from Wake Forest University; I

9  have a Juris Doctor degree from the New York University School

10 of Law; and I have both a Master's Degree and a Ph.D. from the

11 Catholic University of America in World Politics.

12 Q.   How were you employed after college?

13 A.   After college, I was employed by an organization called

14 the Al-Haramain Islamic Foundation, which is a specially

15 designated global terrorist entity today.  As an idealistic

16 young college student, I converted to the Islamic faith and was

17 looking for something to do between college and law school and

18 worked for this organization that was espousing Salafi jihadist

19 ideals and had connections to the al Qaeda network.  Obviously,

20 when I took the job, I didn't know about those connections.

21 Q.   We're going to get later, I hope, to talking -- to

22 defining some of the terms you just used, but did you write a

23 book about your experience?

24 A.   Yes, I did.

25 Q.   And what book was that?

1   A.    It was called *My Year Inside Radical Islam*.

2   Q.    So after your year inside radical Islam, how have you been

3   employed?

4   A.    Well, that experience helped to shape my interest in

5   keeping the country safe.  I moved away both from Islamic

6   radicalism and also ultimately from the Islamic faith, and I

7   was in New York going to law school when the September 11

8   attacks occurred.  That was very transformational for me, and

9   since then, after a brief stint of first clerking on the D.C.

10  Circuit Court of Appeals and then practicing law for a short

11  time, I've been working in the national security sphere from

12  2004 onward.

13  Q.    What have you done in the national security field since

14  2004 in your capacity as a fellow at the Foundation for Defense

15  of Democracies and the Valens Global?

16  A.    A number of different things.  Some of it involves doing

17  work both for private and public entities who need to know more

18  about the threats of terrorism to try to keep both their

19  interests and also the interests of the nation safe.  Some of

20  it is involved doing academic work and writing technical and

21  popular press articles to help to explain the threats that our

22  country faces, including commentary in the media and elsewhere.

23        This has included work for U.S. Customs and Border

24  Protection, for whom I provide strategic analysis of sub-state

25  threats.  I work as a senior advisor through the end of October

Gartenstein-Ross - Direct                                          831

1   of this year.

2          For DHS, the Department of Homeland Security's Office

3   of Community Partnerships, which was at the forefront of

4   countering violent extremism efforts in the United States,

5   which is trying to counter radicalization, training work, work

6   analyzing the threat of sub-state violence in the Horn of

7   Africa for oil and gas clients who need to understand the

8   future shape of insurgencies and --

9   Q.   Let me, let me stop you and ask you about the ICCT.

10  A.   Yeah.

11  Q.   What is the ICCT?

12  A.   The ICCT is the International Centre for Counter-Terrorism

13  at the Hague.  It's a think tank which is partially funded by

14  the Dutch government, and I was a visiting fellow there in the

15  Hague in early 2013, and I've been an associate fellow with

16  that organization since.

17  Q.   What did you do for the ICCT in the Hague in your capacity

18  there?

19  A.   When I was there, I wrote a study on a group called Ansar

20  al-Sharia in Tunisia.  It's a Tunisian jihadist organization.

21  I went to Tunisia and did field research there and subsequently

22  wrote a monograph that was peer reviewed and published by ICCT.

23  Q.   What is Jigsaw?

24  A.   Jigsaw is a think tank associated with the company Google.

25  They think about how Google's applications relate to different

1    complex problems we face.  The first -- I was a fellow there

2    for a spell, for about a year, and the first work I did for

3    them looked at the extremist group ISIS, the Islamic State's

4    use of the YouTube platform, helping them to think through an

5    interesting pilot program that could be used to counter ISIS's

6    spell for people who were seeking out ISIS propaganda material

7    online.

8    Q.    Have you taught at the university level?

9    A.    Yes, I have.

10   Q.    Where and what?

11   A.    I've taught at Georgetown University in the Security

12   Studies Program, which is a graduate program.  I taught a class

13   called Violent Non-State Actors from 2013 through 2016.

14   Q.    You taught the class, not the violent non-state actors,

15   between 2013 and 2015?

16   A.    Right.  I taught the class about violent non-state actors.

17   I taught the same class at the Catholic University of America

18   at the graduate level.  I taught an undergraduate class also at

19   the Catholic University of America called al Qaeda and Its

20   Affiliates.  That was an undergraduate class.

21            And I also teach in the University of Southern

22   California's Summer Executive Program in Counterterrorism.

23   It's a professional education program, and I've taught there

24   every summer since 2011.

25   Q.    Anything at the University of Maryland?

1   A.    Yeah.  I was a faculty research assistant at the

2   University of Maryland.  That wasn't a teaching position.  It

3   was for a research project that I was undertaking with other

4   people who were on faculty there.

5   Q.    Where have you lectured on the topics that you have

6   studied?

7   A.    I've lectured a lot of places.  Some of the recent places

8   I've lectured include the Institute of World Politics, which is

9   a graduate program here in Washington, D.C.; at the UCLA Center

10  for Middle East Development's program in Doha, that's in Qatar,

11  I was just there earlier this month; at the George C. Marshall

12  Center at Garmisch, Germany; at Universitat Tüebingen, which is

13  a German university in the City of Tüebingen.

14  Q.    Can we stop you just for a second --

15  A.    Sure.

16  Q.    -- so you can spell what you just said?

17        Because the court reporter probably needs that.

18  A.    Universitat is U-n-i-v-e-r-s-i-t-a-t, and Tüebingen is

19  T-ü-e-b-i-n-g-e-n.

20        And at Uppsala University, which is U-p-p-s-a-l-a, in

21  Uppsala, Sweden; at Georgetown University, at the Center for

22  American Progress, which is a think tank in D.C.; at the Rand

23  Corporation, which is also a partially government-funded think

24  tank based in D.C.; and the like.  There are dozens of others,

25  National Defense College in Abu Dhabi, which is in United Arab

1    Emirates.

2    Q.    What work have you done regarding the Libyan Civil War?

3    A.    I wrote a peer-reviewed study for the International Centre

4    for Counter-terrorism at the Hague, which was published in

5    early 2015, which provided a history of the Libyan Civil War to

6    that point.

7    Q.    And for whom have you consulted with respect to the Libyan

8    Civil War?

9    A.    With four -- the Joint Improvised-Threat Defeat

10   Organization, JITDO, which is an arm of the U.S. Department of

11   Defense which is trying to anticipate the kind of threats that

12   American service members may face abroad; and also for the

13   Dutch Ministry of Foreign Affairs.  They commissioned a study

14   which I wrote about the crisis we're facing in North Africa,

15   including the Libyan Civil War, and I gave a briefing to the

16   Dutch Ministry of Foreign Affairs, including some follow-on

17   advice about how European policymakers should position

18   themselves.

19   Q.    Where have you taught with respect to the topic of the

20   Libyan Civil War?

21   A.    Where have I taught about the Libyan Civil War?

22   Q.    Where?  Have you taught classes about it?

23   A.    I haven't taught classes about it, no.

24   Q.    Have you provided testimony before Congress on this topic?

25   A.    Yes.  I testified, I believe, on May 1 of 2015 before the

1   U.S. House of Representatives about the Libyan Civil War.

2   Q.   What work have you done regarding violent extremist

3   movements claiming inspiration from Islam?

4   A.   I've done a lot of work on that.  Some of it is what I've

5   previously mentioned with respect to the work I've done for

6   U.S. Customs and Border Protection.  For that, I've done both

7   strategic analysis and also undertaken training work for U.S.

8   Customs and Border Protection.  The work that I did for Jigsaw

9   also fell into that category, looking at several ways that

10  violent non-state actors claiming inspiration from Islam use

11  Google's various platforms.

12          I've done work for oil and gas companies, including

13  for TULA Oil and Statoil, looking at the growth of jihadist

14  movements or violent Islamist movements in North Africa.

15          I've led training for the U.S. Naval Postgraduate

16  School's LDESP program, Leader Development and Education for

17  Sustained Peace, that's what the acronym stands for, which is

18  preparing troops for deployments abroad.

19          I served as the lead instructor and currently do for

20  the U.S. Army Corps of Engineers' Individual Terrorism

21  Awareness course.  That course is designed to provide people

22  with training, giving them an appreciation of threats they may

23  confront when they go overseas.

24          I have served as a subject matter expert for the U.S.

25  State Department's Antiterrorism Assistance Office.  I designed

Gartenstein-Ross - Direct                                          836

1    and -- four different courses for them, the courses could last

2    for as much as a week or two weeks, and have also delivered

3    some training for that entity.  And I --

4    Q.   What about the Office of -- anything in the Department of

5    Defense?

6    A.   Yeah.  A number of those which I named were Department of

7    Defense.

8    Q.   Right.

9    A.   The U.S. Army Corps of Engineers was --

10   Q.   Office of Naval Research?

11            THE COURT:  Mr. Kromberg, don't cut the witness off.

12            MR. KROMBERG:  Sorry.

13            THE WITNESS:  Yeah.  So I'm a coprincipal

14   investigator for a three-year project for the Office of Naval

15   Research, which is using a big data approach to understand

16   where splits are likely to occur within a variety of militant

17   organizations that are self-described jihadist organizations.

18            And one final thing I'll mention in this category is

19   I worked for the European Union as a strategic communications

20   expert.  I worked in Nigeria helping the Nigerian civil society

21   activists to understand extremist groups' use of online

22   platforms and the role that they could play in countering it.

23   Q.   Have you conducted field work in this area?

24   A.   Yes, I have.

25   Q.   And what, what would that consist of?

Gartenstein-Ross - Direct                                       837

1    A.    So for, for either field research or else professional

2    work, I've been to Iraq, Nigeria, Israel, Tunisia, Turkey,

3    Qatar, and the United Arab Emirates, all of which have either

4    involved interviewing people or going to areas where jihadist

5    groups recruit or interfacing with officials and understanding

6    at either a street level or an official level how that entity

7    is looking at the problem jihadism as it relates to their own

8    interests.

9    Q.    For whom have you consulted on this topic, or is that --

10   have you covered that?

11   A.    Yeah, I think I've covered most of the entities who I've

12   consulted for on that topic.  I mean, there are, there are

13   others as well.

14   Q.    NATO?

15   A.    Yeah, NATO is one which I've done a couple of projects for

16   both, both, you know, both, number one, for NATO, putting

17   together a new way that they can undertake monitoring and

18   evaluation of counterterrorism capacity building and more

19   recently developing software for them which relates to that

20   mission.

21   Q.    Oh, sorry.  Have you provided testimony before Congress on

22   this topic?

23   A.    Yes.  I've testified before the U.S. Congress about a

24   dozen times on this topic.

25   Q.    Have you testified before in court as an expert on this

1    topic?

2    A.    I have.

3    Q.    Okay.  And where was that?

4    A.    I testified late last year in the District Court of the

5    District of Columbia on the *Foley v. Syrian Arab Republic* case.

6    That was a civil lawsuit where the plaintiffs were suing the

7    Syrian government for its sponsorship of what I call the

8    Zarqawi network, which is the network that would develop into

9    the group known as ISIS.

10          And I've testified as well in a number of different

11   immigration/asylum cases as an expert witness on militant

12   groups or country conditions.  I've testified on the Taliban in

13   Afghanistan, on al Qaeda's presence in Kenya; and finally, I've

14   testified in five different asylum cases on the Somali militant

15   group Al-Shabaab, which is a part of the al Qaeda network.

16   Q.    Have you -- what, if any, books or monographs have you

17   authored on this topic?

18   A.    I've authored -- I've been the author or editor of 22

19   different books and monographs.  Recent ones I wrote include

20   *Islamic State 2021:  Possible Futures in North and West Africa*,

21   which is a monograph published by the Foundation for Defense of

22   Democracies; *The Islamic State's Global Propaganda Strategy*,

23   which was published in 2016 by ICCT, the Hague; *The War Between*

24   *the Islamic State and Al Qaeda*, which was originally written

25   for U.S. Special Operations Command Central and was then

1    republished by the New America Foundation, which is a

2    D.C.-based think tank; *The Crisis in North Africa*, which I had

3    mentioned before.  That was funded by the Dutch Ministry of

4    Foreign Affairs and then was published by a Dutch institute

5    called the Clingendael Institute.  *Ansar Bayt al-Maqdis's Oath*

6    *of Allegiance to the Islamic State,* it's about how an Egyptian

7    jihadist group ended up taking an oath of allegiance to ISIS.

8    That was published in 2015 by Wikistrat.  *Bin Laden's Legacy*,

9    which was published in 2011 by John Wiley & Sons.

10           That's a relevant selection of some of the monographs

11   I've authored.

12   Q.   What work have you done regarding white and the neo-Nazi

13   movement?

14   A.   I've done a bit of work relevant to that.  I've written a

15   couple of technical publications, "Leadership v. Leaderless

16   Resistance" and "Assessing the Militant White Separatist

17   Movement."  I've written on that in the popular press, and some

18   of my professional work has covered this.  This is -- it has

19   been part of the class I taught at Georgetown at the graduate

20   level.  It's been part of the, two of the courses that I

21   designed for the State Department's Office of Antiterrorism

22   Assistance, including one that looked at prison inmate

23   radicalization, and it's been part of the U.S. Army Corps of

24   Engineers' Individual Terrorism Awareness course, where I

25   looked at this threat for the NORTHCOM, or North America

1    Combatant Command area of operations.

2    Q.   Directing your attention to your work regarding

3    radicalization, can you tell us what you have authored on this

4    topic on radicalization processes?

5    A.   The main thing I authored is an empirical study published

6    in 2009 called *Homegrown Terrorists in the U.S. and U.K.*, which

7    looks at 119 different cases of radicalization in the jihadist

8    context.  I published a case study on this on a man named

9    Carlos Bledsoe, who attacked an Army-Navy Recruiting Center in

10   Little Rock, Arizona, which involved extensive field research

11   and interviews.  It was published in the peer-reviewed journal

12   *Terrorism and Political Violence*.

13          I wrote a piece that appeared in the German journal

14   Der Bürger im Staat, which looks at -- sorry, it's spelled

15   D-e-r B-ü-r-g-e-r i-m, and the last word is Staat, S-t-a-a-t --

16   which looks at homegrown terrorism and radicalization in the

17   context of the United States.

18          I've written --

19   Q.   I'm sorry, was that in German?

20   A.   Yeah, it appeared in German.  I, you know, I don't speak

21   German.  They translated it.  I learned enough to kind of see

22   where there were mistranslations, but it appeared in German.

23          Then a number of different reviews, book reviews of

24   major works in this area, including for technical journals like

25   the *Journal of the Association for the Study of the Middle East*

1   *and Africa Book Notes*, and for *Middle East Quarterly*.

2   Q.   Have you testified before Congress on this topic?

3   A.   Yes, I did.

4   Q.   Do you recall how many times?

5   A.   Only once.

6   Q.   Have you --

7   A.   No, I'm sorry, that's inaccurate; I apologize.  I

8   testified on this topic on three different occasions before the

9   U.S. Congress but --

10           MR. SMITH:  Your Honor, I object to the witness

11  reading documents.

12           THE COURT:  Is that your CV that you're looking at?

13           THE WITNESS:  Yeah, it's the CV.

14           THE COURT:  All right.  You should not be looking at

15  it unless you absolutely cannot remember, and then ask for

16  permission to take a chance to refresh your memory.

17           THE WITNESS:  Sure.  I apologize.

18           THE COURT:  All right.

19  BY MR. KROMBERG:

20  Q.   Dr. Gartenstein-Ross, how do you conduct your research?

21  A.   I conduct my research through a comparative method,

22  primarily looking at primary sources related to the

23  organization in question.  I read as much as I can from various

24  primary sources, including statements they've put out,

25  communiques that have been captured, and information made

1    available in government and other investigations.

2          Secondly, I'll compare that against secondary source

3    material to see whether my conclusions square with those of

4    others in the field; and then I also track my analytic record,

5    that is, anticipatory analysis and other areas through a

6    tracking system to see if what I'm anticipating matches events

7    on the ground.

8    Q.   How in your field does one evaluate competency?

9    A.   I think there's a few ways to evaluate competency.  One

10   way to evaluate competency is based on technical detail,

11   whether someone understands the movements that they're looking

12   at.  Secondly, there's competency that relates to specific

13   projects.  So for the Office of Naval Research, for example,

14   which we've mentioned before, it's a big data project, and

15   competency relates to both accurately coding information

16   related to militant organizations and also understanding the

17   way in which that relates to a big data-based analysis for it.

18         A third way one can evaluate competency is

19   particularly in the area of anticipatory analysis, which is

20   basically a predictive record, looking at when someone predicts

21   that a militant group will grow or shrink or looking at when

22   someone predicts certain actions within an organization, that

23   it will split or that it will join ISIS or that it won't,

24   whether someone's predictions are actually mapping with how

25   events on the ground develop.

1              I think those are all relevant ways to judge

2    competency.

3              MR. KROMBERG:  Your Honor, at this point, I'd ask

4    that Dr. Gartenstein-Ross be designated an expert on violent

5    extremist movements claiming inspiration from Islam, white

6    separatists and the neo-Nazi movement, radicalization

7    processes, and the Libyan Civil War.

8              THE COURT:  All right.  Any objection?

9              MR. SMITH:  We do object, Your Honor, but I think it

10   would be more efficient to conduct voir dire and

11   cross-examination at the same time so we don't split up the

12   testimony.

13             THE COURT:  Well, I'm finding this is sufficient that

14   I'm going to deem him to be an expert.  And what that means,

15   ladies and gentlemen -- and certainly you can cross-examine

16   him -- we normally don't let witnesses testify as to their

17   opinion about any particular issue in a trial, but we make an

18   exception for those persons who either through education or

19   experience have developed a certain amount of expertise in an

20   area that the jury might not normally have much information

21   about.

22             You, however, are the triers of fact.  It's totally

23   up to a jury to decide how much, if any, of any expert's

24   testimony you want to accept.  In other words, you are free to

25   reject any bit of an expert's testimony if you find it's not

1    adequately supported by facts or if it's contradicted by other

2    evidence in the case.

3              So with that understanding, we allow -- we will allow

4    this witness to testify as to his opinions within the relevant

5    areas for which he's been certified, and I do find all four

6    areas, there's adequate expertise.

7              MR. KROMBERG:  Thank you, Your Honor.

8    Q.   Dr. Gartenstein-Ross, when you were describing your

9    personal history, you mentioned the term "Salafi" in the

10   context of the Al-Haramain Foundation.

11   A.   Yes.

12   Q.   Can you talk about that again, but this time describe what

13   you -- what the term "Salafi" means so that the jurors have

14   some sense of what -- who it was you were working for?

15             THE COURT:  Let's spell it, too.  Spell the term,

16   please.

17             THE WITNESS:  Sure.  "Salafi" is spelled S-a-l-a-f-i.

18             THE COURT:  All right.

19             THE WITNESS:  And "Salafi" refers to an austere

20   Islamic religious movement.  This is the term they use to refer

21   to themselves.  It refers to the first three generations of

22   Muslims.  The term "Salaf us Salih," S-a-l-i-h is the second

23   word there, refers to the pious predecessors.  Salafis believe

24   that that --

25             MR. SMITH:  Objection.  Relevance.

1           THE COURT:  Overruled.

2           THE WITNESS:  Salafis believe that Islam has been in

3  a state of decline since the first three generations, and so

4  they seek to return to a religious practice that to them

5  comports with those first three generations.  It tends to be in

6  general variant rules based on outlook, and there are multiple

7  streams of Salafism.

8  BY MR. KROMBERG:

9  Q.   What relationship is there between Salafism and the modern

10 Islamic terrorism?

11 A.   Most of the current Islamic terrorist groups fall under a

12 particular strain of Salafism called Salafi jihadism.  There's

13 other ways to understand Salafism.  Not all Salafis are

14 jihadist, but the jihadist strain of Salafism believes that the

15 world situation is so dire for a variety of reasons, including

16 political reasons and reasons related to, you know, falling

17 from the right practice of religion and needing to install

18 religious governance, that they believe that, that violence is

19 justified.  That is what they -- that is what they call jihad.

20 Q.   But is it correct -- you just said that not all people who

21 follow Salafism believe in violence today.

22 A.   That's absolutely correct.  Not all of them do.

23 Q.   Okay.  So can we please tell the jurors what ISIS is and

24 explain the background of how it came to be and where it is

25 now?

1   A.    Sure.   ISIS, it's a term that stands for the Islamic State

2   of Iraq and al-Sham, a-l-hyphen-S-h-a-m.   It's a group that

3   split from al Qaeda to become its own separate organization.

4         When we look at the history of what ISIS is, the kind

5   of founding figure within ISIS is a man named Abu Musab

6   al-Sarqawi.   Do you need me to spell that?

7   Q.    Please.

8   A.    Sure.   A-b-u, second name M-u-s-a-b, last name

9   a-l-hyphen-S-a-r-q-a-w-i.

10        Abu Musab al-Sarqawi was a long-time militant going

11  back to the 1990s.   He's of Jordanian origin.   He had been in

12  Afghanistan at a time when Afghanistan was mired -- well, as it

13  still is today -- in civil war.   After training with militants

14  in Afghanistan, he returned to Jordan and was jailed for some

15  time.

16        He established his militant organization, which he

17  called Jamaat a-l-hyphen-T-a-w-h-i-d.   Jamaat al-Tawhid, it was

18  an organization that was originally in jail.   After he was

19  released, he then, you know, he was released around the time

20  the 9/11 attacks occurred.   He looked to establish a jihad, an

21  organization that would take part in the Iraq War.

22        The organization in Iraq came to be known as al Qaeda

23  in Iraq.   Both of those organizations were designated by the

24  U.S. government --

25  Q.    When you say "both of those organizations," which are you

1   referring to?

2   A.   So Jamaat al-Tawhid and al Qaeda in Iraq, you know,

3   they're arguably the same organization, but once we got to the

4   point -- but there were some changes, right?  When it became al

5   Qaeda in Iraq, there were other insurgent movements after the

6   U.S. invasion that joined and became a part, and this

7   amalgamation was known as al Qaeda in Iraq.

8           So, you know, there's some debate about which one --

9   where the designation began, and U.S. government documents kind

10  of name them differently, but they're only a few months apart.

11  Both of those organizations were separately designated.

12          After that --

13  Q.   When you say "designated," what do you mean by

14  "designated"?

15  A.   So a designation is when the U.S. government -- and the

16  entities responsible are the State Department, Department of

17  the Treasury, and the U.S. Department of Justice -- based on

18  the best information available, determine that an organization

19  is a foreign terrorist organization.  At that point, it is

20  illegal for U.S. citizens to contribute to that organization or

21  materially support it.

22  Q.   Can I interrupt you for a moment?  Is that different from

23  what Al-Haramain was designated as when you were working --

24          MR. SMITH:  Object to the expert defining the law.

25  An issue and legal opinion --

1              THE COURT:  Overruled.  He's an expert.  He has a law

2     degree.  He can do that.

3              MR. SMITH:  We object to any expert --

4              THE COURT:  The objection is overruled.

5     BY MR. KROMBERG:

6     Q.   Can you explain, when you were talking about the

7     designation, is that the same designation that Al-Haramain,

8     where you worked, was?

9     A.   Yeah, largely.  And there's two different designations.

10    One of them is a foreign terrorist organization for an entity

11    that's entirely foreign.  The other is a specially designated

12    global terrorist.

13             Al Qaeda in Iraq was designated as both, and so it

14    was designated in 2004.  Thereafter, at one point, al Qaeda in

15    Iraq became the dominant military force in Iraq's Anbar

16    Province.  Ultimately, it engaged in very awful forms of

17    torture.  It imposed a version of sharia, or Islamic law, which

18    didn't comport with what Anbari citizens had known.

19             There was a resulting uprising against them known as

20    the Sahwa, S-a-h-w-a, and both this uprising by Sunni Muslims

21    along with a surge in U.S. troops and the U.S.'s turning

22    towards population-centered counter-insurgency, which was a

23    technique of trying to win over the population, helped to cut

24    al Qaeda in Iraq down to size.

25             By 2009, it was a former shell of its former self,

1    but then it ended up getting revived based on a few different

2    factors.

3           Based on the -- so al Qaeda in Iraq is a Sunni

4    organization.  The government of Iraq is dominated by Shias,

5    which is a different Islamic sect.  The Shia government never

6    succeeded in really incorporating Sunnis into the new structure

7    in government in Iraq.  This isolated the Sunni community.

8           Further, you had a civil war break out in Syria which

9    helped to breathe new life into this al Qaeda in Iraq

10   organization.

11          It took on a number of different names from 2006

12   onward, but fundamentally, it remained the same organization,

13   and this is actually shown in the designations.  Rather than

14   redesignating ISIS, which is the name that the group took on

15   prior to taking on just the name the Islamic State, rather than

16   designating these as new organizations, the U.S. government

17   updated the designation to show that al Qaeda in Iraq was now

18   operating under a new name; in other words, there was

19   organizational continuity.

20          In 2014, in February, ISIS, which had previously been

21   a part of al Qaeda, was expelled from the al Qaeda organization

22   by al Qaeda's leadership after going through a number of

23   arguments with them which amounted to turf wars.  Then in June

24   2014, it undertook this massive offensive from Syria, where it

25   was based at the time around a city called Raqqa into Iraq.

1    Q.   Let me stop you.  So Raqqa is R-a-q-q-a?

2    A.   That's correct.

3    Q.   Okay.  I'm sorry for interrupting you.  Please go ahead.

4    A.    It captured major cities including Mosul most

5    significantly, controlled territory around the size of Great

6    Britain, and by the end of June of 2014, ISIS, which obviously,

7    based on how much it was able to capture, was very militarily

8    powerful, announced that it had reestablished the Caliphate.

9    Q.   Okay.  Now you've hit on a term we need to -- you need to

10   explain.  What is the Caliphate?

11   A.   So the Caliphate, the term "caliph," it means successor.

12   A Caliphate was established after the death of the Prophet

13   Muhammad, the Prophet Muhammad being the key religious figure

14   within the Islamic faith.

15        And, you know, thereafter, there were often competing

16   Caliphates over the course of the 1,400 years that followed,

17   but what everyone agrees upon, and this is particularly of

18   resonance to jihadists, is that the Caliphate ended in the

19   1920s, when the Ottoman Empire collapsed, and is replaced with

20   the modern Republic of Turkey, which is a secular state.

21        This is referred to numerous times by various

22   jihadist figures, including Usama Bin Laden and others, as

23   being one of the greatest crimes.  And so jihadists for a long

24   time have sought to reestablish the Caliphate.

25        When one looks at things like al Qaeda's 20-year

1    battle plan against the West, one of the key steps in that

2    plan, which is a plan fashioned by a high-level al Qaeda leader

3    named Saif al-Adl, S-a-i-f, last name a-l-hyphen-A-d-l, you

4    know, it -- one of the key steps there is reestablishment of

5    the Caliphate, which to them means that you'd have a single

6    body, not a state but a single body ruling over the vast

7    majority of the world's Muslims.

8              That to them is what the Caliphate is, not just a

9    political body but a political, a political/religious body,

10   where it incorporates their very strict version of Islamic law

11   and imposes that on the population under its control.

12   Q.   So what relationship does the -- would the Caliphate have

13   to existing nation states?

14   A.   It would -- it's supposed to supplant all existing nation

15   states.

16   Q.   All right.  So when was the Caliphate declared?  You

17   were --

18   A.   At the end of June 2014.

19   Q.   Okay.  And who declared it?

20   A.   It was declared in an announcement by Abu Mohammad

21   al-Adnani, A-d-n-a-n-i, who was the spokesman for ISIS, and Abu

22   Bakr al-Baghdadi also echoed that announcement.  Abu Bakr

23   al-Baghdadi is the, according to ISIS, is the caliph or the

24   leader of the newly established Caliphate.

25   Q.   How noteworthy an event in the Muslim world was the

1    declaration of the Caliphate?

2    A.   Well, it was highly noteworthy but not in the sense that

3    people saw it as legitimate.  It was noteworthy in the sense

4    that, number one, ISIS had come to control an extraordinary

5    amount of territory by this time.  Number two, from the very

6    outset, it was committing the kind of atrocities that were

7    rarely seen, raging from beheadings to sex slavery to literal

8    cases of genocide.

9           Number three, in declaring the Caliphate, they had

10   declared all other entities, including nation states and

11   jihadist groups, to be rendered illegal.  To them, because only

12   the Caliphate had legitimate religious legitimacy, every other

13   entity was not legitimate and was, in fact, an enemy to be

14   conquered.

15          It was significant because throughout the region,

16   people understood that this meant that not only would the

17   Caliphate -- the self-proclaimed Caliphate seek to expand, but

18   also it was going to try to recruit among citizens of various

19   countries to try to get them to carry out terrorist attacks,

20   which ultimately, you know, we've seen a significant increase

21   in terrorism not just in the Middle East but in Europe and here

22   in the U.S. linked to ISIS's rise and declaration of a

23   Caliphate.

24   Q.   So what were the arguments in favor of the Caliphate among

25   Muslims -- and let me focus on Muslims in the United States, to

1    the extent that you could generalize that way.

2    A.    So the arguments in favor of the Caliphate were, number

3    one, that it controlled sufficient territory; number two --

4    Q.    Sufficient territory to mean it's legitimate?

5    A.    Yeah.  Sufficient territory to be a legitimate political

6    entity.

7          Number two, there's requirements for who a caliph can

8    be.  One of them involves the ancestry of the caliph.  He has

9    to be from the Quraishi Tribe.  It's Q-u-r-a-i-s-h-i.

10         MR. SMITH:  Objection.  Relevance.

11         THE COURT:  Well, I think at this point, you know --

12         MR. SMITH:  Quraishi Tribe.

13         THE COURT:  Just a second.  Although it's very

14   interesting, I think we have to keep this focused on the issues

15   relevant to this case, all right?  So I'm going to sustain that

16   objection.

17   BY MR. KROMBERG:

18   Q.    All right.  Dr. Gartenstein-Ross, how fast -- focusing on

19   2014-2015, how did the, how did the size, the geographical size

20   of ISIS change?

21   A.    It expanded from 2014 -- it expanded during the course of

22   2014.  As 2015 began, it was a bit rudderless for a little

23   while.  Then in May of 2015, it -- this is in Iraq-Syria.  In

24   May of 2015, it engaged in an offensive which captured three

25   major geographic areas.  Two of the significant ones were the

1    City of Ramadi in Iraq and Palmyra in Syria.

2           At the same time, it was also expanding outside of

3    Iraq and Syria.

4    Q.    Such as where?

5    A.    One place is Nigeria, where the jihadist group Boko Haram

6    pledged allegiance to them, and also in Libya, where you had a

7    major group in the City of Derna called the Islamic Youth Shura

8    Council, which pled allegiance to them.

9    Q.    And if I can interrupt, stop you for a second, so what

10   impact did the growth of the Islamic State have on the

11   attractiveness of the, of the Islamic State to Muslims who were

12   wondering whether it was appropriate to support the Islamic

13   State or not?

14   A.    It made it very attractive for a certain subset who were

15   inclined to support jihadism.

16   Q.    And why was that?

17   A.    ISIS really rested a lot of its legitimacy on what you

18   could call a winner's message.  It wanted to show that it was

19   strong, that it was constantly taking territory.  It would --

20   even some of the atrocities that it broadcast to the world,

21   when it beheaded people, when it set people on fire, when it

22   melted them in acid, these were all indications that the

23   organization was strong, which could be seen on the one hand as

24   sticking up against the enemies of Islam.  On the other hand,

25   within kind of a debate within the jihadist movement, they

1    wanted to show that they had clearly displaced al Qaeda, the

2    organization which they grew out of.

3    Q.   Let's turn our attention, if we could -- in fact, before

4    we step away, what are the other names that ISIS is known by?

5    A.   It's known by a number of names.  Daesh is, is one of

6    them.  It's thought of as a derogatory term.

7    Q.   D-a-e-s?

8    A.   D-a-e-s-h, which is based on an acronym that relates to

9    another term it's known by.  It's known by many as Dawla,

10   D-a-w-l-a, which in Arabic means state.  They call themselves

11   the Islamic State.

12   Q.   How about ISIL?

13   A.   Yeah, that's another term they're known by, which stands

14   for the Islamic State of Iraq and the Levant.

15   Q.   Okay.  Let me turn your attention to the Libyan Civil War.

16   Can you sketch out the history of the, of the war in Libya that

17   was in existence in 2011 and until it -- until today, if that's

18   what it is?

19   A.   Sir, what's the question?

20   Q.   Could you sketch out the history of the war in Libya that

21   was occurring in 2011?

22   A.   So in 2011, early on, you had anti-Gaddafi protests.

23   Q.   Gaddafi was the dictator?

24   A.   Yeah.  Muammar Gaddafi was the Libyan dictator.

25           There were protests which fairly soon escalated into

1    military action against the regime.  There were multiple fronts

2    on which, on which fighting occurred.  Some of the major

3    battles occurred around Misrata.  Benghazi was another city in

4    which Gaddafi was trying to mount a crackdown.  And the U.S.

5    and NATO intervened in this conflict beginning in March of

6    2011, which helped to turn the tide of the conflict.

7            By the end of the year, Gaddafi had been found by a

8    mob and killed, and a new democratic government was being put

9    in place.  That government, however, was never really able to

10   extend its writ across the country, and there was an ongoing

11   civil war which really kicked up in 2013, in part in response

12   to Islamist groups killing civilians around Benghazi.

13   Q.   When you, when you refer to Islamist groups, what do you

14   mean?

15   A.   By Islamist, I refer to groups that seek to forcibly

16   impose Islamic law.

17   Q.   So what were the various factions on the rebel side

18   against Gaddafi in 2011?

19   A.   There were a few different factions -- actually a number

20   of them.  One faction was the Misratan faction, which was

21   centered around the City of Misrata.  They were seen as the

22   truly revolutionary faction.

23           Another major faction was focused around the City of

24   Zintan, Z-i-n-t-a-n.  That was sometimes referred to as

25   counterrevolutionary.  They were anti-Gaddafi, but there were a

Gartenstein-Ross - Direct                                                857

1   lot of remnants of the Gaddafi regime.

2           There were jihadist factions that were a part of this

3   conflict from the very outset.

4   Q.   When you say jihadist factions, what do you mean?

5   A.   I mean factions that ascribe to Salafi jihadism, as

6   previously defined.  In particular around Derna, there was a

7   group called the Derna Brigade which was involved in much of

8   the earlier action, which was a clearly jihadist organization,

9   and then you had some tribal action as well especially in the

10  south of the country.

11  Q.   What was the Abu Salim Martyrs Brigade?

12  A.   The, the Abu Salim Martyrs Brigade is a group that grew

13  out of the afore-mentioned Derna Brigade.  It referred to a

14  slaughter by Gaddafi in the 1990s of over a thousand prisoners

15  at the notorious Gaddafi prison called the Abu Salim prison.

16          The Abu Salim Martyrs Brigade was founded by

17  individuals with connections both to the Taliban and also al

18  Qaeda.  Individuals who were early commanders in it had played

19  a role in sending fighters up to Iraq during the course of the

20  Iraq War to become a part of al Qaeda in Iraq.  Ultimately, the

21  Abu Salim Martyrs Brigade became a part of the umbrella

22  organization called the Derna Mujahideen Shura Council.

23  When --

24  Q.   And when was that, can you say?

25  A.   The Derna Mujahideen Shura Council was founded in, I

1  believe, late 2014.  It is the 2014-2015 period.

2         But within, you know, within the world of jihadism in

3  this time, you had this intense competition playing out between

4  ISIS and al Qaeda.  ISIS was trying to usurp the al Qaeda

5  network, and al Qaeda was trying to play defense to make sure

6  that ISIS did not become the new dominant jihadist

7  organization.

8         The Derna Mujahideen Shura Council and the Abu Salim

9  Martyrs Brigade ultimately fought against ISIS in Derna and, by

10 the middle of -- by the middle of 2015, were able to largely

11 drive ISIS out of Derna.

12 Q.   So when you were talking before about jihadist groups, how

13 would you characterize Abu Salim Martyrs Brigade on the

14 spectrum of the revolutionary, the counterrevolutionary, the

15 jihadist?  Where, where do they fall?

16 A.   Clearly jihadist.  You know, not only do you have

17 leadership and founders that were affiliated with al Qaeda and

18 the Taliban, but it was also endorsed by al Qaeda in the

19 Islamic Maghreb on more than one occasion, and, you know, al

20 Qaeda organizations, which are -- you know, al Qaeda prior to

21 ISIS was the preeminent jihadist organization, and it doesn't

22 randomly endorse other groups.  It has an expansion strategy

23 where sometimes it expands kind of covertly under other brands,

24 but regardless of whether Abu Salim Martyrs Brigade is a part

25 of al Qaeda, which a number of analysts believe that it is, it

Gartenstein-Ross - Direct                                         859

1    certainly is endorsed by al Qaeda because it fits the Salafi

2    jihadist mood that al Qaeda wishes to promote.

3    Q.    So is the Abu Salim Martyrs Brigade an enemy of ISIS?

4    A.    Ultimately, yes.  It went to war with ISIS.  ISIS in June

5    of 2015 assassinated the head of the Abu Salim Martyrs Brigade,

6    who is also the head of the Derna Mujahideen Shura Council, a

7    man named Salim Darby, S-a-l-i-m D-a-r-b-y, and after they

8    assassinated Salem Darby, the Abu Salim Martyrs Brigade as well

9    as the broader Derna Mujahideen Shura Council coalition that

10   they were a part of went to war with ISIS in Derna and

11   ultimately won that battle with ISIS.  They were able to expel

12   ISIS from the city.

13   Q.    So they were fighting each other.  How do their ideologies

14   differ, if at all?

15   A.    The ideologies are largely the same.  The big point -- the

16   big point of disagreement between them is whether ISIS

17   legitimately established the Caliphate.  Al-Qaeda argues that

18   it did not; ISIS argues that it did.

19             There are some strategic differences between the two,

20   with ISIS being more overtly brutal.  Al Qaeda is also a very

21   brutal organization, but it doesn't advertise its brutality in

22   the same way that ISIS did.  This was a longstanding dispute

23   between the two, going back to Abu Musab al-Zarqawi, as I

24   mentioned before.  When he controlled Anbar Province, al Qaeda

25   leadership warned him about his beheadings and his torture,

Gartenstein-Ross - Direct                                            860

1    asking, "Couldn't you just shoot your captives rather than

2    beheading them?  You would accomplish the same thing without

3    drawing so much public distaste."  So it's a strategic

4    difference.

5           And then you have a lot of personality and

6    organizational differences between them, but both of them

7    believe in establishing sharia law by force, and both of them

8    ultimately believe in reestablishing the Caliphate, though al

9    Qaeda believes that the time hasn't come yet for a Caliphate to

10   be declared.

11   Q.   So I'd like to turn your attention to a particular

12   incident that has come up in the evidence regarding the Jordan

13   pilot.  What would -- what's the reference to the Jordan pilot

14   in 2015 having to do with ISIS?

15   A.   Yeah.  The Jordanian pilot, whose name was Moaz

16   Kasasbeh -- do you need me to spell that?

17   Q.   Please.

18          THE COURT:  Go ahead.

19          THE WITNESS:  M-o-a-z is the first name, and Kasasbeh

20   is K-a-s-a-s-b-e-h.

21          He was a Jordanian pilot who was shot down over ISIS

22   territory.  He was captured by ISIS, and then, you know, as

23   they tend to like to do, they execute their captives on camera.

24   In this case, they executed Kasasbeh by burning him alive.

25   Q.   So I'd like you to take a look at what's been introduced

1   into evidence as Government Exhibit 1-106.

2          Can we put that on the screen?

3          And there's a, there's a reference -- you should have

4   a screen right next to you, and it should be appearing shortly.

5   And what it's going to reference is what happened in France in

6   January 2015.  Do you see the reference to what just happened

7   in France?

8   A.   No.

9          THE COURT:  No, I don't think you have the right

10  exhibit.

11         MR. KROMBERG:  Let's move on then until we can find

12  the right one.

13  Q.   There was a reference we've heard multiple times about

14  Raqqa, so who controlled Raqqa in 2015?

15  A.   The Islamic State, ISIS.

16  Q.   Now, there was also a reference in the evidence to an

17  attack in Texas in 2015.  Could you describe that?

18  A.   Yes.  This was --

19         MR. SMITH:  Objection to the asking the witness to

20  describe what's in evidence.  I don't -- it appears the

21  government just asked the witness to describe what's in

22  evidence.

23         THE COURT:  Wait.  Are you aware of an incident in

24  Texas related to your study of radical jihadists?

25         THE WITNESS:  Yes, Your Honor.

1           THE COURT:  All right.  I think that's relevant.

2    Overruled.

3           THE WITNESS:  So in May of 2015, there was an event

4    in Garland, Texas.  It was a rather provocative event, which

5    was a Muhammad art exhibition.  You know, within traditional

6    Islamic beliefs, the person of the Prophet Muhammad should not

7    be displayed in art or otherwise.

8           And so a couple of individuals who self-identified as

9    jihadists named Elton Simpson and Nadir Soofi drove from

10   Phoenix, Arizona, down to Garland, Texas.  They got out of --

11   they had been in touch with a major ISIS recruiter named Junaid

12   Hussain, who spent a lot of time online trying to encourage

13   people to carry out attacks.

14          They drove up to the art exhibition.  It was well

15   protected.  They hopped out of their car with smiles on their

16   faces and started firing their guns.  They shot a security

17   guard in the ankle, but ultimately, both of them were shot and

18   killed soon after they had opened fire.

19          MR. KROMBERG:  So I've been given the correct exhibit

20   number, 1-219.  If you could put it up on the screen?

21   Q.  It refers to something that happened in Paris.  And this

22   is an e-mail on February 16, 2016.

23          MR. SMITH:  Your Honor, we're objecting to --

24          THE COURT:  Wait, wait, wait.  One person speaks at a

25   time, all right?  Now, what is the objection?

1          MR. SMITH:  The objection is this witness is an

2    expert who may testify about what happened in Texas, but he

3    cannot be asked to interpret the evidence in this case and try

4    to divine the defendant's words and try to figure out what the

5    defendant meant or didn't mean in certain exhibits.

6          THE COURT:  Well, certainly he can explain his

7    understanding of the reference, but whether or not it's the

8    same as what your client understood, I agree, he cannot testify

9    to that.

10         Go ahead.  Overruled.

11   BY MR. KROMBERG:

12   Q.   Did something involving ISIS occur in Paris shortly before

13   February 16, 2016?

14   A.   Yeah.  This appears to be --

15         THE COURT:  No, the question -- you don't need to

16   read the e-mail.  The question is did something happen in Paris

17   slightly before February of 2016 --

18         THE WITNESS:  Yes.

19         THE COURT:  -- related to the issues in this case?

20         THE WITNESS:  Okay.  Thank you, Your Honor.

21         Yes.  A few months before, in November 2015, there

22   was a major urban warfare-style attack in Paris in which about

23   nine different attackers, including suicide bombers and

24   jihadists with guns, made war on the city and succeeded in

25   killing about 130 people in one evening.

Gartenstein-Ross - Direct                                        864

1   BY MR. KROMBERG:

2   Q.   Let's take a look at 6-110-1, which is in evidence.   And

3   there's a reference to Khorasan and De Mahdi.   Can you explain

4   who De Mahdi is and what the Khorasan refers to?

5   A.   Sure.

6             MR. SMITH:   Objection to asking the witness to

7   explain what another witness, a fact witness in this case meant

8   by a certain statement.

9             THE COURT:   Are these, are these terms of art, or do

10  they name people?   What are these, just generically?

11            THE WITNESS:   Yes, they're terms of art.   They're

12  terms of art that derive, Your Honor, from the jihadist

13  movement --

14            THE COURT:   All right.

15            THE WITNESS:   -- and has specific meanings within it.

16            THE COURT:   This expert, he can testify as to what

17  terms mean in that particular movement.

18            MR. SMITH:   He can testify about it, and the proper

19  inquiry would be from Mr. Kromberg:   Are you familiar with

20  the Khorasan?   What is it?   It would not be to pull up an

21  exhibit -- a witness exhibit in this case --

22            THE COURT:   All right, all right.

23            MR. SMITH:   -- and then ask the expert to read off of

24  it.

25            THE COURT:   All right, I agree on that, Mr. Kromberg.

Gartenstein-Ross - Direct                                              865

1    You can argue your case at the end, all right?  But at this

2    point, if there are technical terms you want explained, you can

3    ask it that way.

4              MR. KROMBERG:  That's fine.

5    Q.   Can you explain the term "De Mahdi"?

6    A.   Yes.  De Mahdi, or -- which is a reference to a

7    Messiah-like figure who will come at the end of times and lead

8    the Islamic world in battle, it has different meanings to

9    different Muslims.

10             THE COURT:  How do you spell the word?

11             THE WITNESS:  It's M-a-h-d-i, Your Honor.

12             So it has different meanings to different Muslims.

13   Within the context of Salafi jihadism, it's referring to a

14   figure who will help to usher in significant conquests, and

15   it's tied to the notion of the Apocalypse, the notion of the

16   end times for the world.  It will be a military leader.

17   BY MR. KROMBERG:

18   Q.   How about the Khorasan?

19   A.   Khorasan, which is K-h-o-r-a-s-a-n, is referring to the

20   territory we know as Afghanistan, you know, approximately.

21   It's a figure that -- it's a term that also figures in end

22   times theology for jihadist groups.  There's a reference in the

23   Hadees, the al-Hadees, which are the sayings of the Prophet

24   Muhammad, that at the end times, there will be black banners

25   coming out of Khorasan, and both within al Qaeda and also

1  within ISIS, there's a belief that this is a reference to

2  jihadist flags.  They believe that they are fulfilling this

3  prophecy.

4  Q.   Let's talk about, if we could switch a little bit to

5  radicalization.  What do you refer to when you say

6  radicalization?

7  A.   By radicalization, I refer to the process by which one

8  comes to accept a militant ideology, one that countenances

9  violence in order to impose what that ideology is.  That and,

10 I'd say, also the process of actually seeing violence as

11 something that is acceptable to undertake in service of the

12 ideology.

13 Q.   What factors have you found are important to whether

14 someone radicalizes?

15 A.   There are a number of different factors.  Two of the major

16 factors which I look at and other scholars look at are

17 ideology, that is, being radicalized into an ideology that

18 itself countenances violence, and political grievance, that is,

19 seeing that the world has done wrong to you or a group that you

20 associated with -- associate with, ending violence is justified

21 in response.

22         There are other trajectories as well.  Sense of

23 adventure has been one.  Money is sometimes an ideology

24 correlating with radicalization, and in some cases, mental

25 illness.

1  Q.   Are the factors consistent regardless of the ideology to

2  which someone is radicalized?

3            MR. SMITH:  Objection.  Leading.

4            THE COURT:  No.  Overruled.

5            THE WITNESS:  There's, there's debate about that.

6  Generally speaking, within the academic literature on

7  radicalization, a lot of experts try to look for a universal

8  theory of radicalization, one which can explain radicalization

9  to a variety of different ideologies.  I think some of the more

10 recent empirical citizenship suggest that not all ideologies

11 are equal.

12           For some extremist ideologies and in particular

13 there's a study from the University of Maryland which finds

14 that for neo-Nazism and for jihadism, there's more of a

15 proclivity to violence against innocence based on ideology than

16 you'd find, for example, in eco-terrorism or in other kinds of

17 political terrorism.

18 BY MR. KROMBERG:

19 Q.   What ideology have you found is relevant to radicalization

20 to Islamic violence?

21 A.   Well, I find that, that acceptance of neo-Nazi ideology is

22 relevant to acceptance of jihadist violence.

23           MR. SMITH:  Objection.  Relevance.

24           THE COURT:  Overruled.

25 BY MR. KROMBERG:

1    Q.   Well, before we even get to the neo-Nazi part of it,

2    though, there are -- what other, what other ideologies are

3    relevant to why someone radicalizes to particularly Islamic

4    violence?

5    A.   What other ideologies are relevant?  Oh, do you mean like

6    within the framework of Islamic beliefs?

7    Q.   Yes.

8    A.   So Salafi jihadist ideology is relevant to radicalization

9    violence.

10   Q.   And how so?

11   A.   In that the major groups -- al Qaeda, ISIS -- that want to

12   carry out violence purportedly in service of the Islamic faith

13   define themselves as Salafi jihadists, and looking at, you

14   know, the span of homegrown terrorism cases when I examined

15   them in 2009, I found throughout the sample that evidence of

16   Salafi ideology came up significantly within the people who

17   radicalized to violence or other illegal action in service of

18   the cause.

19   Q.   How is political grievance relevant to radicalization to

20   Islamic violence?

21   A.   Political grievance is relevant in that people aren't

22   always ideologically motivated.  Sometimes they're motivated

23   more by feeling that the world has been unfair.  They might act

24   in service of a cause even if they don't ascribe to the

25   ideology, but sometimes, as scholarship in this field has

1   found, political grievance and ideology can meld together.

2           In other words, you may feel that the world has been

3   unfair, unjust, and ideology can give shape both to defining

4   who your relevant in-group is, that is, in whose service you're

5   trying to act, to find your relevant out-group, that is, to

6   find who it is is responsible for this terrible state of

7   affairs, and then to find a program of action.  So in that way,

8   political grievance and ideology can work together to motivate

9   one towards violence.

10  Q.   Is the same true with respect to Nazi violence?

11  A.   Yes.

12  Q.   A political grievance -- I'm sorry, is it -- when you just

13  talked about what was relevant to radicalization to -- excuse

14  me, you just talked about how political grievance is relevant

15  to Islamic violence.  Is the same thing true --

16           MR. SMITH:  Objection.  Misstating the testimony.

17           THE COURT:  Why don't you let him finish the

18  question?

19           MR. KROMBERG:  I'll just change the question, Judge.

20  Q.   How is political grievance relevant to Nazi violence, if

21  at all?

22  A.   Political grievance is also relevant to Nazi violence.

23  Q.   What, what significance does hate speech have in

24  radicalization?

25  A.   Hate speech is significant in that it helps to clearly

Gartenstein-Ross - Direct                                                870

1   define who the out-group is against whom violence is justified,

2   and hate speech through dehumanization and marginalization of

3   the out-group can both serve to increase hostility towards that

4   out-group while at the same time lowering the threshold for

5   violence.

6          In other words, we all have somewhat of a natural

7   disinclination to want to do violence to other human beings.

8   Hate speech can help to reduce that disinclination and make one

9   think that violence is either justified or perhaps even a

10  heroic act.

11  Q.   Well, I've got to caution you to not talk too much like a

12  professor, but when you talked about marginalization, what do

13  you mean by marginalization?

14  A.   What I mean by marginalization is in this context,

15  marginalizing a group as unworthy of compassion.  As I said,

16  generally speaking, people have some natural disinclination to

17  want to do violence to other people.

18         When we see them -- when we see another group as evil

19  or sub-human, that could make violence neutral.  You know, if

20  you see another group as being kind of the equivalent of

21  vermin, if you have vermin in your house, you'll exterminate

22  them, and you won't think much about it, and if you've really

23  dehumanized another individual, you may see killing them as a

24  heroic act just based on the group to which they belong.

25  Q.   What impact does one's willingness to support violence in

1    support of one type of extremism have on one's willingness to

2    support violence in support of another type of extremism?

3    A.    My conclusion is that it has an impact, that if one has

4    ascribed to an extremist ideology, then it's easier to do two

5    things.  One, it's easier to see another extremist ideology as

6    persuasive.  Your threshold for accepting extreme ideas that

7    may even cause harm to others is lowered.  And secondly,

8    especially if you've already seen violence in service of the

9    first as acceptable, it means your threshold for seeing

10   violence as something you'll undertake or support is, is

11   lowered.

12          In both cases, you're more inclined to, having

13   already accepted an extremist ideology, to accept another and

14   maybe even act in service of it.

15   Q.    What -- maybe this is a basic question:  What is Nazism?

16   A.    Nazism, or National Socialism, is a movement associated in

17   particular with Adolf Hitler, who was the founder of this

18   movement, and it was -- it acted in Nazi Germany starting in

19   the 1930s.  Hitler became chancellor in January of 1933.

20   Shortly thereafter, there was a major fire at the Reichstag, or

21   the parliament building, which created a number of emergency

22   decrees.

23          Nazi Germany was an authoritarian state, a

24   totalitarian state, with secret police, clamp-downs on the

25   press.  Its ideology was based upon Aryan racial supremacy.

1   They saw the, the German and Nordic peoples as at the top of

2   the racial hierarchy.  They saw other races as inferior.

3           They wanted living space for the Germanic people.

4   This caused invasions of a number of different neighboring

5   countries, you know, Poland, Austria, and others.

6   Q.   And that was World War II.

7   A.   That was World War II.  And ultimately, it was also an

8   anti-Semitic ideology which favored the extermination of the

9   Jewish people, which is another program that Nazi Germany

10  attempted to put into effect and managed to kill millions of

11  Jews.

12  Q.   Did Nazism die when, when Hitler's regime fell?

13  A.   The idea of Nazism did not die.  I mean, today we refer to

14  people who still adhere to that ideology as neo-Nazis.  There

15  are -- there is still a movement that believes in Hitler's

16  ideals and believes that at some point, Nazism as a system of

17  governance can be reenacted.

18  Q.   Is adherence to Nazism inconsistent -- excuse me, is

19  adherence to neo-Nazism inconsistent with adherence to militant

20  Islamism?

21           MR. SMITH:  Objection.  Relevance.

22           THE COURT:  Overruled.

23           THE WITNESS:  So the answer is, is no.  In some ways,

24  it is.  You know, there are, there are certainly very clear

25  surface-level inconsistencies, ranging from Nazis, generally

Gartenstein-Ross - Direct                                              873

1   speaking, will see many Muslims as racially inferior, and on

2   the militant Islamic side, those who don't adhere to the

3   Islamic faith are seen as suspect and ultimately as enemies,

4   but, in fact, there is an enemy-of-my-enemy convergence between

5   the two.

6   Q.   When you say the enemy-of-my-enemy convergence, is that

7   the same as the enemy of my enemy is a friend?

8   A.   Yes, that's correct.  It's a famous statement which

9   justifies people with inconsistent ideas or those who

10  ultimately are enemies temporarily aligning to advance a

11  certain goal.

12  Q.   Is adherence to neo-Nazism consistent with all parts of

13  the Islamic spectrum?

14  A.   Absolutely not.  The Islamic spectrum -- the Islamic faith

15  is a diverse faith, and, you know, the vast majority of Muslims

16  reject neo-Nazism.

17  Q.   Who is -- are you familiar with David Myatt, M-y-a-t-t?

18  A.    Yes.  David Myatt was a leader of a neo-Nazi group called

19  Combat 18.  Neo-Nazis often have letters that congregate with

20  numbers, so 18 there stands for A, which is the first letter of

21  the alphabet, and H, which is the eighth letter.  It's

22  reference to Adolf Hitler.  It's a British neo-Nazi

23  organization which would engage in various acts of

24  terrorization of minority communities.

25           David Myatt ended up converting to militant Islam and

Gartenstein-Ross - Direct                                    874

1   arguing basically for the convergence of the two.  He served as

2   a theoretician for a time, arguing that neo-Nazis, those who

3   ascribe to neo-Nazi ideas --

4            MR. SMITH:  Objection to all of this hearsay.

5            THE COURT:  Overruled.

6            THE WITNESS:  -- should embrace the Islamic faith,

7   because he argued that Muslims would be the best weapons

8   against what he called the Zionists, Jews who in his view were

9   conspiring to, to slyly rule the world.

10  Q.   Who is Steven Smyrek, S-m-y-r-e-k?

11  A.   Steven Smyrek was a neo-Nazi who converted to the Islamic

12  faith, actually to the Shia branch of Islam.  He was arrested

13  in Israel in 1997 for trying to carry out a suicide bombing on

14  behalf of a militant organization known as Hezbollah.

15           He was released in a prisoner exchange.  He allegedly

16  renounced violence, but upon coming back to Europe, he gave

17  interviews in which he talked about how he would gladly be a

18  suicide bomber or die for his cause.

19  Q.   Who is Ahmed, A-h-m-e-d, Huber, H-u-b-e-r?

20  A.   Ahmed Huber was a Swiss journalist.  He was born in the

21  1920s.  He's now dead.  He converted to Islam relatively

22  somewhat late in life, in his thirties, after encountering a

23  number of Algerians who were a part of the Algerian Civil War,

24  an anticolonial war against France.

25           He went then to Egypt to meet with its then

1    president, Gamal Abdel due Nasser, G-a-m-a-l, last name

2    N-a-s-s-e-r.  At the time, Nasser's Egypt was a haven for a

3    number of ex-Nazis.  Some of them served in the Egyptian

4    government apparatus, and some of the -- some of them helped to

5    train the Egyptian Armed Forces and to train some sub-state

6    groups which were fighting for Arab nationalist causes.

7            According to Huber, Nasser told him some things about

8    Adolf Hitler that led Huber to eventually become an enormous

9    fan of Adolf Hitler.  Huber would propagandize from his home

10   about the need for Nazis and jihadists to work together.  He

11   was a fan not only of Hitler but of Usama Bin Laden.  He saw

12   the 9/11 attacks as, as he put it, an act of counterterrorism;

13   in other words, he saw them as fully justified.

14           And he also was part of a bank called Al-Taqwa,

15   T-a-q-w-a, which was involved in financing terrorism,

16   supporting terrorist groups, and was designated by the U.S.

17   government for these acts.

18   Q.   How about Sascha, S-a-s-c-h-a, Lemansky, L-e-m-a-n-s-k-y?

19   A.   Yeah.  Sascha Lemansky was a former neo-Nazi who ended up

20   taking part in a German-speaking -- can I refer to my notes for

21   a second just to make sure I'm not mixing up two people?

22   Q.   Please.  If you need to refer to your notes, refer to your

23   notes.

24   A.   My apologies.

25           Oh, sorry, yeah.  As I suspected, I was getting my

Gartenstein-Ross - Direct                                              876

 1    wires crossed.  Soscha Lemansky was a -- was based in Germany.

 2    He had been a neo-Nazi and had, had released videos talking

 3    about fighting against immigrants.  He released a YouTube video

 4    called "Tips for Fighting Against the Cockroaches."

 5              He later converted to Islam in 2014.  He was arrested

 6    by Germany for releasing ISIS propaganda videos and admitted

 7    that he had planned attacks where he wanted to kill German

 8    police officers on ISIS's behalf.

 9    Q.   How about Devon, D-e-v-o-n, Arthurs, A-r-t-h-u-r-s?

10    A.   Devon Arthurs was a former Nazi, by his own admission, who

11    earlier this year held up a Green Planet Smoke Shop in Tampa,

12    Florida.  Arthurs held three people hostage for a time and said

13    that this was in retaliation for U.S. foreign policy in Muslim

14    countries.

15              When the authorities arrested him, he admitted to

16    them that he had just carried out a couple of murders.  He told

17    authorities where it had taken place.

18              When authorities went there, the bodies were there.

19    These were former friends of his who were also neo-Nazis who

20    wouldn't respect his new Islamic faith, so he killed them prior

21    to taking hostages at the smoke shop.

22    Q.   How about Thomas Usztics, U-s-z-t-i-c-s?

23    A.   Thomas Usztics was a former neo-Nazi who became a part of

24    a group called Deutsch Taliban Mujahideen.  This was a

25    Germanic-speaking group in Afghanistan that was a jihadist

1    organization.  He would -- he appeared in a couple of videos

2    for them.  They were associated with a well-known transnational

3    jihadist group called the Islamic Jihad Union.

4           He appeared in a couple of videos propagandizing for

5    them and reached back to German citizens to try to encourage

6    them to materially support this organization.

7    Q.   How about Diego Alvarez?

8    A.   Diego Alvarez is a neo-Nazi based in the Catalan area of

9    Spain, Catalonia.  He worked with a local jihadist cell.  He

10   was not Muslim, but he found based on the idea that the enemy

11   of my enemy is my friend, he found an area to cooperate with

12   them.

13          He helped to arm this cell.  He helped it to select

14   possible targets.  They planned to attack government buildings,

15   police stations, synagogues, a Jewish bookstore.  The plot was

16   broken up before it could be launched by the Catalan Police.

17   Q.   Let me ask you to take a look at an exhibit that's in

18   evidence, Government Exhibit 8-108.  It's a Facebook record

19   with a reference to Emerson Begolly, to a news article about

20   Emerson Begolly.  Are you familiar with Emerson Begolly?

21   A.   Yes.

22   Q.   Are you familiar with -- I don't know if you can tell from

23   that Facebook page where the link is to Emerson Begolly, but

24   tell us about Emerson Begolly.

25          MR. SMITH:  Objection again to asking -- there's no

1   reason why the expert needs to be asked about the evidence in

2   this case.  He can be simply asked about Emerson Begolly.

3            THE COURT:  I'm going to overrule the objection.

4   Let's go.

5   BY MR. KROMBERG:

6   Q.   Can you -- are you familiar with Emerson Begolly?

7   A.   Yes.

8   Q.   Okay.  Who is Emerson Begolly?

9   A.   Emerson Begolly was a young man in Pennsylvania who had

10  been inculcated into neo-Nazi ideology as a young man.  He

11  converted to Islam and was active on a number of different

12  jihadist forums.  On these forums, you know, even for very --

13  for him tended to be fairly anti-Semitic.  He was really known

14  for his Jew hatred, putting together a few nasheeds,

15  n-a-s-h-e-e-d, or songs talking about killing Jews.

16            He took on a, he took on a nom de guerre, and that

17  was his nom de guerre, al-Shishani, which means The Chechen.

18  He would write under that name in jihadist forums.

19  Q.   And then he was arrested on a terrorism offense?

20  A.   Yeah, he was arrested on a terrorism offense in part for

21  trying to encourage attacks, something he would frequently do

22  on the forums that he was a part of, and ended up biting an FBI

23  agent as he was being arrested.

24            MR. KROMBERG:  So at this point, I'd like to read

25  into evidence Government Exhibit 12-28, which is a stipulation:

1   The United States and the defendant hereby stipulate and agree

2   that Government Exhibits 14-100 through 14-140 and Government

3   Exhibit 14-180 were found by the FBI on computer media found

4   and searched by the FBI in September 2011 at the residence of

5   defendant Nicholas Young.

6           And we'd like to move into evidence, Judge,

7   Government Exhibit 14-180, and I'd like to ask the witness

8   about an individual referenced on 14-180.

9           THE COURT:  All right, hold on one second.

10          MR. SMITH:  We object to the extent this is a list of

11  Web sites that includes information that is not relevant to the

12  expert's testimony.

13          THE COURT:  Let me take a look at it.

14          Overruled.

15          (Government's Exhibit No. 14-180 was received in

16  evidence.)

17  BY MR. KROMBERG:

18  Q.   So take a look, if you would, at the screen.  You should

19  be able to see 14-180.  And do you see a reference there to

20  Alois Brunner?  A-l-o-i-s Brunner, B-r-u-n-n-e-r.

21  A.   Yes.

22  Q.   Who was Alois Brunner?

23  A.   Alois Brunner was a figure in Nazi Germany.  He was close

24  to Adolf Eichmann, who ended up going to Syria.

25  Q.   After the war?

1  A.   After the war.  This is when a number of Nazi war

2  criminals -- and he was considered to be a war criminal --

3  ended up fleeing the area.  He cooperated with the Syrian

4  regime.  According to journalists who visited Syria like Robert

5  Fisk, he'd taken part in establishing some torture devices for

6  them, and he had been a convert to Islam.

7  Q.   How about are you familiar with Johann von Leers,

8  J-o-h-a-n-n, von, v-o-n, Leers, L-e-e-r-s?

9  A.   Yeah, Johann von Leers.

10 Q.   Who is that?

11 A.   He was a propagandist for Hitler during Nazi Germany who

12 then took up residence in Egypt after he fled.  He converted to

13 Islam, taking on a Muslim name -- or an Arabic name, and helped

14 to propagandize for the Nasser regime.

15        There was at the time, you know, significant tension

16 ranging on the state of outright warfare between the State of

17 Egypt and the State of Israel, so a lot of the anti-Semitic

18 propaganda which he had produced as a part of the Nazi Germany

19 regime he was able to repurpose and expand upon for Egypt.

20        MR. KROMBERG:  Your Honor, at this time, we'd like to

21 show the witness -- move into evidence Government Exhibit

22 10-230, which has been covered by a stipulation already in

23 evidence that it was found in the computer media of the -- at

24 the defendant's residence in August 2016.  I think Your Honor

25 has seen this before.

1            MR. SMITH:  Objection.

2            THE COURT:  I think now it's relevant.  I'll overrule

3    the objection.

4            MR. KROMBERG:  Can you please show 10-230?

5            THE COURT:  So it's in.

6            (Government's Exhibit No. 10-230 was received in

7    evidence.)

8    BY MR. KROMBERG:

9    Q.    Do you see that poster -- or that graphic, 10-230?

10   A.    Yes.

11   Q.    And do you recognize the individual on the left side of

12   the screen?

13   A.    Yes.

14   Q.    And do you know who that is?

15   A.    It's a cartoon depiction of Haj Mohammad Amin al-Husayni,

16   who had been the Grand Mufti of Jerusalem, a figure who took up

17   refuge in Nazi Germany and propagandized on the part of the

18   Nazi regime, including helping to recruit for the SS, which was

19   its elite intelligence unit.

20   Q.    What was Haj Amin al-Husayni's relationship with Hitler?

21   A.    Haj Amin al-Husayni had met with Hitler when he came to

22   Germany.

23   Q.    Hold on, let me try and -- Government Exhibit 10-231,

24   Judge, is covered by that same stipulation, and we'd move it

25   in.

1            MR. SMITH:  Please don't put it up yet.  Object.

2     403, 401.

3            THE COURT:  Well, now it's relevant, so the objection

4     is now overruled.  231 is in.

5            (Government's Exhibit No. 10-231 was received in

6     evidence.)

7     BY MR. KROMBERG:

8     Q.   So take a look at 231.  Do you recognize that photo?

9     A.   Yes.

10    Q.   And what is that photo?

11    A.   That's -- that photo is, it depicts Adolf Hitler's meeting

12    with Haj Amin al-Husayni.

13    Q.   What did Husayni say that he wanted out of his

14    relationship with Hitler?

15    A.   There were several things that he wanted.  Some of them

16    involved political leadership roles, but the main area of

17    agreement was that he also wanted the extermination of the

18    Jewish people.

19    Q.   What was Haj Amin al-Husayni's relationship to the SS?

20    You just mentioned the SS.

21    A.   He helped to recruit a predominantly Bosnian Muslim

22    division of the SS which aided in Nazi Germany's efforts.  He

23    also wrote a propaganda booklet for -- which went to them

24    called "Islam und Judentum," or "Islam and Judaism," which was

25    a highly anti-Semitic tract encouraging violence against the

1    Jewish people.

2         MR. KROMBERG:  Your Honor, at this time, we'd like to

3    move into evidence additional photos found on the defendant's

4    computer media in August 2016.  They are Government Exhibit

5    10-232, 236, 237, 238, and 240.

6         MR. SMITH:  Now, Your Honor, we object on 401, 403,

7    and cumulative basis.

8         MR. KROMBERG:  And I hope Your Honor will notice I

9    deleted several of the items that we talked about in this

10   series, that we talked about before.

11        THE COURT:  The exhibits you're trying to enter have

12   not only photographs but printing.

13        MR. KROMBERG:  Right.  And we -- there's additional

14   stipulation about that, about the metadata, Judge, and I

15   believe we've entered that one, but that's -- the stipulation

16   is that the government and the defense agree that the printing

17   on the bottom of those photos is metadata from those pictures

18   that were found on the computer of the defendant at his

19   residence.

20        MR. SMITH:  Again, Your Honor, Mr. Kromberg continues

21   to insinuate that stipulations have anything to do with

22   relevance in this case.

23        THE COURT:  I understand that, but what I want to

24   make sure of is, in other words, where there is a name given

25   and there's a name and then there's a, you know, the JPG --

1           MR. KROMBERG:  Name of the file.  That was the name

2    of the file on -- that is the metadata for that picture.

3           THE COURT:  All right.  I'm going to permit those in

4    because the government has cut back on it, so they're all in.

5           (Government's Exhibit Nos. 10-232, 10-236 thru

6    10-238, and 10-240 were received in evidence.)

7           MR. KROMBERG:  Judge, could we publish to the jury --

8    what one did we just do?  231?  Okay.  Please put up 10-232.

9    Q.   Do you recognize that picture.

10   A.   Yes.

11   Q.   And what is that?  What is depicted in that photo?

12   A.   That is Haj Amin al-Husayni inspecting the Bosnian Muslim

13   division of the SS.

14   Q.   And please bring up 10-236.

15           And what is that?

16   A.   That's a photo of Haj Amin al-Husayni.

17   Q.   And how about 10-237?

18   A.   That's a photo of Bosnian Muslim members of the, of the

19   Waffen-SS who had been recruited by Husayni, which he recruited

20   for.  They're reading his booklet, "Islam und Judentum," which

21   is "Islam and Judaism."  I had mentioned that before.

22   Q.   When you say Waffen-SS, what is Waffen?

23   A.   The Waffen-SS was units that are part of the battle of

24   World War II.

25   Q.   Was there any significance between Waffen-SS and just SS?

1    A.   Well, you had different units that were -- you had

2    different units throughout the course of the conflict.  Some of

3    them would be more intelligence units.  Some of them would

4    be battle units.

5              MR. SMITH:  Objection.  Relevance.

6              THE COURT:  I think now we're beyond the field of

7    what we need.  I'll sustain the objection.

8              MR. KROMBERG:  That's fine.

9              So please turn to -- bring up 10-238.

10   Q.   Do you recognize that?

11   A.   Yes.  Those are also Bosnian Muslim members of the SS.

12   Q.   Keep your voice up.

13   A.   Those are also Bosnian Muslim members of the SS.

14   Q.   And 10-240, please.

15   A.   That is a Nazi German propaganda poster depicting,

16   depicting the Mufti with Bosnian Muslim members of the SS.

17   Q.   Okay.  So what is the -- go back to, if we could, 10-230.

18   Can you bring up 10-230?

19             It's on the screen.  What is the point of

20   agreement -- can you tell us what that, what that poster says

21   in German?

22   A.   So "Die Allianz" means the Alliance.

23   Q.   Between?

24   A.   Yeah, from 1939 to 2004.  I don't think there's

25   significance of 2004 other than that may have been the year

1    that it was put together, but it's indicating the convergence

2    that we had talked about, the idea that between men like Haj

3    Mohammad Amin al-Husayni and the Nazis, here this is taken from

4    a previous Hitler Youth poster which had been used during the

5    World War II era, this is obviously put together much later,

6    but the argument that it's making is that this is an alliance

7    based on the idea of the enemy of my enemy is my friend.

8    Q.    And who is the enemy?

9    A.    The enemy is the Jews.  That's the common -- I mean, the

10   Jews but more broadly the West, democratic societies.  The Jews

11   are a point of hatred, a point of dehumanization, but

12   ultimately, the enemy goes far beyond that.

13          MR. KROMBERG:  Your Honor, at this point, we'd like

14   to bring up and move into evidence 10-241, covered by the same

15   stipulation, that it was, it was found on the defendant's

16   computer at his home in August of 2016.  We are not suggesting

17   that we've agreement that it's relevant, but we --

18          MR. SMITH:  No, Your Honor.  At this point, it's far

19   past cumulative.  It's plain 403 evidence, and we object.

20          THE COURT:  I'm -- I understand, again, the problem

21   here, but I am permitting it in.  Overruled.

22          (Government's Exhibit No. 10-241 was received in

23   evidence.)

24          MR. KROMBERG:  Can you publish 241, please?

25   Q.    Now, Dr. Gartenstein-Ross, can you tell from the, the head

1   gear of the people in that poster what religion they are?

2   A.    Yes.

3   Q.    And what can you tell us from what they're dressed?

4   A.    They're wearing burkas.  They're Muslim.

5   Q.    What is a burka?

6   A.    A burka is gear that a woman would wear that is meant to,

7   to cover certain parts of the body.  In this case, it's

8   covering everything except for the eyes and probably the hands

9   and the feet.  It's the garment that is over their face -- over

10  their face and head.

11  Q.    Dr. Gartenstein-Ross, what is -- what -- when someone

12  refers to the Zionist conspiracy, what are they referring to?

13  A.    It's a belief that there is a Jewish conspiracy to

14  secretly control the world.

15  Q.    I'd like you to take a look, if you could, at Government

16  Exhibit 10-862, which is not in evidence, but it's covered by

17  the stipulation that it was found at the defendant's house in

18  August --

19              THE COURT:  Don't show it, don't show it yet.

20              MR. SMITH:  Objection.  403, 401.  Your Honor, the

21  point has been made that Mr. Gartenstein-Ross is trying to

22  establish.

23              THE COURT:  I'm going to sustain that objection.  I

24  think at this point, this is getting cumulative and repetitive.

25              MR. KROMBERG:  Okay.

1                THE COURT:  It's out.

2    BY MR. KROMBERG:

3    Q.   So who is William Pierce?

4    A.   William Pierce is the late leader of an American neo-Nazi

5    group called the National Alliance.

6    Q.   And what -- and what is William Pierce within the National

7    Alliance known for?

8    A.   He's known for a number of things.  In addition to leading

9    the group, he's known for writing a number of fictional novels

10   which depict a domestic race war in extraordinarily violent and

11   gory detail.

12   Q.   What are those books?

13   A.   The books include *Serpent's Walk*, *Hunter*, and *The Turner*

14   *Diaries*.

15                MR. SMITH:  Objection.  Relevance, Your Honor,

16   because there is no document in evidence that is authored by

17   William Pierce.

18                MR. KROMBERG:  Your Honor, we have already in

19   evidence two copies of *Serpent's Walk*, and we've offered

20   *Hunter*, which the defense objected to as irrelevant the last

21   time we did that, and Your Honor said --

22                MR. SMITH:  Mr. Kromberg appears not to know that the

23   books were written under pseudonyms.

24                MR. KROMBERG:  Oh, are you testifying?

25                THE COURT:  This is improper, all right?  Counsel --

1    again, jury, disregard this conversation between the lawyers,

2    all right?

3              We have seen pictures of what appear to be covers

4    that have those titles on them, but whether they're the actual

5    book or not, I don't think we have that evidence here yet.

6              MR. KROMBERG:  Your Honor, Mr. Campbell testified

7    that he was given a gift of the *Serpent's Walk* and he had it

8    at -- he said this book was the book that was given to him by

9    Mr. Young, and then we introduced the cover of the book that

10   had been seized at the house.  That was the *Serpent's Walk*.

11             And then we gave Mr. Campbell a copy of the cover of

12   *Hunter*, which had been seized at Mr. --

13             THE COURT:  Do you have the books themselves in

14   court?

15             MR. KROMBERG:  Certainly *Serpent's Walk* is here.  I

16   do not know --

17             THE COURT:  All right, what's the exhibit number?

18             MR. KROMBERG:  10-860 and 10-861, Judge.

19             THE COURT:  All right.  Mr. van Roekel, see if you

20   can find the actual book.  I don't want the photograph; I want

21   the book.

22             MR. KROMBERG:  Your Honor, could --

23             THE COURT:  Is it not there?

24             MR. KROMBERG:  It's on the desk.  Right, there we go.

25             THE COURT:  All right.  Hand the book -- I don't want

1       the picture -- the book to the witness.

2                   Have you ever seen that before?

3                   THE WITNESS:  Yes.

4                   THE COURT:  And how have you seen it?

5                   THE WITNESS:  So you mean the physical copy or the

6       book itself?

7                   THE COURT:  Have you seen the book itself?

8                   THE WITNESS:  This book itself, not this particular

9       copy, no.

10                  THE COURT:  Have you seen other copies that look like

11      that?

12                  THE WITNESS:  Yes, I have.

13                  THE COURT:  Have you read them?

14                  THE WITNESS:  Yes.

15                  THE COURT:  All right.  You can ask about that.

16                  MR. SMITH:  Your Honor, the objection is that the

17      author, William Pierce, is nowhere found on that book.

18                  THE COURT:  Do you know who the author of that book

19      is?

20                  THE WITNESS:  Yes.  The author is William Pierce.

21                  THE COURT:  And how do you --

22                  MR. SMITH:  The testimony is prejudicial.

23                  THE COURT:  How do you know that?

24                  THE WITNESS:  Because it's what -- everyone,

25      including the National Alliance, accepts that William Pierce

1   wrote the book.  It's universally accepted even by his

2   organization.  He wrote all of his books under pseudonyms.

3   Andrew MacDonald is *The Turner Diaries,* here it's Randolph

4   Calverhall, but the National Alliance makes no secret of the

5   fact that he was the author of these books.

6          MR. SMITH:  Your Honor, our objection is based on

7   that there appears to be no evidence that Mr. Young understood

8   who the pseudonymous author of this novel is.  Now the expert

9   is proposing to testify on the background of William Pierce.

10  There's no evidence in this case indicating that Mr. Young knew

11  who William Pierce is.

12         THE COURT:  I'm not so sure it's important whether

13  one knows who the author of a book is or not.  I mean, the

14  question is what is the book and what are its contents.  That's

15  what's relevant to the case, not who wrote it.

16         MR. SMITH:  I believe Mr. Gartenstein-Ross was about

17  to talk about the background and belief that William Pierce was

18  the pseudonymous author of a book.

19         THE COURT:  Yeah, I think we're going beyond the

20  scope.  The book itself speaks for itself.

21         MR. KROMBERG:  Your Honor, well, here are the books

22  by the way.  So there's the one copy from Mr. Campbell, and

23  here are the two copies of *Hunter* and *Serpent's Walk* that were

24  seized.  We have the books.  And what I was going to ask is who

25  published the book, and that would be the National Alliance.

1  National Alliance is what Mr. Campbell talked about as the

2  neo-Nazi group in America --

3            THE COURT:  You need to stop testifying as well.

4            Do you know who the publisher is of these two books?

5            THE WITNESS:  Yes.

6            THE COURT:  Who is the publisher?

7            THE WITNESS:  The publisher is National Vanguard

8  Books, which is the publishing arm of the National Alliance,

9  William Pierce's organization.

10           THE COURT:  All right.  And these two books were

11 found in the defendant's residence or his backpack?  Where were

12 they found?

13           MR. KROMBERG:  Residence.

14           THE COURT:  All right.  Then the books are in.

15           MR. SMITH:  The books are in.

16           (Government's Exhibit No. 10-860 was received in

17 evidence.)

18           THE COURT:  That's fine.

19           MR. SMITH:  The only objection we're making is that

20 the name "William Pierce" is nowhere found on the document.

21           THE COURT:  I understand.  All right, let's move on.

22 William Pierce is not that important to this case.

23           MR. KROMBERG:  Could I -- do you want me to hold

24 them?

25           THE COURT:  No, you should give it to the court

1   security officer.  They're part of the record of the case now,

2   and the jury will have access to them.  The jury can open up

3   the folder and look at the books if they want to.

4           MR. KROMBERG:  Okay.  Also at this point, Judge, we

5   move in the exhibits that Mr. Campbell testified that he

6   brought from the meeting he went to with Mr. Young that are

7   13-10 -- excuse me -- 13-101, 102, 103, and 104.

8           MR. SMITH:  And here, Your Honor, the relevance

9   objection is that Mr. Campbell testified that these documents

10  were procured during an academic exercise.

11          THE COURT:  That's fine.  And you can get into that

12  on cross-examination.

13          MR. SMITH:  Thank you.

14          THE COURT:  But 101 through 104 -- did you include

15  105?

16          MR. KROMBERG:  No.  105 is already in, Judge.

17          THE COURT:  All right, 101 through 104 are now in.

18          (Government's Exhibit Nos. 13-101 thru 13-104 were

19  received in evidence.)

20          MR. KROMBERG:  If 105 is not in, it should be, but I

21  think it is.

22          THE COURT:  It's not.

23          MR. KROMBERG:  Okay.  Well, then I move 105 in.

24  Mr. Campbell said that he received it as a gift from the

25  defendant.

1          THE COURT:  Yes, it's in.

2          (Government's Exhibit No. 13-105 was received in

3  evidence.)

4          MR. KROMBERG:  Thank you, Your Honor.

5  Q.   Now, we're now going to get into a series of exhibits

6  that, that are not in, and I'd like, I'd like to ask the

7  witness about the Government Exhibit 14-100.  We have a

8  stipulation already read in that this is a document that was

9  found on the defendant's computer media during a search.

10          MR. SMITH:  No objection to 14-100.

11          THE COURT:  I'm sorry, 14-what?

12          MR. KROMBERG:  100.

13          (Government's Exhibit No. 14-100 was received in

14  evidence.)

15          MR. KROMBERG:  Could you please bring up 14-100?

16  Q.   Do you know what the *Book of Jihad* is?

17  A.   Yes.

18  Q.   What is the *Book of Jihad*?

19  A.   The *Book of Jihad* is a book by a man writing under the

20  name Ibn Nuhaas, and it's here N-u-h-a-a-s, which outlines

21  selective verses from the Koran counseling warfare against

22  Unbelievers.  This is a book that has been endorsed by both

23  al Qaeda and ISIS in their propaganda.  ISIS at one point said

24  that just as Muslim women living in kafir lands or the lands of

25  infidels read their children *Cinderella* and *Robinhood*, we

1   should read our children Ibn Nuhaas's *Book of Jihad.*

2            MR. KROMBERG:  I'd like to show the witness, Your

3   Honor, Government Exhibits 10-18 and 10-220 -- excuse me, 10-18

4   and 10-822, which have been stipulated as having been seized

5   from the defendant's residence in August 2016.

6            MR. SMITH:  There is no 10-18.

7            MR. KROMBERG:  10-818.  I'm sorry, 10-818 and 10-822.

8            MR. SMITH:  No objection to 10-818.  The next one was

9   what?

10           MR. KROMBERG:  10-822.

11           MR. SMITH:  No objection to 10-822.

12           THE COURT:  All right, they're both in.

13           (Government's Exhibit Nos. 10-818 and 10-822 were

14   received in evidence.)

15           MR. KROMBERG:  Can you bring up on the screen 10-818,

16   please?

17  Q.   Do you recognize Anwar Awlaki's *Hereafter* series?

18  A.   Yes.

19  Q.   But first, can you please tell us who Anwar Awlaki was?

20  A.   Anwar Awlaki was a leader within al Qaeda in the Arabian

21  Peninsula who had for a time taught and lived in the United

22  States.  He has kind of this career trajectory where when he

23  was in the U.S., he was often thought of as being a moderate.

24  His work received very wide distribution.  It was Salafi in

25  nature.  It was legalistic.

1            And when he went to Yemen and became a part of

2     al Qaeda overtly, it became much more violent.  It called for

3     terrorist attacks against the United States.  He at one point

4     personally sanctioned one terrorist attack, which was to be a

5     Christmas Day bombing of an airplane.

6            The *Hereafter* is a somewhat important work in that it

7     serves as a bridge between his more moderate phase and his

8     later phase of calling for open warfare.  In the *Hereafter*,

9     Awlaki outlines the end times, and the overarching argument

10    that he makes is that the end times will feature a war between

11    the Muslims and Rome, which he characterizes as the United

12    States and Europe.

13           And so this is where he starts to make that bridge

14    where as part of salvation, part of what one needs to do is to

15    make warfare against non-Believers, especially the West.

16    Q.   Now, I'd like to turn your attention -- well, I first have

17    to get it into evidence -- 14-101 -- Judge, 14-101, 102, 103,

18    104, and 105, I believe, are -- they should be treated

19    together.  There's a stipulation that they were found on the

20    defendant's computer, and we move them into evidence at this

21    time.

22           MR. SMITH:  Object to 101, 102, 103, 104 as

23    cumulative.

24           Oh, did you say 14 or 13?

25           MR. KROMBERG:  14.

1            MR. SMITH:  14-101, 2, 3, 4?

2            MR. KROMBERG:  14-101, 102, 103, 104, 105.

3            MR. SMITH:  No objection.

4            THE COURT:  All right, 14-101 through 105 are in.

5            (Government's Exhibit Nos. 14-101 thru 14-105 were

6    received in evidence.)

7    BY MR. KROMBERG:

8    Q.    Okay.  So please take a look at 14-101.

9            Oh, there are hard copies of these exhibits, and if

10   we could give them to the witness, I think it would be easier.

11           And are you familiar with *Inspire* magazine?

12   A.    Yes.

13   Q.    Okay.  Can you tell the jury what *Inspire* magazine is or

14   was?

15   A.    *Inspire* is a publication that was published by al Qaeda in

16   the Arabian Peninsula.  Anwar al-Awlaki, who was just

17   mentioned, was one of the two major figures responsible for

18   producing it along with another American named Samir Khan.  As

19   the name somewhat implies, one of the purposes of *Inspire* is to

20   inspire people to carry out terrorist attacks on their own.

21           One of the big sections is called "Open Source

22   Jihad," which had instructions for how people can make bombs,

23   run over people with vehicles that would puncture their skin,

24   methods that seem to have subsequently been used in actual

25   attacks.

1  Q.   So take a look, if you would, at Government Exhibit

2  14-101, which is the Summer 2010 issue of *Inspire*.   And

3  directing you to page 8, this may be an obvious one, but who is

4  Bin Laden?

5  A.   Usama Bin Laden is the, one of the founding figures in the

6  al Qaeda terrorist organization.

7  Q.   I don't think we have to go more into that.   Let's go to

8  page 11, if you could, and is who is Zawahiri?

9  A.   Ayman al-Zawahiri was at the time this was published the

10  deputy leader of al Qaeda.   Since then, he's been elevated to

11  being the emir following Usama Bin Laden's death.

12  Q.   And page 13, who is Abu Basir?

13  A.   Abu Basir was the head of al Qaeda in the Arabian

14  Peninsula at the time.

15  Q.   Page 26, a prayer from Bin Laden referring to an underwear

16  bomber, who was the underwear bomber?

17  A.   The underwear bomber is a young Nigerian man named Umar

18  Farouk Abdulmutallub.   He had tried to carry out a terrorist

19  attack on Christmas Day of 2009, trying to destroy a plane that

20  had taken a trans-Atlantic flight and was landing in Detroit.

21  He'd hidden liquid explosives in his underpants basically to

22  avoid metal detection.   He was able to get them on board the

23  plane.

24         Fortunately, when he got out a syringe to puncture

25  the liquid explosives, it didn't detonate.   It was obviously

1   quite painful to him, but passengers were able to wrestle him

2   to a stop.

3          Now --

4   Q.   Okay.  Well, I think we can -- that's probably enough on

5   that.

6          Let's go to page 31.  What is "Open Source Jihad"?

7   A.   Open source jihad is, it's a play on open source coding.

8   Open source coding is when people who, you know, code computer

9   programs put the code out there so that anyone can use it and

10  duplicate it.

11         Just like people do open source coding, al Qaeda's

12  open source jihad was taking the way that they build bombs, the

13  way that they would kill people, and making it available for

14  anyone to use.  In other words, consistent with the name

15  *Inspire*, it was meant to inspire people to make the open source

16  jihad instructions their own.

17  Q.   So the article "Make a bomb in the kitchen of your Mom,"

18  page 33, are you familiar with that article?

19  A.   Yes.

20  Q.   Has that article been effective in inspiring people to

21  make bombs?

22  A.   Yes, it has.

23  Q.   How about page 34, the article "What to Bring When You're

24  Going on Jihad"?

25         MR. SMITH:  Objection.  Cumulative.  Relevance.

1          THE COURT:  I think there's enough there.

2          MR. KROMBERG:  Okay.

3          THE COURT:  Move on.

4  BY MR. KROMBERG:

5  Q.   Let's go to 14-102, and would it be fair to say that it's

6  similar articles in 14-102, the *Inspire* magazine from Fall

7  2010?

8  A.   Yes.  There are definitely similar articles throughout the

9  run of the magazine.

10 Q.   And go to page 53, if you would.  What is that ultimate

11 mowing machine reference?

12         MR. SMITH:  Objection.  Relevance, 403, cumulative.

13         THE COURT:  Yeah, I think that's -- I'm going to

14 sustain the objection.

15 BY MR. KROMBERG:

16 Q.   Okay.  How about page --

17         THE COURT:  You've made your point with the magazine.

18 Let's move on to something else.

19         MR. KROMBERG:  All right.

20         THE COURT:  Where do you buy those?  Can you go to

21 the local newsstand and buy one?

22         THE WITNESS:  No, they're not available in the local

23 newsstand.  They're -- al Qaeda posted them to the Internet,

24 and so --

25         THE COURT:  Do you download them?

1          THE WITNESS:  Yes.  They're, they're published

2    electronically.

3          MR. KROMBERG:  And, Your Honor, the stipulation in

4    this case is that they were on Mr. Young's computer.

5          MR. SMITH:  The stipulation was they were acquired

6    from a device that was in the possession of Mr. Young.  That

7    was the stipulation.

8          THE COURT:  Well, more than that, just so the jury is

9    clear and so I'm clear, we have physical exhibits that you were

10   showing to the witness.  I mean, again, I can't see exactly

11   what shape they're in, but he's looking at paper.

12         MR. KROMBERG:  So we printed them out to make it

13   easier for him to look through it.

14         THE COURT:  All right, so I want that clear for the

15   jury.  In other words, the manner in which the government

16   seized them was not the manner in which they're in court, that

17   is, as a paper magazine, like, you know, *Time* magazine.  They

18   were always on -- in electronic format?

19         MR. KROMBERG:  I'm sorry to confuse things, but we

20   did seize one copy that was printed out.  So we have one copy,

21   that is, Government Exhibit 10-8- -- I'll have that number in a

22   moment, but the point is we did seize one copy in hard copy, in

23   paper, and the other -- five copies electronically and one copy

24   in paper.

25         THE COURT:  All right.

1          MR. SMITH:  Your Honor --

2          THE COURT:  I think the jury should understand the

3    difference because what we have on the witness stand are what

4    look like, as I said, a *Time* magazine, a physical piece of,

5    series of pages.

6          MR. SMITH:  And, Your Honor, the defense specifically

7    carved out of the stipulation that the presentation of the

8    evidence that was found on devices in Mr. Young's possession

9    wouldn't accurately reflect how it was seen on Mr. Young's

10   device.  That was not a part of the stipulation.

11         THE COURT:  All right.

12         MR. KROMBERG:  And the paper copy that was seized for

13   which we have a stipulation is 10-850, and we would move that

14   into evidence at this time as well.

15         THE COURT:  There's no objection to that, correct?

16         MR. SMITH:  No objection.

17         THE COURT:  All right.  And do you have 10-850 there?

18   I want to make sure we have it.

19         MR. KROMBERG:  I'm told, Your Honor, that it's

20   outside, and we can bring it in.  We didn't bring all the --

21         THE COURT:  All right.  Well, 850 is -- needs to be

22   here if it's going to be part of the record.

23         THE COURT SECURITY OFFICER:  We have it, Your Honor.

24         THE COURT:  Oh, it's right here.  It's right here.

25         Just, again, so that the jury is clear, what is in my

1    court security officer's hand, that is 850?

2              MR. KROMBERG:  That is a photograph of the pile of

3    documents.

4              THE COURT:  All right.  No, I don't want that.  I

5    want this.

6              That's the correct evidence.  Substitute that for

7    what is -- yeah.  Give back those papers.

8              I don't think it's correct for the jury to be seeing

9    *Inspire* in this different format, all right?  So -- but 850 is

10   an accurate depiction of how *Inspire* existed physically, not

11   electronically, physically.

12             MR. KROMBERG:  With a black-and-white printer as

13   opposed to a color printer.

14             MR. SMITH:  There is no stipulation or evidence in

15   this case that the electronic versions that were just shown

16   were ever viewed by Mr. Young.

17             THE COURT:  All right, I understand that, and that's

18   a legitimate argument that you can make.

19             MR. SMITH:  Okay.

20             THE COURT:  All right, that's fine.

21             (Government's Exhibit No. 10-850 was received in

22   evidence.)

23   BY MR. KROMBERG:

24   Q.   I would like to turn your attention to 14-104, which is

25   the special edition of *Inspire*.

1              THE COURT:  All right, so 14-104, we have to give

2      that back to the witness.

3              MR. SMITH:  And, Your Honor, again, we object on the

4      best evidence rule.  This is not a hard copy.  This is a

5      photograph.

6              THE WITNESS:  I'm familiar with that.  I can give it

7      back.

8      BY MR. KROMBERG:

9      Q.   That's fine.  The electronic evidence -- the special

10     edition of *Inspire* magazine, what was that about?

11     A.   It was about a specific plot which had taken place in late

12     2010.  Al Qaeda in the Arabian Peninsula was able to place

13     bombs onboard parcel shipments.

14             MR. SMITH:  Objection.  Relevance, 401, 403.  There

15     is no charged violence in this case.

16             THE COURT:  The case involves, however, an entrapment

17     defense, where predisposition of the defendant is a critical

18     element the government has to establish, and so they're allowed

19     to put on evidence of that predisposition existing before any

20     government agent got involved, and unfortunately, that leaves

21     the door open to this type of evidence.

22             But the defendant is not charged with a crime of

23     violence, ladies and gentlemen, and as I've told you many times

24     before, you'll have to be very careful how you evaluate the

25     relevance of this evidence to the issues in this case.

1            MR. KROMBERG:  Thank you, Your Honor.

2            THE COURT:  I'm overruling the objection.

3    BY MR. KROMBERG:

4    Q.   The headline is "$4,200."  What is that a reference to?

5    A.   It's a reference to how much this plot cost them to

6    undertake.

7    Q.   And how much did *Inspire* claim, did al Qaeda in the

8    Arabian Peninsula claim that it cost the western world to

9    respond to this $4,200 plot?

10   A.   Millions of dollars or more.  Because they had succeeded

11   in disguising bombs as printer cartridges, which are very

12   difficult to detect, and beyond that, when we send parcels via

13   UPS or FedEx, which these bombs made their way onboard UPS and

14   FedEx planes, not all the parcels are, are screened ahead of

15   time.  It would be far too expensive.

16           So the argument that they made in this issue was that

17   on the one hand, the West can spend millions upon millions of

18   dollars and bleed itself into bankruptcy to try to defend

19   against plots like this.

20           MR. SMITH:  Objection.  Relevance.

21           THE COURT:  I think now it's gone too far, and it's

22   also lunchtime, so we're recessing until two o'clock.  Thank

23   you.

24           MR. KROMBERG:  Thank you, Your Honor.

25           (Recess from 1:06 p.m., until 2:00 p.m.)

1          A F T E R N O O N   S E S S I O N

2                          (Defendant and Jury present.)

3              THE COURT:  All right, Mr. Kromberg.

4              MR. KROMBERG:  Thank you, Your Honor.

5                      DIRECT EXAMINATION (Cont'd.)

6    BY MR. KROMBERG:

7    Q.    Good afternoon, Dr. Gartenstein-Ross.  Have you -- do you

8    know who the individual referred to as Maqdisi is?

9    A.    Yes.

10   Q.    Who is that?

11   A.    Abu Muhammad al-Maqdisi is a well-known jihadist ideologue

12   associated with al Qaeda, someone who has long had connections

13   with the organization and has been -- he originally, though,

14   actually founded the Jama'at al-Tawhid organization.

15   Q.    Let me -- I don't know that it's necessary to go into -- I

16   mean, you could go into more detail, but I'm thinking that we

17   don't need to.

18   A.    That makes sense.  To keep what I was saying brief, he

19   founded the organization that would later become ISIS, though

20   he's allied with al Qaeda.

21   Q.    Okay.  I'd like you to turn to the *Inspire* -- I have one

22   more question for you on *Inspire* magazine, 14-105.  I'd like

23   you to turn to page 36.

24              What is the Clown of the Tawaghit?

25   A.    So "tawaghit" refers to tyrants, and he's referring to

1    Muammar Gaddafi.  It's a notice -- an inspiration to people to

2    join in the fight against Gaddafi's regime.  This was at a time

3    when the revolution was kicking up and Gaddafi was still in

4    power but losing ground.

5    Q.   Okay.  And that was, that was the Spring 2011 issue?

6    A.   Yes.

7    Q.   We are done with the *Inspire* magazines.

8          Is -- can you take a look at -- yes.  So, Judge, we

9    want to ask the witness to look at 10-204.

10          MR. SMITH:  No objection.

11          THE COURT:  All right, 10-204 is in.

12          (Government's Exhibit No. 10-204 was received in

13   evidence.)

14   BY MR. KROMBERG:

15   Q.   You can take a look at it on the screen.

16          Could you interpret -- can you explain what the

17   significance or the meaning or context of this, of this

18   document that was -- graphic that was found on the defendant's

19   computer, computer media in August 2016?

20   A.   Sure.  It's a pro-jihadist and pro-Caliphate statement.

21   At the top, you have what's called al-raya, a-l-hyphen-r-a-y-a,

22   which to jihadists, with the black background and the white

23   lettering, it's a battle flag, and that's meant to symbolize

24   the struggle of replacing all the nation states whose flags are

25   at the bottom with one flag, one people, one cause, in other

1    words, replacing all the current nation states with a

2    Caliphate.

3              MR. KROMBERG:  So let's turn to 10-208 again.  Don't

4    put it on the screen until the judge has had a chance to --

5              MR. SMITH:  No objection, Your Honor.

6              THE COURT:  All right, it's in.

7              (Government's Exhibit No. 10-208 was received in

8    evidence.)

9              MR. KROMBERG:  Okay.  Please put 10-208 on the

10   screen.

11   Q.   Can you explain the context of 10-208?

12   A.   Yes.  This is also a pro-jihadist and pro-Caliphate

13   statement.  What the Arabic says is "Coming soon, God willing,

14   the Caliphate."  At the very bottom, it says "al-Khilafah," the

15   Caliphate in Arabic, and it shows in an hour glass the various

16   flags and nation states melting away and being replaced with

17   two things.

18             One is al-raya, which is the battle flag of jihad,

19   another is a flag called al-liwa, l-i-w-a.  That's the white

20   background with the black lettering, which is a flag that can

21   be used in places that are conquered where sharia or Islamic

22   law is being applied.  This is the way jihadists make use of

23   the raya and the liwa.

24   Q.   Okay.  If you could look at Government Exhibit 10-202,

25   which, I believe, is a video, but I don't -- I think it's --

1  well, is there going to be an objection to it?

2          MR. SMITH:  Yes, there is an objection to playing the

3  video.

4          MR. KROMBERG:  Okay.  I don't want to play the video.

5  I want to ask the witness to describe the video.  Is there an

6  objection to admitting it for the purpose of letting the

7  witness describe it?

8          MR. SMITH:  No, Your Honor, we object to the extent

9  that the expert witness is going to be commenting on a video

10 that the government --

11         THE COURT:  Well, the question is whether or not the

12 witness has seen this video.

13         MR. KROMBERG:  This was -- well, I think the answer

14 is going to be --

15         THE COURT:  Lay a foundation first.

16 BY MR. KROMBERG:

17 Q.   Are you familiar with a statement that --

18         THE COURT:  No, no.  Do you have an exhibit here or a

19 copy of it?

20         MR. KROMBERG:  It is a -- I have a translation of it

21 that I could show him to say -- so that --

22         THE COURT:  No.  Is it -- where is it in my book?

23         MR. KROMBERG:  10-202T is the English part of it.

24 The actual video has the English scrolling along the bottom,

25 but we don't have to play the thing.

1            THE COURT:  No, I understand that.  Hold on a second.

2            All right, so all it is as I look at it, right now

3    I'm seeing just a disc, all right.  All I have in my book --

4            MR. KROMBERG:  Go to the next one, 10-202T, Judge.

5    Do you have it?

6            THE COURT:  It's not in my book.

7            MR. KROMBERG:  Could we pass one up?

8            MR. SMITH:  Your Honor, we object on cumulative

9    grounds as well.

10           THE COURT:  Well, it's a, it's a different medium at

11   this point, so I'm going to allow it if it's all right, but let

12   me take a look at it, please.

13           MR. KROMBERG:  While Mr. Vera looks for that, we'll

14   move on to something else.

15   Q.   What is a nasheed?

16   A.   A nasheed is an a cappella song.

17   Q.   Excuse me, what?

18   A.   It's an a cappella song, an Islamic song.  There are a

19   variety of nasheeds.  It's something -- they've been around for

20   centuries.  Around the 1970s, there started to become

21   increasingly politicized forms of nasheeds.  Nasheeds are

22   something that ISIS in particular has made use to propagandize

23   for its cause.

24           The reason it's a cappella is because in their view,

25   musical instruments are haram, so this is the way that they

1    allow music to be lawful under their interpretation of Islam.

2    Q.    When you say "haram," h-a-r-a-m, "haram" means what?

3    A.    It means unlawful under Islamic law.

4    Q.    Let me ask, the term has come up, "istishhadi,"

5    i-s-t-i-s-s-h-a-d-i.  Can you tell us what "istishhadi" is?

6    A.    I need to see a context.

7              MR. KROMBERG:  So if we can bring up 10-101A?  And

8    also at the same time, I'd pass up to the Court 10-202T.

9              MR. SMITH:  Your Honor, we object to these because

10   there's no evidence in the record that the defendant speaks

11   Arabic, so an English translation performed by the government

12   is irrelevant.

13             MR. KROMBERG:  Right.  And that's as I mentioned,

14   Judge, if you play the video, the English translation scrolls

15   along the bottom as Bin Laden is speaking in the video.

16             MR. SMITH:  There's no evidence in the record, Your

17   Honor, that Mr. -- the defendant watched this video.

18             THE COURT:  I understand that, and that's certainly a

19   relevant issue in cross, but all right.  If that's what this

20   is, then -- again, do you know what we're talking about in this

21   video?

22             THE WITNESS:  Yes.

23             THE COURT:  Have you seen the video yourself?

24             THE WITNESS:  Yes, I have.

25             THE COURT:  All right, I'm going to overrule the

1    objection, so 10-202 and 202T --

2              MR. KROMBERG:  We don't even need to move in the --

3    let's only move in 202T, Judge, and the fact is that the jury

4    will understand that it's an English translation of the video

5    that was found on the defendant's computer pursuant to, as we

6    stipulated.

7              THE COURT:  All right, it's in.

8              (Government's Exhibit No. 10-202T was received in

9    evidence.)

10   BY MR. KROMBERG:

11   Q.   Okay.  Can you explain what that video was?

12   A.   Are you talking about the Bin Laden video?

13   Q.   Yes.

14   A.   So this was a video of Usama Bin Laden addressing

15   essentially a western or American audience.  He was arguing in

16   favor of his cause, arguing that the cause he is fighting for,

17   establishing an Islamic State, will provide the solutions to

18   the various ills of society.

19   Q.   Okay.  Thank you.

20             I think I need to go back to the question I asked you

21   before of what is "istishhadi"?  And I'd like you to look at

22   10-101A, which already is in evidence.

23   A.   I don't know what it's referring to in this context.

24   Q.   Okay.  What is The Light series of lectures?

25   A.   The Light series of lectures is a series of lectures

Gartenstein-Ross - Direct                                          913

1    undertaken by a production company that initially was

2    pro-jihadist and later is ISIS, broke out from al Qaeda, became

3    very explicitly pro-ISIS.  It talked about the ills of society,

4    moved on to how the Caliphate has allegedly idyllic life,

5    showing videos of life under the Caliphate, with children being

6    educated, things like that, showed speeches of Abu Bakr

7    al-Baghdadi, ISIS's caliph, and argued against what are called

8    media lies against ISIS.

9    Q.   Let me show you what I believe has been admitted as

10   Government's Exhibits 8-13, 8-14, and 8-15, which we'll take

11   one at a time.  8-13 --

12            MR. SMITH:  Which series is that?

13            MR. KROMBERG:  8-113, 114, and 115, which are the

14   Facebook records.

15            MR. SMITH:  Objection, Your Honor.  401, 403,

16   cumulative.

17            THE COURT:  Well, they're already in.

18            MR. SMITH:  We're objecting to the expert witness

19   looking at evidence from this case and commenting on the

20   evidence.  He's here as an expert witness.

21            THE COURT:  To the extent that they reference

22   Islamic-type things, he's an expert in that area.

23            MR. SMITH:  The defense's position is that he can be

24   asked about those things without having, showing him the

25   evidence and having him comment on it.

1          THE COURT:  Well, it has to make some connection to

2   the case, so I'm overruling the objection.

3          MR. KROMBERG:  Could you put 8-113 on?

4          THE COURT:  You need to blow that up so people can

5   see it.

6   BY MR. KROMBERG:

7   Q.   Do you see a reference in that Facebook record to Light

8   series?

9          MR. SMITH:  Objection to all of the commentary in

10  this, in this piece of evidence that has nothing to do with The

11  Light series, and it's being posted to prejudice the defendant.

12         MR. KROMBERG:  The commentary, Judge, this is his

13  Facebook page.

14         THE COURT:  I'm overruling the objection.

15  BY MR. KROMBERG:

16  Q.   Dr. Gartenstein-Ross, do you see a reference to The Light

17  series?

18  A.   Yes, I do.

19  Q.   Okay.  And can you tell us, do you know about that,

20  what -- okay.  What reference do you see in there?

21  A.   The reference is to The Light, Part 40.  It gives the

22  title of this episode of The Light series.  It's over 50

23  episodes of The Light series, with different titles.  In this

24  case, the title is "Satanic Leaders Run the World," which is

25  part of the grievances being expressed in The Light series of

1  videos.

2  Q.   Okay.  Let's go to 8-114.

3          MR. SMITH:  Objection, Your Honor.  Relevance.

4          THE COURT:  Overruled.

5          MR. SMITH:  There are statements in the exhibit that

6  have nothing to do with the testimony the expert is giving

7  right now.

8          THE COURT:  All right, overruled.

9          MR. SMITH:  403, cumulative.

10 BY MR. KROMBERG:

11 Q.   Do you see a reference to The Light series in 8-114?

12 A.   Yes.

13 Q.   And what is that reference?

14 A.   The reference is to Part 17, which is titled "The Face of

15 Zionism," and its summary aptly indicates what it's about,

16 various subjects from religion to conspiracy theories of the

17 Illuminati and the New World Order, which are both concepts

18 which are prevalent in several lines of conspiracy theories.

19         MR. SMITH:  Objection.  Relevance.

20         THE COURT:  Overruled.

21 BY MR. KROMBERG:

22 Q.   Please turn to 8-115.

23         Do you see what's going to be blown up in just a

24 moment, do you see the reference to The Light series?

25 A.   Yes.

1  Q.   And what is that reference?

2  A.   The reference is to photos posted by The Light

3  revelations, and it's described as the vile and despicable

4  French committing atrocities in half-a-dozen nations.  One of

5  the themes of The Light is also injustices committed by western

6  nations and some of the grievances that tie into their overall

7  argument for ISIS.

8          MR. KROMBERG:  Okay.  Now, Judge, we're going to look

9  at exhibits that have been stipulated as having come from the

10  defendant's computer but have not yet been admitted:  10-204

11  and 205.

12          I'm sorry, we just talked about -- I apologize, we

13  talked about 10-204.  10-205.

14          MR. SMITH:  Objection.  403, cumulative.

15          THE COURT:  All right, I do think you're adding more

16  than is necessary here, Mr. Kromberg, so let's start moving

17  this along, all right?

18          MR. KROMBERG:  I have just three more like that.

19  We're going to then move on to another, slightly different

20  subject.

21          THE COURT:  All right, 10-205 is in.

22          (Government's Exhibit No. 10-205 was received in

23  evidence.)

24  BY MR. KROMBERG:

25  Q.   Can you explain what, what that is?

 1            MR. SMITH:  Objection.  403, relevance.

 2            THE COURT:  Overruled.

 3            THE WITNESS:  As the photograph indicates, it's Hamas

 4   suicide bombers who are marching in formation.

 5   BY MR. KROMBERG:

 6   Q.   And take a look at --

 7            MR. SMITH:  Your Honor, we'd like to explain the

 8   basis of our objection to all of --

 9            THE COURT:  No, we don't need to have speeches in

10   court.  We've already had it off the record so --

11            MR. SMITH:  This isn't an offer of proof.  This is

12   separate from the previous objections.  Your Honor --

13            THE COURT:  Wait a minute, wait a minute.  Approach

14   the bench.

15            (Bench conference on the record.)

16            THE COURT:  Yes, Mr. Smith.

17            MR. SMITH:  Now, the reason we're objecting to

18   instead of asking the expert questions about particular

19   subjects and showing him the evidence is the government is

20   leading the jury to believe that these images are collected

21   over time.  In fact, the evidence shows in this case that all

22   of these images were downloaded the same day, one day, and they

23   might have been downloaded collectively.

24            By presenting it seriatim image after image after

25   image and representing that it's on Mr. Young's computer,

1   they're creating an impression to the jury that this is a span

2   in time.  In fact, as they know, all of these images were

3   downloaded in one single day.  So to parade them in front of

4   the jury --

5           THE COURT:  But they maintain they were downloaded.

6   This one, 207 on it --

7           MR. SMITH:  Agent Caslen created a timeline which

8   shows when most of these images were created, Your Honor, and

9   most of them were created in one day.  So to parade them in

10  front of the Court like this is creating a deeply misleading

11  impression.

12          THE COURT:  You can make that argument to the jury

13  either when you cross-examine this witness or when Agent Caslen

14  testifies, all right?  So I understand the argument.  It's an

15  interesting one; nevertheless, it's overruled.  Let's go on.

16          MR. SMITH:  Thank you.

17          (End of bench conference.)

18  BY MR. KROMBERG:

19  Q.  We just -- you just spoke about 10-205, correct?

20  A.    The Hamas suicide bombers one.

21          MR. KROMBERG:  Okay.  Let's look at 10-105, Judge.

22  This has not been -- it's been stipulated to but not been

23  admitted, stipulated to the authenticity of it as coming from

24  the defendant's computer media.

25          MR. SMITH:  One moment, Your Honor.

1            THE COURT:  Oh, I think we have enough of these.

2    Let's move on.  105 is not in.

3    BY MR. KROMBERG:

4    Q.   Take a look at 10-704, which has been admitted.  That is a

5    flag.  Can you take a look at that flag -- that's been admitted

6    into evidence -- and tell the jury what that flag is?

7    A.   Yeah.  This is the Reichskriegsflagge.  It's a flag that

8    was used by Imperial Germany prior to the end of World War I,

9    from about 1903 to 1919.  It's a flag that then was replaced

10   with the beginning of the Weimar Republic, which was

11   established after the end of the first World War.

12           This is a flag that was used by a kind of non-state

13   group in Germany called the Freikorps.  They used a number of

14   different flags, but this is one version of the

15   Reichskriegsflagge that they used.  The Freikorps engaged in a

16   lot of violence during that period, especially against Jews and

17   often against women.

18           And it's a flag that today in Germany, where Nazi

19   flags are banned, some neo-Nazis use this flag.

20   Q.   Could you take a look, please, at Government Exhibit

21   11-400, which is in evidence, which is a license plate?

22           MR. SMITH:  Objection.  The expert does not need to

23   comment on a license plate.

24           THE COURT:  Overruled.

25           MR. KROMBERG:  Can you blow that up so we can see the

1   license plate?  Okay.  We can see it.

2   Q.   Does that appear to be a reference to the organization you

3   just mentioned?

4              MR. SMITH:  Objection.  This is not expert testimony.

5              THE COURT:  That was leading actually.

6   BY MR. KROMBERG:

7   Q.   Okay.  What reference do you draw from looking at that

8   license?

9              MR. SMITH:  Objection.  Not expert testimony.

10             THE COURT:  Overruled.

11             THE WITNESS:  It appears to be a reference to the

12  Freikorps, the group that I mentioned.  The Freikorps was

13  largely a group of returned World War I veterans.  They

14  returned to a state which was in somewhat of a -- somewhat of

15  chaos.  The Freikorps had existed for a while, but during this

16  period, there were various groups fighting for control of

17  places in Germany.  There were Communist groups.  The Freikorps

18  tended more towards the nationalist and racialist side of the

19  division.

20  BY MR. KROMBERG:

21  Q.   Take a look, if you would, at Government Exhibit 4-300,

22  which is an exhibit which is in evidence.  It is a tattoo on

23  the defendant's arm.

24             MR. SMITH:  Objection, Your Honor.  This is not

25  expert testimony.

1         THE COURT:  Overruled.  And it's expert because this

2    witness has been proffered as an expert in the area of, among

3    other things, radical groups, including the neo-Nazis, and the

4    symbols used by neo-Nazis would be within his area of

5    expertise.

6         All right, let's go on.

7    BY MR. KROMBERG:

8    Q.   Do you recognize that symbol on the defendant's arm?

9    A.   Yes.

10   Q.   What is that a symbol of?

11   A.   It's a symbol of a division of the SS called the

12   Hohenstaufen.

13   Q.   Take a look, please, at Government Exhibit 3-110, which is

14   in evidence.

15        So if we can bring up 3-110?

16        Can you see that?

17   A.   Yes.

18   Q.   What is that?

19   A.   That is an SS insignia, referring to the German

20   intelligence and fighting units that were both important to

21   Nazi Germany's totalitarian control and later to the Final

22   Solution.

23        MR. SMITH:  Your Honor, we object because just

24   yesterday, the government announced in court that it would not

25   be using this piece of evidence.

Gartenstein-Ross - Direct                                                  922

1              THE COURT:  Yeah, I think you did actually.

2              MR. KROMBERG:  I'm not using the tie tack box.

3              THE COURT:  That's true.  That's true.

4              MR. KROMBERG:  This was already in evidence.  This

5    was admitted already.

6              THE COURT:  All right.

7              MR. SMITH:  Cumulative.

8              THE COURT:  All right.  Overruled.

9    BY MR. KROMBERG:

10   Q.   Take a look, if you would, at Government Exhibit 10-907.

11             Please do not put it up on the screen until the judge

12   has a chance to look at it.

13             MR. SMITH:  Objection.  401, 403, cumulative.

14             THE COURT:  Yeah, I think that's cumulative.  I'll

15   sustain that objection.

16   BY MR. KROMBERG:

17   Q.   Take a look, if you would, at 10-242.

18             MR. SMITH:  Wait.

19             MR. KROMBERG:  Don't put it on the screen until the

20   judge has a chance to look at it.

21             MR. SMITH:  Objection.  401, 403, cumulative.

22   10-242.

23             THE COURT:  This is getting cumulative now,

24   Mr. Kromberg.  We're going to --

25             MR. KROMBERG:  We haven't spoken about this person.

1          MR. SMITH:  Your Honor --

2          THE COURT:  We don't get to speak about every one,

3     Mr. Kromberg.  I've given you some leeway on this, but let's

4     not overdo it.

5          MR. KROMBERG:  Oh, okay.

6     Q.   Take a look at 10-250, 251, and 252.

7          MR. SMITH:  Your Honor, we object.  401, 403,

8     cumulative, and probably leading to a mistrial.

9          THE COURT:  You can put one of those in.  Choose,

10    choose the one you want.

11         MR. KROMBERG:  10-252.

12    Q.   What does that -- what does that mean to you in your

13    field, Dr. Gartenstein-Ross?

14    A.   It's an anti-Semitic cartoon, with a caricature of a

15    Jewish person indicated as Jewish swine.

16    Q.   Who is Nicholas Skorzeny?

17         MR. SMITH:  Your Honor just ruled on this point.

18    Objection.  Your Honor just ruled on 10- --

19         THE COURT:  I'm sustaining the objection.  Let's move

20    this along.  Come on.

21         MR. SMITH:  Your Honor, we move for a mistrial.

22         THE COURT:  Would you please --

23         MR. SMITH:  We move for a mistrial.

24         THE COURT:  It's denied.  Let's go.

25    BY MR. KROMBERG:

1   Q.   Turn to 14-134 -- no, sorry, let's go back to 4-203.

2   4-203 is something that Mr., Mr. Lee was testifying about and

3   was not admitted at that time.

4          MR. SMITH:  Objection, Your Honor.  Cumulative, 401,

5   403.

6          MR. KROMBERG:  I mentioned this in opening statement,

7   and I -- it's time that the jury saw it.

8          THE COURT:  I need Book 4 up here.

9          I'm allowing it in.  Overruled.

10         MR. KROMBERG:  Please publish 4-203.

11  Q.   Can you, can you read that to the jury?

12  A.   Sure.  "The time has come that we, as a nation of earth,

13  as a people, must rise up and take responsibility" --

14         MR. SMITH:  Objection.  An expert witness does not

15  read testimony in a case.

16         THE COURT:  All right, I don't think the -- I don't

17  think the words have to be read.  If you have a question about

18  anything else on that, you can ask him.

19         MR. KROMBERG:  Okay.

20  Q.   This document which was found on, as we have stipulated,

21  it was -- no, excuse me, there is testimony it was found on

22  defendant's phone.  What's the context for this statement?

23         MR. SMITH:  Objection.  He's asking the witness to

24  testify about factual context.  He's an expert witness.

25         THE COURT:  Do you recognize any of the depictions on

1    that as having any significance based upon your studies?

2              THE WITNESS:  Yes.

3              THE COURT:  What is that?

4              THE WITNESS:  Yes.  So the smokestacks here are a

5    reference to the crematoria, when Jewish people were

6    annihilated in World War II.  When it says that together we --

7              THE COURT:  That's all right.  We don't need the

8    words.  All right, that's fine.

9    BY MR. KROMBERG:

10   Q.   Take a look, if you would, at 10-203.  This has not yet

11   been admitted, but it's been stipulated that it was found on

12   the defendant's computer media in August 2016.

13             THE COURT:  We've already had some testimony about

14   that but --

15             MR. SMITH:  Objection.  Cumulative, 401, 403.

16             MR. KROMBERG:  I don't think we had testimony on this

17   one, Judge.  We had a different manual.

18             THE COURT:  All right.  Oh, I see.  All right.

19             MR. SMITH:  We also object to the sequence of the

20   evidence in this case.

21             THE COURT:  Well, that's -- the government can put

22   the evidence on in any order they want.  You can raise that

23   issue in cross-examination if you think it's relevant, but

24   10-203 is in.

25             (Government's Exhibit No. 10-203 was received in

1    evidence.)

2    BY MR. KROMBERG:

3    Q.   Can you take a look at 10-203 and explain what that is?

4          And if you can turn to the next page?

5    A.   Yes.  What -- this newsletter re-published was an al Qaeda

6    handbook.  It was a handbook about how to create and sustain a

7    terrorist organization, how to survive interrogation, things of

8    this sort that would be helpful to a group that wants to make

9    warfare in al Qaeda's cause.

10   Q.   Turn, if you would, to Mr. Young's -- excuse me, to

11   Government Exhibit 8-103, which is in evidence.  I'd like you

12   to look at the profile picture on the Facebook page.

13          MR. SMITH:  Objection.  401, 403, cumulative.

14          THE COURT:  Overruled.

15          MR. SMITH:  Letting the government put up the

16   evidence before an objection can be placed.

17          THE COURT:  Overruled.

18   BY MR. KROMBERG:

19   Q.   Can you explain what this photo -- not what it's doing on

20   the profile page of the Facebook account, but what is that

21   photo of?

22   A.   It's a photo of a man named Abu Musab.  He is a jihadist

23   leader based in Syria.  There are different accounts of who he

24   is.  Some put him with ISIS, some put him with the Nusra front,

25   but he's universally recognized as being a jihadist figure on

1    the battlefield fighting in Syria.

2    Q.   And what is written on his head gear?

3    A.   That's the shahada.  This makes it a, you know, similar to

4    al-raya.  This is what -- so the shahada, s-h-a-h-a-d-a, is the

5    Islamic declaration of faith.  The declaration of faith is, of

6    course, itself innocuous, but put on a black background in --

7    with white lettering, especially when used by a jihadist

8    figure, it takes on specific significance as a symbol of jihad

9    and warfare.

10   Q.   Now, is it correct -- am I correct that you mistakenly

11   thought this was someone else when you first saw it?

12   A.   Yes.

13   Q.   And who --

14          MR. SMITH:  Objection.  Objection.  This is not a

15   fact witness.

16          THE COURT:  Overruled.

17   BY MR. KROMBERG:

18   Q.   Who did you think it was?

19   A.   I thought that it was the defendant initially.

20   Q.   What is the significance of green birds in the Salafi

21   jihadist world?

22   A.   Green birds is a reference to martyrs.  There's a verse in

23   the Koran talking about how in Jannah, in Paradise, the martyrs

24   will be in the hearts of green birds, at the foot of Allah's

25   throne, of God's throne, and they can go anywhere they want in

Gartenstein-Ross - Direct                                        928

1   Paradise.

2            And so green birds are referenced a lot within

3   jihadist material as being representative of martyrdom,

4   martyrdom being thought by jihadists to be an automatic entry

5   into Paradise.

6   Q.   What, what controversy exists in parts of the Muslim

7   community about whether ISIS are Muslims or not?

8   A.   Many Muslims argue that ISIS is not, in fact, Muslim

9   because its actions, ranging from the atrocities that they

10  commit, beheadings and the like, to genocide, to slavery, are

11  not representative of Islam, and cast them out as mere outlaws

12  rather than as Muslims.

13  Q.   And the opposing side?

14  A.   The opposing side is that they haven't committed

15  nullifiers of Islam, that they are actually a part of the

16  Islamic faith.

17  Q.   What are nullifiers?

18  A.   It's traditionally thought that there are ten nullifiers

19  of Islam, things like associating partners with God.  Islam is

20  a monotheistic faith, which would cast somebody out of being a

21  part of that faith.

22  Q.   What is a kafir?

23  A.   A kafir or k-a-f-i-r, is a derogatory term for a

24  non-Muslim.  It's often translated as infidel or unbeliever.

25  Q.   What are Alawites?

1   A.    The Alawites are a sect that's associated with the Assad

2   government, which rules in Syria.  Their status as Muslims is

3   somewhat controversial, though the Iranian clergy has given

4   them some legitimacy within the faith.

5   Q.    The phrase "a large crop of Alawite women" --

6          MR. SMITH:  Objection.  Objection.  Relevance, 403.

7   This is expert testimony, not a recitation of the facts in the

8   record.

9          THE COURT:  I think we don't need to go into that.

10  He's explained what "Alawite" means.  The jury can parse that

11  into what they have there.

12  BY MR. KROMBERG:

13  Q.    Is there a controversy within the Muslim religion among

14  some Muslims who say that others don't think that religion

15  applies to anything in the modern day?

16  A.    Yes.

17  Q.    And what controversy is that?

18  A.    So there's a controversy about liberal Muslims, those who

19  don't -- who according to some people who are of a more

20  conservative bent, think don't actually want to apply the

21  religion.  The argument being made against those Muslims is

22  that God's law supersedes man's law, and so you can't

23  compromise it in order to fit in in countries like the U.S. or

24  western countries.

25  Q.    For those Muslims who say that -- whose position is that

Gartenstein-Ross - Direct                                    930

1   you're not -- excuse me, for those Muslims who are not liberal

2   Muslims, for those Muslims who are against liberal Muslims,

3   what is their position on whether they are authorized to take

4   women as slaves or booty after battle?

5            MR. SMITH:  Objection.  Relevance, 403, cumulative.

6            THE COURT:  Yeah, I think now it's getting

7   cumulative.  I'm going to sustain the objection.

8   BY MR. KROMBERG:

9   Q.   What does the term mean "jihad is within ourselves"?

10           MR. SMITH:  Objection.  Your Honor, without notifying

11  the Court, the government is attempting to sneak in

12  testimony from --

13           THE COURT:  You need to be on your feet, Mr. Smith.

14  I don't want to have to say it again.

15           MR. SMITH:  Objection.  Mr. Kromberg is attempting to

16  cite testimony from this case to the expert witness and have

17  the expert witness comment on fact witness testimony in the

18  case.

19           THE COURT:  That's a -- no, I think that that is a

20  term that would, the average juror would not understand, and

21  it's related to this whole area, so I'm overruling the

22  objection.  Go ahead.

23  BY MR. KROMBERG:

24  Q.   Can you describe what the issue is about "the jihad is

25  within ourselves"?

1   A.   Yes.  So "jihad" is a term that means struggle, and so

2   there is a controversy among Muslims as to what "jihad" means.

3   To some, jihad is a struggle against our own inner demons or

4   proclivity to sin.  That's what the term "jihad is within

5   ourselves" refers to.  It refers to more liberal

6   interpretations of jihad, fairly derisively refers to more

7   liberal interpretations which nullify the warfare-like meanings

8   behind the term.

9   Q.   What is "jihad of the pen"?

10  A.   Jihad of the pen is the idea that rather than undertaking

11  military action against the enemies of the Muslims, one can

12  write about injustice or write against the thing that they

13  oppose.

14  Q.   What is the position of Salafi jihadists regarding jihad

15  of the pen?

16  A.   That it's ridiculous, that one can only define "jihad" as

17  being warfare, that that is the best, truest interpretation of

18  this concept.

19        MR. KROMBERG:  Judge, if I may have a moment to go

20  over my very muddled notes now --

21        THE COURT:  All right.

22        MR. KROMBERG:  -- to make sure that the things that

23  you're allowing me to go into I'm going into?

24        Judge, that's all for this witness.

25        Thank you, Dr. Gartenstein-Ross.  I expect the

Gartenstein-Ross - Cross                                                932

1    defense will have some questions for you.

2              THE COURT:  All right.  Mr. Smith?

3                        CROSS-EXAMINATION

4    BY MR. SMITH:

5    Q.    Good afternoon, Mr. Gartenstein-Ross.  Okay.  So you're

6    here to testify today in part that your expert opinion is that

7    white supremacism is comparable in some sense to militant

8    Islam, correct?

9    A.    In some sense, yes.

10   Q.    And in the sense in which you mean it is that white

11   supremacism and militant Islam share similar mechanisms of

12   radicalization; is that correct?

13   A.    That's correct.

14   Q.    White supremacists are by their nature racist, correct?

15   A.    Yes.

16   Q.    And hundreds of millions of Muslims around the world are

17   ethnic minorities and non-whites, correct?

18   A.    Yes.

19   Q.    By their definition, by their nature, by their ideology,

20   white supremacists deplore racial minorities, correct?

21   A.    Not universally, no.

22   Q.    What is a white supremacist, Mr. Gartenstein-Ross?

23   A.    A white supremacist is someone who believes that the white

24   race is superior to other races.

25   Q.    So that it is your testimony that their ideology is that

1   non-whites are inferior and should not be treated on the same

2   plane as whites, correct?

3   A.    That's correct.

4   Q.    And there are hundreds -- would you agree with this

5   factual matter, as a factual matter, that most Muslims in the

6   world are not white?

7   A.    That's correct.

8   Q.    But that difference is not enough to outweigh the areas

9   they share in common, in your view, correct?

10  A.    There's also another area of compatibility, which is that

11  all not all white supremacy believes that there should be

12  mixing of the races.  So for Nazis during the 1950s, when they

13  were looking at the Arab world --

14  Q.    Dr. Gartenstein-Ross, that wasn't -- you're not answering

15  my question.  Have you ever testified as an expert in any case

16  on this connection between white supremacism and militant

17  Islam?

18  A.    No.

19  Q.    Have you ever testified in a criminal case?

20  A.    No.

21  Q.    Do you have any peer review publications on your thesis

22  that there's a connection between white supremacism and

23  militant Islam?

24  A.    No.

25  Q.    Have you ever had any peer review on that subject at all?

Gartenstein-Ross - Cross                                            934

1   A.   Depends on what you mean by peer review, but I have not

2   authorized a peer-reviewed article on it.  I have talked to

3   other academics about the topic.

4   Q.   Your writings on this subject consist of two popular press

5   articles, correct?

6   A.   That is not correct.

7   Q.   How many articles are there?

8   A.   There are four articles I've written on this topic.

9            THE COURT:  Can you move closer to the microphone?

10  BY MR. SMITH:

11  Q.   I asked you about popular press articles.

12  A.   Oh, yes, there are two popular press articles, but there

13  are other --

14  Q.   So you wrote an article --

15           THE COURT:  Wait, wait, wait.  You have got to slow

16  down and let the witness finish testifying, all right?

17           THE WITNESS:  But there are other articles as well.

18  BY MR. SMITH:

19  Q.   So you wrote an article in *The Weekly Standard,* correct,

20  about this subject?

21  A.   That is correct.

22  Q.   And when was that?

23  A.   2006, I believe.

24  Q.   Was that before the terrorist group in this case emerged?

25  A.   No.

1    Q.    It was not?

2    A.    The Zarqawi network existed long before that.  ISIS is a

3    descendant of al Qaeda in Iraq.  As we talked about when I

4    reviewed the various designations, al Qaeda in Iraq was

5    designated in 2004, and rather than designating ISIS later on

6    as a different entity, the designation was just updated to show

7    that it was using a different name.

8    Q.    When was your --

9    A.    ISIS had already existed by 2006.

10   Q.    Thank you, sir.

11          When was your testimony that the Caliphate was

12   declared?

13   A.    The Caliphate was declared in 2014, June.

14   Q.    Thanks.  Now, you testified about your work on the white

15   supremacist and neo-Nazi movement, correct?

16   A.    Correct.

17   Q.    And your CV indicates this is limited to two technical

18   publications, correct?

19   A.    In terms of writing, yes.

20   Q.    Yes.  And who are those two technical publications?

21   A.    Both written for the Foundation for Defense of Democracies

22   and --

23   Q.    That's an organization you work for, correct?

24   A.    Correct.  One of them is on assessing --

25   Q.    Sir, I didn't ask you about assessing.

1            MR. KROMBERG:  Objection.

2            THE COURT:  You need to, sir --

3   BY MR. SMITH:

4   Q.   It's a yes-or-no question.

5   A.   I'm sorry, I thought you asked what.  I apologize.

6   Q.   So those two technical publications, they were not subject

7   to any peer review, correct?

8   A.   They were not peer-reviewed before they were published,

9   no.

10  Q.   What -- you're an academic, right?

11  A.   Among other things.  I don't primarily --

12  Q.   You testified you teach at Georgetown University?

13           MR. KROMBERG:  Objection.

14           THE COURT:  If you cannot stop talking while the

15  witness is answering the question, I'm going to stop this.

16           MR. SMITH:  Thanks.

17           THE WITNESS:  I have.  I don't teach there now.  I

18  taught there up through the fall of 2016 term.

19  BY MR. SMITH:

20  Q.   What is peer review?

21  A.   Peer review is when other academics or other practitioners

22  review a publication prior to it appearing in print.

23  Q.   And why is peer review important in the field of academia

24  in establishing a thesis?

25  A.   It's important in that it shows that a thesis -- well, two

1   things:  Number one is that it's important in that it shows

2   that other academics think it comports with the standards that

3   are being used; but secondly, peer review is not essential for

4   legitimacy of an argument.

5   Q.   That's your position.  Are you aware of any other expert

6   who has testified on the connection between white supremacism

7   and militant Islam in a, in a case?

8   A.   No.

9   Q.   Are you familiar with Evan Kohlmann?

10  A.   Yes.

11  Q.   Who is Evan Kohlmann?

12  A.   He is a, an individual who studies terrorism and testifies

13  in some terrorism trials.

14  Q.   Is it fair to say he testifies frequently in terrorism

15  trials?  He's one of the primary terrorism --

16  A.   Yes.

17  Q.   -- experts relied on in terrorism prosecutions in this

18  country, correct?

19  A.   Correct.

20  Q.   And are you familiar with Matthew Levitt?

21  A.   Yes.

22  Q.   Who is he?

23  A.   He's a scholar at the Washington Institute for Near East

24  Policy.

25  Q.   And is, is it fair to say that Matthew Levitt frequently

1  testifies on behalf of the government in terrorism

2  prosecutions?

3  A.   I don't know if he testifies frequently.  I know that he

4  has.

5  Q.   On multiple occasions?

6  A.   More than once.  I don't know how often.

7  Q.   Now, are you aware of Evan -- would you say that Evan

8  Kohlmann and Matthew Levitt are qualified to testify about

9  terrorism subjects in cases?

10  A.   Yes.

11  Q.   Are you aware of Evan Kohlmann or Matthew Levitt ever

12  testifying on the subject of a white supremacist and militant

13  Islam connection?

14  A.   No, I am not.

15  Q.   When did the government approach you to testify in this

16  case?

17  A.   February of 2017.

18  Q.   And when you met with them, did they tell you what they

19  wanted you to testify about here?

20  A.   Yes.

21  Q.   What, what did they -- what did they ask you about?  What

22  was the subject of testimony that they inquired about?

23  A.   The subject of testimony involved radicalization processes

24  and items of cultural significance to both jihadists and also

25  to the neo-Nazi movement.

1   Q.   Did they indicate to you that they would like to see a

2   connection made, drawn between white supremacism and militant

3   Islam?

4   A.   No.   They indicated that they wanted me to look at whether

5   there was a connection.

6   Q.   Which items did they want you to look at?

7   A.   Do you mean the items of cultural significance?

8   Q.   Yes.   We'll get to the cultural significance in a minute,

9   but did they show you any documents or pictures during your

10  first meeting with them?

11  A.   During the first meeting, I don't remember if they showed

12  me any initially, but yeah, I've seen items and pictures

13  related to this case throughout.

14  Q.   So the government showed you these items and pictures, and

15  they indicated to you that what?   What were you supposed to do

16  with these items, with these pictures of -- these Nazi pictures

17  they showed you?

18  A.   What was I supposed to do with them?

19  Q.   Did they indicate -- when they showed you these documents,

20  did they indicate what sort of analysis they wanted you to

21  perform?

22  A.   No one could tell me what kind of analysis to perform.

23  They can tell me what to analyze.

24  Q.   I'm not suggesting they told you what your conclusion

25  should be, but when they handed you documents and pictures with

1  the Nazi evidence we just looked at, did they indicate what

2  type of analysis or method -- methodology you would use to

3  analyze those materials?

4  A.   Sure.  They indicated what kind of topics I was interested

5  in.  I'm not -- perhaps I don't understand your question.

6  Q.   Okay.  So you had a meeting with the government before you

7  testified here today, correct?

8  A.   Yes.

9  Q.   And at some point, they showed you the pictures that you

10 just testified about, correct?

11 A.   Correct.

12 Q.   And when they showed you those pictures, did they explain

13 what sort of analysis they wanted you to perform as an expert

14 in connection with those pictures?

15 A.   Yes.

16 Q.   And what sort of analysis did they ask you to perform?

17 A.   They asked me to indicate what the cultural significance

18 was of the items that we saw, in other words, what do they mean

19 to someone who's involved with these movements.

20 Q.   And they asked you what the cultural significance of these

21 items were in connection with a material support for terrorism

22 case?  So in other words, when they showed you these --

23 A.   Cultural significance doesn't change based on whether or

24 not you're involved in a material support for terrorism case.

25 Q.   Did you understand when they showed you the Nazi pictures

1    that this was a cultural significance analysis for a terrorism

2    case?

3    A.   I didn't hear -- I didn't hear the full question that you

4    asked.

5    Q.   You had a meeting with the government before your

6    testimony today in which they showed you the pictures which you

7    just testified about, correct?

8    A.   Yes.

9    Q.   And when they showed you those pictures, did they explain

10   to you that the expert analysis they wanted you to perform was

11   in connection with a material support for terrorism case?

12   A.   Yes, of course.

13   Q.   And what was your response?

14   A.   My -- I agreed to testify.

15   Q.   But you had never performed that analysis before that

16   point, correct?

17   A.   I had performed the analysis of cultural significance on

18   multiple occasions.  It's part of what I do day-to-day --

19   Q.   But you never performed --

20            MR. KROMBERG:  Objection, Judge.

21            THE COURT:  You have to stop cutting off the witness.

22   BY MR. SMITH:

23   Q.   My question is whether you had ever drafted a report, an

24   expert opinion on the connection between militant Islam and a

25   white supremacism before you were approached by the government

1    in this case.

2    A.    Had I ever drafted a report on that connection?  No.

3    Q.    Thanks.  How much were you paid for your services in this

4    case?

5    A.    Well, the money doesn't go to me personally, it goes to my

6    firm, but I believe $16,000.

7    Q.    16,000.

8          And at what point were you paid for your services?

9    A.    The invoices are monthly based on hours per month.

10   Q.    Dr. Gartenstein-Ross, you've testified today that you've

11   served as an expert witness in a federal case, correct?

12   A.    That's correct.

13   Q.    Is it one case that you've testified in as an expert,

14   federal case?

15   A.    One -- well, all the immigration cases I've testified in

16   are federal, so that's eight cases.

17   Q.    But you cited as an example the Foley against the Syrian

18   Arab Republic case?

19   A.    Correct.

20   Q.    You were certified as an expert witness in that case?

21   A.    That's correct.

22   Q.    But there was no opposition to your service as an expert

23   in that case, right?

24   A.    Correct.

25   Q.    It was a default hearing?

1    A.    Yes.

2    Q.    Okay.  That's, that's not a criminal case, is it?

3    A.    No.  It's a civil case, as I specified.

4    Q.    Okay.  So in your, in your testimony today, you referenced

5    a report, University of Maryland report, empirical assessment

6    of domestic radicalization from 2016, correct?

7    A.    Correct.

8    Q.    Your expert report submitted in this case cites that

9    radicalization report, correct?

10   A.    Correct.

11   Q.    It cites it a couple of times, right, your expert report?

12   A.    I think so.

13          MR. SMITH:  Okay.  I'm going to cross-examine the

14   witness and refresh his recollection with this document.  It is

15   not being admitted into evidence.

16          THE COURT:  Well, he hasn't failed to remember

17   anything yet, so why don't you ask the question first.

18          MR. SMITH:  Okay.  Well, that's fair.

19   Q.    Have you reviewed the -- are you familiar with the report,

20   final report, Empirical Assessment of Domestic Radicalization?

21   A.    Of course.

22   Q.    Okay.  So did you review that report before drafting your

23   expert testimony in this case?

24   A.    Yes.

25   Q.    And do you recall that -- so what is the EADR?  I'm going

1    to call it the EADR, but this is the Empirical Assessment of

2    Domestic Radicalization, a 2016 study by two scholars at

3    Maryland.  What is the -- what is that report analyzing?

4    A.   It's a mixed method study.

5              THE COURT:  Can you speak up a little louder, please?

6              THE WITNESS:  Sure.  It's a mixed method study,

7    particularly looking at quantitative factors, which is looking

8    at basically the universe of known domestic terrorists across

9    ideology types, and it looks at a large number of factors to

10   try to understand commonalities and differences in

11   radicalization among these different ideological types.

12   BY MR. SMITH:

13   Q.   Okay.  The EADR study which we're referencing built the

14   largest known database on individual radicalization in the

15   U.S., correct?

16   A.   That's what, what it says.  I believe that's correct.

17   Q.   You have no reason to believe it's not?

18   A.   No, I don't.

19   Q.   Okay.  And radicalization, the mechanisms of

20   radicalization is the basis of your testimony today.  You're

21   drawing a connection between white supremacism and militant

22   Islam based on shared radicalization mechanisms, correct?

23   A.   That's not the entirety of it, no.

24   Q.   That's a part of it, correct?

25   A.   It is a part, yes.

1   Q.   So this EADR study we just referenced and which is cited

2   selectively in your report says that this database that was

3   built by these scholars at the University of Maryland included

4   147 variables covering demographic, background, group

5   affiliation, and ideological information for 1,473 violent and

6   nonviolent extremists from across the ideological spectrum.

7           Do you remember that from your review of the EADR

8   report?

9   A.   Of course.

10  Q.   Okay.  This is an empirical study of radicalization,

11  correct?

12  A.   Yes.

13  Q.   This study found that extant research has failed to

14  rigorously compare Islamist far right, far left, and other

15  extremist movements, right?

16  A.   Yes, in terms of a quantitative look at them.

17  Q.   Do you recall that the report said that extant research

18  has failed to rigorously compare Islamist --

19          MR. KROMBERG:  Objection, Judge.  Asked and answered.

20          MR. SMITH:  Your Honor, the witness said

21  quantitative, so I'm just trying to --

22          THE COURT:  This is a different question.  Overruled.

23  BY MR. SMITH:

24  Q.   This is a different question.  So I'm just trying to

25  clarify whether you recall that the report found that extant

1    research of any stripe has failed to rigorously compare

2    Islamist, far right, far left, and other extremist movements.

3    A.    Yes, but what is --

4    Q.    Sir, do you recall that this report found that initial --

5    that there were initial indications that there are, quote,

6    important differences in the radicalization causes and

7    processes for individuals who act across these ideological

8    milieus?

9    A.    Yes.

10   Q.    This study was funded by the Justice Department, right?

11   A.    Correct.

12   Q.    Did the authors of this -- do you have any reason to

13   believe that the methodology supporting this study is flawed?

14   A.    That the methodology supporting the study is flawed.  As a

15   whole, no.

16   Q.    Were the authors of this study unaware of your writing in

17   this subject area?

18   A.    My writing didn't seek to compare -- my writing didn't

19   seek to compare, if you're talking about the radicalization

20   writing that I've done.  You're mixing apples and oranges with

21   the question.

22          They're not saying that everything that's been

23   written is terrible.  They're looking at radicalization

24   trajectories.  Both of the articles that you referenced which I

25   had written were not about radicalization trajectories.

1    Q.    They weren't peer-reviewed publications, right?

2            MR. KROMBERG:  Objection, Judge.

3            THE WITNESS:  That's correct.

4    BY MR. SMITH:

5    Q.    Okay.

6    A.    It's not -- that statement that you're quoting is not a

7    criticism either of my study on radicalization or of the work

8    that I had done looking at the two movements.

9    Q.    I didn't suggest it was a criticism of your study because

10   your study was created for this case, whereas this report, the

11   EADR, was published in 2016.

12   A.    When I said my study, I'm referring to my 2009

13   radicalization study.

14   Q.    Oh, did the 2009 radicalization study concern the link

15   between militant Islam and white supremacism?

16   A.    No, we've already established that.

17   Q.    Okay.  So this report from the EADR, Final Report

18   Empirical Assessment of Domestic Radicalization, we've

19   established this is an empirical study, a study based on data,

20   correct?

21   A.    Yes, we have.

22   Q.    Your expert testimony today is based on -- your expert

23   testimony today on the subject of shared radicalization

24   mechanisms between white supremacism and militant Islam is

25   based on a case study, correct?

1   A.    That's not fully correct, no.

2   Q.    Does your -- is your report based on a case study of eight

3   individuals who seem to share an interest in both militant

4   Islam and white supremacism?

5   A.    It includes that.  It's not based on that.

6   Q.    And how many individuals are included within that case

7   study?

8   A.    You mean within the eight case studies?

9   Q.    Yes.

10  A.    There are eight individuals.

11  Q.    Eight individuals, right.

12        So we just discussed how the EADR developed a

13  database of 1,473 violent and nonviolent extremists across the

14  ideological spectrum, correct?

15  A.    Yes.

16  Q.    That is the database -- that is the universe of subjects

17  examined in that 2016 study?

18  A.    Correct.

19  Q.    And the universe of individuals covered in your study in

20  this case is eight people, correct?

21  A.    Yes, but the --

22  Q.    Sir, I'm not -- it's a yes-or-no question.

23        So the EADR study, you reviewed this one, correct?

24  A.    Yes, we've established that.

25  Q.    Do you recall that the EADR study identified a number of

1    metrics across which Islamist extremists differ from far right

2    extremists?

3    A.    Yes, of course.

4    Q.    What were some of those metrics along which far right,

5    such as white supremacists and neo-Nazi extremists, differ from

6    militant Islamic extremists?

7    A.    Two metrics off the top of my head are age and education.

8    Q.    And how do those -- what are those metrics -- what are the

9    differences in those metrics between militant Islam extremists

10   and far right extremists?

11   A.    I'd want to check.  You know, my testimony is not that the

12   two trajectories are exactly the same.  I believe off the top

13   of my head that right wing extremists tended to radicalize

14   older, and they tended to have less education, but I could be

15   misremembering.

16   Q.    Those are two factors.  I think the EADR study which

17   you've reviewed found that Islamist extremists are near the

18   average, with 41 percent holding college degrees, correct?  And

19   individuals on the far right are less educated than other

20   groups, correct?

21   A.    Yes.

22   Q.    Do you recall that the EADR study found that far right

23   extremists also show a relatively high rate of involvement in

24   formal extremist groups at 58 percent, but that Islamists

25   are -- Islamists were at 21 percent and 18 percent, acting

1   without any known group affiliation, correct?

2   A.   Correct.

3   Q.   Are you aware of any other study that's -- any other

4   empirical study that tests radicalization across ideological

5   milieus based on data apart from this EADR study?

6              I'll rephrase that.  Are you aware of any other

7   study, empirical study that tests radicalization across

8   ideological milieus in a country separate from this report

9   we're discussing, the EADR report?  Are you aware of any other

10  empirical studies on this, on this subject?

11  A.   No, not that, not that does the cross-comparison across

12  milieus.  There are a number of studies that look at them

13  within single milieus, though.

14  Q.   Well, you would characterize your thesis as a, as a

15  cross-milieux study, correct?  You are comparing militant Islam

16  and white supremacism across those ideological milieus?

17  A.   Part of it is, part of it isn't, right?  The fundamental

18  argument is simply that having been radicalized into Nazism, it

19  can be a pathway into militant jihadism, that once you succumb

20  to one of those ideologies, it makes succumbing to the latter

21  more easy, and that there's a number of cases that bear that

22  out.

23  Q.   As a, as a former academic, would you say that if -- in

24  order to increase the reliability of the results of the

25  conclusion, would one prefer to have more data or less data in,

1   in arriving at a theory, a conclusion?

2   A.    One always wants more data.

3   Q.    One always wants more data.

4         Now, you've testified that there are several areas in

5   which militant Islam can be compared to white supremacism, and

6   one of them -- one of these criteria is radical ideology,

7   correct?

8   A.    Yes.

9   Q.    And you have -- your argument is based on this idea that

10  because both white supremacists and militant Islam supporters

11  have radical ideologies, a supporter of white supremacism might

12  be inclined to support militant Islam as well?  Is that, is

13  that your testimony?

14  A.    No.

15  Q.    No.  So what is the purpose of radical ideology in

16  compiling your argument in this case?

17  A.    Radical ideology -- sorry, could you rephrase your

18  question?  I want to make sure I'm answering your --

19  Q.    So there are several areas in which you identify

20  commonality between white supremacism and militant Islam.

21  A.    Yes.

22  Q.    And one of those areas is what you characterize as radical

23  ideology; is that correct?

24  A.    That's correct.

25  Q.    And how does radical ideology connect white supremacism

Gartenstein-Ross - Cross                                              952

1  and militant Islam?

2  A.   In both cases, radical ideology tends to define very well

3  an in-group.  It tends to point to a variety of out-groups in

4  both cases and define a program of action.  In both cases and

5  for all of the eight cases which we discussed in my direct

6  examination, individuals who gravitated from neo-Nazism to

7  militant Islam connected the two in most cases explicitly in

8  their own words through hatred of the Jews.  They talked about

9  how militant Islam was a great way to combat global Zionism.

10 Q.   We haven't reached the hatred of the Jews point yet.  I'm

11 just focused on radical ideology itself.

12 A.   Right.  I'm answering that question.

13 Q.   Okay.  So doesn't -- so in order to compare two political

14 groups based on radical ideology alone, you have to empty the

15 two political groups' ideologies of their content to compare

16 them that way, correct?  So if you say that there is -- there

17 are Communists, right, and there are Nazis and there are both,

18 would you agree that both of those political movements feature

19 radical ideologies?

20 A.   Yes.

21 Q.   Now, your point is that because both groups have radical

22 ideologies, one may therefore conclude as the next step that if

23 one is a Communist, one is more likely to be a Nazi; is that

24 correct?

25 A.   You'd have to study that.  You know, if, if I were to try

1    to see if there was a pathway from Communism to Nazism, what I

2    would want to look at is, number one, have we seen people

3    following that trajectory; and number two, if people have

4    followed the Communism to Nazism trajectory, what do they say

5    about the linkage between the two?

6           Do they say:  I was a radical Communist, and then I

7    realized that my ideals were being fulfilled in Nazism, such

8    that they see them as connected, or do they see them as

9    distinct?  That what would give you some indication as to

10   whether this was a pathway.

11   Q.   Okay.  So if I understand you correctly, what you're

12   suggesting is that radical ideology per se does not link two

13   different political groups with different content in their

14   radical ideologies.  What you're suggesting is that further

15   nuance is required in assessing the two different political

16   groups and that radical ideology itself as divorced from the

17   underlying content of the ideology is not enough to link the

18   two groups.  Is that your testimony?

19   A.   That -- yes, my testimony is that the fact that someone

20   has ascribed to a radical ideology isn't necessarily a

21   predictor of a jump to the next ideology.  You'd have to look

22   below that to similarities in ideology or the world view being

23   formed, the sets of enemies, and look at whether we've actually

24   seen movement from one to the other.

25   Q.   So, so if I understand you correctly, so radical ideology

1    itself is not enough.  We need more nuance is your point.  Is

2    that -- am I fairly summarizing your point?

3    A.    Yeah.  I mean, I don't have -- on the first point, I don't

4    have a judgment as to whether radical ideology alone is enough.

5    It may or it may not be, but I'm not testifying one way or the

6    other as to whether radical ideology is enough.

7            I am testifying to when you have other nuances, like

8    shared dehumanization, shared enemies, a shared kind of world

9    view in terms of in-group and out-group, that it is easier to

10   transition from one to the other.

11   Q.    In other words, you're suggesting that we need to consider

12   and move on in your testimony, consider some of the other

13   factors in addition to radical ideology.  In order to make this

14   final link between the shared conversions between militant

15   Islam and white supremacism, we need to move on in your

16   testimony.

17           You also testified about hate speech, correct?

18           THE COURT:  Now you're giving a speech.  You need to

19   ask a question.

20   BY MR. SMITH:

21   Q.    Did you also testify how hate speech links militant Islam

22   and white supremacism?

23   A.    Yes.

24   Q.    And you've testified that it is a shared proclivity for

25   hate speech that renders white supremacists who ordinarily hate

1    minorities and militant Islam similar.  That's one of the

2    factors, hate speech, that renders them similar?

3    A.   I don't agree with the way that you phrased that.  It's

4    one of the -- it's one of the similarities that has allowed

5    people to make a transition from one to the other.  It's a

6    similarity that the subjects themselves, people have gone from

7    being Nazis to being jihadists, or vice versa in the case of

8    Ahmed Huber, have pointed to as being significant.

9    Q.   So is hate speech limited to militant Islam supporters and

10   white supremacists?

11   A.   Of course not.

12   Q.   Why do you say of course not?

13   A.   Because we all know that hate speech can come from a

14   variety of corners.

15   Q.   So there's nothing special about hate speech itself that

16   links militant Islam and white supremacism, correct?

17   A.   Well, I haven't made the argument that these two have to

18   be seen as the only things that have hate speech.

19   Q.   We're going to keep moving on.  But you would agree that

20   hate speech itself is not enough to establish the connection

21   you want, which is the basis of your thesis, right?

22   A.   I disagree with your statement, no.  I mean, I'm not

23   saying -- I'm not drawing a connection that these two are

24   unique and that there is nothing like them.  I'm not saying

25   that only these two use hate speech.  Rather, the argument I'm

1  making is that one can transition from being a neo-Nazi to

2  being a jihadist, that we've seen it happen.

3          I'm not saying that it's the only route in or the

4  only area where one would succumb to hate speech that would

5  make them more likely to be a jihadist.  So no, the connection

6  I'm making is not that these two are absolutely unique and that

7  there is nothing in the world like them.

8  Q.   I don't think I suggested that in my question to you, but

9  you would agree that if, for example, focusing on hate speech,

10  if we were to take an easy example, we have a political

11  spectrum in this country with Democrats and Republicans, and if

12  Democrats and Republicans both engaged in hate speech, would

13  you be able to conclude from the hate speech of a Democrat that

14  they are more inclined to become a Republican because

15  Republicans also engage in hate speech?

16          You would not agree with that statement, right?  Take

17  an example of the political spectrum in this country.

18  A.   No, I heard your question.  I agree that I would not agree

19  with the statement that the fact that they both engage in hate

20  speech would make a Democrat more likely to be a Republican.

21  Q.   You also single out dehumanization as a factor that links

22  white supremacism and militant Islam, correct?

23  A.   That's correct.

24  Q.   Is dehumanization a concept that is limited to militant

25  Islam terrorist supporters?

1  A.   No.

2  Q.   Is it limited to white supremacists?

3  A.   No.

4  Q.   Would you agree that governments throughout history have

5  practiced dehumanization in propaganda?

6  A.   Yes.  In fact, you know, the case studies that are, have

7  been done on this and the academic work that has been done on

8  this looks at dehumanization across a variety of contexts,

9  ranging from Nazi Germany to the Rwandan genocide and others,

10  and finds that hate speech has been used in a variety of places

11  and has the impact of dehumanizing in many cases future victims

12  of genocide.

13  Q.   So you would agree that the psychology professor has sort

14  of left the old notion that dehumanization is purely a Nazi

15  phenomenon?

16  A.   I'm not sure that that accurately characterizes the old

17  notions of it.  In looking at hate speech and dehumanization

18  early on, a lot of the early work focused on Nazi Germany.  I

19  don't think that there are that many academics who are so

20  narrow as to think that only Nazi Germany dehumanized its foes.

21  Q.   One of the areas of convergence you identified between

22  white supremacists and militant Islam supporters is that both

23  are "rigid," correct?

24  A.   That is one area, yes.

25  Q.   Is that adjective limited to white supremacists and

1   militant Islam supporters?

2   A.   No.

3   Q.   Your report finds that both groups have far-reaching

4   ideologies, correct?

5   A.   That's correct.

6   Q.   Is that factor limited to these two groups, white

7   supremacists and militant Islam supporters?

8   A.   No.

9   Q.   Your report finds that both groups have all-consuming

10  outlooks, correct?

11  A.   That's correct.

12  Q.   Is that limited to militant Islam supporters and white

13  supremacists?

14  A.   No.

15  Q.   So if I understand your testimony correctly, there really

16  is one linking factor, right?  There is -- well, I can quote

17  you.  So does your report indicate that Jews, quote, lie at the

18  center of literally every Nazi-jihadist-defining affinity?

19  Your report says, "Jews lie at the center of literally every

20  Nazi-jihadist affinity."

21         Is that what your report concludes?

22  A.   Yeah.  What it should have said is every case of

23  Nazi-jihadist affinity.

24  Q.   So would you agree that the connection you're trying to

25  establish between a proclivity to support white supremacists

1    and militant Islam supporters centers around a hatred of Jews?

2    A.   That's an important factor.  It's not the only one.

3    Q.   So when you wrote it lies at the center, you mean it's

4    central, but it's not the only central factor?

5    A.   Yeah.  It's been center to the -- it's central to the

6    eight cases which I've identified, where in all of those cases,

7    the people identified hatred of Jews as being an important

8    aspect of how they were able to move in most cases from Nazism

9    to jihadism or in one case were able to cooperate with

10   jihadists despite being a Nazi.

11          There are other commonalities between the two, but

12   hatred of the Jew looms extraordinarily large across these two

13   ideologies.

14   Q.   That's how I understood your testimony to be.

15          So, so it's hatred of the Jews.  Is hatred of the

16   Jews and anti-Semitism limited to these two groups, white

17   supremacists and militant Islam supporters?

18   A.   No.

19   Q.   It infects groups across the ideological spectrum,

20   correct?

21   A.   Sure.

22   Q.   Left-wing politics, anti-Semitism is prevalent?

23   A.   So I would say there is a core difference, though.

24   Q.   Sir, I'm asking the question.  So would you agree that

25   anti-Semitism is prevalent on the left wing in politics in this

1   country?

2   A.   I --

3   Q.   Far left wing?

4   A.   I have -- I don't have a basis for agreeing or disagreeing

5   with that statement.

6   Q.   Would you agree that anti-Semitism is prevalent on the

7   right wing in this country?

8   A.   Would I agree that it's prevalent on the right wing, on

9   the right wing of this country?  No.  I mean, that's making a

10  fairly large judgment about an entire political, political

11  spectrum.  If your argument --

12  Q.   Are you familiar with the John Birch Society?

13  A.   What?

14  Q.   Are you familiar with the John Birch Society?

15  A.   Yes.  It --

16  Q.   What is the John Birch Society?

17  A.   The John Birch Society was an anti-Communist movement that

18  existed during the Cold War era.

19  Q.   Was it anti-Semitic?

20  A.   Yeah, in many of its -- so if your question is does it

21  exist on the right wing, yes, I agree with it.  I don't agree

22  with it as phrased, which seems to be talking about prevalence

23  across the entire right wing.  I'm not going to talk about the

24  prevalence across an entire part of the political movement, but

25  if you're talking about on the fringe, has it existed for the

1   John Birch Society, for example, yes, of course.

2   Q.   I think it's sufficient just for you to say that you agree

3   that there's anti-Semitism across the political spectrum.

4   A.   Sure, I'm happy to agree with that.  I don't want to agree

5   with questions that seem to make broad generalizations.

6   Q.   So in order to draw your conclusion that there is some

7   sort of connection between militant Islam and white supremacism

8   based on hatred of the Jews, you have to identify some sort of

9   hatred that's unique from all of the hatred that exists across

10  the political spectrum, correct?

11  A.   No, that's not correct.

12  Q.   Why?

13  A.   So number one, most theories of radicalization actually

14  look for a generalized theory of radicalization.  They don't

15  look for something that's unique.

16        So in general, if one is saying that X is a pathway

17  into, say, militant Islamism, if they say ideology is a path to

18  militant Islamism, then most academics are looking for ideology

19  to be a path into multiple kinds of radical ideologies.

20        So if I'm talking about how hatred of the Jews could

21  lead people from Nazism to militant Islamism, I don't -- the

22  argument is not necessary that they're unique in this regard.

23  There can be plenty of other places where hatred of the Jews

24  exists.  It's possible that some of these other places are

25  pathways in as well.

1        But what's not necessary is to have a theory that

2   uniquely connects the two where nothing else can be connected.

3   It's possible that there are other things that could connect as

4   well.  Here all we're looking at is the connection between the

5   two.

6   Q.   The connection between the two, as you've just stated, is

7   based -- what lies at the center of the connection you're

8   arguing is anti-Semitism, correct?

9   A.   Anti-Semitism is, yes, very important.

10  Q.   And you also agree that anti-Semitism is prevalent across

11  ideological groups, correct?

12  A.   Yes.

13  Q.   So it is your position that you can link militant Islam

14  and white supremacism with anti-Semitism even though you agree

15  anti-Semitism exists across ideological spectrums, correct?

16  A.   That's correct, but as I said --

17  Q.   Is that not a logical flaw?

18          MR. KROMBERG:  Objection.

19          THE WITNESS:  No, that is not a logical flaw.

20          THE COURT:  Wait, wait, wait.  Just a second.

21          THE WITNESS:  Sure.

22          THE COURT:  One person speaks at a time, all right?

23  Of course, the transcript of this proceeding is going to be a

24  piece of just, you know, garbled, all right?

25  BY MR. SMITH:

1    Q.    You're attempting to establish a connection between a

2    proclivity for supporting white supremacism and a proclivity

3    for supporting militant Islam based on a shared hatred of the

4    Jews, correct?

5    A.    That is correct.

6    Q.    And you agree that a hatred of the Jews is prevalent

7    across the political spectrum, correct?

8    A.    It -- well, you keep using the word "prevalent."

9    Q.    It exists across --

10   A.    It exists.

11   Q.    Across the political spectrum, correct?

12   A.    Correct.

13   Q.    So in order to make an argument that a proclivity for

14   supporting white supremacism indicates a proclivity for

15   supporting militant Islam, as opposed to any other part, piece

16   of the political spectrum, you would have to establish that the

17   anti-Semitism linking the two groups you want to establish is

18   something distinct from the anti-Semitism you agree exists

19   across the spectrum, correct?

20   A.    You'd have to establish that it's unique?  No, you

21   wouldn't.

22   Q.    It's a premise of your argument, correct?

23   A.    No, that's not correct.  As we talked about, first of all,

24   you don't need to show, like, we need not believe that the two

25   are absolutely unique about radical ideologies.  There could be

1   another radical ideology that also is a pathway into militant

2   Islamism based on anti-Semitic beliefs.  That wouldn't nullify

3   neo-Nazism being a way in.

4           In fact, generally speaking, academics try to look

5   for generalized explanations, not unique explanations which

6   limit it down to two ideologies.  And secondly, not all

7   anti-Semitism is equal.  You know the genocidal anti-Semitism

8   of neo-Nazism is not the same as, say, someone who just has

9   some anti-Semitic beliefs.  Exterminationists' discrimination

10  is not the same as, you know, standard stereotypes or perhaps

11  bigotry.

12  Q.   So if I understand your testimony correctly, you have

13  identified something that is distinguishable about the

14  anti-Semitism of white supremacists and militant Islam

15  supporters that's different from the sort of casual

16  anti-Semitism you might identify across the political spectrum.

17  You -- I believe you just testified that it's more virulent,

18  that the anti-Semitism between -- in militant Islam supporters

19  and in white supremacists is more virulent than the

20  anti-Semitism across the political spectrum?

21  A.   That's correct, but your question before was whether --

22  Q.   Sir, I'm asking -- I'm just asking you a yes-or-no

23  question.

24  A.   Yes.

25  Q.   Okay.

1   A.   Certain --

2   Q.   Do you have any studies -- do you have any data and

3   empirical studies backing up your assessment that there is a

4   more virulent anti-Semitism motivating militant Islam

5   supporters and white supremacism than the anti-Semitism that

6   exists in other parts of the political spectrum?

7   A.   Do I have any studies?  Well --

8   Q.   Did you rely on any data --

9   A.   Yes.

10  Q.   -- in arriving at that premise of your argument?

11  A.   I relied upon statements of neo-Nazis and major jihadist

12  figures who identify Jews as the center -- the central enemy

13  that they see.

14  Q.   What statements?

15  A.   The statements of, of Hitler; of Goebbels; of Zaid

16  Khattab, who is the forefather of the Islamic movement.  You

17  know, as you said, it does tend to be more virulent; I agree

18  with that; and looking at statements from these movements, I

19  think the virulence of their hatred comes across very well.

20  Q.   You've identified your method as one -- your method in

21  comparing militant Islam and white supremacism as one of

22  testing the cultural significance of various items that were

23  found in the defendant's home, correct?  That is the test, one

24  of what is the cultural significance of these items, correct?

25  A.   I don't understand your question.

1   Q.   So you are testifying here today, as your report

2   indicates, about the cultural significance of various items

3   that were seized from the defendant's home?

4   A.   Yes, I have.

5   Q.   That's how you characterize your, your method, is one of

6   assessing the cultural significance of the items?

7   A.   No.  I mean, you're mixing up two different things, right?

8   Looking at the cultural significance of the items is saying

9   what does this mean?  That's a method.  In terms of looking at

10  Nazism and militant Islamism, the method was, number one,

11  looking at mechanisms of radicalization that bind the two, and

12  number two --

13  Q.   Dr. Gartenstein-Ross, I was only asking --

14          MR. KROMBERG:  Objection, Judge.

15  BY MR. SMITH:

16  Q.   I was only asking about the cultural significance element.

17          THE COURT:  Now, you're doing the same thing,

18  Mr. Kromberg, all right?  One person at a time.

19          MR. KROMBERG:  Objection, Judge.  He asked the

20  question.  The witness was in the middle of the answer, number

21  one, and number two, he was cut off.

22          THE COURT:  All right, I'll sustain the objection.

23  Let's keep it calm.

24  BY MR. SMITH:

25  Q.   Are you familiar with the concept of falsifiability?

1   A.   Yes.

2   Q.   What is falsifiability?

3   A.   Falsifiability means that you can falsify something if you

4   test it.  You can determine whether something is false by

5   looking at, say, a data set or running some sort of test to

6   determine the truth or falsehood of a matter.

7   Q.   So you would agree that's a part of scientific method is,

8   it's part of arriving at an empirical conclusion of

9   falsifiability is an important aspect of that?

10  A.   Sometimes, yes.

11  Q.   So would you agree that your cultural significance test of

12  items is not falsifiable?  We can't prove it right or wrong?

13       MR. KROMBERG:  Objection, Judge.  The witness has

14  testified that Mr. Smith is mixing apples and oranges.

15  Cultural significance is one thing he was hired to do, to

16  assess the cultural significance of certain items.

17       That's not, as the witness has testified, that's not

18  his method of studying radicalization.

19       MR. SMITH:  Your Honor, I haven't asked the witness

20  about falsifiability in connection with cultural, his cultural

21  significance test yet.  I'm just trying to elicit one answer on

22  this question, which is --

23       THE COURT:  Why don't you-all approach the bench.

24       (Bench conference on the record.)

25       THE COURT:  I'm giving you some leeway on this, but I

1    don't know if it's really helping your situation that much.

2    Number one, I think the jury is getting a little bit tired of

3    this.  Number two, this is a social science area, and as you

4    know, social sciences are not the same as hard sciences.  If

5    you go too far down this road, you're going to be misleading

6    the jury in that respect.

7              MR. SMITH:  Well --

8              THE COURT:  So I'm just giving you that warning, all

9    right?  But -- and I do think you're mixing things up as you

10   put these questions in.  The questions are way too long.  So

11   that's what I want on the record.

12             MR. SMITH:  We can move on, Your Honor.

13             THE COURT:  What?

14             MR. SMITH:  We can just move on.  I'll move on.

15             THE COURT:  All right, that's fine.

16             (End of bench conference.)

17   BY MR. SMITH:

18   Q.   Now, part of your thesis of the connection of white

19   supremacists to military Islam is based on these eight case

20   studies in your report, correct?

21   A.   Correct.

22   Q.   And these individuals who have an interest in both

23   militant Islam and white supremacism, these individuals were,

24   were engaged in actual support for militant Islam, correct, in

25   the sense that they were either arrested for engaging in

1   violence in support of militant Islam, they, they all attempted

2   violence in some way, correct?

3   A.   Yeah, that's correct.  The, the one exception is David

4   Myatt, who just -- who theorized as to violence, but the

5   others, it's correct.

6   Q.   So Steven Smyrek tried to conduct a terrorist attack,

7   right?

8   A.   Yes.

9   Q.   Ahmed Huber was named by the Treasury Department as a key

10  terrorist financier?

11  A.   Yes.

12  Q.   Lemansky was arrested planning a -- for planning a

13  terrorist attack?

14  A.   Correct.

15  Q.   Devon Arthurs was arrested for holding (inaudible) at

16  gunpoint, and the rest were all involved in violence -- in acts

17  of violence and arrested.  None of these figures in your case

18  study convergence thesis were involved in government sting

19  operations, correct?

20  A.   None of them were caught in sting operations.  I think --

21  you know, I think that's correct, yes.

22  Q.   So none of these -- none of these case studies you're

23  citing involves an example where the government is soliciting

24  the terror crime that was committed, correct?

25  A.   Correct.

1    Q.   And all of these case studies except for the Myatt example

2    you cited involve violent, not nonviolent, support for militant

3    Islam, correct?

4    A.   Well, one case was, as you had said, for Ahmed Huber, he

5    was a financier, not actually directly the one carrying out

6    violence but funding those who were carrying out violence.

7    Q.   So, so we were discussing the difference between empirical

8    study and a case study.  So you've selected eight examples that

9    you believe establish your conclusion that there is some sort

10   of comparison between militant Islam and white supremacism that

11   might lead one supporter of one group to be inclined to the

12   other.

13        Isn't the problem with choosing eight examples and

14   trying to establish a conclusion based on those eight examples

15   that there are many other factors that might lead these

16   individuals to support both militant Islam and white

17   supremacism that has nothing to do with hatred for the Jews?

18   A.   No, that's not a -- that's not a problem in selecting

19   those eight in that in those eight -- if I understand your

20   question correctly, in those eight, they specify this front and

21   center as having been an important point of connection.  There

22   may as well -- there may be other variables as well.

23        Usually radicalization tends to be a complex thing,

24   where it doesn't boil down to a single factor, but they have

25   listed that factor as one important reason that they are able

1  to merge white supremacy neo-Nazi with jihadism.

2  Q.   So you would agree that there are many neo-Nazis in the

3  world, hundreds of thousands, if not more?  Neo-Nazis or white

4  supremacists?

5  A.   Yes.

6  Q.   There are hundreds of thousands of examples?

7  A.   Right.

8  Q.   So if we wanted to, we could find eight neo-Nazis who are

9  also eight carpenters, correct?

10 A.   Yes, but it --

11 Q.   But we could also find eight neo-Nazis who are plumbers?

12 A.   Yes.

13 Q.   And we could find eight neo-Nazis who are also violinists,

14 correct?

15 A.   I have no information on whether there are eight neo-Nazis

16 who are violinists.

17 Q.   Given the statistics, given the big numbers, we could

18 probably find eight neo-Nazis who are also each one of these

19 categories, right?

20 A.   That's correct.

21 Q.   On that basis alone, would you establish a convergence

22 between violinists and neo-Nazism?

23 A.   Not unless they said:  I'm a plumber, and that was

24 absolutely essential to me becoming a neo-Nazi.

25 Q.   Right.  But if only eight individuals who are neo-Nazis

1  and anti-Semites say they are anti-Semites, that's not

2  establishing the point beyond those eight individuals, correct?

3  A.   Could you repeat your question, please?

4  Q.   So you said that you could not craft your convergence

5  thesis about a neo-Nazi-violinist connection unless those eight

6  neo-Nazi-violinists said they supported neo-Nazi and violin and

7  they were violinists because they were anti-Semitic; is that

8  right?

9  A.   Yeah.  I mean, ideally as well, there'd be a history of

10 neo-Nazi war criminals finding shelter with violinists,

11 violinists coming over and playing the violin to try to

12 encourage Nazis to kill the Jews, and recruiting violinist

13 units into the SS to take part in the genocide.

14 Q.   I know you just used a lot of explosive terms right there,

15 but I don't think you've answered my question.

16 A.   No, I've answered your question.

17 Q.   You've also testified about Libya.  You've testified that

18 you have published some articles about the Libyan Civil War.

19 A.   I published some articles in a peer-reviewed study, yes.

20 Q.   Okay.  You haven't published any peer-reviewed studies

21 about this group called the Abu Salim Martyrs Brigade, have

22 you?

23 A.   I have not.

24 Q.   Okay.  You have no personal knowledge of the Abu Salim

25 Martyrs Brigade, do you?

1    A.    What do you mean by personal knowledge?

2    Q.    By personal knowledge, I mean if you were a witness in

3    Libya to -- if you had, knew someone in the Abu Salim Martyrs

4    Brigade, if you had spoken to someone who had spoken to someone

5    in the Abu Salim Martyrs Brigade, if you had traveled to Libya

6    and witnessed the Abu Salim Martyrs Brigade, you would have

7    personal knowledge of that group.

8    A.    So under one of those, which is kind of the indirect

9    connection, yeah, but I've read primary source information of

10   the group.  I've studied the group's connections.  I haven't

11   traveled over to Libya and met with them.  I think I wouldn't

12   get along with them very well.

13   Q.    One of your sources for your testimony on the Abu Salim

14   Martyrs Brigade is *Time* magazine, right?

15   A.    Yes.

16   Q.    One of your sources is a blog, right?

17   A.    No.

18   Q.    What is the Long War Journal?

19   A.    The Long War Journal is an online journal written by

20   professionals which looks at, it's titled "*The New York Times*

21   and Elsewhere," which delves very deeply to connections --

22            THE COURT:  Wait a minute.

23            THE WITNESS:  Sorry.  The Long War Journal is an

24   online journal written by professionals in this field which

25   looks very closely at jihadist groups and the connections

1   between them and their leadership structure and propaganda.

2   BY MR. SMITH:

3   Q.   So I'm going to show you some pictures that are, are going

4   to be newly marked as defense exhibits.

5          And, Your Honor, we'll discuss with you the defense

6   exhibit numbers.

7          THE COURT:  I think we need a break, so I'm going to

8   give you 15 minutes, and we'll reconvene at quarter of.

9          MR. SMITH:  Okay.

10         (Recess from 3:30 p.m., until 3:47 p.m.)

11                       (Defendant present, Jury out.)

12         THE COURT:  Ms. Moreno, as you know, I did the recess

13  because I was getting signals from you.  I don't believe -- I

14  watch the jurors.  I can't see these three, but I did not see

15  the gentleman whom I think you're concerned about actually

16  dozing off.  I think from time to time, he's one of those folks

17  who looks down, but anyway, this should have awakened him, but

18  as I said, the cross was getting tedious, and it's late in the

19  day, and that starts to happen so --

20         MS. MORENO:  Yes, Your Honor.  I would appreciate it,

21  however, if the Court keeps an eye, because I actually have

22  seen him sleeping, and he doesn't assume a, you know, a

23  crouched position.

24         THE COURT:  All right, I'll keep my eye on him.

25         MS. MORENO:  We appreciate it.

1            MR. SMITH:  Your Honor?

2            THE COURT:  For scheduling purposes, Mr. Smith, how

3    much longer do you think you're going to be with your cross?

4    I'm not trying to rush you because I'm giving you equal time

5    with the government.  I want to know whether you think you're

6    going to use all of that.

7            MR. SMITH:  I think approximately 30 minutes, maybe

8    20 minutes.

9            THE COURT:  All right.  All right, that's fine.

10           And then the government has one more witness for

11   today.

12           MR. KROMBERG:  That is correct, Judge.

13           THE COURT:  And how long do you think your witness is

14   going to take?

15           MR. KROMBERG:  It could be an hour and a half.

16           THE COURT:  All right.  That tells me -- we've given

17   you the proposed verdict form, so overnight you can take a look

18   at that and see if there's any objections to it, all right?

19           MR. KROMBERG:  Yes.

20           THE COURT:  Let's bring the jury in.

21                        (Jury present.)

22           THE COURT:  One of our jurors just sent us a note

23   that he's wondering for planning purposes what time I think we

24   might conclude tomorrow, that he has to pick someone up at

25   Dulles on a Friday night, and I think to get to Dulles on a

1    Friday, to be safe, you'd have to leave here by 4:30, and I

2    really don't think we want to end that early.  I'm not going to

3    keep you here until six on a Friday because we're actually

4    ahead of schedule, but I think by five o'clock, I would still

5    like to be able to run the case.

6              So if alternate plans can be made, I'd appreciate

7    that.  If you think it's going to be a disaster, let us know.

8              Which juror?

9              A JUROR:  I'll make alternate plans.

10             THE COURT:  You can do that?  All right.  But I will

11   get you out of here by five tomorrow, all right?

12             A JUROR:  Okay.

13             THE COURT:  All right.

14   BY MR. SMITH:

15   Q.   Dr. Ross, you've testified that you relied primarily on

16   primary sources, correct?

17   A.   Yes.

18   Q.   And what is a primary source?

19   A.   A primary source is a statement from a jihadist group

20   that --

21             THE COURT:  Can you speak up, sir?

22             THE WITNESS:  Sure.  A primary source is a statement

23   from a jihadist group, a document that has been intercepted,

24   you know, a missive that was written, even if a jihadist has an

25   online blog, for example, looking at their online blog.

1   Q.    Okay.  And that's opposed to a secondary source, correct?

2   A.    Right.

3   Q.    And a secondary source is what?

4   A.    A secondary source is a newspaper article, a book, another

5   source which provides a scholar's conclusion about a particular

6   topic.

7   Q.    So an analyst -- an analyst's assessment of a primary

8   source would be a secondary source?

9   A.    Correct.

10  Q.    Okay.  So going back to Abu Salim Martyrs Brigade, you've

11  testified that your understanding of Abu Salim Martyrs Brigade

12  is based in part on *Time* magazine, correct?

13  A.    Yes, in a small part.

14  Q.    Is *Time* magazine a primary source?

15  A.    It is a secondary source.

16  Q.    You've testified that you've relied on something called

17  the Long War Journal in testifying about the Abu Salim Martyrs

18  Brigade, correct?

19  A.    That is correct.

20  Q.    Is the Long War Journal a primary source?

21  A.    It is a secondary source.

22  Q.    Okay.  So you've testified that you prefer to rely on

23  primary sources because they're more reliable, but in

24  connection with the Abu Salim Martyrs Brigade, you are not

25  relying on primary sources, correct?

1    A.    That's incorrect.  In, in the report which you're pointing

2    to, I primarily -- I put secondary sources down there.  The Abu

3    Salim Martyrs Brigade was a late addition to the case, but I've

4    read plenty of primary sources related to the Abu Salim Martyrs

5    Brigade, and in particular their fight against ISIS in Derna.

6    I've done original reporting on that which is based on primary

7    sources, and one can easily find that on the Internet.

8    Q.    You just said it was a late addition to the case.  What

9    did you mean by that?

10   A.    It was added, I think, a couple of weeks before into my

11   report.

12   Q.    And when is that?  A couple of weeks before your report,

13   what time are you referencing?

14   A.    I don't -- sometime in November, I was asked to add it and

15   did.

16   Q.    So the government asked you to add a little section on Abu

17   Salim Martyrs Brigade in November of 2016 -- 2017?

18   A.    That's correct.

19   Q.    And you had never discussed with them up to that point Abu

20   Salim Martyrs Brigade?

21   A.    No, I discussed it before.  I just wasn't going to include

22   a discussion of Abu Salim Martyrs Brigade in my report

23   previously.

24   Q.    Why not?

25   A.    I don't know.  I mean, it all, it all refers -- it all

1  relates to, I assume, admissibility of evidence in the case,

2  what evidence is likely to have been presented.  I simply

3  provided analysis of those items that I was asked to analyze.

4  Q.   Did they ask you not to include the -- did the government

5  attorneys ask you not to include Abu Salim Martyrs Brigade

6  before because you had insufficient information to expertly

7  testify?

8  A.   No, that's not at all correct.

9            MR. SMITH:  Okay.  Let's put up, this is now marked

10 Defense Exhibit 5.  This is a photograph from a camera that was

11 seized by the FBI from the defendant's home after his arrest in

12 August 2016.

13           THE COURT:  I assume there's no objection from the

14 government?

15           MR. KROMBERG:  I don't know what we're talking about

16 yet.

17           THE COURT:  All right, you need to present your

18 exhibits to the government.

19           MR. SMITH:  We have, Your Honor.  That's not entirely

20 accurate.  We gave them an exhibit list this morning.  I showed

21 the pictures to Mr. Kromberg, and he said, "We have no issue

22 with them."

23           MR. KROMBERG:  If that's the picture that we're

24 talking about, we have no issue with it, but I don't --

25           MR. SMITH:  I can understand the, the basis of the

1    testimony in just a minute if we put the picture up here,

2    Defense Exhibit No. 5.

3              THE COURT:  Is there any objection, Mr. Kromberg?

4              MR. KROMBERG:  None.

5              THE COURT:  All right, it's in.

6              (Defendant's Exhibit No. 5 was received in evidence.)

7              MR. SMITH:  So can you blow that up?

8    Q.   So I think you can see the defendant with a backwards hat

9    there giving a peace sign.  This is from a camera that the

10   government seized from Mr. Young's home when he was in Libya.

11   I'm just -- I'd ask you to look at that picture.

12             You're testifying today as an expert on the Abu Salim

13   Martyrs Brigade, correct?

14   A.   Yes.

15   Q.   Do you -- can you identify in that picture for me the

16   indicators of the Abu Salem in that picture?

17   A.   For that picture, one cannot say whether, like, I looking

18   at that don't know whether those individuals are in the Abu

19   Salim Martyrs Brigade or not.

20             MR. SMITH:  Okay.  Let's go to Defense Exhibit 7.

21             THE COURT:  Any objection to 7?

22             MR. KROMBERG:  No.

23             THE COURT:  All right, it's in.

24             (Defendant's Exhibit No. 7 was received in evidence.)

25   BY MR. SMITH:

Gartenstein-Ross - Cross                                                    981

1   Q.   Do you -- so this is another photograph taken from

2   Mr. Young's camera when he was in Libya during this, this trip

3   that the government's been referencing in May of 2011.  Do you,

4   do you see any indication in that photo of the Abu Salim

5   Martyrs Brigade or terrorist --

6   A.   Yeah, I would assume that individual is not a part of the

7   Abu Salim Martyrs Brigade --

8   Q.   Okay.

9   A.   -- both because of his age and a few other reasons.

10            MR. SMITH:  Can you go to No. 4, please, Defense

11  Exhibit 4?

12            THE COURT:  Any objection to 4?

13            MR. KROMBERG:  No.

14            THE COURT:  All right, it's in.

15            (Defendant's Exhibit No. 4 was received in evidence.)

16  BY MR. SMITH:

17  Q.   Any indication here?

18  A.   No indication one way or the other.

19  Q.   Would you call -- now, would you call documentary evidence

20  like this a primary source?

21  A.   Yes.

22            MR. SMITH:  Okay.  Can you go to Defense Exhibit 6,

23  please?

24            THE COURT:  Any objection?

25            MR. KROMBERG:  No objection.

1            THE COURT:  All right, it's in.

2            (Defendant's Exhibit No. 6 was received in evidence.)

3            MR. SMITH:  Can you rotate it?

4    Q.   Any evidence here?

5    A.   That they're part of the Abu Salim Martyrs Brigade?

6    Q.   On the beach.

7    A.   Yeah, there is not evidence here that says that they are.

8            THE COURT REPORTER:  Please repeat that.

9            THE WITNESS:  Sure.  My answer to him was that yes,

10   there's not evidence there that the individuals in this picture

11   are a part of the Abu Salim Martyrs Brigade.

12   BY MR. SMITH:

13   Q.   Thanks.  So you've, you've testified today about these

14   eight case studies that establish the connection between Nazism

15   and -- neo-Nazism and militant Islam.  Would you say that your

16   analysis of those case studies would depend on how seriously

17   the subject matter of the case study took his views of Nazism?

18   A.   I don't understand what you mean by that my analysis of

19   them would depend upon them.

20   Q.   So, so your testimony today about the connection between

21   militant Islam and white supremacism is in part based on your

22   case study of eight individuals?

23   A.   Correct.

24   Q.   And these eight individuals exemplify how a person might

25   have an affinity for white supremacism and militant Islam,

1  correct?

2  A.   Yes.

3  Q.   So would it affect your analysis of those eight

4  individuals if one of the individuals did not take Nazism

5  seriously, but, rather, thought of it as a gag, a joke?

6  A.   If one of them thought of it as a gag, would it affect

7  my --

8  Q.   Do you see some distinction between a political interest

9  in Nazism and sort of, for example, an interest in World War II

10  reenactment?

11  A.   Yes, there is a difference between the two.

12  Q.   What's the difference?

13  A.   On the one hand, someone who has a political interest

14  ascribes to the ideology.  Someone who is a reenactor doesn't

15  necessarily ascribe to the ideology.  They may.

16  Q.   So would you say that in the eight case studies upon which

17  your opinion is based, were those individuals politically

18  interested in Nazism and white supremacism?

19  A.   Yes.

20  Q.   They were not reenactors, correct?

21  A.   They were not -- none of them were solely reenactors.

22  Q.   Solely.  Were any of them World War II reenactors?

23  A.   I don't have information on that.  It's not impossible

24  that one would be.

25  Q.   It's not impossible?

1   A.   But I have no information indicating that they would.

2   Q.   No information upon which you based your report?

3   A.   Correct.

4   Q.   Okay.  So you're testifying that it would affect your

5   analysis of these eight individuals if, for example, it turned

6   out that one of those individuals did not politically support

7   Nazism but, rather, dressed up on the weekends as a Nazi

8   reenactor?

9   A.   Would it change my view if one of them only dressed up as

10  a Nazi on the weekends and didn't support it?  If there was no

11  support at all for that ideology, yes, but it depends on kind

12  of at what point in time we're looking at that.

13  Q.   Okay.

14  A.   It's possible -- so yes, it would, it would affect the way

15  you would view that case.

16  Q.   Okay.  So before you performed your, your cultural

17  significance test on Mr. -- the items seized from Mr. Young's

18  house, did the government inform you that nearly all of these

19  objects were dumped in a closet in his home?

20          MR. KROMBERG:  Objection, Judge.  There is no

21  evidence that that is true in the first place.

22          THE COURT:  Sustained.  Sustained.

23  BY MR. SMITH:

24  Q.   Now, you've testified about Salafism.  That was one of the

25  first areas of inquiry that you addressed.

1    A.    "Salafism."

2    Q.    "Salafism."  Did you testify there are several different

3    kinds of Salafism?

4    A.    Yes.

5    Q.    What were the kinds again?

6    A.    So I only named Salafi jihadism, but in addition to Salafi

7    jihadism, two others I would name are, number one, political

8    Salafism, where one tries to bring about more of an

9    incorporation of Islamic law into the law of the state through

10   political means.

11          A second one I would point to is Salafi quietism,

12   which eschews involvement in the political system.  But there

13   are a number of kinds of Salafism.  Those are three strains

14   that academics tend to look to.

15   Q.    You've testified today about one of the objects you

16   examined for the cultural significance test was a flag.

17   A.    Yes.

18   Q.    A nation state flag that was on the ground, correct?

19   A.    Correct.

20   Q.    Which flag was that?

21   A.    Are you talking about the Reichskriegsflagge?

22   Q.    There was a flag -- you testified about a picture of a

23   flag that was allegedly used as a doormat in front of the

24   defendant's --

25   A.    I actually did not.

1            MR. KROMBERG:  That did not occur.

2            THE WITNESS:  I did not testify about that, sir.

3            THE COURT:  Different witness.  It's been a long day.

4   It came in through a different witness.  It came in with one of

5   the roommates.

6   BY MR. SMITH:

7   Q.   You testified about --

8            THE COURT:  Why don't you show him the picture?  Do

9   you want him to look at the picture?

10           MR. SMITH:  No, I don't want to show him the picture

11  if he hasn't testified about the subject area.

12           THE COURT:  All right.

13  BY MR. SMITH:

14  Q.   So during the course of your testimony, you looked at the

15  various objects you were tasked with assessing the cultural

16  significance of on the computer screen in front of you,

17  correct?

18  A.   Yes.

19  Q.   And when those were first provided to you, the government

20  did not tell you how the defendant interacted with those items,

21  correct?

22  A.   Correct.

23  Q.   So it was not a basis of your testimony -- in formulating

24  your opinion about the cultural significance of the items

25  seized from the defendant's home, you did not know anything

1   about how the defendant used those items?

2   A.   Well, I would disagree with the word "anything," but that

3   wasn't the focus of the testimony.  The focus of the testimony

4   and the focus of the assessment was not on passing judgment

5   upon the defendant.  It was simply looking at the items and

6   giving an assessment of what the items meant.

7   Q.   Right.  So your testimony would be different, for example,

8   about the application of your ISIS-Nazi connection in this case

9   if you learned, for example, that these items were rarely used

10  by the defendant that you testified about?

11  A.   No, that's not correct.  So you're mixing up two different

12  things.

13  Q.   What am I mixing up?

14  A.   On the one hand, I would absolutely say that Nazism can be

15  a funnel into militant Islamism, into jihadism.  What your

16  question is is would that affect the application if, for

17  example, someone were --

18       THE COURT:  Mr. Smith, I don't know if you can hear

19  it or not.  When you do that --

20       MR. SMITH:  You're right, Your Honor; I apologize.

21       THE WITNESS:  And so your question is about the

22  application.  You know, yes, if an individual were not a Nazi,

23  if they were solely a reenactor, for example, the

24  application -- there would be a different application.  It

25  wouldn't fit that framework.

1           But as to the framework itself, that Nazism can be a

2    funnel into militant Islamism, into jihadism, that wouldn't

3    change; that is, only the potential application might change.

4    BY MR. SMITH:

5    Q.    I see.  So you're relying primarily on primary sources,

6    maybe not in connection with Abu Salim Martyrs Brigade, but

7    aspirationally you rely on primary sources.  Do you recall the

8    primary sources you've used in your testimony about the Abu

9    Musab portion of the -- of your testimony?

10   A.    The Abu Musab portion?

11   Q.    Yes.

12   A.    For Abu Musab, it wasn't a primary source portion.  What I

13   was looking at was what does Abu Musab mean to people who've

14   looked at that photograph.

15   Q.    I see.

16   A.    And so I looked at multiple, probably about 12 different

17   people who were interpreting the photo, all of whom believe him

18   to be a jihadist.  The reason why I said that I'm not sure if

19   Abu Musab is associated with Nusra or ISIS is precisely the

20   lack of the underlying primary source.  What I can say, though,

21   is that by everyone, including ISIS, in a primary source, there

22   is one primary source there, which was an ISIS propaganda piece

23   which lists a number of individuals by their nationality, and

24   it lists Abu Musab as a Chechen, as Shishani.

25   Q.    I'm more curious about the way you use blog sources.  So

1   you use a couple of blogs to support --

2   A.    Correct.

3   Q.    -- your testimony about Abu Musab, correct?

4   A.    To support the testimony that he is seen by all observers

5   as a jihadist.

6   Q.    Some of these blogs are in, are in Cyrillic, right?

7   A.    Yes.

8   Q.    Do you read Cyrillic?

9   A.    No.

10  Q.    Do you have a copy of your report in front of you?

11  A.    Yes.

12  Q.    Can you turn to the Abu Musab portion, please?

13  A.    Could you give me the page, sir?

14  Q.    Yes.  It's -- I'm looking at the November 17 copy, and I'm

15  looking at page 90, footnote 387.

16  A.    Yes.

17  Q.    Do you see footnote 387?

18  A.    Yes.

19  Q.    So that, that appears to be a blog that you're using to

20  support some of your testimony, but do you see the initial

21  title of the blog is quoted -- is Cyrillic writing?  Do you see

22  that?

23  A.    Right.

24  Q.    Do you know whether that's Russian or Ukrainian?

25  A.    Not off the top of my head, but --

1   Q.   Can you tell -- wait, sir.  Can you tell me how you

2   reviewed the blog?

3   A.   Through -- what I did was a Google image search to see

4   everybody who was looking at it.  Then I used a translation

5   service for that.  The translation service indicated that they

6   saw him as a jihadist as well.

7           The -- none of the purpose of reviewing this was to

8   get at the truth of the matter as to who he is, but to see how

9   he is perceived by everyone who looked at that photograph, and

10  I gave a comprehensive review of people who talked about the

11  photograph.  I included the Cyrillic sources for the purpose of

12  completeness.

13  Q.   You said you had these, you had these blog posts

14  translated by what, now?

15  A.   Google Translator.

16  Q.   Google Translator.  Did you, did you indicate that in your

17  report?

18  A.   No.

19  Q.   Why not?

20  A.   I mean, I'm not sure there was a need to, but --

21  Q.   Okay.

22  A.   -- I mean --

23  Q.   How many times did you use blogs in formulating your

24  testimony?

25  A.   I think only for that section.  That particular section

1    rested on looking at who do people think that Abu Musab is, so

2    I looked as comprehensively as I could about people who were

3    commenting on that particular photograph.

4    Q.   Some of your testimony on the Nazism side of the

5    equation --

6              THE COURT:  Ah, get away from that microphone.

7              MR. SMITH:  All right.

8    Q.   Some of your testimony on the Nazism piece of this theory

9    is, is predicated on a book called *The Rise and Fall of the*

10   *Third Reich*, correct?

11   A.   Yes.

12   Q.   Is that a primary source?

13   A.   No.  It's a history.

14   Q.   It's a history.  Is it an academic history?

15   A.   It's a history written by a nonacademic that was taught in

16   academia and just had a 50th anniversary edition published.

17   Q.   You called it one of the definitive histories of Nazism,

18   correct?

19   A.   Absolutely.

20   Q.   That's not right, right?

21   A.   No, it's correct.

22   Q.   Okay.

23   A.   It sold over a million copies.  The Smithsonian in their

24   public -- in their magazine had an article commemorating the

25   50th anniversary.  It's not, you know, necessarily the perfect

1    source out there, but it certainly is seen as definitive in

2    terms of defining the way a generation of Americans understood

3    Nazi Germany.

4              MR. SMITH:  Thank you.

5              That's all our questions, Your Honor.

6              THE COURT:  All right.  Any redirect?

7              MR. KROMBERG:  Judge, before we do, I'd like to

8    approach.

9              THE COURT:  All right.

10             (Bench conference on the record.)

11             THE COURT:  I'm watching the juror.  He's awake.

12             MR. KROMBERG:  Judge, in the cross-examination,

13   Mr. Smith made a point that Mr. Young was just a reenactor or

14   suggested that he was just a reenactor and wouldn't it make a

15   difference to the analysis if he was just a reenactor.

16             Well, we have seven photographs of Mr. Young in his

17   Nazi uniform, none of which have anything to do with

18   reenactments.

19             MR. SMITH:  We dispute that.

20             MR. KROMBERG:  And Your Honor has not allowed any of

21   the photographs of him in a Nazi uniform in today.  I'm

22   guessing that Your Honor thought we had done some yesterday,

23   but you have not, so I would like to move those in today to

24   show that he, A, he's in a Nazi uniform, and B, it has nothing

25   to do with reenactments.

1          THE COURT:  We have no context, Mr. Kromberg, in

2    understanding that.  He might have dressed like that before he

3    went off to the reenactment.

4          MR. KROMBERG:  Judge, the guy has a flower in his

5    lapel, and they're somewhere, they're drinking and they're in

6    dress uniforms.  You don't go to a reenactment in your dress

7    uniform.

8          THE COURT:  I'm sorry, I'm going to sustain the

9    objection.

10          MR. KROMBERG:  Not one picture of him in a Nazi

11   uniform?

12          THE COURT:  Not one picture.  Thank you.

13          (End of bench conference.)

14          MR. KROMBERG:  Nothing further, Judge.

15          THE COURT:  No redirect?  All right.  Well, then

16   thank you for your testimony, sir.

17          I assume nobody's going to call the professor again?

18          MR. KROMBERG:  Not from the government.

19          THE COURT:  How about from the defense?

20          MR. SMITH:  No, Your Honor.

21          THE COURT:  All right.  Then, sir, you're excused.

22   You may stay in court and watch the proceedings or leave, but

23   don't discuss your testimony or anything you see or hear in

24   court until the case is over.  Thank you.

25                         (Witness excused.)

Caslen - Direct                                                      994

1          THE COURT:  All right, your next witness?

2          MR. KROMBERG:  Special Agent Caslen.

3     SA NICHOLAS ANGELO CASLEN, GOVERNMENT'S WITNESS, AFFIRMED

4                      DIRECT EXAMINATION

5     BY MR. KROMBERG:

6     Q.   Good afternoon, Special Agent Caslen.

7     A.   Good afternoon, Gordon.

8     Q.   Please state your full name and spell your last name for

9     the record.

10    A.   Nicholas Angelo Caslen.  Last name is Caslen, C-a-s-l-e-n.

11    Q.   And even though you were sitting here all this time and

12    hearing that the witnesses had to speak up, you probably don't

13    recognize that you still need to speak up even more.

14    A.   Noted.

15    Q.   Okay.  Have you been the case agent, the lead investigator

16    in this case for -- since 2015?

17    A.   Since October of 2015, when I transferred to the

18    Washington Field Office, I was assigned this case amongst

19    others.

20    Q.   I'd like you to take a look at Government Exhibit 3-100,

21    which is in evidence.

22          And can we get a close-up on the bumper stickers,

23    please?

24          Agent Caslen, do you recall the bumper stickers on

25    the back of the truck?

Caslen - Direct                                                         995

1    A.    I do.

2    Q.    What are they?

3    A.    So the one on the right-hand side says "Boycott the

4    Terrorist State of Israel."  The one in the middle is similar

5    to another exhibit that we saw earlier that states "Libyan

6    Civil War Vet, Siege of Misrata, April-May 2011"; and the one

7    on the left states "Save our Troops.  Let Israel Fight Its Own

8    Wars."

9    Q.    Okay.  Let's go to 4-101, which is also in evidence.  That

10   was a truck registration that we have a stipulation was found

11   on the defendant's -- in the defendant's bag when he was

12   arrested?

13   A.    Correct.

14   Q.    And who was owner of that truck according to that

15   registration?

16   A.    Nicholas Young.

17   Q.    Okay.  Let's go to 4-105.  Nicholas Young's driver's

18   license, we have a stipulation that that was found upon --

19   seized upon his arrest.  What was his address?  Can you see

20   that?

21   A.    I can.  It is 12737 Heron Ridge Drive, in Fairfax County,

22   Virginia 22030.

23   Q.    I'd like you to turn to 4-104, which is in evidence.  That

24   was a document seized at the time of the arrest.

25             Can we get to the -- so that's the roti falafel

1   document that has the "Essa Kobayashi" on that side?

2   A.    Correct.

3            MR. KROMBERG:   Can you get to the back side,

4   Mr. Vera?  Can you blow that up?

5   Q.    Did you see anything of significance on the back side of

6   that document?

7   A.    I did.

8   Q.    What was that?

9   A.    At the bottom here, it says "Omar Said Al Britani."

10  Q.    Who is Omar Saeed al-Britani?

11  A.    So I researched online who Omar Saeed al-Britani is, and

12  it was a kunya, which is also known as a name an individual

13  might adopt when they go overseas to fight, of an individual

14  from Britain, hence the name Al Britani.

15  Q.    Okay.

16  A.    And he was chastised -- he had joined ISIS and was

17  chastised by ISIS for pushing recruits to Libya rather than

18  pushing them to Syria or Iraq.

19  Q.    Okay.  Take a look, if you would, at Government Exhibit

20  3-104, which was found in the truck, that's already in

21  evidence.  And if you can compare that, please, to Government

22  Exhibit 1-106, which is an e-mail that came from 1&1 Mail &

23  Media records?  And I'd ask you, how does the message in

24  Government Exhibit 3-104 from the truck compare to the e-mail

25  message that you've seen?

Caslen - Direct                                                    997

1   A.   If I could get this one zoomed in on, please?

2            So this is the content of the body of an e-mail that

3   was sent --

4            MR. SMITH:  Objection, Your Honor.  We can't really

5   see what that message says.  Is there a clearer version?

6            THE COURT:  Well, you have a paper set, don't you?

7            MR. SMITH:  Your Honor, this is just -- the version

8   we have was produced in the same format here, but we can't read

9   this on the screen.

10           THE COURT:  All right, this is -- these are hard to

11  read.  This is 3-104?  Is this 101 -- which one is this?

12  Mr. Kromberg, the one on the screen, is that 104 or 106?

13           MR. KROMBERG:  104.

14           THE COURT:  All right, 3-104.  Let me see what it

15  looks like in my book.

16           MR. KROMBERG:  Could we ask the court security

17  officer to pull the original document, 3-104?

18           THE COURT:  Yeah, for the witness.

19           THE COURT SECURITY OFFICER:  Not in here.

20           THE COURT:  Well, the one that's in my book is worse

21  than that one that's on the screen, so you have to do better

22  than that.

23  BY MR. KROMBERG:

24  Q.   Anyway, can you answer -- can you -- are you able to make

25  it out, Agent Caslen?

Caslen - Direct                                                      998

1   A.   I can make it out.

2   Q.   Okay.  What is the relationship between that piece of

3   paper that had been found in the truck with Government Exhibit

4   1-106, which was the e-mail from 1&1 Mail & Media?

5   A.   So this is the -- what you're seeing here in this exhibit

6   is the body of an e-mail that -- and if I could see the other

7   exhibit, I believe it's --

8                MR. SMITH:  Objection.

9                MR. KROMBERG:  Government Exhibit 1-106 is --

10               MR. SMITH:  That's not --

11               THE COURT:  Wait a minute.  He's talking.  Just a

12   minute.

13               MR. KROMBERG:  I've been handed, Judge, what I hope

14   is the actual exhibit.

15               THE COURT:  Show it first to defense counsel.

16               MR. SMITH:  This is not the same thing on the screen.

17               MR. KROMBERG:  It's a band.  You have to open it.

18   Can I --

19               THE COURT:  Do you need scissors?

20               MR. KROMBERG:  I don't know.

21               THE COURT:  I don't know if I should send scissors

22   over there.

23               MR. SMITH:  Your Honor, this isn't the same thing

24   that's on the screen.

25               THE COURT:  Mr. Kromberg, is it or isn't it?

1           MR. KROMBERG:  It is not the same thing that is on

2    the screen.

3           THE COURT:  All right, let's move on to something

4    else, please.  It's too late in the day to be doing this.

5           MR. SMITH:  Your Honor, I think we should inquire why

6    the document that was just on the screen --

7           THE COURT:  Relax.  Don't ask for any more evidence,

8    Mr. Smith.  Come on.

9    BY MR. KROMBERG:

10   Q.   Okay.  Please take a look at Government Exhibit 4-108,

11   which is in evidence.  4-108.

12           Okay.  What, what is that?

13   A.   This is a Verizon prepaid card found in the defendant's

14   backpack on the day of his arrest.

15   Q.   And what is that -- what was the significance of that card

16   to you?  What did you understand it to be?

17   A.   The defendant had had two cellular phones that he used to

18   communicate on the Threema app.  We never found the second

19   phone that had the tilde L account number on it that sent the

20   codes to the undercover agent who was receiving them.  So it

21   was my assumption that this was a card that may have been used

22   to register a second cell phone.

23   Q.   Well, why would that card not have been used for the, for

24   the phone that -- the phones that the government did find?

25   A.   The phone that the government did find was an AT&T prepaid

Caslen - Direct                                                      1000

1    cell phone, not a Verizon cell phone.

2    Q.   And what about Mr. Young's personal phone?

3    A.   That was not a prepaid phone.

4    Q.   Okay.  Now, let's take a look at 3-105, which is in

5    evidence from the truck.  Do you see that?

6    A.   I do.

7              MR. SMITH:  Your Honor, we can't see this.

8    Objection.

9              THE COURT:  Do you have a cleaner copy?

10             MR. SMITH:  Just generally, the government -- we

11   object on any non- -- the government using these images when

12   they have the actual documents themselves.

13             MR. KROMBERG:  So we're going to pass up 3-104 and

14   3-105, the actual documents seized from the truck, not the

15   pictures.

16             MR. SMITH:  So this is the first document that was

17   blurry?  Is that --

18             MR. KROMBERG:  That is correct.

19             MR. SMITH:  It's not blurry in this document.

20             MR. KROMBERG:  No, it is not.

21             THE COURT:  Don't complain then.  Let's put it in --

22   let's get that -- that should have the correct sticker on it,

23   though.  That should be our 3-104.

24             MR. KROMBERG:  That is correct, Judge.

25             THE COURT:  All right.

1          MR. SMITH:  Your Honor, we can't stipulate to the

2    authenticity of this document.

3          MR. KROMBERG:  You already did.

4          THE COURT:  Oh, we'll have this fight outside the

5    presence --

6          MR. SMITH:  Your Honor, we were only -- we were only

7    given an electronic version of this document.  If Your Honor

8    compares this document to the one on the screen, it's not the

9    same.

10         THE COURT:  All right, let's go.  Hand it up here.

11         (Bench conference on the record.)

12         THE COURT:  I began reading it.  This "Salaam alaykum

13   brother" is the first three words of the one on the screen.

14   This looks to be the same.  I'm not going to sit here and do a

15   word-by-word parse of it.  This looks to be exactly the same.

16   We had one of these messages before.  It talks about the

17   brother in Canada.

18         MR. KROMBERG:  Right.  And so the significance of

19   this, Judge, is that it was found in, in either -- it was found

20   in the truck, and since it was the message with a header cut

21   off, that's proof that Mr. Young was the person who was sending

22   that message, because the body of the message was found in his

23   truck.

24         THE COURT:  So this physical item, this is the actual

25   item that was found in the truck?

1          MR. KROMBERG:  Right.  And that's what the parties

2    stipulated was found in the truck.

3          MR. SMITH:  No, Your Honor.  We were never provided

4    the physical copy, Your Honor.

5          THE COURT:  Well, are you disputing that this was

6    found in the truck?

7          MR. SMITH:  We don't -- we've never seen that

8    document.

9          THE COURT:  You see it now.  Are you disputing it?

10          MR. SMITH:  How can I know without speaking to my

11    client?

12          THE COURT:  You have to lay a foundation.

13          MR. KROMBERG:  So first of all, Judge, we have

14    provided access to all seized exhibits in August of 2016, and

15    they were all available all that time, and we sent a copy of

16    that electronically, saying, "Would you stipulate to it?"

17          And they said, "Yes," and they signed the

18    stipulation.

19          That's all we can do with any case.  We made it

20    available in original form, and then we sent a copy of it and

21    asked for the stipulation.

22          THE COURT:  It's been stipulated to.  It's in.

23          MR. KROMBERG:  Thank you.

24          (End of bench conference.)

25          THE COURT:  All right, Mr. Van Roekel, if you'll pick

Caslen - Direct                                                          1003

1    up that item and put that in the sleeve for Exhibit 3-104?  So

2    that is the official document.  And then you can show it to the

3    witness so he can read it.

4              All right.  So then you can give him the original,

5    yeah.  Just make sure it gets in the right jacket.

6    BY MR. KROMBERG:

7    Q.   Now, Special Agent Caslen, can you compare 3-104 found in

8    the seized truck to the e-mail message from 1&1 Mail & Media

9    that's already in evidence, Government Exhibit 1-106, from

10   January 29, 2015?

11   A.   So the exhibit in my hand --

12   Q.   Call it by its number.

13   A.   Exhibit 3-104, 3-104 was a piece of paper found in the

14   defendant's center console of his truck the day we searched his

15   vehicle, which I was present for, and it is the body of this

16   e-mail that was sent to the defendant by the, we'll call him

17   the fake Mo or the notional Mo, who was the FBI undercover

18   agent, on January 29.  However, this page that we found in the

19   defendant's center console of his truck had the header

20   information cut off of it, and it was just the body of the

21   e-mail.

22   Q.   Okay.  Now, I'd like to hand you the original of

23   Government Exhibit 3-105, which has been admitted into evidence

24   as having been seized from the truck, and I ask you how does

25   that message seized from the truck compare to other messages

1    you have seen?

2    A.    So this is another -- Exhibit 3-105 was also found in the

3    same center console of the defendant's pickup truck the day we

4    searched his vehicle, and it is an e-mail from an individual

5    named -- or an individual named Mohamed, and I don't know how

6    to pronounce the last name, so I'll spell it:  A-l-m-n-s-o-r-y,

7    with the e-mail address mohamed_2060@yahoo.com to an e-mail

8    account, freedomforlibya777@yahoo.com, dated Saturday, 11 June

9    2011, and in the body of the e-mail, it's addressed to "Dear

10   Malik," and "Malik" is an alias we know the defendant to have

11   used in Libya.

12   Q.    Well, let's stop there for just a moment.  So could you

13   compare that to Government Exhibit 1-401 that has been -- that

14   was admitted earlier this afternoon?  We did not publish it,

15   but we talked about it was the basis of a stipulation that it

16   was going to be admitted and we were going to publish it when

17   we got to you.

18           So, Mr. Vera, could you publish Government Exhibit

19   1-401?

20           MR. SMITH:  One moment, please.

21           1 dash what?

22           MR. KROMBERG:  1-401.

23           THE COURT:  If it's in evidence, you can publish it.

24   BY MR. KROMBERG:

25   Q.    So, Special Agent Caslen, what's the relationship between

1  the message -- the document found in the center console of the

2  truck to the document obtained from the Internet service

3  provider?

4  A.   They were the same message.

5  Q.   Okay.  Now, the document found in the truck has

6  handwriting on it, correct?

7  A.   Yes, it does.

8  Q.   And what --

9       MR. SMITH:  Objection.  Which document?

10 BY MR. KROMBERG:

11 Q.   The document seized from the truck, Government Exhibit

12 3-105, has handwriting on it, correct?

13 A.   It does.

14 Q.   And what is handwritten on Government Exhibit 3-105, the

15 document seized from the truck?

16 A.   On the first page, it is -- right here, it says "Malik the

17 American."  Down here says "4/20/89."

18      THE COURT:  Agent, what you can do is you can take

19 your finger -- you should be able to take a finger on that

20 screen and circle what you're talking about so the jury can see

21 it.

22      THE WITNESS:  Yes, Your Honor.  Right here --

23      THE COURT:  Not working?

24 BY MR. KROMBERG:

25 Q.   Okay.  So that's the "Malik the American" that's

Caslen - Direct                                                1006

1    handwritten, and is there something else handwritten on there?

2    A.   There is.  Just a little bit lower and to the left is the

3    date "4/20/89."

4    Q.   Okay.  Now, what is Government Exhibit 1-200, which is

5    already in evidence?

6    A.   This was subscriber information we obtained for the

7    defendant's e-mail account, Essa Kobayashi.

8    Q.   The one that was set up at the FedEx store on October 25,

9    2014?

10   A.   Correct.

11   Q.   Okay.  And what is the birth date of Essa Kobayashi on

12   Government Exhibit 1-200?

13   A.   4/20/1989.

14   Q.   Okay.  Let's look at Government Exhibit 1-300, which I

15   believe is in evidence, and what is Government Exhibit 1-300?

16   A.   Government Exhibit 1-300 is subscriber information for an

17   e-mail account, MALIKtheAmerican@mail.com.

18   Q.   And what is the birth date for the individual who

19   registered MALIKtheAmerican?

20   A.   4/20/1989.

21            MR. SMITH:  Objection to the characterization of that

22   as the birth date of the subscriber.  I believe it's the

23   password but not necessarily --

24            THE COURT:  You need to be on your feet in this

25   court.

1          MR. SMITH:  I apologize, Your Honor.  We object to

2     the characterization of this statement as the birth date of the

3     subscriber rather than the password for this subscriber.

4          MR. KROMBERG:  Your Honor, if that's -- to solve that

5     problem, we can go back and play Government Exhibit 6-109-5, in

6     which Mr. Young -- which the jury already heard, where

7     Mr. Young said he was going to use Hitler's birthday, 4/29/89,

8     as the birth date for the account.

9          THE COURT:  It says "Date of birth" on it.  I mean,

10    that's not a solid objection.  I'm overruling it.

11    BY MR. KROMBERG:

12    Q.   What is the significance of 4/20/89?

13    A.   April 20 was the birth date.  I'm unsure of the exact

14    year.

15         THE COURT:  Well, it wasn't 1989, I'm sure.

16         THE WITNESS:  That's correct, Your Honor.

17    BY MR. KROMBERG:

18    Q.   Okay.  Now, looking at Government Exhibit 1-300, how do

19    the login IP addresses from Government Exhibit 1-300, the

20    MALIKtheAmerican subscriber information, compare with the IP

21    addresses from the Essa Kobayashi records?

22    A.   All the IP addresses result back to the same FedEx

23    company, similar to the testimony of the undercover agent who

24    was handling the e-mail account V4Vendetta.

25    Q.   Now, I want to look at the dates on that subscriber

Caslen - Direct                                                    1008

1   information for the MALIKtheAmerican account, 1-300, and how

2   they compare with the dates of Mr. Young's correspondence with

3   Mo about his colleagues from Libya.  So first I'd like to get

4   you to look at 1-211, which is in evidence, which is, I

5   believe, from June 13, 2015, in which Essa Kobayashi said, "I'm

6   going to try to get ahold of him this week."

7           And then if you'd look at 1-301, and what was the

8   date of the e-mail on 1-301?

9   A.   The date on this e-mail was June 15, 2015.

10  Q.   Okay.  And could we -- can you, can you read 1-301?

11  A.   I brought a copy of it up here.  May I read from here?

12  Q.   If you can't -- if you cannot read it from the screen,

13  then read 1-301 from what you brought up.

14          THE COURT:  Well, you don't want him to read the

15  whole thing.

16          MR. KROMBERG:  Okay.  Thank you, Your Honor.

17  Q.   Can you characterize what the e-mail is of 1-301?

18  A.   I can.  This is an e-mail from MALIKtheAmerican to the

19  same individual, mohamed_2060@yahoo.com, that was -- that an

20  e-mail was from in Government Exhibit 3-105, and in this e-mail

21  dated June 15, 2015, Malik is asking for updates on individuals

22  that he was with in Libya and mentions the second line down,

23  the Shuhada Brigade, also in the second paragraph mentions

24  specific names of individuals that they were with when they

25  were in Libya.

1   Q.   Okay.  So take a look now at Government Exhibit 1-302, and

2   I'd ask you the same question, to characterize 1-302 rather

3   than reading the whole thing.

4   A.   This is an e-mail from MALIKtheAmerican to

5   EMAD_lias@yahoo.com, and I would characterize this as Malik

6   reaching out to this individual to see how things were going.

7   Q.   Now, is it correct that Government Exhibits 1-303 and 305

8   are substantially the same but to different e-mail addresses?

9        Can you bring up 303 and 305?

10  A.   That's correct.  This is a -- two more e-mails from

11  MALIKtheAmerican to additional e-mails, essentially asking the

12  same thing.

13  Q.   Okay.  Now let's turn to Government Exhibit 1-304.  That

14  came from the records of the Internet service provider.  What

15  is that?

16  A.   It appeared to be a message back to MALIKtheAmerican

17  informing the user that e-mail address ifaga79@yahoo.com was

18  not a good address, so the e-mail was returned.

19  Q.   Okay.  Turn to Government Exhibit 1-213, which is in

20  evidence, and is it fair to characterize that as an e-mail from

21  Essa Kobayashi to V4Vendetta on July 1, 2015, stating:  I tried

22  reaching out to them but have not received a reply?

23  A.   Yes.

24  Q.   How about Government Exhibit 1-215, also previously in

25  evidence?  Is that from September 7, 2015?

1   A.   It is.

2   Q.   And it said, "still haven't heard from those brothers."

3   A.   That is correct.

4   Q.   Okay.  So go to --

5            MR. SMITH:  Your Honor, I object.  The government is

6   not giving the parties enough time to review these e-mails in

7   establishing these points.  The government -- Mr. Kromberg is

8   asking Agent Caslen to summarize these reports within a matter

9   of seconds before they can be reviewed.

10           THE COURT:  In this court, known as the Rocket

11  Docket, speed is never a problem.  So overruled.

12           MR. SMITH:  I object.

13  BY MR. KROMBERG:

14  Q.   Special Agent Caslen, did you compile a timeline in this

15  case?

16  A.   I did.

17  Q.   Okay.  Can you take a look at Government Exhibit 16-000?

18  And I -- do you have it with you by any chance?

19  A.   I brought a copy of mine up here.

20  Q.   There you go.

21           THE COURT:  That's been shared with defense counsel?

22           MR. KROMBERG:  It has.

23           MR. SMITH:  It has, but we object to it as

24  inadmissible evidence.  It was created as a timeline for this

25  case by the summary agent.  This kind of evidence is not

Caslen - Direct                                                        1011

1    normally admitted.

2              THE COURT:  Well, in this court, it is, as long as

3    it's accurate.  So overruled.

4              MR. KROMBERG:  Judge, I will say, let me just state

5    for the record that it's not a work that's final because it has

6    not incorporated the things that happened up to this moment.

7    It was final as of last night, but we didn't include the

8    evidence that hadn't been -- excuse me, we may have included

9    evidence that we thought was going to be admitted but hasn't

10   been admitted, so we have to tailor it before it can be

11   admitted to make sure that it's not referring to anything that

12   we thought would be admitted but wasn't admitted.

13             THE COURT:  All right.

14             MR. SMITH:  Your Honor, that doesn't make sense to

15   the defense, and we object to the introduction of this.

16             THE COURT:  Well, it does make sense because there

17   are exhibits that the government obviously had in it where I

18   granted your objection and so they're not in the case, and so

19   we're going to -- summary exhibits are certainly permissible in

20   a complex case where there's a lot of data.  Whether or not the

21   jury is satisfied that it's an accurate summary is going to be

22   an issue for the jury, and they'll get an instruction on that.

23             But since it's not -- it can't go in in the format in

24   which it is currently, you'll need to have the agent talk

25   around --

Caslen - Direct                                                    1012

1          MR. KROMBERG:  Right.

2          THE COURT:  All right.

3          MR. KROMBERG:  Absolutely.

4          THE COURT:  All right.

5    BY MR. KROMBERG:

6    Q.    So you have it in front of you now?

7    A.    Correct.

8    Q.    Okay.  So just to go through it, through some of the

9    points that I hope might be helpful at this moment, so can you

10   talk about the --

11         THE COURT:  Explain first how you went about making

12   this timeline.

13         MR. KROMBERG:  Thank you, Your Honor.

14         THE WITNESS:  Your Honor, I took the proposed

15   government's exhibit list and put them in chronologic order

16   based on the date.  So, for example, if the defendant had a

17   meeting with Khalil, I made a line item for a date where he had

18   a meeting with Khalil.  If a graphic or a nasheed was on the

19   defendant's electronic media, based on the CART report, I would

20   place when that item was on, placed onto the computer or the

21   iPod or whatever electronic media onto there.  Same thing with

22   meetings with Mo.  Same things with e-mails that were sent back

23   and forth between the defendant and Mo and the defendant and

24   individuals in Libya.

25         THE COURT:  Thank you.

Caslen - Direct                                                        1013

1   BY MR. KROMBERG:

2   Q.   When you say the CART reports, the CART reports are not in

3   evidence, but the metadata from the CART reports are, correct?

4   A.   Correct.  They would be the metadata strips at the bottom

5   of all the exhibits that had been entered into evidence.  For

6   example, like, with the graphics, you have the picture.  Then

7   underneath the graphic, you have the metadata.

8   Q.   Now, can you turn to -- I think perhaps the most confusing

9   part is 2011, starting in early 2011 to cover the trip to

10  Libya.  So that's fairly -- on my -- it's page, page 5.  Can

11  you start at 4 --

12            MR. SMITH:  Your Honor, the copy that the government

13  provided to us does not have page numbers.  We're not sure if

14  this is even -- this might explain Mr. Kromberg's explanation

15  for the changing exhibit list.  The copy we were provided

16  doesn't have them.

17            THE COURT:  All right.  Now, hold on a second.  Do I

18  have a copy?

19            MR. KROMBERG:  You have a copy, Judge.

20  Q.   Why don't you turn to 4/6/2011.  "4/6/2011, Young enters

21  Egypt."

22            THE COURT:  This is 16-000?

23            MR. KROMBERG:  Correct.

24            THE COURT:  All right.  And you said page 5?

25            MR. KROMBERG:  My page 5, but it's -- "4/6/2011" is

Caslen - Direct                                                  1014

1    the entry.

2              THE COURT:  The very last one on that page?

3              MR. KROMBERG:  I think that your version may be

4    different than mine, but since I'm going to be talking

5    around --

6              THE COURT:  It's the only one for 4/6.  I see it,

7    okay.

8    BY MR. KROMBERG:

9    Q.   Okay.  So the entry "Young enters Egypt," where did you

10   get the information for "Young enters Egypt"?

11   A.   From a stamp in the defendant's passport.

12   Q.   Okay.  So -- and then "Young enters Libya" on 4/10/2011,

13   where did you get that one?

14   A.   Again, from a stamp in defendant's passport.

15   Q.   And then, "5/17/2011, Young returns to Egypt from Libya,"

16   from the passport?

17   A.   Again, from the passport.

18   Q.   And then he returns to the United States 5/20/2011, from

19   the passport?

20   A.   From the passport as well as Government Exhibit 3-109.

21   Q.   And 3-109 is -- that was the CBP form that -- Customs and

22   Border Protection register form 6059B, May 2011, France, Egypt,

23   Libya, that has been admitted into evidence, correct?

24   A.   Correct.

25   Q.   Okay.  So -- then you have, "Special Agent Gervino

1    interviews Young about his trip to Libya that same day"?

2    A.    That is correct.

3            MR. KROMBERG:  Okay.  So, Judge, we're not going to

4    go through the timeline.  I just wanted to go through that part

5    of it so that the jury understands what this timeline is, and

6    we will get a version of the timeline revised to comport with

7    the evidence that has been admitted and not reflect evidence

8    that has not been admitted.

9            THE COURT:  All right.

10           MR. SMITH:  Your Honor, the defense wants to request

11   that we get this up, the final version, in time to

12   cross-examine the, the relevant summary witness.

13           THE COURT:  We'll see.

14           Go ahead, Mr. Kromberg.

15   BY MR. KROMBERG:

16   Q.    Okay.  Can you look, please, at Government Exhibit 6-201,

17   the text message that was sent to Mo's cell phone?  Do you

18   recognize that?

19   A.    I do.

20   Q.    Okay.  Now, look at 6-203, which is the Verizon records.

21   Do you see that?

22   A.    I do.

23   Q.    What does that record reflect regarding the time of the

24   text message?

25   A.    The raw time stamp on the message is November 20, 2014, at

Caslen - Direct                                                    1016

1    23 hours, 1 minute, 22 seconds.

2    Q.   And what does the record reflect regarding the location of

3    the sender's phone?

4    A.   If we could zoom out?

5         The latitude-longitude in this data reflect 39

6    degrees .0388 latitude and -77.5247 degrees longitude.

7    Q.   And where is that?

8    A.   Where it says "SRC_Global_Cell_ID" data.

9    Q.   No, I'm sorry, where is that latitude and longitude?

10   A.   Oh, I apologize.  If you place those coordinates into

11   Google Maps, it drops you right onto the Dulles Greenway,

12   literally right onto a cell phone tower.

13   Q.   Okay.  I'd like you to turn to 1-410, which has been

14   admitted.  That is a declaration of the defendant that it was

15   his -- he was controlling the freedomforlibya e-mail account?

16   A.   That is correct.

17   Q.   Okay.  Did you look through those freedomforlibya e-mail

18   exhibits, Government Exhibits 1-401 through 1-408?

19   A.   I did.

20   Q.   Okay.  Could you take us through what was the sequence of

21   events involving those freedomforlibya e-mails, starting from

22   Government Exhibit 1-401 and the date of that one?

23   A.   I'm sorry, could you repeat the question?

24   Q.   Start with Government Exhibit 1-401, and what was the date

25   of that e-mail on freedomforlibya -- the freedomforlibya e-mail

1   account?

2   A.    Okay.  The date of this first e-mail is June 11, 2011, and

3   this is a, this is a scene from a copy that the service

4   provider gave us, and this is the one that's equivalent to

5   Government Exhibit 3-105 that was found in defendant's pickup

6   truck, and this is an e-mail to the defendant from Mohamed

7   using mohamed_2060@yahoo.com.  This is a different Mohamed

8   other than the, the one that testified earlier.

9   Q.    Right.

10  A.    And this is an e-mail where Mohamed is asking the

11  defendant, using the name Malik, for different pieces of night

12  vision rifle scopes, specifically --

13            MR. SMITH:  Objection.  Hearsay.

14            THE COURT:  Look, is it being offered for the truth

15  of its contents or just to explain the types of communications

16  that are going on with the defendant?  What are you offering it

17  for?

18            MR. KROMBERG:  It's not offered for the truth that

19  Malik -- excuse me, that Mohamed wanted rifle scopes.  It's

20  we're going to set the stage for what the defendant did in

21  response to what he perceived to be a request for rifle scopes.

22            THE COURT:  All right, I'm going to overrule the

23  objection.  But again, this Mohamed is not Mo?

24            THE WITNESS:  No, Your Honor.

25            THE COURT:  All right.

Caslen - Direct                                                    1018

1  BY MR. KROMBERG:

2  Q.   So on Government Exhibit 1-401 -- in fact, let's -- would

3  it be easier to go to 1-4- -- do we have a summary of all these

4  that are laid out in a more clear form?

5           MR. SMITH:  Objection.  Best evidence.

6           MR. KROMBERG:  Okay.

7           THE COURT:  Just take him through the exhibits.

8           MR. KROMBERG:  Okay.  Although the defense did

9  stipulate that Government Exhibit 1-408 was a cleaned-up

10 version of it all?

11          THE COURT:  Mr. Kromberg, just --

12          MR. KROMBERG:  But we'll just go through it.

13 Q.   Okay.  1-401, you're looking at it.  And what Mohamed --

14 let's call him mohamed_2060, okay?  Okay.  He's asking for

15 equipment, correct?

16 A.   Correct.

17          MR. SMITH:  Objection.  Leading.

18          THE COURT:  Sustained.

19 BY MR. KROMBERG:

20 Q.   Okay.  Let's look at Government Exhibit 1-402.  What's

21 that one?

22 A.   So this is an e-mail from mohamed_2060 back to

23 freedomforlibya777, which is the defendant, on June 13, just a

24 few days later, stating that he needs two of each type.

25 Q.   Okay.  And go to Government Exhibit 1-403.

1   A.   So this is an e-mail from the defendant using the

2   freedomforlibya777@yahoo account back to mohamed_2060 on June

3   15, that states that he needs to check export regulations and

4   see what they say, and if it's okay, that he would purchase

5   $1,500 worth.

6   Q.   And go to Government Exhibit 1-404.  What's that one?

7   A.   This was an e-mail from mohamed_2060 to the defendant on

8   the defendant's freedomforlibya777@yahoo.com account, with a

9   subject line only.

10  Q.   405?  1-405, excuse me.

11  A.   So this is an e-mail from the defendant back to

12  mohamed_2060 on July 22, stating -- telling mohamed_2060 that

13  he hasn't been able to buy anything because his old roommate,

14  who he refers to as a freaking Sufi, owed him money, but he's

15  been avoiding him for the last couple months.

16  Q.   Were you here in court earlier, I think it was today, when

17  the former roommate, the Sufi, Brian Menzies, testified?

18  A.   I was.

19  Q.   Okay.  Now, 406, 1-406?

20  A.   So this is an e-mail from the defendant using his

21  freedomforlibya777@yahoo.com account back to mohamed_2060,

22  asking for contact information for some of the brothers in

23  Misrata, which is a city in Libya.  He, he told mohamed_2060

24  that he's not going to be able to send him the stuff that he

25  asked for because it was illegal to send and it would be seized

1   by U.S. Customs, and he stated that he hadn't gotten paid back

2   the money from his roommate; however -- or, excuse me, but he

3   was able to borrow money from a family member.

4           And so if there was something that he could purchase

5   for mohamed_2060 in Egypt, he would bring it, or he stated he

6   would just bring him the cash.

7           Then he proceeded to give mohamed_2060 a new phone

8   number with a 571 area code, asking Mohamed to call him back on

9   that, saying he couldn't talk on his other phone, and that he

10  would be back in two weeks.

11  Q.   Now, how does the date -- take a look at 10-807, which is

12  in evidence, I believe.  If it's not, I'm moving it in because

13  we stipulated that it --

14          MR. SMITH:  Which number was it?

15          MR. KROMBERG:  10-807.

16          THE COURT:  It's not in.

17          MR. KROMBERG:  Okay.  We have a -- we already read

18  the stipulation that said this exhibit was seized during the

19  search of the defendant's residence in August 2016, and we're

20  moving it into evidence.

21          MR. SMITH:  No objection.

22          THE COURT:  All right, it's in.

23          (Government's Exhibit No. 10-807 was received in

24  evidence.)

25          MR. KROMBERG:  Can we publish that to the jury,

Caslen - Direct                                                          1021

1  please?

2             THE COURT:  I'm sorry, is there an objection?

3             MR. SMITH:  Well, we would request the original copy.

4             Your Honor, a lot of these digital versions are,

5  we've noticed this throughout the government's exhibit list,

6  they're zoomed out, and they're blurred where you can't even

7  read them.

8             THE COURT:  Well, you don't get them; they'll be for

9  the jury; but we should have the originals.  There's no reason

10 we don't have them except that they were in these nice

11 envelopes, right?  So for the jury to be able to look at them,

12 they have to open up each envelope, which is one of the reasons

13 why I assume we have these electronic copies.

14            MR. SMITH:  And, Your Honor, just so you know, the

15 defense has e-mailed the government several times asking for

16 higher-quality images that they've sent, and they don't

17 respond, Your Honor.

18            THE COURT:  Well, the point is -- but if you had

19 access to the actual original documents, then the government

20 fulfilled its obligation of giving the defendants access to the

21 information.  Let's not have this discussion now.

22 BY MR. KROMBERG:

23 Q.   Do you have 10-807 in there?

24 A.   I have it.

25 Q.   Okay.  Can you tell us what Government Exhibit 10-807 is?

Caslen - Direct                                                    1022

1   A.   This is a letter from the United States Department of

2   State to the defendant, with the subject line:  "Request to

3   approve the importation of personal protective equipment."

4            MR. SMITH:  Your Honor, hearsay.  What's this being

5   offered for?

6            MR. KROMBERG:  Okay.  One, it shows that Mr. Young

7   was in Libya and brought body armor to Libya and it got seized

8   on the way back; two, that he had just received information

9   from the State Department that body armor was being seized when

10  he wrote to Malik -- when he wrote to mohamed_2060 that I can't

11  send this to you, what you're asking for, because it will be

12  seized.

13           MR. SMITH:  Your Honor, that's offered for its truth

14  in other words.  It's hearsay.

15           THE COURT:  It's an official government document, a

16  communication.  I'm going to overrule the objection.  It's in.

17  BY MR. KROMBERG:

18  Q.   Okay.  So, Special Agent Caslen, what's the -- on the

19  timeline, what, what -- when did the State Department write

20  that letter to Mr. Young talking about the equipment that was

21  seized from him in relation to when he told mohamed_2060 that

22  the equipment that mohamed_2060 requested would be seized?

23  A.   This letter from the U.S. Department of State was issued

24  on July 28, 2011, just a few days before the e-mail was sent to

25  mohamed_2060.

1  Q.   Now, what, if anything, did -- on 1-406, what did the

2  defendant say to mohamed_2060 that he could do even if he could

3  not send the equipment from America?

4           MR. SMITH:  Objection.  Vague.

5           THE COURT:  Well, if he asks it as a leading

6  question, you'd be objecting.

7           MR. SMITH:  We're objecting.  We don't understand it.

8  Yeah, objection.  Leading.

9           THE COURT:  But actually, I want you-all to approach

10  the bench.

11           (Bench conference on the record.)

12           THE COURT:  I may have missed something, but the

13  e-mail from Mohamed is asking for rifle scopes, not body armor.

14           MR. KROMBERG:  Correct.  The point is that when Young

15  wrote back saying, "I can't send this to you because it would

16  be seized," and it was right after he had gotten notification

17  about the regulations on what would be seized, because, in

18  fact, his stuff had been seized.

19           THE COURT:  Yeah, but I don't think that letter

20  mentions rifle scopes.

21           MR. KROMBERG:  Right.

22           THE COURT:  It just mentions body armor, right?

23           MR. KROMBERG:  That's true.

24           THE COURT:  That's apples and oranges.  I don't think

25  that's appropriate.

Caslen - Direct                                                          1024

1          MR. KROMBERG:  Okay.

2          THE COURT:  All right?

3          (End of bench conference.)

4    BY MR. KROMBERG:

5    Q.   Special Agent Caslen, what did, according to the e-mail

6    1-406, did Mr. Young offer to do instead of sending, sending

7    equipment to Libya?

8    A.   Defendant told mohamed_2060 that he had borrowed money

9    from a family member and could bring the money to mohamed_2060

10   in lieu of sending it, or if he could purchase something in

11   Egypt, he would bring it to him.

12   Q.   On 1-407, look at Government Exhibit 1-407.  What did

13   mohamed_2060 write?

14   A.   So this is an e-mail from mohamed_2060 to the defendant on

15   the defendant's e-mail account, freedomforlibya777@yahoo.com,

16   and mohamed_2060 replied to the defendant's e-mail that he

17   needed the amount of $3,000.

18   Q.   So I'd like you to take a look at Government Exhibit

19   10-220.  Now, let me check to see if that is in or not.

20          It is not, Judge.  We -- it is covered by the

21   stipulation that it was a document seized from the defendant's

22   computer.

23          MR. SMITH:  Which exhibit number is this?

24          MR. KROMBERG:  10-220.

25          MR. SMITH:  This is 10 -220.

1              MR. KROMBERG:  Yes, that's 10-220.

2              MR. SMITH:  We object.

3              MR. KROMBERG:  10-220 is two slides, and we're

4    interested in the second -- one page, the second page of the

5    exhibit.

6              THE COURT:  Is that exactly what was seized, or is

7    there --

8              MR. KROMBERG:  I took out the other pages that I

9    thought were --

10             THE COURT:  Yeah, but this is exactly what was

11   seized?

12             MR. KROMBERG:  Yes.  This was a computer, electronic

13   file, and this is the printout of the electronic file.

14             MR. SMITH:  We object to the extent it's not the

15   complete record.

16             THE COURT:  You want the whole thing in?

17             MR. SMITH:  Yes.

18             THE COURT:  All right, the whole thing in.

19             MR. KROMBERG:  We're happy --

20             MR. SMITH:  No, no, no.  The point is the

21   government -- Gordon represented that the piece of evidence

22   he's about to introduce is not complete.

23             THE COURT:  Well, then the whole thing goes in.  He's

24   trying to make it easier for you.  He's trying to make it --

25   are you looking at the right exhibit?  Take a look at 220.  How

1      many pages is there in --

2                MR. SMITH:  Your Honor, the objection is withdrawn.

3                THE COURT:  All right.  So just page 2 of 220.

4                MR. KROMBERG:  Well, page 1 and 2 to show what it is,

5      that it just is the -- that this is -- that in the -- the

6      defendant knew that he had a document saying that this was --

7                THE COURT:  Ah, I understand, yes.  Two pages go in.

8                (Government's Exhibit No. 10-220, pages 1 and 2, was

9      received in evidence.)

10                MR. KROMBERG:  We'd like to publish both pages of

11     10-220, please.

12                Okay.  And if you can go to the second page?

13     Q.   Special Agent Caslen, were there documents or items seized

14     from the house or the truck that had that thunderbolt design?

15     A.   There were items already offered into evidence, such as

16     the tie tack found in defendant's truck was the same SS

17     lightning bolts.

18     Q.   Okay.  Let's go on to 1-701, Government Exhibit 1-701,

19     which is already in evidence.

20                And can you zoom in on that, please?

21                And that's the Google subscriber information for

22     Argel Tal?  Did you try to find who Argel Tal is?

23     A.   I did.  I searched the Internet on Google for Argel Tal

24     and found it is a character referenced in the Warhammer series.

25     Q.   And the Warhammer series is a video game?

Caslen - Direct                                                    1027

A.    I'm not sure if it's a video game, but I do know there's

some books related to it.  It's a science fiction novel series.

Q.    Okay.  Did you find any reference to other Warhammer

characters in this investigation?

A.    The defendant's Facebook page was titled Ciaphas Cain.  I

don't know how it's pronounced.

Q.    C-i-a-p-h-a-s, Ciaphas Cain?

A.    Correct.

Q.    Did you find evidence that the Facebook account in the

name of Ciaphas Cain belonged to Nicholas Young?

A.    I did.

Q.    Okay.  I'd like you to take a look at and compare the

exhibits that have been admitted Government Exhibit 8-101 and

8-102 with government exhibits that have not yet been admitted

but are covered by a stipulation that they came from the

defendant's computer, computer media, 14-121 and 14-122.

        MR. SMITH:  Objection, Your Honor.  Relevance, 403,

and cumulative.

        THE COURT:  All right, let me look.

        MR. KROMBERG:  May I respond to the relevance part?

        THE COURT:  Let me look at them first so I can see

what we're talking about.

        14-1?

        MR. KROMBERG:  14-121 and 14-122.

        THE COURT:  All right.  And you want that compared

Caslen - Direct                                                    1028

1  with 8-101 and 102?

2           MR. KROMBERG:  Right, because 8-101 and 102 are the

3  Facebook account of Ciaphas Cain, and 14-121 and 14-122 are

4  from computer media that we've stipulated was seized from

5  Mr. Young's residence.

6           MR. SMITH:  The defense objects.  The relevance of

7  the fact that these last items are seized from Mr. Young's

8  residence --

9           THE COURT:  I think these two are, that there are 403

10 problems.  I'm going to sustain the objection.

11          MR. SMITH:  Thank you.

12 BY MR. KROMBERG:

13 Q.   Did you find a profile photo of Nicholas Young on the

14 Ciaphas Cain site?

15 A.   I did.

16 Q.   Can you take a look at 8-107?  8-107.  It's in evidence.

17          THE COURT:  It's in evidence?

18          MR. KROMBERG:  Yes.

19          THE COURT:  All right.

20 BY MR. KROMBERG:

21 Q.   Was that the profile -- was that the Facebook page profile

22 photo of Nicholas Young?

23 A.   It was.

24 Q.   And that's in the name of Ciaphas Cain?

25 A.   Correct.

Caslen - Direct                                                      1029

1   Q.   Now, did you find -- was there another profile photo of

2   the Ciaphas Cain Facebook site that you found?  Could you take

3   a look at 15-201, which is not in evidence yet?

4          MR. SMITH:  Objection.  Relevance.

5          THE COURT:  This one I will permit in.  Overruled.

6          (Government's Exhibit No. 15-201 was received in

7   evidence.)

8          MR. KROMBERG:  So we move in 15-201, and can you

9   publish it to the jury?

10  Q.   Special Agent Caslen, is that the profile -- the profile

11  photo is the top photo; is that correct?

12  A.   Correct.  This was in the profile photos album of the

13  defendant's Facebook page, so at one point in time, the

14  defendant used it as a profile photo.

15         MR. KROMBERG:  And go down to the bottom photo, if

16  you would, Mr. Vera.

17  Q.   And that's the Abu Musab photo that Daveed

18  Gartenstein-Ross talked about earlier?

19  A.   Correct.  That's Abu Musab al-Shishani.

20  Q.   Turning to Government Exhibit 8-112, Facebook subscriber

21  information that's in evidence, can you please explain to the

22  jurors what information was used to register the Ciaphas Cain

23  account, what e-mail address?

24  A.   The defendant used the e-mail address

25  herebedragons777@gmail.com.

Caslen - Direct                                                        1030

1    Q.    And the name Ciaphas Cain?

2    A.    Correct.

3    Q.    Take a look, if you would, at Government Exhibit 8-108,

4    which is a Facebook record in evidence, 8-108.  Do you see a

5    link there to Emerson Begolly?

6    A.    I do.  It's on the very top.

7    Q.    Emerson Begolly was the individual who

8    Dr. Gartenstein-Ross talked about?

9    A.    That's correct.

10   Q.    Okay.  And did you -- so this was a link that the

11   defendant put on his Facebook account, correct?

12   A.    It appears to be a like for an item on the defendant's

13   Facebook account, yes.

14   Q.    And did you click on that link to see what that was, what

15   he was liking?

16   A.    We were able to follow this to a YouTube channel.

17   Q.    And is that YouTube, is that Government Exhibit 8-109?

18   Don't -- that has not yet been admitted.  Please take a look at

19   8-109.

20           MR. SMITH:  Objection.  Relevance, 403, cumulative.

21           THE COURT:  Well, are you planning to play this?

22           MR. KROMBERG:  No, no.  Just want to show him the

23   picture.

24           THE COURT:  You're just showing the picture of a

25   disc?  That's what I've got for 8-109.

1              MR. KROMBERG:  Oh, I'm sorry, we wanted -- we were

2    going to play ten seconds of it to show it has a picture of

3    Emerson Begolly.  Well, ten seconds.

4              MR. SMITH:  Your Honor, if you look at the title of

5    the Exhibit 8-109, it's not Emerson Begolly.  It's something

6    else.

7              MR. KROMBERG:  And that's exactly why, Judge, that

8    we --

9              THE COURT:  I think given the context of the case,

10   that's all right.  It can go in.

11             (Government's Exhibit No. 8-109 was received in

12   evidence.)

13             MR. KROMBERG:  So can you display ten seconds of --

14             THE COURT:  8-109 is in.

15             MR. KROMBERG:  -- 8-109?

16             (Excerpt of Government's Exhibit No. 8-109 was

17   played.)

18             MR. KROMBERG:  That's it.

19   Q.   So was that Emerson Begolly in his Nazi uniform on the

20   right?

21   A.   It was.

22   Q.   Okay.  Thank you.

23             Now, look at 8-104, which is a Facebook post from --

24   Facebook record from the Ciaphas Cain account, 8-104.  And did

25   you find the link there to the "Screw Infidels" video?

Caslen - Direct                                                      1032

1    A.    I don't remember which YouTube URL it exactly was, but I

2    did find a link to a video titled "Screw Infidels" on the

3    Facebook page.

4    Q.    So what would you need to refresh your recollection on

5    which link it was?

6    A.    I took a screen shot of the YouTube channel that has the

7    URL.

8    Q.    Okay.  So can you look -- can the witness look at to

9    refresh his recollection, look at Government Exhibit 8-105,

10   which is a screen shot, to refresh his recollection of which is

11   the link?

12          MR. SMITH:  Objection.  The witness can refresh his

13   recollection without publishing it.

14          THE COURT:  We're not publishing it.  He's just going

15   to look at it.

16          THE WITNESS:  Okay.  I remember which one it is.

17   BY MR. KROMBERG:

18   Q.    Okay.  Which one is it?

19   A.    It's the -- this is the -- it's five up, dated May 14,

20   2015, with the URL ending in H-M.

21   Q.    Okay.  And did you go to that link?

22   A.    I did.

23   Q.    And did you watch that video?

24   A.    I did.

25   Q.    All right.

Caslen - Direct                                                        1033

1    A.    A couple times.

2                MR. KROMBERG:   The government -- this is the one

3    video we wish to play, Judge.   This is on the Ciaphas Cain

4    Facebook page, and this is Government Exhibit 8-106, and we

5    move it into evidence so that we can play it.

6                MR. SMITH:   Objection to playing the clip.

7                THE COURT:   I'm sorry, no objection?

8                MR. SMITH:   Objection.   403.

9                THE COURT:   All right, it's overruled.

10               (Government's Exhibit No. 8-106 was received in

11   evidence.)

12               MR. SMITH:   401.

13               MR. KROMBERG:   Okay.   Can you play it?

14               Mr. Vera tells me it's six minutes long, and I think

15   that even just playing two-and-a-half minutes of it will be

16   more than enough to understand what this is.

17               THE COURT:   Is there any objection?   I know there's

18   an objection to the exhibit, but is there an objection if it's

19   going to be played to only a portion of it being played, or do

20   you want the whole thing?

21               MR. SMITH:   We would prefer not to have any of it

22   played, Your Honor.   We think this is all cumulative.

23               THE COURT:   I understand, but I've said it's going

24   in, so the question is is there an objection to it not being

25   complete?

Caslen - Direct                                                    1034

1            MR. SMITH:  No.  If it's going to be played, we have

2    no objection to the clip.

3            THE COURT:  All right, go ahead.

4            (Excerpt of Government's Exhibit No. 8-106 was

5    played.)

6            MR. SMITH:  I think that's over two minutes.

7            MR. KROMBERG:  That's fine, Judge.

8    Q.   Mr. -- Special Agent Caslen, turning to 8-110 from the

9    Ciaphas Cain Facebook page, did you find a photo of a dog on

10   that site, on 8-110?

11   A.   I did.  This is the photo of a dog.

12   Q.   Okay.  Did you find that same photo as the avatar for the

13   defendant posting on another Web site?

14   A.   We did, on the defendant's --

15   Q.   Look at 8 -- okay.  What other Web site?

16   A.   On the defendant's LiveLeak account.

17           THE COURT:  110 is not in evidence.

18           MR. KROMBERG:  Correct.

19   Q.   So I was just asking, what is the LiveLeak account?  Or

20   what is LiveLeak?

21   A.   LiveLeak is a, it's a Web site that folks can upload

22   videos to and people can watch videos.

23   Q.   And did you -- did you find from the -- that photo of the

24   dog was being used as an avatar for someone on that site?

25   A.   I did.

1    Q.   And what was the name of the accountholder for that

2    account that used the dog as the avatar?

3    A.   Düsselkamp.

4    Q.   And what evidence that -- did you have in this case that

5    Young used the name Düsselkamp?

6    A.   On his Nazi reenactment group roster, his name on the

7    roster was Storm Trooper Klaus Düsselkamp.

8    Q.   Okay.  Take a look at 10-706.

9            It is not yet in evidence.  The government is going

10   to move it in evidence.

11           MR. SMITH:  We object on relevance and 403 grounds.

12           THE COURT:  I'm allowing this in, but I think since

13   there are other names here and other addresses, it needs to be

14   redacted.

15           MR. KROMBERG:  Right.  We have provided in the past

16   on our motions a redacted version, and we can substitute a

17   redacted version of it for this as well.

18           THE COURT:  For the record, 10-706 is in, but it will

19   have to go redacted.

20           (Government's Exhibit No. 10-706, redacted, was

21   received in evidence.)

22           MR. KROMBERG:  Can it be published to the jury in

23   unredacted form now?

24           THE COURT:  Yeah.

25           MR. KROMBERG:  Okay.  Please post 10-706, and also

1  just zoom in, if you would, on the left-side column.  Or start

2  at the top.  How about just the heading at the top?

3         Okay.  And now go to the lower left.  That's it, all

4  right.

5  Q.   Okay.  So -- and also, did you find other evidence of --

6  that Young was Düsselkamp at the house?  And I direct your

7  attention to 10-715, which is not in evidence yet.

8         MR. SMITH:  Objection.  Relevance, 403, cumulative.

9         MR. KROMBERG:  10-715 is two photographs, Judge.

10        MR. SMITH:  Your Honor, the original explanation for

11 the government's relevance point on the Düsselkamp evidence was

12 to establish that the defendant opened a LiveLeak account.

13 That is not in dispute in this case, so the relevance point no

14 longer exists.

15        THE COURT:  Well, the first page, I can't even

16 decipher what in the world it's depicting, so I don't think

17 that adds anything to the case.  The second, however --

18        MR. KROMBERG:  Right.  I think that they're two views

19 of the same thing, Judge.

20        THE COURT:  Well, I'm looking at something different

21 then.  I don't see it.  But page 2, I think page 2 -- only the

22 second page of that exhibit should go in.

23        MR. KROMBERG:  That's fine.

24        Mr. Vera, can you move in the second page of page 2?

25 And then we'll delete that other page for when it goes into the

Caslen - Direct                                                              1037

1   exhibit binder.

2          That's -- okay.

3   Q.   Special Agent Caslen, not paying any attention to the book

4   that you see there, but what is underneath the book?

5   A.   So this is a photograph taken during the search of the

6   defendant's residence, and during examination of the photo,

7   there is a, appears to be, like, a foot locker with the name

8   Düsselkamp on the foot locker.

9   Q.   Okay.  Thank you.

10         Now, taking a look at -- did you go to the LiveLeak

11  site to try to find the history of the Düsselkamp posts on the

12  LiveLeak site?

13  A.   I did.

14  Q.   And what did you find?

15  A.   I found a profile for Düsselkamp that has dates of

16  registration, some stats on the account, such as, I believe,

17  videos that were uploaded, videos that were viewed, and a list

18  of comments that, made by the user of the profile.

19  Q.   On that profile page, did you also find any particular

20  insignia or decal identifying -- that helped identify Mr. Young

21  to -- link Mr. Young to that account?

22  A.   There were two.  There was the photograph of the dog that

23  we just saw as well as a, a morale patch that folks wear on

24  backpacks or Velcro patch that has a squirrel in it, and it

25  says "Secret."  We found the photograph of that.

1          MR. SMITH:  Your Honor, we object on -- we've already

2   stipulated that the LiveLeak account was created by the

3   defendant.

4          THE COURT:  All right.

5          MR. SMITH:  We've now heard testimony for about 15

6   minutes on how the --

7          THE COURT:  All right, then we don't need this

8   evidence.  There's no issue about that.

9          MR. KROMBERG:  Well, we do need the evidence because

10  it has when he posted and --

11         THE COURT:  Well, then ask the when question.

12         MR. KROMBERG:  Well, at this point, we move in --

13  please take a look at Government Exhibit 8-500.

14         THE COURT:  All right.  So is there an objection to

15  8-500?

16         MR. SMITH:  No.

17         THE COURT:  All right, 8-500 is in.

18         (Government's Exhibit No. 8-500 was received in

19  evidence.)

20         MR. KROMBERG:  Okay.  So if you can now publish

21  8-500?

22  Q.   Now, Special Agent Caslen, can you explain what -- the

23  data that you can find about the length of time that Düsselkamp

24  was posting on LiveLeak account?

25         And I ask Mr. Vera to zoom in on the left side.

1  You're ahead of me as usual.

2  A.   The, the account information showed that Düsselkamp had

3  been a member of LiveLeak since June 26, 2017 (sic), had last

4  had activity on December 5 (sic) of 2016, and down below on the

5  next page --

6           THE COURT:  I'm sorry, go over that again for me,

7  please?  I didn't hear you.

8           THE WITNESS:  My apologies, Your Honor.  The

9  left-hand side of the account shows that the, the user had been

10 a member of LiveLeak since June 26, 2007, and last had activity

11 on the account on December 15, 2016.

12          THE COURT:  Thank you.

13          THE WITNESS:  And down at the bottom, you can see

14 that there were over 1,100 comments made.

15 BY MR. KROMBERG:

16 Q.   So I'd like to direct your attention to a comment on

17 8-502, and I'm then going to ask you about 8-501, which are not

18 yet in evidence, and we will move them in evidence once the

19 judge takes a look.

20          THE COURT:  All right, so you're moving 502 in at

21 this point?

22          MR. KROMBERG:  501 and 502.

23          MR. SMITH:  We object to the video -- well, we object

24 to both on 401, 403, and cumulative grounds.

25          MR. KROMBERG:  We're not moving in the video.  We

1    want to get in a comment about the video, Judge.

2              MR. SMITH:  We still think it's cumulative, Your

3    Honor.

4              THE COURT:  Well, I'm not even sure I see what a

5    comment is on 501.

6              MR. KROMBERG:  Right, on 502.

7              THE COURT:  But on 502, there are comments.

8              MR. KROMBERG:  Right.  And what I expect the witness

9    to say is that the comments on 502 are about the videos

10   described in 501.  If it helps, I can ask the witness to

11   describe the relationship between 501 and 502.

12             THE COURT:  Let me look at these comments.

13             What's the date this was posted?  February of 2015,

14   is that right?

15             THE WITNESS:  That's correct, Your Honor.

16             MR. SMITH:  Also, Your Honor, we also object on the

17   ground that it's an incomplete statement.  The government is

18   submitting exhibits that splice and dice the relevant screens,

19   and so --

20             THE COURT:  Yeah, I'm sustaining the objection.

21   BY MR. KROMBERG:

22   Q.   Special Agent Caslen, when you looked at these, how did

23   you try to preserve them?  How did you try to preserve what you

24   saw?

25   A.   I was on a laptop and took a screen shot of the entire

1   screen.  So are we talking these two specific exhibits?

2   Q.   Correct.

3   A.   So the first exhibit is, has --

4           THE COURT:  Well, I've ruled.  These are not going

5   in, so let's stop talking about them.

6   BY MR. KROMBERG:

7   Q.   Let's look at Government Exhibit 14-135.  That was found

8   on the -- we have stipulated it was found on defendant's

9   computer.

10          MR. SMITH:  Objection.  This is cumulative to the

11  rest of today's testimony, it fails 403, and it's irrelevant.

12          THE COURT:  Oh, yeah, this is getting very cumulative

13  now.  I'm sustaining the objection.

14  BY MR. KROMBERG:

15  Q.   What materials did you find relating to Mr. Young's

16  interest in weapons --

17          MR. SMITH:  Objection, Your Honor.

18          THE COURT:  Just let him finish the question.

19  BY MR. KROMBERG:

20  Q.   Interest in weapons in a particularly Islamic setting?

21  A.   I believe there was a photograph already placed into

22  evidence that showed the defendant dressed in traditional

23  Islamic attire, strapped with a shoulder holster weapon and a

24  long knife.

25  Q.   Right.  So that was Government Exhibit 3-302, which has

1  already been in evidence.

2  A.   That's correct.

3  Q.   Okay.  So what others did you see?  Let me show -- take a

4  look at Government Exhibit 14-119.

5           MR. SMITH:  Wait, wait.

6           MR. KROMBERG:  We're not publishing it.  I'm just

7  asking the witness to look at it.

8           THE COURT SECURITY OFFICER:  14-119?

9           MR. KROMBERG:  Correct.  It's a computer item.  It's

10  not a -- it's a photo.

11           THE COURT:  It's a document.  I mean, it's just a

12  piece of paper.

13           THE COURT SECURITY OFFICER:  I don't have a 119.

14           THE COURT:  All right, do you have a copy for the

15  witness?  Here.

16           Wait a minute.  Make sure this is what you're talking

17  about, Mr. Kromberg.

18           MR. KROMBERG:  Yes, that is.

19  Q.   Do you recognize that?

20  A.   I do recognize this photo.

21  Q.   And that was found on the defendant's computer in, in his

22  house?

23  A.   It was found on the defendant's computer media -- or

24  electronic media.

25           MR. KROMBERG:  Your Honor, the government moves in

1   14-119.  One of the -- one of the particular relevances of it

2   is the metadata on that, which is six days different from

3   metadata on photos of him in a different outfit.

4                MR. SMITH:  Your Honor, metadata can be elicited from

5   the witness without publishing the photos.  The government

6   knows this is cumulative, 403.

7                THE COURT:  Well, I don't think it's cumulative if

8   the dates are different, but I think you have to get that from

9   the witness.

10               MR. KROMBERG:  That's fine.  Okay.

11  Q.   Special Agent Caslen --

12               THE COURT:  So it's in evidence if you want to post

13  it.

14               (Government's Exhibit No. 14-119 was received in

15  evidence.)

16               MR. KROMBERG:  Thank you.

17               So please publish 14-119.

18  Q.   Okay.  What's the -- according to the metadata that the

19  parties have stipulated is correct, what was the date that that

20  item was created or modified -- it was created on that

21  computer?

22  A.   February 2, 2006.

23  Q.   Okay.  Within -- did you find photos -- we're not moving

24  to introduce them now, we're just talking about photos, but did

25  you find photos that were created on that same computer within

1   six days of that date where, where the defendant was dressed in

2   a Nazi uniform?

3            MR. SMITH:  Objection.  Leading.

4            THE COURT:  Sustained.

5   BY MR. KROMBERG:

6   Q.   Okay.  What photos did you find of the defendant within

7   six -- that were created within six days of the photo that you

8   just -- that was, that was on the screen a moment ago but has

9   disappeared?

10  A.   We found a series of photographs depicting the defendant

11  and several other individuals dressed in SS uniforms, posing

12  for photographs.

13  Q.   Well, did it appear to be a reenactment?

14           MR. SMITH:  Objection.  Leading.

15           THE COURT:  Sustained.

16  BY MR. KROMBERG:

17  Q.   What did -- what was the setting of those photos?

18  A.   The setting was an indoor, I would call it a, like,

19  barracks.  They had some beds, tables.

20  Q.   What kind of uniforms were they wearing?  Were they, were

21  they uniforms designed for being outside in the mud or being at

22  a party?  Actually, let me strike that.

23           Dress uniforms or battle dress uniforms?

24  A.   To me, they appeared to be formal uniforms.

25  Q.   Was one of the gentlemen there wearing a flower in his

1    lapel?

2    A.   Yes.

3    Q.   Now, looking at Government Exhibit 14-119, did you find

4    that firearm in Young's residence?  When I say "you," I don't

5    mean you personally, but was that firearm found in the

6    residence?

7              MR. SMITH:  Objection.  This issue has already been

8    ruled on, Your Honor.

9              THE COURT:  Sustained.

10   BY MR. KROMBERG:

11   Q.   All right.  Did you compare the paper issue of *Inspire*

12   magazine found in August 2016 at the defendant's house to the

13   issue that were found on his computer from 2011?

14   A.   I did.

15   Q.   And what did you find?

16   A.   The -- I believe it was the fall 2010 issue was printed

17   and seized at the defendant's residence during the search in

18   2016, and it was the same copy -- it was a copy of the digital

19   copy on his computer.

20             MR. SMITH:  Objection.  Best evidence.

21             THE COURT:  No.  Overruled.

22             MR. KROMBERG:  So we move in at this time, if it

23   hasn't already been moved in, the paper copy of Government

24   Exhibit 10-850.  We don't need to go through it again, but I

25   just want to move in that it was -- the paper copy was found.

1              THE COURT:  It's already in.

2    BY MR. KROMBERG:

3    Q.   Okay.  So it might be easier to look at this in Government

4    Exhibit 14-102, the electronic version, which is already in.

5    Direct your attention to page 73, and did you find any

6    reference to someone personally known to the defendant?

7    A.   I did.  So this is a page within the magazine which is

8    common to be in *Inspire* magazine, where they list Muslim

9    prisoners that they request prayers for, and at the very

10   bottom, which is three -- three names up is the name of Zachary

11   Adam Chesser.

12   Q.   Now, did you -- take a look, if you would, at Government

13   Exhibit 10-814.

14             MR. SMITH:  Objection, Your Honor.  It's 401, 403,

15   best evidence, cumulative.

16             Your Honor, this is particularly difficult to read,

17   and that's why we would need to see a copy.

18             THE COURT:  Well, I have older eyes than you,

19   Mr. Smith, and I could read it by squinting a bit, so --

20             MR. SMITH:  We think --

21             THE COURT:  You've got a copy of it, right?

22             MR. SMITH:  We have not.

23             THE COURT:  Do you not have the electronic?

24             MR. SMITH:  We have the electronic version, but this

25   is 403 evidence, Your Honor.  If Your Honor is looking at

1   10-814?

2          MR. KROMBERG:  Your Honor, this might be -- for me to

3   explain relevance, I think it's something that you would want

4   me to do at the bench.

5          THE COURT:  Yeah, come on up here.

6          (Bench conference on the record.)

7          THE COURT:  Yeah.

8          MR. KROMBERG:  Your Honor, this appears to be a

9   prayer list in which the defendant is praying for, among

10  others, his family, but of the only -- the only political

11  leaders that he prayed for were Hitler, Mussolini, Saddam, the

12  Mufti, and Ali Timimi, and we were then going to ask that --

13  Special Agent Caslen did Ali Timimi come up in the *Inspire*

14  magazine, and he was going to say yes, he's in that same list

15  of Muslim prisoners.

16         MR. SMITH:  Your Honor, the Timimi connection is just

17  a ruse to introduce highly prejudicial evidence.  I'm sorry to

18  say that, but this is exactly what the government is doing.

19  This is plainly 403 evidence.

20         And furthermore, we can- -- maybe my eyes are not as

21  good as yours, but I cannot read this from the electronic page.

22         MR. KROMBERG:  If you want to use scissors --

23         MR. SMITH:  This is also cumulative, Your Honor.

24         THE COURT:  No.

25         MR. KROMBERG:  This is not cumulative.

1          THE COURT:  This is different.  This is different

2     because it's a linkage between the two.

3          MR. KROMBERG:  Exactly.

4          THE COURT:  No, no, definitely relevant to the issues

5     in this case, all right?  So it's overruled.  If you actually

6     want to see the paper, you can see it.

7          MR. SMITH:  Well, we would request that the witness

8     refresh his recollection with that.  He's representing he can

9     read this.

10         THE COURT:  All right.  The problem, of course, is

11    these don't have stickers on them.

12         MR. KROMBERG:  Well, we can -- I can put one on as

13    soon as we get back to my desk.

14         THE COURT:  You can read it.

15         MR. SMITH:  Wait a second.  I don't think this is a

16    prayer to these individuals.  I don't see where it is.  Where

17    is it, Gordon?

18         THE COURT:  It says "The Dead" on the top.

19         MR. KROMBERG:  I'm sorry?

20         THE COURT:  It says "The Dead" on the top.

21         MR. KROMBERG:  It has "The Dead," "The Living," "The

22    Community."

23         MR. SMITH:  Where does it say this is a prayer?  "The

24    Dead."  We object to the characterization that this is a prayer

25    list.

1          THE COURT:  All right.  Well, you can argue about

2    that, but it's going in.

3          MR. KROMBERG:  Thank you, Your Honor.

4          THE COURT:  All right.  What's the number on that?

5          MR. KROMBERG:  10-814.

6          (End of bench conference.)

7          THE COURT:  That should eventually go in the folder

8    for 10-814.  That is the original, and it's in evidence.

9          (Government's Exhibit No. 10-814 was received in

10   evidence.)

11   BY MR. KROMBERG:

12   Q.   Special Agent Caslen, what is Government Exhibit 10-814

13   that the parties have stipulated was seized from the

14   defendant's residence in August 2016?

15   A.   This is a list of people which the defendant would pray

16   for, hence, by the term "O Allah, protect my father," which

17   would indicate it was a prayer.

18   Q.   Of the -- not talking about his family members that he was

19   praying for, were there -- is there a list of political leaders

20   that he was praying for?

21   A.   There is.

22   Q.   And who were those people?

23          MR. SMITH:  Objection to the characterization in this

24   as a prayer.  He is speculating about the defendant's mindset.

25          THE COURT:  Overruled.

Caslen - Direct                                                    1050

1               THE WITNESS:  So the political leaders include

2     Hitler, Skorzeny, Haj Amin al-Hussaini, Mussolini, Saddam

3     Husein.

4     Q.   Does Ali Timimi appear anywhere on that list?

5     A.   On the back side, Ali al-Timimi as well as the name Saleh

6     does appear.

7     Q.   Okay.  Now, did you find reference to Ali al-Timimi in the

8     *Inspire* magazine that was, it's 14-101, which is already in

9     evidence?  And if I could direct your attention to page 64?

10    A.   I did.  He is the second name down.  He was also on the

11    last example of this that you showed from the other issue.

12    Q.   Okay.  Now, in the winter 2010 issue, 14-103, did you find

13    references to anyone else that Mr. Young has talked about

14    according to the testimony that we heard from Khalil earlier in

15    the trial?  And I'm directing your attention to page 66 on

16    Government Exhibit 14-103.

17    A.   There is.  At the very bottom of the, of the right-hand

18    side, you'll see the name Brother Farooque Ahmed.  As Khalil

19    testified on Day One of the trial --

20              MR. SMITH:  Objection.  Hearsay.

21              THE COURT:  Overruled.

22              THE WITNESS:  As Khalil testified on Day One of the

23    trial, the defendant -- on the day that the defendant met him,

24    the defendant and he talked about Farooque Ahmed, who was the

25    individual arrested by the FBI for attempting to plot to blow

1   up the D.C. subway system.

2          MR. KROMBERG:  Now, can you bring up 9-108, which is

3   in evidence?

4   Q.   And that would be the picture of Farooque Ahmed?

5   A.   Correct.

6   Q.   Okay.  Now, please take a look at Government Exhibit

7   14-180, which is a list of Web sites that were found on the

8   defendant's -- well, let me -- according to stipulation 28,

9   which I can read if I can find it, the United States and the

10  defendant hereby stipulate and agree that Government Exhibits

11  14-100 through 14-140 and Government Exhibit 14-180 were found

12  by the FBI on computer media found and searched by the FBI in

13  September 2011 at the residence of defendant Nicholas Young.

14          I think that 12-28 is already in, but I've lost

15  track.  In any event, 14-180, the government moves into

16  evidence as a list of bookmarks on that computer in -- as of

17  that time, which is slightly different than what Your Honor has

18  seen before, which was a list of bookmarks in 2016.

19          MR. SMITH:  Objection.  Cumulative, relevance, 403.

20          THE COURT:  Overruled.

21          MR. KROMBERG:  Could you publish, please, 14-180?  Is

22  it possible to blow that up so people can read it?  Okay.

23  Q.   Can you -- Special Agent Caslen, on that list of

24  bookmarks, do any of them involve Nazis or Hitler?  Appear to

25  involve, excuse me.

1   A.   Yes.  The first bookmark is titled "YouTube - Are the BNP

2   Nazis."

3   Q.   And that is the British National Party that Mr. Campbell

4   testified about?

5   A.   Correct.

6   Q.   Okay.  Anything about Usama Bin Laden?

7   A.   The third -- the third bookmark down, "LiveLeak.com -

8   Sheikh Osama Bin Laden Speech to American Citizens After the

9   Iraq Invasion," the URL.

10  Q.   Anything about Anwar Awlaki?

11  A.   Yes.  Towards the middle, there is a LiveLeak.com

12  bookmark, "Anwar Al Awlaki Allah is Preparing Us For Victory."

13  Q.   And towards the bottom?

14  A.   There's two more down there towards the bottom.  They're

15  YouTube channels -- excuse me, YouTube videos.  "YouTube.com -

16  Anwar Al Awlaki Jihad Against All Arab Rulers" and "YouTube --

17  Anwar Al Awlaki The True Muslims Must See.

18  Q.   Now, do you see -- is there anything --

19  A.   I apologize, there's two more Anwar Al Awlaki URLs.

20  Q.   Now, you were here when Dr. Gartenstein-Ross talked about

21  Alois Brunner, correct?

22  A.   I was.

23  Q.   Is there a bookmark for Alois Brunner in here?  Near the

24  bottom.

25            MR. SMITH:  Your Honor, objection.  This is all

Caslen - Direct                                                    1053

1   cumulative evidence.  It's not building towards the point.

2   It's just repetitive, and it's been that way for an hour.

3            THE COURT:  Overruled.

4            THE WITNESS:  Right underneath the last YouTube video

5   for Anwar Al Awlaki is, I can't pronounce his name like you

6   did, but Mr. Brunner.

7   Q.   Okay.

8   A.   And I would point out that all these bookmarks were --

9   have a date on the right-hand side between 2009 and 2010, all

10  dates before he met Khalil.

11  Q.   Now, take a look, if you would, at Government Exhibits

12  10-303, 304, and 305.  They are -- I believe we introduced them

13  earlier today pursuant to stipulation 21.

14           THE COURT:  I know we've seen these.  They're in

15  evidence, I believe.

16           MR. KROMBERG:  Right.

17           THE COURT:  Yeah.

18           MR. KROMBERG:  Right.  Okay.  So I'd like -- we have

19  not published them.  I said we were going to publish them with

20  Special Agent Caslen.

21           THE COURT:  All right.

22           MR. KROMBERG:  Can you publish 303?  This was -- can

23  we blow it up just a little?

24           And that's 303.  Could you publish 304?

25           And can you publish 305?

1   Q.   Special Agent Caslen, were you able to -- did you listen

2   to these nasheeds?

3   A.   I did.

4   Q.   Were you able to understand any of them?

5   A.   One of them.

6   Q.   And which one was that?

7   A.   There was a nasheed, I believe, titled "Alhayat Media."

8   However, I'm not 100 percent sure that's the name of the, the

9   file, but it was a lengthier nasheed, but the first couple

10  minutes were in English.

11  Q.   Did you write down what the English language portion of

12  that nasheed was?

13  A.   I did.  I transcribed it.

14  Q.   And is that Government Exhibit 10-305T?  Can you take a

15  look at 10-305T?

16       Is that what you wrote?

17  A.   It is, and it has the file name on here.

18       MR. KROMBERG:  Okay.  Judge, we'd move into evidence

19  Government Exhibit 10-305-T.  We are not playing the video --

20  we're not playing the nasheed, but this is what the special

21  agent wrote down he heard in English on the nasheed.

22       THE COURT:  Is there any objection?

23       MR. SMITH:  No objection.

24       THE COURT:  All right, it's in.

25       (Government's Exhibit No. 10-305-T was received in

Caslen - Direct                                                    1055

1    evidence.)

2              MR. KROMBERG:  Can you publish 10-305-T?  And if you

3    could blow it up so that we can read it?  Thank you.

4    Q.   Special Agent Caslen, would you read at least the first

5    couple paragraphs of that aloud?

6    A.   So I will read the first paragraph, which is sort of a, I

7    would call it a refrain, and it's repeated after each other

8    paragraph.  So I'll read it first and then a couple of the

9    other verses.  The refrain -- and I'm --

10             MR. SMITH:  Objection.  Cumulative.

11             THE COURT:  He's explaining it.  Otherwise, we could

12   play it.  This is giving the jury as accurate a picture of it

13   without having to play it.

14             MR. SMITH:  My cumulative point is that we've seen

15   this kind of evidence for 45 minutes now, Your Honor.

16             THE COURT:  All right, I'm overruling the objection.

17             MR. SMITH:  I'm not exactly sure where this is going,

18   what we're doing right now.

19             THE WITNESS:  "For the sake of Allah, we will march

20   to the gates of the paradise where our maidens await.  We are

21   men that love death, just as you love your life.  We're the

22   soldiers that fight in the day and the night.  We're the

23   soldiers that fight in the day and the night."

24             That paragraph is repeated after each verse.  The

25   first paragraph says:

1           "Going forth preparing to roar are the brothers of

2   light with kuffar in sight.  There rang so many and weapons are

3   heavy, but soldiers of Allah are more than ready, but soldiers

4   of Allah are more than ready."

5   BY MR. KROMBERG:

6   Q.   Okay.  You don't have to read it more.  The jurors can

7   read it more if they so choose later.

8           Take a look, if you would, at the Government Exhibit

9   14-140, which we have stipulated came from the computer in

10  2011.

11  A.   I recognize this.

12  Q.   Okay.  What is that?

13  A.   This is an e-mail sent from the e-mail address

14  herebedragons777@gmail.com to e-mail address

15  herebedragons777@gmail.com.   Herebedragons777@gmail.com was the

16  e-mail address that the defendant used to register his Facebook

17  account, so this is an e-mail he sent to himself.

18  Q.   Slow down, slow down.  That he used to register his

19  Facebook account, and that was Government Exhibit 8-112 that we

20  looked at previously?

21  A.   That is correct.

22  Q.   Okay.  So that's at herebedragons' account, but he

23  e-mailed it to himself?

24  A.   That is correct.

25  Q.   Okay.  Now, did you look at that YouTube channel -- oh,

Caslen - Direct                                                      1057

1    I'm sorry.  Judge, we'd move into evidence Government Exhibit

2    14-140.

3              THE COURT:  Is there any objection to this?

4              MR. SMITH:  Not the e-mail, Your Honor.

5              THE COURT:  All right, then it's in.

6              (Government's Exhibit No. 14-140 was received in

7    evidence.)

8              MR. KROMBERG:  Now, could we publish that e-mail?

9              THE COURT:  Go ahead.

10   BY MR. KROMBERG:

11   Q.   Okay.  Now, what is the content of that e-mail?

12   A.   The content of the e-mail was simply a URL to a YouTube

13   page.

14   Q.   And did you go to that YouTube page?

15   A.   I did.

16   Q.   And what did you find when you went to that YouTube page?

17   A.   I found a series of videos that were posted to that

18   YouTube page which contain images of folks with weapons,

19   speeches by Anwar Al Awlaki, photos -- excuse me, videos that

20   had folks like Usama Bin Laden in them.

21   Q.   And so can you take a look at what's been marked

22   Government Exhibit 14-141?  Are those the screen shots that you

23   took of the contents of that YouTube channel?

24             MR. SMITH:  Objection.  Relevance, cumulative, 403.

25             MR. KROMBERG:  Judge, we're not seeking to play any

Caslen - Direct                                                          1058

1   of them.

2              THE COURT:  I'm permitting this in.

3              (Government's Exhibit No. 14-141 was received in

4   evidence.)

5              MR. KROMBERG:  And you can publish that, please.

6   Q.   Now, Special Agent Caslen, can you explain why there are

7   several pages here of screen shots for this one channel?

8   A.   I can.  So I, I went to the YouTube channel, and I took

9   screen shots as I scrolled down, overlapping so you can see all

10  of the videos that were on this user's YouTube channel.

11  Q.   And so some of those -- is it correct that some of those

12  screen shots have portions of the channel that were already

13  included on another screen shot?

14  A.   That is correct.

15  Q.   Okay.  Now, did you try to find those videos and listen to

16  them?

17  A.   Yes, I did.  I listened to them, and I summarized them.

18  Q.   And would that be Government Exhibit -- take a look at

19  Government Exhibit 16-002.

20  A.   Yes, that's it.

21  Q.   Okay.  Those are the summaries that you made of the

22  videos -- the YouTube videos that you watched from that

23  channel?

24  A.   That is correct.

25             MR. KROMBERG:  Okay.  Judge, we move in Government

1    Exhibit 16-002, Special Agent Caslen's summary of the videos

2    that he watched on that channel.

3            MR. SMITH:  Your Honor, may we approach the bench?  I

4    have an objection.

5            THE COURT:  Yes.

6            (Bench conference on the record.)

7            MR. SMITH:  So if the government is giving us a

8    Hobson's choice where they can say we can play a highly

9    prejudicial video or you can submit to our, our

10   characterization of what happens in the video, that's not fair.

11           THE COURT:  I agree.

12           MR. SMITH:  Okay.

13           THE COURT:  I agree, all right?

14           MR. SMITH:  That's cumulative.

15           THE COURT:  You're getting -- I think you have in

16   your direct case more than enough evidence.

17           MR. KROMBERG:  May I say, Judge, that the point of

18   this is that this was before he met Khalil.  The defense's

19   theory, as I understand it, is we have to prove predisposition

20   from before December 2010.

21           THE COURT:  But you got -- I've let you get the

22   screen shots in, so the jury can see a sampling of the types of

23   things that he is looking at without going into this much

24   detail.

25           MR. KROMBERG:  Okay.

1        THE COURT:  So I'm going to sustain the objection,

2   all right?

3        MS. MORENO:  I have a scheduling question, Your

4   Honor.

5        THE COURT:  Yeah, I'm going to let the jury go home

6   now, all right?

7        MS. MORENO:  Thank you.

8        (End of bench conference.)

9        THE COURT:  Ladies and gentlemen, you've been a great

10  jury, and we're getting, really, we're moving very well.  I am

11  optimistic, unless we have a major glitch, I think the evidence

12  may close tomorrow, which means I can probably get this case to

13  you on Monday.  So it's not going nearly as late into next week

14  as I had been concerned about.

15       Now, again, stuff can happen, but we're really ahead

16  of where everybody thought we would be.  It may not seem that

17  way to you, but we really are.  So I'm letting you go home for

18  tonight.

19       Now, I actually have some other matters in court.

20  Friday is our normal motions day, unrelated to this case, and I

21  don't like to keep juries waiting.  We do value your time.  So

22  I think tomorrow morning, to play safe, I don't need you here

23  until 9:30.  It gives you a few extra minutes in the morning,

24  all right?

25            And as I said, I think you've been such a great jury

1   in terms of being here on time that I'm going to close it down

2   at five o'clock tomorrow, so that you can for planning

3   purposes, all right, you get the extra hour before the weekend

4   starts, all right?

5           It is -- I'm quite sure you'll need to be back here

6   on Monday, so how far into next week we go, I don't know, but

7   the case is moving along quite well.

8           So remember my cautions about avoiding any media

9   coverage, discussing the case in any respect, and that

10  includes, you know, any kind of tweeting.  Stay off the

11  Internet.  In terms of trying to look at any of these URLs or

12  sites or Web sites that's been discussed, you must stay away

13  from anything related to this case.

14          I will see you tomorrow morning at 9:30.  We will

15  stay in session.

16                          (Jury out.)

17          THE COURT:  Mr. Kromberg, about how much longer do

18  you think -- Agent, you may go back to your seat.

19                      (Witness stood down.)

20          THE COURT:  How much longer do you think your case

21  is -- your questioning of the agent will be?

22          MR. KROMBERG:  Just one moment, Your Honor.

23          I would say another 45 minutes.

24          THE COURT:  All right.  Well, then there will be

25  cross-examination, but he is your last witness.

1062

1   MR. KROMBERG:  That's correct.

2   THE COURT:  Now, in the meantime, however, so we

3   don't have any delay on this timeline, I expect you to have

4   done a revised timeline so that -- and get it to the defense as

5   early as you can.

6   MR. KROMBERG:  Try and get it tonight.

7   THE COURT:  All right, that's fine.  All right.

8   And, Ms. Moreno, how long do you anticipate your case

9   taking?

10   MS. MORENO:  May I have a moment, Your Honor?

11   THE COURT:  Yes, ma'am.

12   MS. MORENO:  Your Honor, if the government closes

13   tomorrow with their last witness, we, we feel confident that

14   the case can go to the jury -- I'm sorry, I should be over

15   here -- the case can go to the jury on Monday.

16   I had a question about the Court, the Court's wishes

17   with respect to how long you will allow the closing arguments

18   to be.

19   THE COURT:  What I always do to lawyers is I say you

20   tell me how much time you want.  If it's a reasonable request,

21   you often get it.  If it's unreasonable, you don't get it.

22   So --

23   MS. MORENO:  We think 45 minutes would be apt.

24   THE COURT:  That's just about right.

25   Government want 30 and 15?  What do you want,

1    Mr. Kromberg or Mr. Gibbs?

2           MR. KROMBERG:  That will be fine, Judge.

3           THE COURT:  All right?  So 45 minutes per side, all

4    right.

5           MR. KROMBERG:  I have a question.

6           THE COURT:  Yes.

7           MR. KROMBERG:  I believe that I have the ability to

8    speak with my case agent even though he's in the middle of

9    testifying despite the rule on witnesses because he's the case

10   agent.

11          THE COURT:  Well, he sat through the whole trial,

12   too, so yeah, of course.

13          MR. KROMBERG:  Thank you, Your Honor.

14          THE COURT:  All right, we gave you the proposed

15   verdict form.  It's a little bit different from what either

16   side submitted, all right?  You don't have to tell me tonight,

17   but take a look at it.  If there are any things you want

18   changed or any typos, let us know.  And we're working on the

19   jury charge, which we may be able to get to you by midday

20   tomorrow.

21          So at some point on Monday, I do expect closing

22   arguments and instructions.  We'll get the case to the jury on

23   Monday, all right?  So we are a day or two ahead of schedule,

24   which is great.

25          MS. MORENO:  I forgot to ask you an important

1  question about the Rule 29s, Your Honor.

2          THE COURT:  The government hasn't rested yet.

3          MS. MORENO:  When they do rest --

4          THE COURT:  When they do rest, I will tell you right

5  now you can make a perfunctory motion, but it will be denied

6  because all, all inferences get drawn in favor of the

7  government at this point, and I think at this point, the one

8  issue that I didn't think they were going to get in they're

9  going to get in.  So I think there's no problem.  We'll go

10 forward, all right?  I don't want a long delay in the trial for

11 that.

12         All right, anything further that we --

13         MS. MORENO:  Thank you.

14         THE COURT:  Oh, here's what I'm going to do tomorrow

15 morning:  Because I have a criminal matter, I'm going to make

16 the criminal folks sit at the back table, so it's only the back

17 table that needs to be cleaned up.  You can leave your stuff at

18 the front table, all right?

19         I mean, when we have another criminal matter, I can't

20 have all of your stuff there, so both sides will need to figure

21 out what you want to do with the stuff that's on those back

22 tables, but I think there's less stuff there than there is on

23 the front ones.  That's why we're starting at 9:30.  I mean, I

24 think my criminal matter is going to take five minutes, maybe

25 ten.

1    So you-all should be here around nine tomorrow so you

2    can set the courtroom back up because you're going to have to

3    take it a little bit apart tonight, all right?

4    All right, does the government anticipate the

5    possibility of a rebuttal case?  That's the one thing I think

6    we should all know about.  I'm not going to require you to tell

7    me who but --

8    MR. KROMBERG:  Right.  We reserved particularly

9    Khalil, and we did not release him on the possibility that we

10   would be able to get into -- or we would be required to get

11   into issues that he did not get into before.  So it's possible,

12   depending on what happens.

13   THE COURT:  All right.  You didn't have to tell me

14   who it is.

15   MR. KROMBERG:  Right.

16   THE COURT:  It's just we will not need the screen,

17   though, for any rebuttal evidence; is that right?

18   MR. KROMBERG:  Well, if Khalil does testify, then we

19   would need a screen.

20   THE COURT:  Then you'll need to give us a heads up if

21   that looks like the case.

22   MR. KROMBERG:  So, Judge?

23   THE COURT:  Yeah.

24   MR. KROMBERG:  There is one other issue I think it

25   makes sense to go into now, and that is, as I was -- some of

1    the remaining issues with Special Agent Caslen have to do with

2    other items that were seized from the house.

3           In her opening statement, Ms., Ms. Moreno said that

4    the defendant was a collector of weapons.  So we -- as I've

5    said, we don't need to put in the actual firearms, but I do

6    want to put in body armor because I don't think people have any

7    conception of the magnitude of the body armor that was found in

8    the house in this case.  So I was going to have it brought into

9    the courtroom while Special Agent Caslen is testifying so that

10   when we get to that point, he could reach into the boxes, pull

11   those things out, and it's going to be a pile, because we

12   estimate 60, six-zero, pieces of body armor, which in our view

13   is particularly relevant because one person does not need 60

14   pieces, but a person who talks about getting a team to attack

15   places might have a use for 60 pieces.

16          THE COURT:  But here's the problem:  This case is

17   charged as a material support case, where the material support,

18   although you do have that one set of e-mails about the rifle

19   scopes, but there's no evidence that that ever happened, and,

20   in fact, in the defendant's favor, you've got his statement

21   that he wanted to check to make sure it was legal, finds out

22   that it's not, and he doesn't do it.

23          I said earlier this is not a violent case in that

24   respect, and so I think you create the potential for reversible

25   error if you put that kind of evidence in, and so at this

1   point, at this point, I don't think the door has been

2   adequately opened for that to come in.  All right?

3           MR. KROMBERG:  I will point out, Judge, that defense

4   has said that he's a collector of weapons, ammo cans, U.S. Army

5   equipment, and it just doesn't -- it leaves the wrong

6   impression that he was a collector when this was not

7   collecting.  This was -- I don't know what it is, but it's

8   something almost unfathomable that a normal person would have

9   this kind of equipment in his house that's again not firearms

10  which --

11          THE COURT:  But you can't leave this jury at this

12  point with the impression that Mr. Young was about to go out

13  and start blowing things up.  That's not this case.

14          MR. KROMBERG:  But it's also not the case that he's a

15  peaceful person --

16          THE COURT:  Well --

17          MR. KROMBERG:  -- because the evidence that Your

18  Honor has kept out is -- Ms. Moreno asked the witness, "Isn't

19  it true that he said that he had a respectful attitude towards

20  the FBI agents who interviewed him?" when as we showed Your

21  Honor, that eight lines above that, where the respectful

22  attitude was not respectful at all and had to do with violence.

23          So it's unfair to leave the jury with the impression

24  that Mr. Young has nothing to do, had no indications of going

25  in that direction.

1    THE COURT:  At the present time, the way the case is

2    postured, I don't think enough of the door has been opened on

3    that, but again, it depends on what the evidence is in the

4    defense case.  I mean, again, as I've said, a couple of times,

5    I've used the word "pacific" several times.  If the impression

6    that is being made is that this is a completely benign, pacific

7    situation, then you can approach the bench and see whether or

8    not in rebuttal it's appropriate to bring that in.

9    MR. KROMBERG:  And that's --

10    THE COURT:  All right?

11    MR. KROMBERG:  And that's fine, Judge.

12    THE COURT:  So I'm saying it's not coming in in your

13    case-in-chief.

14    MR. KROMBERG:  And that's fine, but then we would ask

15    that the defense be barred from arguing in closing argument

16    that he exhibited a respectful attitude toward the FBI when he

17    spoke to them or that he was a peaceful man, because that is

18    the wrong impression.  It's unfair to the government to be able

19    to argue that only because the government was not able to bring

20    in this evidence.

21    THE COURT:  I think you have actually at this point

22    enough evidence already in your case-in-chief that if that

23    really came out, you can rebut it if you've thought carefully

24    about which evidence you've already got.  So I don't think you

25    need this extra stuff, as I just said, but it depends on the

1   rebuttal, all right?

2          So, I mean, if it comes in for the first time in the

3   closing argument, in your rebuttal argument, just know what

4   your evidence is.  You've got it in your evidence already.

5          MR. KROMBERG:  Judge, one last question on a slightly

6   different note was the defense had said that they wanted

7   Mr. Cameron Siegfried to be retained, and we would ask if

8   that's still the case so that if he's not, he can go back to

9   where he's -- he doesn't live here, and he can go back to where

10  he's from.

11         THE COURT:  All right.

12         MR. SMITH:  Your Honor, if I may, I'd like to address

13  Gordon's first point.

14         THE COURT:  No, let's do the last one with the agent.

15  Do you need Siegfried again?

16         MR. SMITH:  I don't even recall saying we did need

17  Siegfried.

18         THE COURT:  Yes, you did.  I think you were not sure.

19  So when you're not sure, we hold on to them.

20         MR. SMITH:  Well, since Your Honor told the jury that

21  the case would probably be given to them by Monday, is there

22  any reason we need to decide --

23         THE COURT:  Yes, because they want -- he's an FBI

24  agent -- or Air Force.

25         MR. KROMBERG:  Air Force.

1       THE COURT:  They want to send him back to wherever

2   he's from.  He shouldn't just have to sit around here waiting

3   on whether you're going to call him or not.

4       MR. SMITH:  That's fine, Your Honor.

5       THE COURT:  You're releasing him?

6       MR. SMITH:  Yes, we're releasing him.

7       MR. KROMBERG:  Thank you.

8       THE COURT:  All right.

9       MR. SMITH:  But we'd like to address one point Gordon

10  just made.

11      THE COURT:  Yes.

12      MR. SMITH:  Gordon made a point about Ms. Moreno's

13  opening and the language she used.  I'd just note that the

14  language Ms. Moreno used was no broader than the Court's venire

15  question concerning ownership of firearms.  The Court

16  venired --

17      THE COURT:  I've ruled in your favor at this point.

18      MR. SMITH:  Right.  No, I'm just addressing Gordon's

19  point --

20      THE COURT:  You don't need to address it when you've

21  won.  Most good lawyers just sit down and don't let the judge

22  change her mind, all right?

23      Anything further on this case?

24      MR. KROMBERG:  No, thank you, Judge.

25      THE COURT:  All right, then we'll recess court until

1071

1  nine o'clock tomorrow morning.

2   (Recess from 6:07 p.m., until 9:00 a.m., December 15, 2017.)

3

4                    CERTIFICATE OF THE REPORTER

5      I certify that the foregoing is a correct transcript of

6  the record of proceedings in the above-entitled matter.

7

8

9                                    _____/s/_____
                                     Anneliese J. Thomson
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25