UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

UNITED STATES OF AMERICA . Criminal No. 1:16cr265
.
vs. . Alexandria, Virginia
. December 15, 2017
NICHOLAS YOUNG, . 9:30 a.m.
.
Defendant. .
.
. . . . . . . . . . .

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

VOLUME V

APPEARANCES:

FOR THE GOVERNMENT: JOHN T. GIBBS, AUSA
GORDON D. KROMBERG, AUSA
EVAN N. TURGEON, SAUSA
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314

FOR THE DEFENDANT: NICHOLAS D. SMITH, ESQ.
David B. Smith, PLLC
108 North Alfred Street
Alexandria, VA 22314
and
LINDA MORENO, ESQ.
Linda Moreno P.A.
511 Avenue of the Americas
No. 2
New York, NY 10011

ALSO PRESENT: SA NICHOLAS CASLEN
NICHOLAS ENNS
FABIAN VERA

(Pages 1072 - 1335)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

OFFICIAL COURT REPORTER: ANNELIESE J. THOMSON, RDR, CRR
U.S. District Court, Fifth Floor
401 Courthouse Square
Alexandria, VA 22314
(703)299-8595

# I N D E X

| WITNESS ON BEHALF OF THE GOVERNMENT: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| SA Nicholas A. Caslen (Resumed) | 1079 | 1110 | 1179 | |

Closing Argument by Mr. Gibbs: Page 1241

Closing Argument by Mr. Smith: Page 1255

Rebuttal Argument by Mr. Kromberg: Page 1282

## EXHIBITS

| GOVERNMENT'S: | MARKED | RECEIVED |
|---|---|---|
| Nos. 7-201B and 7-201D | | 1203 |
| 10-620 | | 1097 |
| 10-650 | | 1090 |
| 10-701 | | 1090 |
| 10-806 | | 1082 |
| 10-810 | | 1085 |
| 10-821 | | 1102 |
| 10-823 | | 1086 |
| 10-824 | | 1098 |
| 10-825 | | 1101 |
| 10-826 and 10-827 | | 1092 |
| 10-903 | | 1081 |
| 11-600 | | 1092 |
| 12-24 | | 1204 |
| 16-001 | | 1095 |

EXHIBITS (Cont'd.)

| | MARKED | RECEIVED |
|---|---|---|
| DEFENDANT'S: | | |
| No. 1 | | 1201 |
| 2, 3 and 8 | | 1133 |
| 14 thru 24 | | 1172 |
| 25 | | 1208 |

P R O C E E D I N G S

(Defendant present, Jury out.)

THE CLERK:  Criminal Case 16-265, United States of America v. Nicholas Young.  Would counsel please note their appearances for the record.

MR. KROMBERG:  Good morning, Your Honor.  Gordon Kromberg, John Gibbs, and Evan Turgeon for the United States, and with us is Special Agent Caslen and Mr. Fabian Vera.

THE COURT:  Good morning.

MR. SMITH:  Good morning, Your Honor.  Nicholas Smith for defendant Nicholas Young, and with me is Ms. Linda Moreno.

MS. MORENO:  Good morning.

THE COURT:  All right, the jury is all here, so I don't want to hold them up, but I had one quick question because I just about have the charge -- or at least the draft charge complete, which you're going to probably get around lunchtime.  Is the defense making an entrapment defense as to all three counts or only as to Count 1?  I need to know that because it changes how we structure the language of that instruction.

MR. SMITH:  Your Honor, we are only making the entrapment defense with respect to Count 1.

THE COURT:  That's what I thought, all right.  So we have to modify the instruction slightly to make that clear to the jury.

MR. SMITH: Right.

THE COURT: All right, thank you.

All right, let's bring the jury in.

MR. KROMBERG: Sorry, Your Honor, on the special verdict form, if I may, can I ask Mr. Turgeon to address the Court?

THE COURT: Yes.

MR. TURGEON: Good morning, Your Honor. The government's reviewed Your Honor's proposed verdict form, and it occurred to us yesterday that as to Count 1, which is attempting to provide material support, there are actually two ways based on the evidence currently in evidence in which that could have happened. The first is attempting to provide material -- excuse me, attempting to provide misleading information to the FBI in order to protect Mo's ability to avoid capture and continue to serve ISIL, and that language is right from the indictment, and the other theory is the gift card theory, by attempting to provide material support by providing gift card codes or gift cards to Mo, and that language is from the indictment as well.

So the government would offer this special verdict form that allows the jury to make an independent determination as to each theory of guilt or innocence with regard to Count 1. So I've broken that down. I have a copy for Your Honor if Your Honor would like to review that.

THE COURT: Well, have you given that to the opposing counsel yet?

MR. SMITH: No.

MR. TURGEON: No, we haven't.

MR. SMITH: And, Your Honor, we're able to object right now to this proposal.

THE COURT: Well, wait. Let me take a look at it and think about it. I don't want to -- again, when a jury is on time, I don't want them to be held up. Let's get the jury in here. You have time to think about it.

MR. SMITH: Okay.

THE COURT: I'm not making up my mind. I just want to see it, and you can hand it up -- let's get the jury in first. Then hand it up.

MR. TURGEON: Thank you, Your Honor.

(Jury present.)

THE COURT: Good morning, ladies and gentlemen. Again, thank you for being here promptly. We're going to get the case started right away and move it as quickly as we can. Unless the snow looks like it's going to be horrendous, I would like us to stay in session then until five o'clock. If something changes, we start seeing a blizzard out there, I'll let you go home earlier.

All right, Mr. Kromberg?

MR. KROMBERG: Thank you, Your Honor.

SA NICHOLAS ANGELO CASLEN, GOVERNMENT'S WITNESS,
PREVIOUSLY AFFIRMED, RESUMED
DIRECT EXAMINATION (Cont'd.)

BY MR. KROMBERG:

Q. Special Agent --

THE COURT: You're still under your affirmation to tell the truth from yesterday.

THE WITNESS: Yes, Your Honor.

BY MR. KROMBERG:

Q. Special Agent Caslen, when did the FBI first learn that the defendant's associates in Libya in April 2011 were at the Abu Salim Martyrs Brigade?

A. We first learned about his association with that group through an e-mail that the defendant sent to alias Mo, who was -- the e-mail address was being handled by one of the FBI undercover agents. I believe it was in July.

Q. Well, hold on. The evidence is already in evidence.

Mr. Vera, can you put up 1-213, please?

Is that the one you're referring to?

A. It is.

Q. And what's the date of that?

A. The date is July 1, 2015.

Q. And the reference to the organization was what in that message?

A. The second line from the bottom, "People from the Abo

Salem Suhada Brig."

Q. Okay. Was a more complete name given in, in February 2016 in a text message?

A. It was.

Q. Okay. Could we put on Government Exhibit 2-126? And in that message, is the more complete name in there?

A. It is. It's in the second message from the bottom. It states, "Please let me know if you find any brothers from derna or Abu Salim martyrs brigade."

Q. And before those two messages, who did -- what organization did the FBI understand Mr. Young to have been with?

A. We did not know at the time.

Q. Now, yesterday, you were talking about Government Exhibit 14-119.

Can you put on 14-119?

Now, you mentioned that six days -- you had seen photos from six days earlier with Mr. Young dressed in a Nazi uniform. Did you see photos after this, chronologically after this time of him dressed in a Nazi uniform?

A. I did. In 2007, there was -- we had seized the disc from the defendant's residence that had photographs of the defendant and some other folks at a, what appeared to be a dinner party dressed in Nazi uniforms, with flags, with swastikas.

Q. Was he holding a gun in one of those photographs?

A. He was.

MR. KROMBERG: Judge, we would ask that you take a look at 10-903.

MR. SMITH: We object, Your Honor. Relevance, cumulative.

MR. KROMBERG: And we're particularly interested in the metadata on the bottom of 10-903.

THE COURT: I'll permit that. Overruled.

(Government's Exhibit No. 10-903 was received in evidence.)

MR. KROMBERG: Thank you. Please publish 10-903.

Q. And, Special Agent Caslen, what is the date that that document was created?

A. November 17, 2007.

Q. Okay. Let me turn your attention to Government Exhibit which is not yet in evidence 10-1006.

I don't think you're going to have any issue with it.

MR. SMITH: There is no 10-1006.

THE COURT: 10 what?

MR. KROMBERG: 10-806.

THE COURT: 806.

MR. KROMBERG: And the next is 10-810. I don't think you care about that.

MR. SMITH: No, no. No objection.

THE COURT: All right, it's in.

(Government's Exhibit No. 10-806 was received in evidence.)

MR. KROMBERG: So 10-806, please publish.

Q. And it's very difficult to read those, but, Special Agent Caslen, can you tell us what those documents are?

MR. SMITH: Objection. This is another example of documents where we cannot read the documents. They're too far zoomed out. The originals aren't here.

MR. KROMBERG: The originals are here if you want the originals, but we can't put the originals on the screen in any way other than this.

THE COURT: Well, you actually can. The old-fashioned way is you put these on the Elmo and it projects, but, I mean, I can't even read these in my book.

MR. KROMBERG: We're going to blow them up. Let me ask the witness, if I may, Judge, what are these documents?

THE WITNESS: I recognize the photo as being e-mails that we seized from the defendant's residence on the date of his arrest and search that are correspondence between his employers about his trip.

BY MR. KROMBERG:

Q. Regarding his, his request for leave?

A. Correct.

Q. Okay. And they provided some dates that you were using to put into the timeline that you were compiling, correct?

A. That is correct.

Q. Okay. Can you --

THE COURT: See, the normal way this would be done is the originals, that is, what you've got in your hand would be sitting over here and would be shown to the witness or -- and then you'd have the electronic version which the jury could be seeing, all right? So we may have to spend some time before the case goes to the jury with your substituting what you're holding, and we will, we will use the scissors to open them all up, and the only thing I'll ask the jury is be very careful when you look at the document to put it back in the correct folder. Otherwise, we lose control because I don't think we've put stickers -- you want scissors again? Can we get scissors?

We're going to leave them there. You just behave yourselves with them, all right?

MR. KROMBERG: Thank you, Your Honor. And we did, in fact, discuss this very issue this morning. Mr. Vera is working with the court security officer to substitute the originals for the items -- for the copies, excuse me.

THE COURT: All right. So if defense counsel want to look at them, go ahead.

While that's happening, so, Agent, these are communications -- printouts, right, of e-mail communications between the defendant and his employer?

THE WITNESS: I believe it's between the defendant's

employer and another employer. I don't -- I do not recall if it is the defendant e-mailing the employer.

THE COURT: But they were in his possession?

THE WITNESS: They were in the -- I'm sorry, Your Honor?

THE COURT: They were where?

THE WITNESS: They were seized out of defendant's residence.

THE COURT: All right.

MR. SMITH: No objection, Your Honor.

THE COURT: All right.

MR. KROMBERG: Thank you, Your Honor.

THE COURT: Let's get them all pooled together and give them to the witness. These are what, five sheets of paper? Four sheets. They should all have labels on them.

BY MR. KROMBERG:

Q. Okay. So the judge had asked, was the defendant a recipient or copied on those e-mails?

A. No.

Q. And they were from Sergeant Washington, is it?

A. They're from Sergeant Tiffany M. Washington to Julius Byrd and Ronald Pavlik, who was the chief --

Q. And they were regarding a request for leave by the defendant?

A. Yes.

Q. Okay. We'll move on. They're in evidence.

And is it correct that you used that information to put on the timeline to try to reconstruct the events of what happened in 2011?

A. Correct.

MR. KROMBERG: Okay. We also move in Government Exhibit 10-810, which is the passport that was found at the defendant's house in August 2016.

THE COURT: I assume there's no objection?

MR. SMITH: No objection.

THE COURT: No objection. All right, it's in. It's in, Mr. Kromberg.

(Government's Exhibit No. 10-810 was received in evidence.)

THE COURT: All right, now don't get so aggressive with the cutting that we're losing the stickers.

MR. KROMBERG: In fact, I think we need to put the sticker on that because the sticker was put on the bag.

THE COURT: I know. That's why I'm saying you're getting too aggressive. We're going to lose control of the evidence. We have one here.

Oh, you've got one? All right.

Now, Mr. van Roekel, I'm sorry, that sticker needs to be put on the passport. Just put it on the back of the passport.

BY MR. KROMBERG:

Q. Okay. Special Agent Caslen, did you use this passport to come up with events in the timeline?

A. Yes, this passport was used.

Q. Okay. Take a look, if you would, at Government Exhibit 10-823, which is not yet in evidence.

MR. SMITH: No objection, Your Honor.

THE COURT: It's in.

(Government's Exhibit No. 10-823 was received in evidence.)

MR. KROMBERG: Okay. Mr. Vera, can you publish 10-823? We'll put the original in later, but for now just --

Q. Special Agent Caslen, can you tell what that document is, 10-823?

A. I recognize this document. It was -- I requested that it be translated by --

Q. Well, before you even go into the translation, but just Libyan customs -- a Libyan customs form?

A. Correct.

Q. And there's a date on it?

A. There is. It's September 8, 2011.

Q. And it reflects body armor?

A. Correct.

Q. Okay. And you used that for your timeline as well, correct?

A. I did.

Q. Now, take a look at 10-701, which is a book?

THE COURT: Now, wait, hold on a second. I want to make sure that I understand the evidence.

MR. SMITH: Objection.

THE COURT: The evidence appears to be in both Arabic and English.

THE WITNESS: Correct.

THE COURT: The English that's on this exhibit, was that originally on the exhibit just like this?

THE WITNESS: It was, Your Honor.

THE COURT: All right. So in other words, none of this has been translated by anybody, I mean, anybody at the FBI's direction?

THE WITNESS: None of the writing placed onto the exhibit, Your Honor, was placed on there by an FBI translator. We requested a translator translate the Arabic portion, but that is not reflected directly onto the exhibit. The English on there was written by, that's original to the exhibit.

THE COURT: That's all I wanted to make sure. So that just so the jury understands, 10-823 is exactly what you got from wherever you got it?

THE WITNESS: From the defendant's residence, Your Honor.

THE COURT: All right, that's fine.

BY MR. KROMBERG:

Q. Okay. 10-701 is a book?

MR. SMITH: And here, Your Honor, we object. This is again cumulative, 401, 403.

THE COURT: All right, let me see.

MR. KROMBERG: And, Judge, I believe this is the only book that -- in the defendant's possession that its title establishes a point we've been trying to make.

THE COURT: All right, hold on.

Is that in a folder of some kind?

MR. KROMBERG: I have the book here.

THE COURT: All right. I want to take a -- I assume the defense has already seen it?

MR. KROMBERG: It's been --

THE COURT: Where are you going?

MR. SMITH: I was going to hand it up.

THE COURT: No, you never hand anything up. You give it to my court security officer, Mr. Smith.

MR. SMITH: I just wanted to be careful.

THE COURT: Okay. So you have clips on it because it's falling apart. There's no binding.

I don't see what the purpose of this is given all the other evidence that's in the case.

MR. KROMBERG: Your Honor, we need to approach if you want my response.

THE COURT: Yes, go ahead.

(Bench conference on the record.)

MR. KROMBERG: Your Honor, the title of the book is *The SS: Hitler's Instrument of Terror*. We want to show that -- the symbol of the front, the parallel bolts, and that the SS was a terror organization and that's what Mr. Young was posing as, a member of a terror organization.

THE COURT: No, I think only the cover can come in.

MR. KROMBERG: Absolutely fine.

MR. SMITH: Your Honor, this is the point of parity. This is 403 evidence, pure 403 evidence, and the word "terror," "terror" can mean many things. Terrorism, non-state act of terrorism is not the same as the abstract word "terror." This argument is plainly silly and --

THE COURT: It works into the entrapment issue, and I'm allowing just the cover, all right?

MR. KROMBERG: That's fine.

THE COURT: So actually then, you don't need the book 701 as you've done it.

MR. KROMBERG: That's fine.

THE COURT: Take it back.

(End of bench conference.)

THE COURT: Just for the record, I've determined just the cover is all that's needed for 701, so 10-701 is in evidence, but that exhibit will consist solely of the cover

that we already have through a slide.

(Government's Exhibit No. 10-701 was received in evidence.)

MR. KROMBERG: Can you publish the cover of 701, 10-701? Okay.

Q. Now, Special Agent Caslen, how many cell phones were found in the defendant's house at the search in August 2016?

A. There were a lot of cell phones.

Q. I'm handing you what's been marked --

THE COURT: You don't have to open that.

MR. KROMBERG: I wasn't. I was just going to hand him the bag, which has been marked 10-650.

THE COURT: Is there any objection to 650?

MR. SMITH: To the extent it's just the physical phones themselves, no.

THE COURT: Is there anything other than the phones in there?

MR. KROMBERG: No. Just bags with phones in them.

THE COURT: All right, 650 is in.

(Government's Exhibit No. 10-650 was received in evidence.)

BY MR. KROMBERG:

Q. Now, Special Agent Caslen, were you able to determine the names in which all of these phones were registered in?

A. Not all of the phones here we were able to determine the

name, but we were able to determine the name that some of the defendant's phones were registered in.

Q. Okay. Take a look, if you would, at Government Exhibit 3-125, which I believe has already been admitted.

THE COURT: Wait until we confirm that.

It's in. 125 is in.

MR. KROMBERG: It was seized from the truck, and we stipulated that it was seized from the truck.

Okay. Can you put 3-125 on the screen, please? And you're going to have to blow that up. That's a bad term to use here, but expand it.

MR. SMITH: Objection.

THE COURT: Sustained.

MR. KROMBERG: And focus in on the top, if you would.

Q. Now -- well, can you tell the jury what this document was -- is?

A. This is a document seized from the defendant's truck the day we searched his vehicle, and it's a piece of paper with an account summary for a Virgin Mobile cellular telephone.

Q. And in what name was it in?

A. I recognize the exhibit, and the name is an Otis Driftwood.

Q. Okay. Did --

THE COURT: I'm sorry, spell that. Otis?

THE WITNESS: Otis, O-t-i-s. Driftwood,

D-r-i-f-t-w-o-o-d.

BY MR. KROMBERG:

Q. Can you take a look at Government Exhibit 11-600?

MR. SMITH: No objection.

THE COURT: All right, it's in.

(Government's Exhibit No. 11-600 was received in evidence.)

MR. KROMBERG: Can you publish 11-600, please?

Q. And is that the Sprint subscriber information for Otis Driftwood?

A. It is. This is a subscriber information for another account on Sprint in the name of Otis Driftwood as well.

Q. Were you able to find a 12939 Shadow Lane in Fairfax?

A. There is a Shadow Lane in Fairfax, but there's not a 12939.

Q. Take a look, if you would, at Government Exhibits 10-826 and 827. Now, they are not in evidence yet; however, the parties have stipulated in stipulation No. 40, which is Government Exhibit 12-40, that's -- just one moment.

THE COURT: Is there any objection to 26 or 27?

MR. SMITH: No, Your Honor.

THE COURT: No? All right, they're both in.

(Government's Exhibit Nos. 10-826 and 10-827 were received in evidence.)

MR. KROMBERG: Okay. Thank you.

Can you publish, Mr. Vera, 10-826? And you have to expand that near the top.

Q. Special Agent Caslen, can you tell what 10-826 is?

A. This is a receipt for a Boost Mobile phone dated December 2, 2011, and the customer name was Simon Belmont.

Q. Take a look now at 10-827. And can you tell what that document is?

A. This is a document for another Virgin Mobile phone.

Q. In the name of?

A. I believe that one was also in the name of Simon Belmont.

Q. Now, were you able to locate Simon Belmont?

A. We searched for -- we did a Google search for Simon Belmont, and he's a character in a, I believe in a movie.

Q. But you didn't find the person who was a subscriber who had these phones, Simon Belmont?

A. No.

Q. Okay. Now, Special Agent Caslen, what involvement did you have -- sorry -- did you have with a grand jury investigation involving the defendant, Nicholas Young?

A. Over the course of the investigation, the FBI, myself included, my colleagues, some who have testified earlier, have requested federal grand jury subpoenas related to the defendant for subscriber information, information such as Agent Cameron Siegfried stated, introduced related to the FedEx surveillance videos. We received that information directly at times from

the providers, from FedEx, for example. There were federal grand jury subpoenas that we ourselves issued and received the response back from.

Q. When you say you yourself issued, what do you mean?

A. The agents assigned to the investigation and that were doing the investigation.

Q. Right, but did they write the grand jury subpoena or obtain a grand jury subpoena and then serve it?

A. We obtained the grand jury subpoena from the grand jury and then served them directly to the providers or via the portals that some of these online social media companies have us serve them through.

Q. And how was -- what was your involvement in the receipt of information that were provided in response to grand jury subpoenas?

A. We would analyze the data.

Q. No, I'm sorry, before you get there, how did, how did you get the data to analyze?

A. It would be sent directly to us. Sometimes, for example, Facebook or Google, for example. We'll use Google as an example in this case. You serve the subpoena through an online portal to Google. Google notifies us, the agent, that your results are ready. You log on to your account in Google. You download the results, and then we upload them into our case file.

Q. What district was the grand jury that was involved in the investigation located?

A. Eastern District of Virginia.

Q. Okay. Now, please take a look at Government Exhibit --

THE COURT: I'm sorry, when did you start getting grand -- as far as you know, when did you start, you being the FBI, start getting grand jury subpoenas? From what year?

MR. KROMBERG: If I may, Judge, the next -- what I was asking the defendant -- the witness to look at --

THE COURT: Are you going there?

MR. KROMBERG: -- is a list.

THE COURT: All right.

BY MR. KROMBERG:

Q. Okay. Can you please look at Government Exhibit 16-001? It's not in evidence.

THE COURT: All right.

BY MR. KROMBERG:

Q. It should be 16-001.

MR. SMITH: No objection.

MR. KROMBERG: Oh, in that case --

THE COURT: There's no objection?

MR. SMITH: No.

THE COURT: All right, it's in.

(Government's Exhibit No. 16-001 was received in

evidence.)

MR. KROMBERG: Please publish 16-001.

Q. Special Agent Caslen, what is that document?

A. This is a document that we put together showing examples of grand jury subpoenas that were served in this investigation.

Q. Was this all the subpoenas that were served in this investigation?

A. No, it was not. This is just a sampling.

Q. Were all of those subpoenas directed at Nicholas Young?

A. Yes.

Q. Were other subpoenas in this investigation directed at individuals other than Nicholas Young?

A. They were.

Q. For example, were there -- were you looking for subscriber information for other individuals?

A. Yes.

Q. Okay. 16-001 is in. Then we can take it off -- I mean, we can take it off the screen.

So, Special Agent Caslen, what techniques of operational security did you observe or did you find the defendant to have used?

A. There were plenty. For example, as we've heard in testimony, the defendant would instruct Mo to take the battery out of his cell phone when they would talk about derogatory information. The defendant would routinely use a FedEx store

to disguise where he was e-mailing people from rather than using his home computer.

The use of the bag of cell phones that we showed earlier rather than simply using his phone to communicate with other individuals.

Q. Let me ask you to look at Government Exhibits 620 -- 10-620 and 10-621. They are things, 10-620 and 621.

THE COURT: Any objection to 621 and 620?

MR. SMITH: One moment, Your Honor.

Your Honor, we object on relevance grounds. I don't understand.

MR. KROMBERG: I'm going to hand to the Court --

MR. SMITH: Relevance and 403.

THE COURT: Wait a minute. 620?

MR. KROMBERG: In fact, we don't need -- it's already, it's already marked.

Judge, I'm going to hand to the court security officer to hand to the Court what is 10-620 so the Court can see what it is.

THE COURT: The objection to 620 is overruled. Go ahead.

(Government's Exhibit No. 10-620 was received in evidence.)

BY MR. KROMBERG:

Q. And where was this found, Special Agent Caslen?

A. This item is an RF bug detector, and it was found in the defendant's residence on the day we searched his residence.

MR. SMITH: Objection to the evidence, Your Honor.

THE COURT: Overruled. That's not looking for cockroaches. What is it looking for? You said it's a bug detector.

THE WITNESS: This would search for devices that were placed inside of a residence that were transmitting a signal.

THE COURT: It's in.

BY MR. KROMBERG:

Q. Take a look at the photo of Government Exhibit 10-824, but it's not in evidence.

Could we get the photo of 10-824?

MR. SMITH: No objection.

THE COURT: All right, 824 is in.

(Government's Exhibit No. 10-824 was received in evidence.)

MR. KROMBERG: All right, can you publish 10-824?

Q. And what is that?

A. This is a receipt from PayPal for a pair of night vision goggles that were purchased by Nicholas Young, with the defendant's address and an e-mail address used by the defendant, flyingdutchman1979@hotmail.com, with the defendant's auction ID name, skraal777, and that is spelled s-k-r-a-a-l-7-7-7.

Q. Now, I'd like you to look at Government Exhibit 10-821, which is a booklet which the parties have stipulated was seized from the defendant's house, but the parties have not agreed on its admission into evidence.

MR. SMITH: And we object on 401 and 403 grounds and cumulative grounds.

THE COURT: Hold on a second.

MR. SMITH: Your Honor, may we approach the bench about this issue? There's something we need to explain.

THE COURT: All right, go ahead.

(Bench conference on the record.)

THE COURT: Yes.

MR. SMITH: This was apparently work-related material. I don't know what the government's relevance argument is, but to the extent they're presenting this as some sort of a --

THE COURT: Well, it puts him on notice. I mean, this is evidence again of what was in this man's mind as to an issue and what investigators look for in terms of indicia of terrorist activities. It goes to the entrapment issue, it seems to me.

MR. KROMBERG: Mr. Gibbs suggested it was a checklist that the defendant was trying to follow, but I thought that was being sarcastic. But Your Honor is exactly right; it lists various things that the government looks for, and that goes to

the defendant's knowledge of what the government looks for.

THE COURT: Yeah, I'm overruling the objection.

(End of bench conference.)

MR. KROMBERG: I'm handing to the court security officer Government Exhibit 10-821, and it's been admitted into evidence.

Mr. Vera, can you put the first page of that on the screen? And blow it up so the jury can see it, please. "Warnings Signs of Terrorist Events."

Q. So, Special Agent Caslen, this was found in the defendant's house in August 2016?

A. Correct.

Q. What is the point of -- what's the Bureau of Justice Assistance's aim in distributing this document?

A. This is to be a pocket guide for law enforcement officers, state, local, tribal law enforcement officers, on how to spot signs of terrorist events and explain to them what to do if you see them.

MR. KROMBERG: Can you turn to page 5, Mr. Vera?

Q. And, Special Agent Caslen, what is a precursor, a possible sign of terrorist activities that local offices should be on the lookout for?

MR. SMITH: Objection. This is being used to prove the truth of the --

THE COURT: No. At the bench conference, we

explained why it's going into evidence. Overruled.

THE WITNESS: There are several things in here. Just to point out the relevant ones, modifications of vehicles, which the defendant had gutted his truck, the interior of his truck; possession of or attempts to acquire the following types of items: body armor, identifications. An example, military identifications.

Q. What military identifications are you talking about?

A. In the defendant's residence, there were two visitor's IDs to DTRA, the Defense Threat Reduction Agency.

Q. Can you take a look at Government Exhibit 10-825? It's not yet in evidence.

MR. SMITH: No objection.

THE COURT: All right, it's in.

(Government's Exhibit No. 10-825 was received in evidence.)

MR. KROMBERG: If you could put that on the screen, please? Okay.

Q. So that was -- so please continue, Special Agent Caslen.

A. I stand corrected. I said they were visitor's badges. They are temporary badges. Those are the badges that were found at the defendant's residence.

Q. Okay. Go back to 10-821. Now, you said as a precursor, there's body armor. What body armor was found at the defendant's house?

MR. SMITH: Objection, Your Honor. 401, 403, law of the case.

THE COURT: Now that's become relevant. I'm permitting it in.

(Government's Exhibit No. 10-821 was received in evidence.)

BY MR. KROMBERG:

Q. What body armor was found?

A. There was over 70 pieces of body armor found in the defendant's residence of various types: helmets, ballistic helmets, a ballistic face mask, full length body armor, to include legs. I would say --

Q. For how many people?

A. Well, there were ten tactical vests that were, contained ballistic panels as well as many other inserts that could be placed into them. There was neck guards. There were ceramic plates.

Q. How many neck guards were there?

A. I don't recall the exact amount, but there were several.

MR. KROMBERG: So we have them, and, Judge, we can move them into evidence, but they take up a lot of space because of the volume and such, but we can move them in now, and they are Government Exhibits 10-500 through 10-569.

MR. SMITH: And before that, may we have one final bench conference?

THE COURT: Now, you said the word "final." If I hold you --

MR. SMITH: On this issue.

THE COURT: All right.

MR. SMITH: Thanks.

THE COURT: Approach.

(Bench conference on the record.)

THE COURT: Yeah.

MR. SMITH: Okay. So our position is that it is the law of the case already that the body armor would be excluded unless the defense opened the door. We believe we have not opened the door. We believe that it's on the record that the judge has already ruled that unless the government -- the defense opened the door, the body armor would not be coming in, so we're going to move for a mistrial on that ground.

THE COURT: Stop. We're not having a mistrial in this case.

The jury does not need to see it.

MR. KROMBERG: Okay.

THE COURT: I think, however, because this timeline is significant, I'm allowing -- you've got enough on that.

MR. KROMBERG: Okay.

THE COURT: So just go ahead.

(End of bench conference.)

BY MR. KROMBERG:

Q. Scratch that, Special Agent Caslen. We are not going to bring those -- bring the body armor in, but -- -

MR. SMITH: Objection.

THE COURT: Overruled. Let's not just having objections all the time.

BY MR. KROMBERG:

Q. I'd like to show you Government Exhibit 10-532A.

MR. SMITH: Objection, Your Honor. 401, 403. It's the same issue Your Honor just ruled on, and Gordon is ignoring it.

THE COURT: Let me see what we have here. 10-532?

MR. KROMBERG: 532 is a piece of body armor. 10-532A is photographs.

MR. SMITH: Objection to --

THE COURT: Just a second.

No, we don't need that. 532 is not in.

BY MR. KROMBERG:

Q. Okay. When you mentioned the types of body armor that you --

THE COURT: No, let's get on to another topic.

BY MR. KROMBERG:

Q. Okay. Let's go back to 821, page 5. Weapons or ammunition, were there weapons and ammunition in the house?

MR. SMITH: Objection. This is law of the case, and it's also 403.

THE COURT: Yeah. Mr. Kromberg, I think we've been through some of this pretrial, all right? So move on to another question. Sustained.

BY MR. KROMBERG:

Q. Okay. Were there unusual chemicals or ingredients in the house?

MR. SMITH: Objection. Law of the case, 401, and 403.

THE COURT: I don't think that issue was addressed.

MR. KROMBERG: I don't think it has, Your Honor.

THE COURT: No. Overruled.

BY MR. KROMBERG:

Q. Were there unusual chemicals or ingredients in the house?

A. Yes, there were. There were smoke grenades --

MR. SMITH: Objection. We move for a mistrial.

THE COURT: Overruled.

MR. SMITH: This is the law of the case.

THE COURT: Overruled and denied.

Go ahead.

BY MR. KROMBERG:

Q. Go ahead.

MR. SMITH: But to be clear, this was -- this is an issue that Your Honor ruled on before trial.

MR. KROMBERG: That is not correct, Judge, and it's also correct that sometimes the Court changes its mind, but

that did not happen in this case because that did not -- question did not come up before.

THE COURT: I've made the ruling, but I do want to move this along.

MR. KROMBERG: Right.

Q. So what are the chemicals? What were the chemicals that you saw that were found in the house?

A. There was also a thermite grenade, which --

MR. SMITH: Your Honor, objection. This is exactly what the Court just ruled on.

THE COURT: All right.

MR. SMITH: Mr. Kromberg tried to elicit the exact same testimony right after Your Honor ruled on it.

THE COURT: Mr. Kromberg, move on to identification issues or other items that might be there on the list.

MR. KROMBERG: We've talked about the prepaid cell phones. Can we go to the next page?

Can we go to the next page?

Q. And, Special Agent Caslen, under "Contacts," what does this, the document that the defendant had in his house say to do if you see a threat or something that is suspicious in this regard? Step one says either arrest them or detain them or report them?

A. Okay.

MR. SMITH: Objection. Leading.

THE COURT: Sustained.

THE WITNESS: Yes, that is correct.

BY MR. KROMBERG:

Q. Okay. And when the judge says "sustained," then you don't answer -- don't answer the question.

A. My apologies.

MR. KROMBERG: Can we go to the next page?

Q. Now, these are warning signs which, some of which appear to be the same as the precursors we went over before, but were there anti-government special interest tattoos involved in this case?

MR. SMITH: Objection. Leading.

THE COURT: Yeah, I think that's leading. You've got to do it in a non-leading manner. Sustained.

BY MR. KROMBERG:

Q. Okay. Starting from the top with domestic terrorist warning signs, were there any signs of domestic terrorism warnings in the -- you've seen in this case?

A. There were. There were bumper stickers. There were anti-government special interest tattoos. There -- am I allowed to read?

Q. Go ahead.

A. Claims regarding government conspiracies.

Q. And how about claims that law enforcement is illegitimate?

A. That's correct.

MR. KROMBERG: Okay. Let's go to the next page. Is that the end? No, okay.

Q. How about on the last page, under "Other Signs," "extremist religious literature and paraphernalia"?

A. There were. Already placed into evidence were the copies of *Inspire* magazine, the Book of Jihad.

Q. And the history of visiting suspicious Internet sites?

A. Correct.

Q. And the -- how about bomb-making manuals?

MR. SMITH: Objection, Your Honor. Your Honor has already ruled on this. Law of the case.

THE COURT: I believe we've ruled on that -- all right, I think we have enough on this, Mr. Kromberg. Let's move on.

BY MR. KROMBERG:

Q. Okay. And the last is a picture of a book by Andrew Macdonald. Was that book found in his, in his house? No, correct?

A. No, *The Turner Diaries* was --

MR. SMITH: Leading.

MR. KROMBERG: Okay. Strike that. The answer is no.

THE COURT: Let's move on. Come on.

BY MR. KROMBERG:

Q. What book was seized by the author Andrew Macdonald?

MR. SMITH: Objection. Cumulative.

THE COURT: You may ask the question.

BY MR. KROMBERG:

Q. What book was seized from the defendant's house by Andrew Macdonald?

A. I believe the book *Hunter*, which was already placed into evidence.

MR. KROMBERG: And that was 10-860 in evidence? I've lost track.

MR. SMITH: No. The Court excluded that exhibit.

MR. KROMBERG: Then now we're moving it into evidence.

MR. SMITH: Your Honor, it's already been excluded.

THE COURT: Just a second.

I don't think we need to get into this. I'll sustain the objection.

MR. KROMBERG: Okay. Just one moment, please.

Judge, at some point, we're going to need to get with the court reporter to make sure that the evidence that we think is in is in --

THE COURT: Yes.

MR. KROMBERG: -- but we reserve -- this is all for this witness, but we do reserve, I hope, the ability to move things into evidence on the basis of, on the basis of testimony already if we have somehow forgotten to move them in.

THE COURT: My practice with cases involving an

extensive amount of documentary evidence is that we don't waste the jury's time with that. We do it on the record at some point when we're in recess, all right?

MR. KROMBERG: And I will pass -- return the Court's pair of scissors.

THE COURT: All right.

MR. KROMBERG: Thank you, Your Honor.

THE COURT: Cross-examination, Mr. Smith?

CROSS-EXAMINATION

BY MR. SMITH:

Q. Good morning, Agent Caslen.

A. Good morning, counselor.

Q. So, Agent Caslen, you're here testifying as a summary witness today, correct?

A. Correct.

Q. And that means you're testifying about the length of the investigation into the defendant, about the course of the investigation into the defendant?

A. Towards the evidence that was put in, correct.

Q. Towards the evidence that was put in.

And you are the case agent on this investigation, correct?

A. I currently am, yes.

Q. What does that -- what does that mean, case agent?

A. The agent in charge of managing the investigation, and

have been so since October 2015.

Q. So at some point since October 2015 and the present, have you familiarized yourself with the case, the case file, so to speak, into Nicholas Young?

A. I have.

Q. So you're familiar with the course of the investigation into Mr. Young?

A. Correct.

Q. Okay. Mr. Caslen, when did the counterterrorism investigation into Nicholas begin?

A. I believe it began in 2010.

Q. And what prompted the investigation into Mr. Young?

A. It was the defendant's connection to Zachary Chesser.

Q. And can you explain what you mean by "connection"?

A. I believe there were phone contacts that were, they were attempting to verify.

Q. And do you remember how many phone contacts there were?

A. I do not recall.

Q. It was about two, right?

A. I would not know.

MR. SMITH: Your Honor, I'm just not introducing an exhibit. I'm handing up a document, which is an FBI memorandum dated September 9, 2010, just to refresh Agent Caslen's recollection.

Q. Have you ever seen that memorandum, Agent Caslen?

MR. KROMBERG: Objection, Judge. The question is does it refresh your recollection.

THE COURT: Yeah. That's the only proper question.

BY MR. SMITH:

Q. Does it refresh your recollection?

A. Is there a portion that you'd like me to read rather than the whole thing in interests of time?

Q. There is. The second page. There's a reference to Zachary Chesser on the --

A. By second page, do you mean the back of the first page or the second --

Q. The second document. The first page of the second document.

There's a reference to Zachary Chesser about halfway down the page, three-quarters of the way down the page.

THE COURT: And the question, Agent, is whether after you read that, does that jog your memory so that you can answer the question?

THE WITNESS: Might I also ask what the question is that you're asking to jog my memory about?

BY MR. SMITH:

Q. When you were the case agent familiarizing yourself with the case file of Nicholas Young, do you recall learning that Mr. Young's cell phone had only two communications with Zac Chesser on it?

A. I do not know how many it had.

Q. And you do not recall after reviewing the document in front of you?

A. I do not.

Q. So, Agent Caslen, do you -- after your review of the case file, do you recall what prompted the FBI investigation besides -- into Mr. Young besides Zachary Chesser's communications with Mr. Young? Were there any other factors?

A. Are you sure you want me to answer that question?

Q. No, I -- sir, I'm only asking you about Mr. Young's involvement at work. Was there a work-related issue with Mr. Young at the Metro Transit Police Department that prompted the investigation to begin?

A. I believe there was information that came from his department regarding a room that the defendant had set up.

Q. That's what I'm referring to. What was that incident? What was that?

A. So I'm not familiar with all the details of that because I was not here back then, but there was a room that the defendant had set up that had some books and some things in it that the Metro Transit Police Department had informed us about.

Q. And would you -- do you recall whether that book was a Koran?

A. I don't recall exactly which books they were.

Q. Okay. Do you recall whether there were just newspaper

articles --

A. Again, I wasn't here when all that happened, so I don't recall exactly what was there. I attempted to find the information and was not able to find exactly what they were, but I do recall a mention of newspaper articles.

Q. Do you recall that there was -- the investigation began partly because Mr. Young was having a beard dispute with his police department he was working for?

A. Did you say "beer" or "beard"?

Q. Beard, beard dispute.

A. I recall the defendant mentioning on his Facebook account that he was having a dispute with his department over his beard.

Q. But you don't recall whether that had anything to do with the beginning of the investigation?

A. I do not.

Q. So at some point after the investigation began in September 2010, Zac Chesser was arrested on terrorism charges, correct?

A. I don't think that's correct.

Q. At some point -- I mean, at some point after the investigation into Mr. Young began --

MR. KROMBERG: Objection, Judge. The witness (sic) is misstating the evidence that has already come in. What the witness said was the investigation started after Zachary

Chesser was arrested.

BY MR. SMITH:

Q. Is that correct, what Mr. Kromberg said?

A. The investigation into Mr. Young started after Zachary Chesser was arrested.

Q. Correct.

A. Yes.

Q. But Mr. Chesser had been a subject of a counterterrorism investigation before Mr. Young was arrested, correct?

A. That is correct.

Q. Okay. Now, there would come a time after the counterterrorism investigation into Mr. Young began that you would interview Mr. Young about Zachary Chesser, right?

A. I did not interview the defendant about Zachary Chesser, no.

Q. Do you recall learning about Mr. Young's interview about Zac Chesser when you reviewed the case file when you came into this case?

A. Yes. The defendant was interviewed by the initial case agents.

Q. And do you recall what Mr. Young told the case agents on that occasion?

A. I do not recall exactly what he said.

Q. Well, do you recall that he said that he was shocked by Mr. Chesser's arrest and that it would be his religious duty to

inform on Chesser if he ever learned that he was committing any acts of terrorism?

A. The interview wasn't recorded, so I was never able to listen to the defendant say that, so I do not recall exactly what he said.

MR. SMITH: Your Honor, I'm just handing up a document to refresh Mr. Caslen's recollection to see whether he recalls this from the case file. This is an important document because it's dated September 13, 2010. This is an important date for the entrapment defense.

THE COURT: All right.

MR. SMITH: So I'm handing up a document dated 9/13/2010. It's an FBI 302 memorandum. This should have been in Nicholas Young's case file.

THE COURT: All right, hand it up.

BY MR. SMITH:

Q. Are you familiar with that document, Agent Caslen?

A. I recognize the document.

Q. And does it refresh your recollection about what Mr. Young may have told the interviewing agents on -- in September 2010?

A. In the interests of time, would you point me to exactly where in here that you want me to read?

Q. Does it refresh your recollection that Mr. Young told the interviewing agents --

THE COURT: Well, wait. He's asking you to point him

to the paragraph. Where? On the first part of the page or the back? Where are you looking at?

MR. SMITH: Your Honor, it's on the second page. There's a conversation. It's only a one-page document, Your Honor, and Chesser's name is capitalized, so all of Mr. Young's comments in the 302 are clearly recognizable.

MR. KROMBERG: Your Honor, I would -- I object on the grounds of hearsay. It's improper to elicit the defendant's statements from the government witness, and when the government does it, it's an admission from a party opponent, but when the defendant is asking to get what the defendant already said to a government agent, that is not an admission from a party opponent.

THE COURT: He can ask, however, what, if anything, was the agent's understanding.

MR. SMITH: And state of mind, Your Honor, which is --

THE COURT: Wait, no. The agent's state of mind has nothing to do with this at this point.

MR. SMITH: Mr. Young's state of mind, Your Honor.

THE COURT: He cannot possibly go into the state of mind of somebody else. All you can say is what does that reflect the defendant having said to whoever was investigating him.

THE WITNESS: Yes, Your Honor.

THE COURT: All right?

THE WITNESS: So I don't doubt the words by the interviewing agents that are on here, but again, I never heard the defendant say any of these things.

BY MR. SMITH:

Q. Thank you.

Now, Agent Caslen, I'm going to continue on the theme of Zac Chesser, because you've been in court during the testimony of this case, correct?

A. Correct.

Q. So it's correct that Zachary Chesser's image was published on the screens, and there was testimony from prior witnesses in this case concerning Zac Chesser and his possible relationship with Nicholas Young, correct?

A. Correct.

Q. Now, did there come a time when you learned that Zac Chesser himself said --

MR. KROMBERG: Objection, Judge. This is hearsay, but the defendant -- but the witness is being asked to say what Zachary Chesser said.

MR. SMITH: Your Honor, it's not being offered to prove the truth of the matter asserted.

THE COURT: Well, approach the bench.

(Bench conference on the record.)

MR. SMITH: There's two reasons we would use this.

The first is impeachment testimony. Agent Caslen has indicated that he has reviewed the entire case file, he's familiar with the investigative history of this case, and Mr. Chesser has indicated that he did not have extensive contacts with Nicholas Young. If Agent Caslen testifies that he did, this would be an impeachment statement not offered for its truth.

Second, the very fact that an individual made this statement is not being offered to prove the truth of the matter asserted. It is merely to -- it is a statement that has been made. The very fact that it's been made is significant and relevant, regardless of whether the truth is, the underlying truth is accurate.

The government can on redirect question the -- whether this letter is, is authentic. They know it's authentic because they produced it to us.

Those, those are perfectly legitimate uses of this document to cross-examine a witness, and, Your Honor, since the government has made a big deal out of connecting Mr. Young to Chesser in its opening, I think it would be highly unfair to not allow the defense to cross-examine the case agent, who we've allowed to go onto the stand without objecting to his summary testimony when we could have.

So this is --

THE COURT: All right. Mr. Kromberg?

MR. KROMBERG: Judge, what Mr. Smith is referring to

is a letter that Zachary Chesser from jail wrote. If they wanted Zachary Chesser's testimony, they should have subpoenaed him, but to present his testimony through a letter is wrong.

And if we go that route, then I'm going to ask the agent, "What did Zachary Chesser say publicly on the Internet?" The answer is going to be, "I lied about everything I ever said to the government."

MR. SMITH: That's fine.

THE COURT: I'm going to allow it. I'm going to let the defense do it, and it opens the door.

MR. KROMBERG: Okay.

(End of bench conference.)

BY MR. SMITH:

Q. So when you were reviewing the case file into Mr. Young's investigation, did you learn that Mr. Young had a relationship with Zac Chesser?

A. I knew there was phone contact between the two.

Q. Was there anything more than that?

A. I believe based off of -- I believe both of them were members of the Muslim Student Association at George Mason.

Q. At George Mason.

Was it more extensive than that?

A. I don't, I don't recall finding anything else that led to believe it was more extensive.

Q. Did you learn the opposite, that Zac Chesser may have been

suspicious of Nick Young?

A. I actually do not recall that.

Q. Now, I'm going to hand you up a document to refresh your recollection. It's not being admitted into evidence. It's not being admitted for its truth. It is a letter from Zachary Chesser, which the date on the letter is an FBI stamp dated 1/24/2017, but I think the actual underlying letter was drafted on August 9, 2016, and I'm going to direct your attention to page 3 and page 4.

So after you review the first page, just let me know if you've ever seen that document before.

A. I have seen this.

Q. And do you recall this -- that in this letter, Mr. Chesser said that when he was at George Mason, Mr. Young never said anything supporting jihad?

A. And that's on page 3, you said?

Q. 3 or 4.

A. Could you repeat the question?

Q. Do you recall in this investigation learning that Mr. Chesser said that Mr. Young at George Mason never said anything supporting jihad?

A. This letter does not specifically reference George Mason, but it does say that Nick had -- essentially, Nick had nothing to do with jihad.

Q. Thank you.

Do you recall learning that Zac Chesser said that Mr. Young wasn't particularly knowledgeable about Islamic law and would not have known that being any kind of cop was forbidden?

A. Yes. It says at that time, he wasn't particularly knowledgeable of Islamic law.

Q. I'm just asking whether it refreshes your recollection. You don't have to read it.

A. Oh.

Q. Do you recall learning that Mr. Chesser said, "Nick was a transit cop, and none of us were even willing to reveal to him that we supported jihad"?

A. Yeah.

Q. And do you recall that an agent we're calling Jones at this trial would later acknowledge that Young had few contacts with Chesser?

A. I don't recall that specifically.

MR. SMITH: Okay. We can move on. Thank you.

Q. Now, another individual of interest in connection with these interlocking investigations that we discussed during the government's case-in-chief was Hisham Hall. Are you familiar with Hisham Hall?

A. I am.

Q. And what is the nature of Hisham Hall's relationship with Mr. Young according to your investigation?

A. I understand the two to be friends.

Q. Has -- did you see the, the photo of Hisham Hall?

A. I did.

Q. Was that an arrest shot? Was that a kind of mug shot?

A. They're all driver's license photos, I believe.

Q. Has Hisham Hall ever been arrested or charged with any terrorism crimes?

A. I'm unaware of any arrests.

Q. Okay.

A. He has not been charged with a terrorism crime.

Q. Okay. Another individual that you mentioned was Peshwaz Waise. I don't know how you say -- is "Waise" --

A. I believe that's correct.

Q. Okay. Has -- and did you see his photograph published on the screen up there?

A. I did.

Q. Okay. Has Peshwaz Waise ever been arrested or charged with terrorism?

A. He's been arrested.

Q. Has he been charged with terrorism crimes?

A. I don't remember exactly what he was charged with, but he was locally arrested in Texas for going into a government building making statements related to jihad, I believe.

Q. Statements, was it?

A. I believe.

Q. Okay. And T. J. Singh? Did you see his photograph published?

A. I did.

Q. And has he been arrested?

A. Not to my knowledge.

Q. And not charged with terrorism crimes?

A. Not to my knowledge.

Q. Okay. There was another individual, Amine Khalifi. You recall him, correct?

A. I do.

Q. And his photograph was published on this TV screen?

A. Yes.

Q. Okay. And Mr. Khalifi has been arrested and indicted with terrorism charges, correct?

A. He's been convicted of terrorism charges, not just indicted.

Q. Correct. And at some point when you learned in your investigation -- when you researched the case file into Mr. Young, you learned that the undercover agent, Khalil, who testified in this trial, introduced Mr. Young to Amine Khalifi, correct?

A. No.

Q. You did not learn that?

A. I did not learn that he introduced him, as stated -- as he stated himself up here.

Q. Did you learn that Mr. Young was, encountered Amine Khalifi because he was going out to dinner with the UCE Khalil?
A. So what UCE had explained was there's circles of friends, and a group of friends went out to dinner, and Khalifi was with him, and at the dinner, the defendant was also there.
Q. Correct.
A. I do not recall that Khalil actually introduced him together.
Q. Yeah. I believe he said he didn't ask him --
THE COURT: Wait, wait. It's not for you to be testifying.
BY MR. SMITH:
Q. So do you recall an individual, Liban Mohamed?
A. I do.
Q. And his picture was published on the screen, correct?
A. That's correct.
Q. Did there come a time when you were researching the investigation into Mr. Young that you learned that the UCE Khalil would indicate that Mr. Young had nothing to do with any plots that were hatched by Liban Mohamed?
A. That is correct.
Q. Okay. So at any time during the course of the investigation into Mr. Young -- this was, this was a counterterrorism investigation, correct, that started in September 2010?

A. I don't recall the exact month it started, but yes, it was a counterterrorism investigation.

Q. But it was always a counterterrorism investigation. It wasn't an investigation into narcotics or any other sort of type of federal crime?

A. Well, the defendant was known to have --

Q. No, I'm only asking you about whether you, your role in this case as case agent is counterterrorism related.

A. No, that's not correct. If we're -- in the course of a counterterrorism investigation, if we uncover other crimes, we can investigate those as well. We're FBI agents, so we can investigate a wide variety of crimes, and it's not just centralized on counterterrorism investigation. If I find something else related to another federal crime, I can investigate that under the same case file, so yes.

Q. That is true. I am merely asking you whether the investigation that led to the indictment in this case was a counterterrorism investigation.

THE COURT: It was. For purposes of this case, it was.

MR. SMITH: Yes, thank you. Thank you, Your Honor.

Q. So at no point prior to the indictment in this case were you investigating Mr. Young for a hate crime, correct?

A. No.

Q. What is -- do you know what a hate crime is?

A. It's -- I don't know the exact definition of it.
Q. What is it -- just based on your knowledge as a --
MR. KROMBERG: Objection, Judge. Relevance.
THE COURT: Sustained.
BY MR. SMITH:
Q. So, Mr. Caslen, at trial, there were two witnesses for the government, Ian Campbell and Police Officer McNulty. Do you recall that?
A. It's "Ian" Campbell.
Q. "Ian" Campbell.
A. And Officer McNulty, correct.
Q. Officer McNulty.
Before Mr. Young's -- when was Mr. Young indicted?
A. I believe it was December of -- 2016?
Q. Right. At any point prior to December 2016, had you interviewed Ian Campbell about the subject of his testimony?
A. I don't recall when we interviewed Ian Campbell about the subject of his testimony, but I did interview Ian Campbell. I can't remember if it was pre or post-indictment.
Q. Was it after the -- was it after July of 2016?
A. I just said I don't remember when it was.
Q. Not even the year?
A. I don't. It could have been January 2017. You asked me if it was pre --
Q. How about with Officer McNulty? Do you recall vaguely

when you first interviewed him?
A. When I first interviewed -- when I personally first interviewed him was just a couple weeks ago.
Q. Okay. Thank you.
So there came a time when -- upon your review of the case file into Nicholas Young, you learned that there came a time when the counterterrorism investigation into Mr. Young learned that Mr. Young traveled to Libya in May of 2011, correct?
A. Yes. We, we learned that he traveled to Libya, correct.
Q. And at the time the counterterrorism investigation learned that Mr. Young traveled to Libya, was it -- did the counterterrorism investigation believe that Mr. Young had traveled to Libya to join a terrorist organization?
A. We were unsure why he traveled to Libya.
Q. Well, did there come a time when the counterterrorism investigation determined that Mr. Young traveled to Libya probably not for reasons related to terrorism?
A. I'm sorry, could you repeat the question?
Q. Sure. Did there come a time when the counterterrorism investigation into Mr. Young determined that Mr. Young had not traveled to Libya to join a terrorist organization?
A. Determined? No.
Q. Sorry, can you clarify? Did there come a time when the FBI analyzed and assessed that it was unlikely Mr. Young had

traveled to Libya to join a terrorist organization?

A. There was a less-than-high-confidence assessment made that it could have been for other reasons other than joining a terrorist investigation.

Q. And what were some of those other reasons?

A. I don't recall exactly the other reasons. Actually --

MR. KROMBERG: Objection, Judge. This is -- I think it might be easier to approach the bench on this.

THE COURT: All right.

(Bench conference on the record.)

MR. KROMBERG: Judge, at some point over the years, there was an assessment that said something about people we don't know.

THE COURT: Yeah, I've seen it.

MR. KROMBERG: However, the agent testified on direct that we only found out about Abu Salim Martyrs Brigade until 2015. So to determine any relevance that might have to what the FBI thought on the basis of incomplete information before finding out about the Abu Salim Martyrs Brigade is irrelevant to anything in this case.

MR. SMITH: Your Honor, it's relevant because we're disputing the statement the government has made repeatedly in this case that Mr. Young traveled to Libya with the intent to join Abu Salim Martyrs Brigade. So documents from the government indicating there were facts and circumstances to

suggest that individuals traveling to Libya in this time period could not have been doing it to join a terrorist organization, it goes to predisposition, Your Honor.

THE COURT: I'm not sure about that, but the problem is you've got the wrong witness for that as well, so I'm going to sustain the objection. This is not going very well. And again, it gets the case mired down in what one particular agent thought or didn't think. It's not going to help in the case.

MR. SMITH: Well, Your Honor, this -- the problem in this case is that we believe the government has selected which agents to present at trial in order to avoid certain documents.

THE COURT: But then you had an ability to subpoena any other witness that you thought you needed to subpoena.

MR. SMITH: We didn't receive a witness list until the government, the first day of trial. We repeatedly asked the government.

So, Your Honor, just for the sake of fairness, this is, this is impeachment evidence. This is refreshing recollection.

THE COURT: No, it's not, but here's the problem: You got the 302s. You had the names of the agents who were interviewing people.

MR. SMITH: They're often redacted, Your Honor.

MR. KROMBERG: Not on the classified --

THE COURT: Wait a minute. I can't hear you.

MR. KROMBERG: I'm sorry, the agents are not redacted from 302s that were classified, and they got them in both classified form and unclassified form.

THE COURT: Well, Ms. Moreno just got the names of the agents, didn't she, on the 302?

MR. KROMBERG: I believe that the names were on the 302, but they certainly could have asked us if they were interested, and we would have come up with it.

THE COURT: No, I'm going to sustain the objection.

(End of bench conference.)

BY MR. SMITH:

Q. Agent Caslen, you familiarized yourself with the items seized from Mr. Young's home, correct?

A. I did.

MR. SMITH: So, Your Honor, we published some photographs yesterday from a camera that was taken -- yeah, from a camera that was seized from Mr. Young's home, and the government produced it to us in a file called "The Libya Camera."

THE COURT: All right.

BY MR. SMITH:

Q. Did you review the files in "The Libya Camera"?

A. I remember that.

Q. And so I'd like to publish some of these just to see if you recall --

THE COURT: What are the exhibit numbers?

MR. SMITH: Your Honor, the exhibit numbers are 2, 3, 4, 5, 6, 7, 8.

THE COURT: Several of those are already in, correct?

MS. MORENO: Yes.

MR. SMITH: Yes, several of those are already in. Actually, we published -- I think yesterday, we published 5, 7, 6 -- 4, 5 --

THE COURT: Mr. Kromberg, do you have any objection to 2 through 8?

MR. KROMBERG: If there are new ones, I'd like to see them first, but --

MR. SMITH: I showed them to Mr. Kromberg a couple of days ago.

MR. KROMBERG: I have no doubt that Mr. Smith is right, but I'd like to know what the exhibits are marked as at this point. It would be helpful if they had exhibit numbers on them, Judge.

MR. SMITH: Your Honor, our paralegal has them over there. He can walk over there and ask him.

MR. KROMBERG: No objection, Judge.

MR. SMITH: Okay.

THE COURT: Do we have -- hold on a second. What numbers went in?

THE CLERK: 4, 5, 6, and 7.

THE COURT: Only 4, 5, 6, and 7 are here.

MR. SMITH: Did you hand up the originals?

THE COURT: 2, 3, and 4 -- all right, do we have them all? Where are the defense exhibits?

MR. SMITH: Did you hand the originals to the court security officer?

MR. ENNS: I gave them to him yesterday.

MR. SMITH: Okay. You have 4, 5, 6, and 7. Can you give the other originals to the Court?

THE COURT: All right. Where's 2, 3, and 4?

MR. SMITH: And also, yeah, 2, 3, 4, 5, 6, 7, 8 should be with the court security officer.

THE COURT: Just -- wait. Show the originals to the government so we're sure we're dealing all with the same thing.

MR. KROMBERG: Thank you, Your Honor.

MR. SMITH: And here is 8. Here's 8.

MR. KROMBERG: Thank you. No objection, Judge.

THE COURT: All right. Defense Exhibits 2 through 8 are in evidence.

(Defendant's Exhibit Nos. 2, 3, and 8 were received in evidence.)

MR. SMITH: Okay. Now, can you put up No. 2?

Q. So, Agent Caslen, a witness has testified in this trial, correct, that Mr. Young entered Libya through Egypt, correct, in May of 2011?

A. Correct.

Q. And what is your understanding of what Mr. Young was doing in Egypt when he traveled through there into Libya?

A. My understanding of when I saw this was that Mr. Young was setting himself a guise of a tour before he went into Libya to join the Abu Salim Martyrs Brigade, similar to what he told Mo to do by touring Turkey.

Q. I see.

Can you publish Exhibit No. 3?

Is this the guise of the tour that you're referring to? What is the guise of a tour, according to you?

A. A guise would be going on a tour to make it look like you're there to be on a tour rather than your true intentions.

Q. I see. So what, what do you see in Defense Exhibit 3? What do you see? Does it look like Mr. Young is in front of a pyramid?

A. It does.

Q. Do you believe that Mr. Young is actually in front of a pyramid in that picture, or is it not real?

A. Oh, I do.

Q. Okay. So is this a guise of a tour, or is it a real tour?

A. I'm not sure.

Q. Not sure. Okay.

Can you publish Exhibit No. 4?

So, Agent Caslen, you and, I think, a couple of other

witnesses have testified that the government believes Mr. Young traveled to Libya to join Abu Salim Martyrs Brigade, correct?

A. That is correct.

Q. And you agree that these photographs were found on a camera that Mr. Young brought with him to Libya, correct?

A. They were found on a camera, I believe, in the defendant's truck. Whether he brought the camera with him to Libya or the SD card that was in it, it's my opinion that he brought the SD card with him to Libya.

Q. Right. And you have previously told other agents that you believe these are photos from Libya and they're interesting, right?

A. And that they're interesting?

Q. Yeah. You recall talking to other agents, saying, "Oh, these are photos from Libya. They're interesting"?

A. I don't recall mentioning they were interesting to other agents.

MR. SMITH: Okay. Can you go to Defense Exhibit 5?

Q. Have you seen this photograph?

A. I have.

Q. And when did you review these photographs?

A. After the SD card and the camera were seized.

Q. Okay. So when you saw these photographs, what was your impression of the nature of Mr. Young's trip to Libya?

A. Similar to what I said before. I -- I'm sorry, are you

asking me what I believed his trip to Libya was?

Q. Yeah. Would it be -- as an investigator, when you're investigating whether Mr. Young traveled to Libya to join a terrorist group, would, would documents like photographs from the trip be important to the inquiry?

A. Yes.

Q. Okay. So, so these photographs were important to the inquiry about whether Mr. Young had joined a terrorist group in Libya, right?

A. Well, this one not so much in particular.

Q. No? Why not? It looks like -- I don't know, it's hard to say who's in here, but it looks like a couple of elderly people that are on a beach, they're giving peace signs.

MR. KROMBERG: Your Honor, the government will stipulate that not every photograph taken by a person in Libya going to a terrorist group has to be of members of a terrorist group.

THE COURT: All right.

MR. SMITH: We appreciate that stipulation.

Can you go to Defense Exhibit No. 7?

Q. Did you see that photograph?

A. I did. I saw it on the defendant's Facebook page as well, I believe.

Q. Oh, so he published his photos on Facebook from Libya?

A. I believe so.

Q. Did that indicate to you as an investigator that he was attempting to hide his travels there?
A. No.
Q. No? Didn't Mr. Young publish on Facebook that he had actually -- are you familiar on Facebook with the function that allows you to indicate where you are at any given time geographically?
A. You put your, like, your hometown? Is that what you're --
Q. Right.
A. I am, yes.
Q. Your hometown or where you're visiting maybe?
A. I don't know so much about visiting, but yes, the hometown.
Q. So in your review of the case file in this case, did you ever see that Mr. Young had posted something about a hometown in Libya?
A. I did. I believe his hometown on Facebook was Misrata.
Q. Right. So did that indicate to you as an investigator that Mr. Young was attempting to hide his trip to Libya?
A. No.
Q. Agent Caslen, early in the trial, ICE Special Agent Gervino testified about what Mr. Young told him on a reentry interview in May of 2011, correct?
A. I'm sorry, what he was what?
Q. The ICE Agent Gervino, Special Agent Gervino testified in

this trial about his reentry interview with Mr. Young in May of 2011, correct?

A. Correct.

Q. And you learned at some time that Mr. Young told Agent Gervino that he went to Libya?

A. Correct.

Q. That he was in Benghazi, that he was in Misrata?

A. I believe he said Benghazi and Misrata.

Q. Okay. So, Mr. Caslen, you've testified about these e-mails you found in Mr. Young's possession from an individual named Mohamed in Libya, and you've testified about how you sort of uncovered the trail of what those, what those e-mails said, right?

A. Yes.

Q. And one of the e-mails, you indicated, was an exchange between Mohamed and Nicholas Young about night vision scopes, right?

A. Correct.

Q. At what -- and do you recall what that exchange essentially -- can you summarize that exchange?

A. In summary, mohamed_2060, as we referred to him yesterday, was asking the defendant to send variations of night vision rifle scopes to him. The defendant stated that he would have to look into it, but he'd buy, I believe it was, $1,500 worth if he could. He found out that it was illegal to send them

overseas, so he couldn't send them because they would be seized by Customs, and rather -- in lieu of sending them, he offered to bring money the next time he went back or purchase things in Egypt and then bring them over.

Q. So when did you first learn about that e-mail exchange when an individual named Mo from Libya asked for night vision scopes and Nick said, "No, I'm not going to do it. It's illegal"? When, when did that come to your attention as the case agent in this?

A. To correct the question, it was actually Mohamed, not Mo.

Q. Mohamed, right. Mohamed_2060.

A. Yes. We're calling him mohamed_2060.

So we learned about that when we found the printed e-mail that is a government exhibit in the center console of defendant's pickup truck during the search of his vehicle. We found that e-mail, and then we subsequently received -- through legal service received the rest of them.

Q. Okay. So you learned about this exchange after Mr. Young was arrested for the charges in this case, correct?

A. Correct.

Q. Okay. Now, did you determine who mohamed_2060 is?

A. It was a contact of the defendant's in Libya, but I do not know the identity of the individual.

Q. So you do not know whether this individual was a member of something that's being called the Abu Salim Martyrs Brigade?

A. I believe in some of the other e-mails that the defendant said under the e-mail address MALIKtheAmerican, he referred to other brothers in the brigade, so I believe that he was.

Q. You're speculating, right? Is that fair to say?

A. I believe it's in, it's in the e-mail.

Q. You're referring to an e-mail in which he says "brothers," correct?

A. I believe so.

Q. And do you have any e-mails indicating "brothers" means mohamed_2060?

A. I would have to see the e-mail to know the exact, the exact content of what it was, but --

Q. You testified --

A. -- I believe that mohamed --

MR. KROMBERG: Objection.

THE COURT: Wait. You're talking over the witness again.

THE WITNESS: The way I believe the MALIKtheAmerican e-mails to go was that the defendant was referring to mohamed_2060 and the other individuals that he e-mailed from the MALIKtheAmerican e-mail address to be members of Shuhada Brigade.

Q. I'm only asking to confirm that that is your interpretation of various e-mails, but you do not have a document indicating a direct connection, correct?

A. I'd have to see the e-mail to see exactly how it was phrased, because I think that may be a direct connection.
Q. As you testify right now, you do not recall?
A. I do not recall.
Q. Thank you.
So after Mr. Young returned from Libya, there came a time when the counterterrorism investigation learned that -- from a CBP officer that Mr. Young had complied with all of the rules for moving body armor overseas, correct?
A. I don't recall exactly which document you're speaking of.
Q. I'll try to refresh your recollection. Maybe I can refresh it by just talking about it with you. There came a time when FBI agents learned from an individual, an officer named Chrispen, a CBP officer named Chrispen that after Mr. Young returned from Libya, he actually -- body armor was seized, and then he returns to Customs to try to have it given back to him.
Do you recall that sort of sequence of events?
A. I don't recall him coming back to get it seized, but I do recall, for example, the letter that the State Department sent him yesterday about it.
Q. Okay. That's sufficient. Thank you.
Now, when Mr. Young returned from Libya, he had an interview with an individual, an agent on this investigation, and Mr. Young tells the agent he was with migrant workers and

black Africans in Libya during his trip in May 2011, correct?
A. I don't recall exactly him saying that.
Q. But do you recall an interview generally speaking, just to speed this along, that there was an interview with an agent in this case who we're calling Jones in this case after Mr. Young returned from Libya, and Mr. Young described to Agent Jones the types of people Mr. Young was with in Libya?
A. I recall that happening. I recall the document. I do not recall the interview because I was not here when that happened.
Q. So seeing the pictures we looked at today, do you have any reason to believe that Mr. Young was misleading Agent Jones about the types of individuals he was with in Libya?
A. I would say the physical descriptions of them are correct --
Q. Okay. You can't --
A. -- but I would say that the, the nature of who they were and what he was doing over there, I don't think he was forthright with.
Q. So during that interview that I'm referring to with Agent Jones which is after Mr. Young returns from Libya, Mr. Young is telling Agent Jones about his trip, and fair to say, you know, that's unusual for a police officer in the Washington, D.C., police force to be traveling to Libya, correct?
A. Depends for what purpose.
Q. What purpose would it be usual for?

A. I mean, if a Libyan police officer is on the D.C. Metro Police Department and he goes home to visit family, I don't see that as unusual.

Q. Fair enough. But for someone who is not a Libyan.

A. For the purposes of what the defendant went over there for, I would say it's unusual.

Q. Okay. All right. So during this interview with Agent Jones, after Mr. Young explains what he was doing in Libya, Agent Jones inquired whether Mr. Young would have any interest in being a confidential human source for the FBI, correct?

A. So in speaking with Agent Jones, I understood that to be more of a ruse to interview the defendant more than an actual attempt to recruit him as an informant.

Q. Okay. Do you recall that after this meeting when they discussed serving as a confidential human source in September of 2011, Agent Jones met with the defendant on a, on a second occasion?

A. I believe there were two interviews afterwards.

Q. And was the second one in Richmond?

A. I don't recall where, but it was somewhere in Virginia.

Q. So was the second meeting also a ruse, or was it actually to discuss serving as a confidential human source?

A. In my conversations with Agent Jones, I understand it to also be similar to the purpose of the first one.

Q. And, and do you understand that after that meeting, Agent

Jones sent the defendant multiple texts to inquire whether he was still interested in serving as a confidential human source? I think it would have been, you know, September and October 2011?

A. I recall seeing text messages when I was doing discovery for you, but I don't recall the nature of the text messages.

Q. And were those text messages ruses as well, or did you not discuss that with Agent Jones?

A. Again, I don't know the nature of the text message, so I wouldn't be able to tell you.

MR. SMITH: So, Your Honor, we're just going to publish a document -- excuse me. We're going to refresh Mr. Caslen's recollection with a document. We're not going to publish it. And I'm going to give it to the prosecution first just to correct -- refresh the agent's recollection.

THE COURT: Ladies and gentlemen, I'm going to give you your break for 15 minutes, all right? We'll reconvene at quarter after.

(Recess from 11:01 a.m., until 11:18 a.m.)

(Defendant and Jury present.)

THE COURT: All right, Mr. Smith.

MR. SMITH: Thank you, Your Honor.

Q. So, Agent Caslen, we were just discussing Agent Jones's attempt, a discussion with the defendant, Mr. Young, about becoming an undercover informant. I think you had testified

that those discussions were a ruse designed to elicit an interview with the defendant.

A. To my understanding and based on my discussions with Agent Jones.

Q. Okay. I'd just like to hand you a document to see if this refreshes your recollection about those, the nature of the conversations between Jones and the defendant. It's an FBI memorandum dated November 7, 2011. It's not being published to the jury. So let me know if you, if you recognize that memorandum after you review it. It's one page.

Well, first, what does it -- have you ever seen that memorandum?

A. I recognize it.

Q. And what's the date on that?

A. It's dated November 7, 2011.

Q. And does it indicate whether Agent Jones sincerely attempted to recruit the defendant as a confidential human source? And by "sincerely," I mean --

MR. KROMBERG: Objection, Judge. If it's being offered to refresh the agent's recollection --

THE COURT: Sustained.

BY MR. SMITH:

Q. I'm asking -- Agent Caslen, I'm asking you whether that document refreshes your recollection as to whether the attempt to recruit Mr. Young was a ruse or was a sincere effort.

MR. KROMBERG: Objection, Judge. The witness has never said that he failed to recall. The witness said what he said. He didn't say he didn't remember.

THE COURT: Well, wait. Does that in any way refresh your memory about your conversations with Agent Jones concerning whether his approach to the defendant was a genuine approach to enlist him as a confidential source or was a ruse?

THE WITNESS: No, Your Honor. I specifically remember a phone call between myself and Agent Jones regarding my prior testimony.

THE COURT: Then the answer is it doesn't change his testimony in that respect.

MR. SMITH: Right. Thank you.

Q. In reviewing the case file into the investigation into Mr. Young, did there come a time when you learned that Mr. Young informed the FBI that he gave comments to the FBI about his negative views of Anwar Awlaki? Did you come a -- did there come a time when you learned that Mr. Young had said something negative about Anwar Awlaki to the counterterrorism investigators?

A. I am unaware of that.

Q. Can you remind us who Anwar Awlaki is?

A. Anwar Awlaki was the imam at the Dar Al-Hijrah mosque right after 9/11 who left the country to go, essentially landed in Yemen and became a prominent figure in al Qaeda and the

Arabian Peninsula.

Q. And there's a document in evidence that was recovered from Mr. Young's home that might have related to Anwar Awlaki, correct?

A. There were issues of *Inspire* magazine that were printed.

Q. Okay. So that would relate to Anwar Awlaki, would you say?

A. Correct.

Q. Okay. But there was also another piece of evidence, wasn't there, like a disc, maybe something called The Awakening?

A. It was the Hereafter series.

Q. Hereafter.

A. There were two, volumes 1 and 2 in defendant's residence.

Q. And what is the connection between the Hereafter series and Anwar Awlaki?

A. I believe Sheikh Anwar Awlaki was the one who recorded the series.

Q. Okay. So I'm going to hand you a document to refresh your recollection -- see if it refreshes your recollection.

MR. KROMBERG: Objection.

THE COURT: I don't think there was anything he said he couldn't remember, so there's nothing to be refreshed at this point.

MR. SMITH: Your Honor, what he's -- what I'm

refreshing is --

THE COURT: Just ask the question. The only way you can refresh a memory is if the witness says, "I don't remember."

MR. SMITH: Your Honor, I did ask the question. I asked him whether he recalls if Mr. Young informed the FBI that he had a negative view of Anwar Awlaki, and Mr. Caslen replied, "I do not recall ever seeing that."

THE WITNESS: That is correct.

MR. SMITH: So I would like to refresh his recollection as the case agent.

THE COURT: All right, all right.

BY MR. SMITH:

Q. It's September 29, 2011, and it's page No. 2. It is an FBI 302 memorandum, I believe. I think it's with Agent Jones.

A. I'm sorry, could you repeat the page number?

Q. Page 2.

A. Page 2? Thank you.

Q. And if you look to the bottom of page 2, let me know if that conversation refreshes your recollection.

A. So again, I don't doubt that the agent who wrote the --

Q. I'm only asking you if it refreshes --

A. It doesn't refresh my recollection of anything I personally know the defendant to have said.

Q. That's all I'm asking. So you do not -- so you do not

recall after reviewing that memorandum that Mr. Young said Anwar Awlaki went off the deep end?

THE COURT: He said he didn't remember it. Let's move on.

BY MR. SMITH:

Q. Okay. Do you recall that in the course of your review of the case file in this investigation, that Mr. Young told one of the case agents investigating Mr. Young that the Koran states that killing one person is like killing the world, and Bin Laden led to the murder of people, correct?

MR. KROMBERG: Objection, Your Honor. This is calling for hearsay because it's not offered against the party --

MR. SMITH: State of mind, Your Honor.

MR. KROMBERG: It's offered to establish that Mr. -- someone wrote that Mr. Young said something. That's -- you can't do that when you are representing Mr. Young.

THE COURT: I'm sustaining the objection. Let's move on.

MR. SMITH: And the objection is it's not offered for its truth. It's offered for the state of mind of the individual whose predisposition is at issue in this case.

THE COURT: I sustained the objection.

BY MR. SMITH:

Q. Now, did there come a time in September of 2012 where

Mr. Young gave an interview with Customs agents at the Canadian border? Do you recall that in your review of the case file?

A. I recall there being an interview at the Canadian border. The exact date I do not recall, though.

Q. Do you recall what the nature of the interview was?

A. I believe the defendant was reentering the country.

Q. And what, what is significant about that date, September 14, 2012, to you? Is it, is it nearby a significant date in terms of counterterrorism investigations?

A. September 14?

Q. September 14, 2012.

A. It's a few days after September 11?

Q. In September '12. So are you familiar with the embassy attack in Benghazi?

A. Yes, I am.

Q. Okay. Do you believe that the, the attack on the Benghazi Embassy which killed Ambassador Stevens in Benghazi, that occurred on about September 11, 2012?

A. I believe it was September 11, 2012, correct.

Q. Okay. And do you recall whether the CBP agents had an interview with Mr. Young in which they inquired whether he would share some of his information about his travels to Libya to help them investigate the attack on the Benghazi Embassy?

A. I don't recall the nature of that interview and what was actually discussed.

MR. SMITH: Okay. So I'd like to hand up a document to see if it refreshes the agent's recollection.

THE COURT: Yeah, we've had a complaint from one of the jurors that when you move from the podium, they cannot hear you.

MR. SMITH: Sorry, Your Honor.

THE COURT: You need to --

MR. SMITH: I'd like to -- I'd like to move a document -- I'd like to provide a document to Agent Caslen dated September 14, 2012, and it's an FBI 302 memorandum reflecting an interview at the Canadian border with Customs.

Q. First you can just let me know if you've ever seen that memorandum.

A. I have.

Q. You have? And can you look at the bottom of page 2 to the top of page 3? I'm referring to the page numberings at the bottom of the page, so I think it's the first -- the last full paragraph on 2 and then continues up to the top of 3.

And you can just -- you don't have to read it. You can just let me know if that refreshes your recollection of the review -- your prior review of that document.

A. Yes.

Q. Okay. And now, do you recall that the CBP agents during the interview on September 14, 2012, were interested in Mr. Young's knowledge of Libya in connection with the recently

conducted Benghazi attack on September 11, 2012?

A. So again, as with the rest of the interviews that were done outside my presence, I don't doubt the information in the 302, but my personal knowledge of what was asked of him, I don't have any.

Q. Do you recall whether Mr. Young offered to help in connection with their investigation into Benghazi?

A. Again, I wasn't there during the interview, so I wouldn't know if that -- exactly how that was phrased.

Q. Fair enough.

Now, Agent Caslen, did there come a time in your review of the case file that you learned that at another point in September 2012, the counterterrorism investigators in this case, Agent Jones reached out to Mr. Young to discuss the Benghazi attacks in September -- on September 11, 2012?

A. I do recall an interview with Agent Jones around that time.

Q. And do you recall the subject matter that Agent Jones discussed or was inquiring of Mr. Young about?

A. I believe it was related to the attack.

Q. And do you recall whether Agent Jones was interviewing Mr. Young, doing his job as an investigator, what does this guy know about Libya? He's traveled there, the September 11 Benghazi attacks had just occurred, and Agent Jones wanted to know if Young had some useful information.

MR. KROMBERG: Objection, Judge. I think we need to approach.

THE COURT: Yes, let's go.

(Bench conference on the record.)

MR. KROMBERG: Your Honor, I think Mr. Smith is doing his job properly in the sense of the way he's asking questions. However, the answers that he's - he's asking, "Is it a ruse or not?" and he's pressing Special Agent Caslen, who's going to say, "I think it was a ruse. We wanted to keep our eye on him because he was dangerous, and that's why we were talking to him."

And if he keeps asking that question, we're eventually going to get to that answer, which I thought we don't want to get to.

MR. SMITH: Your Honor, every time we try to use a document to cross-examine the witness, they threaten to bring up guns. We're noting this for the record. It's highly inappropriate, 403. This is law of the case on the guns. Every time we have attempted to use a cross-examination document with the witness --

THE COURT: Look, the problem is this is a very unusual and, I think, really improper cross-examination because you don't have the right witness. The correct witness in this case are the witnesses who are interviewing the defendant, who can then testify: This is what I did, or this is -- this is,

like, second- and third-hand hearsay.

MR. SMITH: Your Honor, his testimony on direct, this exact witness has testified in the exact areas Your Honor is putting her finger on. He has testified about what other agents learned in this investigation. We are merely attempting to cross him on the same -- within the same parameters that the government conducted direct on, and this is --

THE COURT: All I can tell you is you ask a question. If the answer is an appropriate answer to the question and not trying to sneak something in that's not proper, but if it's responsive to your question, you've asked the question.

MR. SMITH: I'm only asking whether he recalls something. I'm not going to say, "Is it true?"

MR. KROMBERG: Well, I think that perhaps Mr. Smith is not focused on the problem. The problem is that he asked the question was this a ruse, was this another ruse. Then the answer may be yes, it was another ruse because, and then we run --

THE COURT: Then we'll see.

MR. SMITH: Well, I'll stop there. If he says this is a ruse, then I will inquire no further.

THE COURT: That's not the question right now. All right, let's go back.

MR. KROMBERG: Thank you.

(End of bench conference.)

BY MR. SMITH:

Q. Okay. So, Agent Caslen, I was asking you whether in your review of the case file in the investigation of Mr. Young, you came to learn about an interview conducted in September of 2012 by Agent Jones with Nicholas Young concerning the attacks in Benghazi in September 2012. Are you familiar with -- you said you were familiar with that interview?

A. I believe that was a topic discussed.

Q. Okay. And do you recall whether during this interview, Mr. Young said he was shocked by the attacks in Benghazi on Ambassador Stevens?

A. I don't recall exactly what was said during the interview, because again, I was not present for the interview. I just remember that in discussions I had with Agent Jones, that that topic was discussed.

Q. That topic was discussed.

A. Yes.

Q. Okay.

A. And as far as the content of it, I don't know exactly what was said between the parties.

Q. Okay. And do you recall that -- on a slightly separate subject, do you recall that Mr. Young said that Ambassador Stevens was well liked among the individuals he had met in Benghazi -- excuse me, in Libya?

A. Again, I don't remember the exact content of what was said

because I was not present.

THE COURT: Well, again, I just want to remind the jury that when a lawyer makes a statement and the witness says, "I don't know," or "I don't recall," the lawyer's statement is not evidence.

MR. SMITH: Now, we are just -- one more refreshing of the recollection, and then we'll move on.

Q. So this is a document dated October 9, 2012. It's an FBI 302 memorandum with Agent Jones and Mr. Young. And the conversation is on the second page concerning --

A. The back of the first page?

Q. The back of the first page. It's page 2. There should be a page 2 at the bottom of the page. And you can see references to Stevens, Benghazi.

A. I see it.

Q. And does that refresh your recollection?

A. Again, I don't doubt the, the -- what was put in here by Agent Jones himself, but I was not present during the interview, so I don't know exactly how the defendant would have phrased it. The interview wasn't recorded.

Q. Why wasn't it recorded?

A. I do not know.

Q. Okay. Agent Caslen, you've testified about some of these LiveLeak -- you testified about how you investigated the defendant's LiveLeak account, correct?

A. I observed the defendant's LiveLeak account and read some of the comments, correct.

Q. And so when did you join the investigation again as the case agent? Which month was it again?

A. October 2015.

Q. October 2015. Had there been any investigations into analysis of Mr. Young's LiveLeak account prior to October 2015?

A. I believe so.

Q. And do you recall the nature of this analysis of Mr. Young's LiveLeak account?

A. Are you asking me at the time that I joined the investigation, did I know, or --

Q. Well, did there come a time when you learned about the -- you joined in October 2015, so did you learn about a prior investigation prior to your arrival as the case agent on this case? Did you learn about a previous investigation -- analysis of Mr. Young's LiveLeak account that had been conducted?

A. After the defendant was arrested, in going through the case file for discovery, I found a document where it had been discussed.

Q. And do you recall the key judgments from that memorandum?

A. I do not.

Q. Well, do you recall just generally what the memorandum was analyzing?

A. Comments that were placed onto the account by the

defendant.

Q. And, and what was the purpose of the analysis of the comments that were placed on LiveLeak?

A. Well, the document was written, if I recall correctly, by one of our intelligence analysts, and the purpose of what they do for the case team and the case agents is to provide guidance to the case agents on things that they have observed, and they put things in memorandums that help us make decisions later on.

Q. Do you recall whether this analysis determined that Slow Decline -- and Slow Decline is Mr. Young -- that he consistently presents himself on LiveLeak as a conservative, patriotic veterans supporter?

MR. KROMBERG: Objection, Your Honor.

THE COURT: Wait, wait, wait.

MR. KROMBERG: We tried to get into the LiveLeak Government Exhibits 8-501 and 502, and the Court barred us from going into what was said on the LiveLeak account. At this point, it's wrong for the defense to be able to go into the LiveLeak account, the comments made on the LiveLeak account, when we were not allowed to go into the LiveLeak account.

MR. SMITH: Your Honor will recall it was only specific messages that Your Honor excluded, and Mr. Caslen just testified about his investigation into the LiveLeak account.

THE COURT: Well, I think if you're --

MR. SMITH: This was on direct.

THE COURT: But on cross, if you're going to start going into specific elements within that account, and I don't quite know where that's all being tied up, the government then has a right to ask if they can go into other comments on the same account, so, I mean, you need to think about where you're going with this.

MR. SMITH: Your Honor, can I ask the government to explain what it just meant by --

THE COURT: Well, you know what's going on. So ask the question if you want to, or move on to something else.

MR. SMITH: Your Honor, we need a bench conference. Can we have that, please?

THE COURT: No, we've had too many. Let's go.

BY MR SMITH:

Q. Okay. So you're familiar with the entire case file from the beginning of the investigation in September 2010 until the arrest in August 2016, correct?

A. I don't know the contents of every single document in there, but after the defendant was arrested, I've reviewed the case file and produced relevant documents in discovery as well.

Q. So do you know, after -- upon your review of the entire case file from September 2010 to August 2016, did you find any evidence that the defendant ever actually spoke to a member of ISIS?

A. So there was no evidence that said that he had spoken

directly to it, just the, the e-mails sent to individuals that he had been in with Libya that he had later told Mo were like-minded with the brothers that Mo was with.

Q. Thank you.

So your testimony is that he's never directly spoken with anyone in ISIS according to your information?

MR. KROMBERG: Objection. The testimony is what the testimony is.

THE COURT: I think that is correct. Sustained.

BY MR. SMITH:

Q. Now, upon your review of the case file between September of 2010 and August 2016, did you find any evidence that Mr. Young ever actually materially supported a member of ISIS?

A. No.

Q. So upon your review of the case file between September 2010 and August '16, is it fair to say that the ISIS connection in this investigation was notional?

A. I would, I would say that's not entirely accurate given the fact that the defendant stated he was with brothers in Libya that were -- he later told the notional Mo that those brothers were like-minded with the brothers you are with, and I'm wondering if they had pledged to your brothers. So we've never found any evidence that the defendant was able to confirm whether or not that was true.

Q. You testified earlier today that Mr. Young's exchanges

with a Mo 2060 regarding night vision scopes, you discovered that after you investigated Mr. Young, correct -- arrested Mr. Young, correct?

A. Correct.

Q. Thank you.

And after you charged Mr. Young, correct?

A. I can't remember if that was before or after indictment.

Q. Okay. So at some point during the investigation into Mr. Young, you interviewed some of his colleagues that worked at the Metro Transit?

A. Correct.

Q. Okay. And do you recall an interview with a retired Officer Eubanks?

A. I do recall interviewing him.

Q. And what did Mr. Eubanks say to you?

MR. KROMBERG: Objection, Judge.

THE COURT: Oh, that clearly would be hearsay, so I'll sustain the objection.

MR. SMITH: Your Honor, it's not being offered to prove the truth of the matter asserted.

THE COURT: What's it being offered to prove then?

MR. SMITH: It's offered to be -- it's offered to be proved that someone who worked with Mr. Young had stated --

THE COURT: Wait, wait, wait, wait. Approach the bench on this one.

(Bench conference on the record.)

THE COURT: Go ahead.

MR. SMITH: The very fact that an officer working with Mr. Young made this statement to the FBI is irrelevant apart from its underlying truth.

THE COURT: What's the statement?

MR. SMITH: The statement is that he never knew Mr. Young to be radical in any way, he was shocked by the charges, he never had any relationship --

THE COURT: You have got to call the person, Eubanks himself, to put that in.

MR. SMITH: Well, Your Honor, we've tried our hardest, but we can't, so --

THE COURT: No, you can't do it this way. You're offering it for the truth of its contents. That's the only point. No. Objection sustained.

(End of bench conference.)

BY MR. SMITH:

Q. Upon your review of the case file into this investigation, at what point did the investigators recover the Nazi items that are in the evidence in this case?

A. The photographs -- some of the photographs of the defendant in his Nazi attire were uncovered in 2011. The rest of the physically seized items were seized post-arrest in 2016.

Q. And so the items you introduced today were seized from

Mr. Young's home in August of 2016, correct?

MR. KROMBERG: Objection, Judge. There's a lot of items that were introduced today. I'm not sure that that's correct.

THE COURT: Can you be more -- can you be more specific as to what items you're talking about?

BY MR. SMITH:

Q. His physical copies of the Nazi paraphernalia that you have introduced into evidence were seized from Mr. Young's home in August 2016.

A. The physical copies, correct. Correct.

Q. So were those items a part of the case investigative file before Mr. Young was arrested?

A. Those specific items?

Q. Yes, the physical copies of the Nazi evidence that you have authenticated in this case.

MR. KROMBERG: Objection, Judge.

THE COURT: Go ahead.

MR. KROMBERG: The question is, could only lead to misleading answers. If the question is the things you seized after the arrest, were they part of the investigation before the arrest --

MR. SMITH: Your Honor, this is relevant because it is an appropriate line of inquiry whether any of the Nazi paraphernalia was a part of the investigation before Mr. Young

was indicted.

MR. KROMBERG: And the witness just said yes, that some of it was found in 2011.

THE COURT: You need -- focus your questions more appropriately. This is not a good question. I'll sustain the objection.

BY MR. SMITH:

Q. Agent Caslen, upon your review of the case file into the investigative history of Nicholas Young, was there ever any hate crime investigation into Mr. Young?

A. No.

Q. Were you prepared for your testimony today with the government attorneys?

A. Absolutely.

Q. Okay. And so when was the first time that you discussed the Nazi evidence with the prosecutor in this case?

A. Prior to the defendant's arrest, I believe we discussed the evidence that we knew about from 2011.

Q. You did. So when the agents seized the items, the physical items from Mr. Young's home in August 2016, did there come a time when they called the prosecutor and asked whether it would be appropriate to seize those Nazi items?

A. I was not at the defendant's residence during the search; I was on vacation; but I do believe they did call the prosecutor.

Q. And did they call the prosecutor about the *Inspire* magazines?
A. I do not recall.
Q. And why do you -- did there come a time when you learned why the investigators who seized the Nazi items were uncertain whether they should be seized?
MR. KROMBERG: Objection, Judge.
THE COURT: Sustained.
BY MR. SMITH:
Q. Now, you conducted two interviews on December 3, 2015, and December 5, 2015, with the defendant, correct?
A. Correct, myself and Agent Smith.
Q. Agent Smith.
Now, at the time you conducted these interviews with Mr. Young, you testified that there was a grand jury proceeding already pending into the defendant, correct?
A. I'm sorry, could you repeat the question?
Q. At the time you interviewed Mr. Young in December 2015, a grand jury proceeding was currently pending in connection with Mr. Young, correct?
A. Correct.
Q. During your interview with Mr. Young, two interviews in December 2015, did you inform him that there was a grand jury investigation into him?
A. No, that's not common. We wouldn't do that.

Q. Did he give any indication in the interview that he was aware of the grand jury investigation into him?
A. No.
Q. Was there a grand jury investigation into the informant Mo during -- at the time of your December 2015 interview?
A. No.
Q. Was there an FBI investigation?
A. No.
Q. Did there come a time when you learned during your review of the case file into the investigation into Nicholas Young that Mr. Young was aware of the grand jury investigation into him?
A. I'm sorry, could you repeat that question?
Q. In your review of the case file when you came onto the case, this investigation in October 2015, you reviewed the case file, correct?
A. Correct.
Q. And did you learn from your review of the case file that there was evidence to suggest that Mr. Young was aware of a grand jury investigation into him?
A. Not specifically a grand jury but there was evidence that led us to believe he assumed that we were investigating him.
Q. And what, what evidence was that?
A. His conversations with Khalil that Khalil had testified about.

Q. His conversations with Khalil in what year?
A. I don't recall the specific year.
Q. Well, do you recall Khalil's testimony that his meetings with Mr. Young were in 2010 and 2011 and discontinued in April 2012?
A. Yes.
Q. And when was the first grand jury subpoena that you mentioned in this case?
A. So the grand jury subpoena list we put up was a sampling, and I believe it was in 2011. The one we listed was in 2011. The exact date of the first grand jury subpoena, I don't, I don't know that date.
Q. Will you be providing a complete list of the grand jury subpoenas?
A. I don't know. I believe so.
Q. Okay. So you mentioned that Mr. Young indicated he was aware of an investigation into him in his conversations with Khalil. Can you tell me what you're referring to?
A. Khalil's testimony where he testified that the defendant believed that the FBI was --
Q. -- listening to his communications, correct?
A. Yes.
Q. And so is that, is that the statement that you're saying is the indication that Mr. Young knew that there was an investigation into him?

A. That's an example of one, yes.
Q. Can you give me some other examples?
A. I mean, I believe that he mentioned to Khalil that he believed that him and Saleh Al-Barmawi were also being investigated. That would be another example.
Q. Did he say investigated, or did he say that he was being spied on?
A. I don't recall exactly how he said it.
Q. Okay.
A. But it led me to believe that he believed we were investigating him.
Q. Is it fair to say that that's the sum of the evidence you've reviewed in the case file, that Mr. Young was aware of an investigation into him?
A. There was also the time when he was looking for counter-surveillance outside of his house, when he believed we were outside of his house, with the weapon pointed out the window.
Q. You're referring to the occasion when he thought someone might be spying on him, right?
A. Correct.
Q. And is your position that that is the piece of evidence in the case file that indicates Mr. Young knew there was a criminal investigation opened into him?
A. That's, that's me saying that I -- it's my understanding that the defendant knew that. I'm not saying that that is

concrete that he absolutely knew we were.

Q. Oh, right. So is there a piece of evidence that does concretely indicate it upon your review of the case file?

A. I would say his arrest. That would be -- he may have become aware that we were investigating after his arrest.

Q. Which was on August 3, 2015, right?

A. '16.

Q. 2016.

I guess I'm asking you whether there's a piece of evidence -- so your interview with Mr. Young was on December 3, 2015, and December 5, 2015?

A. Correct.

Q. So I guess I'm asking you about whether upon your review of the case file in this case, which goes back to September 2010, Mr. Young -- you had any evidence indicating Mr. Young was aware of the investigation before December 3, 2015, or before December 5, 2015?

MR. KROMBERG: Objection, Judge. Asked and answered. The witness has already said he talked about Khalil's testimony and Khalil's reports from 2010, '11, and '12.

THE COURT: All right, both lawyers are making too much -- are including too much in their discussions and in their objections, but I'm going to sustain the objection because it's already been asked and answered.

BY MR. SMITH:

Q. Now, Khalil has testified -- you were here during Khalil's testimony, correct?
A. I was.
Q. Okay. Now, Khalil has testified that the last meeting he had with Nicholas Young was in April of 2012?
A. I don't recall exactly what day it was, but I believe it was --
Q. Early, early 2012?
A. It's fair to say.
Q. Okay. And is it fair to say that upon your review of the case file, that there were no other confidential informants who were tasked with reporting on Mr. Young between April 2012 and May 2014, when he met -- when Mo testifies that he meets the defendant?
MR. KROMBERG: Objection, Judge. It's irrelevant to whether there were confidential informants other than Khalil or anyone that's testified in the case.
THE COURT: I'm going to sustain the objection.
MR. SMITH: Your Honor, may I explain?
THE COURT: No. I'm sustaining the objection.
BY MR. SMITH:
Q. Okay. To the best of your knowledge, the first time that -- upon your review of the case file, the first time that the defendant encountered a confidential human source in the course of the investigation was May 2014, correct?

MR. KROMBERG: Objection, Judge. Again, the defense attorney is asking who the -- is leading to whether there were confidential informants and tipsters in the case that have not been brought up in this case, and that cannot be gone into.

THE COURT: We're going to sustain the objection. Move on to something else, Mr. Smith.

BY MR. SMITH:

Q. Agent Caslen, there was another individual who was referenced in connection with Mr. Young. His name was Saleh Al-Barmawi. A couple of witnesses have testified about that individual, Saleh Al-Barmawi, correct?

A. Correct.

Q. And his image was published on the screen?

A. It was.

Q. Has Saleh Al-Barmawi been indicted for terrorism charges?

A. He has not.

Q. Has he been arrested?

A. He has not.

MR. SMITH: Your Honor, one moment?

THE COURT: All right, counsel, this is taking too long. Let's go. Are there any other questions?

MR. SMITH: Your Honor, we are just formally objecting to the exclusion of the documents we attempted to cross-examine the witness with, and we will rest. We'll discontinue our line of questioning right now.

THE COURT: All right. Any --

MR. SMITH: Actually, sorry, sorry, Your Honor. There is one more line of cross, and we have some stipulated documents that we'd like to publish to the jury. So can we start with Defense Exhibit 14?

MR. KROMBERG: Can we see what it is that we're stipulating to?

MR. SMITH: The government's seen them already, but we can show them again.

MR. KROMBERG: It would be helpful when I know what the exhibits are.

No objection, Judge.

THE COURT: All right, what are the numbers for these?

MR. SMITH: It's 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24.

THE COURT: 14 through 24.

MR. SMITH: 14 through 24.

THE COURT: All right, that's fine. They're in.

(Defendant's Exhibit Nos. 14 through 24 were received in evidence.)

THE COURT: Do you want them shown to the witness?

MR. SMITH: We can publish them, Your Honor, but let's just start with 14.

Q. So, Agent Caslen, you were not at the, the search of

Mr. Young's home in August 2013, correct?
A. I was not.
Q. But you've mentioned earlier in your testimony that there came a time when you had conversations with the searching agents about the search of Mr. Young's home, correct?
A. That's correct.
Q. And you've testified earlier that one of the agents had a question about whether the Nazi material should be seized, and they called the prosecutor, correct?
A. I'm sorry, could you repeat that one?
Q. You testified that you had a conversation with one of the searching agents who searched Mr. Young's home on -- in August 2013?
A. Correct.
Q. 2016.
And they indicated that they had a question about whether to seize the Nazi materials, and they called the prosecutor in the case, correct?
A. They called the prosecutor about the Nazi materials, to whether -- the nature of the call, I'm unaware.
Q. All right. So in your conversation with that agent who called the prosecutor about the Nazi materials, did the agent indicate whether there were other military objects in the home separate from Nazi materials and white supremacism memorabilia?
A. So I've seen these exhibits, and I have gone through --

I've talked to that agent, and I've also gone through some of the photographs we took at the defendant's residence to try and ensure that some of these items were actually there, and some of them were.

Q. Okay. So would you agree that Defense Exhibit No. 14 is sort of -- this is not how it appeared. This does not purport to be -- this is not how the agent described the scene of the arrest to you in August 2016, correct?

A. That's correct.

Q. And so would you say that these items are collectively representing some military objects in Mr. Young's home that were assembled after the search of Mr. Young's home in August 2016?

A. I would, I would not say that because in my review of the photographs as well as talking to some of the agents who were there, they did not see all of this. However, I did see some of the items in the defendant's residence. So I would not characterize it as that these represent items that were in the defendant's residence, but some of them were.

Q. Okay. So, for example, like, Defense Exhibit 15, they describe, you know, Japanese artifacts, Japanese historical artifacts?

A. I recall seeing something similar to this in defendant's vehicle.

Q. Okay.

A. Not so much in the photographs from the defendant's residence.

Q. Okay.

A. As well as a photograph of a kamikaze pilot on the defendant's Facebook page that had something similar.

Q. Okay. How about 16?

A. These are -- they're out of order, so --

Q. There's a, there's a stamp on the bottom of 16. And it's published on the screen right next to you.

A. Oh, I'm sorry.

Q. So is this an item that you would -- would you say it's fair to say that the agent who searched the home found a wide range of historical memorabilia?

A. Again, in my discussion with the agent as well as personally going through the photographs, I did not see as wide a variety as that's in these photographs, so I would not say that that's correct.

Q. How about 17? These are airborne jump boots?

A. I did not see that in the photographs as well, and I did not hear that the -- from the agents that were there that they were there, but not out of the realm of possibility to have been there given the amount of shoes that were in the --

Q. How about 18?

A. Same as my last, the last photograph. This was not seen in any of the photographs, but there was a bookshelf, and there

were a lot of books in the residence.

Q. There were a lot of books in the residence?

A. Yes.

Q. What kind of books?

A. Well, there were some Nazi books.

Q. Right. Well, we've seen those.

MR. KROMBERG: Objection, Judge. When the defense -- I think we have to approach.

THE COURT: No. Overruled.

MR. KROMBERG: Well, then it's misstating the evidence because we haven't seen the books. We've seen the cover of one book.

MR. SMITH: I'm asking the witness a question.

THE COURT: The witness just said he saw Nazi books. That's the only answer that was made to the question, all right?

MR. SMITH: That was for some of the books he saw, but I guess I'm eliciting whether that was all of the books.

THE COURT: And you saw other books as well; is that right?

THE WITNESS: In the photographs, Your Honor, there's other books as well on the bookshelves.

THE COURT: That's fine, all right.

BY MR. SMITH:

Q. Okay. So let's go to No. 19. Do you see that?

A. I see the exhibit.

Q. You don't recall learning that that book was also there?

A. I do not.

Q. Okay. How about 20?

A. Same. I do not recall seeing that in any photographs or --

Q. Do you recognize -- so if you look at No. 20, do you, do you recognize the figure on that book?

A. I do not.

Q. You don't?

THE COURT: All right, we're not getting into --

MR. SMITH: Well, no, Your Honor. This is a predisposition issue.

Q. Are you familiar with Libertarian politics?

A. I am not.

Q. Are you familiar with conservative politics?

MR. KROMBERG: Objection. Irrelevant.

THE COURT: Sustained. Sustained.

MR. SMITH: Can you go to 21, please?

Q. Did you find a series of Bibles in his home?

A. Again, I was not present during the search, but again, in my search of the photographs that were taken, I did not see a photograph of the Bible.

Q. All right. Four Bibles?

A. Of any Bible.

MR. SMITH: Okay. Can you go to No. 22?

Q. Do you have any reason to believe that there was a -- there wasn't a wide range of history books like this at the home?

A. I do not recognize that book as being in the residence via the photographs that I reviewed.

Q. How about Exhibit 23?

A. Same with this one.

Q. 24?

So I guess the point here is, Agent Caslen, you have no reason to believe that there wasn't a wide array of books in the home that was not Nazi related, correct?

A. I'm sorry, could you repeat that?

Q. You have no reason to believe after your review of the case file and speaking with the searching agents of Mr. Young's home that there was not a wide range of books in the home?

A. I did not see a wide-ranging view of these books in any of the photographs that were taken at the residence.

Q. You don't dispute these were, these were found in the residence, right?

A. I do dispute it because I did not -- I was not there, so I'm not, I'm not comfortable in saying that they were in the residence.

MR. SMITH: Your Honor, we have a stipulation from the government that these documents -- these items were found

in Mr. Young's home at the time of the search of Mr. Young's home.

THE COURT: The government didn't object.

MR. KROMBERG: We don't oppose it, but I think the problem is that Special Agent Caslen doesn't have any --

THE COURT: Right.

MR. KROMBERG: He's not in on stipulations that the prosecutors made.

THE COURT: All right. So these exhibits are pictures of items that were found in the home, all right.

MR. KROMBERG: Right.

MR. SMITH: That's it, Your Honor.

THE COURT: All right. Any redirect?

MR. KROMBERG: Very briefly, Judge.

REDIRECT EXAMINATION

BY MR. KROMBERG:

Q. Special Agent Caslen, based on your review of the pictures of the search, location, and your conversations with the agents that were there, what framed portraits of political leaders of the 20th Century were found in the home?

A. Only that of Adolf Hitler.

Q. What uniforms --

MR. SMITH: Objection. 403, and we move for a mistrial again.

THE COURT: No, I think you got into the whole issue

about what was found in the home, and I've overruled the objection. Thank you.

MR. KROMBERG: All right, we have nothing further. Thank you, Judge.

THE COURT: All right. Agent, you may step down.

(Witness excused.)

THE COURT: All right, any further evidence from the United States?

MR. KROMBERG: No, but as I said, we do ask for leave to go over the exhibit lists with the clerk and make sure that we have properly moved in the things we ought to move in.

THE COURT: All right.

MR. KROMBERG: But otherwise, we are done. We close.

THE COURT: And we still have an issue about 10-600, the summary?

MR. KROMBERG: Oh, I'm sorry, yes.

THE COURT: We'll discuss that outside the presence of the jury. All right. All right --

MR. KROMBERG: And, Judge, by the way, that's 16- --

THE COURT: Is it 16-whatever?

MR. KROMBERG: 002.

THE COURT: That's it, yeah.

All right, do you-all need to approach the bench?

(Bench conference on the record.)

THE COURT: Who's making the motion?

MR. SMITH: Which motion?

THE COURT: Do you want to make a Rule 29 motion?

MR. SMITH: We would like the time to draft a motion.

THE COURT: No, we make it right now at the bench.

MR. SMITH: Oh, the Rule 29 motion? We would --

THE COURT: Are you moving for judgment as a matter of law at this point?

MR. SMITH: Only on the obstruction counts, Your Honor, but we would like an opportunity --

THE COURT: The obstruction counts were more than adequately made because the government now got into evidence that there was, in fact, a grand jury investigation going on, and one can draw from the evidence in this case reasonable inferences in favor of the government that the defendant knew or had reason to believe that there would be an active investigation against him. So I'm overruling the objection.

Now, on Count 1, you're not making a motion?

MR. SMITH: Yes, we're making a formal motion.

THE COURT: And again, there's more than enough evidence at this point, drawing all inferences in favor of the government, the plaintiff -- sorry, that the defendant attempted to provide material support to a designated foreign terrorist organization.

So let's get on with your case. Thank you.

MR. SMITH: Your Honor, there's a couple more items,

if we could address with the Court?

We would like to --

THE COURT: Wait a minute. All right, go ahead.

MR. SMITH: Evan Turgeon raised several questions about the description of the charges in this case, and he's -- we'd like --

THE COURT: We're at the point now where we want your case in, all right? We need to get the evidence to the jury.

MS. MORENO: Your Honor, we are going to rest.

THE COURT: You're going to rest?

MS. MORENO: We're going to rest.

THE COURT: Right now?

MS. MORENO: Yes.

THE COURT: I need to have the defendant -- I need to make sure.

MS. MORENO: Of course. I understand.

THE COURT: I'm going to excuse the jury for lunch at this point, all right?

MR. SMITH: And what is the next step, Your Honor?

THE COURT: I'm sorry?

MR. SMITH: And what's the next step if the defense rests?

THE COURT: If the defense rests, the case is over.

MR. SMITH: Right.

THE COURT: The next step will be that we will do the

final charging conference.

MS. MORENO: We also have an issue on the verdict form.

THE COURT: That's fine. We'll discuss the verdict form. We'll have our charging conference, and I guess we're going to get the case to the jury this afternoon.

MR. SMITH: Your Honor, we would request until Monday. There are several things we have to -- we need to --

THE COURT: Oh, no, no. When we finish this early, we're five hours ahead of schedule, I'm not going to waste the time to get the case to the jury this afternoon. That's wonderful. There's no reason not to.

MR. SMITH: Your Honor, we want to review the evidence submitted in this case more than two hours before -- one agent just finished testifying.

THE COURT: I don't know where you practice, Mr. Smith; we don't work that way in this court. We don't waste the jury's -- waste civilians' time on something like that.

No, I'm going to let the jury go to lunch. We'll do our charging conference. I don't think I've yet seen the verdict form, so I'm going to give everybody a 15-minute break so you can think about the verdict form, and we'll talk.

MR. KROMBERG: And we also have one additional instruction that we wanted to propose.

THE COURT: We'll have to have a charging conference. We need to look at this proposed verdict form.

Do you have the verdict form?

THE LAW CLERK: No.

THE COURT: You need to get a verdict form. Do you have an alternate verdict form you want to discuss?

MS. MORENO: We have no objection to your verdict form. They've changed it.

THE COURT: All right. Okay. All right. So we're going to let the jury go. I'm going to give them longer than normal for lunch because I want to make sure we don't have a problem. We have to get all this exhibit stuff in, too. So I'm going to give them until 1:30, all right?

MR. KROMBERG: Thank you, Judge.

(End of bench conference.)

THE COURT: All right, ladies and gentlemen, we actually are so far ahead of schedule that all the evidence is in. So what I'm going to do now, because it takes us a while to get the exhibits organized and to have the instructions put together in a format that will be of assistance to you, I'm going to give you actually until 1:30 for lunch.

And you don't have to stay in the building, although it's not terribly nice out there. It's cold, but I don't think it's snowing yet.

But in any case, when you come back at 1:30, what we

will have are the closing arguments, and I will give you the instructions. Whether there's enough time for you to get started deliberating tonight, because I had said that we would stop at five, although, frankly, if the whole jury wants to stay later than five, we'll just keep the heat on, and we can let you do that as well, but in any case, do not begin making up your minds about any issue because you have not heard the closing arguments, and you have not gotten the instructions from the Court.

But we would like you back here at 1:30. Thank you. We're going to stay in session.

(Jury out.)

THE COURT: All right, so the first order of business is, number one, Mr. Kromberg, if you have an additional instruction you want the Court to be considering, was a copy given to the defense?

MR. KROMBERG: May I pass this matter for Mr. Turgeon to speak about?

THE COURT: If you'd hand it up to us, please? Do you have one for the Court?

MR. TURGEON: Yes, Your Honor. This is Government's Proposed Jury Instruction No. 57. We've provided a copy to defense counsel.

THE COURT: All right, I want one for my law clerk, too, if you have an extra one.

MR. TURGEON: Excuse me, Your Honor?

THE CLERK: Do you have some for my court reporter and for my law clerk?

MR. TURGEON: Yes, absolutely.

And this is a jury instruction with regard to venue, Your Honor, with the citations at the bottom.

MR. SMITH: Your Honor, we would just note we received this instruction this morning. We have had no opportunity to conduct any research, and we object.

THE COURT: I don't even know if I need this instruction. Do I really? We've established that the grand jury was convened in the Eastern District of Virginia. Again, there's no dispute about venue.

MR. TURGEON: Your Honor, okay. That's okay.

THE COURT: Is there a dispute about venue?

MR. SMITH: There actually is a dispute about venue, Your Honor.

THE COURT: Well, all right, at the lectern. Let me hear what the dispute is.

MR. SMITH: Your Honor, if Your Honor has a copy of the indictment, you can see that Count 4 concerns a text message that was sent from one location to -- from Mr. Young's phone to the phone owned by the informant Mo.

I'm not sure why the government has decided to produce this instruction for venue. We simply had a

conversation with the government outside the courtroom that, inquiring whether the government had evidence indicating the text was sent from Virginia, as opposed to Washington, D.C., where Mr. Young is employed -- was employed.

So I assume that's what's prompting this venue instruction, but I'm just noting for the record that we received this draft instruction just now. We've had no opportunity to research this issue. We would like an opportunity because we think it could be a significant issue.

And, Your Honor, while we're on the subject of venue, there's been some testimony in this case from Agent Sikorski that he may have received the gift cards at issue in this case -- Agent Sikorski was the agent who was in control of the alias Mo's e-mail account in about July 2016, and there is some testimony from Agent Sikorski that he wasn't sure whether he received -- it was actually his, his phone that he was e-mailing the defendant with.

He has -- I think he has a residence in Virginia and D.C., or he's working in D.C. and has a residence, so he didn't recall whether he received the text message in Washington, D.C., or Virginia, the Google Play message, but we do know and can establish that Mr. Young -- the phone from which the gift cards were sent was in Washington, D.C., in L'Enfant Plaza, when the gift cards were sent.

Now, if Your Honor looks at the venue provisions,

there could be an issue here. That is Count 1, so we are not sure why Count 2 and Count 4 -- now, just to be completely frank, Mr. Gibbs stood up during Agent Sikorski's testimony and said, "Well, isn't it true that the gift cards were purchased at a Best Buy in Virginia?"

We haven't had the opportunity to look at these nuances yet, but there could be an issue with Counts 1 and 4.

THE COURT: Well, we don't play -- we're not going to take the jury's time up while everybody runs around and tries to put the case together. The case has moved faster than expected, and everybody who practices in this court knows that's how we proceed. As I said, it's 12:10, and we have plenty of time left in the day to get this case to the jury. I'll give you, you know, you've got a bit longer lunch period if you can find something on this.

I will look at the Instruction 57 and look at the source the government has provided for it. Normally, venue does not become an issue, it does in some cases, but the grand jury was impaneled and was working in the Eastern District of Virginia, and my experience with these types of offenses is if the obstruction was intended to affect a proceeding in a particular venue, that is sufficient basis for venue. I think that's solid law.

There could also be venue in other jurisdictions as well. You know, in federal cases, there could be multiple

venues, but as long -- and the government did establish that. I was listening for it because at one point, I thought 2 and 4 might go, but they've got that evidence in the record now.

So I think I see no problem with this, and frankly, I mean, I will give the instruction if the defense feels that it's going to be an issue, but I wasn't planning to put a venue instruction in the case.

MR. SMITH: Thank you, Your Honor. There's one more housekeeping issue that --

THE COURT: Yeah.

MR. SMITH: Evan Turgeon raised a supplementary verdict form in the hearing before --

THE COURT: I still don't have a copy. Somebody give me a copy of it so I can see what we're talking about.

MR. SMITH: I'll let him speak first.

MR. TURGEON: Yes. Your Honor, as I mentioned a moment ago, the government presented evidence on two theories of guilt for Count 1, the first line, preventing material support by lying to the FBI to conceal the whereabouts of Mo, and second, sending gift cards to Mo, preventing material support in that way, and it's the government's position that there's evidence in the record sufficient for the jury to find guilt, that the defendant was guilty under either theory on Count 1, but as the verdict form currently stands, if the defendant is convicted, we won't know whether the jury found

him guilty under one theory or the other theory or both.

And the special verdict form that I just handed up essentially asks the jury to tell us that, tell us what they found, and there are certainly, as the Court can imagine, potential benefits down the road to that.

THE COURT: It usually helps both sides. It helps the defense, too. If the case does go to appeal, they have a clearer picture as to how the jury saw the case.

MR. SMITH: Your Honor, if I may?

THE COURT: Yes, Mr. Smith.

MR. SMITH: Thank you, Your Honor. So if Your Honor sees in the verdict form -- in the new verdict form that Mr. Evan Turgeon is referencing, the first, the first comment here is as to Count 1, attempting to provide material support to a foreign terrorist organization by attempting to provide misleading information.

Now, if Your Honor looks at Count 1 in the indictment, you'll see that it's a charge under 18 U.S.C. 2339(b), 2339(b), but the theory of liability here is providing misleading information.

Your Honor, we think at some point, the government may have realized or will soon realize they used the wrong statute to charge a misleading -- a deception, a concealment crime concerning terrorism. The correct statute is 18 U.S.C. 2339(a), and, Your Honor, we would just -- we can put this

orally on the record, we'd also like to brief this, but there's a couple of moving parts here.

THE COURT: The cleaner way of doing this is just to do the second paragraph as to Count 1 because this case is a gift card case.

MR. SMITH: Exactly.

THE COURT: That's cleaner and simpler, and if this jury doesn't find on that, they're not going to find on the other. You've got the others covered in Counts 2 and 4, but I think this unnecessarily complicates the jury's analysis of this case, and I don't see any reason why it benefits anybody in making it more complicated than is necessary.

MR. SMITH: Thank you.

THE COURT: So my intention is actually to use a revised verdict form, but it would only be the last three counts there.

MR. SMITH: Why would it be revised, Your Honor, if it's just the last -- I think that's what --

THE COURT: We'd get rid of the first paragraph entirely because we're not talking about the providing.

MR. SMITH: Then I think the next three are just what Your Honor proposed originally.

THE COURT: It's even cleaner this way because it tells you specifically it's the gift cards.

MR. SMITH: I see.

THE COURT: And it doesn't open up the door for it becoming mucky about the other aspect of it, all right?

MR. TURGEON: Your Honor, if I may, it's the government's position, and I think the evidence bears this out, that there can be no entrapment as to the first theory of liability here. That is legally sufficient. The evidence is legally sufficient under that theory to prove the defendant guilty, but there has been no evidence of inducement, that the defendant was induced in any way to lie to the FBI because the government didn't ask him to lie. No one asked him to lie.

THE COURT: Then you'll get him on Counts 2 and 4, but Count 1 is a cleaner, easier count for the jury to understand on the gift card issue, and I think that's a better way of doing it. In other words, my original -- the original instruction was just the general is he guilty of Count 1, all right?

MR. TURGEON: Yes, Your Honor. As long as the Court --

THE COURT: But the way you've parsed it makes me think since you're worried about the first element, that it's even easier and even more specific to say this is the government's real theory of the case. The essence of Count 1 is the providing the gift cards or gift card codes to Mo, and Counts 2 and 4 have to do with the misleading of the FBI.

MR. TURGEON: Misleading is certainly essential to

Counts 2 and 4; however, the misleading is also part of Count 1, Your Honor.

THE COURT: Well, I'm going to make this simple. I'm going with my instinct on this one. So I'm going to take the verdict form you've proposed, I'm striking the first paragraph. So it's going to just be -- and we'll give it to you again, but that's how it's going to go. Okay?

MR. TURGEON: Thank you.

THE COURT: All right. Let me give you a ten-minute break so I can pull together the instructions, because we are a little bit ahead of ourselves on this, and tell you exactly what you're going to get. We had a pretty good, I thought, charging conference before the case even got started, and I want to just go through it with you one more time so you know what's in and what's out, all right? So we'll be back in ten minutes.

(Recess from 12:20 p.m., until 12:48 p.m.)

(Defendant present, Jury out.)

THE COURT: All right. Now, before we get started on the other matters, I need to put this on the record. Mr. Young, go up to the lectern, please.

Mr. Young, I just want to make sure that you had enough time to discuss with your counsel your options of testifying as a witness in the case or of not testifying. Have you had enough time to discuss that decision?

THE DEFENDANT: Yes, Your Honor.

THE COURT: All right. Because I do know that from prior press releases, you indicated you wanted to testify. It's your absolute right to testify in the trial as a witness. Do you understand that?

THE DEFENDANT: Understood, Your Honor.

THE COURT: All right. Now, I assume you have made the decision not to testify; is that correct?

THE DEFENDANT: That's correct, Your Honor.

THE COURT: And have you made that decision after consulting with counsel?

THE DEFENDANT: That's correct.

THE COURT: And are you making that of your own free will? In other words, are you comfortable making that decision?

THE DEFENDANT: Yes, Your Honor.

THE COURT: All right. Because I need to make sure that that is a voluntary and knowing waiver of the right to testify.

And you're satisfied that you've had enough time to make this consideration?

THE DEFENDANT: Yes, Your Honor.

THE COURT: All right, that's fine. You may have a seat.

All right. Now, the next thing we have to do to get

 this case ready to go to the jury is to make sure that all of the exhibits are in, so what I normally have is my very, very good courtroom deputy is going to read to you what her records show are the exhibits that have been entered into evidence, and before we do that, I had said yesterday -- again, I may misremember what was said yesterday, but I thought the time estimate that I had gotten from counsel -- and I would never fault anybody for moving faster than expected, but I thought the anticipation was that the evidence would go throughout most of today, and that's why we said we would then probably finish the case up on Monday.

Again, I'm not going to waste the jury's time. Since they're here, we're going to get this case to them today, but that may have put both sides at a little bit of a surprise, although I suspect the defense kind of knew they would have time today.

Does the government have its exhibit list ready for the jury? In other words, I had said I wanted an index. The defense doesn't have very many, so that's not a problem, I think, for the defense.

MR. TURGEON: Your Honor, I have prepared a list that will be ready for the jury, but we need maybe half an hour to get that in final shape.

THE COURT: The jury may not be able to start at 1:30. You-all need to get lunch and a little bit of extra time

to prepare, but anyway, all right, I'm aware of that. Let's keep moving then.

So Ms. Guyton is now going to read her list of what she believes are the exhibits that have been entered into evidence, and the government needs to let us know and the defense need to let us know if, number one, there are any exhibits the government feels they thought should be in but are not in, and then, obviously, if the defense feels that there are exhibits that we're recording as being in that they think were not formally admitted.

This is not the time to renew objections. It's just a time to reflect what the record should be showing, all right?

THE CLERK: Exhibit No. 1-100 to 1-107, 108, 109 through 1-115. So 1-100 to 1-115.

MS. MORENO: Excuse me, I'm so sorry to interrupt. These are all in?

THE COURT: These are in, yes.

THE CLERK: 1-116, 1-200 to 1-222, also 1-210A, 1-300 to 301, 302, 303, 304, 305, 306, 307, 308, 1-401, 402, 403, 404, 405, 406, 407, 408, 410, 600, 701, 702.

THE COURT: Wait, wait. Slow down. That's 1-600, correct?

THE CLERK: Yes. And then 2-101, 102, 103, 2-104, 105, 106, 107, 108, 109, 110, 111, 112, 2-116, 2-118, 119, 120, 121, 122, 123, 2-125, 126, 127, 128, 129, 130.

3-101, 102, 103, 104, 105, 3-108, 109, 110, 3-115, 117, 117A, 118, 118-A, 119, 119-A, 120, 120-A, 3-125. I skipped 3-121. 3-100 also I skipped.

3-200, 3-202, 203, 204, 205, 206, 207, 208, 3-209, 210, 211, 212, 213, 214, 215, 216, 217, 218, 219, 220, 221, 222, 223, 224, 225, 226, 3-300, 302.

4-101, 102, 104, 105, 106, 107, 108, 109, 4-200, 4-203, 4-300.

5-101-1, 101-1T, 101-2, 101-2T, 101-3, 101-3T, 101-4, 101-4T, 101-5, 101-5T, 101-6, 101-6T, 101-7, 101-7T, 5-102, 102-T, 5-301-1, 301-2, 301-3, 301T1, 301T2, 301T3.

6-101-2, 601-2T, 6-102-2, 6-102-2T, 6-103-2, 6-103-2T, 6-103-3, 103-3T, 6-103-5, 6-103-5T, 6-103-6, 103-6T. 103-7, 103-7T, 6-104-2, 104-2T, 104-3, 104-3T, 6-105-1, 105-1T, 6-106-4, 106-4T, 6-107-1, 107-1T, 6-108-1, 108-1T, 108-2, 108-2T, 6-109 -4, 109-4T, 109-5, 109-5T, 109-6, 109-6T, 6-110-1, 110-1T, 6-201, 202, 203.

7-101, 101-1, 101-2, 101-3, 7-102, 7-201A, 7-201C, 7-202A, 7-204A, 205A, 205B, 7-207A, 207B, 7-209A, 209B, 7-211A, 211B, 211C, 7-212-A, 212B, 7-213A, 213B, 214A, 7-216A.

8-101, 102, 103, 104, 8-106, 8-107, 8-108, 8-109, 8-112, 113, 114, 115, 8-500.

9-101, 102, 103, 104, 105, 106, 107, 108.

10-000, 10-100, 10-101A, 10-103, 10-203, 10-204, 10-205, 10-208. 10-220, page 1 and 2 only. 10-230, 10-231,

10-232, 10-236, 10-237, 10-238, 10-240, and I also have 10-202T. 10-241, 10-252, 10-303, 10-304, 10-305, 10-305T, 10-620, 10-650, 10-700. 10-701, cover only. 10-706, redacted. 10-7- --

THE COURT: Hold on a second. With 706, has that redaction been done so that that's in the original report that's going to go to the jury?

MR. KROMBERG: Judge, should it be redacted to go to the jury or only in the public -- in the copy that is filed with the Court?

THE COURT: Can you pull 706 for me? I want to see what the --

THE COURT SECURITY OFFICER: 7?

THE COURT: 706 -- I'm sorry, 10-706.

MR. KROMBERG: The ones that we have filed publicly have been redacted, but the ones that Your Honor examined in court at the motions hearing was unredacted.

THE COURT: These are the ones going to the jury.

Now, I thought we decided with 706, this is the list of the Panzer grenade? The only thing that's relevant on this exhibit is the Düsselkamp name. Otherwise, it has the names of other people, with their home phone numbers and their addresses, which I don't think is proper to go to the jury.

So unless there's an objection from the defense, my position would be to not even give page 2 because that doesn't

have anything with the plaintiff. With page 1, we can white all out except for it's the fourth paragraph on the first column.

Is there any objection from the defense to do it that way?

MS. MORENO: No objection.

MR. KROMBERG: And also not white-out the top, the heading.

THE COURT: The heading would be there and the filigree around the side, but I don't want these other people's names and addresses going out, all right? We'll show it to defense counsel before it's done. I'm going to give this to my courtroom deputy now to hold on to, but we will be redacting then 706. That's what will go to the jury, and that's what will be in the official court file should anybody ever look at it, all right, because the evidence now does become available. All right.

THE CLERK: Next would be 10-714; 10-715, page 2 only; 10-806; 10-807; 10-810; 10-814; 10-818; 10-821; 10-822; 823; 824; 825; 826; 827; 10-850; 10-860; 10-861; 10-863; 10-903.

11-220, 11-400, 11-401, 11-600. I also have 11-202A.

12-001, 002, 003, 004, 005, 006, 007, 008, 009, 010, 011, 012, 013, 014, 015, 018, 019, 020, 021, 022, 027, 028, 029, 031, 032, 033, 034, 035, 036, 037, 038, 039, 040, 041,

042.

13-101, 13-102, 13-103, 13-104, 13-105.

14-100, 14-101, 14-102, 14-103, 14-104, 14-105, 14-119, 14-140, 14-141, 14-180.

15-201. 16-000, revised version. 16-001, 16-101, 16-102, 16-103, 16-105, 16-106, 16-401, 16-402, and 18-100.

THE COURT: I didn't hear the last one. One zero --

THE CLERK: I'm sorry?

THE COURT: What's the 18?

THE CLERK: 100.

THE COURT: Okay. And then just for the record, the defense exhibits that are in evidence, let's read those.

THE CLERK: Defense exhibits are 2, 3, 4, 5, 6, 7, 8, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24.

MR. SMITH: Your Honor?

THE COURT: Yes.

MR. SMITH: A couple of days ago, Your Honor requested that we clean up the recordings we attempted to play for the jury and then put them on one disc in a clip format, so what we have done, we've notified the government of this a couple days ago, is we've created Defense Exhibit 1, which is a DVD with files from the recordings we attempted to play during the testimony of the CHS Mo.

The dates of those recordings are May 31, 2014; August 10, 2014; September 11, 2014; October 10, 2014; October

16, 2014; October 17, 2014; and October 24, 2014.

Now, that sounds like a lot of dates, but actually, the number of clips from each day is very limited, so I would estimate that the total number of recorded minutes for the sum of those days is probably on the order of 10 to 15 minutes.

THE COURT: Those are the ones that were played in court?

MR. SMITH: Correct.

THE COURT: All right. Is the government satisfied with that?

MR. KROMBERG: Yes, Your Honor.

THE COURT: All right, that's fine. So Defense Exhibit 1 is in evidence.

(Defendant's Exhibit No. 1 was received in evidence.)

THE COURT: All right, so we'll need to hand that to the court security officer.

Yes, Mr. Kromberg?

MR. KROMBERG: Judge, our list is 99.9 percent the same, but we have 7-201B, as in --

THE COURT: All right, hold on. You have 7-201B, as in boy?

MR. KROMBERG: Correct, and 7-201D, as in David.

THE COURT: Let me take a look at them. Which witness would have put those in?

MR. KROMBERG: That would have been Mr. Siegfried.

This was FedEx still photos.

I'm sorry, Judge, Agent Caslen advised me that might have been during Mo's testimony, but this is the still photos of the 10 -- October 25 --

THE COURT: Wait, I'm sorry, 7-20 what?

MR. KROMBERG: 201B, as in boy, and D, as in David.

THE COURT: Well, in Siegfried's testimony, I had 202A through 216A going in.

MR. KROMBERG: Yes. And --

THE COURT: Well, he may also have them in. I definitely have a marking that with Siegfried, they were already in. And I have Exhibits -- and my courtroom deputy is correct -- also with Mo, I have 7-201A and I have 7-201C going in with Mo at that point in his testimony.

But is there any objection to those in case for some technical reason they weren't formally moved? They were certainly discussed. Is there any objection?

MR. SMITH: Your Honor, Ms. Moreno has the exhibit list, so I'm not --

THE COURT: All right.

MS. MORENO: I'm so sorry, Your Honor, I was distracted.

THE COURT: That's all right. We're talking about two of the FedEx pictures.

MS. MORENO: Yes. No objection.

THE COURT: No objection? All right, those two are in.

(Government's Exhibit Nos. 7-201B and 7-201D were received in evidence.)

MR. KROMBERG: Thank you, Your Honor.

Now, on our list, we had the *Miranda* warning form 5-302, and I remember it was under discussion --

THE COURT: I don't think it was necessary because there was no issue about that, so that's out.

MR. KROMBERG: That's fine. Okay. The two others that came in, I believe, during Khalil's testimony -- I shouldn't say two; one -- 11-500, and that was matched to Government Exhibit 12-17, which is a stipulation for 11-500.

THE COURT: Hold on a second. 11-500 is in.

MR. KROMBERG: And 12-17 is the stipulation that describes --

THE COURT: There's no objection to the stipulations being --

MR. KROMBERG: Oh, okay.

THE COURT: Is there? I want to hear from the defense.

MR. KROMBERG: I'm sorry, I was confused. 12-17 is in. I wrote it on my note to let you know that 12-17 was in about 11-500, but since it's in, that problem is solved.

THE COURT: All right. First of all, was there

any -- we normally send the stipulations to the jury. Is there any issue from the defense about that?

MS. MORENO: Our list shows that 11-500 is in as well.

THE COURT: Yeah. So 11-500 is definitely in.

MR. KROMBERG: And Government Exhibit 10-903 is in, but there's a stipulation that states what it was, and I, I must have forgotten to read the stipulation. Stipulation No. 24, which refers to Government Exhibit 10-903 as having been found by FBI on a CD found in the course of searching the residence of defendant Nicholas Young in August 2016. And that's Government Exhibit 12-24.

THE COURT: Is there any objection to 12-24 going in? Again, we normally let all of the stipulations go to the jury.

MS. MORENO: 12-24 is a stipulation?

THE COURT: Yes.

MR. KROMBERG: Well, Government -- Stipulation No. 24 is Government Exhibit 12-24.

THE COURT: The 12 series are your stipulations, correct, Mr. Kromberg?

MR. KROMBERG: Yes, Your Honor.

MS. MORENO: That's fine.

THE COURT: Is there -- there's no objection? All right, that's fine. That's in.

(Government's Exhibit No. 12-24 was received in

evidence.)

MR. KROMBERG: And all of the rest that we have are the ones that the Court has.

THE COURT: All right. Well, the only issue, though, that I don't think is yet totally resolved is that summary exhibit. I've not seen the revised one.

Has the defense received a copy of that?

MR. SMITH: You're referring to the final Government Exhibit 16-000 that --

THE COURT: Correct.

MR. SMITH: -- that was created on December 14 at 10:14 p.m.?

THE COURT: Yes.

MR. SMITH: Yes, we have received it, and we object to its inclusion in evidence.

THE COURT: All right, let me take a look at it.

MR. TURGEON: Your Honor, the only -- for Your Honor's reference, the only change in that from the copy Your Honor has -- does Your Honor have a copy of this?

THE COURT: Did you give me the revised one? I have the old one.

MR. TURGEON: Here's the one from today. Thank you.

The only difference other than the highlighting will be removed from the final version and there's one entry that will be taken out that I'm trying to find -- Your Honor, I

believe the entry that will be taken out is the one that I marked on your copy with an X, to the left of the highlighted entry that's coming out, and that is -- and that is on page 4, the entry for November 2, 2010, because I don't believe that was admitted into evidence.

MR. SMITH: And, Your Honor, however the Court rules, we'd just like to note the particular subject matter of our objection on the record.

THE COURT: Go ahead. Let me hear your objection.

MR. SMITH: Okay. So there's a couple of things we object to here. We don't dispute that this is a useful aid for Agent Caslen's testimony. It was very useful, including to the defense, but the -- to introduce this into evidence creates a misleading impression in the jury's mind possibly that this is reflective of every activity Mr. Young has conducted in this period, and it's just prejudicial after prejudicial after prejudicial item.

You can see that it's in chronological order, so it creates this view that is distorted. It creates a kind of selective, narrow view of what Mr. Young was doing during that period, when if Your Honor looks at the dates, it's all cherry-picked.

If you see that the dates in December 2007, almost all of the, you know, the vast majority of the government's predisposition evidence before 2010 was downloaded on the same

day, Your Honor, so we think it's misleading.

The second objection we have is that some of the highlighted additions to it include visits to Muslim countries. To the extent this is being used to suggest a predisposition to support terrorism, I don't know what, what sort of constitutional question you want to raise here.

THE COURT: I can shorten your argument. This to me would be like letting Agent Caslen's testimony be in the jury room, which we don't do. It's far too detailed. It speaks too much as if he were in the witness -- in the jury room speaking the case to the jury. The jury has to rely on their own memory.

Had this been less detailed, just a more general, a few blocks, I think it would be helpful to the jury, but it's way too detailed. It does include information, you know, it has the exhibit number, the witness name. It's basically putting a government witness in the jury room.

I'm going to sustain the objection, and this exhibit will not go in.

MR. SMITH: Thank you, Your Honor.

THE COURT: All right? It was very helpful, Mr. Kromberg, but it's too much for the jury.

MS. MORENO: Your Honor?

THE COURT: All right, yes, ma'am.

MS. MORENO: There is one final defense exhibit that

I've discussed with the government.

THE COURT: All right.

MS. MORENO: It's a photograph of Mr. Young with his father on the day -- it's up on the screen now -- that he graduated from the Police Academy. We failed to introduce that through any of the witnesses; however, the government is not objecting to that; and if we need to reopen just to admit that, we can do that.

THE COURT: No. Of course, you may have that in. And what number are we putting on that?

MS. MORENO: It would be Defense Exhibit No. 25, I believe.

THE COURT: 25?

MS. MORENO: Next in line. 25.

THE COURT: Yes, 25. All right.

(Defendant's Exhibit No. 25 was received in evidence.)

THE COURT: Now, is that -- is there a hard copy of that in the folders yet?

MS. MORENO: Is there a hard copy?

THE COURT: Do you have a hard copy of it?

MR. SMITH: No, we're publishing it. We're just publishing it on the screen.

THE COURT: Well, I know, but how is the jury going to see it?

MR. SMITH: The jury can --

THE COURT: They're not going to be able to take it back with them.

MS. MORENO: It's going to be used during closing, Your Honor.

MR. SMITH: It's just a demonstrative for closing, Your Honor.

THE COURT: But you want the jury to have it as --

MR. SMITH: We can, we can have it printed out. Our paralegal can have it printed out immediately.

THE COURT: All right, you need to have it printed out so when the evidence goes to the jury, they have it with all of your other exhibits. Other than the audiotapes, all of your exhibits should be in hard copy so they'll go back with the jury.

MR. SMITH: All of the other exhibits are in hard copy.

THE COURT: All right, that's fine. So we don't need to reopen the case for that.

All right, in terms of the verdict form, I'm not sure if we have a copy of that for you at this point or not. The verdict form is going to be, there should be no surprises on it. As I said, we've taken off the first paragraph that the government had on their proposed one, so it's just going to be the second, third -- what I'm calling second, third, and fourth

paragraphs, all right?

In terms of the, of the jury charge, as I said, I thought we had a pretty valuable pretrial charge, and not much has changed during the case. So let me tell you what I've given you in terms of the Court's proposed final charge.

The first group of instructions that you've got there are what I would call essentially boilerplate instructions. They are mirror images of what the government had submitted in their early instructions for which there was no objection, other than Instruction No. 11, which is on page 12 of your packet. The defense did object to an instruction telling the jury that the government's use of undercover agents and informants is not a problem.

That's a standard instruction we've given before in this type of case. It is proper to give that to the jury, and so I'm not -- I'm overruling that objection.

Now, since I've -- since I just struck 16-000, I'm not even sure we need a demonstrative exhibit instruction --

MR. KROMBERG: That's correct.

THE COURT: -- because there are no other demonstrative exhibits in this record; is that correct?

MR. SMITH: Correct.

THE COURT: All right. I'm therefore going to remove 10, so you can remove 10 from your packet, all right? And we'll renumber these at some point. Okay.

MR. SMITH: Did Your Honor say we will renumber them?

THE COURT: I will renumber them because I eventually give them to the jury after I've instructed them. But 11 is staying in because that is correct.

Now, in terms of the expert witness instruction, I believe the government had a line in there about whether there's other expert testimony that might be contradictory. There was only one expert in the case, so we edited that instruction, so that's not in there.

I gave my standard law enforcement witness instruction, which is 14.

I went ahead and included an interest in outcome. I can take that out. I don't know if that was in the government's original instruction, but sometimes defense like that in because either the informants, because you had the issue about getting paid for successful whatever, I can take it out because it wasn't within the government's group. So let me know if you want that in or out.

MR. SMITH: Your Honor, we're fine with it.

THE COURT: You're fine with that?

MS. MORENO: Yeah.

THE COURT: All right, we'll keep that in.

Instruction 18, inconsistent statement, that's a pretty standard instruction, and there were inconsistent statements here, so I'm leaving that in.

And with 19, I will give B. That's the alternative instruction as to whether a defendant testifies or not.

Are you satisfied with that instruction, 19B?

MR. SMITH: We're satisfied.

THE COURT: All right. On 20 is a general law about, about the indictment, that it's not evidence, only the offense charged, and each count gets considered separately. Those again are standard. No objection?

MR. SMITH: No objection.

THE COURT: All right. On or about, that's again a standard instruction. There shouldn't be any dispute about that.

The explanation of disjunctive proof, which some day we've got to get that figured out because it's terrible, but that's a standard one.

Now, I decided since we have "attempt" running through all three counts, that there ought to be a general introduction to "attempt" before we even get into the counts. So Instruction 23 is different only in structure, not in content.

So it reads: In Count 1, Nicholas Young is charged with attempting to provide material support or resources to a foreign terrorist organization. In Counts 2 and 4, he's charged with attempting to obstruct justice.

Then I'm defining "attempt." An attempt means the

defendant did some act that under the circumstances as he believed them to be, which is language which the defense wanted the Court to add, was a substantial step toward the commission of the substantive crime. For example, to show that Nicholas Young is guilty of the offense charged in Count 1, the government must prove beyond a reasonable doubt that he did some act that, under the circumstances as he believed them to be, was a substantial step toward the commission of a crime of providing material support or resources to a foreign terrorist organization.

MR. SMITH: Correct.

THE COURT: That incorporates your language.

And then the substantial step is defined. There's a little repetition here because when I go through the elements for Count 1, some of that's repeated, but anyway, there was no objection to what is now 24. That is the nature of the offense.

The fact that there's a -- that the government added "as that term is defined" I don't think is a problem even though the defense doesn't like it because we have the definition further down.

Instruction 25, there was no objection to that.

MR. SMITH: Your Honor, may I make one point before the jury returns at 1:30?

THE COURT: Yes.

MR. SMITH: So counsel haven't had a chance to eat lunch or use the restroom since the Court just --

THE COURT: Do you need a five-minute bathroom break? We're going to -- we're going to break. I'm going to give you time to get a little bit of lunch, not a full hour, and to -- but if you need a break this morning, we'll take a break right now.

MR. SMITH: Not at this moment but when the jury comes back at 1:30.

THE COURT: We're going to tell them at 1:30 that we're not ready and they'll get another half-hour.

MR. SMITH: Thank you.

THE COURT: So the statute, there's no issue about that. Then we go through the elements, and I don't recall that there's any real dispute about the elements as the government has laid them out here.

The first element for Count 1 is that the defendant knowingly and intentionally attempted to provide material support or resources to a designated foreign terrorist organization; and two, that the defendant knew that ISIL, also known as ISIS and the Islamic State, was a designated foreign terrorist organization or had engaged or was engaging in terrorist activity or terrorism; and three, that the defendant did some act that was a substantial step in an effort to provide material support or resources to ISIL, also known as

ISIS or the Islamic State.

And then I redefine the substantial step.

MR. SMITH: No objection, Your Honor.

THE COURT: All right. Then I'm giving the government's proposed instruction on foreign terrorist organization, and the defense does object, but I'm finding based on the evidence in the record that I am going to instruct the jury that on May 2014, the Secretary of State amended the designation, etc. In other words, I am going to basically indicate that.

MR. SMITH: And, Your Honor, we just object. This instruction appears to go further than what the government originally requested, which I believe in the government's original --

THE COURT: Mr. Smith?

MR. SMITH: The government's original instruction, it said that al Qaeda in Iraq was designated by the Secretary of State on October 15, 2004, as a foreign terrorist organization and that the ISIS name was added as an alias in May of -- oh, it says here: I instruct you that in May of 2014, the Secretary of State amended the designation to add the alias . . . as the primary name of this . . . and added the following . . ..

Okay. And Your Honor is ruling on the basis of Dr. Gartenstein-Ross's testimony?

THE COURT: Plus the Federal Register, all right?

MR. SMITH: Okay.

THE COURT: All right?

MR. SMITH: Thank you, Your Honor.

THE COURT: All right. Then in terms of material support, I think I may have told you yesterday, but I took out some of the categories because they're absolutely unrelated to this case, and there's no sense having them there. Again, it's not meant to be a primer on the law of terrorism. It's meant to be the law that they need to decide the case.

I did add at the defendant's request, although again, I don't really think it's needed here, but the training and the expert advice or assistance.

MR. SMITH: Your Honor, we added those originally, just in case the Court is curious, because we understood that the government was going to attempt to charge a misleading statement under Count 1 and that they charged the wrong statute. They should have used 2339(a).

So I included these to -- I included these to cover the scenario where they would realize they would, you know, they were trying to use 2339(b) and they would have to use the assistance --

THE COURT: Well, I think the training and expert advice ought not to go to the jury. I mean, I think it's adding extraneous information.

MR. KROMBERG: We have no issue with -- we're fine with it not going to the jury.

MR. SMITH: We're fine with it as well.

THE COURT: All right. Then just so you know, we'll give you a revised 28, but it will have the last two paragraphs out, all right?

And for that matter, let's look at the rest of the terms. I mean, what's involved in this case is property, intangible or tangible, including currency or monetary instruments. I think "training" should come out of that first paragraph.

MR. SMITH: No objection.

THE COURT: What about from the government?

MR. KROMBERG: No objection, Judge.

THE COURT: All right.

MR. KROMBERG: We never said this was a training case.

THE COURT: Right. Expert advice or assistance?

MR. KROMBERG: No.

THE COURT: You-all agree with that?

MR. SMITH: Agreed.

THE COURT: It comes out. Okay.

Communications equipment? Arguably, the -- arguably -- I don't know how the government wants to put that. I mean, the cards were --

MR. KROMBERG: It was communications equipment and facilities, but it's not really what we're focused on, but it is covered.

THE COURT: It's the currency or monetary instruments. It's the cards --

MR. SMITH: Yeah.

THE COURT: -- it seems to me.

Yeah, I'm going to -- or personnel. So how that instruction is going to read then is: The term "material support or resources" includes any property, tangible or intangible, or service, including currency or monetary instruments.

MR. KROMBERG: Judge, I think it should also be personnel, though, because --

THE COURT: Because using them to recruit.

MR. KROMBERG: Correct.

THE COURT: Or personnel, all right. Other than that, any objection?

MR. KROMBERG: No objection, Judge.

THE COURT: How about from the defense?

MR. SMITH: We object to personnel.

THE COURT: All right. I'll leave it in, though, because that was sort of the explanation as to why the cards were needed, all right? But that's all that one is going to read as, all right? All right.

Then I believe --

MR. KROMBERG: If Your Honor is looking at one that says "provision of personnel" --

THE COURT: Yeah.

MR. KROMBERG: -- fine, we withdraw that. Not necessary.

THE COURT: Let's take 29 out entirely. Any --

MR. SMITH: No objection.

THE COURT: All right, that's out. Okay.

All right, then I don't believe there was any objection to how the government proposed the nature of the offense for Count 2 and Count 4.

The definition in the statute, which is Instruction 32, there was no objection to that. And I don't -- I think I actually changed what the government had for the elements because the first element should be that defendant unlawfully and knowingly attempted to obstruct, influence -- I know how I did it. You had the -- your instruction originally had the substantive offense or attempted to do it, and I decided why put it that way? So I've made it more direct.

If you compare it to what the government originally submitted, which is --

MR. SMITH: No objection, Your Honor.

THE COURT: All right, so that's how 33 will go in.

Then factual impossibility is a correct statement of

the law.

MR. SMITH: Oh, actually, you know what? Your Honor, can we take one step back? I didn't understand Your Honor's point, but I just did. So on Instruction No. 33 --

THE COURT: Correct.

MR. SMITH: -- I believe Your Honor ruled in the charging conference that we had before the trial that the Court was going to indicate that an FBI investigation is not an official proceeding.

THE COURT: Yeah, but we've got the grand jury in here now. I'm taking out the FBI business entirely. That's not in this instruction, though.

MR. SMITH: But if the government attempts to prove its case through the FBI investigation --

THE COURT: But they're not, I don't believe. They've got the grand -- because among other things, they've clearly established there was a grand jury investigation.

MR. SMITH: I believe their position is it's either. I believe their position is it could be either an FBI investigation or the grand jury.

MR. KROMBERG: Your Honor, theoretically, we don't want to waive the argument that in another case, there might be a possibility of an FBI investigation. In this case, there was a grand jury investigation.

THE COURT: I'm not taking -- the point is I'm not

taking judicial notice that an FBI investigation --

MR. KROMBERG: And that's fine.

THE COURT: -- qualifies.

MR. KROMBERG: It's not necessary in this case.

MR. SMITH: And, Your Honor, here's why it should become important whether we clarify in the instruction whether an FBI investigation is an official proceeding: Agent Caslen just testified about some occasions in which Mr. Young gave an indication he might have been under surveillance or under investigation.

If an FBI investigation is separate in an official proceeding category from a grand jury investigation, it's easier for the --

THE COURT: Let me stop you. You're talking about the wrong instruction. This instruction is not your problem. Your problem is 35. So let's just take it one instruction at a time.

MR. SMITH: Okay.

THE COURT: All I, all I want to make sure is everybody is comfortable with 33 because I changed the literal way in which the government presented 33 by putting "attempt" first.

MR. SMITH: No objection.

THE COURT: All right. And the government --

MR. KROMBERG: That's fine.

THE COURT: All right. Then 34 addresses the fact that -- factual impossibility is not a defense, which is a correct statement of the law.

35 has the definition of "official proceeding," and there I'm taking it right from the statute. You can't go wrong on that. That's what the statute says, and that's all we're going to say. You-all can argue to the jury however you want to argue the case, but that's the law.

MR. SMITH: Okay. With respect --

THE COURT: And if the jury -- now, if the jury comes in with a question, we'll have to address it down the road, all right? If they say, well, is an FBI investigation alone sufficient, then I'm going to have to wrestle with it because I told you I thought the Ninth Circuit case was pretty strong on this, but the bottom line is this is a direct quote from the statute, so it cannot be a misstatement of the law.

MR. SMITH: Your Honor, we understand the Court's ruling. We're just pro forma filing an objection to the extent that we might not understand when the jury gets the question, whether it's finding an official proceeding on an FBI investigation or grand jury, we will not know, so the purpose of the instruction would be to avoid the scenario where --

THE COURT: All right. I understand your position, but I'm -- all right.

All right, the official proceeding need not be

pending. Again, I'm not even sure you need that since there's no dispute in this evidence that there was an official proceeding, that is, the grand jury.

MR. KROMBERG: That is true. We withdraw it.

THE COURT: Is there any objection to that being withdrawn?

MR. SMITH: No objection.

THE COURT: All right, so 36 is out. We'll kill a few fewer trees this way, all right.

Obstruction need not be successful. That again is a correct statement of the law. I assume there's no objection to 37.

MR. SMITH: No objection.

THE COURT: All right. 38, that's a standard definition of "corruptly." Is there any issue with that? I don't think there was.

MR. SMITH: No objection.

THE COURT: All right. 39, knowingly, that's a standard instruction.

MR. KROMBERG: Judge, I lost track.

THE COURT: Yeah.

MR. KROMBERG: What instruction is No. 39?

THE COURT: 38 is corruptly.

MR. KROMBERG: Okay.

THE COURT: Now, we gave you a copy of what we're

going to do. You're probably reading from your original instructions.

MR. KROMBERG: That's right. I'm mostly following along, but I lost you at that point.

THE COURT: Okay. Because the order in which you gave me your instructions didn't always in my view make logical sense, all right?

All right. Now, the 39 again is the standard knowingly instruction. Is there any issue about that?

MR. SMITH: No, Your Honor.

THE COURT: All right. And 40, the willfully instruction, any dispute about that?

MR. KROMBERG: Which one is 40, Judge?

MR. SMITH: Willfully.

THE COURT: Willfully.

You do have a set. We gave you a set.

MR. TURGEON: We don't, Your Honor.

THE COURT: Sean, did we not give them?

THE LAW CLERK: They definitely have a set there.

THE COURT: You do.

MR. KROMBERG: Oh, this makes it easier.

THE COURT: Yeah. All right, there's no problem with 40?

MR. SMITH: No objection.

THE COURT: All right. These are new numbers. 41

again is standard right out of the instruction books. Proof of knowledge or intent?

MR. SMITH: Just to clarify, by instruction books, Your Honor means the Fourth Circuit standard jury instructions?

THE COURT: They've been used a million times and never been reversed, never been questioned. They're either coming -- most of them come out from O'Malley, some of them come out from Sand's, and they've all been -- these are standard instructions.

MR. SMITH: No objection.

THE COURT: I'm not sure we need motive. It's never really been argued in this case. Sometimes it goes in; sometimes it doesn't. Does anybody care about motive?

MR. KROMBERG: I do, Judge. The reason, if the defense is sort of --

THE COURT: Acting out of friendship?

MR. KROMBERG: *The Washington Post* defense that was floated in *The Washington Post*, if the closing argument is that, well, he did it not because he was trying to support ISIS but he was doing it because he was, wanted to help a friend --

THE COURT: All right.

MR. KROMBERG: -- I think it does --

THE COURT: It is -- this is the standard instruction, so the language in here is not a problem. Do you agree with giving it or not giving it?

MR. SMITH: Does the government take -- just to clarify Mr. Kromberg's comment, does the government take the position that it is a defense to the charge, Count 1 charge that if Mr. Young had provided gift cards to the informant Mo for the reason that he was his friend and not to support ISIS, that is a defense to charge 1?

THE COURT: A good motive doesn't excuse you from committing a crime.

MR. SMITH: Correct, Your Honor, but I understood Mr. Kromberg to be saying that -- Mr. Kromberg referenced the defense of indicating the gift cards had been sent to Mo because he was his friend and not because he was in ISIS.

THE COURT: In any case, we don't know what your closing argument is going to be, so I could also hold this in abeyance, but I think motive probably is not an improper instruction to give in this case.

MR. KROMBERG: I agree, so that in case that's what the defense argument is, the jury will be properly instructed.

THE COURT: All right.

MR. SMITH: No objection.

THE COURT: All right. Now, the entrapment defense, again, I've refined that, because that's why I asked you the question earlier. So the defense -- the defendant asserts as to Count 1 that he was a victim of entrapment. An entrapment defense has two elements, and the elements, there's no dispute

about those, but there's no entrapment defense as to Counts 2 and 4.

Everybody agree about that?

MR. SMITH: Agreed, Your Honor.

THE COURT: All right. I think the instructions you'll need to look at the most carefully are the entrapment instructions. The entrapment analysis, I think, is a correct statement. It's very close if not exactly what the government did. I can't recall now whether we made any changes to it.

And the only objection the defense had, as I recall our earlier conference, about inducement is you didn't want terms defined until the jury asked for it, and as I told you back then and I'm not changing my position on this, you give the jury as many definitions as you think they may need to understand the case, and I don't recall there being any dispute about the actual language of the explanation of what inducement is.

And the next instruction, which is 46, is predisposition.

MR. SMITH: The next instruction is 45, Your Honor, inducement?

THE COURT: 45 is inducement, is a definition of "inducement."

MR. SMITH: So we do object to this, but we've already stated our reasons.

THE COURT: Right. All right, so I'm overruling that objection, and that will be that.

Now, 46 simply combines the three or four government instructions on predisposition onto one page. It makes it easier for the jury to look at, and I think again those various points of law are correct.

MR. SMITH: So, Your Honor, the one objection we would make here is that if Your Honor sees the first sentence in predisposition, Instruction No. 46, it reads: Predisposition refers to the defendant's statement before government agents made any suggestion that he commit a crime.

And if Your Honor considers the *Jacobson* decision, the rule of law is that predisposition refers to the defendant's state of mind before first contact with a government agent, which is not necessarily the same time the government agents made the first solicitation to commit the crime.

So -- and this is not just a semantic issue because if you go back to the *Jacobson* decision, the Supreme Court pegged the predisposition date to when Jacobson had first contact with an undercover agent sending him inappropriate materials. It did not refer -- the predisposition point did not refer to when the government first solicited Jacobson to purchase the inappropriate materials.

So there's a -- we believe that this should read:

Predisposition refers to the defendant's state of mind before the defendant's first contact with government agents in the investigation. We can give you a pin cite for that.

THE COURT: Mr. Kromberg, what's your position about that?

MR. KROMBERG: That sentence is a direct quote from the 2014 decision of the Fourth Circuit in *McLaren*. I think that had Khalil solicited a crime, as happened in *Jacobson*, when the first government agent solicited the crime, then it would be a correct statement of law that you go to the first solicitation of the crime, but I think that the Court is on safe grounds by, by pointing out that this is directly from *McLaren*. It's what the Court gave, this Court gave in *Carranza*, and this case is different from *Jacobson* because Khalil was not soliciting the defendant for a crime. He just happens to be a government agent who had contact with the defendant.

THE COURT: I think the government is correct, that it's only Mo who starts to talk at all about, you know, ISIS and whether, ultimately whether or not to provide --

MR. SMITH: If Mr. Kromberg were correct on that point of law, we would agree. He's not correct. If Your Honor does review the *Jacobson* decision, the first contact with government agents does not involve the solicitation to commit a crime.

So, Your Honor, we think that this statement is being pulled from *McLaren* in a context in which the Fourth Circuit was not considering a very nuanced question that we're considering now. There are other cases that indicate that Your Honor's previous ruling in this case that Mr. Khalil's meeting with Mr. Young would be relevant for predisposition purposes was a correct ruling. We have circuit precedent from various circuits indicating that the trigger point is the first contact with government agents.

THE COURT: Well, yeah, but I didn't get all the evidence -- didn't see all the facts until I heard Khalil testify. There's nothing in any of Khalil's testimony that I can recall that would indicate any suggestion on his part to the defendant of getting involved in any kind of criminal activity.

And again, as I recall this evidence, it's crystal clear that your client was not a target when Khalil met him. He met him because he was looking at Chesser and other people, and your client just happened to be in that milieux. After that, they started to have some contact.

But I don't think the evidence is in this record that supports that, so I'm going to go with this, with this instruction.

MR. SMITH: We just have one more fact for the record.

THE COURT: All right.

MR. SMITH: Your Honor said there's no evidence to suggest it. I don't have a transcript with me right now, but I believe that Khalil testified that he did initiate a conversation about the propriety of jihad in Kosovo with Mr. Young. That's one fact. I believe that Ms. Moreno elicited a couple more facts that are similar to that, but again, I don't have a copy of the transcript.

THE COURT: I'm not sure that would be sufficient anyway. So anyway, I'm going to go with this instruction.

MR. SMITH: Okay.

THE COURT: But as I said, recognize that it combines all the other sort of, you know, one sentence other further instructions. So, for example, predisposition is not limited only to crimes specifically contemplated by the defendant prior to government's suggestion. Instead, it is sufficient if the defendant is of a frame of mind such that once his attention is called to the criminal opportunity, his decision to commit the crime is the product of his own preference and not the product of government persuasion.

Predisposition may be found from a defendant's ready response to the inducement offered. A defendant's predisposition must be determined as of the time he was first approached by a government agent; however, inferences about that predisposition may be drawn from events after the two

parties came into contact.

I think it's all there. *Jacobson* is adequately covered in all of that, all right?

MR. SMITH: Okay.

MR. KROMBERG: That's fine, Judge.

THE COURT: Now, the venue instruction, in addition to what's here for Counts 2 and 4, is there going to be a venue issue as to Count 1? I've looked at some of the -- I did a quick look at some of the books on this, and unless the defense raises venue, often the government doesn't even have to get into it, and at least during the questioning in this case, I'm not sure a specific venue issue was ever raised.

But we've got for Counts 2 and 4 this instruction. Do I need to put in an extra just general venue instruction?

MR. SMITH: Your Honor, we would ask for the general venue instruction because there has been cross-examination on this issue. We cross-examined Agent Sikorski on this issue. There was a back-and-forth, again, we don't have the transcripts handy, but there was back-and-forth about where the, most of the codes were sent from and where they were received, and there was also cross-examination of Mo about where he received the text message.

THE COURT: Well, an easier way of doing this may be just something like this: In addition to the foregoing elements for Counts 1, 2, and 4, you must also consider whether

any act in furtherance of the crime occurred within the Eastern District of Virginia. In this regard, the government need not prove that the crime itself was committed in this district or that the defendant himself was even present here.

It is sufficient to satisfy this venue element if any act in furtherance of the crime occurred within this district. If you find that the government has failed to prove that, that any act in furtherance of the crime occurred within this district or if you have a reasonable doubt on this issue, you must then acquit.

Now, that's -- for reasonable doubt, that's really only a preponderance issue, but given the evidence in this case, I don't see how there could be a reasonable doubt.

MR. KROMBERG: Your Honor, if the defendant is making an issue of venue, for Counts 2 and 4, we'd ask that you give the instruction based on 18 U.S.C. 1512(i), which says that venue is proper in the district in which the proceeding was existence -- in existence. If the defendant says now that he's not making an issue of venue, then there's no need for the instruction.

THE COURT: For Counts 2 and 4.

MR. KROMBERG: Correct.

THE COURT: What about Count 1?

MR. KROMBERG: I think what Your Honor said about Count 1 was just exactly right.

THE COURT: All right. Well, let me hear about Counts 2 and 4. I mean, there's no question that the law provides that if the, if the proceeding is in this district, there's, there's venue.

MR. SMITH: Your Honor, this again raises the question of what the proceeding is. If there was no proceeding at all --

THE COURT: But there was. I mean, the evidence is unrefuted, is unrefuted that there was a grand jury investigation.

MR. SMITH: Your Honor, there was a grand jury investigation, but as Your Honor knows, in order to prove obstruction, the government has to prove Mr. Young knowingly obstructed the proceeding.

THE COURT: He doesn't have to know that there was a proceeding.

MR. SMITH: He doesn't have to know there was a proceeding. He has to know there was an investigation that could lead to a proceeding.

THE COURT: I don't think it goes that far, no.

All right, I'll --

MR. SMITH: That's in the mens -- Your Honor, there's a mens rea subsection in Section 1512, and that's -- I'm not quoting it directly, but I'm paraphrasing it.

THE COURT: All right. We'll go ahead then, I'll

have to cobble together what, what the government has given me.

What about for Count 1? Is there any venue issue as to Count 1? If you're not raising it, I'm not giving it.

MR. SMITH: Oh, Your Honor, we take the position it's the government's burden. The defense doesn't have any.

THE COURT: I'm sorry?

MR. SMITH: We take the position it's the government's burden to establish venue.

THE COURT: All right. Then we'll put in, as I said, I'm going to put venue all in one instruction, however, rather than having two, all right? So that one you haven't quite seen yet, but it will have the government's -- or a version of what's given to you as, I guess it's, I can't see the number here, 47 or 48.

Presumption of innocence, that's the standard instruction we always give in this court, and then the last instruction is the unanimity requirement.

So that's what the charge looks like, all right? So I think the only thing I have to clean up is venue.

Anything else before I give you your break? We'll tell the jury that we're going to be a little bit later.

The government's index, you've got your index of exhibits together or ready to go?

MR. TURGEON: Again, Your Honor, we'll have it when we reconvene.

THE COURT: All right, all right. So I think half an hour should be enough time to grab lunch and do whatever you-all need to do.

MR. SMITH: Your Honor, can we have 45 minutes? We haven't had one break since we started this morning, and we haven't even had an opportunity to use the bathroom because we've been using, we've been --

THE COURT: All right, we'll tell the jury that because of the amount of evidence, we just have another delay, but we're going to definitely start up at 2:30, all right?

MR. KROMBERG: Thank you, Your Honor.

THE COURT: All right, we're in recess until 2:30.

(Recess from 1:50 p.m., until 2:36 p.m.)

A F T E R N O O N  S E S S I O N

(Defendant present, Jury out.)

THE COURT: All right, counsel, we've given you the final set of instructions. I just want you to know on page 9, because there are no summaries or charts, I took that instruction out but replaced it with one that neither one asked for, which was tape recordings and typewritten transcripts, and so I think they have to have that. Not that they have typewritten transcripts, but they have the printed transcripts on those videos.

And I guess they do have some -- do they have transcripts in paper?

MR. KROMBERG: Yes, Your Honor.

THE COURT: All right. All right, in any case, they need that instruction a second time.

All right, is there anything further before we bring the jury in?

MR. SMITH: Yes, Your Honor. We just have one short objection to the ruling Your Honor made about 45 minutes ago indicating that the defense -- the predisposition standard in this case would require the government to prove the defendant's predisposition to commit the crime charged in Count 1 before the solicitation of the crime, as opposed to before Mr. Young's first contact with government agents.

We had believed we had a ruling from the Court on

this before trial, and we understand that this ruling changed about 45 minutes before our closing statements. Our entire -- part of the entire structure of our argument in closing depended on the law of the case, which was that the first government contact with Mr. Young would be the trigger point for proving predisposition to commit the charged crime. So we are objecting on due process grounds.

THE COURT: Well, you've made your objection. I don't think actually the instruction is nearly as egregious as you think it is. I think it's there. In any case, we're going with the case as it is.

The government is always expected to protect its record. You've given me an instruction that I've used, and I think that the law there is appropriate. If the government thinks there's any defect, you need to tell us now.

MR. KROMBERG: Your Honor, we think that your instructions are fine. In fact, there is -- in one of your instructions, you do say that if the predisposition occurs before the first contact or it's measured, so I'm not sure what Mr. Smith's problem is.

MR. SMITH: The problem we're referring to, Your Honor --

MR. KROMBERG: If I may continue -- oh, I'm sorry -- but I think that everything that's needed is there.

MR. SMITH: Your Honor, there was a conference we had

before trial in which, it wasn't a charging conference, because we just did that, but there was a kind of pretrial charging conference in which Your Honor -- we don't have the transcripts right now, but Your Honor read what it called the sort of preliminary predisposition standard that would be used at trial.

Ms. Moreno was in a colloquy with the Court about how the defense was taking the position the government had to prove predisposition beyond a reasonable doubt before December 2010, when Khalil testified that he met Mr. Young, and --

THE COURT: Well, here's what it says: Predisposition refers to the defendant's state of mind before government agents made any suggestion that he commit a crime.

MR. SMITH: And, Your Honor, the solicitation in this case is July 2016. I believe the government agrees with that, that date.

MR. KROMBERG: Your Honor, if you go to the last sentence in that very instruction, you say: A defendant's predisposition must be determined at the time he was first approached by a government agent.

That's what the defense wants you to say. I'm not sure what the problem is here.

MR. SMITH: We were just referring to the first sentence.

THE COURT: Well, but, I mean -- yeah, you're not

reading these carefully enough. It's all there. You can still make whatever argument you were going to make.

MR. SMITH: Thank you, Your Honor.

THE COURT: All right, that's great.

All right, 45 minutes. The government's got 30 for their opening and 15 for rebuttal; defense has 45. All right, are we ready to go?

MR. GIBBS: Ready to go, Judge.

THE COURT: Let's bring the jury in.

(Jury present.)

THE COURT: All right, ladies and gentlemen, I do want to -- have a seat, please. I do want to apologize for the, the delay. I hate wasting juries' time, but we had to get a lot of exhibits together and organized for you-all. We've done that now, and so we now start the closing arguments.

As I told you at the beginning of the trial, the government, because it has the burden of proof, gets to make the first closing argument. They have been given a half an hour in which to do that. Then the defense makes their closing argument. They have up to 45 minutes to make theirs. The government gets 15 minutes for rebuttal, and then I'll be giving you the instructions, all right?

So we're starting now with the government's opening closing argument. Mr. Gibbs?

CLOSING ARGUMENT

BY MR. GIBBS:

Thank you, Your Honor.

Ladies and gentlemen, as the judge just told you, this is the opportunity for the government to make its closing argument in this case, and what I will tell you is that when you go back to deliberate, you should find the defendant, Nicholas Young, who's seated back here, guilty of all three crimes in this case.

And I'll get to that more in a moment, but before I talk about that, I want to thank you-all for your service in this case. I know that this is a busy time of year. We've worked long days since we started this trial. You've looked at a lot of evidence, heard from a lot of witnesses, and I think everyone here in court recognizes how diligent and attentive you've been, so for that I want to express my gratitude.

Now, I said a minute ago that you should find the defendant, Nicholas Young, guilty of all three counts in the indictment. Why do I say that? I say that because put quite simply, the defendant is guilty and the evidence proves his guilt beyond a reasonable doubt.

Now, let's start with Count 1 of the indictment. That's the attempted material support to ISIS. The defense is claiming that the defendant was entrapped into committing that offense.

So let's talk about friendship a little bit. I expect the defense to argue that their client was entrapped into committing a violation of Count 1 by two government agents, Khalil and Mo, who used their friendships with the defendant to convince him to commit that offense. So let's start with Khalil. What do we know about him?

We know that Khalil was around the defendant from around 2010 to 2012, and the reason is because Young was friends with Saleh, the guy that Khalil was actually targeting. Remember Saleh, the guy that advocated jihad against Israel, who said that the U.S. and Israel were his enemies? Who endorsed shahid and martyrdom? Who expressed disgust at seeing a woman in our coalition forces, and who was outspoken along with the defendant in his disgust for Jews, calling them pigs? The guy who would take secretive walks around the golf course with Young and Khalil and who said jihad would solve a lot of our problems?

That guy was Saleh. He was the reason Khalil even got to know Young in the first place. And we know Khalil was never directly targeting Young because after Amine El Khalifi, yet another person in Young's circle, got arrested for plotting to blow up the U.S. Capitol, Khalil left. Would the FBI have really removed him if they wanted to use him to target the defendant?

But more importantly, Khalil couldn't have entrapped

Young because that crime didn't occur until much later. Do you really think Khalil was asking Young in 2011 or 2012 to help ISIS get Google Play gift cards in 2016?

There's another reason that Khalil couldn't have entrapped Young, and that's because Young had figured out that Khalil was a source. Remember how paranoid and security conscious Young was? The guy was a cop, after all, for 13 years.

You heard that recording where Young told Mo all about the Marine guy, who was clearly Khalil, and if Young was using Khalil as an example and a cautionary tale to explain to Mo to be careful about whom you befriend, how could Khalil have successfully befriended and entrapped Young? Young's friendship with Khalil was not entrapment.

So then two more years go by until Young finally meets Mo. So how about him? At least in his case, he was targeting Young for at least some period of time, but what exactly did that consist of?

The two of them were around each other for less than six months, from May to October 2014. By the end, Mo had made it clear that he was leaving to go join ISIS, so the defendant suggested setting up covert e-mail accounts so they could communicate, and after that point when Mo allegedly left to go join ISIS, the FBI used that covert account to impersonate Mo.

And there is no question that Young believed Mo had

gone off to join ISIS. Getting rid of the device for real. Gonna eat the SIM card.

But the evidence you heard about their relationship just doesn't sound like it was so deep or compelling that Mo would have been able to convince Young to do anything he didn't want to do. They never visited each other's houses. They got together maybe 20 times or so. Weeks or even months might pass between e-mails from the Essa Kobayashi account.

Was Mo really a friend who could entrap a cop who had served for 13 years and who was incredibly paranoid? Incredibly paranoid. Burner phones, thinking the FBI was tapping his communications, take the battery out. A woman friend let him know that he was under investigation.

He told Mo there are 25,000 informants in mosques around this country. He said that a lot of the people being arrested for terrorism crimes made a mistake, and what was that? Communicating online with people who turned out to be agents or informants.

So perhaps we shouldn't limit the friendships in this case that we look at to just Khalil and Mo. Perhaps we should widen it out a bit to look at the friends that Young spent a lot more time with and knew a lot better than Khalil or Mo, friends in addition to Saleh and Khalifi such as Liban Mohamed, who, like Young, talked about how they should try to uncover informants. Friends like Farooque Ahmed, who was arrested for

planning to blow up the Washington Metro. Or Peshwaz, the guy that Mo was targeting in that May recording where he talked about jihad.

Or Hicham Hall or T.J. Singh, do you remember them? Do you remember how Young showed Mo those ISIS videos and said, "Hicham and T.J. watch these a lot"? And remember Hicham on that one recording from September where he told Mo about the real jihad in Afghanistan where you can kill Americans who are all Kevlared up?

Those were Young's friends. Those were the people he hung around with. Those were the circles Nick Young ran in.

Now, when the defense gets the opportunity to give their closing, I expect them to say that a big part of the entrapment in this case was the rapport building that Khalil and Mo did, but that's sort of the point, isn't it? If you have an undercover, they have to build up enough of a relationship to gain the trust of the target so you can figure out if the target is a threat or not, right?

It can't be the law that simply cultivating a friendship like that is entrapment, and, in fact, the judge will instruct you on the law, and what she will tell you regarding Count 1 is this: Simply cultivating the friendship of a target in preparation to present a criminal opportunity is not inducement to commit a crime. Unless that friendship involved coercion, threats, or pleas that would constitute more

than just providing an opportunity to commit the crime, the defendant's relationships with Mo and Khalil were not inducement.

Let's talk a little bit more about inducement. As the judge will also tell you in her instructions, inducement requires more than mere solicitation by the government. "Inducement" is a term of art necessitating government overreaching in conduct sufficiently excessive to implant a criminal design in the mind of an otherwise innocent party.

So let's talk about these Google Play gift cards for a minute. Was there government overreaching in conduct sufficiently excessive to implant a criminal design in the mind of an otherwise innocent party? Not even close, ladies and gentlemen.

Let's think about what happened in this case. It wasn't until the summer of 2016 that this topic even came up, and the defendant willingly agreed to send the codes without any coercion or pressure: Inshallah, more codes will come your way.

Think back to those Threema messages. The defendant hadn't seen Mo in almost two years. His only means of communicating with the person he thought was Mo for most of those two years was through the covert e-mail account that he set up. He only accessed that account sporadically.

Remember the surveillance photos of him casually

strolling into the store so he could log on to the computer? He wasn't being pressured by any government agent to do that.

And when you look at those Threema messages to the defendant, they're barely a request, but don't take my word for it. When you get back in the jury room, take a look at all the communications that the FBI sent where they brought up the Google Play gift cards.

What you will see is that if those messages were written out grammatically, you wouldn't even be able to insert a question mark at the end of them: What we need is more of the Google codes. We have two very trusted brothers in U.K. who buy us Google gift cards.

The FBI employed about as light a touch with this defendant as they possibly could because they knew that anything overt would spook him. Now, certainly they were hoping that he would send the codes, and they gave him an explanation for the codes that they thought would appeal to him.

And what did they say? Let's come back to that in a minute because first I want to talk about the codes for a second, and we need to put one issue to rest because you heard the defendant's opening statement, and I expect a similar argument in closing, and the thrust of it is this: The government spent all this time investigating our client, and what do they have to show for it? $240 worth of Google Play

gift cards.

Putting aside the fact that that six-year figure is really not right, what was the defendant told about these codes? He was told that each code represented an encrypted communication platform, meaning two people could use it to communicate secretly. On one end was an ISIS recruiter, and on the other end was a prospective ISIS fighter from the West. So with the investment of just $10 or $15, ISIS could bring a fighter to Dawah.

How much did the defendant provide? $245. How many fighters would that represent? Fifteen, twenty? Twenty fighters that Officer Nicholas Young was willing to help send to join a foreign terrorist organization that burns people in cages, enslaves captured women, attacks western capitals, and then brags all about it in the ISIS propaganda videos that the defendant watched during his lunch break at work while serving as a police officer. I bet it tasted terrible, but no wonder he ate that SIM card.

And the $245 figure is pretty interesting, too, because did you ever see any instance of the FBI asking for a specific amount? The defendant could have sent $20 worth, maybe enough for a couple of fighters, but on his own initiative, he sent ten times that.

Now, let's go back to the explanation that the FBI gave the defendant about where these fighters would be sent.

He was told that they were being pushed to Wilayat Sirte, in Libya, and why would that appeal to the defendant? Because Libya was near and dear to his heart. He was a Libya Civil War vet from the seeds of Misrata in April and May 2011, just as the bumper sticker on his car said. He had fought with the Abu Salim Martyrs Brigade.

And what do we know about that group? Well, we heard Dr. Gartenstein-Ross say they were founded by people with connections to the Taliban and al Qaeda, and he even said that ISIS and the Abu Salim Martyrs Brigade were rivals.

So it seems sort of odd that the defendant would be sending money to buy secure apps to someone in ISIS, right? Well, not really, because what did the defendant say in his messages to Mo's account? He said the brothers he was with was, quote, like-minded with the brothers where you are. He said he wanted to see the division solved and the brothers united. He said that everyone needs to join under one banner to repel them.

Who was "them"? According to the defendant, it was Russia and the puppet coalition in the West and all the countries who were uniting to pummel ISIS.

And unlike his old friends in Libya, whom he was e-mailing as Malik the American, Mo was responding to his messages.

So consider the entrapment instruction. What the FBI

did with the Google Play gift cards simply doesn't rise to the level of inducement because it was mere solicitation, asking someone to commit a crime, and as the judge will tell you, the fact that government agents initiated contact with the defendant, suggested the crime, or furnished the ordinary opportunity to commit it is insufficient to show inducement. This was not inducement, and it's not even close.

Now, before we get to predisposition for Count 1, we should quickly dispose of the last two counts of the indictment. Now, the defense is not claiming that Young was entrapped into committing those two offenses. Those are the obstruction counts. And there really aren't any factual disputes about what happened.

In Count 2, it's alleged that he attempted to deceive the FBI with respect to the destination and purpose of Mo's trip. Did he do that? Of course he did.

As you heard in the recordings, it was the defendant who first told Mo that he should pretend that he was going to Turkey for a vacation. The defendant prepped him on what to say to Customs. He told him what to pack. He suggested how much money to carry. He told him the sorts of questions to expect and what certain codes on his ticket meant. And most importantly, the defendant told him to stick with the story that the defendant had given him and never waiver.

And you know what? When the FBI came around in

December 2015 to ask about Mo, the defendant stuck to that story, too, but it was a lie, and most importantly, those were lies that he came up with all on his own.

Now, the last count is the text message lie, and that's the one where the defendant believed that Mo was going to join ISIS, and he knew that was a really big deal. It's a federal crime. It's also something that the FBI would have to investigate fully and completely.

And the defendant knew from experience that such an investigation would eventually lead back to him, and when the FBI showed up, he was already thinking about what he could say to make it look like he truly believed that Mo had gone to Turkey for a vacation. So in order to bolster that story and knowing that the FBI would likely search Mo's phone and would search his phone, the defendant sent a text message that made it look as though he expected Mo back in the country by November 20.

You saw that text message. You saw the records from the defendant's phone, where he sent the text at 11:01 p.m., and Mo forwarded it to John Minichello at 11:06 p.m.

You heard the defendant on tape saying that he was going to do this and that it would be, quote, good for me.

The defendant is guilty of that crime.

Now, before we move on, there's one last point I do need to make. All three counts in this indictment are charged

as attempts. Why is that? Because this was an undercover investigation. Mo was not really with ISIS, thankfully.

So even though the defendant wanted to provide material support to ISIS, he was only attempting to do so since the gift cards actually went to the FBI. And even though he lied about what Mo was doing, he was actually lying about an FBI source. And in her instructions to you, the judge will explain the law of "attempt."

Predisposition. Even though it's clear there was no government inducement in this case, if there had been any inducement, this still wouldn't be a case of entrapment because the defendant was predisposed to commit these crimes.

As the judge will instruct you, it is not entrapment where a person already has the readiness and willingness to break the law, and the mere fact that government agents provided what appears to be a favorable opportunity is not entrapment.

Now, the defendant already had a readiness and a willingness to break the law in this case, and you heard about that. You heard how the defendant, long before Khalil or Mo came into the picture, way back in the early 2000s, tell Ian Campbell, "Don't discount the Muslims' ability to fight the Jews."

Young even kept photographs in his house depicting an alliance between Islamists and the Nazis, and you saw that.

That was Exhibit 10-230. That was a poster that celebrated this alliance.

You saw Exhibit 10-231. That was a photograph that the defendant kept showing a meeting between Hitler and the Mufti of Jerusalem.

And Young himself, long before he met Khalil or Mo, embodies this alliance. He had a photograph of him dressed as a Nazi, and that was Exhibit 10-903. The creation date on that was in 2007.

He had another photograph of himself where he was dressed not in a Nazi uniform but in traditional Muslim garb holding a gun, and that's 14-119. That was in 2006, ladies and gentlemen.

The defendant kept a photograph of belching smokestacks on his phone for two years with words that read in part, "Together we can finish what Hitler started." And that was 4-203.

He kept a photograph showing two burka-clad individuals holding a sign saying, "God Bless Hitler." In fact, he could drive to his house in a truck with a bumper sticker that read, "Boycott the Terrorist State of Israel," and when he walked into his home, he could wipe his feet on an Israeli flag that he used as a door mat. That's 11-401.

When he and Mo set up the covert e-mail account so they could communicate, he picked Hitler's birthday as his own.

And you saw electronic versions and one paper version of *Inspire* magazine that he kept, and you heard Dr. Gartenstein-Ross explain what *Inspire* magazine was. You saw that photograph on the bumper of his truck that said "Libya Civil War Vet." You saw the Threema messages where he told Mo -- or the person he thought was Mo -- how he had been in the Abu Salim Martyrs Brigade back in 2011 and how he carried body armor back from that trip. And you saw the defendant describe that group as being like-minded with ISIS in his e-mails.

Ladies and gentlemen, this is who the defendant is, and this is who the defendant was long before he met Mo and long before he met Khalil. He was not entrapped by the government into doing anything. As careful as he was, as security conscious as he was, as much of a trained law enforcement officer as he was, he was also someone who was drawn powerfully to the Islamist cause.

He didn't try to help Mo go join ISIS because he really liked Mo. He did it because he really liked ISIS.

ISIS was putting into practice all of the things that he believed: the beheadings, the burnings, the things that he watched on the Light Revealed and the Light Reloaded videos during his lunch breaks at work. How did Dr. Gartenstein-Ross describe it? A winner's message.

All of the predisposition evidence in this case gives a glimpse into who this defendant is and what is important to

him. This interest in Nazis, the National Alliance, and other hate groups was not fleeting for the defendant. It lasted for a long time. It predated Mo, and it predated Khalil.

And when his focus did shift, it shifted to things like the Abu Salim Martyrs Brigade, ISIS, in trying to help Mo get over to Syria to fight, and to send money so other fighters could join in the cause, the cause of the Caliphate.

Friendship, inducement, predisposition. Those friendships with Khalil and Mo were nowhere near enough to entrap this defendant into doing anything he didn't want to do.

Inducement. The defendant was not induced into committing Count 1. There was no overreaching on the part of the government. There was no excessive conduct. The defendant was predisposed to commit Count 1 of this indictment. He was not coerced, and he was not entrapped. He committed all three crimes knowingly, willingly, and voluntarily, and because of that, I would ask that you find the only just verdict in this case: a verdict of guilty on all three counts.

Thank you, ladies and gentlemen.

THE COURT: All right, thank you.

Mr. Smith?

CLOSING ARGUMENT

BY MR. SMITH:

Good afternoon. Ladies and gentlemen, the case you just witnessed presents the jury with challenging issues that

are not simple, and because we've tried to fit a six-year undercover investigation into a few trial days, there are a number of issues, and it's a lot of information to digest, but one issue is the most important issue in this case that you will consider: Will we, the jury, allow the government's evidence to play to our emotions, our fear, and our anger, or will we tune out the noise and faithfully follow the rules as they are described to us by the Court?

I've represented Mr. Young over a year now. I've gotten to know him. I've had many conversations with him. I've learned much of what I know about this case from him, and I will confess to you that at some points, the noise has been very loud.

Much of what happened in this case is very far outside of our everyday experience -- handler agents, Libya, undercover operations -- but I'm here today to argue to you as best I can that justice requires tuning out the noise and faithfully following the rules as they are described to you by the Court.

Tuning out the noise and listening to the key parts of the case can be hard here, admittedly. It's kind of like trying to hear Mr. Young's voice on one of the tapes I tried to play for you at trial. The signal and the noise is faint, but, ladies and gentlemen, it is there.

You hear it in various parts of this case. Police

Officer McNulty, Nicholas's old friend who described to you a Nicholas that is very different from the government's description. He lived with Nick between 2004 and '7, and he testified that he saw Nick as not as a racist person, as supporting U.S. troops, as being in the ROTC with Nicholas, and as patriotic.

Officer McNulty testified that he used to hang out with Nicholas after 2007, that Nicholas had no racist views when it came to his dating habits, that he never exemplified racism around any of his friends or any of their mutual acquaintances. This was a government witness.

The testimony of Mo, the informant Mo in this case, admits that you that Nicholas would in his own way suggest Mo should not travel to Syria. You've heard this evidence. We've also resubmitted an exhibit with a disc that includes clips from all of the recordings we attempted to play at trial. We strongly urge the jury to review those clips before making any decision in this case.

There are also questions in this case about why and whether Mr. Young's early conversations with the informant Mo were not recorded and what's behind redacted information in certain government documents.

There are pictures of Nick's trip to Libya that you've seen, the trip where the government alleges he joined Abu Salim Martyrs Brigade. This jury saw pictures of Mr. Young

with families, children, on the beach.

Ladies and gentlemen, these points are what we call reasonable doubt, reasonable doubt that before the government made any efforts to induce Mr. Young to commit a crime, Nicholas had a predisposition to materially support terrorism.

If the jury is able to disregard the noise, which is very difficult, and follow the law, it will acquit Mr. Young of the charges in this case, and on behalf of Nicholas and Linda, we thank you for your service and your attention to our arguments.

The government has put on some unusual evidence in this trial. The main charge is that in July 2016, Nicholas attempted to materially support a terrorist group by agreeing to send Google Play gift cards to an undercover agent who had pretended to go to Syria.

Nicholas is not charged for possessing any of the pictures, pamphlets, or books you've seen throughout the trial. The First Amendment ensures that. But to prove its gift card case, the government has bombarded you with inflammatory pictures and literature. Many of these were not of militant Islamism at all. This is a travesty.

The government paid an expert witness to tell you white supremacists are like Islamist terrorists in his expert opinion. 2 plus 2 equals 5. The government paid $16,000 to tell you that.

And the government subpoenaed Nicholas Young's old friends to come to the trial against their will and try to remember some off-color comments he might have made 10 years ago, 15 years ago.

Why did the government's case look like this? Why was the government bombarding you with Nazi pictures? It looked like this because buried beneath this mountain of inflammatory evidence that they have attempted to deceive you with over the course of this trial, there are facts showing Nicholas was entrapped. Pay close attention to these facts. They're often obscured in the government's case behind a lot of Nazi prejudicial evidence.

One, this is a material support for terrorism case without real ISIS terrorists. Two, the government has shown you no evidence Nicholas Young ever spoke to anyone actually in ISIS. Three, the government has shown you no evidence Nicholas Young ever attempted to join the group ISIS. Four, the government has shown you no evidence he ever attempted to give anything to the real ISIS at all. Five, the government has shown you no evidence ISIS does, in fact, request gift cards from anyone in this country.

The six-year-plus investigation leading up to this gift card charge involves government agents weaving a web of deception about militant Islam around Nicholas Young for six years. Much of the evidence of this case is unquestionably

offensive to many people. That's not in dispute. I'm one of those people.

But Nicholas's defense of entrapment in this case exists to prevent something more troubling than a Nazi picture but also less immediately obvious. The defense of entrapment exists to prevent a world where the government can insert undercover agents into people's lives for years, develop relationships, and encourage crimes, all without having to show the person was predisposed to commit those crimes beforehand.

And this particular sting operation raises special concerns. After the defendant succumbed to the government's pressure to commit a crime and raise the defense of entrapment, can the government now expose all the ugly parts of his life in response to his efforts to defend himself? Can the government prove the defendant had a predisposition to commit the government-induced crime by showing some ugly pictures and literature he possessed, even when it doesn't have to directly do with militant Islam at all? And can the government prosecute someone in this country through a series of guilt-by-association implications?

Ladies and gentlemen, these are very serious concerns, and the defense puts it to you that these are far more serious than some pictures in the defendant's basement.

I'd like to walk through the facts we've learned at trial, but let's first cover the charges. The burden is on the

government to prove the charges beyond a reasonable doubt. Proof beyond a reasonable doubt is proof that leaves you firmly convinced the defendant is guilty.

Count 1, as Mr. Gibbs explained, is in the indictment, charges Nicholas with attempting to materially support a foreign terrorist organization by sending Google Play gift cards in July 2016 to someone he thought was a friend named Mo but who was, in fact, an undercover agent who had pretended to join ISIS in Syria.

To prove this count, the government must prove beyond a reasonable doubt that Nicholas knowingly attempted to provide material support and resources to a foreign terrorist organization, knowing that the organization was a designated terrorist organization or engages in terrorism.

Count 2 alleges that during his FBI interviews on December 3rd and 5th, 2015, Nicholas attempted to obstruct the fictitious investigation of Mo, the government's own informant, and the investigation of Mr. Young himself for attempting to provide material support to ISIS by attempting to mislead the investigators about their informant's whereabouts.

To meet its burden on this charge, the government must prove beyond a reasonable doubt that Nicholas attempted to corruptly obstruct an official proceeding. That is a special term: an official proceeding.

And Count 4 alleges that on November 20, 2014,

Nicholas attempted to obstruct justice by sending a text to Mo's cell phone in order to make it appear to the FBI that their informant Mo had left the country to go to Turkey, when Nicholas allegedly believed the informant Mo had gone to Syria, but he didn't actually go to Syria because he was a government informant.

All three charges are attempt crimes. This means that the government does not allege the charged crime was committed, and that makes sense because the government has acknowledged in its case through its witnesses that ISIS members are not actually involved in this case. That is why all of the crimes at issue are called "attempt" because it would have been impossible for Mr. Young to complete the crimes given the nature of the witnesses involved. There are no ISIS members involved in this case. There never have been.

To prove an attempt crime, the government must prove beyond a reasonable doubt that Nicholas took some act that was a substantial step towards the completion of the crime, a substantial step towards a completion of the crime. That is a requirement on the government even though ISIS does not exist in this case. The government has to show he made -- the defendant made a substantial step towards materially supporting ISIS and misleading the government about the whereabouts of their informant Mo.

Nicholas raises the defense of entrapment with

respect to the material support for terrorism charge, and that means that even if the government proves beyond a reasonable doubt that Nicholas sent Google Play gift cards to an undercover agent who he thought was his friend, knowing that Mo was notionally but not really in ISIS, Nicholas may still be acquitted if two conditions are met.

First, the jury must find that the government induced Nicholas to send the gift cards to the undercover agent in July of 2016. This means not only that it was the government's idea that the gift cards are sent, but there has to be a plus factor as well. Friendship alone is not enough. However, friendship with pleas, additional pleas are considered sufficient to constitute an inducement.

Second, the government must prove beyond a reasonable doubt that Nicholas had a predisposition to commit the crime, material support for terrorism, before first being contacted by government agents. In this case, the first contact with government agents was Nicholas Young's meeting with the undercover informant Khalil in 2010.

If the jury finds that the government induced the gift card crime and that the government failed to prove beyond a reasonable doubt that Nicholas's predisposition to commit the crime before meeting a government agent, then the jury must acquit Nicholas of that count, Count 1.

The facts established at trial show the government

has failed to prove these charges beyond a reasonable doubt and that Nicholas Young was entrapped. The trial firmly established that the government induced Nicholas Young to send the gift cards, and the government has failed to prove beyond a reasonable doubt that Nicholas had a predisposition to materially support ISIS before December of 2010.

What did we learn at trial? That every step of this six-year investigation is riddled with reasonable doubt about Nicholas's predisposition to materially support ISIS.

Let's start in the middle. We learned that on May 22, 2014, Nicholas met the undercover informant Mo at the Sully Adams mosque. Mo would testify his relationship with Nicholas lasted between May 22, 2014, and October 25, 2014.

Mo testified that he lied to the FBI in April 2014, a month before he met ISIS -- a month before he met Nicholas. And right out of the gate, Mo's testimony was off. Mo testified at first that the first time he recorded one of Nicholas's meetings -- his meetings with Nicholas was July 2014, at some point in July 2014, but then we played one of his audio recordings with Nicholas from May 2014. Mo then appeared to waiver on whether there were earlier recordings with himself and Nicholas.

Special Agent Minichello, John Minichello, Mo's handler, testified about why these potentially missing recordings could be a significant issue. Minichello

acknowledged that memoranda he drafted as Mo's handler concerning meetings with Nicholas between May and July of 2014 were likely the first conversations he had -- Mo had with Nicholas, he wasn't sure, about ICE, the first conversations Mo had, the informant, with Nicholas about ISIS, but for some reason, Mo either wasn't recording these meetings or the tapes are now gone.

Mo's credibility took another hit when he testified that he had never recorded a conversation with a target without his handler's permission. Special Agent Minichello had testified right before Mo that Mo made such recordings. Mo likely perjured himself on the stand.

The serious questions concerning these potentially missing tapes is itself reasonable doubt as to Nicholas's predisposition to support ISIS. These unrecorded conversations with Mo allegedly concern the initial conversations between the defendant and the informant about the subject matter of the case.

Did Nicholas indicate he did not support ISIS in these conversations? That would have been consistent with Nicholas's position on May 31, 2014, that the mujahideen attempting to overthrow the Soviet government in Afghanistan were criminals. We played that recording for the jury. That statement appears to be misrepresented in a memorandum that purports to summarize that conversation on May 31, 2014.

And we learned from Mo that he was inducing Nicholas to attempt to support ISIS continuously in this period. Now, the government argues that inducement can only happen in the moments before the crime is committed. That's not the case. During this period that Mo was hanging out with Nicholas and courting his friendship, between May 2014 and October 2014, Mo would ask Nicholas what equipment he should bring to Syria, whether he should go, what should Mo do with his truck, what did Nicholas think about ISIS.

Mo testified on the stand he would try to exploit Nicholas's interest in geopolitics to induce Nicholas to discuss ISIS. That is testimony in this case.

Many of Nicholas's responses to Mo's pro-ISIS comments, as testified by Mo, indicated a lack of predisposition to support ISIS before the gift cards were sent in July 2016 and certainly before Mo met Khalil, the undercover informant, in December 2010.

All of these comments constitute reasonable doubt that Mr. Young had a predisposition to materially support ISIS before the gift cards were sent in July 2016 and before he met Khalil in December 2010. This is the predisposition standard the jury is required to follow by law.

On September 11, 2014, it was testified that Young informed Mo, "I was against ISIS because of all the bad stuff I was hearing about them."

On September 11, 2014, Young told Mo, "I saw Baghdadi's mug shot on the news, and I was like, oh, they sound like a bunch of criminals hungry for power and money." This is reasonable doubt.

Nicholas told Mo he wanted to help out Muslims without doing anything criminal or losing his job. He also told that to Khalil, both of the undercover agents and informants in this case. That's reasonable doubt.

If -- Nicholas told Mo if he ever heard someone was going to blow up a subway, he needed his help to stop them. This is reasonable doubt. Why did Nicholas Young refer to the subway? Nicholas Young is a police officer in the Metro Transit subway system. When Mo said he wanted to help out militant Islam, Nick said, "Why now?" and told Mo, "They have a good life in America, and Muslims are allowed to pray here without hassle." That's reasonable doubt.

On October 17, 2014, Nicholas told Mo he wanted to help people stay in the U.S., take care of his parents. Repeatedly in October 2014, the month that Mo pretended to leave for Turkey and then possibly Syria, Nicholas told Mo to follow his conscience repeatedly. Mo testified that during this period, Nicholas would tell Mo, "Follow your conscience," over and over and over. Those are not the words of someone who is predisposed to materially support ISIS.

On October 16, 2014, when Mo said the whole purpose

of this booking the Turkey tour was to have a good story, right, Nicholas said, "Mo, you should actually take the tour, too."

The government doesn't explain that evidence in its opening statement, which is why several of the counts fail.

On the night before Mo leaves, on October 24, 2014, Nicholas tells Mo to keep his options open. He's indicating to Mo, "Perhaps you should not go to Syria." Nicholas informs Mo, "It would be okay if you change your mind. Sometimes we get stuck in one mindset out of pride." That's October 24, 2014, the day before Mo goes to Syria.

The government's presented evidence that Nicholas discussed Mo's gear for the trip overseas and talked about Mo with his trip and potentially going to Syria, but the positive comments I've just read to you alone prevent the government from proving beyond a reasonable doubt a predisposition to materially support terrorism.

And Mo also -- let's talk about inducement because the government is attempting to limit inducement to the moments before the gift card was sent in July of 2016, but there were many other facts in this record dealing with inducement.

Mo and Nicholas went to the same mosque together. That's where they met, in a place of religious worship, where Mo was sent to report on individuals and Nick Young. They went to the same college. They had the same religious conflict at

work. Mo bought Nicholas gifts. Nicholas bought Mo's meals. Mo testified that he exploited Nicholas's interest in geopolitics to get Nick talking about ISIS. This is testimony from Mo in this case.

Mo testified that he bonded with Nicholas over discussions of their girlfriends, Nicholas's deceased father. Nicholas and Mo shared friends in common, including Hicham Hall, who Mo testified was very close to Nicholas.

So then around in October 2014 to about July 2016, the government swaps in an agent for Mo, so the informant Mo is no longer having conversations with Nicholas, but an agent pretending to be Mo, who is pretending to be Nicholas's friend, is now talking to Nicholas.

So the government repeatedly e-mails Nicholas, pretending to be Mo from Syria, and the jury learned that in the first couple of these e-mails, for a couple of months, Nicholas didn't even respond.

In May 2016, an agent, Agent Sikorski, pretending to be Mo, raises the idea of communicating on a secure app and through the purchase of Google gift cards via e-mail to Nicholas. Nicholas doesn't respond to that e-mail for a month.

In July 2016, Agent Sikorski pretending to be Mo asks Nick for gift cards on Threema. Nick doesn't send them in response to that first text. Then the agent asks again a second time before getting them, but inducement didn't start on

Threema. It started when Mo cultivated Nick's friendship between May and October of 2014. So that's inducement.

The government's burden at trial was to prove beyond a reasonable doubt that Nicholas Young had a predisposition to materially support ISIS before December 2010, and that's because Khalil, the undercover agent, testified to you that's when he first met Nicholas at a wedding.

Khalil told you he had a pretty good friendship with Nicholas, implying that he might have been friends with him even apart from his role as an undercover agent, but let's talk about what the crime is here that the government has to prove Nicholas had the predisposition to commit before December of 2010. This isn't apparent in the government's argument.

The crime here is not possessing literature. I don't know what percentage of the government's case consisted of dirty literature and pictures, but that's not the crime here. The crime here is materially supporting ISIS, giving money or other aid, material aid to the terrorist group.

The government cannot satisfy its burden in this case that Nicholas Young had a predisposition to materially support ISIS before December 2010 by showing you a bunch of pictures. The pictures do not go one step further and show that the defendant would be willing to open his pocket and provide money to a terrorist organization. The government has shown no evidence that Nicholas Young has a predisposition to give money

to ISIS.

So what has the government shown you? In a material support for terrorism case in 2017, the government has introduced Nazi pictures and anti-Semitic pictures from Mr. Young's computer. This is a complete travesty. White supremacist memorabilia does not prove beyond a reasonable doubt that Nicholas would materially support militant Islamic terrorism.

The theory doesn't make sense. And, ladies and gentlemen, the theory is being offered to satisfy the government's burden in this case. It has to prove Mr. Young had a predisposition to support ISIS before December 2010, so the government made its theory fit the facts, but it did so in a way that is particularly inappropriate.

White supremacists by definition do not support non-whites, and most Muslims are not white. The government's expert, Gartenstein-Ross, testified on this subject, but Gartenstein-Ross has no credibility on this issue.

Gartenstein-Ross has never published in a peer-reviewed publication on the subject of his thesis of this connection between white supremacism and militant Islam. He's written a couple arguments about this subject in popular press, and this thesis was likely concocted in order to establish the government's case here. Gartenstein-Ross's thesis is based on eight case studies. This is not science.

The case agent today testified that Mr. Young has not been investigated for hate crimes on the basis of these materials. And besides, the government has not proven that Nicholas's interest in these materials was political rather than dress-up, reenactment. Gartenstein-Ross told you that if his eight case studies were, involved people who were not politically supporting Nazism but were dressing up, his thesis might have changed.

Officer Ian Campbell testified about a project for a European racism class that Mr. Young was in. Officer Campbell testified that for a class at George Mason University, Nicholas went to what he described as a British National Party meeting. This is not serious evidence.

Officer McNulty testified that he was shocked by the charges against Nick. He couldn't have imagined that Nick would be in this position. Nick supported American troops. Nick wasn't racist towards friends or girlfriends. This is all reasonable doubt.

A second subject of the government's predisposition evidence are the *Inspire* magazines. You'll notice that at trial, we didn't object to the relevance of these magazines because this is a material support for terrorism case.

ISIS *Inspire* magazines are relevant evidence, unlike the Nazi evidence, but just because the evidence is relevant doesn't mean the government has proven beyond a reasonable

doubt that the fact that this information was found on Nicholas Young's computer proves beyond a reasonable doubt that he would materially support ISIS.

A great deal of these pictures, these Nazi pictures and white supremacist pictures that were shown during trial were all downloaded on the same day, December 7, 2007, not spread out over time, but the presentation for the jury at trial showed picture after picture after picture after picture, sometimes consuming hours of trial testimony. That created a misleading impression with the jury. The misleading impression was that Mr. Young might have been downloading these materials continuously over the course of the six-year investigation.

It's not a crime in this country to own radical literature, and owning radical literature doesn't get the government there.

Let me give you an example. If I own a subscription to a magazine, for example, the *National Geographic* magazine, the government -- and the government raids my house and finds the *National Geographic* magazine, the government may be able to use that evidence to prove beyond a reasonable doubt that I have an interest in wildlife.

What the government cannot do with that *National Geographic* magazine after it raids my house is prove that I have beyond a reasonable doubt, I have a predisposition to give money to animals in Africa. It cannot do that. Owning

literature does not prove beyond a reasonable doubt that someone will give money and open their pockets to that cause. The government has given you none of that evidence, none, zero.

Let's turn to Libya. Libya is a big piece of the government's predisposition case because the government is arguing repeatedly that Nicholas Young traveled to Libya with the intention of joining a terrorist group, the Abu Salim Martyrs Brigade.

It troubles me to say this, but these are misrepresentations. There is no evidence in this case to indicate that when Mr. Young traveled to Libya in May 2011, it was his intent on traveling there to join something called the Abu Salim Martyrs Brigade. There's no evidence of that in this case. There are e-mails that follow his trip there.

But the government would later learn that Nicholas did not break the law in traveling to Libya, that he acquired the proper forms for bringing body armor there, that he told government agents that he went there and had body armor.

We've shown you the pictures of Nicholas Young's trip to Libya. There are pictures of families on the beach. At the same time that this evidence exists, the government is trying to argue to you that it can prove beyond a reasonable doubt that Mr. Young had a predisposition to support ISIS because he was with the Abu Salim Martyrs Brigade in Libya. We've shown you pictures of the trip to Libya. That is reasonable doubt

alone.

Now, let's turn to the government's -- actually, let's go back to Libya. There's one more important piece. This was a piece of the government's evidence.

The government testified, one of the case agents testified that an individual Nicholas met in Libya, Mohammad, had once asked Nicholas to send night vision scopes to Libya. It wasn't explained what they were for in the e-mails.

Nicholas Young responded, "No. I will not do that because that is illegal."

Now, the case agent testified that he believed that he probably didn't send those gift cards because he didn't want to get caught.

Why Mr. Young wants to follow the law is not the issue. The issue is whether he has a predisposition to follow the law, and this e-mail exchange is another piece of reasonable doubt. And in fact, it's closer than any other piece of evidence in this case to what the underlying crime is. The underlying crime is an attempt to materially support ISIS.

What this evidence shows is that when someone from a foreign country, Libya, where the government alleges Abu Salim Martyrs Brigade was running wild, sent an e-mail to Nicholas to ask for night vision scopes, Nicholas said in writing, "No, because that's illegal." This by itself is reasonable doubt as to Young's predisposition to materially support ISIS.

And furthermore, this individual Mo, he wasn't an informant. This was the real world.

Let's discuss the dangerous associations that the government has been trying to spin in this case. The government has presented what looked like mug shots on the TVs. They're actually driver's license photos.

One of the government's witnesses testified about Zac Chesser. Government witnesses in this case have acknowledged that Nick was not known to have met Chesser on that many occasions. Chesser was not known to be an acquaintance of Nicholas Young's, a close friend.

The government has thrown up pictures of T.J. Singh. T.J. Singh was never arrested. The government has shown pictures of Hicham Hall, a mug shot-looking picture. This individual was never arrested, either, and this is Mr. Young's friend. So the scary-looking photos certainly look like they've been arrested.

Liban Mohamed, this was another individual who is planning to attack, an act of terrorism. The UCE Khalil testified that Nicholas had nothing to do with Mohamed's plots. Why are all of these photos being shown to the jury? What are these associations? What is the government trying to imply? These people were never arrested.

There are contradictions in the government's case, the very structure of the investigation that suggests there can

be no predisposition to materially support terrorism before the gift cards were sent in 2016. The government acknowledges that after Mr. Young returned from Libya, there may have been an attempt to recruit him as an undercover informant. We don't know whether that was a ruse or not, but it's possible that it was an attempt to recruit him as an undercover informant.

And yet at the exact same time period, the government is attempting to allege he had no -- he had a predisposition to materially support terrorism. So which is it? Was he ripe material to be an informant for the FBI at the same time that he had a material support for terrorism?

Here's another contradiction: The government is suggesting to you that Mr. Young had a predisposition to support terrorism between 2010, when the investigation into him began, and 2016, and yet during this whole period, he remained as a police officer on the force.

You have seen no evidence indicating that Mr. Young ever performed inadequately on the job, was ever racist towards any individuals he met on the job. In fact, the government has stipulated he received a commendation from the D.C. U.S. Attorney's Office.

MR. KROMBERG: Objection, Judge. That is not in evidence.

THE COURT: All right, if it's not in evidence, the jury has to disregard that statement.

MR. SMITH: If Mr. Young had a predisposition to materially support terrorism between 2010 and 2016, what was he doing on the force with a gun every day? Why was he never fired? Why have you seen none of his colleagues from the WMATA here today? Where are they?

Now, each one of those facts could establish a reasonable doubt. All of them together establish that the government has not proven beyond a reasonable doubt Nicholas Young had a predisposition to materially support terrorism before July 2016, but the government's burden is December 2010.

If the jury reviews the evidence that has been submitted for the period before December 2010, it's just a bunch of Web site clicks. The witness Menzies testified that Nicholas Young -- he remembers Nicholas Young making some comment years and years and years ago.

Count 2 in this case alleges that Nicholas Young attempted to mislead Agents Caslen and Smith on December 3, 2015, and December 5, 2015, about the whereabouts of Mo and his purpose in traveling to Turkey, but you heard from Agents Caslen and Smith that there was no criminal investigation into Mo because Mo was an informant. There was no grand jury investigation into Mo. That only leaves an investigation into Mr. Young himself.

But Agent Smith testified that nobody told Mr. Young during these two interviews on December 3, 2015, and

December 5, 2015, that Mr. Young was under investigation. In fact, you'll recall the testimony was these questions that the agents asked Mr. Young during these interviews were about Peshwaz Waise and their own informant, Mo. Mr. Young was never told he was under investigation in that meeting.

The government's burden in this case is to show beyond a reasonable doubt for this count that Mr. Young knowingly obstructed justice. So on the one hand, the government's agents have acknowledged that there is no investigation into Mo, so that can't be obstructed, but the government on the other hand has said that Mr. Young was never informed he was under investigation in this meeting.

Now, the case agent testified today about some of the evidence that might show Mr. Young knew he was under investigation when he was interviewed on December 3, 2015, and December 5, 2015, but the evidence you heard was that in 2011, Mr. Young was security conscious, and he might have told the UCE Khalil that he thought he was under investigation. That's not reasonable doubt. That's not beyond a reasonable doubt. That the defendant made a statement about possibly being under investigation four years before the meeting?

The government has failed to meet its burden for Count 2 because it has not proven beyond a reasonable doubt that Mr. Young knowingly obstructed any official proceeding.

On Count 4, the government alleges that Young

obstructed justice by sending a text message to pretend to Mo -- to pretend Mo, he sent a text message to pretend Mo on November 20, 2014, that was designed to mislead the FBI about Mo's whereabouts.

So again, let's step back. The charge is that -- not that Mr. Young misled the FBI. That would have been impossible because Mo was an agent -- was an informant of the FBI. They're alleging that he attempted to, not that he actually could mislead the FBI in any real way.

But even if we grant the government's fictitious theory of an obstruction of justice charge based on their own informant, the facts don't satisfy the case. The facts don't satisfy the charge here.

This text was sent on November 20, 2014, but the jury heard testimony at the trial that in the days before Mo left, Nicholas Young was repeatedly making inconsistent statements to Mo about whether he knew he would actually be going on to Syria from Turkey or not.

You heard testimony that Nicholas told Mo -- Mo said to him, "This whole story about Turkey is a front, right?"

And Nicholas said, "Actually, I think you should go to Turkey, too."

And then on October 24, 2014, the night before Mo goes to Turkey, Nick says, "You know, maybe you'll change your mind. Maybe you'll take a trip to Turkey and come back."

The government has shown you no evidence that between that date and November 20, 2014, Nicholas Young knew to a certainty that Mo would not be coming back from Turkey. Of course, he never went to Turkey, but hypothetically. He did go to Turkey for a day to take pictures with the agent.

So Nicholas said, "I think you actually should take the trip to Turkey."

So the government's theory in Count 4 is that Nicholas intended to obstruct justice by misleading the FBI about whether Mo would go on to Syria. When this text message was sent, the government has not shown beyond a reasonable doubt that Mr. Young knew he would go on to Syria.

The government has made a lot of statements about Mr. Young's character and personality that have nothing to do with the elements of the charges in this case. The government's prosecutor said, after reeling off a list of Nazi evidence and anti-Semitism, of which I know something myself, but perhaps I know not as much as the government's prosecutor, that Mr. Young was -- this is who he is. This is who he is.

I think the government is revealing more than it knows when it makes that statement because in this country, we're not prosecuted for being who we are. In this country, we're not prosecuted for owning literature. We're not prosecuted even if we have repellant views. But this is nothing new. This was established in this country decades and

decades ago. The government's attorneys in this case haven't caught up.

Ladies and gentlemen, these are the facts of the case. We respectfully request that you review the recordings we have provided to you. They're on a disc marked Defense Exhibit 1. They constitute all of the recordings we tried to play in trial but could not. They're easily accessible. They'll back up some of the statements we've made in this closing argument with recordings between the informant Mo and Nicholas.

We respectfully request that you review them. They're very short. It's about five to ten minutes over the course of five days, maybe ten to fifteen minutes.

So we respectfully request that you carefully review and dispassionately consider the evidence and find Nick not guilty of all three charges. Thank you.

THE COURT: All right. Mr. Kromberg?

REBUTTAL ARGUMENT

BY MR. KROMBERG:

Thank you, Your Honor.

Good afternoon, ladies and gentlemen. So here we are. I get to speak to you again. When I was speaking to you during the opening statement, I laid out what we would prove. I think that you'll see that what we did was what we said we'd do.

And apparently, there's now no dispute that Nicholas Young knew that he -- or believed that he was sending money to ISIS to help ISIS bring fighters to fight for ISIS. That's what he did, and that's what he's now not contesting that he knew that's what he was doing. He was sending money to ISIS to help ISIS bring more fighters to ISIS.

Okay. That part is settled. He did that. Put that -- you don't have to spend any time in the jury room on whether he did it or not. That's now settled. He did it.

When Mo -- fake Mo sent the text message to Nicholas Young saying, "Thanks," Nicholas Young wrote back talking about ISIS, talking about fighting, saying that I'd like to buy a slave girl. I hope that a bunch of Alawite women are going to fall -- I gather that a bunch of Alawite women are going to fall into the hands of the mujahideen.

And then he goes on to talk about this woman that he met who doesn't believe in jihad the way that he does, and you'll go and read that text message, the last text message, he says, "Yeah, she believes in jihad of the pen, the internal jihad, the struggles we put upon ourselves, all that stuff that there's no evidence for."

What the judge is going to instruct you is that you can measure someone's predisposition even from how they act now. Someone who acts that way now, you can use that to think what was his predisposition before.

What was it that you heard that Mo or Khalil said that would induce a police officer in Washington, D.C., to say, "I want to buy a slave"? Or that jihad, internal jihad stuff, there's no evidence for that. Internal struggle, that's a bunch of baloney. The real jihad is fighting.

Did Khalil or Mo tell him to do that? Did Khalil or Mo induce him to that?

Can we -- could I have the clicker from the PowerPoint? Thank you.

So when you look back at this -- okay. We'll start there. So you can see that this Nicholas Young in the center and the driver's license photo of Saleh Al-Barmawi and the driver's license photo of Amine El Khalifi, Khalifi is the guy who wore the suicide vest trying to get to the U.S. Capitol. Saleh Al-Barmawi is the guy that you heard from Khalil and Menzies, Brian Menzies, that Barmawi is the guy that says Anwar Awlaki is the man. Muhammad Maqdisi is the man. Those are the guys you should follow. Khalil didn't come into this picture yet.

And then the Chesser. So Chesser was there first, and then -- excuse me, Al-Barmawi is there first with Mr. Young, and then Chesser is there, and then El Khalifi is there, and Liban Mohamed is there. That's the circle he was traveling in.

Do you think -- do you think it's Khalil that caused

him to have the beliefs that he had? Or maybe it was Zachary Chesser and Saleh Al-Barmawi and Liban Mohamed and Amine El Khalifi? Or, hey, we can go to the guys from 2014, but I don't have them on my PowerPoint.

See -- oh, there we go, a circle.

So the guys in 2014 that Mo is telling you about, there was Tejpal Singh and Peshwaz Waise. Peshwaz was the guy who got arrested in Texas who you heard about, and he was the guy that Mo was trying to get on the recording in the first place. That was the original target.

And then there's Hicham Hall, and you heard a clip and saw a transcript for that time that Hicham Hall was saying, "Hey, Mo, you should not go join ISIS. Absolutely not. You should not go join ISIS. You should go to Afghanistan and fight against Americans in Afghanistan."

That's the crowd, that's the circle that Mr. Young was traveling in.

Now, you also heard, I think the defense brought out on cross-examination of Mo that Hicham Hall was -- told Mo that if I hear you're going to ISIS and if I ever see you, I'm going to physically harm you. Good for Hicham Hall.

What about Police Officer Young? Police Officer Young didn't quite react that way, did he? Police Officer Young said, "Hey, you want a ride to the airport?"

Defense talks about that text message that Officer

Young sent in November 2014, that they're not proof of what Officer Young knew at that time. You don't have to think about it. We know why he sent the message. You heard the tape, the recording. You saw the transcript.

And as I explained in the opening statement, Officer Young tells Mo, "Hey, Mo, a couple of weeks after you leave, I'm going to send you a text message. Don't respond."

Mo says, "Don't respond?"

Officer Young says, "Don't respond. The FBI is going to come looking for you, and they're going to be -- once they find out you're gone, they're going to be investigating the people who are in contact with you. That would be me -- actually, this is Officer Young thinking, That would be me.

So he says, "I'm going to send you this text message to make it look like I don't know that you're really going to try and join ISIS.

Okay. That's the proof. So what inference can you draw from that? The defense would have you draw the inference that that text message was, was sent maybe for some other reason. Well, maybe, maybe Officer Young really wanted to get together with Mo for lunch.

You don't need to draw that inference. You have what Officer Young said. Officer Young said, "I'm sending you that so when the FBI comes and investigates and they look to see if I" -- Officer Young -- "knew you were going, it's going to make

me look like I didn't know that you were going."

Okay. What's the next inference you can draw from that? Perhaps that Officer Young expected there would be an investigation into Officer Young's own conduct? That's why Officer Young wanted it to look good for Officer Young.

And if Officer Young expected there would be an investigation into his own conduct, what would Officer Young, a police officer for 13 years, think would be involved in the investigation? Perhaps a grand jury? I mean, he is after all a cop for 13 years. Presumably cops know that people who get arrested and charged are indicted by a grand jury sometimes.

So what, what the defense didn't mention, what the judge is going to say is that -- is going to instruct you, I predict, is that the existence of the grand jury investigation did not have to be known to the defendant. It had to be foreseeable to him.

You think that an officer with 13 years of experience, it might be foreseeable to him that a grand jury might be involved in the investigation, when he knows, he's expecting the investigation to happen?

Defense just mentioned that, oh, he was -- he performed his job adequately. See, defense is hoping that you don't remember the evidence enough putting the pieces together.

When Khalil testified, Khalil said, "Yeah, there was that time that Officer Young told me he had been stopped for a

traffic violation, and Officer Young said to Khalil, 'I didn't tell the cop that I was a cop myself and maybe try to get out of the ticket because I was afraid that he would call my department, and that would be bad because I had already called in saying I was on duty when I wasn't.'"

And you heard from, from Joanne Dill, the retired Metro officer, said the officers were on their honor to, to be on patrol where they were supposed to be on patrol and that Officer Young apparently called in to say, "Yeah, I got that covered. I'm at the Metro station. If anything happens, I'm there."

Well, that's what we know about how Officer Young conducted his job as a police officer: calling in to say he's on the job when he wasn't.

There is -- there are gobs of evidence of predisposition to support terrorism before 2010.

Could you bring up 14-119?

So defense doesn't -- says that Nazi stuff, that's just the government trying to smear the guy. Well, who are you going to believe, the defense or your own eyes?

You heard Ian Campbell say walking out of the neo-Nazi rally -- or, excuse me, meeting, "Hey, don't discount the idea of an alliance with the Muslims to combat the Jews."

Well, the defense says it's impossible. How could a neo-Nazi support Islamists?

Well, okay. There's 14-119, and the metadata on that picture is from 2006. That was four years before the defendant met Khalil.

And then we have -- 10-203, please?

10-203, which will pop up on your screen in a moment, was a terrorism manual. You heard Daveed Gartenstein-Ross talk about that. That was downloaded onto his, you know, Mr. Young's computer in 2007, three years before he met Khalil.

And how about Government Exhibit 14-100, the *Book of Jihad*? You heard about that from Daveed Gartenstein-Ross. That was downloaded in November 2010. That was only a month and a half before he met Khalil.

Then you have all the *Inspire* magazines which we went through. You probably don't want me to show them to you again. They were all before he met Khalil. Make a bomb in the kitchen of your mom; the ultimate mowing machine: Drive your car and knock people down; how to use encrypted communications. All that stuff on his computer and in hard copy, one issue in hard copy, all before he ever met Khalil.

So don't let the smoke screen fool you about whether there's a relationship between Nazi terrorism and Islamic terrorism.

But -- can I have 10-701?

THE COURT: You've got five minutes left.

MR. KROMBERG: Thank you, Your Honor.

Mr. Young knew that the SS, the Nazi SS was Hitler's instrument of terror, that's his book, and yet he has a tattoo of an SS guy. He has a license plate of the FRI KRP. He has the prayer list where the people he's praying for include his family, it's a wonderful thing, and his friends, and those great political leaders of the 20th and 21st Century: Hitler, Mussolini and Sadam and the Mufti of Jerusalem.

When Mr. Gibbs was speaking, you saw the Alliance poster. Now, that looked like a World War II vintage poster, and yet it said 1939 to 2004, the Alliance Between Islamists and Nazis. That wasn't a World War II thing. That was a 2004 thing, six years before he met Khalil.

And 4-203, "Finish what Hitler Started," had that on his phone for a couple of years before the phone was seized.

Could we have 10-863?

Let's talk about music. Okay. You're going to -- that's a picture, but you're going to have the actual document before you in the jury room. That's the white power music, your source for white power music. Well, it is -- in case the music really changed, let's go to 10-303.

Jihad nasheeds. You heard what nasheeds are. Nasheeds are songs. As Mr. Gibbs said, this is who he was, and this is who he is. He yearned to be a terrorist.

Nobody convinced him. It certainly wasn't Khalil or Mo. Go back and think, what was it that Khalil or Mo did that

convinced Nicholas Young to be a terrorist or to want to support terrorists? No, this is who he was.

Go to 3-302, please.

That's the photo from 12/27/15. So that's, that's years after he met, he met Khalil.

Okay. Let's go back a couple years. How about 8-103? That's his Facebook profile picture. He takes the picture of a jihadi from overseas and makes that his Facebook profile picture. What more do you have to have in order to determine that this is what he wanted to be, if he could only have the opportunity where he wouldn't get caught?

Ladies and gentlemen, think back on what Khalil said. He wanted to attack the FBI. He said peaceful protest was useless. You have to take things by force. If you were attacking a federal building, you couldn't do it with one person, but if you had multiple people, it would be different. He had body armor to outfit a team.

What more do you need to -- well, when he's -- now -- we now know he did it. He sent the money to bring the ISIS fighters over to help ISIS. What more do you need?

I guess my final point is that the defense says, well, but he was equivocal.

Could we have 16-106, please?

That's his oath of office. He was equivocal.

And he told Mo sometime in 2014 that, you know, maybe

it's not a great thing to do.

Okay. Dr. Gartenstein-Ross said, explained that the attraction of ISIS varied depending on ISIS's success because the more ISIS succeeded, the more it appeared they really were the actual Caliphate.

So the fact that Young was equivocal in 2014 really doesn't have anything to do with what he believed in 2016, when ISIS was in a much different position. Hicham Hall would have hit Mo for trying to join ISIS.

THE COURT: Mr. Kromberg, your time is up.

MR. KROMBERG: Officer Young helped.

Thank you, ladies and gentlemen.

THE COURT: All right, we're going to take a five-minute recess to reset the courtroom because people cannot come and go when we're instructing the jury.

When you-all come back in, folks, the people I can't see, if you'll now all sit down towards the far end, the other end? Because I like to be able to watch your faces while I'm giving the instructions, all right?

We'll take a five-minute recess.

(Recess from 4:04 p.m., until 4:16 p.m.)

THE COURT: All right, ladies and gentlemen, now that you have heard all of the evidence that is to be received in this trial and each of the arguments of counsel, it becomes my duty to give you the final instructions of the Court as to the

law that is applicable to this case. You should use these instructions to guide you in your deliberations.

All of the instructions of law given to you by the Court, that is, those given to you at the beginning of the trial, during the course of the trial, and now in these final instructions, must guide and govern your deliberations.

It is your duty as jurors to follow the law as stated in all of the instructions of the Court and to apply these rules of law to the facts as you find them to be from the evidence received during the trial.

Counsel have quite properly referred to some of the applicable rules of law to you in their closing arguments. If, however, any difference appears to you between the law as stated by counsel and that as stated by the Court in these instructions, you, of course, are to be governed by the instructions given to you by the Court. You are not to single out any one instruction alone as stating the law but must consider all of the instructions as a whole in reaching your decisions.

Neither are you to be concerned with the wisdom of any rule of law stated by the Court. Regardless of any opinion you may have as to what the law ought to be, it would be a violation of your sworn duty to base any part of your verdict upon any other view or opinion of the law than that being given to you in these instructions, just as it would be a violation

of your sworn duty as judges of the facts to base your verdict upon anything but the evidence received in this case.

You were chosen as jurors for this trial in order to evaluate all of the evidence received and to decide each of the factual questions presented by the allegations brought by the government in the indictment and the not guilty plea of the defendant. In resolving the issues presented to you for decision in this trial, you must not be persuaded by bias, prejudice, or sympathy for or against any of the parties to this case or by any public opinion.

Justice through trial by jury depends upon the willingness of each individual juror to seek the truth from the same evidence presented to all the jurors here in the courtroom and then to arrive at a verdict by applying the same rules of law as are now being given to each of you in these instructions.

Now, during this trial, I permitted you to take notes, and I believe several of you did, and many courts do not permit note-taking by jurors, so a word of caution is in order. There is always a tendency to place undue importance to matters which one has written down. Some testimony which is considered unimportant at the time presented and thus not written down may take on greater importance later in the trial in light of all of the evidence presented.

Therefore, you are instructed that your notes are

only a tool to aid your own individual memory, and you should not compare your notes with other jurors in determining the content of any testimony or in evaluating the importance of any evidence. Your notes are not evidence and are by no means a complete outline of the proceedings or a list of the highlights of the trial. Above all, it is your memory which should be the greatest asset when it comes time to deliberate and render a decision in this case.

Moreover, I want to remind you that you are coequal judges of the facts, and each juror's memory of and opinion about the evidence is worthy of consideration by all the other jurors. That a juror may have taken extensive notes does not mean that his or her memory or opinion is worthy of more consideration than that memory or opinion of any juror who took few notes or none at all.

Now, there is nothing particularly different in the way that a juror should consider the evidence in a trial from that in which any reasonable and careful person would deal with any very important question that must be resolved by examining facts, opinions, and evidence. You are expected to use your good sense in considering and evaluating the evidence in the case. Use the evidence only for those purposes for which it has been received, and give the evidence a reasonable and fair construction in the light of your common knowledge of the natural tendencies and inclinations of human beings.

If the defendant be proved guilty beyond a reasonable doubt, say so. If not proved guilty beyond a reasonable doubt, say so.

Keep constantly in mind that it would be a violation of your sworn duty to base a verdict upon anything other than the evidence received in the case and the instructions of the Court. Remember as well that the law never imposes upon the defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence because the burden of proving guilt beyond a reasonable doubt is always with the government.

Now, the evidence in this case consists of the sworn testimony of the witnesses, regardless of who may have called them, all exhibits received in evidence, regardless of who may have produced them, and all facts which may have been agreed to or stipulated to or judicially noticed.

Now, when the attorneys on both sides stipulate or agree as to the existence of a fact, you may accept the stipulation as evidence and regard that fact as proved. You are not required to do so, however, since you are the sole judges of the facts.

Any proposed testimony or proposed exhibit to which an objection was sustained by the Court and any testimony or exhibit ordered stricken by the Court must be entirely disregarded by you. Anything you may have seen or heard

outside the courtroom is not evidence and must be entirely disregarded.

The questions, objections, statements, and arguments of counsel are not evidence in the case unless made as an admission or stipulation of fact.

Now, you are to base your verdict only on the evidence received in the case. However, in your consideration of the evidence received, you are not limited to the bald statements of the witnesses or to the bald assertions in the exhibits. In other words, you are not limited solely to what you see and hear as the witness testifies or as the exhibits are admitted. Instead, you are permitted to draw from the facts which you find have been proved such reasonable inferences as you feel are justified in the light of your experience and common sense.

Inferences are simply deductions or conclusions which reason and common sense lead the jury to draw from the evidence received in the case.

If any reference by the Court or by counsel to matters of testimony or exhibits does not coincide with your own recollection of that evidence, it is your recollection which should control during your deliberations and not the statements of the Court or of counsel.

Testimony or an exhibit can be admitted into evidence during a trial only if it meets certain criteria or standards.

It is the sworn duty of the attorney on each side of a case to object when the other side offers testimony or an exhibit which that attorney believes is not properly admissible under the rules of law. Only by raising an objection can a lawyer request and then obtain a ruling from the Court on the admissibility of the evidence being offered by the other side. You should not be influenced against any attorney or his or her client because the attorney has made an objection.

Moreover, do not attempt to interpret my rulings on objections as somehow indicating how I think you should decide the case. I am simply making a ruling on a legal question regarding the particular piece of testimony or exhibit.

It is the duty of the Court to admonish an attorney -- and I think in this case, I did it to both sides -- who out of zeal for his or her cause does something which I feel is not in keeping with the rules of evidence or procedure. You are to draw absolutely no inference against the side to whom an admonition of the Court may have been addressed during the trial of this case.

And during the course of the trial, I occasionally asked questions of a witness. Do not assume that I hold any opinion on the matters to which my questions may have related. The Court may ask a question simply to clarify a matter, not to help one side of the case or to hurt the other.

Now, there are two types of evidence which are

generally presented during a trial, and these are called direct evidence and circumstantial evidence. Direct evidence is the testimony of a person who asserts or claims to have actual knowledge of a fact, such as an eyewitness. Circumstantial evidence is proof of a chain of facts and circumstances indicating the existence of a fact.

And let me give you an example of circumstantial evidence. You leave your home at noon on a cold February day. At that time, your front yard is bare. It starts to snow, you return at 5 p.m., and you see a footprint in the snow that now covers your yard.

From the facts I've just given you, that is, the fact that you left your home at noon, returned at 5 p.m., you see the footprint, and you know from common experience that human beings normally are associated with footprints, you can infer that there was a person in your yard sometime between noon and 5 p.m. If you had actually seen a person, that would be direct evidence of that fact.

Now, the law makes no distinction between the weight or value to be given to either direct or circumstantial evidence. Nor is a greater degree of certainty required of circumstantial evidence than of direct evidence. Your job is to weigh all the evidence in the case in making your decisions.

Tape recordings of conversations have been received in evidence and have been played for you. I'm sorry, tape

recordings of conversations have been received in evidence, and they've been played for you, and typewritten transcripts of these tape-recorded conversations have been furnished to you solely for your convenience in assisting you in following the conversation or in identifying the speakers.

The tapes themselves, however, are the evidence in the case, and the typewritten transcripts are not evidence. What you hear on the tapes is evidence; what you read on the transcript is not. So if you perceive any variation between the two, you must be guided solely by the tapes and not by the transcripts.

If you cannot, for example, determine from the tape recording that particular words were spoken or if you cannot determine from the tape recording who said a particular word or words, you must disregard the transcripts insofar as those words or that speaker are concerned.

Now, your decision on the facts of this case should not be determined by the number of witnesses testifying for or against a party or by the number of exhibits introduced by one side or the other. You should consider all the facts and circumstances in evidence to determine which of the witnesses you choose to believe or not believe and which of the exhibits have more or less value.

You may find that the testimony of a smaller number of witnesses on one side is more credible than the testimony of

a greater number of witnesses on the other side, or that one or two exhibits may have more significance to your evaluation of the case as against numerous exhibits which you find have less significance.

To sum up this instruction, always consider the quality of the evidence rather than the quantity of the evidence.

You have heard testimony from an undercover agent and an informant who were involved in the government's investigation in this case. Law enforcement officials may engage in stealth and deception, such as the use of informants and undercover agents, in order to investigate criminal activities. Undercover agents and informants may use false names and appearances and assume the roles of members in criminal organizations.

Now, you as jurors are the sole and exclusive judges of the credibility of each of the witnesses called to testify in this case, and only you determine the importance or weight, if any, that their testimony deserves. And the word "credibility" simply means the degree to which you're going to believe somebody.

After making your assessment concerning the credibility of a witness, you may decide to believe all of that witness's testimony, only a portion of it, or none of it at all.

In making your assessment of that witness, you should carefully scrutinize all of the testimony given by that witness, the circumstances under which each witness has testified, and all of the other evidence which tends to show whether a witness in your opinion is worthy of belief. Consider each witness's intelligence, motive to falsify, state of mind, and appearance and manner while on the witness stand. Consider the witness's ability to observe the matters as to which he or she has testified, and consider whether he or she impresses you as having an accurate memory or recollection of these matters.

Consider also any relation a witness may bear to either side of the case, the manner in which each witness might be affected by your verdict, and the extent to which, if at all, each witness is either supported or contradicted by other evidence in the case.

Now, inconsistencies or discrepancies in the testimony of a witness or between the testimony of different witnesses may or may not cause you to disbelieve or discredit such testimony. Two or more persons witnessing an incident or a transaction may simply see or hear it differently. Innocent misrecollection, like failure of recollection, is not an uncommon human experience. However, in weighing the effect of a discrepancy, always consider whether it relates to a matter of importance or to an insignificant detail, and consider

whether the discrepancy results from innocent error or from intentional falsehood.

After making your own judgment or assessment concerning the believability of a witness, you can then attach such importance or weight to that testimony, if any, that you feel it deserves. You will then be in a position to decide whether the government has proven the charges beyond a reasonable doubt.

Now, as I told you during the trial, the rules of evidence ordinarily do not permit witnesses to testify as to their own opinions or their own conclusions about important questions in a trial. An exception to this rule exists as to those witnesses who are described as expert witnesses. An expert witness is someone who by education or by experience may have become knowledgeable in some technical, scientific, or very specialized area. If such knowledge or experience may be of assistance to you in understanding some of the evidence or in determining a fact, an expert witness in that area may state an opinion as to a matter in which he or she claims to be an expert.

You should consider each expert opinion received in evidence in this case and give it such weight as you may think it deserves. You should consider the testimony of an expert witness just as you consider other evidence in this case. If you should decide that the opinion of an expert witness is not

based upon sufficient education or experience, or if you should conclude that the reasons given in support of the opinion are not sound, or if you should conclude that the opinion is outweighed by other evidence in the case, you may disregard the opinion in part or in its entirety. Again, you, the jury, are the sole judges of the facts of this case.

Now, you have heard the testimony of law enforcement officers. The fact that a witness may be employed by the government as a law enforcement official does not mean that his testimony is necessarily deserving of more or less consideration or greater or lesser weight than that of an ordinary witness.

At the same time, it is quite legitimate for defense counsel to try and attack the credibility of a law enforcement witness on the ground that his testimony may be colored by a personal or professional interest in the outcome of the case.

It is your decision, after reviewing all the evidence, whether to accept the testimony of the law enforcement witness and give to that testimony of the law enforcement witness such weight, if any, as you feel it deserves.

In evaluating credibility of the witnesses, you should take into account any evidence that the witness who testified may benefit in some way from the outcome of the case. Such an interest in the outcome creates a motive to testify

falsely and may sway the witness to testify in a way that advances his own interests. Therefore, if you find that any witness whose testimony you are considering may have an interest in the outcome of this trial, then you should bear that in mind when evaluating the credibility of his or her testimony and accept it with great care.

This is not to suggest that every witness who has an interest in the outcome of a case will testify falsely. It is for you to decide to what extent, if at all, the witness's interest has affected or colored his or her testimony.

The testimony of a witness may also be discredited, or as we sometimes say, impeached, by showing that the witness previously made statements which are different than or inconsistent with his or her testimony here in court. The earlier inconsistent or contradictory statements are admissible only to discredit or impeach the credibility of the witness and not to establish the truth of these earlier statements made somewhere other than here during the trial. It is the province of the jury to determine the credibility of a witness who has made prior inconsistent or contradictory statements.

If a person is shown to have knowingly testified falsely concerning any important or material matter, you obviously have a right to distrust the testimony of such a person concerning other matters. You may reject all of the testimony of that witness or give it such weight or credibility

as you may think it deserves.

Now, the defendant in a criminal case has an absolute right under our Constitution not to testify. The fact that the defendant, Nicholas Young, did not testify must not be discussed or considered in any way when deliberating and in arriving at your verdict. No inference of any kind may be drawn from the fact that a defendant decided to exercise his privilege under the Constitution and did not testify.

As stated several times before, the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or of producing any evidence, and that is because the burden of proof is always on the government.

Now, the next series of instructions are going to address the structure of the indictment and the actual charges that are at issue in this case. I first of all want to make sure I have told you that an indictment is only a formal method used by the government to accuse a person of a crime. It is not evidence of any kind against Nicholas Young, who is presumed to be innocent of the crimes charged. Even though this indictment has been returned against him, he begins this trial with absolutely no evidence against him.

Nicholas Young has pleaded not guilty to this indictment, and therefore, he denies that he is guilty of the charges.

And Mr. Young is not on trial for any act or any

conduct not specifically charged in the indictment.

A separate crime is charged in each count of the indictment, and there are three counts in this case. Each charge and the evidence pertaining to it should be considered separately by the jury. The fact that you may find the defendant guilty or not guilty as to one of the counts should not control your verdict as to any other count.

Now, the indictment charges that the offenses alleged were committed on or about a certain date. Although it is necessary for the government to prove beyond a reasonable doubt that each offense was committed on a date reasonably near the dates alleged in the indictment, it is not necessary for the government to prove that the offense was committed precisely on the dates charged.

Before I discuss the elements of the offenses charged in the indictment, I need to instruct you on the meaning of the word "and" as it is used in the charging language in the indictment. And "and" is a-n-d, the ordinary "and" word that you-all know.

Where a statute, that is, where a law is worded in the disjunctive, that is, it uses the word "or," you do X or Y or Z, that's a disjunctive structure, so where a statute is worded in the disjunctive, meaning it uses the word "or," federal pleading requirements require that the government charge in the conjunctive, meaning that it uses the word "and,"

so it would say X and Y and Z. Where a statute specifies several alternative ways in which an offense may be committed, if only one of those alternatives is proved beyond a reasonable doubt, that is sufficient for conviction.

Now, all three of the charges in this case are attempt charges, so I'm going to give you now a general explanation of what we mean by "attempt." In Count 1, Nicholas Young is charged with attempting to provide material support or resources to a foreign terrorist organization. In Counts 2 and 4, he is charged with attempting to obstruct justice.

An "attempt" means the defendant did some act that, under the circumstances as he believed them to be, was a substantial step toward the commission of the substantive crime. For example, to show that Nicholas Young is guilty of the offense charged in Count 1, the government must prove beyond a reasonable doubt that he did some act that, under the circumstances as he believed them to be, was a substantial step toward the commission of the crime of providing material support or resources to a foreign terrorist organization.

A substantial step is a direct act in a course of conduct planned to culminate in the commission of a crime that is strongly corroborative of the defendant's criminal purpose. A substantial step is more than mere preparation but less than completion of the crime.

So now we're going to go into the specific counts.

Count 1 of the indictment charges that between on or about December 3, 2015, and on or about August 2 of 2016, in Fairfax County, in the Eastern District of Virginia and elsewhere, the defendant did knowingly and unlawfully attempt to provide material support and resources, as that term is defined in Title 18 of the United States Code, Section 2339A(b), including personnel, money, property, and services, to a foreign terrorist organization, to wit: the Islamic State of Iraq and the Levant, ISIL, which at all relevant times was designated by the Secretary of State as a foreign terrorist organization, knowing that ISIL had been designated as a foreign terrorist organization, and knowing that ISIL had engaged in and was engaging in terrorist activity and terrorism.

Now, the statute that's involved in Count 1 is Section 2339B of Title 18 of the United States Code, and it defines the offense of attempting to provide material support or resources to a foreign terrorist organization as follows: "Whoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned . . .. To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization, that the organization has engaged or engages in terrorist activity, as defined by law, or that the organization has engaged or engages in terrorism as defined by law."

Now, every federal crime have what are called essential elements. These are particular components, and the burden is on the government to prove -- in order for them to prove a person guilty of a particular crime, they have to prove each and every one of the elements beyond a reasonable doubt. That means, therefore, for example, if you have a crime with four essential elements and let's say the government proves three of those beyond a reasonable doubt but the jury has a reasonable doubt about the fourth element, you cannot convict on that particular offense. So it's an all-or-nothing proposition for the government.

So the elements for Count 1. As I said, Section 2339B of Title 18 makes it a crime for any person to attempt to commit this offense, that is, to provide material support or resources to a foreign terrorist organization, knowing that the foreign terrorist organization is designated by the United States as such or that the terrorist organization had engaged or was engaging in terrorist activity or terrorism.

To sustain its burden of proof for the crime of attempting to provide material support and resources to a foreign terrorist organization, the government must prove the following three essential elements beyond a reasonable doubt:

First, that the defendant knowingly and intentionally attempted to provide material support or resources to a designated foreign terrorist organization. So that's number

one;

Two, that the defendant knew that ISIL, also known as ISIS and the Islamic State, was a designated foreign terrorist organization or had engaged or was engaging in terrorist activity or terrorism; and

Three, that the defendant did some act that was a substantial step in an effort to provide material support or resources to ISIL, also known as ISIS and the Islamic State.

And again, a substantial step is a direct act in a course of conduct planned to culminate in the commission of a crime that is strongly corroborative of the defendant's criminal purpose. A substantial step is more than mere preparation but less than completion of the crime.

Now, as explained in that previous instruction, you must find as one of the elements beyond a reasonable doubt that the defendant knew that ISIL, also known as ISIS and the Islamic State, was a designated foreign terrorist organization or had engaged or was engaging in terrorist activity or terrorism.

The term "foreign terrorist organization" has a particular meaning under this statute. In order for an organization to qualify as a foreign terrorist organization, the organization must have been designated as such by the Secretary of State through a process established by law. I instruct you as a matter of law that ISIL has been designated a

foreign terrorist organization by the United States Secretary of State and was so designated under a previous name of al-Qaeda in Iraq by the Secretary of State on October 15, 2004.

I further instruct you that in May of 2014, the Secretary of State amended the designation to add the alias Islamic State of Iraq and the Levant, that is, ISIL, I-S-I-L, as the primary name of this foreign terrorist organization, and added the following aliases to the ISIL listing, among others: the Islamic State of Iraq and al-Sham, that's ISIS; the Islamic State of Iraq and Syria, also ISIS; and Daesh, D-a-e-s-h.

The term "terrorist activity" includes any activity that, if it had been committed in the United States, would be unlawful under the laws of the United States or any state and that involves a threat, attempt, or conspiracy to use any explosive, firearm, or other weapon or dangerous device other than for mere personal monetary gain, with the intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property.

The term "terrorism" means premeditated, politically motivated violence perpetrated against noncombatant targets by subnational groups or clandestine agents.

The term "material support or resources" includes among other things any property, tangible or intangible, or service, including currency or monetary instruments, and personnel.

Now, Count 2 alleges that between on or about December 3, 2015, and December 5 of 2015, in Fairfax County, in the Eastern District of Virginia, the defendant, Nicholas Young, did knowingly, unlawfully, and corruptly attempt to obstruct and impede an official proceeding, in specific, that he knew that the FBI was investigating the circumstances of what Young believed to be the attempt of an individual referred to in this trial as "Mo" to travel to join ISIL, a designated foreign terrorist organization. Nevertheless, in an attempt to thwart the investigation and prosecution of Mo and of Nicholas Young, himself, for attempting to provide material support to ISIL, Nicholas Young attempted to deceive investigators with respect to the destination and purpose of what Young believed to be Mo's travel overseas in 2014.

And Count 4 charges another violation of the same statute, and this one is that on or about November 20 of 2014, in Fairfax County, in the Eastern District of Virginia and elsewhere, the defendant, Nicholas Young, did knowingly, unlawfully, and corruptly attempt to obstruct, influence, and impede an official proceeding of the grand jury; in specific, that Nicholas Young sent a text message to a cell phone that Young believed to be used by an individual referred to in this trial as "Mo" in order to make it falsely appear to the FBI that Mo had left the United States to go on a vacation tour in Turkey when, instead, Nicholas Young believed that Mo had gone

to Turkey to go from there to Syria in order to join and fight for the designated foreign terrorist organization known as ISIL.

Now, the statute involved in Counts 2 and 4 is Section 1512(c)(2) of Title 18 of the United States Code, and that provides in pertinent part that: "Whoever corruptly . . . obstructs, influences, or impedes any official proceeding, or attempts to do so . . . shall be fined under this title or imprisoned . . .."

There are two essential elements for the -- for Counts 2 and 4, so to sustain its burden of proof for the crime of attempted obstruction of justice, the government must prove the following elements:

One, that the defendant unlawfully and knowingly attempted to obstruct, influence, or impede an official proceeding; and

Two, that the defendant did so corruptly.

The fact that the defendant was dealing with undercover government agents rather than real members of the Islamic State, that is, with ISIS or ISIL, is not a defense to any charge in this indictment.

The term "official proceeding" includes a proceeding before a judge or court of the United States, a United States magistrate judge, a federal grand jury, or a proceeding before a federal government agency which is authorized by law.

The government does not need to prove that the defendant was successful in obstructing, influencing, or impeding an official proceeding. An attempt to do so is sufficient for Counts 2 and 4.

To act "corruptly," as this term is used in these instructions, means to act with an improper purpose, personally or by influencing another, including making a false or misleading statement, or withholding, concealing, altering, or destroying a document or other information.

The term "knowingly" as used throughout these instructions describes the alleged state of mind of the defendant, and it means that he was conscious and aware of his actions, realized what he was doing or what was happening around him, and did not act or fail to act because of ignorance, mistake, or accident.

The government is not required to prove that the defendant knew that his acts were unlawful.

The term "willfully," as used in these instructions to describe the alleged state of mind of the defendant, means that he knowingly performed an act, failed to act, deliberately and intentionally, that means on purpose, as contrasted with accidentally, carelessly, or unintentionally.

Now, the intent of a person or the knowledge that a person possesses at any given time may not ordinarily be proved directly because there is no way of directly scrutinizing the

workings of the human mind. In determining the issue of what a person knew or what a person intended at a particular time, you may consider any statements made or acts done or omitted by that person and all other facts and circumstances received in evidence which may aid in your determination of that person's knowledge or intent.

You may infer, but you are certainly not required to infer, that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted. It is entirely up to you, however, to decide what facts to find from the evidence received during the trial.

Now, intent and motive are different concepts and should never be confused. Motive is what prompts a person to act or fail to act. Intent refers only to the state of mind with which the act is done or omitted.

Personal advancement and financial gain, for example, are two well-recognized motives for human conduct. These praiseworthy motives, however, may prompt one person to voluntary acts of good while prompting another person to voluntary acts of crime.

Good motive alone is never a defense where the act done or omitted is a crime. The motive of the defendant is therefore immaterial except insofar as evidence of motive may aid in the determination of state of mind or the intent of the defendant.

Now, the defendant asserts as to Count 1 that he was a victim of entrapment. An entrapment defense has two elements.

The first element is that the government -- I'm sorry, the first element is the government inducement of the crime, and the defendant's lack of predisposition to engage in the criminal conduct.

Where a person has no previous predisposition, that is, intent or purpose to violate the law, but is induced or persuaded by law enforcement officers or their agents to commit a crime, that person is a victim of entrapment, and the law as a matter of policy forbids that person's conviction.

On the other hand, where a person already has the readiness and willingness to break the law, the mere fact that government agents provide what appears to be favorable opportunity is not entrapment. For example, it is not entrapment for a government agent to pretend to be someone else and to offer either directly or through an informer or other decoy to engage in an unlawful transaction.

If then you should find beyond a reasonable doubt from the evidence in the case that before anything at all occurred respecting the alleged offense involved in this case, the defendant was ready and willing to commit a crime such as the one charged in the indictment, even if not the exact crime charged, whenever opportunity was afforded, and the government

officers or their agents did no more than offer the opportunity, then you should find that the defendant is not a victim of entrapment.

On the other hand, if the evidence in the case should leave you with a reasonable doubt whether the defendant had the previous intent or purpose to commit an offense of the character charged, apart from the inducement or persuasion of some officer or agent of the government, then it is your duty to find the defendant not guilty. Remember, the burden is on the government to prove beyond a reasonable doubt that the defendant was not entrapped.

Inducement requires more than mere solicitation by the government. "Inducement" is a term of art necessitating government overreaching and conduct sufficiently excessive to implant a criminal design in the mind of an otherwise innocent party. For purposes of entrapment, the word "inducement" means solicitation plus some overreaching or improper conduct on the part of the government.

Simply cultivating the friendship of a target in preparation to present a criminal opportunity is not inducement to commit a crime unless that friendship involves coercion, threats, or pleas that would constitute more than just providing an opportunity to commit the crime.

The fact that government agents initiated contact with the defendant, suggested the crime, or furnished the

ordinary opportunity to commit it is insufficient to show inducement.

Now, the term "predisposition" refers to the defendant's state of mind before government agents made any suggestion that he commit a crime. The focus on the predisposition inquiry is on whether the defendant was an unwary innocent or instead an unwary criminal who readily availed himself of the opportunity to perpetrate the crime. The government does not entrap a defendant even if he does not specifically contemplate the criminal conduct before the government agent makes any suggestion that he commit the crime, if his decision to commit the crime is the product of his own preference and not the product of government persuasion.

Predisposition is not limited only to crimes specifically contemplated by the defendant prior to government suggestion. Instead, it is sufficient if the defendant is of a frame of mind such that once his attention is called to the criminal opportunity, his decision to commit the crime is the product of his own preference and not the product of government persuasion.

Predisposition may be found from a defendant's ready response to the inducement offered. A defendant's predisposition must be determined as of the time he was first approached by a government agent; however, inferences about that predisposition may be drawn from events after the two

parties came into contact.

Now, in addition to the foregoing elements for the three offenses -- three counts we've discussed, the government must also prove with respect to Count 1 -- to each of these counts that it has venue for the offense. So for Count 1, they have to be able to prove that it is more likely true than not true that at least one act in furtherance of the crime occurred in the Eastern District of Virginia. If the government has not proven that it is more likely true than not true that at least one act in furtherance of the crime of attempted provision of material support or resources to a foreign terrorist organization occurred in the Eastern District of Virginia, then you must find the defendant, Nicholas Young, not guilty as to Count 1.

In addition to the foregoing elements as to Counts 2 and 4, the government must also prove with respect to these counts that it is more likely true than not true that either the official proceeding that was intended to be affected was in the Eastern District of Virginia, or the conduct constituting the alleged obstruction of justice occurred in the Eastern District of Virginia. If the government has not met this burden, then you must find Nicholas Young not guilty as to Count 2 and/or Count 4. It's the same venue for both of those counts.

This burden that the government has to prove venue is

not proof beyond a reasonable doubt. It's what we call -- and we're not using it here -- preponderance of the evidence, but that simply means more likely true than not true.

Now, the last two instructions, I know these take a while, I instruct you that you must presume the defendant to be innocent of the crimes charged. Thus, the defendant, although accused of crime in the indictment, begins this trial with a clean slate, that is, with no evidence against him. The indictment, as you already know, is not evidence of any kind. The law permits nothing but legal evidence presented before the jury in court to be considered in support of any charge against the defendant. The presumption of innocence alone therefore is sufficient to acquit the defendant.

The burden is always upon the prosecution to prove guilt beyond a reasonable doubt. This burden never shifts to a defendant because the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence. The defendant is not even obligated to produce any evidence by cross-examining the witnesses for the government.

It is not required that the government prove guilt beyond all possible doubt. The test is one of reasonable doubt. And there's no fancy technical definition for that term. "Reasonable" and "doubt" are two ordinary English language words.

Unless the government proves beyond a reasonable doubt that the defendant has committed each and every element of the offenses charged in the indictment, you must find the defendant not guilty of the offense.

Now, upon retiring to your jury room to begin your deliberations, you must first elect one of your members to act as the foreperson. The foreperson will preside over your deliberations, and he or she will be your spokesperson here in court.

Your verdict must represent the collective judgment of the jury. In order to return a verdict, it is necessary that each juror agree to it; in other words, it must be unanimous.

It is your duty as jurors to consult with one another and to deliberate with each other with a view towards reaching an agreement if you can do so without violence to your individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence in the case with all the other jurors. In the course of your deliberations, do not hesitate to reexamine your own views and to change your opinion if convinced it is erroneous; however, do not surrender your honest conviction solely because of the opinion of the other jurors or for the mere purpose of being able to return a unanimous verdict.

Remember at all times you're not partisans. You

don't represent the United States, and you don't represent Mr. Young. Instead, you are judges, and your job is to judge the facts of the case, with your sole interest being to seek the truth from the evidence received during the trial.

Now, your verdict must be based solely upon the evidence received in the case, and nothing you have seen or read outside of court may be considered. Nothing that I have said or done during the course of this trial is intended in any way to somehow suggest to you what I think your verdict should be. Nothing said in these instructions and nothing in any form of the verdict is to suggest or convey to you in any way what I think your verdict should be. What the verdict shall be is the exclusive duty and responsibility of the jury. As I have told you so many times now, you are the sole judges of the facts of this case.

Now, I don't recall if any of you have sat as a juror in a Virginia court, and if you have, you might know that in Virginia state court, the jury not only determines the issue of guilt or innocence, but if a jury convicts, it also addresses sentencing. That is not how it works in the federal system.

So the punishment provided by law for the offenses charged in the indictment is a matter exclusively within the province of the Court and should never be considered by the jury in any way in arriving at an impartial verdict as to the offenses charged.

Now, we've prepared a verdict form, if I can find it, and this is the document on which the jury is going to report its decision. It has the caption of the case, United States of America v. Nicholas Young, and then the verdict form reads as follows:

As to Count 1, and then we've explained what it is, attempting to provide material support to a foreign terrorist organization by providing gift cards or gift card codes to Mo, we, the jury, unanimously find beyond a reasonable doubt that the defendant, Nicholas Young, is, and we have two lines: Not Guilty or Guilty. You can use an X or a check, whatever you-all want to do, to indicate your decision.

Then as to Count 2, attempt to obstruct justice, we, the jury, unanimously find beyond a reasonable doubt that the defendant, Nicholas Young, is, and again, Not Guilty or Guilty.

As to Count 4, attempt to obstruct justice, we, the jury, unanimously find beyond a reasonable doubt that the defendant, Nicholas Young, is, and then Not Guilty or Guilty.

Then we ask the foreperson to sign his or her signature, and please print his or her name underneath because we can't always read your signatures, and then the date that the decision is made is also placed on the verdict form.

Now, when you go to the jury room, as I said, your first business is going to be to select one of you to act as the foreperson. It will take us, unfortunately, because

there's so much evidence in this case and we have to make sure it's all in good condition, it's still going to take a bit of time to get the exhibits in to you, but you will have the verdict form, you'll have your notebooks you may take in with you, and I am going to have a couple of copies of these jury instructions made so you can refresh your memory about them.

Now, it's about 5 after five. It's a very light snow out there. I don't think there's a problem on the roads, but I think also as soon as you go into the jury room, you should decide whether you want to continue deliberating -- or start deliberating tonight or come back Monday morning.

Once the jury gets the case, it's basically you control our schedule. If the jury says they want to start deliberating at eight o'clock in the morning, I'll make sure we have the building open for you, although technically, physically it doesn't really open until eight. If a jury wants to stay later in the evening, we let juries stay late in the evening, although I can't guarantee we'll have heat unless I know about it sufficiently in advance.

So I'm going to send you back in a minute, and as I said, if you will decide who the foreperson is going to be and how you want to proceed today, all right?

Anytime the jury wants to communicate with the Court, it's done by sending a written note. That's why you have your notebooks, and if you need extra paper, we'll get it for you.

You should never do it orally.

And in any communication you make with the Court, you should never tell us how you're voting on any issue. In other words, we are not supposed to know what your -- how your deliberations are going, but if you have a question or you have a piece of information you want to give us, such as: We're taking a break at, you know, two o'clock or whatever, you write that down in a note, the foreperson ought to sign it and date it, and then you fold it over and you give it to my court security officer to bring to court.

Now, I require the lawyers to stay in the courtroom whenever a jury is deliberating, and that's because if you have a question, I can't answer it without running it by the attorneys. That means if you're not working, if you're taking your coffee break downstairs or going to lunch, I can let the lawyers leave the floor. So I do ask the jury foreperson to make sure that you give us your schedule so I know if you're going to take the coffee break at 11:00 Monday morning to 11:15, then I can let everybody go at that point, all right?

All right, counsel, approach the bench.

(Bench conference on the record.)

THE COURT: Mr. Kromberg, is there any objection to the charge?

MR. KROMBERG: I have one, I guess it's my fault for not raising it before, but we had the instruction entitled

"Official Proceeding Need Not Be Pending," and we agreed that it wasn't necessary to the extent that there was no dispute regarding whether there was a proceeding in effect, but the second half of that instruction said that the standard for the defendant was foreseeability.

So I do request that sentence in there because otherwise, they're left with the defense arguing that they had to know there was an official proceeding, and the law is it had to be foreseeable.

MR. SMITH: Your Honor actually ruled on this in a hearing we had before trial. This issue was raised, and it's on the record. Your Honor ruled that the foreseeability language the government wanted to include was actually not found in 18 U.S.C. 1512(f), and Your Honor, after considering that subsection, I believe Your Honor ruled that that was not appropriate to include the foreseeability language. So I believe that's law of the case.

THE COURT: I'll keep that under consideration. Anything else?

MR. KROMBERG: Okay. I think we -- I don't know if you were going to do this anyway, but we have two alternates.

THE COURT: Oh, I know.

MR. KROMBERG: Okay. That's all. And everything else is fine, Judge.

THE COURT: All right. Anything?

MR. SMITH: None.

THE COURT: Okay. Mr. Kromberg, we did consider that. We're leaving that out. I think that is the law of the case at this point.

MR. KROMBERG: Okay.

THE COURT: Wait, wait, wait. As we said earlier, we've got 14 people here. Now we're going to select the two alternates, so what happens is my courtroom deputy, Ms. Guyton, is going to randomly pull two names. The first name is alternate No. 1; the second name is alternate No. 2.

What I then do is I keep those two under the same admonition about not conducting an investigation, all right, should we have to pull anyone back in, but they don't come back to the courthouse in the meantime. They go back to their regular life. We don't do that. In my time, I've never had a person come back in, all right? So just so you know, all right?

MR. SMITH: Judge, are they going to be allowed to -- are they going back into the jury room now and deciding if they're --

THE COURT: I have to get the 12 first.

MR. SMITH: Okay.

THE COURT: All right, stay here.

Alternate No. 1 is No. 90, Garrett Wolf.

No. 2 is Justin Scuiletti, No. 70.

All right? You can go back.

(End of bench conference.)

THE COURT: Now, ladies and gentlemen, some of you may have wondered that there are 14 of you sitting in the box, and what you've always heard is 12 people make up the jury. It turns out that we did have 14 of you seated because given the length of the trial, and I did think it would go much further into next week than it has, we had to have a couple of extra jurors because a criminal trial has to have 12 people in the jury box, so two of you have now been pulled as alternates, and so who is Mr. Wolf?

Mr. Wolf, you are alternate No. 1.

And who is Mr. Sciuletti? You are alternate No. 2.

Now, what that means is that you are not going to be able to deliberate with the jury. We're going to send you home. However, you must continue to follow my instructions; that is, you cannot conduct any investigation about the case. You can go to work on Monday. That's fine.

But you're to conduct yourself just as if you were a regular juror, all right? Because if for some reason someone gets ill or we're not able to get a decision and then one of the jurors has to leave for some reason, we would first pull you, Mr. Wolf, in, and then if we needed a second alternate, Mr. Sciuletti.

We will call you as soon as the case is over to let

you know you're no longer needed as an alternate, but you need to make sure that you don't get yourself contaminated, all right? So what you should do is leave your notebooks here, and then you gentlemen are free to go.

And the rest of you, if the remaining 12 jurors -- and I do want to thank both of you. It's been a whole week of your life. I hope you realize you were a very important part of the process, but we do have to let you go at this point, all right? So you, both of you may leave at this time.

(Alternate Jurors excused.)

THE COURT: So the remainder of the group, you are now the jury that's going to decide this case. So I will ask that you go back to the jury room, decide who wants to be the foreperson, decide what you want to do, whether you want to try to start deliberating tonight, although, as I said, I can't get the evidence yet to you tonight, it's going to take a while to pull all of it together.

If you decide -- and obviously, you're going to have to come back, I suspect, on Monday. Decide what time you want to start on Monday. Just remember, however, that you can't start until all 12 of you are here.

One last thing: Whoever becomes the foreperson, jury deliberation is a collective thinking process, so the opinions and the memories of the 12 of you are very important because you have to listen to each other. So anytime a juror is out of

the room, whether it's to use the restroom or to run downstairs and grab a cup of coffee or something, you have to stop talking about the case, because while that juror is away, he or she is not hearing what you're all talking about, and so the foreperson needs to really sort of control how things are done, all right?

So we're going to let you-all go back into the jury room, decide who's going to be the foreperson, and then write down his or her name, please, on a slip of paper, and let us know whether you do want to stay a bit tonight or if not, what time you want to come back on Monday. Then we'll bring you back in here, all right?

We'll recess court to await the decision of the jury.

(Recess from 5:15 p.m., until 5:27 p.m.)

(Defendant present, Jury out.)

THE COURT: All right, we've got the most succinct note I've ever seen from a jury: "End now." Let's bring the jury in.

(Jury present.)

THE COURT: Mr. Hull, I've got to tell you, that's the most succinct statement we've gotten from a jury: "End now." So anyway, we got your message -- have a seat for just a second -- so we're sending you home.

As I said, when you come in Monday morning, as soon as everybody is here, you can start deliberating, all right?

You will have -- at 9:30, when you come in, you will have three sets of the jury instructions. I think that should be enough for you-all. You can share them. You will have a copy -- the verdict form, and you will have all of the exhibits.

You're also going to have, because I asked the parties to do this, sort of a list of the exhibits that have been introduced, so if you're trying to find something, it will help you find them.

If you need to replay any of the tapes, I'm not sure whether we're going to have you listen to them here in the courtroom, because here we could give you headsets. We can't work that out in the jury room. So if that happens, we'll work it out for you. So if you need to listen to the tapes again, we'll make sure you can do that. And I think that's all you need to know.

Again, it's really important that you continue very carefully to follow my instructions. Given the fact that we ended early and that there were closing arguments, there may be some media coverage about the trial, so it's very important that you avoid any contamination of your thought process.

Have a good weekend. I know we're getting close to the holidays. And I don't think we're going to have any weather issues on Monday. If for any reason any of you get stuck and you're going to be late, it does help if you can contact the Clerk's Office because then we can send the message

to the other jurors, and you can't deliberate, but you could get a longer coffee or something like that, all right?

Thank you again for your hard work this week. We'll see you-all on Monday. I'm going to stay in session with counsel. I have a couple of housekeeping matters with them, but you're all free to go home. Thank you.

(Jury out.)

THE COURT: All right, since we have the luxury of a little time, I am still concerned that we absolutely be positive that all the right exhibits are going to the jury. So I put the burden on counsel to work with Ms. Guyton to make sure that that's fine, but we need to have that all ready to go.

The second thing is are both sides satisfied with the list of exhibits? You were supposed to do a list.

MR. KROMBERG: We are, Your Honor.

THE COURT: Have you looked at the government's list?

MR. SMITH: We are, Your Honor.

THE COURT: All right.

MR. SMITH: The same as we went through with Your Honor.

THE COURT: No, no, no, I mean the physical one they're going to send to the jury. I asked --

MR. SMITH: No, I haven't seen the physical one yet.

THE COURT: All right. I asked for the record for

each side to initial the other side's so that there's no dispute about somehow there's something that creeped in in the -- on that list.

Before the government leaves, I want you to take all your extra notebooks, all right? So I'll make sure that you get those.

And we only require one attorney per side. I mean, if you-all want to be here, that's fine, you're welcome to be here, but just so you know, as long as there is one attorney who can respond to any questions the jury might have, that is sufficient, all right?

Ms. Moreno, you're from out of town, so that's totally up to you.

And I think that should be it. Are there any other issues we need to address this evening?

MR. KROMBERG: Not from the government, Judge.

THE COURT: All right. Anything further from the defense?

MS. MORENO: No, Your Honor.

THE COURT: All right, then you-all have a good weekend. The two of you both got colds. I hope it's not running around the air system in the building. But by Monday, everyone should be healed.

All right, we'll recess court until 9:30 Monday morning.

(Recess from 5:31 p.m., until 9:30 a.m., December 18, 2017.)

CERTIFICATE OF THE REPORTER

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter.

/s/
Anneliese J. Thomson