1

```
                    UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF VIRGINIA
                       ALEXANDRIA DIVISION

UNITED STATES OF AMERICA      .    Criminal No. 1:16cr265
                              .
        vs.                   .    Alexandria, Virginia
                              .    December 1, 2017
NICHOLAS YOUNG,               .    9:51 a.m.
                              .
              Defendant.      .
                              .
.  .  .  .  .  .  .  .  .  .  .
```

                    TRANSCRIPT OF MOTIONS HEARING
           BEFORE THE HONORABLE LEONIE M. BRINKEMA
                 UNITED STATES DISTRICT JUDGE

<u>APPEARANCES</u>:

FOR THE GOVERNMENT:          JOHN T. GIBBS, AUSA
                             GORDON D. KROMBERG, AUSA
                             EVAN N. TURGEON, SAUSA
                             United States Attorney's Office
                             2100 Jamieson Avenue
                             Alexandria, VA 22314


FOR THE DEFENDANT:           NICHOLAS D. SMITH, ESQ.
                             David B. Smith, PLLC
                             108 North Alfred Street
                             Alexandria, VA 22314
                               and
                             LINDA MORENO, ESQ.
                             Linda Moreno P.A.
                             511 Avenue of the Americas
                             No. 2
                             New York, NY 10011


ALSO PRESENT:                SA NICHOLAS CASLEN
                             W. SCOOTER SLADE


OFFICIAL COURT REPORTER:     ANNELIESE J. THOMSON, RDR, CRR
                             U.S. District Court, Fifth Floor
                             401 Courthouse Square
                             Alexandria, VA 22314
                             (703)299-8595

                       (Pages 1 - 31)

        COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

1                          P R O C E E D I N G S

2              THE CLERK:  Criminal Case 16-265, United States of

3     America v. Nicholas Young.  Would counsel please note their

4     appearances for the record.

5              MR. KROMBERG:  Good morning, Your Honor.  Gordon

6     Kromberg, John Gibbs, and Evan Turgeon for the United States.

7     With us at the second table is FBI Special Agent Nicholas

8     Caslen.

9              THE COURT:  Good morning.

10             MS. MORENO:  Good morning, Your Honor.  Linda Moreno

11    and Nick Smith on behalf of Nicholas Young, who should be

12    coming out, I believe.

13             THE COURT:  All right.  Is the defendant up here?

14             THE COURT SECURITY OFFICER:  Yes, ma'am, he is.

15             THE COURT:  Let's get him in here.

16                            (Defendant present.)

17             THE COURT:  All right, the defendant is now in court.

18             All right, we have several motions on the Court's

19    calendar.  I want to address the one that was filed late last

20    night by the defendants.  Mr. Kromberg, you need to respond to

21    that motion because that motion creates a real issue for the

22    Court.

23             MR. KROMBERG:  First, I will say that I haven't read

24    it yet but I think I know what's in it, and it exhibits an

25    amazing misunderstanding of what's happened.  What was provided

1    yesterday --

2         THE COURT:   The question is the defense has argued

3    that around 6 p.m. last night, they received from your office

4    an indication that there was classified *Jencks* material, and

5    there was no notice to the Court that there was going to be any

6    kind of additional classified information that might need a

7    CIPA hearing.   Remember, we asked you-all to give us a notice

8    if there were any CIPA matters out there, and you filed a

9    status report a week or two ago indicating there were none.

10        MR. KROMBERG:   And, Your Honor, there has not been a

11   CIPA dispute in this case.   We've resolved them all, and we

12   will resolve these, too.   There will not be a CIPA dispute that

13   rises to this case.

14        Now, keep in mind that what, what was provided

15   yesterday was not the real *Jencks*.   The real *Jencks* was

16   provided 14 months ago.   Every single report in this case by

17   the agents, every single one except for the agent who

18   summarized the reports of another agent, and the summarizing

19   agent isn't even testifying anyway, but every single report was

20   provided 14 months ago.

21        What was provided yesterday, we did a canvass for

22   text messages and e-mails of all the government -- of the

23   testifying agents, and as the Court knows, years ago, that

24   wasn't even an issue.   The point of *Jencks* is we want the

25   defendant to have the agents' reports so he can cross-examine

1   the agents when they testify.  They've had that for over a

2   year.

3           What these are are the e-mails.  When I sent an

4   e-mail to Special Agent Caslen saying:  Do we have this piece

5   of evidence, he then sent an e-mail to Special Agent

6   Minichello, who said:  Let me look at my old report.  And he

7   sends it back to Caslen; Caslen sends it to me.

8           These are the types of things that were provided.

9   Now, because the FBI's e-mail system is classified and the text

10  messages are classified, these things were being generated

11  until now.  In fact, I just learned today that there was one --

12  there was another e-mail that we're going to have to deal with

13  that was generated yesterday.

14          So these are text messages among the agents and

15  they're e-mails among the agents, but every single report was

16  provided more than a year ago.  That's why up to now, the

17  defense attorneys have been saying there's so much stuff in the

18  SCIF, there's so much materials in this case.  It's because we

19  provided the reports in October 2016 that are all the reports

20  that are relevant to the case.  What we're talking about now

21  are the agents' e-mails about their reports.

22          Mr. Gibbs and I -- Mr. Turgeon spent an enormous

23  amount of time going over it.  Mr. Gibbs and I looked every one

24  of those documents that was provided yesterday, and I can tell

25  you that I went through 50 percent of them in an hour, and

1 Mr. Gibbs went through the other 50 percent in less than an

2 hour.

3          Now, it's true we had seen many of them before, so we

4 know what's in them, but there's nothing new in here.  These

5 are e-mail trains, trails, I guess, where six e-mails get

6 repeated and then someone writes someone new, it's another

7 e-mail for another agent.

8          THE COURT:  All right.

9          MR. KROMBERG:  This is what we're talking about.

10          THE COURT:  Are all these physically in the SCIF in

11 the courthouse right now?

12          MR. KROMBERG:  Maura Peterson said that her

13 associate, Scooter, whose last name I forgot --

14          THE COURT:  He's here.

15          MR. KROMBERG:  -- is here.

16          He's going to get them and bring them to Ms. Moreno

17 this morning.  By the way, there is one, one document that is

18 four lines long that is *Giglio*.  Everything else is *Jencks*, but

19 there is one document that was -- that is *Giglio*, and I told it

20 orally to Ms. Moreno this morning and told her if it needs to

21 be declassified, we will get it declassified in time for it to

22 be used at trial.

23          So I am telling Your Honor that there will not be a

24 CIPA issue in this case.

25          THE COURT:  All right.  Ms. Moreno?  Ms. Moreno, my

1  understanding is you are the attorney who has access to the

2  classified information, correct?

3          MS. MORENO:  That is correct, Your Honor.  I'm

4  cleared counsel.

5          THE COURT:  Right, all right.  And obviously, our

6  CISO is here this morning.  Do you have the information they're

7  talking about?

8          CISO SLADE:  (Shaking head.)

9          THE COURT:  You do not.

10         Well, the problem is Ms. Moreno is here from New

11  York.  She's the only attorney who has access to the classified

12  information, and her motion was a reasonable motion, and that

13  is, that the court -- the SCIF -- access to the SCIF is

14  limited.  She's -- her office is in New York.

15         But you are here this morning.

16         MS. MORENO:  Well, Your Honor, in all candor, I've

17  been here for the last week.  I'm here.  I live across the

18  street at the hotel.

19         THE COURT:  All right.  So if we get the information

20  to you midday today, you can go down to the SCIF and you can

21  look at it.

22         MS. MORENO:  But, Your Honor --

23         THE COURT:  Yes.

24         MS. MORENO:  Yes, and I intend to do that, but I am

25  not as optimistic as Mr. Kromberg that there will be absolutely

1   no CIPA litigation.  This Court knows that the CIPA discussions

2   which predate my entry in the case, the request and then the

3   ultimate declassifications and summaries that were provided

4   took several months.

5          Now, Mr. Kromberg is characterizing what he knows is

6   in the SCIF, but I, of course, have no idea, and just in

7   listening to him generically characterize text in e-mails, that

8   raises a few red flags for me, quite frankly, as someone who's

9   dealt with a lot of classified materials.

10         So we're very concerned that on Thursday, with jury

11  selection on Tuesday, they're disclosing these classified

12  materials that they've had for years probably and that we were

13  told and so represented to Your Honor that all CIPA litigation

14  was over.  In fact, I had a conversation with Maura Peterson,

15  when she asked me:  Linda, do you think I should be there on

16  Friday for this particular hearing?

17         I said:  No, I think we're done with the CIPA issues.

18         And then last night, I realized that I was wrong.  So

19  I think there should be some consequence to this, and, frankly,

20  I'm very concerned.  I don't know what I'm going to see or

21  find.

22         THE COURT:  All right.  Well, how soon can the

23  government get those three --

24         MR. KROMBERG:  Right now.  The question was when the

25  court -- classified information security officer could come

1  pick it up, and my exchange of e-mail with Maura Peterson this

2  morning led to it's available in the SCIF, and it can be -- we

3  can still be in court, but Pam Benson from our office is

4  available to turn it over.

5          THE COURT:  All right.  What I'm going to do then is

6  as soon as we finish, I'm going to direct Mr. Kromberg, his

7  office to get you this, the materials.  We have our CISO is

8  here.  You go down to the SCIF and look at it.

9          If it is as described by Mr. Kromberg, if it is

10 simply, you know, here's our 302 from January 3, if it's just

11 completely, you know, almost not statements, just

12 communications, you can easily tell the Court later this

13 afternoon there's nothing there.  In other words, I can reset

14 this case for a hearing this afternoon.

15         If there are issues within that material that you

16 feel are going to raise a matter, then we've got to take care

17 of it today.  I'm in trial all day Monday.

18         MS. MORENO:  I understand.

19         THE COURT:  I have no time to give this case on

20 Monday, and we have a large jury panel currently scheduled to

21 come in on Tuesday, all right?  So I think that's the best way

22 to handle it.

23         But if, in fact, there are substantive issues raised

24 in those three binders, as I'm told that's what it is, that are

25 going to require some kind of CIPA evaluation or that you feel

1  are more than just, you know, routine communications, we may

2  have to consider whether this case has to be continued, all

3  right?  There are some other issues that I'm concerned about as

4  well, but that's the first one, all right?

5          MS. MORENO:  And, Your Honor, how would you like me

6  to proceed in that regard?  Because --

7          THE COURT:  You'll go down and -- you'll go down and

8  look at this stuff in the SCIF.

9          MS. MORENO:  I will.

10          THE COURT:  If after you've looked at it you feel

11 that there needs to be a hearing of some kind, then you'll come

12 up to my chambers.  I'm on the bench until probably 1:30 today,

13 but I can hear you this afternoon, and the government will just

14 have to be on standby as to whether or not there's going to be

15 a hearing.

16          MS. MORENO:  Thanks.

17          MR. KROMBERG:  Your Honor, if I may, I would request

18 that before coming to you, Ms. Moreno contact us, because I've

19 been told by the FBI that they can get this stuff declassified

20 as necessary, because there are no -- these are not -- they're

21 secret because it was on a secret e-mail system or secret text

22 message system, but they're not secret in any other sense.

23          So I've been told, it's been represented to me that

24 the FBI can get, if -- to the extent that it's necessary, they

25 can get it done quickly.

1       THE COURT:  Well, we can have a CIPA hearing without

2   that having to be done.  All my folks are cleared, all right?

3   So that's not a problem.  The problem would be if Ms. Moreno

4   feels that she needs to use this information Tuesday or

5   Wednesday of next week --

6       MR. KROMBERG:  Then we will --

7       THE COURT:  -- you're telling me that it can be

8   declassified.

9       MR. KROMBERG:  I am told that, that it can be done in

10  time for it -- before any government witness who it applies to

11  is going to testify.

12      THE COURT:  Does this only apply to government

13  agents?

14      MR. KROMBERG:  Yes.  This is the e-mail system and

15  the text messages among the FBI agents and one guy who's no

16  longer in the FBI but was on the JTTF, now in the Air Force.

17      THE COURT:  All right.  Ms. Moreno, if you're going

18  to speak, you've got to be at the lectern.

19      MS. MORENO:  Again, I appreciate Mr. Kromberg's

20  representations.  I need to make my own evaluation.

21      THE COURT:  Of course.

22      MS. MORENO:  And I prefer to report back to the

23  Court, if it's the Court's pleasure.  If you would like me to

24  just engage with Mr. Kromberg, whatever is the Court's

25  pleasure, but I'm, I'm worried.

1          THE COURT:  I don't want to have to spend any more

2     time than needed, all right, so that if, in fact, there's a

3     question that you have that can be answered directly by

4     Mr. Kromberg, that's fine, but you will need to let my, my

5     secretary know one way or the other we're going to need a

6     hearing/we're not going to need a hearing, all right?

7          MS. MORENO:  I understand.

8          THE COURT:  All right?

9          MS. MORENO:  Thank you.

10          THE COURT:  All right.  Now, I am extremely concerned

11     about what I think is going to be a problem with pretrial

12     publicity in this case.  There was earlier this week on *The*

13     *Washington Post*, at least on their electronic version of the

14     paper, a fairly extensive article that reflected this interview

15     that should never have occurred, in my view, this summer,

16     before you were on the case, Ms. Moreno.

17          MS. MORENO:  Yes.

18          THE COURT:  But obviously, I'm sure you've seen it as

19     well; have you not?

20          MS. MORENO:  I have.

21          THE COURT:  And I understand -- I don't know whether

22     it's going to appear in print or not, but in any case, it was

23     certainly something that I had several people bring it to my

24     attention, so I'm assuming a fair number of Northern Virginia

25     jurors, potential jurors will have seen it.

```
 1              I am concerned about how that may affect our ability
 2   to get a jury, and that's why I've increased up to 125 the
 3   number of jurors that we've called in.  There should have been
 4   a supplemental list sent to counsel at this point, so you
 5   should know who's on that list, and we're going to conduct the
 6   voir dire up on the ninth floor in a larger courtroom solely
 7   just to get the jury in place.
 8              In my view, that should not have happened.  It's
 9   unfortunate that it has because there would be enough other
10   issues in this case that are problematic.
11              I am extremely concerned that both sides are really
12   violating multiple local rules, and I'm actually going to
13   direct that, Mr. Kromberg, you and Mr. Smith, because you're
14   local counsel, both reread the local criminal rules over the
15   weekend.  For example, I don't have any proposed voir dire yet
16   from the United States.  The local rule says five business
17   days.
18              MR. KROMBERG:  We are not planning on submitting any
19   in this case, Judge.
20              THE COURT:  All right.
21              MR. KROMBERG:  Because the ones that the Court has
22   done in every other case that we've ever been in are fine with
23   us.
24              THE COURT:  Well, this is not like every other case.
25   There are a whole bunch of issues that I think are going to
```

1    have to be addressed to the jury, and I certainly am prepared

2    to do that, but I think as a courtesy, it would be nice to have

3    a one-line no voir dire is being requested.

4              MR. KROMBERG:  I understand.

5              THE COURT:  All right.  In terms of from the defense

6    standpoint, Mr. Smith, you clearly have not read the local

7    rules.  You sent us proposed jury instructions.  You didn't

8    follow the rule that requires there be a citation at the bottom

9    of each jury instruction indicating where the source of it is.

10   That's in the rules.  You should know that.

11             You submitted proposed voir dire that included a

12   significant number of questions that anybody who routinely

13   practices in this court would know are answered by the jury

14   lists that are given.  I mean, whether a juror is married or

15   not married, how many children they have, that's all

16   information you get.  I was surprised that local counsel would

17   not know that.

18             We're not getting courtesy copies.  Our divisional

19   rule is even though there's electronic filing, we're supposed

20   to get a hard copy within 24 hours of your filing any kind of

21   pleading of any length.

22             It goes on and on like that.  Mr. Smith, you're not

23   following local Rule 47 in terms of the font size of your

24   footnotes.

25             So I am very concerned that both sides are being

1   either lax or just don't know the rules, and I expect there to

2   be no problems with that next week.

3           We do have all the electronic issues resolved.  Each

4   side will be bringing one laptop into the courthouse for use at

5   the trial.  Any recording devices on those computers must be

6   unworkable at the time they're in the courthouse, and so I just

7   want to make sure we don't have any problems with that.

8           As I indicated earlier, or if I didn't, we're going

9   to seat fourteen jurors, two of whom will be alternates.  I

10  give each side one additional peremptory, so defense will have

11  eleven peremptories; the government will have seven.

12          At the end of the trial, if we have all fourteen

13  jurors here, we will randomly choose two to be the first and

14  second alternates, and then the remaining twelve will be the

15  group that will decide the case.

16          I think in terms of logistics, that takes care of all

17  the logistic issues.  Are there any other logistic issues,

18  Mr. Kromberg, the government feels may occur?

19          MR. KROMBERG:  I spoke with the Marshals Service

20  yesterday about the screen, and they were a bit unclear at --

21          THE COURT:  Don't worry about the screen.

22          MR. KROMBERG:  Okay.

23          THE COURT:  We're taking care of that.

24          But we are going to have to coordinate with you-all

25  down the road, and we may do that at a, at a bench conference,

1    the order of witnesses because it -- because of various

2    logistical things, I don't want long gaps between witnesses, so

3    those that need some special handling, you're going to have to

4    work with us about what order they're coming in, all right?

5              MR. KROMBERG:  Yes, ma'am.

6              THE COURT:  All right.

7              MR. KROMBERG:  So one, I don't know if it's a

8    logistical question or not, but because a couple of the

9    witnesses will be testifying under unusual circumstances, we --

10   it would be helpful to know what the Court is going to tell the

11   jury about that because for opening statements, I want to make

12   sure that I don't say something wrong.

13             My plan -- my hope would be that I could say that a

14   couple of our witnesses are going to be speaking from behind

15   the screen because of ongoing involvement in government work.

16             THE COURT:  Well, I'm not going to say "behind the

17   screen."  I'm going to say we're going to have a screen in the

18   courtroom that prevents the public from seeing certain

19   witnesses because they have sensitive roles, and would that

20   affect the jury's evaluation as to the case.  We did that in

21   *Sterling*, so, I mean, I've done that before.  That's not a

22   problem.

23             MR. KROMBERG:  Excuse me just one moment?

24             THE COURT:  Yes.

25             MR. KROMBERG:  May I defer to Mr. Gibbs on the next

1    question?

2              THE COURT:  Yes.

3              MR. GIBBS:  Judge, you were asking about logistics.

4    This sort of -- it goes back to a case I had before Your Honor

5    a couple of years ago, the *Amar Endris* case.  I think in terms

6    of the presentation, when the confidential human source

7    testifies, we do -- he did record the conversations, so we have

8    clips we would like to play in court, and then we would like to

9    project the transcript, which will just be an aid to the jury,

10   along with that.

11             THE COURT:  That's not a problem.

12             MR. GIBBS:  Okay.  The one little tweak to that is at

13   the end, the case agent will testify about the post-arrest

14   interview, which was videotaped, so we want to play the video,

15   and we would -- the transcripts are short.  They're a page

16   each.  We would propose to hand out paper copies because it's

17   hard to simultaneously have the video up and the transcript up.

18             THE COURT:  That kind of logistic is not a problem.

19   Just make sure you have enough copies of the transcript not

20   just for the jury but for the Court, for counsel, so there's no

21   issues with that.

22             And the practice in my court, if there are recorded

23   conversations for which we have transcripts, is I do not have

24   my court reporter taking down that -- the words that are being

25   spoken because we have transcripts.  Is there any objection,

1    Ms. Moreno, to proceeding that way?

2           MS. MORENO:  No, Your Honor.  Would then the

3    transcripts be admitted as exhibits?

4           THE COURT:  They're not usually because that would be

5    like having the witness's testimony in the jury room.  The jury

6    gets to hear them.  Now, if the jury wants to re-listen to

7    those, because they are exhibits, they can re-listen to them in

8    court.

9           MR. GIBBS:  And that was our understanding as well,

10   Judge.  The recording is the actual evidence.

11          THE COURT:  Right.

12          MR. GIBBS:  The transcript is simply an aid to the

13   jury.

14          THE COURT:  Right.  So that if the jury wanted to --

15   but it's a piece of evidence, so if they wanted to review that

16   piece of evidence, they would come back into court, and we'd

17   play it for them again.  They'd have the transcript.  They

18   don't take the transcripts back with them.

19          MS. MORENO:  May I address the Court?

20          THE COURT:  Yes, ma'am.

21          MS. MORENO:  With respect to the, the screen, we

22   would ask that the Court instruct the jury that, that the fact

23   that there is a screen and Your Honor's characterization of the

24   witnesses as being involved in sensitive investigations should

25   not impact their --

1        THE COURT:  Of course.

2        MS. MORENO:  -- ability to be fair, and really

3  inquire into that.

4        I mean, it is an unusual situation.  I've been in

5  that situation before, and, of course, the concern for the

6  defense is that it sends a message of security and safety that

7  unfortunately will inure to the detriment of Mr. Young, when it

8  shouldn't.

9        THE COURT:  Look, there are several very sensitive

10  issues in this case that I am going to clearly probe with the

11  jury.  One of them will be the screen.  The other one is, of

12  course, going to be the evidence as to the defendant's -- I'll

13  be careful how I say it -- possessing material, white

14  supremacist-Nazi material, all right?

15        Because I want to emphasize to the jury he can only

16  be convicted, if they're going to convict him, on the basis of

17  the specific charges the government has raised and not on any

18  other conduct.  So there are a lot of sensitive points.

19        But while we're talking about this, to try to get the

20  case as focused as possible, I am assuming -- if you don't want

21  to tell me, you don't have to, but from everything we've had

22  during the history of this case -- that the defense does plan

23  to raise an entrapment defense.  Is it appropriate to discuss

24  that early with the jury or not?

25        MS. MORENO:  May I have a very brief moment with my

1   cocounsel?

2            THE COURT:  Yes.

3            MS. MORENO:  Yes, Your Honor.

4            THE COURT:  All right.  We'll see how that works.

5            Now, the other thing is as long as we're getting the

6   logistics out, how long, Ms. Moreno, do you feel that you need

7   for an opening statement in this case?

8            MS. MORENO:  I was going to ask what is the Court's

9   protocol with that.

10            THE COURT:  The shorter the better.  So go ahead.  If

11   you make a reasonable request, you often get it granted.  If

12   it's unreasonable, it won't be.

13            MS. MORENO:  It won't be longer than 30 minutes.

14            THE COURT:  That's on the long side for an opening

15   statement.

16            MS. MORENO:  Twenty.

17            THE COURT:  Twenty.

18            All right, Mr. Kromberg, twenty for the government.

19            MR. KROMBERG:  Mine is going to be longer, Judge.  We

20   have to explain what the case is about before the --

21            THE COURT:  Yours is going to be 20 minutes, 20

22   minutes per side.  I have never seen an opening statement going

23   much more than that that was terribly effective.  So just make

24   it succinct.  All right.

25            MR. KROMBERG:  Judge, among the other logistical

1    issues are stipulations.  We supplied the defense with a number

2    of stipulations that Ms. Moreno has said that we should be able

3    to enter, and we would like to get them entered so that we can

4    cull down, make sure we can tell the witnesses, who are

5    otherwise custodial witnesses, that they do not need to come.

6              THE COURT:  It's to the benefit of both sides to let

7    the jury focus on the key issues in the case, and so I would

8    hope you can work that out, Ms. Moreno.

9              MS. MORENO:  Your Honor, several weeks ago, I

10   represented to the government and actually we communicated with

11   the government that we would stipulate to authenticity and

12   foundational issues to scores of their exhibits already so that

13   they don't have to bring in those custodians.  And I agree with

14   the Court, this case needs to be focused elsewhere.

15             THE COURT:  All right, great.

16             Now, while we're doing that, again, so that we can

17   again use all of our resources effectively, I don't understand

18   why there is any kind of a dispute or lack of agreement on the

19   jury instructions.  As I understand it from what was

20   represented to the Court, there was no objection by the defense

21   to any jury instruction up through 27, and then starting at 27,

22   as I understand, there's an objection, and then the defense

23   submitted a bunch of instructions which, as far as I can tell,

24   are, several of them are exactly the same as the government's.

25             I want to know why those are in dispute.  I mean, why

1     is Government Exhibit -- Instruction 28, the description of the

2     nature of the offense, why is that being objected to, and why

3     is there a Defense Instruction 27 offered in its stead?

4            MR. SMITH: Your Honor, if I may, I can go through

5     each, each one of the proposed instructions.

6            THE COURT: Well, I'm not going to do a charging

7     conference now. I just want to know generically, why is there

8     a dispute?

9            MR. SMITH: Generically, so we carefully reviewed the

10    government's proposed jury instructions, and with respect to 1

11    through 26, as Your Honor said, we found no -- we had no

12    quarrel with those, but we began examining the statutory

13    language in each of the charges, and, frankly, there were some

14    omissions in the statutory language that should have been

15    included.

16           I'll give Your Honor one example. For 2339(b), one

17    factual pattern that allows a violation of the statute is to

18    provide advice or training to a foreign terrorist organization.

19    Now, that is the correct language from the statutory definition

20    in 2339(a). However, there are two amendments to the statute

21    that were subsequently entered narrowly defining what

22    "training" and "advice" mean, to mean -- these two amendments,

23    I believe, were entered after the *Holder v. Humanitarian Law*

24    *Project* Supreme Court case on 2339(a) and the First Amendment.

25          "Training" is narrowly defined to mean, I don't have

1    the exact language in front of me, but sort of technical

2    training.  Those two narrowly defined elements of the statute

3    were left out of the government's instruction.  We're not sure

4    why they're defining the statute, so we put those in.

5           For the Section 1512 counts, the parties have a

6    dispute concerning what proof has to be adduced at trial to

7    achieve a guilty verdict, and so there is various different

8    formulations of the law based on Your Honor's decision in *Amri*

9    and some other decisions on, for example, what an official

10   proceeding is under Section 1512 and what facts have to be

11   proven to establish a violation of Section 1512(b)(3).

12          THE COURT:  Well, in the future, when you're

13   disputing jury instructions, you still have to put the

14   citation, all right?  And yours are without citation.

15          MR. SMITH:  And thanks for bringing that up, Your

16   Honor, because actually, we put a citation for every charge

17   where the government put a citation in its versions.  So if you

18   compare the two copies and look at 27 through I believe it's 43

19   in the government's jury charges and look at 27 through 43 in

20   ours, every time that the government's charge cites a citation,

21   we do as well.

22          THE COURT:  Well, both sides have to put citations

23   in.  That's the rule.

24          MR. SMITH:  But so I believe that Your Honor is

25   putting its finger on the issue here with Section 1512.  The

1   parties just have a dispute about what sort of proof has to be

2   adduced at trial.

3          THE COURT:  All right.  Now, the actual motions that

4   are pending before the Court on the docket right now are the

5   defendant's motion in limine concerning evidence produced on

6   November 7; the government's motion to amend or correct the

7   indictment, which involves Count 3 only of the indictment; and

8   the defendant's motion in limine to exclude the two expert

9   witnesses from trial.  I'm not going to hear much argument on

10  those motions because I've had enough time to look at them.

11         Mr. Kromberg, you're not going to like this ruling of

12  the Court, but on the government's motion to amend or correct

13  Count 3, I'm denying the motion, and I'm dismissing that count.

14  It completely, in my view, based on my *Amri* decision, I'm

15  satisfied that, in fact, that count can't go forward; plus, in

16  my view, it's duplicative of Count 2.  It's at the same time

17  periods, at basically the same -- it's a different gloss on the

18  case.

19         So I'm dismissing that count, all right?  And the

20  case will go forward on Counts 1, 2, and 4.

21         MR. KROMBERG:  Judge, when you say "all right," does

22  that --

23         THE COURT:  No, you don't have to say anything.  I'm

24  just telling you that's what I'm doing, all right?  There's no

25  sense in making the case any more complicated than it already

1    will be.

2             You can't possibly have an objection to that.

3             MR. SMITH:  No objection, Your Honor, of course.  No

4    objection.  I would just note that one reason we put this point

5    in our brief, we believe there's reason to believe the

6    government will file an interlocutory appeal on this issue.

7             THE COURT:  We'll worry about that when it happens,

8    all right?  But the point is I am dismissing that count right

9    now, all right?

10            Now, in terms of the experts, I am satisfied over the

11   defendant's objection that the first expert -- and hopefully, I

12   will some day learn how to pronounce this man's name

13   correctly -- Gartenstein-Ross or "Gartenstein"?  How is it,

14   -stein or "-stein"?

15            MR. KROMBERG:  I believe it is Gartenstein-Ross, Your

16   Honor.

17            THE COURT:  All right, Gartenstein-Ross.  I'm

18   allowing him to testify as an expert in all the areas in which

19   he's been designated.  I realize that he's a better expert in

20   some areas than others, but I think there's enough in his

21   background, the fact that the United States government uses him

22   for training in these areas is sufficient in my view, plus his

23   extensive academic credentials, and the fact, even though the

24   defense disputes this, he has been qualified as an expert.

25            And even in default cases, a judge still doesn't just

1  willy-nilly allow evidence into the record.  So I'm satisfied

2  that there's enough record that he may testify.

3          In terms of Ian Campbell, I think he is limited to

4  being a fact witness.  I don't see him as an expert, but to the

5  extent that he starts to put himself forward as an expert, he

6  can talk about what he as an officer has experienced himself as

7  a fact witness, what his interactions were with the defendant,

8  what he may have seen or heard the defendant say, and from his

9  experience on the street dealing in cases, if he has such

10  experience, he can testify to that.  That helps the jury.  The

11  average juror wouldn't necessarily understand this stuff.

12          But beyond that, his PowerPoint is not an appropriate

13  exhibit in this case, and I would not allow testimony along

14  those lines.  So that's my ruling on that.  So I guess that's

15  granted in part and denied in part.

16          And the last motion is the defendant's motion in

17  limine concerning evidence produced on November 7.  I am

18  concerned a bit about the hearsay element, so I want you to

19  respond to that, Mr. Kromberg.

20          MR. KROMBERG:  Your Honor, as I told the defense, we

21  never said or suggested we were going to use that evidence.

22  We've given the defense all of our exhibits.

23          THE COURT:  Ah.

24          MR. KROMBERG:  It was just presented to the defense

25  as one of the many things that we presented in discovery, in

1  part because Mr. Smith had represented to the Court that there

2  was no such thing as a terrorist asking for Google Play gift

3  cards, when, in fact, there was.

4          So we provided it, but we're not introducing that

5  unless they ask, and if they ask, then someone may, may answer

6  the question.

7          THE COURT:  All right.  At this point then, I'm not

8  going to actually rule on it.  As I said, the last time we had

9  a motion in limine, sometimes, you know, things change at

10  trial.  So my normal motto is, you know, if you open the door,

11  the government or vice versa, the other side can walk through

12  the door, and so you'll have to be sensitive as to what doors

13  are opened or not opened, all right?

14          I think that takes care of all the motions that were

15  formally on the docket.  Is there anything else, Mr. Smith?

16          MR. SMITH:  We understand Your Honor's ruling on

17  Gartenstein-Ross, but there was a second element to it, which

18  is that apart from certification, the expert's report indicates

19  that there's a large amount of hearsay evidence that he --

20          THE COURT:  I'm not letting his -- his report will

21  not be an exhibit, all right?

22          MR. SMITH:  Right.

23          THE COURT:  He will testify.  If he starts testifying

24  to something that you feel is based on hearsay or is hearsay,

25  you make the objection during the trial.

1          MR. SMITH:  Thank you.

2          THE COURT:  All right?  Then I have context.

3          MR. SMITH:  Thanks.

4          THE COURT:  Is there anything else either side needs

5   to bring to the Court's attention?

6          MR. KROMBERG:  No, Your Honor.

7          THE COURT:  No?  All right.  All right, so we're

8   going to wait to hear from Ms. Moreno.

9          MS. MORENO:  Yes, ma'am.

10          THE COURT:  And let us know as soon as you can.  As I

11   said, I can't do anything before 1:30.  After that, I would

12   like to not be here until seven or eight tonight; my staff

13   certainly doesn't want to be; so as soon as you can, let us

14   know what the situation is, all right?

15          MR. KROMBERG:  Your Honor, I did have one question.

16          THE COURT:  Yeah.

17          MR. KROMBERG:  For trial scheduling, do you plan to

18   hold the trial on Friday?

19          THE COURT:  Ah, all right.  We're going to start

20   Tuesday hopefully at ten o'clock, and I think out of an

21   abundance of caution, because I don't want to waste the jury's

22   time, I'm going to indicate that if there are any last-minute

23   pretrial issues, they must be noticed for 9:30 that morning up

24   on the ninth floor, which is where we're doing the voir dire,

25   so that we can take care of them before the jury comes in, all

1    right?

2              I run my trials until six o'clock at night.  We will

3    have court on Friday, probably not until 11:00-11:30 because I

4    have a docket that morning, all right?  And just if I didn't

5    already tell you, Monday the 11th, we will not start until two

6    in the afternoon, all right?  Other than that, we're going to

7    go -- and all other days start at 9:30 in the morning.  So we

8    go 9:30 to 6:00 Wednesday, Thursday.  Friday will be sort of a

9    half-day.  Monday will be a half-day.

10             And, Mr. Kromberg, I did need -- I noticed in your

11   request for electronic device, you indicated you thought the

12   trial would run through about the 15th.  Is that accurate?

13   Because I need to tell the jury, you know, an approximate time.

14             MR. KROMBERG:  I think our case is likely to take a

15   week, and whatever the defense case happens.

16             THE COURT:  So when you say a week, five trial days?

17             MR. KROMBERG:  Yes.

18             THE COURT:  All right.  And, Ms. Moreno, as far as

19   you can tell, what do you think the defense case might take?

20   Another day or two?

21             MS. MORENO:  If.  If that, yes.

22             THE COURT:  All right.  I will tell the jury to

23   expect two weeks, through the 15th, I think, is a fair

24   estimate, all right?  We're getting close to the holiday

25   season.  I know we have Hanukkah in that time frame.  We have

1   then the other -- the Christmas holiday coming up as well.  But

2   I think if we can get the case to the jury by the 15th, that

3   would be good, all right?  I mean, when I say "to the jury,"

4   get the whole case done by the 15th if we can.

5            All right, are there any -- yes, Mr. Smith?

6            MR. SMITH:  One, one final point.  I made an

7   incomplete statement to Your Honor's question before.  When the

8   Court inquired about the differences between the two

9   instructions, our entrapment instruction is taken directly --

10  almost directly from an instruction Your Honor issued in the

11  *Carranza* case, with some amendments to reflect what we think is

12  *Jacobson*'s -- the standard from the *Jacobson* decision on

13  entrapment.

14           However, the government included a series of

15  subsidiary instructions that we don't think are ever issued at

16  the trial level, instructions relating to friendship per se not

17  constituting entrapment.

18           THE COURT:  Well, all right, we'll address that issue

19  when we do the formal charging conference.  I was primarily

20  concerned, number one, with not wasting my time reading two

21  sets of instructions that are the same, and number two, that I

22  wasn't getting citations on the bottom.  Now, if you're telling

23  me you cited to *Carranza* and *Jacobson*, I'll re-look at the rest

24  of them.

25           But anyway, I just was putting both sides on notice

1    that I want the rules complied with as best possible.

2              MS. MORENO:  One more thing?

3              THE COURT:  All right, yes, ma'am.

4              MS. MORENO:  Would it be fair to say that we should

5    be prepared for opening statements Wednesday morning?  Do you

6    think we would be picking all day Tuesday?

7              THE COURT:  Not with me, no.  We'll have a jury --

8    no, you should be planning to open on Tuesday, and you may even

9    see a witness go on.

10             MS. MORENO:  On Tuesday.

11             THE COURT:  On Tuesday, oh, yeah, definitely.

12             MS. MORENO:  Thank you.

13             THE COURT:  Definitely.

14             All right, anything further on this case?

15             MR. KROMBERG:  So -- sorry.  Should we plan for

16   opening statements after lunch on Tuesday?

17             THE COURT:  Well, it depends how long it takes to get

18   the jury, all right?  I think given the number of jurors who

19   are going to be there, it may take a little bit longer, but be

20   prepared.  I mean, you may wind up, the government may have to

21   open before lunch.

22             MR. KROMBERG:  Okay.  Thank you.

23             THE COURT:  Lunch is normally around one o'clock, and

24   I take a mid-morning and a mid-afternoon break usually.  I do

25   let jurors take notes.  And I want to make sure, by the way,

1  that the defense is, in particular that you are completely

2  familiar with our no back-striking rule.

3          MS. MORENO:  Yes.

4          THE COURT:  And if you're not, my law clerk, you need

5  to get with him ahead of time so you understand how that's

6  done.

7          All right, anything further on this case?

8          MR. KROMBERG:  No, Your Honor.

9          THE COURT:  No?

10         MS. MORENO:  No, Your Honor.

11         THE COURT:  You're all free to go, and the defendant

12  is remanded.

13                          (Which were all the proceedings

14                           had at this time.)

15

16               CERTIFICATE OF THE REPORTER

17      I certify that the foregoing is a correct transcript of

18  the record of proceedings in the above-entitled matter.

19

20

21          _____/s/_____

22                          Anneliese J. Thomson

23

24

25