**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:16-CR-265 |
| | ) | |
| NICHOLAS YOUNG | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S POSITION ON SENTENCING FACTORS**

Nicholas Young stands before this Honorable Court 66.6% less guilty, further rehabilitated, and with deepened sentencing disparities than when the Court imposed its previous sentence. In keeping with this percentage,[1] and for the reasons outlined in more detail below, a sentence of 60 months is sufficient, but not greater than necessary to comply with the factors enumerated under 18 U.S.C. §3553(a).

**OBJECTIONS/CORRECTIONS TO PRESENTENCE REPORT**

Mr. Young is not convicted of obstruction of justice and therefore no longer qualifies for the two-level obstruction of justice enhancement in previously recommended in the Presentence Report. *See* PSR ¶33. Mr. Young maintains his previous challenge to the USSG §2M5.3(b)(1)(E) enhancement, his challenge to the failure to apply the three-level inchoate crime reduction in 2X1.1, and additionally challenges the application of the twelve-point enhancement under USSG §3A1.4(a) known as the "terrorism enhancement." *See United States v. Chandia*, 675 F.3d 329, 334 (4th Cir. 2012).

In *United States v. Jumaev*, the district court found the Terrorism Enhancement did not

---

[1] 180 months less $^2/_3$ equals 60 months.

apply to a situation that parallels this case. *See* No. 12-cr-00033-JLK, 2018 U.S. Dist. LEXIS 119916, at *17-18 (D. Colo. July 18, 2018). The court explained, "Mr. Jumaev gave only $300 to a person who himself was short on cash and did not even know how to get the money to the intended organization. If Mr. Jumaev's offenses were truly calculated towards a political objective, Mr. Jumaev would have done more, e.g., contributed more money on more occasions via a more reliable conduit to a more robust organization." It further concluded that "there is no evidence in the record that he knew about, and certainly not that he intended to promote, any plan by the IJU to commit a politically-motivated crime of terrorism."[2] *Id.*

Like, Jumaev, Mr. Young's conduct, providing $245 in gift cards, was motived by a desire to assist his "friend," not to advance "any plan by [ISIS] to commit a politically motivated crime of terrorism." *Id.*

Based on this, and on his previous Guidelines arguments (ECF No. 219), Mr. Young submits that the proper Guidelines calculation is:

| | |
|---|---|
| Base Offense Level USSG §2M5.3(a) | 26 |
| Attempt reduction | -3 |
| Offense Level | 23 |
| Criminal History Category I | |
| **Guidelines Range** | **46-57 months** |

Even if the Court does not find that the above is the appropriate Guidelines range, a significant downward departure is warranted because Criminal History Category VI

---

[2] The district court also found that increasing the 51-year old's criminal history category from I to VI substantially over-represented the seriousness of his criminal history. It therefore departed it back down to category I under U.S.S.G. § 4A1.3(b)(1).

2

substantially over-represents Young's criminal history, which is zero, and the government engaged in sentencing entrapment. "Sentencing entrapment occurs when the police encourage a defendant to act criminally, who otherwise lacks the predisposition to commit the charged crime." *United States v. Wilson*, No. 3:12CR00035-001, 2016 U.S. Dist. LEXIS 36576, at *18 (W.D. Va. Mar. 21, 2016)(citing *United States v. Jones*, 18 F.3d 1145, 1153 (4th Cir. 1994)); *See also United States v. Brown*, 69 F. App'x 175, 177 (4th Cir. 2003) (finding that a sentencing entrapment argument failed, not because it was not viable law, but because the defendant did not claim that he lacked a predisposition to commit the offense); *United States v. Romirez-Rangel*, 103 F.3d 1501, 1506 (9th Cir. 1997) (applying sentencing entrapment to sting where defendant initially induced to purchase drugs but then also a machine gun); *United States v. Atwater*, 336 F. Supp. 2d 626, 630 n. 2 (ED. Va. 2004).

In this case, after several years of investigating Young, the government developed three obstruction of justice charges in 2014 and 2015. In 2014 and 2015, the FBI instructed a confidential informant to tell Young of his plans to join ISIS, and then interviewed Young who concealed the activity of his "friend." This conduct gave rise to Counts 2, 3, and 4 in the indictment. Nevertheless, despite having chargeable conduct, the government did not cease its intrusions into Young's life. The government agents wanted "Slow Decline" to "take one more step" to ensure they could jail Young for a significant period. *See* J.A. 1868. Their stated goal in the prosecution was to "put him away for good." *See* J.A. 1871.

This government action amounted to sentencing entrapment. The multi-year undercover investigation had already resulted in chargeable conduct, yet the government sought "one more step" to grasp a 12-level terrorism enhancement, (including a five-level criminal history category increase) a 2-level enhancement under §2M5.3(b)(1)(E), and a 12-level increase on the base offense level (base offense level 14 for obstruction of justice

3

versus 26 for a material support offense).

As with standard entrapment analysis, the focus of sentencing entrapment is on the defendant's predisposition to commit the charged crime prior to his first contact with a government agent. *Jones*, 18 F.3d at 1153. Here, the government's purported predisposition evidence related to Nazi/white supremacist propaganda. *See* J.A. 114-15. Leaving aside the First Amendment issues, Nazi pictures, history books and artifacts are not evidence of a predisposition to support ISIS. The Court need not take the defense's word for it: a recent comprehensive empirical terrorism study sponsored by the Department of Justice found that: (a) insufficient data exists to compare militant Islamist and far-right radicalization; and (b) initial indicators suggest dozens of distinctions in radicalization between the two. Jensen and LaFree, *Final Report: Empirical Assessment of Domestic Radicalization*, Report to the National Institute of Justice, Office of Justice Programs, U.S. Department of Justice (Dec. 2016).[3]

Additionally, the "positional" element of predisposition lacks in this case. *See United States v. Hollingsworth*, 27 F.3d 1196, 1200 (7th Cir. 1994) (en banc) (Posner, C.J.) ("Predisposition is not a purely mental state, the state of being willing to swallow the government's bait. It has positional as well as dispositional force….The defendant must be so situated by reason of previous training or experience or occupation or acquaintances that it is likely that if the government had not induced him to commit the crime some criminal would have done so; only then does a sting or other arranged crime take a dangerous person out of circulation.").[4] The government presented no evidence that ISIS or any other Foreign Terrorist Organization requests gift cards or other small financial contributions from

---

[3] Available at https://www.ncjrs.gov/pdffiles1/nij/grants/250481.pdf
[4] The Fourth Circuit has neither accepted nor rejected the "positional" element of entrapment. *See United States v. Squillacote,* 221 F.3d 542, 567 (4th Cir. 2000).

4

Americans. Thus, even if Young were psychologically predisposed to give material support to the group, which he was not, the government failed to show that, had the government left him alone, he likely would not have given such financial support in his objective circumstances. Given these government-driven events, a significant downward departure is warranted.

## **ARGUMENT**

**I.     Legal Standard**

Since the Guidelines were held to be advisory in *United States v. Booker*, 543 U.S. 220, 226 (2005), imposing a sentence is no longer a strictly mathematical exercise. While "a district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines," *United States v. Hughes*, 401 F.3d 540, 546 (4th. Cir. 2005), district courts must now make "an individualized assessment based on the facts presented" after calculating the advisory Guidelines range. *Gall v. United States*, 552 U.S. 38, 50 (2007). The Guidelines range is but one of several factors a court must consider when imposing a sentence and it is legal error to treat those ranges as default sentences. *See United States v. Mendoza-Mendoza*, 597 F.3d 212, 216-17 (4th Cir. 2010); Nelson v. United States, 555 U.S. 350, 352 (2009) (per curiam); *Spears v. United States*, 555 U.S. 261, 263-64 (2009). A court must also weigh the factors enumerated in 18 U.S.C. § 3553(a) when imposing a sentence.

Taking into account the factors enumerated in § 3553(a), which state that a judge must "impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing," *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (quoting 18 U.S.C. § 3553(a)), courts are not required to point to "'extraordinary' circumstances to justify a sentence outside the Guideline range." *Gall v. United States*, 552 U.S. 38, 47 (2007). A below-Guidelines sentence may be appropriate if the Court determines that the Guideline sentence

5

"falls outside the 'heartland' to which the Commission intends individual Guidelines to apply, perhaps because the Guidelines . . . fails to properly reflect § 3553(a) factors." *Rita v. United States*, 551 U.S. 338, 351 (2007)(citation omitted).

The factors for the district court to consider include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant, (2) the kinds of sentences available, (3) the Guidelines range, (4) the need to avoid unwarranted sentencing disparities, (5) the need for restitution, and (6) the need for the sentence to reflect: the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to the defendant and others, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. See 18 U.S.C. § 3553(a). The Court must weigh each of these factors when determining the appropriate sentence with the least amount of imprisonment necessary pursuant to §3553(a). *Id.*

**II. A sentence no greater than 60 months is sufficient but not greater than necessary to achieve the goals of sentencing.**

*i. The balance of equities has tipped in Mr. Young's case*

When Mr. Young previously appeared before this Honorable Court, he was guilty of three distinct criminal offenses stemming from three different types of conduct. Now he is guilty of one.

At his prior sentencing hearing, this Court found that fifteen years was the appropriate sentence for all three separate instances, running all three offenses as one. Now there is only one.

Fairness and reason follow that an individual guilty of one criminal offense is less guilty than he who committed three separate and distinct criminal offenses. By mathematical terms, he is 66.6% less guilty. Regardless of whether the lead count is the one that remains,

balancing shear equities, Mr. Young is before the Court less guilty than before.

The Fourth Circuit's decision implicitly acknowledges that vacating two convictions may affect Mr. Young's sentence. Knowing that this Court imposed 180 months concurrent on all counts, the Fourth Circuit could have addressed Mr. Young's sentencing challenges and affirmed the sentence on Count One.[5] Instead, the Fourth Circuit chose to remand for re-sentencing on the single remaining count, thereby implying that its ruling could result in a lower sentence below. And it should. The balance of equities has changed since Mr. Young was previously before this Honorable Court.

*ii. Mr. Young is further rehabilitated.*

Not only is Mr. Young legally less culpable, he is further rehabilitated. Thus, there is a lessened need to protect the public than when Mr. Young was previously before this Court. *See Pepper v. United States*, 562 U.S. 476, 481 (2011) (holding that a district court at resentencing may consider evidence of a defendant's post-sentencing rehabilitation in support of a downward variance).

For over a year, Mr. Young has lived within the four corners of his cell at Petersburg Federal Correctional Institute staring down the throat of a 15-year sentence. Anyone would find it difficult to refrain from wallowing in self-pity. Mr. Young resisted this urge and instead used his time to better himself and make amends. During his first six months, Mr. Young's only class option was an HIV awareness program, but he did not hesitate to participate. He was then admitted into a Spanish level 1 class, passed, and is seeking to begin level 2.

---

[5] For preservation purposes, Mr. Young maintains all of his prior sentencing arguments and challenges. *See* 1:16CR265, *Def.'s Set. Mem.*, ECF Nos. 219, 222; USCA4 Appeal: 18-4138, *Appellant Opening and Reply Brs.*, Doc. No. 23; 38.

7

Mr. Young submitted several applications for the Victim Impact class, but has yet to be admitted. This class is interactive. Groups engage with each other to discuss the effects of their conduct on individuals and the community. Mr. Young is eager to participate, and sought advice from his case manager on ways he can get admitted. His case manager advised him to continue to submit his name, and Mr. Young is following that advice in the hope the class will be soon be available. Mr. Young also requested the RDAP entry questionnaire from the psychology department. Additionally, Mr. Young holds a job at the prison. Last year he was assigned to clean the outside compound. His respect and dedication earned him the position of unit orderly. Since moving facilities, he works in the dining room and is there each day before sun up.

Young also has not allowed his difficult circumstances to stifle his care and concern for others. As Young's letters show, he continues to reach out to people from prison when he knows they are experiencing difficulties. *See* Def.'s Ex. 1 *Letters on Nicholas Young's Behalf*. He called his mother the evening before her major surgery and contacted family friends when their father suffered a heart attack over Christmas. *See id.* Even people in prison, deputies and other inmates, who have only known Nick recently, recognize Nick's compassionate sprit. *See id.* Young's sister noted that sometimes Young was still addressed as "Officer Young," that other inmates wrote letters to have Young moved back into their unit after he was removed, and that Young often assisted other inmates who needed help. *See id.* She wrote, "When my brother could not call me one evening, another inmate did on his behalf as not to worry me." *Id.* These collection of letters, full of experience and knowledge of who Nick truly is, all have a common theme: that the government's monstrous portrayal of their friend/brother/son/colleague/cellmate is like looking at a molecule of a man and assuming that represents the full man. Young is far more than the repetition of sinister

images on a government computer presentation. These letters represent who Young truly is, and they show he is kind, compassionate, generous, loyal, soft-spoken, personable, polite, respectful, dedicated, introspective, and remorseful.

*iv. Sentencing disparities have deepened since Mr. Young was last before this Honorable Court*

Courts across the country are gaining a new perspective when sentencing defendants in these types of cases. Since Young's sentencing hearing, a number of courts have given time-served, or similar, in material support cases. The District Judge in *United States v. Doe* recently opined, "Terrorism in support of ideology is not unknown in American history…. Nor is the history of export of American volunteer fighters to foreign wars unusual: we need only recall American individuals' aid to civil wars in Greece, Israel, Italy, Spain, Sri Lanka, the Soviets, and Nazi Germany." 323 F. Supp. 3d 368, 370 (E.D.N.Y. 2018) (citing David S. Reynolds, *John Brown, Abolitionist* 11 (Alfred A. Knopf 2005) ('Whitman sought to provide America with healing and reconciliation through poetic language . . . Brown . . . resorted to terrorist tactics to disrupt the South's peculiar institution.')).

In *United States v. Doe*, the defendant pled guilty to material support for a foreign terrorist organization after traveling to Syria and receiving training from ISIS. There he remained for several months until he managed to escape back to Turkey and into the arms of United States authorities. *See id.* The district court applied the terrorism enhancement, resulting in guidelines of approximately 30 years. *See id.* at 383. Nevertheless, the district court sentenced Doe to time-served, stating, "Further incarceration will inhibit defendant's reentry into lawful life and could encourage defendant to re-engage with violent extremism. Rehabilitation will more likely be achieved through a long term of supervised release…." *Id.* at 392.

In July 2018 in Colorado, Bakhtiyor Jumaev was convicted of three counts involving

9

material support to a terrorist organization after a 19-day jury trial. Similar to Young's actions in this case, Bakhtiyor Jumaev mailed his co-defendant, Jamshid Muhtorov $300 after Mr. Muhtorov informed him that the Islamic Jihad Union (IJU) needed financial support. *United States v. Jumaev*, No. 12-cr-00033-JLK, 2018 U.S. Dist. LEXIS 119916, at *1 (D. Colo. July 18, 2018). "The trial was extensive, lasting seven weeks and involving hundreds of exhibits and tens of witnesses. The resources expended—to bring foreign witnesses and experts here, to depose witnesses abroad, to ensure accurate translations, to sift through mountains of evidence, and to exhaustively litigate the relevant issues—were great." *Id.* Nevertheless, the court recognized that "Mr. Jumaev was entitled to a fair trial and put forward the type of legitimate defenses that necessitate a trial." *Id.* At sentencing, the court found the guidelines to be "illogical and inadequate." The court called the Terrorism Enhancement a "wrecking ball" and "draconian," and the government's request for a 15-year sentence "absurd." *Id.* The district court sentenced Jumaev to time-served.

In *United States v. Daniels*, No. 2-16-cr-00222 (S.D. Ohio July 10, 2018), the FBI arrested Daniels at the airport before he boarded his outbound flight to Libya to join ISIS. He had also previously sent $250 via Western Union to an ISIS member and recruiter. Pursuant to a plea agreement, Daniels pled guilty to one count under 18 USC §2339B. The government urged the court to impose a sentence between 15 and 17 years imprisonment based on Daniels' "ability to manipulate others and his commitment to one of the most pernicious terrorist organizations in modern history." Gov't Sentencing Mem. at 14, ECF No. 87. The judge sentenced Daniels to 80 months' imprisonment with lifetime supervised release.

Not only have sentencing disparities increased within this category of offense since Mr. Young was last before this Court, but the First Step Act was also enacted since then, and it

10

increased the divide among those with the same sentence, but different offenses.

The First Step Act now allows some offenders – mainly white collar offenders – to earn "earned time credits."[6] These "earned time credits" decrease a defendant's sentence up to one year.  Thus, if a fraud offender were to come before this Court the same day as Mr. Young and if he were to receive the same sentence as Mr. Young, the fraud offender would have the opportunity to serve less time.

Although this may not be far from the disparity between those who are RDAP eligible and those who are not, or those who are U.S. citizens (and eligible for programs) and those who are not, it is nonetheless a newly created sentencing disparity. Thus, Mr. Young asks this Honorable Court to account for the fact he will be ineligible for "earned time credits," available to other white-collar defendants, when fashioning its sentence in this case.

*iii. A word on deterrence*

Mr. Young had never served a day in jail prior to this case. Thus, a sentence of 60 months has a substantial deterrent effect. As the Second Circuit noted, a defendant who has previously been sentenced to minimal incarceration, might very well be deterred by a lesser amount of incarceration than someone who has shown themselves to be undeterred by a lengthy sentence. *See United States of America v. Mishoe*, 241 F.3d 214, 220 (2d Cir. 2001).

Both specific and general deterrence in the criminal justice context are primarily achieved through the act of being caught, not through lengthy prison sentences. This is makes sense. Offenders do not engage in criminal conduct thinking they will be caught. Rare are the circumstances in which a would-be criminal engages in reasoned thought and logic,

---

[6] *See* https://www.judiciary.senate.gov/imo/media/doc/115.xxx%20-%20First%20Step%20Act%20of%202018.pdf#page=12 listing pages of "Ineligible Prisoners."

11

balancing his desire to commit the crime against the prospect of number of years he would serve in prison. No – he simply questions whether he will get caught. If a person believes he would be apprehended, he would likely rethink his decision to commit a crime. For this reason, an increased likelihood of being caught, rather than an increase in prison time, is the driving force behind criminal deterrence. Neither the public nor the defendant are more deterred whether Mr. Young spends five years in prison or fifteen. In fact, more incarceration can actually increase the chance of recidivism.

Research has proven this axiom time and time again. *See United States v. Courtney*, 76 F. Supp. 3d 1267, 1304 n.13 (D.N.M. 2014) ("An avalanche of criminological studies have determined that this theoretical symmetry between severity of punishment and certainty of detection does not exist in the real world.").[7] "[I]ncreases in severity of punishments do not

---

[7] For support on this point, *Courtney*, 76 F. Supp. 3d at n.13 cites the following studies and research:
Isaac Ehrlich, *Participation in Illegitimate Activities: A Theoretical and Empirical Investigation*, 81 J. Pol. Econ. 521, 544-47 (1973)(finding that the certainty of punishment was a more important indicator than severity in deterring murder, rape, and robbery); Harold G. Grasmick & George J. Bryjak, *The Deterrent Effect of Perceived Severity of Punishment* 59 Soc. Forces 471, 472 (1980)(reviewing twelve deterrence studies and explaining that "nearly all these researchers conclude that perceived certainty of legal sanctions is a deterrent, [while] only one (Kraut) concludes that perceptions of the severity of punishment are part of the social control process"); Jeffrey Grogger, *Certainty v. Severity of Punishment* 29 Econ. Inquiry 297, 304 (1991)(studying California arrestees and concluding that "increased certainty of punishment provides a much more effective deterrent than increased severity" and that a "six percentage point increase in average conviction rates would deter as many arrests as a 3.6 month increase in average prison sentences"); Steven Klepper & Daniel Nagin, *The Deterrent Effect of Perceived Certainty and Severity of Punishment Revisited*, 27 Criminology 721, 741 (1989)(surveying graduate students about tax evasion scenarios and finding that certainty of punishment is an effective deterrent); Daniel S. Nagin, *Criminal Deterrence Research at the Outset of the Twenty-First Century*, 23 Crime & Just. 1, 13 (1998)(reviewing the literature and concluding that "cross-sectional and scenario-based studies have consistently found that perceptions of the risk of detection and punishment have negative, deterrent-like associations with self-reported offending or intentions to offend"); Daniel S. Nagin & Greg Pogarsky, *An Experimental Investigation of Deterrence: Cheating, Self-Serving Bias, and Impulsivity*, 41 Criminology 167 (2003)(testing whether students would cheat on a trivia quiz to earn a cash bonus and finding that cheating decreased when the certainty of detection was higher but

yield significant (if any) marginal deterrent effects. Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion. (Blumstein, Cohen, and Nagin 1978; Blumstein, Cohen, Roth, and Visher 1986; Reiss and Roth 1993), as has every major survey of the evidence (Cook 1980; Nagin 1998, 1999; von Hirsch et al. 1999; Doob and Webster 2003)." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28- 29 (2006).

The research shows that lengthier prison sentences do not prevent recidivism either, and that a lengthier sentence can actually increase the chance of reoffending. *See id.* ("The weight of the research indicates that incarceration -- imposing it at all or increasing the amount imposed --either has no significant correlation to recidivism or *increases* the defendant's likelihood to recidivate.")(emphasis in original).[8] "[H]aving pulled together the

---

not when the perceived severity of punishment increased); Ann Dryden Witte, *Estimating the Economic Model of Crime with Individual Data*, 94 Q. J. Econ. 57, 79 (1980)(studying men released from the North Carolina prison system and demonstrating that "a percentage increase in the probability of being punished has a relatively larger effect on the number of arrests or convictions than does a percentage increase in the expected sentence"); Andrew von Hirsch et al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* 47 (1999); Robert Apel & Daniel S. Nagin, *General Deterrence: A Review of Recent Evidence, in Handbook on Crime and Criminal Justice* (Michael Tonry ed.)(2011); Alfred Blumstein & Daniel Nagin, *The Deterrent Effect of Legal Sanctions on Draft Evasion*, 29 Stan. L. Rev. 241, 269 (1977)(studying draft evasion and finding a significant negative association between the probability of conviction and the draft evasion rate, leading the authors to conclude that their "findings are consistent with the work of other investigators who have argued that the certainty of punishment has a stronger deterrent effect on crime than the severity of punishment"); Aaron Chalfin & Justin McCrary, *Criminal Deterrence: A Review of the Literature*, 55(1), 5–48 J. Econ. Literature (2017)
[8] For support on this point, *Courtney*, 76 F. Supp. 3d at n.13 cites the following studies and research:
Lin Song & Roxanne Lieb, *Recidivism: The Effect of Incarceration and Length of Time Served* 4-6, Wash. St. Inst. for Pub. Pol'y (Sept. 1993), available at http://wsipp.wa.gov/ReportFile/1152/Wsipp_Recidivism-The-Effect-of-Incarceration-and-Length-of-Time-Served_Full-Report.pdf (summarizing available studies on the correlation between incarceration and recidivism); T. Bartell & L.T. Winfree, *Recidivist Impacts of Differential Sentencing Practices for Burglary Offenders*, 15 Criminology 387 (1977)(outlining the results of a New Mexico-based study and concluding that offenders placed on probation were less likely

best available evidence, we have been persuaded that prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011). "Among low-risk offenders, those who spent less time in prison were 4% less likely to recidivate than low-risk offenders who served longer sentences. Thus, when prison sentences are relatively short, offenders are more likely to maintain their ties to family, employers, and their community, all of which promote successful reentry into society. Conversely, when prisoners serve longer sentences they are more likely to become institutionalized, lose pro-social contacts in the community, and become removed from legitimate opportunities, all of which promote recidivism." Valerie Wright, *Sentencing Project, Deterrence in Criminal Justice: Evaluating Certainty v. Severity of Punishment* 7 (2010).[9]

    Even the Sentencing Commission itself acknowledged this fact. "There is no correlation between recidivism and guidelines' offense level. Whether an offender has a low or high guideline offense level, recidivism rates are similar." U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 15 (2004). And

---

to be reconvicted than similarly situated offenders who were incarcerated); D.M. Gottfredson, M.G. Neithercutt, J. Nuttfield & V. O'Leary, *Four Thousand Lifetimes: A Study of Time Served and Parole Outcomes, Nat'l Council on Crime & Delinquency* (1973)(outlining the results of a study of over 100,000 male parolees and finding that similarly situated offenders who served longer periods of incarceration were more likely to recidivate than those who received shorter periods of incarceration); T. Orsagh & J.R. Chen, *The Effect of Time Served on Recidivism: An Interdisciplinary Theory*, 4 J. Quant. Criminology 155 (1988)(concluding that similarly situated robbery convicts' recidivism rates rose with rising length of incarceration, while burglars and some other criminals had a "sweet spot" length of incarceration -- 1.2 to 1.3 years for younger offenders and 1.8 years for older offenders -- deviations from which increased recidivism); David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes* 33 Criminology 587 (1995).
[9] available at http://www.sentencingproject.org/ doc/Deterrence%20Briefing%20.pdf.

perhaps most notably, the Department of Justice has tacitly acknowledged this fact, "[C]onfinement or increased length of incarceration served the crime control purpose of incapacitation but had little or no effect as a 'treatment' with rehabilitative or specific deterrent effects" Don M. Gottfredson, U.S. Department of Justice, National Institute of Justice, *Effects of Judges' Sentencing Decisions on Criminal Cases*, Research in Brief 9 (Nov. 1999). Based on all these reasons and findings, the significant deterrent effect in Mr. Young's case has already been achieved because he was caught. Neither specific nor general deterrence increases further with the length of sentence later imposed.

This principle rang true in the new recidivism study for terrorism offenses. The Intercept's, "Trial and Terror" series and data project in 2017 revealed that more than half of all convicted terrorists since 9/11 had been released. *See* Trevor Aaronson and Margot Williams, *Trial and Terror*, The Intercept (May 31, 2019) (noting that 479 terrorism defendants out of 891 have been released from custody).[10] Though the study concedes there is relatively little data on terrorist recidivism, it notes that "[N]one of the convicted Islamist terrorists released from federal prison have been charged with new terrorism-related offenses or have been alleged to be part of a terrorist plot in the United States." Trevor Aaronson, *Is "Terrorist Recidivism" Real?* The Intercepts (May 27, 2019).[11]

For example, all members of the "Liberty City Seven," a group former Attorney General Alberto Gonzales said wanted to wage "a full ground war" against the United States, have all been freed. Their purported leader, Narseal Batiste, is now a painter in Houston. *Id.* Similarly, Bryant Neal Vinas, who was captured in Pakistan and admitted to discussing

---

[10] Available at https://trial-and-terror.theintercept.com/
[11] Available at https://theintercept.com/2019/05/27/terrorist-recidivism-john-walker-lindh/

specific plots against Americans with al-Qaeda members, including blowing up the Long Island Rail Road was sentenced to three months in prison after being confined for eight years during his cooperation. He now lives in New York while trying to find odd jobs to support himself. He also engages in interviews to discuss his case. *See* Adam Goldman, *He Turned on Al Qaeda and Aided the U.S. Now He's on Food Stamps and Needs a Job*, New York Times (March 6, 2018).[12]

A particularly poignant and personal example presented itself in Leena Al-Arian's letter to the Court. Ms. Al-Arian's father was before this Court in 2008 for five years before this Honorable Court granted his release. *See* Def.'s Ex. 1. His daughter writes now how moved she was at the time and the world she gained by having her father reconnect to his family in a real and tangible way. Her father did not waste his second chance. He is now a distinguished professor and the director of a leading English-language research center at a university in Istanbul. His work is dedicated to building cross-culture understandings and promoting peace. Upon Mr. Al-Arian's release, the community ceased supporting another inmate and began benefiting by having Mr. Al-Arian among its ranks. Like Mr. Al-Arian, Young would not waste his second chance.

Finally, with respect to protecting the public, lengthy incarceration is far more severe than necessary because supervised release can achieve this same aim. Mr. Young's criminal conduct was not the product of impulsive, violent, behavior – problems that are far more difficult to contain via supervised release. Mr. Young provided a gift card code to an undercover officer at his request. This type of behavior can easily be addressed through supervision by the Probation Office. Mr. Young has no violent criminal history, and now

---

[12] Available at https://www.nytimes.com/2018/03/06/us/politics/bryant-neal-vinas-terrorism-cooperation-fbi-witness-protection.html

cannot lawfully own a firearm even if he sought to. Supervised release can cover drug treatment (and is more equipped to do so than a prison), drug testing, and can perform routine home checks. Thus, in keeping with §3353(a) supervised release is the least restrictive method to achieve the enumerated sentencing goals, with lengthy incarceration far greater than necessary to protect the public.

## CONCLUSION

A decade of Mr. Young's life is worth saving. A sentence of 60 months achieves the goals of sentencing and would demonstrate that this a country that believes in equity and redemption.

Respectfully submitted,
NICHOLAS YOUNG
By Counsel
AYOTTE CARMICHAEL ELLIS & BROCK, PLLC
_____/s/_____
Jessica N. Carmichael, Esq.
Virginia Bar No. 78339
Counsel for Defendant
108 N. Alfred Street, First Floor
Alexandria, Virginia 22314
(703) 684-7908
jcarmichael@ayottecarmichael.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 14th day of June, 2019 I filed the foregoing pleading through the ECF system, which shall then send an electronic copy of this pleading to all parties in this action.

/s/
Jessica N. Carmichael, Esq.
